1

IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM

UNITED STATES OF AMERICA, Plaintiff, vs. JOHN D. WALKER, et al., Defendants.

Criminal Case No. 18-00010

TRIAL TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE FRANCES TYDINGCO-GATEWOOD,
CHIEF JUDGE
JUNE 8, 2022 - AUGUST 22, 2022; 10:01 A.M.
HAGATNA, GUAM

**Testimony of Viranousith Khamvongsa**

(Jury Trial Excerpt)

Veronica F. Flores, CSR-RPR
Official Court Reporter
veronica_flores@gud.uscourts.gov

APPEARANCES


Appearing on behalf of plaintiff:


**OFFICE OF THE UNITED STATES ATTORNEY**
**BY: MARIE MILLER, SAUSA,**
**SAMANTHA MILLER, SAUSA,**
**STEPHEN LEON GUERRERO, AUSA**
Suite 500, Sirena Plaza
108 Hernan Cortez Avenue
Hagatna, Guam 96910
(671) 472-7332


Appearing on behalf of Defendant Walker:

**MARTIN LAW OFFICE**
**BY: MACK K. MARTIN, ESQ.**
125 Park Avenue, 5th Floor
Oklahoma City, OK 73102
(405) 236-8888


Appearing on behalf of Defendant Hansen:

**MCCONWELL LAW OFFICES**
**BY: EDWARD A. MCCONWELL, SR., ESQ.**
**LAURA MCCONWELL, ESQ.**
5201 Johnson Drive, Suite 300
Mission, KS 66205
(913) 262-0605

**LAW OFFICE OF EDWARD C. HAN**
**BY: EDWARD C. HAN, ESQ.**
238 Archbishop Flores Street
DNA Building, Suite 802
Hagatna, Guam 96910
(671) 477-5055


ALSO PRESENT:

Jon D. Walker, Defendant

Carmen Santos, Clerk

I N D E X

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| GOVERNMENT WITNESS: | | | | |
| Viranousith Khamvongsa | 6(SM/MM) | 758(EM) 841(MM) | 994(MM) 1220(MM) | 1202(MM) |

EXHIBITS:

| | Description | Page |
|---|---|---|
| 742 | E-mail dated 6/26/2014 from Crowe to Reed re: Having Reed Forward Tim's documents to get his plane in Hawaii | 45 |
| 183 | Pilot/Mechanic List from seized computers from FBI SW | 159 |
| 1254 | SW/Subpoenaed Records from HH Summary Chart | 165 |
| 726 | Wilma's Flight Services, Inc. Billings and Collections from Dec 2013 to April 2018 | 347 |
| 725-1-26 | Hansen Helicopters, Inc. Aircraft/ Vessel assignment from 8/18/2014 to 3/14/2018 | 362 |
| 40-2 | Excerpt of paragraph 127 of the Second Superseding Indictment | 383 |
| 2900-3522-3527 | PDF of Contracts | 406 |
| 92 | 2017 Non-owed Aviation - GA99-8CC6E-00 Sea Global Fisheries, LLC Yr 2017-2018 Insurance | 483 |
| 21 | BOH Caledonian Agency, Inc. Acct. 9134 from 8/31/2015 to 9/30/2015 | 501 |
| 22-1-21 | BOH Caledonian Agency, Inc. Acct. 9134 from 11/30/2015 to 12/31/2015 | 526 |

10:38:19AM
10:38:21AM

| | | |
|---|---|---|
| 2900-1976-1981 | PDF of Contracts | 534 |
| 2936-1-4 | BOH Caledonian Agency, Inc. Acct. 9134 Statement dated 9/30/2016 to 10/31/2016 | 540 |
| 25-1-11 | BOH Caledonian Agency, Inc. Acct. 9134 from 11/30/2016 to 12/31/2016 | 552 |
| 25-12 | BOH Caledonian Agency, Inc. Acct. 9134 from 11/30/2016 to 12/31/2016 | 556 |
| 25-22-23 | BOH Caledonian Agency, Inc. Acct. 9134 from 11/30/2016 to 12/31/2016 | 559 |
| 23-1-2 | BOH Hansen Northern Helicopters, Inc. Acct. 3534 from 11/30/2016 to 12/31/2016 | 562 |
| 30 | CBT Walker Agricola LLC signature card | 569 |
| 31-1-3 | CBT Walker Agriola LLC from 11/30/2016 to 12/30/2016 | 571 |
| 366-1-98 | MNS Capitol Files identifying corporate structure, various helos in inventory, vessels | 613 |
| D-130-1 15 | Amended Articles of Incorporation of Wilma's Flight Services, Inc. | 782 |
| D-131 | Minutes of Shareholders and Board of Directors of Wilma's Flight Services, Inc. | 782 |
| D-132 | Minutes of Shareholders and Board of Directors of Wilma's Flight Services, Inc. | 782 |
| D-133 | Minutes of Shareholders and Board of Directors of Wilma's Flight Services, Inc. | 782 |
| D-134 | Minutes of Shareholders and Board of Directors of Wilma's Flight Services, Inc. | 782 |

| | | |
|---|---|---|
| D-135 | Minutes of Shareholders and Board of Directors of Wilma's Flight Services, Inc. | 782 |
| D-136 | 2002 Constitution for Wilma's Flight Service, Inc. (Vanuatu) | 820 |
| D-76 | Insurance policy #11-22-4571-05 by Caledonian Insurance Co., Limited for Beanbag Helicopters, Inc., and wholly Owned Vanuatu Companies | 822 |
| D-66A-85 | GAO 2020 Report | 836 |
| D-66A-86-87 | GAO 2020 Report | 837 |
| 3003-15 | CAAP documents | 1032 |
| 2939-82-83 | CFGu FCU Limey Air Service, Inc. Acct. 9899 Signature Card, Corporate Records, 2018 & 2019 Incoming Wire Transfer Log | 1171 |
| 3007 | Thomas Geluz Bustos Helicopter Pilot Resume | 1213 |

June 8, 2022; 10:01 a.m.; Hagatna, Guam

* * *

(Beginning of excerpt.)

THE CLERK: Sir, please state your name and spell your name for the record. 10:01AM 10:01AM

THE WITNESS: May I be seated? Thank you. Good morning, my name is Viranousith Khamvongsa and I reside in Guam. Last name is Khamvongsa, that's K-H-A-M, as in Mike, V-O-N-G-S-A. 10:01AM 10:02AM 10:02AM 10:02AM

COURT REPORTER: Can you spell your first name? 10:02AM

THE WITNESS: Viranousith. Common spelling, V-I-R-A-N-O-U-S-I-T-H. 10:02AM 10:02AM

10:02AM

DIRECT EXAMINATION 10:02AM

10:02AM

THE COURT: You may proceed. 10:02AM

BY MS. S. MILLER: 10:02AM

Q. Okay, good morning, Agent Khamvongsa. 10:02AM

A. Good morning. 10:02AM

Q. Good morning, ladies and gentlemen of the jury. 10:02AM

THE JURY: Good morning. 10:02AM

BY MS. S. MILLER: (CONTINUING) 10:02AM

Q. Agent Khamvongsa, can you please describe your educational background for the jury? 10:02AM 10:02AM

A. I graduated with an accounting degree from the University of Alaska. It's a BBA, bachelor of business administration, with a minor in management information systems.

Q. And what year is that, sir?

A. I graduated in 2002.

Q. Could you please tell the jury, what was your first job out of college assuming you had one?

A. My first job I graduated -- upon graduation, I was immediately hired by IRS Criminal Investigation as a Special Agent.

Q. And where do you currently work, Agent Khamvongsa?

A. I am still a Special Agent with IRS Criminal Investigation.

Q. How long have you been a special agent with the IRS?

A. Almost 20 years.

Q. Could you please tell the jury a little bit about your duties as a criminal investigator for the IRS?

A. As a Special Agent, I investigate crimes that -- like tax fraud or tax evasion, failing to file a false return -- or failing to file returns, filing a false return, impeding the IRS. But in addition to enforcing the internal revenue code, I also investigate other financial crimes, such as money laundering and the money and banking statutes.

Q. Did you have to do any special training to become an

IRS special agent?

A. Yes, upon -- upon graduating, I immediately went to the federal law enforcement training center where I spent six months. While there, I was attending the federal law enforcement training center to do special agent training. And then after a couple months of that, what we learned investigative techniques in the law and how to apply it as a special agent. We take on our agency-specific classes at the federal law enforcement training center.

Q. Have you done any special training since that first initial training?

A. We take CPEs, or continued professional education, on a yearly basis.

Q. Special Agent Khamvongsa, where are you located?

A. I currently am here in the Guam, but I also cover the CNMI.

Q. How long have you been located in the Guam/CNMI office?

A. I've been here since September 2010.

Q. And where were you prior to that?

A. I was in Anchorage, Alaska.

Q. Sir, can you tell the jury a little bit about the training specifically that you received regarding money laundering?

A. Money laundering, that took place in the federal law

enforcement training center while I was there in 2002. In addition, we get yearly training on the various money laundering statutes as it applies. And in addition, in the course of our training, in order to prove money laundering, we have to identify the underlying criminal activity that occurs, then money laundering occurs thereafter.

Q. Okay. Okay, before we go on to the underlying criminal activity, can you just tell the jury what is money laundering?

A. Money laundering is a three-step process. Upon identifying where the source of the funds are coming from, in this case, I'll use the example --

MR. MARTIN: Your Honor, I object to -- the Court will instruct the jury on what money laundering is and this is trying to go way beyond that. I object.

THE COURT: All right. Let me just hear the last question. I'm sorry. I just was talking to my jury administrator. Hold on. Last question? Or was it his answer, was that --

MR. MARTIN: It was the question and the answer.

THE COURT: Let me just hear the question real quick, please.

(Whereupon the reporter read back requested portion.)

THE COURT: That's okay. Thank you. I'm sorry,

10:05AM 10:05AM 10:05AM 10:05AM 10:05AM 10:05AM 10:05AM 10:05AM 10:05AM 10:05AM 10:05AM 10:05AM 10:05AM 10:05AM 10:06AM 10:06AM 10:06AM 10:06AM 10:06AM 10:06AM 10:06AM 10:06AM 10:06AM 10:06AM 10:06AM

Veronica, I didn't mean to cut you off. I appreciate it. The Court will sustain the objection. There will be a definition of money laundering, ladies and gentlemen. So the Court will sustain that.

BY MS. S. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, you mentioned that in order to prove money laundering, you have to have some underlying criminal activity.

Can you give the members of the jury of the some examples of the types of underlying criminal activities that you have investigated to prove money laundering?

MR. MARTIN: Well, Your Honor, I again object.

MS. S. MILLER: I asked the types.

THE COURT: Hold on. Let me hear the objection, Counsel. Don't interrupt. What's the objection?

MR. MARTIN: I again object to him defining what underlying criminal activity is. There's going to be a definition of that in the Court's instructions.

THE COURT: Okay. Go ahead. You can respond.

MS. S. MILLER: Yes, Your Honor. I didn't ask him to define it. I asked for the types of underlying crimes he has investigated to prove money laundering.

THE COURT: All right. The Court will overrule that objection then. And he may testify as to the type of investigations that he's conducted in regard to this

particular area.

THE WITNESS: Thank you, Your Honor.

THE COURT: You may proceed.

THE WITNESS: One more time, please.

BY MS. S. MILLER: (CONTINUING)

Q. Sure. You mentioned that there were -- in order to prove money laundering, there has to be some underlying crime. Could you tell the members of the jury the types of underlying crimes you've investigated to prove money laundering, the types?

A. The types of crimes in my career, I've investigated that are the underlying crimes for money laundering include visa fraud, wire fraud, and drug trafficking.

Q. Thank you. Now, you stated that you've done a lot of investigating of tax-related crimes. Can you please tell the jury what's tax fraud?

A. Tax fraud includes tax evasion, failing to file a tax return. So for example, if an individual is -- files a tax return where they're only reporting, let's say $10,000 as their gross income or what they make in that year, yet their bank account represents a deposit of $1 million and they took steps to evade that reporting, that would go to the tax evasion, like the steps of like creating a corporation where they sign the income to the corporation saying that belongs to the corporation. These are steps they take to hide the money

from the IRS. And the tax return itself is signed under penalties of perjury. So the information within the document is relied upon by the government as being true and correct.

So when that information is submitted and there is other documents or other pieces of evidence showing that it's something completely different, that would -- I would then move forward and present that to the U.S. Attorney's Office or...

Q. So Special Agent Khamvongsa, when you're looking at the different types of documents related to a tax investigation, as you compare them, what generally speaking are you looking for?

A. So, initially, in the course of my investigation, I rely on the tax return. Again, it's a document that's submitted to the government in good faith. And from there, I identify what the allegation may be. So if it's tax evasion, we'll say, I have to identify where on that tax return they were -- there was some --

MR. MARTIN: Your Honor, I object, this is a narrative. She said what documents did you look at. Now, he's going into detail about --

THE COURT: Okay, objection is narrative. The Court will sustain.

BY MS. S. MILLER: (CONTINUING)

Q. When you -- when you're looking at the different

kinds of documents, what are you looking as you compare them? What are you looking for?

A. When I'm looking at the documents, I'm looking at patterns of inconsistencies or misrepresentations within the document.

Q. What do you do to determine the accuracy with respect to inconsistencies?

A. I review the records that are submitted to the government, which are often under penalties of perjury, which are being truthful and accurate by the taxpayer, and then I look at records, such as bank records, records filed with other government agencies, records maintained with other businesses and I compare that to what is reported with the government; in this case, the IRS.

Q. When you look at that type of information that's submitted to government agencies, do you use any other investigative tools to obtain additional evidence?

A. Yes. I also use subpoenas or summonses.

Q. Could you please tell the jury what subpoenas and summonses are?

A. It's a tool that compels an individual or business to provide records to the government.

Q. And in your 20 years of experience as a criminal investigator, what type of information do you normally obtain with a subpoena?

10:10AM 10:10AM 10:10AM 10:10AM 10:10AM 10:10AM 10:10AM 10:10AM 10:10AM 10:10AM 10:10AM 10:10AM 10:11AM 10:11AM 10:11AM 10:11AM 10:11AM 10:11AM 10:11AM 10:11AM 10:11AM 10:11AM 10:11AM 10:11AM 10:11AM

     A. The information I generally obtain with a subpoena, include bank records, they may be invoices from a retail store, or a car dealership or even an individual or an accountant. 10:11AM

Q. Could you tell the jury what the difference between a subpoena and a summons is?

A. A summons is an agency-specific tool to compel documents or witness testimony. And a subpoena comes from the grand jury and I make the request through the U.S. Attorney's Office.

Q. Okay. So for summons purposes, as an IRS investigator and agent, it would be an IRS summons?

A. Yes.

Q. Okay. Who does the information -- how would you generalize about who the information that responds to summons and subpoenas comes from? How would you generalize those entities?

MS. MCCONWELL: Your Honor, I object to the form of the question.

THE COURT: Yeah, that's kind of vague and ambiguous. You want to rephrase that? Court will sustain that.

MS. S. MILLER: Sure.

BY MS. S. MILLER: (CONTINUING)

Q. Typically in your work with the IRS, are you issuing

subpoenas to defendants or other organizations?

A. To other organizations. But if I were to issue a summons, I would notify the bank holder, like the accountholder that we are subpoenaing their -- or issuing a summons for their bank records.

Q. Do grand jury subpoenas require notice to the accountholder that you're looking for a bank account information?

A. No.

Q. So is that another difference that differentiates summons versus subpoenas?

A. Yes.

Q. A notice?

A. The grand jury is more --

MS. MCCONWELL: Your Honor, I object to relevance. Leading -- and leading.

THE COURT: Okay --

MS. S. MILLER: Just trying to provide some general information.

THE COURT: Okay, overruled and then sustained on leading.

MS. S. MILLER: Sure.

BY MS. S. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, once you get information in response to grand jury subpoenas, what do you do with that

10:12AM 10:12AM 10:13AM 10:13AM 10:13AM 10:13AM 10:13AM 10:13AM 10:13AM 10:13AM 10:13AM 10:13AM 10:13AM 10:13AM 10:13AM 10:13AM 10:13AM 10:13AM 10:13AM 10:13AM 10:13AM 10:13AM 10:13AM 10:13AM 10:13AM

information?

A. I review them and I analyze them.

Q. How many criminal investigations have you participated in, throughout your over 20 years as a special agent for the IRS?

A. How many criminal investigations?

Q. Yes.

A. A lot. At least 40, alone.

Q. And what about with respect to, specifically, wire fraud investigations?

A. I would say, at least 20.

Q. 20 of those --

A. Of being wire fraud, yes; correct.

Q. Okay. What about with respect to money laundering investigations?

A. The money laundering, at least the same number; about 20.

Q. Okay. How about with criminal tax fraud?

A. Prior to my -- prior to doing money laundering and wire fraud, I was focused primarily on tax cases. So the 20 -- about 20.

Q. Now, as a special agent for the IRS, let's talk a little bit more about the sources of evidence. How do you use evidence obtained from experts?

A. How I do use -- I use that information to corroborate

10:13AM 10:13AM 10:13AM 10:13AM 10:13AM 10:13AM 10:14AM 10:14AM 10:14AM 10:14AM 10:14AM 10:14AM 10:14AM 10:14AM 10:14AM 10:14AM 10:14AM 10:14AM 10:14AM 10:14AM 10:14AM 10:14AM 10:14AM 10:14AM 10:14AM

the documents. My cases are paper-intensive. So the witness testimony or the expert testimony goes to creating a bigger picture or better understanding of what is reported on a piece of paper.

Q. How do you use evidence obtained from trial testimony?

A. Trial testimony is the same thing. It's under oath, so it has a little bit more weight to it versus just an interview. So I use that information to corroborate, again, what a piece of paper says.

Q. And specifically with respect to this trial, have you been listening to all the testimony throughout the trial?

A. Yes.

Q. How do you use evidence obtained through interviews?

A. Interviews, the same way; I utilize that information to corroborate what a document says.

Q. Do you ever use evidence obtained from foreign records?

A. Yes, I do use -- I do review foreign records.

Q. How do you use those foreign records?

A. A lot of times, again, when records or when documents are completed, most of the documents that I've reviewed are signed and they're certifying that the information is true and accurate. So there is a re -- there is a good faith basis that the information they're providing whether it's a foreign

10:14AM 10:15AM 10:15AM 10:15AM 10:15AM 10:15AM 10:15AM 10:15AM 10:15AM 10:15AM 10:15AM 10:15AM 10:15AM 10:15AM 10:15AM 10:15AM 10:15AM 10:15AM 10:15AM 10:15AM 10:15AM 10:16AM 10:16AM 10:16AM 10:16AM

entity or a bank or any other agency --

MS. MCCONWELL: Your Honor, I think we're onto a narrative.

THE COURT: I'm sorry?

THE WITNESS: -- good faith.

MS. MCCONWELL: I object to narrative.

THE COURT: All right. Sustained.

BY MS. S. MILLER: (CONTINUING)

Q. Can you tell the jury a little bit about how you use records obtained through search warrants?

A. Um, I review that information, I analyze it and I compare it to what other documents may or may not say.

Q. Now, can you tell the jury a little bit about the difference between evidence obtained from third parties, like banks versus typically what you obtained through search warrants?

A. Documents obtained from third parties, such as banks, again, when those information -- that information is reliable because the information presented to the bank is based on good faith, a lot of times again it's being submitted -- that is being true and correct to the bank.

MS. MCCONWELL: Your Honor, I object. This is also a narrative.

THE COURT: Okay. Sustained.

MS. MCCONWELL: And it's inserting nonresponsive

information.

THE COURT: All right. Sustained.

BY MS. S. MILLER: (CONTINUING)

Q. How is that information different from evidence obtained through search warrants?

A. The evidence comes from a different entity. And the information is provided to me via grand jury subpoena or summons.

Q. And just to clarify for the jury, typically search warrant information comes from who?

A. It comes from oftentimes the -- or the defendant.

Q. What about corporate records, how do you use evidence obtained through corporate records?

A. Again, I use corporate records to verify, invalidate or corroborate other pieces of evidence, such as testimony.

Q. So in terms of the investigations that you've done, tax fraud, money laundering and wire fraud, do you do those investigations with respect to individuals and corporate entities?

A. Yes.

Q. Have you received any training specifically in investigating corporations?

A. Yes.

Q. Can you tell the jury a little bit about that training?

A. The training, again, goes back to my time at the federal law enforcement training center. And again, it involves yearly training with the continued professional education through my agency, the IRS.

Q. Can you please provide the jury with an example of how a corporation might violate the law?

MR. MARTIN: I object to this. This is so speculative and hypothetical.

THE COURT: Yeah. The Court will sustain the objection.

BY MS. S. MILLER: (CONTINUING)

Q. Okay, Special Agent Khamvongsa, turning to your investigation with respect to this case, are you familiar with the indictment in this case?

A. Yes.

Q. How are you familiar with the indictment?

A. I've been involved since 2017 and I helped investigate it since then.

Q. How did you first get involved in investigating this case?

A. The U.S. Attorney's Office reached out and requested my assistance to review records that were provided me from the FBI search warrant in October 2016.

Q. And the records you initially looked at, where did those come from?

A. Those records came from Hansen Helicopters.

Q. What has your role been in this investigation?

A. My role is to -- was to investigate any allegations or the possibility of wire fraud and money laundering.

Q. In fulfilling that role, did you look for any evidence of an agreement between persons to violate the law?

A. Yes.

Q. I'd like to show you what's been marked and admitted as Exhibit G-302. Special Agent Khamvongsa, how did -- did you review this document?

A. Yes.

Q. How did it inform your analysis?

A. This document was obtained via the search warrant. And it contains submissions that were made by the defendant or by Walker, Hansen Helicopters --

MR. MARTIN: Your Honor, I object to this. Everything he's saying is speculative. This is a business plan. He's making generalizations that are not supported by the document. He can say what the document says, but he can't just come here -- this is what this means and this is what that means. Wholly improper.

THE COURT: Just a minute. Okay. That's your objection. What's -- yes, your objection?

MR. MARTIN: My objection -- mine or Ms. McConwell?

THE COURT: Your objection is specifically improper, it's not --

MR. MARTIN: Yes, Your Honor. He can say what the document says but he can't interpret the document that's totally foreign to him.

THE COURT: All right. And then speculative.

MS. MCCONWELL: I add that it's a narrative. It is beyond -- he was nonresponsive to the question.

THE COURT: All right. Let me hear the question and answer, please.

(Whereupon the reporter read back requested portion.)

MS. S. MILLER: May I respond, Your Honor?

THE COURT: No, not yet. Um... I mean, he doesn't. He just says -- I mean, he answered the question. He's not getting into a -- first of all he's not -- he's not -- I don't think he's interpreting it. You think that answer is interpretive.

MR. MARTIN: He was on the way, Judge. That's my objection.

THE COURT: He was on the way. This is like preventive?

MR. MARTIN: Correct. That's a preventive objection, Your Honor. It's a new one I made up today.

THE COURT: That's that a new one because I never

 heard that. All right, overruled. And then -- okay. So yeah, it's overruled for right now. Let's just see -- just, you know, I want to make it, Khamvongsa, right?

MS. S. MILLER: Very good.

THE COURT: Did I say that?

THE WITNESS: Yes, Your Honor.

THE COURT: I just put it on my posty here. Then I put it phonetically. So Kham. K-H-A-M. Vongsa.

THE WITNESS: Yes, ma'am.

THE COURT: So you already know how to testify. So avoid narratives and answer the question. I know you know that because you testified in my court before.

THE WITNESS: Yes, Your Honor.

THE COURT: So, go ahead.

MS. S. MILLER: So, one second. Could we just pull the Exhibit back up, please?

THE COURT: Sometimes you don't have to respond because I'm just trying to --

MS. S. MILLER: Yes, Your Honor.

THE COURT: -- figure out what the question is or the objection. Go ahead.

BY MS. S. MILLER: (CONTINUING)

Q. Would you like to hear the question?

A. Yes, please.

Q. How did this document inform your analysis in this

investigation?

A. It helped me identify the agreements.

Q. How?

A. There is specific statements within this document that help me form that agreement, identify the agreements.

Q. Okay. Let's take a look, I believe it's page 3?

THE COURT: Of the same exhibit?

MS. S. MILLER: Yes, please.

THE COURT: So Exhibit 302-3. Is that what you're talking about?

MS. S. MILLER: One second.

THE COURT: Just make sure you put on the record what page we're looking at.

MS. S. MILLER: Yes, Your Honor, of course. This is page 2. So Exhibit 302 page 2.

BY MS. S. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, can you please tell the jury if there was anything specifically on this page that informed your analysis?

A. In the bottom of the page, under Item No. 4, there is a response. "It is all Hansen Helicopters."

Q. Before you go on, let's actually -- can you read the question and then the response, please, in full?

A. Yes. "Some of the leases refer to Wilma's Flight Service as the lessor and operator registered owner; whereas

other leases do not. This is a -- is this a typo or is there some explanation?"

Q. And then the answer, please?

A. "It is all Hansen Helicopters. All of the aircraft are owned wholly by Hansen and its subsidiary companies and all leases and contracts are basically with Hansen, John and Ledger, were trying to spread out the liability through the forming of the other companies. Everything is controlled by Hansen, and John. They are synonymous."

Q. Thank you. Now, I'd like to show you what's been previously admitted as G-304. Did you review this document in your analysis, Special Agent Khamvongsa?

A. Yes.

Q. How did it inform your analysis?

A. This helped me identify the agreement that took place, as well as one of the overt acts to prove the -- one of the charges in the indictment, specifically conspiracy to commit wire fraud or wire fraud itself.

Q. And when you say "overt act," what do you mean by that?

A. That's a willful act taken by an individual, in this case, Hansen Helicopters, Walker, Crowe, Reed and Kapp.

Q. Okay. Can you tell the jury -- first of all, can you remind the jury what this document is?

A. This is a plea agreement. It is signed by Timothy J.

Cislo.

Q. And I think the jury knows by now who Timothy Cislo is, but can you tell them, please, what in this agreement informed your analysis as to the overt acts?

MR. MARTIN: Your Honor, I object to him unless he's going to read from the document, his opinion or his interpretation of the document, I object to.

THE COURT: You're -- are you having him read from the document?

MS. S. MILLER: Sure, yes, Your Honor.

THE COURT: All right. So...do you know where to look?

MS. S. MILLER: Yes.

THE WITNESS: Yes.

THE COURT: Okay, go ahead. Is this a grand jury indictment?

MS. S. MILLER: No, Your Honor, this is the Cislo plea agreement.

THE COURT: Oh, the Cislo plea agreement.

MS. S. MILLER: Yes.

THE COURT: Okay. Very good.

BY MS. S. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, is there a particular page you'd like to read from?

A. Yes, it's the Elements of the Offense and Factual

Basis on page 3.

Q. Okay. Could we zoom in a little bit further, just so it's a little bigger?

THE COURT: That has already been admitted, right?

MS. S. MILLER: Yes, Your Honor.

THE COURT: So this has already been shown. Jurors, you can see it? Okay. Very well. Go ahead.

BY MS. S. MILLER: (CONTINUING)

Q. Could you please read for the jury, Special Agent Khamvongsa, the portion of this that informed your analysis?

A. Item No. 5.

Q. Feel free to please read it.

A. Okay. Thank you. "Defendants understand and agrees that to establish the offense, honest services, wire fraud in violation of 18 U.S. Section 1343, 1346 and 2, the United States must prove each of the following elements beyond a reasonable doubt.

First, the defendant devised or knowingly participated in a scheme or plan to deprive the United States and its citizens of their right of honest services.

Second, the scheme or plan consisted of a bribe. His receipt of an aircraft in exchange for the defendant's services. The exchange may be express or may be implied from all the surrounding circumstances.

Third, the defendant owed a fiduciary duty to the United States and its citizens.

Fourth, the defendant acted with the intent to defraud by depriving the United States and its citizens of their right of honest services.

Fifth, the defendant's act was material, that is, it had a natural tendency to influence or was capable of influence[*sic*] a person or an entity's acts.

And sixth, the defendant used or caused someone to use an interstate," I don't know what that other word is that's written there, "a wire communication to carry out or to attempt to carry out the scheme or plan."

Q. Thank you for that dramatic reading. Could you please tell the jury what is honest services fraud?

A. I can give an --

MR. MARTIN: Your Honor.

THE COURT: Yeah? You didn't like that --

MR. MARTIN: The Court will instruct --

THE COURT: You didn't like the dramatic reading?

MR. MARTIN: No, it was very dramatic, but my objection is, the Court will instruct the jury on what the law is in this case, because the question was, will you tell the jury what honest services fraud is.

THE COURT: Yeah , so okay, so yeah, the -- yeah, so the Court will sustain the objection.

MS. S. MILLER: No problem, Your Honor. 10:28AM

THE COURT: So ladies and gentlemen, let me just tell you because some of you have been jurors and some of you haven't. But as you know, I'm going to give a concluding jury instructions. Remember how I gave opening instructions earlier. But when you go in to deliberate, I will give you concluding jury instructions and you will have a packet and you'll be reading, but you'll also be reading it -- we'll have it flashed on the screen. But it will have, it will have the definitions of honest services and other -- other instructions that we believe are appropriate that I have approved and I worked closely with the defense counsels and the prosecutor and those will be instructions that are relevant to your consideration. So yeah, so when it comes to the law, I will give that to you and the Court will sustain the objection.

MS. S. MILLER: Thank you, Your Honor.

BY MS. S. MILLER: (CONTINUING)

Q. If we could turn to page 4 of this document. So 304-4, please.

Now, Special Agent Khamvongsa, I'm not going to have you read this entire page to the jury, but could you please identify and then read -- identify the line and then read to the jury any information on this page that informed your investigation?

A. Again, you want me to read just the specific line?

Q. Right. So if you're going to read anything, please identify the line and then read it.

THE COURT: Do you want to point to him what line he's going to read or --

BY MS. S. MILLER: (CONTINUING)

Q. Yeah. You can point to it, too, but for the transcript you might as well say the line, please?

THE COURT: Okay.

THE WITNESS: We can go specifically to line 7 on that page. "The defendant knew that the scheme or artifice consisted of his receipt of a Taylorcraft BC12D aircraft Serial No. 6904, valued at approximately $20,000 from Hansen Helicopters, Inc., and its employees in exchange for the defendant's services of issuing and reissuing special airworthiness certificates to Hansen Helicopters without conducting the necessary inspections and examinations of such helicopters."

BY MS. S. MILLER: (CONTINUING)

Q. Thank you. And we you could look at --

MS. MCCONWELL: I'm sorry, I thought you were on page 5. What page are you?

MS. S. MILLER: This is page 4.

THE COURT: Okay, so that was page 4, lines -- for the record, line 7 through 11; is that correct, Counsel?

MS. S. MILLER: Yes, Your Honor. 7 through 11

exactly.

THE COURT: All right.

BY MS. S. MILLER: (CONTINUING)

Q. And if we could zoom back out, please. If you look at the bottom of the paragraph, beginning on line 20, could you please read for the jury after stating the line any information here that informed your analysis, if any?

A. I'm sorry can you restate that.

Q. Sure, can you do the same thing with respect to the remaining portion of this page, if there is any statements in this page at the bottom that informed your analysis, could you read it for the jury after stating the line it begins on?

A. Give me one moment. Starts on line 22. "In May 22, 2014, e-mail transmission between the defendant and Hansen employee Kenneth Rufus Crowe," and its initials there, "regarding the selection of a Taylorcraft BC12D aircraft worth $20,000, including..."

Q. If we could please go to page 4, I mean 5 of the document. Could you continue reading, Special Agent Khamvongsa, the rest of that sentence?

THE COURT: Okay. That's -- when you say "document" just state for the record, is that three -- that's still 302.

MS. S. MILLER: Yes, Your Honor G-304-5. Now we're on page 5.

THE COURT: Okay. 304. Very well.

MS. S. MILLER: Yes.

THE WITNESS: Continue.

BY MS. S. MILLER: (CONTINUING)

Q. Yes, please.

A. Defendant's statement. "I have to go with the yeller one; two, a $22,500 wire transfer on May 29, 2014, from Bank of Hawaii account ending in 9134 to EJS to purchase the aircraft and; three, a February 13th, to 2015 e-mail transmission between the defendant and Hansen employee, Eric J. Seacrest..." and there is initials, "including defendant's statement, I'm looking at May or June to have a sign fest concerning the restricted aerial survey certificates."

Q. Thank you. Now, I'd like to show you what's been previously admitted as G-0158, please.

THE COURT: G-51 --

MS. S. MILLER: 158, please.

THE COURT: G-158.

MS. S. MILLER: Yes.

THE COURT: Okay. And that's already been admitted?

MS. S. MILLER: Yes, Your Honor.

THE COURT: All right. Very well. Yes?

MS. MCCONWELL: I don't have it.

THE COURT: Hold on.

MS. MCCONWELL: If Carmen could check.

THE COURT: Oh, you don't have it down as admitted?

MS. MCCONWELL: No, ma'am.

THE COURT: We'll verify. Hold on.

(Pause.)

THE COURT: We don't have that as admitted, Counsel, we don't have that either.

MS. S. MILLER: Sorry, Your Honor. That may have been a duplicate. Let me grab the one that has been admitted. Yes, sorry about that, it's Exhibit 422.

THE COURT: Let me know, Carmen. Ms. McConwell, you want to check your 422?

MS. MCCONWELL: Yes, I have that.

THE COURT: You have that? Okay.

THE CLERK: Yes.

THE COURT: Okay, Carmen said okay. All right, that's good.

MS. S. MILLER: Great.

THE COURT: It's been admitted.

MS. S. MILLER: Thank you, Your Honor, and Ms. Santos and Ms. McConwell.

BY MS. S. MILLER: (CONTINUING)

Q. So -- and could we publish to the jury, please?

THE COURT: And could you, please, make that

larger too, Mr. Leon Guerrero, or whoever is doing it. 10:35AM

BY MS. S. MILLER: (CONTINUING) 10:35AM

Q. Special Agent Khamvongsa, did you review this document in your analysis of the investigation? 10:35AM

A. I have. 10:35AM

Q. Could you please tell the jury what you discovered with respect -- if anything, in this document with respect to Mr. Crowe's role in the bribe? 10:35AM

MR. MARTIN: Your Honor, I object to the characterization of the word *bribe*. She can ask him what he discovered, but that's improper. 10:36AM

THE COURT: All right. Court will sustain the objection. 10:36AM

MS. S. MILLER: Yes, Your Honor. 10:36AM

BY MS. S. MILLER: (CONTINUING) 10:36AM

Q. Could you please describe what you discovered and how it related to your investigation within this e-mail? 10:36AM

MR. MARTIN: And I would object to him interpreting the e-mail. He can read a particular portion of it, Your Honor, but an interpretation is speculation. 10:36AM

THE COURT: All right. Court will sustain the objection. You want to rephrase the question? 10:36AM

MS. S. MILLER: Yes, Your Honor. 10:36AM

BY MS. S. MILLER: (CONTINUING) 10:36AM

Q. Could we please go to, I believe it's the third page 10:36AM

of this document.

(Discussion with clerk.)

MS. S. MILLER: I'm sorry, I think it's actually the second page.

THE COURT: Jurors, if you have any problem seeing the print, let me know. Just raise your hand, okay? I mean, am I the only one that has a problem? Am I only one that has a problem? Because if I am... I still count a little bit, but I want to see if anybody else has a problem. Yes, if you do, can you raise your hand. Like the small print. I think that's like .003 or something. Anybody have -- I see one person, at least. Okay. Okay. The rest of you must have good eyes. Sharp eyes. All right.

BY MS. S. MILLER: (CONTINUING)

Q. So could you please read the first e-mail, starting from Tim Cislo to Rufus Crowe here, please, Special Agent Khamvongsa?

A. From Tim Cislo sent Thursday, May 15, 2014, 4:53 p.m. to Rufus Crowe subject re Cessna 206. "Hey, Rufus, you like T carts? Taylorcraft BC12D, 22,500, light sport aircraft for sale."

Q. Thank you. And then if we go to page 1, please.

THE COURT: And this is the same exhibit?

MS. S. MILLER: Same exhibit, yes, Your Honor. It goes in reverse chronological order.

THE COURT: Okay.

BY MS. S. MILLER: (CONTINUING)

Q. Could you just read the bottom sentence of this part we have zoomed in, please? No problem. First, could you tell the jury who this e-mail is from?

A. Rufus Crowe wrote.

Q. And what was his e-mail address, please?

A. Rufus@hansenhelicopters.com.

Q. And then jut the bottom sentence could you read that please?

A. "You need to show me the one you want and give me an address where you want it shipped."

Q. Can you please tell the jury how that statement informed your analysis with respect to Crowe's role based on your investigation?

A. Crowe helped facilitate --

MR. MARTIN: Well, Your Honor, I object to him saying what -- how he helped. That's not responsive and it's speculation.

THE COURT: All right. The Court will sustain the objection.

BY MS. S. MILLER: (CONTINUING)

Q. Did this particular communication inform your investigation?

A. This supports the plea agreement, that I just read

earlier.

Q. How?

A. This is a direct communication between Crowe and Cislo that further supports the selection of the Taylorcraft airplane.

(Pause.)

MS. S. MILLER: Could I have just one second, Your Honor? Check one thing.

THE COURT: Sure. Mm-hmm.

BY MS. S. MILLER: (CONTINUING)

Q. So Special Agent Khamvongsa, can you then read the e-mail going up from the middle of the page -- yes, basically the top half of this page?

THE COURT: What's the cite on this?

MS. S. MILLER: Sure. 422-1 and actually just starting from -- could you zoom in, Mr. Leon Guerrero, from which one of them Taylorcrafts did you pick out and above, please?

BY MS. S. MILLER: (CONTINUING)

Q. So starting at the bottom, could you please read this e-mail chain going from the bottom to the top, Special Agent Khamvongsa?

A. From Tim Cislo, mailed to cislot002@gmail.com, sent Wednesday May 21, 2014, 1:44 p.m. to Rufus Crowe, subject re Cessna 206. "Which one of them Taylorcrafts did you pick

out?"

On Wednesday, May 21, 2014, at 11:11 a.m., Rufus Crowe, rufus@hansenhelicopters.com, wrote "I can't decide. Let me know which one."

From Tim Cislo mailed to cislot002@gmail.com sent Thursday May 22, 2014, 4:35 p.m. to Rufus Crowe subject regarding Cessna 206. "Tough decision, that big old round wheel on the blue one is way cool, real old-school. Bitchin' even. The yeller one got an A65 with the spare A65 as part of the deal. Makes more sense. I'd have to go with the yeller one."

Q. Thank you. And if we could take to page 4 of this document, please. So 422-4. If we could zoom in on the top half of this page, please.

Could you please read for the jury the middle e-mail, which is May 14th at 6:58 a.m., please?

A. On Wednesday May 14, 2014, at 6:58 a.m., Tim Cislo, cislot002@gmail.com wrote "ai sus."

On May 13, 2014, 8:02 p.m., Rufus Crowe, rufus@hansenhelicopters.com wrote "no, but you pick one out and I'll have John buy it for you."

From Tim Cislo mailed to cislot002@gmail.com.

Q. You can actually stop there. Thank you, Special Agent Khamvongsa. How did this set of e-mails on this page inform your investigation?

10:41AM 10:41AM 10:41AM 10:41AM 10:41AM 10:41AM 10:41AM 10:42AM 10:42AM 10:42AM 10:42AM 10:42AM 10:42AM 10:42AM 10:42AM 10:42AM 10:42AM 10:42AM 10:42AM 10:43AM 10:43AM 10:43AM 10:43AM 10:43AM 10:43AM

A. This e-mail further supports the plea agreement that Crowe helped -- helped negotiate the sales on behalf of Jon Walker or negotiate the purchase of other aircraft. 10:43AM

MR. MARTIN: Your Honor, I'm going to object to him interpreting e-mails, Your Honor. They say what they say. The jury is to decide. This is an ultimate conclusion.

MS. S. MILLER: May I respond, Your Honor?

MR. MARTIN: Pure speculation.

THE COURT: Hold on. Let me hear the objection. You don't have -- repeat it.

MR. MARTIN: He is interpreting an e-mail, Your Honor. He can read the e-mail but he cannot interpret what it means or what it supports. That's for the jury to decide. This is speculation.

THE COURT: All right. Any objections from Ms. McConwell?

MS. MCCONWELL: Yes, ma'am. Hansen joins.

THE COURT: Yes, your response?

MS. S. MILLER: My response, Your Honor, is under 701, he's providing his opinion. If he can't testify as to his opinion throughout his investigation, what is he going to testify to? I'm asking how this --

THE COURT: He can testify as to his investigation but...

MS. S. MILLER: Right. How did it inform his

investigation is what I asked. How did it inform his investigation.

THE COURT: Okay, I have not ever heard that question, but okay the Court will sustain the objection. There's a way to rephrase that. So the Court will sustain the objection.

BY MS. S. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, was there anything in this e-mail from which you drew conclusions as a criminal investigator investigating wire fraud and money laundering in this case?

MR. MARTIN: Which I object, Your Honor. His conclusions are speculation.

MS. S. MILLER: It's his lay opinion.

THE COURT: He's going to give a lay opinion on his investigation?

MS. S. MILLER: Right.

THE COURT: That's what you want him to do?

MS. S. MILLER: Yes --

MR. MARTIN: He testified to --

THE COURT: Go ahead.

MR. MARTIN: He can testify I did this, this and this. He can't testify to an ultimate conclusion. He can testify I interviewed people, I picked up documents, I did this but he can't testify based on that, we have a crime. And

that's what she's trying to get him to do and I object.

THE COURT: Yeah, he's -- it's not that -- yeah, he's not qualified as an expert. You haven't qualified him as an expert.

MS. S. MILLER: Right, but --

THE COURT: Okay. But you're asking to give -- he conducted an investigation so what did you do, what did you find?

MS. S. MILLER: Right, what you found. Exactly.

THE COURT: What did you find, that's it. He could say what he found after he investigated.

MR. MARTIN: That's not what I'm objecting to.

THE COURT: I'm sorry? That's not what you're objecting to?

MR. MARTIN: Right. I'm objecting to him saying based upon that, this proves X.

THE COURT: Okay. So I think just the rephrasing, why don't you rephrase.

MS. S. MILLER: Yes, Your Honor.

THE COURT: Because he's -- he's a professional who had an investigation, what -- based on his investigation, what did he find? What did he find?

MS. S. MILLER: Thank you, Your Honor.

BY MS. S. MILLER: (CONTINUING)

Q. Special Agent --

THE COURT: Simple. You guys can keep it simple.

BY MS. S. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, with respect to this e-mail what did you find?

A. This e-mail is -- involves Tim Cislo, Rufus Crowe, having discussion. And in it, it says "you pick one out and I'll have John buy it for you," which further supports the plea agreement --

MR. MARTIN: I object to what it supports, Your Honor. It says what it says. There is no support in there. That's a conclusion.

THE COURT: Okay, so --

MS. S. MILLER: We could move on, Your Honor.

THE COURT: So the Court will sustain that part of the objection. I mean part -- in terms of the last part of his answer.

BY MS. S. MILLER: (CONTINUING)

Q. Sure. If we could --

THE COURT: There is probably a different way to rephrase this.

BY MS. S. MILLER: (CONTINUING)

Q. We'll move on, Your Honor. If we could turn to Exhibit 742, which has already been admitted, please?

THE COURT: Okay, 742. Yes?

MS. MCCONWELL: Carmen could check, I do not have

that 742 is admitted.

THE COURT: Okay. Let's verify. Counsel, all the Counsel verify. And I'll have Carmen verify.

THE CLERK: One moment, Your Honor.

THE COURT: I'm sorry?

THE CLERK: One moment.

THE COURT: Okay, hold on one moment.

(Pause.)

THE COURT: It's not admitted, Counsel? Okay, it's not admitted. Did you want to show it?

MS. S. MILLER: Yes, please.

THE COURT: Or introduce it?

MS. S. MILLER: Yes, please.

THE COURT: So don't publish this.

BY MS. S. MILLER: (CONTINUING)

Q. Can you see the document, Special Agent Khamvongsa?

A. Yes.

Q. Before we zoom in on it actually, can we go to the bottom.

Do you know how it was obtained, Special Agent Khamvongsa?

A. Yes, this was obtained from the FBI search warrant. This e-mail comes from the electronic media seized from the FBI search warrant in October of 2016.

MS. S. MILLER: Thank you. At this time, Your

Honor, I move Exhibit 742 into evidence.

MR. MARTIN: May I voir dire for an objection?

THE COURT: Yes, you may, Mr. Martin. Go ahead.

**VOIR DIRE**

BY MR. MARTIN: (CONTINUING)

Q. Agent Khamvongsa?

A. Good morning, Mr. Martin.

Q. Did I say that right, sir?

A. Khamvongsa.

Q. Khamvongsa. Thank you?

A. Thank you, sir.

Q. Good morning to you.

A. Good morning.

Q. Is Mr. Walker a recipient or a carbon on this e-mail, sir?

A. He's not on this e-mail.

MR. MARTIN: I object on the basis of hearsay, Your Honor.

THE COURT: Okay, and Ms. McConwell, do you have any objections?

MS. MCCONWELL: Hansen Helicopters joins, Your Honor.

THE COURT: Okay. And the citation?

MS. S. MILLER: 801(d)(2)(E) as in echo.

THE COURT: Okay. The Court will overrule the objection and admit the document. And yes, you may publish, if you'd like.

(Exhibit 742 admitted.)

MS. S. MILLER: Thank you, Your Honor. I would like to publish it.

BY MS. S. MILLER: (CONTINUING)

Q. So if we could zoom in on the top, please, Mr. Leon Guerrero. Thank you.

Special Agent Khamvongsa, can you please read this e-mail to jury to the e-mail, starting with the very top?

A. "Tim's plane, from Rufus Crowe, rufus@hansenhelicopters.com. To marvinreed@hansenhelicopters.com. Date, Thursday, 26 June, 2014, at 17:55:34, 0400. Morning Marvious, could you please forward me the document that Tim's going to need to get his plane in Hawaii? Do you know when it's going to arrive? You're da bomb. Rufus."

Q. Thank you, Special Agent Khamvongsa. Can you please tell jury what, if anything, you found based on this e-mail?

A. This e-mail is from Rufus to Marvin Reed and it's discussing the need to forward Rufus --

MR. MARTIN: Your Honor, I object to what -- he can read what it says. He cannot interpret it.

THE COURT: Sustained.

THE WITNESS: It says, "Could you please forward the document --"

MS. S. MILLER: Sustained. Sustained.

THE COURT: You could read it.

MS. S. MILLER: He just did.

MS. MCCONWELL: He already has.

THE COURT: Did you want him to read it again? Okay. Asked and answered. Go ahead next question. All right. Next question.

BY MS. S. MILLER: (CONTINUING)

Q. Sure. I'd now like to direct your attention to Exhibit 551, which has been admitted. And if we could zoom in on the actual text of the letter, please.

Special Agent Khamvongsa, can you please read the first full paragraph for the jury of this letter?

A. "Dear John --"

Q. Yes, thank you. Sorry.

A. "Dear John, it is my understanding of our agreement as follows: You are purchasing all of Trafficopters, Inc., 369 helicopter assets and parts, as well as two trucks and two trailers as defined in our invoice. This includes anything used for or on the Hughes 369500 helicopter, all for $135,000."

Q. Special Agent Khamvongsa, who is this letter from?

A. Randy Rogers of Trafficopters.

Q. Thank you. Is he a defendant in this case? 10:52AM
A. Yes. 10:52AM
Q. Okay. And can you please read for the jury the last paragraph of this letter? 10:52AM
A. "I feel it will be better to do everything through Vanguard Aviation since it has the business license here in Valdosta and Vanguard has the lease with the airport. No sense stirring any pots. You agree? That way when you do take all the assets of Trafficopters, Inc., I can close it quietly without any problems." 10:52AM
Q. Thank you. And if we zoom out of the document. Can you please read who this letter is addressed to in the address? 10:52AM
A. Mr. Jon Walker, Hansen Helicopters via e-mail jwalker@guam.net. 10:53AM
Q. Thank you. I'd now like to show you what's been previously admitted as G-761. 10:53AM
THE COURT: Yes? 10:53AM
MS. S. MILLER: Have you seen this document? 10:53AM
THE COURT: Hold on. Hold on. 10:53AM
MS. MCCONWELL: This is only admitted as to Hansen Helicopters, Your Honor, not to Mr. Walker and I would object to relevance for any line along -- with this exhibit because -- 10:53AM
THE COURT: With this witness? 10:53AM

MS. MCCONWELL: With this witness because this witness is testifying about counts that Hansen Helicopters is not charged in.

THE COURT: Okay, so -- so I see what you're saying, so this was -- this exhibit was only admitted against Hansen and not against Mr. Walker.

MS. MCCONWELL: That's correct.

THE COURT: So it's irrelevant to both?

MS. MCCONWELL: That's correct.

MS. S. MILLER: My response, Your Honor.

THE COURT: Yes.

MS. S. MILLER: He was involved in the entirety of this investigation. He has knowledge and certainly some of the manner and means that he -- that are included in other counts relate to his investigation. So he also testified that he reviewed all of the evidence, including filings.

THE COURT: But that's not the object -- you heard the objection. The objection is irrelevant. It's just not relevant to Hansen Helicopters.

MS. S. MILLER: It's also relevant because it describes the relationship and to the money laundering wire fraud counts. The relationship is relevant to those --

THE COURT: I'm sorry. Wait. Wait. Wait. Hold back. It's not relevant to the Hansen -- let's think about this. It's not relevant to the Hansen Helicopters.

MR. MARTIN: Could we take the document down, Your Honor.

THE COURT: I don't think it's published. Is it?

MS. S. MILLER: It is, but it's been admitted already.

MR. MARTIN: But it's not admitted against Jon Walker.

THE COURT: It's not admitted against Jon Walker and right now, they're saying it should not be used against Hansen Helicopters. So the objection is, it's not relevant to anything to do with Hansen Helicopters. If that's true, then Mr. Khamvongsa has no business discussing this exhibit.

MS. S. MILLER: So one of the counts that he has testified to is conspiracy. So --

THE COURT: So just tell me the count number, you don't have to tell me, so Count 1.

MS. S. MILLER: 99. Count 99 is conspiracy.

THE COURT: Just let me look at Count 99.

MS. S. MILLER: And it's relevant to that, Your Honor.

THE COURT: All right, let me look at 99. And everybody else look at 99 over there on that side. 99. Page 33. Okay, let me look at this. Okay. So again, so 99 does not include, does not include Hansen Helicopters. Number one. And this document is not -- was not admitted against

10:54AM 10:54AM 10:54AM 10:54AM 10:54AM 10:54AM 10:55AM 10:55AM 10:55AM 10:55AM 10:55AM 10:55AM 10:55AM 10:55AM 10:55AM 10:55AM 10:55AM 10:55AM 10:55AM 10:55AM 10:55AM 10:55AM 10:55AM 10:55AM 10:56AM

Walker. So the Court will sustain the objection. Unless you have another.

MS. S. MILLER: I would ask Your Honor to reconsider that ruling because it does show evidence of the conspiracy described in Count 99.

THE COURT: But Counsel, but Counsel, no. The Court will sustain the objection. Based on -- I don't know if you understand my ruling, but based on the fact that that exhibit is only to be used against Hansen Helicopters, but not against Mr. Walker.

MS. S. MILLER: Right. And that's what I'm asking the Court to reconsider is that should be admitted also --

THE COURT: Oh, I see, against Walker now?

MS. S. MILLER: Right, because -- because of 99.

THE COURT: Hold on a second. So Mr. Martin? Okay. So now, she's independently --

MR. MARTIN: Well, I need time to review the document again, Your Honor. I'll have go back to my notes as to why we kept it out. But I knew it was out so I objected to it. So...

THE COURT: You need ten minutes?

MR. MARTIN: That'd be great.

THE COURT: Ten minutes, ladies and gentlemen. Let's go, get up and exercise again. Keep an open mind. Do

not form or express any opinion on this case. And you know this is important, I want you to know, it's really because these are legal issues, I'm required under the law to just speak to the lawyers and it has to stay out of your presence and because you guys are fact-finders. Not legal finders. Okay. Thank you. Enjoy your break.

(Jury out at 10:57 a.m.)

THE COURT: Maybe we could have you step out.

THE WITNESS: Yes, ma'am.

THE COURT: Thank you.

MS. M. MILLER: Are we taking a brief recess, Your Honor? Are the attorneys, too, Your Honor?

THE COURT: I'll let you, hold on a minute after Mr. Khamvongsa goes out. The prosecutor is asking that this exhibit, that exhibit was -- 761, right? 761.

MS. S. MILLER: Yes, Your Honor.

THE COURT: That has already been admitted as against Hansen. But now she's going to try to -- I assume you're going to try to set -- does he -- you're going to be able to lay a foundation with this witness?

MS. S. MILLER: Right. He's reviewed a number of declarations that are under -- I think he testified earlier that he reviewed a lot of third-party information where they're swearing under oath.

THE COURT: Can you put 761 back up, please.

MS. S. MILLER: Sure.

THE COURT: It's not very long.

Oh, declaration of Crowe, let me see. Okay, let's go to the next page. There is four pages. Okay, go ahead. So basically he's discussing the operations of Hansen Helicopters; is that right?

MS. S. MILLER: There are some of that, Your Honor. It also in paragraph 14 specifically mentions the relationship between the co-conspirators and Mr. Walker, which is relevant to conspiracy.

THE COURT: So are you saying that on paragraph 14, is what you're really trying to get?

MS. S. MILLER: Well there is a number of different paragraphs, but that's probably the most important one.

THE COURT: Well, which ones are you trying to get? Let's focus on that.

MS. S. MILLER: Okay, so paragraph --

THE COURT: Because maybe some of it is irrelevant to Walker and some of it is relevant to Walker. Mr. Walker. Go ahead. So which ones are you looking at?

MS. S. MILLER: So I would -- these are all relevant to the agreement and sort of relationship between the co-conspirators, including Walker. So paragraph 2.

THE COURT: Okay, so let me go up to paragraph 2,

10:58AM 10:58AM 10:58AM 10:59AM 10:59AM 10:59AM 10:59AM 10:59AM 10:59AM 10:59AM 10:59AM 10:59AM 11:00AM 11:00AM 11:00AM 11:00AM 11:00AM 11:00AM 11:00AM 11:00AM 11:00AM 11:00AM 11:00AM 11:00AM 11:00AM

please. Two. Okay, one more page. Okay. Next one.

MS. S. MILLER: Paragraph 5.

THE COURT: All right. Let's go to five, next page. Okay. Next one?

MS. S. MILLER: 6, right there.

THE COURT: Okay. Next?

MS. S. MILLER: 7.

THE COURT: Okay.

MS. S. MILLER: 9.

THE COURT: Okay.

MS. S. MILLER: Which, I think, continues on to the next page, please.

THE COURT: Okay.

MS. S. MILLER: 10.

THE COURT: Okay.

MS. S. MILLER: 11.

THE COURT: Okay.

MS. S. MILLER: 12.

THE COURT: Let me look at 12, hold on. Okay.

MS. S. MILLER: And then 14.

THE COURT: Not 14. I mean not 13, but 14?

MS. S. MILLER: Right. Well, the end of 12 at the top and then 14, Your Honor.

THE COURT: Okay. 14.

(Pause.)

11:00AM 11:00AM 11:00AM 11:00AM 11:00AM 11:00AM 11:00AM 11:00AM 11:00AM 11:01AM 11:01AM 11:01AM 11:01AM 11:01AM 11:01AM 11:01AM 11:01AM 11:01AM 11:01AM 11:01AM 11:01AM 11:01AM 11:01AM 11:01AM 11:01AM

THE COURT: So 10, 11 -- 12 and 14?

MS. S. MILLER: 2, 5, 6, 7, 9, 10, 11, 12, 14.

THE COURT: Right. Okay.

MS. S. MILLER: I can do that again, if you'd like.

THE COURT: No, I got it.

MS. S. MILLER: Okay.

THE COURT: All right. 9 of 14 paragraphs. All right. And you're saying that -- you're trying to offer -- well, it's pretty much most of it. As evidence of the conspiracy that in Count 99?

MS. S. MILLER: Right. It explains the relationship among the co-conspirators that are alleged as co-conspirators in the conspiracy in Count 99, including Mr. Walker.

THE COURT: Okay.

(Pause.)

THE COURT: Ready? Go ahead.

MR. MARTIN: Yes, Your Honor.

THE COURT: Yes?

MR. MARTIN: First of all, so that the record is complete.

THE COURT: Okay, get on your mic. Yup.

MR. MARTIN: First of all, so the record is complete, Your Honor, this is a legal pleading in this case

filed July 5, 2018, by Mr. Crowe.

THE COURT: Mr. Crowe's lawyer, lawyers filed on his behalf, right?

MR. MARTIN: Yeah.

THE COURT: A declaration.

MR. MARTIN: Yeah. Declaration by Mr. Lujan on behalf of Mr. Crowe requesting that he be allowed, it's in support of his motion to modify conditions of release. Mr. Walker has nothing to do with it. He didn't adopt it. He hasn't seen it. He wasn't a party to it. And it's -- it's not co-conspirator hearsay because it's not -- it doesn't further nor is it a statement in furtherance of the conspiracy. And it's not in the -- it's not in any capacity for Mr. Walker because he doesn't -- he's not even a party to it, Your Honor. This is a legal document requesting the Court to modify his conditions of bond and it has to be filed or I assume it has to be filed. I didn't represent Mr. Crowe and it could be admissible absolutely against Mr. Crowe but not against Mr. Walker.

THE COURT: Yeah, I think he makes a good point. I see what you're trying to do, but if it was a declaration in support of a bail hearing to be released out of Guam, it's not like -- like -- it's not as if Mr. Crowe was making a statement to an investigator like a 302. It's not as if Mr. Crowe was, you know, caught on tape making his statements

in furtherance of a conspiracy. So I'm inclined to sustain the objection.

MS. S. MILLER: May I respond, Your Honor?

THE COURT: Yeah. Go ahead.

MS. S. MILLER: So while I agree it's not Mr. Walker's statement.

THE COURT: That's not -- yeah, that's not the point, but go ahead.

MS. S. MILLER: Well, Mr. Kapp signed it. He swore under oath that these facts were true. I'm sorry Crowe. Did I -- Crowe. So it is 801(d)(2)(E). It's a co-conspirator statement. And it's in furtherance of the conspiracy as a whole because this conspiracy is ongoing as Your Honor knows and is allowed --

THE COURT: I don't know that. Don't say I know that that's what you want to prove.

MS. S. MILLER: Right. So it is a co-conspirator statement because plenty of the facts in here show they're still operating in this manner as of today. Because the conspiracy continues till today.

THE COURT: And so you are offering it under 801? What? (d)(2)? What?

MS. S. MILLER: (d)(2)(E) as in echo.

THE COURT: Got it. "(E), was made by the party's conspirator during and in furtherance of the

conspiracy. The statement must be considered, but does not establish -- but does not by itself establish a declarant's authority under... the existence or scope of a relationship under the existence or the conspiracy or participation" and it's under (E)." All right. Mr. Martin.

MR. MARTIN: Your Honor, this is a statement for modification of conditions of bond. It is not a statement in furtherance of the conspiracy. It is a statement by Mr. Crowe saying Mr. Lujan wants to modify my conditions of bond. That's the purpose of it. That's what it's for. And for the government to be able to use Mr. Crowe's legal pleading to let him modify his conditions of release against Mr. Walker is very inappropriate. Let's just put it that way, I'll say.

MS. S. MILLER: And may I respond again, Your Honor?

THE COURT: Hold on. Not yet. Okay. For the record, Cann deposition has been docketed for all those that need to go and --

MS. M. MILLER: Thank you, Your Honor.

THE COURT: -- work. My clerk's office has docketed it. Are you offering this for the truth of the matter asserted?

MS. S. MILLER: I'm offering it as a co-conspirator statement so it's not hearsay at all.

THE COURT: No, I know. But -- okay, it's

non-hearsay but the question is, was this made in the

furtherance of the conspiracy?  Hold on.

So generally, I'm just trying to think this

through.  I'm not saying you're right but I'm not saying

you're wrong, either.  I don't know.  I'm just thinking this

through.  Because I have not had somebody use a bail

declaration for a co-conspirator statement.  Generally, you

guys have other things for co-conspirator statements, i.e., a

302 or something else, a tape or something, but not to the

point of going into the magistrate judge and saying, release

me, release me, let me go for whatever purpose.

MR. MARTIN:  And we're not party to it at all,

Judge.

THE COURT:  No, I don't think you have to be a

party to it but it's more like, was this made in furtherance

of a conspiracy?  And --

MS. S. MILLER:  My response, Your Honor, is that

the entire reason Mr. Kapp and Mr. Crowe were seeking

modifications of bail is so that they could operate the

business and continue their conspiracy, including, for

example, flying to the Philippines where they moved their

operation.

THE COURT:  All right.  So you can say that's

your theory all you want.  The thing is, did the judge

believe you downstairs, because if the judge did, why did he

release him?

MS. S. MILLER: I'm not sure why that's relevant.

THE COURT: Well, it is relevant because if you're trying to say that your theory is, is that they did this, did you guys argue that before the judge downstairs.

MS. S. MILLER: We opposed every time they tried to get their bail modified, yes.

THE COURT: All right. All right. So you did that. You argued that. So that's good for you.

MS. M. MILLER: And Judge Manibusan did deny Mr. Kapp going to the Philippines, then he retired. Then Judge Bordallo heard it. And Judge Bordallo, Your Honor, just as a reminder, has recused himself from any decisions in this case. We don't know why. We never got any of the reasons why he recused himself. So I don't know that that means anything. This is clearly an admission by Mr. Crowe.

MR. MARTIN: Well, you just said Mr. Kapp. This is Mr. Crowe.

MS. M. MILLER: No, my point is, Mr. Kapp initially was the one trying to go to the Philippines all the time. And then Mr. Crowe wanted to go to the Philippines as well. And, Your Honor, until we got the records from the Philippines , we didn't even know all the details we know now.

MR. MARTIN: That's not relevant.

MS. M. MILLER: Of course it's relevant.

THE COURT: No, no, wait, wait, okay. No, no, not necessarily. Okay. I'm talking about -- okay, you guys have a theory to the case. The thing is, we have a statement by Crowe, forget Kapp for right now, we're talking about Crowe; correct?

MS. M. MILLER: Yes.

THE COURT: I don't care about Kapp right now. This is Crowe's statement for purposes of a bail reduction. You saw Judge --

MS. M. MILLER: No, no, no, no, this is his statement for purposes of travel, I believe. I don't think --

THE COURT: Okay, not bail reduction, but bail modification. It's bail modification.

MS. M. MILLER: To allow him to travel to the Philippines, yes.

THE COURT: Bail modification. Okay, so he was his -- okay, his pretrial release status, he wants to go to the Philippines. Did you guys make this argument before the judge. Which judge?

MR. MARTIN: I wasn't a party to it so I don't know, Your Honor.

MS. M. MILLER: And we did not make this argument that we're making in front of you in front of Judge Bordallo because we did not have the records from the Philippines that we do now.

THE COURT: Okay, so you did not know, you did not know that there was -- it was part of your theory that there was an ongoing conspiracy? 11:10AM

MS. M. MILLER: Correct. We didn't get the records.

THE COURT: That's all I want to know.

MS. M. MILLER: Yes.

THE COURT: So that's my question. But she just said, yeah, you did make that argument.

MS. M. MILLER: No, we made an alternative argument to Judge Manibusan when he was still the magistrate judge on the case when Mr. Kapp in 2017 wanted to go to the Philippines.

THE COURT: So my only question, though, but my question was, with regard to Crowe, did you make that --

MS. M. MILLER: No, we didn't.

THE COURT: -- argument.

MS. M. MILLER: We did not get those records from the Philippines until 2022.

THE COURT: Okay, so that's all I wanted to know. I got it. But had you not -- had you not made it or make it look like okay what -- and if you made it, and the judge decided against it, that's another issue I have to resolve. But that's not the case.

MR. MARTIN: I can't tell what was argued there,

Your Honor, because I was not a party to this.

THE COURT: All right.

MR. MARTIN: Mr. -- I do know that he was granted permission.

THE COURT: Okay, so he's made a statement. So this is Crowe making a statement. He's saying okay, this is where I work, this is what I do, this is my operation, I mean this is how it's operated. So is this a statement made in furtherance of the conspiracy? That's really the question.

MR. MARTIN: My answer is, it's a statement made so he could travel to whatever the motion for modification. We just have the affidavit. I don't even know what the motion says, Your Honor. Like I said, I wasn't a party to it. Mr. Lujan represents Mr. Crowe.

THE COURT: Right. Okay.

MR. MARTIN: And --

THE COURT: Doesn't matter whether you're a party to it necessarily for purposes of --

MR. MARTIN: I agree. I agree.

THE COURT: -- of trying to figure out what kind of statement this is, right? So I'm just trying to figure out because I never had somebody use a bail or a declaration to try to get off Guam and modify conditions to say that's made in furtherance of a conspiratorial statement.

MR. MARTIN: The primary purpose of the

affidavit, we know, is for modification of conditions of bond.

THE COURT: We do know that. I think the prosecutor would agree with that.

MS. S. MILLER: Yes.

THE COURT: That it is. The question is, was this statement -- is the statement offered against an opposing party and was it made by the party's co-conspirator during and in furtherance of the conspiracy? During and in further of the conspiracy? That's really the question.

MR. MARTIN: Well, and I can't say, Your Honor, and I would say that they can't say this is in furtherance of the conspiracy. I mean, they've alleged that the conspiracy started back in 1992. And there is no other way for, let me say this, Your Honor, there is no absolutely no other way for Mr. Crowe to modify request a modification of conditions of bond, other than to file a motion and an affidavit in support.

THE COURT: Is his going to the Philippines part of the conspiracy?

MR. MARTIN: Well, I don't think that's alleged in here, Your Honor.

MS. M. MILLER: Yes.

THE COURT: Is his -- wait, is his going to the Philippines part of the conspiracy?

MR. MARTIN: That's not alleged.

THE COURT: As contained in Count 99?

MR. MARTIN: No.

THE COURT: Hold on. Let me look at it. Everybody just let me look because I just need to read this really quick. Present a scheme? Okay, that's the question. And the answer is, yes, Ms. Samantha Miller, what's the answer? What is --

MS. S. MILLER: Sorry. I'm just pulling up manner and means, Your Honor. Just one second please.

THE COURT: Manner and means. Are you looking at what page?

MS. S. MILLER: Right, I'm looking at pages 33, 34 --

THE COURT: Well, that's not -- okay.

MS. S. MILLER: It's the manner and means of the conspiracy to commit wire fraud.

THE COURT: That's before Count 99, but okay, let's see, is it count --

MS. S. MILLER: No, it's the manner and means of Count 99. Count 99 begins on page 33, line 18.

THE COURT: Yeah, you said it was before that, though.

MS. S. MILLER: I'm sorry if I misspoke, page 33 onward is the manner and means.

THE COURT: Yeah, you misspoke there.

MS. S. MILLER: Sorry about that, Your Honor.

THE COURT: All right. So manner and means are on page 34, line 18, 19. Okay.

MS. S. MILLER: Let me know when you want me to respond, Your Honor.

THE COURT: Hold on a second.

MS. S. MILLER: One second.

THE COURT: Okay. Tell me. Go ahead.

MS. S. MILLER: So Your Honor, on pages 34 and 35, you see the list of aircraft and the list of tuna boats.

THE COURT: Yup.

MS. S. MILLER: So we have evidence and presented evidence already that these same helicopters now have been moved from the United States to the Philippines. They're still being leased to the same tuna boat companies. So the conspiracy continues and it's related to these particular tuna boat and particular aircraft.

THE COURT: Okay, so let's look at his date -- what is the date of his declaration?

MS. S. MILLER: It was early on in the case, Your Honor. That's why we didn't know about the moving -- 2018.

THE COURT: No, just answer the question.

MS. S. MILLER: 2018.

THE COURT: Okay. What date?

MR. MARTIN: July 5, 2018.

THE COURT: July 5, 2018, okay. So you're saying

that -- so -- but you're not using the July 2018, you're saying it's more recent? Right?

MS. S. MILLER: Well, we're saying it establishes the relationships between the defendants at the time of the declaration was filed. And that the fact that he was trying to go to the Philippines is evidence of how the conspiracy operated. By moving these same aircraft into leases with Philippine companies is part of the conspiracy and how they committed wire fraud. They moved their bank accounts to the Philippines.

THE COURT: Okay. Did he go to the Philippines to establish leases? At that time?

MS. S. MILLER: We believe so, Your Honor.

THE COURT: Not you believe so. Why the --

MS. S. MILLER: I think he's on bills of sale that were filed with the Philippines. I think he was on the board of directors for Pacific Spotters, the director or --

MS. M. MILLER: We have the contracts, we have the opening of the bank account, we have everything.

THE COURT: Okay, let's -- FYI the jurors' food is already here. I'm just going to tell them to eat. So they're waiting for me, but it arrived ten minutes ago. I'm just going to tell them to eat.

MS. M. MILLER: Yes, Your Honor.

THE COURT: Tell them to eat. Okay. Let's

return back. But you're saying this is in furtherance of the Count 99 conspiracy?

MS. S. MILLER: Right, because he took the same -- or all of the co-conspirators took the same aircraft identified in Count 99 with the same tuna boat companies identified in Count 99 and moved the entire operation to the Philippines. And Mr. Crowe was traveling at the very time that they established the new operations in the Philippines. We've presented evidence about starting, I think there was articles of incorporation with Pacific Spotters, we have the bank records established that they were opening accounts at that time.

THE COURT: All I care -- you're arguing that this particular exhibit is in furtherance of Count 99? That's what you just said.

MS. S. MILLER: Yes. Yes.

THE COURT: All right.

MS. S. MILLER: And, of course relatedly, the money laundering, too.

THE COURT: Go ahead.

MR. MARTIN: Well, first of all, Your Honor, Count --

THE COURT: 99.

MR. MARTIN: 99 alleges conspiracy to defraud and cheat others. It does not allege anything about the

11:18AM 11:18AM 11:18AM 11:18AM 11:18AM 11:18AM 11:18AM 11:18AM 11:18AM 11:18AM 11:18AM 11:18AM 11:18AM 11:18AM 11:19AM 11:19AM 11:19AM 11:19AM 11:19AM 11:19AM 11:19AM 11:19AM 11:19AM 11:19AM 11:19AM

Philippines or transferring anything to the Philippines. And if you go to the money laundering counts, those are all alleged to have occurred in 2016. And this declaration is made in 2018, two years after the fact, which can't be in furtherance of money laundering because it happened two years earlier, if it happened at all.

So I submit that there is no object or manner and means alleging anything about the Philippines or setting up any type of business in the Philippines in Count 99 and this is improper.

THE COURT: Okay, hold on. I'm just looking at this carefully. Have you guys presented evidence that he established -- evidence that he went to the Philippines to establish leases and have you presented that already? Crowe?

MS. S. MILLER: Yes, Your Honor, we --

THE COURT: During this timeframe?

MS. S. MILLER: Yes, Your Honor. We admitted a number of exhibits with the representative from the Philippines Civil Aviation Authority, if you recall. And a lot of those documents involved the starting of Pacific Spotters and who was on those articles of incorporation for that company. And it coincide --

THE COURT: Just give me the exhibit number.

MS. S. MILLER: 3003 is one of those exhibits.

THE COURT: That is all I care about. Don't make

your arguments. I don't need your argument. I just need the evidence. I'll remember the evidence. Go ahead.

MS. MCCONWELL: Certain pages.

THE COURT: 3003?

MS. S. MILLER: Yes, Your Honor.

MS. MCCONWELL: Only certain pages of 3003 were admitted. Not the entire document, Your Honor.

THE COURT: So what page on 3003?

MS. S. MILLER: Page 7, for example, Your Honor.

THE COURT: All right. I'll look at that in a minute. And so as I look at Count 99, Mr. Walker is saying that this only deals with committing wire fraud. Right. So this is dealing with wire transfers. All right. And what was your point then, Mr. Martin?

MR. MARTIN: If it was page 7 --

THE COURT: We're focusing only on Count 99. That's what she says. Go ahead.

MR. MARTIN: Well, as far as 3003 is concerned, Your Honor, our record --

COURT REPORTER: I'm sorry, Your Honor, I don't think the mic is on.

THE COURT: Mic. Mic.

MR. MARTIN: Sorry, Your Honor. As far as Exhibit 3003. Number one, our records show it's not admitted, page 7. Number 2, if it was admitted, it's dated 2013, which

is well after this declaration, and before this declaration. And it does not support the government's theory that, oh, we suddenly just now found out because it was back in 2013. So -- and finally, Count 99 does not allege anything about moving a business to the Philippines.

THE COURT: Okay, hold on one second. Let me look at this carefully.

All right. Let's go back to this. All right. Let me understand your proffer here. Why do you want -- give me the reason why you want this document in? You want Crowe's -- Mr. Crowe's declaration to a magistrate judge because he wants to be able to be released from Guam and modify his conditions of release.

And Mr. Crowe is saying, look, I'm part of Hansen Helicopters. And he's basically -- he's basically saying, hey, Hansen Helicopters is a corporation that has so many employees. We've been on Guam for a long time. I mean, he builds up Hansen Helicopters. So that's what he's doing.

And you're saying that you want to bring that evidence in as part of the conspiracy because it relates to Count 99? So tell me exactly and narrowly and what is your proffer on Count 99, because let me just say, I've read 99. So it's a conspiracy to commit wire fraud, that's what the charge is, and all this other stuff about objects and manners, okay, that's not -- you know, it's really the elements that

the court looks to. I mean it's what the jury looks to, is really the elements. All this other stuff is really your theory of how the conspiracy occurred on wire fraud. And the elements are, how do you -- what are you trying to prove, how, with regard to this statement made in furtherance of a conspiracy. Was this statement about his business made in furtherance of a conspiracy? Go ahead. And the conspiracy to commit wire fraud in particular. Go ahead. So what's your proffer?

MS. S. MILLER: So the proffer, Your Honor is, you heard testimony from Ms. Jones who reviewed also a lot of the bank records. And one of the things she testified to was that defendants started closing all their U.S. bank accounts in the summer of 2018. She also admitted evidence, we didn't go through it extensively, but we admitted evidence with Ms. Jones that showed suddenly they opened a Wilma's bank account in the summer of 2018 and started receiving funds from account they couldn't identify at the time, which now we know is a Philippine bank account.

So money was going into the Philippine bank account from tuna boats and being transferred all around between the accounts including Wilma's U.S. account. The reason why this declaration is relevant is because, first of all, it shows what one of the co-conspirators is stating the relationship was between the defendants, what their roles were

within the company.

THE COURT: All right. So -- but has that already been established? I mean, is it cumulative? Have you already established the relationship as stated by Crowe already?

MS. S. MILLER: Right. But it's now relevant as to Mr. Walker with respect to wire fraud. So I think we admitted it, I can't remember what count --

THE COURT: How are you connecting Walker, the Philippines and Crowe right now? How are you connecting this as far as Count 99 goes?

MS. S. MILLER: Sure. So he was requesting in...

THE COURT: Who is he?

MS. S. MILLER: Mr. Crowe was requesting to modify bail so that he could travel to the Philippines.

THE COURT: Okay.

MS. S. MILLER: We have documents in evidence and we will present further documents that show, for example, 3 -- Exhibit 3003 page 32 --

THE COURT: So Crowe's request, what is the date of his declaration?

MS. S. MILLER: July 2018.

THE COURT: July what 2018 what day? July 5th. So Crowe is requesting modification of his bail conditions or his trial -- pretrial release conditions. All right.

11:26AM 11:26AM 11:26AM 11:26AM 11:26AM 11:26AM 11:26AM 11:26AM 11:26AM 11:26AM 11:26AM 11:26AM 11:26AM 11:26AM 11:26AM 11:26AM 11:26AM 11:26AM 11:27AM 11:27AM 11:27AM 11:27AM 11:27AM 11:27AM 11:27AM

MS. S. MILLER: Right.

THE COURT: On July 5, 2018.

MS. S. MILLER: Right.

THE COURT: This, okay, so this document -- I mean, this was in 2018 his request and this is -- okay, so the conspiracy here is 2000 to the present. So it's before -- before this -- his release, his request for release condition, he's asking that it be before what -- the start date on the conspiracy. Correct?

MS. M. MILLER: After.

MS. S. MILLER: No.

MS. M. MILLER: After.

THE COURT: I'm sorry, that's right. It's after. I read it wrong, 2020. Okay. That's right. 2018 you're right. So 2018 he's requesting this and continuing to present. What day did I say present meant?

MS. M. MILLER: Yes.

THE COURT: Was it January 8, 2021, right?

MS. M. MILLER: Correct.

MR. MARTIN: Correct.

THE COURT: So January 8, 2021. All right. And this is -- okay. Very well. Go ahead.

MS. S. MILLER: So at the very time he's submitting this declaration, which describes, allegedly, what the company looked like, the relationship among the

defendants, they're moving their operations to the Philippines, large transfers of money from a Philippine -- we now know Philippine bank account is coming into the U.S. bank account. And then we see all of these Philippine --

THE COURT: Okay, so we're looking at the timeframe between July 5, 2018 to January -- well to January 8, 2021. That's the timeframe that we're talking about.

MS. S. MILLER: Yes.

THE COURT: Okay, and there is evidence to show that there is okay. Go ahead. What's the evidence?

MS. S. MILLER: So you recall Ms. Jones testified that four U.S. bank accounts were closed in the summer of 2018. And then the one remaining bank account that they opened around that exact time, I think it was August 2018, started -- you started seeing transfers in from an account that at the time we couldn't identify, but we now know is a Philippine bank account.

THE COURT: Okay.

MS. S. MILLER: So it's just further evidence that there is a conspiracy among these defendants at the very time that he's swearing under oath establishing that the relationship was what Mr. Crowe says it is in the declaration, that that's in furtherance of this conspiracy because at that time, he was actually going to the Philippines to move their

11:28AM 11:28AM 11:28AM 11:28AM 11:28AM 11:28AM 11:28AM 11:28AM 11:28AM 11:28AM 11:28AM 11:28AM 11:28AM 11:29AM 11:29AM 11:29AM 11:29AM 11:29AM 11:29AM 11:29AM 11:29AM 11:29AM 11:29AM 11:29AM 11:29AM

fraud scheme to the Philippines and we have bank records backing that up among other things, like the -- the -- the articles of incorporation documents in the Philippines with Mr. Crowe and Mr. Walker's name on them. 11:29AM

THE COURT: Okay. And this is between the timeframe of July 5, 2018 to January 8, 2021? 11:29AM

MS. S. MILLER: Yes, Your Honor, mostly in the summer of 2018. 11:29AM

THE COURT: Well, summer. What is summer to you? 11:30AM

MS. S. MILLER: Summer and fall, the second half of 2018. So the bank accounts were closed I believe in July -- 11:30AM

THE COURT: Yeah, but give me the dates, I mean I need the dates. Some people count summer as one month. Okay. So July 5, 2018, is the date that Mr. Crowe requested his modification? 11:30AM

MS. S. MILLER: Right. 11:30AM

THE COURT: So when was the bank account opened in the Philippines? 11:30AM

MS. S. MILLER: I don't have that date on the top of my head, but I do have a document right here, which is when they opened Pacific Spotters, which is November 21, 2018. 11:30AM

THE COURT: Okay. Is that part of the Philippines bank account? 11:30AM

MS. S. MILLER: That's the Philippine company, 11:30AM

Pacific Spotters, and it was filed with the Securities Exchange Commission.

THE COURT: Okay, but you're talking about wire fraud. So you're talking about banks. All I care about is the bank.

MS. S. MILLER: Right, but they had to submit these documents to the bank in order to show they were actually opening companies.

THE COURT: You told me a bank account was opened. I want to know the date. So just look that up.

MS. S. MILLER: Sorry, I don't have that right in front of me.

THE COURT: You guys should know that if you want me to focus on this timeframe. And you're theory is, is that there is a bank account that we're focusing in on, let's get the date because the period is July 15th, I think we all agree, if in fact -- I mean --

MR. MARTIN: Your Honor, I don't agree.

THE COURT: Okay, you don't have to agree. But nobody has to agree with me, I don't care. It doesn't matter, I'm not saying that flippantly, I'm saying you don't have to agree with me. I'm trying to think this through logically.

If her proffer is Mr. Crowe was trying to further the conspiracy of wire fraud, it would have to be, it would have to be between I would -- I'm thinking out loud so if I'm

wrong, I know you'll try to correct me.

MR. MARTIN: No, I'm sorry, Your Honor.

THE COURT: As I'm thinking out loud, it would have to be from the time that he made his request because he's trying to go to the Philippines, July 5, 2018, and they're saying there is an ongoing conspiracy, ongoing conspiracy ends, according to my ruling, date of present, under the grand jury indictment, second superseding is January 8, 2021. That's the timeframe we're talking about. Do you agree with that?

MR. MARTIN: No, Your Honor, can I briefly respond?

THE COURT: Okay. Can I briefly -- why don't we briefly come back after lunch.

MR. MARTIN: Sure.

THE COURT: Because I need to go have my lunch and I need to use the restroom, to be honest. But okay, but as you know, this is my thought process, if the -- the only reason why I'm saying this is the -- if the prosecutor is saying their proffer is what they say it is, is that the conspiracy was still ongoing and that when Mr. Crowe made his request to the magistrate judge, I want to leave Guam, but you know what I want to leave Guam for whatever X reason, I have to go back and look at the document, but if he says I want to leave Guam but he was allegedly furthering a conspiracy and it

was related to Count 99, then what evidence is that?

MR. MARTIN: I would ask the Court to look at Counts 100 through 104 as well because that's the -- that's the wire fraud counts that they're talking about that the conspiracy relates to. And we could talk about that after lunch, Your Honor.

THE COURT: Oh, I see. Okay. So the wire transfers are, okay, the counts are 2015, the 2015 date?

MR. MARTIN: Yes, Your Honor.

MS. MCCONWELL: And 2016.

THE COURT: And 2016. So -- yeah, but her argument is not so much as it relates to those dates that are alleged in the indictment. Her argument is the timeframe up to the present. So it sounds to me their theory -- I may be wrong -- is between the 2018 of July 5th, to January 8, 2021.

MR. MARTIN: I know that's their theory, but I'm saying the indictment doesn't support that based upon Count 99. And then -- it's conspiracy to commit wire fraud. The next four, five counts are wire fraud.

THE COURT: I may have to revisit this issue of up to present then. Let me tell you why, okay, in terms of notice to the defendant, and really, I do think I may have to revisit that issue. That it may not -- you know, when we say "up to present," what does that really mean?

I mean, if you're a defendant, you want notice of

what your crime is. And if there is an ongoing conspiracy, they need to have you, the defense, defendant, Mr. Walker and Hansen Helicopters, needs to know what exactly is the crime that they're committing and what are the dates. So you know what, you guys might want to revisit that, too. And we might want to go back on that date and just use the date of the -- of what's alleged in the indictment, because you surely and could have and still can indict the defendants for conspiracy, any defendant, just generally, let me put this out, any defendant, for additional acts that are not... well, I mean there could be double jeopardy argument, I have to think about that, but anyway, putting that aside, if there's not -- we might think about that, Counsels. We'll come back to that issue. Up to present.

Do you understand what I'm saying, Marie Miller?

MS. M. MILLER: Yes, Your Honor. I do understand what you're saying. I do understand what you're saying. But part of this is twofold. Number one, at least through the date of the indictment, obviously is going to be included and we had a superseding indictment in 2021.

THE COURT: Yeah.

MS. M. MILLER: The second issue is, the defendants, for the first time at trial, tried to assert that Jon Walker either retired or stopped operating and went to Missouri and did nothing.

So a lot of evidence that has come in regarding actions had to do with refuting that contention which is not correct. And the defendants have had notice because there isn't the evidence that we're introducing regarding that that they haven't seen that hasn't been part of the discovery or the record.

Now this issue with the Limey bank and the Limey Air account and the Philippine stuff, that happened in 2018. And what the evidence is going to show is that the transfers through the accounts that are the subject not only to the conspiracy to commit wire fraud, but also the subject of the substantive wire fraud counts, the money laundering counts, came from their work in the Philippines. That is exactly what Special Agent Khamvongsa is going to testify to. So we don't even have to go beyond the date of the second superseding indictment, Your Honor, to include all of this information.

THE COURT: No, okay, okay, you can -- okay, we'll come back to this but I'm just saying that when a prosecutor goes to the grand jury and they ask the grand jury to return an indictment of a conspiracy to commit wire fraud as in Count 99 --

MS. M. MILLER: Yes.

THE COURT: - the execution of that fraud usually has a date on it.

MS. M. MILLER: Yes.

THE COURT: Which you do in Counts 100 to 104, as the defense Counsel has indicated. Now, as you're trying to allege this, I mean, it becomes almost -- I'm not sure what the right word is. It's not -- if there is no date on it, if there is no -- if there is just no date, like on Count 100, September 4, 2015, there was a fraud, a wire transfer --

MS. M. MILLER: Right --

THE COURT: Wait, wait, wait. So you have that and the defendants can defend that.

MS. M. MILLER: Right.

THE COURT: Now, we're saying okay, there is a conspiracy to keep the fraud going.

MS. M. MILLER: Right.

THE COURT: And so now, it's really they are -- they are defending against actually further crimes, even though it's not listed in the indictment. Not -- not -- it's a further aggravation of a crime, I should say.

MS. M. MILLER: Correct.

THE COURT: Conspiracy.

MS. M. MILLER: Correct.

THE COURT: And conspiracy, obviously, is one of the most powerful tools in a prosecutor's box.

MS. M. MILLER: Absolutely.

THE COURT: Because conspiracy is just so strong.

MS. M. MILLER: Yes.

11:36AM 11:37AM 11:37AM 11:37AM 11:37AM 11:37AM 11:37AM 11:37AM 11:37AM 11:37AM 11:37AM 11:37AM 11:37AM 11:37AM 11:37AM 11:37AM 11:37AM 11:37AM 11:37AM 11:37AM 11:37AM 11:37AM 11:38AM 11:38AM 11:38AM

THE COURT: And so wide.

MS. M. MILLER: Yes.

THE COURT: Wide web there.

MS. M. MILLER: Yes.

THE COURT: Anyway, so I'm just thinking out loud. And let's come back to that, okay?

MS. M. MILLER: Yes, Your Honor.

THE COURT: You guys -- you think about that, Counsels.

MS. M. MILLER: We will.

THE COURT: Let me just say something for prosecution. I know you guys you got upset, but you know I help you guys, too. I mean you say -- I throw out lifelines --

MR. MARTIN: I'm not upset, Your Honor. I'm not upset.

THE COURT: You shouldn't be. I think I threw out a lifeline yesterday, last night. But anyway my point is, I do that sincerely and I call it case management, Counsels, for the record, case management.

But you know what, you have -- you have an indictment, this is your second superseding indictment, which by the way, mine is getting holes in it because I've read it so many times and you could see. Okay, keep it simple.

MS. M. MILLER: Yes.

THE COURT: Just keep it simple. 11:38AM

MS. M. MILLER: Yes, Your Honor. 11:38AM

THE COURT: That's all. Think about it. 11:38AM

MS. M. MILLER: Yes, Your Honor. We will, thank you. 11:38AM 11:38AM

THE COURT: I'll see all of you guys at -- time -- 12:30. Go to your lunch. 11:38AM 11:39AM

MS. S. MILLER: Your Honor, can I give you specific cite to a document you might want to take a look at you're reviewing this? 11:39AM 11:39AM 11:39AM

THE COURT: Sure. 11:39AM

MS. S. MILLER: So it's in evidence already. Exhibit 2898. 11:39AM 11:39AM

THE COURT: 2898. Okay, go ahead. 11:39AM

MS. S. MILLER: Page 14. You'll see deposits coming in. That's when they begin with Pacific.Spotters, which is the Philippine version of Pacific Spotters. 11:39AM 11:39AM 11:39AM

THE COURT: Okay. So just, yeah, and yeah. All right. 11:39AM 11:39AM

MS. S. MILLER: Thank you. 11:39AM

THE COURT: Thank you. I'll look at it. 11:39AM

MS. S. MILLER: Thank you. 11:39AM

THE COURT: Okay. Thank you. 11:39AM

(Recess taken at 11:39 a.m.) 11:39AM

(Back on the record at 12:39 p.m.) 12:39PM

          THE COURT: All right. We're back on the record. All Counsels are present, defendants are present and the witness is present.

And so the Court has reviewed G-2898-14, which was what was requested of by Ms. Samantha Miller. And it appears that this is dated July 21 -- sorry, July 31, 2018 -- and so -- July 31. Hold on a second. Let me just check another thing. Hold on. Did you have a chance to review that, Mr. Martin and Ms. McConwell? The exhibit?

MR. MARTIN: I did, Your Honor.

THE COURT: Okay. We might ask Mr. Khamvongsa to step out on this.

MS. S. MILLER: Sith.

THE COURT: Khamvongsa, I'm sorry, Khamvongsa, Khamvongsa. Just continue to step out. I'm sorry, Mr. Khamvongsa.

THE WITNESS: No problem, thank you, Your Honor.

(Witness exited courtroom.)

THE COURT: Yeah. Thank you. Okay, this -- all right. So let me just tell you what I'm looking at. Mr. Crowe's request was July 5, 2018. That's when he signed the declaration; is that correct?

MS. S. MILLER: Yes, Your Honor.

THE COURT: Was it approved for him to travel and what day was that or what period of time, do you guys know ?

12:39PM 12:39PM 12:39PM 12:39PM 12:39PM 12:39PM 12:39PM 12:39PM 12:39PM 12:39PM 12:39PM 12:40PM 12:40PM 12:40PM 12:40PM 12:40PM 12:40PM 12:40PM 12:40PM 12:40PM 12:40PM 12:40PM 12:40PM 12:40PM 12:40PM

MS. S. MILLER: When he was supposed to travel? 12:40PM

THE COURT: No, what day did the judge approve -- or when did he travel? You said the judge approved it, but what day did he actually travel, if he did travel? 12:40PM 12:40PM 12:40PM

MS. S. MILLER: That I don't know. I don't know whether he ended up traveling or not, Your Honor. The motion was on the 5th. 12:41PM 12:41PM 12:41PM

THE COURT: No, yeah, but the critical thing -- no, but wait. The critical thing is you're saying that he traveled to the Philippines. So I need to know what date did he actually travel? 12:41PM 12:41PM 12:41PM 12:41PM

(Pause.) 12:41PM

MS. S. MILLER: I don't know what date he traveled. I do know that he signed paperwork for Philippines in November of 2018 and that's in a different document. 12:41PM 12:41PM 12:41PM

THE COURT: I'm sorry. Can you repeat -- okay, wait. This is what -- let me just back up. 12:41PM 12:41PM

MS. S. MILLER: Sure. 12:41PM

THE COURT: His request that you showed me, was that he signed this on July 5, 2018. 12:41PM 12:41PM

MS. S. MILLER: Right. 12:41PM

THE COURT: His declaration to the judge? Right? 12:41PM

MS. S. MILLER: (Nodded head.) 12:41PM

THE COURT: So a modification was made. You said there was a bank account. So you're showing me a wire 12:41PM 12:41PM

transfer account on G-2898-14; correct?

MS. S. MILLER: Yes, that's money coming into the United States account from the Pacific Spotters Philippine bank account. That's what I was directing Your Honor to.

THE COURT: Okay. So this is coming -- okay, so it's a transfer from U.S. -- no, from the Philippines to U.S.?

MS. S. MILLER: Right. At bottom of that page.

THE COURT: And that's on July 31 -- well actually the date -- the transfer is actually July 27th.

MS. S. MILLER: Right.

THE COURT: All right. Let me get these dates right. Okay. I'm sorry, wire transfer from the PI -- from the Philippines to U.S.?

MS. S. MILLER: Yes, Your Honor.

THE COURT: All right. And then, okay, so these are the critical dates that I know as of right now, hold on.

Okay, so -- so the -- Mr. Crowe's declaration was signed July 5, 2018. The wire transfer from the Philippines to the United States is evidence, according to the prosecutor, on G-2898-14, which is July 27, 2018. Okay. So July 27, 2018. And the date of pres -- date to present on the grand jury indictment is January 8, 2020 -- what year? Two? One?

MR. MARTIN: '21.

THE COURT: Okay. January 2021. So the prosecution, you're saying that he was actually in the

Philippines. When was he in the Philippines, that's my question. 12:43PM

MS. S. MILLER: So an exhibit that we're seeking to introduce with this witness is the Philippine bank records. They're not in evidence, yet, but we've marked them. The defense has them. And those records show opening the signature card in the Philippines for Pacific.Spotters Corporation on July 26, 2018.

THE COURT: All right. Okay. Okay. So somebody opened an account in the Philippines? Is that what you're saying?

MS. S. MILLER: Yes, Jon Walker, Crowe, Kapp.

THE COURT: Who opened the account? Somebody opened the account. Who opened the account?

MS. S. MILLER: So Mr. Walker's signature and Mr. Crowe's are both on it, on the signature card paperwork.

MS. MCCONWELL: What exhibit is this?

MS. S. MILLER: That's 3020, which has not been admitted, yet.

MS. MCCONWELL: It was not on our exhibit list.

THE COURT: Okay. Hold on. So there was a signature -- we'll get to that in a minute. I just got to get the dates figured out. The signature card was signed -- there was a signature card by Mr. Crowe and Mr. Walker. And it was a Philippines bank account, right?

MS. S. MILLER: Yes, Your Honor.

THE COURT: An opening of an account?

MS. S. MILLER: Yes.

THE COURT: Okay. Bank. All right. So it was on July?

MS. S. MILLER: 26.

THE COURT: 26, 2018?

MS. S. MILLER: Yes.

THE COURT: Okay. So there was a wire transfer that you're focusing in on only. And that's the only wire transfer that you're telling me right now, July 27, 2018; correct?

MS. S. MILLER: That is one example, yes. There is a lot of example of wire transfers.

THE COURT: All I care about is the relevant sample for my decision. So listen to --

MS. S. MILLER: Yes.

THE COURT: Listen to that, because that's critical. So July 27, 2018, since you guys don't know -- so the request to travel was granted August 27, 2018. I pulled this out myself, ECF 129. So it was granted. The question is, what dates did he travel? Does anybody know? Can we try to get that? Can we try -- this is the day that the judge granted it. I guess I want to know what date was he in the Philippines, because if you're trying to say that he was

conducting business in the Philippines during a specific timeframe, then where is it in relation to the bank records? Okay? I mean that's what we're talking about.

MS. S. MILLER: Right. And that exhibit isn't in evidence, yet, Your Honor. But...

THE COURT: But putting that aside, even if it's not in evidence, so give me an example.

MS. S. MILLER: So the signature card pages --

THE COURT: I got that.

MS. S. MILLER: Are July 26th. The day --

THE COURT: You already said that. I got that down. So what is the banking transaction? You said he was conducting banking transaction during that timeframe. So...

MS. S. MILLER: Right --

THE COURT: No, but I'm talking about his actual presence in the Philippines, because your theory was that he was in the Philippines conducting business. When was he present? That's my question.

MS. S. MILLER: I believe he was present to sign those signature card documents in the Philippines.

THE COURT: How could he have been there if he didn't get approved until after that time?

MS. S. MILLER: I thought you just said it was the 26th.

THE COURT: August 27th. This is July. Did you

say it was July 26th? Did you say it was July 26, 2018?

MS. S. MILLER: That's when he signed signature card documents in the Philippines.

THE COURT: Okay. But according to our court record, the judge did not grant his request to travel until August 27, 2018. So that's a month later.

MS. S. MILLER: Well, perhaps he ignored and did it anyway, I'm not sure.

THE COURT: If he ignored it, his butt would be grass and he would be arrested and he'd be put in jail. I'll tell you that right now. So don't say stuff like that because you can't. You've got to give me -- my question is, when was he in the Philippines because you're saying -- you're arguing that he was in the Philippines to conduct business.

MS. S. MILLER: Right. What I'm saying is, he signed documents for bank records in the Philippines on July 28th -- I'm sorry, 26, 2018 and then there were large transfers the next day into their U.S. bank accounts from a Philippine bank account with the same name.

THE COURT: Yeah, but you're not listening to me, though. You argued earlier, Ms. Samantha Miller, that the defendant was in the Philippines during this critical period of time. My question is, what days was he in the Philippines?

MS. S. MILLER: I don't know.

THE COURT: Well, then I'm going to deny your

request.

MS. S. MILLER: Well, may I respond?

THE COURT: You got -- no, you -- it's your burden. You are here -- they're making an objection, figure it out.

MS. S. MILLER: Well, my response, Your Honor, is --

THE COURT: It's not good enough. Your response is not good enough because it's not evidence. All I care about is evidence. I don't care that you said well, he might have just violated the court law -- court order. Let me tell you, these U.S. Probation offices and the United States Attorney's office, I would assume, would be on his grass to get a revocation and put him in jail. So that's not a good comeback.

MS. S. MILLER: Well, my response, Your Honor, is that the point of all this, the point of citing to that document at all is to show that he was swearing under oath as a co-conspirator as to one thing about some of the paragraphs on that declaration talk about sort of where they're located, who works for the company.

THE COURT: Let me tell you something, I already know it, I'm a fast learner, I've already read it. But you come into the court on a proffer to say that the defendant was in the Philippines during this critical period of time.

My only question is, when was he in the Philippines? During -- between July 5th, no, not even that, from the date the judge granted his request to the time of date of -- to the indictment.

(Counsel conferring.)

MS. S. MILLER: Maybe I misunderstood what Your Honor was asking.

THE COURT: No. Okay. Go ahead. Maybe you did. Go ahead.

MS. S. MILLER: So some of the documents that have already been admitted with respect to -- from the Philippines Civil Aviation Authority have him signing documents in December of 2018, where he had to physically sign documents.

THE COURT: Okay. Was he there?

MS. S. MILLER: I assume so.

THE COURT: Don't assume it.

MS. S. MILLER: I mean yes. He signed documents as if --

THE COURT: Hold on, hold on. Hold on. I don't know if you do bail hearings. I don't know who does bail hearings over there in the prosecution side. But let me tell you, when the judge gives a defendant an opportunity to modify his release conditions, they'll say, okay, and we would know. The record would be he left on this date and returned on this

date. Does anybody know the answer to that question?

(Counsels conferring.)

MS. S. MILLER: What, is this an ECF number?

MS. M. MILLER: No. But this is what we have from probation.

MS. S. MILLER: Okay. Apologies, Your Honor. This was well before I was involved in this case, so I didn't have this document available to me.

THE COURT: I know, but can I say something? If you're going to argue it, you got to be prepared on this. So your proffer is that the defendant was in the Philippines conducting business. All I care about right now because I've got the dates, I've got the start date and the end date right here.

MS. S. MILLER: Sure.

THE COURT: And really, the start date would actually be when the judge granted it August 27th, but not even that. It will be the date that he actually traveled.

So what date did he travel and what date did he return on that particular request, which was related to the declaration of Crowe? That's all I care about. Do you understand what I'm saying now?

MS. S. MILLER: Yes.

THE COURT: Go ahead.

MS. S. MILLER: And now I have his itinerary in

front of me, it looks like he left Guam on November 17, 2018.

THE COURT: Okay. Hold on. So -- okay, so let me see. So the judge granted it August 27, 2018. This is when judge granted. Okay. And then he departed Guam on what day, November what?

MS. S. MILLER: November 17, 2018.

THE COURT: November 17, 2018. Okay. To. And when did he return?

MS. S. MILLER: He returned December 1st, 2018.

THE COURT: 12/1/2018. Okay, so he was gone almost like two or, yeah, two and a half, three weeks.

MS. S. MILLER: Yes, Your Honor.

THE COURT: So this is when he's in the Philippines. And where did you find this from?

MR. LEON GUERRERO: It was the itinerary provided to probation, Your Honor.

THE COURT: I don't care about an itinerary. I want to know, did he make the flight.

MR. LEON GUERRERO: This is what he gave probation.

THE COURT: Right. So you could give probation anything you want.

MS. M. MILLER: We're getting the affidavit that he signed in the Philippines with a notary from the Philippines. We're getting that exhibit for Your Honor right

now.

THE COURT: Okay. Should have had it like an hour ago.

MS. M. MILLER: I understand, but it's part of 3003 and we only introduced certain provisions of 3003, one of which included John Walker's signature in the Philippines on that same date, but we're pulling that.

THE COURT: That's fine. You could pull that. But my point is, the critical timeframe, was he in the Philippines.

MS. M. MILLER: Yes.

THE COURT: Defense attorney can give a probation officer -- listen, I've been through so many bail hearings. I've been a judge 29 years. I know all the games that everybody plays with these -- I know all the games that defendants play. That's what I mean. And sometimes they're in or they're out. Sometimes they give a judge an itinerary and then they change their itinerary. So it doesn't matter. The question is, when was his actual days of travel, when was he in the Philippines and when did he leave the Philippines. That's what I care about. So do we have that information? We have an itinerary and it could very well be, Mr. Leon Guerrero, Ms. Miller that, yes, it is consistent with his itinerary. It could also very well not be that.

MS. M. MILLER: Right.

THE COURT: I've seen this happen all the time. All right. So, all right, so you think that he was in the Philippines November 17, 2018 to December 1, 2018. Okay. The wire transfer that you are discussing, this Bank of Hawaii transfer occurred July 27, 2018, before he was there. Okay. So that's irrelevant. This is irrelevant.

MS. S. MILLER: Well, I cited it to Your Honor as an example of why that bank account was opened and what sort of came after that to show that what his dec -- how his declaration at that time was relevant and what happened after that with respect to conspiracy to commit wire fraud. So that was when those transfers began and they continued thereafter because that is right after he opened this account.

THE COURT: I know. But you were telling me and the prosecutor this morning, I mean the defense Counsel this morning that he was there during these time -- this timeframe where he was conducting actual business. This business of transfer, yeah, he signed the card in July, he even signed it before he -- before -- yeah, he signed it before -- he signed the court -- the bank in July, but he probably wasn't in the Philippines there.

MS. S. MILLER: Right. So the sequence of events was, he requests permission to leave the country, an account is opened in the Philippine.

THE COURT: Okay.

MS. S. MILLER: Transfers start coming from that account into the U.S. bank account, four other U.S. bank accounts are closed, another Limey bank account is opened in the U.S. where we see lots of money going back and forth between the Philippine bank account. Then he gets permission to travel to the Philippines and he does to submit documents to the Philippines Civil Aviation Authority establishing Pacific Spotters, the fact that he's a director at Pacific Spotters and registering the same aircraft that are registered in the United States, that are the subject of the conspiracy count.

THE COURT: Okay, but your statement to the Court was, he was actually in the Philippines conducting business and you were going to pull out -- I mean actually conducting business. He was in the Philippines. He was not in the Philippines when this business was conducted. Not this exhibit. I'm just talking about this exhibit. I'm only looking at what you guys are giving me. So he was not in the Philippines on July 27th, according to just what you guys have said. He was in the Philippines August, September, October, four months later.

MS. S. MILLER: Right, Your Honor. And the reason why it's relevant is because it shows that pattern, the timeline of events.

THE COURT: But that wasn't your proffer. Your

proffer was that he was in the Philippines conducting business. That was your proffer.

MS. S. MILLER: I apologize if I wasn't specific enough with respect to the timing of each of these incidents but --

THE COURT: No, you were specific. The question -- the thing is --

MS. S. MILLER: I didn't realize it was granted three months later. I thought it was granted more quickly. I thought the order was granted more quickly, so I was mistaken about that.

MS. M. MILLER: Your Honor, just so you know, Mr. Lujan, on behalf of Mr. Crowe, filed a pleading with the Court and signed it as an officer of the Court stating as follows: "The government --" this is when we objected to a later trip by Mr. Crowe to the Philippines.

"The government fails to address the basic fact that in 2018 with this Court's approval, ECF 178, Crowe traveled to the Philippines and returned to Guam as he promised."

THE COURT: Well, here's the deal, he -- Crowe and Kapp and whoever else has been allowed to travel, including Mr. Walker, a magistrate judge, and even this Court, will look at what is his travel history? Or her travel history. If they are following the rules, if they are not

breaking the law, then they're not a flight risk, really, they're not a flight risk. And you guys know that. I mean, the Court has to look at that under the bail statute.

But anyway, all right, so back to this. So that's why I'm really like going at you here, Ms. Samantha Miller, because you're telling the Court he was in the Philippines conducting business during a relevant transaction of wire fraud. And you're specifically saying the date that he signed the card. Not true. He wasn't in the Philippines then. You said -- then you presented to the Court Exhibit 289814, which again he was not in the Philippines on that date.

MS. S. MILLER: And I apologize, Your Honor. I thought that he got there sooner than he did, but it all is relevant because that's when it started. So the transfer started in July. Then as I said, accounts were closed in the U.S., accounts were opened in the Philippines, money starts going back and forth between the remaining U.S. accounts and the Philippine account, then he flies there to submit the documents to this Philippine Civil Aviation Authority for the aircraft that are listed in Count 99 in the conspiracy to commit wire fraud.

THE COURT: Okay, so that's your theory. Where is the evidence that he then signed documents with leases, is that what you're saying?

MS. S. MILLER: Yes, Your Honor, so --

THE COURT: What exhibit will that be or has that been?

MS. S. MILLER: Pages of that exhibit have been admitted, one of which is it's Exhibit 3003.

THE COURT: Okay. And what page?

MS. S. MILLER: Pages 32 through 36.

THE COURT: All right. What else?

MS. S. MILLER: So for example --

THE COURT: No. No. Don't tell me what it is. I don't want you guys to read anything to me. I would rather read it myself. Just tell me the exhibit numbers.

MS. S. MILLER: So that's one example.

THE COURT: Is there any -- are there any other examples?

MS. S. MILLER: That entire document we didn't admit as a whole, but the whole document evidences --

THE COURT: I got that. I got that. So my point is, is Exhibit 3003, pages 32 through 36, all of the relevant exhibits that you want us to look at for purposes of this proffer? Including, including what you just gave me which is the 2898-14 and whatever else you already gave me.

MS. S. MILLER: So Your Honor, it would be that entire exhibit. Not just those pages. And then 3020 is the Philippine bank record, which have not been admitted yet.

We're seeking to admit that --

THE COURT: All I care about is just give me exhibits. Give it to me and the defense Counsels. What are the exhibit numbers? Okay. We've got 3003, 32 through 36, I'll look at that. What's the other exhibit?

MS. S. MILLER: 3020.

THE COURT: Okay. And that's the bank account?

MS. S. MILLER: The Philippine bank records, yes, Your Honor.

THE COURT: Anything else?

MS. S. MILLER: There is one other document we were going to admit with this witness, which is the Limey --

THE COURT: Remember, all I care about is what's relevant to this issue. I don't care about anything else. Because I -- don't make me read something I don't need to read.

MS. S. MILLER: Of course, Your Honor. So those -- that exhibit is 2939.

THE COURT: Okay. And what is that?

MS. S. MILLER: That's the Limey account bank records.

THE COURT: Okay.

MS. S. MILLER: And the last two pages of that document, which I believe -- so Counsel objected initially because we didn't have the right witness for it, so those have

not been admitted, but I believe it's page 82 and 83 of that document.

THE COURT: Make sure it's the right page, don't just -- make sure you send us to the right pages.

MS. S. MILLER: Yes, let me triple check here.

(Pause.)

THE COURT: Carmen, maybe you could pull these for me, too. We have the hardcopy. I want to see Exhibits 3003, pages 32 through 36, Exhibit 3020 and then Exhibit 2939. What page?

MS. S. MILLER: So the first page, which would be the signature page so you could see who's on that and then pages 82 and 83.

THE COURT: So 82 and 83. Those are the only two pages --

MS. S. MILLER: I just said that they are not admitted, yet, but yes, those are the relevant pages.

THE COURT: Okay, they're not admitted. So we're -- you're just trying to see if she even has -- she's trying to lay a proffer here. All right. Any other exhibits?

MS. S. MILLER: Anything else?

MS. M. MILLER: No.

MS. S. MILLER: No. That should be it.

THE COURT: So let's be clear so we're all on the same page, we're all speaking the same language. Are you

saying then that these exhibits will demonstrate to the Court that the defendant, I'm sorry, that Mr. Crowe, in particular, was in the Philippines at relevant times that are pertinent to Count 99?

MS. S. MILLER: Yes, Your Honor.

THE COURT: As it deals with wire fraud? As it deals -- is that what you're saying? Yes?

MS. S. MILLER: Conspiracy to commit wire fraud, yes.

THE COURT: Conspiracy to commit wire fraud and specifically as it deals with -- that's Count 99. But also as it deals with Counts 100 to 104, which focus in on the execution of the fraud? Is that what you're saying?

MS. S. MILLER: It's the same -- yes, the wire fraud went between the same bank account. So it's relevant in that, it's not those specific transactions because as we said, Your Honor, earlier, we didn't get the Philippine bank records until very recently.

THE COURT: So the answer is no, it has nothing to do with 100 to 104, because 100 to 104 is very specific.

MS. S. MILLER: Sure.

THE COURT: So is it relevant to 100 to 104 or is it not relevant?

MS. S. MILLER: It is less relevant than it is to 99.

THE COURT: No, forget that. If you're a prosecutor -- you are the prosecutor, are you going to prove that -- what are you trying to prove then as it relates to this count? Are you going to -- are you going to introduce evidence that this proffer will prove that he committed wire fraud, the execution of wire fraud is 100 to 104 here?

MS. S. MILLER: No, Your Honor.

THE COURT: Okay, so then it's no.

MS. S. MILLER: Okay.

THE COURT: No, I mean it's no. Right?

MS. S. MILLER: Well, it's involving the same bank account, some of the same bank accounts. The specific wire fraud transactions involve the same U.S. bank accounts.

THE COURT: Okay, okay. That may be so, but Ms. Miller. Samantha Miller.

MS. S. MILLER: Yes.

THE COURT: All we care about the pros -- the defense is arguing against specific counts that you are saying is relevant. So it's either relevant to 100 to 104 in terms of your burden of proof and the answer, I think you're saying, is not relevant to the execution of wire fraud on these counts, the 2015 date. It's not relevant to any of that.

MS. S. MILLER: Okay, Your Honor, I will concede that.

THE COURT: You will concede that, right?

MS. S. MILLER: Yes.

THE COURT: I'm not trying to make you tell me, I'm not trying to make you answer the way I think to me seems the certain way. I want to make sure that I understand your theory how you're proving your case. So is it or is it not relevant to your prosecution beyond a reasonable doubt of Counts 100 to 104?

MS. S. MILLER: It is not relevant, Your Honor.

THE COURT: Okay. So it's out. Let's not even talk about that. All right. So that's -- overruled on that objection, Mr. Martin. Because you thought -- you were talking about 100 to 104. Okay. All right. Anything else? Are these all the exhibits?

MS. S. MILLER: Yes, Your Honor. For count -- relevant to Count 99, conspiracy to commit wire fraud.

THE COURT: And your focus is just Count 99?

MS. S. MILLER: Yes, Your Honor.

THE COURT: All right. Thank you. Now defense? Have you looked at all this? You want to look at it? Because all I looked at -- I have looked --

MR. MARTIN: I just looked at the... excuse me, Your Honor, what we were given before we went to lunch.

THE COURT: Yes.

MR. MARTIN: That's the only thing. The other exhibits, I have not looked at.

THE COURT:  Okay.  Excuse me.  2898-14, the Bank

of Hawaii?

MR. MARTIN:  That's the one I looked at.

THE COURT:  Okay, I have looked at it, too, but I

have not looked at everything else, yet, because she's just

announced it.

MR. MARTIN:  Right.

THE COURT:  Okay.  So you want to look at it?

MR. MARTIN:  I would appreciate the opportunity.

THE COURT:  Why don't we take, like, take about

15 minutes to look at it.  I'll pull mine up and then we'll go

to that and look at it.  You have any questions on her proffer

so that we all are on the same wavelength?

MR. MARTIN:  The only thing I was saying, Your

Honor, related to Counts 100 through 104 was that -- my point

was that the conspiracy count relates to those counts and the

date therefore that makes this relevant is the 2015 area,

therefore, Mr. Crowe's affidavit in 2018 is three years after

the alleged conspiracy to commit wire fraud that is supported

by Counts 100 through 104.

THE COURT:  No, you're right on that.  I agree

with you on that.  I'm just -- so it is -- but it's irrelevant

to -- you're right, I mean I agree with you on that.  So I

shouldn't have said -- anyway, your objection should be

sustained on that.  That's what I meant to say.  It is

sustained on that. But she's saying up to the present. That's what she's saying. That's their theory now. Is that right?

MS. S. MILLER: Yes. And that's what's stated in Count 99.

MR. MARTIN: And I have a problem with up to the present, Your Honor, in that, you know, we're getting to a point where we're starting to amend this indictment.

MS. S. MILLER: None of the documents I just cited, Your Honor, go past the indictment date.

THE COURT: Hold on. Hold on. I think I made a ruling that if -- if -- if the charge -- if the conspiracy is inextricably intertwined, if the charge is inextricably intertwined with what they're trying to prove with regard to up to present, then that is allowed under conspiracy law. Wouldn't you agree with that?

MR. MARTIN: I saw the ruling, Your Honor. I'm just saying, we're going beyond that. We have received in excess of a hundred new exhibits and we get 'em every day. I'm sure if we haven't got 'em yet, we're going to get new exhibits again today. But every day we get new exhibits. This -- this -- I do know this, this is 2939, pages 81, excuse me, 82 and 83, that's a new exhibit. We just --

MS. S. MILLER: No, it's not.

THE COURT: Wait. Wait. Wait. One person at a

time. Okay, let him make his objection, then you guys can come back. Go.

MR. MARTIN: Let me back up, Your Honor. It is not a new exhibit. It is a summary chart we haven't agreed to.

THE COURT: All right. Let's...see that, can I just say something? That's the danger, Counsels, when you're a prosecutor and you want to extend a conspiracy beyond what's contained in the indictment. We're going to get these delays and listen, listen to my experience. I'm telling you now. Whether you take it or not, that's up to you and whether I change my ruling on the up to present, that's another issue. But I am concerned -- I don't -- I don't necessarily agree that you're amending the indictment, but I do think you're complicating your prosecution and the defense.

I think that that is -- you know what, when you go in with a clean indictment and you're saying these are the dates, these are the charges, this is wire fraud, these are the -- this is the execution of the wire fraud, blah-blah-blah, and we know specifically what dates, which wire transfer, that's easy.

But when we start coming in to, okay, the conspiracy is continuing even up to this moment. Okay. Well, put aside that up to this moment, because I have a bar date, which I said was, I should know this by heart, is January 8,

2021. January 2021. And that -- you know, it's complicated by the fact that this is the third indictment in this case against these defendants, No. 1.

And No. 2, it seems like you're building evidence when you may really just have a good case -- sufficient case with which you have in the indictment. But I mean, I'm not trying to tell you guys how to run your prosecution, but I'm just warning you that these issues keep percolating. Whether you take that for what it's worth and... yeah, I mean I think Mr. Martin makes good points. You may not like to hear that, but he's a defense Counsel. He's got to represent his client to the best of his ability and I understand the prosecution can be aggressive and wanting, in the best interest of the United States of America, to nail whoever they want to nail on the charges.

But oftentimes, sometimes it's better to stay within the confines of what was presented to the grand jury because -- because some of the stuff was not presented to the grand jury. The ongoing conspiracy beyond -- I mean well, it may not have been presented to the grand jury because you unveiled it after that. Correct? Is that a fair statement?

MS. S. MILLER: Yes. Although all these documents I just told Your Honor about focus on the timeframe of sort of middle of 2018 to middle of 2019, which is well before the second superseding indictment in January of 2021.

THE COURT: But the point is, this is the third indictment.

MS. S. MILLER: Right.

THE COURT: Three indictments, the defendants have gone through three indictments. That's a lot.

MS. S. MILLER: Well, the interesting thing is, these things that we're talking about right now happened within the three or four months following the first indictment. That's what makes them highly relevant.

THE COURT: Okay. And so but, but, but -- okay, so -- so that's not -- that's -- that's a good point. But my point is, we're going through it and you're saying that this evidence has come through, you're just coming through this, these guys are just receiving it. But they're really focusing on what's contained within the indictment. Do you understand? They're looking at specific dates. 2015, execution of wire fraud, that's what they're looking at. You're saying that hey, you know what, the conspiracy continued on up to January 8, 2021, but the indictment says 2015 on Count 99. That's what I'm saying. That's three years later. Or no, let me see, '15, '16, '17, '18, '19, '20; that's six years later. Think about that. Yeah.

MR. MARTIN: Your Honor.

THE COURT: Yes, Mr. Martin? Tell the jury it'll be another 20 minutes.

MR. MARTIN: I have in my hand --

THE COURT: They could take their smoke break. Yes?

MR. MARTIN: I have in my hand what was filed this morning by the government, ECF 1595, filed, excuse me yesterday, June 7, 2022, is the *United States' Fourth Amended Exhibit List*. It is 96 pages long. It has more new exhibits on it. And two of the exhibits that they've asked you to rely on are outside the exhibit list. Their exhibit went to 2,940 and we're now at 2,000 -- excuse me, 3,051, Exhibits 3003, pages 32 and 36 -- through 36, and Exhibit 3020 are both beyond the Court's order for them to turn over exhibits to us and it continues to happen every day. And this is -- I mean...

THE COURT: Okay, you know what?

MR. MARTIN: We're not getting notice of what we're defending against when they drop documents, and big documents, on us every day.

THE COURT: Good point, if what you're saying is true, that's a good point. That's a good point.

MR. MARTIN: Well, here's what I got yesterday.

MS. MCCONWELL: Hansen joins.

THE COURT: Uh-huh. You tell them they could take --

MR. MARTIN: These are Guzzetti exhibits that we

01:11PM 01:11PM 01:11PM 01:11PM 01:11PM 01:11PM 01:11PM 01:11PM 01:11PM 01:11PM 01:11PM 01:12PM 01:12PM 01:12PM 01:12PM 01:12PM 01:12PM 01:12PM 01:12PM 01:12PM 01:12PM 01:12PM 01:12PM 01:12PM 01:12PM

got couple days ago. I mean, and I get something like this every night, Judge.

MS. S. MILLER: May I respond?

THE COURT: Yeah, Hansen joins?

MS. MCCONWELL: Yeah, Hansen joins.

THE COURT: What's that?

MS. MCCONWELL: These are some of the documents that they have given us that are new that were not on the prior exhibits.

THE COURT: So how much inches of documents is that?

MS. MCCONWELL: Well, I would say at least -- I would say when I put the rest of these in, it's at least six, maybe seven.

MR. MARTIN: Doesn't go to the space station.

MS. MCCONWELL: Doesn't go to the space station.

THE COURT: Obviously. Obviously it's not terabytes, Mr. Martin. (Laughing.) I don't even know what terabytes is. All right. Yeah. Is that true? Wait. Wait. Let me ask, before you respond.

MS. S. MILLER: Sure.

THE COURT: Is it true that the prosecution is dropping exhibits to the defense Counsels daily or almost daily new exhibits?

MS. S. MILLER: I don't think it's daily. I

would say we've given them a small number compared to the entire exhibit list of new exhibits. But Your Honor, unfortunately --

THE COURT: No, no, no, strike that. Let's go to another question.

MS. S. MILLER: No, it's not daily.

THE COURT: Okay, forget the daily. Since this trial started 20 -- how many days ago, Carmen? Trial dates, right? Since the trial started 27 trial days ago, has the prosecution been dropping Exhibits to the defense, new exhibit -- a new exhibit list containing new exhibits?

MS. S. MILLER: Yes.

THE COURT: And how many of those trial dates have you been doing that, would you say? Honestly? Approximately?

MS. S. MILLER: Maybe ten times?

THE COURT: That's a lot. Okay. So was it one page?

MS. S. MILLER: No.

THE COURT: On the average, how many pages?

MS. S. MILLER: Some were one page, some were longer.

THE COURT: Like how many much equals longer?

MS. S. MILLER: You know, I don't think there are any over a hundred pages.

01:13PM 01:13PM 01:13PM 01:13PM 01:13PM 01:13PM 01:13PM 01:13PM 01:13PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM

THE COURT: A hundred pages? I'll tell you this, if I was the defense Counsel, I would say that's not fair. In the middle of trial, in the middle of -- not in the middle of trial, we are now at end of the trial with big -- big witnesses testifying, experts and so forth. And these guys are getting exhibits dropped on them 10 out of 27 days? Some of them could be as high as a hundred pages? That's not good. 01:14PM

MS. M. MILLER: Your Honor, to be fair. 01:15PM

MS. S. MILLER: Let me respond, please.

THE COURT: Yeah. Ms. Marie Miller.

MS. M. MILLER: Yes?

THE COURT: She could do it.

MS. S. MILLER: Maybe.

THE COURT: I know -- I know that you are the lead Counsel but -- let your co-Counsels fly. Go.

MS. S. MILLER: My response, Your Honor, is that I have been a part of this because I'm on the team of the folks who are sitting here in Guam, that the second we heard when we came back from our six-week hiatus -- so before that, remember we initially had --

THE COURT: Just answer the question.

MS. S. MILLER: So we started hearing a completely -- two different defenses that we never heard before. One was, they're going to blame it all on Crowe because he got severed.

The second was that Mr. Walker stepped away from the business. So we have been scrambling to put -- that's not -- that was not our focus up until now. But because they raised that the second we got back here, we've been scrambling to put together documents specifically to refute that because we weren't focused on that before.

THE COURT: So you're saying all the documents out of the 10 to 27 days, those documents are there to be refutation of what you believe is the defense Counsel's defense?

MS. S. MILLER: 100%.

THE COURT: Well, I don't think it's 100% because you are saying in this particular matter right now as we speak, these exhibits that you've just dropped to these defense Counsels and to the Court, that this is part of the ongoing conspiracy, that's what you're saying.

MS. S. MILLER: Well, right and that it continues till today.

THE COURT: Right. So that is part of the indictment.

MS. S. MILLER: Right, but this shows -- I mean these documents all show that Crowe and Walker together were heavily involved, holding hands, marching to the Philippines and doing -- moving their operations there. So we're showing two things; that Crowe wasn't the only man at the hour to

defeat that defense, and two, that Mr. Walker also was heavily involved after 2011. That was the year they cited. So these are in 2018 showing Mr. Crowe and Mr. Walker --

THE COURT: Wait, wait, wait. Okay, but first of all, Crowe is not on trial. But --

MS. S. MILLER: But they're blaming him. That's their defense.

THE COURT: Is it?

MS. S. MILLER: Yes.

THE COURT: I think their defense is a lot of things.

MS. S. MILLER: Well, that's one of them.

THE COURT: I think their defense is a lot of things. That you may think that. I don't know what they're going to argue, but you're using this, though, to show -- let's focus, as an example, demonstrative exhibit that this particular exhibits that you have just given me and the defense Counsel, you're saying that this is part of your burden of proof for the conspiracy? That's what you've just told us.

MS. S. MILLER: Yes.

THE COURT: Not for refutation, but for really as a proof of conspiracy, your burden of proof.

MS. S. MILLER: Well, that's at the same time.

THE COURT: No, but that's not what you said when

you made your proffer. Your proffer was, this is part of our proof for Count 99. Now, if that's true -- 01:17PM

MS. S. MILLER: To show their relationship, yes.

THE COURT: No, you don't get it. You're not listening to me. I don't know. Some attorneys just don't listen to the judge.

My point is, Ms. Miller, what I'm telling you is that if this is part of your Count 99 burden of proof, then this should have been given to them way before today. That's my point. If it's part of a refutation only, that Walker was not around and so forth, that's a little different story.

Ut the fact is, if the evidence truly is, and you guys really better think about this, if the evidence is truly is that out of the 27 trial days, that close to half of those days these defense Counsels, these defendants, have been receiving new exhibits for purposes of your conspiracy theory under the indictment, that is a no-no. And I could exclude all of that right now and say that you can't even prove anything up to January 8, 20 -- 2021. So that's concerning.

MS. S. MILLER: I say this with the most respect for Your Honor, but I don't think you can prove a count without disproving a defense at the same time. So it's our burden of proof, but it's also our burden to disprove their theory.

THE COURT: You can prove. But that's okay. But

the problem is you can't -- you can't come into Court -- that could be on rebuttal. Save it for rebuttal. But you're trying to do this in your case in chief and you're trying to put it under the guise of proving it as part of your burden of proof for your case in chief. That's what's happening.

There is one thing to say a burden of proof and there is another thing to say I'm going to rebut the defense. Because if it was a rebuttal of a defense, you don't even have to give them, you do not have to give the defense Counsel notice.

MS. S. MILLER: Well, that has been our -- what we said to Your Honor this entire time when we brought in new documents is that we're rebutting the defense that they've raised through cross-examination.

THE COURT: Yeah, but that's not what you're doing with this. I'm talking about case in point. This particular proffer is for your case in chief. You've just argued that. "Judge, I need this evidence for Count 99 because I have to prove it beyond a reasonable doubt." Did you not say that?

MS. S. MILLER: Right. But my opinion, Your Honor, is that proving it beyond a reasonable doubt is also disproving what they're trying to do otherwise. So it does both things; it shows the relationship between these defendants and it disproves that Crowe is the only one running

the show.

THE COURT: Okay. Good point. But the problem is that your proof, if you're going to prove it beyond a reasonable doubt, these defendants, any defendant that comes into my Court, they have the right to have notice of what they're defending against.

Now if they bring up a defense in the middle of trial and you want to refute that, that's one thing. You can impeach them and so forth. You can even have a rebuttal and rebut that in your case in chief. You could do that.

MS. S. MILLER: And I think that's what we're trying to do.

THE COURT: No, no, you're not. You're trying to integrate it within the burden of proof that you have and you're saying that. Now you're your theory -- your proffer changes.

MS. M. MILLER: Your Honor, I want to remind everyone, we're talking about Exhibit 761, which was on our original exhibit list, which is Mr. Crowe's affidavit. We have had it on our list the entire time.

MS. S. MILLER: And it's been admitted.

MS. M. MILLER: Ms. Miller is not -- she's arguing to Your Honor why that particular affidavit is relevant and using additional evidence to show why that's relevant.

01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:21PM 01:21PM 01:21PM 01:21PM 01:21PM 01:21PM 01:21PM 01:21PM

THE COURT: Listen, you guys -- no, you don't have to tell me that. I know that. But she's dropping out -- she's dropping in Exhibit 3003, 3020, 2939 and those pages to show that this is relevant to her burden of proving Count 99. Why wasn't this provided to the defense a long time ago?

MS. M. MILLER: First of all, 3003 is rebuttal. Secondly, we don't need it to use 761, which was already produced to the defense. We went down this rabbit hole because of arguing in response to the defense why Mr. Crowe's affidavit was in fact a co-conspirator statement. Your Honor had already admitted it as a co-conspirator statement against Hansen.

THE COURT: Okay. That's true. So even if I admitted a co-conspirator statement, the way in which she's presenting this now, is this -- this is a declaration, put aside the co-conspirator, why do you even need this, okay. But put aside, because you guys want to be cumulative. I do think is a cumulative issue, too. But putting that aside, this is your theory.

You guys are putting in a declaration used in a bail hearing in a modification of pretrial release. And you're trying to say that, hey, you know what, Crowe got to go to the Philippines and he was conducting business. And that is part of our burden of proof of Count 99. I mean, I don't know, I'm not going to repeat myself. I already know what I

think.  I know this.  I mean you guys, remember, I'm a former

prosecutor.  I totally understand bail --

MS. M. MILLER:  No, I think --

THE COURT:  -- bail and stuff.

MS. M. MILLER:  I think we should just move on at

this point, Your Honor.  We'll withdraw.

THE COURT:  Can I tell you something?

MS. M. MILLER:  Yes.

THE COURT:  Let me just say something.

MS. M. MILLER:  Yes, Your Honor.

THE COURT:  I think you should regroup here.  And

I say this in all sincerity because we are looking at a case

where -- and we're looking at a very serious case, both for

the United States and for the defense.  You guys are...

everybody, okay, sometimes there is a lot of unnecessary

arguments and proffers and -- that I believe are being made

here.  You guys have less than a hundred -- let's say a

100-count indictment.  We've thrown out some of the stuff, but

not a lot, or removed it.  All right.

So you got -- have this big indictment that you

have filed with the grand jury and the -- I'm sorry, the grand

jury has returned against Mr. Walker only, right now, and

Hansen Helicopters.

It just keeps -- if you keep it simple and just

focus on the indictment , it's so much easier.  But I do

believe and I'm warning you and I may even change my mind on

something with regard to this inextricably intertwined because

it's getting too complicated.  You guys are spinning your

wheels, we're wasting jury time.  These jurors want to be --

these jurors have been very dedicated.  And you know that.

They even said, Judge, we'll stay late and they've stayed late

every night last week or so.  And they're even going to come

in Saturdays.  They've been coming on Saturday.

But you might really need to consider, do you

real need to go down the line of ongoing conspiracy?  I really

think you better regroup.  So I'm going to it to take a

15-minute recess and maybe you should think about it.  I know

that you might think that I'm interfering and I'm trying --

I'm not interfering.  I'm talking about case management.  I'm

just telling you that I believe as your trial judge, that

there is a lot of unnecessary arguing and a lot of expended

time that you don't need.

Assuming you believe you have a strong case,

which I think you do have a strong case, but I also think that

there is a strong defense, too.  You know you've got very good

defense lawyers here, got good prosecution here.  Why are you

making it more complicated than you should.  So maybe you

should regroup.  15 minutes.  I'll see you in 15 minutes.

MS. S. MILLER:  Thank you, Your Honor.

(Recess taken at 1:25 p.m.)

(Back on the record at 1:41 p.m.)

THE COURT: Okay. We're back on the record. All Counsels present, defendants present. Let me just make a comment here. All right. So let me just say, the inextricably intertwined is only an issue if it's -- if it's from the date of the indictment, I just want to make sure I got this because I don't want to mix this up here.

So the date of the second superseding indictment is...where is my second superseding indictment. Okay, January 8, 2021. Okay, so hold on. Second superseding indictment. Give me a second, please. All right. So let me just get this clear. So Count 99 reads from on or about January 2000 and continuing to present, the Court has made a decision dated March 4, 2022, regarding evidence of an ongoing criminal conspiracy and gave a bar date of January 8, 2021.

Okay. And so when we look at count -- let's just focus on Count 99, it's the Count 99 element of date is from on or about January 2000 and then continuing to present would be January 2000 to January 8, 2021.

Mr. Walker*[sic]* points out to the Court that Counts 100 to 104 specifically dealing with the conspiracy to commit wire fraud dates -- is dated September 4, 2015, December 1, 2015, December 17, 2015, September 2, 2016, October 3, 2016, okay. So those are very specific dates.

Now, anything -- and what we were talking about

was anything that occurred between 2000 to January 8th -- and

in this case, as it relates to Mr. Crowe, it would have been

the date that he went to the Philippines and then first date

that he goes is November 17, 2018, the timeframe to January 8,

2021.  That's really the focus.

But -- this is not inextricably intertwined

because inextricably intertwined -- yeah, it is, it is up to

that date.  So from the date of the 2015 date, that's

contained in the indictment to -- and 2016 dates from Count 11

to 104 up to 2021, that timeframe focuses on the inextricably

intertwined time.

And my concern is, is that, really, is just by

listening to every single day or every other day or however

you want to say it, when the defense Counsel comes in and

says, Judge, we just got new exhibits in, we didn't have

notice of it, and I say well do you -- you want to go review

it.  And so you know, they go review it and so forth, but I'm

concerned that in terms of notice, if the defense Counsels are

receiving evidence, and it's true, I already -- I already know

the law about overt acts and so forth, those things -- those

-- and objects of a conspiracy, all of that information, that

evidence can come in to show an ongoing conspiracy.  That -- I

was in agreement with the prosecution on that.  And that's why

I said that I would allow evidence up to a bar date of

January 8, 2021.

 My concern is, now that we're in the trial, and as Mr. Martin points out on behalf of his client, Mr. Walker, on counts -- I'm sorry, 100 through 104, they have notice of all those events that occurred during that timeframe, 2015, 2015, 2015 -- okay, they've got notice of that and so they're able to properly defend.

But if they're getting evidence or exhibits to have to defend outside of those dates, between the 2015, '16 date up to the bar date, and in this case, it's just that little timeframe that I've already talked about as it relates to Crowe, which would be 2018 to 2021, if -- and if they're still receiving evidence, it's really delaying the trial now. And it's really not giving them sufficient notice.

And so for me, as a judge now trying to monitor this case, if they haven't received this evidence but they're receiving it during the course of the trial, we're not playing a fair game here. It's not -- we're not -- it's just not being fair. This is causing a delay.

So I say that to you because I went back and looked at my notes here and I just want to be clear on that and I don't know if you guys -- I mean, how you want to proceed with this.

MS. S. MILLER: Your Honor, we're not planning on using any more exhibits with this witness that were not in the -- we're not in the first, second or third amended exhibit

01:46PM 01:46PM 01:46PM 01:46PM 01:46PM 01:46PM 01:46PM 01:46PM 01:46PM 01:46PM 01:46PM 01:47PM 01:47PM 01:47PM 01:47PM 01:47PM 01:47PM 01:47PM 01:47PM 01:47PM 01:47PM 01:47PM 01:47PM 01:47PM 01:47PM

 list. So none of the new ones.

THE COURT: Did you hear that?

MR. MARTIN: I couldn't hear what she said, Your Honor.

THE COURT: Repeat that.

MS. S. MILLER: Sure. Maybe this isn't close enough to my mouth. We're not planning on using any of the new exhibits that defense Counsel has received since we've been in Guam, round two.

MR. MARTIN: Since -- so the record is straight, that would be anything before Exhibit No. 2940? After 2940.

MS. MCCONWELL: 2955.

MR. MARTIN: 2955?

MS. S. MILLER: Yes.

MS. MCCONWELL: Well, and Your Honor, I would also --

THE COURT: Okay, hold on.

MS. M. MILLER: Wait, one sec. One sec. There is physical evidence that was marked, Your Honor, at trial that was identified on our third amended exhibit list and second amended exhibit list, but hadn't been marked until we were here. So those numbers are going to be later than that. But those exhibits are already in and those exhibits were identified before, so I want to be really clear.

MR. MARTIN: I'm not objecting to anything that's

already in.

MS. S. MILLER: Right, and I should have been careful. Nothing that hasn't already been admitted, we're not going to seek to admit any documents that were not numbered 2955 or lower in terms of government exhibit numbers.

THE COURT: Or higher? Higher.

MS. M. MILLER: Higher.

MS. S. MILLER: That were not below that number or, yes, higher.

MS. MCCONWELL: And, Your Honor, I want to have it be that it's the government's third -- third amended exhibit list, which was the one that we've come into trial with. They had other iterations of it. They removed a number of exhibits and it's also not fair game for those exhibits to be coming back because that's what has been happening, they decide they want to use some exhibit that they'd already removed from their exhibit list, which we didn't think would be on -- was not on the exhibit list. And we want those also to not -- to be excluded. That's not fair game, either.

MS. M. MILLER: So two things, Your Honor.

THE COURT: Hold on. Hold on. Just wait. I just got to understand her objection. So are you saying, okay, so how many -- first of all, how many exhibit lists have been brought in? Remind me.

MS. MCCONWELL: Well, now a fourth one was filed

01:48PM 01:48PM 01:48PM 01:49PM 01:49PM 01:49PM 01:49PM 01:49PM 01:49PM 01:49PM 01:49PM 01:49PM 01:49PM 01:49PM 01:49PM 01:49PM 01:49PM 01:49PM 01:49PM 01:49PM 01:49PM 01:49PM 01:49PM 01:49PM 01:50PM

that we got a copy of it today.

THE COURT: So today you got a fourth amended exhibit list?

MS. MCCONWELL: I got a fourth amended exhibit list.

THE COURT: So they said now they're going to drop the fourth amended exhibit list.

MS. MCCONWELL: Well, the thing with the fourth exhibit list in addition to new exhibits that we haven't seen and they haven't offered yet, I think it also includes some of the ones that they -- above 2955. Some of those are in but --

THE COURT: Let me understand what you have. You have received four amended exhibit lists. The prosecution is saying, with regard to the fourth witness list -- I mean exhibit list, it's out, don't worry about it; correct?

MS. M. MILLER: Right.

THE COURT: That's all I care about.

MS. MCCONWELL: She said for this witness.

THE COURT: Well, for the trial.

MS. M. MILLER: Yes, except for what's come in rebuttal, Your Honor. Now we're not waiving any rebuttal that we've already brought in and we're not waiving any right to bring in additional rebuttal if they keep arguing that Jon Walker retired.

THE COURT: Of course not. Of course you're not

going to waive rebuttal.

MS. M. MILLER: Right. Right. No.

THE COURT: All I care about -- listen. Okay, that I said how many exhibit lists, amended exhibit lists has the prosecution brought in. Four. You said delete No. 4, we won't even consider it.

MS. M. MILLER: Yes.

THE COURT: 1, 2, and 3. Let's just talk about that. Is there a problem with those? And if so, say it now.

MS. MCCONWELL: Yes. And what I've objected to is that -- their Exhibit 2 and 3 are substantially similar. I think they contain the same exhibits, but they dropped off, they took out and removed a number of exhibits off of that list and then they also substituted some other stuff. But I mean, if they're going to stick to the third amended exhibit list, that's fine, but they have been trying to bring in other exhibits that they removed from the third exhibit list that, you know, I didn't -- I don't have copies of because that's the exhibit list that I've been going with.

THE COURT: So would you agree, though, okay, so as it relates to the first, second and third amended exhibit list, you're not objecting to that, that's already -- that's already passed?

MS. MCCONWELL: Yeah. I'm not objecting to the third one. What I'm objecting to is, if they pull things off

of the first list that were removed and not on contained on the third list.

THE COURT: Okay. Well, that's a whole different story. So you want to be able to rely on the third amended exhibit list? That's what you're saying?

MS. MCCONWELL: Correct. Yes, ma'am.

THE COURT: And that's it. And if anything was removed earlier, it's removed. Now, to the extent that they --

MS. MCCONWELL: That's correct.

THE COURT: -- have rebuttal evidence, obviously they can come forward on the rebuttal evidence and at least try to bring it in.

MS. MCCONWELL: Well, the rebuttal -- well, yeah, the rebuttal case and then the only rebuttal that was my understanding that Your Honor was allowing during this trial was related to their concern about Jon Walker after 2011.

THE COURT: Well, it related to the issue of refuting whether he was in retirement or if he was slowing down his involvement. Whatever you want to call it.

MS. MCCONWELL: Right. And that was it.

THE COURT: That was it because a lot of that was because you have witnesses that are off island and you wanted to be efficient, I thought. That was really the whole goal, right?

01:52PM 01:52PM 01:52PM 01:52PM 01:52PM 01:52PM 01:52PM 01:52PM 01:52PM 01:52PM 01:52PM 01:52PM 01:52PM 01:52PM 01:52PM 01:52PM 01:52PM 01:52PM 01:52PM 01:52PM 01:53PM 01:53PM 01:53PM 01:53PM 01:53PM

                    MS. MCCONWELL: That was -- I think so.

THE COURT: Well, at least that was my thought process. All right. So does everybody agree with that then?

MS. S. MILLER: The only caveats to that, Your Honor, about the third amended exhibit list are, one, we reserve the right to use any of the underlying documents for the summary charts that have already been introduced and any that we will -- that were part of our third amended exhibit list and we haven't introduced yet because I think we have two or three more.

THE COURT: Let's just put this way, I'm not going to make any rulings on that. We could get to that. If there is a summary chart that has already been admitted or stipulated by stipulation or by court order, and obviously there is underlying documents that have supported it, both sides have had an opportunity, defense have had an opportunity to object; if they fail to object, I just say okay, it comes in because case law allows all that. Okay. Don't worry about it.

My point is, let's just wait and see what happens. If you try to bring it in, and you say they have notice of it, it was like exactly like what we just said. Okay. So I may let it in. I may not let it in on another basis, irrelevant, 403, okay, whatever. But you can try to bring it in. Any other caveats that you want to propose?

MS. S. MILLER: I think there were just a couple of accidents with the -- between removal of exhibits from one of the early exhibit lists to the third that were with respect to the depositions and I believe Your Honor ruled on those within the transcripts anyway. So if there was one or more of those in the Cann deposition, we would just ask should be allowed to use an exhibit that we accidentally took off the third list.

THE COURT: Okay. So let's cross that bridge when we have to.

MS. S. MILLER: I think you already probably ruled -- I haven't looked at it yet, but you made those rulings.

THE COURT: But if I didn't, let's just cross --

MS. S. MILLER: Okay, yes, Your Honor. Thank you. That's it.

THE COURT: Is that it? Okay, are we all like on the same page now?

MS. S. MILLER: Yes.

THE COURT: Okay. But I will say, though, that prosecution, you are not allowed to drop off new -- let's put it -- well, be careful when you send over new discovery over to defense Counsel. Reason why new discovery is given to prosecutors or defense, depending on who gives it, is usually is because they just found out that information 30 seconds ago

01:54PM 01:54PM 01:54PM 01:54PM 01:54PM 01:54PM 01:54PM 01:54PM 01:54PM 01:54PM 01:54PM 01:54PM 01:54PM 01:54PM 01:54PM 01:54PM 01:54PM 01:54PM 01:54PM 01:54PM 01:55PM 01:55PM 01:55PM 01:55PM 01:55PM

or one minute ago, not five years when they should have given to the other side. This is all about notice. This is about no surprises, this is not a shotgun case. And we could make it orderly.

Okay. Are we all on the same page? These are the rules of engagement, again. Okay. Mr. Martin, you're good?

MR. MARTIN: I'm good, Your Honor.

THE COURT: Ms. McConwell?

MS. MCCONWELL: I believe so, Your Honor.

THE COURT: And Mr. McConwell?

MR. MCCONWELL: Yes, Your Honor.

THE COURT: And Ms. Marie Miller?

MS. M. MILLER: Yes, Your Honor.

THE COURT: Ms. Samantha Miller?

MS. S. MILLER: Yes, Your Honor.

THE COURT: Mr. Leon Guerrero.

MR. LEON GUERRERO: Yes, Your Honor.

THE COURT: Call in the jury. Are they ready?

MS. MCCONWELL: And Mr. Han is, too.

THE COURT: Oh, Mr. Han. You're going to hate me, Mr. Han, please, I'll give you a hug. I'm sorry. It's because you're behind the podium, I can't see you.

MR. HAN: It's okay, Your Honor.

THE COURT: Just hiding away. Sorry, Mr. Han.

That's not intentional, you know.

MR. HAN: I know.

THE COURT: Yeah. Okay. No, but I have forgotten you other times so I don't mean to because you're like tucked away hidden over there.

MS. S. MILLER: Probably had a good nap in there. Huh?

THE COURT: Did he?

MS. S. MILLER: We won't ask him.

THE COURT: Yeah don't. He might be embarrassed.

(Witness returned to witness stand.)

THE COURT: How much longer do you have with this witness, Counsel?

MS. S. MILLER: Maybe 45 minutes hopefully. Maybe less. He speaks fast. Just like me.

THE COURT: He's very --

MS. S. MILLER: Animated.

THE COURT: Radio voice. You could probably be hired by Disney and so forth.

THE WITNESS: You're too kind.

THE COURT: They actually have people that are -- you know paid to be a voiceover on, like, cartoons. You know that.

THE WITNESS: My brother is a much better voice actor than I am.

THE COURT: Oh, is he a voice actor?

THE WITNESS: He was trying for that.

THE COURT: Did he make it?

THE WITNESS: No, he's still working on it.

THE COURT: He's got to work on his voice?

THE WITNESS: Yes.

MS. S. MILLER: Who did you say that was?

THE WITNESS: My brother.

MS. S. MILLER: Oh, really?

(Pause.)

(Jury in at 1:58 p.m.)

THE COURT: Please be seated, ladies and gentlemen. Thank you. Apologize for that long delay but we did have to take care of a few legal matters and I think we're done with that. So go ahead, you may proceed.

MS. S. MILLER: Thank you, Your Honor.

BY MS. S. MILLER: (CONTINUING)

Q. Good afternoon, Special Agent Khamvongsa.

A. Good afternoon.

MS. S. MILLER: Good afternoon, ladies and gentlemen of the jury.

THE JURY: Good afternoon.

BY MS. S. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, I'd like to talk to you a little specifically about the types of seized evidence you

reviewed for your analysis.

Could you tell the juries the types of seized evidence you reviewed, please?

A. Yes. I reviewed the e-mails, I reviewed the pilot mechanic list, which was seized from the search warrant evidence. I reviewed contracts. That's most of it.

Q. When you say "contracts," do you mean what we already been calling throughout this trial as "leases"?

A. Yes, lease agreements.

Q. I'd like to show you what's been previously marked and admitted into evidence as Exhibit 1248, please.

Special Agent Khamvongsa, do you recognize this document?

A. Yes.

Q. Did you use this document, which is a summary chart in your analysis in this case?

A. Yes.

Q. How did you use it?

A. I used it to -- well, going back, I looked at the bank records, to -- from the bank records I saw payments being made by the tuna boat companies. From there, I identified the helicopters assigned to those tuna boats as well as the pilot and mechanics assigned to the helicopters. So I used this to verify whether or not those mechanics were FAA certified.

Q. Thank you. You went a little quick there so can we

take a step back. Can you go piece by piece, so what you went through. So first, you did what?

A. First, I --

Q. Bank records?

A. Right. Correct. First, I reviewed the bank records.

Q. And what were you looking for in the bank records?

A. The bank records show wire transfers from the tuna boat companies for leasing the helicopters.

Q. Then what did you do?

A. There, I identified the -- from the helicopters, I looked at the Hansen Helicopters records to identify who the pilot and mechanics were assigned to the specific helicopter.

Q. How did you connect the tuna boat company information and the bank records to the helicopters?

A. There is an aircraft vessel assignment in which I reviewed that helped identify which vessels the helicopters were assigned to.

Q. And then could you tell what the next step was again, what was the next step in your process?

A. Once I identified which helicopters were assigned to a particular vessel or tuna boat, I then identified whether -- who the pilot and mechanic were for that helicopter.

Q. And what documents did you use to do that analysis?

A. I used a -- I used the pilot mechanic listing that was seized from the search warrant, or that was provided from

 the FBI as a result of the search warrant.

Q. And how did you use that -- I'm sorry, I'm really loud, how did you use that information in combination with, if you did, this search warrant that's in front of the jury?

A. I used that chart to identify whether or not the mechanic was FAA certified.

Q. Now, the pilot and mechanic listing that you mentioned, did you create a summary chart of that information?

A. Yes.

Q. I'd like to show you what's been previously identified but not yet admitted as Government's Exhibit 1254. Do you recognize this document?

A. Yes.

Q. What is it?

A. It is a summary of the search warrant evidence that I reviewed. I reviewed over 30 files from the search warrant and this is a summary of that information, as well as information provided as a result of a grand jury subpoena.

Q. Thank you.

MS. S. MILLER: Your Honor, at this time I move Exhibit 1254 into evidence.

THE COURT: Yes, Counsel?

MR. MARTIN: Your Honor, I need a minute to find the document. My list does not have it on it.

THE COURT: All right. Go ahead. Let's see if

you -- try to see if you have it. Can you make this bigger?

MS. S. MILLER: Sure. Can you zoom in on a portion. You might have to do it left side, right side.

THE COURT: Yeah, that's fine. I just need to read it.

(Pause.)

THE COURT: Yes, yes, Mr. -- continue, go ahead.

MR. MARTIN: Your Honor, I haven't found mine. It's obviously in another folder somewhere that was produced at a different time but I'm -- I object to the chart because the chart has dates on it from what I could tell that are outside the dates on the indictment.

THE COURT: Okay. Let's start with the -- okay, which block there? Tell me, they've highlighted block one, two, three, four, five, which one -- is there anything in there? Or no? Or can you just show me where, tell me which block it is.

MR. MARTIN: If I might just have a moment, Your Honor?

THE COURT: Uh-huh.

MS. MCCONWELL: Your Honor, this is --

THE COURT: Go ahead. Yes.

MS. MCCONWELL: -- is not relevant to the Count 99 or 100 through 110, which this witness is testifying about.

THE COURT: Okay. Which count is this relevant to?

MS. S. MILLER: It is relevant to Mr. Khamvongsa's entire analysis with respect to Counts 99 through 110.

THE COURT: Okay, Counts 99 through 110. All right. And you're saying it's not relevant. We'll get back to that. We'll get back to the relevancy but that's what she's saying it's relevant to.

MS. S. MILLER: Your Honor, just so you're aware, this was part of the hearing we had on summary charts. This was one of the charts we discussed back in March.

THE COURT: Was this already admitted then?

MS. S. MILLER: It wasn't admitted because he was the one --

MS. MCCONWELL: Your Honor, we did not stipulate to admission of this chart.

THE COURT: That's what I'm asking. Did they stipulate to this?

MS. S. MILLER: Yes, Your Honor.

THE COURT: To the admission of this chart?

MS. S. MILLER: Not to the admission, I'm sorry. To the authenticity of the underlying document. This was one of the ones we discussed at that hearing.

THE COURT: So this was stipulated to, as far as

 authenticity?

MS. S. MILLER: Right.

THE COURT: No need to get a records custodian.

MS. S. MILLER: Right.

THE COURT: And just to be clear, Counsel received the underlying document supporting this summary chart?

MS. S. MILLER: Yes, and the G numbers on the chart itself.

MS. MCCONWELL: Yes, we didn't receive specifically the exhibits, but I did review the G number, they did -- on the chart has G numbers and I did find most of the G numbers contained within their exhibit list.

THE COURT: So I mean, but you're not disputing that defense Counsel received the underlying documents supporting this chart?

MS. MCCONWELL: Well, I looked -- searched for them myself out of their exhibits, yes.

THE COURT: So you are disputing them or you're not disputing?

MS. MCCONWELL: Well, if you're asking me, Your Honor, if they gave me the chart -- well --

THE COURT: No, my question is, okay, obviously you've seen the chart, right?

MS. MCCONWELL: Right. And I looked at the Gs on

there.

THE COURT: Okay, so my question is, have you received all of the underlying documents supporting the summary chart? That's all I want to know.

MS. MCCONWELL: I believe so. I don't have my notes but I believe --

THE COURT: So there is no objection based on that.

MS. MCCONWELL: No.

MR. MARTIN: Your Honor.

THE COURT: If there was, there would be an issue. Go ahead. Yes?

MR. MARTIN: If we can to go to -- I think it's the second page referring, for example, to Count 53.

THE COURT: Okay. Let's go to page 2.

MS. MCCONWELL: The third page.

THE COURT: 1254, page 2.

MS. MCCONWELL: Three.

THE COURT: 1254, page 3? And then can you make that bigger. What count did you say? Count what?

MR. MARTIN: 53.

THE COURT: Okay, there is no 53. You got to go down more. There it is, there, there. Okay. Count 53. Okay. Let me look at the date. Which date are you looking at?

MR. MARTIN: I'm looking at -- let me see. It will be the fourth column.

THE COURT: Okay. 1, 2, 3, 4. Okay. Okay, I see it.

MR. MARTIN: That's an accurate date. The fifth column is not. And the sixth and seventh --

THE COURT: Okay. Wait, 1, 2, 3, 4, okay 5, 6 and 7 are not accurate? Is that --

MR. MARTIN: They're not alleged in the indictment, Your Honor.

THE COURT: Okay. Okay. I can't see what the -- can I go up to the headings, please? Can you move, heading. 5, 6, 7 heading, okay. Okay. I guess I don't understand -- can you go back up to the heading, please. Can you keep it -- there. Are you saying those heading dates are not contained in the indictment?

MR. MARTIN: I'm saying, Your Honor, the fourth -- there is what's alleged in the indictment. Then I'm saying that what's alleged in the other dates are outside, for example that one.

THE COURT: Okay. Let me just go to Count 55.

MR. MARTIN: 53, Your Honor.

THE COURT: Oh, 53 excuse me, so Count 53. Oh, I see what you're saying. So Count 53 only has one date, right?

MR. MARTIN: Correct, Your Honor.

THE COURT: Okay. Oh, I see. Well, it one only has one month and one year.

MR. MARTIN: Correct, Your Honor, and there are dates way outside that.

MS. S. MILLER: Your Honor, if I may respond?

THE COURT: Yeah.

MS. S. MILLER: So this summary chart is summarizing the facts within these documents that are defendants documents.

THE COURT: Okay. So let's back up. So essentially, what you're saying is that there are underlying documents that support these other dates? That's what you're saying?

MS. S. MILLER: Right. The dates are just taken from the document themselves.

THE COURT: No, I got it. All I want to know is, because one of the documents that's underlying -- an underlying document that supports this summary chart is the indictment. But there is also other documents. That's what you're saying?

MS. S. MILLER: I wasn't referencing the indictment. I was just saying the dates that read blue columns which I think is what he's taking issue with, are just summarizing what the dates are within the underlying document.

THE COURT: Right. So my -- okay. But my

question is, okay, but it's clear that at least one of those month and year is contained within the indictment. Is contained in the indictment, so the indictment is an underlying document, right? Ms. Samantha Miller.

MS. S. MILLER: Not for the summary chart. Well, I guess yes, it is. It's referencing the counts, you're right, yes.

THE COURT: I think it is. But my only question was, so there are other document -- you're not relying -- another underlying document that supports this summary chart which has these other dates outside of the indictment date are other documents?

MS. S. MILLER: Yes. And they're all referenced in the last column on the far right, all the documents that are --

THE COURT: That's only question I have. Okay, Mr. Martin? Yes?

MR. MARTIN: Well, my objection is, Your Honor, the summary chart presents evidence that's not even included in the indictment, and I object to that.

THE COURT: Okay, the objection will be overruled because the summary chart is based on underlying documents, it's not just one document, according to the prosecutor. They have more than one document, including -- can you go up to the heading please, including the documents contained in the last

 -- in the last chart in the last column, government exhibit number. Is that a fair statement?

MS. S. MILLER: Yes.

THE COURT: All right. Mr. Martin, so based on that -- go ahead. So based on that objection, the Court will overrule the objection because apparently you guys have received all the underlying documents that support the summary chart. If that's the case, then the Court will admit this. Yes.

MS. MCCONWELL: Your Honor, it's not relevant to Count 99.

THE COURT: Oh, okay, so -- now there is a different argument. So it's not relevant to Count 99?

MS. MCCONWELL: Right. If you look at what's charged and what they're alleged to have done, this isn't relevant.

THE COURT: Well, she said -- he's speaking what's relevant as to Count 99 through 110. Oh, I see, you're saying Count 53 is not relevant but there is --

MS. MCCONWELL: No, I'm saying this chart she wants to admit is not relevant to any of the Counts 99 and above.

THE COURT: Oh, so there is no counts noted here from 99 to 110? Is that what you're saying?

MR. MARTIN: Yes, Your Honor.

          THE COURT: Oh okay, I get that now. All right, so therefore? Go ahead.

MS. S. MILLER: So Your Honor, he just testified what -- the first step in his analysis was using the bank records to tie the tuna boat companies to the uncertificated mechanics and he found that information in these types of documents. So he's summarizing the types of documents he reviewed to get to the Counts 99 through 110.

THE COURT: I'm sorry. So you're saying that this summary chart will -- I'm sorry, this summary chart relates to Counts 99 to 110, even though it's not noted as a count but the information contained in the underlying documents --

MS. S. MILLER: He relied upon to get to those counts.

THE COURT: To -- for his investigation of 99 through 110?

MS. S. MILLER: Yes.

THE COURT: Okay, that's her proffer.

MS. MCCONWELL: Well, it's not -- it isn't relevant, Your Honor. And if you look at what he -- all his testimony and what he's told us he was going to be doing was about -- the wire fraud and the money laundering charges, that is what his testimony was limited to in the second superseding indictment, which actually does not include 99, it starts off

with Counts 100 through 104 and Count 105 to 110 which provide

very specific dates and transactions that he's complaining

about and that's what's contained in his summary of what he's

going to talk about as the internal revenue officer.

THE COURT:  Okay.  Why don't I do this, let's see

if she can lay the foundation.  If she can lay the foundation,

then the exhibit will come in.  I mean, well the exhibit will

be deemed relevant.  So let's just let her lay the foundation.

Because I think you guys objected immediately when the exhibit

thing came up.

MS. MCCONWELL:  Okay.  All right.  We expect him

to be limited to what they provided in their trial brief,

though.

THE COURT:  You don't think -- you don't -- you

think he's going beyond that in terms of his proffer?

MS. MCCONWELL:  Yes, I do because --

MR. MARTIN:  He already has, Your Honor.  Their

offer didn't include Count 99.

THE COURT:  Did it not include Count 99?  Did it

or did it not?

MS. S. MILLER:  I think we stated generally the

wire fraud and money laundering counts which include 99

because it's about conspiracy to commit wire fraud.

THE COURT:  But the question is, did it include

Count 99.  Let's not do generally.  I'm a judge.  I know the

words. Is it or not? Is it or is it not 99?

MS. MCCONWELL: If you look at Document ECF 1311 on page 51 of 68, it has what his summary testimony and it says "Khamvongsa will testify as to wire fraud and money laundering charges reflected in the second superseding indictment."

MS. S. MILLER: Exactly. It was general.

THE COURT: Okay, hold on. So Count 99 is wire fraud. Conspiracy to commit wire fraud.

MS. MCCONWELL: It doesn't say conspiracy. It says the wire fraud and the money laundering. And those are Counts 100 through 104, is wire fraud and 105 through 110 is money laundering.

THE COURT: I'm sorry, so what does his notice say to you all?

MS. MCCONWELL: He's going to testify about wire fraud and money laundering.

THE COURT: Okay. Hold on. Hold on. Wire fraud and money laundering. So the charges -- the charges for wire fraud is count --

MS. MCCONWELL: 100 to 104.

THE COURT: 100 to 104. And money laundering is 105 to 110, right?

MS. MCCONWELL: Yes.

THE COURT: Do we agree with that?

MS. S. MILLER: No, Your Honor, we generally state --

THE COURT: No. Wait.

MS. S. MILLER: I thought you were asking me.

THE COURT: No, I'll come to you in a minute. Let me just understand her objection. All right. So the notice that you have is this witness will only testify as to Count 100 to 104 and 105 to 110.

MS. MCCONWELL: Yes.

THE COURT: Is that a fair -- is that what you're saying?

MS. MCCONWELL: Yes.

THE COURT: And therefore, you had no notice that he was also going to speak about Counts 99 through, well --

MS. MCCONWELL: 99.

THE COURT: Well, she said 99 through 110. So really, you had no notice that he was going to speak on Count 99.

MS. MCCONWELL: Right.

THE COURT: But as far as 104 to 110, you do have notice. 100 to 110 you have notice. Because she just said that he was going to speak of 99 through 110, right? Did you say that?

MS. S. MILLER: Yes.

THE COURT: He was --

MS. S. MILLER: Wire fraud and money laundering charges as a whole.

THE COURT: Okay. Okay. Wait. Wait. Okay. Her proffer is, is that this witness is going to speak to Counts 99 through 110. The document that you guys have just submitted says that he's only going to speak to 100 to 104, 105 to 110. So you're really just talking about Count 99?

MR. MARTIN: Well, the summary chart, Your Honor, deals with Counts 14 through 95.

THE COURT: Well, okay, but -- does it?

MR. MARTIN: Yes.

MS. MCCONWELL: Yes.

MS. S. MILLER: So I think there are two different objections going on here. I don't know which one the Court would like me --

THE COURT: Hold on. Hold on. Hold on. Let me figure out the objection.

MS. S. MILLER: One was to our disclosure about this witness --

THE COURT: You don't have to tell me that. Hold on. I just got to figure out. You guys want me to analyze this.

All right. So the first objection is, Count 99 should not be discussed, number one. And then No. 2, your second objection is that this exhibit, this summary chart, it

only focuses on all other counts except for the counts that he said he was going to speak of, which is 100 to 110 and the proffer, is that -- those are the two objections?

MR. MARTIN: It's 13 through 95, Your Honor. Counts 13 through 95 -- 14.

THE COURT: What's contained in the summary chart?

MR. MARTIN: Yes, Your Honor.

MS. MCCONWELL: Yes.

THE COURT: 13 through 95.

MS. MCCONWELL: Well, 14 through 95.

THE COURT: Okay. What is it?

MS. MCCONWELL: 14 through 95.

THE COURT: Okay. 14. So this exhibit is 14 -- only supposed to be focusing on 14 through 95. All right. Go ahead. Now, you can -- now, I think we know the three -- two objections. Go ahead.

MS. S. MILLER: Yes. So in response to the first objection, what our trial brief says about Agent Khamvongsa is, he will testify, quote, "as to the wire fraud and money laundering charges reflected in the second superseding indictment." It doesn't specifically mention any count numbers but conspiracy to commit wire fraud is a wire fraud charge. We didn't --

THE COURT: I suppose they're getting very

particular because there is a conspiracy to commit wire fraud charge and there is a straight wire fraud charge and there is a straight money laundering charge. Okay, got it. Next. Your response to the next objection.

MS. S. MILLER: Yes, the next response is, as Mr. -- or Agent Khamvongsa just testified before we took this break, he reviewed these specific documents, all of them, that are summarized in the summary chart in order to trace the funds from the bank accounts to the uncertificated mechanics to identify the transactions that are in 104 through 110.

THE COURT: All right. Anything further, Counsels? Any further objections? I can rule.

MR. MARTIN: I've laid ours out, Your Honor.

MS. MCCONWELL: Well...

THE COURT: Yes, Ms. McConwell?

MS. MCCONWELL: In their Counts 1 -- 100 through 104 and 105 through 110, there are no financial transactions as described by Ms. Miller.

THE COURT: I'm sorry, can you repeat that? What was that?

MS. MCCONWELL: Ms. Miller indicated --

THE COURT: Summary chart.

MS. MCCONWELL: Yes. Ms. Miller indicated that the summary chart supports 100 through 104 and 105 through 110 because there were supposedly financial transactions that he

identified using this -- this -- her summary chart that she's attempting to get into evidence, but there is nothing about any of the information from these Counts 14 through 95 which are contained in 100 through 104 or 105 through 110. Those are very specific financial transactions that in no way relate to the chart that's 1254.

THE COURT: Okay. Hold on one second. So Counts 14 through 93 are employing a pilot without a pilot certificate. And counts -- okay, just a minute. I'm just looking at the indictment. Correct? 14 to 93 is employing a pilot without a pilot certificate and 94 to 95 is registration -- no, no, is that right?

MS. S. MILLER: Yes.

THE COURT: Okay, I'm sorry. One. Two. Okay. 14 to 93 is employing a mechanic without a mechanic's certificate. And Counts 94 to 95 is employing a pilot without a pilot certificate.

So this is dealing with mechanic and pilot certificate. And you're saying that this has nothing to do with Counts 99 to 110? She -- but her -- her comment is, is that the information contained herein is relevant to his investigation of 99 to 110.

MS. MCCONWELL: And I say with 100 through 110, it is not. It relates in no way to those counts.

THE COURT: Okay, so I mean maybe at first blush

that may be true, but let's see if the prosecutor lay a foundation on this. Okay, go ahead. Try to lay a foundation with the witness. Let's see if you can do it, Counsel.

MS. S. MILLER: Yes.

THE COURT: Okay. So I won't make a ruling on the admission of this. Let's just try to lay the foundation first. This is only for purposes of relevancy, Counsel. Okay, go ahead. Because otherwise it would be admitted, but if it's irrelevant, it won't be admitted.

(Pause.)

BY MS. S. MILLER: (CONTINUING)

Q. Okay. I'd like to show -- let's move away from this so I can lay a foundation. I'd like to show you what's been previously marked as Exhibit 166 and page 68, specifically. Yes. Exhibit 166, page 68, please. Okay, what about 176, page 79, please.

(Pause.)

BY MS. S. MILLER: (CONTINUING)

Q. Okay. Let's -- is 183 in there? Okay, let's pull up Exhibit 183, please.

THE COURT: Okay. And has this been admitted?

MS. S. MILLER: It has not.

BY MS. S. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, do you recognize this document?

A. Yes.

Q. What is it?

A. This is a pilot mechanic listing that was provided to me as a result of the search warrant.

MS. MCCONWELL: Your Honor, I think he needs to --

THE COURT: I'm sorry, what was the objection?

MS. MCCONWELL: Well, he's testifying about an exhibit that's not been admitted into evidence.

THE COURT: Right. Just say, do you recognize it without saying what it is.

THE WITNESS: My apologies, Your Honor.

THE COURT: Okay, that's fine. So do you recognize it?

THE WITNESS: Yes.

THE COURT: Okay. Next question.

BY MS. S. MILLER: (CONTINUING)

Q. I think I asked him, what is it for identification purposes?

THE COURT: He can't say what it is until it's admitted.

MS. S. MILLER: So I move to admit Exhibit 183, please, Your Honor.

THE COURT: How does he recognize it?

BY MS. S. MILLER: (CONTINUING)

         Q. How do you recognize it?
A. It was provided to me from the FBI search warrant.
Q. And can you remind the jury what the FBI search warrant materials are?
A. The FBI search warrant materials include lease agreements, pilot-mechanic listings, e-mails, invoices.
MS. S. MILLER: So at this time, Your Honor, I move Exhibit 183 into evidence.
THE COURT: All right. Any objections, Counsels?
MR. MARTIN: On behalf Mr. Walker, Your Honor, I object on the basis of hearsay.
THE COURT: Okay. And Ms. McConwell?
MS. MCCONWELL: This is -- this document is not relevant to Hansen Helicopters. Hansen Helicopters is not charged in Counts 99 through 110 and...I had one other one, but I can't remember what it was.
THE COURT: Okay, then I can't rule on that. Counts 99 through 110, is this really only to Counts 99 through 110?
MS. S. MILLER: No, Your Honor. This is one of the underlying documents for that summary chart that Agent Khamvongsa reviewed in his investigation.
THE COURT: Okay.
MS. MCCONWELL: And, Your Honor, it's not relevant to any of those counts.

02:27PM 02:27PM 02:27PM 02:27PM 02:27PM 02:27PM 02:27PM 02:27PM 02:27PM 02:28PM 02:28PM 02:28PM 02:28PM 02:28PM 02:28PM 02:28PM 02:28PM 02:28PM 02:28PM 02:28PM 02:28PM 02:28PM 02:28PM 02:28PM 02:28PM

THE COURT: Okay. So it's relevancy. Okay. So even though it supports the -- it may support the summary chart, the objection is relevancy. So that's the real objection.

MS. S. MILLER: Right, and it's relevant to how he traced the funds, his analysis of tracing those funds to finally conclude that there was --

THE COURT: You don't have to tell us the conclusion, just say to what count.

MS. S. MILLER: That led to the counts, the allegations in Counts 99 through 110.

THE COURT: Okay. Okay. Yes?

MS. MCCONWELL: Well, Your Honor, he -- Mr. Khamvongsa is an investigator. He's not an expert, first of all. And then second, and I was remiss not asking when he started that Hansen Helicopters would also request a limiting instruction that his testimony is only for Mr. Walker and not for Hansen Helicopters.

THE COURT: Any objection to that?

MS. S. MILLER: No, Your Honor.

THE COURT: All right. So as far as it relates to Counts 99 to 100, first of all, let's see G-183-1, based on your proffer, the Court, ladies and gentlemen of the jury, will admit G-183-1. This -- so that's G-183-1, this particular exhibit. It's only one page?

02:28PM 02:29PM 02:29PM 02:29PM 02:29PM 02:29PM 02:29PM 02:29PM 02:29PM 02:29PM 02:29PM 02:29PM 02:29PM 02:29PM 02:29PM 02:29PM 02:29PM 02:29PM 02:29PM 02:29PM 02:29PM 02:29PM 02:30PM 02:30PM 02:30PM

         MS. S. MILLER: I think it's longer than that, Your Honor. We can just admit page -- it's four pages total. We could do the first page or all four. Either way.

THE COURT: You tell me what you want to do. What is relevant to the case?

MS. S. MILLER: Let's go for all four pages, please.

THE COURT: So G-183 to 2, 3 and 4 will be admitted with objection. And ladies and gentlemen, it is would only apply to -- if you believe it, you would only apply to -- or you consider it, it would only apply to defendant Walker but not to Hansen Helicopters.

(Exhibit G-183 admitted)

And that is as it relates to, according to the prosecutor, 99 through 110; is that correct?

MS. S. MILLER: Yes, Your Honor.

THE COURT: All right. Go ahead. You may proceed.

MS. S. MILLER: May I publish to the jury, Your Honor?

THE COURT: You may.

MS. S. MILLER: Thank you. So if we could just zoom in, just on the top left quarter perhaps of the document, please, Mr. Leon Guerrero. I know it's hard to see with the video there. There you go. Perfect. Top quarter on the

left, please. So down a little bit and down to the right just a little more. Just up to the date, perhaps. Perfect. Thank you so much.

BY MS. S. MILLER: (CONTINUING)

Q. So Special Agent Khamvongsa, can you please read to the jury the title of this document in the top left corner?

A. "Hansen Helicopters, Inc. Pilot Mechanic Aircraft Vessel Fax, Phone E-mail List."

Q. Special Agent Khamvongsa, I believe you refer to the documents you used in your investigation as PM lists; can you explain whether that relates to this document?

A. It does. PM list is the electronic Excel file as to how it was saved. That was the title of the file itself.

Q. So "P" stands for what?

A. Pilot.

Q. And "M" stands for what?

A. Mechanic.

Q. So you would agree that that title that you used is what is featured here in the top left corner?

A. That's correct.

Q. Okay. Now, can we walk through, please -- can you walk the jury through the information that we're seeing just in this top quarter of page 1 of Exhibit 183?

A. The first column identifies the helicopter assignment to the fishery that is leasing it out. And then the next

02:31PM 02:31PM 02:31PM 02:31PM 02:31PM 02:31PM 02:31PM 02:31PM 02:31PM 02:31PM 02:31PM 02:31PM 02:32PM 02:32PM 02:32PM 02:32PM 02:32PM 02:32PM 02:32PM 02:32PM 02:32PM 02:32PM 02:32PM 02:32PM 02:32PM

column identified as vessels, identifies the specific tuna

boats in which the helicopter is assigned to.

          The next column entitled *Pilot* identifies the pilot,

the start contract date and the end contract date captures

their contract period for the pilot.  The days remaining is

calculating what days are left and it's a running clock as

identified by the negative.  The mechanic is the -- identified

there, the mechanic assigned to the helicopter.  The start

contract date and the end contract date refers to the

mechanic.

     Q.   When you say it "refers to the mechanic," can you

explain that a little further?

     A.   It refers to the timeframe in which the mechanics are

assigned to the helicopters, which are identified in the first

columns.

     Q.   Now, did you see more than this one example, this

four-page document of what you've called *PM lists* or pilots

and mechanics lists?

     A.   Yes.  I reviewed over 30.

     Q.   Over 30.

          And also, I realize you've also referred to it as an

aircraft vessel list, right?

     A.   Correct.

     Q.   Okay.  So if we hear you say pilot mechanic list, PM

list or aircraft vessel list, you're talking about this type

of document?

A. This one and another one.

Q. Okay. Before we go back to the summary chart, while the jury is looking at this particular example, can you walk them through, again, how you used this type of document in your wire fraud, including conspiracy to commit wire fraud, and money laundering investigation?

A. So in reviewing this document, I compiled all the names on there as it relates to the mechanics. There, I gave that information to my counterparts at DOTOIG and FAA, who verified whether or not they were FAA certified or certificated mechanics. I utilized that information to identify. Once the information came back, I tied those vessels that paid lease payments into the bank accounts to the mechanic and the helicopter.

Q. How did you -- how did you tie that? Can you explain what you mean by "tie that" a little bit more?

A. When I say "tie that," I mean I associate that the from one document to another document to another document. So in reviewing this document again, for example, if we take the first person, Henry Delumen, I would then go to another document that was provided by FAA that would say that he -- that would say whether or not he's certificated.

Q. Now, let me stop you there. I know you've been working on this investigation for a long time. But once a

summary chart of that information was created, did you use that summary chart to identify whether the particular mechanic listed in that column was a FAA-certificated mechanic?

A. Yes.

Q. Okay. Continue please.

A. Once identified, I would then look at another source document that was provided via grand jury subpoena from the Hansen Helicopters, Inc. and from there, I would verify if a payment was made. There, I would refer to the --

Q. Sorry. Let me stop you there. When you say a payment was made, from who and to who?

A. When I say payment was made, it's from the tuna boat company to Hansen Helicopters or one of its subsidiaries.

Q. And what documents did you look at to see whether a payment was made from a tuna boat company to a Hansen entity or one of its subsidiaries?

A. I looked at two documents.

Q. Okay. What are those two document?

A. I looked at Hansen Helicopters' own billing, schedule of billing and collections and I compared that to the bank records.

Q. Okay. So now I'd like to go back to the summary chart, Exhibit 1254, please.

THE COURT: Let me just tell you, we're going to take a recess at 3 for like a 20-minute recess because I'm

02:35PM 02:35PM 02:35PM 02:35PM 02:35PM 02:35PM 02:35PM 02:35PM 02:35PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM

sorry, ladies and gentlemen of the jury, I have to handle another legal matter. So -- which is not part of this case, but I have to handle it. So it will be from 3 to 3:20 okay.

MS. S. MILLER: Thank you, Your Honor.

THE COURT: Yeah. Do you think you'll be done with the witness before --

MS. S. MILLER: I don't think so. Probably not.

THE COURT: Okay.

MS. S. MILLER: But not too much after that time.

THE COURT: Okay. Go ahead. Just checking on our time.

BY MS. S. MILLER: (CONTINUING)

Q. Yeah. So if we can look at Exhibit 1254, please. Now, Special Agent Khamvongsa, you've already testified that you recognize this document. Can you tell -- well, I would move for its admission Your Honor, Exhibit 1254?

THE COURT: Okay. Counsels?

MR. MARTIN: Your Honor, I think I previously objected to this document.

THE COURT: Yeah. Yeah. So I do have your objections. You have any further objection?

MR. MARTIN: No, Your Honor.

MS. MCCONWELL: I have a voir dire in aid of an objection.

THE COURT: Yes. Go ahead.

**VOIR DIRE**

BY MS. MCCONWELL:

Q. Mr. Khamvongsa --

MS. MCCONWELL: I want a limiting instruction. I'm sorry. Hang on a second.

THE COURT: I'm sorry? I'm sorry, go ahead.

MS. MCCONWELL: I need to confer with Counsel.

(Pause.)

MS. MCCONWELL: Your Honor, I still have my objection, but I would like a limiting instruction.

THE COURT: Okay, for 1254?

MS. MCCONWELL: For 1254.

THE COURT: Al right. Okay, ladies and gentlemen of the jury, the Exhibit 1254 will be admitted over objection and it will not apply to Hansen Helicopters, but it will apply for your consideration, to the defendant, Mr. Walker. So yes, you may proceed and the relevancy objection is overruled.

MS. S. MILLER: Thank you, Your Honor, may I publish to the jury?

(Exhibit 1254 admitted.)

THE COURT: You may.

MS. S. MILLER: Thank you.

BY MS. S. MILLER: (CONTINUING)

Q. So Mr. Leon Guerrero, could we do a top, sort of fourth of this document through the blue column first, please.

So we can make sure the jury can read it, it's a little small. That works. Great, thank you. 02:39PM

So Special Agent Khamvongsa, you testified that this is a summary chart, right? 02:39PM

A. Yes. 02:39PM

Q. Could you tell the jury what it's summarizing? 02:39PM

A. This particular summary chart is summarizing the information in which I reviewed, which includes search warrant evidence and grand jury subpoenaed evidence all belonging to Hansen Helicopters, Inc. or its subsidiaries. 02:39PM

Q. And could you tell the members of the jury the name of the summary chart? 02:39PM

A. The name of the summary chart is Summary of PM List Data from Search Warrant and Subpoenaed Hansen Helicopters Records. 02:39PM

Q. Okay. And could we go one by one and I'll ask the questions for each column, but first can you tell the members of the jury what's in the first column entitled *Helicopter*? 02:39PM

A. The first column contains all the helicopters identified in the documents, which I just discussed. 02:40PM

Q. Okay. And in the mechanic column? 02:40PM

A. The mechanic lists all the names I found in the search warrant material and the grand jury subpoenaed material from Hansen Helicopters. 02:40PM

Q. And what are -- what's indicated in the count column? 02:40PM

A. The count is in reference to the number in the indictment for that particular individual.

Q. Okay. And then what does the indictment column mean?

A. The indictment is in reference to the timeframe, which is identified within the indictment for that mechanic.

Q. So is it fair to say that those two columns, count and indictment, is just repeating information contained in the second superseding indictment?

A. That's correct.

Q. Okay. And then the next two columns, the first two sort of aqua-colored ones, reported contract dates, can you read, before you tell them exactly what is in there, sort of the subheading above that, please?

A. It says "PM list files from search warrant."

Q. Can you please tell the jury what that means?

A. Again, this pertains specifically to the search warrant material or search warrant evidence that was provided to me from the FBI search warrant in October 2016.

Q. And when it says "PM list," what does that mean?

A. Pilot mechanic.

Q. So is that -- are these references that are taken directly from examples of documents like the last one we just looked at?

A. Yes.

Q. And in the next two columns that are the gray

heading?

A. The gray heading refers to subpoenaed records I received from Hansen Helicopters and it's a summary of that.

Q. I'm sorry, let's go back one. File saved dates. Can you tell the jury what that means?

A. So of the 30 files that I reviewed, at the end of the title of the document when it says "PM list," a date was provided in reference to the save date of that file.

Q. So to be clear, the documents you're referencing, the 30 files, they were electronic files you were reviewing?

A. Yes. They were electronic Excel files.

Q. Okay. Thank you. And then finally the government exhibit number column, could you tell the jury what that means, please?

A. Those reference the pilot mechanic listings and the government exhibit numbers that are tied to those specific pilot mechanic lists from the search warrant.

Q. Thank you.

A. Or the subpoenaed documents.

Q. Thank you. Okay. Let's -- well, taking a step back, Agent Khamvongsa, you testified earlier that you also reviewed the lease contracts or lease with the tuna boat companies, right?

A. Correct.

Q. About how many leases would you say you reviewed?

A. Over 200.

Q. Okay. About how many pages was that?

A. Um... 4 to 5,000 pages.

Q. Okay. I'd like to take a look at one of those leases, which has been previously admitted. Could we can please go to Exhibit 2900-1142.

THE COURT: Okay. This has not been admitted.

MS. S. MILLER: No, it has been admitted, Your Honor.

THE COURT: Oh, it has been?

MS. S. MILLER: Yes.

THE COURT: 2900 dash what?

MS. S. MILLER: 1142.

BY MS. S. MILLER: (CONTINUING)

Q. Now, while we're pulling that up, can you remind the jury, Special Agent Khamvongsa, why you looked at the helicopter leases or contracts?

A. I looked at the helicopter leases and contracts just to verify the information that's provided within the document here, so I was just trying to corroborate all the evidence and tie them all together.

Q. So what was it specifically in the lease documents you were looking at?

A. I was looking at the lease contract information, itself, what was stated within the contract.

Q. Okay. Special Agent Khamvongsa, of the -- I think you said 200 leases, is this one of the leases you reviewed?

A. Yes.

Q. Could you tell the jury who the lessor is?

A. The lessor identified in this document is Wilma's Flight Service, Inc.

Q. And that's the one leasing the helicopter?

A. That is the one leasing the helicopter.

Q. And who is the lessee?

MS. MCCONWELL: Your Honor, I object to this line. The dates contained in the chart that he's talking about, Exhibit 1254, all occur within 2015 -- '14, '15 and '16. And the document she's asking questions about occurred in 2008. So it in no way -- so these questions are not relevant to the document.

THE COURT: So the objection is relevance?

MS. MCCONWELL: Relevance.

THE COURT: Okay. Counsel?

MS. S. MILLER: Count 99 goes well beyond those specific dates.

THE COURT: Count 99?

MS. S. MILLER: Mm hmm.

(Pause.)

MS. MCCONWELL: Well, Your Honor, she specifically -- she's specifically asking him what he looked

02:43PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:45PM 02:45PM 02:45PM

at in tying together the information for this summary chart that's just been admitted, 1254, and he indicated he looked at leases to tie together the information with pilots and mechanics. And 2008, which is what this 2900-1142, which is dated. There are no dates. This document that was created was about eight years after or before -- or yeah, they're discussing now is eight years before any item that's contained on 1254.

THE COURT: So let me just be clear, so this particular document, this is 1254, right?

MS. S. MILLER: Yes.

THE COURT: This is 1254?

MS. S. MILLER: This is 2900-1142. This document.

THE COURT: Right now, this is 2900.

MS. MCCONWELL: Yes.

THE COURT: So you're saying between 2900-1142 is irrelevant to the summary chart?

MS. MCCONWELL: Is not relevant to the summary chart that she's having him testify what he looked at in creating his -- yeah.

THE COURT: His investigation?

MS. MCCONWELL: Yes, ma'am.

MR. MARTIN: It's not an underlying document.

THE COURT: I'm sorry?

MR. MARTIN: It's not an underlying document to the chart.

THE COURT: It's not an underlying document to the chart?

MR. MARTIN: Correct.

MS. S. MILLER: May I respond, Your Honor?

THE COURT: First of all, is it an underlying document to the chart?

MS. S. MILLER: So it's way beyond --

THE COURT: No, so my question, forget -- is it an underlying document to the summary chart?

MS. S. MILLER: No, Your Honor.

THE COURT: Okay. Second question is, is it relevant to the dates that are contained in the summary chart? That's their objection.

MS. S. MILLER: Right, and it's not related to the summary chart. So...

THE COURT: It's not related to the summary chart. Okay?

MR. MARTIN: But the question she asked him was, can we go to some documents that you used in creating the summary chart. And if that's not the question, I mean don't ask it, if that's not what you expect.

THE COURT: So you want -- so you said she was tying it to the summary chart.

MR. MARTIN: Yeah. We can reread the question. But I'm almost positive.

THE COURT: Let's check the evidence. Veronica, can you read that last question?

(Whereupon the reporter read back requested portion.)

MR. MARTIN: It's going to be a little before that, Your Honor.

THE COURT: It's going -- so it has to deal with the word *summary chart*.

MS. S. MILLER: Your Honor, I'll withdraw and I'll use another example. It's not worth the time. So I'll just use another.

THE COURT: You're withdrawing the question?

MS. S. MILLER: I'll withdraw this exhibit. We can move on to a different exhibit.

THE COURT: Okay. The question is withdrawn. Exhibit is withdrawn and objection is withdrawn. I don't have to make a ruling. And Veronica, you don't have to read it. So let's go. Next question.

BY MS. S. MILLER: (CONTINUING)

Q. I'd like to show you what has been previously marked and admitted as Exhibit 2900-1447, please.

THE COURT: Has been admitted.

MS. S. MILLER: It has been.

THE COURT: 2900-14.

BY MS. S. MILLER: (CONTINUING)

Q. So while that's getting pulled up, Special Agent Khamvongsa, can you please say again what you did in your investigation with respect to the lease agreements, the 200-plus lease agreements you reviewed?

A. Again, in reviewing those lease agreements, I didn't -- I reviewed it to identify how it matches up with the rest of the documents. I was looking for patterns of consistency. I relied on not only the pilot mechanic listings, but also other records that I looked at from the FAA, such as the registration documentations.

Q. Now, for example, did you also --

MS. MCCONWELL: Your Honor, Hansen Helicopters is not charged in Counts 99 through 110. And so I object to relevance of this objection -- or to this exhibit being discussed with this witness.

THE COURT: Okay. Counts 99 through 110. So you're just saying it's irrelevant to your client.

MS. MCCONWELL: Relevant to Hansen Helicopters.

THE COURT: So would you like a limiting instruction?

MS. MCCONWELL: Yes, ma'am.

THE COURT: No objection, I'm sure?

MS. S. MILLER: No, Your Honor.

THE COURT: All right. Ladies and gentlemen of the jury, this particular exhibit, 2914-47, is not relevant to Hansen Helicopters as a defendant, and may be relevant -- I'm sorry? Carmen, it's not admitted? Carmen just corrected me. It's 2900-147. Okay, I said that incorrectly. Let me change that. So 2900-147. Let me repeat that. Strike everything I just said. So ladies and gentlemen, 2900-147 --

MS. S. MILLER: 1447, Your Honor. I know it's hard to hear in here.

THE COURT: No, it's just -- okay. Let me start again.

Ladies and gentlemen of the jury, this exhibit, 2900-1447 is not -- should not be used against Hansen Helicopters. It's not relevant to the charges against Hansen Helicopters because Hansen Helicopters are not named in Counts 99 through 110. They may, however, be used --

MR. MARTIN: May I make an objection, Your Honor, before --

THE COURT: Before I say anything?

MR. MARTIN: Yes, Your Honor.

THE COURT: So I won't say anything. Go ahead.

MR. MARTIN: I didn't mean to interrupt you, but I'd like to ask a question in aid of an objection to the same exhibit.

THE COURT: Okay. Go ahead.

02:49PM 02:49PM 02:49PM 02:49PM 02:49PM 02:49PM 02:49PM 02:49PM 02:49PM 02:49PM 02:49PM 02:49PM 02:49PM 02:49PM 02:50PM 02:50PM 02:50PM 02:50PM 02:50PM 02:50PM 02:50PM 02:50PM 02:50PM 02:50PM 02:50PM

**VOIR DIRE**

BY MR. MARTIN:

Q. Agent *Khamvonska*?

A. Khamvongsa, sir.

Q. I'm sorry. I'm from Oklahoma.

A. You have a great accent, sir.

Q. That's how we say it there.

THE COURT: He has a great accent?

THE WITNESS: Yes. Yes, Your Honor.

BY MR. MARTIN: (CONTINUING)

Q. *Khamvolsa*?

A. Khamvongsa.

Q. Vongsa?

A. Yes.

Q. Okay.

THE COURT: Practice.

THE WITNESS: We'll go with that.

MS. S. MILLER: It's like a "K" sound.

MR. MARTIN: It's got a "K." Vongsa?

THE WITNESS: Khamvongsa. G is a little bit soft.

THE COURT: Vong. Vong. It's got an "N" in there, right?

THE WITNESS: Yeah. Like song, but replace it with a "V" Vong.

02:50PM

BY MR. MARTIN: (CONTINUING)

Q. Agent.

A. That works, Your Honor -- sir. Thank you.

Q. Are you familiar with the document that's been introduced, 2900-1446 through the end of the -- through the end of that entire document, just that one document, sir?

A. Let me correct you. It's 1447, 2900-1447. You said 2900-1446.

Q. Actually, I think it starts -- let me go back up to the top. 1441. Oh, I'm sorry. I'm looking at the wrong document. I apologize. Thank you for correcting me.

Have you read that entire document, sir?

A. Yes.

Q. Is John Walker's name mentioned anywhere in that document?

A. I don't recall seeing his name in this particular document, but I do recall seeing his name in other --

Q. I didn't ask you about other documents. I'm talking about this one right here. Okay?

A. Okay.

Q. Do you need time to review it?

A. I'd have to review the rest of it. But as -- I can't say for sure because there are so many documents. There's over 4 to 5,000 documents.

Q. I'm just talking about this one document. It's

labeled a lease, right?

A. Yes. Yes. It's a lease service agreement.

Q. And it ends on page 1452; correct, sir?

A. I would have to see it.

Q. Okay. And I -- can it be shown to the witness so he could see the document, Your Honor? Because my next question is, on the very last page, did Mr. Walker sign this document.

THE COURT: Okay, so sure. Go ahead.

BY MR. MARTIN: (CONTINUING)

Q. Can you answer my question, sir?

A. Yes, sir.

Q. Did Mr. Walker sign this document?

A. No, he did not.

Q. Okay. And would you take my word if I told you his name is not in there anywhere?

A. Um...I would only after reviewing the evidence.

Q. All right. I'd ask that he be given the opportunity to review it, Your Honor. It's almost 3 o'clock. Maybe he can do that. And --

THE COURT: Sure. Let's do that.

MR. MARTIN: Thank you.

THE COURT: So you could review it. That would be fair. All right, ladies and gentlemen of the jury, I have a call at 3 o'clock, let me try to get on my call right now, so I should be back at 3:20. Please keep an open mind. Do

not form or express any opinion on this case until it's submitted to you. I'll see you after your afternoon break. Please rise for the jury.

(Jury out at 2:52 p.m.)

THE COURT: We're outside the presence of the jury. Are you trying to have 2900-1447 through 1452 in its entirety be admitted?

MS. S. MILLER: It's already admitted, Your Honor.

THE COURT: Oh, it's already been admitted? Okay. That's right. You did say that. Okay. That's fine. Thank you. So you want to review it? Can you review it.

THE WITNESS: Sure, I can review.

MS. S. MILLER: I'll show it to him on my computer.

THE WITNESS: Thank you, Your Honor.

THE COURT: Okay, thank you.

(Recess taken at 2:54 p.m.)

(Back on the record at 3:50 p.m.)

THE COURT: We'll call in the jury, oh, no, let's get ready. Ready?

(Pause.)

THE COURT: We'll call in the jury. You guys ready to go?

MR. MARTIN: Yes, Your Honor.

THE COURT: Okay. There you go. Let's call in the jury. Sorry that took longer than I thought. There is not enough hours in the day with this trial.

MS. S. MILLER: Your Honor, can we address one thing before we bring in the jury, actually?

THE COURT: Make it fast because they're coming.

MS. S. MILLER: So because Your Honor issued a limiting instruction with respect to Hansen Helicopters, I think it's a waste of time for Hansen Helicopters to continue objecting to this evidence since you've already issued that limiting instruction. So could we perhaps --

THE COURT: Well, I think it depends on what the objection is. The objection was relevance, so we had to talk about it. If --

MS. S. MILLER: But if we're talking about counts that are not even -- that Hansen Helicopters isn't even involved in, why is she objecting to relevance?

THE COURT: Well, she doesn't want -- she wants to make sure that it's not -- there is a limiting instruction as to the -- to any particular piece of evidence. She's --

MS. S. MILLER: Standing objection so we don't have to keep doing it for every piece of evidence with this witness.

THE COURT: She has to preserve her objection or she's out of luck in the appellate court.

         MS. MCCONWELL: That's right.

THE COURT: I mean, if it's a different exhibit, she must preserve her specific objection or they're going to say you waived it. That's why.

MS. S. MILLER: What about as to exhibits that are already admitted?

THE COURT: Well, she's talking about it's irrelevant, though. It may be admitted, but it's irrelevant to the testimony of the witness so she can still make a relevancy objection. So your request is denied.

MS. S. MILLER: Okay.

(Pause.)

THE COURT: What are you practicing?

MR. MARTIN: Khamvongsa.

THE COURT: Just write it down phonetically.

MR. MARTIN: How is that?

THE WITNESS: It was very close.

THE COURT: Practice. It's Khamvongsa.

THE WITNESS: Vongsa.

THE COURT: Just do phonetics.

THE WITNESS: The occasional "hey you" works, too, sir.

THE COURT: What's that?

THE WITNESS: Hey you.

THE COURT: Hey. Just write it down.

03:51PM 03:51PM 03:52PM 03:52PM 03:52PM 03:52PM 03:52PM 03:52PM 03:52PM 03:52PM 03:52PM 03:52PM 03:53PM 03:53PM 03:53PM 03:53PM 03:53PM 03:53PM 03:53PM 03:53PM 03:53PM 03:53PM 03:53PM 03:53PM 03:53PM

MR. MARTIN: I've written it down about five different times, Judge.

THE COURT: I know, but do it phonetically.

(Jury in at 3:53 p.m.)

THE COURT: Please be seated. Welcome back, ladies and gentlemen of the jury. Even for me to remember tail rotor pitch change link, that's very difficult. Go ahead.

MR. MARTIN: Agent Khamvongsa. Close?

THE COURT: Give him a lesson.

MR. MARTIN: Help me out here.

THE WITNESS: It's Khamvongsa. G is a little softer.

MR. MARTIN: Khamvongsa.

THE WITNESS: Yes, sir.

THE COURT: Very good.

BY MR. MARTIN: (CONTINUING)

Q. Agent Khamvongsa, do you recall the question I asked you before we took the recess, sir?

A. Yes, sir.

Q. And did you have an opportunity during the recess to review 2900-1447, sir?

A. Yes, sir.

Q. And did you find the name "Jon Walker" anywhere in that document, sir?

 A. No, sir.

MR. MARTIN: I object, Your Honor, to the introduction of that document on the basis of relevance.

THE COURT: Can you just pull that exhibit up. What exhibit is that? Is that 1376?

MS. S. MILLER: Actually, Your Honor, we can withdraw my question.

THE COURT: Withdrawn. Okay. The case -- I'm sorry, exhibit withdrawn. Go to the next question.

MS. S. MILLER: Thank you, Your Honor.

BY MS. S. MILLER: (CONTINUING)

Q. Agent Khamvongsa, I'd like to show you what's been admitted as Exhibit 1252, please. And specifically, page 9, I believe.

Now, Agent Khamvongsa, what is this document?

A. This is a summary document of the registration for all the aircrafts in this case.

Q. Thank you. And if we could zoom in on the entry for N454S, please. Could you please walk the members of the jury through this entry, starting at the bottom to the top, so oldest to newest, please?

A. Starting on 6 -- sorry, starting --

THE COURT: Can you make it larger, this font size, Mr. --

MS. S. MILLER: I don't think so. But why don't

we zoom in on everything except the last one, two, three, four five rows. Maybe that'll make it a little bigger. I mean columns. Last four columns. Perfect. Maybe that will be better. Is that better, Your Honor.

THE COURT: I can see it better, go ahead.

THE WITNESS: Begin?

BY MS. S. MILLER: (CONTINUING)

Q. Yes, please.

A. This is for N454S Serial No. 330454S. And I'm starting at the bottom. 671996, source R. AC Form 8050-1, Hansen Helicopters, Inc., PO Box 9099 Tamuning, Guam 96931. It is -- name of applicant, Hansen Helicopters, Inc., U.S. corporation, Jon Walker, handwritten, Jon Walker.

Q. Okay. And then if we go up to the entry for 12-21-2007, could you please tell the members of the jury what we're seeing there?

A. The date is 12-21-2007. The sources are, it's AC Form 8050-1, Dave's Helicopter Service, Inc., 9102 Lini Highway PMB Port Vila, Vanuatu, Dave's Helicopter Service, Inc. U.S. corporation, Jon Walker, handwritten, Jon Walker.

Q. And then without reading every single entry above that, would you agree that the entries above that are consistent with the entry in December 2007, so Dave's continues to be the registered owner?

A. That's correct.

Q. And Jon Walker continues to be the, let's see, certified and signed by on behalf of applicant?

A. That's correct.

Q. Okay. Now I'd like to go to Exhibit 2900-1142.

THE COURT: Okay. Repeat that. What was that exhibit?

MS. S. MILLER: 2900-1142, which has already been admitted, please.

BY MS. S. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, what is this document?

A. This is a lease agreement.

Q. And what is the aircraft identified in this lease agreement?

A. N454S.

Q. Would you agree that's the same --

MR. MARTIN: Your Honor, I object to this testimony. We just had this document up and we objected to it. It's a 2008 document. It doesn't support the summary chart.

THE COURT: Okay. Let me look at --

MS. S. MILLER: Which summary chart, Counsel?

MR. MARTIN: The one you were using a while ago.

MS. S. MILLER: This testimony is totally separate from that summary chart. I think he's going back to the PM list summary chart. This is separate now.

THE COURT: So it's not connected to the summary chart.

MR. MARTIN: Well it's not -- I also submit, Your Honor, it's not connected to Counts 100 through 110.

THE COURT: Okay, so Counsel?

MS. S. MILLER: I can ask some foundational questions.

THE COURT: All right. Very well. Go ahead and do that.

BY MS. S. MILLER: (CONTINUING)

Q. So Agent Khamvongsa, did you review this document in your investigation of the conspiracy to commit wire fraud?

A. Yes.

Q. What count is that in the indictment?

A. 99.

Q. Okay. What is the timeframe alleged in that count?

A. 2002 and it's an ongoing conspiracy.

Q. So there is no end date?

A. None.

MS. MCCONWELL: Your Honor.

THE COURT: I'm sorry. Yes? What's the objection?

MR. MARTIN: The objection is that his summary from the government's trial exhibits says he will be testifying about wire fraud and money laundering, Your Honor.

03:59PM 03:59PM 03:59PM 03:59PM 03:59PM 03:59PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM

Not conspiracy.

THE COURT: Okay, so same objection in terms of notice.

MR. MARTIN: Yes, Your Honor.

THE COURT: All right. And not include the Count 99, that's what you're saying?

MR. MARTIN: Correct. Your Honor.

THE COURT: Will you join the objection, Ms. McConwell?

MS. MCCONWELL: I am, but I still -- we're still not in the count.

THE COURT: So it's not relevant to you anyway.

MS. MCCONWELL: Right. It's not relevant so I need a limiting instruction with regard to any testimony about or disregard it with regard to Hansen Helicopters.

THE COURT: As it relates to this document and his testimony as it relates to this document.

MS. MCCONWELL: Yes, ma'am.

THE COURT: Okay. All right. So do you agree with that with regard to -- okay, so.

MS. S. MILLER: I do not agree --

THE COURT: As far as the limiting instruction.

MS. S. MILLER: Sure, Your Honor.

THE COURT: All right, ladies and gentlemen of the jury, this exhibit, 2900-1142, which has already been

admitted does not have any applicability to Hansen Helicopters. Okay, you may proceed. What's your response, though, as to the Count 99 notice objection made by Mr. Martin?

MS. S. MILLER: So as we said earlier, Your Honor, it was a broad general description of what Agent Khamvongsa was going to be testifying about. We said wire fraud charges. That includes conspiracy to commit wire fraud.

THE COURT: The Court will overrule the objection and allow the question. Go ahead. You may proceed.

BY MS. S. MILLER: (CONTINUING)

Q. Thank you, Your Honor. So Agent Khamvongsa, can you tell the jury again what registration number for the aircraft are we dealing with?

A. N454 Sierra.

Q. You don't need to zoom in, Mr. Leon Guerrero. Thank you.

And could you tell the ladies and gentlemen of the jury who is the lessor on this agreement?

A. Wilma's Flight Service, Inc.

Q. And now you'd agree that that's different from -- well, who was listed on the summary chart for registrations as the owner of this aircraft?

A. Dave's Helicopter.

Q. And you agree that we looked at that, that was true

from I think we said December 2007 onward, right?

A. Correct.

Q. So that would apply here?

A. Correct.

Q. What's the date here?

A. June 27, 2008.

Q. Thank you. And could you tell the members of the jury who the fishing company is listed here?

A. The lessee or the fishing company on this document is fishing company Friesland N.V. Kaya Flamboyan 11, I believe that's the address.

Q. And is Friesland, as a fishing company, in any of the wire fraud counts in the indictment?

A. Yes.

Q. Now, Agent Khamvongsa, have you had an opportunity to review this lease?

A. I've reviewed this and many other leases.

Q. Okay. Is Dave's Helicopters mentioned in this lease?

A. Dave's Helicopter is not mentioned in this lease.

Q. Even though that was the registered owner at this time?

A. That's correct.

Q. Okay. Now, based on your investigation and also all the testimony you've heard throughout this trial, who was maintaining the helicopters listed in the second superseding

indictment?

A. Hansen Helicopters.

Q. And where is Hansen Helicopters mentioned in this lease?

MS. MCCONWELL: Your Honor, I object to any testimony about Hansen Helicopters. We're not in counts 99 through 110.

THE COURT: Okay. Sustained.

BY MS. S. MILLER: (CONTINUING)

Q. Agent Khamvongsa, where is the bribe of the airworthiness inspector mentioned in this lease?

A. It's not.

Q. And if we go down to Section 1, can you please read the sentence to the ladies and gentlemen of the jury about how long the tuna company had to review the aircraft, the sentence beginning in Section 1 with "lessee," please, in the middle of that paragraph.

A. "Lessee shall have 24 hours from arrival of aircraft in which to provide lessor with written notification of any defects in the aircraft or its equipment and accessories or in case the pilot is not sufficient capable for his work according to the judgment of the captain of MFV Friesland. In the absence of written notification, lessee agrees it is satisfied with and finds the aircraft and its equipment and accessories to be acceptable."

Q. Thank you. And now, turning to Section 5 of the lease agreement, please, which is page 1144 of this exhibit.

In Section 5, Agent Khamvongsa, can you please read to the jury the sentence starting with "at."

A. "At the sole discretion of the lessor, lessor shall provide a fully qualified and licensed pilot, mechanic or pilot mechanic for flight operations and maintenance of the aircraft. Compensation for professional flying and maintenance services shall be born by the lessor."

Q. Where in this lease agreement is there a reference to the pilots not being FAA certificated?

A. It's not. There is no reference.

Q. Where in the lease is there a reference to the mechanics not being FAA certificated?

MR. MARTIN: Objection, Your Honor, both questions were leading.

THE COURT: Sustained.

MS. S. MILLER: What was the objection?

THE COURT: Leading.

MR. MARTIN: Leading.

THE COURT: Sustained.

BY MS. S. MILLER: (CONTINUING)

Q. Is there any reference in this agreement to the mechanics not being FAA certificated?

A. There is no indication that -- that they are not FAA

certificated.

Q. Okay. Now, if we turn to -- if we look here on Section 4, please, could you please read the first paragraph under "indemnification and insurance"?

A. The first paragraph?

Q. Under Section 4, please. Yes.

A. "Lessee agrees to indemnify lessor against all losses, including cost and expenses by reason of claims for injury to or death of persons and loss of damage to property arising from or in any manner connected with negligent possession, use or operation of the aircraft by lessee or its agents during the term of this lease."

Q. And you can stop there. Thank you.

And the lessee is who again in this contract?

A. It's the tuna boat company, Friesland.

Q. And the lessor?

A. The lessor is Wilma's Flight Services.

Q. Thank you. And then can you read the second sentence of the second paragraph of that section, please?

A. "It is agreed..."?

Q. Yes.

A. "It is agreed that the cost of repairs and parts arising from damage to the aircraft, which was caused by negligence or any action of members of the crew of lessee's vessel will be reimbursed to the lessor upon determination of

the value thereof."

Q. Now let's take a look at Section 6, which is on page 1145. Can you please read Section 6, Repairs and Maintenance to the jury?

A. The entirety?

Q. At least the first paragraph, please.

A. "Lessor shall maintain and repair the aircraft so that at all times, it is in a safe and airworthy condition for the conduct of flight and fish spotting operations. Lessor shall pay all costs for replacements of parts and accessories arising from normal use in flight operations. Lessor shall be entitled to all salvage from used, worn, or broken parts recovered from the aircraft."

Q. Special Agent Khamvongsa, where in that section is there a reference to a machine shop in Oregon making critical parts?

A. There is none.

Q. Thank you. We can take that exhibit down. Special Agent Khamvongsa, in your role in the investigation, did you ever contact the tuna boat companies?

A. Yes.

Q. And did you ever issue any subpoenas to those tuna boat companies?

A. Yes.

Q. What evidence did you receive in response to the

 subpoenas?

A. They provided copies of payments as well as insurance documents.

Q. Okay. I'd like to show you what's been previously marked as Exhibit 102. Please. Do you recognize this document?

A. Yes.

Q. In very general terms, what is it?

A. This is a document that was provided to me from the specific tuna boat company.

Q. Okay. At this time, Your Honor, I would move Exhibit 102 into evidence.

THE COURT: Counsel? Yes?

MS. MCCONWELL: Your Honor.

THE COURT: Yes.

MS. MCCONWELL: I object to the admission of this document. Hansen Helicopters is not in Counts 99 through 104 and it's also hearsay.

THE COURT: All right.

MS. S. MILLER: It's a business record, Your Honor.

THE COURT: Okay.

MS. S. MILLER: That's my response to the hearsay objection.

THE COURT: Did you lay the foundation for

business records exception?

MS. S. MILLER: It was provided in response to the subpoena, yes.

THE COURT: Counsel?

MS. MCCONWELL: Your Honor, that's not a foundation for a document. It's still -- it doesn't change that Hansen Helicopters is not in Count 99.

THE COURT: You have no objection to a limiting instruction?

MS. S. MILLER: No, Your Honor.

THE COURT: So we don't have to get to the business records exception foundation issue. Ladies and gentlemen of the jury, if Exhibit 102-1 is admitted, you are to disregard that has no bearing whatsoever as to Counts 99 through 110 as it relates to the testimony of this witness. All right. Mr. Martin, your objection?

MR. MARTIN: May I voir dire the witness, Your Honor?

THE COURT: Yes, you may voir dire the witness in aid of an objection.

MR. MARTIN: Thank you, Your Honor.

VOIR DIRE

BY MR. MARTIN:

Q. Agent, the -- what company is this insurance policy

from?

A. South Pacific Tuna Company.

Q. Okay. And whose insurance policy is this, sir?

A. It's for the -- the South Pacific Tuna Company manages several tuna boats. So it pertains to those tuna boats those vessels.

Q. So it's not Jon Walker's insurance policy, it is the insurance policy of the South Pacific Tuna Boat Company, sir?

A. Yes, and their various tuna boats.

Q. So it has nothing with Jon Walker?

A. Yes, sir.

MR. MARTIN: Relevance, Your Honor.

THE COURT: Relevance?

MS. S. MILLER: So Your Honor, one of the elements of the --

THE COURT: Which exhibit, which count?

MS. S. MILLER: It would relate to both 99 and 100 through 104.

THE COURT: All right. So let me just look at the elements.

MS. S. MILLER: Sure.

THE COURT: I'll look at 99 in particular. Let's see. I'll go to 99. And I am looking at page -- cite me to the page and line, that's all I care about. Page. Line. And I'll figure out which element. If I can't, I'll ask you.

MS. S. MILLER: So Your Honor, I would cite you to page 34.

THE COURT: Okay.

MS. S. MILLER: Line 5 through 10.

THE COURT: First of all, that's not an element. The elements are on 122.

MS. S. MILLER: Right. It goes to the intent elements of the defendants and also --

THE COURT: I'm sorry, hold on. That's not an element, though. Those are just objects. That's not -- the elements that you have to prove are contained on paragraph 122.

MS. S. MILLER: Right. It goes to the intent element of the crime. But the reason this document is --

THE COURT: No, no, no, you said it goes to an element. So I just want to find out which element is it going to. So you're saying it's on paragraph 122 are the elements of the crime of conspiracy.

MS. S. MILLER: Right.

THE COURT: Which element is it, just focus on --

MS. S. MILLER: Sure, lines 22 and 23 of page 33?

THE COURT: Okay. So it goes to the mental state, the culpable mental state elements.

MS. S. MILLER: Yes, Your Honor.

THE COURT: Okay. Mr. Martin, goes to the

culpable mental state element.

MR. MARTIN: Your Honor, the witness has testified this document has nothing to do with Mr. Walker. It's therefore irrelevant.

THE COURT: He did say that. So based on that, the Court will sustain the objection, unless you lay another foundation. So just based on the question and answer that he just responded, the Court will sustain the objection. Next question, if you want to try to --

MS. S. MILLER: Sure.

THE COURT: -- establish a foundation.

MS. S. MILLER: Sure.

BY MS. S. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, in your 20 years as a criminal investigator, when you're investigating fraud cases, what types of evidence do you look for in terms of whether there are any victims of the crime?

A. Speak directly to the victims that were defrauded or look at pieces of evidence that establishes that this is what they believed they were getting.

Q. And why are you -- why do you look into whether a victim might have believed what they were getting?

A. It goes to show what's represented to the victim versus the inconsistencies in the evidences. The inconsistencies established by other pieces of evidence.

Q. And what type of evidence do you use to determine whether a victim relied on the representations?

A. Can you ask that again?

Q. What types of evidence do you review and look for to determine whether the victims of fraud relied on the representations being made by the alleged?

A. They could be a variety of evidence, they could include e-mails, it could include additional steps taken by the victims, in believing that this is what they were getting; for example, insurance.

Q. What does insurance show?

A. The insurance shows the state of mind and why they got it. Why they got it is based upon the premises told to them in regards to a contract.

Q. Okay. Taking a step back, specifically with this case where there is helicopters that are being leased to tuna boat companies, what did you look for with respect to the tuna boat companies that would show they relied on the representations made, for example, in the lease agreements?

A. What I was looking for specifically was any indication if they believed what they were getting was FAA-compliant, if they met FAA regulations.

Q. Meaning, whether the aircrafts were airworthy pursuant to the FAA?

A. Correct.

Q. What about with respect to pilots and mechanics?
A. Again, I was looking at, I was trying to determine whether or not the victims involved believed they were getting FAA-certificated pilots.
Q. And did you see any evidence of that in any of the insurance documents?
A. I did.
Q. What did you see in the insurance documents?
A. The insurance documents, itself, required that in order to meet --
MR. MARTIN: Well, Your Honor, I object to him testifying about documents that have not been admitted.
THE COURT: Is he going to be talking about this document?
MS. S. MILLER: I think he was talking about insurance documents with respect to the ones he received in general, but I would again move this in now with additional foundation laid.
THE COURT: Your objection?
MR. MARTIN: May I ask another question?
THE COURT: You may.
BY MR. MARTIN: (CONTINUING)
Q. Is your answer still the same, that this insurance policy has nothing to do with Jon Walker, sir?
A. Can you restate the question?

201

Q. Do you recall the one I asked a while ago about whether or not this was Jon Walker's insurance policy and your answer was "no," sir?
A. So you're asking if this is John Walker's insurance policy?
Q. Yes, sir.
A. This is not John Walker's insurance policy.
Q. And he's not named in the policy?
A. He is not named as a holder in this policy.
MR. MARTIN: Relevance, Your Honor.
MS. S. MILLER: May I ask a couple additional clarifying questions?
THE COURT: Sure, go ahead. I mean just based on what he just said, again the Court will sustain the objection, but I'll give you another chance. Go ahead.
BY MS. S. MILLER: (CONTINUING)
Q. So Special Agent Khamvongsa, what was the subject, what was being insured in these insurance policies?
A. The item --
MR. MARTIN: Your Honor, I object to him testifying from the documents.
THE COURT: Sustained. Unless it's admitted, he can't talk about it. So objection will be sustained.
BY MS. S. MILLER: (CONTINUING)
Q. Why would the tuna boat -- what evidence did you

04:17PM 04:17PM 04:18PM 04:18PM 04:18PM 04:18PM 04:18PM 04:18PM 04:18PM 04:18PM 04:18PM 04:18PM 04:18PM 04:18PM 04:18PM 04:18PM 04:18PM 04:18PM 04:18PM 04:18PM 04:18PM 04:18PM 04:18PM 04:18PM 04:18PM

*Direct - Khamvongsa*

review that indicated in the leases, for example, why the tuna boat companies will be getting their own insurance?

MR. MARTIN: To which I object, Your Honor, speculation.

BY MS. S. MILLER: (CONTINUING)

Q. Let's go back to that lease.

THE COURT: Sustained.

BY MS. S. MILLER: (CONTINUING)

Q. Let's go back to the lease. So could we please pull up 1142, please. I'm sorry, 2900-1142.

THE COURT: That's already been admitted, right?

MS. S. MILLER: Yes, Your Honor. It's the lease we were just looking at.

THE COURT: Okay.

MR. MARTIN: Your Honor, if I might enter an objection. The exhibit being pulled up is dated in 2008. The exhibit that we are looking at is dated in 2018. I don't know how the two could be connected. So I object to --

THE COURT: Well, let's hear the question, first.

MR. MARTIN: Sure.

THE COURT: 2900-1142 and let's see. Go ahead.

MS. S. MILLER: It's not up yet, Your Honor.

THE COURT: All right.

BY MS. S. MILLER: (CONTINUING)

Q. If we could actually go to Section 4, which might be

on the second page.  Am I on?  I believe it's on the second

page, Section 4.

        So Special Agent Khamvongsa, was there a section

about indemnification and insurance in pretty much every lease

you reviewed of those 200-plus leases?

    A.    Section 4 was in every lease.

    Q.    Okay.  And, again, can you tell the jury what -- who

is responsible, if there is any damage to the aircraft during

the time of lease?

        MS. MCCONWELL:  Your Honor, I object.  I think

that misstates what the language says.  I think he either

needs to read from it.  Not paraphrase.

BY MS. S. MILLER: (CONTINUING)

    Q.    Okay.  So can you please read the first sentence of

Section 4 again?

        MR. MARTIN:  Well, Your Honor, again, this is not

-- this is in evidence, but it's dated 2008.  And what the

other exhibit --

        THE COURT:  Objection is relevance?

        MR. MARTIN:  Yes, Your Honor.

        MS. S. MILLER:  And he just stated that same

provision is in all the leases he looked at.

        MR. MARTIN:  Well, I think they need to go to a

lease that is maybe one of the ones that was used in the

indictment, Your Honor.  I got the number here, if they need

it.

MS. S. MILLER: Well, Your Honor, the conspiracy count is from 2000 to present so this would be implicated in that.

MR. MARTIN: It's -- it is, Your Honor, but the exhibit they're trying to introduce is dated 20 -- 2018.

THE COURT: Okay. But did you say that -- what did you say about this section in particular, Section 4 as it relates to, I guess, insurance policies?

THE WITNESS: This.

THE COURT: Generally?

THE WITNESS: This section is found in the 4,000 pages as it relates to 2900. So it's the same -- it's the same wording, the same --

THE COURT: Identical?

THE WITNESS: Yes.

THE COURT: All right. Did you hear that?

MR. MARTIN: I heard what he said, Your Honor, but I respectfully disagree that the language has been the same for over the 20-year period of time. I think we need one that's dated in 2018 and I object.

THE COURT: All right. So I think that'll go to the credibility and the weight of the evidence. The Court will overrule the objection and you may answer the question.

BY MS. S. MILLER: (CONTINUING)

Q. Do you remember the question, Special Agent Khamvongsa? 04:22PM

A. No. 04:22PM

Q. Can you please read the first sentence of Section 4, indemnification and insurance. 04:22PM

A. "Lessee agrees to indemnify lessor against all losses, including cost and expense by reason of claims for injury to or death of persons and loss or damage to property arising from or in any manner connected with negligent possession -- possession, use or operation of the aircraft by lessee or its agents during the term of the lease. Such losses, as seizure by foreign countries resulting from illegal fishing, helicopter landing without lessor's consent and gross negligence, such as destruction of the helicraft by the ship crew members." 04:22PM

Q. Now, Special Agent Khamvongsa, if the fishing company, the lessee, agrees to indemnify the lessor, meaning, the helicopter company leasing to the tuna fish -- fishing company, what could the tuna company do to protect itself? 04:22PM 04:23PM

A. Get insurance. 04:23PM

Q. So let's go back, please, to Exhibit 102. And Special Agent Khamvongsa, this exhibit, is that what -- what you received in response to a subpoena that is evidence of the fishing companies doing just that? 04:23PM

A. Yes. 04:23PM

THE COURT: I'm sorry, Exhibit 102, can you pull that up?

MS. S. MILLER: Yes. We're working on that, Your Honor.

THE COURT: Has that been admitted?

MS. S. MILLER: No. That's the insurance policy we're trying to admit.

THE COURT: Okay. Hold on. Oh, that's right. Yes? Let's -- go ahead, Mr. Martin.

MR. MARTIN: Well, she hasn't asked a question. I'll wait, Your Honor.

THE COURT: Next question.

BY MS. S. MILLER: (CONTINUING)

Q. Yes. Could we turn to page 2 of this document, please. And page 3, please.

Special Agent Khamvongsa, in terms of the grand jury subpoena to the tuna boat companies for insurance policies, what was the subject of those insurance policies? What was being insured?

MR. MARTIN: Well, Your Honor, I object. This has not been admitted.

THE COURT: Sustained.

MS. S. MILLER: I'm having trouble understanding.

MR. MARTIN: It's not been admitted.

THE COURT: Sustained.

BY MS. S. MILLER: (CONTINUING)

Q. Why, Special Agent Khamvongsa, did you request by subpoena insurance policies from the tuna companies?

A. Determine if they got insurance for the helicopters they leased from Hansen Helicopters or its subsidiaries.

Q. And which specific --

MS. MCCONWELL: Your Honor, I object. He identified Hansen Helicopters. Hansen is not part of Counts 99 through 105 -- or to 110.

THE COURT: All right. Sustained. So disregard, strike the last question and answer. Well, the last answer as it relates to Hansen Helicopters. Next question.

BY MS. S. MILLER: (CONTINUING)

Q. Sorry, which helicopter are you referencing? How do you know what helicopters you were asking about in terms of the insurance policies with fishing companies?

A. How do I know which helicopters are tied to which specific companies?

Q. No. Well, sure, yeah. That's a good question.

A. The helicopters identified in the registration helps support that Walker or one of the companies in which he's 99% owner of owns and operates the helicopters which are being leased to the tuna boat companies.

Q. And did you see any of those helicopters -- did the subpoena request insurance information for specifically those

helicopters?

A. Not specifically those helicopters, just helicopters as it relates to the leases they have with the lessor or the various companies that Jon Walker owns as 99% holder, shareholder.

MS. S. MILLER: So at this time, Your Honor, I would move Exhibit 102 into evidence.

MR. MARTIN: Same objection, Your Honor. Mr. Walker is not an insured under this policy, it's irrelevant to him. And Hansen is not named in these counts.

MS. S. MILLER: May I respond, Your Honor?

THE COURT: Yeah.

MS. S. MILLER: So the fishing companies listed as -- in the transactions in 100 through 104 are among --

THE COURT: I'm sorry, in the Count 100 to 104.

MS. S. MILLER: Yes.

THE COURT: In the indictment. Go ahead. So let me just go to that. And I see it. Go ahead.

MS. S. MILLER: So for example --

THE COURT: You don't have to tell me an example. Just say whatever the number is. And so the point is?

MS. S. MILLER: So these insurance policies were purchased by the specific tuna boat -- certain of the specific tuna boat companies referenced in those counts.

THE COURT: Okay.

MS. S. MILLER: In the transactions in those counts.

MR. MARTIN: May I respond, Your Honor?

THE COURT: Yes. Yes, go ahead.

MR. MARTIN: Is the purchaser Sea Global Fisheries, LLC, sir?

THE WITNESS: I'm sorry, are you --

MR. MARTIN: Your Honor, I withdraw the question. Your Honor, if you'll look at page -- Exhibit No. G102-2.

THE COURT: Okay, let's go to that, G102-2, oh okay. Is this it right here? 102-3 you mean?

MR. MARTIN: If we could go to page 2 at the very top.

THE COURT: Okay. 102-2.

MR. MARTIN: To help highlight, there is a No. 1 at the top. If that could be highlighted, it will show you who the insured is, Your Honor.

THE COURT: Okay.

MR. MARTIN: Right there. And if you will compare that to Counts 100, 101, 102, 103 and 104, that is not one of the companies listed.

THE COURT: Okay.

MR. MARTIN: I object.

THE COURT: So you mean, it's not one of the companies listed in all caps, right?

MR. MARTIN: Right.

THE COURT: All caps.

MR. MARTIN: In all caps in the counts, yes, Your Honor.

THE COURT: From 100 to 104.

MR. MARTIN: Yes, Your Honor.

THE COURT: Okay. Counsel?

MS. S. MILLER: May I ask Special Agent Khamvongsa a couple clarifying question on that.

THE COURT: Sure.

BY MS. S. MILLER: (CONTINUING)

Q. So Special Agent Khamvongsa, in Count 103 of the indictment, there is a wire transfer from Ocean Conquest, LLC. Do you know who is the holding company that owns Ocean Conquest, LLC?

A. Ocean Conquest, LLC is owned by South Pacific Tuna Company.

Q. Okay. And I'm sorry, go ahead?

A. Go ahead.

Q. And what about Sea Fox, LLC?

A. Sea Fox, LLC is actually one of the many sea -- so a lot of the tuna boat companies start with "sea" and then have a second name to it, but those --

MS. MCCONWELL: Your Honor, I object to the narrative.

THE COURT: Hold on. What's the objection?

MS. MCCONWELL: Narrative.

THE COURT: No, overruled. He's just trying to explain. Okay, what was the question? Veronica, can you just tell me what the question is?

(Whereupon the reporter read back requested portion.)

THE COURT: Make that question more specific.

BY MS. S. MILLER: (CONTINUING)

Q. Sure. So Special Agent Khamvongsa, who is the holding company that owns Sea Fox, LLC, which is in Count 104 of the indictment?

A. Sea Global Fisheries, LLC.

THE COURT: Okay.

MS. S. MILLER: So I think that should clarify, Your Honor, the name differentiation.

THE COURT: Well, the name of the holding company. Not differentiation because it's not -- it's not a differentiation. It's just a -- I mean, it's different -- okay, anyway, Mr. Martin?

MR. MARTIN: Your Honor, if we could go to page 6 of that exhibit.

THE COURT: Okay. Page 6 of G-102.

MR. MARTIN: Under name and address of lessor, Your Honor, Mr. Walker is not named. I still have my

relevancy --

THE COURT: Name and address of lessor. Is that under the -- the first?

MR. MARTIN: It's on the right side.

THE COURT: Right. Okay.

MS. S. MILLER: May I respond, Your Honor?

THE COURT: Hold on. Hold on. Hold on. Just -- okay. Let me go to -- okay, so this says -- I see what that says. Let me go to the other exhibit that you just showed, Mr. Khamvongsa. Khamvongsa. Go ahead. What was the last one you showed?

MS. S. MILLER: The last exhibit, Your Honor?

THE COURT: Yeah, the last exhibit he just identified.

MS. S. MILLER: The lease agreement?

THE COURT: Whatever it was. Exhibit G-102-2.

MS. S. MILLER: On the second page of this document, Your Honor?

THE COURT: Yeah, let's go to 2.

MS. S. MILLER: Sure. Would you like us to zoom on it?

THE COURT: Okay. So -- okay. The objection will be sustained. Can I say that there is three different names here. There is three different names. There is a name on the indictment, there is a name in G-102-2. And the Court

finds there is another name in G-102-6. So the Court will sustain the objection as it -- he has a very specific objection. It's based on that, so the Court will sustain the objection.

BY MS. S. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, I'd like to direct your attention to Exhibit 829.

A. Yes.

Q. Can you remind the jury in the last lease we looked at, who was listed as the lessor?

A. Wilma's Flight Services.

Q. Am I pointing to it right here?

A. I can't see. Oh, yes.

Q. Okay. And then can you tell the jury who was listed as the owner of the aircraft in that lease?

A. Dave's Walker -- or excuse me, Dave's Helicopter Service.

Q. Am I pointing to it here?

A. That's correct.

Q. Okay. And can you tell the jury please what's the title of this section of this exhibit?

A. 30 Vanuatu International Companies.

Q. And who is at the top of this column of the document?

A. John D. Walker.

MS. S. MILLER: May I have a moment, Your Honor?

THE COURT: Yes.

MS. S. MILLER: Your Honor, could we have a sidebar, please?

THE COURT: Sidebar?

MS. S. MILLER: Yes, Your Honor.

THE COURT: Okay. Let's go. Let's have a sidebar. Oh wait, we can't. This is plugged in? Is this all plugged in?

(Discussion with clerk.)

THE COURT: No. It's just too much of hassle to have sidebar because it's all plugged in for the COVID situation. 15-minute recess, ladies and gentlemen, or ten minutes. Please rise for the jury. Keep an open mind. It's not yet over.

(Jury out at 4:34 p.m.)

THE COURT: Go ahead. Yes. You wanted to say something?

MS. M. MILLER: Yes, Your Honor. I'm going to speak about this particular issue. It is misleading to leave the Court or the jury with the impression that the defendant has nothing to do with these insurance policies.

All of those companies that were named as the, quote, "owner" of those helicopters and all of those helicopters that were listed on that insurance policy are actually in our second superseding indictment. Those

helicopters were used in the fraud.

THE COURT: But here's the deal, you've got to set the foundation. She's not setting it. The problem is you're not setting up the foundation. Just a minute. Listen. Look, all I have is what's before me. You guys have so much more...background information. What do you call it, anyway you just have more background information than I do.

The issue is, the objection is very specific, he's saying this witness has said, Mr. Walker has nothing to do with the insurance policy. You guys are pointing to the particular indictment, Sea Fox, LLC. Holding company is Sea Global Fisheries, and then you moved down to the next exhibit, I can't remember -- Fox what is it? Fox Start?

MS. S. MILLER: May I explain, Your Honor?

THE COURT: No. No. No. Don't explain anything right now because I'm telling you my analysis if you guys listen. So what I hear is you're not setting up the proper foundation. If you don't set it up, but you got all this institutional history and it's not doing me any good. I'm trying to make a ruling based on what you present to me. So all of this is, he says it has nothing to do with Jon Walker's company or Jon Walker's name.

You look -- we're looking at the indictment and he agrees it doesn't say anything about Jon Walker. You're showing me a name of a tuna boat company. You're showing me

the name of a holding company. And the third one, what is Fox Star, is it Fox Start?

MS. S. MILLER: So --

THE COURT: What is that last one?

THE WITNESS: Sea Fox.

THE COURT: Sea Fox. Okay. What is Sea Fox then.

MR. MARTIN: Your Honor, can we excuse the witness, please?

THE COURT: No, I just want to know, what you did you testify that last one was.

THE WITNESS: Sea Fox is one of the boats that make up Sea Global on the insurance company.

THE COURT: Okay. I'm sorry, Sea Fox...okay, just a minute, no, no, no, don't talk. Please. Please. Just let me get through this.

MS. S. MILLER: Yes, Your Honor.

THE COURT: Sea Fox is listed as a tuna boat company in the indictment 104; correct?

THE WITNESS: Yes.

THE COURT: That's what I see. Holding company is Sea Global Fisheries, that's what you testified to; correct?

THE WITNESS: Yes.

THE COURT: Then there was a third one, Fox what?

What's the last one?

THE WITNESS: Are you thinking about the...um... one of Jon Walker's company Foxtrot?

THE COURT: So Foxtrot did you testify -- what was the last exhibit? Let's go to the last exhibit. G -- what was the last exhibit that was brought up and you testified and I looked at the -- let's go to the last exhibit. Hold on. Let's go to the last exhibit.

MS. MCCONWELL: Page 6, Your Honor.

THE COURT: Okay. Let's go to 102-6, I think that's what it is. Can we go there? Okay. There it is. Okay, so Foxtrot Air, Inc. And it's individual executive director is the lessor, that's what it is, Foxtrot. I was right. Okay. Foxtrot Air. All right. Is the lessor. So all I see here is tuna boat companies says Sea Fox. Holding company is Sea Global Fisheries and lessor is listed as Foxtrot Air. Let's just stop there. Now you can step out. Thank you. But thank you for clarifying. So we've got those three different -- okay. Okay, go ahead.

MS. S. MILLER: So Your Honor.

MS. MCCONWELL: Your Honor.

THE COURT: Wait till he gets out for a second. Wait. I'm sorry.

MS. S. MILLER: If I could answer before Ms. McConwell speaks, Your Honor?

THE COURT: Yes. Go ahead.

MS. S. MILLER: So Sea Fox is in Count 104 of the indictment.

THE COURT: That's right. We just said that.

MS. S. MILLER: Right.

THE COURT: He just said that.

MS. S. MILLER: Then on page 2 of this insurance document, please, if we could go there. I think it's three actually. So Special Agent Khamvongsa testified that the insured on this insuring agreement Sea Global Fisheries is the holding company of the company in Count 104, Sea Fox.

THE COURT: I just said that. Go ahead.

MS. S. MILLER: So I agree with you there.

THE COURT: Okay. Good.

MS. S. MILLER: So if we look, before we go on, if we look in 5, No. 5 here, paragraph 5. Would you like us to zoom in on there?

THE COURT: Paragraph 5. Go ahead. Let's go to 5.

MS. S. MILLER: So it says "description of aircraft and aircraft physical damage coverage" and it talks about what this insuring agreement is covering. And it lists N-registered aircraft, which are all in the second superseding indictment.

THE COURT: But you didn't bring this to me.

This was not --

MS. S. MILLER: Well, I couldn't talk about the document.

THE COURT: All right. I know you can't talk about the document, but you could say to the witness to refer -- hold on.

MS. S. MILLER: Sorry.

THE COURT: You could have said look at -- so under Item 5 and then specifically which particular helicopter you're discussing, you know what line there. That's -- so this was not part of my analysis.

MS. S. MILLER: I'm sorry, Your Honor.

THE COURT: Well, is that not true?

MS. S. MILLER: No. You're right. You're right.

THE COURT: So -- okay, so you got to understand. I don't know what you're talking about.

MS. S. MILLER: Right.

THE COURT: Other than what is brought in through the witness. So that's where you're trying to loop in? And which registration number? All of them? All five of them? One, two, there, four, five FAA registration? Or yeah is that what you're saying?

MS. S. MILLER: Yes. And then what's connected on page 6, that Your Honor identified, was you saw the Foxtrot name. If we could please go to page 6.

THE COURT: And that's the name of the lessor, the name and address of the lessor is Foxtrot Air?

MS. S. MILLER: One of these aircrafts, right. So like the lease agreement that we just identified, Wilma's was the lessor in that lease agreement we looked at, that's also true here. Wilma's, Marlin Bay, Bravo Air, Foxtrot are the lessors of these aircrafts that are being insured by the tuna companies, so they're getting additional insurance.

THE COURT: I'm sorry. Okay, I'm not following you right now. I followed you with the other -- the one that you did not show me, paragraph 5. And we'll go back to that. But I'm sorry, what's your argument here on this particular Exhibit 102 dash, what is it? 6?

MS. S. MILLER: Right. Sixth page of the insurance agreement. And it just gives additional detail as to the aircraft that had been listed in that last page we looked at.

THE COURT: All right. So the relevance is the aircraft? And these aircrafts have already been identified?

MS. S. MILLER: Yes. And also, of course, in what's in 829, show all of these name and addresses of the lessors funnels up to Mr. Walker, who is 99.9 percent owner in all.

THE COURT: Okay, wait. All the names and addresses of the lessors.

MS. S. MILLER: Right the --

THE COURT: The 9102 PMB Lini Highway, which is the same address all the way down?

MS. S. MILLER: Right. So they're all listed here and then funnel up to Mr. Walker at the top, as the 99.9% owner of all of those companies.

THE COURT: All right. Well now that you've given me a more complete foundation, that makes more sense. But based on what you have said before that, the objection was sustained. Okay. Mr. Walker and Ms. McConwell?

MR. MARTIN: Your Honor, if we could go back up to page Item No. 5?

THE COURT: Okay. Let's go to -- the exhibit that she just brought up?

MR. MARTIN: The one that's on the screen. Page 3.

THE COURT: This one? Okay. Let's go right here.

MR. MARTIN: If we go --

THE COURT: 5.

MR. MARTIN: Paragraph 5, Your Honor.

THE COURT: All right. There we go. So this G-102-3 paragraph 5.

MR. MARTIN: These helicopters are not covered by insurance, Your Honor. There is no coverage for every one of

'em, number one. So these aren't insurance policies on these helicopters. These are liability for the boat in case they kill somebody, I believe. And it's still, in spite of what the government may want to say, Mr. Walker is not named as an insured in this insurance policy.

MS. MCCONWELL: And RPC 4901 is not mentioned in those counts that's she referred to.

MS. S. MILLER: Right. We said the N-numbered aircraft.

THE COURT: Actually, you said all of them. I asked you for all of them. You said "yes."

MS. S. MILLER: I'm sorry, Your Honor. The N-numbered aircraft is what I thought I had said prior to your question.

THE COURT: No, I said all five, you said "yes." So RPC is out, so that's out. But on the other four, the four, one, two, three, four, N, FAA registration number, you heard his argument? That this is not an insurance policy and your position, Ms. Miller?

MS. S. MILLER: Right, so if we go to later pages, there are endorsements that modify that. I'm sure you're very familiar with how insurance policies work. So for example --

THE COURT: Don't ever be too sure what a judge knows or doesn't know.

 MS. S. MILLER: I guess not for aircraft, that's for sure. Right, so to be clear, this is an insurance policy for the tuna boat companies in the instance that something goes wrong with the helicopters that they are leasing, which is why the leasing information is in the insurance policy. 04:44PM 04:44PM 04:44PM 04:44PM 04:44PM

THE COURT: Okay. So but based on what you presented me, I mean you're connecting it slowly, slowly, slowly. 04:44PM 04:44PM 04:44PM

MS. S. MILLER: I know, it is -- 04:44PM

THE COURT: Dribble, trickling, trickling. So yes... 04:44PM 04:44PM

MS. MCCONWELL: Well, Your Honor, I object to Ms. Miller having a second and third and fourth and fifth opportunity. 04:44PM 04:44PM 04:44PM

THE COURT: Chance? 04:44PM

MS. MCCONWELL: Outside, yeah, to try to work out how she's going to try to get this in once the -- have this practice for the jury. I object to that. I think it's extremely prejudicial to Hansen Helicopters because we're not in -- 04:44PM 04:44PM 04:45PM 04:45PM 04:45PM

THE COURT: You guys won all the objections in front of jury. But -- so it's not prejudicial because you've won every objection in the front of the jury. 04:45PM 04:45PM 04:45PM

MS. MCCONWELL: Well, but we're given her a whole lot of slices of the apple to come back and do this exhibit. 04:45PM 04:45PM

And it's going to -- I mean it's unnecessary and it drags us out, so I object.

THE COURT: It's a waste of time you're saying.

MS. MCCONWELL: It's a waste of time and I object. I object to that.

THE COURT: Okay. I mean that's a valid objection. Because you guys -- I mean you haven't -- you're trying to figure how to lay the foundation here.

MS. MCCONWELL: I mean, a sidebar was asked for us to have -- I thought -- you know to bring -- a sidebar was requested and a sidebar apparently was requested that we work on how Ms. Miller is going to try to get this in. Anyway, and I object.

MS. S. MILLER: Thank you for that, Ms. McConwell. Your Honor --

THE COURT: But I think it's true, though. I think you are trying to figure it out as you go along.

MS. S. MILLER: Well, it's challenging because as insurance documents work, there is a little bit on one page and then it's modified and endorsement which is modified in another.

THE COURT: No excuses. No excuses. You can't -- you cannot say insurance documents are so cumbersome and complicated. Who cares. Everybody knows that. Bottom line is, it's your burden of proof. You got to walk into court and

04:45PM 04:45PM 04:45PM 04:45PM 04:45PM 04:45PM 04:45PM 04:45PM 04:45PM 04:45PM 04:45PM 04:45PM 04:45PM 04:45PM 04:45PM 04:45PM 04:46PM 04:46PM 04:46PM 04:46PM 04:46PM 04:46PM 04:46PM 04:46PM 04:46PM

say, Judge, Mr. Khamvongsa, I'm going to show you what's been marked as Prosecutor's Exhibit 1, 2, 3, 4, 5, 102 pages 1, 5, 10, whatever and read it and tell me where is it that Jon Walker is involved in here? Really, that's really what you have to say, but you guys are kind of pulling it out.

MS. S. MILLER: But then they objected that we're talking about the contents of the document.

THE COURT: But you can't talk about the contents of the document until it's admitted. That's a valid objection. You guys made the same objection. That's the rules of evidence. We're going to take a ten-minute recess and I'll come back. And I'll decide, figure out this --

MS. S. MILLER: Your Honor, may I grab the hardcopy of this so you could look at the insurance policy as a whole?

THE COURT: I don't -- can I tell you something, you could give me a thousand pages of an insurance policy. All I care about is your foundation for what you're trying to do and your proffer. That's it. You guys can't just -- don't do me a dump because you guys do each other dumps all the time. No, no , no.

Focus on exactly what you are -- how are you trying to get in this evidence? I mean, I don't disagree with Ms. McConwell. I mean, this is like, you guys, it's excruciating because you haven't gotten all the documents in

 order. And you can't give me excuse, like it's too cumbersome, Judge. Because I don't care. And neither -- I shouldn't care how cumbersome it is.

What I care about is that we move the trial along and the exhibit numbers should have been already prepped up and lined up for this proffer. It isn't and I agree with Ms. McConwell.

So at this point, I do think you're just trying -- you're trying to figure it out. And I mean, it just sounds like it. So I'm going to take a ten-minute recess. I'll come back and I'll make a decision on the objection.

(Recess taken at 4:48 p.m.)

(Back on the record at 4:56 p.m.)

THE COURT: We're back on the record. All Counsels present. Defendants are present. Okay. Yes, Ms. Miller.

MS. S. MILLER: Yes, Your Honor, if I could just direct Your Honor to one last page that is crucial for Your Honor to understanding with respect to my proffer?

THE COURT: Go ahead.

MS. S. MILLER: Just make sure it's up on the screen. Can you see it okay or do you want me to zoom in on that, Your Honor?

THE COURT: Yes. Please make it bigger. Just take it as a given, if it's that small of a font, it's really

04:47PM 04:47PM 04:47PM 04:47PM 04:47PM 04:47PM 04:47PM 04:47PM 04:48PM 04:48PM 04:48PM 04:48PM 04:56PM 04:57PM 04:57PM 04:57PM 04:57PM 04:57PM 04:57PM 04:57PM 04:57PM 04:57PM 04:57PM 04:57PM 04:57PM

difficult for me to read.

MS. S. MILLER: Yes, Your Honor. No problem.

THE COURT: So this is exhibit what now? 102-4.

MS. S. MILLER: Yes, Your Honor.

THE COURT: All right. And what are we looking at?

MS. S. MILLER: So the crucial part here is that it says on the third-ish paragraph here, if you saw my dot. Item 9, requirements for the pilot flying the aircraft. And then down here on this line, you'll see that it says "the pilot certificate with necessary ratings each as required by the FAA for each flight."

So what's crucial about this document is it shows that the tuna boat companies believed that these aircrafts were, because of their N registration, were going to have FAA-certificated pilots and mechanics and that these aircraft were airworthy. It specifies FAA.

THE COURT: Okay. And what does that have to do with the -- okay, so what is this endorsement issue then?

MS. S. MILLER: It's just an endorsement that modifies earlier portions of the insurance policy.

THE COURT: He could say that, he can testify to that, this witness can testify he knows that for a fact?

MS. S. MILLER: Right. Because if you read the whole document as a whole, like I was saying earlier you know,

it'll have provision 1. Like this says it modifies.

THE COURT: Are you saying that he can testify to that.

MS. S. MILLER: Yes, Your Honor.

THE COURT: Okay. I still don't -- I'm not sure about the -- okay, I understand what you're saying about this. Anything else?

MS. S. MILLER: That's it, Your Honor.

THE COURT: Okay. Mr. Martin? Yes, go ahead.

MR. MARTIN: Well, Your Honor, that requirement doesn't mean anything. The insurance company, the insurance policy is not valid if those requirements aren't met. It's like if I have an insurance policy for my car that says I've got to have certain restrictions on it, if I don't have it and I'm involved in a wreck, the insurance company isn't going to cover me. This is not something the boat company did, this is a requirement of the insurance company that is not a party to the contracts that they're talking about. As I showed you earlier, Your Honor, there is no insurance on these aircrafts anyway. There is no endorsement. They are not insured.

MS. S. MILLER: May I respond, Your Honor?

THE COURT: Hold on. What's your objection, Ms. McConwell?

MS. MCCONWELL: Well, additionally , the contract that they're trying to tie to this was from 2008 and this is a

04:59PM 04:59PM 04:59PM 04:59PM 04:59PM 04:59PM 04:59PM 04:59PM 04:59PM 04:59PM 04:59PM 04:59PM 04:59PM 04:59PM 04:59PM 04:59PM 04:59PM 04:59PM 04:59PM 04:59PM 04:59PM 05:00PM 05:00PM 05:00PM 05:00PM

2018 policy.

MS. S. MILLER: No. We're beyond that lease at this point. We're not talking about that lease anymore.

THE COURT: What are you talking about then?

MS. S. MILLER: We're talking about the aircraft specifically mentioned in this insurance agreement, which are in the second superseding indictment and the fact that these tuna boat companies purchased additional insurance that required the pilots and mechanics to be FAA certificated. And this insurance wouldn't apply if there was evidence that they weren't. So it shows the tuna boat boats believed the representations of what they were getting because it was N-registered --

THE COURT: But what evidence is that the tuna boat companies believed that? What evidence is there of that?

MS. S. MILLER: That's exactly what this insurance agreement shows. Is that if that weren't true, if the aircraft --

THE COURT: No. No. No. Wait. Wait. Wait. I'm sorry. You said that the opportunity tuna boat companies believed that their boats were insured.

MS. S. MILLER: They believed that -- no. No, Your Honor.

THE COURT: I don't understand what you just said then.

MS. S. MILLER: Sorry. They believed that the helicopters they were leasing were N-registered, meaning, U.S. registered with the FAA, which requires pilots to be FAA certified. And it shows they relied on the representations --

THE COURT: Okay, I'm sorry, so who believes that? Who on the tuna boat believes that? The pilots of the tuna boat?

MS. S. MILLER: No, this is the holding company of the vessel.

THE COURT: No, you're saying somebody believes it. Who believes what?

MS. S. MILLER: The tuna companies as a whole.

THE COURT: And who testified to that?

MS. S. MILLER: That is what this document shows.

THE COURT: Okay, no, no, no, this is what -- this is what the document expects to have happened. My question is, who in the tuna boat companies in particular, who's testified that they believe what you're saying that they believe what you're saying they believe?

MS. S. MILLER: That's my proffer with respect to this, is it shows they relied, because why would you buy insurance that wouldn't cover you if there weren't FAA-certificated pilots. This is requiring FAA-certificated pilots in order for this insurance to apply.

THE COURT: All right. And so how does that

relate to the case -- the indictment?

MS. S. MILLER: So the helicopters --

THE COURT: Which count? Which count?

MS. S. MILLER: In the conspiracy in Count 99, we list all the helicopters and all the tuna boat companies.

THE COURT: So Count 99 and then that relates to Count 101, 100 to 104 right; is that correct?

MS. S. MILLER: Right. And specifically this holding company owns specifically Sea Fox, LLC, also in --

THE COURT: So really only Count 199 and 104?

MS. S. MILLER: Yes, Your Honor.

THE COURT: All right. So Sea Fox. Okay, so therefore, let's talk about Sea Fox then.

MS. S. MILLER: So Sea Fox funnels up to Ocean Sea Global Fisheries, which is the insured in this insurance policy.

THE COURT: It's a lessor. Sea Global Fisheries is the lessor.

MS. S. MILLER: No, that's the lessee. The lessor are the ones that Your Honor noticed on page 6 of this document.

THE COURT: Okay. I'm sorry. Sea Fox is the tuna boat. The holding company, I thought, was --

MS. S. MILLER: Sea Global Fisheries, which is the person --

THE COURT: Sea Global Fisheries, yeah. They're the holding company.

MS. S. MILLER: Right.

THE COURT: I thought I said that. All right. Go ahead.

MS. S. MILLER: Right --

THE COURT: And then the lessor, though, is Foxtrot Air.

MS. S. MILLER: That's one of the lessors of the helicopters.

THE COURT: Well, that's only one we're talking about.

MS. S. MILLER: No, it is, Your Honor. So fishing boat buys insurance to cover them in case there is an accident with respect to the helicopters they're leasing from Foxtrot being one of the helicopters they're leasing from, Wilma's being another that they're leasing from --

THE COURT: But we're only talking about Foxtrot. So Foxtrot is on there.

MS. S. MILLER: Yes. Foxtrot is right here.

THE COURT: So we're only talking about Foxtrot because that's all I see here. I don't see Wilma's up here, right now. All I see, what you showed us is Foxtrot, right?

MS. S. MILLER: Well, page 6 includes Wilma's, it is confusing but...

THE COURT: I'm not confused. I want to make sure I know exactly what you're talking about. So in particular, he was focused on Foxtrot. 05:03PM 05:03PM 05:03PM

MS. S. MILLER: Well, part of it is because there is Fox in both the name of one of the -- 05:04PM 05:04PM

THE COURT: Doesn't matter what it is. He was only focused, well, he was focused on Foxtrot in terms of the question, who is the name of the lessor and the specific lessor was Foxtrot. 05:04PM 05:04PM 05:04PM 05:04PM

Now you brought up this other stuff that, okay, which was never brought to me before. Now it's brought during the break. This description of lease property, lease aircraft, that names all the FAA numbers. So this is different. This has not been the subject -- he, meaning, the witness has not been questioned on this. On these. On this description of lease aircraft with all the FAA numbers and the names and address of lessor, other than Foxtrot Air. Okay. 05:04PM 05:04PM 05:04PM 05:04PM 05:04PM 05:04PM 05:04PM 05:04PM

You don't have to agree with me because I'm not asking if you agree with me. All right. So okay, so again, the objection is, how is it -- how does this relate to Jon Walker. He says it does not relate to John -- your witness says that. 05:04PM 05:04PM 05:04PM 05:04PM 05:04PM

MS. S. MILLER: Right. Well it relates -- 05:04PM

THE COURT: So if your witness says that, the objection will be sustained. 05:05PM 05:05PM

MS. S. MILLER: Yes. But then right after, he testified that Wilma's and Foxtrot all funnel up to Jon Walker through these shell companies. And those are the entities leasing aircrafts that the tuna boat companies are seeking insurance to cover.

THE COURT: Okay. So she makes a good point. Your best -- the best objection is, is that Ms. McConwell's objection is that, basically, this has been a lot of wasted time because we're having the prosecution try to figure out their evidence and they trying to go through this excruciating exercise to figure out which Exhibit really counts.

MR. MARTIN: I join that, No. 1, Your Honor.

THE COURT: So that's the best objection so far, but go ahead.

MR. MARTIN: Number 2, Count 104.

THE COURT: Yeah, Count 104. I'm looking at it.

MR. MARTIN: 2016.

THE COURT: Right.

MR. MARTIN: Government's Exhibit 102. 2018, two years afterwards.

THE COURT: Right.

MR. MARTIN: Not tied to Count 104. The government is further, Your Honor, trying to reform a contract because -- and that was one of the arguments that we had that there is --

THE COURT: I haven't heard that in a long time since law school, but go ahead. Contract reformation.

MS. S. MILLER: I didn't even know what he said. Reform?

THE COURT: Yeah. There is contract reformation in contract law. Go ahead.

MR. MARTIN: They're basically trying to make the FAA a party to this contract. And you will recall the testimony of Marvin Reed who said the FAA are not involved in these at all and they don't have anything to do with this. And there is no representation there, Your Honor.

MS. MCCONWELL: And, additionally, Your Honor, they're trying to infer intent. And you cannot infer intent. Ms. Miller --

MS. S. MILLER: No, we're showing reliance --

THE COURT: Wait. Wait. Wait. Counsel, please let them make their objections. If you keep doing that, I'm just -- I cannot hear to two people at one time.

MS. S. MILLER: I apologize. I'm sorry, Ms. McConwell.

THE COURT: Inferring intent. Go ahead.

MS. MCCONWELL: They're trying to infer intent and a contract is what a contract is. It's the four corners of the document. What is contained -- what is the language that is contained within the document. So in addition,

they're trying to do some type of contract reformation.

THE COURT: Wow. She's a business lawyer.

MR. MCCONWELL: She is.

MS. MCCONWELL: Yes, I am. What they tried to do with the leases.

THE COURT: So is my son.

MS. MCCONWELL: And with the insurance contracts. They can't -- I mean, they can't do that. And you cannot infer intent.

THE COURT: Let me just make my decision right now. All right. The Court will sustain the objection based on the objection made by Ms. McConwell that it's just been -- yeah, it's been a waste of the time and prosecution is not ready to present this particular exhibit or this type of line of questioning.

So the Court will sustain the objection. Exhibit 102 will not be admitted or allowed to be discussed. Lack of foundation. And it just taken too much time.

MS. S. MILLER: With this witness, right, Your Honor?

THE COURT: Well, if it's the same objection -- I mean, I don't know, depends on your foundation. Right now with this witness, the answer is objection is sustained. So let's put it this way, it's not forecast the future because I don't know the future other than with this witness.

Sustained. Let's go. Call the jury because now we are now at 5:07.

And FYI, based on the fact that we thought we were going to be done today, I have a 9 o'clock hearing -- bankruptcy matter at 9:00 a.m. that I counted on to be available for. And I think I have an 11:30 Pacific Judicial Council executive board budget meeting. Just an FYI, Counsel, because I thought we'd be done today. So that was the only -- and reliance on that. I'm going do my best to -- do I have something else?

(Discussion with clerk.)

THE COURT: Do I have a 7:30 motion on which case? Who? Oh, Joysa Willy. That's just a status hearing, right? What's the motion? Oh, yeah. Yeah. Yeah. That's easy. Okay. Right. Who is that Razzano and? Who is it? Who are the lawyers?

(Discussion with law clerk.)

THE COURT: Those guys are fast. I'll make it fast, too. That's 7:30 tomorrow morning?

THE CLERK: Yes, ma'am.

THE COURT: Okay. Please stand. Please rise for the jury.

(Jury in at 5:09 p.m.)

THE COURT: Please be seated. Welcome back, ladies and gentlemen of the jury. And you may proceed, Ms.

Miller.

MS. S. MILLER: Thank you, Your Honor.

BY MS. S. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, you said you reviewed a lot of bank records, right?

A. Yes.

Q. About how many different pages of bank records would you say you reviewed?

A. Easily 10 to 15,000 pages of bank records, if not more.

Q. Okay. So did you review the signature card for Caledonian Agency, Inc.'s bank record?

A. Yes.

Q. Did you review the signature card page for Hansen Northern Helicopters's bank account?

A. Yes.

Q. Did you review the signature card page for Hansen Helicopters Inc.'s bank account?

A. Yes.

Q. What about Wilma's Flight Services' bank account?

A. Yes.

Q. Was Mr. Walker a signer, an authorized signer on all those cards?

A. Yes, as president.

Q. Okay. And was there a mailing address of Tamuning,

05:09PM 05:09PM 05:10PM 05:10PM 05:10PM 05:10PM 05:10PM 05:10PM 05:10PM 05:10PM 05:10PM 05:10PM 05:10PM 05:10PM 05:10PM 05:10PM 05:10PM 05:10PM 05:10PM 05:10PM 05:10PM 05:10PM 05:10PM 05:10PM 05:10PM

Guam on all those --

MS. MCCONWELL: Your Honor, I object to leading.

THE COURT: Okay. Sustained.

BY MS. S. MILLER: (CONTINUING)

Q. What was the mailing address reflected in all those signature --

MS. MCCONWELL: I also object that this is cumulative.

MS. S. MILLER: I don't think we discussed --

MS. MCCONWELL: Ms. Jones testified about the signature cards. I think it's cumulative.

THE COURT: Same signature card.

MS. MCCONWELL: Yes.

THE COURT: All right. If that's the case, if it's the same signature card and if Jones did testify to that, then the objection will be sustained. If they're different signature card, you can ask the question.

BY MS. S. MILLER: (CONTINUING)

Q. I'd like to turn your attention to Exhibit G-2898. 2898, please. Could we publish to the jury, please?

THE COURT: That's already been admitted.

MS. S. MILLER: Yes, Your Honor.

THE CLERK: I'm just verifying.

MS. MCCONWELL: Only certain pages of this document have been admitted.

THE COURT: So whichever pages -- whichever pages have been admitted may be published.

MS. MCCONWELL: And I would also object that it's cumulative. Ms. Jones testified about this document and as well.

THE COURT: Are you going to ask her -- ask him something different from Ms. Jones because if that's --

MS. S. MILLER: Yes, Your Honor. After this -- after talking about this first page, I'm going to go to a page that we didn't cover with Ms. Jones.

THE COURT: Okay. Very well. So to that extent go ahead and proceed.

BY MS. S. MILLER: (CONTINUING)

Q. Thank you. So Special Agent -- could we publish please? Page 1?

THE CLERK: One moment.

BY MS. S. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, which account is this -- the corporate signature card page for?

A. Wilma's Flight Services, Inc.

Q. Okay. And what's the date on this document?

A. 11/3/2017.

Q. Okay. And on page -- can we go to page 16, please. Special Agent Khamvongsa, what's the date on this check?

MS. MCCONWELL: Your Honor, this is cumulative.

This was gone over completely with Ms. Jones.

MS. S. MILLER: And I'm going to ask him questions about this that were not asked of Ms. Jones.

THE COURT: Very well. You may proceed.

THE WITNESS: 2/7/2018.

BY MS. S. MILLER: (CONTINUING)

Q. Okay. You work for the IRS, right, Special Agent Khamvongsa?

A. Yes.

Q. Can you tell the ladies and gentlemen of the jury what actions you took on behalf of the IRS shortly after this check?

A. Actually.

Q. Or before?

A. Actually, before this check, I obtained a seizure warrant and seized approximately $4.6 million.

Q. From?

A. From accounts belonging to Jon Walker and the subsidiary companies, including Caledonian Agency, Inc., including Hansen Northern Helicopters and Hansen Helicopters as well as Walker Agricola.

Q. Could you tell the ladies and gentlemen of the jury what Walker Agricola is?

A. It is a bank account and Walker, Jon Walker is the sole signer of that bank account.

Q. Is it a corporate account or a personal account? 05:14PM

A. It appears to be a business account. 05:14PM

Q. Okay. Now, I'd like to go to page 14, please? Now, Special Agent Khamvongsa, do you see the transaction -- well first of all, what are we looking at here in terms of deposits versus payments going out? 05:14PM 05:15PM 05:15PM 05:15PM

A. These are wire transfer credits or deposits going or going into the account Wilma's Flight Services, Inc., and it's identified by the word *additions* at the top of the header above the dollar amounts. 05:15PM 05:15PM 05:15PM 05:15PM

Q. Thank you. And if we look at the wire transfer company coming into this account on July 27th, in the amount of 299,000 and change, do you recognize the name of where that wire transfer is coming from? 05:15PM 05:15PM 05:15PM 05:15PM

A. I see in the name Pacific Spotters Corporation and I do -- I am aware of a Pacific Spots Corporation that was opened. 05:15PM 05:15PM 05:16PM

MS. MCCONWELL: Your Honor, this is beyond the -- nonresponse and narrative. 05:16PM 05:16PM

THE COURT: Okay. Sustained. 05:16PM

BY MS. S. MILLER: (CONTINUING) 05:16PM

Q. Okay. Could you tell the members of the jury what you know, based on your investigation, about Pacific Spotters? 05:16PM 05:16PM

A. Pacific.Spotters corporation was opened in the Philippines in 2018. 05:16PM 05:16PM

MR. MARTIN: Your Honor.

THE COURT: Yes?

MR. MARTIN: I object. My recollection is Pacific Spotters is not named anywhere in this indictment and I object on the base of relevancy.

THE COURT: Is it named in the indictment?

MS. S. MILLER: No, Your Honor, but it formed -- it was part of his investigation was looking --

MR. MARTIN: I object to the narrative then, Your Honor.

MS. S. MILLER: It's part of the records he reviewed for -- -

MR. MARTIN: I object to a narrative.

THE COURT: Okay. So in terms of relevance to the indictment, that's their objection. If it's not relevant to the indictment, then the Court will sustain the objection on that ground.

BY MS. S. MILLER: (CONTINUING)

Q. Okay. Mr. Khamvongsa, Agent Khamvongsa, with respect to the Count 99, conspiracy to commit wire fraud, can you just generalize for the jury the types of information you reviewed within the bank records related -- and how it relates to that count?

A. I've reviewed foreign bank account records, I reviewed bank records here from financial institutions here

05:16PM 05:16PM 05:16PM 05:16PM 05:16PM 05:16PM 05:16PM 05:16PM 05:16PM 05:16PM 05:16PM 05:16PM 05:16PM 05:16PM 05:16PM 05:16PM 05:16PM 05:16PM 05:16PM 05:16PM 05:17PM 05:17PM 05:17PM 05:17PM 05:17PM

within Guam, which include Bank of Hawaii, Community First Guam Federal Credit Union, I also looked at articles of incorporation as it relates to Jon Walker being president and majority shareholder, which includes Pacific.Spotters Corporation as well as Hansen Helicopters --

MR. MARTIN: Your Honor, I object, I mean the answer is directly in violation of the Court's order relating to Pacific Spotters, Your Honor, and I object it's not named in the indictment.

THE COURT: Okay. Sustained.

BY MS. S. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, around the time of that wire transfer from Pacific Spotters, what else do you know --

MR. MARTIN: Your Honor... I have objected to this three times now.

MS. S. MILLER: I'm asking what else he knows.

THE COURT: So --

MS. MCCONWELL: Hansen joins.

THE COURT: So with regard to Pacific Spotter questions, the Court will sustain the objection. Move on to the next question.

BY MS. S. MILLER: (CONTINUING)

Q. Okay. So around the time of July 27, 2018, could you please tell the jury what else you know based on your investigation occurred during that time?

05:17PM 05:17PM 05:17PM 05:17PM 05:17PM 05:17PM 05:17PM 05:17PM 05:17PM 05:17PM 05:17PM 05:17PM 05:18PM 05:18PM 05:18PM 05:18PM 05:18PM 05:18PM 05:18PM 05:18PM 05:18PM 05:18PM 05:18PM 05:18PM 05:18PM

A. Limey Air Service Incorporated was opened with Community First Guam Federal Credit Union. In addition, additional bank accounts were opened in the Philippines.

Q. Were any banks -- what if any bank account were closed shortly before that timeframe?

A. Actually, the bank accounts with Bank of Hawaii for Caledonian Agency, Inc., for Wilma's Flight Services, for Hansen Northern Helicopters and Hansen Helicopters closed August 1st of 2018.

Q. And what, if anything, happened with respect to this case in May of 2018?

A. This case was indicted in May of 2018.

Q. Now, I'd like to go to Exhibit 2939, please. And I'd like to first start with the first page which is already admitted.

Special Agent Khamvongsa, what is this?

A. This is a member application card from Community First Guam Federal Credit Union, which I obtained from -- via grand jury subpoena and it's for Limey Air Service, Inc.

Q. Based on your review of all the documentation you received on Limey Air Service --

MS. MCCONWELL: Your Honor, I object to this as being cumulative. Ms. Jones went over this signature card and this exhibit as well.

MS. S. MILLER: I'm going ask him other questions

than the ones I asked Ms. Jones, Your Honor.

THE COURT: All right. Based on that, go ahead. You may proceed.

MS. S. MILLER: Thank you.

BY MS. S. MILLER: (CONTINUING)

Q. Let me step back.

About how many pages, if you could estimate, of bank records did you review with respect to this bank account for Limey Air Services?

A. For Limey Air Service, the number of pages is about 2500 to 3,000 pages.

Q. Okay. And did you see within those pages anything that indicated Mr. Walker's relationship to Limey Air Services?

A. Yes, it's in the articles of incorporation, which was part of the account opening.

Q. Okay. What was his role as listed in the articles of incorporation, Mr. Walker?

A. Well, there is a letter in which he says that he's 99.9% owner of Limey Air Services.

Q. Okay.

A. And that was around the time of 2018.

Q. Okay. Now like to go to pages 82 and 83 of this document, which have not yet been admitted.

THE COURT: Okay. This is G-2939-18?

MS. S. MILLER: I'd like to go to page 82. So 2939-82.

THE COURT: Oh, 82, okay. Thank you.

BY MS. S. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, have you seen this document before?

A. Yes.

Q. Do you know where it came from?

A. It came from Community First Guam Federal Credit Union in pursuant to the grand jury subpoena.

MS. S. MILLER: Okay. At this time, Your Honor, I'd move pages 82 and 83 of Exhibit 2939 into evidence.

THE COURT: Counsels?

MR. MARTIN: May I have just a second, Your Honor?

THE COURT: Yup.

(Pause.)

MS. MCCONWELL: And, Your Honor, while Mr. Walker is reviewing this, I would ask for a limiting instruction again on this. Hansen Helicopters is not part of Counts 99 through 110. So any questions, I would ask that you advise that Hansen is not part of that in the limiting. And if you do admit these, that it's not to be used against Hansen Helicopters.

THE COURT: All right.

 MR. MARTIN: May I ask a question?

THE COURT: Did you say it's already been admitted, right?

MR. MARTIN: No.

THE COURT: I'm sorry, it has not.

MS. S. MILLER: These two pages have not.

MS. MCCONWELL: And the prior one has only been admitted for Mr. Walker. Not for Hansen Helicopters.

THE COURT: Okay. Well, admitted for consideration. Yes. Go ahead.

MR. MARTIN: May I ask some questions in aid of an object, Your Honor?

THE COURT: You may.

VOIR DIRE

BY MR. MARTIN: (CONTINUING)

Q. Agent, I'm looking at what's characterized it looks like as Exhibit A, page 82 of that exhibit and Exhibit B, 82 of that exhibit.

Are you telling me, that is a bank record kept in the normal course of business at the bank, sir?

A. This is what they provided me in response to the grand jury subpoena that I issued.

Q. It is not a bank record kept in the normal course of business then?

A. It is a bank record that they provided, which is kept

in ordinary course of business.

Q. So they keep a running list of specific questions that you asked in a grand jury subpoena?

A. This was provided in response to that account and the information that is a summary of what was going on in that account that was done by the bank.

Q. The bank prepared this document pursuant to a grand jury subpoena that was issued to them?

A. I don't know if they did it in response to the grand jury subpoena, but it was provided in response to a grand jury subpoena.

Q. And did the grand jury subpoena ask for a specific list of information, sir?

A. The grand jury subpoena asked for all records as it relates to Limey Air Service, Inc.

Q. No. I'm talking about relating to pages 82 and 83 of this exhibit?

A. This was provided in response to activity that occurred within that account in response to the grand jury subpoena.

Q. And that is -- is that same evidence contained in pages 1 through 81 of this exhibit, sir?

A. 1 through 81 of this exhibit is a portion of the entirety of the 3,000 -- 25 to 3,000 documents I reviewed from Limey Air Services, Inc., from the Community First Guam

Federal Credit Union.

Q. And are these page -- are these 2939-82 and 2939-83, are those specific transactions contained within those 3,000 documents you reviewed, sir?

A. Yes, sir.

MR. MARTIN: Your Honor, I object. This is a summary exhibit. I have not been provided the underlying data to authorize me to determine the validity of the information. I object.

THE COURT: First of all, is this a summary chart?

MS. S. MILLER: No, Your Honor. This was provided as-is from the bank.

THE COURT: This was provided as the witness has said?

MS. S. MILLER: (Nodded head.)

THE COURT: Mr. Martin?

MR. MARTIN: Your Honor, this is not -- it's obvious from its face, this is not a bank record kept in the normal ordinary course of business. And I object on that ground.

THE COURT: All right. Can you just pull up the -- can you make it larger? All right. Are you trying to bring it under the business records exception. If you are, the objection will be sustained because there is no foundation

laid. So go ahead and if you try to figure out, lay a foundation with this witness.

MS. S. MILLER: Well, Your Honor, the witness.

THE COURT: You said you're bringing it under business records exception. That's what you said you're bringing it under business records exception. That's what you said you're bringing it under. So go ahead and set it up as business records exception. Go ahead.

MS. S. MILLER: Well, we stipulated to not have records custodian, first of all.

THE COURT: Right.

MS. S. MILLER: And this came directly from one of those records custodian from the bank.

THE COURT: But did you stipulate to this particular exhibit? You did?

MS. S. MILLER: Yes.

THE COURT: You both -- you guys stipulated as --

MS. S. MILLER: And even from the bank, we obviated the need custodians.

THE COURT: Okay. All right. Counsels? Okay.

MR. MARTIN: We did not stipulate to this exhibit, Your Honor.

MS. S. MILLER: It came from the bank.

THE COURT: Hold on. Hold on. Okay. Is this a business record, I mean did you stipulate that certain

business records from a specific bank would obviate the need to get in a records custodian? I think you guys --

MS. MCCONWELL: We said they didn't need a records custodian, but did not stipulate to having additional summary charts.

MR. MARTIN: And this is not -- this is not a business records, Your Honor. This is something that he did not get from the bank, he got it pursuant to a grand jury subpoena.

MS. S. MILLER: I move to strike that comment because he has no --

THE COURT: Counsel. Counsel. Please. I cannot hear the objection. Don't move to strike because I don't even know what he just said. Okay. What? Go ahead. You guys, you know what, if I hear that again, I'm going to ban you guys from speaking in my Court. I will tell you that now.

I need to hear the specific objection and I need to hear the responses before I make an informed decision. What is the objection, Mr. Martin?

MR. MARTIN: Your Honor.

THE COURT: Yes? Exhibit?

MR. MARTIN: I stipulated to them having -- not required to bring in custodian in. This is not being brought in as a custodian. This is being brought in through this witness as a pursuant to a grand jury subpoena. That's

different.

THE COURT: All right. So it's my understanding and correct me if I'm wrong, both of you, let me just start with the defense, that if there were any specific business records from a bank, in particular, the parties would review that and they would say, okay, we do not object, we agree on the authenticity of the documents and that would obviate the need to bring in a business records custodian, that was the general stipulation, right? Agreement?

MS. S. MILLER: Yes, Your Honor.

THE COURT: That was the agreement, is that right, Mr. Martin?

MR. MARTIN: Your Honor, that is right.

THE COURT: Okay. So are you saying that this -- this document, and let's -- this particular document, what is this again?

MR. MARTIN: 2939-82 and 83. And I submit to the Court, those two pages are not business records.

THE COURT: So these have not been presented to you as business records for you to have reviewed and you do not review this as bank business records? That's what you're saying.

MR. MARTIN: Those two pages, Your Honor.

THE COURT: Those two pages. All right. Is that true?

MS. S. MILLER: No, Your Honor. This has been on our exhibit list in full since day one. This is -- what about it sounds like Mr. Martin is saying is that he doesn't believe Agent Khamvongsa --

THE COURT: No. No. Don't say what you think he believe -- no, no, no, Ms. Miller. Do not comment, let me -- the attorneys do not need to comment on what you think your opposing side believes. I don't care what you think. I only care about is what your argument is here.

The question is, is this a business record from the bank that came from the bank and that was presented to defense Counsel for their review to ascertain whether a chain of custody, I mean I'm sorry, a business record custodian need not be brought in and you said yes.

Let me ask you is this, is this a business record that came from the bank directly?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. But then the -- the next question is, was that presented to the defense Counsel?

MS. S. MILLER: Yes, Your Honor.

THE COURT: Mr. Martin?

MR. MARTIN: May respond briefly.

THE COURT: Yeah.

MR. MARTIN: Your Honor, bank records are checks, statements, signature cards, letters, not summary documents

like this. This is a document that was created pursuant to a grand jury subpoena. It is not a business record kept in the normal course of the business, I can go to my bank today and I won't get anything like that looks like this and you can, too. We all can.

THE COURT: Okay.

MS. S. MILLER: May I respond, Your Honor?

THE COURT: Okay. Hold on. Let me just look at this. Okay. Yes, you may respond, Ms. Miller.

MS. S. MILLER: So ECF 1516 contains a stipulation which says that they are stipulating to the authenticity and chain of custody of all records and objects, whether seized or obtained through a grand jury subpoena.

THE COURT: Okay.

MS. S. MILLER: Perhaps this an unusual looking document, but our witness --

THE COURT: Never mind. You don't need to comment on that. Just focus on that stipulation. Okay. How do you respond to that? Grand jury subpoena.

MR. MARTIN: I was -- I was under the belief, Your Honor, that everything seized was a "business record" and my representation to the Court is this is not a business record because I was led to believe that what was seized by the grand jury were business records.

THE COURT: Okay. But the stipulation, though,

05:31PM 05:31PM 05:31PM 05:31PM 05:31PM 05:31PM 05:31PM 05:31PM 05:31PM 05:31PM 05:31PM 05:31PM 05:31PM 05:31PM 05:31PM 05:31PM 05:31PM 05:32PM 05:32PM 05:32PM 05:32PM 05:32PM 05:32PM 05:32PM 05:32PM

do you agree with the stipulation?

MR. MARTIN: I agree with the stipulation, Your Honor, but we have been given over 3,000 exhibits. There they are. We did our -- I did my best to look at every one of them, but if I missed two pages of the 3,055 exhibits, which encompasses over 30,000 pages, I goofed up and I am sorry, Your Honor. But this is not a bank record, which is what I thought we were stipulating to that was obtained pursuant to a grand jury subpoena.

THE COURT: Okay, but he just testified that this is a business record. And he testified it was obtained through a grand jury. This is what the witness has testified to.

MR. MARTIN: He testified he obtained it pursuant to a grand jury subpoena, Your Honor. I would like to voir dire him about --

THE COURT: You want to voir dire the witness in aid of an objection on the foundation. Go ahead.

VOIR DIRE

BY MR. MARTIN:

Q. Sir, did you hear me talking about what bank records are earlier?

A. Yes.

Q. Will you agree that they are statements, sir?

A. They are many things.

Q. No, I'm going through them. Statements?
A. Statements are one.
Q. Signature cards?
A. Signature cards are one.
Q. Copies of checks?
A. Checks are one.
Q. Loan documents?
A. Loan documents are one.
Q. And letters from the bank to you and you to the bank?
A. That's another one.
Q. All right. This document, 2939-82, and 2989-33 are not document, is not a document that is kept in the normal course of business, is it, sir?
A. This is provided by the bank and kept in the ordinary course of business because this was provided to me because they've been tracking that the information that these specific transactions were suspicious.
Q. And was that... is it your testimony then, that this is all wire transfers, sir?
A. Yes, sir. Wire transfers from the Philippine bank account.
Q. And those are required by law -- by law, is that correct, sir?
A. It's required by law for banks to establish and anti-money laundering policies within the bank to prevent

05:33PM 05:33PM 05:33PM 05:33PM 05:33PM 05:33PM 05:33PM 05:33PM 05:33PM 05:33PM 05:33PM 05:34PM 05:34PM 05:34PM 05:34PM 05:34PM 05:34PM 05:34PM 05:34PM 05:34PM 05:34PM 05:34PM 05:34PM 05:34PM 05:34PM

criminals or individuals from trying to laundering money. | 05:34PM
Q. I understand what the law is, sir. | 05:35PM
A. My apologies. | 05:35PM
Q. And where -- do you have copy of these? Does the IRS have a copy of these? | 05:35PM
A. Are you asking if they sent it to me? | 05:35PM
Q. Yes, sir. | 05:35PM
A. I did not -- I only got this as a result of the grand jury subpoena, but this was kept during the ordinary course of their business. | 05:35PM
Q. Aren't all suspicious activities with banks required to be forwarded to some other entity for investigation and follow up, sir? | 05:35PM
A. There is -- they keep records, their own records within their -- the bank, as well as it's -- it goes to other agencies. | 05:35PM
Q. Well, one of them is the IRS, isn't it, sir? | 05:35PM
A. There is a -- it goes to FinCEN. | 05:35PM
Q. I'm sorry, I couldn't hear you? | 05:35PM
A. It goes to another agency. | 05:35PM
Q. And do you have access to that, sir? | 05:36PM
A. I do. | 05:36PM
Q. And did you obtain this document from them? | 05:36PM
A. No, I did not. | 05:36PM
Q. Do you know whether or not they have this document? | 05:36PM

A. I do not know whether or not they have this document. This was provided from the bank as a result --

Q. I heard what you said, sir.

A. Okay. Thank you.

Q. What was the date of the grand jury subpoena, sir?

A. I would have to review it, I don't know.

Q. Well, I think it's critical because the date is relevant to the information contained herein.

A. Um. I believe it's...can we go to the page 83? It would have been provided sometime around the end of 11-25-2019, so it would have been around that timeframe.

Q. So the grand jury subpoena would have been prior to 11-25 of '19?

A. It would have been around 11-25-2019. I can't say for sure because the record stops at that date. So generally when grand jury subpoenas are issued, it says from this date to present.

MR. MARTIN: Your Honor, I would like that the -- before further ruling that the copy of the grand jury subpoena be provide to defense Counsel so that we can make an informed objection if one is appropriate.

THE COURT: All right. Let me -- okay, that's fine. The Court will allow that. But let me just ask the agent.

This particular exhibit, G-2939-82 and 83, was

this made in the course -- the regular practice -- I'm sorry, was this made in the course of the business of the bank or was this made for use for this court case?

THE WITNESS: This was --

THE COURT: Or both? What is it?

THE WITNESS: This was not -- this was not developed in response to this court case. This was something that the bank did on its own, during the normal course of business.

THE COURT: And so you know for a fact, okay, so just in terms of the -- of business records exception, you know for a fact that this record was made at or near the time this information was transmitted by someone with knowledge, do you know that for a fact?

THE WITNESS: Yes.

THE COURT: And how do you know that?

THE WITNESS: The records custodian is the person that --

MS. MCCONWELL: I would object to hearsay.

THE COURT: Okay. But -- all right. Maybe I'll talk to him outside the presence of the jury. All right. Ladies and gentlemen, why don't we -- we're going to recess for the day. And I'm just going to talk to this witness. Keep an open mind. I'll see you tomorrow morning at 8:15. Okay. We're not done today.

MS. S. MILLER: Sorry.

THE COURT: Keep an open mind. Do not listen to any social media or anybody reporting if it's being reported, okay?

(Jury out at 5:39 p.m.)

THE COURT: All right. Please be seated. All right. Okay, so just -- let me just say because this is so contentious on whether or not this is a business records exception, I mean, putting aside all this issue of the stipulation and everything, this is like the one document that the two of you have been fighting for. And the Court notes that if a document was calculated for use, essentially in the court system -- for the Court, then it's inadmissible. It's not a business record.

MR. MARTIN: And I agree with that, Your Honor.

THE COURT: Right. So I'm just trying to ascertain. Go ahead.

MR. MARTIN: And I want to look at the subpoena. But also, Your Honor, you've already sustained three separate objections relating to specific -- Pacific Spotters, which is in the -- which is where all these -- every one of the transfers appears to be coming from Pacific Spotters, which is not named in the indictment.

THE COURT: Are these all Pacific Spotters issues or transactions?

THE WITNESS: Yes, these are -- this is from Pacific.Spotters, which Walker is president of.

THE COURT: Okay. This is from Pacific dot -- Pacific Spotters, all right. And this is -- okay, but I think the objection was, okay, what were you saying then? Yes, right, the Court has sustained that objection.

MR. MARTIN: We went over this, I objected that Pacific Spotters is not in the indictment anywhere. And they tried to introduce three separate documents relating, he's testified about it and we had to object. And we are going way outside the indictment with this.

THE COURT: Okay. You can take that off, Counsel. All right. Anything -- any other -- so on this issue of Pacific Spotters. What else?

MR. MARTIN: I'd like to seen the subpoena, Your Honor.

THE COURT: You'll get the subpoena. Who has the subpoena? Do we have it? Do you guys have it? Who has the subpoena?

MS. S. MILLER: I'm sure we have a copy. We could get it, Your Honor.

THE COURT: Do you have it with you right now?

MS. M. MILLER: No.

THE COURT: You don't? You don't have it electronically --

MR. MARTIN: They can e-mail. They have my e-mail.

THE COURT: Okay. Just e-mail to defense Counsel. All right. What about his Pacific Spotters argument. The Court has sustained that objection. And now you're bringing in a document that is replete with Pacific Spotter transfers. He said it's all of them. So that's a fair objection. How do you respond to that objection?

MS. S. MILLER: So Your Honor, this witness has testified that Limey Air Services bank account with Community First Guam was opened, I think, within five months of the first superseding indictment. And then although Mr. Walker's name is not on the signature card, he is the -- you know, there were letters within this same document received from the bank that said that he was, I think he said -- actually, I might want to look at it, but he signed an affidavit under oath saying that he was the 99.9% owner and he was the director of the company related with this bank account. So this is further information that shows the conspiracy. In Count 99.

THE COURT: Okay, so I understand that argument. But what about this Spotters -- Pacific Spotters objection made by Counsel? Because your witness just testified that all of these, and correct me if I'm wrong, Agent, but all of the wire transfers deal with Pacific Spotters.

MS. S. MILLER: Right. He also testified that Mr. Walker is the owner of it and he's the one named in Counts 99 through 110.

MR. MARTIN: And he had testified to it, Your Honor, before I could get my objection out, which you sustained after I objected. And I would ask that the witness be excused, Your Honor.

THE WITNESS: Sorry.

THE COURT: No, it's okay. I didn't excuse you. Yes, you may be excused. Thank you.

THE WITNESS: Thank you.

THE COURT: See you tomorrow.

THE WITNESS: Thank you, Your Honor.

THE COURT: Okay. Yes. Wait. Wait till he goes out.

MS. S. MILLER: Sure.

THE COURT: Wait till he goes out. Okay. He's out. The double doors. Go ahead.

MR. MARTIN: As I said, Your Honor, he did testify about the Pacific Spotters before -- sorry. Before I could get my objection out because that was one of the three objections that I had. Because he was testifying about something that was not contained or outside the scope of this indictment. I mean, we --

THE COURT: But does it change the landscape, now

that he has evidence or testimony that Mr. Walker is the owner of Pacific Spotters? Should that --

MR. MARTIN: Your Honor, I'm here on an indictment that talks about what I'm charged with to defend Mr. Walker. And Pacific Spotters is not anywhere in this indictment and I shouldn't have to, on the 27th day of trial, be having to defend against something that's not in the indictment and we're not required to defend against.

MS. S. MILLER: May I respond, Your Honor?

THE COURT: Yeah. Go ahead.

MS. S. MILLER: So there --

THE COURT: So he makes a point. I mean I agree with that.

MS. S. MILLER: So there already has been plenty of evidence about Pacific Spotters and the fact that he originally purchased it from defendant Crowe. Also, in a manner and means paragraph of the indictment in the conspiracy to commit wire fraud.

THE COURT: Just cite to me.

MS. S. MILLER: Yes. Page 37. I'm sorry. The end of 36 into 37.

THE COURT: Okay. Just what line.

MS. S. MILLER: Line 24 on the last line of page 36.

THE COURT: Okay.

MS. S. MILLER: It references numerous shell corporations. Pacific Spotters is one of those corporations and was using the same aircraft, the same pilots and mechanics after the first indictment and the bank accounts were closed and moved to the Philippines.

So this is relevant information to the fact that the money started coming into the United States account from one of these shell corporations.

THE COURT: All right. But he's saying he doesn't have notice that -- he does not have notice --

MS. S. MILLER: He had --

THE COURT: Just a minute. Listen to what I just -- you guys, you keep forgetting that your institutional history means nothing to me. Zero. All that matters to me is what's brought into this courtroom.

MS. S. MILLER: Right.

THE COURT: The defense is saying they have no notice in the indictment as to -- in the indictment as to which shell company he has to defend against. That's what he just said. Is that what you said?

MR. MARTIN: Yes, Your Honor.

THE COURT: And Pacific Spotters is not one of 'em.

MS. S. MILLER: Their own filing in this case identified Pacific Spotters. So...

MS. MCCONWELL: No, it doesn't.

MS. S. MILLER: Yes, it does.

MR. MARTIN: I'm not --

THE COURT: I'm sorry, your own exhibit. What exhibit number is that?

MS. S. MILLER: This is Exhibit 829.

THE COURT: It says Pacific Spotters on it.

MS. S. MILLER: I mean I could rattle --

THE COURT: Is that what you just said?

MS. S. MILLER: Yes.

THE COURT: That's your -- but he's talking about the indictment.

MS. S. MILLER: Right. It reference shell corporation.

THE COURT: Listen. Listen. Just look at it objectively. Try to -- you probably can't because you represent one side. So does he. But if you look at it from a worldly point -- global point of view. So the defendants can have their organizational chart. That may be so. But what he's defending against is in the indictment. So his objection is, I don't have notice as to which shell -- which shell corporation, i.e., Pacific Spotters, is being discussed here. So.

MS. M. MILLER: Your Honor, there is notice in the indictment in the wire fraud counts of the funds coming in

--

THE COURT: That's not what -- okay, but she's referring -- no, no, no, Counsel you could say all you want. That's not what Ms. Miller is referring to.

MS. M. MILLER: I know.

THE COURT: She's asking me -- first of all, listen to this, again you guys -- people -- I don't why you guys are not listening to me. Listen. Manners and means and objects of a conspiracy are not the elements. That's just the theory of the case. When the prosecutor walks into any courtroom and you know this, Ms. Miller.

MS. M. MILLER: Yes, I know.

THE COURT: Because you are an experienced lawyer. When a prosecutor walks into this courtroom or any federal courtroom or local courtroom, they have to prove the elements of the case.

MS. M. MILLER: Yes.

THE COURT: You guys are citing to me non-elements. You're citing to me theories.

MS. M. MILLER: I was going to the element.

THE COURT: Okay. Well, she's not. She did not go to the element. She was going to manners and means.

MS. M. MILLER: If you look at the specific counts, forget about the manners and means, look at specific counts.

THE COURT: Show us specific count. He's only testifying 99 to 110. Which one is it?

MS. M. MILLER: Correct. So Counts 99 to 110 --

THE COURT: Okay, let's go to 99, where are we talking about?

MS. M. MILLER: Include transfers into the bank accounts that are specifically identified in the indictment.

THE COURT: Okay. Hold on. Hold on.

MS. M. MILLER: In the indictment.

THE COURT: Count 99, elements. Elements. Okay, through the use of wire transfer, okay, I see that.

MS. M. MILLER: Yes.

THE COURT: All right. So therefore, continue. So that's 99.

MS. M. MILLER: Yes, Your Honor. And then when you go to the specific counts under the conspiracy to commit wire fraud, you see the allegations of transfers of funds coming in and the amount of the transfer of the funds.

THE COURT: I see that. What counts? 100 through 104. That is what you're talking about?

MS. M. MILLER: That's 100 though 104. And then we have the money laundering counts, 105 to 110.

THE COURT: No, no, no. Let's just focus on Counts 100 to 104.

MS. M. MILLER: Yes, Your Honor.

THE COURT: And the only one he talked about is Sea Fox 104.

MS. M. MILLER: Yes.

THE COURT: All right.

MS. M. MILLER: And all of these accounts were involved in the money laundering. What Mr. -- Special Agent Khamvongsa is testifying to is that the funds were passing through multiple accounts to eventually get to Jon Walker. That's the whole basis of his testimony.

And the conspiracy to commit wire fraud, which is Count 99, not these specific counts, says from 2000 until this Court said January 7, 2021, the defendants conspired to commit wire fraud. And when you look at those specific allegations, and I'm not talking about the manner and means now, Your Honor, I'm talking about the conspiracy to commit wire fraud. You're looking at Jon Walker being named there. And Jon Walker being identified as a person who participated in the conspiracy to commit wire fraud.

The defendants took all of their leases from these companies up here and changed it all to Pacific Spotters Corporation, same helicopters, same airmen, same registration numbers. All they did was change the name of the shell company. And we alleged in the indictment that they used numerous shell companies. We didn't name all the shell companies, but we alleged they used numerous shell companies.

THE COURT: And I think he said that.

MS. M. MILLER: Yes.

THE COURT: He says you did state generally.

MS. M. MILLER: Yes.

THE COURT: That there are shell companies. What he's saying he doesn't have -- okay, he doesn't have specific notice as to Pacific Spotters.

MS. M. MILLER: Two things about Pacific Spotter s--

THE COURT: Wait. Wait. Wait. Wait. Wait. Wait. Let me ask you this.

MS. M. MILLER: Yes.

THE COURT: He's saying it's not in the indictment that the shell company is Pacific Spotters. Let's put that aside for one second.

MS. M. MILLER: Yes.

THE COURT: Then you guys are focusing on Count 104, Sea Fox. That's what this witness is talking about.

MS. M. MILLER: Yes.

THE COURT: Now, how are you putting together Sea Fox equals Pacific Spotters equals Jon Walker?

MS. M. MILLER: Because, Your Honor, starting on or about 2013, Pacific Spotters Corporation was originally opened and Pacific Spotters Corporation started being used by

the defendants in their fraud.

We alleged in the earlier part of the indictment that the defendants were using the Philippine Civil Aviation Authority as one of the ways in which they were defrauding the FAA. We have a lease from Pacific Spotters Corporation that has an N U.S.-registered helicopter that is in the indictment, that the defendants entered into a lease with one of these shell companies in front of you, 829. And then after the first indictment, they changed that lease to Pacific Spotters Corporation and they continued to lease that N-registered helicopter even though they deregistered it to ostensibly export it to the Philippines. So --

THE COURT: Okay. All right. So I understand all that. My question, though, is just -- to make the connection, Ms. Samantha Miller is querying the Special Agent on the stand from the IRS.

And I guess, I'm trying to ascertain, where has the evidence been that Sea Fox, LLC tuna company with the holding company Sea Global Fisheries with the lessor Foxtrot Air equals Jon Walker and Pacific Spotters, that's the connection.

MS. M. MILLER: Yes.

THE COURT: That you guys are trying -- I'm not seeing it.

MS. M. MILLER: Well, here's the evidence, Your

Honor. Exhibit 102, which you said we can't use, that's one piece of it.

THE COURT: Well, because you guys didn't set the proper foundation.

MS. M. MILLER: I understand. I understand, Your Honor, but you said where is the evidence and did they have notice. That is one way in which they had notice. Another way they had notice were these bank records --

THE COURT: Okay. But here's the problem, the witness, your witness, said 102 has nothing to do with Jon Walker.

MS. M. MILLER: He did not say that, Your Honor.

THE COURT: I thought he did. It's not mentioned.

MS. M. MILLER: The question was, is Jon Walker in that document. And he said he is not in that document. But when Ms. Samantha Miller asked him, how is Jon Walker related to this document, he said the registered aircraft, the N numbers in this and these shell companies, the Vanuatu companies, are owned 99.9% by Jon Walker.

THE COURT: Okay. But here's the thing. Here's the problem. These -- those particular -- and you know this, the particular helicopter numbers, the N numbers, that was not brought in during the course of the colloquy with this witness.

MS. M. MILLER: Yes.

THE COURT: To set up the foundation.

MS. M. MILLER: Yes.

THE COURT: So when I made my decision, I considered that and Ms. McConwell, you know, appropriately said, look, this is a waste of time, the prosecutor just is still trying figure out which evidence. So that's why, I mean it's like I mean so sad because you guys just -- for yourself.

MS. M. MILLER: No but --

THE COURT: For yourself because you just didn't have the --

MS. M. MILLER: No. But your question was, did they have notice. And what I'm answering is, Your Honor, they did have notice.

THE COURT: Yeah. But my point is, you guys are setting up as you're trying figure out your case. That's the problem.

MS. M. MILLER: The problem is this, Your Honor, I actually have a terrible cold and I asked Samantha Miller to manage this witness today. And I'm not making an excuse.

THE COURT: No, no, no.

MS. M. MILLER: I do have a terrible cold. I feel terrible. I've been taking DayQuil all day. I did rapid COVID tests. I do not have COVID so I'm perfectly fine.

THE COURT: Okay. Now you're telling me that you

don't have COVID.

MS. M. MILLER: No, I don't -- no, no, no, I don't want anybody to be freaked because I have a cold. I have a cold. That's all. But in the eleventh hour, I said could you please handle this.

So that's one of the problems here. It's not Ms. Samantha Miller not being prepared. It's not the government not being -- it's that I'm sick and I should be laying in bed somewhere.

THE COURT: Okay, let me just say this. Should we take a recess tomorrow. Honestly, let's think about this.

MS. M. MILLER: That would be extraordinarily helpful, Your Honor, because I feel terrible.

THE COURT: All right. So I am sympathetic to that.

MS. M. MILLER: Thank you.

THE COURT: I am. If you're sick, you're sick. And honestly, I know what you mean. I was sick last week and I know exactly what you mean. So we will recess tomorrow. How is that?

MS. M. MILLER: Thank you, Your Honor. Thank you.

THE COURT: And let's come back to this.

MS. M. MILLER: Thank you, Your Honor. Thank you.

THE COURT: Okay.

MR. MARTIN: Have a good evening, Your Honor.

THE COURT: Did I forget anything? Emily? Oh.

MR. MARTIN: I said have a good evening.

THE COURT: Yes, I will always -- I always have a good evening. But Mr. -- wait, wait, wait, oh, Ms. McConwell Mr. McConwell, do we have the -- who was your client? Kapp, Mr. Kapp's waiver, you know --

MS. MCCONWELL: The declaration, yeah, that he will consent to it. He's -- he's sending that back so we'll have that filed.

THE COURT: He's consenting to your withdrawal as counsel?

MS. MCCONWELL: Yes.

THE COURT: Right. That's what we do need to get that before the status hearing.

MS. MCCONWELL: Yes.

THE COURT: How is he doing by the way? Better?

MS. MCCONWELL: He's still in Arizona, but he's out of the hospital so --

THE COURT: Counsel, we will recess. Today is -- today is Wednesday? Okay. This gives me a chance to do my Thursday stuff, but I hope you feel better.

MS. M. MILLER: Thank you.

THE COURT: And I want to say this to anyone of

you. If you're sick, I know you're away from home, if you're ill and you feel like you need to break, just let me know. 05:56PM

MS. M. MILLER: Thank you, Your Honor.

THE COURT: Because I'm going to be sympathetic to that. Because I know how it feels to be in trial.

MR. MCCONWELL: Your Honor, I'll be speak to Mr. Kapp also.

THE COURT: Please speak to Mr. Kapp. Get that to me some time tomorrow.

MR. MCCONWELL: He just got out of the hospital. He's been in almost the whole time.

THE COURT: Very well. Thank you all. I'll tell the jurors to come back the following day unless you guys tell me otherwise.

MS. M. MILLER: Yes. Thank you, Your Honor.

THE COURT: Take care.

(Proceedings concluded at 5:56 p.m.)

* * *

August 15, 2022; 8:32 a.m.; Hagatna, Guam

* * *

07:49AM 07:49AM 07:49AM

THE COURT: All right, everyone, welcome back to Guam. Did you all arrive last night or sometime earlier?

MS. M. MILLER: Earlier, Your Honor.

THE COURT: Earlier?

MS. M. MILLER: Yes.

THE COURT: Okay, good to know. Well, don't worry, I'm okay, I think. And I took my COVID test. FYI, I'm fine. When we have go to federal court conferences, they make us take it every day.

MS. M. MILLER: Wow.

THE COURT: Yeah. But we're on the honor system, so we're hoping everybody is telling the truth they don't have it. But -- yeah, but I did take mine and -- and so -- so I'm clear.

All right. So we're going to go ahead and begin. Just an FYI before we start, so there is five Government -- four Government motions that are pending, and we're working on those now. The Government's motion for order permitting testimony and evidence of defendant's alter ego shell companies, Government's motion in limine to admit summary charts pursuant to Federal Rule of Evidence 1006, motion to use expert Jeffrey Klang as a summary witness, and defendant's

motion in limine concerning testimony of Jeff Guzzetti. So those are -- those are still pending and we're just still working on it, just to let you know for an update.

Okay, where were we last?

MS. M. MILLER: We're in the middle of the testimony of Mr. Khamvongsa. And as you recall, Your Honor, Mr. Khamvongsa was supposed to be my witness. I was sick that day --

THE COURT: Yeah.

MS. M. MILLER: -- and Ms. Samantha Miller started his direct examination, but I'm ready to proceed with his direct examination.

THE COURT: Okay. Very well. Yes, Mr. Martin?

MR. MARTIN: Are they asking to change lawyers?

THE COURT: Well, I think -- you want to get on your mic; repeat that question.

MR. MARTIN: My question was, Your Honor, are they asking to change lawyers in mid examinations?

THE COURT: Well, probably because maybe she wasn't feeling well, as I recall and --

MS. M. MILLER: That's right.

THE COURT: -- I think Samantha Miller went up to assist her.

MS. M. MILLER: Step in.

THE COURT: Step in, yeah.

08:33AM 08:33AM 08:33AM 08:33AM 08:33AM 08:33AM 08:33AM 08:33AM 08:33AM 08:33AM 08:33AM 08:33AM 08:33AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM

MR. MARTIN: Because the problem I have, Your Honor, is we didn't find out she was even ill until the end of the day. Had we known it, we could have recessed for the day and she could have done it. We're halfway through this. I object to changing lawyers midstream like this. I mean, no one had notice Ms. Miller was even feeling bad until that -- at least on our side, maybe they did, but that she was even feeling bad until that evening.

And then, quite honestly, I wish we had known and then I wouldn't have had to deal with COVID, which I had to deal with, and we could have recessed that day when -- and so I -- I object to changing lawyers midstream. I don't think it's appropriate. I think there is -- you know, the procedure should have been followed. We should have been notified she wasn't feeling well. She shouldn't have been in the courtroom with us that day, and we could have recessed. But to change right now, I just want my objection on the record.

THE COURT: Yeah, I'll -- I'll let Ms. Miller speak in a minute, but I guess sometimes -- and I can't tell you this because I personally have never had COVID. I haven't. I've been very fortunate. My entire family has had it. One of them has been in ICU. My grandchild is eight months old. Everybody's had it in my family, but -- and they're all fine. And even a lot of my staff members have had it here even while pretrial, during trial, after trial since

08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:35AM 08:35AM 08:35AM 08:35AM 08:35AM 08:35AM 08:35AM 08:35AM 08:35AM 08:35AM 08:35AM 08:35AM 08:35AM 08:35AM 08:35AM

our last time. So -- but I do take the test. And I think like many, like even myself, if I start feeling like allergies -- I think it's usually allergies. I'm probably in denial in thinking that, you know, I'm not -- I don't -- I'm pretty sure I don't have COVID. I don't even think it's the flu; I think it's allergies. I mean, I -- maybe that's what happened. I think that's what Ms. Miller had indicated, she thought it was -- 08:35AM 08:35AM 08:36AM 08:36AM 08:36AM 08:36AM 08:36AM 08:36AM

MS. M. MILLER: Yes, Your Honor. I had gone to the emergency services the night before and they told me with no fever and with the main symptom being my throat that they thought I may have strep, but that was it. And my rapid test, which I bring with me, was negative, not that I should be talking about my medical issues in open public court. 08:36AM 08:36AM 08:36AM 08:36AM 08:36AM 08:36AM

But there's absolutely no legal basis for Mr. Martin's objection, and we want to finish this trial this week, which means if I have prepped this witness, I know the evidence, I know the objections, we need to get going and not waste the jury's time with -- with anything that isn't totally supported by the law. There is absolutely no law that says that because Ms. Samantha Miller started with this witness because I wasn't feeling well, she must finish with the witness. There's no prejudice to the defendants. 08:36AM 08:36AM 08:36AM 08:36AM 08:36AM 08:36AM 08:36AM 08:36AM 08:36AM

As a matter of fact, Your Honor, there would be a prejudice to this Court by having any further delay as opposed 08:37AM 08:37AM

to just let's get it done. The jury is here. We're ready to go. Let's go.

THE COURT: And also -- well, I don't -- so let me just tell both of you, I understand both positions, plus we lost a juror. You -- you heard that.

MS. M. MILLER: I saw that.

THE COURT: The Court, just as an FYI, the juror had to -- well, the juror sent in a note and said, "May I be excused? I have a family member who has cancer."

And I -- so I said -- - Well, no, just a minute. I said, "I want to talk to you in person -- or on the phone," and I did, "and I want to see" -- you know, I know that sounds kind of strict, "but I want to see what stage cancer, how serious was this, in terms of could we keep you on until the end."

And she said, "Judge, he just got diagnosed. It's Stage 4. And on a scale of 9 -- 1 to 10, he's at a 9 right now." And she goes, "I want to stay on." She said she was very -- loved being on the jury. She felt all you were professional and so on. So she was on the phone with me and the jury administrator. So it was with a heavy heart that she told us she didn't -- you know, she had to leave, and so I excused her. I don't want -- I don't want to lose any jurors.

Yeah, Mr. Martin, I think I'm -- I'm inclined to just allow Ms. Miller to return. Your point is taken, and I

understand that.

MR. MARTIN: May I make a comment, Your Honor?

THE COURT: Yeah.

MR. MARTIN: I've been coming to this Court now for -- well, I've been in Guam over 70 days now, but I've been coming to this Court. And every morning when I come in, I come in the front door --

THE COURT: Yeah, they --

MR. MARTIN: -- and there's a sign. And if I don't meet the qualifications of those signs, which she didn't, I would have never got in the courtroom that day. And -- and it's --

MS. M. MILLER: I'm going to object to move to strike any further comments on my medical issues or condition. I don't come in the front door, Your Honor, first of all.

Second of all, I did not --

MR. MARTIN: May I finish my --

MS. M. MILLER: -- not meet --

MR. MARTIN: May I finish my record, please?

THE COURT: Wait, wait, wait --

MS. M. MILLER: No, because he wants to talk about my potential physical condition. It's inappropriate. And, again, we are now wasting time.

THE COURT: Okay, Ms. Miller, all right. Let him --

MS. M. MILLER: We want to get this court done.

THE COURT: Let him finish --

MS. M. MILLER: Let's get going.

THE COURT: Okay. Without -- without -- okay, I understand. Okay, a medical condition is brought -- it was -- has already been brought to -- to Court earlier. So the Court -- the point is well taken, and I think Ms. Miller knows -- she knows the rules that the Court has specific requirements that, you know, you can't come into Court.

MS. M. MILLER: Right.

THE COURT: I mean, it's -- it's in my -- it's in my general orders. So she knows it, and I -- and I believed her when she said she did take the -- made the effort to try to find out, hey, do I have an issue, should I stay away, and -- and basically, her doctors told her, look, you might have strep throat or -- or you might just have something else. Then there was no indication that she has COVID. And, you know, this COVID, and its variants and are so -- everything is so fluid about it. I mean, it just changes every week, I think. But I'm inclined to deny your request and allow Ms. Miller to return to be back the -- the original interrogator of the witness.

MR. MARTIN: Well, she's -- my objection is she's never interrogated him yet, Your Honor, and now we're changing midstream, and so I --

08:38AM 08:38AM 08:38AM 08:38AM 08:38AM 08:39AM 08:39AM 08:39AM 08:39AM 08:39AM 08:39AM 08:39AM 08:39AM 08:39AM 08:39AM 08:39AM 08:39AM 08:39AM 08:39AM 08:39AM 08:39AM 08:39AM 08:39AM 08:39AM 08:39AM

THE COURT: All right. 08:39AM

MR. MARTIN: -- I want that on the record. 08:40AM

THE COURT: Okay, well, I guess to let her be -- to allow her to -- to interrogate because that was the intention in the first place, that was her witness in the first place according to them, and I think that was stated --

MS. M. MILLER: That's correct, Your Honor.

THE COURT: -- that was stated at the time.

Yes, Counsel, Ms. McConwell?

MR. MCCONWELL: Hansen Helicopters -- Hansen Helicopters joins in the objection and -- and that was not stated prior to the witness testifying at the end of the day --

THE COURT: That's true. You mean in terms of that she wasn't feeling well?

MS. MCCONWELL: At the term -- yeah, in terms that she wasn't feeling well, we were not notified that this was her witness that Ms. Miller -- Ms. Samantha Miller was going to take the witness for that day. And even when she said that she didn't feel well at end of the day, she -- well, it may have been the next day when we heard that it was her witness that she had Ms. Miller take --

MS. M. MILLER: No, it actually was that --

MS. MCCONWELL: -- because she wasn't feeling well.

THE COURT: The Court -- okay --

MS. M. MILLER: -- day, Your Honor, and I think we've beat on this horse -- horse to death.

THE COURT: Okay.

MS. M. MILLER: Can we move on now?

THE COURT: The Court -- the Court will recall -- make -- okay, Defendant will rely on its own recollection, but -- but the -- your -- the Court accepts your joinder. The Court will deny the motion to disallow Marie Miller to continue with the interrogation -- or start the interrogation of the witness.

Anything further?

MS. MCCONWELL: I have two things: I hope we're not going to re -- re-plow the ground that was plowed by Ms. Samantha Miller in our last day in Court?

MS. M. MILLER: No, no.

THE COURT: Okay.

MS. MCCONWELL: And then my -- my second thing --

THE COURT: I'm sure there would be objection asked and answered.

MS. M. MILLER: Right.

THE COURT: Yes.

MS. MCCONWELL: My next question, Your Honor, so our Juror No. 8 was excused who was formally Alternate No. 1 --

THE COURT: Yeah.

MS. MCCONWELL: -- and I have on my sheet that juror -- that juror that was originally Alternate No. 3 is who is going to replace Juror 8, and I just wanted to make sure that that was -- is consistent.

THE COURT: Okay, Carmen, you want me -- let me have Carmen check her notes and I'll pull up mine too.

MS. MCCONWELL: Are we -- I wasn't sure if we're supposed to say the name, so that's why I didn't.

THE COURT: Just need -- no, the number is fine. Okay, well, just let me get --

MS. MCCONWELL: Well, the last number I have was -- was Alternate 2, but this person may have been Alternate 1. Anyway, I just want to make sure we have the same --

THE COURT: Yeah, that's -- that's a good point. Let's -- let's try to get that.

(Discussion with clerk.)

THE COURT: Sure, yeah, go ahead.

(Carmen spoke to Defense Counsel.)

THE COURT: Can we get Lani to come in too?

(Pause.)

THE COURT: Okay. We'll get you a copy of the new chart. Carmen --

MS. MCCONWELL: Carmen, were we the same?

THE CLERK: Yes, ma'am.

THE COURT: So Alternate No. 2 now becomes Juror No. 8, and I'll give you the...

(Pause.)

THE COURT: Okay. If you all have a copy now that we're on the same page.

Good morning.

THE WITNESS: Good morning, Your Honor.

THE COURT: So before we begin, while Carmen is passing all that out, how many more witnesses do you have left, Ms. Marie Miller?

MS. M. MILLER: After Special Agent Khamvongsa, just two.

THE COURT: Oh, okay. Good. And then it's Mr. Klang?

MS. M. MILLER: Mr. Klang and Mr. Guzzetti.

THE COURT: Guzzetti. Just those two?

MS. M. MILLER: Yes.

THE COURT: All right. And, defendants, you probably -- are you -- are you now -- are you prepared to tell me if you have any witnesses you're going to call or you want to wait until...

MR. MARTIN: Your Honor, we're to kind of waiting to see how everything falls out.

THE COURT: Okay. Very well.

(Conferred with the Clerk.)

THE COURT: So we're good to go. All right. Shall we call in the jurors everyone?

MS. M. MILLER: Yes, Your Honor.

THE COURT: Okay. We'll call in the jurors. Everyone feeling okay? Do I need to get you guys free COVID tests? You guys have your test kits?

MS. M. MILLER: Yup.

THE COURT: We have test kits too. Okay. How long do you think you'll be with your --

MS. M. MILLER: We'll be done hopefully -- well, we'll be done today but I'm hoping we'll be done before end of the day so that we could actually start his cross today.

THE COURT: Oh, okay, that's a long -- okay, so you -- you're looking at having him all day with --

MS. M. MILLER: Possibly.

THE COURT: Okay. Yes?

MR. MARTIN: It was 45 minutes --

MS. M. MILLER: On Thursday.

MR. MARTIN: -- last -- last time we were in here, Judge, and now it's all day.

THE COURT: Okay. I'll --

MR. MARTIN: That's one of the reasons I'm objecting to changing lawyers midstream.

THE COURT: Well, how do you know it wouldn't --

MR. MARTIN: I believe it substantially --

THE COURT: -- it might -- it could have been the same. She -- Ms. Samantha might --

MS. M. MILLER: It wouldn't have been any shorter with Ms. Samantha Miller.

THE COURT: She might have said the same, you know.

MR. MARTIN: It was announced that it would be about a 45-minute witness.

THE COURT: Okay. Well, maybe it will turn into 45. We'll see. We'll see what happens.

Okay. Well, I guess I haven't really missed you all.

(Laughing.)

MS. M. MILLER: I missed you for five minutes. Now we're back, no more.

THE COURT: Okay, no, we're getting there. Oh, it looks like you have three to witnesses and --

MS. M. MILLER: Yes.

THE COURT: -- then, yeah. You have the jury instructions. I've reviewed your jury instructions --

MS. M. MILLER: Yes.

THE COURT: -- that you sent me. Thank you everyone. And then we'll go through all that, and, yup, we're good. And I don't -- yeah, we're good on -- I'm -- I'm here.

I don't have any place to go.

MS. M. MILLER: Wonderful.

THE COURT: Yeah.

MS. MCCONWELL: I was curious while we're waiting, do we have an estimate on the length of Mr. Guzzetti or Mr. Klang?

MS. M. MILLER: On how long they'll be?

THE COURT: Yeah, all right.

MS. M. MILLER: So Mr. Guzzetti, Your Honor, I anticipate being about four hours, and Mr. Klang I anticipate being about the same.

THE COURT: Okay. So it looks like, if anything, I mean, if everything went well, we probably could get through them in the next three days.

MS. M. MILLER: That's -- that's my hope. And, Your Honor, if we stick to legal arguments only either in the mornings --

THE COURT: Oh, we can --

MS. M. MILLER: -- or in the evenings --

THE COURT: Yeah.

MS. M. MILLER: -- we will definitely do that.

THE COURT: We are sticking with that. You see my calendar --

MS. M. MILLER: Excellent.

THE COURT: -- it's set up that way. We're not

08:46AM 08:46AM 08:46AM 08:46AM 08:46AM 08:46AM 08:46AM 08:46AM 08:46AM 08:46AM 08:46AM 08:46AM 08:47AM 08:47AM 08:47AM 08:47AM 08:47AM 08:47AM 08:47AM 08:47AM 08:47AM 08:47AM 08:47AM 08:47AM 08:47AM

having anything interrupt my calendar.

MS. M. MILLER: Excellent.

THE COURT: Yeah, all my sentencings, whatever needs to be bumped. Well, I haven't checked it lately, but I'm pretty sure it is that way.

MS. M. MILLER: Uh-huh.

(Jury in at 8:47 a.m.)

THE COURT: Welcome back, ladies and gentlemen. Nice to see all of you. I appreciate your dedication to staying healthy and being here today. Unfortunately, we did lose one juror. She had a family issue, so and -- and so we had -- I had to let her go. And she didn't want to go but she was very -- she had go, but she was very -- wanting to stay, very dedicated to continuing to stay.

But so we -- I have 14 of you, so every one of you are very important. We want to finish this. The prosecution intends to finish their case in chief in this week. They have three witnesses remaining, including the witness currently on the stand who, you might recall, was still on the stand the week before we had our last recess. And then -- and then they have two witnesses after him, and then we will proceed -- I'll tell you how we're going to proceed after that, and then -- and then, you know, there'll be potential other evidence we'll see and closing arguments and then deliberations. So that's that -- so there is an end

in sight, and so thank you for your patience. 08:48AM

At this time, Ms. Miller, Marie Miller. 08:49AM

MS. M. MILLER: Yes, Your Honor, thank you. 08:49AM

THE COURT: Are you willing to restate the name of the witness for the record or you can have him? 08:49AM

THE WITNESS: It's Viranousith Khamvongsa. I'm a Special Agent with IRS Criminal Investigation. 08:49AM

MS. M. MILLER: Thank you, sir. 08:49AM

May I proceed, Your Honor? 08:49AM

THE COURT: You may. 08:49AM

MS. M. MILLER: Good morning, members of the jury. 08:49AM

THE COURT: Okay. What is that noise? 08:49AM

MS. M. MILLER: I don't know. I don't think it's me but maybe. 08:49AM

THE COURT: Okay, is it -- Carm -- Carm -- 08:49AM

MS. M. MILLER: Maybe somebody's mic is live and there's rep -- I don't know. 08:49AM

(Conferred with the Clerk.) 08:49AM

THE COURT: Oh, you're breathing. 08:49AM

MS. M. MILLER: I'm breathing. Okay, I'm going to stop breathing. This may be a long night -- will that work? 08:49AM

THE COURT: Well, I don't know CPR. 08:49AM

MS. M. MILLER: Hold my breath. 08:49AM

THE COURT: Anybody? The fireman probably knows CPR.

MS. M. MILLER: Yeah, we'll do that. You'll -- you'll handle it? Thank you, thank you. Thank you for not letting me die.

THE COURT: Yeah, I don't know CPR; I'm not a good judge. Okay, go ahead.

MS. M. MILLER: Is that better? Is that better, Your Honor? All right, wonderful.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, welcome back.

A. Thank you.

Q. Could you, please, tell the members of the jury, how long have you been working on this case?

A. I've been involved in this case since 2017.

Q. And could you also tell the members of the jury, who is the primary owner of every single company that was used to lease the helicopters to the tuna boat companies?

MR. MARTIN: Your Honor, I object; asked and answered. This is -- this is replowing what was already done.

MS. M. MILLER: And, Your Honor, I can assure the Court it has not been asked and answered. I read the entire transcript of Special Agent Khamvongsa's testimony.

MR. MARTIN: I have too, Your Honor, and I object; asked and answered.

08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:50AM 08:50AM 08:50AM 08:50AM 08:50AM 08:50AM 08:50AM 08:50AM 08:50AM 08:50AM 08:50AM 08:50AM 08:50AM 08:50AM

MS. M. MILLER: Then point -- point to it.

THE COURT: Counsels, all right. Address the Court, not each other.

All right. The jurors will -- it's going to be your memory that -- that counts. So the Court will allow this preliminary ones, and whether -- this will entail me to go back and look at the transcript, but I'm going to let the jurors' memory prevail, but I'll allow this one question. So go ahead, you may proceed.

MS. M. MILLER: Yes, Your Honor.

THE COURT: Go ahead, sir.

BY MS. M. MILLER: (CONTINUING)

Q. Sir, could you, please, tell the members of the jury, who owns every single company that was used to lease helicopters to the tuna boat companies?

A. Defendant Jon Walker.

Q. And could you tell the members of the jury how you know that?

A. I know that based upon the corporate records along with Hansen Helicopters, which was obtained through the search warrant as well as provided to the Government -- Government through a grand jury subpoena. I also -- it's also based upon my review of the bank records, statements made by the co-defendants, including Mr. Reed, Mr. Crowe and Mr. Walker himself. A good example is on the bank records --

MR. MARTIN: Your Honor, I object to the narrative.

BY MS. M. MILLER: (CONTINUING)

Q. Could you provide the jury with an example?

THE COURT: Okay.

MR. MARTIN: May I have a ruling on my objection?

THE COURT: Okay, the objection will be sustained, yeah.

BY MS. M. MILLER: (CONTINUING)

Q. Can you provide the jury with an example, sir?

MR. MARTIN: Your Honor, I object that's going right -- he's already done that.

MS. M. MILLER: Actually --

THE COURT: Overruled.

MS. M. MILLER: -- he didn't --

THE COURT: Overruled.

MS. M. MILLER: -- finish.

THE COURT: Overruled. Go ahead. Go ahead.

MR. MARTIN: Your Honor, may -- may I have a standing objection. When I object, I would like the Court to rule and Ms. Miller to wait for you to rule before --

THE COURT: Okay, very well.

MR. MARTIN: -- she starts talking.

THE COURT: Point --

MR. MARTIN: We've -- we've started a process and

it's been going on throughout the trial. It's not appropriate. It's not proper.

MS. M. MILLER: I'm going to move to strike Mr. Martin's comments --

MR. MARTIN: And I ask the Court to --

MS. M. MILLER: -- because that --

MR. MARTIN: -- to allow him --

MS. M. MILLER: -- that is not correct.

THE COURT: Okay, listen, I've been a judge 30 years. I think I've only used my gavel three times. I don't think I need to do it another time. So let's just say point well taken. Whoever makes an objection, but in this particular case if Mr. Martin makes an objection, Counsel wait until he's done.

MS. M. MILLER: Yes, Your Honor.

THE COURT: And then I will -- then if I -- if I think I need you to respond, I'll do it; otherwise, I can just make my ruling without your response. Both ways, okay, Counsels?

MS. M. MILLER: Yes, Your Honor.

THE COURT: Right, so objection over -- sustained. Go ahead.

MS. M. MILLER: No, you overruled it.

THE COURT: I'm sorry, no, objection -- his request -- I'm sorry, his request is granted, I should say.

MS. M. MILLER: Right.

THE COURT: The request is granted.

MS. M. MILLER: But then the --

THE COURT: You know, the objection is overruled.

MS. M. MILLER: -- I could ask the example?

THE COURT: Go ahead, yeah. Yeah.

BY MS. M. MILLER: (CONTINUING)

Q. Could you provide the jury with an example?

A. A good example is the exhibit that we have, as it relates to Exhibit 829, as you look at the 30 Vanuatu companies, you can see that it flows through Bean Bag, then it flows through Caledonian Insurance Company, and eventually it all flows through to Jon Walker.

In addition, we have tax records which reflect that those companies are wholly owned by Hansen Helicopters, and Hansen Helicopters is 99.9% owned by --

MS. MCCONWELL: Your Honor --

THE WITNESS: -- Mr. Jon Walker.

MS. MCCONWELL: -- I object to any testimony about Hansen Helicopters. Hansen Helicopters is not part of any of the counts that Mr. Khamvongsa is testifying to.

THE COURT: Okay, the relevance?

MS. M. MILLER: May I respond, Your Honor?

THE COURT: Yes.

MS. M. MILLER: Yes. As we saw from the

08:53AM

testimony and from the documents that were all admitted into evidence, Jon Walker is the sole owner of Hansen Helicopters. So some of the evidence that the control of these leases, the control of the helicopters was actually directed by Jon Walker but through Hansen Helicopters.

THE COURT: Is this -- oh, okay, yes?

MR. MARTIN: Your Honor, may I --

THE COURT: Mr. Martin, yes?

MR. MARTIN: My objection is Ms. Miller is testifying.

MS. M. MILLER: I'm not testifying.

MR. MARTIN: She responded --

THE COURT: Okay, wait --

MR. MARTIN: May I --

THE COURT: -- wait, wait --

MR. MARTIN: May I make my --

THE COURT: Don't -- don't respond -- wait, wait, Ms. Miller, don't respond, please. Just -- nobody respond unless I ask you guys to respond.

MS. M. MILLER: Yes, Your Honor.

MR. MARTIN: Ms. Miller is testifying in response to a legal objection. That's inappropriate. That's for the jury to decide who owns what, who doesn't own what. I object to these testifying responses she's making and ask the Court, if we need to go into that, excuse the jury and do it

appropriately.

THE COURT: All right. And, Ms. McConwell?

MS. MCCONWELL: And I object to any reference or inference of Hansen Helicopters or trying to bootstrap them into counts that they have not -- Hansen Helicopters has not been indicted on, which are Counts 99 through 110.

THE COURT: All right. And let me just have one more -- okay, go ahead, Ms. --

MS. M. MILLER: May I respond --

THE COURT: Yes --

MS. M. MILLER: -- Your Honor?

THE COURT: -- Marie Miller, go ahead.

MS. M. MILLER: First of all, it's impossible to respond to a relevance objection without reminding the Court of the evidence that has been --

THE COURT: Okay, let me just --

MS. M. MILLER: -- produced.

THE COURT: -- let me just say -- let me just look at 99. Let me look at the indictment.

MS. M. MILLER: Well, no, Your Honor, Hansen Helicopters is not named as a named defendant in Count 99.

THE COURT: All right, so okay --

MS. M. MILLER: However --

THE COURT: -- so we all agree on that. So --

MS. M. MILLER: Yes.

THE COURT: -- it has to do with another theory --

MS. M. MILLER: Yes.

THE COURT: -- not that theory?

MS. M. MILLER: Correct.

THE COURT: Which is what?

MS. M. MILLER: Which is that Jon Walker, as the 99.99 --

THE COURT: All right. So we heard --

MS. M. MILLER: -- percent --

THE COURT: Okay, hold on. The Court already has that evidence before it, so you don't need go any further with that.

MS. M. MILLER: Correct. So what Mr. Khamvongsa was talking about -- was answering the question about --

THE COURT: Got it.

MS. M. MILLER: -- is how he knows through his investigation --

THE COURT: I got it. I understand.

MS. M. MILLER: Yes.

THE COURT: I already -- I been here as long as you guys have.

MS. M. MILLER: Yes.

THE COURT: Okay, go ahead. Anything further, Counsels?

MS. MCCONWELL: Well, I would also say asked and answered. Some of this ground we went through on Thursday, June 8th, and so I think we need to move on to subject matters that have not been --

THE COURT: Okay.

MS. MCCONWELL: -- inquired of.

THE COURT: All right. Anything -- okay. Any -- on the asked and answered?

MS. M. MILLER: It has not been, Your Honor. As a matter of fact, as I've stated earlier, I reviewed the entire transcript of the testimony of Agent Khamvongsa and I ensured myself for the Court that there is not one question that has been asked and answered.

THE COURT: All right, very well. And I've heard the opposite sometimes from the defense.

All right. On the -- on the objection of asked and answered, again, the Court will -- the Court will overrule that objection and I will allow the jurors to recall their own memory of the prior testimony, which did occur sometime ago.

Secondly, on the particular original objection, the Court will overrule that objection, and you may proceed.

MS. M. MILLER: Thank you, Your Honor.

MS. MCCONWELL: Your Honor, I'd ask for a limiting -- the limiting instruction that you have given about that Hansen Helicopters is not charged in this Counts 99

through 110 --

MS. M. MILLER: And, Your Honor --

MS. MCCONWELL: -- which are the only counts that Mr. Khamvongsa's testimony is relevant to, and we -- because it's been some time since the jury's heard that limiting instruction.

THE COURT: All right.

MS. M. MILLER: Your Honor --

THE COURT: Yes?

MS. M. MILLER: -- that limiting instruction was given repeatedly. The jury just heard the objection.

THE COURT: All right, so --

MS. M. MILLER: The jury has heard the Government say that Hansen --

THE COURT: All right, the question is --

MS. M. MILLER: -- is not named.

THE COURT: -- you -- you -- just way minute. So you're not saying that the instruction is incorrect. You're just saying that just think it's not -- I've already stated --

MS. M. MILLER: It is at this point so cumulative --

THE COURT: Let me have a --

MS. M. MILLER: -- it's just --

THE COURT: Let me have a copy of that instruction --

MS. M. MILLER: -- wasting time.

THE COURT: -- copy of the instruction.

MR. MARTIN: Judge, it's been 45 days since the jury has heard the instruction.

THE COURT: Has it been 45 days?

MR. MARTIN: And --

THE COURT: My gosh.

MR. MARTIN: -- and --

THE COURT: Okay, we got it. I got it. You guys don't have to explain it. You may proceed.

MS. M. MILLER: They don't remember the instruction but they remembered the 200 pages of testimony --

THE COURT: The Court will overrule --

MS. M. MILLER: -- over that period of time --

THE COURT: The Court will overrule --

MS. M. MILLER: -- right?

MR. MARTIN: These sidebar comments are continuing.

THE COURT: All right.

MS. M. MILLER: And your objections are --

THE COURT: No --

MS. M. MILLER: -- continuing --

THE COURT: Counsel --

MS. M. MILLER: -- so I need to respond to the objections.

THE COURT:  Listen, I don't want to have to reach
over.  It's like five more inches from me.

All right.  The Court will -- the Court will --
okay, first of all, on the instruction, I'll give the
instruction this time.  So let me pull it up to make sure I
say it correctly.  I'm pretty sure I have it in my pile here,
but I'm going to get it faster with Emily giving it to me.  I
think.

You don't have it?  All right, let me see.  Maybe
I have it.  Hold on.

Secondly, yeah, Counsels, let's just keep our
comments to ourselves, as much as we want to say stuff, you
know, in the heat of the trial.  We get all excited.  How do I
know?  Because I used to be a trial lawyer.  But you need to
calm down, everyone.

All right, let me see.  Let me pull my --

(Conferred off the record.)

THE COURT:  Excuse me, ladies and gentlemen of
the jury.

(Pause.)

MS. MCCONWELL:  Your Honor, I think we created it
when Ms. Jones also testified.

THE COURT:  Who?  Ms. Jones?

MS. MCCONWELL:  Ms. Jones.

THE COURT:  All right, let me try -- we'll try to

find it. We'll try to find it but let me -- so let's just craft one -- wait, hold on, it's right here. No, that's -- that's got to -- that's got to do with COVID stuff. That's not it. Find it?

All right. Basically you want a limiting -- I'll find a limiting instruction, but I just -- basically just say that the defendant not charged under -- under Counts 99 through 110?

MS. MCCONWELL: Yes, and his testimony is not relevant to Hansen Helicopters.

THE COURT: It's not relevant as to -- well, it's -- they're saying -- they're saying it's relevant to Hansen Helicopters --

MS. M. MILLER: Exactly.

THE COURT: -- to a certain extent. But -- but, in terms of the charging, that's what you're saying --

MS. M. MILLER: No.

THE COURT: -- you're focusing on the actual charged indictment, which I have a copy of.

MS. M. MILLER: And that's --

MR. MARTIN: Your Honor, if the Court remembers --

MS. M. MILLER: -- and that changes.

MR. MARTIN: -- the Government's trial brief said his testimony would be limited to Counts 100 through 110.

MS. M. MILLER: No, that's incorrect.

THE COURT: Okay, wait, wait, hold on, let him --

MR. MARTIN: It says 100 --

THE COURT: -- let him just finish.

MR. MARTIN: It says wire fraud -- I'll be more specific. It says wire fraud and money laundering, which is counts --

MS. M. MILLER: Conspiracy --

MR. MARTIN: -- one --

MS. M. MILLER: -- to commit --

MR. MARTIN: Can she just --

THE COURT: Wait, Ms. Miller --

MR. MARTIN: May I finish?

THE COURT: Ms. Miller, let him, and then I -- if you don't let him finish, I'm not going to let you respond.

MS. M. MILLER: Yes, Your Honor.

THE COURT: So it's better to let him finish if you want to get your point across.

MS. M. MILLER: Yes, Your Honor.

THE COURT: All right. What is it, Mr. Martin?

MR. MARTIN: It says --

THE COURT: No, just want what count -- what counts are you talking about?

MR. MARTIN: I'm reading from the Government's summary of their trial brief where it says his testimony, what

it will be --

THE COURT: Uh-huh, counts --

MR. MARTIN: -- will testify as to wire fraud and money laundering charges reflected in SSI, which is Counts 100 through 110.

MS. MCCONWELL: And, Your Honor --

THE COURT: Okay.

MS. MCCONWELL: -- that's at 1311-51.

THE COURT: Okay.

MR. MARTIN: Page.

THE COURT: 100 -- strike -- okay, hold on, hold on. I'm a fast reader but I got to -- let me look at this real quick. 100 -- okay, 100 to 104 is wire to fraud. And let's see, okay, and 105 to 110, well, that wouldn't be relevant. That's -- that was the forfeiture allegations. So 100 to 104 is money laundering.

MS. M. MILLER: No, Your Honor.

THE COURT: 1 -- 99 --

MS. M. MILLER: Count 99 is conspiracy to commit wire fraud.

THE COURT: Oh, I'm reading it wrong; that's right. Okay -- but, okay, you're talking about 100 to 104 --

MR. MARTIN: 110, Your Honor.

THE COURT: Okay, 1-0 -- 100 to 104 is --

MR. MARTIN: Wire fraud.

THE COURT: -- money laundering and notice of forfeiture allegations.

MR. MARTIN: Your Honor, 1 --

THE COURT: Are you guys looking at the Second Superseding Indictment?

MR. MARTIN: Yes, Your Honor, 105 through to 110 is money laundering.

THE COURT: Oh, okay, you're right. Strike that. I'm looking at -- you know what --

MR. MARTIN: And -- and if the Court will look at --

THE COURT: Yeah, you're right, you're right. I'm sorry.

MR. MARTIN: -- ECF 1311, page 42 --

MS. M. MILLER: It's 51 on the ECF.

MR. MARTIN: Yeah, ECF. It's Page 51 on the ECF. At top of page, it tells what the summary testimony of the witness will be.

THE COURT: All right. Okay. So let's look at this really quick, let me look -- I'm looking at the -- I was reading the -- I was reading the order wrong. So 100 to 104 is wire fraud.

MS. M. MILLER: 99, Your Honor, is the wire fraud --

THE COURT: Okay, wait, Counsel -- but, Counsel,

he's only talking about -- okay, we'll talk about -- you can respond in a minute. He's only talking about 100 to 110. That's all I'm focused on right now.

MS. M. MILLER: But he's misleading you, Your Honor.

THE COURT: But you can say -- you can say that when you respond.

MS. M. MILLER: Okay.

THE COURT: Let me just -- yeah, let's just hear what he has to say. 100 to 104 is wire fraud, and 105 to 110 is --

MS. MCCONWELL: Money laundering.

THE COURT: -- money laundering. Okay, we all agree on that. Anybody disagree? Okay?

MS. M. MILLER: Yes, Your Honor, I disagree.

MR. MARTIN: That -- that is found, Your Honor, at ECF 1311, Page 51, where it tells what his summary testimony will be, that's where that comes from. It's the Government's document and it says "wire fraud and money laundering charges."

THE COURT: Okay.

MR. MARTIN: And I've read that. I can read it --

THE COURT: No, you don't have to read it. Please don't read to me. Nobody needs to read to me.

MS. M. MILLER: And Count 99 is conspiracy to commit wire fraud. By the way, we had this legal argument --

MR. MARTIN: We've not --

MS. M. MILLER: -- the last time that --

THE COURT: All right, wait, wait, Counsels --

MS. M. MILLER: -- Agent Khamvongsa --

THE COURT: Okay --

MS. M. MILLER: -- testified.

THE COURT: Okay, all I care about is --

MS. M. MILLER: This is the --

THE COURT: Let me --

MS. M. MILLER: This is the same argument.

THE COURT: Let me -- okay, I found the instruction. Everybody could be seated. Here we go.

Ladies -- I got the instruction.

The Court notes what -- I see the Counts 99 through 110. It says, "Although the defendants are being tried together, ladies and gentlemen of the jury, you must give separate consideration of each -- to each defendant. In doing so, you must determine which evidence in the case applies to each defendant, disregarding any evidence admitted solely against some other defendant or defendants. The fact that you may find one of the defendants guilty or not guilty should not control your verdict as to any other defendant or defendants." This is Court's -- gets this instruction from

6.12, all right, so separate consideration for each defendant.

So we have two defendants in this case, that are remaining here in Court now, right, Mr. Jon D. Walker represented by Mr. Martin and Hansen Helicopters represented by Mr. McConwell and Ms. McConwell.

So that's the limiting instruction count, ladies and gentlemen. If I'm going to get more specific about it, I will give you another one, okay?

So proceed, next question.

MS. M. MILLER: Okay. Thank you, Your Honor.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, based on your investigation, can you, please, tell the members of the jury who was the sole controller of all of the Vanuatu companies used in this case?

MS. MCCONWELL: Your Honor, I object, that calls for a conclusion.

THE COURT: All right. The Court will sustain the objection. You have to lay a foundation.

MS. M. MILLER: The question said --

THE COURT: Who -- who --

MS. M. MILLER: -- based on all of his investigation, it calls for a concl- -- I'm not -- that's --

THE COURT: Oh, yeah --

MS. M. MILLER: -- not a conclusion.

THE COURT: -- did you -- did you say based on your investigation?

MS. M. MILLER: Yes.

THE COURT: Oh, okay. Well, then, I'm sorry, I didn't hear that.

MS. M. MILLER: Yes.

THE COURT: All right. Anything further?

Yes, Mr. Martin?

MR. MARTIN: Your Honor, I believe that the Court has entered an order that -- and I object that he may testify as to what he did relating to the facts of his investigation.

THE COURT: Right.

MR. MARTIN: But any opinions that he may have are -- are to be excluded, and the Court issued an order the other day on that.

MS. M. MILLER: No, you did not. Again, misrepresentation --

MR. MARTIN: And may we have --

THE COURT: Wait, wait, wait, Ms. Miller, please let him finish --

MS. M. MILLER: Okay.

THE COURT: -- let him finish his objection. Better to let him finish. You don't -- you want to --

MR. MARTIN: They filed --

THE COURT: -- be able to speak on behalf of the

Government.

Go ahead.

MR. MARTIN: The Government filed a motion requesting that he be allowed to testify not only as to what he found in the facts to be but as to his opinions, and the Court issued an order. They also asked that he be a summary witness, and the Court issued an order that he cannot testify as to his opinions or as to any summary testimony, and she's asking that very thing right now.

THE COURT: All right.

MS. M. MILLER: Three things.

MR. MARTIN: And I object.

THE COURT: All right. Any -- wait, wait. Any other -- any other objections?

Wait, wait, wait. Ms. Miller, don't speak until I say you can speak. Zip it.

MR. MARTIN: That's --

THE COURT: Go ahead.

MR. MARTIN: That's the basis of my objection, Your Honor.

THE COURT: All right. Yes?

MS. MCCONWELL: Hansen joins.

THE COURT: Hansen joins.

All right, yes, Ms. Miller?

MS. M. MILLER: Number one, I did not ask him for

an opinion.

Number two, I did not ask this Court to allow him to testify as a summary witness; that was Mr. Klang.

Number three, this Court entered an order saying that you could not preliminarily render opinions about whether lay witness opinion is appropriate through this witness or not. You needed to wait until the questions were asked and then you would rule, Your Honor. That is what you ruled and that is exactly what was in that motion, not what Mr. Martin just represented.

THE COURT: Okay. But he is -- he is somewhat giving an opinion by, based on his investigation, he's -- he's making a finding that he believes somebody was doing something. It was while he was performing his --

MS. M. MILLER: No, the finding is that the --

THE COURT: -- job.

MS. M. MILLER: Not at all. He's saying based on the investigation and all of the evidence that he reviewed, which was he already testified earlier thousands and thousands of documents, that the sole controller was Jon Walker. That's not an opinion. That is what the evidence showed based on the transactions and based on who was signing off on those transactions.

THE COURT: But that's based on --

MR. MARTIN: Your Honor, I object to the --

THE COURT: I'm sorry, that's --

MR. MARTIN: -- narratives and the factual -- the factual way she's answering your questions, not arguing the law but trying to testify to this jury again.

THE COURT: All right. Let me just say couple things:

Number one, Ms. Miller's correct that in my order I said that Counsels can make specific objections during the trial, which you guys are -- which defense is doing now and which prosecution will have an opportunity to if they need to do so as well.

On the issue of this last question, the Court will overrule the objection and allow it. You may proceed.

MS. M. MILLER: Thank you, Your Honor.

THE COURT: Answer?

BY MS. M. MILLER: (CONTINUING)

Q. Would you like me to repeat the question, Special Agent Khamvongsa?

A. Could you please?

Q. I will.

Based on your investigation and the evidence that you reviewed, could you, please, tell the jury who was the sole controller of the Vanuatu companies that were used in this case?

MR. MARTIN: Your Honor, I object. It calls for

09:09AM 09:09AM 09:09AM 09:09AM 09:09AM 09:09AM 09:09AM 09:09AM 09:09AM 09:09AM 09:09AM 09:09AM 09:09AM 09:09AM 09:09AM 09:09AM 09:09AM 09:09AM 09:09AM 09:09AM 09:09AM 09:09AM 09:09AM 09:10AM 09:10AM

a conclusion, beyond the scope of this witness.

THE COURT: All right. Anything -- Ms. McConwell, anything?

MS. MCCONWELL: Hansen joins.

THE COURT: All right. The Court will overrule the objection. You may proceed.

BY MS. M. MILLER: (CONTINUING)

Q. Can you tell the jury --

A. Defendant Jon Walker.

Q. -- based on your review of the corporate records in this case, including the bank records, who was the president of every single one of these corporations used in this case?

MR. MARTIN: Same objection, Your Honor.

THE COURT: Overruled.

THE WITNESS: Defendant Jon Walker.

BY MS. M. MILLER: (CONTINUING)

Q. Based on your review of all of the bank records, who was the number one authorized signer to move money from accounts in this case?

A. Defendant Jon Walker.

Q. And, based on your review of all of the bank records and the tax records, who was the person who received the profits from the tuna boat leases in this case?

MR. MARTIN: Same objection, Your Honor.

THE COURT: Okay, overruled.

THE WITNESS: Defendant Jon Walker.

BY MS. M. MILLER: (CONTINUING)

Q. As a Special Agent with the IRS for the last 20 years and based on the education and experience that you already shared with this jury that you have, can you tell the members of the jury what do you look for in terms of evidence of a valid corporate structure?

MR. MARTIN: Your Honor, I object to the question, "a valid corporate structure." That's an improper question and I object. She can ask what a corporate structure is. She can ask -- he's not an expert, Your Honor, and they're trying to make him one, and I object.

MS. MCCONWELL: And I object to foundation and join in his objection.

THE COURT: All right, the Court -- okay, so -- okay, there's an objection to "valid corporate structure" and another objection to foundation. So the Court will sustain the objection on foundation.

MS. M. MILLER: So I will lay a foundation, Your Honor.

THE COURT: Right. Very well, go ahead.

BY MS. M. MILLER: (CONTINUING)

Q. So could you, please, let the members of the jury know what training and experience did you have as an IRS special agent to determine the validity of a corporation when

you're doing your investigation?

MR. MARTIN: Asked and answered, Your Honor. He's already testified as to all this background six weeks ago.

MS. M. MILLER: Which means the foundation has been laid. So I either lay it again --

MR. MARTIN: Your Honor, that's totally inappropriate --

THE COURT: Okay, wait, wait, wait.

MS. M. MILLER: -- or I don't lay it again.

THE COURT: I'm sorry. Ms. Miller, yes.

Go ahead, Mr. Martin. Go ahead.

MR. MARTIN: It wasn't laid because he's not an expert, Your Honor, and so he can't testify to expert opinions.

MS. M. MILLER: This is not an expert opinion. He's been an IRS criminal investigation agent for 20 years.

THE COURT: Okay, the Court notes that. The Court notes that.

Anything further, Mr. Martin?

MR. MARTIN: No, Your Honor.

THE COURT: All right, the Court will overrule the objection. You may proceed.

MS. M. MILLER: Thank you, Your Honor.

BY MS. M. MILLER: (CONTINUING)

Q. Could you, please, tell the members of the jury what are the indicators that you look for when you're doing an investigation to determine whether a corporation is a valid corporation?

MR. MARTIN: Your Honor, this is expert testimony; I object.

MS. M. MILLER: And you already overruled it. And, Your Honor --

THE COURT: Wait, wait, wait.

MS. M. MILLER: We're never going to get done with this trial.

THE COURT: All right, calm down, Counsels. We don't need -- I don't need every -- I just want you guys to focus on the objections.

Any -- what else, Mr. -- you made the same objection.

MS. MCCONWELL: We'll join and I'm also objecting to foundation --

THE COURT: All right.

MS. MCCONWELL: -- to her question.

THE COURT: The Court will overrule -- the Court will overrule the objection. You may proceed.

MS. M. MILLER: Thank you, Your Honor.

Ms. Santos, do you have a marker that I can use on the white board?

(Pause.)

MS. MCCONWELL: And, Your Honor, I would also object to this being cumulative. Ms. Jone[sic] has already testified, and while she was testifying, they were -- they discussed markers and a number of other items. This is cumulative testimony, and she was their person that was designated as an expert, not Mr. Khamvongsa.

THE COURT: So what -- what's the objection, though, I'm sorry?

MS. MCCONWELL: Cumulative. This is all cumulative --

THE COURT: On this -- on this --

MS. MCCONWELL: -- testimony.

THE COURT: On this last issue of -- well, the last question?

MS. MCCONWELL: On this last question and the line of questioning, this is cumulative to Ms. Jones' testimony.

THE COURT: Is it -- is it cumulative --

MS. M. MILLER: Not at all.

THE COURT: No, Ms. Jones, though, did go through what constitutes a --

MS. M. MILLER: Not a valid corporate structure.

MS. MCCONWELL: Yes, she did.

MS. M. MILLER: Her testimony was based solely on

the Quickbook records and her analysis of the bank transactions. It was not an issue of the companies themselves, which is a nuanced but important distinction between the two. Because Special Agent Khamvongsa, as an IRS criminal investigation agent --

MS. MCCONWELL: Your Honor --

MS. M. MILLER: -- has a different role and a different responsibility --

THE COURT: Okay, the Court --

MS. M. MILLER: -- as a forensic accountant.

THE COURT: All right. Very well. The Court notes that. Go ahead.

MS. MCCONWELL: Well, I object to Ms. Miller testifying and not soliciting whatever information's going to come in --

THE COURT: All right.

MS. MCCONWELL: -- through a witness.

THE COURT: All right. Very well. The Court will overrule the objection. You may proceed.

MS. M. MILLER: Yes, Your Honor.

THE COURT: Let's just go quickly through --

MS. M. MILLER: Yes, Your Honor.

THE COURT: -- what is required.

BY MS. M. MILLER: (CONTINUING)

Q. So, Special Agent Khamvongsa, we're going to use this

board, and I'm going to keep it back here.

MS. M. MILLER: Could we turn it so that the jury could see it. Did we lose our three-legged stool?

THE COURT: Yeah, we lost it in COVID.

MS. M. MILLER: We lost one of our legs here.

THE COURT: Yes, Mr. Martin, I see you standing up?

MR. MARTIN: I'd like to be able to see the board as well.

THE COURT: Okay, let's -- let's zoom in on this. Let's see, okay, try to zoom in on this. Try to do that. Okay.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent --

THE COURT: Okay, hold on, hold on. Let's see if we can get -- make sure that Mr. Martin and defense team can see this. So we'll zoom in on the chart there, the easel.

And so, Mr. Martin, can you see that in your -- your computer screen there or is that too -- we'll try to make it --

MR. MARTIN: I can see what Ms. Miller has written on there.

THE COURT: Okay, very good.

MS. M. MILLER: Perfect.

THE COURT: Okay. If you can't, just let me

know.

All right. You may proceed. Make sure that we have a dark, dark --

MS. M. MILLER: Yeah, this is a -- it's black marker.

THE COURT: Is it dark enough? Okay.

MS. M. MILLER: I think now with the camera on it, I think everyone will be able to see it --

THE COURT: Okay.

MS. M. MILLER: -- better.

THE COURT: Okay, go ahead.

BY MS. M. MILLER: (CONTINUING)

Q. So Special Agent Khamvongsa, could you please tell the members of the jury what is one of the indicators that you look for as an investigator with the IRS for a valid corporate structure?

A. First of all, I look at independent assets; does the corporation actually control that asset?

Q. And what is the next thing you look for?

A. Independent employees; who do the employees actually work for.

Q. And what else do you look for?

A. Shared ownership; in a corporation, it's made up -- there are shares that make up the corporation and so those shares are bought up by investors and those investors have a

voting right.

MS. MCCONWELL: Your Honor, I'm going to object to this line. I object to foundation for this witness being able to testify about physically corp -- it sounds like he's testing[sic] about corporate law and he's trying to inform the jury about who investors are. There is no foundation for him to provide any of this testimony, regardless of the fact he's been an agent for 20 years.

MR. MARTIN: I join in the objection, Your Honor. I object, this -- I object to the testimony of him -- they're making him an expert. He's not designated an expert and they're trying to do that.

THE COURT: All right. Ms. Miller?

MS. M. MILLER: Yes, Your Honor. We're not asking him any questions about opinions that would normally be an expert-only opinion. We're asking him facts that he relies on in investigation. That is an appropriate line of inquiry and it is extraordinarily relevant in this case where the defendant used all of these shell companies --

MR. MARTIN: I object --

THE COURT: You don't have to get into the --

MS. M. MILLER: Yes, Your Honor.

THE COURT: I agree with that, that objection is sustained. Let's go back for a second. With regard to his -- he's going through the corporate -- what he believes are

corporate requirements. But with regard to the foundation, the particular objection is, what is his background to know what constitutes a valid corporation. The Court --

MS. M. MILLER: And when I asked that, the objection was cumulative because it was asked and established already. So which way are we going to go? I'm happy to go back and lay the foundation again and let the jury hear again about all of his training and experience. And then you know what's going to happen --

THE COURT: Wait, wait. We know. Mr. Martin, go ahead.

MR. MARTIN: Your Honor, I'm going to object to everything she does that I think is inappropriate. It's my job to do that. If she wants me to pick one side or the other, I'm picking 'em all. It's my job to defend my client. And I am offended when people keep making -- testifying about facts that have not been testified to in this case and I want the Court to instruct her --

THE COURT: That's right.

MS. M. MILLER: Your Honor --

THE COURT: No, Ms. Miller, the Court will warn you, just focus on the objection. If the objection is foundation, all you have to say is "I've already done it, you've already said it." Okay.

MS. M. MILLER: I've already done it, you've

already said it.

THE COURT: Simple. Brevity is better.

MS. M. MILLER: Perfect.

THE COURT: But let's not get into an analysis of why, team. We don't care about that. I can figure that out. All right, yes?

MS. MCCONWELL: And, Your Honor, I'm also going -- I have an objection that this is beyond the scope of what this witness was identified to testify regarding.

THE COURT: All right. So the Court will overrule the objection on the last objection. But on this objection on the corporate structure, the Court will allow Counsel, Ms. Miller, to just focus in on that particular part --

MS. M. MILLER: Yes, Your Honor.

THE COURT: -- his knowledge, background, experience, just on -- zoom in. Not the entire breadth -- depth and breadth of your resume, just that part. Go ahead.

BY MS. M. MILLER: (CONTINUING)

Q. So can you please tell the members of the jury, what training, education and experience you have that allows you to testify about your investigations into corporate structures?

A. So the -- with the IRS criminal investigation, I received extensive training as it relates to corporations. Oftentimes, through the course of our investigations,

corporations can be abused and used to conceal the beneficiary and conceal criminal acts. Corporations are their own legal entities separate from the owners, but --

MR. MARTIN: Your Honor, I object to the narrative here. The question was what training he had. Now he's giving a lecture on what this does and I object it's a narrative.

THE COURT: Objection will be sustained. Just like, you know, what school did you go to, to learn about this. Or what training, you know, like that. What experience -- in terms of experience, you just say how many times you had to testify regarding the adequacy of the corporation. That's it. Just that simple.

THE WITNESS: Yes.

THE COURT: You know --

THE WITNESS: My apologies, Your Honor.

THE COURT: Okay, go ahead.

THE WITNESS: I've had -- every year, we go through continuing professional education, I received training at the Federal Law Enforcement Training Center. I received continuous training through the IRS. It's... that's it.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. And when you say you received training, do you actually attend classes?

A. Yes.

Q. What was your undergrad degree in? 09:21AM

A. It was in accounting. 09:21AM

Q. Okay. And in accounting, I was an accounting major as well, can you tell the members of the jury what you learn about corporations when you are going through an undergraduate degree in accounting?

A. We learn how the corporation is made, the purpose behind the corporation, um, how it's beneficial to an individual or groups of individuals.

Q. And when you go through your training to become an IRS criminal investigations agent, how long do you go through that training?

A. IRS criminal investigation has one of the longest training programs. It runs about 6 to 8 months.

Q. Okay. So in addition to your four-year college degree, you also went to training for 6 to 8 months to become a criminal investigation agent; is that correct?

A. That's correct.

Q. And were some of the classes that you took or the seminars that you took related to the validity of corporate entities?

A. Absolutely.

Q. And is that where you learned how to investigate a case that involves a corporation?

A. Yes.

Q. And have you had many hours of studying that?

MR. MARTIN: Your Honor, I object to the continual leading of this witness.

MS. M. MILLER: It's laying a foundation. Leading is appropriate in laying a foundation.

THE COURT: Let him finish the objection --

MS. M. MILLER: He did.

THE COURT: No, he didn't. He was in mid-sentence.

MS. M. MILLER: Foundation.

THE COURT: He was in mid-sentence. He was still going. Yes, go ahead.

MR. MARTIN: My objection is to the continual leading of this witness.

THE COURT: You know what, it's been a long time since I've been with these lawyers. (Laughing.) I feel like I never left. Go ahead. Mr. Martin, go ahead.

MR. MARTIN: My objection is to the continuous -- she's asked five leading questions in a row. It's inappropriate.

THE COURT: All right. So generally, the Court does allow for foundational questions, I do allow leading. So the Court will overrule the objection. All right. I think he's getting -- wrap it up.

MS. M. MILLER: Absolutely. I think that's

sufficient.

BY MS. M. MILLER: (CONTINUING)

Q. So let's move on now to the next question. Can you tell the members of the jury, based on your training, education, experience, what else do you look for when you are trying to determine whether a corporation is valid?

MR. MARTIN: To which I object, Your Honor, is an expert opinion and he's not been designated.

THE COURT: Overruled. Go ahead.

THE WITNESS: Shared decision making. Because with investors, when like earlier I talked about voting power, you vote in a board of directors and it's those board of directors that decide how the corporation is going to operate. So it's a shared decision-making process.

BY MS. M. MILLER: (CONTINUING)

Q. And what else do you look for?

A. Recorded meetings. So oftentimes, these board of directors meet and these meetings are recorded so that these meetings are transparent to the investors.

Q. And what else do you look for?

A. Shared profits.

Q. And tell us what you mean by *shared profits*?

A. So a corporation's sole purpose is to generate money, generate profits, and oftentimes, these profits are shared with the investors as dividends.

Q. In this case, did you take what you had learned from your education, training and experience, about valid corporate entities, and apply it to the information that was seized from the defendants regarding the Vanuatu companies?

A. Yes.

Q. And could you please tell the members of the jury, first, did you -- what did you find about whether these Vanuatu companies had independent assets?

A. There are none.

Q. What did you find about whether these Vanuatu companies had independent employees?

A. There were none.

MR. MARTIN: Your Honor, I object to this line of questioning not being related to Counts 100 through 110, which was the substance of what the government provided to Counsel for defense in this case that this witness's testimony would go to. And this has nothing whatsoever to do with Counts 100 through 110, and I ask that the testimony be stricken.

MS. MCCONWELL: And Hansen joins.

MS. M. MILLER: May I respond, Your Honor?

THE COURT: Yeah, does it relate to 100 to 110?

MS. M. MILLER: It absolutes relates to Count 99 which is conspiracy to commit wire fraud --

THE COURT: Okay. So you agree that we're not focusing on 100 --

MS. M. MILLER: No, I do not agree. Absolutely not. As a matter of fact --

THE COURT: All right. You know what, why don't you guys get on your little thingy.

Oh, do we still have that?

THE CLERK: Yes, Your Honor.

THE COURT: Okay, let's try it. Let's do it.

Because I can already feel you're going to be objecting, jumping up.

(Pause. )

THE COURT: You know what, let's just do this, Carm, I'll let the jurors go. 10-minute, 15 minutes, let's take a break. Please rise for the jury.

(Jury out at 9:27 a.m.)

THE COURT: All right. We're outside the presence of the jury. Yes, Ms. Martin[sic]? What's it relevant to? Okay, so let's just focus on 100 -- let's not get on to 99 yet. On 100 to 110, what's the relevance to that?

MS. M. MILLER: The relevance to that, Your Honor, is if you look at Counts 100 through 104, those are specific wire fraud counts and those wire fraud counts involve transfers of funds into an account called Caledonian Insurance Company's bank accounts, and if I could show the Court and remind the Court of the corporate structure of the defendants

09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:27AM 09:27AM 09:27AM 09:27AM 09:27AM 09:27AM 09:27AM 09:27AM 09:27AM 09:28AM 09:28AM 09:28AM

here, we see Caledonian Agency here. Okay? So the funds that were coming in for the tuna boat contracts were coming into Caledonian Agency --

MS. MCCONWELL: Can Agent Khamvongsa step out while we're having this conversation?

THE COURT: Oh, yes, Mr. Khamvongsa, you want to step out then?

MS. M. MILLER: This is a legal argument. Why does he have to step out? Because we have people sitting there including the defendant's own expert.

THE COURT: They think it's a factual argument. That's why.

MS. M. MILLER: It's not a factual argument. It's a legal argument about whether the indictment --

THE COURT: That's okay. He could step out. He can hold his own. Let's go. All right.

MS. M. MILLER: Okay.

THE COURT: So, go ahead.

MS. M. MILLER: What the evidence is going to show, Your Honor, is that these shell Vanuatu companies entered into the tuna boat contracts with the tuna boat companies, then the money was sent to Caledonian Agency from the payment for these contracts and Caledonian Agency was identified as an investment company.

THE COURT: All right.

MS. M. MILLER: From Caledonian Agency, the money was then sent out to Hansen Northern and Hansen Helicopters for payment of expenses relating to operating, and then the profit went to Jon Walker.

So what we have with the wire fraud counts is we have a situation where these Vanuatu companies were used as shells to enter into these leases with the tuna boat companies, but ultimately, the money is going to Caledonian Agency and then eventually to Jon Walker.

So we alleged and we incorporated by reference the allegations that are contained earlier on in our second superseding indict that the defendants used the Vanuatu companies to commit their fraud.

As a matter of fact, Mr. Martin and Mr. McConwell, in pleadings filed with this Court, specifically ECF 541 said, that the Vanuatu companies were created to quote, "avoid liability," and that the Vanuatu companies ultimately are all owned, if you follow the trail, by Jon Walker. We have him at the top, and he has all these corporate entities that are used to confuse, deceive, lie, but ultimately, the money all goes back to him.

So what they're trying to do is they're trying to create this situation where, Hey, Your Honor, no, it's irrelevant to talk about these other corporate entities as to these counts. No, it's not. Those counts are based on leases

         that the defendants signed, that they named these corporate entities, these Vanuatu companies as the lessors, despite the fact the companies did not own the helicopters, did not have any employees, did not have any assets, Hansen Helicopters did everything, controlled everything. And Jon Walker is in fact Hansen Helicopters. This goes to the very heart of our alter ego argument to this Court. 09:31AM

Additionally, this argument was made by defense Counsel the last time we were here and you, Your Honor, overruled the argument. And we have on the transcript where this Court already heard this argument and already overruled the argument. Mr. Martin knows that.

So now all we're doing is we are literally wasting the jury's time because the same arguments are being made that this Court has already overruled. And if he's read that transcript so carefully as he claims he has, then he knows that. But we're trying to interrupt the flow of the evidence to this jury because the evidence is damming to his client. That's not a valid legal basis to raise an objection over and over again that's already been ruled on by this Court. We're one hour into presentation of evidence and we had to excuse the jury to have a legal argument that we already had that this Court has already overruled.

THE COURT: All right. Anything further?

MR. MARTIN: Yes, a lot, Your Honor. I disagree

with everything she just said, Your Honor.

MS. M. MILLER: Of course.

THE COURT: Okay.

MR. MARTIN: When she cited to the Court 541, first of all, that was a motion to suppress relating to the First Superseding Indictment, it has nothing to do with this indictment. It was withdrawn when they filed a superseding indictment.

Secondly, Your Honor, this argument, if she says it's in the transcript, point it out to us, point it out to us. I disagree. We had this argument the last time we were in Court. You sustained it. You said we are limiting this to 100 through 110 and 100 through 104 is wire fraud. That means they have to establish a scheme to defraud.

MS. M. MILLER: Exactly.

MR. MARTIN: His testimony that he's giving, their scheme to defraud, alleges that they have -- they have alleged these -- pardon me, the helicopters don't meet the standards of the FAA, and therefore, this is wire fraud. It has nothing to do with the corporate structure of these companies.

And so I submit to you, Your Honor, his testimony is way beyond the testimony that he's put -- the government's put in their trial brief and is relevant to the substance of Counts 100 through 110.

MS. M. MILLER: The scheme to defraud has everything to do with the Vanuatu companies. We allege that in our Second Superseding Indictment. And the reason why I cited the ECF is because as an officer of the Court, representations were made by both Mr. Martin and Mr. McConwell about the relationship of Jon Walker to all of these corporate entities and they're the ones that tied it all up. And I'll remind the Court in ECF 265, when this case was first brought before the Court, they were saying there is no relation between the Vanuatu company and the defendants.

Now let's fast forward, ECF 541, okay, there is a relationship but they're valid corporations. That was one of their defenses. Then they say that the helicopters are owned and registered by Vanuatu companies, which they withdraw that contention in ECF 573 only to raise it again in ECF 1492, which was the subject to the government's motion to strike because the constant misrepresentations by defense Counsel. And, Your Honor, I will cite the Court to the transcript dated June 8th, and the Court said --

MR. MARTIN: Page number, please?

(Pause.)

MS. M. MILLER: I'm skipping over all the argument to the order.

(Pause.)

THE COURT: Okay, I'll giving you guys one minute

09:33AM 09:33AM 09:34AM 09:34AM 09:34AM 09:34AM 09:34AM 09:34AM 09:34AM 09:34AM 09:34AM 09:34AM 09:34AM 09:34AM 09:34AM 09:34AM 09:34AM 09:34AM 09:35AM 09:35AM 09:35AM 09:35AM 09:35AM 09:35AM 09:35AM

because I'm ready to rule, but go ahead. One minute unless you have anything further. Go ahead and cite to him what you're looking for.

MS. M. MILLER: So it starts -- the argument is on page 115 of the transcript. You said, Your Honor, "I suppose they're getting very particular because there is a conspiracy to commit wire fraud charge, and there is straight -- a straight wire fraud charge and there is a straight money laundering charge, okay, got it."

Next, your response, the objection and then Ms. Miller responded to the objection. And then your Court -- you said "Anything further, Counsels?"

Mr. Martin said, "I laid it out." Mr. McConwell, then Ms. McConwell and then the Court said, "Can you repeat that?" Blah-blah-blah blah blah. Here we go...

MR. MARTIN: Just so we are clear, Your Honor, I don't think we have the same transcript because my page 115 doesn't have that.

MS. M. MILLER: 50, I said. Not 15.

THE COURT: Oh, 1-5-0?

MS. M. MILLER: 1-5-0.

MR. MARTIN: I thought I heard --

THE COURT: Okay, 1-5-0.

(Pause.)

MS. M. MILLER: Boy, we argued a lot.

09:35AM 09:35AM 09:35AM 09:35AM 09:35AM 09:36AM 09:36AM 09:36AM 09:36AM 09:36AM 09:36AM 09:36AM 09:36AM 09:36AM 09:36AM 09:36AM 09:36AM 09:36AM 09:36AM 09:36AM 09:36AM 09:36AM 09:36AM 09:37AM 09:37AM

THE COURT: I'm ready to make my ruling but if --

MS. M. MILLER: Yeah, go ahead and make your ruling, Your Honor, because this goes on for pages but the point is --

THE COURT: No, you guys -- I get it. Let me -- I don't think I need to hear anybody -- more arguments. I understand the arguments. It is true that Count 99 talks about the conspiracy to commit wire fraud and I'm looking at the Second Superseding Indictment. I already stated that in the transcript that Ms. Marie Miller just briefly focused on.

Counts 100 to 104 zeros in on the underlying wire fraud. So there is a conspiracy to commit the wire fraud in 99 and the 100 to 104 is the underlying wire fraud. And then the remaining counts is money laundering that has been the subject of the -- these objections.

The whole issue now is coming to light, has been coming to light towards the end of the testimonies before we had our recess was this whole issue of the shell company motion, the alter ego defense, whether or not the Court can find by -- make a factual finding pursuant to 104(b) of the Federal Rules of Evidence if there is relevance, can the jury reasonably find by a preponderance of the evidence that these are alter ego corporations. And I think that's where we're getting to -- it appears that that's been -- the particular matter that's been heating up, especially during our latest

recesses, and the Court notes that.

So the Court will overrule the objection and allow him to speak on this issue and include Counts 99 through 110. But I will also say that, and just looking back on the issue of expert witness, it's true that the prosecution did not identify or call this latest -- how do you say his name again?

MS. M. MILLER: Khamvongsa.

THE COURT: Khamvongsa, that's right, as an expert witness. There was no notice of that and that's not what he -- they're trying to propound by him. But he can give testimony as a lay witness and under Federal Rule of Evidence 701, if he's not testifying as an expert, he can give opinion testimony if his testimony is rationally based on his perception, it's helpful to clearly understand his testimony or to determine a fact in issue and it's not based on scientific, technical or other specialized knowledge within the scope of Rule 702. Sometimes it does blend, 702 and 701 does blend, but he -- I think it's clear that he can testify regarding a lay witness opinion testimony in this regard. So that'll be the order of the Court. And then let's call in the jury. You guys want to take -- what time is our recess supposed to be?

MS. M. MILLER: I think it's supposed to be at 10:15 maybe.

THE COURT: Why don't you guys take a recess and come right back. Yes, Ms. McConwell? I'm sorry.

MS. MCCONWELL: I just want to make sure, Hansen Helicopters is not indicted on Counts 99 through 110.

THE COURT: And I think the prosecution would agree on that --

MS. M. MILLER: Yes, Your Honor, for the five-thousandth time, we do.

THE COURT: Now when it come to jury instructions, we can modify instructions to fit the evidence into -- and so forth. Okay?

MS. MCCONWELL: Yes. And I appreciate the prosecutor's frustration, however, we have a record to protect.

THE COURT: No, I think -- you know, you don't have to apologize for that. I mean you guys -- you have a right and you have a duty, both of you, Mr. McConwell and Mr. Martin have a duty to protect and zealously advocate -- oh, Mr. -- yeah, I'm sorry, see, you're hiding behind the podium, Mr. Han. I can't see you there. Mr. Han. All you have a duty to zealously safeguard your clients' rights, what you believe them to be, and to advocate for them. So let's take a ten-minute recess and we'll be back.

MS. M. MILLER: Yes, Your Honor, thank you.

(Recess taken at 9:41 a.m.)

(Back on the record at 9:59 a.m.)

THE COURT: Let's call in the jury.

(Pause.)

THE COURT: Welcome back, ladies and gentlemen of the jury. And the Court will overrule the objections and let me just say, thank you for your patience, ladies and gentlemen. And you may proceed, Ms. Miller.

MS. M. MILLER: Thank you, Your Honor.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, could you tell the members of the jury what evidence did you see that, in relation to the Vanuatu companies, there was a shared ownership of the Vanuatu companies?

A. There was none.

Q. What evidence did you see that there was shared decision making?

A. There was none.

Q. What evidence did you see of recorded meetings?

A. There was none.

Q. What evidence did you see that anyone besides Jon Walker received profits?

A. There was none of shared profits.

Q. What is a wire?

A. A wire is a telecommunication -- an electronic telecommunication such as a phone, an e-mail, an instant

message through social media, communications between banks such as a wire transfer, a fax. Those are some of the things that make up a wire.

Q. Okay. And could you tell the members of the jury what an originator of a wire transfer is?

A. Originator of a wire transfer, an OBI, often referred to or identified within a bank statement, just -- just says that the originator may come from one bank and that the B, beneficiary, is that's where is that wire going to, who is benefitting from that wire.

Q. And could you tell the members of the jury also, when you have a wire in relation to the counts in this case, is there some aspect of cross state lines or international lines or anything like that?

A. Yes, in -- in regards to wires -- the wires in this case, the wires crossed international and state lines.

Q. Okay. And how are the leases paid for the tuna boat and the pilots and the mechanics?

A. The fishing companies, or the tuna boat companies, pay by a wire transfer.

Q. Okay. And can you explain to the jury what you mean when you say wire transfer in conjunction with this case?

A. So, in reviewing the bank statements, a wire transfer is identified, and that's an electronic communication, from one bank to another saying that this amount of money is going

from one bank account to another bank account.

Q. And can you tell the members of the jury what happened around the year 2000, in this case, that changed the way Hansen Helicopters was operating?

A. So around 2000 is when Jon Walker acquired Hansen Helicopters. In 2000 is when the Vanuatu companies were first created. Around that same time is when Hansen Helicopters stopped registering the helicopters in their name and suddenly they're in the names of the Vanuatu companies.

Q. Which bank accounts were funds deposited into from the leases?

A. The funds were deposited into Caledonian Agency Inc.'s bank account.

Q. Okay. And based on the bank records, could you tell the members of the jury, what kind of company was Caledonian Agency?

A. Caledonian Agency is -- its nature of business is an investment.

Q. Could you tell the members of the jury what you did to obtain information from Hansen Helicopters in this case in relation to these transactions?

A. I issued a grand jury -- I issued a grand jury subpoena for all financial records for Hansen Helicopters and its subsidiaries, for -- including its fleet reg- -- its entirety of its fleet, the schedule of billings and

collections, the pilots and mechanics that they employ, and -- and those are but a few of some of the things in which we subpoenaed.

Q. Okay. I'd like to show you what has been previously marked --

MS. M. MILLER: But not entered into evidence yet, Your Honor.

BY MS. M. MILLER: (CONTINUING)

Q. -- Exhibit 726. You're going to see it come up in front of you. Do you see that document, sir?

A. Yes.

Q. Do you recognize it?

A. Yes.

Q. What is it?

A. This is one of the documents that came as a result of the grand jury subpoena. This is a Wilma's Flight Services, Inc. top level schedule of billings and collections.

Q. And who did you receive this document from?

A. From Hansen Helicopters.

MS. M. MILLER: Your Honor, at this time the Government would offer into evidence what has been previously marked as Government's Exhibit 726.

THE COURT: Counsel?

MR. MARTIN: No objection, Your Honor, on behalf of Mr. Walker.

MS. MCCONWELL: And, Your Honor, I would ask that the admission be limited to Mr. Walker, because this is used for the purpose of these Counts 99 through 110, which Hansen Helicopters has not been charged with.

MS. M. MILLER: And, Your Honor, again, you've already given that instruction to the jury multiple times. I don't think it's necessary to do it again. And as, Your Honor, has heard, our contention is that these companies were alter egos of --

THE COURT: Right.

MS. M. MILLER: -- Jon Walker.

THE COURT: Right. All right. So the Court will -- ladies and gentlemen, for Exhibit G-726, without objection, as to Mr. Walker, will be admitted and you may review. And then with regard to the limiting instruction, the Court has given the limiting instruction, so I don't think I need to do that any further.

MS. MCCONWELL: Right. I just wanted to make sure it was not admitted to Hansen Helicopters, solely to Jon Walker, but that's it. Thank you, Your Honor.

THE COURT: Well, all right.

(Exhibit G-726 admitted.)

THE COURT: Counsel?

MS. M. MILLER: Yes, Your Honor.

THE COURT: So --

MS. M. MILLER: You're going to instruct the jury at end of the case pursuant to the --

THE COURT: So -- okay, so we don't need to argue this case.

MS. M. MILLER: Yes.

THE COURT: Okay. Next question.

MS. M. MILLER: May I publish it, Your Honor?

THE COURT: You may.

MS. M. MILLER: Thank you.

And, Ms. Miller, if you are driving or is Mr. Leon Guerrero driving? You're driving. Mr. Leon Guerrero, can you first hone in on just the very top portion. Yes, sir. Thank you.

BY MS. M. MILLER: (CONTINUING)

Q. Now, just to make it clear for the jurors what we're talking about, who did you issue the grand jury subpoena to?

A. Hansen Helicopters.

Q. And what did you ask for?

A. Again, I asked for all financial records relative to the leasing of the helicopters as well as the pilots and mechanics, their identifications, any accounts which we receive the tuna boat money, or the lease payments from the tuna boats, those are but a few of the things we asked.

Q. Could you tell the members of the jury, Wilma's Flight Services, Inc., who's Wilma's Flight Services, Inc.,

based on your investigation and review of the records?

A. Wilma Flight Services, Inc. is a -- is a corporation belonging to Jon Walker.

Q. Where was Wilma's Flight Services, Inc. incorporated?

A. It was incorporated here in Guam.

Q. Does that make it a U.S. corporation?

A. Yes.

Q. Do you know why, in Exhibit 829, the defendants' identify Wilma's Flight Services --

MR. MARTIN: Your Honor, I object to the question --

BY MS. M. MILLER: (CONTINUING)

Q. -- as a --

MS. M. MILLER: I'm not even finished with --

THE COURT: Okay, wait, wait.

MS. M. MILLER: -- my question is yet.

THE COURT: All right. Yeah, don't answer the question. Let -- let's hear the question.

MS. M. MILLER: Can I finish the question?

THE COURT: It sounds like speculation, but go ahead.

BY MS. M. MILLER: (CONTINUING)

Q. Can you tell the jurors why, in Exhibit 829, the defendants list Wilma's Flight Service as a Vanuatu company even though we have records that it was incorporated in the

U.S.?

THE COURT: Okay. Hold on. Objection?

MR. MARTIN: I'll adopt the Court's -- sounds like speculation. Secondly, Your Honor, the defendants, I would ask Ms. Miller to identify who she is referring to, because there is no indication that Mr. Walker --

THE COURT: Fair enough.

MR. MARTIN: -- had anything to do with that exhibit, and I object to it.

THE COURT: All right. So the Court will sustain the -- the last objection -- and both objections, yeah, sustained.

MS. M. MILLER: So --

THE COURT: Rephrase on the --

MS. M. MILLER: Yes, Your Honor.

THE COURT: -- question. And then if you want to identify a specific defendant if it applies to --

MS. M. MILLER: Yes, Your Honor.

THE COURT: All right, very well.

BY MS. M. MILLER: (CONTINUING)

Q. So Mr. Khamvongsa, this exhibit --

THE COURT: Can you just state what exhibit number is that?

MS. M. MILLER: Yes, it's Exhibit 829 --

THE COURT: Okay.

10:09AM 10:09AM 10:09AM 10:09AM 10:09AM 10:09AM 10:09AM 10:09AM 10:09AM 10:09AM 10:09AM 10:09AM 10:09AM 10:09AM 10:09AM 10:09AM 10:09AM 10:09AM 10:09AM 10:09AM 10:09AM 10:10AM 10:10AM 10:10AM 10:10AM

MS. M. MILLER: -- but this was, Your Honor, just for the record, filed in Document 541 by both Jon Walker's attorney and --

MR. MARTIN: I object to whose --

MS. M. MILLER: -- Hansen Helicopters' attorney.

THE COURT: All right, hold on. I'm sorry, objection?

MR. MARTIN: Your Honor --

THE COURT: Sustained. The objection will be sustained. Let's just focus on -- we don't need to get into the --

MS. M. MILLER: Well, because --

THE COURT: No, no, wait, Counsel. We don't need to -- it's not relevant --

MS. M. MILLER: No, no --

THE COURT: Wait, wait. It's not relevant as to prior filings and motions at this point. So as far as it's being -- it's already been admitted in this Court.

MS. M. MILLER: This is already admitted.

THE COURT: Yeah, that's all I care about.

MS. M. MILLER: And I was just clarifying something Your Honor, Mr. Martin said that his client did not --

THE COURT: All right. So --

MS. M. MILLER: -- submit this.

THE COURT: -- the Court has that. All right.

MS. M. MILLER: That was not correct.

THE COURT: All right.

MR. MARTIN: That is correct, Your Honor, and --

MS. M. MILLER: That is not correct.

THE COURT: All right, Counsel, Counsel, we'll get back on that issue.

MS. M. MILLER: Okay.

THE COURT: The Court will sustain that objection at this time. We'll come back to that issue later during a break --

MS. M. MILLER: Yes. Thank you, Your Honor.

THE COURT: -- and we'll talk about that. But as far as it being submitted for this Court purposes admitted here --

MS. M. MILLER: Yes.

THE COURT: -- the Court does -- notes for the record that -- it's Exhibit what number?

MS. M. MILLER: 829, Your Honor.

THE COURT: All right. You may proceed.

MS. M. MILLER: Thank you, Your Honor.

THE COURT: And we'll get back together that issue, Mr. Martin.

Go ahead.

MS. M. MILLER: Thank you, Your Honor.

BY MS. M. MILLER: (CONTINUING)

Q. Sir, where is Wilma's Flight Service on this document?

A. I can't see it.

MS. M. MILLER: Can I --

THE WITNESS: Could you please --

MS. M. MILLER: Can I approach?

THE COURT: You may.

THE WITNESS: Okay. Wilma's Flight --

THE COURT: Why don't you go -- why don't you go on the other side, so you don't block the jury's view of him.

MS. M. MILLER: Oh, what I could do, is I could do this, Your Honor.

THE COURT: Oh, oh, okay.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, you want to step down point to where it is?

THE COURT: Okay, you can. And then let's just get a -- let's get a --

MS. M. MILLER: Sure.

THE COURT: -- a visual for the defense Counsels --

MS. M. MILLER: Okay, okay.

THE COURT: -- to see it.

Carmen -- okay, hold on, let's see if Carmen can

get the defense Counsels to see where he's pointing to.

Can you -- can you all see?

MS. M. MILLER: No.

THE COURT: Okay. Yeah, go ahead. Okay, let's see -- hold on, hold on, hold on, one second. I want to see -- we'll get you on the screen.

MS. M. MILLER: You'll be able to see it. Carmen's gonna get the camera on it and then --

(Discussion with the clerk.)

THE COURT: Oh, mic. You have a mic? Yeah, okay, go to the mic there. That's fine. Can you -- there you go.

THE WITNESS: Wilma's Flight Services is located, within this document, under the 30 Vanuatu international companies here at the very bottom.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. Thank you, sir. Thank you.

A. Thanks.

Q. What evidence did you see, in your review of all of the evidence in this case, that Wilma's Flight Service was in fact a Vanuatu company?

A. I've seen none.

Q. And this document that was just admitted into evidence that was received from Hansen Helicopters says Wilma's Flight Service, Inc. schedule of billings and

collections, can you tell the members of the jury what other documents did you see besides these types of documents that identified any other company as having a schedule of billings and collections?

A. I've seen none.

Q. So all of the billings for the tuna boat contracts went through Wilma's?

A. Yes.

MS. M. MILLER: And now, Mr. Leon Guerrero, if you could pull out, so the jury could see the rest of this document -- maybe you could just go across the entire document but a small portion. No, no, much shorter. Yeah, there you go.

BY MS. M. MILLER: (CONTINUING)

Q. So can you walk us through the columns in this document, sir? First, on the left-hand side, we see fishing companies. Could you tell the members of the jury what this is referencing?

A. This is identifying all the fishing -- fishing companies that have leases with Hansen Helicopters and its subsidiaries.

Q. And then the next column says boat name, could you explain to the jury what we are seeing there?

A. So these are the various boats which had the helicopters assigned to them, so they're generating invoices

for those services.

Q. Okay. And then invoice number, what is that referencing?

A. That references the period and the time billed.

Q. Okay. What about date billed?

A. Again, it's the date billed to the company.

Q. To the tuna boat company?

A. To the tuna boat company, correct, or the fishing company.

Q. And then it says period covered, what does that reference?

A. That's the period in what they're billing for the lease agreement --

Q. Okay. So if you --

A. -- where the lease --

Q. -- look at the first row, that's a one-month period; is that correct?

A. That's correct.

Q. And then in the column amount, what are we seeing there?

A. That's the amount being billed to the tuna boat companies.

Q. And then where see a column for fishing see -- fish -- shipping fee overtime, downtime, what are where seeing there?

A. Again, that's in relation to any fees generated, any overtime or any downtime costs which may affect the overall billing to the fishing company. 10:15AM

Q. Okay. And this is one example of many that you received in terms of the documents from Hansen Helicopters?

A. Yes.

Q. Okay.

MS. M. MILLER: Thank you, Stephen.

BY MS. M. MILLER: (CONTINUING)

Q. How much money total did the evidence demonstrate to you was received as a result of these fishing contracts?

A. In total during -- at least during the timeframe from 2000-present, $400 million.

Q. Okay. Now, could you tell the members of the jury, Wilma's Flight Service, who's the president of Wilma's Flight Service?

A. Mr. Jon Walker.

Q. Who is the signer on the bank accounts for Wilma Flight Service?

A. Defendant Jon Walker.

Q. You said that the funds from these billings went into a company called Caledonian Agency; is that correct?

A. Yes, Cal -- it went into a bank account for Caledonian Agency, Inc., which is with Bank of Hawaii here in Guam.

MS. MCCONWELL: Your Honor, I would object. I'd ask for a timeframe. It's -- it's just unclear.

THE COURT: Okay. Ms. -- you want to get a timeframe on that, please?

MS. M. MILLER: Yes, Your Honor.

THE WITNESS: My -- my review of the records go from 2014 through 2018.

BY MS. M. MILLER: (CONTINUING)

Q. For this particular account?

A. Yes.

Q. Okay. Where was Caledonian Agency incorporated?

A. Caledonian Agency -- I'm unsure, but its parent company, Caledonian Insurance Company, was incorporated in the CNMI.

Q. The CNMI?

A. Yes.

Q. Does that make it a U.S. corporation?

A. Yes.

Q. Is Hansen Helicopters a U.S. corporation?

A. Yes.

Q. And you said Wilma's was a U.S. corporation?

A. I said Wilma's was a U.S. corporation, yes.

Q. I'd like to show you a demonstrative aid, which is just an excerpt from paragraph 126 from the Second Superseding Indictment. It's Demonstrative Aid 40-1.

MR. MARTIN: Could we have the question repeated, Your Honor? I couldn't hear the --

THE COURT: Okay, I'm sorry. Could you repeat the question? Bring the mic a little closer.

MS. M. MILLER: Yes, Your Honor, I just wanted to show the witness a demonstrative aid, which is an excerpt from paragraph 126 from the Second Superseding Indictment.

THE COURT: Okay. And it's marked as 40-1?

MS. M. MILLER: Yes, Your Honor, it's marked as Government's Demonstrative Aid 40-1.

THE COURT: All right.

MS. M. MILLER: And, Your Honor, may I publish this to the jury as a demonstrative aid?

THE COURT: All right. Counsels? Okay, this is 99... oh, I see, okay, this is just a -- just really a repeat --

MS. M. MILLER: It's just demonstrative aid, yes.

THE COURT: Yeah, it's -- it's exactly what's contained within the indictment?

MS. M. MILLER: Yes, Your Honor.

THE COURT: All right. No objections, Counsels, I assume, Mr. Martin --

MR. MARTIN: No, Your Honor.

THE COURT: -- no objection?

Ms. McConwell?

MS. MCCONWELL: No, Your Honor.

THE COURT: All right. Very well. That'll be allowed as a demonstrative aid, 40-1. You may proceed.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, do you see this document in front of you?

A. Yes.

Q. Okay. Could you tell the members of the jury, how did you identify these helicopters that are in the Second Superseding Indictment?

A. All these helicopters were identified from Hansen Helicopters' own records, which I obtained either through a search warrant or through the grand jury subpoena.

Q. Okay. And now let's look at what you received pursuant to a grand jury subpoena. It has been marked but not introduced into evidence yet as Exhibit 725, and you're going to see it come up on the screen in front of you. Do you see Exhibit 725, sir?

A. Yes.

Q. What is it?

A. This is one of the documents I received from Hansen Helicopters through the grand jury subpoena, and it's an aircraft vessel assignment as it relates to the fleet of helicopters and their assignment to the tuna boats.

Q. Is it a true and correct copy of what you received

from Hansen Helicopters?

A. Yes.

MS. M. MILLER: Your Honor, at this time the Government would move into evidence what has been previously been marked as Government's Exhibit 725.

THE COURT: Any objections, Counsels?

MS. MCCONWELL: How many pages is your document, Ms. Miller?

MR. LEON GUERRERO: Twenty-six pages.

MS. MCCONWELL: Twenty-six, okay.

THE COURT: So that's 725-1 through 26?

MS. M. MILLER: Yes, Your Honor.

THE COURT: Okay.

MR. MARTIN: No objection, Your Honor.

THE COURT: Ms. McConwell?

MS. MCCONWELL: I just would renew that this is admitted only to -- for this purpose of these counts to Jon Walker and not to Hansen Helicopters.

THE COURT: All right, very well. I think that's understood, at least at this point.

So, ladies and gentlemen of the jury, Exhibit 725-1 through 725-26 are admitted. At this point they're admitted against Mr. Walker and not necessarily to Hansen Helicopters. And the Court has given you that instruction on how to evaluate each defendant separately. Of

course the Court will give further instructions later before you deliberate. You may proceed.

(Exhibit 725-1 to 725-26 admitted.)

MS. M. MILLER: May I publish it, Your Honor?

THE COURT: You may.

MS. M. MILLER: And, Mr. Leon Guerrero, could you just highlight the top portion so we could show the jury one section of what we're looking at here? Thank you, sir.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, what are we looking at here?

A. In the first column, it identifies the aircraft belonging to Hansen Helicopters, Inc., and then on the right column is the vessel or tuna boat company as it relates to the assignment.

Q. Okay.

MS. MCCONWELL: Your Honor, I object to any -- any speculation with regard this witness testimony on the document. The document speaks for itself and he's trying to -- he's interpreting the document. If he -- it's complete speculation. It's spec- -- his testimony is speculative -- or response is speculative.

MR. MARTIN: I join, Your Honor.

THE COURT: Okay.

MS. M. MILLER: May I respond, Your Honor?

THE COURT: You may.

MS. M. MILLER: This is in response to a grand jury subpoena where the request was to provide the list of all the helicopters and the vessels.

THE COURT: All right.

MS. M. MILLER: And so they provided the list of all the helicopters and the vessels. That's not speculative; they provided --

MR. MARTIN: Based off of a subpoena.

MS. M. MILLER: -- this information. Okay, I'm --

MR. MARTIN: That's not what -- may I object, Your Honor? That's not what the subpoena asked for. It asked for every record from this date to this date, and this -- they have hundreds of thousands of documents, and that's a misrepresentation by the prosecution and I object.

MS. M. MILLER: Your Honor, I object --

THE COURT: Okay, wait, let --

MS. M. MILLER: -- and move to strike.

THE COURT: -- him -- hold on.

MS. M. MILLER: If he doesn't want me to talk about misrepresentations by him, then I certainly --

THE COURT: Counsel, I -- no --

MS. M. MILLER: -- don't expect him --

THE COURT: -- Ms. Miller, let him --

MS. M. MILLER: -- to make this statement.

THE COURT: -- let him -- no, no, let him finish his objection -- finish his statement.

MR. MARTIN: He's testifying to what it is. That's --

THE COURT: All right. So let me -- let me just say this, what you guys happened -- what happened with the request for grand jury, what happened in filings, keep that to yourself. Really, the jurors don't need to know that unless I say they need to know that, because that's really more of a legal matter that's taken care of outside the presence of the jury. So the Court will sustain that request.

Now, on this -- but let me, let me just -- on the particular question and answer, let me just hear the question and answer again. I want to hear Ms. -- hear that.

Veronica, could you get the last question and last answer by our witness here.

(Whereupon the reporter read back requested portion.)

THE COURT: All right. The Court -- the Court will overrule the objection. The witness's answer, it -- as it indicates here on this the particular exhibit, this is the aircraft, this is the vessel. So the Court will overrule the objection.

MS. MCCONWELL: Well --

BY MS. M. MILLER: (CONTINUING)

Q. And could you tell --

THE COURT: Wait, hold on, hold on, hold on, what -- yes?

MS. MCCONWELL: He's asking about ownership of a vessel -- or of an aircraft. All this document says it has type. It doesn't identify ownership of aircraft --

THE COURT: Okay, so your objection is --

MS. MCCONWELL: -- and that's my objection.

THE COURT: -- to the ownership, who owns it --

MS. MCCONWELL: His response --

THE COURT: -- the question.

MS. MCCONWELL: Yeah, his response saying it's that Hansen Helicopters owns those aircraft, because all this document -- it has Hansen Helicopters on it, the document speaks for itself, but it doesn't have the ownership of the particular aircraft.

THE COURT: All right. All right. Ms. McCon- -- Ms. Miller.

MS. M. MILLER: Yes, Your Honor. First of all --

THE COURT: Yeah.

MS. M. MILLER: -- I didn't ask the question who owns. Second of all --

THE COURT: He -- so he -- so his answer is not responsive to the question; that's really --

MS. M. MILLER: He didn't --

THE COURT: -- the objection.

MS. M. MILLER: -- he didn't -- he didn't testify to that either. The question was --

THE COURT: No, no, don't tell --

MS. M. MILLER: -- what is the jury --

THE COURT: Okay, wait.

MS. M. MILLER: What is the -- what is the --

THE COURT: No, no, I don't want --

MS. M. MILLER: Okay.

THE COURT: -- I don't want you guys to tell me what the question was.

MS. M. MILLER: Well --

THE COURT: Let me hear it again. Hold on --

MS. M. MILLER: Yes.

THE COURT: Hold on. Veronica, repeat it again. I want to make sure now that I know what the specific objection is. Go ahead.

(Whereupon the reporter read back requested portion.)

THE COURT: All right. The objection will be sustained as to that last part as to not responsive to the question, "What are we looking at here?" He's laying -- this is an aircraft -- aircraft number; that's what it should say. Okay. So the Court will sustain that objection.

As to the ownership, that -- that wasn't the question, so I'm -- the Court is going to sustain the objection as not responsive to the question.

Okay, next question. So disregard that part of the answer. All right, next question.

MS. M. MILLER: Yes.

BY MS. M. MILLER: (CONTINUING)

Q. Sir, who did you get this information from?

A. Hansen Helicopters.

Q. What is at the very top of this document that you received?

A. Hansen Helicopters, Inc.

Q. And what does it say under that?

A. Aircraft vessel.

Q. And what is in the first column on the left of all 26 pages of this document?

A. It's the U.S.-registered aircraft as well as the New Zealand and Philippine --

Q. Okay. And on the right of this document, what is being identified?

A. The tuna boats.

Q. Now, let's talk about ownership of these helicopters. Can you tell the members of the jury, in reviewing the evidence in this case, did you see any evidence that indicated who was purchasing the helicopters used in this scheme?

MR. MARTIN: Your Honor, I object to the form of the question. 10:27AM

THE COURT: Yeah, the Court will sustain the objection. Why don't you rephrase that. That seems too -- too broad "in this scheme." Which scheme? Which --

MS. M. MILLER: Okay.

MR. MARTIN: I object --

THE COURT: -- which there's a lot of schemes here possibly.

MR. MARTIN: Your Honor, I --

THE COURT: So the Court will sustain the objection.

MR. MARTIN: I object to the word "scheme."

THE COURT: All right. The objection will be sustained. Rephrase, Ms. Miller.

MS. M. MILLER: Okay.

BY MS. M. MILLER: (CONTINUING)

Q. Could you tell the members of the jury, what evidence did you review in this case that supported an identification of the owner of the helicopters?

A. I reviewed Hansen Helicopters' own records. A good example is the Eastern Shore Invoice, which reflected that it was purchased by Hansen Helicopters, Vanuatu --

MS. MCCONWELL: Your Honor, I object. That's also nonresponsive. She didn't ask about purchasing. She

asked about ownership.

MS. M. MILLER: I asked him what evidence was there about who owned it. If they -- if Hansen purchased it --

THE COURT: Well, no, no, no --

MS. M. MILLER: -- they owned it.

THE COURT: -- no, no, that's not necessarily so. The Court will sustain the objection. It was -- so the Court sustained the objection. Disregard. The question was only as to ownership. So go ahead.

BY MS. M. MILLER: (CONTINUING)

Q. Okay, so how do you know who owned these helicopters, sir?

MS. MCCONWELL: And, Your Honor, I want -- want a timeframe.

BY MS. M. MILLER: (CONTINUING)

Q. How do you know who owned these helicopters, sir?

THE COURT: Timeframe, which -- which helicopters? Are these the ones that are --

MS. M. MILLER: The helicopters that are disclosed in Exhibit 725 that was just admitted into evidence, and the helicopters that are identified in the Second Superseding Indictment, which the jury saw as Demonstrative Aid 40-1 --

THE COURT: So you're asking for --

MS. M. MILLER: -- so subject helicopters of this case.

THE COURT: For those two timeframes?

MS. M. MILLER: Yes, Your Honor.

THE COURT: Okay, so the -- okay, so she's giving -- she's giving it to him. All right. Those timeframes. Go ahead, can you answer?

THE WITNESS: The question again?

BY MS. M. MILLER: (CONTINUING)

Q. How do you know who owned the helicopters that we see listed here in this exhibit?

A. I know, based upon the corporate records from Hansen Helicopters as well as the tax return information and who benefitted from the monies that these helicopters generated.

Q. And you've talked about the purchase --

MS. MCCONWELL: Your Honor, I object to that being nonresponsive.

THE COURT: Yeah. Sustained.

MS. M. MILLER: Your Honor, that is responsive. How do you know who owned? So they're objecting to as to speculation --

THE COURT: The Court will -- the Court will sustain the objection.

BY MS. M. MILLER: (CONTINUING)

Q. Sir, when you talk about the ownership issue, can you

tell the members of the jury what did you see, in terms of actual physical evidence that Hansen Helicopters owned these helicopters?

A. The physical evidence was actually in Hansen Helicopters' own facilities.

MS. MCCONWELL: Your Honor, I would --

THE COURT: And so what was that? What is the evidence? That's what she -- how do you know? What is it? What is it that show you had that?

BY MS. M. MILLER: (CONTINUING)

Q. Can you identify the --

A. There's -- there's a variety --

Q. So I know there's a variety --

A. Your Honor, there's a variety of evidence and there's no one particular source.

Q. List the variety of evidence, that's the question.

A. Okay.

MS. MCCONWELL: And, Your Honor, I'd ask about timeframe. I'd object --

THE COURT: Is it the same time frame?

MS. MCCONWELL: -- it's speculative.

MS. M. MILLER: Same time frame, Your Honor.

THE COURT: Okay. Same time frame as in the indictment --

MS. M. MILLER: Same time frame.

THE COURT: -- as on this exhibit?

MS. M. MILLER: Yes, Your Honor.

THE COURT: Do you -- yes?

MS. MCCONWELL: Well, I'm going to object because --

THE COURT: Yeah.

MS. MCCONWELL: -- I'm -- I'm confused. Ownership changes. I -- there is -- and a time period's relevant as to who -- what the -- who the owner was. So if there's a specific --

THE COURT: Do you want to voir die the witness in aid of your objection?

MS. M. MILLER: There's also --

THE COURT: Wait, just a minute, just a minute --

MS. M. MILLER: -- cross-examination.

THE COURT: -- hold on a second. Do you want to voir dire the witness in aid of your objection, because honestly, I'm -- I -- I'm not sure if I'm understanding your theory. And you know -- you guys know the evidence a lot more than -- better than I do because you've got everything more than I -- I mean, a lot more stuff than I've read because I don't have everything. Do you want to voir dire the witness?

MS. MCCONWELL: Um -- um, yes.

THE COURT: Okay, go ahead.

VOIR DIRE EXAMINATION

BY MS. MCCONWELL:

Q. So what's the time period that you're -- that -- what -- what time period did you look at ownership of --

Well, are you representing to this Court and jury that you looked at the ownership for each and every one of the aircraft that's on Exhibit 275?

A. I looked at evidence --

Q. That's a yes or no.

A. -- as well there's admissions made by --

Q. That's a yes or no.

A. -- by Mr. Crowe.

Q. Did you look at each and every one of the aircraft that's listed on Exhibit 275?

A. Yes.

Q. Did you look at the aircraft files for each aircraft that's listed on 725?

A. I looked at summary charts, and I relied upon the information provided by the FAA.

Q. So that's a no, you did not look at the aircraft charts.

And did you --

MS. M. MILLER: Objection, Your Honor, Counsel's --

THE COURT: No, no, no, I'm sorry --

MS. M. MILLER: -- testifying. The witness says yes --

THE COURT: Wait, wait.

MS. M. MILLER: -- and she says that's a no.

THE COURT: Okay. Is that right --

MS. MCCONWELL: He said he looked --

THE COURT: Is that right --

MS. MCCONWELL: -- at summary charts --

THE COURT: Hold on. Is that right, what she just asked? Go back -- go back to your last question.

BY MS. MCCONWELL: (CONTINUING)

Q. Did you look at each and every aircraft file on the aircraft that are listed on 725 or on the demonstrative aid 40-1?

A. Yes.

Q. You looked at every single aircraft chart -- I mean, aircraft file?

A. As it -- yes, as it relates to this, yes.

Q. And did you look at each -- even each year --

You're saying you looked at it between which year, 2000 to 2018, or did you look at it from 2014 to 2018?

A. I looked into this in the entirety of the wire fraud conspiracy.

Q. That didn't answer my question.

THE COURT: Which is?

THE WITNESS: Yes, it's 2000 to present.

BY MS. MCCONWELL: (CONTINUING)

Q. All right. And so that you would know what -- what changes of ownership had occurred and with any of these aircraft?

MS. M. MILLER: Objection, Your Honor, assuming facts not in evidence.

THE COURT: Overruled. Go ahead. Do you understand the last question?

THE WITNESS: Could you rephrase -- could you rephrase it, please?

BY MS. MCCONWELL: (CONTINUING)

Q. So you would be able to testify to any change of ownership in any of these aircraft?

MS. M. MILLER: Objection, Your Honor.

THE COURT: If -- if there was any.

MS. M. MILLER: If there was any, right.

THE WITNESS: Absolutely.

THE COURT: All right. Overruled.

BY MS. MCCONWELL: (CONTINUING)

Q. And would -- and were there?

A. These were all alter egos of Jon Walker --

Q. That wasn't my --

A. -- so there was no change --

Q. -- question.

A. -- as to the ownership.

THE COURT: Wait, wait. Just -- just -- the answer -- what's the answer to that question, was there any? Was that your question, was there any changes? Is that your question --

MR. MARTIN: Your Honor, I have an objection that -- that the witness needs to be instructed to answer the question and not do evidentiary harpoons like he just did. He's making these statements up about alter egos that there's no evidence --

MS. M. MILLER: Your Honor, he's --

THE COURT: Wait, wait, wait, hold -- wait, Counsels. No, no, I disagree with that. I think he's trying to answer. You got -- we've got three lawyers breathing down his back right now, so let's -- let's calm down, and we got a judge right next to him. So let's -- let's -- let's -- so, go ahead, proceed. What's your question?

BY MS. MCCONWELL: (CONTINUING)

Q. Did you look at the registration for each of these aircraft?

A. Through the course of my investigation, yes.

Q. The registration files?

A. Yes.

Q. All right. Okay. So you looked at the individual registration for each of these aircraft?

         A. Again, that's yes.

MS. M. MILLER: Your Honor, he's answered that question twice now. May we move on?

THE COURT: Okay? Yes?

MS. MCCONWELL: All right.

THE COURT: Asked and answered. Okay. Go ahead, next question.

Need some water?

BY MS. M. MILLER: (CONTINUING)

Q. So of the evidence --

THE WITNESS: Yes, please.

THE COURT: Let him get water.

BY MS. M. MILLER: (CONTINUING)

Q. Of the --

THE COURT: Let him get a water.

MS. M. MILLER: Yeah, absolutely. He needs it, I'm sure. (Laughing.)

THE COURT: All right. Next.

MS. M. MILLER: Yes, Your Honor.

BY MS. M. MILLER: (CONTINUING)

Q. Of the evidence that you reviewed from 2000 to present regarding the ownership of the helicopters at issue, can you please tell the jury what evidence did you see that indicates that Hansen Helicopters owned the helicopters at issue?

MS. MCCONWELL: Is this limited to 40-1, Demonstrative Aid 40-1? 10:34AM

MS. M. MILLER: Yes.

THE WITNESS: There is a document in which Mr. Crowe responds to a potential buyer about the helicopters, and in that document Mr. Crowe says that everything is owned by Jon Walker.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. In addition to that document, did you see invoices to Hansen Helicopters for the purchase of helicopters?

MS. MCCONWELL: And, Your Honor, I'm going to object to leading.

THE COURT: Overruled. Go ahead.

THE WITNESS: Yes.

BY MS. M. MILLER: (CONTINUING)

Q. Did you see invoices to any other company besides Hansen Helicopters?

A. No.

Q. What else did you see that referenced the purchase of helicopters in this case during this time period?

A. There was a $4.8 million check that was for -- in the memo line for purchase of helicopters.

Q. And who was that check made payable to?

A. Jon Walker, Defendant Jon Walker.

MS. MCCONWELL: And the time period is when? 2000 to when?

MS. M. MILLER: Current --

THE WITNESS: To present.

MS. MCCONWELL: To present.

MS. M. MILLER: -- for the fourth time.

THE COURT: All right, Counsel, you don't need to --

MS. M. MILLER: Well, I mean, Your Honor, I -- I was hopeful we'd get done this week --

THE COURT: No --

MS. M. MILLER: -- but maybe --

THE COURT: -- no, we'll get done -- we're going to get done even if we have to go till late in the evening, which I'm sure you don't want to do that because you don't want the jurors to be -- staying late --

MS. M. MILLER: I -- I think we go late, we start early, we do whatever we need to do and --

THE COURT: Okay, Counsel --

MS. M. MILLER: -- and we'll get it done.

THE COURT: -- we don't need -- I don't need everybody to comment on the evidence or comment on Counsel's questioning. Just keep it professional.

MS. M. MILLER: All right. Your Honor, at this --

THE COURT: Yes, Mr. Martin? 10:36AM

MR. MARTIN: Your Honor, sidebar comments as we've had delay things. And if we could stop that, we could get through it quicker.

THE COURT: I agree with all -- I --

MS. M. MILLER: If we could stop the repeated objections that you already ruled on --

THE COURT: Okay.

MS. M. MILLER: -- Your Honor, we could get moving.

THE COURT: The Court --

MR. MARTIN: Sidebar comments --

THE COURT: Excuse me.

MR. MARTIN: This is a sidebar comment.

MS. M. MILLER: This is not a sidebar comment. What --

THE COURT: These are -- these are --

MS. M. MILLER: -- time frame --

THE COURT: -- sidebar. It's --

MS. M. MILLER: -- for the fourth time.

THE COURT: Counsel, this is open bar, and the four -- the fourth-time comment is not necessary. The Court will take care of that later. Let's move on, next question.

BY MS. M. MILLER: (CONTINUING)

Q. So, sir --

THE COURT: Come on, because, you know, we don't have all day, let go. It's 10:25 --

MS. M. MILLER: I know.

THE COURT: -- I think you've asked --

MS. M. MILLER: I know.

THE COURT: -- seven questions, let's go.

MS. M. MILLER: I know.

THE COURT: Go ahead.

MS. M. MILLER: Well, Your Honor, and for the record --

THE COURT: I mean, everybody's asked seven questions.

MS. M. MILLER: Thank you, Your Honor.

THE COURT: I'm just overexaggerating, but let's go ahead.

MS. M. MILLER: Yes.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. Can you also, please, also tell the members of the jury whether you correlated the helicopters that are listed here with the tuna boat companies and the leases?

A. Yes, I did exactly that. In addition --

THE COURT: Okay. Hold on. There is an objection?

MS. MCCONWELL: "Here," is "here" referring to what?

THE COURT: Yes, I agree with that.

MS. M. MILLER: It's the Exhibit 725, which is in front of you that I'm pointing to when I say "here."

THE COURT: All right.

Answer?

THE WITNESS: So I did use this document, as it relates to the aircraft and vessel, and I correlated that -- or compared it to what was we -- what we discussed earlier as it relates to the schedule of billings and collections, and I used that to identify what helicopters were assigned to those boats and then whether or not those payments were made.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. I'd like you to look at a demonstrative aid marked as Government's Demonstrative 40-2, which is an excerpt of paragraph 127 of the Second Superseding Indictment.

MS. M. MILLER: Mr. Leon Guerrero, can you pull that up?

MR. MARTIN: Since we weren't provided that, could you give me the paragraph number again, please?

MS. M. MILLER: 127. And it is an excerpt from the Second Superseding Indictment, Your Honor.

THE COURT: Okay.

MS. M. MILLER: And may I publish that to the jury, Your Honor?

THE COURT: You may.

Counsel, any -- did you want a -- did you have a chance to review that, Mr. Martin?

MR. MARTIN: I have now --

THE COURT: Okay.

MR. MARTIN: -- that it's been identified, yes, Your Honor. I have, Judge.

THE COURT: Okay. All right. No objections.

Ms. McConwell, you want to just look at that? Is that okay with you?

MS. MCCONWELL: Well, yes, Your Honor, other than Hansen Helicopters is not in that -- this paragraph.

THE COURT: So noted. Okay, you may -- you may publish.

MS. M. MILLER: Thank you, Your Honor.

(Government's Demonstrative 40-2 admitted)

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, can you tell the members of the jury how did you develop this list of tuna boat companies for the Second Superseding Indictment?

A. I used the document which we looked at just recently, the aircraft vessel assignment, as well as the schedule of billings and collections, which we just talked about earlier, as well as there is a pilot mechanic listing which actually identifies the vessel and the tuna boats and which they're assigned to. So I looked at three different documents to

verify and corroborate that the information was correct.

Q. And when you say you looked at the pilot-mechanic list of which pilots and which mechanics were actually working on these boats, where did you get that information from?

A. That information came both from the search warrants, as well as provided by Hansen Helicopters.

Q. Can we look at Exhibit 183, which has been entered into evidence, please, and this has been entered into evidence so we could it show to the jury.

MS. M. MILLER: Mr. Leon Guerrero, can you, please, just highlight the first section across the top of this exhibit? Thank you, sir. Is there a way to blow that up at all or is that as big as we get it? Are we going to make it bigger? Okay, yeah, that's much better.

BY MS. M. MILLER: (CONTINUING)

Q. So, Special Agent Khamvongsa, is this one of the pieces of evidence that you've just described you relied on?

A. This pilot-mechanic list is one of many in which I reviewed and relied upon.

Q. And could you, please, tell the members of the jury, what does it say on the upper left-hand corner of this document?

A. "Hansen Helicopters, Inc."

Q. And then under that?

A. "Pilot-mechanic aircraft vessel fax, phone, e-mail

list."

Q. Okay. And then what do we see going across the first row, just to show the jury how you coordinated this information?

A. What we see is the fishing company and then we see a listing of the U.S.-registered numbers -- or U.S.-registered helicopters underneath the fishing company. Then we see the vessels and then we see the boats -- or the vessel names. Then we see the pilot and then the names of the pilots. Then we see the start contract date and the end contract date for the pilot, days remaining. Then we see the mechanic, the names of the mechanics underneath, start contract date, the end contract date and the days remaining. Then we see the fax number and then the e-mail address as it relates to the fishing vessel or the tuna boat.

Q. Okay. And, sir, you also referenced the leases. Can we look at what has been marked but not yet admitted into evidence as Exhibit 2900-2904. Do you see that document, sir?

A. Yes.

Q. Do you recognize it?

A. Yes.

Q. Is it a true and correct copy of the lease that was seized from the Defendant Hansen Helicopters' computers?

A. Yes.

MS. M. MILLER: Your Honor, at this time the

Government would offer into evidence what has been previously marked as Exhibit 2900-2904 through 2909.

MR. MARTIN: May I voir dire the witness, Your Honor?

THE COURT: You may.

MR. MARTIN: I'm sorry, Your Honor, I'm trying to pull that up on my computer.

VOIR DIRE EXAMINATION

BY MR. MARTIN:

Q. Agent Khamvongsa --

THE COURT: Could you make that -- I'm sorry, Mr. Leon Guerrero, can you make that a little bigger? Just the... that helps me.

Okay, go ahead. Yes, go ahead, Mr. Martin.

BY MR. MARTIN: (CONTINUING)

Q. Agent Khamvongsa --

MR. MARTIN: If we could go to the last page of this document, Mr. Leon Guerrero, so we the agent can see it.

THE COURT: Is that 2909, is that what it would be, Mr. Martin?

MR. MARTIN: Yes, Your Honor.

THE COURT: Okay.

BY MR. MARTIN: (CONTINUING)

Q. Is that document signed by anyone, sir?

A. Yes.

Q. The one that I'm looking at, 2909?

A. We have the amended copy of this contract that's signed.

Q. I'm asking you about the one on screen in front of you, sir. If you don't understand my question, please let me know.

Is that contract, 290-2909, that's on the screen that the Government sought the admission of, signed by anyone, sir?

A. If you're talking about this particular page, there is no signature on it. But, again, we do have copies of a signed contract.

Q. Agent, did you not understand my question?

A. Go ahead and rephrase it. I'm -- I apologize if I'm not answering it correctly.

Q. The document in front of you on the computer, do you see that document, 2909?

A. Yes.

Q. Is there a signature on that screen on that document, sir?

A. As -- if we're talking about specifically what I'm seeing on the screen --

Q. Do you not --

A. -- there is no --

Q. My question --

A. -- there is no -- 10:45AM
Q. -- is very specific. 10:45AM
A. There is no signature. 10:45AM
Q. That screen, yes, sir. 10:45AM
A. There is no signature. 10:45AM
Q. Okay. Is there a signature for a boat company or for a lessee or a lessor on that page, on that screen, sir? 10:45AM 10:45AM
A. For what I'm saying here, there is -- 10:45AM
Q. Yes, sir, I'm not talking -- I'm not talking about something else. I'm talking about the screen I'm looking at that's been provided to me by the Government that they're trying to introduce into evidence, that screen. Is that -- is that something not understandable? 10:45AM 10:45AM 10:45AM 10:46AM 10:46AM
A. No, I just want to -- 10:46AM
MS. M. MILLER: Objection, Your Honor -- 10:46AM
THE WITNESS: -- clarify, sir. 10:46AM
MS. M. MILLER: -- move to strike. 10:46AM
THE COURT: No, no, no. Objection overruled. 10:46AM
Go ahead. Go ahead. Do you understand -- 10:46AM
BY MR. MARTIN: (CONTINUING) 10:46AM
Q. Is there a signature on that document that is on the screen right there by lessee or a lessor? 10:46AM 10:46AM
A. Only on the screen, no. 10:46AM
Q. That's all I'm asking about. I'm not asking about in the universe. I'm asking about what's on the screen. Do you 10:46AM 10:46AM

understand that?

MS. M. MILLER: Objection, Your Honor, asked and answered three times now.

THE COURT: Okay, the answer is no.

MS. M. MILLER: Yes.

THE WITNESS: Yeah, no.

THE COURT: All right, okay.

MR. MARTIN: I object to the introduction of this exhibit, Your Honor.

THE COURT: All right. Counsel?

MS. MCCONWELL: Hansen also objects.

MS. M. MILLER: And, Your Honor --

THE COURT: All right. Did you want to respond?

MS. M. MILLER: Yes, Your Honor.

BY MS. M. MILLER: (CONTINUING)

Q. This is one part, is it not, sir, of a lease which includes an amendment that is signed?

A. Yes.

Q. Okay. Let's look at Exhibit 3035, which is also part of 2900.

MR. MARTIN: Your Honor, I object to the question --

MS. M. MILLER: If you pull that up to the screen.

MR. MARTIN: -- unless this -- we have an

unsigned document and then she makes reference to the fact that it is an amendment to an unsigned document.

THE COURT: All right, I think -- okay --

MR. MARTIN: I object to the question.

THE COURT: -- so -- so are you asking me to hold off on my decision until you --

MS. M. MILLER: Yes.

THE COURT: -- ask the next question?

MS. M. MILLER: So that you could see --

THE COURT: All right.

MS. M. MILLER: -- the rest of --

THE COURT: So the --

MS. M. MILLER: -- this contract.

THE COURT: All right. So you're not moving to admit at this point?

MS. M. MILLER: At this point --

THE COURT: You're going to withdraw your motion --

MS. M. MILLER: -- I'm going to withdraw the motion and we'll go back.

THE COURT: -- to -- go ahead. Go.

BY MS. M. MILLER: (CONTINUING)

Q. Let's look at 3035 of Exhibit 2900, please. And, sir, we got these leases from the defendants' computers, right?

MR. MARTIN: Your Honor, I -- I object.

MS. M. MILLER: To what?

MR. MARTIN: I object. These are not leases. These are things they seized from a computer. They are pieces of paper. They are not leases. Her reference to that is -- as evidenced by the exhibit she just tried to introduce is inappropriate.

MS. M. MILLER: Your Honor, the --

THE COURT: Okay. The objection -- I'm sorry. The objection will be overruled. Go ahead. On here -- on the -- on the -- on the characterization --

MS. M. MILLER: Yes.

THE COURT: -- of leases.

MS. M. MILLER: Yes.

THE COURT: All right. Overruled.

MS. M. MILLER: Now --

THE COURT: Go ahead. Next question --

MS. M. MILLER: Yes.

THE COURT: -- next objection?

MS. MCCONWELL: Okay. Well, this was not -- this page is not on any of the -- it's 3035 and it's not on any of the ones that was on our list that she provided. So I'm going to -- so we're going to have to take a second to look at it.

THE COURT: Okay.

(Pause.)

MS. MCCONWELL: Is there -- I'm sorry --

THE COURT: I'm just waiting for you. You said you were going to check to see if you got notice of the exhibit.

MR. MARTIN: We didn't.

MS. MCCONWELL: Well, we -- we didn't.

THE COURT: You didn't?

And, Counsel --

MS. M. MILLER: Yes, Your Honor, so we --

THE COURT: -- they just said they didn't.

MS. M. MILLER: -- did give notice that we were using leases in Mr. Khamvongsa's testimony, and we were going to use a different lease. We decided to use this lease, and they're right I didn't specify this lease. But, as Your Honor knows, these leases, all of them came from the defendants, were provided to the defendants --

THE COURT: Okay. Let -- okay --

MR. MARTIN: Your Honor, I object to the testifying.

THE COURT: -- but, yeah, okay, we don't -- putting that aside, the question is did you give them notice of this lease?

MS. M. MILLER: Correct --

THE COURT: The answer is no.

MS. M. MILLER: -- of this particular lease,

which they have now had an opportunity --

THE COURT: I'm sorry, "this page," "this page" meaning --

MS. M. MILLER: These pages, yes.

THE COURT: -- the signature page?

MS. M. MILLER: Yes, the signature page which is on page 3035.

MS. MCCONWELL: Completely separate.

THE COURT: Okay. So, I'm sorry, the objection is to what now?

MS. MCCONWELL: Well, first --

THE COURT: Receiving notice of --

MS. MCCONWELL: No, no notice of this page.

THE COURT: This page, and what -- can you identify it for the record.

MS. MCCONWELL: Sorry, 2900-3035.

THE COURT: Okay, this is the one I see right in front of me. Okay, so there's no -- no notice of that, uh-huh.

And the same with you, Mr. Martin?

MR. MARTIN: Yes, Your Honor.

THE COURT: Did you have notice of the -- the -- was there a draft this? Was there a first -- okay, strike that. Okay, tell -- respond to that then, they didn't have notice of -- they didn't have notice of this page. Is that --

10:51AM 10:51AM 10:51AM 10:51AM 10:51AM 10:51AM 10:51AM 10:51AM 10:51AM 10:52AM 10:52AM 10:52AM 10:52AM 10:52AM 10:52AM 10:52AM 10:52AM 10:52AM 10:52AM 10:52AM 10:52AM 10:52AM 10:52AM 10:52AM 10:52AM

you would agree with that?

MS. M. MILLER: No, I won't agree with that. I would say that they did have notice of this document, all of 2900 --

THE COURT: No, that you intended --

MS. M. MILLER: -- at least in 2900 --

THE COURT: -- to use it, in other words, you intended to use it.

MS. M. MILLER: -- but this particular one, no. This one out of the 4,000 pages in 2900, no.

THE COURT: All right.

MR. MARTIN: I object, Your Honor. I was given two pages, which took me all yesterday afternoon to look them all up, and this isn't one of them.

THE COURT: Uh-huh.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. Let's go --

THE COURT: All right.

BY MS. M. MILLER: (CONTINUING)

Q. -- to Exhibit 2900 --

THE COURT: Oh, you're withdrawing --

BY MS. M. MILLER: (CONTINUING)

Q. -- 1142 --

THE COURT: -- your motion?

MS. M. MILLER: Yes.

THE COURT: You're withdrawing your motion? 10:53AM

MS. M. MILLER: Yes -- 10:53AM

THE COURT: Yes, okay -- 10:53AM

MS. M. MILLER: -- because I don't want to waste any more time, Your Honor. 10:53AM 10:53AM

THE COURT: -- okay, withdrawn. Next question. 10:53AM

BY MS. M. MILLER: (CONTINUING) 10:53AM

Q. Let's go to 2900-1142, please. 10:53AM

THE COURT: Okay. 10:53AM

BY MS. M. MILLER: (CONTINUING) 10:53AM

Q. And, Special Agent Khamvongsa, you will see that appear before you. 10:53AM 10:53AM

MS. M. MILLER: And I believe that's already been entered into evidence; is that correct? 10:53AM 10:53AM

MS. MCCONWELL: Yes. 10:53AM

MS. M. MILLER: Okay. So we can publish it -- 10:53AM

MS. MCCONWELL: So only as to Jon Walker. 10:53AM

MS. M. MILLER: -- to the jury as well. 10:53AM

THE COURT: 1142? 10:53AM

MS. M. MILLER: 1142. 2900-1142. 10:53AM

MS. MCCONWELL: And we agree that's only admitted to Jon Walker. 10:53AM 10:53AM

MS. M. MILLER: And since this is admitted, can we go ahead and publish to the jury please? 10:54AM 10:54AM

THE COURT: Right, that's fine. So this has been 10:54AM

admitted, 2900 --

MS. M. MILLER: Yes, Your Honor.

THE COURT: -- 1142? All right.

MS. M. MILLER: Yes, Your Honor.

THE COURT: You may admit that -- I mean, you may publish to the jury if --

MS. M. MILLER: Thank you --

THE COURT: -- that's admitted.

MS. M. MILLER: -- Your Honor.

THE COURT: Okay.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, do you see this exhibit in front of you?

A. Yes.

Q. Okay. Let me step back for a moment. When you reviewed the leases that we marked for use in evidence as 2900, what did you do to correlate the leases, whether they were signed or not, with the information that Hansen Helicopters gave you in 725, 726, and 183?

A. Ask the question again --

Q. Yes.

A. -- I -- I'm --I don't think I'm understanding it.

Q. What did you do to determine whether the lease was actually executed; in other words, that money came in from that helicopter being leased at that period of time?

10:54AM 10:54AM 10:54AM 10:54AM 10:54AM 10:54AM 10:54AM 10:54AM 10:54AM 10:54AM 10:54AM 10:54AM 10:54AM 10:54AM 10:54AM 10:54AM 10:54AM 10:54AM 10:54AM 10:54AM 10:54AM 10:54AM 10:54AM 10:54AM 10:55AM

A. So I used the leases, compared it to what was reflected in what had we discussed about Exhibit 725 and 726. Again, 725 reflects the helicopter and the boat or vessel assignment. And then I reviewed that to see if any payments came in for those leases as it relates to the lease contracts. And then I went into the bank account to see if they actually received the money for the lease -- lease agreements for these particular helicopters.

Q. And did you do that for the lease we just talked about that was not introduced even though it wasn't signed?

A. Yes.

MS. MCCONWELL: Your Honor, I'd object.

THE COURT: What's the objection?

MR. MARTIN: The objection is she's talking about a document that's not been introduced, she's referred to as a lease. It's a piece of paper that's unsigned.

MS. M. MILLER: And that's the issue right there, that statement in front of this jury that it's not a lease because it wasn't signed, when he knows --

THE COURT: Oh, wait, wait, Counsel --

MR. MARTIN: Your Honor --

THE COURT: -- okay, wait, wait, wait.

MR. MARTIN: -- we --

THE COURT: Wait, wait, wait --

MS. M. MILLER: -- it was signed --

THE COURT: -- Counsel, just a minute.

MR. MARTIN: She knows and --

THE COURT: Just a minute.

MR. MARTIN: -- we got to stop this.

THE COURT: No, no, no.

MR. MARTIN: We got to stop this.

THE COURT: Okay, first of all, it says on the very first page it's a lease.

MS. M. MILLER: Yes.

THE COURT: It just says it's a lease.

MR. MARTIN: It's unsigned.

THE COURT: Whether it's a lease or not, you know, that -- that's -- anyway, the point is, you're right it's not admitted into evidence, but he's being asked about the process of what he's doing.

MS. M. MILLER: Correct.

MR. MARTIN: And I don't ask -- have a problem with that, but when she's referring to a document that's not signed, I object -- not -- excuse me. I withdraw that statement. When she's referring to an exhibit that is not admitted, I object to him testifying about an exhibit that has not been admitted.

THE COURT: Okay, I thought he was just testifying --

MS. M. MILLER: The question --

THE COURT: Hold on. I thought he was testifying as to the process on the demonstrative exhibit. 10:56AM

MS. M. MILLER: Yes.

THE COURT: It was a -- wait just a minute. I thought, as I'm listening to this, he's saying the demonstrative exhibit and trying to track payments as to those particular vessels; right? That's --

MR. MARTIN: She made a specific reference to the -- a -- a proposed exhibit that was not admitted.

THE COURT: Okay, well, if that's -- if that's the case, if -- if the Counsel -- Counselor is making a reference to an exhibit that's not admitted, then your -- the objection will be sustained.

MS. M. MILLER: Let me respond, please.

THE COURT: Yeah, uh-hmm.

MS. M. MILLER: Throughout this case, this jury has seen Exhibit 2900 and they've seen leases called leases, some signed, some not. This issue goes to credibility. This witness just testified that he used Exhibit 725 --

THE COURT: Okay, wait, wait, Counselor --

MS. M. MILLER: -- which was produced --

THE COURT: -- okay, wait, wait, wait, okay. I don't need you to give me that explanation. What the issue is, is let's focus on, because you withdrew your admission of that -- of that exhibit. Now we're focusing on the process.

MS. M. MILLER: We are --

THE COURT: The Court --

MS. M. MILLER: -- the process.

THE COURT: Okay. The Court will overrule the objection as to the process --

MS. M. MILLER: The process.

THE COURT: -- how he performs his duties on the paperwork that he has before him. But with regard to any document that's not admitted, if there's a reference to that that's not been admitted, the Court will sustain that objection.

All right. So you may proceed.

MS. M. MILLER: Yes, Your Honor.

BY MS. M. MILLER: (CONTINUING)

Q. In terms of your process of verifying whether there was in fact a lease where there was payment made, could you please explain to the jury what you did to ensure that that process was complete?

A. Again, I went through multiple steps. I -- first, I looked at the bank accounts: Did money come in from the tuna boat companies? And then I identified the tuna boat companies which made the payments on the billing schedule that we just discussed in 726. There I compared to see the date and the amount to what's reflected in the bank account. Okay?

And then from there, I tried to identify what

helicopter was assigned to the tuna boat. So then we go to 725. 725 reflects the aircraft assigned to the vessel.

Then from there, I'll look at the lease, I'll look at the registrations with the FAA, I'll review the pilots and mechanics assigned to that helicopter.

Q. Okay. And now let's look at the lease in front of you, sir, which has been entered into evidence as Exhibit 2900-1142?

MS. M. MILLER: And, Mr. Leon Guerrero, if you could just include the top portion including the recitals but stop above (B). Yup, thank you so much.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. So what is the date of this lease, sir?

A. It's identified as June 27th, 2008.

Q. And that's within the timeframe of the conspiracy to commit wire fraud as alleged in the Second Superseding Indictment indictment?

A. Yes.

Q. And who is identified as the lessor of this particular aircraft?

A. Wilma's Flight Service.

Q. And what is the registration number of this particular aircraft?

A. The registration number is reflected as N454S.

Q. Did you look at, as Ms. McConwell asked you, the

registration information relating to this aircraft?

A. Yes.

MS. M. MILLER: Could we, please, pull up the summary chart for registrations which has been entered into evidence as Exhibit 1252, I believe.

BY MS. M. MILLER: (CONTINUING)

Q. N454S, is that the correct number of the helicopter?

A. Yes, that is correct, N454S.

MS. M. MILLER: Okay. If we could go to N454S, please. And can you highlight that please? All the way down to the bottom, please. All the way. Yup, perfect. Thank you.

BY MS. M. MILLER: (CONTINUING)

Q. Could you tell the members of the jury who registered that aircraft in 1996, it looks like?

A. Hansen Helicopters.

Q. And then who registered that aircraft in 1999?

A. Eddie Air, Inc.

Q. And let's look at Exhibit 829, please, sir. Do you see Eddie Air, Inc. on Exhibit 829 as one of the Vanuatu companies?

A. Yes, that's correct.

Q. Who registered the helicopter after Eddie's Air?

A. Dave's Helicopter.

Q. Who was the registered owner of the helicopter

according to what was filed with the FAA at the time that the lease was entered into that we just saw?

A. Dave's Helicopter Service, Inc.

Q. Now, let's go back to that lease, 2900-1142. And, by the way, Dave's Helicopter, Inc. also a Vanuatu company on Exhibit 829?

A. Yes, that's correct.

Q. And who's signing these registrations as we see on Exhibit 1252?

A. Defendant Jon Walker.

Q. Okay. Now, who --

MS. M. MILLER: Can you go to the end of this lease, please and let's remind the jury who signed this lease.

THE COURT: Give me the number on that too, what's exhibit number --

MS. M. MILLER: Yes, Your Honor, we will --

THE COURT: -- when you get to it.

MS. M. MILLER: -- when we get --

THE COURT: Okay.

MS. M. MILLER: Mm-hmm.

THE COURT: Okay.

MS. M. MILLER: And could you highlight the signature, please.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, who signed this lease?

11:02AM 11:02AM 11:02AM 11:02AM 11:03AM 11:03AM 11:03AM 11:03AM 11:03AM 11:03AM 11:03AM 11:04AM 11:04AM 11:04AM 11:04AM 11:04AM 11:04AM 11:04AM 11:04AM 11:04AM 11:04AM 11:04AM 11:04AM 11:04AM 11:04AM

A. Defendant Jon Walker.

Q. Okay. And could we go back to the page 1 of the lease, and the first paragraph that identifies the lessor company, who is the lessor company identified in this lease?

A. Wilma's Flight Service, Inc.

Q. In June 27th of 2008, was Wilma's Flight Service, Inc. the registered owner of the helicopter according to the FAA records?

A. No.

Q. I'd like you to look at what has been previously marked as Government Exhibit 2900-3522.

MS. M. MILLER: And, Mr. Leon Guerrero, could you highlight the top portion of that, please.

BY MS. M. MILLER: (CONTINUING)

Q. Do you see this document, sir?

A. Yes.

Q. Okay. Do you see the date? Could you tell the members of the jury what the date is?

A. January 27th, 2016.

Q. And is this within the timeframe of the alleged conspiracy to commit wire fraud?

A. Yes.

MS. M. MILLER: Mr. Leon Guerrero, can you highlight the registration number of the aircraft being leased in this document.

BY MS. M. MILLER: (CONTINUING)

Q. And do you see that registration number, sir?

A. Yes.

Q. And what is that registration number?

THE COURT: Sorry, hold on, hold on. Hold on one second.

MS. M. MILLER: Yes, Your Honor.

THE COURT: Hold on, just check with my Court -- clerk just a minute. Is that 2900 -- what was the last --

MS. M. MILLER: 35 --

THE COURT: 3522.

MS. M. MILLER: 3522, Your Honor, through 3527. I'm laying the foundation for its admission.

THE COURT: Oh, okay, very well. Thank you.

MS. M. MILLER: Yes, Your Honor.

THE COURT: I just wanted clarification. Go ahead.

BY MS. M. MILLER: (CONTINUING)

Q. Is that registration number one of the numbers that was on Exhibit 725 that the jury just saw that you received from Hansen Helicopters, sir?

A. Yes.

MS. M. MILLER: Your Honor, at this time the Government would offer into evidence what has been previously marked as Government's Exhibit 2900-3522 to 3527.

THE COURT: Let me let Counsels look at that -- those numbers and see if there is any objections.

(Pause.)

MR. MARTIN: 3522, 3527?

MS. M. MILLER: That's correct, Your Honor.

MR. MARTIN: No objection.

MS. MCCONWELL: And admitted to Jon Walker only, not to Hansen Helicopters.

THE COURT: All right. Ladies and gentlemen of the jury, Exhibit 2900-3522 through 3527 is admitted without objection as to Jon Walker. Okay. You may proceed.

(Exhibits 2900-3522 through 3527 admitted.)

MS. M. MILLER: May I publish it to the jury, Your Honor?

THE COURT: You may. You may.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, did I just write the correct number of the -- the registration number on the board that is the subject of this lease?

A. N369V is the -- that is the same number that I'm seeing here on the screen.

MS. M. MILLER: Okay. And, Mr. Leon Guerrero, let's go to the top portion of the lease that shows who the lessor is.

BY MS. M. MILLER: (CONTINUING)

Q. And, Special Agent Khamvongsa, could you tell the members of the jury who is the lessor identified in this lease?

A. Wilma's Flight Service, Inc.

Q. Okay. And the date of this lease, sir?

A. January 27th, 2016.

Q. And could we go back to Exhibit 252, the registration chart, and could you tell the members of the jury which company was identified as the register owner of 369V in January of 2016? And it will take a second to flip back over that chart.

MS. M. MILLER: And could you go to the page that has November 369V, please. I think it's the prior page.

THE COURT: We have about 38 minutes before --

MS. M. MILLER: Lunch.

THE COURT: -- lunchtime, yeah. How much longer do you have with this witness do you think, Ms. --

MS. M. MILLER: With objections or without?

THE COURT: No need to be smarty.

MS. M. MILLER: With objections, eh -- probably to the end of the day.

THE COURT: Okay. All right.

BY MS. M. MILLER: (CONTINUING)

Q. So, Special Agent Khamvongsa, let's highlight N369V, please, on the registration chart.

MR. LEON GUERRERO: Sorry, I just need one moment.

MS. M. MILLER: Okay.

THE COURT: This has already been admitted, did you say?

MS. M. MILLER: This has already been admitted, Your Honor, yes.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. So, Special Agent Khamvongsa, can you tell the members of the jury which company was the registered owner of this helicopter according to the paperwork filed with the FAA at the time of the lease?

A. Foxtrot Air, Inc.

Q. And who signed that registration paperwork?

A. Jon Walker, Defendant Jon Walker.

Q. Now, let's go back to the lease. And if we look at first paragraph again, can you tell the members of the jury what was the name of the boat that this helicopter was leased to?

A. The date?

Q. The name of the boat.

A. Oh, the name of the boat, I apologize.

Sea Bounty, LLC/South Pacific Tuna Corp.

Q. And the date on this lease, sir?

A. January 27, 2016.

Q. Okay.

MS. M. MILLER: And now let's go to page 2 of the lease, Mr. Leon Guerrero. And if we look at top of the page, can you highlight the top of the page, sir.

BY MS. M. MILLER: (CONTINUING)

Q. How long was this lease supposed to last for?

A. This lease shall be for a period of 36 months from the occurrence of delivery of the aircraft.

Q. Okay. Now, did you actually go back and look at Exhibits 725 and 726 to ensure that this particular aircraft was listed in those two documents?

A. Yes.

Q. And could you tell the members of the jury, was that particular aircraft listed in those two documents?

A. The aircraft is listed in the aircraft vessel, but it's not listed in the schedule of billings. What's listed is the tuna boat company, which is referenced as Sea Bounty and South Pacific Tuna Company.

Q. Okay. Let's go back to Exhibit 725 which was admitted into evidence already, and let's locate this particular aircraft in Exhibit 725.

MS. M. MILLER: Okay. And could you do a search, Mr. Leon Guerrero, for -- yup, there we go. And we're highlighting that portion of 725.

BY MS. M. MILLER: (CONTINUING)

11:13AM 11:13AM 11:13AM 11:14AM 11:14AM 11:14AM 11:14AM 11:14AM 11:14AM 11:14AM 11:14AM 11:14AM 11:14AM 11:14AM 11:14AM 11:14AM 11:14AM 11:15AM 11:15AM 11:15AM 11:15AM 11:15AM 11:15AM 11:15AM 11:15AM

Q. So do you see that aircraft that was part of that lease, sir?

A. Yes.

Q. And --

MS. MCCONWELL: I have a question, are we on page 1? Is that where you're highlighting on page 1? I would object to --

MS. M. MILLER: It is on page 1, which is on the screen, Your Honor.

MS. MCCONWELL: Yeah, I would object to the time frame.

MS. M. MILLER: It's identified as that.

THE COURT: I'm sorry? You're objecting what?

MS. MCCONWELL: Okay, never mind.

THE COURT: No objection? Okay. Go ahead, proceed.

BY MS. M. MILLER: (CONTINUING)

Q. And do you see the name of the vessel?

A. Yes, the vessel is Sea Bounty.

Q. And does that match up with the lease that we just saw?

A. Yes, it does.

Q. Is there any place else on this document where we see a reference to N369V?

A. It's referenced throughout the document.

Q. Okay.

A. And, in the range of this document, it goes from August 2014 to May of 2018.

Q. Okay. And you said that Sea bounty is also on Exhibit 726. Can we go to Exhibit 726 please, and can you, please, go to Sea Bounty.

(Pause.)

BY MS. M. MILLER: (CONTINUING)

Q. Okay. Sir, do you see that reference to Sea Bounty on Exhibit 726 as well?

A. Yes.

Q. Okay. And then with the schedule of billings and records that you reviewed in this case, can you tell the members of the jury, was there anything different that occurred during the three-year period of this lease that changed that number from N369V to something else?

A. If we -- if you go back to the prior exhibit, the aircraft vessel exhibit, you'll see that there is a small break sometime around January 2017 which a different boat is identify -- or, I mean, excuse me, helicopter is identified.

Q. Okay. And could you go back to 725 please, and to January 5th of 2017, and do you remember what the registration number was of the helicopter that was used with Sea Bounty during that short period of time?

A. I don't remember the exact. I just recall it being a

RP number -- an RP prefix, which is a Philippine aircraft. 11:19AM

Q. Okay. We're going to locate it in 725 and we will -- we'll show you and the jury. 11:19AM

And do you see the RPC number there with Sea Bounty on page 15 of Exhibit 725? 11:19AM

A. Yes. 11:19AM

Q. And could you read that RPC number to the jury please? 11:20AM

A. It is RPC4913. 11:20AM

Q. What happened before January of 2017, regarding Hansen Helicopters, immediately prior to January of 2017? 11:20AM

A. There was immediately -- there was a transfer of funds of over 7 million -- approximately $7 million in December of 2016 from Hansen Northern Helicopters to Walker Agricola as well as, in October 2016, there was the FBI search warrant that was conducted at Hansen facilities. 11:20AM

Q. Okay. If we go back to the lease, sir, let's look at the very first paragraph of the lease underneath the identification of the lessor and the helicopter. 11:21AM

MS. M. MILLER: No, that's not it. 11:21AM

(Pause.) 11:21AM

MS. M. MILLER: It's 3522. Yup. 3522, not 3552. 11:21AM

(Speaking to co-Counsel.) 11:22AM

MS. M. MILLER: Okay. And if you could highlight, Mr. Leon Guerrero, that first section including 11:22AM

(A), the top section including (A), including lease of the aircraft.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. So can you read what subsection (A) says there, sir?

A. "The operator is the registered owner of an aircraft described as follows: Helicopter manufacturer, Hughes; model number 369A; serial number 191021; registration number N369V. The above referred to as the aircraft is available for delivery to lessee."

Q. Now, the first paragraph of this lease identifies who as the operator?

A. Who's the -- Wilma's Flight Services, Inc.

Q. The registered owner of this helicopter, however, at this same time was --

MS. MCCONWELL: Your Honor, I object, that's a misstatement of the document. The document speaks for itself.

THE COURT: Yeah, the Court will sustain the objection as to the last question.

MS. M. MILLER: The -- the last question, Your Honor?

THE COURT: Uh-huh.

MS. M. MILLER: Okay.

BY MS. M. MILLER: (CONTINUING)

Q. Who is identified as the registered owner of this

aircraft at the time of this lease?

A. Foxtrot Air.

MR. MARTIN: Your Honor, I object, that's not what the document says if he's referring to the document.

THE COURT: All right. The Court will sustain the objection.

MS. M. MILLER: Your Honor --

THE COURT: You want to maybe rephrase that.

MS. M. MILLER: -- the registered owner was shown in Exhibit 1252, which is the summary chart of registrations.

THE COURT: All right.

MS. M. MILLER: The question --

THE COURT: All right. So is it -- so is that where it's coming from --

MS. M. MILLER: Yes.

THE COURT: -- the summary chart?

MS. M. MILLER: Yes.

THE COURT: All right. Counsel?

MR. MARTIN: That's not what she asked.

MS. M. MILLER: That is --

MR. MARTIN: She asked who was the registered owner.

THE COURT: All right. So, yeah, so -- so, I mean, just for clarification then that's fine --

MS. M. MILLER: Yes, Your Honor.

THE COURT: -- maybe you can --

BY MS. M. MILLER: (CONTINUING)

Q. Go back please --

MS. M. MILLER: Mr. Leon Guerrero, can you, please, highlight the first part of this lease that identifies the operator?

THE COURT: All right. Okay. I just got a note from one of the jurors they have to use the restroom, so why don't we -- let's just go ahead and take our lunch break. Let me -- hopefully the lunch is here already. Let's just go take our lunch break early. Let's do it now --

MS. M. MILLER: Yes, Your Honor.

THE COURT: -- since -- so we don't have to come back.

All right. Please keep an open mind. Do not form or express any opinion on this case until it's submitted to you. Do not speak to anyone on any subject connected to the trial. I'll see you guys as soon as we have our lunch. Hopefully it's delivered. Go ahead. Sorry about that.

(Jury out at 11:24 p.m.)

THE COURT: So hopefully lunch is already here. We can come back 15 minutes earlier. So let's see, let's try to come back at -- well, let's -- well, we'll assume that -- just come back at 1:15 unless we tell you otherwise.

MS. M. MILLER: Yes, Your Honor.

THE COURT: Okay. Because hopefully it's here. 11:25AM

(Recess taken at 11:25 a.m.) 11:25AM

(Back on the record at 12:25 p.m.) 12:25PM

THE COURT: So still not till this afternoon? Just checking the... 12:25PM

MS. M. MILLER: Maybe Friday the way it's going. 12:25PM

THE COURT: Don't say that. Don't say that. 12:25PM

MR. MARTIN: I could read you a quote from the transcript that's very enlightening, Your Honor, about the length of time it will take to finish the testimony. 12:25PM

MS. M. MILLER: And I could read the objections that were repeated over and over and over and over again even after they'd been overruled. 12:25PM 12:26PM

MR. MARTIN: Well, those were sustained very good too, Your Honor, if we're going to get into that. 12:26PM

THE COURT: All right. I feel like -- I feel like David Lujan still in the courthouse. (Laughing.) Getting more feisty. All right. No, I'm just teasing. 12:26PM

We'll call in the jurors. Okay. So you're going to have him, the witness, testify until the end? 12:26PM

MS. M. MILLER: Yeah, my guess is it will be -- 12:26PM

THE COURT: Until this afternoon? Okay. 12:26PM

MS. M. MILLER: Yup. 12:26PM

THE COURT: All right. Then we'll figure out how many -- how much time you guys want for closing arguments. 12:26PM

Yeah, so just think about it, Counsels. We'll talk about that. 12:26PM

(Pause.)

MS. M. MILLER: Could we also discuss, Your Honor, potentially going on a little bit longer if we need to.

THE COURT: Yeah, we can do that. Let's see how today goes.

MS. M. MILLER: Okay.

THE COURT: It's not going so well, but let's see how it goes today.

THE WITNESS: Sorry.

THE COURT: No, it's not your fault. It's just that's way it goes. That's -- it's how trial goes. Nothing surprises me in trial, let's put it that way. Uh-huh.

(Pause.)

THE COURT: No, we could discuss that. Maybe we could do that, you know, maybe tomorrow we'll go longer --

MS. M. MILLER: Yeah, that's --

THE COURT: -- or start earlier.

MS. M. MILLER: I think that would be -- that would be good.

THE COURT: Do I have anything in the morning?

MR. MARTIN: Your Honor, the only concern I have I don't know what our jurors' schedules are --

THE COURT: Yeah.

 MR. MARTIN: -- and going longer impacts them. 12:27PM

THE COURT: Yeah, I mean, I'll have all -- I'll call on and -- let me call -- Emily, can you ask Lani to -- I'll talk to Lani. I'll have Lani talk to them at break and say, hey, we're thinking about trying to push this along and -- because you think -- well, you think the other two witnesses will take four hours each based on -- 12:27PM 12:27PM 12:27PM 12:27PM 12:27PM 12:28PM

MS. M. MILLER: Yes. 12:28PM

THE COURT: Okay. Oh, you think two hours each? 12:28PM

MS. MCCONWELL: No, I think two days each. 12:28PM

THE COURT: Wow. 12:28PM

MS. M. MILLER: I've gone through my questions with them, it's -- 12:28PM 12:28PM

THE COURT: Oh, you mean like -- you mean like total, not just her? 12:28PM 12:28PM

MS. MCCONWELL: No, I'm just based on -- based on the time estimates from prior witnesses, I anticipate that Mr. Guzzetti and Mr. Klang will each take two days. When Mr. Khamvongsa started on the 8th of -- did I say that right? 12:28PM 12:28PM 12:28PM 12:28PM

THE WITNESS: Absolutely. 12:28PM

MS. MCCONWELL: Okay. When he started on the 8th of June, we were told that this would be about a 45-minute witness and we're now on -- we're now into the afternoon of day two on this witness. 12:28PM 12:28PM 12:28PM 12:28PM

THE COURT: Uh-huh. 12:28PM

MS. MCCONWELL: So --

MS. M. MILLER: And, Your Honor --

MS. MCCONWELL: -- if Mr. Guzzetti and Mr. Klang are represented to be each four-hour witnesses, I would anticipate that they're probably --

THE COURT: And that also depends on my rulings too. I mean, so we have the -- is both of them there's a request -- well, there is a request for -- for Mr. Klang to be a summary witness.

MS. M. MILLER: Correct.

MS. MCCONWELL: Well, if -- if Mr. Klang's testimony is estimated, I think he'll go longer.

THE COURT: Oh, I don't know, but you're assuming that that's --

MR. MCCONWELL: We're assuming.

THE COURT: -- if I grant that request is four?

MS. M. MILLER: Yes, Your Honor.

THE COURT: Okay. All right. Well, then --

All right. Call in the jury.

MS. M. MILLER: Your Honor, our colleagues are reporting they're not getting sound.

THE COURT: I'm sorry?

MR. MCCONWELL: I'm getting no sound on my --

THE COURT: No -- no sound?

MS. M. MILLER: Yeah, I think there's -- oh, now

it is? Now it is. Okay, never mind.

THE CLERK: Sorry, I forgot to turn on the...

THE COURT: Oh, just now? Okay. Oh, do you mean like -- because it's getting zoomed out?

MS. M. MILLER: Yes, they weren't hearing it. Yeah, thank you.

THE CLERK: My apologies, Your Honor.

THE COURT: Okay, that's fine. You can hear okay, though, Mr. McConwell, Mr. Han, everybody? Okay.

(Jury in at 12:29 p.m.)

THE COURT: Welcome back, ladies and gentlemen of the jury. I hope your lunch was okay. All right. We'll go ahead and start -- continue on with this witness.

You may proceed, Ms. Marie Miller.

MS. M. MILLER: Yes, Your Honor. Thank you.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, let's go back to Exhibit 1252, and I'm going to have Ms. Miller now show that on the screen at the name of the registered owner of 369V, and then we're also going to look at the lease for that helicopter.

MS. MCCONWELL: Which page of 125 -- 1252?

THE COURT: What did you say, what --

MS. M. MILLER: It will be up on the screen in a moment, Your Honor.

THE COURT: Okay. Yeah, what exhibit is coming up? 1252?

MS. M. MILLER: Yes.

THE COURT: Has this already been admitted?

MS. M. MILLER: Yes, it's already been admitted. We've already actually shown it to the jury --

THE COURT: Okay.

MS. M. MILLER: -- but there has been an objection, so we're going back to it because I don't know that Counsel remembers the -- the name.

THE COURT: All right. 1252, what -- okay, let's pull it up.

MS. M. MILLER: Yeah.

MS. MCCONWELL: What page?

THE COURT: I think she's going to pull it up right now.

MS. MCCONWELL: Okay.

THE COURT: Page 8, okay. 1252, page 8.

MS. M. MILLER: Okay. So what we see here on the screen, Your Honor -- an both of these exhibits have already been entered into evidence, so if we could show it to the jury.

THE COURT: Okay.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, could you remind the jury,

please, sir, what is the name of the registered owner of the helicopter we identified as N369V?

A. Foxtrot Air.

Q. And what is the name of the lessor entering into the contract with the tuna boat company that you see below the excerpt from 1252?

A. Wilma's Flight Service.

Q. All right.

MS. M. MILLER: Ms. Miller, now could you please get rid of 1252 and go to Section 8 of the lease, (pause) and can you highlight that section. Thank you.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, could you, please, read that paragraph to the jury?

A. "The registration and title to the aircraft shall be in the name of the lessor and the aircraft at all times during the term of this agreement or automatic renewals shall bear internationally-recognized registration markings."

Q. Let me stop you there for a moment. Was the registration and title to the aircraft in the name of the lessor?

A. The lessor on this lease agreement does not match up with what's in the registration of the FAA.

Q. Okay. Now, sir, let's look at Section 5 of the lease. Do you see Section 5?

A. Yes.
Q. And could you please read the sentence that starts with the "at the sole discretion of the lessor"?
A. "At the sole discretion of the lessor, lessor shall provide a fully qualified and licensed pilot, mechanic, or pilot mechanic for flight operations and maintenance of the aircraft."
Q. Sir, do you know who the mechanics were that were assigned to this particular aircraft?
A. Yes.
Q. How do you know?
A. I know because it's based upon the records I received from Hansen Helicopters, as well as my review at FAA records.
Q. And who were those mechanics, sir?
A. The mechanics during this time is -- the -- the mechanics were Dixey Dizon and Vilamore Fabian, Jr.
Q. Were they certified by the FAA at the time that they were working on this aircraft?
A. No, they were not FAA-certificated mechanics.
Q. Okay. Let's go to Section 13 of this lease, please, and could you tell the members of the jury what law applies in the event that there were any issues with this lease?
A. The laws of United States -- the laws of United States jurisdiction where appropriate.
Q. Okay. Now, let's look at Section 4 of the lease.

12:34PM 12:34PM 12:34PM 12:34PM 12:34PM 12:34PM 12:34PM 12:34PM 12:34PM 12:34PM 12:34PM 12:34PM 12:34PM 12:34PM 12:34PM 12:34PM 12:34PM 12:34PM 12:34PM 12:35PM 12:35PM 12:35PM 12:35PM 12:35PM 12:35PM

Now, when we look at Section 4 of the lease, can you please read the first sentence of the second paragraph there regarding indemnification and insurance?

A. The first sentence of which?

Q. Second paragraph, please.

A. "Lessor shall maintain in full force and effect sufficient insurance to cover loss of or damage to the aircraft resulting from flight operations or maintenance procedures performed by members of the air crew."

Q. Could you tell the members of the jury in this case who is the lessor?

A. The lessor is -- as it -- as it relates to this contract?

Q. Yes.

A. Is Wilma's Flight Services, Inc.

Q. And did your investigation uncover the insurance that the lessor had or did not have in this case?

A. The -- Wilma's Flight Services did not have any outside or third-party insurance.

Q. Okay. Now, let's look at the first paragraph, and can you read the first sentence of the first paragraph to the jury about the tuna boat companies' obligations?

A. So again read the first paragraph?

Q. Just read the first sentence of the first paragraph.

A. "Lessee agrees to indemnify lessor against all

losses, including costs and expenses, by reasons of claims for injury to or death of persons and loss or damage to property arising from or in a manner connected with the negligent possession, use, or operation of the aircraft by lessee or its agent during the term of this lease." 12:37PM

Q. During the course of this investigation, sir, did you determine whether the lessee in this case did, in fact, obtain insurance in conjunction with Section 4 of this lease?

A. Yes.

Q. And could you explain to the jury how you determined that?

A. I obtained insurance documents from South Pacific Tuna Company which is identified in this contract, and they provided it to me.

MS. MCCONWELL: Your Honor, I object, I think the question's non-responsive and there's no foundation. I mean, the response is non-responsive and there's no foundation.

THE COURT: All right. Rephrase the question then.

MS. M. MILLER: Yes.

BY MS. M. MILLER: (CONTINUING)

Q. Could you please tell the members of the jury what you reviewed that supports your earlier testimony that you did obtain information regarding this particular tuna boat company's obtaining of insurance?

A. I reviewed an insurance policy from South Pacific -- South Pacific Tuna Company Corporation that --

MS. MCCONWELL: Your Honor, I object to him testifying about something not in evidence.

THE COURT: All right. Just -- just say what you reviewed, that's it. Don't say what it says. Just say what you reviewed. She just asked what did you review.

THE WITNESS: Okay.

THE COURT: So just -- I reviewed "X". Whatever that "X" is. And hold on a second. Yeah, go ahead. Okay.

BY MS. M. MILLER: (CONTINUING)

Q. So you reviewed an insurance policy?

A. Yes.

Q. Okay. I'd like you to look at what has been entered -- not entered into evidence, marked as Exhibit 0092, and it will come up in front of you in one moment.

THE COURT: What is that again, 0092?

MS. M. MILLER: Yes, Your Honor.

THE COURT: Okay. Dash one here?

MS. M. MILLER: Yes.

THE COURT: Okay.

BY MS. M. MILLER: (CONTINUING)

Q. Do you recognize this?

A. Yes.

Q. And is that the insurance policy referred to a moment

12:38PM 12:38PM 12:38PM 12:38PM 12:38PM 12:38PM 12:38PM 12:38PM 12:38PM 12:38PM 12:38PM 12:38PM 12:38PM 12:38PM 12:38PM 12:38PM 12:39PM 12:39PM 12:39PM 12:39PM 12:39PM 12:39PM 12:39PM 12:39PM 12:39PM

ago?

MS. MCCONWELL: Your Honor, I would -- I object to it being described or any reference to it until it's been admitted into evidence.

THE COURT: Overruled. Go ahead.

BY MS. M. MILLER: (CONTINUING)

Q. Is that the insurance policy that you referred to a moment ago?

A. Yes.

Q. And is the aircraft that we just saw the lease for, N369V, included in that insurance policy?

A. Yes, it is.

Q. And does it cover the time frame that we just saw that was also covered by --

MR. MARTIN: Your Honor, I object to her --

BY MS. M. MILLER: (CONTINUING)

Q. -- the lease for that insurance policy?

MR. MARTIN: I -- I object.

THE COURT: Okay, I'm sorry --

MR. MARTIN: She's going into the substance --

THE COURT: -- what's the objection?

MR. MARTIN: She's going into the substance of a document that's not been admitted.

THE COURT: I thought this was admitted.

MS. M. MILLER: I'm laying the found- -- no, it's

not admitted yet, Your Honor. 12:39PM

THE COURT: Oh. 12:39PM

MS. M. MILLER: I'm laying the foundation for it. 12:39PM

MR. MARTIN: And we spent hours on insurance documents the last time we were here and none of these were -- 12:39PM 12:39PM

MS. M. MILLER: Your Honor, I'm going to ask, Mr. Martin -- 12:39PM 12:39PM

THE COURT: Okay, just a minute -- 12:39PM

MS. M. MILLER: -- to refrain -- 12:39PM

THE COURT: -- just a minute. Okay, I -- hold on. I thought this was already admitted. All right. So the -- the objection will be sustained as to the substance. Move on. If you get it admitted -- 12:39PM 12:39PM 12:39PM 12:40PM

MS. M. MILLER: Your Honor, at this time I would offer into evidence Exhibit 92. 12:40PM 12:40PM

THE COURT: Okay. 12:40PM

MR. MARTIN: Your Honor, I can renew all the objections I had on all the other insurance policies the Court sustained. I mean, they have -- they have nothing to do with the substance of Counts 100 through 110 in this case, Your Honor. 12:40PM 12:40PM 12:40PM 12:40PM 12:40PM

MS. M. MILLER: Yes, they do, Your Honor. 12:40PM

THE COURT: Okay. Wait, wait, wait. 12:40PM

MS. M. MILLER: And would you like me to go -- 12:40PM

THE COURT: So -- I'm sorry, so it's -- the 12:40PM

objection's irrelevant --

MS. MCCONWELL: It's not relevant.

THE COURT: -- to -- to which counts?

MR. MARTIN: 100 through --

MS. MCCONWELL: Ninety-nine.

MR. MARTIN: -- 99, I guess, through 110, Your Honor --

THE COURT: Okay.

MR. MARTIN: -- which is the substance of his testimony.

THE COURT: Okay. So to Counts 99 through 110 is irrelevant. Okay, what about any other objections?

MS. MCCONWELL: I think hearsay.

THE COURT: Okay, hearsay. What else? Anything else?

MS. MCCONWELL: I don't -- there hasn't been found -- any foundation for it.

THE COURT: Okay. All right.

MS. MCCONWELL: Yeah, it's not -- it's -- it's -- and it's not relevant.

THE COURT: Okay, I got that. I got irrelevant, hearsay, foundation. Any other objections, Counsels?

MS. MCCONWELL: Well, you have my hearsay.

THE COURT: I got it. I know the three objections so far.

MS. MCCONWELL: And 403.

THE COURT: Okay, four objections.

MS. MCCONWELL: Well...

THE COURT: Is that it, four objections? We'll start with the easiest one -- yeah, anything else?

MR. MARTIN: Your Honor, last time we tried -- we went through this whole thing, and the most telling objection was one made by Ms. McConwell when the Court sustained it saying that we've been going over the introduction of these insurance policies --

MS. MCCONWELL: For hours.

MR. MARTIN: -- for hours and hours and it was three or four times, and -- and you finally said we're not going to go into that anymore --

THE COURT: Okay, all right. So --

MR. MARTIN: -- and we're doing it again.

THE COURT: All right.

MR. MARTIN: This is becoming cumulative and repetitive.

THE COURT: All right. Oh, okay, so another, five. Let me write it down so I can remember. And repet- -- okay, repetitive.

All right. Let's start with the easier one for me --

MS. M. MILLER: Sure.

THE COURT: -- foundation.

MS. M. MILLER: Yes, Your Honor. So --

THE COURT: Have you laid a foundation that this witness knows this insurance policy?

MS. M. MILLER: Yes, Your Honor, and this witness has already testified that this is the insurance policy that he obtained from the tuna boat company that he reviewed.

MS. MCCONWELL: Your Honor --

MS. M. MILLER: He also testified --

THE COURT: Okay, so you laid -- you said you've laid foundation. Anything else?

MS. M. MILLER: I've laid the foundation, yes, through his testimony that this is the policy that he obtained and he reviewed, and he also already testified that this policy pertains to that aircraft that --

THE COURT: Okay, without getting into the --

MS. M. MILLER: Yeah, no --

THE COURT: -- what it pertains to.

MS. M. MILLER: -- he said that aircraft --

THE COURT: He said his knowledge of --

MS. M. MILLER: -- that's in this policy --

THE COURT: All right.

MS. M. MILLER: -- and this policy covers the time frame for the lease of this aircraft.

THE COURT: All right.

MS. M. MILLER: We also saw --

THE COURT: I just want to know -- I just want to know foundation as to know the foundation as to --

MS. M. MILLER: Yes, so we laid --

THE COURT: -- the foundation as to how --

MS. M. MILLER: -- so we laid the foundation --

THE COURT: -- how he can say that this -- that -- how he can bring -- authenticate that this document --

MS. M. MILLER: Yes --

THE COURT: -- is what it says.

MS. M. MILLER: -- so he can authenticate it, Your Honor, because; number one, it is a business record, number two --

THE COURT: Okay, so you have -- have you laid the business records exception?

MS. M. MILLER: He will be able to --

THE COURT: So go ahead and do that.

MS. M. MILLER: -- assert that it's a business --

THE COURT: That's the first objection.

MS. M. MILLER: -- record, number one; number two --

THE COURT: Okay. Wait, wait, wait, so lay the foundation now so they can get through that -- I get through that exhibit -- that objection.

MS. M. MILLER: Yes.

THE COURT: Go ahead.

BY MS. M. MILLER: (CONTINUING)

Q. Could you please explain to the Court and to the jury exactly how you obtained this record?

A. I obtained this record directly from South Pacific Tuna Company, which is identified in the contract.

Q. Okay. And --

THE COURT: Which is what, I'm sorry?

THE WITNESS: Which is identified in the contract that we just discussed as it relates to N369V.

THE COURT: Okay. Go ahead.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. And how do you know that this is a true and correct copy of the insurance policy that they took out for this particular lease?

A. This -- I know based upon my review of this document and the helicopter identified within this document this insurance --

MR. MARTIN: Your Honor, may --

THE WITNESS: -- policy is the same one --

MR. MARTIN: -- may I enter an objection to the question?

THE COURT: I'm sorry.

MR. MARTIN: May I enter an objection?

THE COURT: Yeah.

MR. MARTIN: He is not a business records custodian.

THE COURT: Well, I'm -- but hold on. They're trying to -- they're trying to -- I'm sorry, she's trying to see if she can get it under the business records exception, so let me hear --

MR. MARTIN: He's not a business records custodian. He's a CID agent with the IRS. He can't qualify --

THE COURT: Okay, well, let -- okay, let her finish her -- try to get it in. And if you're right, then I'll sustain the objection.

MS. M. MILLER: And there's also, Your Honor, under 80 --

MR. MARTIN: Let me -- let me --

THE COURT: Okay.

MS. M. MILLER: There's also under --

MR. MARTIN: May I briefly respond?

THE COURT: Yeah.

MS. M. MILLER: We --

THE COURT: Hold on. I just need to get her -- she -- she -- I said lay the foundation. If the prosecutor can lay it, then I'll let it in. If she can't, then it's out on foundation. That's easiest --

MR. MARTIN: I understand. And in that regard,

Your Honor, business records custodian would be someone from the company that produced the document that she's trying to introduce.

THE COURT: Yeah, I think I know what business records exception is --

MR. MARTIN: And -- and --

THE COURT: -- so okay. Well, we had -- he -- she only just started asking. Let's see what he says.

MS. M. MILLER: And in --

THE COURT: So go ahead -- go ahead, continue on.

MS. M. MILLER: Well, there's -- there's two things I want to say first before we do this. Number one, the stipulation that the defense entered into with the Government that said it is unnecessary --

MR. MARTIN: No.

MS. MCCONWELL: No.

MS. M. MILLER: Excuse me.

THE COURT: Okay, wait, wait, wait, Counsels --

MS. M. MILLER: That for any --

THE COURT: -- don't interrupt. You don't like her to interrupt you. Go ahead.

MS. M. MILLER: Right. Any of the documents that were seized or subpoenaed. If you look at the stipulation, they agree that we did not have to bring in a records custodian for any document that was seized or subpoenaed, and

this document was subpoenaed from the tuna boat companies, number one.

THE COURT: All right. Okay.

MS. M. MILLER: Number two --

THE COURT: So, first of all -- so if that's the case, then you don't even have to get into the --

MS. M. MILLER: Right.

THE COURT: -- foundation.

MS. M. MILLER: Right. And that is --

THE COURT: So, okay, okay, stop right there.

MS. M. MILLER: Okay.

THE COURT: Just stop.

MS. M. MILLER: Okay.

THE COURT: Stipulation, Counsel?

MS. MCCONWELL: No, Your Honor, we -- what we stipulated to was what's contained on page -- if you recall, we had this conversation the night before we came to Court.

THE COURT: I can barely recall, but go ahead.

MS. MCCONWELL: Okay.

THE COURT: Barely.

MS. MCCONWELL: So -- and we have the records --

THE COURT: But I'm pretty sure you're going to remind me.

MS. MCCONWELL: -- we have the records custodian which are contained on page 2 of the United States' Amended

Witness List, and then we also agreed to the search warrant that was at Hansen Helicopters.

THE COURT: Okay.

MS. MCCONWELL: And --

THE COURT: Okay, the prosecutor has -- okay, let -- okay, hold on. So let me just -- let's pull -- let's pull out the prosecutor's stipulation, and see --

MS. M. MILLER: Yes.

THE COURT: -- did you agree to this. Hold on, make it easier.

MS. M. MILLER: 1516 is the ECF of the stipulation, and it's paragraph 4 --

THE COURT: Okay. So --

MS. M. MILLER: -- specifically, and paragraph 5.

THE COURT: All right. And --

MS. M. MILLER: So that's Exhibit 1516 of ECF paragraph 4 and 5. Paragraph 4 says, defendants --

MR. MARTIN: You don't need to read.

THE COURT: You don't have to say -- you don't have to say what it says.

MS. M. MILLER: Okay.

THE COURT: Counsel, read it and see if you agree with what the prosecutor just said.

MS. MCCONWELL: No, Your Honor, and we addressed this --

THE COURT: Okay, I know -- okay --

MS. MCCONWELL: -- on the very first day --

THE COURT: -- even --

MS. MCCONWELL: -- we were here.

THE COURT: Let me just ask you, you guys can address a thousand things a thousand times ago -- a thousand years ago. I get that. My question is I'm here right now. Did you all stipulate to this? Did you -- if you --

MS. MCCONWELL: Not to this, no.

THE COURT: -- stipulated to this, then we'll discuss it. If you withdrew your stipulation, we'll discuss it.

MS. MCCONWELL: We did not stipulate to -- to --

THE COURT: You did not stipulate to --

MS. MCCONWELL: -- to that.

THE COURT: But did you review what she just sent you?

MS. M. MILLER: No, they're not reviewing it.

THE COURT: Okay, wait.

MS. MCCONWELL: I'll -- I'll review it.

THE COURT: No, no, just review it. You guys have to review it. That's how I'll make my decision.

MR. MARTIN: Can we please have the ECF again?

THE COURT: What the ECF again? ECC what?

MS. M. MILLER: ECF, Your Honor, is 1516 --

THE COURT: Uh-hum.

MS. M. MILLER: -- page 2, paragraphs 4 and 5.

THE COURT: All right.

(Pause.)

THE COURT: And did you guys have a chance to review it? Yeah, did you review -- Ms. McConwell, do you agree or disagree?

MR. MARTIN: Your Honor, I haven't been --

THE COURT: Oh, you're still reviewing it.

MR. MARTIN: I don't have 1516.

THE COURT: Could you give them a copy? Could you give them a copy? Sometimes we get -- you know, you got -- you got a million pages --

MS. M. MILLER: It's 1516.

THE COURT: --16, page 2 --

MS. M. MILLER: 1516 --

THE COURT: -- paragraph 4 and 5?

MS. M. MILLER: Yes.

THE COURT: Ms. -- why don't you guys review that.

MS. MCCONWELL: And -- and, Your Honor, no, it doesn't -- it doesn't change what my position is. When Ms. Miller and I discussed this the night before I leave at 6:00 the next morning, I -- we -- we agreed to was the records custodians that are --

THE COURT: And so it was amended. So, I'm sorry, it might --

MS. MCCONWELL: -- contained on here --

THE COURT: All right.

MS. MCCONWELL: -- and -- and what was -- what was got from all of the -- of Hansen Helicopters. We did not agree to a complete free-for-all that anything that they ever got we were going to agree to, and that is why, when we came back to Court and Ms. Miller asked for another stipulation, and I said, no, I cannot do that --

THE COURT: All right.

MS. MCCONWELL: -- because you're misrepresenting what we agreed to.

THE COURT: Okay.

MS. M. MILLER: Your Honor, what we agreed to --

THE COURT: Okay, wait, wait --

MS. M. MILLER: -- is in writing.

THE COURT: Okay, you know what, so why don't we do --

MS. M. MILLER: It's in writing.

THE COURT: Wait, wait, wait. Why don't we do this, ladies and gentlemen, we'll see you in ten minutes.

Please rise for the jury. I don't want to keep cutting off people, I'd rather just kind of get through this.

(Jury out at 12:50 p.m.)

THE COURT: We're outside the presence of the jury. This is what I want to do. Just let's take -- let's take a five-minute recess and allow Ms. Miller to talk to Ms. Miller, Marie -- not you, Marie, but Miss other Miller, and to go over with your stipulation. Because if it was amended -- let them -- let them try to see if they agree or disagree because I -- because you're, like, in the middle, but they may have had their own deal. And I'm not saying they did or did not.

MS. M. MILLER: Right.

THE COURT: So let's take five minutes and then we'll come back and talk.

MS. M. MILLER: Yes, Your Honor.

THE COURT: It makes it easier.

MS. M. MILLER: Yes, Your Honor.

THE COURT: Because -- because it's true, I did have Ms. McConwell go in and -- and meet with you guys --

MS. M. MILLER: Yes.

THE COURT: -- separately. So let's --

MS. M. MILLER: Yes.

THE COURT: -- let's just five minutes, okay.

MS. M. MILLER: Yes.

THE COURT: If it takes ten, that's fine.

MS. M. MILLER: Yes, Your Honor.

(Recess taken at 12:51 p.m.)

(Back on the record at 12:56 p.m.)

THE COURT: Okay. We're back on the record outside the presence of the jury. The question is, has there been a stipulation as to specifically this exhibit that's in question, it's a policy -- an insurance policy.

Ms. Marie Miller is attempting -- to trying to attempt to get in a foundational colloquy going. The defense Counsel -- and then -- and then Ms. Marie Miller said, look, we don't even have do it this essentially because we have stipulated to the admission without getting a custodian of record.

Is that correct, Ms. Marie Miller?

MS. M. MILLER: That is correct, Your Honor. And --

THE COURT: Now -- okay, so that's all. I just need to focus --

MS. M. MILLER: Yes.

THE COURT: -- streamline this.

Ms. McConwell says, and can you -- and my understanding is Ms. McConwell says, no, we never agreed to a -- you guys call it free-for-all, an omnibus-type-of-admission of insurance policies as in this case or documents. And, in fact, we got together and you spoke to Stephanie Miller to go over and --

MS. MCCONWELL: No.

THE COURT: I'm sorry, you talked to Marie Miller? You talked to who?

MS. M. MILLER: I met with --

THE COURT: I'm sorry, wait, wait, wait --

MS. M. MILLER: -- Ms. Laura McConwell.

THE COURT: Hold on, hold on, no, no, no. I -- let me -- let me talk to Marie -- I mean let me talk to Ms. McConwell. You spoke to who?

MS. M. MILLER: Me.

MS. MCCONWELL: Ms. Marie Miller and I had a conversation --

THE COURT: Okay.

MS. MCCONWELL: -- late on a Tuesday or --

COURT REPORTER: I'm sorry, ma'am, can you get on the microphone, please.

THE COURT: Can you get on a mic --

COURT REPORTER: I can't hear you.

THE COURT: Can you get on a mic because the court reporter.

MS. MCCONWELL: Ms. Marie Miller and I had a telephone conversation late in the evening I believe on a Tuesday evening before we were -- at the Court's direction before we were coming back.

THE COURT: Okay.

MS. MCCONWELL: Okay?

THE COURT: And?

MS. MCCONWELL: And so what we agreed to was she wasn't going to need to call these records custodians --

THE COURT: Right.

MS. MCCONWELL: -- which are on page 2 of their amended witness list, and they weren't -- and they weren't going to need to call a custodian on the FBI search warrant documents from my client.

THE COURT: All right.

MS. MCCONWELL: And I think also the documents that -- that came from Hansen via the -- the -- I think the subpoena.

THE COURT: And you guys put that in writing?

MS. MCCONWELL: Well, we didn't put it in writing. Ms. Miller said she would go ahead and file a stipulation, which she did.

THE COURT: Okay.

MS. MCCONWELL: And then you adopted it. When we got to Court --

THE COURT: Right.

MS. MCCONWELL: -- in May, I did bring it up that we didn't -- that's -- that's much broader than what we had agreed to. What we agreed to is what I just represented to you, and that's what we've been operating under through the rest of Court. No, I did not file a separate motion because

we had -- as I understood it, had -- had cleared that up --

THE COURT: With the Court, with me --

MS. MCCONWELL: Yes, with you --

THE COURT: -- some time ago.

MS. MCCONWELL: -- when we were right back -- right back -- when we were back that week of, what, May 9th, or whatever week we were here.

THE COURT: Uh-huh. Was this the last week before we adjourned?

MS. MCCONWELL: No, that was first week we came back.

THE COURT: Okay.

MS. MCCONWELL: Now, on June 8th, which was our last trial date --

THE COURT: Yeah.

MS. MCCONWELL: -- then we did spend several hours outside the presence of the jury where Ms. Samantha Miller was attempting to get in Exhibit 102, which is another issue insurance policy --

THE COURT: Right.

MS. MCCONWELL: -- and was -- the Court ruled that wasn't coming in --

THE COURT: I remember that.

MS. MCCONWELL: -- as with this one --

THE COURT: Okay. That's what --

MS. MCCONWELL: -- and they don't --

THE COURT: -- I thought it --

MS. MCCONWELL: -- have -- yeah.

THE COURT: All right, okay --

MS. M. MILLER: Your ruling at that time --

THE COURT: Wait, wait --

MS. M. MILLER: -- was not based on a lack of foundation. Your ruling at that time, if we look at the record, was based on their arguments that it wasn't relevant. That was your ruling at the time.

THE COURT: Okay, okay, putting that aside -- okay, but that's -- that's not really my -- my focus. Right now my focus is this particular exhibit number and it is --

MS. MCCONWELL: 92.

MS. M. MILLER: 92.

THE COURT: -- Exhibit 92.

MS. M. MILLER: Yes.

THE COURT: All right. So Exhibit 92.

MS. M. MILLER: Yes.

THE COURT: And your -- your argument is that you've never agreed to the admission. Ms. McConwell, there is no documentation that shows that you have agreed to the admission of this exhibit, this insurance to policy.

MS. MCCONWELL: That's correct.

THE COURT: That's all I care about right now.

MS. MCCONWELL: That is correct.

THE COURT: You never admit -- admitted -- agreed to that. And you said --

MS. M. MILLER: And this is the documentation that proves it. I sent this stipulation to Ms. McConwell and Mr. Martin and Mr. McConwell and Mr. Han. The paragraph --

THE COURT: And they signed it?

MS. M. MILLER: And they signed off on it and this Judge, you, granted this. And it says in paragraph 4 and 5 -- now they're saying, well, we didn't really mean it to be so broad. I call BS on that, Your Honor, because when you look at paragraph --

THE COURT: Okay, as long as you sign -- okay, wait, wait, wait. So you signed it.

MS. M. MILLER: Yes.

THE COURT: That's all I care about. All right.

MS. M. MILLER: Yes, they did.

MS. MCCONWELL: No, we did not sign it.

THE COURT: All right.

MS. M. MILLER: And paragraph 4 says --

THE COURT: Wait, wait. Did they sign it?

MS. M. MILLER: They did agree -- it's a joint stipulation that we filed. And, yes, here we go, page 2 of the joint stipulation filed by Laura McConwell, Edward McConwell, Mack Martin, Edward Han.

THE COURT: Right. So my -- 01:01PM

MS. M. MILLER: All of us filed this. All of us filed this. And from May 5th, at the time that we filed this, until today, from the time you entered an order granting paragraphs 4 and 5 and 6 of this stipulation, the defendants have never moved to say, Your Honor, we didn't mean to file paragraph 4, which says that they stipulate --

THE COURT: I got it. I got it.

MS. M. MILLER: -- to the authenticity and the chain of custody of all --

THE COURT: All right.

MS. M. MILLER: -- all records.

THE COURT: All right.

MS. M. MILLER: Now they don't want this policy in, so all of a sudden there's a limitation.

THE COURT: Well, no, no, no, the -- I guess the question is, did they file it? They signed it and filed it, you said yes.

MS. M. MILLER: They did.

THE COURT: And you said what, Ms. McConwell?

MS. MCCONWELL: I'm saying no, and if I have to go get my airline tickets to show I was on a plane, Ms. Miller prepared it, Ms. Miller filed it.

MS. M. MILLER: Here's the e-mail from you confirming yes, file it. Do I need to show --

MS. MCCONWELL: That you --

MS. M. MILLER: -- that to the judge.

MS. MCCONWELL: You told me you were going to prepare one and file it and I said that's --

MS. M. MILLER: I sent it to you, Laura.

MS. MCCONWELL: -- great.

MS. M. MILLER: I didn't say I'm going to prepare one. I sent you this. I sent you this.

THE COURT: All right. My question --

MS. M. MILLER: You approved it.

THE COURT: Okay, my question is --

MS. MCCONWELL: Well --

THE COURT: Wait, hold on, hold on.

MS. M. MILLER: Well what?

THE COURT: No, because you both are professionals, let's calm down. We got -- we just got to get to the bottom of this.

MS. M. MILLER: I'm just going to find the e-mail --

THE COURT: Now the question.

MS. M. MILLER: -- now because apparently that's what we need to do.

THE COURT: Well, even if you got the e-mail, the question is, did you sign the stipulation.

MS. M. MILLER: Yes.

 THE COURT: Wait, you did. You did, Ms. Marie. Everybody, your signatures are on -- is everybody's signature on the stipulation?

MS. MCCONWELL: Well, she put an e-signature -- everybody's e-signature on it.

THE COURT: All right. Did she get your --

MS. M. MILLER: Which she approved.

THE COURT: -- permission to get an e-signature?

MS. M. MILLER: Yes, she did.

MS. MCCONWELL: Well, I'm going to have to --

THE COURT: Let her speak.

MS. MCCONWELL: I'm going to have to pull up and look at the e-mails. I do not recall --

MS. M. MILLER: Oh --

THE COURT: Okay, why don't we come back to this -- hold on -- because this -- this is a foundational question. Okay, putting that aside, even if you don't agree -- hold on. Even if -- even if -- even if I can't make a decision on -- on that, the question is can she lay a foundation with this witness. So let's just get the -- oh, he's gone. Well, okay, we -- we just got to get -- can he -- can she pull it out and make the -- make it so --

MS. M. MILLER: And let me address that, Your Honor. So, first, when you look at the exception 803(6) for a business records --

01:02PM 01:02PM 01:02PM 01:02PM 01:02PM 01:02PM 01:03PM 01:03PM 01:03PM 01:03PM 01:03PM 01:03PM 01:03PM 01:03PM 01:03PM 01:03PM 01:03PM 01:03PM 01:03PM 01:03PM 01:03PM 01:03PM 01:03PM 01:03PM 01:03PM

THE COURT: Okay, go ahead.

MS. M. MILLER: -- the business records --

THE COURT: No, you don't have to read it. Just tell me the -- I got it.

MS. M. MILLER: So 803(6) is one way in which it comes in, because Special Agent Khamvongsa is able to lay the foundation for all of the requirements under --

THE COURT: Okay, as long -- if he could do that, then you -- you may get it in under that basis.

MS. M. MILLER: And I'm trying to --

THE COURT: So you're trying to do it.

MS. M. MILLER: And I have another argument about it, Your Honor, besides 803(6). In addition, there is a catch-all provision under the Federal Rules of Evidence for the veracity of a document, whether it fits within a particular exception or not --

THE COURT: Okay, what -- just what is it?

MS. M. MILLER: That is 803 --

THE COURT: Just tell me what it is.

MS. M. MILLER: Yes, Your Honor.

THE COURT: Don't -- don't read it, because I can read myself.

MS. M. MILLER: Yes, Your Honor.

THE COURT: 803 --

MS. M. MILLER: 807.

THE COURT: All right. Let me just look at 807 for a minute.

MS. M. MILLER: Yes, Your Honor.

THE COURT: All right. She has not been able to try to get through the foundation because you guys are objecting.

MS. M. MILLER: Right.

THE COURT: So if -- if the prosecutor can get through 80 -- 803(6) through colloquy, then the Court may allow it. So 807, in the alternative narrative, she's asking me to look at 807.

MS. M. MILLER: Yes, Your Honor.

THE COURT: Let me look at that really quick, residual exception.

MS. M. MILLER: Yes, Your Honor.

THE COURT: All right. So she can try to bring it in under 807. All right. So --

MS. M. MILLER: Yes, and then I have a third argument --

THE COURT: Okay, so --

MS. M. MILLER: -- Your Honor.

THE COURT: Okay, wait a minute.

MS. M. MILLER: The third argument is --

THE COURT: Yeah.

MS. M. MILLER: -- it's not being offered for the

truth of the matter asserted.  It's being offered to show that
the tuna boat companies relied on the representations of Jon
Walker in these leases that the helicopters were in fact
properly registered, airworthy, and that the airman were in
fact qualified by the FAA.

And I want this to be on the record, Your Honor,
because it becomes extremely important.  This is a conspiracy
to commit wire fraud count.  The reason why they're objecting
so vehemently to the introduction of this insurance policy is
it shows --

THE COURT:  All right.

MS. M. MILLER:  -- that the state of mind of the
tuna boat companies was that they were getting a helicopter
that was registered with the FAA properly by the owner, number
one; number two, that the helicopter was airworthy according
to the FAA; and, number three, that the airmen were in fact
FAA certified.

The words FAA appear in this Document 50 times in
11 pages, that's why they don't want it in --

THE COURT:  All right.

MS. M. MILLER:  -- because it clearly shows that
reliance by the tuna boat companies on their
misrepresentations.  So I would argue that it's not even
hearsay because I want to bring it in to show the state of
mind of the tuna boat companies who are the victims of the

conspiracy to commit wire fraud.

THE COURT: Got it. Okay.

MR. MARTIN: Your Honor --

THE COURT: Yeah.

MR. MARTIN: -- Mr. -- Agent Khamvongsa is not an individual that could testify --

THE COURT: Okay, let's get him on the stand. Let's just -- outside the presence of the jury, let's just do it. Let's just see if he can --

MR. MARTIN: He can't testify as to state of mind of a tuna boat owners.

THE COURT: All right, that's -- that's --

MR. MARTIN: They need a tuna boat owner to testify to that.

THE COURT: Okay, let's go -- let's just go -- let's see if he can do -- get through the foundation first. Let's see if he can get through the -- if they can get through 803(6) and 807. Okay, and then -- then we could talk about the state of mind later.

MR. MARTIN: All right.

MS. M. MILLER: And then, Your Honor, I also have for the Court's record the e-mail that went to Ms. McConwell.

THE COURT: Okay, we'll -- we'll look at that -- we'll look at that later. Let's just try and see --

MS. M. MILLER: Okay.

THE COURT: We'll -- we'll come to that later. Let's -- because that could -- let's -- let's see if he could get through this. This might -- this might be easier.

MS. M. MILLER: Well, it may be easier, but I also want it on the record --

THE COURT: Okay, you put it on the record.

MS. M. MILLER: -- that she had the stipulation --

THE COURT: All right.

MS. M. MILLER: -- when she approved filing it with the Court.

THE COURT: All right. So you could show that to her later. Go ahead. 80 -- go ahead, 803-6.

MS. M. MILLER: Yes.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, could you, please, tell the Court whether this particular record is a record that the tuna boat company would normally maintain?

A. Yes.

MR. MARTIN: Objection; speculation.

THE COURT: Okay, how does he know that?

MS. M. MILLER: Yes.

BY MS. M. MILLER: (CONTINUING)

Q. How do you know that, sir?

A. I know that because the tuna boat company

representative told me this is their record --

MR. MARTIN: Objection; hearsay.

THE WITNESS: -- and they provided it to me --

MR. MARTIN: Objection; hearsay.

THE WITNESS: -- directly.

THE COURT: Okay. Hearsay?

MS. M. MILLER: Your Honor, it's not hearsay because, again, it is not being offered for the truth of the matter asserted.

MR. MARTIN: What the tuna boat owner said to him is not the --

MS. M. MILLER: The tuna boat company gave him a lease. The lease itself -- not the lease, the insurance policy. If you look at the insurance policy itself, the insurance policy --

Can we pull that back up on the screen so the Court can see it, please?

MR. MARTIN: Your Honor, my objection was he was testifying to hearsay, not -- not what the policy --

MS. M. MILLER: He subpoenaed from the tuna boat company their insurance --

THE COURT: All right, just ask the question --

MS. M. MILLER: -- policy.

THE COURT: The objection -- okay, the Court -- let me just -- let's clarify this. Go back to the question.

MS. M. MILLER: Yes.

BY MS. M. MILLER: (CONTINUING)

Q. How do you know that this particular insurance policy, which you obtained from the tuna boat company, is in fact a business record of the tuna boat company consistent with the federal rules?

MR. MARTIN: Objection; speculation.

BY MS. M. MILLER: (CONTINUING)

Q. How do you know?

THE COURT: Overruled.

MS. M. MILLER: Let's hear what he has --

THE COURT: Overruled.

MS. M. MILLER: -- to say about --

THE COURT: How do you know -- how do you know that?

BY MS. M. MILLER: (CONTINUING)

Q. How do you know?

A. It was provided directly -- directly to me from the owner of that -- that contractor -- insurance, and that is South Pacific Tuna Company which oversees the tuna boat vessels.

Q. And now --

THE COURT: Somebody gave it to you and you believed that that's what it is; that's what you're saying?

THE WITNESS: Yes.

THE COURT: Okay. Next question.

BY MS. M. MILLER: (CONTINUING)

Q. Yes.

And when you received it, did you review the entire insurance policy carefully?

A. Yes.

Q. Did you ensure that the policy itself matched up with the evidence in this case in terms of the aircraft that was identified in the policy?

A. Yes.

Q. The lease term that was identified in the policy?

A. Yes.

Q. The boat that was being used to lease that in the policy?

A. Yes.

Q. Was there anything in that policy or in that document that made you question the authenticity or veracity of the information contained in the insurance policy?

A. No.

MS. M. MILLER: Your Honor, under 807, the residual exception, this clearly comes in. It also goes to the weight, not the admissibility --

MR. MARTIN: May I voir dire the witness, Your Honor?

THE COURT: Okay, hold on. Okay, you're --

01:08PM 01:08PM 01:08PM 01:08PM 01:08PM 01:09PM 01:09PM 01:09PM 01:09PM 01:09PM 01:09PM 01:09PM 01:09PM 01:09PM 01:09PM 01:09PM 01:09PM 01:09PM 01:09PM 01:09PM 01:09PM 01:09PM 01:09PM 01:09PM 01:09PM

you're bringing it under 807.

MS. M. MILLER: Yes.

THE COURT: All right, so I got it.

All right, so --

MR. MARTIN: May I voir dire?

THE COURT: -- yes, well, you may.

VOIR DIRE

BY MR. MARTIN:

Q. Agent Khamvongsa, who gave you this document, the name of the person?

A. Dan Hoff of -- or Keith Solar of South Pacific Tuna Company.

Q. What is his title?

A. He is the legal counsel that was obtained from -- that -- that's for South Pacific Tuna Company.

Q. He's a lawyer?

A. Yes.

Q. Does he work for the company?

A. He worked -- as far as I know, he works for the company.

Q. All right. Is he an employee of the company?

A. I don't know. I just know that he represents the company.

Q. Does he -- is it his job to keep the records of the

company?

A. Again, he's a representative of the company and he represented the --

Q. Is it his job to keep the records of the company?

A. He --

Q. Do you understand the question?

A. He was representing the individuals involved with providing the records.

Q. I'm talking about his job. I'm talking about his responsibility. Is it his responsibility to keep the records of the company?

A. Yes.

Q. Okay. And so where does he store all these records he keeps of the company?

A. At the company facility.

Q. Does he work at the company facility or is he a private lawyer?

A. I do not know. I don't know as it relates to that question.

Q. Okay. Well, is it his job to keep the records of the company?

A. He is representing -- he's a representative of the company.

Q. I understand you said he's a representative of the company.

01:10PM 01:10PM 01:10PM 01:10PM 01:10PM 01:10PM 01:10PM 01:10PM 01:10PM 01:10PM 01:10PM 01:10PM 01:10PM 01:11PM 01:11PM 01:11PM 01:11PM 01:11PM 01:11PM 01:11PM 01:11PM 01:11PM 01:11PM 01:11PM 01:11PM

A. And he represented that these --
Q. I understand that he's a representative --
A. -- are true and create documents from the company.
Q. May I ask the question, sir?
A. Yes, sir.
THE COURT: You know, just -- okay, answer the specific question. Okay. Go ahead, what's the question?
BY MS. M. MILLER: (CONTINUING)
Q. They have people at the company whose job it is to keep the records of the company, do they not, sir?
A. Yes, absolutely.
Q. And who are those people?
A. The chief financial officer who provided the records through --
Q. Who is that person, was my question, sir.
A. The name escapes me at the moment. But --
Q. Okay. And he would be the person then that would come to the courtroom and show -- tell us that these records are kept in the normal course of business if they are kept in the normal course of business. Would you agree with that, sir?
A. He represents the company. He's one of the many that could testify to that.
Q. Okay. And you don't work for the company?
A. I don't work for the company, but the records were

provided --

Q. No, you don't --

A. -- from the company.

Q. -- work for the company; correct?

A. No, I do not. I work for the government.

Q. I -- that's -- all right.

And it's not your job to maintain these records in a normal course of business, is it, sir?

A. (Pause.)

Q. That's a simple question.

A. It's my job to review business records.

Q. Okay. Is it your job to maintain the records of this tuna boat company in the normal course of your business, sir?

A. After it's been provided to me from a business as a result from a subpoena, yes.

Q. No, I -- my question is, in your day-to-day operations, do you maintain the records of this tuna boat company?

A. Again, if it's provided to me through a subpoena, I do maintain it after it's been provided to me. If I'm misunderstanding --

Q. Before it's --

A. -- your question --

Q. -- provided to you, sir, before anything is provided to you, is it your job to maintain the records of this tuna

 boat company?

A. No.

Q. Okay. And... (pause.)

You know whether or not -- as far as the keeping and maintaining of these records and the practice of keeping and maintaining these records, is that your job before they were given to you, sir?

A. It's the job of the custodian of records for the business itself.

Q. Okay. And you would agree with me, you are not the custodian of records for the tuna boat company; isn't that true, sir?

A. I am not the custodian of records for the South Pacific Tuna Company.

Q. Okay. And --

MR. MARTIN: Your Honor, that concludes my voir dire --

THE COURT: Okay.

MR. MARTIN: -- and my argument is he's not the custodian of records --

THE COURT: All right.

MR. MARTIN: -- for the tuna boat company.

THE COURT: So as of -- as of right now, I would agree with you, but let's see if the prosecutor can --

MS. M. MILLER: Yes, Your Honor.

01:13PM 01:13PM 01:13PM 01:13PM 01:13PM 01:13PM 01:13PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM

THE COURT: Go ahead.

MS. M. MILLER: So two things. Number one, the stipulation, I do have the e-mail that went to Laura McConwell --

THE COURT: Okay.

MS. M. MILLER: -- with the attached stipulation that was filed with the Court, and I have her e-mail returning to me saying we agree with these stipulations, you are approved to file it. And I am going to e-mail that -- I'm going to instruct Mr. Leon Guerrero to, please, e-mail that to the Court because of the representation that was made --

THE COURT: And also --

MS. M. MILLER: -- by Ms. McConwell --

THE COURT: Okay. And let me --

MS. M. MILLER: -- that is inaccurate.

THE COURT: -- receive a copy of that too.

MS. M. MILLER: So that is -- yes, can you, please, e-mail that to the Court right now.

THE COURT: Yeah, but also --

MS. M. MILLER: As well, number two --

THE COURT: -- e-mail it to Ms. McConwell --

MS. M. MILLER: Yes, and e-mail it back to her.

THE COURT: -- and Mr. Martin. Go ahead.

MS. M. MILLER: Number two, Your Honor, is, under 807, the residual exception to the hearsay rule, 807

specifically says that a hearsay statement, if the Court rules, first of all, that this is a hearsay statement, is not excluded by the rule against hearsay even if the statement is not admissible under any hearsay exception if the statement is supported by sufficient guarantees of trustworthiness.

We heard this agent testify that he subpoenaed the records from the tuna boat company and that the tuna boat company put him in charge with their -- put him in contact with their attorney who produced these insurance policies to him that aligned with the leases that have already been entered into evidence in this case. So there is no question about that. The policies themselves align with the leases. They align with the N number of the helicopters that were owned by Hansen Helicopters and Jon Walker. They align with the leases that were entered into. They identify the tuna boat companies.

And the second part of 807 says, that if this evidence is more probative on the point for which it is offered than any other evidence, that the proponent can obtain through reasonable efforts, then it may be admitted. Now, we've already discussed why this evidence is so probative. The defense are the ones who opened the door arguing, even though the jury instructions for conspiracy to commit wire fraud do not require that we prove that the tuna boat companies suffered a financial loss, the defendants have been

01:15PM 01:15PM 01:15PM 01:15PM 01:15PM 01:15PM 01:15PM 01:15PM 01:15PM 01:15PM 01:15PM 01:16PM 01:16PM 01:16PM 01:16PM 01:16PM 01:16PM 01:16PM 01:16PM 01:16PM 01:16PM 01:16PM 01:16PM 01:16PM 01:16PM

arguing, well, isn't it true the insurance boat companies haven't suffered a loss.

This evidence shows that the tuna boat companies paid $30,000 a year for additional insurance on these helicopters and on the airmen that the defendants were producing to them, and that the insurance policy itself says if these helicopters do not comply with the FAA rules, if the helicopters are not airworthy under the FAA rules, and if the airmen are not certified by the FAA, then there's no coverage.

Why would the tuna boat companies pay $30,000 a year for that insurance if they didn't believe the defendants' own representations that they were getting airworthy, FAA registered, properly-owned aircraft with airmen who were qualified by the FAA?

It absolutely refutes that argument, and it is more probative than any other evidence that we have.

And I would argue, Your Honor, in terms of notice, look at the number of this exhibit. It is Exhibit No. 92. The defendants have had this since our first witness list was sent to them more than two years ago. We immediately disclosed it.

And I would go back to the stipulation for the admissibility of any records that were either subpoenaed or obtained through the search warrant, and the defendants agreed that no records custodians would be required.

        This is a damming piece of evidence. So to say --

THE COURT: All right, I got it, I got it. I got your argument.

All right. So the first question is, did you all want to review the e-mail Ms. McConwell?

MR. GUERRERO: It was just sent, Your Honor, so they should be --

MS. MCCONWELL: No, Your Honor, we went -- we went -- had gone -- we went back and forth, and what -- and -- and it was late at night before I'm leaving the next day. And what we agreed to and what I understood we agreed to, and clearly we should have asked more questions, is the records custodians. The only records custodians I'm aware of at the time I'm having the conversation is what was on page 2 of their witness list, which are nine custodians of -- for records. And we've been talking to the bank custodians. We've been talking about the medical custodians. And I'm, like, no, you don't need those custodians. Those are the records custodians that we agreed to.

THE COURT: Okay.

MS. MCCONWELL: With regard to what was -- the search warrant and the subpoenas, they -- they execute search warrants on Hansen Helicopters and subpoenas on Hansen Helicopters. Those are the search warrants and those subpoena

I -- I -- I am talking about. And so at no time did I -- did I anticipate that it means the universe of any subpoena that they'd ever issued was going to be in -- was going to be included in that stipulation. 01:19PM

THE COURT: All right.

MS. MCCONWELL: And then we didn't agree that things were just going to automatically be admitted. The things that we did agree to where they didn't need to have the records custodian was authenticity, so they didn't have to have that records custodian. We didn't agree that something just gets to be admitted.

THE COURT: All right, but okay, so let me just say I believe you. But my question is, on this e-mail, was there, like, further conversations between you and Ms. Marie Miller --

MS. MCCONWELL: I was -- I was --

THE COURT: -- about -- about the -- about go ahead and file this stipulation?

MS. MCCONWELL: What it was, was is I said -- and on me, we changed it because I didn't want a word "otherwise" in it. I didn't want -- we didn't -- we didn't specifically said, no, 1 through 9 on that --

MS. M. MILLER: Here's what she said --

THE COURT: Okay, no, no, no.

MS. MCCONWELL: What she --

THE COURT: No, no, no, Counsel, let me -- just let me hear from her.

MS. MCCONWELL: That's the only thing I thought we were talking about was what was on their witness list --

THE COURT: All right.

MS. MCCONWELL: -- were those. So that's the first thing. The second -- and that's -- that's -- that's, I think, Item 3 on her stipulation, which I don't think I saw the final one. I sent her this e-mail and then I -- then it got -- then it was filed.

Then the next thing is I said, everything that you've got -- and, in my head I'm thinking from us, was either seized or subpoenaed, because they -- they issued several subpoenas against Hansen Helicopters and Hansen -- Hansen-affiliated companies all in the same time. And then they'd also done a subpoena that got responded to that we gave Agent Khamvongsa's stuff in January of 2020.

So when she's saying, you know, are you going to agree with the subpoena and the -- and the -- the subpoenaed and the -- the -- the search warrant stuff, I'm thinking this is what she's wanting --

THE COURT: Okay.

MS. MCCONWELL: -- is the Hansen Helicopters stuff.

THE COURT: Let -- let me just say -- let me just

say -- okay, on this --

MS. MCCONWELL: There is nothing more specific.

THE COURT: On this stipulation and this -- and you -- sounds like there could be a misunderstanding on your part or their part, whatever. I'm not going to make a ruling on that because I don't know. I'd have to really probe that further, so I'm not going to make a ruling at this time.

On the business records exception, the Court will sustain the objection. There has not been made -- the witness cannot testify as a chain -- a custodian of record.

On the residual exception, it does say that notice -- reasonable pretrial notice is required for that to be admissible, but it goes on to say, and the prosecutor's already argued that you all have had a copy of this, and -- and it does say that the Court may give -- the Court may allow this type of residual exception to apply if I find that there is lack of earlier notice for good cause.

Now, that's only -- hold on. It only becomes relevant if the Court agrees that this is a hearsay statement. The prosecutor is saying she's not offering it for the truth of the matter asserted. If I agree with her, then residual business records is irrelevant right now at this point. So what -- what she's saying it's being offered for was -- what was it?

MR. MARTIN: To prove intent.

MS. M. MILLER: The state of mind -- no.

THE COURT: Oh, the state of mind --

MS. M. MILLER: State of mind --

THE COURT: Of the tuna boat --

MS. M. MILLER: -- of the tuna boat companies.

THE COURT: Okay. I've got it, yeah.

MS. M. MILLER: Right.

THE COURT: So that's her -- it's going to -- okay, yes?

MR. MARTIN: And -- well --

THE COURT: Okay. So that's what she's saying that they're going to try to prove it -- I mean, that's her argument. She's going to infer that maybe or do you have -- do you have --

MR. MARTIN: No.

THE COURT: -- a tuna boat guy to say, hey --

MR. MARTIN: No.

MS. M. MILLER: No, we don't.

THE COURT: -- we relied on that?

MR. MARTIN: No, they don't.

MS. M. MILLER: No, because they stipulated that we didn't need a records custodian.

That -- that --

THE COURT: No, no, no, my question is -- hold on.

MS. M. MILLER: -- to begin with.

THE COURT: Hold on, hold on, calm down. My question is, is there any tuna boat owner --

MR. MARTIN: No.

THE COURT: -- to come in say, you know what, our state of mind was such that --

MS. M. MILLER: No.

THE COURT: I mean, okay, so basically you're going to say we believe that this was their state of mind because who would go proceed forward -- okay. I got it. I know.

MS. M. MILLER: And paid $30,000 a year for an insurance policy --

THE COURT: I know. You -- you are -- yeah --

MS. M. MILLER: -- that was -- that was not valid.

THE COURT: Okay. All right.

MS. MCCONWELL: Well, wait --

THE COURT: So -- so it's really an inferential or circumstantial -- yeah, okay. Okay, go ahead, Mr. --

MR. MARTIN: Well, Your Honor --

THE COURT: Yes?

MR. MARTIN: -- I understand you're not going into what stipulation was or wasn't, but I want --

THE COURT: Well, I don't -- I don't have time to

go into it right now because I -- I just want to try to see if I can make a ruling --

MR. MARTIN: Well --

THE COURT: -- without having to deal with that.

MR. MARTIN: The residual -- as to the residual rule, Your Honor --

THE COURT: Yes.

MR. MARTIN: -- when we got the Government's witness list -- not two years ago -- we got it probably 6-8 months ago, but there were 30,000 -- 20,900 and something exhibits on it.

THE COURT: Uh-huh.

MR. MARTIN: Okay. And for them to say we got notice, there it is, Judge. That is a --

THE COURT: Are you pointing to the many, many binders in front of us?

MR. MARTIN: And that's not all of them. That's --

THE COURT: Okay, I got it. Yes, we know.

MR. MARTIN: We had thousand of exhibits, and to say that that is notice to us is like looking for a needle in a haystack, Your Honor.

THE COURT: All right, okay, so let's --

MR. MARTIN: That's not a fair representation.

THE COURT: All right, so I've got your notice

argument. What about this argument on the state of mind in the tuna boat or --

MR. MARTIN: They can call a tuna boat owner to come in and say why we bought insurance company[sic]. But for this agent to say that the insurance policy reflects the state of mind of somebody that he's never met is totally inappropriate. It's speculation.

MS. M. MILLER: He's not going to say that, Your Honor. It's the policy itself --

THE COURT: But you want to argue -- no, but what you're going to argue that, though --

MS. M. MILLER: The policy itself --

THE COURT: -- wait, wait, wait. But you want to be able to argue it; right?

MS. M. MILLER: What I want --

THE COURT: Wait, wait.

MS. M. MILLER: Yes.

THE COURT: You want to be able to get this in --

MS. M. MILLER: What I want to be able to argue --

THE COURT: -- so you can argue it.

MS. M. MILLER: Yes --

THE COURT: That's --

MS. M. MILLER: -- I want to be able to argue -- absolutely, Your Honor.

THE COURT: So we got it --

MS. M. MILLER: What I want to be able to argue is why would --

THE COURT: I know.

MS. M. MILLER: -- a tuna boat company --

THE COURT: I got it.

MS. M. MILLER: -- pay $30,000 a year for a policy that requires FAA certification?

THE COURT: All right. I got it. You guys don't have to -- you don't have to pound it in my head; I got it.

MS. M. MILLER: And, in terms of the notice issue, just so you know, this insurance issue, when we sent them the list of exhibits that were going to be used with Special Agent Khamvongsa before we broke three months ago, these policies were listed on that list three months ago, three months ago. So to say, well, it's 30,000 pages and we haven't had a chance to look at it, insincere, absolutely insincere.

THE COURT: Okay.

MS. M. MILLER: Of course they've had a chance to look at it. They don't want it in because it is so probative of the fraud.

THE COURT: All right. Anything else?

MS. M. MILLER: No.

THE COURT: Okay, yes?

MS. MCCONWELL: Well, I was just -- you know you give -- we're given an exhibit list and we don't have to disclose what all of our objections may be --

THE COURT: No, I know.

MS. MCCONWELL: -- to an exhibit --

THE COURT: I agree.

MS. MCCONWELL: -- until it's actually offered.

THE COURT: Right, or if it's offered because it could --

MS. MCCONWELL: If it's offered --

THE COURT: Yeah.

MS. MCCONWELL: -- because a lot of them aren't being offered, so I'm not really clear where that --

THE COURT: All right. All right. So the Court is going to hold this under advisement. Let me think about it for a little bit, and then just move on to the next question.

MS. M. MILLER: Yes, Your Honor.

THE COURT: All right. By the way, I did have Lani speak to the jurors and say, hey, is it possible that we could, you know, go up -- go earlier or go later. And they're asking -- the consensus is they say a lot of them have to pick up their children -- go to school in the morning, pick them up at end of day. It would be difficult for them to. It's not until they start deliberating, I suppose, where we're going to be able to do that. So just wanted to at least give you

477

heads-up.

All right. Let's take a ten-minute recess. Everybody go use the restroom. We'll come back -- but let me hold off on that. How many more -- you can go on to another area, and --

MS. M. MILLER: Yeah, we'll go on to another area.

THE COURT: -- we'll come back to this insurance policy later.

MS. M. MILLER: Yes, Your Honor.

THE COURT: Okay. Ten minutes, Counsel.

MS. M. MILLER: Thank you.

(Recess taken at 1:26 p.m.)

(Back on the record at 1:56 p.m.)

THE COURT: We're back on the record, all Counsels present. The jurors are not present, but we'll call in the jurors.

Let me just say couple things. Let me just make a ruling.

Okay, for -- on the relevancy objection, the Court finds that the evidence is relevant.

On the foundation exception -- or the objection, excuse me -- not exception, objection -- I would agree with the defense Counsel that a business records exception is not met here in terms of the colloquy.

01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:27PM 01:56PM 01:58PM 01:58PM 01:58PM 01:58PM 01:58PM 01:58PM 01:58PM 01:58PM 01:58PM 01:58PM 01:58PM

*Direct - Khamvongsa*

Under the -- the next exception that the prosecution has asked the Court to bring it under, 807, the residual exception, the Court notes that -- okay, the Court notes that -- well, the threshold issue the Court has to decide is whether or not this is hearsay. So the prosecution has indicated that --

Okay, before I get to the hearsay, let me -- before I get to the hearsay, let me just make my ruling. So with regard to the business records and the residual exception, at this point, the Court will sustain the objections. I don't find it is hearsay, but I'll get to the hearsay issue -- the non-hearsay issue, the second.

On the issue of the stipulation, the Court has reviewed the particular e-mail and -- by Laura McConwell and to Marie Miller, and so -- and so I looked at that over the recess. And so I think -- you know, honestly, I think that it probably went both ways. I think really there was a good faith basis to -- to -- the Court to believe what Ms. McConwell said, and I think that there's a good faith basis to -- to believe what Ms. Marie Miller said and did, so -- so I'm not going to make a ruling on that. I don't want to choose the between of you, because I think really probably happened both ways. So -- so with regard to that, the Court's deciding not to make a ruling on that particular issue.

But on the issue of hearsay, the prosecution is

saying it's not being offered for the truth of the matter asserted but it's being offered to show the state of the mind of the tuna boat companies. And so it's very -- it's going to be a very inferential circumstantial argument, but the Court will overrule the objection and indicate that I do believe that they could arguing that as -- as their offer of proof.

But, of course, Mr. Martin and Ms. McConwell and Mr. McConwell, whoever makes the closing arguments, you could just -- you could argue that away too, I mean, just as easily. I mean, this is -- there's nobody here to -- I mean, state of mind is very subjective. And -- and, you know, for the prosecution to say, well, we believe that, you know, who would do this, who would spend this much money? You've heard her argument already. She's already given you a preview of that. But then again, you could argue that, well, there's nobody hear saying that, that that was their state of mind.

So the Court will -- with regard to that particular proffer, the Court -- and that particular -- well, first, as to that objection of hearsay, the Court finds it's not hearsay based on the proffer. So the Court will allow this exhibit in for that limited purpose.

Okay. Very well. We'll call in the jury.

Oh, and then let me just say, the Court does not find it cumulative and the Court does not feel that the -- under 403, because that was the sixth -- sixth objection, so

under 403, let me just say, the Court finds that -- it says the relevant evidence may be excluded if its probative value is substantially outweighed by danger of unfair prejudice, confusion of issues, misleading the jury, or by considerations of delay, waste of time, or needless presentation, cumulative evidence. And the Court finds that, based on that particular rule, that the Court does not find that its probative value is substantially outweighed by those particular danger points. So the Court will allow that -- this exhibit to be admitted, okay, for that limited purpose.

Yes, Ms. McConwell?

(Exhibit admitted.)

MS. MCCONWELL: And that's only as to Jon Walker, not to Hansen Helicopters?

THE COURT: Yeah, that's fine.

Okay. We'll call in the jury. And then make sure -- just -- just ask me for the admission then --

MS. M. MILLER: Yes, Your Honor, I will.

THE COURT: The Court's already made the ruling and then just ask --

MS. M. MILLER: I will.

THE COURT: -- ask -- ask the Court to admit it and then I will admit it --

MS. M. MILLER: Yes, Your Honor.

THE COURT: -- and then I'll give a limiting

instruction.

And you just want to say specifically as to -- or just state what the proffer is, so I can state it exactly --

MS. M. MILLER: Yes, Your Honor.

THE COURT: -- how I'm going do it in the limiting instruction.

MS. M. MILLER: Yes, Your Honor.

THE COURT: Okay.

MS. MCCONWELL: And, Your Honor, I'm concern -- I'm confused. What's the limiting purpose?

THE COURT: That it's on for -- the particular proffer is for state of mind. That's it. And is it as to all the companies?

MS. M. MILLER: Yes, Your Honor.

THE COURT: Be very specific when you --

MS. M. MILLER: Yes.

THE COURT: Or do you want to wait to give a limiting after to write it out and then you guys can review it? Do you want --

MS. M. MILLER: I think so.

THE COURT: -- to do that instead?

MS. M. MILLER: I think that might be better.

THE COURT: Mr. Martin and Ms. McConwell?

MS. M. MILLER: I think so.

THE COURT: Do you want -- do you want me to wait

and give a limiting instruction afterwards?

MR. MARTIN: Yes, Your Honor.

THE COURT: So maybe you can look at the wording on that.

(Jury in at 2:03 p.m.)

THE COURT: Okay. Okay, welcome back, ladies and gentlemen of the jury. Thank you very much for your time. I'm sorry, that was -- there's a legal issue that I really needed to speak to the lawyers about, so don't hold it against the lawyers. They both have a duty to represent their clients vigorously and zealously, and the Court has a equal duty to make sure that I listen to their arguments and make a decision. So I've already -- we've already had our hearing here outside your presence.

So, yes, Ms. Miller, you may proceed.

MS. M. MILLER: Yes, Your Honor, at this time, the government would offer into evidence what has been previously marked as Government's Exhibit 92.

THE COURT: All right. The Court notes that Mr. Martin and Ms. McConwell, Mr. McConwell have objected strongly, and the Court has overruled the objections as indicated in the hearing outside the jury. The Court will admit Exhibit 92 for a very limited purpose, and I'll give that limiting jury instruction later on. I want the attorneys to review that instruction. But there will be only a limited

purpose for the admission of Exhibit 92.

(Exhibit 92 admitted.)

MS. M. MILLER: Yes, Your Honor.

THE COURT: Yes, you may publish.

MS. M. MILLER: May I publish it please?

THE COURT: Mm-hmm.

(Pause.)

BY MS. M. MILLER: (CONTINUING)

Q. So, Special Agent Khamvongsa, could you please tell the members of the jury what we're looking at here?

A. This is the aircraft insurance policy from South Pacific Tuna Company.

Q. Okay. Could you please go to the first content page of the policy, which is 92-2. Okay.

MS. M. MILLER: And can you hone in, if you don't mind, Ms. Miller, on the top portion first, just so we could see the coverage period and what's covered -- thank you.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. So could you please tell the members of the jury first who is the insured?

A. The insured is Sea Global Fisheries, LLC and its individual executive officers and members.

Q. And, sir, going back to that lease that we talked about earlier involving this aircraft, is that the same as Sea Bounty/South Pacific Tuna?

A. Yes, it's one of the individual items that make up the Sea Global Fisheries, the individual tuna boats.

Q. Okay. And could you tell the members of the jury the policy period, please?

A. September 15th, 2017 to September 15th, 2018.

Q. Okay. And was that during the period of time that the lease which was entered into evidence previously?

A. Yes.

Q. Okay. Now, can you look at, under paragraph 5, the description of the aircraft, and can you tell the members of the jury what does it say under paragraph 5 in terms of the description of the aircraft and the registration number?

A. Paragraph 5? Did you want me to read it?

Q. Yes, if you don't mind.

A. "You have told us that each of the aircraft below (1) is a fixed wing land aircraft with an FAA standard airworthiness certificate unless noted in the aircraft description below, and (2) is solely and unconditionally owned by you unless noted differently in Item 1 or endorsements we issue. If no agreed value amount is shown, no aircraft physical damage coverage is provided."

Q. Okay. And then can you tell the members of the jury what do you see underneath that where it says "registration number"?

A. It says FAA registration number.

02:05PM 02:05PM 02:05PM 02:06PM 02:06PM 02:06PM 02:06PM 02:06PM 02:06PM 02:06PM 02:06PM 02:06PM 02:06PM 02:06PM 02:06PM 02:06PM 02:06PM 02:06PM 02:06PM 02:06PM 02:06PM 02:06PM 02:06PM 02:06PM 02:06PM

Q. Okay.

MS. M. MILLER: And, Ms. Miller, can you now zoom out and can you please go to the next page where it has the listing of the aircraft? Thank you. And can you please highlight under Section 5. Yes, Section 5 and 6. Okay.

BY MS. M. MILLER: (CONTINUING)

Q. Do you see N3699V there, sir?

A. Yes.

Q. And can you tell the members of the jury, what does it indicate the description of that aircraft is?

A. The description is the -- N369V is a 1969 Hughes 369A helicopter.

Q. And could you, please, read paragraph 5 where it says description of the aircraft, and again "you have told us"?

A. "You have told us that each of the aircraft below (1) has an FAA standard airworthiness certificate unless noted below, and (2) is solely and unconditionally owned by you unless noted differently in Item 1 or endorsements we issue."

Q. Now, can you remind the jury please, sir, where did these airworthiness certificates come from, specifically the one for N369V?

A. The -- they come from the FAA, the airworthiness certificates.

Q. And who is the inspector who issued the airworthiness certificate?

A. Mr. Cislo.

Q. And Mr. Cislo who agreed that he accepted a bribe in exchange for 'em?

MR. MARTIN: Your Honor, I object to her leading question, testifying. It's inappropriate and I object. There is a proper way.

THE COURT: All right. The Court will sustain the objection as to leading.

BY MS. M. MILLER: (CONTINUING)

Q. Yes. What did Mr. Cislo receive in exchange for issuing the airworthiness certificate, sir?

A. Mr. Cislo received an airplane --

MS. MCCONWELL: Your Honor, this is -- I object to the foundation of that question, Your Honor.

THE COURT: Foundation?

MS. MCCONWELL: Yeah, there's -- it's -- it's --

THE COURT: All right. Sustained.

MS. MCCONWELL: There is no evidence --

THE COURT: All right. Sustained, foundation. Go ahead.

BY MS. M. MILLER: (CONTINUING)

Q. How do you know, sir, what Mr. Cislo received in exchange for these airworthiness certificates?

A. I know --

MR. MARTIN: Your Honor, we object to that

question. That's the same issue. There's no evidence that he received anything in exchange. She can ask a question but not -- not the way she's doing it.

MS. M. MILLER: Your Honor --

THE COURT: Okay, okay, the Court will overrule of the objection. She's trying to -- go ahead. Overruled. Go ahead.

BY MS. M. MILLER: (CONTINUING)

Q. Could you please tell the jury?

A. Yeah.

THE COURT: She's trying to -- she's trying to lay a foundation. You guys are objecting to foundation. Go ahead.

THE WITNESS: Mr. Cislo received an airplane for looking the other way and not doing his due duty -- due diligence as a safety inspector for the FAA. So he issued airworthiness certificates without ensuring their --

MS. MCCONWELL: Your Honor, I object to the narrative.

THE WITNESS: -- safety.

THE COURT: Okay, so the question, though, is how do you --

MS. MCCONWELL: And to foundation.

THE COURT: How do you know?

THE WITNESS: I know based upon testimony

provided by Cislo, as well as my review -- review of the records.

MS. MCCONWELL: And the remoteness in time.

THE COURT: Overruled. Go ahead. All right.

BY MS. M. MILLER: (CONTINUING)

Q. I'm not sure if the jury heard you, so how do you know again, sir?

A. I know based upon statements made by Mr. Cislo.

Q. Okay. And, as a special agent who is assigned to this case, were you permitted to listen to the testimony of Mr. Cislo?

A. Yes.

Q. Okay. Now, could you, please, tell the members of the jury again where we see, under paragraph 5, what does it indicate in terms of the registration number, which agency is issuing that registration number?

A. For U.S. -- it's a -- for N369V which agency, federal agency? For all the N-related numbers, they're U.S.-registered numbers, and FAA has a responsibility to ensure their safety.

Q. Did you count how many times the word FAA appears in this insurance policy?

A. This document FAA appears 54 times.

Q. So, as we go down to the next section, can you tell the members of the jury what they're seeing in terms of

paragraph 6?

A. Did you want me to read it specifically?

Q. Yes, please. What is the title of paragraph 6?

A. Liability and medical payments coverage and limits of coverage.

Q. And what was the limit of coverage for each occurrence for N369V?

A. $1 million.

Q. Okay. And then let's go down to paragraph 7, premiums.

MS. M. MILLER: And, Ms. Miller, can you pull in all of paragraph 7, including the total for the premiums paid.

BY MS. M. MILLER: (CONTINUING)

Q. And could you tell the members of the jury, what was the total of the premiums paid per year for these insurance policies, sir?

A. $27,624.

Q. Okay.

MS. M. MILLER: And, Ms. Miller, could we go to the next page, please. Is that on the next page?

(Pause.)

MS. M. MILLER: It's on, yeah, page 4. Sorry. Thank you.

BY MS. M. MILLER: (CONTINUING)

Q. And could you tell the members of the jury if we look

at paragraph 9, what is the use of the aircraft being cited in paragraph 9?

A. The use of the aircraft?

Q. Yes.

A. "The aircraft will be used for your pleasure and business-related purposes where no changes made for such use, and also may be used for other uses described below. Other uses, fish spotting, see endorsement number three."

MS. M. MILLER: And now let's go to the next page, Ms. Miller, and where it says requirements for the pilot flying the aircraft. No, next page. Next page. There you go. And can you highlight that for the jury, please.

BY MS. M. MILLER: (CONTINUING)

Q. And could you read for the jury what the requirements were for the pilot flying the aircraft?

A. Would you like me to start at where the aircraft or read it --

Q. Just where it says "this endorsement"?

A. Okay. "This endorsement applies only to the following aircraft. If no entry is made in this endorsement -- if no entry is made, this endorsement applies to all aircraft covered by your policy. This endorsement completes or changes Item 9, requirements by the pilot flying the aircraft of your coverage identification page to read as follows: The aircraft must be operated in flight only by a

pilot named below having the minimum qualifications shown. The pilots must have a current and valid medical certificate, flight review, and pilot certificate with necessary ratings, each as required by the FAA for each flight. There is no coverage if the pilot does not meet the qualifications or requirements specified below for each designated use of the aircraft."

Q. How many of these policies, sir, did you review?

A. I was provided approximately 60 policies.

Q. Okay. And did you review them all?

A. Yes.

Q. All right. I'd like to now turn your attention to a demonstrative aid that will show the jury what these specific wire fraud counts are in our Second Superseding Indictment.

MS. M. MILLER: Ms. Miller, could you please show the jury Demonstrative Aid 43.

And, Your Honor, may I publish it to the jury? It's just an excerpt from the Second Superseding Indictment.

THE COURT: Okay, Counsels?

MR. MARTIN: Could we be advised what it is --

THE COURT: Yeah.

MR. MARTIN: -- since we've not been provided it?

THE COURT: Okay, yeah, tell us where it is.

MS. M. MILLER: Yes, Your Honor, I did. It's an excerpt from --

MR. MARTIN: Got that.

MS. M. MILLER: -- the Second Superseding Indictment of Counts 100 through 104, which are the wire fraud counts.

THE COURT: Okay, so it's in -- it's on the Second Superseding Indictment, Counts 100 to 104?

MS. M. MILLER: Yes, Your Honor.

THE COURT: And the -- what is the exhibit number?

MS. M. MILLER: It is Government's Demonstrative Aid No. 43-1.

THE COURT: Okay, did you find that there, Mr. Martin?

MS. M. MILLER: It's on the screen, Your Honor.

THE COURT: No -- okay.

MR. MARTIN: We didn't -- we didn't get the demonstrative aid, but I have the indictment, Your Honor.

THE COURT: Okay, all right. Very well. Go ahead, you can compare. Any objections, Counsels?

MR. MARTIN: Other than we'd like to be provided the demonstrative aids ahead of time, Your Honor, so we could be prepared.

THE COURT: All right, that's fair enough. Counsel, make sure you provide it ahead of time.

MS. M. MILLER: Yes, Your Honor. Maybe we

publish this to the jury? 02:15PM

THE COURT: All right, yeah, no -- okay, with you, Ms. McConwell? 02:15PM 02:15PM

MS. MCCONWELL: Yes, ma'am. 02:16PM

THE COURT: All right, very well, may be published. 02:16PM 02:16PM

BY MS. M. MILLER: (CONTINUING) 02:16PM

Q. Special Agent Khamvongsa, do you see Demonstrative Aid 43 in front of you? 02:16PM 02:16PM

A. Yes. 02:16PM

Q. What role did you have in assisting the Government in preparing the indictment? 02:16PM 02:16PM

A. Not only did I do the -- not only did I do the investigation as it relates to these specific counts, but I also assisted the U.S. Attorneys with the preparation of the indictment. 02:16PM 02:16PM 02:16PM 02:16PM

Q. And could you tell the members of the jury why you chose these particular transactions for the wire fraud counts? 02:16PM 02:16PM

A. So of the transaction, I learned there was over 3,000 transactions, and this is a sample of the 3,000 transactions that I reviewed as it relates to the wire fraud. 02:16PM 02:16PM 02:16PM

Q. Okay. And now let's talk about specifically Count 100. Can you tell the members of the jury, what was the date of that wire transfer that constitutes that particular allegation? 02:16PM 02:16PM 02:16PM 02:17PM

A. September 4th, 2015.
Q. And where was it a wire transfer from?
A. It was from Friesland Fishing Company, LLC.
Q. And what was the amount?
A. $134,219.92.
Q. Could you tell the members of the jury what you did in order to determine whether that particular wire transfer was supported by the evidence in this case?
A. What I did was I started first with the bank statement. The bank statement from there, at the bank -- I looked at the bank statement, and I looked at that specific transaction. In this case, it's Friesland Fishing. From there I identified the tuna boat company.

I went back to the billing schedules and collections to identify the vessel that it may have been -- that was assigned to that and also to refer to whether or not the payment matches up. So I was looking at both the bank record and Hansen Helicopters' own records.

And then from there, once identifying the tuna boat, I reviewed the aircraft vessel assignment to determine the helicopter. Once I identified the helicopter, I went back to the pilot-mechanic listings that were provided by Hansen Helicopters that I received and I determined the pilot and mechanic assigned to that. I compared that to the FAA records as to whether or not they were certified as a mechanic or a

pilot.

Q. Okay. And, in each of these instances, can you tell the members of the jury whether the pilots and mechanics were in fact certified by the FAA?

A. They were not.

Q. Okay. And in each of these instances, did they involve a helicopter that had received an airworthiness certificate from Mr. Cislo?

A. Yes, Counts 100, 101 and 102 reflect -- or reflect Mr. Cislo's involvement in not doing his duty in ensuring that they were properly inspected and safe.

MS. MCCONWELL: Your Honor, this calls for -- it's beyond the scope of the question and it's a narrative.

THE COURT: Overruled, go ahead.

BY MS. M. MILLER: (CONTINUING)

Q. Did you finish answering the question, sir?

A. Yes.

Q. Okay. Now, can you tell the members of the jury which helicopter was involved in Count 100?

A. Count 100 --

Q. Yes.

A. -- involved N454S.

Q. Okay. And could you tell the members of the jury who had registered N454S with the FAA as the owner?

A. Could you, please, provide 1252 --

Q. Yes.

A. -- the summary chart?

Q. Yes.

MS. M. MILLER: Yes, Ms. Miller, could you pull up Exhibit 1252.

BY MS. M. MILLER: (CONTINUING)

Q. Do you see that, sir?

A. Yes.

Q. Can you tell the members of the jury which company registered this helicopter with the FAA?

A. Dave's Helicopter Service, Inc. registered this particular helicopter.

Q. And that was the registration at the time of that wire transfer?

A. Yes.

Q. And could you tell the members of the jury which company registered the helicopter initially with the FAA?

A. Hansen Helicopters, Inc.

Q. And who had signed that initial registration?

A. I don't know -- Defendant Jon Walker.

Q. And then in 1999, what was that changed to?

A. It was changed to Eddie Air, Inc.

Q. And, again, who signed that registration?

A. Jon Walker.

Q. And then in 2002, who was it changed to?

A. Dave's Helicopter Service, Inc.

Q. And who signed off on that registration?

A. Defendant Jon Walker.

MR. MARTIN: Your Honor, I object. His name is Jon Walker. It doesn't say *Defendant* on there, and he's done this over and over. It's -- it's Jon Walker or -- and -- and --

THE COURT: Okay. All right. Just say Jon Walker.

MS. M. MILLER: Jon Walker is the defendant.

THE COURT: Just say just Walker.

MR. MARTIN: No, Your Honor.

MS. M. MILLER: No?

MR. MARTIN: That's training, Marie.

MS. M. MILLER: Excuse me?

THE COURT: Jon Walker -- you can say -- Counsel, that's fine. The Court will sustain the objection. Just say Jon Walker, that's what it says, yes?

MS. MCCONWELL: We're on 12 -- 1252, correct, isn't that --

THE COURT: Exhibit --

MS. M. MILLER: Because that is what has been admitted into evidence, then it's --

THE COURT: Yes.

MS. MCCONWELL: Well, I'm just using one off of

02:21PM 02:21PM 02:21PM 02:21PM 02:21PM 02:21PM 02:22PM 02:22PM 02:22PM 02:22PM 02:22PM 02:22PM 02:22PM 02:22PM 02:22PM 02:22PM 02:22PM 02:22PM 02:22PM 02:22PM 02:22PM 02:22PM 02:22PM 02:22PM 02:22PM

my flash drive, and my page for N454S is different than... yeah, I -- I don't think I have the same one that Counsel's using. Yeah, I don't.

THE COURT: Okay. Was it amended?

MS. M. MILLER: No.

THE COURT: It wasn't amended. You want to double-check that, Ms. McConwell? She's --

MS. MCCONWELL: May I approach?

THE COURT: Yeah, go ahead, you can talk -- you want to show the prosecutor? Okay, why don't you do that.

(Counsel conferred.)

MS. M. MILLER: This was -- this an amendment you wanted to take out reference.

MS. MCCONWELL: But that's what's on -- I don't --

MS. M. MILLER: But what was submitted into evidence is this.

MS. MCCONWELL: I don't -- I don't have the current one on the flash drive.

MS. S. MILLER: I just re-sent it.

MS. M. MILLER: She just sent it.

There was -- there was a request by defense Counsel to remove information of prior owners before it got to Hansen, which we did. And what was admitted into evidence is the one that only had the Hansen ownership information.

02:22PM 02:22PM 02:22PM 02:22PM 02:22PM 02:22PM 02:22PM 02:22PM 02:22PM 02:22PM 02:23PM 02:23PM 02:23PM 02:23PM 02:23PM 02:23PM 02:23PM 02:23PM 02:23PM 02:23PM 02:23PM 02:23PM 02:23PM 02:23PM 02:23PM

THE COURT: All right.

MS. M. MILLER: And so --

MR. MARTIN: Your Honor, I don't know that the explanation is necessary. Let's just get the right document.

THE COURT: Well, I know.

MR. MARTIN: We have a comment on everything --

THE COURT: Okay.

MR. MARTIN: -- and I object to that.

THE COURT: Let me just -- so, Ms. McConwell, did you find -- okay, did you figure it out, what happened?

MS. M. MILLER: Ms. Miller just --

MS. MCCONWELL: No. Ms. Miller has -- has e-mailed me. She sent the correct one. The one that was on the flash drive that they gave me is not.

THE COURT: So you just got it now?

MS. M. MILLER: No, Your Honor. This was used --

MS. MCCONWELL: No, I did not --

THE COURT: Okay, wait, wait, let me just ask her. What was that?

MS. MCCONWELL: I pulled up the one that's on the flash drive. She's e-mailed it to me. I will -- I will pull it up.

THE COURT: Okay, give her a minute. Give her a minute.

MS. MCCONWELL: Okay, I'm -- I'm with her now.

THE COURT: All right, very well. Go ahead. Proceed.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. Special Agent Khamvongsa, so Dave's is the registered owner at the time of this particular wire transaction?

A. Yes.

Q. And you told the members of the jury that you also looked at the bank records; is that correct?

A. Yes.

Q. So let's look what has been previously marked but not introduced, Exhibit 0021. Do you recognize this document, sir?

A. Yes.

Q. Is it a true and correct copy of the document that you received from the Bank of Hawaii?

A. Yes.

MS. M. MILLER: Your Honor, at this time the Government would offer into evidence what has been previously marked as Government's Exhibit 21.

THE COURT: Okay. Counsels?

MR. MARTIN: We stipulated to it, Your Honor. I don't have any objections.

THE COURT: All right.

MS. MCCONWELL: And this is only as to Jon

Walker, not Hansen.

THE COURT: All right. Very well. Ladies and gentlemen of the jury, Exhibit G-0021 admitted without objection and applies to Defendant Jon Walker. You may proceed.

(Exhibit G-0021 admitted.)

MS. M. MILLER: May I publish this to the jury, Your Honor?

THE COURT: Okay, uh-huh. It's only one page; right?

MS. M. MILLER: No, Your Honor.

THE COURT: Oh, how many pages? So let's see --

MS. M. MILLER: Eleven.

THE COURT: All right. Okay. So let's just make sure we say G-0021 through 11?

MS. M. MILLER: Yes, Your Honor.

THE COURT: All right. Very well. That'll be admitted then without objection and as I already stated.

Okay. Go ahead. You may publish.

MS. M. MILLER: Thank you, Your Honor.

And, Ms. Miller, can you highlight just the top portion so we can show the jury what this record is.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, could you tell the members of the jury how you obtained this record?

A. I obtained this record through the grand jury subpoena.

Q. Okay. And could you tell the members of the jury what is the name of the company on this bank -- bank record?

A. Caledonian Agency, Inc. is identified here in this bank statement.

Q. Okay. And could you remind the members of the jury what kind of business was Caledonian Agency, Inc.?

A. Investment.

Q. Okay.

MS. M. MILLER: And could you please back off of the highlight please, Ms. Miller, and can you bring the jury to the transaction that specifically -- or transactions that underline the Count 100 of the indictment, the wire transfers. I believe it's page 11.

BY MS. M. MILLER: (CONTINUING)

Q. Do you see that there, sir?

A. Yes.

Q. Okay. And can you tell the members of the jury where are the -- where is the wire transaction that is the subject of Count 100?

A. It's right here. Whoops.

Q. Should you do that?

A. Should I not have done that?

Q. Okay.

A. How do I... I don't know how to undo it.

Q. So, okay, we erased that.

MS. M. MILLER: Ms. Miller, can you just highlight that portion of the bank record to make it easier for me to see and for the jury to see, and then Special Agent Khamvongsa doesn't have to -- zone in on it. I said highlight, but I didn't mean that.

MS. S. MILLER: I did that by accident.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. So we see the wire transfer. What is the date of this wire transfer, sir?

A. September 4th, 2016 -- 2017, excuse me.

Q. Okay. And it says "ORG." What does that mean?

A. It's the originator or organization.

Q. Okay. And does that mean that company sent the money into the Caledonian account?

A. Yes, Friesland Fishing Company, LLC sent that money --

Q. Okay.

A. -- to this account.

Q. And where it says "OBI," what does that mean?

A. Originating beneficiary information.

Q. And what is the originating beneficiary information?

A. It's identifying that the beneficiary is Hansen as reflected in this bank statement.

Q. Okay. So just to recap for the jury, the bank account that the money goes into from the lease is Caledonian, which is an investment company; correct?

MR. MARTIN: Your Honor, I object to the leading.

THE COURT: All right.

MR. MARTIN: We don't need to recap for the jury. She can ask him his next question.

THE COURT: Very well. The Court will sustain the objection.

BY MS. M. MILLER: (CONTINUING)

Q. Which account did the money go into, sir?

A. It went to -- into Caledonian Agency, Inc. bank account identified as investment.

Q. And who is identified as the beneficiary of those funds?

MR. MARTIN: Asked and answered, Your Honor.

THE WITNESS: Hansen --

MR. MARTIN: Asked and answered, Your Honor.

THE COURT: All right. Sustained.

MS. M. MILLER: Okay.

BY MS. M. MILLER: (CONTINUING)

Q. And, when we look at Exhibit 829, which was already admitted into evidence, do you see Caledonian on Exhibit 829 --

A. Yes.

Q. -- Agency?

A. It's located there on the -- on my right, the far right, and it's nowhere located anywhere near the 30 Vanuatu international companies.

Q. Okay.

MS. M. MILLER: All right. We can back out of that, Ms. Miller.

BY MS. M. MILLER: (CONTINUING)

Q. So, sir, who's the president of Dave's Helicopters?

A. It is Jon Walker.

Q. Who's the president of Caledonian Investment Company?

A. Mr. Jon Walker.

Q. Who's the president of Hansen Helicopters?

MR. MARTIN: Your Honor, these are all cumulative --

THE WITNESS: Mr. Jon Walker.

THE COURT: I'm sorry?

MR. MARTIN: -- asked and answered, repetitive. I object; cumulative, asked and answered, repetitive. We've --

THE COURT: All right.

MR. MARTIN: -- we've done this for six weeks now.

THE COURT: Counsel?

MS. M. MILLER: Well, Your Honor, if they want to

stipulate to it, we could not do it anymore. Then it will become something the jury --

THE COURT: Okay, but the objection --

MS. M. MILLER: Doesn't even have to decide.

THE COURT: -- the objection is cumulative, though.

MS. M. MILLER: Okay, it's not cumulative with this particular witness with this particular testimony because now we're talking about the wire fraud counts, and it's important for the jury to see --

MR. MARTIN: Your Honor, this -- this is another speech.

THE COURT: All right. All right, okay. Any further objections, Mr. Martin?

MR. MARTIN: No, Your Honor, it's cumulative.

THE COURT: All right. The Court will sustain the objection as cumulative. Next question.

BY MS. M. MILLER: (CONTINUING)

Q. So let's look at Exhibit 726, which is the schedule of billings and records. And if you look at page 21, I believe it is, we can see the transactions that equal that wire transfer.

MR. MARTIN: Is that a question, Your Honor?

THE COURT: I think it is.

MS. M. MILLER: We're looking at it.

THE COURT: Okay.

MS. M. MILLER: Ms. Miller, can you, please, highlight the transaction for 14,100 --

MR. MARTIN: Your Honor, I would ask her to ask the witness a question and not make speeches.

MS. M. MILLER: I'm asking Ms. Miller to highlight a portion of this --

MR. MARTIN: She -- she --

MS. M. MILLER: -- exhibit, Your Honor, so that the jury --

THE COURT: Okay.

MS. M. MILLER: -- could see it --

THE COURT: That's fine.

MS. M. MILLER: -- and Your Honor could see it. Thank you, Your Honor.

THE COURT: Let her -- she's asking Ms. Miller to just get the exhibit up, so the Court will overrule the objection at this time.

MS. M. MILLER: Thank you, Your Honor.

THE COURT: Go ahead.

BY MS. M. MILLER: (CONTINUING)

Q. So, Special Agent Khamvongsa, did you see the -- one of the transactions that equals $134,000 wire transfer?

A. Yes.

Q. And could you identify it for the jury?

A. Yes, if we look at the far right -- may I touch the screen?

Q. Okay.

A. On 9/4/2015, $14,193.52 was received, and it's reflected in Hansen Helicopters' own records.

Q. Now, this was the record that who provided to you?

A. Hansen Helicopters.

Q. And, on the top of this record, what's the name of the company that this is a billings and -- and schedule for?

A. Wilma's Flight Services, Inc.

Q. Okay. Now let's look at page 23.

THE COURT: This is the same Exhibit 726?

MS. M. MILLER: Yes, Your Honor, it's still Exhibit 726.

THE COURT: All right.

BY MS. M. MILLER: (CONTINUING)

Q. And let's look at the next transaction that comprised the $134,219.92 wire transfer. Do you see it, sir?

A. Yes.

Q. And how much was that transaction?

A. Again, this is capturing another payment of $40,000 received on 9/4/2015 for Friesland covering the invoice period of May to June, 2015.

Q. Okay. And now let's look at page 25, same date, September 4th, 2015, could you tell the members of the jury

02:32PM 02:32PM 02:32PM 02:32PM 02:33PM 02:33PM 02:33PM 02:33PM 02:33PM 02:33PM 02:33PM 02:33PM 02:33PM 02:33PM 02:33PM 02:33PM 02:33PM 02:33PM 02:33PM 02:33PM 02:33PM 02:33PM 02:33PM 02:33PM 02:34PM

what they see there, in terms of the amount of money paid from the tuna boat company into the Caledonian account?

A. Friesland is paying $40,000 -- or $40,026.40 on September 4th, 2015.

Q. Okay. And now let's look at page 28 the transaction dated 9/4/15 between Friesland and what was deposited into the Caledonian?

A. Again --

MS. MCCONWELL: Your Honor, I object to leading.

THE COURT: Overruled. Go ahead on this exhibit. Go ahead.

THE WITNESS: Again, Friesland is making a payment of $40,000 on September 4th, 2015, for the invoice period of July to August 2015.

BY MS. M. MILLER: (CONTINUING)

Q. So, when you have, in the Second Superseding Indictment as the jury saw in Demonstrative Aid 43, the total of 134,291.92, these are the transactions that comprise that total amount?

A. Yes.

Q. Okay. Did you conduct the same analysis for each of the counts in the Second Superseding Indictment indictment?

A. I did.

Q. Okay.

MS. M. MILLER: Ms. Miller, could we go back to

Demonstrative Aid 43 and look at Count 101.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. Could you read to the jury Count 101, please? It should be right in front of you.

A. December 1st, 2015, wire transfer from Golden Village Global Limited in the amount of $194,183.52.

Q. Okay. Could give me that amount? I'm sorry, 194?

A. 194,18 -- $194,183.52.

Q. Okay. And could you tell the members of the jury if you identified which helicopter was used to generate that income from the tuna boat company?

A. N501FC.

Q. And let's go to --

A. F as in Foxtrot.

Q. Oh, F as in Foxtrot? F -- FC?

A. FC.

Q. Thank you.

A. Foxtrot Charlie.

Q. And could we go to Exhibit 1252, which is the registration summary chart, and could you tell the members of the jury who the registered owner was of that aircraft at this time in December of 2015?

MS. M. MILLER: And could you highlight that, Ms. Miller, that portion. Excellent.

BY MS. M. MILLER: (CONTINUING)

02:35PM 02:35PM 02:35PM 02:35PM 02:35PM 02:35PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:37PM 02:37PM 02:37PM 02:37PM 02:37PM 02:37PM

Q. Okay. Could you tell the members of the jury, sir, who is the registered owner of that helicopter at the time that this particular lease was in effect?

A. Eddie Air, Inc.

Q. And who is the individual who registered it as Eddie Air, Inc.?

A. Jon Walker.

Q. Where did the money go from this lease, into which account?

A. It went into the Caledonian -- excuse me, Caledonian Agency, Inc. bank account with Bank of Hawaii.

Q. Now, in the first count and in this count, we talked about two helicopters. I'd like you to look at what has been entered into evidence as Government's Exhibit 645. Do you recall this piece of evidence? And this has already want been entered into evidence.

A. Yes.

Q. And could you tell the members of the jury if we go to the next page, are the aircraft that you've identified that we're talking about these wire fraud counts, are they on this e-mail communication?

A. Yes, they are. I could point out them if you'd like.

Q. Yes, please.

A. They're identified in Item No. 4 and 5.

Q. Okay. And four was Count 100 we just saw?

                A. Correct.

Q. Five is Count 101, which we just saw?

A. Correct.

Q. And tell the members of the jury what about this particular piece of evidence, as an investigator with the IRS, did you view, in terms of these wire fraud counts?

A. Well, this helped me establish that the helicopters that --

MR. MARTIN: Your Honor, that's -- "did he view." I object to the question. I mean, it just opens the door for him to give a narrative.

THE COURT: I'm sorry?

MR. MARTIN: I didn't understand the question.

THE COURT: Okay. Okay. Repeat the question.

BY MS. M. MILLER: (CONTINUING)

Q. Sure. What is it about this piece of evidence that -- well, first, let's go back and look at what this piece of evidence is. This is what? What kind of evidence is this?

A. This is evidence of the --

Q. No, what is it? Is it an e-mail?

A. Oh, it's an e-mail. Excuse me.

Q. Who is it to?

A. This e-mail is to Timothy Cislo.

Q. Who is it from?

A. Turner -- Kapp Turner, or Turner Kapp.

Q. Is it from Rufus with copying Turner? 02:40PM
A. It could be -- yes, it is. 02:40PM
Q. Okay. And the date of this? 02:40PM
A. February 11th, 2015. 02:40PM
Q. Okay. And could you please read this e-mail to the jury and then tell the jury why this e-mail has anything to do with the wire fraud count. 02:40PM
A. "Hey, Tim, I brain-farted getting these to you. Sorry about that. Having Walker with us for a month immediately followed by the DOIPO Boys onslaught has left me a bit dingier than usual. What paper do you want me -- or Turner to have ready? Here are the machines, Hansen Helicopters restricted aerial survey, number, type, serial number." 02:41PM
And it goes -- do you want me to read the list of helicopters? 02:41PM
Q. No. 02:41PM
A. And it identified ten helicopters. "Much appreciated, Rufus." 02:41PM
Q. Now, let's go to the e-mail that followed this on the first page of this document on the bottom there, and what do we see there? 02:41PM
A. Another e-mail, the response from Timothy Cislo. 02:41PM
Q. Okay. And what does it say? 02:41PM
A. "Rufus, all we need is an FAA Form 8130-6 for each 02:41PM

one. When do the current certificates expire? I'm looking at May or June to have a sign fest."

Q. Okay.

A. "Regards, Tim."

Q. So can you please explain to the members of the jury why this particular e-mail has anything to do with the wire fraud counts?

MR. MARTIN: Objection. Speculation, Your Honor.

MS. M. MILLER: Based on your investigation, sir.

MR. MARTIN: Objection; speculation.

THE COURT: Overruled -- I mean, I'm sorry, sustained. The Court will sustain that objection.

BY MS. M. MILLER: (CONTINUING)

Q. Based on your investigation, sir, did you connect up these aircraft with the money that was coming in from the companies?

A. Yes.

Q. Based on your review of the documents, what did Jon Walker ever communicate to the tuna boat companies about the fact that he had bribed an inspector to obtain those --

MR. MARTIN: Your Honor, I object to the leading form of the question that -- that --

BY MS. M. MILLER: (CONTINUING)

Q. What did --

THE COURT: Okay, wait, wait. Just a minute.

Let me -- let me -- okay, wait. Just rephrase the question.

MS. M. MILLER: Yes, Your Honor.

BY MS. M. MILLER: (CONTINUING)

Q. What did Jon Walker communicate to the tuna boat companies in the leases so that they would know that the helicopters they were leasing had airworthiness certificates as a result of a bribe?

MR. MARTIN: Your Honor, I object to the question. It assumes facts that -- up to the jury to decide. It assumes -- it assumes a negative right off the bat.

THE COURT: All right. The Court will sustain the objection. Rephrase.

MS. M. MILLER: Yes, Your Honor.

BY MS. M. MILLER: (CONTINUING)

Q. Could you tell the members of the jury what information was provided -- did you --

First of all, did you review the leases that pertain to each of these transactions?

A. Yes.

Q. Okay. What information was in those leases that let the tuna boat companies know that they were paying for aircraft that had airworthiness certificates as a result of a bribe?

MR. MARTIN: Your Honor, I object to the question. It assumes a fact that's up to the jury to decide.

It assumes a negative. It's an improper question. It's leading.

MS. M. MILLER: Your Honor --

THE COURT: Okay. Could the Court --

MS. M. MILLER: -- Mr. Cislo already testified --

THE COURT: Wait, wait. The Court --

MS. M. MILLER: -- he --

THE COURT: The Court will sustain the objection based on speculation. Next -- just rephrase.

BY MS. M. MILLER: (CONTINUING)

Q. Let's look at Exhibit 166, please. Do you recognize Exhibit 166?

A. Yes.

Q. What is it?

A. This is a pilot-mechanic list that I obtained from Hansen Helicopters through the search warrant.

MS. M. MILLER: Your Honor, at this time the Government would offer into evidence what has previously marked as Exhibit 166.

THE COURT: Counsels, any objections?

MR. MARTIN: May I have just a second, Your Honor?

THE COURT: Yes, you may.

(Pause.)

MR. MARTIN: May I ask a --

02:43PM 02:43PM 02:43PM 02:43PM 02:43PM 02:43PM 02:43PM 02:43PM 02:43PM 02:43PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:44PM 02:45PM

THE COURT: Yes.

MR. MARTIN: -- question in aid --

THE COURT: Yes.

MR. MARTIN: -- of maybe or maybe not an objection?

THE COURT: Right.

VOIR DIRE EXAMINATION

BY MR. MARTIN:

Q. Government's Exhibit --

THE COURT: Can you speak into the mic? Bring the mic a little closer there, Mr. Martin. Yes. Go ahead.

BY MR. MARTIN: (CONTINUING)

Q. Government's Exhibit 166, sir, did you obtain that?

A. Yes.

Q. Pursuant to a grand jury subpoena or a search warrant?

A. No, this was obtained by the search warrant -- through the search warrant.

Q. Okay.

MR. MARTIN: No objection.

THE COURT: No objection.

Ms. McConwell?

MS. MCCONWELL: Well, I'm -- I'm going to object to the -- the relevance of this. I don't think it's relevant

to the line -- well, first of all, I don't think -- it shouldn't come into Jon -- or to Hansen Helicopters because we're not in any of these counts, but it doesn't appear to be relevant to the Count 100 or 101, which is the counts which the line of questioning is. The dates don't match.

MS. M. MILLER: Okay. First of all, as to relevance, Your Honor, this was obtained at Hansen Helicopters pursuant to the search warrant.

Secondly, if you look at very top of the document, it identifies it as being a Hansen Helicopters crew and vessel list.

Thirdly, we are talking about -- we're talking about aircraft N501FC. If you look at paragraph -- Row 33 on this document, it shows N501FC. It shows the name of the tuna boat company that that particular aircraft was leased to, and then it identifies the name of the individuals who worked on that aircraft, both as pilot and mechanic, and the dates that they worked on it, which coincide, Your Honor, with this particular wire fraud count. That's why it's relevant and that's why it should comment in.

THE COURT: All right.

MS. MCCONWELL: Okay. So the wire -- 101 is -- is a wire fraud count that's dated December 1st, 2015, and this 166 is a pilot-mechanic list date 8/15/16. I think that its prejudicial value outweighs any possible probative value

because it's confusing. This -- this pilot-mechanic's list is about a year after the counts that she's asking Mr. Khamvongsa about right now --

MS. M. MILLER: No, it's not, Your Honor.

MS. MCCONWELL: -- so I think it confusing.

MS. M. MILLER: If you -- if you --

THE COURT: Okay.

MS. M. MILLER: If you look at the date to the right of the mechanic, it specifically says that that mechanic started working on this aircraft in October of 2015. We're talking about a wire transfer that occurred in December of 2015. How is that a year after?

MS. MCCONWELL: Well, then --

MS. M. MILLER: And it also shows --

THE COURT: Okay.

MS. M. MILLER: -- that this person worked until 10/19/16. So, again, these are transactions that occurred in 12 of '15. How is that outside the dates?

MS. MCCONWELL: Then I think it's cumulative because they've already admitted Exhibit 183, which is a pilot and mechanic's list which covers the same period.

THE COURT: All right. The Court will overrule the objection on both counts. You may proceed.

MS. M. MILLER: May I publish it to the jury, Your Honor?

THE COURT: You may.

BY MS. M. MILLER: (CONTINUING)

Q. And, Special Agent Khamvongsa, could you please tell the members of the jury what we're seeing in Row 33 on this document?

A. Yes, what we're seeing is that N51FC is assigned to the tuna vessel -- or the vessel SHUNFA8. And then we see the name of the pilot, Francisco Enriquez, the contract start date and the contract end date of 3-7-2016 to 3-7-2017. Then we see the mechanic, Vilamar Batara, Jr. The contract -- start -- starting contract date of October 19th, 2015, to the contract date of 10-19-2016.

Q. So as to the mechanic, Mr. Batara, Jr., was he the mechanic for this particular aircraft during the period of time that these transactions were taking place?

A. Yes.

Q. And was he certificated by the FAA, sir?

A. No.

Q. Okay. Now let's please look at the top of this document before we leave this document.

MS. M. MILLER: Ms. Miller, the very top of the document where it identifies the heading. Yes, thank you.

BY MS. M. MILLER: (CONTINUING)

Q. What is the heading of this document, sir?

A. Hansen Helicopters Air Crew Vessel Contact List,

total aircraft 46, air crew vessel contact list 7-16-2016.

Q. Okay. Thank you.

MS. M. MILLER: Now, Ms. Miller, could you, please -- could you please go to the schedule of billings and collections Exhibit 726, and could you go to page 38.

THE COURT: Sorry, 726-8, this has already been admitted?

MS. M. MILLER: Thirty-eight. This has already been admitted, Your Honor, yes.

THE COURT: Thirty-eight. Okay.

MS. M. MILLER: Could you go to 38 please and far right column, December 1st, 2015.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, could you please tell the members of the jury which of these transactions constitute the told of 194,193.52 that is in Count 101?

A. So if you look at the billing schedule, it identifies the vessel SHUNFA8 that Golden Village Global made a basement for SHUNFA8, and there's three different invoice items. There's the three-month deposit and then there's the lease period of October 21st to October -- excuse me -- October 21st to October 31st, 2015, and then the other period is November 1st, through November 30th of 2015. And if we look on far right column, we see that the date paid all are 12-1-2015, and it identifies individuals amounts. So for the

three-month deposit it's $120,000, $120,000. Then the invoice period of October 21st to October 31st, it's $34,193.52. And then the invoice period of November 1st through November 30th, 2015, we see that it's $40,000. So a lump sum payment of $194,193.52, it corroborates what's reflected in the bank -- bank statement.

Q. So just so the jury is clear, we're looking at the schedule of billings that Hansen Helicopters produced to you; correct?

A. Yes.

Q. Now let's look at the bank records, let's look at Exhibit 22 which has not been entered into evidence yet. Do you see Exhibit 22?

A. Yes.

Q. Is that a true and correct copy of the bank records that you received pursuant to a subpoena in this case?

A. Yes.

Q. And is it for the time period that we're discussing with this particular count?

A. Yes.

MS. M. MILLER: Your Honor, at this time I would offer into evidence what has been previously marked as Government's Exhibit 22.

THE COURT: And is it more than one page?

MS. M. MILLER: It is.

THE COURT: How many pages? 02:53PM

MS. M. MILLER: Twenty-three, Your Honor. 02:53PM

THE COURT: All right. So 22-1 through 23? 02:53PM

MS. M. MILLER: Yes, Your Honor. 02:53PM

THE COURT: Any objections, Counsels? 02:53PM

MS. MCCONWELL: Could -- could we limit this to -- to the relevant pages? 02:53PM

THE COURT: We could. You can ask, yeah. I mean, they're -- they're asking for a limitation to the relevant pages. Any objections to that? 02:53PM

MS. M. MILLER: No objection -- well, yes, Your Honor. I -- I don't think that's necessary. This isn't a voluminous document, and I think it is relevant for the jury to see the income coming into the account. 02:53PM

MR. MARTIN: And we only 2900 Exhibits, Your Honor, so I -- 02:53PM

THE COURT: Well -- 02:53PM

MS. M. MILLER: Your Honor, I wish that -- 02:53PM

THE COURT: No, we don't -- 02:53PM

MS. M. MILLER: -- the Court would -- 02:53PM

THE COURT: Yeah. 02:53PM

MS. M. MILLER: -- instruct Mr. Martin to please stop. He doesn't want me to make these extraneous -- 02:53PM

THE COURT: All right. 02:53PM

MS. M. MILLER: -- comments. 02:53PM

THE COURT: You both are making extraneous comments, okay --

MS. M. MILLER: But -- but --

THE COURT: -- so you're both guilty of it --

MS. M. MILLER: -- it goes both ways.

THE COURT: -- so the Court -- hold on, I agree. So the Court will sustain the objection.

MR. MARTIN: Your Honor --

Yes, Mr. McConwell -- Mr. Martin, we accept your apology. Go ahead.

MS. M. MILLER: So I will move to admit page 1 which shows the jury --

THE COURT: Okay. Wait just --

MS. M. MILLER: -- the information about --

THE COURT: I already know what the motion --

MS. M. MILLER: -- this account.

THE COURT: -- is. Okay, wait, wait.

Any other objection, Ms. McConwell?

MS. MCCONWELL: Well, I wasn't sure if she's -- that's we're going to do that or we're not going to do that.

THE COURT: No, she's indicated she prefer to not limit it to the pages that it focuses in on.

MS. MCCONWELL: Well, I -- it contains information about a lot of individuals who are paid through this account that are not relevant to this -- this jury

trial --

MS. M. MILLER: Your Honor --

MS. MCCONWELL: -- and so --

THE COURT: Okay. Hold on. Hold on.

MS. M. MILLER: I'm withdrawing.

THE COURT: Hold on. Let me hear -- let me hear --

MS. MCCONWELL: -- just the relevant pages.

THE COURT: -- the objection.

MS. M. MILLER: I'm just -- I'm agreeing with her. I'll just --

THE COURT: Oh, okay --

MS. M. MILLER: -- introduce --

THE COURT: -- okay, okay.

MS. M. MILLER: I want to move on for the jury --

THE COURT: Okay. She agrees with you.

MS. M. MILLER: -- so --

THE COURT: Okay. Got it.

MS. M. MILLER: -- let's just introduce page 1, which shows the jury what this document is.

THE COURT: Motion -- okay. There's a motion to admit 22-1. No objections, Ms. McConwell?

MR. MARTIN: No objection.

THE COURT: Mr. Martin?

Okay. Admitted. Yes, you may publish.

MS. M. MILLER: And then I believe page 21 is the one that has the transaction. Once I verify that, I will move to admit just that page so that we could move on.

THE COURT: Okay. So 22-1 and 20[sic] is admitted without objection. Why don't you guys look at 22-21 now.

(Exhibit 22-1, 22-20 admitted.)

MS. M. MILLER: Can you go to 21? And can you hone in on the 194? It's towards the bottom. Yeah, there you go.

THE COURT: Yes?

MS. M. MILLER: Any objection to that, Your Honor?

THE COURT: I think they're looking. They're looking. They're speed reading there.

MR. MARTIN: I've already said I have no objection.

THE COURT: Oh, yeah.

MR. MARTIN: I'm sorry.

THE COURT: But -- but -- okay, no objections. Ms. McConwell?

MS. MCCONWELL: Well, yeah, I mean, it's only to Mr. Walker, so --

THE COURT: All right. So objections -- 22-1 and 22-21 will be admitted without objection. You may proceed.

(Exhibit 22-21 admitted.)

MS. M. MILLER: Thank you, Your Honor. May I publish?

THE COURT: Yes, you may publish. 26.

MS. M. MILLER: So Ms. Miller, yes, thank you for starting the first page.

BY MS. M. MILLER: (CONTINUING)

Q. And, Special Agent Khamvongsa, once this gets on the screen -- okay, wonderful. So can you tell the members of the jury how you obtained this information, please?

A. I obtained -- I obtained it through the grand jury subpoena.

Q. Okay. And, again, the name of the company that is identified in this bank record?

A. Caledonian Agency, Inc.

Q. And that was the investment company, sir?

A. Yes.

Q. The address of the company, do you recognize that?

A. Yes.

Q. And what do you recognize about that address?

A. It's the same address belonging to Hansen Helicopters --

Q. Okay.

A. -- here in Guam.

Q. And let's look at page 21 of this document, and,

Ms. Miller's going to highlight the transaction on 12-1-2015. Do you recognize this?

A. Yes.

Q. And is this wire transfer reflected in the Hansen Helicopters' schedule of billings that we just saw previously?

A. Yes.

MS. M. MILLER: Okay, thank you, Ms. Miller.

BY MS. M. MILLER: (CONTINUING)

Q. Now, if we go back to Demonstrative Aid 43 again, and let's look at Count 103. And could you read 103 to the jury, please?

A. September 2nd, 2016, wire transfer from Ocean Conquest, LLC in the amount of $234,980.

Q. Okay. And did you see the information in the schedule of billings and collections that you received from Hansen Helicopters?

A. Yes.

Q. Let's look at Exhibit 726, page 67, please. Okay. Sir, do you see the schedule here that corresponds with that particular count?

A. Yes.

Q. And can you tell the members of the jury, what are the transactions that equal that 290 -- $234,980 that is reflected in that wire fraud transaction?

A. So there's six tuna boats identified here in this

02:56PM 02:56PM 02:56PM 02:56PM 02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM

schedule of billings and collections identified as Ocean Challenger, Ocean Expedition, Ocean Warrior, Ocean Encounter, Ocean Conquest, Ocean Galaxy, which made a lump sum payment of $230,980, and it's reflected individually for each tuna boat company covering the period of September 2nd, to October 1st, 2016.

Q. Okay. And, again, this is a record received from the Defendant Hansen Helicopters?

A. Yes.

Q. Now, let's look at Exhibit 725, which is another record received from Hansen Helicopters, and I'd like you to look specifically at pages 13 and 15 of that exhibit so that you can identify the aircraft that were used in those leases. Do you see those there, sir?

A. Yes.

Q. And could you read those for the jury, please?

A. N911GP is assigned to Ocean Challenger. N336SP is assigned to Ocean Warrior. N9938A is assigned to Ocean Expedition. N1156X is assigned to Ocean Encounter. N810M is assigned to Ocean Conquest. N26892 is assigned to Ocean Galaxy.

MS. M. MILLER: Okay. Now, Ms. Miller, if we could keep that up and move it over and pull up Exhibit 1252. Is that asking too much?

MS. S. MILLER: I'll try.

MS. M. MILLER: We'll try.

BY MS. M. MILLER: (CONTINUING)

Q. What I'd like you to do, sir, is let the jury know who registered those helicopters that were used in these leases.

(Counsel conferred.)

MS. M. MILLER: And just pull up 1252. I'm writing the numbers on the board, so...

BY MS. M. MILLER: (CONTINUING)

Q. Okay. So we're going to pull up Exhibit 1252, which is the registration information, okay, and let's start with the first helicopter, 9911GP. Can you tell the members of the jury, who is the registered owner of that helicopter during the payment from the lease?

A. South Pacific Spotters, Inc.

Q. Then if we look at November 336SP, can you tell the members of the jury who was the registered owner of that helicopter during the time of the lease?

And, by the way, who was the person that you just saw that registered that helicopter with the FAA?

A. Jon Walker.

Q. Okay. Now, N336SP, who was the registered owner of that aircraft during the time of this transaction?

A. Alpha Air, Inc.

Q. And who registered it with the FAA under Alpha Air,

03:00PM 03:00PM 03:00PM 03:00PM 03:00PM 03:00PM 03:01PM 03:01PM 03:01PM 03:01PM 03:01PM 03:01PM 03:01PM 03:01PM 03:01PM 03:01PM 03:01PM 03:01PM 03:01PM 03:02PM 03:02PM 03:02PM 03:02PM 03:02PM 03:02PM

Inc?

A. Jon Walker.

Q. Now, let's look at the next aircraft, which is N9938A, and could you tell the members of the jury which company was that aircraft registered under?

A. South Pacific Spotters, Inc.

Q. And who registered it?

A. Jon Walker.

Q. Now, could you look at N1156X, and could you tell the members of the jury which company was that aircraft registered under at the time of the lease?

A. Walker Helicopters, Inc.

Q. And who's the person who registered it that way with the FAA?

A. Jon Walker.

Q. All right. Let's look at N810M, and could you tell the members of the jury which company was that aircraft registered under during the time of this transaction?

A. Bravo Air, Inc.

Q. And who registered it?

A. Jon Walker.

Q. And the last helicopter for this transaction, N26892, can you tell the members of the jury which company was that helicopter registered under?

A. Wilma's Flight Service, Inc.

Q. And who registered it under Wilma's Flight Service, Inc?

A. Jon Walker.

Q. Now, sir, in addition to reviewing the list of aircraft and boats in 725 and reviewing the schedule of billings that the Defendant Hansen Helicopters provided in 726 and looking at the registration information, did you also determine who the mechanics were for each of these helicopters during the relevant period of time?

A. Yes.

Q. Could you tell the jury how you made that determination?

A. Based upon the process that we've gone through thus far, once identifying the helicopters, I took that information and reviewed the pilot-mechanics list to determine who was assigned that the point in time to those particular helicopters.

Q. And when you made that determination, what did you do then?

A. I then compared that information to FAA records, and -- and then I made a determination from there as to whether or not they were certificated with the FAA.

Q. Were any of the mechanics used during this period of time for these leases certificated by the FAA?

A. No.

Q. Okay. Let's look at what has been previously marked as Exhibit 2900-1976. Do you see that document, sir? 03:05PM 03:05PM

A. Yes. 03:06PM

Q. Is that a true and correct copy of the lease that you reviewed? 03:06PM 03:06PM

A. Yes. 03:06PM

MS. M. MILLER: Your Honor, at this time, I would offer into evidence what has been previously marked as Government's Exhibit 2900-1976. 03:06PM 03:06PM 03:06PM

THE COURT: Counsels? 03:06PM

MR. MARTIN: Just a moment, Your Honor. 03:06PM

THE COURT: No problem. 03:06PM

(Pause.) 03:06PM

THE COURT: And how many pages is that? 03:06PM

MS. M. MILLER: It is -- all of these leases are six pages, Your Honor, so I believe it goes through 81 -- 981 -- 1981; is that correct? 1981. 03:06PM 03:06PM 03:06PM

(Pause.) 03:07PM

MR. MARTIN: Your Honor, on behalf of Mr. Walker, I don't object to 1976 through, I believe it's 1918; is that right? 03:07PM 03:08PM 03:08PM

THE COURT: That's correct, yeah. 03:08PM

All right. Ms. McConwell? 03:08PM

MS. MCCONWELL: It's -- I would object that it's on a completed contract but it's not going to come -- it's 03:08PM 03:08PM

not -- it's not a completed document. It's not been fully executed. So I would object to it on that basis, but it would only come in as to Jon Walker. It will not come in as to Hansen Helicopters --

THE COURT: All right.

MS. MCCONWELL: -- because we're not in these counts.

THE COURT: Okay. So with regard to -- the Court will admit 2900-1976 through 1981 and there's no objection by Mr. Walker's Counsel, so that's admitted without objection.

(Exhibit 2900-1976 to 1981 admitted.)

THE COURT: With regard to the objection made by Ms. McConwell, the Court will overrule that objection.

You may proceed.

MS. M. MILLER: And, Ms. Miller, could you, please, highlight the top portion of the document after we publish it. May I publish it to the jury, Your Honor?

THE COURT: Yes, you may.

MS. M. MILLER: Thank you.

And could you, please, pull out the top portion of the document. Okay.

BY MS. M. MILLER: (CONTINUING)

Q. So, Special Agent Khamvongsa, is this lease -- what is the date of this lease?

A. June 17th, 2016.

Q. And who is identified as the lessor?

A. Wilma's Flight Service, Inc.

Q. All right. Now, let's go down to the helicopter that is identified in this lease. What is the registration of the helicopter that is involved in this lease?

A. N911GP.

Q. Now, sir, could you please remind the jury who is identified as the registered owner of this helicopter --

A. South --

Q. -- during this period of time?

A. South Pacific -- South Pacific Spotter.

Q. But who's identified as the lessor in this particular lease?

A. Wilma's Flight Service.

Q. Can you go to Section 8 of the lease, please, and could you read that to the jury, please?

A. "The registration and title to the aircraft shall be in the name of the lessor and the aircraft at all times during the term of this agreement or automatic renewals shall bear internationally-recognized registration markings."

Q. Was the name of the lease in the name of the lessor?

A. No.

Q. Or the registered owner?

A. It did -- it did not reflect what was reflected in the FAA registry.

03:09PM 03:10PM

Q. Okay.

A. "It" being the contract.

Q. Okay. Now, let's look at Exhibit 2935, please.

MS. M. MILLER: And, Ms. Santos, just to verify, we have on our list that that has already been admitted, 2935.

THE CLERK: Yes.

MS. M. MILLER: Okay, 2935, and, Ms. Miller, specifically page 22.

MS. MCCONWELL: I have that as to Jon Walker only.

THE COURT: I'm sorry, what was -- so what is the question?

MS. M. MILLER: I'm sorry, Your Honor?

THE COURT: What was it -- what is it? She's looking for the document?

MS. M. MILLER: No, we're pulling up the Document 2935. It's already been admitted into evidence.

THE COURT: Okay, all right.

MS. M. MILLER: And I asked Ms. Miller to go to --

THE COURT: All right.

MS. M. MILLER: -- page 22 which reflects the transactions that we're talking about in this particular count, Your Honor.

THE COURT: Okay.

MS. M. MILLER: Okay. Ms. Miller, could you please highlight the transaction that shows the -- yes, thank you so much.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, could you tell the members of the jury what we're seeing here, please?

A. On September 2nd, a wire transfer credit of $234,980 was made into the bank account of Caledonian Agency, Inc., and it's from Ocean Conquest, LLC.

Q. And did that money correlate with this list of helicopters that we just discussed?

A. Yes.

Q. That were registered to this list of companies that we just discussed?

A. Yes.

Q. That we saw on the documents that Hansen Helicopters produced in response to the grand jury subpoena?

A. Yes.

Q. Now, let's talk about Count 104.

MS. M. MILLER: And, Ms. Miller, if you can go back to the demonstrative aid. Thank you.

BY MS. M. MILLER: (CONTINUING)

Q. And, Special Agent Khamvongsa, could you read to the jury Count 104?

A. "October 3rd, 2016, wire transfer from Sea Fox, LLC

in the amount of $401,558.41."

Q. Did you say 558?

A. $558.41.

Q. Thank you.

Did you perform the same kind of analysis for this count as you did for the others?

A. Yes, I -- yes, I did.

Q. Okay. And could you tell the members of the jury, first, Sea Fox, LLC, did they have a holding company?

A. Yes, they have a parent company or an umbrella company.

Q. Okay. And what was the name of that holding company?

A. That was the South Pacific Tuna Company.

Q. Okay. Let's look at what has been previously marked as Government's Exhibit 2936. I do not believe this is entered into evidence yet. Do you recognize this?

A. Yes.

Q. What is it?

A. It's a -- it's a monthly bank statement for Caledonian Agency, Inc. bank account.

Q. How do you obtain this?

A. It was provided to me through the grand jury subpoena.

Q. Is it a true and correct copy of what was provided?

A. Yes.

MS. M. MILLER: Your Honor, at this time, the Government would offer into evidence what has been previously marked as Government Exhibit 2936.

And pages?

THE COURT: How many pages or do you just want to do one -- the pertinent page?

MS. M. MILLER: It's a total of five pages, Your Honor.

THE COURT: You're moving to admit all five?

MS. M. MILLER: And the wire transfers, so I would move to admit page 1 and page 4.

THE COURT: I'm sorry, what is it, page 1 and page 4?

MS. M. MILLER: Page 1 and page 4. Page 4 shows the wire transfer.

THE COURT: Okay. All right. Any objections, Counsels?

MR. MARTIN: No, Your Honor.

THE COURT: Okay. Ms. McConwell?

MS. MCCONWELL: Yeah, no, Your Honor, but I would -- it's not -- this is not Hansen Helicopter's counts.

THE COURT: All right, very well. So, ladies and gentlemen of the jury, 2936-1 through 5 will be admitted without objection, and it applies to Mr. Walker.

MR. MARTIN: I thought it was one and four.

THE COURT: Oh, I'm sorry. It's one and four.

MS. M. MILLER: One and four.

THE COURT: I made a mistake, one and four, that's right. Strike that. 2936-1 and 2936-4 admitted without objection as applied to Mr. Walker.

(Exhibit 2936-1 to 2936-4 admitted.)

THE COURT: Go ahead.

MS. M. MILLER: May I publish page 1, Your Honor?

THE COURT: You may, yes.

MS. M. MILLER: And, Ms. Miller, could you hone in on the very top of the document.

BY MS. M. MILLER: (CONTINUING)

Q. And, Special Agent Khamvongsa, could you tell the members of the jury what they're seeing here?

A. This is a bank statement covering the period of September 30th, 2016, through October 31st, 2016, for Caledonian Agency, Inc., PO Box 9099, Tamuning, Guam 96931.

Q. Okay. And, now, let's go to page 4, and can you tell the members of the jury what they're seeing here?

A. This is on October 3rd, 2016, a wire transfer credit of $401,558.41 was made by the organization Sea Fox, LLC.

Q. Into the account of Caledonian Agency?

A. Yes, into the Caledonian Agency, Inc. bank account.

Q. Okay. Now, did you do an analysis to determine which transactions comprised the $401,558.41 wire transfer?

03:15PM 03:15PM 03:15PM 03:15PM 03:15PM 03:15PM 03:15PM 03:15PM 03:15PM 03:15PM 03:15PM 03:15PM 03:15PM 03:15PM 03:15PM 03:15PM 03:15PM 03:15PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM

A. Yes. 03:16PM

Q. Okay. Let's go back to Exhibit 726, and specifically I'm going to ask you to look at pages 65 and 66. We could start with 66. Do you see the transaction for September 2016 from Sea Quest?

MS. M. MILLER: Can we hone in on that?

THE WITNESS: No, I think you have the wrong page.

(Pause.)

MS. M. MILLER: Ms. Miller, can you highlight the fishing companies on the left, please.

THE WITNESS: Okay. Yes.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. And could you tell the members of the jury what do we see here?

A. We see six tuna boats which make up Sea -- which make up that lump sum payment of $239,867.58, which was received on 9-1-2016.

Q. Okay. And could you go through this for the members of the jury just, please, quickly the names of the boats?

A. Yes. The boats include Sea Quest, Sea Defender, Sea Trader Sea Fox, Sea Honor, Sea Bounty.

Q. Okay. And now let's look at the prior page, which is Exhibit 726-66.

MS. S. MILLER: Sorry, that was page 65.

MS. M. MILLER: Oh, that was page 65. Now go to page 66. Sorry. Thank you.

BY MS. M. MILLER: (CONTINUING)

Q. There was an additional transaction, wasn't there, sir, so that we get the total of 401,558.41?

A. Yes.

Q. Okay. And I believe that's on --

A. It may be on the prior page.

Q. -- next page.

Okay. And do you see what has been highlighted there, sir?

A. Yes.

Q. And could you tell the members of the jury what that is?

A. That's for the Sea Fox invoice for damage charges of $161,593.41.

Q. If you total that amount with the amount we had on the prior page, do you come up with 401,558.41?

A. Yes.

Q. Now, let's look at Exhibit 725, please.

THE COURT: Yes, Ms. McConwell?

MS. MCCONWELL: I'm -- I'm not clear what she -- when she said "the other page," I'm not -- I didn't see what other page she's talking about.

MS. M. MILLER: The prior page that we just

showed the total amount of the billings, to be 239,000 and change --

MS. MCCONWELL: I only saw that on page --

MS. M. MILLER: -- added to the --

MS. MCCONWELL: -- you only showed page 65. You didn't show another page.

MS. S. MILLER: It was just one page, Marie.

MS. M. MILLER: Oh, just one page?

MS. MCCONWELL: Just one page.

MS. M. MILLER: Were they both on one page? Okay, it was both on one page. Sorry.

THE COURT: All right. 725-1?

MS. M. MILLER: Yes, Your Honor, 725 --

THE COURT: Has that been admitted?

MS. M. MILLER: 725's already been admitted, and I would like Special Agent Khamvongsa to look at pages 13 to 15 of 725.

THE COURT: Okay. Those have been admitted as well?

MS. M. MILLER: Yes, Your Honor.

THE COURT: All right.

BY MS. M. MILLER: (CONTINUING)

Q. So do you see the Sea Bounty, Sea Quest, Sea Defender, Sea Fox, Sea Honor and Sea Trader?

A. Yes.

Q. And could you please tell me the registration numbers of the helicopters that were being leased to those companies?

A. N369V, N755PC, N271M, N40490, N -- N831FG to Sea Honor, and N90176 to Sea Trader.

Q. And 9 --

A. -- 0176.

Q. Okay. And did you perform the same analysis where you looked at the registration summary chart to determine who was identified as the registered owner of these helicopters during the period of time of this transaction?

A. Yes.

Q. Okay.

MS. M. MILLER: Can we go to that chart please, Ms. Miller.

BY MS. M. MILLER: (CONTINUING)

Q. Okay, for 369V could you tell the members of the jury what was the name of the company that was identified as the registered owner?

A. Foxtrot Air, Inc.

Q. And who registered it under Foxtrot Air?

A. Jon Walker.

Q. Okay. Can you go to N755PC, and tell the members of the jury what was the name of the company that this particular helicopter was registered under during this period of time?

A. HH Helicopters, Inc.

Q. And who registered it?
A. Jon Walker.
Q. Can you go to N271M and please tell the members of the jury which company was the registered owner of N271M during this period of time?
A. Jan's Helicopters Service, Inc.
Q. And who registered that helicopter under Jan's name?
A. Jon Walker.
Q. Okay. Can you go to N40490 and please tell the members of the jury which company that particular helicopter was registered under?
A. Wilma's Flight Services, Inc.
Q. And who registered that helicopter under Wilma's Flight Services, Inc.?
A. Kenneth Crowe.
Q. Okay. Now, could you please go to November 831FG, and tell the members of the jury which company was identified as the registered owner during the period of time?
A. Marlin Bay Helicopters.
Q. And who registered that company -- that aircraft with that company?
A. Jon Walker.
Q. And then could you please look at N90176 and tell the members of the jury which company that helicopter was registered under?

03:22PM 03:22PM 03:22PM 03:22PM 03:22PM 03:22PM 03:22PM 03:22PM 03:22PM 03:22PM 03:22PM 03:22PM 03:22PM 03:22PM 03:22PM 03:23PM 03:23PM 03:23PM 03:23PM 03:23PM 03:23PM 03:23PM 03:23PM 03:23PM 03:23PM

A. Spotters, Inc.

Q. And who registered that helicopter in the name of Spotters, Inc?

A. Jon Walker.

Q. Now, let's look at Exhibit 750-1.

THE COURT: Has that been admitted?

MS. M. MILLER: Yes, Your Honor, that's what I have on my record that --

THE COURT: Okay.

MS. M. MILLER: -- that has already been admitted.

THE COURT: 750-1, okay.

MS. M. MILLER: 750-1.

BY MS. M. MILLER: (CONTINUING)

Q. First of all, can you tell me the date of this letter, sir?

A. It's dated -- it's dated July 9th, 2020.

Q. Okay. Let's stop for a moment.

MS. M. MILLER: Ms. Santos, do you have that as admitted?

THE CLERK: I'm just verifying.

MS. M. MILLER: Oh, I'm sorry.

THE CLERK: One moment, thank you.

MS. M. MILLER: No, no, no, take your time.

THE CLERK: Yes.

03:23PM 03:23PM 03:23PM 03:23PM 03:24PM 03:24PM 03:24PM 03:24PM 03:24PM 03:24PM 03:24PM 03:24PM 03:24PM 03:24PM 03:24PM 03:24PM 03:24PM 03:24PM 03:24PM 03:24PM 03:24PM 03:24PM 03:24PM 03:24PM 03:25PM

BY MS. M. MILLER: (CONTINUING)

Q. So the date of the letter, sir, I'm sorry?

A. July 9th, 2020.

Q. A who is it addressed to?

A. Stephanie Lewis with the Federal Aviation Administration.

Q. Who is it from?

A. It's from Jon D. Walker.

Q. And what address is Mr. Walker sending this from?

A. 3561 Route C, Neosho, Missouri.

Q. Okay. And if we look at the next page of this document.

MS. M. MILLER: Would you go to the next page, Ms. Miller. Next page, sorry.

BY MS. M. MILLER: (CONTINUING)

Q. Do you see that list of helicopters, sir?

A. Yes.

Q. And does that list include some of the helicopters that we see here, for example, 831FG?

A. Sorry.

Q. It's okay. It's line 11.

A. Okay. Yes.

Q. Okay. All right. Did you analyze, like you did for the other transactions, who the mechanics were that were assigned to these helicopters to work on them?

03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:26PM 03:26PM 03:26PM 03:26PM

A. I did.

Q. And were you able to determine whether those mechanics were or were not certificated?

A. They were not certificated by the FAA.

Q. Okay. And if we go back to page 1 of this letter, 750-1, and could you please read this paragraph that Ms. Miller just highlighted?

A. "Included with this letter is a list of containing 1DQ and 16 Model 369-HS aircraft whose certificate of aircraft registration has been signed by me and returned to the registry. I am the president and a director of the corporation listed with each aircraft. Although I do not agree that the HS aircraft are subject to the Cape Town Treaty or international registry, I hereby certify, as president of each listed corporation, that all registered interests, if any, ranking in priority to the -- of the owner of each aircraft have been discharged. Please complete the deregistration process. Sincerely yours, Jon D. Walker."

Q. Okay. Thank you.

MS. M. MILLER: Thank you, Ms. Miller.

BY MS. M. MILLER: (CONTINUING)

Q. Now, I'd like to show you a demonstrative aid that will show the jury the money laundering transactions from the Second Superseding Indictment.

MS. M. MILLER: Ms. Miller, if you could pull up

Demonstrative Aid 43, and I believe it's page 2 that has money laundering counts from the Second Superseding Indictment. 03:27PM 03:27PM

THE COURT: What was the -- 03:27PM

MR. MARTIN: What paragraph is this? Is this a paragraph of the indictment? 03:28PM 03:28PM

MS. M. MILLER: It is. 03:28PM

MR. MARTIN: Can you identify it for us, please? 03:28PM

THE COURT: And what exhibit is this? Demonstrate what? 03:28PM 03:28PM

MS. S. MILLER: Forty-three. 03:28PM

MS. M. MILLER: It's Demonstrative Aid 43, G-DA-43. 03:28PM 03:28PM

THE COURT: Okay. And then give -- point, Mr. Martin to -- 03:28PM 03:28PM

MS. M. MILLER: It's paragraph 139, Your Honor. It's on screen. 03:28PM 03:28PM

THE COURT: Right, okay. 139 of the indictment? 03:28PM

MS. M. MILLER: Yes, Your Honor. 03:28PM

THE COURT: Okay, 139, Counsel, Second Superseding Indictment. 03:28PM 03:28PM

BY MS. M. MILLER: (CONTINUING) 03:28PM

Q. And, Special Agent Khamvongsa -- 03:28PM

MS. M. MILLER: Ms. Miller, could you highlight just that section please? 03:28PM 03:28PM

(Counsel conferred.) 03:28PM

MS. M. MILLER: No, that's okay. There you go. Thank you.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, could you please read this paragraph to the jury?

A. "On or about December 2016 in the District of Guam and elsewhere, the Defendant John D. Walker aka Jon Walker, knowingly engaged or attempted to engage in monetary transactions, that is the deposit, withdrawal, transfer, or exchange of funds or a monetary instrument, through or to a financial institution, affecting interstate or foreign commerce, in criminally-derived property of value greater than $10,000, such property having been derived from a specified unlawful activity, that is, honest services and wire fraud, in violation of Title 18, United States Code, Sections 13 -- 1343, 1346, and 2, as more fully described in the paragraphs of Count 100 through 104 of this Second Superseding Indictment to wit."

Q. Okay. And let's go to -- and Counts 100 through 104 are the ones we just went over that were the wire fraud counts?

A. Yes.

Q. Okay. Now, let look at Counts 105 to 110, please. There we go. So let's start with Count 105, please, and could you read that count to the members of the jury?

A. "December 14th, 2016, Walker electronically transferred $3 million from Caledonian's Bank of Hawaii corporate bank account ending in 9134 to Hansen Northern's Bank of Hawaii corporate bank account ending in 3534."

Q. Okay. Now, let's look at what has been marked but not introduced as Government's Exhibit 25. Do you recognize this document?

THE COURT: How many page is that are you going to put in? What are you trying to put in, how many pages?

MS. M. MILLER: Twenty-three total, Your Honor.

THE COURT: Okay. So 25-1 through 25-23.

MS. M. MILLER: Yes, Your Honor.

THE COURT: Go ahead.

BY MS. M. MILLER: (CONTINUING)

Q. Do you recognize this document?

A. Yes.

Q. What is it?

A. This is the bank statement for Caledonian Agency, Inc.

Q. Okay. Bank of Hawaii?

A. Yes, from Bank of Hawaii.

Q. Is it a true and correct copy of the bank statement that you received pursuant to a subpoena in this case?

A. Yes.

MS. M. MILLER: Your Honor, at this time I would

offer into evidence what has been previously marked as Government's Exhibit 25.

THE COURT: 1 through 23?

MS. M. MILLER: Dash 1 and 25-11 --

THE COURT: Okay, so --

MS. M. MILLER: -- which is the specific monetary transactions.

THE COURT: Those two pages. All right, Counsel?

(Pause.)

THE COURT: Yes?

MR. MARTIN: As to 25-1 and 11, no objection.

THE COURT: All right. Very well. And --

MS. MCCONWELL: And Hansen -- and the same for Hansen Helicopters, it's just it's admitted to Mr. Walker not to Hansen Helicopters.

THE COURT: All right, very well. Counsel -- ladies and gentlemen of the jury, 25-1 and 25-11 are admitted without objection and it applies to Mr. Walker.

And, yes, you may publish.

(Exhibit 25-1 to 25-11 admitted.)

MS. M. MILLER: Okay. So let's first publish page 1, please, and the top of the page please.

BY MS. M. MILLER: (CONTINUING)

Q. And could you tell the members of the jury same bank, same company; right?

A. Yes, it's Caledonian Agency, Inc. bank account.

Q. Okay. Now let's look at page 11, and can you identify for us the transaction that you identified as a money laundering transaction?

A. Sure. It is the December -- it's a December 14th, 2016, transaction right here which are marked, which is the BBC web transfer.

Q. Can you see that better?

A. Yes.

Q. Okay.

A. It's the BBC web transfer of $3 million going into the account ending in 3534, which is the Hansen Northern Helicopters account.

MS. M. MILLER: I'm out of paper. Can I get another one?

BY MS. M. MILLER: (CONTINUING)

Q. So the $3 million went from Caledonian Agency; correct?

A. Yes.

Q. To Hansen Northern; correct?

A. Yes.

Q. And while we're getting the white paper put up there, let's look at what has already been entered into evidence as Exhibit 829. Do you see those two companies here, sir?

A. Yes.

Q. And could you tell the members of the jury -- step down and show the members of the jury where they're located. You can use this microphone. It's awkward. I'll stand here. You stand there.

A. Bless you.

Hansen Northern Helicopters and Caledonian Agency are owned by Jon Walker and they're -- they're underneath the Jon Walker here in this corporate structure.

Q. Okay. And so can you show, by using your hand, the -- the flow of the money from Caledonian to Hansen Helicopters -- Hansen Northern Helicopters, Inc.?

A. So the tuna boat companies' money would come into here into Caledonian Agency, Inc., the investment account, which went into Hansen Northern's Helicopters' Inc. bank account.

Q. Okay. Thank you, sir.

And the president of both of those companies, sir?

A. Jon Walker.

Q. And that transaction obviously involves more than $10,000?

A. Yes.

Q. Okay. Let's look at page 12 --

MS. M. MILLER: And that has not been admitted yet, Your Honor.

THE COURT: Same -- 29 --

MS. M. MILLER: It's the same Exhibit 25 but it's page 12, and so the same foundation for it.

THE COURT: All right. Any objections, Counsel?

MR. MARTIN: May I have judgment a moment, Your Honor?

(Pause.)

MS. M. MILLER: Before we go to page 12, there's one more thing I want to do on 11.

THE COURT: Let's see if there is any objections as to 25-12?

MR. MARTIN: No objection to 12, Your Honor.

THE COURT: All right.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. So, Special Agent Khamvongsa --

THE COURT: Hold on, hold on, let me see -- Ms. McConwell? Yes?

MS. MCCONWELL: Hansen's not on these. You know, Your Honor, as I'm looking at the -- at the statements, I wish we could go in and redact, and I would ask if the Government would be willing to do this, redact some of the names of the people that are on here. We're going to be -- if it's going to be published into the -- into the public, because there are, you know, individuals that were paid that have -- may work for the organizations that I don't think it's appropriate to have their names out there. They're not defendants.

They're not parties to this litigation, and -- and I think their privacy should be protected. And, I'm sorry, to announce that --

THE COURT: All right. No objections to that. All right. Very well. The Court will admit Exhibit 25-12 without objection, except with the proviso that any other names that are not relevant to the transaction at hand will be redacted.

MS. MCCONWELL: Thank you.

THE COURT: All right. Very well.

Admitted. Yes, published.

MS. M. MILLER: Thank you, Your Honor.

THE COURT: Go ahead.

MS. M. MILLER: Thank you, Your Honor.

(Exhibit 25-12 admitted.)

BY MS. M. MILLER: (CONTINUING)

Q. Now, Count 105, Special Agent Khamvongsa, involved a $3 million transaction; correct?

A. Yes.

Q. Count 106 involves a transaction of how much?

A. $3 million.

Q. And if you look at what has been admitted as Exhibit 25, page 11, on the bottom of that page, do you see the transaction -- the second transaction for $3 million there?

A. Yes.

Q. Where was that money transferred to?

A. That is -- that $3 million was transferred from Caledonian Agency, Inc. to Hansen Northern Helicopters, Inc. bank account with Bank of Hawaii.

Q. Count 107 involved a monetary transaction. If we can go to page 12, please, and do you see that transaction there, sir?

A. Yes.

Q. And what is the amount of that transaction?

A. $200,000.

Q. And where did those funds go?

A. This one went into the Hansen Helicopter bank account with Bank of Hawaii.

Q. So to Hansen Helicopters, not Hansen Northern?

A. No.

MR. LEON GUERRERO: Your Honor, sorry, this particular exhibit published to the jury? It's been admitted.

THE COURT: 25-12 has been admitted.

MS. M. MILLER: Yeah.

MR. LEON GUERRERO: Now it's being shown.

THE COURT: 25-12 --

MS. M. MILLER: Oh, I'm sorry, it wasn't being published. Thank you.

THE COURT: 25-12?

MS. M. MILLER: Yes. Okay, I think the jury could see it now, Your Honor.

Thank you, Mr. Leon Guerrero.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. So that $200,000 transaction went from Caledonian to Hansen Helicopters?

A. Yes.

Q. Okay. And then let's look at the transaction that is reflected in Count 108, and that is also on page 12, and could you tell the members of the jury what the amount of that transaction was?

A. $500,000.

Q. And where did that money go?

A. It went into the Hansen Northern Helicopters, Inc. bank account with Bank of Hawaii.

MS. M. MILLER: And then, Your Honor, on -- in this same exhibit, Exhibit 25, on pages 22 to 23, we have the -- beginning and the ending balance for this account that I would like to share with the jury, so I would ask the Court to allow me to move into evidence Exhibits 22 to 23.

MS. MCCONWELL: Pages?

MS. M. MILLER: Pages 22 and 23 of Exhibit 25.

THE COURT: Okay. I think I've already -- I think I've already admitted 23. So we're going add 22. Any objections to that?

MS. M. MILLER: It's Exhibit 25, pages 22 and 23.

THE COURT: Right, right, yeah.

MS. MCCONWELL: Um...

MR. MARTIN: Your Honor, I have no objection.

THE COURT: Okay. Ms. McConwell?

MS. MCCONWELL: Subject to my request for redaction, I don't have -- Hansen has no objection. This is also admitted as to Walker, not to Hansen.

THE COURT: All right. Ladies and gentlemen of the jury, Exhibit 25 through 20 -- 25-22 and 23-23[sic] has been admitted, but 22 will also be admitted without objection, and to the extent that there are names in there that deserve privacy, then have them redacted.

MS. M. MILLER: Yes, Your Honor.

THE COURT: All right.

(Exhibit 25-22 to 25-23 admitted.)

MS. M. MILLER: May I publish --

THE COURT: You may.

MS. M. MILLER: -- page 22 to the jury, please?

(Pause.)

BY MS. M. MILLER: (CONTINUING)

Q. Okay. So this is from page 22, sir. Can you tell the members of the jury what they're seeing here?

A. So what's reflected here is the monthly balance. So it starts off on a -- on a November 30th, 2016, at

$6,102,121.62, and throughout that time frame, it stays relatively at that amount. Do you want me to read each --

Q. Yeah.

MS. M. MILLER: Let's go to the next page please, Ms. Miller, page 23.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. Can you tell us what we're seeing here, please?

A. So what we're seeing is on December 14th, 15th and 16th, we see -- it reflects a substantial drop in the balance, which is an anomaly in regards to this particular account with Caledonian Agency, Inc. And then for the rest of the month, the balance is under a million dollars after 12-16-2016.

Q. What happened in December of 2016 or immediately prior to 20 -- December 2016, in regards to this particular case?

A. In October 2016, the FBI and Department of Transportation OIG executed this search warrant on Hansen Helicopters' facilities.

Q. Okay. How much money total was transferred out of the Caledonian Agency account and moved into either Hansen Northern or Hansen Helicopters?

A. We're looking at $6.7 million.

Q. Okay. Now, I'd like you to look at what has been previously marked and I believe entered into evidence as

03:41PM 03:42PM 03:42PM 03:42PM 03:42PM 03:42PM 03:42PM 03:42PM 03:42PM 03:42PM 03:42PM 03:42PM 03:42PM 03:42PM 03:42PM 03:43PM 03:43PM 03:43PM 03:43PM 03:43PM 03:43PM 03:43PM 03:43PM 03:43PM 03:43PM

Government's Exhibit 23 --

MS. M. MILLER: Or has that been in yet? Not yet. Okay, good. This not into evidence yet, Your Honor, Exhibit 23.

BY MS. M. MILLER: (CONTINUING)

Q. Do you see it, sir?

A. Yes.

Q. Do you recognize it?

A. Yes.

Q. Is it a true and correct copy of a bank account record that you received in this case?

A. Yes.

MS. M. MILLER: Your Honor, at this time, the Government would move into evidence Exhibit 23.

THE COURT: Just that -- there's no other pages?

MS. M. MILLER: No, so there's more pages. Page 2 of Exhibit 23, this is the Hansen Northern account. It's going to show the money coming into the Hansen Northern Helicopters' account.

THE COURT: So what are you moving to admit?

MS. M. MILLER: I'm moving to admit page 1, page 2 -- and let me make sure that there are no other relevant pages here.

MS. MCCONWELL: I only have two pages. It's only two pages long, Marie.

MS. M. MILLER: Oh, yeah, that's it, one and two.

THE COURT: All right. Counsels, any objections to 23-1 and 23-2?

MR. MARTIN: No, Your Honor.

THE COURT: Ms. McConwell?

MS. MCCONWELL: No, Your Honor, and it's not admitted as to Hansen Helicopters because we're not in the Counts 99 through 110.

THE COURT: Oh, okay. All right.

Ladies and gentlemen of the jury, Exhibits 23-1 and 23-2 will be admitted without objection. Will be admitted as to Mr. Walker. And to the extent that there's any privacy issues on any other names not relevant to this case, they will be redacted.

(Exhibit 23-1 to 23-2 admitted.)

MS. M. MILLER: And, Your Honor, may I publish it to the jury?

THE COURT: You may, yes.

MS. M. MILLER: And, Ms. Miller, can you highlight the top portion of this record.

BY MS. M. MILLER: (CONTINUING)

Q. And, sir, whose bank account is this?

A. Hansen Northern Helicopters, Inc.

Q. And what is the address shown here?

A. PO Box 9099, Tamuning, Guam 96931.

Q. Who else shares that address? 03:45PM

A. Hansen Helicopters and Caledonian Agency, Inc. 03:45PM

Q. Okay. And if we look at page -- can you go down this page to the transaction section. Yes. Do you see the transactions identified here, sir? 03:45PM 03:45PM 03:45PM

A. Yes. 03:45PM

Q. And could you tell the members of the jury what we're looking at, in terms of those transactions? 03:45PM 03:45PM

A. So immediate -- immediately after the 12-14 to[sic] 2016 transfer of funds from Caledonian Agency, Inc. bank account into Hansen Northern, now we see from December 16th to December 2020, $2.5 million going out for each one of those individual days. So 12/16, 12/19 and 12/20 of 2016, we see $2.5 million going out to the account belonging to Walker Agricola, and it's an outgoing wire transfer. 03:45PM 03:45PM 03:45PM 03:46PM 03:46PM 03:46PM 03:46PM

Q. Who owns Walker Agricola? 03:46PM

A. Jon Walker. 03:46PM

Q. Who's the signer on the account for Walker Agricola? 03:46PM

A. The sole signer of that account is Jon Walker. 03:46PM

Q. Is anyone else a beneficiary on that account besides Jon Walker? 03:46PM 03:46PM

A. No. 03:47PM

Q. Let's look at page 2, please, and what do we see here on page 2? 03:47PM 03:47PM

A. Page 2 -- we're going out of order -- actually 03:47PM

reflects the money that we just talked about earlier regarding Caledonian Agency transferring the monies into Hansen Northern. So this reflects the money coming into the Hansen Northern Helicopter account.

So earlier we talked about the $3 million coming in on December 14th, 2016, and then the day later, December 15th, 2016, another $3 million, and then December 16th, 2016, we see $500,000, which came from the Caledonian Agency, Inc. bank account.

Q. For a total of how much going into the Caledonian -- from the Caledonian Agency account to Hansen Northern?

A. 6.5 million.

Q. And how much went out from Hansen Northern to Walker Agricola?

A. 7.5.

Q. What is the business of Hansen Northern Helicopters?

A. Airline.

Q. Okay. Not leasing of tuna boat companies -- I mean, tuna boat --

MR. MARTIN: Asked and answered.

BY MS. M. MILLER: (CONTINUING)

Q. -- helicopters for tuna boat companies?

MR. MARTIN: Asked and answered, Your Honor.

THE WITNESS: No.

THE COURT: I'm sorry -- I'm sorry, wait, wait

just a minute. What was the objection?

MR. MARTIN: It was asked and answered, and it's a leading question. It was asked and answered.

THE COURT: Overruled on -- we'll just let it go. Go ahead. Overruled.

THE WITNESS: No.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. Now, what is the beginning balance of the Hansen Northern airline account shown on page 23-1?

MS. M. MILLER: Can you go to 23-11, Ms. Miller?

BY MS. M. MILLER: (CONTINUING)

Q. Can you see the beginning balance there in the middle of the page?

MS. M. MILLER: If you could pull that out.

BY MS. M. MILLER: (CONTINUING)

Q. What was the beginning balance?

A. $975,377.91.

Q. And what was added during this month?

A. The total additions is 6. -- $6,579,978.20.

Q. And how much went out of the account?

A. $7,534,443.65.

Q. And what was the ending balance of this account?

A. $20,912.46.

Q. Let's go back to Exhibit 43, the Demonstrative Aid 43, and look at Count 109. Demonstrative Aid 43, Count 109.

THE COURT: Okay. Ten minutes before we recess for the day.

MS. M. MILLER: Yes, Your Honor.

THE COURT: How we doing on time?

MS. M. MILLER: We're doing great on time. I'll actually 1, 2, 3 -- yeah, I'm on the last page-and-a-half of questions, so we're doing good on time.

THE COURT: You're going to be able to finish this witness before ten minutes you think or not? Probably not?

MS. M. MILLER: We're to going to stop in ten minutes?

THE COURT: Yeah.

MS. M. MILLER: I'll have very few questions for tomorrow morning if we stop --

THE COURT: All right.

MS. M. MILLER: -- in ten minutes.

THE COURT: That's fine.

MS. M. MILLER: But it will be done before the first recess.

THE COURT: All right. That's fine.

BY MS. M. MILLER: (CONTINUING)

Q. Could you please read Count 109 to the jury?

A. "December 19th, 2016, Walker electronically transferred $2,500,000 from Hansen Northern's Bank of Hawaii

corporate bank account ending in 3534 to Walker Agricola LLC's Community Bank and Trust business bank account ending in 4056.

Q. By the way, where is the Walker Agricola account located?

A. Neosho, Missouri.

Q. Now, can you please look at count --

THE COURT: Sorry, where is it located?

THE WITNESS: Missouri.

THE COURT: Oh, Missouri, okay, that's right.

MS. M. MILLER: Neosho, Missouri.

THE COURT: That's right.

BY MS. M. MILLER: (CONTINUING)

Q. Could you now look at Count 110, and could you read that count to the jury?

A. "December 20th, 2016, Walker electrically transferred $2,500,000 from Hansen Northern's Bank of Hawaii corporate bank account ending in 3534 to Walker Agricola, LLC's Community Bank and Trust business bank account ending in 4056.

Q. And were those the transactions that we saw earlier in the bank statement?

A. Yes.

Q. Who lives in Neosho, Missouri?

A. Mr. Jon Walker.

Q. I'd like to show you what has been previously marked as Exhibit 30. It has not been entered into evidence yet. Do

you recognize this?

A. Yes.

Q. Is it a true and correct copy of what you received?

A. Yes.

MS. M. MILLER: Your Honor, at this time, I would offer into evidence what has been previously marked as Exhibit 30.

THE COURT: Counsel?

MR. MARTIN: Just a second, Your Honor, I'm sorry.

THE COURT: Mm-hmm.

(Pause.)

MR. MARTIN: No objection, Your Honor.

MS. MCCONWELL: I have no objection, Your Honor, but this is not admitted to Hansen Helicopters. We're not in these counts.

THE COURT: All right. Ladies and gentlemen of the jury, Exhibit --

MS. M. MILLER: Thirty.

THE COURT: -- 30 -- is it just one page there, 30?

MS. M. MILLER: Thirty.

THE COURT: 30-1?

MS. M. MILLER: 30-1, yes.

THE COURT: All right.

MS. M. MILLER: It's only one page, Your Honor.

THE COURT: Admitted without objection and --

MS. M. MILLER: May I publish it?

THE COURT: Yeah, you may.

MS. M. MILLER: Thank you.

(Exhibit 30 admitted.)

THE COURT: As applied to Mr. Jon -- Mr. Walker.

MS. M. MILLER: Yes, Your Honor.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa --

MS. M. MILLER: Ms. Miller, could you just highlight the top portion of it and then we'll go through it. Thank you so much. It's okay.

BY MS. M. MILLER: (CONTINUING)

Q. So, first, can you tell the members of the jury what is this -- what is this document?

A. This is a -- an account card, which is generally created at the opening of the bank account.

Q. Okay. And could you tell the members of the jury, what was the initial deposit to open up this bank account?

A. $50,000.

Q. And when was it opened?

A. March 19th, 2014.

Q. Okay. Now, let's look at the middle portion of this document, okay, and let's see -- now, who signed this

03:53PM 03:53PM 03:53PM 03:53PM 03:53PM 03:53PM 03:53PM 03:53PM 03:53PM 03:53PM 03:53PM 03:53PM 03:53PM 03:53PM 03:53PM 03:53PM 03:53PM 03:54PM 03:54PM 03:54PM 03:54PM 03:54PM 03:54PM 03:54PM 03:54PM

document?

A. Jon Walker.

Q. And what box is checked next to his citizenship status?

A. He's a U.S. citizen.

Q. Okay. And do we see the name of the company that you referenced earlier on this document?

A. Yes.

Q. Is that Walker Agricola?

A. Yes.

Q. Okay. And then who do we see as the signer on this account?

A. Jon Walker.

Q. How many signatures are needed -- how many signatures are needed to remove any funds from this account based on this card?

A. Just Jon Walker.

Q. Okay. Now let's look at the bottom, and we just -- what do we see here?

A. Walker Agricola, LLC, and just Jon Walker's signature.

Q. Okay. Now let's look at what has been previously marked but not admitted yet as Exhibit 31. Do you recognize this document?

A. Yes.

Q. Is it a true and correct copy of what you received from the bank?

A. Yes.

MS. M. MILLER: Your Honor, at this time, the Government would move into evidence what has been previously marked as Exhibit 31. How many pages? Three pages, Your Honor.

THE COURT: 1 through 3?

MS. M. MILLER: Yes, Your Honor.

THE COURT: All right. Counsels?

(Pause.)

MR. MARTIN: No objection Your Honor.

THE COURT: Ms. McConwell?

MS. MCCONWELL: No objection, Your Honor, but, again, Hansen Helicopters is not in the counts in 99 through 105 -- or 110.

THE COURT: All right. Ladies and gentlemen of the jury, Exhibits 31-1 through 31-3 will be admitted without objection as to Mr. Walker. And, again, as to the extent that there is any private information from -- for other third parties, please redact this -- redact their names and their information. So admitted and yes, you may publish.

(Exhibit 31-1 to 31-3 admitted.)

MS. M. MILLER: Thank you, Your Honor.

THE COURT: You got three minutes.

MS. M. MILLER: So, Ms. Miller, can you -- yeah, we'll just wrap up this document and then we'll be done for the day.

THE COURT: Yeah, that's fine.

MS. M. MILLER: Could you highlight the top portion. Thank you so much.

BY MS. M. MILLER: (CONTINUING)

Q. And could you tell the members of the jury, sir, what are we seeing right here?

A. What we're seeing is this is a statement from Community Bank and Trust from Walker Agricola, LLC in Neosho, Missouri.

Q. Okay. Do you recall, sir, did the signature card indicate what type of business Walker Agricola, LLC was?

A. I don't recall that.

Q. Okay. And, again, do we see that address in Neosho, Missouri?

A. Yes.

MS. M. MILLER: And could you please now, Ms. Miller, go to the transactions part of this page.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. Sir, and could you tell the members of the jury what we're seeing here?

A. We're seeing a bunch of transactions as it relates to the account.

MS. M. MILLER: Okay. Now, let's go to the next page, and can you highlight that page, please, just the transactions.

BY MS. M. MILLER: (CONTINUING)

Q. And, again, what are we seeing here, sir?

A. What we're seeing is that the transfer of funds from Hansen Northern Helicopters is being received by the Walker Agricola bank account. As reflected here in the very -- in the very top in this area here of the bank statement, we see the $2.5 million being received about December 15th, 2016. Again we see another wire transfer of funds being received in December 16th, 2016, of $2.5 million, and it's identifying Hansen Northern Helicopters. And then we see another wire transfer of $2.5 million again for December 19th, 2016 from Hansen Northern Helicopters.

Q. Okay. So the transactions that we talked about in Counts 109 and 110, we're seeing go into the actual account of Walker Agricola; is that correct?

A. Yes. This reflects that they received the money -- Mr. Walker received the money.

Q. Do you see expenses going out of this account for various businesses here in Guam?

A. Yes.

Q. Both on this page and the prior page?

A. Well, some appears to be in Guam and then some

appears to be in Neosho, Missouri.

Q. Okay.

MS. M. MILLER: And, Ms. Miller, let's go to page 3. Okay. And let's go to the summary of the account, please, if you can highlight that.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. So what are we seeing here, sir, in terms of the starting and ending balance of this account?

A. (No response.)

Q. Let me ask you the question a different way, because this account is kind of set up differently. What are the total credits into this account for this month?

A. $7,508,887.82.

Q. What are the total debits, meaning money, going out of the account for that particular month?

A. $16,867.58.

Q. Okay.

MS. M. MILLER: Your Honor, at this time, we will stop. I just have wrap-up questions for tomorrow. So --

THE COURT: Okay, very well.

MS. M. MILLER: -- we'll be done tomorrow morning.

THE COURT: All right. You'll be done with this witness tomorrow morning?

MS. M. MILLER: Yes, Your Honor.

THE COURT: And defense has an opportunity to call -- to cross-examination the witness and you'll have your next witness ready to go.

Ladies and gentlemen of the jury, first of all, the Court will thank you again for coming back and being faithful to staying healthy, as I've indicated earlier, and also staying faithful to fulfilling your civic duty. It's very important, as I've indicated to both the prosecution and defense, that we have our jurors intact. And all of you, every one of you who are here today are very important to the -- this success of this process towards completion.

So, as I indicated, the prosecution has two more witnesses. We're hoping to get done by this week so that you can all start deliberating and, you know, complete this case.

The Court will keep the schedule as-is as we've already discussed.

I would admonish you to continue to keep an open mind. Do not form or express any opinion on this case until it's submitted to you. Do not speak to anyone on any subject connected with this trial.

I hope you have a safe evening. And also if you don't feel good, make sure you don't come in. Let us know. I mean, you know, COVID is still, you know -- and its variants are still around Guam, but I think the good thing is a lot of us are immunized and taken -- having taken our booster shots.

             So the Court, as I've indicated, because the governor has said that masks are optional except for in healthcare facilities, I think it may be even in the schools, I'm not sure, but in healthcare facilities for sure, the Court will keep that, will follow that particular executive order. And my general order will allow jurors, if they wish to put on their masks they can. If they don't, they don't have to.

We'll continue to provide you lunch and snacks. And, again, thank you for your patience and your attention.

Please rise for the jury. See you tomorrow morning. Start again on time 8:15.

(Jury out at 5:03 p.m.)

THE COURT: Agent Khamvongsa, I'll see you tomorrow.

THE WITNESS: Thank you so much.

THE COURT: I'll see you tomorrow. Focus on getting your limiting instruction that you were going to talk about.

MS. M. MILLER: Yes, Your Honor. Thank you.

THE COURT: Thank you.

(Proceedings concluded at 5:03 p.m.)

* * *

04:02PM 04:02PM 04:02PM 04:02PM 04:02PM 04:02PM 04:02PM 04:02PM 04:02PM 04:02PM 04:03PM 04:03PM 04:03PM 04:03PM 04:03PM 04:03PM 04:03PM 04:03PM 04:03PM 04:03PM 04:03PM 04:03PM

August 16, 2022; 8:13 a.m.; Hagatna, Guam

* * *

(In Chambers.)

THE COURT: Let's go on the record. Who's present first of all? Your client, Mr. Walker is present. Mr. McConwell, Ms. McConwell, Mr. Martin, Mr. Han. Okay yes, Mr. Martin?

MR. MARTIN: Yesterday afternoon, when I first found out about it, and I didn't have a chance to look at it because we were in Court, a website has been created June 27th.

MS. MCCONWELL: July 27th.

MR. MARTIN: July 27th, just recently. And it looks like a legitimate website and it is, for lack of a better word, a website designed to ensure we get convicted and go out of business because it's -- we have it here, Laura's actually got it.

MS. MCCONWELL: It's Hansen-Helicopters.

THE COURT: Why don't we put it on my big screen, send it to me JFTG --

MS. MCCONWELL: Hold on a second.

THE COURT: I'll give it to you. Is it Kandit News?

MS. MCCONWELL: No, it is not.

THE COURT: Ed Han, is it Kandit News?

04:03PM 04:03PM 08:13AM 08:13AM 08:13AM 08:13AM 08:14AM 08:14AM 08:14AM 08:14AM 08:14AM 08:14AM 08:14AM 08:14AM 08:14AM 08:14AM 08:14AM 08:14AM 08:14AM 08:14AM 08:14AM 08:14AM 08:14AM 08:14AM 08:14AM

MS. MCCONWELL: It's not.

MR. MARTIN: Every link goes to our case, it acts like it's an aviation website and what is it called, Pomposity?

MS. MCCONWELL: Pomposity.

THE COURT: Is that a word?

MS. MCCONWELL: I don't know. I haven't looked it up.

THE COURT: Pomposity.

MR. MARTIN: Maybe that's what it is.

MS. MCCONWELL: What e-mail?

THE COURT: Jftg@gud.uscourts.gov.

MS. MCCONWELL: Let's see if I can -- I'm going do this. Copy.

THE COURT: You think it's from the prosecution?

MR. MARTIN: No, Judge, we have no clue. We have no clue.

THE COURT: Why aren't we calling the prosecution in then?

MR. MARTIN: Well, we don't know. We wanted to address you first with it.

THE COURT: Okay. And then decide?

MR. MARTIN: Just -- we're not accusing anybody of anything. We're not certainly not accusing anybody because we don't know.

          THE COURT: Okay. How did you guys find the website?

MR. MARTIN: Our -- one of our clients -- one of our clients...

MS. MCCONWELL: Well, actually we found it... we found it because our client's girlfriend had -- was aware that hansen-helicopter.com, a website was created but that's all that we knew. And yesterday, we get e-mails while we're in court and we find out that there have been contacts and e-mails to Hansen Helicopters employees, and they've sent now e-mails to --

MR. MARTIN: Boat companies.

MS. MCCONWELL: All of the boats and the only way they could have gotten the information is from the exhibits in this trial.

THE COURT: Okay, did you send it?

MS. MCCONWELL: I did. It should be in your inbox.

THE COURT: Okay. I don't have it yet.

MS. MCCONWELL: I may have gone to junk.

THE COURT: Let me go to junk.

MS. MCCONWELL: If she just tells you the URL, you could type it in.

THE COURT: What was that?

MS. MCCONWELL: Hansen-helicopters.com and go to

the website and we'll just type it in.

THE COURT: Okay.

(Pause. )

MS. MCCONWELL: Then at the top, in the top one, just do H-A-N-S-E-N.

THE COURT: We don't need to go to Google?

MS. MCCONWELL: You don't even need to go to Google. You just type it in.

THE COURT: You want to do it?

(Pause. )

THE COURT: My law clerk. Emily do it. Okay, hold on. While you're doing that.

(Pause. )

THE COURT: Okay. Is this is it?

MR. MARTIN: That's it.

MS. MCCONWELL: And it has like an employment record from Phillip Kapp in the Pacific Spotters -- from the Philippines on it. It has a letter that this appears -- from an organization that's Aeronavigator Advocacy Association which can be found nowhere and it's definitely not in Keizer, Oregon, which is one of the links in this page. It directs people to contact Mike Boler --

MR. MARTIN: The FAA.

MS. MCCONWELL: -- who is the FAA Special Assessment team -- investigation team who had been -- you know

on the list for a witness.

MR. MARTIN: There is a docket link on there, Judge, that was just filed.

THE COURT: Wow, so somebody is watching this trial.

MS. MCCONWELL: It all -- it went live on July 27th is what we discovered. It's hosted by somebody in Arizona, but if you go in here, it links to -- it links to -- basically prosecution filings, it references the prosecution.

MR. MARTIN: Every link is to us. Although --

MS. MCCONWELL: FAA inspector took "Hookers and money", Phillip Kapp. Pomposity vs. Reality.

THE COURT: Pomposity?

MS. MCCONWELL: Okay. Pomposity.

MR. MARTIN: You can call me Mr. Pomposity now.

THE COURT: All right.

MS. MCCONWELL: So if you scroll, it talks about Mr. Martin's opening but then it goes, but then the reality.

THE COURT: Wow. So somebody is really watching this. You know what also too, we could find out -- but it's not that everybody will be identified on the Zoom -- you know how we -- it's open to the public?

MS. MCCONWELL: Well, what I wondered about getting the document, because it would have to go into PACER to get the documents.

THE COURT: Yeah. They can get it as long as it's not sealed. Are these sealed documents? 08:19AM 08:19AM

MS. MCCONWELL: Well, no, this is the problem, they have the ability to get -- if they get into the -- the exhibits aren't all redacted and so we don't know how they've been able to contact all of our employees, how they've been -- and now they've contacted all of our boats.

MR. MARTIN: All the boats.

MS. MCCONWELL: All the tuna boats.

MR. MARTIN: Have been notified.

MS. MCCONWELL: All of the e-mails that are on some of those documents, all those people now have been -- an e-mail -- this e-mail which is -- and I don't know, I don't remember where I found or got -- went to this one which is the Aeronavigator's Advocacy Association link that is --

THE COURT: All right. So I guess where it says identifying link between Hansen Helicopters and Pacific Spotters--Aeronavigators media release. I don't know if you can see that Emily. That's...

Let's get -- we can -- what was that you wanted -- oh --

MS. MCCONWELL: Well, no, I wanted you to see this just because this then has just a lot salacious things in it.

THE COURT: What do you want us to look at?

MS. MCCONWELL: Let me show Emily what the thing was.

LAW CLERK: This photograph, this is and exhibit right? That's not docketed, Judge.

MS. MCCONWELL: There are a bunch of exhibit pictures in here.

MR. MARTIN: Some of them may have been in the media.

MS. MCCONWELL: Well those aren't docketed though.

MR. MARTIN: Oh.

THE COURT: Is that like over at the -- is that at the... is that at National Guard?

MR. MARTIN: No, that's one of the government exhibits, Judge. The one at National Guard are --

THE COURT: Okay.

MS. MCCONWELL: So if you scroll down, that's where it's directing, it talks about a class action and directing people to contact Mike Boler.

THE COURT: But there is no class action suit, is there?

MR. MARTIN: No. But it's -- it's --

THE COURT: Or there is somebody --

MR. MARTIN: It's a solicitation for --

THE COURT: This is former and current helicopter

staff.

MS. MCCONWELL: This is what it says but we don't know this -- but it's not.

THE COURT: Okay. Aeronavigator Advocacy Association.

MR. MARTIN: There is no such group as that.

MS. MCCONWELL: That purports to be the secretary of this organization, we can't find him. And we can't find him and the organization on Page 4.

THE COURT: So the docket, that's the CMECF docket number right here that are recited?

MS. MCCONWELL: Yes.

THE COURT: I think we should call in the prosecutors then. And just say that, you know, this is here and see if they know anything about it.

MS. MCCONWELL: And one of them they have referenced the motion that the prosecutor just filed, 1629, which is about the alter egos.

MR. MCCONWELL: That was the exhibit yesterday right there.

THE COURT: Okay. All right. Well, let's call in the prosecutors. And Emily, you want to call them in. Then we'll just... you can call them in.

MR. MCCONWELL: Actually, that's not the same one, that's --

MR. MARTIN: Right. It's an extract from a filing and that's 1120 --

MR. MCCONWELL: The filing yesterday had the boat number on it too.

(Prosecutors now present.)

MS. M. MILLER: Good morning, Your Honor.

THE COURT: The defense Counsels have asked -- come on in, you guys can be seated for a second. So for the record, Marie Miller, Stephanie Miller and Mr. Leon Guerrero are all present -- so they just came in a few minutes ago to speak to me first as they weren't sure, I said, well, let's see if we should call the prosecutors and we all agreed that we with should. So I will leave -- you want -- who wants to speak? They found something that they wanted to bring to our attention.

MS. M. MILLER: Sure.

THE COURT: Go ahead. Whoever wants to speak.

MR. MARTIN: There is a website that was created, we believe, July 27th, that is purporting to be some type of aviation news website, you find it by going to *Hansen hash[sic] Helicopter*.

THE COURT: And here it is.

MR. MARTIN: Yeah, there it is.

THE COURT: I asked him to put it on the big screen.

MS. MCCONWELL: It's Hansen-Helicopters.

MR. MARTIN: And every link is something negative about our case from the defense side. And it is -- and it's requesting people get together for a class action lawsuit. There are --

MS. MCCONWELL: That they contact Mike Boler.

MR. MARTIN: And there are links to documents, like 1629, it says latest Court filings, and it's got all kinds of Court filings in there. It's got comments about my opening statement and it's got -- all kinds of -- nothing bad about you-all. And I'm not suggesting anyone had anything to do with it. We don't know what it is. We are very concerned. Boat companies have been contacted. This has been forwarded to --

MS. MCCONWELL: Employees -- and that's how we found out about it.

MR. MARTIN: And we found out about it last night. Had a chance to look at it last night and thought it should be brought to the Court's attention. And I'm very concerned that -- and if the jurors have any access to it or have access to it or find out about it, it puts us in a very difficult situation as far as the validity of any verdicts in this case, Your Honor. And so that's why we came to you because we just found out about it. But it is -- I don't know how to find out -- I don't have the technology --

technological savvy to find out who posted it, how it was done, who's behind it. But it's very concerning to us. Particularly, at this point in the game.

MS. M. MILLER: So Your Honor, one of the questions I would have is, is there anything on this site that is not in the public domain or part of the public record as a result of this trial? Because if there is not --

MR. MARTIN: There is.

MS. M. MILLER: I mean we've had to -- I personally have had to deal with bad press in this case when Mr. Lujan filed his motion against me and made the comments he made against me and my picture was in a news article and negative things were said and, you know, I mean that's what happens. So what is in here that's not part of the public record?

MR. MARTIN: No disrespect to you, but you're not on trial. Jon is on trial.

MS. M. MILLER: No, but my question is, what in here is not --

MR. MARTIN: I haven't had a chance to look at everything but I will tell you there are things in there, there are things, just like what you said, negative things about you, negative things about Jon, there is misrepresentations of the trial testimony in here that I've seen. I haven't seen it all.

MS. MCCONWELL: Well, there are things that are -- I mean whoever is doing this, is actively watching the trial but there are things about some of the exhibits --

MR. MARTIN: There is a Turner Kapp document.

MS. MCCONWELL: -- which have not been filed, which aren't there as part of the public -- in the public domain or the public record. And these links are being sent to...I guess the world. I mean --

THE COURT: By who, do we know?

MR. MARTIN: That's --

MS. MCCONWELL: We don't know who's doing it. We don't know who is behind it.

MR. MCCONWELL: E-mails have gone out.

MS. M. MILLER: From who though?

MS. MCCONWELL: From a newsletter at hansen-helicopters.com. I don't know.

MS. M. MILLER: So Your Honor, obviously we're not hearing that anything confidential has been put out there that could negatively influence or unfairly influence. There is not much we could do, you know, other than a gag order to prevent there from being publications. Mr. Martin said, initially, there's nothing about you-all there that is negative, then he said well there is something about you in there, Ms. Miller, that is negative. I have no idea --

THE COURT: No, I think -- I'm not going -- well,

first of all, I'm not going to issue a gag order.

MS. M. MILLER: I don't think you can't.

THE COURT: I have to look specifically --

MS. M. MILLER: Right, right.

THE COURT: -- justify that.

MS. M. MILLER: Right, right.

THE COURT: But what I think we can do --

MS. M. MILLER: Ask the jurors if they've seen it.

THE COURT: I'll just do my regular questions, about any media contact and so forth. I have that question. And that they're to tell me immediately, and if they say nothing, then that's fine, we just leave it at that. But in the meantime, you guys can investigate this, look at it carefully both sides.

MS. M. MILLER: Absolutely.

THE COURT: But I don't want to be looking for something myself. I don't -- you know, unless there is something that you show me right now that is egregious, like something sealed has now been published, that would concern me.

MR. MARTIN: Well, let's say -- for example, Judge, we know that we've been advised -- I don't want to say now, we have been advised that this has been forwarded to various boat companies that have contracts with Mr. Walker.

THE COURT: Oh, currently?

MR. MARTIN: Currently, by e-mails. And the only way they could have -- we believe the only way they could have gotten those e-mails would be off of exhibits that have been published in Court, because that's the only place I know that they there are unless they're in a court filing.

MS. MCCONWELL: Which I don't believe they are.

MR. MARTIN: This is an extensive website. I haven't looked at all of it.

THE COURT: Well, how many employees are currently working for Hansen Helicopters?

MR. MARTIN: Well, however many -- however many helicopters there are.

MS. MCCONWELL: I don't know because we have W-2 and then there'd be potentially 1099.

THE COURT: Okay, so what, 10, 20, 100? I mean it could be an inside job too, somebody is disgruntled.

MR. MARTIN: I'm not saying that it isn't, Your Honor, I'm just saying we found it, it was a concern.

THE COURT: Yeah, of course.

MR. MARTIN: We wanted to bring to your attention first.

THE COURT: Totally understand.

MR. MARTIN: And then get the prosecution involved. We'd like for it be stopped. It's, you know,

08:29AM 08:29AM 08:30AM 08:30AM 08:30AM 08:30AM 08:30AM 08:30AM 08:30AM 08:30AM 08:30AM 08:30AM 08:30AM 08:30AM 08:30AM 08:30AM 08:30AM 08:30AM 08:30AM 08:30AM 08:30AM 08:30AM 08:30AM 08:30AM 08:30AM

totally inappropriate and there is nothing in there --

MS. MCCONWELL: He didn't mean there was anything in there negative about you, Marie.

MR. MARTIN: No.

THE COURT: This is my point, I think you guys have got to do your due diligence and investigate it, file a motion. If you want me to issue an order, just file it and I'll look at it, both parties can -- I don't want, of course understanding amendment laws.

MR. MARTIN: The problem is, who do we issue an order against?

THE COURT: I don't know, because I don't even know what the issue is, so you guys have to tell me what the problem is. You're upset because -- and rightly so, because this is coming out. But the question is, what is the real issue for me to act upon? So unless and until you tell me what it is, I can't do anything. But I will out of abundance of caution just talk to the jurors, not alert them to anything. I'll just say, hey, just wanted to go back to my long instruction about making sure that you decide this case solely on the evidence before you.

MR. MARTIN: My concern, Judge, and the reason I brought it to your attention, not to blame anyone but my concern is, make sure that this doesn't impact the validity of any verdict in this case and I don't want to have to come back

at a later date. I want to try to be proactive on it and that's why I brought it to everybody's attention.

THE COURT: No, so I appreciate that. I think we're fine, but you have to investigate it. You have to look at it carefully and see if there is any violation. And if there is anything that the Court has the authority to do, I'll look at that. Okay?

MS. M. MILLER: Yes.

MR. MARTIN: Sure.

THE COURT: Yeah, so you guys just have to do your due diligence, both sides. I think both sides because prosecution should find out if there is anybody doing anything to sabotage your own case. I have no idea. This is like a whole... looks like somebody is really definitely looking at this case.

MR. MARTIN: I mean --

THE COURT: It's a whole website for this.

MR. MARTIN: It looks like it's some type of an aviation -- if you go to the very top, it looks like it's some type of an aviation industry update and that's --

THE COURT: I don't know anything about the aviation world but is that -- is that --

MR. MARTIN: That is not -- apparently that is not a --

THE COURT: Standard? Commonly known?

MR. MARTIN: It doesn't exist.

THE COURT: Oh, okay.

MS. MCCONWELL: The Aeronavigator doesn't exist either.

MR. MARTIN: It's just something somebody made up.

MS. MCCONWELL: Aeronavigator Advocacy Association doesn't exist.

THE COURT: Oh, Aeronavigator media release, whoever that is. Yeah, and we could always look at -- I mean you could always ask to look at who's zooming in on the trial. We have a list -- I could -- I could tell ask Chuck. You guys can look at my listing. I have an idea like who -- but that doesn't mean that they're telling the truth either.

MR. MARTIN: Anybody could put down Bill Smith and watch.

THE COURT: If they're trying to be deceptive, they're --

MS. MCCONWELL: Could we find out who accesses our case on PACER or gets documents?

THE COURT: We could check. Is that public record?

MS. MCCONWELL: I have no idea. I highly doubt it. We don't run PACER out of here, you know it's like --

THE COURT: It's run out of DC. I don't even

know if it's out of DC but it's administrative office. It's a good question. We could find out. I can look but... but, okay, so let me call -- we'll call the jurors in and how much time do you need with your next --

MS. M. MILLER: It'll probably be a half hour.

THE COURT: Okay. Let's do it.

MS. M. MILLER: And Your Honor, before we go in, one thing that I will ask, just to allow this to go much more smoothly so that we can finish this week, when there is an objection, I would like, first of all, the privilege of being able to finish my question, then if Counsel will say objection, and state the legal basis only of the objection, that will then give me an opportunity to respond to the legal basis only of the objection. But if Counsel stands up and starts with a long-speaking objection, then I'm put in a position of having to respond. And one example that I think really stands out to me is a comment made by Mr. Martin that Jon Walker did not produce Exhibit 829 to the government. And that wasn't true, because 829 was in fact an attachment to an ECF that was signed by Mr. Martin on behalf of Jon Walker. So once he makes that comment in the presence of the jury and the jury hears that comment, he's attacking my credibility as an officer of the Court. When I ask the question, a document that the defendant themselves provided to the government and to the Court that we should be able to rely on if it was

08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:34AM 08:35AM 08:35AM 08:35AM 08:35AM 08:35AM 08:35AM 08:35AM

provided by them as an officer of the Court.

But then to not allow me to respond to correct it, or more importantly, not be able to establish that what Mr. Martin said was absolutely not correct or true, creates a problem for the prosecution. So I think to avoid this and it's on both sides, when they do their cross-examination, I will object. I will state the legal basis for my objection and I will stop and then they could respond and Your Honor can rule.

THE COURT: I agree it is for both sides, but I will say this that when you guys start saying, well, it was a filed documents, sometimes I don't know if I struck any part of it. So we have to go back and look at it, you know. I mean, it takes a while. There's lots and lots of document filed here, so I don't want to sit there and get into a investigation into all this. That's why I say, okay, I don't need to hear that, let's move on. And that's why I may cut you off. But I do agree that, you know, you could -- Counsel could say, well, it has been previously provided or it hasn't been and you could say it's previously provided in other filed documents. You could say that. But we don't have to get into like -- because the jurors are like what, what are they talking about?

MR. MARTIN: Your Honor, I want the record to reflect the document she's talking about was attached to an

e-mail to Rufus Crowe.

MS. M. MILLER: No.

MR. MARTIN: Just because I attached it, if I did, I don't remember attaching it, to a pleading in our case, doesn't mean Mr. Walker produced it. And I take issue with her representing I did something, when if Mr. Crowe does something or Mr. Lujan does something on his behalf, that doesn't mean Jon Walker.

THE COURT: Okay. So rather than get into the intricacies and the complexities of that situation, because he says he's got his defense, you say you got -- because I don't want to sit there and investigate this. This is like a side issue for me. You know, it's just a distraction. And so you may be right, you may be wrong. I don't know. Because I don't want to sit here and rule on that.

But my point is, I agree, let the person make their objection and then if you feel -- if you feel there is an objection, you could stand up, so I could tell the witness don't answer. And usually, sometimes the witnesses want to answer, just slip it in or sometimes if I say just don't answer, let's listen to the question, then let me hear the objection. Let's do it that way.

MS. M. MILLER: And also, Your Honor, Ms. McConwell continually objects on the basis of form. Form is not a valid legal objection to a question in a criminal

trial. If she needs to object, is it relevance? Is it leading, is it speculation? Form is an objection that's made in a civil deposition to preserve a ruling at a later date, but it is an inappropriate legal basis. And if the Ninth Circuit looks at this, that objection means nothing. So it needs to be an objection based on one of the rules of the federal rules of evidence that say, you can't lead, unless it's foundational, hearsay, relevance; that kind of thing.

MR. MARTIN: Your Honor, I'll object for whatever basis I feel. If I feel like I'll need to object on behalf of my client and if it I think it's form, I'm going do it in spite of the lecture.

THE COURT: Okay. Let me say, all right, I don't necessarily disagree with Ms. Martin -- I mean Ms. Miller, but let's just say, if they want to make on objection on form, let them do it. And I'll just -- if they want to preserve it, that's fine.

MS. M. MILLER: But here's the problem --

THE COURT: Whether it's appropriate or not --

MS. M. MILLER: How do I respond to an objection based on form?

THE COURT: But basically, her only -- those objections were like, look, it really doesn't apply to me and my client, it doesn't apply to Hansen Helicopters, but I just want to place on the record that -- she's concerned about --

like a concern I thought was legitimate was the redaction of private materials of third-party custodian.

MS. M. MILLER: And we have no objection to that but that is not a form objection.

THE COURT: Okay. So however -- however it's stated, I got it. Sometimes a judge could say, okay, it may not have been stated the way it should be, but I got it.

MS. M. MILLER: But it is the parties' responsibility to preserve the record for their client. And if they don't know how, that's their problem, No. 1. No. 2 -- No. 2, we know we have preserved the issue of alter ego -- excuse me, if you don't want me talking over you, you have to give me the same privilege.

THE COURT: Okay. You guys, we have to hurry up because the jurors have been waiting. Let's go.

MS. M. MILLER: No. 2, she's already stated these counts aren't against my client a thousand times. The jury knows that. You'll instruct them. However, if it's not against her client and you've asked -- been asked and you've given that instruction over and over again, she shouldn't be objecting. She shouldn't be objecting anyway because she's not going to do the cross-examination, Mr. McConwell is. But you've given them that privilege, fine, no problem.

THE COURT: I'll give it to both you guys --

MS. M. MILLER: But she should not be objecting

if the counts do not apply to her client, which they don't. However, here's the other issue that's come up in this case which is very unusual: We have a witness, his role in this case is the conspiracy to commit wire fraud, we all know or should know that underlying a wire fraud is another fraud, a criminal violation that underlies the transfer of money from one place to another. We have alleged repeatedly in our superseding indictment and in all of our argument that Hansen Helicopters is a key actor here. So we're just -- we're creating a very muddy record with objections that are not valid and -- anyway, so my whole point is this, Your Honor, let me finish a question, there is an objection.

THE COURT: Well, I think it goes to both.

MS. M. MILLER: Both sides.

THE COURT: I will say I agree with that. Now on her -- you want to speak on your behalf, Ms. McConwell?

MS. MCCONWELL: Well, I didn't make one form objection yesterday.

MS. M. MILLER: You did, but that's in the record.

MS. MCCONWELL: I don't recall saying I object to the form of the question in any of my objections, but --

THE COURT: Okay. Well, putting that aside --

MS. MCCONWELL: I said foundation plenty of times, and so I hear what your comment is and I hear what your

concern is, but we have a duty to represent our client.

MS. M. MILLER: No doubt.

MS. MCCONWELL: And you interjected Hansen Helicopters repeatedly to counts we're not involved in so...

THE COURT: Yeah, you guys, just focus on your own objections and let's focus on civility in the courtroom. I think that's what counts. And we will get this trial done with.

MR. MARTIN: So we --

MS. M. MILLER: This week?

MR. MARTIN: Could we ask you-all advise your witness that if he sees us stand up, to avoid answering the question so that we don't have to -- he gets in a hurry.

MS. M. MILLER: Well, I think part of it is just his personality.

MR. MARTIN: Could you ask him?

MS. M. MILLER: There are also times, Mack, when you stand up and you don't object and you change your mind and sit down. I'm not going to tell my witness to stop talking every time you stand up. If you have an objection, let me finish my question. First of all, I have to be able to finish my question.

THE COURT: I think that goes to all of you.

MS. M. MILLER: -- hear my question then stand up and say objection, as opposed to --

MR. MARTIN: Marie, I'm asking can you ask your witness, if he sees me stand, to not answer until --

THE COURT: You know what, I will tell the witness that. It's probably better it comes from the Judge.

MR. MARTIN: Fine.

THE COURT: But, yeah, I mean it's not that he's that guilty all the time but he does get a little excitable.

MS. M. MILLER: It's his personality. And he's also focusing on me, he's looking at the jury. And like I said, there have been moments when both of them have stood up and then they changed their mind and they sit down, and I -- we want to get this case tried and we want to get moving.

THE COURT: Team, we're almost there.

MS. M. MILLER: Let's go in and do it.

THE COURT: We don't want any issues.

MS. M. MILLER: No.

THE COURT: We don't want COVID.

MS. M. MILLER: Lord no.

THE COURT: Lord no, please.

MS. M. MILLER: Lord no.

THE COURT: We don't want any what's that, not deviant. It's not deviant.

MS. MCCONWELL: Variant.

THE COURT: Variant. Not deviant.

MS. M. MILLER: Oh, COVID variant.

THE COURT: We don't need another variant.

MS. M. MILLER: Or Monkey Pox. I don't know what Monkey Pox even is.

MR. MCCONWELL: You don't want to go to the definitions.

THE COURT: I was on a trip with my child -- my grandchild and they thought he might have Monkey Pox but he didn't have it.

MS. M. MILLER: I don't even know what it is.

MS. MCCONWELL: Google it. So I do have one question -- from Hansen Helicopters, I mean we want the phone numbers, e-mails and then I think we're taking care of the bank records redacted, because the only way this stuff gets out there is because of what's in -- what exhibits that have been -- in this trial.

THE COURT: Let me say this, because we don't know who's doing this, we don't know how they're getting this information, but to the extent that you want me to do something, you guys tell me what needs to be done, what you find, so put it in a motion.

MS. MCCONWELL: Okay, I will do that.

THE COURT: Just do that. In the meantime, I will check about if it's public record about CM/ECF which I doubt, but who knows, but it is public accessible. And then we'll take it from there. To the extent that if you want to

have access to who Zooms in every day?

MS. MCCONWELL: I didn't even know if Zoom was supposed to be recorded.

THE COURT: It's not recorded.

MS. MCCONWELL: But someone who watches it may record it.

THE COURT: They're not supposed to.

MS. M. MILLER: How can the Judge control that?

THE COURT: They're not supposed to record it and republish it, that's the thing. That's against the federal stuff. But you know what, who knows what people do. They do whatever the hell they want.

MR. MCCONWELL: Even on PACER, I don't think you can reproduce it and use it like that.

THE COURT: I don't know. I have to ask my IT guys, do you know? Could they record -- they can't record?

(Discussion with law clerk.)

THE COURT: They could screenshot it, who knows. I don't know, but we'll work with you.

MR. MARTIN: We don't have where this is -- who sets this up, where it's coming from, the IP address; things like that.

THE COURT: Let me just say, to the extent that there needs to be an investigation, you got to put it in a motion and if I have to ask FBI or whoever or even my own IT

people, I'll do that.

But just put it in writing because I can't speak -- just speak out of nowhere.

MR. MCCONWELL: Given Mr. Boler's involvement with SEIT and manager involved in this case.

THE COURT: Who is this?

MR. MCCONWELL: Mike Boler. He was supposed to be a witness, him and Dymock were supposed to be witnesses for SEIT.

THE COURT: Okay.

MR. MCCONWELL: Given their reference in e-mails, say e-mail them, that caused me some serious concern because I have some opinions about the SEIT team and practices in general, but that opens up a lot of -- terrible questions.

THE COURT: But you guys can all have your own theories and your own suspicions --

MS. M. MILLER: Right.

THE COURT: Yeah, it's okay, it's understandable. You guys have been living and breathing this case, but the question is what evidence you have, if you have it, send it to me and I'll act on it. Okay, we'll call the jury in.

MS. M. MILLER: Thank you, Your Honor.

(Off the record at 8:46 a.m.)

(Back on the record at 8:52 a.m.)

THE CLERK: Good morning, Your Honor. This is

08:45AM 08:45AM 08:45AM 08:46AM 08:46AM 08:46AM 08:46AM 08:46AM 08:46AM 08:46AM 08:46AM 08:46AM 08:46AM 08:46AM 08:46AM 08:46AM 08:46AM 08:46AM 08:46AM 08:46AM 08:46AM 08:46AM 08:46AM 08:46AM 09:11AM

Criminal Case No. -- I'm sorry, one moment.

(Feedback.)

THE CLERK: Criminal Case No. 18-00010, *United States of America v. John D. Walker* and Hansen Helicopters; Jury Trial, Day 29.

Counsel, please state your appearances, beginning with the government.

MR. LEON GUERRERO: *Buenas* and *hafa adai*, Your Honor, Stephen Leon Guerrero on behalf of the United States. Also present are Special Assistant U.S. Attorneys Marie Miller and Samantha Miller for the government.

MS. M. MILLER: *Hafa adai*, Your Honor.

MS. S. MILLER: Hi.

MR. MARTIN: Morning, Your Honor, Mack Martin appearing with Jon Walker who's also present.

THE COURT: Good morning, Mr. Walker and Mr. Martin.

MR. MCCONWELL: Good morning, Your Honor, Edward McConwell, Laura McConwell and Edward Han for Hansen Helicopters. Is my mic working okay?

THE COURT: What's that?

MR. MCCONWELL: Is my mic going to work okay?

THE COURT: Oh, yes, you sound very nice. And then Mr. Han, yes. Good morning, everyone. Okay. So we just had a slight delay. We had to take care of a legal matter

which we'll continue a little later and we'll go ahead and call in the jurors at this time.

And, Ms. Miller, how much time do you have with this witness?

MS. M. MILLER: Half an hour, Your Honor.

THE COURT: Half an hour. Anything further? Yes, Mr. Martin?

MR. MARTIN: Your Honor, were you going to instruct the witness about objections?

THE COURT: Oh, right. So, yeah, so I'm going to instruct you as well as all other witnesses, if the defense Counsels stand up, that means they're getting ready with an objection so just don't answer until I tell you it's okay.

THE WITNESS: Yes, ma'am. Yes, Your Honor.

THE COURT: Because the prosecution needs to hear -- well she needs to -- well in this case, the prosecutor needs to state the question, then the defense need to formulate the objection. Then -- and then I need to rule on it, then I could just tell what to answer.

THE WITNESS: My apologies. I was so focused on the jury, I didn't see it so...

THE COURT: Don't worry about it. We'll follow protocol here. Okay, we'll call in the jury.

(Jury in at 9:13 a.m.)

THE COURT: Please be seated. *Hafa adai*. Good

morning, everyone. How are we doing, ladies and gentlemen? All right. I apologize for the delay, I had to work on some legal issues with the lawyers and we just completed it and it was important enough that I'm sorry I had to delay the trial for a little bit, but we are ready to proceed. The United States Attorney, Ms. Miller, has indicated that she has about 30 minutes left in direct examination of this witness. You may proceed.

MS. M. MILLER: Thank you, Your Honor.

THE COURT: Okay.

BY MS. M. MILLER: (CONTINUING)

Q. Mr. Khamvongsa, Special Agent Khamvongsa, I apologize, and good morning, members of the jury. Thank you for your patience. Could you tell the members of the jury, do all the transactions that we discussed yesterday, both in the crime fraud -- crime -- I'm sorry, wire fraud counts and the money laundering counts, do they all exceed $10,000?

A. Yes.

Q. And do they all involve the movement of money interstate or internationally?

THE WITNESS: Yes.

BY MS. M. MILLER: (CONTINUING)

Q. Could you tell the members of the jury what was the source of all of the funds for the counts in the Second Superseding Indictment regarding wire fraud and money

09:13AM 09:13AM 09:13AM 09:13AM 09:13AM 09:13AM 09:13AM 09:13AM 09:13AM 09:13AM 09:13AM 09:14AM 09:14AM 09:14AM 09:14AM 09:14AM 09:14AM 09:14AM 09:14AM 09:14AM 09:14AM 09:14AM 09:14AM 09:14AM 09:14AM

laundering?

A. Leasing of the helicopters and pilots and mechanics.

Q. I'd like to show you and the jury two exhibits that were entered into evidence yesterday, one is Exhibit 750. And the other is Exhibit 31. And to refresh your memory, Exhibit 750 is a letter that Jon Walker sent to the FAA in 2020 and Exhibit 31 is the Walker Agricola bank account. May I publish a portion of those two exhibits to the jury, Your Honor?

THE COURT: Right, that's fine. Counsels, have you been able to pull that? And then are there any objections to that?

MS. M. MILLER: They're both entered.

THE COURT: Oh, they're both entered?

MS. M. MILLER: Yes, Your Honor.

THE COURT: Go ahead and publish then. Thank you.

MS. M. MILLER: Okay.

BY MS. M. MILLER: (CONTINUING)

Q. So, Special Agent Khamvongsa, could you tell the members of the jury what do you see about the addresses used both for the Walker Agricola bank account that the $7.5 million was moved into, and the address that was included in the letter that Jon Walker sent to the FAA?

A. They both reflect 3561 Route C, Neosho, Missouri,

64850. The same address.

Q. Thank you, sir. Now, can you tell the members of the jury who issued all of the airworthiness certificates for every single aircraft that was involved in the wire fraud and money laundering counts?

A. Mr. Cislo.

Q. Where did the funds for the airplane that he received come from?

A. The Caledonian agency Inc., bank account.

Q. Who's the president of that business?

A. Mr. Jon Walker.

Q. Who's the signer of that account for that business?

A. Mr. Jon Walker.

Q. Okay. I'd like to show you what has been previously entered into evidence as Exhibit 366.

THE COURT: Admitted as well?

MS. M. MILLER: It has been admitted, Your Honor.

MS. MCCONWELL: I only have that certain pages are admitted, I don't that the whole exhibit is admitted.

MS. M. MILLER: And I have that the whole thing has been admitted, Your Honor.

THE COURT: All right. 366 in total.

MS. M. MILLER: You don't though --

THE COURT: Hold on, hold on.

MS. M. MILLER: So we'll lay the foundation.

THE COURT: All right. Hold on, hold on. Let's find out. Carmen, what do we have? 366, has that been admitted?

THE CLERK: I have pages only 2, 37 and 38, Your Honor.

THE COURT: 237 and 238 are the only --

THE CLERK: No, 2.

THE COURT: Oh, 37 and 38?

THE CLERK: Yes.

THE COURT: You want to check that, Ms. Miller?

MS. M. MILLER: So what I will do, Your Honor, is lay the foundation for the admission of the rest of the documents.

THE COURT: Very well.

MS. M. MILLER: It could be that what we were doing when it was first admitted was just covering those pages.

THE COURT: And you want all --

MS. M. MILLER: All of it, yes, and we've already laid the foundation, but if I need to lay it again, I can.

THE COURT: Go ahead.

MS. M. MILLER: Okay.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, could you tell the members of the jury what is this document?

A. (No response. )

MS. MCCONWELL: I -- Your Honor, I don't know that that's the proper way to lay the foundation just to say, okay, what's the document? I mean I think she needs to lay the foundation with the admission of the rest pages she's interested in without having him talk about the document.

THE COURT: Okay. Overruled. Go ahead. He's not going to -- you can't talk about what it is, just do you recognize it. Okay. Go ahead.

MS. M. MILLER: Thank you, Your Honor.

BY MS. M. MILLER: (CONTINUING)

Q. Could you please tell the members of the jury what is this document, sir?

A. This is an e-mail.

Q. Okay. And the attachments to the e-mail?

A. Yes.

Q. Okay. And could you tell the members of the jury how the government obtained this document?

A. This was obtained from the search warrant in October 2016.

Q. And is it a true and correct copy of what was obtained via the search warrant?

A. Yes.

MS. M. MILLER: Your Honor, at this time the government would move into evidence the remainder of

09:17AM 09:17AM 09:17AM 09:17AM 09:17AM 09:17AM 09:17AM 09:17AM 09:17AM 09:17AM 09:17AM 09:17AM 09:17AM 09:17AM 09:17AM 09:17AM 09:17AM 09:18AM 09:18AM 09:18AM 09:18AM 09:18AM 09:18AM 09:18AM 09:18AM

Exhibit 366.

THE COURT: All right. So for the record, what is the remainder? Can you tell me what that is?

MS. M. MILLER: Yes, Your Honor, it is an e-mail with attachments from Rufus Crowe at Hansen Helicopters.

THE COURT: Right.

MS. M. MILLER: To Tom Ferruzzo. And it's dated October 5, 2016 and the attachments include Hansen Helicopter's information including aircraft information --

THE COURT: Okay. I just need to know the numbers, what is it?

MS. M. MILLER: Oh, yeah, so the pages are actually Page 1 through -- give me one second, Your Honor.

MS. MCCONWELL: A 102 pages.

MS. M. MILLER: I'm going to be using Pages 1 through 98. It's a 102 pages.

THE COURT: But you only need 1 through 98?

MS. M. MILLER: Yes.

THE COURT: All right. So prosecution is moving only Pages 1 through 98 but there have been two other pages that have already been previously admitted. So no objections, Counsels?

MR. MARTIN: May I approach a minute and talk to prosecution, Your Honor?

THE COURT: Yes, you may.

(Pause. )

MR. MARTIN: No objection, Your Honor.

THE COURT: Ms. McConwell?

MS. MCCONWELL: (No response.)

THE COURT: Bring your mic a little closer, please, to your -- yeah. Okay. There you go. Go ahead. Yes?

MS. MCCONWELL: Your Honor, I would ask that any sensitive information be redacted from the pages that are going to be admitted.

THE COURT: Okay.

MS. MCCONWELL: Based on our conversation yesterday. And with that, I'm assuming it is only admitted to Mr. Walker, and not to Hansen Helicopters.

THE COURT: Very well. The Court then will admit this exhibit, No. 366, Pages 1 through 98, without objection. And with this proviso that any sensitive third-party information be redacted and it's specifically as to Mr. Walker.

(Exhibit 366-1 through 98 admitted.)

MR. MCCONWELL: Very well.

THE COURT: You may proceed.

MS. M. MILLER: May I publish Page 1, Your Honor?

THE COURT: You may.

MS. M. MILLER: And, Ms. Miller, could you please

hone in on that first top portion?

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, who is this e-mail from?

A. It's from Mr. Crowe.

Q. And his e-mail address?

A. Rufus@hansenhelicopters.com.

Q. And who is it to?

A. Mr. Ferruzzo.

Q. Okay. And what is the date?

THE WITNESS: The date is October 5th, 2016.

BY MS. M. MILLER: (CONTINUING)

Q. And there is a reference to attachments?

A. Yes, several attachments.

Q. Okay. And we're going go through those attachments. First, can you please tell the jury, did you see other evidence in this case that explained the purpose of this communication?

A. Yes.

Q. What was it?

A. It was another e-mail, this is in response -- all this information is in response to requests as it relates to purchase of Hansen Helicopters.

Q. Okay. Was Hansen at this point trying to sell the company?

A. Yes.

MS. MCCONWELL: Your Honor, this calls for speculation.

MS. M. MILLER: Your Honor, it doesn't call --

THE COURT: Wait just a minute. The objection is speculation?

MR. MARTIN: The -- he's testified as to his interpretation of an e-mail, Your Honor. And our objection is speculation.

MS. M. MILLER: Your Honor --

THE COURT: Okay. Wait, wait. Are there any other objections?

MR. MARTIN: No, Your Honor.

THE COURT: Ms. McConwell?

MS. MCCONWELL: (Shook head.) No.

THE COURT: Okay. Yes?

MS. M. MILLER: Yes, Your Honor, it's not speculation. What he referenced is there other evidence that has already been introduced that shows that this e-mail is in response to another e-mail requesting information about purchasing Hansen. If we need to go back --

THE COURT: I'm sorry?

MS. M. MILLER: -- to that other document, we can.

THE COURT: I think you need to do that. Objection will be sustained. And the objection will be

sustained and the jurors are to disregard the last question, last answer. But if you need to go back, go back and do it that way.

MS. M. MILLER: We will.

MS. MCCONWELL: And the colloquy which we discussed which we weren't going to be doing.

THE COURT: I'm sorry? Which one?

MS. MCCONWELL: I thought we all had an agreement we weren't going to be make long speaking objections and responses.

THE COURT: Okay.

MS. M. MILLER: Well, Your Honor, that was not a long speaking objection. I'm trying to --

THE COURT: Right now it's long enough. Hey, let's go. Move on. I already made my ruling. Let's go by the rules, team.

MS. M. MILLER: Yup.

THE COURT: Wow. I came back on Saturday, Sunday night from a long trip to Washington, D.C. and I came in Monday morning, I feel like I never left you. I should be jet lagged.

MS. M. MILLER: You're not though.

THE COURT: I know. I feel like I should be but go ahead.

MS. M. MILLER: It's easier not to be coming

here. It's harder when you go stateside.

BY MS. M. MILLER: (CONTINUING)

Q. So we're going to look at Exhibit 425, Your Honor, which has already been entered into evidence. And Special Agent Khamvongsa, could you please tell the members of the jury, what do you see here in terms of who this e-mail is from?

A. It's from Mr. Ferruzzo.

Q. And is that the same gentleman we just saw on the e-mail on Exhibit 366?

A. Yes.

Q. And who is it to?

A. It's to Mr. Crowe.

Q. And who is copied on this e-mail?

A. Mr. Walker and Mr. Ferruzzo and a Ms. Aragon.

Q. And subject?

A. Subject is Hansen Helicopters.

MS. M. MILLER: Okay. And Ms. Miller, can you hone in on the request there. And, Special Agent Khamvongsa, can you tell the members of the jury is this the communication that you were referencing when you were describing what Exhibit 366 was responding to?

THE WITNESS: Yes.

MS. M. MILLER: So, Ms. Miller, can we go back to Exhibit 366 now. Thank you.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. Now we're back at Exhibit 366, let's start looking at the attachments.

MS. M. MILLER: First, Ms. Miller, can you go to Page 2 of Exhibit 366?

BY MS. M. MILLER: (CONTINUING)

Q. And, Special Agent Khamvongsa, can you please tell the members of the jury what we're seeing on Page 2?

A. We're seeing the corporate structure for the corporations listed on the documents, similar to 829.

Q. Okay.

A. Exhibit 829.

MS. M. MILLER: And then could you please go to Page 3, Ms. Miller. Just Page 3 for now.

MS. S. MILLER: Sorry.

MS. M. MILLER: No, it's okay. Perfect. And, Ms. Miller, is there a way to highlight all of it except for the white board on the bottom? Yup, perfect.

BY MS. M. MILLER: (CONTINUING)

Q. And could you tell the members of the jury what we're seeing here that was attached to the e-mail from Mr. Crowe to Mr. Ferruzzo?

A. This is the fleet of helicopters owned and controlled by Hansen Helicopters.

Q. Okay. Now can we -- and by the way, this list of

09:25AM 09:25AM 09:25AM 09:25AM 09:25AM 09:25AM 09:25AM 09:25AM 09:25AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM

helicopters, does this include the helicopter that was included in your evaluation for the wire fraud and the money laundering?

A. Yes.

Q. Okay. Now, could we please go to Page 4 and, yes, if can you highlight just the top of that. Wonderful. Could you tell the members of the jury what you're looking at here?

A. This is proof that the helicopters are registered with the FAA.

Q. Okay. And from Page 4 through Page 33, do we see the same thing?

A. Yes, four U.S.-registered helicopters.

Q. Okay. And this is information going from Rufus at Hansen Helicopters to Mr. Ferruzzo; correct?

A. Yes.

MS. M. MILLER: Okay. Now let's go through these pages, Ms. Miller, if you don't mind, to Page 34.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. And then what do we see here on Page 34?

A. This is proof that they have -- Hansen Helicopters had aircraft registered in New Zealand.

MS. MCCONWELL: Your Honor, I object to the use of the word "proof." The question is, What do we have here? He's trying to make up an ultimate conclusion.

THE COURT: Okay. Yeah, maybe he's getting

conclusion. All right. Sustained. You want to rephrase that?

BY MS. M. MILLER: (CONTINUING)

Q. So what is this document, sir?

A. This is a registration with New Zealand for helicopter ZKHIA.

Q. And, again, let's remind the jury, all of these documents are being sent to Mr. Ferruzzo by Hansen Helicopters through Rufus Crowe; correct?

THE WITNESS: That's correct.

MR. MARTIN: That's a leading question, I object. "Let's remind the jury" and then -- I mean --

THE COURT: All right. Objection will be sustained. Rephrase, please, Counsel.

BY MS. M. MILLER: (CONTINUING)

Q. So when you look at that communication we saw, that e-mail between Mr. Ferruzzo asking Mr. Crowe, copying Jon Walker on that request, can you tell the members of the jury what was Mr. Ferruzzo requesting?

A. Mr. Ferruzzo was requesting additional documents as pertains to Hansen Helicopters, its fleets. And this was provided in response to that.

Q. Okay. And now let's look at Page 35 and tell the members of the jury what we're seeing on Page 35.

A. This is a New Zealand aircraft registration for ZKHMF

and it identifies Jon Darrell Walker.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. Now let's look at Page 36. And tell the members of the jury what we're seeing on Page 36.

A. This is the certificate of registration with the Philippine government for another helicopter with the ID number of U.S. -- or the registration number RPC588.

Q. Okay. Now let's look at Page 37. And what are we seeing here on Page 37?

A. 37 lists all the leases that Hansen Helicopters had.

Q. Okay. And across the top we can see it says Hansen Helicopters Inc.,; correct?

A. That's correct.

Q. Okay. And total number of helicopters, that were being represented available?

A. 46.

Q. And the current rate, I'm sorry, Ms. Miller, what was the current rate per month for the helicopters as shown on this document?

A. They were either $37,500 or $40,000 a month.

Q. And what's represented on top current rate of helicopters per year?

A. Current rate of helicopter rental is $480,000 per annum.

Q. Okay. Per helicopter?

A. Per helicopter.

Q. Okay. Now let's look at Page 38 oh, sorry, thank you, Ms. Miller. Line 61 on Page 37, what is the yearly contract revenue that is being represented in this document?

A. $21,450,000.

Q. And is that consistent, sir, with the other documentation that you've reviewed in this case?

A. Yes.

Q. Okay. Now let's look at Page 38, please. And can you tell the members of the jury what we're seeing on Page 38?

A. This involves the director and shareholder relationship with the 31 companies identified on the left.

Q. And are those what we've heard in this case as the Vanuatu companies?

A. Yes.

Q. Okay. And then let's look at Page 43 and starting on Page 43 and going all the way through Page 98. Can you tell the members of the jury what's contained here?

MS. M. MILLER: Ms. Miller, can you stay on 43 for one second, then we'll go through. Thank you.

BY MS. M. MILLER: (CONTINUING)

Q. Can you tell the members of the jury what we're seeing on Pages 43 through 98?

A. This is Wilma's Flight Services Inc., accounts receivable agent summary as of June 30th, 2016, and it

identifies all the tuna boats and the accounts receivable.

Q. Okay. And when is an account receivable?

A. It's essentially money still owed by the tuna boat company.

MS. M. MILLER: Okay. And now, Ms. Miller, if you can continue down to the pages. So 43, 44, and 45 is all the Wilma's Flight Services account receivables?

A. Yes.

Q. Okay. And then 46 is just blank 47 blank. Let's go to Page 53, I think that's the next time we see any substantive information. And by the way, the blanks in these markings that we see on these pages, was this exactly the way we received the information or downloaded it from the defendant's computers?

A. Yes.

Q. Okay. Now on Page 53, what are we seeing here?

A. This is financial information for Caledonian Agency Inc.

MS. M. MILLER: Okay. Ms. Miller, can you highlight the top portion, please.

BY MS. M. MILLER: (CONTINUING)

Q. What is a balance sheet?

A. The balance sheet identifies the assets and liabilities in owner's equity within a company.

Q. Okay. And this is for what time period?

09:32AM 09:32AM 09:32AM 09:32AM 09:32AM 09:32AM 09:32AM 09:32AM 09:32AM 09:32AM 09:32AM 09:32AM 09:32AM 09:32AM 09:32AM 09:32AM 09:32AM 09:32AM 09:32AM 09:32AM 09:32AM 09:33AM 09:33AM 09:33AM 09:33AM

A. As of December 31, 2013.
Q. Okay. And if we continue on beyond Page 53, Pages 54, that's also part of the balance sheet, sir?
THE WITNESS: Yes.
BY MS. M. MILLER: (CONTINUING)
Q. And then Page 55? And I believe Page 56 is the last page of the balance sheet for Caledonian Agency; is that correct?
A. Yes.
MS. M. MILLER: Okay, now Ms. Miller, if can you go to Page 63.
BY MS. M. MILLER: (CONTINUING)
Q. And can you tell the members of the jury what we're seeing here on Page 63?
A. This is Caledonian Agency Inc's., profit and loss statement from January through December 2013.
Q. What is a profit and loss statement?
A. It identifies the revenue and -- coming into the business as well as the expenses as it relates to that business.
MS. M. MILLER: Okay, Ms. Miller, if you can now go to Pages 71 and 72.
BY MS. M. MILLER: (CONTINUING)
Q. What are we seeing here on Page 71?
A. This is Caledonian Insurance Company Limited balance

sheet as of December 31st, 2015.

Q. And 72? Is that just a continuation?

A. It appears that way, yes.

MS. M. MILLER: Okay, now, Ms. Miller, can you go to Page 79.

BY MS. M. MILLER: (CONTINUING)

Q. Can you tell the members of the jury what we're seeing here?

A. This is Caledonian Insurance Company Limited profit and loss statement for January through December 2013.

Q. Okay. And now could we go to Pages 87 and 89 -- through 89. Let's start with 87. If you could hone in on the top of that would be great. And what is this that we are seeing here, sir?

A. This is Wilma's Flight Service Inc., balance sheet as of December 31st, 2013.

Q. Okay. And that continues on to the next page; is that correct?

A. Yes.

MS. M. MILLER: Okay. Now, Ms. Miller, can you please -- and actually, it goes through Page 89. And then Ms. Miller, can you go to Page 97. And can you hone in on the very top of that page.

BY MS. M. MILLER: (CONTINUING)

Q. And what are we seeing on Page 97?

A. This is Hansen Helicopters profit and loss January through December 2015.

Q. Okay. And when you look at the income, combined income for the year 2015, what are we seeing there?

A. $23,167,598.96.

Q. Is that consistent with some of the other information you've seen about how much money these companies were bringing in?

A. Yes.

Q. Okay. Now could you tell the members of the jury of the companies whose financial record we just reviewed, Wilma's, Caledonian's and Hansen Helicopters, where are those companies incorporated?

A. The U.S.

Q. Okay. And which of those companies is shown as receiving all of the income from the tuna boat leases?

A. On this document, it's Wilma's Flight Services receives 18 -- over $18 million from the tuna boats.

Q. And what about this particular document, Hansen Helicopters profit and loss statement?

A. That also comes from either lease or rent income.

Q. Okay. Now can you also tell the members of the jury what else did you review in addition to the documentation that was seized and subpoenaed that you've already discussed to validate information that you presented to the jury about the

total amount of this fraud.

THE WITNESS: Well, I also --

MR. MARTIN: Your Honor, I object, the total amount of this fraud, he can talk about his investigation. That's a improper question --

THE COURT: All right. The Court will sustain the objection and rephrase the question, Counsel.

MS. M. MILLER: Okay, Your Honor.

BY MS. M. MILLER: (CONTINUING)

Q. What else did you review that supported your testimony and information about the total amount of the funds that were received by Hansen and all these other companies for leasing these tuna boats, leasing these helicopters?

A. I reviewed the QuickBooks records, I reviewed the bank records, I reviewed also of the billing schedule which all corroborates the $20 million that I discussed earlier, which equaled the 400 million covered in the timeframe of 2000 to present.

Q. Did you also review tax records?

A. Yes, I also reviewed tax returns as it relates to Hansen Helicopters and Jon Walker.

Q. When you look at what we just saw in terms of income reported on Hansen Helicopters profit and loss statement for 2015, what is the difference, if any, between what's shown here and what is in the tax records of Hansen Helicopters?

A. Less than 20% of the money reflected here, the 23 million, is recorded on the Hansen Helicopters tax return, corporate tax return.

Q. What did Jon Walker do in 2018 --

MS. M. MILLER: Oh, thank you, sorry. Before we get off this document, can you please hone in, Ms. Miller, on the upper left-hand corner of the document. Thank you.

BY MS. M. MILLER: (CONTINUING)

Q. And, Special Agent Khamvongsa, and if you can, yeah, I keep saying highlight. Thank you. Can you please tell the members of the jury what is shown on Line 1?

A. Jon D. Walker Group Companies.

Q. Okay. Now, what did Jon Walker do in 2018 after he was indicted?

A. All the accounts that the government knew about were closed out and businesses -- business was opened up in the Philippines.

Q. Under what name?

A. Pacific.Spotters Corporation.

Q. And did you also review bank records for Pacific.Spotters Corporation?

A. I did.

Q. And could you tell the members of the jury which bank had those records?

A. I reviewed two bank accounts, there was a Philippine

bank account with Coconut Planters Bank and then there was also another bank account here in Guam with Community First Guam Federal Credit Union for Limey Air Services.

Q. Okay. And has the jury seen some of these bank records already?

A. Yes.

MS. M. MILLER: Okay. So, Your Honor, I would like to show, Special Agent Khamvongsa, Exhibit 2939 but pages that have not been admitted into evidence yet which are Pages 82 and 83 of that Exhibit, 2939.

MR. MARTIN: Your Honor, if we could.

THE COURT: Yup.

MR. MARTIN: I'd ask that the jury be excused, we had extensive, very extensive discussion on these documents.

THE COURT: Okay, hold on. Okay, let me just get the Exhibit No. 2939.

MS. M. MILLER: Yes, Your Honor, Pages 82 and 83.

THE COURT: All right. All right. Ladies and gentlemen, let's take a 15-minute recess. Keep an open mind and we'll see you shortly. Please rise for the jury.

(Jury out at 9:40 a.m.)

THE COURT: All right. Please be seated. We're outside the presence of the jury. And, yes, Agent?

THE WITNESS: I'm sorry, thank you.

THE COURT: Why don't you step out. We'll call

you when we're ready. So let's -- page -- pull up the page, let's just pull up the page that we're looking at. Exhibit 2939, Page 82 and 83 that's already on. So what's the offer of proof, what do you -- why do you want to bring that --

MS. M. MILLER: Your Honor, if you recall previously, we tried to bring this in, Mr. Martin asked for the Court to hold off on ruling on it because he wanted to see the grand jury subpoena that was issued to the bank in order to receive these records. We gave him a copy of that subpoena and that was all we've heard about the issue until now.

MR. MARTIN: Your Honor.

MS. M. MILLER: So --

THE COURT: All right. That's it?

MR. MARTIN: Your Honor, we -- that was not my objection. I asked the grand jury subpoena and I did get the grand jury subpoena.

THE COURT: Right.

MR. MARTIN: The objection was, Pacific Spotters which is the whole scope of this, as you'll recall when Samantha Miller was doing this, we had a huge argument about -- Pacific Spotters is nowhere in this indictment. We argued notice and the Court sustained the objection that the -- we're here to defend what's in this indictment.

THE COURT: Yeah.

         MR. MARTIN: Pacific Spotters is nowhere in there. And that's what these two pages of this Exhibit deal with. I believe it's wire transfers into the Limey bank account relating to Pacific Spotters which is not in the indictment. And we objected to it on that basis.

MS. M. MILLER: And Your Honor --

THE COURT: Okay. Wait, wait hold on. Hold on just a minute.

Okay. So you're saying Pacific Spotters is nowhere in this the Second Superseding Indictment?

MR. MARTIN: Correct.

THE COURT: All right.

MR. MARTIN: And we argued, Your Honor, if the Court will recall that we didn't get notice that they were going to going into this Pacific Spotters information. And unless I'm mistaken, Your Honor, and I could be but I think you sustained our objection based upon that, we asked them to provide us the subpoena which we got. I believe it was -- while we were in recess, Your Honor. I had received that subpoena now.

THE COURT: Okay, wait. Hold on. Let me just look at my notes on this issue. Everybody give me a second because I can't listen to two people at one time. Let me just look at my notes here. Okay, so -- all right. This is something we've been working on, me -- I've been working on.

So this is government's theory of relevance here requires a finding that Pacific Spotters is an alter ego of Walker or Hansen Helicopters.

And just on my preliminary review, Counsels, it's not clear to the Court whether or not Pacific Spotters Corp. and specific -- or Pacific Spotters Corp. are the same entity, this evidence indicates that Mr. Marinho received his paychecks from Pacific Spotters Corporation despite the fact that he testified that he believed he was employed by Defendant Hansen Helicopters or Alpha Air, which is an alleged alter ego of Defendant Hansen Helicopters. And Defendant -- that's G-1061. Defendant's Walker, Crowe and Kapp were appointed officers when Pacific Spotters Corp. was incorporated, G-3003 Page 25, and although these circumstances could indicate the unity of interest of alter egos, it does not appear to the Court that there is sufficient evidence pertinent to Pacific Spotters Corp. or -- and/or Pacific Spotters Corp. for a jury to reasonably find that it is an alter ego of either defendant. Should other evidence be presented that pertains specifically to Pacific Spotters Corp. and/or Pacific -- Pacific.Spotters Corp., the government may move for a finding under Rule 104(b) at the that time.

MS. M. MILLER: And, so Your Honor, my offer of proof --

THE COURT: This is the time?

MS. M. MILLER: This is the time.

THE COURT: Okay, hold on. This is the time, right? Hold on.

MS. M. MILLER: Yes.

THE COURT: So what -- so let me just hear now how this is the time?

MS. M. MILLER: This is the time, Your Honor, because first of all, this particular document and particularly, these two pages show that the lease income started coming into this account. Additionally, we have the leases that the bank required Pacific Spotters to provide it to prove that the income coming into the accounts was legitimate because there was a concern. In addition to that, we have proof that the helicopters that are the subject of those leases are the exact helicopters that were being owned and operated by Jon Walker and all of these companies that you see here in 829 and it is all the same thing, all the same company.

And, Your Honor, we have representations that have been made by not only Mr. Walker, but by Mr. Crowe and Mr. Kapp, that Pacific Spotters Corporation was in fact part of their Hansen Helicopters affiliates. I would refer the Court to the ECF filings of both Mr. Crowe and Mr. Kapp and if you need the specific numbers we can get those for you, where they actually represent to the Court repeatedly their need to

09:45AM 09:45AM 09:45AM 09:45AM 09:45AM 09:46AM 09:46AM 09:46AM 09:46AM 09:46AM 09:46AM 09:46AM 09:46AM 09:46AM 09:46AM 09:46AM 09:46AM 09:46AM 09:46AM 09:46AM 09:46AM 09:47AM 09:47AM 09:47AM 09:47AM

go to the Philippines because Pacific Spotters Corporation is in fact part of their corporate entity and that they are operating out of the Philippines.

We also have, Your Honor, which was an Exhibit that the defense introduced, Mr. McConwell specifically, D4-124, which was a list of helicopters that Mr. McConwell represented to the Court and I have the transcript of the representation, that those helicopters were being registered in the Philippines to be used in the Philippines, in current leases. There is no other person who is tied to Pacific Spotters than Jon Walker and the other named co-defendants and as I've indicated, Your Honor, we have the evidence to show that the leases are covering the same helicopters.

Two of the leases, even have U.S.-registration numbers on them despite the fact that Jon Walker in 2020 deregistered those helicopters with the FAA, as you just saw that came into evidence. His letter that he sent to the FAA from his location in Missouri, saying I am the owner and controller of all of these helicopters I want to deregister them. Well, guess what? They're still using all of them in the Philippines. They just changed the name of the company to Pacific Spotters Corporation. Plus we have the testimony of Mr. Marinho who was paid through Pacific Spotters Corporation, plus we introduced in 3003, the pages of the bank records where Jon Walker actually flew to the Philippines, as did

Rufus Crowe, as did Turner Kapp, to open up that account, to establish that account, and to set up that account and all of those leases were submitted to that bank to prove that that's where the money was coming from. There is no distinction.

THE COURT: Okay. So, yes? Mr. Martin, go ahead.

MR. MARTIN: Your Honor, if you'll recall on June 8th, we had this very same argument, the flights where you were asked -- you actually asked, did these flights lineup with when these signatures were made on these bank statements, they didn't. You asked the government to establish that for you, they didn't. And I would point out, Your Honor, this is -- we got an updated exhibit list from the government on Friday. This exhibit is not on that list. And I mean I hate to gripe about that but we've got all these exhibits we're trying to prepare for.

I remember this just because of what happened last time, that these exhibits, the times that they're talking about, flying to sign these bank statements, didn't lineup, the things didn't lineup. The Pacific Spotters is nowhere in this indictment, isn't named. I would be more prepared had I known had it been on their exhibit list that they were going to try to do this again, I would be a little more prepared. But, Your Honor, this is not relevant to the pending indictment and they're going way beyond where we are, and I

object to it.

THE COURT: Okay. And Ms. McConwell?

MS. MCCONWELL: Well, I mean we probably spent an hour and a half or two hours talking about this on June 8th and the Court -- the Court did not allow -- I mean she overruled -- she sustained our objection on the admission and so... I would ask that we move on, that you sustained. They're essentially trying to take a shot at your ruling with the same witness, because we were on Agent Khamvongsa when we -- they were attempting to get these two pages in.

THE COURT: All right. You may reply.

MS. M. MILLER: Yes, Your Honor. Two things.

THE COURT: Go ahead.

MS. M. MILLER: First of all, this idea that they didn't have notice is just not correct because we actually identified this exhibit as something that we wanted to use, with Special Agent Khamvongsa months before he first started testifying.

Second of all, all of the prior pages of this exhibit were admitted by this Court except for the last two pages because the objection was they just didn't look like documents that the bank would produce pursuant to a grand jury subpoena. I'm sure you remember that whole argument.

And, therefore, we produced the grand jury subpoena to the defendants and they never said a word about it

after that. They never said we still have an objection, we still don't think it's legitimate. You heard the testimony of Special Agent Khamvongsa at that time who said, "I received these documents from the bank as is, I made no changes to them or anything." Additionally, for Counsel to say they have no notice is false, but I would refer the Court to several additional ECF filings.

First of all, Your Honor, your order in ECF 1387, the defendants had already moved to dismiss or strike references to the shell companies that the government contended were used in this fraud. And Your Honor, in that order on Page 3 starting at Line 4, you stated, "The Court further finds that evidence that the shell corporations were passed through companies is relevant to whether the transactions of the corporations can be imputed to defendants." And in this situation, Jon Walker, who actually flew out to the Philippines after he was indicted, opened up those accounts, you just heard yesterday the testimony of Special Agent Khamvongsa who said that Jon Walker removed all of that money from the accounts that the government was aware of, and from the corporate names that the government was aware of to move it into Pacific Spotters Corporation, which we introduced the deposit of those funds in Exhibit 3003.

Mr. Martin is saying we can't tie up the amount of money that came in from the leases to the use of Pacific

Spotters, absolutely we can. These two pages show the hundreds of thousands of dollars of income that started going into Pacific Spotters for these leases after the Defendants were indicted. Again, I refer the Court to the ECF filings of Mr. Crowe and Mr. Turner Kapp who signed declarations that their lawyers filed with this Court saying that they had to go to the Philippines because Pacific Spotters Corporation was an integral part of the Hansen Helicopters operations.

The defendants admitted it. There is no contrary evidence. There is no evidence that there was any other person who controlled, operated or did anything related to Pacific Spotters other than Jon Walker and these Defendants. Additionally, Your Honor, you also granted the government's motion to allow us to bring in evidence the Defendants were still violating the law today.

If you look at ECF 1521, you said that, that evidence is relevant because we were able to show the Court that despite the fact Jon Walker deregistered all of these N-numbered helicopter in 2020, his employees are still flying around using N-registered helicopters. As a matter of fact, we have evidence, Your Honor, that after the indictment, there are two more accidents involving a U.S.-registered helicopter and a helicopter that was registered in New Zealand. That evidence has already come into court. And those accidents, Your Honor, involved helicopters that were supposedly

de-registered from those two registrations. But they were operating under leases with Pacific Spotters Corporation.

MS. MCCONWELL: Your Honor, this exhibit, the first --

THE COURT: Okay, which exhibit?

MS. MCCONWELL: The one -- this Exhibit 2139, I'm going to bring us back to what -- is our issue is at hand and what Ms. Miller today is trying to redo what Ms. Miller did on June 8th with regard to 2939, 82 to 83. The Pages 2 -- or Page 1 was admitted with Agent Prozik on 5/11 of '22, and I believe that's the signature card for this account.

On the 31st of May, Counsel agreed... Hansen Helicopters had an objection to this and so it was not admitted as to Hansen Helicopters on either of those, but on May 31st, there was -- the two through -- Pages 2 goes through 81 were admitted because that's what the government represented is all that they wanted to have admitted.

So then they come in on June 8th and we have at least, I think we talked for probably two hours on 82 and 83, and Ms. Samantha Miller did pull out all the records because excepts of that Exhibit 3003, which by the way, is an additional exhibit which wasn't on their third amended list but several pages were admitted but they could not match up any of the air travel with the dates that were on the documents. She was purporting that they had travelled and

then these documents had been signed; none of that lined up or matched. It appeared to be, this was some type of also a summary chart. Agent Khamvongsa represented that this was some special activity chart that the bank provided, that just happened to keep, which is what -- which is what precipitated Mr. Martin's request to see what the subpoena was that was issued to the bank on what records were going to be admitted.

But -- and so after we went through all of that, the Court still denied admission for Pages 81 -- 82 and 83 and I would submit that this is -- the government's, just another attempt to replough the ground we've already done with the government and already sustained the objection to admission.

THE COURT: All right, let me just say, okay, so this is the Court's ruling: The Court will say that at this point, unless the prosecutor can tie a contract to Hansen Helicopters or to one of the Vanuatu companies on G-829 and activity in this Pacific.Spotters account by citing to me specific exhibit numbers, not ECF numbers, I'll look at that. We can look at that. But otherwise, the objection will be sustained. So why don't you -- let me give you guys 15 minutes and then give -- and then pull the ECF -- I'm sorry, cite me the specific exhibit numbers.

MS. M. MILLER: Yes, Your Honor.

THE COURT: And then make sure you give that to defense Counsel.

09:57AM 09:57AM 09:57AM 09:57AM 09:57AM 09:57AM 09:57AM 09:57AM 09:57AM 09:57AM 09:57AM 09:58AM 09:58AM 09:58AM 09:58AM 09:58AM 09:58AM 09:58AM 09:58AM 09:58AM 09:58AM 09:58AM 09:58AM 09:58AM 09:58AM

MS. M. MILLER: Yes, Your Honor.

THE COURT: We'll review it. I'm not saying I'm going to rule in your favor, but I'm just saying that I don't see the tie in yet.

MS. M. MILLER: Yes, Your Honor.

MS. MCCONWELL: And I'm also -- I just want to make it real clear that the government did give us their exhibits that they were going to use with Mr. Khamvongsa and they gave us a list on August 2nd, they also gave us a list on August 12th and their renewed effort to attempt to get these two pages into evidence did not appear -- that Exhibit 2939 did not appear on that exhibit list that they gave us of the exhibits that they were going to use.

MS. M. MILLER: And that is because it appeared on the list that they were provided before Special Agent Khamvongsa testified the first time, Your Honor. So what we're going to do -- because this is a critical issue --

THE COURT: Well, it's a critical issue for both of you.

MS. M. MILLER: This is a critical issue --

THE COURT: So this is my point -- Okay, we'll come back to that objection. Noted, okay. But in the meantime, I'll give you guys 15 minutes to come back with the exhibit numbers and we'll look at it.

MS. M. MILLER: Yup.

THE COURT: All right. Unless you want to go ahead and finish this guy with other questions or?

MS. M. MILLER: No, because I literally have --

THE COURT: This is it?

MS. M. MILLER: -- a handful of questions. So we have to definitely resolve this issue with him.

THE COURT: All right. 15 minutes is enough time?

MS. M. MILLER: Yes. Absolutely.

THE COURT: Okay, 15-minutes recess. Go ahead and then get back to me.

MR. MARTIN: Okay.

THE COURT: So just make sure give them -- give them -- Ms. Marie Miller, give the defense Counsel the exhibit numbers that you're relying and then give me the exhibit numbers. Give it to Carmen, then I'll review it. Thank you, Counsels.

MS. M. MILLER: Thank you, Your Honor.

THE COURT: All right.

(Recess taken at 10:00 a.m.)

(Back on the record at 11:11 a.m.)

THE COURT: Okay. So we're back on the record. All counsels present, Defendants are present. So let me just say this: I think this is the best way to proceed with this. I was scrambling with my law clerk, going through all of the

exhibit numbers, the ECF numbers, we're going -- my chamber desk trying to figure out what the argument might be, I think it's more prudent instead of rushing it, because -- and having everybody argue back and forth on this exhibit, this exhibit, so forth, I think it's better that the prosecutor just write out, it's easier to say, okay, these are the exhibit numbers, this is the specific page on this exhibit number and this is my argument why Pacific Spotters dot -- Pacific.Spotters, Pacific Spotters, whatever.

MS. M. MILLER: Yes.

THE COURT: Is an alter ego of Hansen.

MS. M. MILLER: Yes.

THE COURT: I think it's easier that way because then the defense will have an opportunity to be able to respond and so they can make their objection. So if their objection is, well, we didn't have notice or whatever it might be or, you know, anyway, they can just make their objections, and I think it will just be cleaner because --

MS. M. MILLER: Yes.

THE COURT: Believe me, we were rushing through all of these -- as we were -- as we got the list , we were going through them really quickly, pulling up ECF, pulling up the exhibits, going -- studying it really fast and so forth. Carmen would come in every 20 minutes or so or 15 minutes, you know, and add stuff. So we were doing it but I just think

it's just cleaner. And so I'm going to ask the prosecutors to go back.

MS. M. MILLER: Yes, Your Honor, will do.

THE COURT: So there is two options, one, go back and do it today and then we come back tomorrow morning. But the defense -- how long is it going to take you to do this?

MS. M. MILLER: We'll get it done tonight.

THE COURT: I know but the defense Counsel need to be able to review it and respond to it.

MS. M. MILLER: Yes. They already have the exhibit numbers we intend to rely on and I will also, you know, if there is anything else, obviously one thing I didn't put up in the e-mail because that's the exhibit we were talking about is 2939.

THE COURT: Right okay.

MS. M. MILLER: So 2939 is obviously critical exhibit. All of it has gotten in except for the last two pages, that's what they're objecting to. And so that's going to be probably the first thing. The rest of them I already e-mailed Counsel and gave them the ECF for G numbers of the exhibits we intend to rely on and so we can prepare a memorandum, for --

THE COURT: How long will that take you, so I want to give them the defense Counsel sufficient opportunity to review what you've written and they could respond to it,

then I could look at it too before we have arguments on it tomorrow.

MS. M. MILLER: Yes.

THE COURT: By the way, I reviewed a lot of it.

MS. M. MILLER: Yes.

THE COURT: So far, quickly, and I'm a fast reader, so is Emily. So we're going through it, some of them I must say I'm not sure where the theory comes from, some of it may be, and there's plausible argument there, but some of them I don't understand why they submitted this. Could be either I got the wrong number, or you know, I don't know --

MS. M. MILLER: I will.

THE COURT: -- citation.

MS. M. MILLER: It will be easier for me to pull it together for the Court and for Counsel and to lay it all out, because frankly, once I lay it all out, it's going to be extremely clear and we also have admissions made by defense Counsel in a hearing in front of Judge Manibusan.

THE COURT: Well, I've read the bail hearing.

MS. M. MILLER: Yes.

THE COURT: Just a minute.

MS. M. MILLER: Yes.

THE COURT: The Court has read the bail hearings orders by Judge Manibusan.

MS. M. MILLER: Yes.

THE COURT: As it relates to the defendants who want to go to the Philippines. That's what you're talking about?

MS. M. MILLER: Correct, correct. Where Judge Manibusan represented in there, we can get the transcript if we need to, that defense Counsel said that Pacific.Spotters was in fact an affiliate of Hansen Helicopters. So we're going to pull all of that together, because the last thing we want obviously and I'm sure the Court is for there to be any fraud on the Court, there is zero doubt that Pacific.Spotters, once you see all of this pulled together, is in fact just another alter ego of Jon Walker. When you look at the bank records, Limey Air -- Jon Walker --

THE COURT: Let's not get --

MS. M. MILLER: I'll put it all in writing, we'll get it done.

THE COURT: Put it in writing because I think it's fair. It's only fair to the defense Counsel. It's also fair to the Court.

MS. M. MILLER: Yup.

THE COURT: But we have -- all of us have a lot of background on --

MS. M. MILLER: Yes.

THE COURT: And I have reviewed the orders by the Judge for travel.

MS. M. MILLER: Right.

THE COURT: Travel requests.

MS. M. MILLER: We'll tie it all together and we'll do it right after court today, Your Honor, so we could get it filed, if we end Court at 4:00 --

THE COURT: Well, no, no, no, I guess the question is, do you want to continue on or do you want -- here's --

MS. M. MILLER: Yeah, no, so this is what I propose: Let's get Special Agent Khamvongsa back on the witness stand --

THE COURT: And then you're going to go to something else?

MS. M. MILLER: I'll put a pin in main documents.

THE COURT: Okay.

MS. M. MILLER: I'm going to go to the rest -- I'll be done with his direct examination before lunch.

THE COURT: Okay.

MS. M. MILLER: We could do his cross-examination after lunch and we could move on with our case. If the Court rules in favor of the government, then I would ask to be able to bring him back before we close our case. If the Court doesn't, we've moved on and we haven't held up the jury anymore so --

THE COURT: So you want the opportunity to --

you'll send in the stuff tonight then?

MS. M. MILLER: Yes.

THE COURT: Okay. Yes?

MR. MARTIN: Your Honor, I would like them to go do it now, send it to us so we can be prepared to argue it tomorrow. I don't want to have to stay up all night responding to their motion that they get to us tonight and I don't think it's fair to us to have him come back and forth, back and forth. I would just say we go now, give them help however much time they need.

THE COURT: Yeah, how long -- if I let you guys recess now?

MS. M. MILLER: We'll get it done before -- if you let us recess now and we come back from lunch at 12:30, we'll have it filed.

MR. MARTIN: We want an opportunity to respond.

THE COURT: You guys are fast.

MS. M. MILLER: We could do that quick.

MR. MARTIN: If they can get, then that will give us time. I would like us to have the afternoon to finish up and file a response and we could argue it in the morning.

THE COURT: Okay. That's a possibility. Yeah, so there is two options, that's Option 1. Option 2 is option that was proposed by the prosecutor, which you don't want to have?

MR. MARTIN: No, Your Honor. I want to get through with this witness, done. I don't want to have to piecemeal this together. I want to get through with this witness and this is a critical piece of evidence I'd like to have sometime to review what they are arguing. It's very -- it's very important to us we have all --

11:17AM 11:17AM 11:17AM 11:18AM 11:18AM 11:18AM

THE COURT: What's my calendar tomorrow? What is today? Tuesday.

11:18AM 11:18AM

MS. M. MILLER: Do I have anything on Wednesday morning?

11:18AM 11:18AM

(Discussion with clerk.)

11:18AM

THE COURT: Thursday I have something, but don't have compassionate release stuff. So why don't we do this, Counsels, I think that's fair, I think, you know, because there is a lot of exhibits that were just thrown to me and my clerk. So I think it's fair and just be very -- I don't need to tell you that but just make sure that you're focused on what is really truly relevant to your justification.

11:18AM 11:18AM 11:18AM 11:18AM 11:18AM 11:18AM 11:18AM

MS. M. MILLER: Yes, Your Honor.

11:18AM

THE COURT: Because that -- instead -- because I think there was like some stuff I read and I was like, I wonder what -- I don't really get this but maybe I don't know your theory on this.

11:18AM 11:18AM 11:18AM 11:18AM

MS. M. MILLER: We'll tie it altogether, Your Honor. So we will have this done -- we'll get it -- are we

11:18AM 11:18AM

going to just break for the rest of the day?

THE COURT: I'll let jurors eat their lunch. They haven't eaten their lunch yet but they're going to eat lunch in a few minutes.

MS. M. MILLER: And so we will get it filed and served on the defendants by, let's say 1:00 p.m. today, assuming we do that, when can we expect their response so that we can make this argument tomorrow morning at 7:00 a.m. so we can continue on with this?

THE COURT: Counsel, maybe -- if they get it to you by 1:00, which is now two hours from now, less than two hours.

MS. M. MILLER: I say give them two hours to respond. There is all of them. There is only us.

MR. MARTIN: There is only us.

THE COURT: Us, you got a strong us here.

MS. M. MILLER: We do got a strong us.

MR. MARTIN: Judge, if they can get it to us at 1:00, can we have until 4:00?

MS. M. MILLER: That's fine.

THE COURT: That's fine.

MS. M. MILLER: And then we'll see you tomorrow at 7:00?

THE COURT: Yeah, 7:00.

MS. M. MILLER: 7:00, I love 7:00 hearing.

MR. MARTIN: How about 7:30, Judge? 11:19AM

MS. M. MILLER: The way this group goes, I think we need to start at 7:00 so we get this jury in at 8:15 and we go. Because Special Agent Khamvongsa, seriously, whether this is in or out, his direct is going to be over and we could then move on to Mr. Guzzetti and we could still get this done this week, which is, obviously, the government's goal.

THE COURT: Tomorrow is Wednesday. Hold on. I'm looking at my docket here. I don't have anything on my docket so I'm just trying to figure out if I have any other -- sometimes I have meetings. I have to get early in the morning. All right, 7:30. I'll do it. I'll just do it 7:30. I was going to cut the baby in half and do it 7:15 but we'll do it 7:30.

MS. M. MILLER: Okay.

THE COURT: And that will give me staff too enough time -- yeah, are we going to be okay at 7:30 with the marshals letting us in? We're good. Let me find out because marshals -- because that constitutes overtime. Hold on. And we're on continuing resolution with DC. You know how they are, kind of slow on our budget.

(Pause. )

THE COURT: Is 7:30 okay? And if not, then we'll do it at 8:00. Can you -- he's going to verify right now. But okay, so prosecution will turn theirs in at -- did you say

1:00?

MS. M. MILLER: We'll get it filed by 1:00. Can we work in here or do we need to --

THE COURT: No, you can work in here, that's fine. You want to work in here, that's fine. And defense could turn theirs in at 4:00, then we'll look at it and then we'll meet tomorrow morning to decide. So depending on what they say. Please, Counsels, just be very, you know, specific and articulate about your justification and your objections.

MS. M. MILLER: Yes, we will put in to our motion the specific excerpts from the documents, page number, line numbers, if there are line numbers --

THE COURT: Well if, you add that on, so I don't have to look for it, that's even better.

MS. M. MILLER: We're going to do that, Your Honor, so you do not have to look through a bunch of exhibits, we'll just attach and file have pictures of those excerpts with the citations.

THE COURT: That's a good idea.

MS. MCCONWELL: And if there is any confidential information on that, like we've discussed before with bank records or employees, we would like that redacted.

THE COURT: All right. That's fine. I'm pretty sure prosecution will take care of that, Ms. Miller?

MS. M. MILLER: Yes, Your Honor.

THE COURT: All right. And then let's see what the marshals say. They're still checking their budget? They're checking their budget? I know. Because their director is coming out pretty soon. He might -- he's coming out in September, might get in trouble if we don't do this right. 7:30, see you guys at 7:30 a.m.

MS. M. MILLER: Thank you, Your Honor.

THE COURT: Thank you. Take care.

And then, Carmen, just let the jurors know we're going to come back tomorrow morning, come back at... well, we start at 8:15. I'm going to tell the jurors to come back at 9:00.

MS. M. MILLER: Yes, Your Honor.

THE COURT: Because I do not think we'll be done by 8:15.

MR. MARTIN: I agree.

MS. M. MILLER: Yes, Your Honor.

THE COURT: So I'll tell them 9:00, okay. To be here, start at 9:00. So Carmen will let them know. Okay.

(Proceedings concluded at 11:23 a.m. )

* * *

August 17, 2022; 7:32 a.m.; Hagatna, Guam

* * *

THE CLERK: Morning. This is Criminal Case No. 18-00010, *United States of America versus John D. Walker and Hansen Helicopters;* Motion Hearing.

Counsel, please state your appearances, beginning with the government.

MR. LEON GUERRERO: *Buenas* and *hafa adai*, Your Honor. Stephen Leon Guerrero on behalf of United States. Also present are Special Assistant U.S. Attorneys Marie Miller and Samantha Miller.

THE COURT: Oh, okay. *Hafa adai*. *Hafa adai*.

MS. S. MILLER: *Hafa adai*, Your Honor.

THE COURT: Was I calling you Stephanie Miller yesterday, right?

MS. S. MILLER: I don't remember.

THE COURT: I think I did. Sorry about that. I just realized that.

MS. S. MILLER: I get Amanda a lot too.

THE COURT: Sorry. I just realized that. I apologize.

MR. MARTIN: Morning, Your Honor. Mack Martin also present with my client, Jon Walker.

THE COURT: Good morning, Mr. Martin and

Mr. Walker.

It's not turned on.

MR. MCCONWELL: Edward McConwell on behalf of Hansen Helicopters, Laura McConwell and Edward Han.

THE COURT: Okay. Good morning, Mr. Han, Mr. McConwell, Ms. McConwell. We'll make sure it's on. All right. So the Court is in receipt of the prosecutor's offer -- Plaintiff's -- Pacific Spotters is affiliated with the Defendants. The Court is also in receipt of Mr. Walker and Hansen Helicopters' response and opposition to this motion regarding specific exhibits, G-2939-82-83, and the Court also in receipt of the United States' reply to the Defendants' response. So -- and that's it, I don't have any other files, right?

MS. M. MILLER: That's it, Your Honor. Yeah. There are two issues that have come to our attention and --

THE COURT: Outside of this?

MS. M. MILLER: Outside of this in the last -- well, one has to do with this, and one tangentially has to do with this. There was apparently another accident yesterday of the helicopter that the Defendants are illegally operating, RPC 6911, which used to be N1DQ. As you heard the testimony of Mr. Bustos, he flew N1DQ, and Mr. Walker personally went out to the boat to fix it when there was a problem with it. It was in an accident yesterday in the Philippines, or outside

of the Philippines, and the pilot died. And two additional people were injured. In addition to that and, by the way, that is a helicopter that is registered under Pacific Spotters.

In addition to that, Your Honor, it appears that Mr. Walker traveled to the Philippines without the approval of the probation office. We verified that yesterday once we carefully reviewed the documentation showing that Mr. Walker was actually in the Philippines in December of 2018, after he had been indicted and after the Court had imposed restrictions on his travel. And it appears that he never filed any motion with the Court to allow him to travel, yet we have his passport photographed in the Philippines and we have a notarized signature of Mr. Walker in the Philippines when he flew out there to open up a new bank account for Pacific.Spotters Corporation.

That obviously is of great concern to the United States. We know that Mr. Walker has a jet. We know that Mr. Walker had the capacity to fly from here to the Philippines on his own jet. And we're now very concerned about him fleeing in anticipation of a negative jury verdict. So we will be filing a motion to ask the Court to consider remanding Mr. Walker until the end of this trial because we are very concerned about that. So I wanted to bring those two things to the Court's attention before we consider -- proceed

with this proffer.

THE COURT: All right. Yes, Mr. Martin?

MR. MARTIN: First, Your Honor.

THE COURT: Yup.

MR. MARTIN: Relating to an accident, which we have no clue what they're talking about since they provided us no information on it, we don't know what caused the accident since they provided us no reports. If it was pilot error, if it even happened. I don't know the purpose that the government is bringing this to anyone's attention other than to attempt to prejudice our case in the eyes of the Court. It's totally inappropriate to bring something up without any evidence whatsoever to support it, and I am offended that the government would do that at this point in the trial.

Secondly, if Ms. Miller had been involved in this case from the beginning, she would know that until the Second Superseding Indictment, which was in January of 2022, Mr. Walker had -- 2021, Mr. Walker had absolutely no restrictions on his travel. It was only at the Second Superseding Indictment at their insistence that he be detained that the magistrate judge put restrictions on him that required him to contact his probation officer for any travel. He has not traveled improperly at all. And the allegations by the government are unfounded, and that, again, offends me because the order allowing him release did not require

anything for travel like that. So I -- I don't know why we're going into things that, number one, are designed to prejudice my client without evidence to support it, and number two, are designed to prejudice our case in your eyes, Your Honor. It offends me, and it's continued throughout this case.

MR. LEON GUERRERO: Your Honor, if I may?

THE COURT: Okay. Hold on. Hold on. Does the other Counsels -- go ahead.

MR. MARTIN: That -- that's it, Your Honor. I mean, I don't like -- if they've got some evidence, they need to provide it to us in this case.

THE COURT: Okay. Ms. McConwell, did you want to say something?

MS. MCCONWELL: Not on these two issues, Your Honor.

THE COURT: Oh, okay. All right. Yes, Mr. Leon Guerrero, go ahead.

MR. LEON GUERRERO: Yes, Your Honor. With respect to the travel restrictions, I know that the government had opposed the travel by the Defendants. Travel restrictions were in place for foreign travel, not domestic travel. So the Defendants were able to travel domestically within the United States, but any foreign travel, there had to be a motion so we had an opportunity to oppose it. So I want to --

THE COURT: But, you know, I don't really want to

get into the merits of it, file your motion.

Don't worry, Mr. Martin, I'm not prejudiced by it. I mean, I don't see anything before the Court. If there is an allegation, I'll certainly review the motion, and then from there, I'll decide. But the parties need to, you know, have their ducks in order. If there really was a violation they'll file it, and I'm sure the U.S. probation and pretrial officer will be knowledgeable of this issue.

MS. M. MILLER: We will be doing that.

THE COURT: As I recall, I think it was Judge Manibusan who did most of the bail detention hearing.

MS. M. MILLER: Right. And the other Defendants actually did seek permission from Judge Manibusan to travel in 2018, both Mr. Kapp and Mr. Crowe. As a matter of fact, some of the proffer evidence that we submitted to your Court, Your Honor, yesterday included the allegations made by Mr. Kapp that were asserted by Mr. McConwell here about traveling to the Philippines in order to work with Pacific.Spotters on behalf of Hansen Helicopters.

So we will be filing that motion. The reason why I brought it up is I want Your Honor to be aware of it because we just confirmed with probation yesterday that that was a violation, number one. Number two, we just got notification this morning about this accident. It was in the news, and it was flagged by the FAA. We will be sending that information

to the Defendants. We're bringing it to this Court's attention because the seriousness of the fact that the Defendant has been permitted to continue to fly these helicopters, that we heard testimony are not airworthy, and to continue his fraudulent operation in the Philippines with these identical helicopters is just an unbelievable fraud on the United States, on the Court, it's our duty.

THE COURT: Well, let me ask you since I did not do the bail detention hearing, as I recall. Was there a request --

MS. M. MILLER: There was.

THE COURT: -- was there a request in terms of --

MS. M. MILLER: Of remanding --

THE COURT: Not -- okay, I don't know, remand is one thing. Another thing might be --

MS. M. MILLER: Yes. Yes.

THE COURT: -- continuation, I'm sorry, continuation of certain --

MS. M. MILLER: Yes. There was a motion for protective order filed both under Rule 16, and a motion to actually allow the government to seize the helicopters that were being illegally operated under 17. What happened was, Your Honor, and this is something we just don't know why. Judge Manibusan, as you know, retired. Judge Bordallo took over. Judge Bordallo heard those motions. Judge Bordallo

denied those motions. And then Judge Bordallo recused himself from hearing any other motions that were filed in the case saying that he had a conflict of interest, and we have no idea what that conflict is. We have no idea why. And so that has just left kind of a question mark for us in this case. But I do want the record to reflect that the government has made multiple, multiple attempts to try to cease the operations to avoid exactly what just happened yesterday. Another pilot died.

THE COURT: Okay. Well --

MR. MARTIN: May I respond? May I respond, Your Honor.

THE COURT: Well, go ahead, but let me say before you do that, since I wasn't the judge that handled the bail detention hearing, I don't have the history -- I mean, I've read some of it, but not all of it. But in terms of what may have happened, but -- so -- I can't really comment on what's before a judge, I mean, what had came before Judge Bordallo or Judge Manibusan, I don't know. And putting that aside, we're here in a new day, file your motion. We'll just proceed forward. Yes?

MR. MARTIN: Her comments that she just made, Your Honor, refer to them trying to cease helicopters, had nothing to do with the bond hearing. Both those motions were denied by the Court.

THE COURT: All right. I will submit to the Court that my client has not violated any court order. He has not been to the Philippines in violation of his conditions of bond. If they will give us a date, time, and place, we will verify that. But to come in here and try to distract this trial, which it happens every day, we get something new coming in. I -- you know, I thought we were going to try to finish this case, but apparently we're not going to until Christmas.

Yeah, we're going to finish it. Don't worry about it.

MS. M. MILLER: The accident is something new. The death is something new.

THE COURT: Okay. Well, but that's not -- so the accident is something new.

MS. M. MILLER: The death is something new.

THE COURT: But the issue of what's relevant is not before me. So you're going to have to bring it -- you have to bring it formally.

MS. M. MILLER: We're going to file that.

THE COURT: That's right.

MS. M. MILLER: I want Your Honor to know because I, you know --

THE COURT: Yeah, give me heads up. I got it. I appreciate that.

MS. M. MILLER: Yes.

THE COURT: But I would say that if the defense -- if Mr. Martin, he seems to be quite adamant that you're wrong about the dates. Whether -- whether that's true or not doesn't matter. What matters is maybe you should meet with him after the next break to confirm that because if he has a -- an explanation or you guys have a misunderstanding with U.S. Probation and Pretrial, then that particular motion is for nothing.

MS. M. MILLER: Absolutely. We would love to do that. We would absolutely like to meet Mr. Martin, show him, we will show him the photograph of the passport that was taken in December of 2018, and we'd love to hear the explanation. That would be great.

THE COURT: I mean, they don't have to respond, but you could at least give them the dates.

MS. M. MILLER: Absolutely. 100 percent.

THE COURT: And perhaps Mr. Martin would want to talk -- walk in with his client to speak to the probation officer who's his -- or pretrial officer, I should say -- pretrial officer, to figure out what's going on. Yes?

MR. MARTIN: Your Honor, he reports to his officer every week.

THE COURT: Okay.

MR. MARTIN: If he was out of the country, they would know it.

07:43AM 07:43AM 07:43AM 07:43AM 07:43AM 07:43AM 07:43AM 07:43AM 07:43AM 07:43AM 07:44AM 07:44AM 07:44AM 07:44AM 07:44AM 07:44AM 07:44AM 07:44AM 07:44AM 07:44AM 07:44AM 07:44AM 07:44AM 07:44AM 07:44AM

THE COURT: Okay. Well, usually, what's interesting too though is if there is a violation -- I will say this, if there is a violation, usually my pretrial officers bring in a violation, they let us know. I'm not sure --

MS. M. MILLER: They were unaware because there was no record of the travel.

THE COURT: Okay. I see. All right.

Yes, Ms. McConwell?

MS. MCCONWELL: Before we start our hearing on the motion that was filed by the government -- before we start our hearing, yesterday if you'll recall, Your Honor, what paused our trial and paused our conversation was the government's attempt to admit its Exhibit 2939-82, 83. And your request was for them to provide you the offer that supports the admission of those two pages --

THE COURT: Correct.

MS. MCCONWELL: -- out of that document. What they filed yesterday was completely something different than what we had discussed in Court yesterday.

MS. M. MILLER: What?

MS. MCCONWELL: And so -- yeah, it is.

THE COURT: All right. Well, then --

MS. MCCONWELL: And quite frankly, Your Honor, the frustration from the point of Hansen Helicopters in

representing our client is it's a constant, "this is the issue," but then we're over here, and then we take sharp left turns, and there has just been this continual drip, drip, drip throughout the trial that one argument is made and then when something else is filed, it takes us off in a completely different direction. 07:45AM

We're just trying to get this particular case tried, and it's constantly being changed by the United States and, yeah, and... I'm extremely frustrated by the adjectives that the prosecution continues to use because they're being the basically the prosecution, the jury and executioner in the form of the questions that are used. Pardon me, Ms. Miller, calling it the form, in her questions, calling them the guilt, the fraud, the illegality, all of those are highly, highly inflammatory and the overall cumulative effect, since this trial began in March, I don't know how the jury ever avoids it and then now, they're trying to reform, apparently with the motion that was filed yesterday, the indictment. And so --

THE COURT: Well, if that's the case, then we'll address that. But let's get to the motion, you guys.

MS. M. MILLER: Yes, Your Honor.

THE COURT: Let's get to it because the jury is waiting.

MS. M. MILLER: Yes, Your Honor.

THE COURT: And I will address any further

distractions. I do think that we should focus, but I do appreciate the fact at least now you guys know, they may file a motion for remand, revocation of detention.

MS. M. MILLER: Absolutely.

THE COURT: Revocation, but that -- you know, at least you know. Be prepared.

MS. M. MILLER: Right. All right, Your Honor, so --

THE COURT: Whether or not it's true or not, I don't know. But let's go. Proceed.

MS. M. MILLER: So regardless of what Ms. McConwell said, which is absolutely incorrect, our entire offer of proof yesterday was geared towards why the two pages that were at the very end of the bank records that were originally admitted several months ago should in fact come in. And the Court yesterday said that you did not see the connection between Pacific Spotters and Limey Air and the Defendants in order to allow that in. So our offer of proof was geared directly towards that, and we started our offer of proof with the exhibit itself, 2939, pages 82 and 83. And, Your Honor, when you look at 2939, pages 82 and 83 and, Ms. Miller, is that something could you bring up on Trial Director for the Court to see?

MS. S. MILLER: Yup.

MS. M. MILLER: If we could show you, Your Honor.

On those two pages, what we see is the Limey Air bank account, and we see funds coming in to the Limey Air bank account from Pacific Spotters Corporation. When you look at those last two pages, that's a summary of wire transfers from Pacific Spotters to Limey Air starting at the end of 2018 and going through 2019.

Do you have the number 2939?

And we're going to pull up those two pages. And, Ms. Miller, could you just focus in on the first page and blow up that part there.

So, Your Honor, this was a record we received from the bank, and it was the bank account for Limey Air Service Inc., and as Your Honor knows and why the rest of the record was previously admitted is Limey Air Service Inc. is, according to the Defendant's own submission to this Court, one of the companies that is being used by Jon Walker and Hansen Helicopters. It's contained on this list. Limey Air Services Inc., which is why we got the subpoena and we got those bank records. When you look at pages 82 and 83, you see that this is a wire transfer schedule showing that -- and if you look at the dates received, the dates it starts on August 31st of 2018, and what is very important about this is that this is after the first indictment was filed against Jon Walker and Hansen Helicopters. So we have August of 2018, wire transfers start coming in to Limey Air, one of the Defendants admitted

alter ego shell companies from -- and this is what's really
important, Your Honor -- the originator on this document is
Pacific Spotters Corporation. And you see that on pages 82
and 83.

Now the rest of the exhibits that were already
entered into evidence, 2939, show the creation of Limey Air
and show the creation of the bank account. Now, if we go to
the rest of the exhibits for 2939, which the government cited
in its proffer and we actually put in the excerpted pages, we
see that Limey Air was created in 1999. This was after Jon
Walker purchased Hansen Helicopters from Vern Hansen. And he
created it in 1999, and we also submitted documentation
showing that when it was created, Hansen Helicopters, the
company, that Jon Walker owned 99.9% of, owned 99.9% of Limey
Air.

We produced to Your Honor 2939-39, which was an
excerpt from the minutes creating Limey Air, and we also
showed Your Honor the signature of the Defendant, Jon Walker,
in creating that company on May 3rd of 1999. Exhibit 2939-49
shows that Hansen Helicopters is the 99.9% owner of Limey Air,
and Jon Walker is also listed as an owner, and he also, again,
signs off on that document that we produced to the Court, and
that has been entered into evidence in this case.

Beginning in 2015, we see a reference in these
records to Wilma's Flight Services. Wilma's Flight Services,

as you know, Your Honor, based on the Defendant's own
admission and submission and the evidence admitted in this
court, is another one of the companies that is used by the
Defendants as a shell alter ego of Hansen and Jon.  The reason
why it's important to know that Wilma's Flight Services makes
it into these records is that as you heard from the testimony
of special agent Khamvongsa, Wilma's Flight Services is the
company that manages all of the schedules and billings for the
tuna boat leases.  And we produce to Your Honor 2939-72 which
references Wilma's Flight Services as an affiliate and minutes
that were signed again by Jon D. Walker, the Defendant, who is
identifying that the financial statements and information that
apply to Wilma's support Limey Air's income into the bank
accounts.

Less than one month after the indictment, Limey
Air, with Mr. Walker as the chairman and now the 99.9% owner
of Limey Air, opens up a bank account for Limey Air, and
that's 2939-73.  So now we have 1990 -- sorry, 2018 and
Mr. Walker is the 99.9% owner of Limey Air, and he opens up a
bank account.  You see the minutes there that we produced
showing that he said we wanted to open up the bank account.
This is right after he's indicted.  This coincides with
Special Agent Khamvongsa's testimony --

THE COURT:  You mean the second indictment?

MS. M. MILLER:  Yes, Your Honor.  This is the

first indictment. This is right after the initial indictment. And this also aligns with Special Agent Khamvongsa's testimony that Jon Walker was closing and removing funds from the accounts that the government was aware of and creating accounts that the money could be moved into.

We then show Your Honor 2939, that's a typo in our proffer, dash 76, Jon Walker notarizes an affidavit confirming he is now the 99.9% owner of Limey Air Services Inc., and interestingly in this -- it's dated July 25th, 2018 -- he indicates that Limey Air services, a U.S. corporation, and he uses the address of Hansen Helicopters for Limey Air. So now we have Jon Walker, 2018, 99.9% owner of Limey Air, and by the way, Your Honor, the bank records indicate that Limey Air is in the business of leasing helicopters to tuna boats for income. And we know that Limey Air is associated with Wilma's, which as the Court saw, was the company that was being used to schedule all of the billings, handle all of the accounts receivable for all of the helicopters subject to this indictment. So Jon Walker opens up this bank account. And we have the minutes, and we have the indication that he says, we're opening up this account, I'm the 99% -- 99.9% owner of the account, and here it is, 2939-81, Limey Air Services Inc., we produced this in our proffer, incorporated in Guam, which by the way Your Honor, is inconsistent with what the Defendants have represented to the Court and to the

07:55AM 07:55AM 07:55AM 07:55AM 07:55AM 07:55AM 07:55AM 07:55AM 07:55AM 07:55AM 07:56AM 07:56AM 07:56AM 07:56AM 07:56AM 07:56AM 07:56AM 07:56AM 07:56AM 07:57AM 07:57AM 07:57AM 07:57AM 07:57AM 07:57AM

government.  And Jon Walker is the president, director, 99.9% owner, and what happens?  The bank account is opened and one month later, funds start coming in from Pacific Spotters Corporation into the Limey Air bank account.  We're talking about $5 million, Your Honor, from August of 2018 through 2019, from Pacific Spotters.

Now, the question became, what is the connection between Pacific Spotters and Jon Walker?  Well, the government thinks that's very clear, but the government also refers the Court to documents regarding that relationship.  If Your Honor looks at the documents that we produced previously in this case, Exhibit 3003, one of the first things that you're going to see that we produced is that the helicopters that are being used are all insured by another one of the Defendant's shell companies, Caledonian Insurance.  And that's why we produced it to you as well, Your Honor, to show the connection.  Caledonian Insurance Company, which is 99.9% owned by Hansen Northern, which is 99.9% owned by Jon Walker.  Jan's Flight Service, which is listed as one of the Vanuatu shell companies used by Jon Walker, is listed as the owner of these helicopters.  Which, by the way, this is part of the fraud, that is not the registered owner of these helicopters according to what Jon Walker filed with the FAA.  So that's the first document we see the connection between Jan's and we see the connection with the... Pacific Spotters Corporation in

3003-18 and 19.

And what is the connection here? We attached a board resolution that shows that Jon Walker sold aircraft from Jan's Helicopters, so Jan's Helicopters supposedly owned these aircraft. This is another connection that's very important for the Court to know. This list of the helicopters, under Jan's Helicopters, that Jon Walker then sells to Pacific Spotters, is the same list of helicopters that were issued a cease-and-desist order and a delisting and a deregistration order from the Philippine authorities because of Jon Walker's failure to comply with their rules and their regulations.

The helicopters had been registered in the Philippines from 2009, they never reregistered them properly, they never allowed an inspection of them, they never produced any proof that they were airworthy, and they never produced any proof that the pilots flying them were registered in the Philippines and certified as Philippine pilots. That has come into evidence as Exhibit 355, G-355, we see that notice forcing the deregistration and delisting of all of these helicopters for the failure to comply with the Philippine authorities rules and regulations, just like they were failing to comply with the FAA rules and regulations. But here we see Jon Walker selling these helicopters to, you guessed it, Pacific.Spotters. And we produced this to Your Honor, and you see Jon Walker's signature on this document, and that's

07:59AM 07:59AM 07:59AM 08:00AM 08:00AM 08:00AM 08:00AM 08:00AM 08:00AM 08:00AM 08:00AM 08:00AM 08:01AM 08:01AM 08:01AM 08:01AM 08:01AM 08:01AM 08:01AM 08:01AM 08:01AM 08:01AM 08:01AM 08:01AM 08:02AM

page 10 of our offer. So Jon Walker sells his helicopters to himself, but in the name of a different company.

So now Pacific.Spotters owns these helicopters. And now I think it's important for us to take a step back and look at these helicopters that are sold to Pacific.Spotters.

These are helicopters that are all in the Second Superseding Indictment. These are helicopters that have a corollary U.S. registration number attached to them. These are helicopters that Mr. McConwell produced in a list that he represented to this Court was from the Philippine authorities that identifies them as Hansen Helicopter helicopters that they intend to use in the Philippines. In the list that Mr. McConwell produced as Defense Exhibit 4-124, he also references the name Pacific Spotters Corporation as being the company under which these helicopters will be operating. But what's really interesting about these helicopters, Your Honor, is that they're on the MD Helicopters Destroyed List. They've been involved in multiple accidents. And Jon Walker has actually represented falsely to the FAA that several of them have been lost at sea. And these are the helicopters that are being sold to Pacific Spotters Corporation, so that after the first indictment, the Defendant can continue his fraud in the Philippines, because he couldn't continue his fraud here in Guam.

We also attached, Your Honor, on page 10 of our

proffer, the photograph of Mr. Walker and the reference to his U.S. passport number and the date on which that information was produced in the Philippines to the Philippine authorities so that Mr. Walker could sign the paper work for this Philippine corporation, Pacific.Spotters Corporation, so that he could identify himself as the president and director of the company, as the primary owner of the company, and represent to the Philippine authorities that the company is a company. And we produced the articles of incorporation for Pacific Spotters Corporation signed by Jon Walker, identifying him, Your Honor, as you could see here on page 11 and 12, as the primary owner, the primary director, the primary controller, the person responsible for the helicopters that are being leased pursuant to contracts to boat companies out in the middle of the Pacific Ocean. 08:04AM 08:05AM

Then we learned this morning that one of these helicopters, which was previously N1DQ, which is currently being operated in the Philippines as RPC 6911, crashed yesterday and killed another pilot. It hasn't stopped, Your Honor.

We also showed Your Honor in this proffer that his employee and co-Counsel, Turner Kapp, filed a motion with the Court, which is marked as a Government's Exhibit, 775, and he represented the following to Judge Manibusan, he said, "Hansen works with Pacific.Spotters Corporation, a Philippines 08:06AM

company, that contracts with fishing vessels to supply
helicopters, pilots and mechanics."  Page 2, paragraph 7,
"Since December 2018, I've been the vice president of
Pacific.Spotters."  Page 2, paragraph 8, "In order to
discharge my professional duties to Hansen Helicopters, it is
necessary that I be in Guam most of the time, but it is also
necessary for me to travel overseas to the Philippines where
Hansen has its business activities."  And he goes on through
page 4 in paragraphs 9 through 13 making these
representations.

     Then we have in Exhibit 770, Mr. McConwell
stating the following, and I quote "The fact that Hansen
Helicopters has aviation business interests in the
Philippines, which requires the presence of Mr. Kapp as the
person in charge of maintenance and safety of Hansen
affiliates, aircraft, has been known to the government and
monitored."  So Mr. McConwell is identifying Pacific.Spotters
as an affiliated company of Hansen Helicopters.

     This is before we had the records that were
produced in evidence as Exhibit 3003 from the Philippine
authorities, showing what was given to them.  The articles of
incorporation, again, Jon Walker, same group.  We now own
this, we now operate it, etc.

     Then we have Mr. Kapp filing something through
Mr. McConwell, Exhibit 771, where he indicates to the labor

department in the Philippines that he is working for Pacific.Spotters, but stateside his employer is Limey Air. We see another direct connection between Pacific.Spotters and Limey Air if the receipt of the funds in Exhibit 2939 isn't enough.

Then what we see, Your Honor, are the leases. The leases for the helicopters that were being used in the fraud against the United States. Those same helicopters are now being used in leases for Pacific.Spotters, which of course makes sense, because Jon Walker sold the helicopters from himself to himself to continue conducting his fraud. We produced to Your Honor leases showing that these helicopters and these identical helicopters, and by the way, the examples we produced to Your Honor shows he's so bold as to even still be using N-numbered helicopters even though he deregistered all of the helicopters with the FAA claiming to the FAA, himself personally, that these helicopters were being deregistered because they were going to be exported to the Philippines, and they were going to be used in the Philippines. You can't use U.S. registration numbers anymore once you do that. We've heard that testimony. He knows that. He's been an A&P mechanic for his entire career. He's been an IA. He's worked with the FAA; intentional fraud.

And then we see, Your Honor, that Judge Manibusan is concerned about the representations being made not only by

Mr. Kapp, but by his attorney, Mr. McConwell. Because when Judge Manibusan was initially being asked to allow travel to the Philippines, he was being told by Mr. Kapp, co-defendant, co-conspirator, employee and friend of Jon Walker, we have this business in the Philippines, it's affiliated with Hansen Helicopters, it's Pacific.Spotters, but I'm an employee of Hansen Helicopters, so Judge, you don't have to worry about me fleeing, don't be concerned about it. I get a diminutive compensation from Pacific.Spotters. Everything -- you know, I live in Guam, my employment is in Guam, you don't have to worry about it. Judge Manibusan asks Mr. McConwell, Can you explain the relationship between Pacific Spotters and Hansen Helicopters? And Mr. McConwell can only say, Well, it's an affiliate. It's an affiliate, can't tell you anymore than that.

We also quoted Judge Manibusan when he said, when he questioned the Defendant about why he never disclosed to the probation officer as part of his pretrial requirements that he was employed by this foreign corporation. His attorney, Mr. McConwell said, It's because his interests were de minimis, and there is no income from Pacific Spotters Corporation, the Defendant just started earning income from Pacific Spotters in January of 2019. The defense Counsel and the Defendants would not explain anything further to Judge Manibusan, and Judge Manibusan was concerned and said that he

found it suspect that the Defendant was representing to the

Court that the relationship with Pacific Spotters was de

minimis, that it was an affiliate of Hansen Helicopters, yet

when the judge was looking at the information, it seemed like

there was more going on there.

Now, Your Honor, this happened back in 2019.  And

now here we are in 2022, and we have a lot more information,

and we know, yes, there was a lot going on there, which brings

us back to the point of this particular bank account.

Pacific.Spotters was created to continue the fraud, to

continue to use the same helicopters that are identified in

the Second Superseding Indictment, it was another shell

corporation, that just wasn't listed on the Defendants'

exhibit that it produced to the Court because it wasn't

created for this purpose until 2018.

We know that it was used by Jon Walker, created

by Jon Walker, we know that it had an association with the

Limey bank account because we see the money coming into the

Limey bank account from Pacific Spotters, and by the way, the

Limey account has the same address as Hansen Helicopters here

on Guam.  Because of all of these reasons, Your Honor, it is

absolutely appropriate, relevant and very probative to this

fraud to show the modus operandi, that it is continuing for

this evidence to come in.  That is why we presented this

information to the Court in this way so the Court could see

very clearly the connection between Jon Walker, Hansen Helicopters, Limey Air, and Pacific Spotters Corporation. 08:13AM 08:13AM

THE COURT: All right. Thank you. Okay. Who wishes to go -- you're going to argue the matter, Ms. McConwell? Okay.

MS. M. MILLER: Oh. Ms. Miller just brought something else up to my attention. So Pacific Spotters Corporation actually lists the Guam address of Hansen Helicopters on its website and on the "contact us" form on the website. Just another connection showing this isn't some random entity.

MS. MCCONWELL: Your Honor, can you hear me?

THE COURT: Bring the mic a little closer in. There we go.

MS. MCCONWELL: Is that better?

THE COURT: Yeah. Thank you.

MS. MCCONWELL: Just holler at me if I need to be louder.

THE COURT: Okay.

MS. MCCONWELL: I'm going to start in reverse on the -- for Ms. Miller's argument. So she has spent sometime claiming that Mr. McConwell made representations on behalf of Mr. Kapp at a hearing on May 22nd, 2019. I would start by saying that at this point in our proceeding, Mr. McConwell's representing Hansen Helicopters, and the proffer for this

Exhibit 2939-82 and 83 is relevant only to Counts 100 through 110, to which Hansen Helicopters is not a party. That's my first thing. My second thing--

MS. M. MILLER: Your Honor, the question is then why is she up here even arguing --

MS. MCCONWELL: Would you ask Ms. Miller not to interrupt me?

THE COURT: Hold on. Let her finish, then you could --

MS. M. MILLER: Okay.

THE COURT: What was that? Go ahead.

MS. MCCONWELL: And then if I would direct your Court -- the Court's attention to -- because this is beyond what was in our original filing last night. If you look at ECF 237, Mr. McConwell was not present at that hearing, Attorney Anthony Perez was the attorney that was representing Mr. Kapp at that hearing on May 22nd, 2019.

THE COURT: Okay.

MS. MCCONWELL: And ultimately, any concerns that Judge Manibusan had had about Mr. Kapp's travel was -- was subsequently resolved, and in my brief, I listed those ECF numbers which showed where those were.

THE COURT: So it sounds like the judge, when this happened, allowed people to travel, right?

MS. MCCONWELL: That is true. It cleared it up,

 and Mr. Kapp was allowed to travel thereafter and the government -- I believe all but one of the travel requests did object to his travel. But each time, either Judge Manibusan or Judge Bordallo did allow him to travel. 08:16AM 08:16AM 08:16AM 08:16AM

THE COURT: And has there been any revocation of anyones travel so far? 08:16AM 08:16AM

MS. MCCONWELL: No, never. 08:16AM

THE COURT: For all the co-conspirators? 08:16AM

MS. MCCONWELL: He has -- I can't speak to all of them, I know that Mr. Kapp's travel has never been revoked. This was the only time where he was not allowed to have his passport released to do travel, but then it was ultimately resolved and he has -- he was never a flight risk, and it was never revoked. I don't believe that any of the Defendants' travel has ever been revoked. But... um... I can't speak to -- I can't speak specifically to that. 08:16AM 08:16AM 08:16AM 08:16AM 08:16AM 08:16AM 08:16AM 08:16AM

THE COURT: Okay. 08:16AM

MS. MCCONWELL: And I'm sorry, Your Honor, I thought I had my response up here. 08:16AM 08:17AM

(Pause.) 08:17AM

MS. MCCONWELL: I think I lost my battery, sorry about that. 08:17AM 08:18AM

(Pause.) 08:18AM

MS. MCCONWELL: Ms. Miller spent an inordinate amount of time discussing Exhibit 2939, and in Exhibit 2939, 08:18AM 08:18AM

Your Honor. Let me pull that up. She identifies a number of exhibits. And I'm going to have to -- I have to be my own person here.

THE COURT: Okay. That is -- I'm sorry. 2939, which --

MS. MCCONWELL: 2939, 1 through 81 is what's been admitted to Court already.

THE COURT: Right. She only cited a certain number. Which one are you looking at?

MS. MCCONWELL: Right. I'm going to be -- I'm going to -- we're going to kind of go over a number of the things in 2939 because I think it's important for the Court to see the entire exhibit.

And then, Carmen, do I have the ability to publish? And that's one of these?

(Pause.)

MS. MCCONWELL: Well, thank you. As our threshold, Your Honor, I think in our motion we said we weren't given notice that this issue was going to be revisited. We had discussed this -- this ad nauseam, and we supplied to the Court excerpts of the transcript which -- at our Exhibit 2, which went through -- wherein we exhaustively discussed Exhibit 2939-82 and 83 and why it should not be admitted at that time. So we object to this being revisited at this time.

In our Exhibits 3 and 4 that we attached to our motion, we attached to you the Exhibit List that was provided to us by Ms. Miller, and at no time did she indicate that the government intended to revisit this issue or many of these exhibits that she has attached to her motion at this time. So we object to having any lack of notice of these particular exhibits.

We also submit that she represent -- misrepresents Limey Air Service when she knows -- and it is included in Exhibit 239, if you look at Exhibit 239, and I'm just going to walk through it, it's not in the complete order of my filing but I think it's important at the pages 1 through 12, and you can see it on the screen, page 1. We see that Limey Air Service did open up a number of bank accounts, and we see that the authorized individuals on each and every one of these bank accounts is Mr. Crowe, Mr. Kapp and Mr. Reed. Mr. Walker's signature is not contained on any one of these signature cards for the bank accounts that Mr. Khamvongsa is testifying.

If we go to 39... if we go to 39, which is for -- which is at the end, and I'm going to go up so that you could see what the document is that it's attached to. It's basically the end of the bylaws for Limey Air Service which was created in -- actually it starts on page 13, which was created in 1999. And Mr. Walker was just one of the officers

08:20AM 08:20AM 08:20AM 08:20AM 08:20AM 08:20AM 08:20AM 08:20AM 08:21AM 08:21AM 08:21AM 08:21AM 08:21AM 08:21AM 08:21AM 08:21AM 08:21AM 08:21AM 08:21AM 08:21AM 08:22AM 08:22AM 08:22AM 08:22AM 08:22AM

of that.  And when we go to where the ownership of Limey Air

Service is, Hansen Helicopters is the majority owner of Limey

Air Service, Inc., which was lawfully created in Guam.  And

I'm going to show you on page 439.  So it shows that Hansen

Helicopters, not Jon Walker, is the predominant owner of Limey

Air Service, which is a valid Guam corporation.

Additionally -- and so throughout, Ms. Miller

just sort of cobbles back and forth, she identifies Hansen

Helicopters in her Exhibit 2939-72, which having shareholder

meeting minutes, where they discussed Wilma's.  Well, Wilma's

is not Pacific Spotters.

She goes through and she shows then that Limey

Air Service, which is a valid Guam corporation, at pages 73,

74 and 75 -- let me go to there.  There is page 73.  73.  In

2018, it shows that they had a board of directors meeting and

then they also -- they also -- a month -- later in the month

had board of directors meetings and you could see that they --

they signed things as shareholders and directors.

In our Exhibit 5 that's attached to the motion,

are letters from the Bank of Hawaii indicate that they're

going to be closing all of the accounts that were at the Bank

of Hawaii that Agent Khamvongsa had actually issued the

original subpoena against prior -- at the time of the first --

or the first indictment.  And so thereafter, Bank of Hawaii

told them that they were going to close all their accounts.

And so in this time period -- and Agent Khamvongsa and the
government conveniently leave that part out.  That there was
some scrambling to get some accounts opened so that they could
continue operating their business and Judge Manibusan
indicated that Hansen Helicopters could continue operating its
business, and as we know, Hansen Helicopters was acting as an
operator for a number of different entities.

So throughout, Limey Air Service, additionally
when we look at 2939, pages 80 and 81, they did file --
actually they filed a number of places, but in these in
particular, were for years 2017 and 2018.  And these are
annual reports that were signed by Defendant Crowe, not
Walker.  So if he added an S and called it Limey Air Services
instead of Limey Air Service, that's -- that's a typographical
error.  And if we look at what their actual operations are, it
shows what their operations are.  The government likes to say
it's just specifically for leasing but it's not, it's for a
broader business purpose.

And their next -- the Limey begins to open, well,
they indicate Limey has received $5 million in transfers, but
according to Mr. Khamvongsa, the annual revenues for the
organization is $20 million, and so clearly, this wasn't a
wholehearted shift of any type of operations because this is a
de minimus amount.  When you look at the amounts that have
been coming -- that were coming through.

       Their next exhibit that they want the Court to look at that they identified on page 8 is an exhibit that has not been admitted. And even if it had, the date on this is 2012, which is not relevant to the dates which are on pages 82 and 83, which begin in August of '18 and end in about a year later in '19.

The next thing that the prosecution wants you to look at is on their 303-18[sic], 19 which indicates there is a bulk sales resolution. If you actually look at the document, this indicates that this is a resolution by the board of directors for Jan's Helicopters Service, located in the Philippines. And so Mr. Walker signed this as a board director -- as a director, and not in any other ownership capacity, in individual ownership capacity.

Then with Pacific Spotters, the government wants to say that it's solely on leasing helicopters. If you look at its primary purpose, which is contained -- is contained on page 22 of 3003 and is admitted to this Court, it is in the business -- primary function is to overhaul, repair and maintain all types of aircraft. A secondary purchase involves -- or secondary purpose involves purchase, acquisition ownership, leasing, selling and conveying of any kind of property, which is able -- which it can do.

The 3003 that they reference, 33 and 34, is out of context. You need to look at Exhibit 3, and let me find

it, 3,000 -- at page 30, because in that it shows the actual

ownership interest of Pacific Spotters.  And if the Court will

-- let me pull that up so that I can show the Court.  Bring it

up so you could see it.  3003 at page 30 shows what the

ownership interest -- there is another page, 31 after this.

But that was not admitted.  This shows all but 15% of the

ownership and it shows that Mr. Walker only owns 32% of this

entity.  So he's -- he's not -- he does not own the

controlling interest in this particular entity.

Additionally, when we -- at 3003 at pages 35 and

36, we have reviewed those previously when Mr. Marty was here,

I believe it was Mr. Marty.  And in those, it indicates what

the -- what the functions are for the board of directors and

what also the roles and obligations and the duties of the

various officers, not just who the president of that

corporation is.

Then with regard to the Exhibits 775, 770, 771,

I'm sorry, ECF, the ECF 238, I mean those are all pleadings,

those are all out of court.  The 775 has to do with -- and 770

have to do with bond release applications of no party that is

in this trial right now.  And Hansen Helicopters is not in, as

I said, is not in this particular count.  The release document

--

THE COURT:  Would the fact that statements made

at a bail detention hearing about dealing with

co-conspirators, would that not be relevant to an issue that it might be relevant to?

MS. MCCONWELL: No. And we discussed this on June 8th, that statements made by other -- that others -- well, first of all, Hansen Helicopters is not in the count. And these aren't relative to -- these aren't relative to the wire fraud or the money laundering count. The government is very specific with Counts 101 through 104, and those are specifically cited and you have specific evidence about that. And also 105 through 110. And these ECF do not relate to any of those monetary transactions that form the basis for those particular -- those transactions. All those transactions occurred in 2015 and 2016. And so the -- the document they're trying to get in is 2018, 2019, which there is no relationship to 2015 and 2016.

Then the same -- the government continues to attempt to use as its offer of proof, which they've attached leases that are primarily unsigned or not -- don't relate to the time period in question. In those counts, 100 through 110. And so we would ask that the Court deny the admission of 2939-82, 83. I think that covered all of my things.

Mr. Martin?

(Pause.)

THE COURT: Okay. Thank you.

MS. MCCONWELL: Let me look and make sure there is...

THE COURT: Okay.

(Pause.)

MS. MCCONWELL: Yeah. I think this is a miss -- yeah, we talked about this, we talked about --

MS. M. MILLER: I can't hear you, Ms. McConwell. I'm sorry.

MS. MCCONWELL: Sure. That it's a misrepresentation to say that Jon Walker sold to Pacific Spotters what he signed was the -- as a director on the exhibit that's attached, that he signed it bulk sales, which is required apparently when you're going to sell assets as opposed to a straight up corporation.

THE COURT: Thank you.

MR. MARTIN: Your Honor, we were asked to come to court today and argue the admissibility of Exhibits 2939-81 and 82, I believe.

MS. MCCONWELL: 83.

MR. MARTIN: 82, 83. I stand corrected. And this is not the first time we've done it. We submitted the transcript. This is the third time we argued the admissibility of this exhibit. This is the transcript of Mr. Khamvongsa from the day of June 8th. He was on the stand from ten -- from 10:03 until approximately 5:27, June 8th. He

was on the stand all day Monday, Your Honor. And he was on the stand for however long he was yesterday, and he's still on the stand, and the government is still in direct examination under their second lawyer in this case.

And we have heard the government argue and chastise Counsel, and I say that, Your Honor, because I have tried in excess of 200 jury trials in my career. I have never in my life been asked more than -- no less than three times to be sanctioned by a Court, which I have in this case. I've never been accused of misrepresenting anything to a Court as I have in this case. I've never heard co-Counsel be attacked, as I have heard in this case, when he wasn't even in Court and had nothing do with what he's been accused of. And it is offensive to me that that has continued to occur in this case. And I know the Court wants us to, "get along," and I agree with that, Judge, but it is very difficult to do when every time you come to court, you wake up in the morning, as I did this morning, and I looked at a reply that was filed by the government that starts out, "unfortunately defense Counsel's misrepresentations to this Court continue."

The government has not argued law, they have stood up here and given you a scenario in this case of Jon Walker, in our opinion, is a bad person. And here's why he's bad, I don't have the evidence to support it, but because he's a bad person, I want you to allow us to take this indictment,

that this is our third indictment, take this indictment and reform it, and let us argue things that aren't in the indictment, admit exhibits that we haven't provided to Counsel in this case.

As you'll recall on June 8th, I stood over there and Ms. McConwell stood over there, and we had a stack of new evidence that was six or seven inches thick that we had just gotten. And the Court made comments about the fact that I think the government finally conceded they had been giving us new evidence every -- they said ten days of the 27 days we were in trial, I would say it's more like 20 days of the 27 days we were in trial. Way beyond the Court's scheduling order. And we continue to get it today, Your Honor. I filed a motion this morning because the government gave me four new summary charts, now they call them demonstrative aids, but they're summary charts that they intend to use in this case. And while we've been here this morning, I've got e-mails about new summary charts they call demonstrative aids.

I submit to you that this indictment laid the groundwork and the framework for what we are defending against. That's what every indictment does. And what we've gotten here is the government comes up every day with a brand-new theory of why we should introduce new evidence.

As we heard this morning, something about a helicopter crash that nobody knows the facts of, nobody knows

a thing about it, what it was. They come in here this morning and accuse Mr. Walker of being in the Philippines in 2018. I'm having his passport delivered here, Your Honor. Last time he was in the Philippines was 2016. I will have the passport here, I want to introduce it into evidence as a Court Exhibit for you to know when he was here, so that we could put that issue to rest. But they come in here and make these allegations with no support whatsoever, make us a, "bad person," in their eyes, and ask you on passion to admit an exhibit which doesn't meet the definitions of what's in the -- in this indictment here, Your Honor.

They have not come in here and said this is why this -- this is why Pacific Spotters, that's not mentioned in the indictment anywhere, this exhibit about them should be admitted. I will submit to you, Your Honor, that the government can't go outside the four corners of the indictment. They can't reform the indictment. They need to argue legally, not facts that they make up and write on this board for you, why this exhibit should be admitted. They need to give us notice of what we're going to have to defend against. And I don't know, Your Honor, I don't think it's going to get resolved. I don't think we're ever going to get along as long as every morning when I wake up, I'm accused of misrepresentation and Mr. McConwell and Ms. McConwell are. And I don't know how to deal with that issue, but I'll abide

by whatever Court -- whatever order this Court --

THE COURT: Well, let me just say, look, I mean in the heat of trial, people get off and they start becoming quite accusatory, overzealous, probably insulting. I don't like that, I told everybody that. Civility is very important in my courtroom.

Now if I thought that anybody was out of hand already, I would have said, hey, you're out of my Court, I would have sanctioned you. Let me tell you, my 30 years as a judge, 16 of that as a federal judge, it's rare that I sanction a lawyer. I will tell that you. It's rare that attorneys come to me and ask that other attorneys be sanctioned.

MR. MARTIN: It's occurred to me three times in this Court, Your Honor. Three motions have been filed where I have been asked to be sanctioned by you. Now you have done nothing. And I understand --

THE COURT: I think -- you know, it's true, I have -- if I really felt there was legitimacy to any motion, or if I felt that -- you know, there was other motions too that were filed regarding Mr. Lujan and others which I have kept in abeyance because that was more insulting words, so forth. And I said, I will deal with those later, but if I felt that there was anything immediate that needed to be addressed, I would have warned -- I have warned all of you,

08:40AM 08:40AM 08:40AM 08:40AM 08:40AM 08:40AM 08:40AM 08:40AM 08:40AM 08:40AM 08:41AM 08:41AM 08:41AM 08:41AM 08:41AM 08:41AM 08:41AM 08:41AM 08:41AM 08:41AM 08:41AM 08:41AM 08:41AM 08:41AM 08:41AM

Counsels, both of you. Not just both of you, everybody that's been in this court from day one when I took over. Of course, the magistrate judges have had the case longer than I have because they were involved in the discovery and all the three indictments, and then by the time it got to me, then now it's here, we're in trial. So, you know, I'm sorry that you are feeling that way, you know, of course the Court always feels that civility is paramount. I expect that. I -- I -- I, myself, am civil to all of you. I expect you to be civil to me and to each other. So I would warn -- because I can see that you're quite upset about this, I would warn everyone to be civil and respectful to each other. You all have your own interests in representing who -- your parties. And there is no -- there is no reason why one Counsel should be berated because he or she represented somebody that the other party may not like, it doesn't matter. So like I said, I continue to order that there be civility. I think we've controlled everything pretty much. We just have to get through this trial.

To the extent that there is motions filed, and there is objections, the Court has ruled on those. And so --

MR. MARTIN: Well, Your Honor, and I appreciate that. It just -- it rakes me over the coals when there is an ECF 237 that clearly shows Mr. McConwell wasn't present when something happened, and then we are read quotes of things he

08:41AM 08:41AM 08:41AM 08:41AM 08:41AM 08:42AM 08:42AM 08:42AM 08:42AM 08:42AM 08:42AM 08:42AM 08:42AM 08:42AM 08:42AM 08:42AM 08:42AM 08:42AM 08:42AM 08:42AM 08:43AM 08:43AM 08:43AM 08:43AM 08:43AM

said that he didn't say, that apparently -- and then interpretations of what that means.

THE COURT: All right. So what we can do -- let me just say --

MS. M. MILLER: Let me just clarify the record.

THE COURT: No, wait, wait, wait. Ms. Miller, just wait until he's done.

MS. M. MILLER: I just want --

THE COURT: No, no, no.

MS. M. MILLER: Okay.

THE COURT: One person at a time. Let me say, there is ways that the Court can handle any misrepresentations that have been brought before it, motion to strike, sanctions, so forth. We can take care of that later. My goal is to just get the trial done with. And these issues of misconduct, we'll take care of that later.

MR. MARTIN: And in relation to the motion, Your Honor.

THE COURT: Yeah?

MR. MARTIN: This is a legal argument based on the four corners of the indictment. That's our position.

THE COURT: All right.

MR. MARTIN: We've not had any notice, the government has not said anything about this indictment. They could pull up any documents they want, but unless they relate

to the four corners of this indictment, we shouldn't have to defend against our life through -- for eternity unless they're accusing us of an incident or an act in the four corners of this indictment. And what they're doing is -- Mr. Walker is basically having to defend from birth to today, because the government says this is just a suggestion, it's really not -- I'm holding my hand on the indictment, this is just a suggestion, it's really not that important, we're just going to bring in whatever evidence we want. And that's not the law, Your Honor. And I object to the way they're trying to do this.

THE COURT: Well, do know that I -- I mean, the law is clear that the defendant or all defendants that come before the Court must be apprised of what they have to be defending against. And if it's not within the four corners of the indictment, then it's not within it. Then the Court handles that in that way. And that's probably your best argument, I guess. And so let's just -- we'll proceed forward. Okay?

MR. MARTIN: Thank you, Your Honor.

THE COURT: All right. Thank you. Ms. Miller, you want to reply?

MS. M. MILLER: Yes, Your Honor, I do.

THE COURT: I'm sorry? Okay. Hold on. You got it? Yes?

MS. M. MILLER: Okay.

MR. MARTIN: May I do one thing? I apologize.

THE COURT: Yes, yes.

MR. MARTIN: May I have a -- I have Mr. Walker's passport, Your Honor. I'd like to have a copy made of it and let --

THE COURT: You just wanted that timeframe? We we're talking about what year that was? You probably don't have to do everything, you just probably want the year of -- what did you say? What year was it?

MR. MARTIN: There is only actually only one page in the entire passport, Your Honor.

THE COURT: For -- is it 2018?

MR. MARTIN: Yeah. There is only one page in the entire passport.

THE COURT: Okay. Well, give it to Carmen then.

MR. MARTIN: If we could make a copy and provide it to all Counsel, but it should show exactly where he has been.

THE COURT: Okay.

MS. M. MILLER: And, Your Honor, I don't want just a copy of that one page. I'm going to need a copy of the actual passport number, etc., because we just submitted into Court a copy of his passport with a notarization from the Philippine authorities dated 2018. So if we're not producing

a passport to the Court that doesn't have that information in, we've got yet another thing I guess we'll have to address later with Mr. Walker.

THE COURT: Let me just say, I don't know. Let's just know that -- we know that the Philippines is not altogether with their... well, I shouldn't -- I'm not trying to insult them, but they may not be altogether with their processes, if you will. So I'm not sure. When you -- when there is -- I mean, myself, I have traveled to the Philippines, and I've given them my U.S. passport, that -- I mean, I've seen that. But how that plays out all the time, I'm not sure. And this issue of something other than a passport to gain entry into the Philippines, I don't know about that either. So, again, if he wants to give that to you, we'll give him a copy. Then you guys -- it's your burden, so I don't think --

MS. M. MILLER: Okay.

THE COURT: It's the prosecutor's burden. You guys have got to be sure of this because you are accusing him of violating a Court order. That is a major accusation. That can cause him -- you're asking the Court to remand him to the custody of the marshals. So be sure what you say.

MS. M. MILLER: Oh, no, we will file the appropriate motion and we're in the process of getting the --

THE COURT: Okay. Well, file it.

MS. M. MILLER: -- evidence.

THE COURT: I'm just saying -- I'm saying that if his attorney has said, look, I got my passport and it doesn't show a stamp that I -- that he had traveled to the Philippines during the period in question, then that's one thing.

MS. M. MILLER: Right.

THE COURT: If there is another way to enter the Philippines and exit the Philippines without a passport, I don't know.

MS. M. MILLER: And it has to do with, Your Honor, what we've already submitted into evidence with Your Honor, that shows a copy of his passport was provided to the Philippine authorities and they notarized him signing off on corporate documents for Pacific.Spotters Corporation, using his passport as his identifier. So this is a collateral issue.

THE COURT: No, I guess my point is, let's assume --

MS. M. MILLER: It's a collateral issue. We'll address it.

THE COURT: Yeah, we can address it later, but my point is, since you're bringing it up and Mr. Martin has gone out of his way to get the passport.

MS. M. MILLER: Yes, Your Honor.

THE COURT: Assuming that's true, that you have

this issue that Mr. Walker may have presented this passport, there was a signature on another piece of paper, I mean, then we have to call into question the Philippines processes. And we're going to have a whole trial on that, and frankly, I'm not prepared to have a whole trial on that.

I think that when we -- even myself, when I -- I've been vetted as a federal judge; they take my passport from birth or 18 years old to current, and they look at every single entry of any foreign country that I've been to. There is a reliance that we're hoping that every foreign country would have followed their own processes.

Now, I don't know if the Philippines has a different process. I'm going to gather that he's probably not a -- there is not dual citizenship here. I don't know.

Anyway, putting that aside, you -- he'll get a copy of that. You guys figure it out, and let's not get distracted by that. But you can do a quick rebuttal because the jurors are here.

MS. M. MILLER: Yes, Your Honor, definitely.

THE COURT: Right?

MS. M. MILLER: First of all, Mr. Martin didn't address any of the substantive arguments that the government --

THE COURT: Okay. Putting that aside. I read everything on the substantive arguments. What about his

08:48AM 08:48AM 08:48AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM

arguments that they have had no notice in the Second Superseding Indictment?

MS. M. MILLER: Two things, Your Honor. First of all --

THE COURT: That's his only argument really. Or best argument.

MS. M. MILLER: If you look at the Second Superseding Indictment, Your Honor.

THE COURT: Yeah.

MS. M. MILLER: Page 12.

THE COURT: Uh-huh, go ahead.

MS. M. MILLER: Sub paragraph N, says using shell companies to conceal the true fraudulent actors in the scheme to avoid criminal culpability. So that's on page 12 of the Second Superseding Indictment and it is identified as one of the ways in which the Defendants, the manner and means of their conspiracy. So it is clearly in the indictment. The other thing I would --

THE COURT: All right. Okay. Hold on. Strike that -- not strike that, but where does it say, and the specific one is Pacific Spotters, right? We're talking about Pacific Spotters as a shell --

MS. M. MILLER: Pacific.Spotters, yes, Your Honor.

THE COURT: Sometimes it's called Pacific

Spotters, sometimes it's called Pacific.Spotters. Are they all the same?

MS. M. MILLER: They are. They use them both ways.

THE COURT: So where in the indictment does it talk about Pacific Spotters?

MS. M. MILLER: It does not specifically identify all of the shell corporations in the indictment.

THE COURT: So let me ask you this though.

MS. M. MILLER: Yes.

THE COURT: Does that mean that Mr. Walker does not have notice that Pacific Spotters is an issue for him?

MS. M. MILLER: Absolutely not, Your Honor, it does not mean that. As a matter of fact, Your Honor, if you look at your order, ECF 1387, the Defendants -- this is an issue that has come up repeatedly, repeatedly.

THE COURT: Yes.

MS. M. MILLER: If you recall during the deposition of Mr. Marinho, he talked about Pacific Spotters being one of the entities being used by the Defendants because his paycheck came from them. The government brought that up. The government has been arguing this issue since the first indictment so --

THE COURT: Okay. But even if the government has been arguing, why didn't the government put down Pacific

Spotters within this indictment?

MS. M. MILLER: The government didn't name any of the 47 shell companies that the Defendant was using, but the government did say that the Defendant was using these shell companies. The government's theory of the case from day one has been that the shell companies are all alter egos of Jon Walker. When you're a 99.99% owner of a corporate entity, that is not a valid structure.

THE COURT: Okay. But it's not as if the government did not know who the shell companies were. Is that not true?

MS. M. MILLER: Your Honor, over time the government has developed its knowledge regarding all of the shell companies. As a matter of fact --

THE COURT: And that's obvious because the prosecution has gone through three indictments with three grand jurors.

MS. M. MILLER: Well, yes, because the Defendant continues to commit crimes.

THE COURT: Okay. Yeah --

MS. M. MILLER: And that's why we superseded, as you know.

THE COURT: Yeah, I know that.

MS. M. MILLER: For the second time, because Ms. McConwell says, well, deposits in 18 and 19 aren't relevant.

That's the whole point why -- why we superseded and added all of those counts.

THE COURT: I understand that, but my question is --

MS. M. MILLER: Here's --

THE COURT: When -- okay, I understand --

MS. M. MILLER: No, no.

THE COURT: I think I've memorized that chart.

MS. M. MILLER: Oh, you probably have, but what is important about what's not on here?

THE COURT: Yeah.

MS. M. MILLER: Pacific Spotters.

THE COURT: Correct.

MS. M. MILLER: And we filed motions with the Court, and of course you don't have everything that has been in front of Judge Bordallo. When Judge Manibusan was the Magistrate Judge in this case, this issue came up, this issue was litigated. Judge Manibusan was very concerned about the fact that Pacific Spotters was now being used by Jon Walker to continue the fraud. When Judge Manibusan was replaced by Judge Bordallo --

THE COURT: I -- can I tell you that? I know that, I read that. My only question is, he's arguing, the defense is arguing, that look, why didn't the prosecutors put in any or all or some or whatever of the shell companies

because -- at least the ones that they knew of? 08:53AM

MS. M. MILLER: What we did, Your Honor, is we have identified repeatedly throughout this case, if you look at the ECF filings in this case going back to 2018.

THE COURT: I don't disagree -- I don't disagree -- wait, wait, wait. I don't disagree with you. I'm putting you up to the highest burden because you guys are the prosecutors.

MS. M. MILLER: Of course.

THE COURT: My question is, you guys have gone through the grand jury three times. That's a lot of times. This is a big case for both the United States of America and the Defendants.

MS. M. MILLER: Yes.

THE COURT: This is a 100-count indictment.

MS. M. MILLER: And what is the purpose of an indictment? To give notice. And there is case law --

THE COURT: They're saying they don't have notice.

MS. M. MILLER: They do have -- that is absolutely incorrect, Your Honor. They haven't filed a motion for --

THE COURT: Well, what about -- let me ask you this, let's change the crime. What if this was a rape case? And the defendant, I'm not saying Mr. Walker, but a defendant

says, look, he's been accused of raping one woman, just one woman, but there is accusations that there is a lot of other women that have been raped.

MS. M. MILLER: That's right.

THE COURT: During that period of time --

MS. M. MILLER: Yes.

THE COURT: The question is --

MS. M. MILLER: And that evidence may come in through the case to show --

THE COURT: It could come in.

MS. M. MILLER: -- for modus operandi.

THE COURT: Possible.

MS. M. MILLER: Right? And the jury would be instructed that that evidence is being brought in to show the modus operandi and that evidence -- you wouldn't name every single one of those rape victims in the indictment. Paragraph -- not only sub paragraph N, but in paragraph 127, let me tell you where these are in the indictment. Paragraph 127 in the Second Superseding Indictment says, specifically, that the Defendant used numerous shell corporations, including but not limited to, and we talk about those shell corporations.

The purpose of an indictment, as the Ninth Circuit has said and every other circuit has said, is to give general notice to the defendant. If the defendant said, I have insufficient notice, and the defendant files a motion for

a Bill of Particulars, and the Court, and you have, Your Honor, in this case granted motions for bills of particulars requiring the government to identify more specifically what it meant or what it charged. They never filed a motion for Bill of Particulars on the reference to the shell companies either to the first part, which is paragraph 47, 48, and nor did they file motion for Bill of Particulars as to paragraph 127 of the Second Superseding Indictment.

THE COURT: Okay. But my question is, if you guys knew of some or all or -- of the names of the shell corporations, why not name them?

MS. M. MILLER: We did. In all of our pleadings, Your Honor. If I went through ECF --

THE COURT: Okay, I'm saying in the indictment, in the indictment.

MS. M. MILLER: Supersede again to now name and add every single one of shell companies used?

THE COURT: No. I'm talking about in any one of these indictments.

MS. M. MILLER: Because there was -- our position has always been that Jon Walker is the puppeteer. All of these companies are alter egos of Jon Walker. The evidence is relevant. We're missing the point here, the evidence is relevant to prove --

THE COURT: That's not the question though.

08:55AM 08:55AM 08:55AM 08:55AM 08:55AM 08:56AM 08:56AM 08:56AM 08:56AM 08:56AM 08:56AM 08:56AM 08:56AM 08:56AM 08:56AM 08:56AM 08:56AM 08:56AM 08:56AM 08:56AM 08:56AM 08:56AM 08:56AM 08:56AM 08:56AM

That's not the question of relevancy. He's bringing up the issue of notice.

MS. M. MILLER: There is notice. There is notice throughout the discovery in this case.

THE COURT: You're saying so the discovery in and of itself is sufficient notice --

MS. M. MILLER: Yes.

THE COURT: -- to say to the Defendant, hey, you better be prepared --

MS. M. MILLER: Yes.

THE COURT: -- to --

MS. M. MILLER: Yes.

THE COURT: -- defend --

MS. M. MILLER: Yes.

THE COURT: -- on an indictment that doesn't name any of these shell corporations?

MS. M. MILLER: Yes. And, Your Honor, in ECF, if you look at ECF 1387, you entered an order indicating that the government was correct that the use of the shell companies is relevant because Jon Walker did not act under his own name. From day one, the discovery has -- there are hundreds of documents in the discovery with Pacific Spotters Corporation. We were litigating the issue of Pacific Spotters Corporation and the relationship to the Defendants. We have filed motions, we have filed pleadings. The shell corporations use

has been in the Second Superseding Indictment.  Our theory of
the case from the time this case was supposed to go to trial
back in 2020 until now has always been that Jon Walker used
multiple corporations as alter egos.

THE COURT:  The Court understands your argument,
your theory, your pleadings.  I guess the question is, then
why not just name them?  In the indictment?  If you know it,
name it.

MS. M. MILLER:  They never ever -- they never
filed a motion saying, tell us which shell corporations you
are referencing in the indictment.  And, Your Honor, we have
withstood numerous motions to dismiss.

THE COURT:  Let me just ask you this, could they
strategically not have done that -- just put that aside.
Could the defense strategically not have done that and said,
look, the prosecution may have messed up because they did not
-- they did not submit with particularity the indictment with
the shell corporations when they presented it to the grand
jury?  Is that possible?

MS. M. MILLER:  I have no idea.

THE COURT:  Okay.  All right.  Anything further,
Counsels?

MS. M. MILLER:  No, but I do think that I want on
the record, Your Honor, that the Ninth Circuit says an
indictment is required to let the defendant know what he is

being charged with, and this indictment did just that. We never hid the fact that our position was he was using all of these companies as shell corporations. The Defendants filed, by the way, motions to dismiss, starting in 2018 continuing through 2020. Motions to suppress, again, starting in 2018 throughout 2020. They filed responses to motions that we filed regarding the use of shell corporations to which this Court has already ruled in ECF 1387. And we have another motion pending that you have not ruled on yet regrading the alter egos.

Our theory of our case, in both the indictment and continuing throughout, has been the Defendant's use of all of these corporate entities as shell companies, and we have produced discovery to the Defendants and identified as G-number exhibits in this case, numerous documents regarding Pacific Spotters Corporation being one of the 47 shell companies used in this case. To say that they had no notice is just not supported by the record. It is not supported by the record.

THE COURT: To say that they have no notice is not supported, correct, by the filed record and by the discovery --

MS. M. MILLER: Yes.

THE COURT: -- but it is supported by the fact that it's not in the indictment.

08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 09:00AM 09:00AM 09:00AM 09:00AM 09:00AM 09:00AM 09:00AM 09:00AM 09:00AM 09:00AM

MS. M. MILLER: None of the shell companies are in the indictment, Your Honor.

THE COURT: I know, which I find amazing. I just think it should be in there. Seriously.

MS. M. MILLER: Well, we could file a Bill of Particulars right now. I mean, I think that we --

THE COURT: You could try to file a Bill of Particulars, but now they're going to say, okay, no, that's unduly prejudicial to us right now in the middle of trial.

MS. M. MILLER: I guess the question becomes what are we really here to do?

THE COURT: Well, he's arguing, and he has the right to argue, look, we didn't have notice about Pacific Spotters and whatever else, all the other corporations. But right now the focus is Pacific Spotters. That's what his argument is.

MS. M. MILLER: And what I'm saying, Your Honor, is obviously they did. This has been litigated in front of Judge Manibusan. This has been litigated in front of Judge Bordallo. This was then litigated in front of you and, Your Honor, the government has relied on your order, ECF 1387, saying that the government has presented sufficient evidence that shell corporations are in fact relevant to this case.

THE COURT: Well, they are relevant, but that's not the issue they're arguing. But, anyway.

MS. M. MILLER: No, I understand. And so here's Ms. Miller. Thank you, Ms. Miller.

We argued also the point of what is an indictment supposed to do? If we put every single allegation of how Mr. Walker committed the fraud in the indictment instead of having a 40-page indictment, we'd have a 150-page indictment. And the Ninth Circuit has said that bills of particulars are seldom employed in modern federal practice because an indictment is sufficient to provide a temporal framework for the crimes alleged because open-file discovery obviates the need for greater specificity. This is the Ninth Circuit, this is all circuits, not only the Ninth Circuit.

THE COURT: I know the law.

MS. M. MILLER: Because Counsel has no argument against the admissibility of those two pages, instead the tact is, let's say we have no notice. And, Your Honor, I will ask this Court to look at the record as a whole because the government is entitled to a fair trial, just like Jon Walker is entitled to a fair trial. And if this Court does not allow any evidence of a shell company that Mr. Walker clearly created to use to continue this fraud, then there will be no real justice done in this case.

THE COURT: Well --

MS. M. MILLER: Ms. McConwell actually got up here and said to Your Honor in her argument -- well, look --

09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:02AM 09:02AM 09:02AM 09:02AM 09:02AM 09:02AM 09:02AM 09:02AM 09:02AM 09:02AM 09:02AM 09:02AM 09:02AM 09:02AM

THE COURT: Counsel, you have one minute because the jurors are ready.

MS. M. MILLER: Look at 2939, page 49, it says, Hansen Helicopters, not Jon Walker, is the owner of Limey Air. That's a total misrepresentation because on page 76, years later, Jon Walker is representing, I, Jon Walker, am the 99.9% owner of Limey Air. They're not saying they had no notice of Limey Air. The argument here is that when Limey Air gets $5 million from Pacific Spotters Corporation and we have evidence that Pacific Spotters Corporation is using the identical aircraft that are in the indictment, and it is during the period of time of the indictment, how is that not relevant to be admitted? We're not going to ask the jury to find --

THE COURT: Counsel, Counsel, you do not have to -- it's not a relevance issue right now. It's not -- right now.

MS. M. MILLER: But it is.

THE COURT: Well, it could be. But the point is, the Court is going to -- I'll get back to you in ten minutes.

All the jurors ready to go?

All right, Counsels. Yes, Mr. McConwell?

MR. MCCONWELL: Can we go to the restroom first?

THE COURT: Yes. No -- we'll take a 15-minute recess, and I'll come back. Thank you, Counsels.

(Recess taken at 9:04 a.m.) 09:04AM

(Back on the record at 9:24 a.m.) 09:24AM

THE COURT: All right. Please be seated. All Counsel present, Defendants are present. 09:24AM 09:24AM

Yes, Mr. Martin? 09:24AM

MR. MARTIN: Your Honor, I provided to the government and to Carmen the passport. I'd like to introduce it as a sealed exhibit, if I could, and maybe give it an exhibit number. The government has a copy of it. If that's okay, we could. 09:24AM 09:24AM 09:24AM 09:24AM 09:24AM

THE COURT: All right. Carmen, what number can this be? Defendant's Exhibit? 09:24AM 09:24AM

THE CLERK: 129, Your Honor. 09:24AM

THE COURT: Hold on. 09:24AM

MR. MARTIN: If it could be sealed, Your Honor? 09:24AM

THE COURT: Very well. It will be sealed. And you gave a copy to the prosecution? 09:24AM 09:24AM

MR. MARTIN: Yes, Your Honor, I did. 09:24AM

THE COURT: All right. Exhibit 129. 09:24AM

All right. So over the break, I thought about this issue, I want the parties to give me -- I don't want you to give me a brief, I just want you to give me the Ninth Circuit case law on this issue. Is discovery sufficient to give a defendant notice? I've not heard this argument, to be honest with you, in all my years about discovery and pleadings 09:24AM 09:24AM 09:25AM 09:25AM 09:25AM 09:25AM

are sufficient to give a defendant notice of the charges against him. I think there -- maybe Second Circuit may have ruled on it, but I don't think the Ninth Circuit has, but I may be wrong. And I'm going to check, but you guys will have to find the case law. So just get me the case law on that, and I would think that you want to wait until we finish this issue, right? You want to get him out of --

MS. M. MILLER: Yeah. We're done. This is the last piece of his direct examination. So we're done. He can go to cross now. We will get that case law to Your Honor.

THE COURT: All right. Do you want to -- Mr. Martin and Ms. McConwell?

So you're done with him?

MS. M. MILLER: I'm done.

THE COURT: Did you say that already to the jury?

MS. M. MILLER: No, no, no. When the jury comes back, I will let them know we're finished.

THE COURT: All right. Very well.

MS. M. MILLER: What I'll say, Your Honor, is we're finished pending further ruling from the Court so that if he is called back, it's not unusual.

THE COURT: Right. Okay.

Mr. Martin, Ms. McConwell, you ready to proceed then on cross-examination of the witness pending this issue?

MR. MARTIN: So just so I understand, it's the

intent then that with crossing, and then based on the Court's ruling, he'll either be recalled or he won't be recalled?

THE COURT: Right. Right.

MR. MARTIN: I prefer to get it resolved, Your Honor, but --

THE COURT: Well, can you get your cases in 20 minutes? Can you guys do it, like -- it shouldn't take --

MS. M. MILLER: I already have them. I could just e-mail it to chambers.

THE COURT: You've got Ninth Circuit case law on that?

MS. M. MILLER: I will tell you in one second, Your Honor. I have case law on it.

THE COURT: I think there is District Court cases, but I don't know about Ninth Circuit.

MR. MARTIN: The only concern I have, Your Honor, is, as the Court is aware.

THE COURT: Yes.

MR. MARTIN: The discovery in this case is the universe. It's not like it's, you know -- we've got 30 -- I don't remember how many terabytes of data, it's a gazillion.

THE COURT: You said it was up to where the --

MR. MARTIN: The International Space Station. And it's kind of -- that's the kind of cases I'm going to be looking for. I don't know if I can do it in 20 minutes, but I

can sure try, Judge.

THE COURT: Well, all right. Look, I think it's just a pretty simple issue. Okay. We already know that a defendant is entitled to notice of the charges against him in an indictment. We know that.

The question is, and this is an interesting issue because you have a defendant, Mr. Walker, who's being accused of owning 99.9% -- 99% of Hansen Helicopters and has all of these -- allegedly, I'm just saying allegedly, alter ego corporations that he's working through, these shell corporations, there is 47 of them, I guess. And the question is not one of them are mentioned in the grand jury indictment. There are three grand jury indictments in this case. We're talking about right now. The Second Superseding Indictment. And so is it sufficient notice to the defendant that the charges against him, as it relates to the alter ego of the corporations, with regard to who they are and what they are, to be found in discovery. Whether it's 30 terabytes, I don't know whatever you want to call it, to the international news station, whatever you call it, you know. With regard to discovery and with regard to pleadings, really, I've not heard this argument. I'll be honest, all the years I've been a judge, I've not heard this.

MR. MARTIN: Your Honor, let me be clear, there are multiple corporations mentioned in the indictment.

THE COURT: Right.

MR. MARTIN: It's not like there are none. There are multiple. I mean if you just go to page 13, there is -- page 14, I mean there is a bunch of them. So I mean...

THE COURT: Well, I know, but -- okay, so -- any way, so you could make that argument.

MS. M. MILLER: Yes.

THE COURT: The point is -- the point is, the shell corporations, that's it.

MS. M. MILLER: Yes, we will get you the case law, Your Honor. And --

THE COURT: All I -- I don't want -- I don't need you guys to do an analysis. I can look at the case law.

MS. M. MILLER: No. We're just -- we're just going to get you the case law.

THE COURT: Prosecution will get theirs. Defense, you can get yours. How much time do you need, it's 9:30?

MR. MARTIN: I mean... I didn't even look, Judge, but I'll --

THE COURT: How much time? What do you think? What's your feel? I don't think it should be that big of a -- honestly, I don't think it should be that difficult of a find, but I don't know.

MR. MARTIN: I'll -- you tell me how much time I

have, Your Honor, I'll use it.

MS. MCCONWELL: Maybe an hour? Could we check back in an hour.

THE COURT: Okay. You're going to just do it from here?

MR. MARTIN: Yeah. We'll just go back there.

THE COURT: Okay. I'll give you an hour. The prosecutor -- might be faster if the prosecutor gives you their cases since they already have it, and if she wants to give it to you now, would be better. Give it to me and the -- give it to me too so I could look at it. We already have been looking at some cases anyway.

MS. M. MILLER: Yes.

THE COURT: But why don't we look at that. And then I'll give you an hour. And if it's earlier than an hour, let me know because the jurors are waiting.

Just tell the jurors we're still working on legal issues. Okay. Thank you.

And they're all here. By the way, all the jurors are here. They all came in on time, by 9:00 a.m., number one. Well on time for today. Number two, there is one juror, as you might recall, whose wife is ready to give birth any minute, so just FYI. He might be called out, but just FYI. Another juror just wanted to give us notice that they have a family member that's really sick, but they're just on call,

but they're here. All right.

MS. M. MILLER: And the only other thing I want to bring to the Court's --

THE COURT: Can you get on the mic there, Ms. Miller?

MS. M. MILLER: I'm sorry. I put my mic on, Your Honor.

THE COURT: Go ahead.

MS. M. MILLER: So Mr. Martin represented to the Court that Mr. Walker's passport showed no travel to the Philippines after 2016, but I'm looking at the copy of it and there is a stamp for the Philippines in November of 2018. So I'm curious about -- I'm unsure of that representation versus what I'm seeing here.

THE COURT: All right. So why -- you know what they could flush that out. They'll have to flush that out. I mean if -- (Pause.) Sometimes too, I'm not sure, you know, Ms. Miller, I know that sometimes you have to look at it carefully. If the stamps are -- come together, sometimes they get --

MS. M. MILLER: It's pretty clear.

THE COURT: Okay. So if it's clear then -- okay. I notice on some of my stamping, they put one on top of the other.

MS. M. MILLER: Says November 15th, 2018 on it.

MS. MCCONWELL: Let's take our break and work on what our issue is that the Court --

MR. MARTIN: Two years. That's a run, Marie.

MS. M. MILLER: Excuse me?

MR. MARTIN: Does not mean he was in the Philippines two years ago.

MS. M. MILLER: So are you saying now that -- you represented to this Court that the last stamp was from --

MR. MARTIN: No. What I'm saying is there is a run.

MS. M. MILLER: -- 2016.

MR. MARTIN: It's a run. It's 2016. If you'll look at it.

THE COURT: Okay. Well, you guys can argue that later because that's not before me. And I'm focusing on the indictment. It's 9:32. I'll see all of you at 10:32. Unless you find the cases earlier, which I'm probably sure you will be able to find it.

MS. MCCONWELL: They're going to e-mail it to us.

MS. M. MILLER: Yeah. We have a case right here, Your Honor, so we'll send to you.

THE COURT: Just one case.

MS. M. MILLER: Well, there are many, but you wanted Ninth Circuit and you wanted on point so we'll --

THE COURT: And there is a Ninth Circuit Court of

Appeals case. Okay. Good to know.

MS. M. MILLER: Yes. And it's citing a second one.

THE COURT: It's not a District Court case, it's a Ninth Circuit Court of Appeals case?

MS. M. MILLER: Both. Ninth Circuit citing another Ninth Circuit. We will send it to chambers --

THE COURT: Yeah. Send to it chambers and to Counsels. Thank you, Counsel.

MS. M. MILLER: Thank you, Your Honor.

THE COURT: Okay. We'll see you in an hour. Longest witness ever.

(Recess taken at 9:33 a.m.)

(Back on the record at 10:30 a.m.)

(Pause.)

THE COURT: Did you guys send me something, Defense?

MR. MARTIN: We didn't, Your Honor. I didn't find anything specific on the issue you raised about discovery expand --

THE COURT: Okay. You ready to go? Okay. Let's go. We'll call the case up then. Okay. Or I'll just call -- let me know. We're outside the presence of the jury and we took a 30-minute, or no -- hour recess, right? Was it an hour? It was an hour recess. So the Court is in receipt of

09:32AM 09:32AM 09:32AM 09:32AM 09:32AM 09:32AM 09:32AM 09:32AM 09:32AM 09:32AM 09:32AM 09:32AM 09:33AM 10:30AM 10:30AM 10:31AM 10:31AM 10:31AM 10:31AM 10:31AM 10:31AM 10:31AM 10:31AM 10:31AM 10:31AM

 an e-mail from Samantha Miller to Carmen Santos, my clerk, and to the defense Counsels and then -- so one page e-mail and then the notice of an unpublished, I'm sorry, unpublished opinion. *United States versus Vera*, 894 F.2d 410, 1990 -- hold on one second. All right. So the Court is in receipt of the case from United States of America. And then defense Counsel, on the record, did you guys submit anything to the Court?

Mr. Martin, I'm sorry, just to place it on the record?

MR. MARTIN: No, Your Honor. I did not. I did not find anything on point to the issue that you cited to us, nor did I find that the government's case was on point to the issue it was directed to.

THE COURT: So I've already read the government's case. So let's hear from you why the government's case should not be considered by this Court. Mr. Martin.

MR. MARTIN: Sorry, Your Honor.

THE COURT: That's okay.

MR. MARTIN: And if I might, Judge. Which I got it here, I'm trying to remember which case it was.

THE COURT: Okay. *United States of America versus Vera;* Johnny Vera 894 F.2d 410. 894 F.2d 410, 1990.

MR. MCCONWELL: Is that a memorandum or a order?

THE COURT: This was an unpublished decision.

        MS. M. MILLER: Citing a published Ninth Circuit decision, Your Honor. *U.S. v. Long*.

MS. MCCONWELL: *U.S. v. Long* only has to do with a denial of the request for Bill of Particulars. It's not on point.

THE COURT: Okay. Well, let me just hear the arguments then. Okay. Did you find the case, Mr. Martin and Ms. McConwell? Did you find the prosecutor's case?

MR. MARTIN: Ms. McConwell is going to argue it, Your Honor. I was looking at another one.

THE COURT: Oh, okay. All right.

MS. MCCONWELL: So, Your Honor, first of all, this is a non-published opinion. So it's not -- I don't think -- it does not have precedence for this Court -- for this Court to rule upon that. The Ninth Circuit case, which is the *U.S. v. Long* that the United States also provided, dealt with a Bill of Particulars issue and an indictment. Each time, the only thing that was complained of was the sufficiency and the specific counts that were contained in the indictment that they weren't -- that they didn't give notice. None of these cases are for the case on point which is expanding the actual indictment to include additional party defendants or -- or try to shoehorn defendants -- other entities into an indictment.

In our indictment, the paragraphs that Ms. Miller, I mean, Ms. Marie Miller had cited to, which was

10:33AM 10:33AM 10:33AM 10:33AM 10:33AM 10:33AM 10:33AM 10:33AM 10:33AM 10:33AM 10:33AM 10:34AM 10:34AM 10:34AM 10:34AM 10:34AM 10:34AM 10:34AM 10:34AM 10:34AM 10:35AM 10:35AM 10:35AM 10:35AM 10:35AM

127, does not give -- does not give any of the Defendants either I guess, Mr. Walker or Hansen Helicopters, and Hansen Helicopters isn't in this; it identifies specifically using Caledonian Agency, Bank of Hawaii and Hansen Northern Helicopters. And in those specific bank accounts, it doesn't give us any type of a notice that Pacific Spotters is somehow going to be -- attempted to be dovetailed into -- into this action.

We are actually in the third to the last witness. We've been in trial since March. And at no point has this -- has the government raised this issue that they want to include a Philippine corporation that the United States government has no jurisdiction over or Philippine-registered aircraft into a criminal trial in the United States.

So the case that they provided is -- is -- what he's trying to -- what this defendant was trying to do was have his conviction set aside because he didn't -- he didn't have adequate -- because he didn't have adequate notice or due process. And I believe in this *Vera*, it was a very limited indictment. It wasn't -- it was a drug -- he was -- it was a drug charge, whether he knowingly and intentionally possessed or to distribute cocaine.

THE COURT: Well, I mean I think it was more the amount, whether it was approximately -- approximately five kilograms of cocaine versus the statutory requirement that it

 be five grams.

MS. MCCONWELL: Five grams. Right.

THE COURT: Five kilograms or more.

MS. MCCONWELL: So at least he knew he was dealing with a drug, cocaine. This is a completely different entity being -- trying to be shoehorned into a -- how many -- or indictment is -- and it's the third one... 47 pages long, 110 counts. And as you see in your Exhibit 3003, it's -- you know, a corporation that is incorporated in the Philippines, and they're attempting to say because Mr. Walker has an ownership interest, somehow that should put everybody on notice that that -- that that lawful corporation should be brought into this Court in this criminal trial. And I just think should fail, and particularly, since it's trying to be brought in on the third day of the third to the last witness testimony in the trial. If this was an issue, if this was something that the government thought was part of this indictment, we should have been hearing about this at the very beginning of trial, which we have not. We did not.

THE COURT: Okay. Yes, Mr. Martin?

MR. MARTIN: Your Honor, pardon me. This case that the government cites -- and I apologize for not being fully prepared when we first walked in. I was trying to find some cases that were on point to what you submitted to us and I hadn't read all of this, but this case is a -- more than an

issue related to the indictment. It's a sentencing issue. It talks about, you know, does it meet a -- is the sentence ten to life versus what other sentence it might be. And the defendant in that case alleged he did not have sufficient notice.

This -- the case we have, Your Honor, the issue that you ask is, are we informed that -- through an indictment -- can an indictment basically be broadened by discovery so that we are informed of everything? I don't necessarily think this case touches that. And the reason I say that is this, this is a one-count indictment that this gentleman plead to, Mr. Vera, I'm assuming it's Mr. Vera, pled to. We're dealing with 110 counts. We're dealing with tons and tons of discovery in this case. Much of which we are -- as the Court is aware, we have been getting, during this trial, exhibits, which I consider to be discovery in this case. And I submit that although *Vera* is instructive, it's not necessarily controlling and that it would be more prudent at this point, this far along in the trial, for us to stay on scope, on focus as to where we have been up until today. Because virtually, we're at the point where the government is trying to completely change the theory of the case in their third from last witness and bring in new things that we have to defend against. And I don't think it's appropriate. And I don't think this case addresses the specific point that the Court

10:38AM 10:38AM 10:38AM 10:38AM 10:39AM 10:39AM 10:39AM 10:39AM 10:39AM 10:39AM 10:39AM 10:39AM 10:39AM 10:39AM 10:39AM 10:39AM 10:39AM 10:39AM 10:39AM 10:40AM 10:40AM 10:40AM 10:40AM 10:40AM 10:40AM

 asked us to address.

THE COURT: Are you -- I'm sorry. So I heard Ms. McConwell say that she felt that the Second Superseding Indictment in this case, she didn't use the word "reform" but she's saying adding on a -- other defendants in this case, including Pacific Spotters.

MR. MARTIN: Yes, Your Honor, it included -- when we first got this case in May of 2018, there were four defendants: Jon Walker, Rufus Crowe, Turner Kapp and Marvin Reed. There was a second -- there was a superseding indictment, which included Hansen Helicopters, and I believe Randall Rogers. Then there was the Second Superseding Indictment which added the Frank Litkei and Spares, Inc. So we've gone through -- and we went from -- and I may be wrong on my numbers, but we want from 18 counts, or somewhere in that neighborhood, to 70 or 80 counts, to 110 counts is what's alleged in this indictment, Your Honor. So each indictment expanded and expanded and expanded. If that was the question you asked me?

THE COURT: Okay. Yes?

MS. MCCONWELL: Well, and, Your Honor, also the witness that is on the stand right now is on the stand for only the wire fraud and the money laundering counts. And so it's also not clear on them trying to reform the indictment that -- I mean, I assume it's only relevant to if -- it would

only be relevant to these Counts 100 through 110, but I would submit I don't think they've given notice. I don't think it's patently fair to the Defendants to change it this late in the game.

THE COURT: Okay. Anything else, Counsels?

MR. MARTIN: No, Your Honor.

THE COURT: Hold on one second before I hear from -- let me check my notes. Ms. Marie Miller, are you going to argue this?

MS. M. MILLER: Yes, Your Honor, I am.

THE COURT: Okay. You may proceed.

MS. M. MILLER: The whole point of a superseding indictment, Your Honor, is to add additional charges or additional defendants if evidence comes to the attention of the government that additional crimes are being committed.

To correct Ms. McConwell, we are absolutely not adding Pacific Spotters Corporation to the indictment. We're not charging Pacific Spotters Corporation. We've charged Jon Walker. Also, Your Honor --

THE COURT: Okay. Hold on, hold on. So let me just think about that. Are you not incorporating by reference Pacific Spotters into the shell corporations that are being alleged in the indictment?

MS. M. MILLER: It is one of many shell corporations that Jon Walker used, yes. However --

THE COURT: Okay.

MS. M. MILLER: -- even though Ms. McConwell is saying, well, wait a minute, what does that have to do with the wire fraud charges? It has everything to do with the wire fraud charges. She keeps ignoring Count 99 of the Second Superseding Indictment which is the conspiracy to commit wire fraud. And where we incorporated in all of our allegations that preceded that. What's important about that count, Your Honor, and what's important about this piece of evidence is we have evidence that Pacific Spotters Corporation wired funds from its continued lease of the helicopters to Limey Air, Inc. That's the evidence that is subject of this motion.

Ms. McConwell also said we haven't heard about it in this case until this point. That's not true. We talked about it in opening, Ms. Jones testified specifically about Pacific Spotters, Mr. Marinho testified specifically about Pacific Spotters. And by the way, to remind the Court, Mr. Marinho's testimony wasn't live. It was a deposition that was taken years ago, and where that issue about Pacific Spotters being used in the fraud was flagged by the government for the Defendants during the course of that deposition.

We introduced a number of exhibits that pertained directly to Pacific Spotters: Exhibit 2939, Exhibit 3047, Exhibit 829, Exhibit 3003, Exhibit 775, Exhibit 770, Exhibit 771, 2900, 2990. ECFs that we've asked this Court to

take judicial notice of.

I think the other thing that's critical for the Court to note is that these helicopters were sold to specific -- Pacific Spotters by Jon Walker who signed off on it. And, Your Honor, those helicopters, when they were sold to Pacific Spotters, had been registered under the name of Bean Bag, which you've heard, which the Defendants are not contending they had no notice of; O'Hara, which you've heard that name, the Defendants are not contending they had no notice of; of Hansen Northern, which you've heard, the Defendants aren't contending they had no notice of; of Whirlwide and of Helifish. Those were the registered --

THE COURT: I'm sorry. They are not -- let's -- they're not at least -- they have not complained about that, that's right.

MS. M. MILLER: No, they have not.

THE COURT: As of right now, we're only focusing though on Pacific Spotters because of the witnesses on the stand.

MS. M. MILLER: But Pacific Spotters bought those helicopters. Jon Walker sold his own helicopters to Pacific Spotters from the shell companies that have been identified to Pacific Spotters after the first indictment --

THE COURT: Listen.

MS. M. MILLER: -- to conceal --

THE COURT: Okay. The theory of your case is all well and good, we've got that down, you got it down. The question is notice.

MS. M. MILLER: So let's --

THE COURT: I guess my question to you is --

MS. M. MILLER: Yes.

THE COURT: -- what about allowing amendment of the indictment? If it would not prejudice the Defendant, the Court could allow it. Should I do that? Allow amendment of the indictment? I know they're going to just jump up and go crazy.

MS. M. MILLER: Your Honor, I would argue this is not an amendment of the indictment, and that's why we cited this case law to you.

THE COURT: I think this case is weak, I'll be honest with you. I looked at this case carefully. This is a one-count indictment. This has to do with a guilty plea, and this is really an issue of does the defendant have notice that he's going to receive a more severe sentence because the indictment says approximately five kilograms, whereas the statute says five kilograms or more. I mean it's pretty simple. I've done hundreds of sentencings. So I mean this is like kind of a weak -- I mean this particular case is a weak case for your citation. And then the judge -- I'm looking at how this was written by the appellate court, and where they

talk about --

MS. M. MILLER: In *Long*.

THE COURT: They look at the District Court's colloquy and where the District Court judge, before the plea of guilty to that count, specifically informed the defendant of the penalties, the maximum penalties. The defendant says I'm going to show you that it doesn't apply, and in fact, with regard to the weight of the cocaine, the prosecution and the defense both had expert witnesses to say how much was that cocaine weighing.

So, I mean, I think that clearly this case is strong in terms of -- strong in terms of for that case, but I just don't see it. I'm more concerned about this case, where you have a 100-count indictment and I still don't -- I guess I still don't understand why the prosecution, anybody in the prosecutor's office, they just didn't put in the names of the corporations. You guys knew it. You guys knew that Pacific Spotters -- I mean, you may not want to admit there was -- I don't know, whatever -- I've just not seen this in court, like, you guys knew that after the first indictment, as I recall, and correct me if I'm wrong, that you allege that Mr. Walker or somebody went ahead and -- yeah, Walker, they opened up an account to get moneys, that's after the first indictment. Well, then fast-forward to the Second Superseding Indictment, I mean, I just -- I just --

MS. M. MILLER: Your Honor, first of all --

THE COURT: You guys knew that.

MS. M. MILLER: Your Honor.

THE COURT: I just don't understand why it's not in there. It's not that big of a deal to stick it in there.

MS. M. MILLER: And it's also -- if the Defendants wanted to know all of the shell companies that the government is contending were used by Jon Walker for this fraud, the Defendants could have filed a Bill of Particulars. And Your Honor knows that they did in fact file motions for bills of particulars pertaining to counts that they had questions about. We have alleged and have continued to allege in the Second Superseding Indictment --

THE COURT: I don't think we -- I don't think we disagree with that. I think everybody agrees that they could have done it. They didn't do it. As I recall, somebody correct me if I'm wrong, with regard to the record, the defense did not file a motion for Bill of Particulars as it relates to the names --

MS. M. MILLER: Correct.

THE COURT: -- and addresses of any alleged shell corporations.

MS. M. MILLER: Correct. They did not because they knew.

THE COURT: Okay. You could say that.

MS. M. MILLER: This is an issue of notice, but what's really, really important here is that we go beyond the external and we go to what's really happening here. There is no question that the Defendants were aware that Jon Walker was going to now use Pacific.Spotters Corporation to continue the fraud. There was always a question, and Your Honor is saying, well, the -- the government you knew -- we didn't know in 2018. In 2018 --

THE COURT: But you guys knew it. No, but you knew the corporations. Is it not true --

MS. M. MILLER: We didn't --

THE COURT: You guys correct me if I'm wrong, but --

MS. M. MILLER: Yes.

THE COURT: -- did the prosecution not know of the 47, 48, whatever shell corporation names by the time the Second Superseding Indictment was brought to the grand jury?

MS. M. MILLER: We knew those -- yes, that are on 829.

THE COURT: And it's actually 48. There's 47 there plus Pacific Spotters is 48.

MS. M. MILLER: But we did not know Pacific Spotters was being used the way it was because I want to bring this Court's attention to Judge Manibusan's order at 238. That was in 2019, Your Honor. And the Defendants, as a matter

of fact, Mr. Kapp was saying to Judge Manibusan that there was
a de minimus relationship between Pacific Spotters and Hansen
Helicopters.  It wasn't until after the Second Superseding
Indictment that we learned that all they did was completely
move the business over there.  It was after.  You've seen the
dates on the records that we received from the Philippines,
every single one of those dates is after the Second
Superseding Indictment, not before.

And you also saw the representations made by
defense Counsel in seeking to get travel to the Philippines.
Jon Walker never sought to obtain travel to the Philippines,
yet when we got the documents showing the creation of Pacific
Spotters, that's when we saw that Jon Walker had his passport
as an identifier for him to have his signature notarized in
the creation of Pacific Spotters and also in the creation of
the bank account.

Limey Air, which is the bank account at issue
here, and I want to get two pages into evidence from that bank
account, those two pages show that Limey Air received
$5 million from Pacific Spotters in --

THE COURT:  All right.  So Ms. -- okay.  You
don't have to go -- listen, please, I don't need to hear the
evidence.  I know -- I think I know the evidence pretty well.
I'm pretty -- I'm a quick study on this.

MS. M. MILLER:  Yes.

THE COURT: So you guys don't have to go through the evidence. The only issue before this Court is this case that you cite --

MS. M. MILLER: Yes.

THE COURT: -- enough for me to agree with you? That's it. Is that -- that -- so I just -- I say that to you, I read this -- okay, maybe there is a stronger case because this is -- it's different, I mean, you know, this case has gotten more longevity, and we are talking about shell corporations. You're saying Jon Walker is Hansen Helicopters, is spotty -- so forth, so on and 47 others. He is all that in one.

MS. M. MILLER: Yes.

THE COURT: Yeah. And I just don't -- I guess you're just not giving me an answer as to why any prosecutor just didn't put in there. Why not?

MS. M. MILLER: We would have had to supersede a third time to put all the shell corporations in.

THE COURT: You could have done it by the first one or the second one.

MS. M. MILLER: We couldn't have done it by the first one. The first one --

THE COURT: Well, how about by the second one?

MS. M. MILLER: We couldn't have done it by the second one, Your Honor.

THE COURT: You couldn't have put 47 in?

MS. M. MILLER: No. Your Honor, we could not have done it by the second one because we were still --

THE COURT: Investigating?

MS. M. MILLER: -- getting information about the -- we filed an MLAT with the Philippine authorities to get information from them.

THE COURT: Okay. But here's the deal, I totally understand that, you guys were still investigating this case.

MS. M. MILLER: Yes.

THE COURT: As you were --

MS. M. MILLER: Yes.

THE COURT: As you were going into the grand jury --

MS. M. MILLER: Yes.

THE COURT: -- the investigation was not complete. And that's part of your theory that you feel the conspiracy was still ongoing.

MS. M. MILLER: Which is why we had that allegation in the Second Superseding Indictment.

THE COURT: I understand that, but my point is that, here we are -- I mean, that is -- that is kind of -- that is the problem with notice. I mean, because you're still -- even as right now as we're at trial, the balls are juggling, you're saying to me, Judge, we believe that there's

still deaths occurring, alleged deaths occurring. We still believe there is some stuff going on that shouldn't be going on with the Defendants or Defendant. And so that's still going to be maybe an additional charge, additional indictment.

MS. M. MILLER: Mm-hmm.

THE COURT: Or --

MS. M. MILLER: But not Pacific Spotters. We, Your Honor --

THE COURT: But I'm just saying that even as we are in trial and even as have you gone through the grand jury indictment, the original grand jury indictment to the third grand jury indictment to today's trial, right before the end of the prosecution's case in chief, this case is still developing as we speak.

MS. M. MILLER: Because the Defendants are continuing the fraud. I am not sure what we can do, Your Honor, other than what we have done.

THE COURT: Let me just say this, because I'm not the one that did bail detention hearings.

MS. M. MILLER: Yes.

THE COURT: I don't know and I'm not going to criticize any of my judges --

MS. M. MILLER: Yes.

THE COURT: -- before me. But there is always a way that certain activities could be banned, prohibited --

MS. M. MILLER: Yes.

THE COURT: -- if it's part of criminal conduct --

MS. M. MILLER: Yes.

THE COURT: -- related to the indictment.

MS. M. MILLER: Yes.

THE COURT: But obviously, either you tried and you were unsuccessful or whatever it may have been. That's what's happened. So I'm not even going to say I think you're right or you're correct in any culpability by the Defendants because I don't know.

MS. M. MILLER: Right.

THE COURT: You know everything is a clean slate to me here. But my point is, that is always a danger of -- I've been a prosecutor too for ten years before I became a judge. So we're talking 40 years of experience on this bench, and I'm saying this only because when I evaluate the case and, I mean, I'm listening to all of you -- you're a good prosecutor, Ms. Miller, really you are. I'm just baffled by why the hell -- I must say that, I just don't understand, really why it wasn't even -- why it wasn't put in the indictment, and let's assume you couldn't put it in the indictment, I mean, this is a good motion, this is a valid motion for the defense to bring up. Question is whether they win or not is a different story, but I'm just saying that had

even the prosecutor said -- submitted, and I don't know, maybe you did, tell me if I'm wrong, I've read a lot of things in this case. You can see my staff and I have been working our overtime to get all my orders out too. That was there anything, any addendum to say, hey, by the way, when we say shell corporation as to this, you know, this is what we mean?

MS. M. MILLER: In Mr. Marinho's deposition, Your Honor, when Pacific Spotters Corporation was identified as the company that paid Mr. Marinho --

THE COURT: Yup.

MS. M. MILLER: -- his payment, even though he was hired by Hansen Helicopters, and he was put on a boat through a company called Alpha Air, at that point, the government maintained that Pacific Spotters was another entity of Hansen. And at that point, the question was asked of Mr. Marinho in his deposition, "Do you know who Pacific Spotters was?" And I don't know if you recall this or not, but he said, he asked Diane Keller, who was an employee of Hansen Helicopters, "Who is Pacific Spotters? The bank stopped my payment because I gave them a contract with Hansen and Alpha Air and now I get a check from Pacific Spotters." And Diane Keller on behalf of Hansen, an agent of Hansen, said, "Pacific Spotters is just another Hansen entity."

The defense Counsel said to Judge Manibusan that Pacific Spotters was another Hansen entity. This occurred

after the Second Superseding Indictment, and we did not get all of records from the Philippines pursuant to the MLAT until before trial. That's why they're marked 3003, because we didn't even have them at the time that we did our first exhibit list.

And, Your Honor, Limey Air, which is the bank account that that $5 million was wire transferred into, has always been -- the defense is not saying, well, we didn't know about Limey Air. It's always been a part and parcel of this case. In their own filings --

THE COURT: If I could just say --

MS. M. MILLER: -- which -- referring to this.

THE COURT: Okay, I know you -- listen, again.

MS. M. MILLER: Your Honor, if you're not going allow it in --

THE COURT: No, no, no. That's not the issue. I'm trying to understand this. What I'm telling you is, as I listen to this, the question is, did the indictment give the Defendant notice of the alleged facts and of the prosecution's basic legal theory? I'm talking about the four corners of the indictment.

MS. M. MILLER: Yes.

THE COURT: The -- okay, you're arguing that.

MS. M. MILLER: Our position is yes.

THE COURT: I got your position. But you're

10:57AM 10:57AM 10:57AM 10:57AM 10:57AM 10:57AM 10:58AM 10:58AM 10:58AM 10:58AM 10:58AM 10:58AM 10:58AM 10:58AM 10:58AM 10:58AM 10:58AM 10:58AM 10:58AM 10:58AM 10:58AM 10:58AM 10:58AM 10:58AM 10:58AM

citing me to go outside the indictment. That's what you're telling me to do. You're citing this case.

MS. M. MILLER: No.

THE COURT: Oh, this is outside of the indictment.

MS. M. MILLER: Paragraph 47 and paragraph 127 of the indictment both identify the use of shell companies, plural, in the fraud.

THE COURT: Right, you -- okay. And that's true, but my point is, I really feel that that -- for you to say, look, it's in the deposition with Marinho who, by the way, can barely speak English, and we've had to go through interpretations, and I listened to him, and I -- we had him on the video or whatever it was. We had to get Counsel in, as I recall, Razzano, Lujan, blah-blah-blah. And so, I mean, is that -- and not even knowing at that point, because I don't even know whether or not -- no, I had not even reviewed yet his deposition -- I don't think I had ruled on his deposition testimony, what was going to be in or out. And so that whole issue of notice again, I mean, that's just another issue that makes it more complex. And I got to just tell you honestly, I've never seen this in all my years. I have not. You know, 47, 48 shell corporations is a lot.

MS. M. MILLER: It is.

THE COURT: If it was -- yeah, I mean, and I just

10:58AM 10:58AM 10:58AM 10:58AM 10:58AM 10:58AM 10:58AM 10:58AM 10:59AM 10:59AM 10:59AM 10:59AM 10:59AM 10:59AM 10:59AM 10:59AM 10:59AM 10:59AM 10:59AM 10:59AM 10:59AM 10:59AM 10:59AM 10:59AM 10:59AM

think that this case is -- is not the strongest. It's probably -- I think it's a weak case for you to cite to me.

MS. M. MILLER: Well, we tried to stick with Ninth Circuit. There are other cases --

THE COURT: No, all I care about is the Ninth Circuit.

MS. M. MILLER: Right. And there are other cases in other circuits that could be persuasive that are much, much stronger involving challenging indictments, involving indictments where there is fraud alleged and where there is substantial things and every single court recognizes the fact that if the prosecutor was required to put every single fact they were going to prove at trial in an indictment, indictments would be unwieldy. And this is a fact, we're really talking about here a fact. The Defendant is saying they didn't have notice.

THE COURT: What case are you talking about, what circuit? I have never had this issue in my court in my life, so I want to see it. If you're telling me that there is something that could be persuasive --

MS. M. MILLER: Yes.

THE COURT: Not mandatory, I'll look at it, but you --

MS. M. MILLER: Yes.

THE COURT: And I did say just give me the Ninth

Circuit because I thought you guys had Ninth Circuit case law, but I --

MS. M. MILLER: We do, you're saying it's a weak case. Okay, it's a weak case.

THE COURT: It's a weak case. It's a weak case. If you're going to compare this -- now you're saying, look, there's other cases that are more complicated.

MS. M. MILLER: There are.

THE COURT: That deals with fraud, that have a lot of indictments, could be shell -- whatever it might be. Give me the case law.

MS. M. MILLER: Then we will do that, but at this point, Your Honor, what I would recommend, because I don't want to hold the jury up any longer, I will end my direct examination of Special Agent Khamvongsa. The government feels very strongly that those two pages of that bank record for Limey Air should come in to prove the conspiracy to wire fraud, and we'll just put a pin in. We will cite you the other circuits which are persuasive, as you recognized, not -- they're not mandatory for you to follow it, but there are fact patterns in other cases --

THE COURT: All right. We'll look at it. I never -- I never believe a lawyer until I read it myself.

MS. M. MILLER: Yeah. Absolutely.

THE COURT: So.

MS. M. MILLER: We will do that.

THE COURT: I'm not necessary saying against you because I think you're a good lawyer, but I don't believe lawyers.

MS. M. MILLER: We will absolutely do that. We will do that.

THE COURT: Yes.

MR. MARTIN: Your Honor, very briefly. When the government submits to you that they didn't know about Pacific Spotters until 2020, that's disingenuous. And I want to point to the Court --

THE COURT: I think they did say though earlier on in 2018 or if I recall -- I can't remember the date, but I did think that there was evidence --

MS. M. MILLER: It was when they were filing their motions to go to the Philippines, obviously they mentioned Pacific Spotters first.

MR. MARTIN: May I --

MS. M. MILLER: Which means, you know, they're saying they have no notice, but they mentioned Pacific Spotters first.

THE COURT: Well, listen, Counsel, we're talking about notice in the indictment. Not notice in the world out there, space.

MR. MARTIN: You asked them when they knew about

it so that they could have put it in the indictment. I received this grand jury subpoena June 10th, 9th or 10th from the government, which is the one that formed the basis for these two exhibits that we're arguing about. The grand jury subpoena that supports these two pages of exhibits they want to introduce is dated November 22nd, 2019. They've had these records prior to the Second Superseding Indictment, Your Honor. And we never had this grand jury subpoena.

THE COURT: Well, okay. No matter what, bottom line is, there has been no mention of any of the specific shell corporations. That's really the issue before the Court.

MR. MARTIN: Correct.

THE COURT: And specifically we're only talking about Pacific Spotters. Because that's the only matter that's being challenged, because of the agent. So I -- the prosecution is going to, you know, she could bring back the witness, but I -- she can go ahead and submit a -- if she thinks that there is stronger, not Ninth Circuit but circuit opinion, I'll look at it, you guys can look at it. But in the meantime, if the prosecution has no further questions of the witness, you guys go ahead and start your cross.

MS. M. MILLER: Yup.

THE COURT: And then nothing about Pacific Spotters would be allowed to be discussed at this time. I think that's fair. So at this point, the Court is not going

to allow Pacific Spotters issue to be brought up. So we should move right along because it's -- oh.

MR. MARTIN: Just to protect my record, Your Honor.

THE COURT: -- 11:04.

MR. MARTIN: I am asking that this issue is at an end, and that Agent Khamvongsa is not -- I want to put him behind us. I'm just making my record. So I object to him being allowed to be recalled.

THE COURT: Well, I mean, I haven't said he could be recalled. The prosecutor wants to just have the opportunity to look at -- pull a circuit opinion. How long will it take you -- it took you -- you guys could get that fast.

MS. M. MILLER: We have one right now. We're going to send to chambers, Your Honor.

THE COURT: Let's look at it right now. Hold on, we'll wait then. If you got it now, let's look at it now. What circuit?

MS. M. MILLER: It's Second Circuit, Your Honor.

THE COURT: That's what I thought. I thought it was second. All right.

Did you guys send it? Did you send it, Ms. Miller?

MS. M. MILLER: I'm sending it.

THE COURT: You're sending it now? 11:06AM

MS. M. MILLER: Right now. 11:07AM

THE COURT: Then, Emily, you're going to send it to me? 11:07AM

(Discussion with law clerk.) 11:07AM

MS. M. MILLER: It was sent, Your Honor. 11:07AM

THE COURT: Okay. Thank you. Let me look at that. You sent it to Counsel, too? 11:08AM

MS. M. MILLER: Yes. 11:08AM

THE COURT: Yeah. Okay. Thank you. 11:08AM

(Pause.) 11:08AM

MS. S. MILLER: Emily, will you get it if I send it to chambers at -- 11:08AM

(Pause.) 11:08AM

MS. MCCONWELL: So which is the case, the *Hamling versus United States*? 11:08AM

THE COURT: I'm sorry? What was that? 11:08AM

MS. MCCONWELL: I'm trying to figure out which case she wants us to look at. 11:08AM

THE COURT: How many -- did you send one case, or how many cases did you guys send? 11:08AM

MS. MCCONWELL: She sent a bunch of texts. 11:08AM

MS. S. MILLER: I sent -- it cites three cases, but there is a string cite within one of them that includes additional case law from other circuits, including the Second 11:08AM

Circuit.

THE COURT: I'm sorry. Did you send me the case, or are you sending me the citations?

MS. S. MILLER: Sorry. Did you want the actual cases themselves?

THE COURT: No. It just takes time, now. I'll find it. If you have the case, it'd be nice.

MS. MCCONWELL: Is the case the *United States versus Cohen* case then?

MS. S. MILLER: All of them in there we think are relevant.

(Pause.)

THE COURT: Which case? Okay. I'm just looking at the little summaries, but which case is the one that you said is more similar to this case? Counsel? I'll just pull -- I'll go to that one first.

MS. M. MILLER: The one that we sent the hard copy of to -- the entire copy, Your Honor.

THE COURT: Which one? The one that you sent me already?

MS. M. MILLER: *LeMay*, the Second Circuit one, yes. Oh, I'm sorry. It's Ninth Circuit quoting second?

MS. S. MILLER: Quoting second.

MS. M. MILLER: Yes, it's Ninth Circuit quoting Second Circuit on this issue.

THE COURT: Okay. What second -- what case is the Second Circuit? That's *Long*? No. Oh, that's Ninth Circuit. *Long* is Ninth Circuit. I'm sorry. Which circuit -- which case is that, what's the name of the case?

MS. M. MILLER: One second.

THE COURT: Okay. All right. I want to review these cases. I want to look at them. I want to look at the facts. Which one are you relying on, Counsel? All I care about is the facts. The case law -- I already know the case law. Which facts are more relevant or similar to the facts of this case? You said it's a Second Circuit case?

MS. MCCONWELL: It says *United States versus Cohen*.

THE COURT: I'm sorry?

MS. MCCONWELL: It's *United States versus Cohen*, which is in the second or third paragraph of their e-mail. They cited that, a 1975 case.

THE COURT: Is that the one you guys are relying on? I don't want --

MS. M. MILLER: That's one of them, Your Honor. That's one of them, Your Honor. There are several that are conspiracy cases with representations by the Court that it is not necessary for the government to allege in the indictment every single fact that supports and so, yeah.

THE COURT: Yeah. That goes with overt acts.

That's true. You don't even have to put overt acts at all in the indictment. You don't have to prove that.

MS. M. MILLER: Right.

THE COURT: That's actually surplusage. Shouldn't even --

MS. M. MILLER: Right. Since we were contending that it was all Jon Walker, that was our position. So anyway, those are --

THE COURT: I'm sorry? Since you were what?

MS. M. MILLER: Since we were contending that the illegal conduct was all Jon Walker, that he was the alter ego for all of these companies, that was our position. And by the time that subpoena was issued in November, we went to the grand jury for a Second Superseding Indictment in December. We didn't even have the records.

So, you know, our position is Limey Air, that was the bank account, those were the wire fraud proceeds that went into Limey Air. They came from leasing the same helicopters, that are identified in the indictment, to the same tuna boat companies, that are identified in the indictment. That is more than sufficient for notice. And Pacific Spotters has been mentioned by defense Counsel, Defendants, and is cited in all of the G-number evidence that the government cited. I think --

THE COURT: All right. I got it.

MS. M. MILLER: We just need to --

THE COURT: Yes.

MR. MARTIN: The grand jury subpoena, Your Honor, is December -- November 2019. The indictment is January 2021. I don't think it took two years for them to get a return on this grand jury subpoena that we didn't have a copy of.

THE COURT: All right. Listen, I want to read these. It's going to it take me a little bit. So let me just ask, is the prosecutor relying on *Cohen*, *LeMay* and *Williams?* Are those your three top ones?

MS. M. MILLER: Yes, Your Honor.

THE COURT: Okay, is there any one -- other ones that you want me to look at?

MS. S. MILLER: I mean, I think the bulk quote of all those SDNY cases are relevant here. One of them is security fraud case, for example.

THE COURT: All I care about, honestly, all I care about is which facts are similar to the indictment in this case, in terms of what has happened.

MS. S. MILLER: So the *United States versus Bin Laden* case, 92 F.Supp.2d, where there was a denial of a Bill of Particulars because unindicted co-conspirators weren't listed.

THE COURT: You don't have to tell me what it is, just tell me the case cite. All I care about is the case. I

don't want to review things I don't need to review. I honestly know -- I think I know the case law. I just want to know how -- which case you are you relying on to say, Judge, this is -- this is persuasive authority that should allow us to get this in.

MS. MCCONWELL: I don't see a *Bin Laden* case.

THE COURT: So *USA versus Bin Laden*. I saw Ms. Marie Miller said yes as to *Cohen, LeMay* and *Williams*, right? Right? Anything else?

MS. S. MILLER: I think the final one would be *U.S. v. Bonventre*. It's 2013 Westlaw 2303726.

MS. MCCONWELL: Can you e-mail that case?

MS. S. MILLER: They're all in the cite right there.

THE COURT: So will you repeat it?

MS. MCCONWELL: I don't have Westlaw.

THE COURT: 2013.

MS. S. MILLER: Sorry. 2013 Westlaw, 2303726.

THE COURT: Okay. Got it. So there is five cases. This is what I'm going to go review. All right. Let's go ahead and take a lunch break, and then we'll come back. I'll tell the jurors to go ahead and eat lunch. Their lunch is going to be here in a few minutes. And it's now 11:20. So I'll see all of you at 12:15.

MS. M. MILLER: Yes, Your Honor.

MS. MCCONWELL: And, Samantha, will you e-mail that to me?

MS. S. MILLER: They're all publicly available. You can just Google it, and they'll come up on Casetext for free.

(Recess taken at 11:18 a.m.)

(Back on the record at 12:47 p.m.)

THE COURT: All right. We're back on the record. All Counsels present. Defendants are present. All right. So I reviewed the prosecutor's cases, I still -- I'm not sure 100% on this issue, so I want to take a little bit more time, to be honest with you. It's an important decision for both the prosecution and defense. So I don't want to be rushed into this decision. And anyway, so what I'm going to do is I think we should just go ahead and proceed forward with the agent.

MS. M. MILLER: Yes, Your Honor.

THE COURT: Go ahead and begin cross -- you can end your cross, I mean direct. Defense can start their cross. And then if the Court decides that it would be allowed, then the Court may allow him to be called back. We can -- I can decide that at that time.

MS. M. MILLER: Yes, Your Honor.

THE COURT: But that's -- and I understand that the defense are objecting on the record. Is that -- Mr.

Martin, your objection is preserved and --

MR. MARTIN: Thank you, Your Honor.

THE COURT: -- so is yours Ms. McConwell. All right. We can get the witness up and we'll call in the jury.

MS. M. MILLER: Yes, Your Honor.

THE COURT: I think she's going to say -- are you going to just ask any further questions? You want to just at least let the jurors --

MS. M. MILLER: I'm just going to let jurors know at this time I have no further questions, subject to further rulings of the Court.

THE COURT: All right.

MS. M. MILLER: And then I'll turn it over to Mr. McConwell. If he wants to stand up so he doesn't have to walk over, that's fine. I don't have to go up to the podium to do that, Your Honor.

THE COURT: That's fine. Mr. McConwell, you can do that. Do you want --

MS. MCCONWELL: I'd like them to take their board down.

MS. M. MILLER: Oh, is it okay with you if I just flip it to just a blank page, or you want it --

MS. MCCONWELL: That's fine.

MS. M. MILLER: That's fine?

MS. MCCONWELL: And, Your Honor.

12:47PM 12:47PM 12:47PM 12:47PM 12:47PM 12:48PM 12:48PM 12:48PM 12:48PM 12:48PM 12:48PM 12:48PM 12:48PM 12:48PM 12:48PM 12:48PM 12:48PM 12:48PM 12:48PM 12:48PM 12:48PM 12:48PM 12:48PM 12:48PM 12:48PM

MR. MCCONWELL: I'll need you to help with that. 12:48PM

MS. MCCONWELL: Ms. Miller's -- if he's recalled, it will only be limited to that one item? 12:48PM 12:49PM

THE COURT: Right. I think that's all she wants to talk about is those exhibits. She wanted to get those exhibits and that one issue. Those issues, the issues related to that one -- those two -- 12:49PM 12:49PM 12:49PM 12:49PM

MS. M. MILLER: Correct. 12:49PM

MS. MCCONWELL: It's two pages on one, but -- because I don't want another 30, 40-hour long -- to be called a direct if we come back, if he's called back. That's my concern based on experience is one question turns into an hour. 12:49PM 12:49PM 12:49PM 12:49PM 12:49PM

THE COURT: Okay, so noted. Let's call in the jury. So understood. 12:49PM 12:49PM

MS. M. MILLER: I don't think I've taken 30 or 40 hours. Might have felt like -- 12:49PM 12:49PM

THE COURT: It feels like it, team. Both sides, both sides. 12:49PM 12:49PM

MS. M. MILLER: Sometimes, yeah. 12:49PM

THE COURT: Not all the time, please. 12:49PM

(Jury in at 12:49 p.m.) 12:49PM

THE COURT: Please be seated. Welcome back, ladies and gentlemen of the jury. Okay. You have been here a long time, like 9:00, 10, 12, 4 hours. You had your lunch, 12:50PM 12:50PM 12:50PM

couple of your breaks. And the Court ran into an issue with the attorneys on legal matter that had to be resolved. It's taken us this long. So rather than send you back home, we decided to see if we could try to resolve it, and we resolved it somewhat. So at this time, let me ask Ms. Miller, Marie Miller, do you have any further questions of the agent?

MS. M. MILLER: Your Honor, at this time, the government has no further questions of the agent subject to recalling him after Your Honor rules on the issue.

THE COURT: All right. Very well. And so at this time, ladies and gentlemen, Mr. McConwell, on behalf of Hansen Helicopters, is going to conduct his cross-examination of the agent. You may proceed, Mr. McConwell.

MR. MCCONWELL: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. MCCONWELL:

Q. Mr. Khamvongsa, why don't you take us through your assignment in this matter. What were you retained to do by the government?

A. We have a hand.

THE COURT: Yes?

JUROR: The monitor.

THE COURT: Oh, monitors. Are the monitors are not on? They're on now? IT? Somebody's monitor is not

working? Only one, we'll get the IT person to come on up. Okay. Go ahead and proceed. Let's just see.

BY MR. MCCONWELL: (CONTINUING)

Q. First of all, when did you get the assignment?

A. I got the assignment around 2017.

Q. Could you give me approximate date?

A. Um... about the fall of 2017.

Q. And what were you designated to do?

A. My primary role was to investigate the conspiracy as it relates to the wire fraud and the money laundering.

Q. And take us through the -- your investigation process then. What did you do first?

A. First I reviewed the records that were provided to me from the FBI and Department of Transportation OIG and U.S. Attorney's Office --

Q. What were those records?

A. The records relate to everything as it pertains to what was seized from the search warrant, as well as any FAA records that were available that the time.

Q. How about DOT records, memorandums to DOT?

A. I would have reviewed them.

Q. All the DOT -- you've seen the 2015 DOT memorandums concerning the progress of the case at that point?

A. There was a lot.

Q. You've seen those; correct?

A. Yes.

Q. And you did note that in the memorandums, and particularly in September, and again, in November, they detailed the Jon Walker companies by name, they identified each of the Vanuatu companies involved in this case and depicted on Exhibit 829; correct?

A. What exactly is your question specifically? I'm not understanding your question, I'm sorry.

Q. Okay. The DOT memos as of September and November of 2015, detailed or identified Jon Walker as the beneficial owner of various Vanuatu corporations that owned aircraft involved in this case; correct?

A. I looked at a lot of documents. Do you have the specific document I could review?

Q. We could pull those out for you if you need it?

A. Sure.

Q. Did you have a liaison with the FAA that you worked with initially?

A. Initially it was through DOT OIG. And when I say DOT OIG, meaning Department of Transportation Office of Inspector General.

Q. And that's the same office of Ms. Miller? Marie Miller is from; is that correct?

A. Yes.

Q. So you received initial information, the status of

the case, from someone in DOT OIG; correct? 12:54PM

A. It was primarily through the U.S. Attorney's Office. 12:54PM

Q. Okay. What documents did you receive? 12:54PM

A. They include pilot-mechanic list, there was a lot that I reviewed, but I reviewed pilot-mechanic lists, the bank records pertaining to various companies belonging to Jon Walker, memorandums, e-mails, statements made from witnesses that were interviewed by the FBI. 12:54PM 12:54PM 12:54PM 12:55PM 12:55PM

Q. Let's focus on the Jon Walker matter. What companies are identified when you first got in the case as having been involved with Mr. Walker? 12:55PM 12:55PM 12:55PM

A. When I initially reviewed the case, the -- all the moneys were going into the Caledonian Agency Inc. bank account with some funds as it relates to the leasing of the helicopters, going to Hansen Northern Helicopters and Hansen Helicopters itself. 12:55PM 12:55PM 12:55PM 12:55PM 12:55PM

Q. Okay. We'll come back to that after a while and talk a little bit about that detail. You were critical of the corporate structure that Mr. Walker established to handle the business that he acquired in 1998; correct? 12:56PM 12:56PM 12:56PM 12:56PM

A. When you say I'm being critical, what exactly are you referring to? 12:56PM 12:56PM

Q. Well, you defined what a valid corporation was; correct? 12:56PM 12:56PM

A. I did -- I did speak about that earlier, yes. 12:56PM

Q. Well, your education you said as an accounting major?

A. Yes.

Q. Did you take corporations?

A. Yes.

Q. Did you take auditing?

A. We did, yes.

Q. Did you take contract course?

A. Yes.

Q. Okay. Can you tell me what the phrase beneficial interest -- the essential benefit means in terms of what -- of a contract, what that means?

A. The beneficial interest?

Q. No. Strike that. Essential purpose, I'm sorry, essential purpose.

A. The essential purpose, as it relates to?

Q. A contract.

A. The essential purpose? I'd have to see it within the contract itself.

Q. For example, and we'll get into it a little bit later, if we have lease agreements concerning tuna boats and aircraft being supplied to tuna boats, the essential purpose of that contract would be to provide that facility of an aircraft that would be able to do fish spotting in this instance; correct?

A. Are we talking about the misrepresentations made to

the tuna boat companies from --

Q. I'm talking about the essential purpose of the contract was to get an aircraft that can go spot for tuna; correct?

A. Are we talking about specific contracts?

Q. I'm talking about -- yes, specific contract for a tuna boat -- tuna contract and an aircraft. Essential purpose of that contract is to get an aircraft that can spot for tuna for that boat for the period of time of the contract; correct?

A. We're talking about the tuna boat companies as it relates to this case; correct?

Q. I'm talking about any tuna boat contract with an aircraft -- helicopter for fish spotting?

MS. M. MILLER: Your Honor, I'm going to object because only the tuna boat contracts as they relate to this case are relevant. So I think what's tripping up the question is here is Mr. McConwell saying any tuna boat contract, anywhere. That's not relevant.

THE COURT: All right. Mr. McConwell, you want to specify?

MS. M. MILLER: I'll rephrase it, Your Honor.

THE COURT: Rephrase it. All right. Very well. Sustained.

BY MR. MCCONWELL: (CONTINUING)

Q. Let's say a tuna boat contract for an aircraft to

spot for tuna, in this -- similar to this case, the essential purpose of that contract is to provide an aircraft and spot for tuna for the period of time requested; correct?

A. If we're talking about the contracts I looked at?

Q. I'm talking -- yeah, a tuna boat contract similar to the one in this case.

A. In --

Q. Ones in this case.

A. And what you're asking me is they could provide any aircraft?

Q. An aircraft that would provide fish spotting services for that contract, that's the essential purpose of the contract; correct?

A. It's not correct.

Q. Not correct?

A. Yeah, that's not correct.

Q. What's uncorrect -- not correct about it?

A. Well, the contract misrepresented that they're providing U.S.-registered helicopters when in fact -- that there were issues within the contract.

Q. Try to answer my question. The purpose of the contract is to get an aircraft to provide tuna spotting services; correct?

A. Tuna spotting services, that's it.

Q. Okay. That's what the purpose of the contract,

12:58PM 12:58PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 01:00PM

right?

A. Yeah, they would provide tuna spotting.

Q. For the boat for the three years or whatever the period of the contract; correct?

A. As it relates just to the purpose, yes, tuna spotting.

Q. That's the purpose of the contract. All right. Now, we'll get into it a little bit later, but you have gone through -- you have gone through 3 or 4,000 pages of contracts; correct?

A. I've gone through a lot, sir.

Q. And the essential purpose of all those contracts, whether signed or unsigned, was to provide an aircraft to provide tuna spotting services for the boat involved; correct?

A. To provide tuna spotting services; correct.

Q. For the boat?

A. For the boat, fishing boat.

Q. Now, how many times have you testified by the way?

A. Um, it's maybe 3 or 4. Most of my cases plead out.

Q. When were these -- in Federal Court?

A. Oh, absolutely, yes.

Q. For the U.S. Attorney's Office?

A. Yes.

Q. Now, you took an oath to tell the truth, the whole truth and nothing but the truth; correct? In this case?

      A. Absolutely. Yes.

Q. Is it your job to tell the whole truth about the circumstances that apply to this case?

A. Absolutely, absolutely.

Q. I mean, you don't give just the government's version of it, for the purpose of convicting someone, you give the good points and the bad points; correct?

A. I tell the truth and nothing but the truth, so...

Q. I believe toward the end of the direct examination the other day, you went through the wire transfers for certain boats and you matched it up to the billing history of Wilma's; correct?

A. What I testified to is I went through 3,000 transactions and we just picked a sample. So I've actually reviewed every single wire as it relates to what I was involved in, in regards to the investigation.

Q. Now, was this a random sample or was it a selected sample?

A. This sample, these particular ones involved wires that happened to coincide with the FBI search warrant. In addition, it was an abnormal transaction that occurred within that account. It was a huge dollar amount, which represents trying to move money to get away -- to get it out of law enforcement oversight.

MR. MCCONWELL: Move to strike that answer.

That's not responsive, Your Honor.

MS. M. MILLER: Well, Your Honor, I think that answer was absolutely responsive.

THE COURT: Okay. Hold on. Let me just -- Veronica, can you repeat the question and answer real quick here?

(Whereupon the reporter read back requested portion.)

THE COURT: All right. The Court will make its ruling. I will sustain the objection and the Court will order the witness to just answer the question. That was a very specific question. Was it random or actual. Okay. So you want to answer the question random or actual? You want to still ask the question?

MR. MCCONWELL: Yes.

THE COURT: Okay.

THE WITNESS: So the question again is?

BY MR. MCCONWELL: (CONTINUING)

Q. It was not a random sample; correct?

A. No, it was not a random sample.

Q. It was a selection of ten particular aircraft and then two more; correct?

A. No.

Q. Okay. How did you make the selection?

A. No. Your question was ten random aircraft?

Q. Ten random aircraft, that received special restricted airways certificates on February the 25th, 2015, and two others that received standard airworthiness certificates several years earlier.

A. I apologize, sir, but I thought we were talking about the transactions as it relates to the wire fraud and not the -- I think I misunderstood your question. Are you talking about the airplane or the monetary -- the wire fraud transactions themselves?

Q. I'm talking about the money, the $4.9 million you seized, and you went through this analysis of the money and tracked it through the accounts of the various companies, and it was specific just selected items, not a random sample?

MS. M. MILLER: Your Honor, I'm -- I apologize. I'm not sure I understand the question, so I'm not sure if there is an objection there. He started with the transactions, then he went to the money that was seized.

THE COURT: Okay. I think the objection will be sustained. Can you just rephrase the question, Mr. McConwell?

BY MR. MCCONWELL: (CONTINUING)

Q. Well, you got -- you ultimately got a search warrant or a warrant to seize $4.9 million?

A. Yes.

Q. And for each of the items that you -- that came up in that total $4.9 million, you did that analysis of tracking the

 money; correct?

A. Yes, yes. I did trace the money as it relates to what I seized.

Q. Okay.

A. To the wire fraud and the misrepresentations made to the tuna boat companies as well as the helicopters and the pilots and mechanics involved.

MR. MCCONWELL: Again, I move to strike. That's not responsive, Your Honor.

THE COURT: Just answer yes or no. The Court will strike your answer, and just answer yes or no. Did you or did you not? Just answer it that way. Okay.

THE WITNESS: Yes, ma'am.

MS. M. MILLER: Your Honor, I don't believe -- can we hear Mr. McConwell's question back because it didn't call for a yes or no answer.

THE COURT: Okay. Let's call it back then. Let me hear. Veronica, last question, last answer.

(Whereupon the reporter read back requested portion.)

THE COURT: Okay. So that's fine then. Objection -- I mean, let me take back my ruling. So he answered the question, yes.

MR. MCCONWELL: It was the tail end of the answer was not responsive. The first part was correct.

THE COURT: The part about seized?

MR. MCCONWELL: No. I think it went beyond that. We can go on --

THE COURT: No, I think that's all. That was all -- is there any other parts to that answer?

(Whereupon the reporter read back requested portion.)

THE COURT: All right. So the Court will strike the last -- last part of the answer. The part where he says yes, the Court will keep that. So disregard anything after the word yes. Okay. Proceed.

BY MR. MCCONWELL: (CONTINUING)

Q. Now, did you utilize the QuickBooks programs of the companies?

A. Um... I did review it.

Q. Did you run a trial balance for yourself off the quick -- or just -- what did you do to review -- let me withdraw.

What did you do in your review and what action did you take with regard to the QuickBooks program in your analysis?

MS. M. MILLER: Objection, Your Honor; compound question.

THE COURT: What did you do? What was the last part of that?

MR. MCCONWELL: I'll rephrase.

THE COURT: Okay. Go ahead.

BY MR. MCCONWELL: (CONTINUING)

Q. You used QuickBooks; correct?

A. I didn't use that. I reviewed what the forensic accountant -- the forensic accountant and I reviewed it together.

Q. Okay. So you had the QuickBooks reports that the forensic accountant, Ms. Jones, came up with; correct?

A. Yes, Ms. Jones; correct.

Q. And did she -- did you identify any general accepted accounting principles that were violated in the preparation of the QuickBooks?

A. Um... I didn't look at that for that purpose; no.

Q. And you heard Ms. Jones' testimony, she -- her issue with regard to the QuickBooks was not gapped general aviation -- generally-accepted accounting principles, she just didn't like it. Remember that?

A. Are you talking about the -- how the quickbook[sic] records were being maintained?

Q. Right; correct.

A. So -- so the question you want me to ask -- or respond to is what again, sir?

Q. Well, there is no gap problem with it, but do you agree with Ms. Jones you just didn't like the way it was

structured or do you have any opinion on that at all?

A. Well, the quickbook[sic] records moved around just like what my review of the bank records, in that money was being moved to other corporations owned by Jon Walker for no legitimate business reason.

Q. It was identified where the money was going, and when it was going to go; correct? Nothing wrong with that, is there?

A. If it's a legitimate business reason, there is nothing wrong with it. But if you're using it to hide money or conceal some criminal activity or conceal who the beneficiary of the money is, then it's a problem.

Q. There's never been a concealing that Jon Walker was the beneficiary of these companies, was there?

A. The concealment is in the tax record. Hansen Helicopters, if you looked, we talked about $23 million to a potential --

MR. MARTIN: Your Honor, I've got to object. That's not responsive at all to the question that was asked.

MS. M. MILLER: Your Honor, the question that asked --

THE COURT: Okay. Okay. Hold on. I don't want to hear it. Let me see. Let me just hear the question again.

(Whereupon the reporter read back requested portion.)

THE COURT: All right. The -- so let me -- let me just do it this way. Let's -- the Court will strike the answer, and just answer the question, so just reask-- you want to still ask the same question, Mr. McConwell?

MR. MCCONWELL: Yes, Your Honor.

THE COURT: Okay. So let me ask my court reporter to reask the question. Say it again, Veronica.

(Whereupon the reporter read back requested portion.)

THE WITNESS: Yes, there's been concealment.

THE COURT: Okay, next question.

BY MR. MCCONWELL: (CONTINUING)

Q. Where?

A. On the tax returns.

Q. Now, tax returns, you're talking about the Hansen Helicopters tax returns?

A. And his own personal tax returns.

Q. Now, you announced that there was -- Hansen Helicopters reported only 20% of the overall income, was that what you said the other day?

A. Yes. They reported less than 20% on the corporate tax returns; correct.

Q. How would you describe for us your assessment of the different -- in the structure of the companies, the Hansen Helicopters' companies, affiliated companies or however you

want to describe it, ones you attribute to Mr. Walker?

MS. M. MILLER: I'm not sure I understand the question, Your Honor.

THE COURT: Do you understand the question, Mr. Witness?

THE WITNESS: Could you rephrase it, sir?

MR. MCCONWELL: I'll rephrase it.

THE COURT: Let's see if he understands it.

MR. MCCONWELL: I was going to preliminaries originally. We'll start from the beginning.

BY MR. MCCONWELL: (CONTINUING)

Q. The -- when Mr. Walker bought the company, he decided obviously to set up a series of companies; correct?

A. He decided -- Jon Walker decided to set up a series of companies.

Q. Right.

A. Companies or alter egos, yes.

Q. Well, I asked you about companies. We'll talk about alter egos later. Whole different topic, sir. He set up eight United States corporations; correct? In Guam?

A. Yes.

Q. And then he set up another United States corporation called Wilma's Flight Service[sic], Inc.; correct?

A. Walker set up Wilma's Flight Services here in Guam, yes.

Q. Okay. And that was in 1999; correct? 01:13PM
A. Around that time, yes. 01:13PM
Q. And you verified that by looking at the corporate records of Guam, and you know that that actually did occur; correct? 01:13PM
A. Yes. 01:13PM
Q. Okay. You also know, don't you, sir, that that corporation was dissolved in 2008; correct? 01:13PM
A. Yes. 01:13PM
Q. Okay. 01:13PM
A. Well, I recall that there being no more filings as of 2008, doesn't -- I didn't really see anything that reflected that it was dissolved. 01:13PM
Q. Were you aware that the procedure for dissolving a corporation is to lower the life of the corporation from perpetual to some fixed amount, sometime, and that was done in this instance at 2008? 01:13PM
A. Was that a question or a statement? 01:13PM
Q. That's a question. Are you aware that that's the procedure in Guam? 01:14PM
A. I'm not aware of that. 01:14PM
Q. But you see -- that wasn't an actually active business company, was it, sir? Wilma's, the U.S. company? 01:14PM
A. How is it receiving money then if it's not active? 01:14PM
Q. You also know, don't you, sir, that in 2002, that 01:14PM

Wilma's Flight Service, Inc., in fact it was July the 1st, 2002, Wilma's Flight Service, Inc. was set up in Vanuatu as a Vanuatu corporation? Don't you know that, sir?

A. In name only.

Q. Now -- well, how do you come up with that?

A. Because Wilma's Flight Service had a bank account here in Guam, and it was receiving money as though it's a U.S. corporation.

Q. Not until 2014 or so; correct?

A. So then it was not dissolved then if it's operating as a U.S. corporation in 2014, when you said it dissolved in -- when it stopped filing in 2008, right?

Q. Are you aware that a foreign corporation can set up a bank account if they go through the right procedures in Guam -- in United States, as was done in this instance in 2017, by Wilma's Flight Service, Inc., the Vanuatu corporation?

MS. M. MILLER: Objection, Your Honor; assuming facts not in evidence.

THE COURT: Mr. McConwell, on that objection?

MR. MCCONWELL: We have an exhibit on that. Laura.

It's a new exhibit. It's the Wilma's Flight Services board of directors from October 25, 2017.

THE COURT: Okay.

MR. MCCONWELL: Okay. We're going to -- I'm

going to withdraw that, Your Honor.

THE COURT: Okay.

MR. MCCONWELL: We're going to have a new number, it's called "Certificate of Amendment of Articles Incorporation" with a file stamp of November 21, 2008.

THE COURT: I'm sorry. So you're going to try to get a new exhibit marking? Is that what you're saying?

MR. MCCONWELL: I want to -- I'm marking exhibit -- this is Exhibit 130, Defendants.

MS. M. MILLER: And these are exhibits the government has not seen, Your Honor.

THE COURT: Have you not seen that yet?

MR. MCCONWELL: This is cross-examination material that we just received.

MS. M. MILLER: I'm sorry? I didn't hear what he just said?

MR. MCCONWELL: This is cross-examination material that we just received.

MS. M. MILLER: This is -- so for the record, just so we're clear, this is cross-examination information you've just received?

MR. MCCONWELL: Yes.

THE COURT: Okay, Exhibit 130. Look at it. See what -- see if you know, okay. Look at that, Counsels. Defendant's Exhibit 130, is that a correct number, Carm?

THE CLERK: It is, it's next. 01:17PM

THE COURT: Defendant's Exhibit 130. 01:17PM

(Exhibit D-130 marked.) 01:17PM

THE COURT: Hold on. Give the prosecutor a minute to look at the certificate of amendment. And you want to look -- you want all of this brought -- you're going to try to move to admit all of this, Mr. McConwell? 01:17PM 01:17PM 01:18PM 01:18PM

MR. MCCONWELL: Yes. 01:18PM

THE COURT: Exhibit 130? 01:18PM

MR. MCCONWELL: It's the entire document. 01:18PM

THE COURT: Okay. Exhibit 130 consisting of how many pages, 13... 15 pages. 01:18PM 01:18PM

MR. MCCONWELL: Right. 01:18PM

THE COURT: Any objections, Counsel? 01:18PM

MS. M. MILLER: Well, since I just received it, Your Honor, and suspiciously, this was not in the Defendant's computers when the computers received and the information was downloaded. I would like more than 30 seconds to review 15 pages. 01:18PM 01:18PM 01:18PM 01:18PM 01:18PM

THE COURT: All right. 01:18PM

MR. MARTIN: Your Honor, may I ask the Court to admonish the jury to disregard, the *suspiciously* comment by Counsel, and if we continue with these, we're going to -- I'll be making a motion and -- because that's totally inappropriate. 01:18PM 01:18PM 01:18PM 01:18PM 01:18PM

THE COURT: Yes. I think the issue -- the wording *suspiciously* will be stricken from the record. Ladies and gentlemen of the jury, disregard that. If you guys want to talk about suspiciously, talk to me about it privately.

MS. M. MILLER: And the government would like any other exhibits the defense obviously intends to use with this witness now, so that we could prepare for it. Your Honor has held the government to a very tight requirement to provide the defense with these exhibits, yet they're obviously intending to use a number.

THE COURT: All right, Counsels, so you got more than -- you got a minute or two. Go ahead and review it.

MS. M. MILLER: Thank you.

THE COURT: It's not -- it's just an article of incorporation. Just see if you guys have notice of that.

(Pause.)

MS. M. MILLER: No objection, Your Honor.

THE COURT: Very well. Ladies and gentlemen of the jury, Exhibit No. 130 will be admitted without objection.

(Exhibit 130 admitted.)

THE COURT: Is there any other evidence you want to pass over?

MR. MCCONWELL: I've got 131.

THE COURT: Okay. Why don't you pass that over to the prosecutor. Is that a number one?

MR. MCCONWELL: Yes.

THE COURT: Okay. 131. Anything else? Why don't we give it to them now so we can move right along.

MR. MCCONWELL: I don't think anything new --

THE COURT: Just those two Mr./Ms. McConwell?

MR. MCCONWELL: Yes.

THE COURT: Okay.

MR. MCCONWELL: Of the new exhibits. The others have been identified as exhibits in the trial.

THE COURT: Okay. Very well. So 130 and 131. Is there a 132?

MR. MCCONWELL: Yes, there is, Your Honor.

THE COURT: Oh. 130, 131, 132.

(Exhibit 131 marked for identification.)

(Exhibit 132 marked for identification.)

MS. MCCONWELL: They have these.

THE COURT: They have them? The prosecution has them? Okay.

MS. M. MILLER: We have 132?

MS. MCCONWELL: I'm going to give it to them.

THE COURT: Give it to them again.

MS. MCCONWELL: I will, I will.

THE COURT: Assuming you have them. I don't want to have like a whole diatribe about whether you have them or not.

01:20PM 01:20PM 01:20PM 01:21PM 01:21PM 01:21PM 01:21PM 01:21PM 01:21PM 01:21PM 01:21PM 01:21PM 01:21PM 01:21PM 01:21PM 01:21PM 01:21PM 01:21PM 01:21PM 01:21PM 01:21PM 01:21PM 01:21PM 01:21PM 01:21PM

MS. MCCONWELL: I'm moving slow to make sure I don't mess --

THE COURT: Okay. You're moving slow because of what?

MS. MCCONWELL: I want to make sure that I don't mess it up.

THE COURT: (Laughing.)

Okay. All right. 130, 131, and 132. I got 132. Okay.

MR. MCCONWELL: Can we go ahead and hand those to the witness?

THE COURT: Okay. Yes, sure. 130, 131, 132. Anything else there, Mr. McConwell? Is this it for right now?

MR. MCCONWELL: For right now, Yes, Your Honor.

THE COURT: Okay.

So the prosecution you should have 130, 131, 132.

MS. M. MILLER: We do, Your Honor.

THE COURT: Okay.

There is a 133? Oh, okay. Why don't we get -- do we have a 134? Why don't we get them all together. You want to do that, Mr. McConwell. Why don't we get it all together.

MR. MCCONWELL: I think those are all the new ones, Your Honor.

THE COURT: I think there is a little bit more.

 Let's -- why don't we just get -- Ms. McConwell is just marking really quick. Prosecution are speed readers, they could get it done fast.

Anything beyond 135? Not right now. Okay, Mr. McConwell, Ms. McConwell will pass to the prosecution 130, 31, 32, 33, 34, 35.

MS. M. MILLER: Oh, we're up to 135 now?

THE COURT: Well, this has been happening, team.

MS. M. MILLER: Okay.

THE COURT: By both sides.

(Pause.)

MS. M. MILLER: No, Your Honor, we have no objection to any of the exhibits being admitted.

THE COURT: Fabulous. Ladies and gentlemen of the jury, Exhibit 130, 131, 132, 133, 134, 135 is admitted into evidence without objection.

(Exhibits 130-135 admitted.)

THE COURT: And yes, Mr. McConwell, you may proceed with your questions.

MR. MCCONWELL: Thank you, Your Honor.

Laura, are we going to be able to put that on?

THE COURT: Okay. You want this on?

MR. MCCONWELL: We'll put it on electronically.

THE COURT: Okay. It will be on the screen then.

MR. MCCONWELL: Yes.

THE COURT: Okay.

MR. MCCONWELL: If the witness wants the individual exhibits, I could give them all to him.

THE COURT: Do you have the hard copies there?

THE WITNESS: They provided me with the hard copy, Your Honor.

THE COURT: They've got -- he's got the hard copies, but, yeah.

MR. MCCONWELL: Up to 135.

THE COURT: If you want to publish it to the jurors, you may do so.

MR. MCCONWELL: Thank you, Your Honor.

THE COURT: I think we were able to fix the monitor there, Carm?

THE CLERK: Yes, ma'am. With the help of one of the other jurors.

THE COURT: Oh, good. Yes? Hold on, she's going to let you in.

BY MR. MCCONWELL: (CONTINUING)

Q. Can you read the introduction to the -- this Exhibit, 130, the first paragraph and the beginning?

A. Sir, would you like me to start with the undersigned?

Q. I'd like you to start with "Certificate of amendment of articles of incorporation filed by the Department of Revenue and Taxation." That's what I'd like for you to read.

A. Okay. Sure. "Certificate of amendment of articles of incorporation, filed Department of Revenue and Taxation, Gov Guam, business registration, November 21st, 2008."

Q. The undersigned?

A. Oh. You want me to read whole thing, sir?

Q. Yes.

A. Oh, okay. "The undersigned being the duly elected president and secretary and a majority of the members of the board of directors of Wilma's Flight Services, Inc., a Guam corporation, do hereby certify that the annexed second amended articles of incorporation reflecting the amendment of Article 4 of the first amended articles of incorporation were duly approved by a majority vote of the board of directors and the written assent of more than two-thirds of the stockholders representing all of the subscribed capital stock of the corporation pursuant to a duly unexecuted unanimous consent of shareholders and directors in lieu of combined special meetings dated November 21, 2008. The undersigned do hereby further certify that the same is correct and that said amendment does not affect adversely or otherwise any rights or actions which have or might have accrued to others between the time of filing the first amended article of incorporation and the filing of the second amended articles."

Q. Okay. Let's stop right there and go to article four please on page 5. Could you read that, please?

A. "The corporation shall have succession by its corporate name for the term expiring November 21st, 2008, and it shall have all the powers here in enumerated or implied here from and the powers now provided or which may be hereafter provided by law for incorporated companies. "

Q. So isn't that the termination date of this corporation, sir?

A. Expiring November 21st, 2008.

Q. Yes.

A. Yes.

Q. Correct?

A. Yes. That's what it appears on here.

Q. Now, with regard to Wilma's -- let's go back, I want to put this in early so we can -- you represented to the jury that Wilma's was a U.S. corporation and it was the one that took all this money in that you looked at and said was wired wrongfully; correct?

A. The last part, I'm sorry, I didn't -- it was wired wrongfully?

Q. That they were -- this is part of the wire fraud by Wilma's, the U.S. corporation, that was instrumental in your findings; correct?

A. It was one of the vehicles used to receive -- that was involved in the wire fraud, but it's more so Caledonian Agency, Inc. Its just that the --

01:29PM 01:29PM 01:29PM 01:29PM 01:29PM 01:29PM 01:29PM 01:29PM 01:30PM 01:30PM 01:30PM 01:30PM 01:30PM 01:30PM 01:30PM 01:30PM 01:30PM 01:30PM 01:30PM 01:30PM 01:30PM 01:30PM 01:30PM 01:30PM 01:30PM

 Q. Wilma's -- you put Wilma's in the middle of it, but Wilma's was gone by the time these wires occurred; correct? 01:30PM
A. Wilma's was not gone. 01:30PM
Q. Wilma's, the U.S. corporation, expired, did no more business after November 21, 2008; correct? 01:30PM
A. That's not correct. 01:31PM
Q. That's your opinion; correct? 01:31PM
A. It's not my opinion. It's based on fact. 01:31PM
Q. What fact? 01:31PM
A. In 2016, Jon Walker tried to sell Hansen Helicopters, and as you recall, Wilma's Flight Services generated over $20 million from tuna boat company. It had not disappeared. He claimed it as being still in existence and generating a lot of money -- 01:31PM

MR. MCCONWELL: Move to strike this answer as totally not responsive, Your Honor. 01:31PM

THE COURT: The Court will overrule that. He's responding to -- you asked him how he knew that. 01:31PM

BY MR. MCCONWELL: (CONTINUING) 01:31PM

Q. I probably left it a little open, sorry. Go ahead. 01:31PM
A. As I said, Wilma's was still in operation because their own records, Hansen Helicopters and Jon Walker's own records, and earlier Mr. Crowe said that they are synonymous. It showed that Wilma's still generated money. All those various corporations that we saw earlier in that -- that was 01:31PM

released to a potential buyer, it showed that it was still operating, generating money. These corporations are nothing more than alter egos because if you look at the tax returns, it should have been reported on Hansen Helicopters' tax return only --

MR. MARTIN: Your Honor, I now object. We're getting into a narrative here.

THE COURT: Yeah. The Court will sustain that part. Just how did you get it, not explain narrative about what type of corporation you believe it to be. Just your process of how you came to that conclusion --

THE WITNESS: Okay.

THE COURT: -- is sufficient.

Anything else on that --

THE WITNESS: I will end it on that note. Sorry, thank you.

THE COURT: No, no, if you're done, you're done, if you're not --

BY MR. MCCONWELL: (CONTINUING)

Q. Now take a look at Exhibit 131 if you would, sir. Let's put that up on the ELMO, on the screen.

THE COURT: I'm sorry, 131?

MR. MCCONWELL: 131, Your Honor.

THE COURT: Okay. Exhibit 131.

MR. MCCONWELL: That's 130.

MS. MCCONWELL: Sorry.

(Pause.)

MR. MCCONWELL: Before we do that, I'd like to put up this 829, or have you hold up the poster board, Laura.

MS. MCCONWELL: Okay.

THE COURT: You want Mr. Han to hold up the poster board?

MR. MCCONWELL: If he would, that'd be great.

BY MR. MCCONWELL: (CONTINUING)

Q. Now do you see 829? You're familiar with this document, aren't you, sir?

A. Yes, sir.

Q. Okay. And that represents the 31 Vanuatu corporations, and Bean Bag and on up; correct?

A. You're talking about the corporate structure that the 30 Vanuatu companies at the bottom, then Bean Bag, and then it ended up flowing through Jon Walker, yes.

Q. Jon Walker is at the very top, but there is several corporations in between; correct?

A. There are layers in between to -- between Walker and the Vanuatu companies, there are layers in between.

Q. Now the Vanuatu companies, you see Wilma's Flight Service, Inc. there as a corporation, a Vanuatu company; correct?

A. I see it on that document, but I've never seen a

01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:34PM 01:34PM 01:34PM 01:34PM 01:34PM 01:34PM 01:34PM 01:34PM 01:34PM 01:34PM 01:34PM 01:34PM

constitution for Wilma's Flight Services saying it's a Vanuatu company.

Q. Okay. Explain how -- first of all, each of the Vanuatu companies owned at least one aircraft pursuant to the federal aviation registry information; correct?

A. The 30 Vanuatu companies all represented as U.S. corporations on the FAA registry.

Q. And now the word FAA -- FAA is not on it, or U.S. is not on the FAA bill of sale or the application for registration form; is it, sir?

A. Are we talking about the registry or the bill of sale? Because --

Q. I'm talking about 8050-1, the application for registration. Doesn't say U.S. corporation on that at all, does it, sir? It has a box for corporation; correct?

A. Can you please pull it up so we can discuss it?

Q. We'll do it a little later after a break, yes. You don't remember that?

A. Well, I'm not going to respond until I look at it, sir.

Q. Okay. We'll get that for you. So isn't it correct, and you've read the leases, the 2900; 4,000 pages or whatever, the leases were with Wilma's Flight Service, Inc., that has a Vanuatu address on it, and with a particular individual boat; isn't that correct?

01:34PM 01:34PM 01:34PM 01:34PM 01:34PM 01:34PM 01:35PM 01:35PM 01:35PM 01:35PM 01:35PM 01:35PM 01:35PM 01:35PM 01:35PM 01:35PM 01:35PM 01:35PM 01:35PM 01:35PM 01:35PM 01:35PM 01:35PM 01:35PM 01:35PM

A. That's not correct.

Q. What's wrong about that statement?

A. Any time you look at those Vanuatu companies, it is Jon Walker. All the corporations are owned by Jon Walker.

Q. Sir, it's not responsive. I move to strike. That is absolutely not responsive, sir.

THE COURT: So moving to strike?

MR. MCCONWELL: Yes.

THE COURT: All right. Let me -- all right. The Court will grant the motion to strike. Please disregard, ladies and gentlemen of the jury, and that will be stricken from the record. Next question.

BY MR. MCCONWELL: (CONTINUING)

Q. Are you saying that all the companies, all the Vanuatu companies, was all just a setup as a structure by Jon Walker for his sole benefit?

A. Yes.

Q. Okay. And nobody else benefitted from that but Jon Walker, all the various corporations on 829; correct?

A. Yes.

Q. And they were set up starting in 1999 with Bean Bag; correct?

A. Which is owned by Jon Walker.

Q. You know about -- you took corporations, didn't you, in college? You could be a shareholder of a corporation, that

doesn't necessarily mean you own the corporation assets, you own a share in the corporation, doesn't it, sir?

A.   Are we talking about as it relates to this case or just in general?

Q.   In general.

A.   So you're asking me can any individual own a share of stock in a corporation?

Q.   Can any individual set up a corporation and be the sole individual that owns any interest in the corporation?

A.   Of course they could, but there is also other filing requirements that are needed to show that that entity is its own legal entity separate from the owners.

Q.   And you're saying you've not seen any -- in your research, this thorough research you did, you did not see any documentation from Vanuatu of the constitutions of each one, the minutes that set each of those corporations up?  Is that what you're saying?

A.   Can you rephrase the question, sir?

Q.   Are you saying that you have not looked at any of the constitutions of any of those 30 companies or any of the minutes that set up the initial companies at all?

A.   I looked at a variety of documents as it relates to everything that's up there.

Q.   Have you looked at the constitutions for each of the 30 corporations, or any of the 30 corporations?

A. I looked at what -- what we did have.

Q. What did you have?

A. We have Evan Air, Marlin Bay, I believe Alpha Air. There might be a couple more that seem to slip my mind.

Q. And you know that there is a Caledonian Insurance Company, that was set up in about 2001, or about 2000, actually; isn't that correct?

A. I'll have to see the corporate records.

Q. You looked at it one time or another, haven't you, sir?

A. I have.

Q. Have you looked at the insurance policy that was issued in 2005 by this insurance company?

A. The insurance policy?

Q. Yes.

A. I've seen an insurance policy.

Q. For -- issued by Caledonian Insurance Company; correct?

A. From Caledonian Insurance Company. Okay, yes.

Q. You've seen that.

A. I --

Q. And you've seen numerous of the constitutions of the various 30 Vanuatu international companies; correct?

A. Yeah, again -- yeah, I've seen documents.

Q. Okay. And you've seen leases between Wilma's Flight

Services concerning aircraft that are registered under the names of each of the 30 -- individual -- the 30 corporations; correct?

A. (No response.)

Q. Let me start -- I'll withdraw that. Each of these companies has, by the FAA registry, ownership of one or more of the aircraft involved in this case?

A. But they didn't always match up with what was on the contract.

Q. Sir, would you --

MR. MCCONWELL: I move to strike, and ask him to answer the questions, Your Honor.

THE COURT: Mr. Khamvongsa, please just answer the question.

THE WITNESS: Yes, ma'am.

THE COURT: Okay. Do you understand last question?

THE WITNESS: Could you ask again, please?

BY MR. MCCONWELL: (CONTINUING)

Q. Each of the 30 companies had an aircraft registered on the U.S. registry, or more, one or more aircraft; correct?

A. Yes.

Q. And Wilma's acted as management company for the other Vanuatu corporations, to enter into leases, with the boat -- individual boats; correct?

A. Wilma's? Specifically?

Q. Yes.

A. I just want to make sure I understand. So Wilma's specifically had contracts for the tuna boats?

Q. Right. And the individual Vanuatu corporations, supplied their aircraft to Wilma's to be used for those leases; isn't that correct, sir?

A. I've never seen a contract between... could you rephrase the question one more time?

Q. It doesn't need to be a written contract for the Vanuatu companies to supply their aircraft to Wilma's to fulfill a lease requirement, does there, sir?

MS. M. MILLER: Objection, Your Honor. That calls for a legal conclusion.

THE COURT: It calls for speculation. The Court will sustain the objection. Rephrase.

BY MR. MCCONWELL: (CONTINUING)

Q. You're aware that the various companies, various Vanuatu companies that had boats -- had aircraft, their aircraft are on boats and they're on there pursuant to a written lease between Wilma's and the individual boat, tuna boat. You're aware of that, aren't you, sir?

A. I'm aware that there are multiple companies identified within the contracts, including Wilma's.

Q. But the vast majority of the leases in 2900, the

4,000 pages of leases, are between Williams -- Wilma's and a boat; correct?

A. The vast majority?

Q. Yes.

A. I -- I'm going to say no.

Q. Well, approximately what percentage of the total 4,000 pages for the written agreement between Wilma's and a particular boat?

A. I -- I couldn't say.

Q. How many of them did you look at?

A. I looked at every one, sir.

Q. And you can't give us a sense of the percentage of Wilma's involvement. Do we need to go through each one for you to verify that for you?

A. Yeah, if you'd like. I mean, I'm not trying to be difficult, but it's -- if I recall correctly, it's about 5,000 pages, 4 to 5,000 pages, and so when I went through, I looked at specifically the sections as it relates to my investigation. I didn't actually keep a tabular count which -- to identify how many went to a specific company.

Q. And Williams[sic] actually did the billing and the collection of the money, and it came back into Williams -- Wilma's bank account; correct?

A. Wilma's, which Jon Walker had control; yes.

MR. MCCONWELL: I move to strike. And ask just

answer the question.

THE COURT: Yeah, the Court will sustain the objection. The part about "which Jon Walker" -- that's surplusage or added verbiage and just answer the question. The Court will sustain that objection and strike it. Please disregard the last few words.

BY MR. MCCONWELL: (CONTINUING)

Q. In your investigation, you had the power of the United States government behind you for subpoenas and request for information, didn't you, sir?

A. I did use the grand jury subpoenas; yes.

Q. Well, you should know then that the Wilma's money was collected for the boat leases went into a Vanuatu bank account for a good deal of time. It was handled in that manner from the Vanuatu bank account; correct?

A. That's not correct.

Q. Do you know why after 2014 there was no Vanuatu bank account for Williams -- for Wilma's?

A. I do.

Q. Is that because Vanuatu changed the rules and said they had to get their money out of the bank and out of the country? And other corporations like them, not just -- wasn't singling out --

MS. M. MILLER: Objection, Your Honor. Counsel is testifying and he's also inserting facts that are not in

evidence.

THE COURT: The Court will overrule that objection, he says he knows why. Overruled.

Can you answer his question?

THE WITNESS: Yes.

THE COURT: Okay.

THE WITNESS: So any offshore account that they had, they were forced to close it and so all moneys went into Caledonian Agency, Inc. bank account thereafter.

MR. MCCONWELL: I move to strike his answer. We'll get to that, Your Honor.

THE COURT: Okay. The Court will grant that motion to strike, just -- he talked about the corporate structure change. That was the question, so answer that question.

MR. MCCONWELL: But my question -- the answer is okay. It's just the law made them get the money out of the Vanuatu, out the banks, the Vanuatu -- I think that's what he said.

THE COURT: No, actually, I think he went beyond that but --

MR. MCCONWELL: He did. That's why I move to strike.

THE COURT: So I guess it's not clear how he answered that question. So did the law change? That was his

question, did the law change?

THE WITNESS: No, I -- I thought I heard that -- I apologize, but I thought he asked me what happened with the bank, the bank account specifically.

THE COURT: Okay. Let's go back to the question. Hold on. Let's go back to the question. Hold on. Hold on. Hold on one second.

How are you doing there, Mr. Han? Are you tired? Do you need help there, Mr. Han? We need to get you an easel there. Let's help him. I think he's going to be tired.

I'll have Veronica just read. Thank you, Steven. I appreciate that. Let's get a repeat of that question. I think it was very specific. Let's see what Veronica says here.

(Whereupon the reporter read back requested portion.)

THE COURT: Okay, so that's the question.

THE WITNESS: About the law.

THE COURT: About the rules. I thought it was the law, but they said the rules.

THE WITNESS: I -- I don't know about the rules specifically.

THE COURT: All right. Next question.

BY MR. MCCONWELL: (CONTINUING)

Q. But you do know that the money, if it really was in

01:45PM 01:45PM 01:45PM 01:45PM 01:46PM 01:46PM 01:46PM 01:46PM 01:46PM 01:46PM 01:46PM 01:46PM 01:46PM 01:47PM 01:47PM 01:47PM 01:47PM 01:47PM 01:47PM 01:47PM 01:47PM 01:47PM 01:47PM 01:47PM 01:47PM

the Vanuatu bank account for the -- Wilma's, went to Caledonian Agency; correct?

MS. M. MILLER: Objection, Your Honor; assuming facts not in evidence. Calls for speculation.

MR. MCCONWELL: He's already testified about that.

MS. M. MILLER: He said the money, if it was in.

THE COURT: The Court will -- okay. Let's see. The Court will sustain the objection. Just ask it another way if you want to.

BY MR. MCCONWELL: (CONTINUING)

Q. Will you agree that the money that was collected from the leases after 2014 went into an account of -- Caledonian Agency?

A. Yes.

Q. Okay. And that was a non-operating company; correct?

A. Yes.

Q. And it was -- it held the moneys in trust for the distribution of bills and the like for -- or handled by Hansen in its administrative capacity; correct?

A. No.

Q. Now, the Vanuatu -- or the Williams[sic] money collected was not income in United States, was it, sir?

A. I'm sorry? One more time.

Q. The money collected by Wilma's Flight Service, Inc.,

a Vanuatu company, on behalf of the Vanuatu 30 corporations, was not income in the United States; correct?

A. Oh, it's income to Hansen Helicopters.

Q. No, it's not -- it's income to the individual Wilma's, isn't it? It's being held for the benefit of Williams -- Wilma's.

A. No, that's incorrect.

Q. Okay. And you do know, don't you, that the chief financial officers of Hansen, over the years, had been certified public accountants, and the current one is one, he's not an active one, but he was manager of a local big accounting firm?

MS. M. MILLER: Objection, Your Honor; compound question, speculation, assuming facts not in evidence.

MR. MCCONWELL: I'll withdraw and ask again.

THE COURT: Okay, withdrawn. Next question.

BY MR. MCCONWELL: (CONTINUING)

Q. Are you aware what that the current CFO of Hansen is a CPA that was a former manager of one of the Big 8 accounting firms?

MS. M. MILLER: Objection, Your Honor; outside the scope. Current CEO of Hansen? Current meaning as of today?

MR. MCCONWELL: CFO.

THE COURT: I'm sorry? Sorry? She's saying --

current, what do you mean by current?

MR. MCCONWELL: CFO during the relevant time period within this --

THE COURT: So not current.

MS. M. MILLER: Not current, okay.

THE COURT: You don't mean current, right?

MR. MCCONWELL: Well, he is current at the time, yes. The CFO of Hansen was the CPA at the time the money went into Caledonian Agency?

THE COURT: Okay.

THE WITNESS: So the question is?

BY MR. MCCONWELL: (CONTINUING)

Q. You're aware that -- the money --

THE COURT: Your question is again?

BY MR. MCCONWELL: (CONTINUING)

Q. The deposit was under the eyes and ears of a CFO, chief financial officer, who was a CPA?

A. So you're asking me if the CFO is aware of the money coming into the bank account?

Q. At Caledonian Agency, in terms and conditions under which it comes into that bank account?

MS. M. MILLER: Objection, Your Honor. That would call for speculation.

THE COURT: Sustained.

BY MR. MCCONWELL: (CONTINUING)

Q. Okay. Do you know what kind of business the Caledonian Agency was actually engaged in, if any?

A. According to -- yes.

Q. What?

A. It should have been investment as it says on the bank signature card.

Q. But you're not aware of any investment income or expenses relating to that, are you, sir?

A. No.

Q. Let's take a look at 131, if we can. Now would you tell us what this is, please?

A. This is Wilma's Flight Services, Inc. minutes.

Q. And would you go ahead and read that first line, first two lines for us, please?

A. Yes, sir. "Minutes of the shareholders and board of directors meeting of Wilma's Flight Services, Inc. held at the company affiliates Hansen Helicopters.Inc. Offices in Harmon, Guam on October 25th, 2017."

Q. Keep going.

A. "Present Jon D. Walker, Director, also representing Bean Bag Helicopters, Inc., the 100% owner of the company ultimately owned by Jon D. Walker. Kenneth R. Crowe, Director. Chairman, by agreement, Jon D. Walker, chaired the meeting. Discussion." Do you want me to read all that, sir?

Q. Yeah, go ahead.

A. "The general operations of the company were discussed. The initial financial statements as and for the year ended December 31st, 2016, were reviewed and discussed. It was agreed that the financial statements show that the company continues to do extremely well in its business activities and it is expected to do even better by the time the year ends this coming December based on current demand for helicopters owned by Wilma's Flight Services, Inc.

Personnel matters were also discussed and it was agreed that additional pilots and mechanics may need to be hired based in the increasing demand for helicopters. There was a specific discussion held as to the need for Wilma's Flight Services, Inc. to open a general checking account at Bank of Hawaii in order to receive lease deposits for leases of helicopters where the lease income is generated in open waters and is not considered U.S.-effectively connected income. Given that Wilma's Flight Services, Inc. qualifies as the active NFFE per the form W8BENE, and given that there is no U.S.-source income generated by Wilma's Flight Services, Inc., as such, there should be no problem opening the bank account at Bank of Hawaii.

It was unanimously agreed to open this account at Bank of Hawaii. It was further agreed that effective immediately, the following are appointed to be officers of the corporation as follows: President, Mr. Jon D. Walker; Vice

President, Mr. Phillip T. Kapp; Secretary-Treasurer, Mr. Kenneth R. Crowe.  As there was no further business to be discussed, the chairman moved to adjourn the meeting.

Signed as true record of the meeting, President and Director, Jon D. Walker, signs it, Kenneth R. Crowe, Vice President, Secretary and Director signs it."

Q.   Are you aware of the requirement of this type of a letter at Bank of Hawaii for a foreign corporation to open an account at Bank of Hawaii at this particular time?

A.   I am aware that the banks do require certain documents to open an account; yes.

Q.   And you saw -- you see the statement, "is not U.S.-effectively connected income," that's a requirement to open an account by the foreign corporation; correct?

A.   Are we talking about this specific document?

Q.   That point in time, the requirement that was to assure that the income being deposited, the Bank of Hawaii, was not U.S.-effectively connected income, it had to be certification by your board, up to that effect?

A.   That's incorrect.

Q.   Well, you know whether Bank of Hawaii required this letter in this format in order to open the account?

A.   The bank did require these kind of documents to open corporate accounts; that's correct.

Q.   And what is active NFFE mean per that form, W8BENE?

A. I'm sorry, I don't recall. 01:55PM

Q. Okay. Now this would be one of the banks official records that you would have subpoenaed back in 2018; correct? 01:55PM 01:55PM

A. It might have been before that time; yes. 01:56PM

Q. You subpoenaed all the banks records which should have included this particular document; correct? 01:56PM 01:56PM

A. It should have been provided, if it was a bank document; yes. 01:56PM 01:56PM

Q. So you should have known back in 2017 that Wilma's Flight Service, Inc., a foreign corporation, had money in the Bank of Hawaii that was generated from lease income from tuna boats; correct? 01:56PM 01:56PM 01:56PM 01:56PM

A. U.S. income. 01:56PM

Q. It generated income. Whether it's U.S. or not, that's not subject to this case, is it, sir? 01:56PM 01:56PM

A. But you're asking me about U.S. income, if it was U.S. income. 01:56PM 01:56PM

Q. Well, I misspoke, I'm sorry. This particular letter should have been -- 01:56PM 01:56PM

MS. M. MILLER: Your Honor, I'm confused. 01:56PM

MR. MCCONWELL: I am too. Could we read back? It's late in the day. We've had too long a day. We can start again here. 01:56PM 01:57PM 01:57PM

THE COURT: Okay. Start again. 01:57PM

BY MR. MCCONWELL: (CONTINUING) 01:57PM

 Q. I think we've established that this letter should have been produced to you --

THE COURT: Okay, we have like three minutes before the next break. So I'm going to get back on track, so at 2:00, we'll take a recess and then you guys can get unconfused. Go ahead.

BY MR. MCCONWELL: (CONTINUING)

Q. Okay. So this document should have been the information you got from the bank; correct?

A. Right.

Q. Okay.

A. Correct.

Q. And part of the information you utilized in your assessment of this wrongful transfer of money back and forth?

A. It's the transfer -- it's wire fraud, it's the -- so the question is?

Q. Is it illegal for a company to transfer money that it's earned through lease income, lawfully-earned lease income?

A. That's incorrect.

Q. Well, explain why that's not correct.

A. Because the money involved in this case involves the misrepresentations made to the tuna boat companies as it relates to the helicopters, and the airmen that are not FAA certificated.

MR. MCCONWELL: Now, I move to strike that. It was totally nonresponsive, even though I left it a little bit open. It was a speech, a narrative.

THE COURT: Well, he answered the question.

MR. MCCONWELL: He got me. We'll take care of that then.

MS. M. MILLER: Your Honor, that's the problem is, the question is open-ended. Then he responds accordingly --

THE COURT: I'm not going to -- yup, strike, go ahead. Proceed.

BY MR. MCCONWELL: (CONTINUING)

Q. Okay. There is nothing illegal about wire transferring from one bank to another income that was lawfully earned from lease income to buy a tuna -- from a tuna boat; correct?

A. Are we talking about this case?

Q. I'm talking about in general, period.

A. So we're not talking about this case?

Q. I'm -- I asked you a general question, and I'm asking you to give me a general answer.

MS. M. MILLER: Your Honor, I object as to relevance.

THE COURT: Overruled. General question.

THE WITNESS: In general, not related to this

case, there is no problems with moving money among banks, it's just inefficient.

BY MR. MCCONWELL: (CONTINUING)

Q. If it's lawfully-earned income, there is no problem about moving money around by Jon Walker from one account to another that he owns, that clearly identified where the money is going, there is nothing wrong with that, is there?

A. Are we talking about Jon Walker?

Q. I said if it's lawfully owned by -- earned by Jon Walker, there is nothing -- or his companies that he's been involved with, there is nothing wrong with moving that money around at his direction to different banks of the company, and when transactions are totally open, there is nothing hidden here? Nothing unlawful?

THE COURT: That's a hypothetical question there, Agent.

MS. M. MILLER: Well, Your Honor, I'm going to object because I was not permitted to ask any hypothetical questions.

THE COURT: Overruled. Overruled. Go ahead, answer the question. He just gave you one.

THE WITNESS: That's completely incorrect as it relates to this case because it's all based upon the misrepresentations --

MR. MCCONWELL: I move to strike. Ask him to

answer the question as proposed to you, sir.

THE COURT: The question as proposed to you.

THE WITNESS: Okay. So --

THE COURT: He said -- he already gave you the hypothetical.

THE WITNESS: The hypothetical, not related to any of the evidence that I looked at?

THE COURT: Well, okay, just whatever -- just the hypothetical, period.

THE WITNESS: I'm sorry, the accounting side --

THE COURT: You're adding -- no, no, no, you're adding to the question. You're not supposed to add to the question. The hypothetical as propounded by the attorney, what's your answer? Do you have an answer?

THE WITNESS: I don't have an answer. Maybe I need to hear it one more time.

THE COURT: Again?

THE WITNESS: Yeah.

THE COURT: Okay. Let me see. Let Veronica ask the question, before we take our next recess.

(Whereupon the reporter read back requested portion.)

THE WITNESS: And this is purely a hypothetical, not -- as a hypothetical, if it truly was lawful income, as a hypothetical, moving around between bank accounts, as a

02:00PM 02:00PM 02:00PM 02:00PM 02:00PM 02:00PM 02:00PM 02:00PM 02:00PM 02:00PM 02:00PM 02:00PM 02:00PM 02:00PM 02:00PM 02:00PM 02:00PM 02:00PM 02:00PM 02:00PM 02:01PM 02:01PM 02:01PM 02:01PM 02:01PM

hypothetical, for a legitimate business reason, as a hypothetical, then there is hypothetically nothing wrong with it.

(Laughter in courtroom.)

THE COURT: Okay. You got the answer to the question.

BY MR. MCCONWELL: (CONTINUING)

Q. It's a hypothetical answer -- let me ask one more.

THE COURT: Go ahead.

BY MR. MCCONWELL: (CONTINUING)

Q. You responded to Ms. Marie Miller's question about the money, the operation of the money that you had analyzed from this being wired around. That you -- you answered -- I believe you answered that that money came from the operation of the helicopters pursuant to the lease as the source of the funds that you seized; correct?

A. To the wire fraud, the money came from leasing the helicopters to the tuna boats, which were fraudulent.

Q. That's your opinion, and that's the issue of what we're here for, to decide whether they're fraudulent or not. That's not for you to decide, is it, sir?

A. You're right. It's for the jury to decide.

MR. MCCONWELL: Probably a good time to break.

THE COURT: I think so. All right. It's -- okay, ladies and gentlemen, we'll see you in 15 minutes.

Please rise for the jury. Keep an open mind.

(Jury out at 2:03 p.m.)

THE COURT: How much longer do you think you have, Mr. McConwell, with this witness?

MR. MCCONWELL: Probably not too much, maybe 30 or 40 minutes. I'll try to do better.

THE COURT: That's fine. I'm not rushing you. I just wanted to know.

MR. MCCONWELL: I got some other documents I can pull out at the break.

THE COURT: If there is if new or additional documents, why don't you pass.

MR. MCCONWELL: They were previously identified.

THE COURT: Oh, they've already --

MR. MCCONWELL: Well, in general, we haven't set for this cross-examination. We didn't know what he was going to be talked about for sure but -- we'll get them -- I'll give them the numbers.

THE COURT: Yeah, yeah, if you give -- if you -- if they've already been marked and identified?

MR. MCCONWELL: They're identified in our trial. Pretrial stuff.

THE COURT: All right. So just work it out so we don't have to take time during the testimony.

MR. MCCONWELL: I will, Your Honor.

THE COURT: All right. Thank you. All right. I'll see you all in shortly. Yeah, 15 minutes.

THE WITNESS: Thank you, Your Honor.

THE COURT: Yeah, thank you.

(Recess taken at 2:04 p.m.)

(Back on the record at 2:21 p.m.)

(Pause.)

THE COURT: Are we ready?

MR. MARTIN: Ms. McConwell is looking for some of the exhibits. She put them somewhere, Judge.

THE COURT: Did you give them to the prosecution, Mr. McConwell? Your listing?

MS. M. MILLER: I'm sorry, Your Honor?

THE COURT: I'm just asking.

MR. MARTIN: She did not give them.

MS. M. MILLER: She did not.

THE COURT: Oh, okay.

MS. M. MILLER: I think she's got the hard copies there.

THE COURT: Right. She didn't give it to you. All right. Before we call in the jury in here.

MR. MCCONWELL: I think I'm back online here.

THE COURT: So 30 to 40 minutes and then, Mr. Martin, are you going to cross-examine the witness?

MS. M. MILLER: Ms. McConwell, do you have a

02:03PM 02:03PM 02:03PM 02:04PM 02:04PM 02:21PM 02:27PM 02:28PM 02:28PM 02:28PM 02:28PM 02:28PM 02:28PM 02:28PM 02:28PM 02:28PM 02:28PM 02:28PM 02:28PM 02:28PM 02:28PM 02:29PM 02:29PM 02:29PM 02:29PM

copy?

MR. MARTIN: At least 1 or 2 questions, Judge.

THE COURT: That's it?

MR. MARTIN: Probably 3 or 4.

THE COURT: Maybe 5 or 6. 10 or 11.

MS. M. MILLER: You don't have to put stickers on them, I could just write numbers on them.

MR. MCCONWELL: Get the official one.

THE COURT: Oh, wow, I like the cooperation.

MS. M. MILLER: I try to be cooperative, Your Honor.

MS. MCCONWELL: I'm the low girl on the totem pole.

THE COURT: You're the low girl? You're the high girl on the totem pole. Appearances can be deceiving. Okay.

THE WITNESS: Your Honor, have you ever thought about doing karaoke in the courtroom?

THE COURT: What's that?

THE WITNESS: Have you ever thought about doing karaoke in the courtroom?

THE COURT: I think --

THE WITNESS: I think it could be kind of fun. I mean, off hours.

THE COURT: Ask Stacy? You know Stacy.

THE WITNESS: I haven't.

THE COURT: My community outreach.

THE WITNESS: Oh.

THE COURT: You know she's the one that puts everything together. Should ask her to do that for law week.

THE WITNESS: That would be kind of fun.

THE COURT: Yeah. It might be, I don't know. I don't know about my voice, I don't have a good voice.

THE WITNESS: It's karaoke, not American Idol.

Are we ready to go then?

MS. MCCONWELL: We are.

THE COURT: Mr. McConwell, you ready, sir?

MR. MCCONWELL: Yes, ma'am.

THE COURT: Okay, we'll call in the jury. And so will we be done with this witness today, Counselors? If it's really going to be 30 minutes with continuation with Mr. McConwell and then Mr. Martin, by 4:00 p.m.?

MR. MARTIN: We'll do everything we can to make that happen, Judge.

THE COURT: All right. And then who's the next witness up?

MS. MCCONWELL: I believe Mr. Guzzetti.

THE COURT: Guzzetti, okay. I think I have -- all right. So there is a pending summary chart motion from last week. So I'll hear that tomorrow after Court at 4. I have a 5:00 meeting tomorrow morning, a.m., 7:00 a.m. motion

02:30PM 02:30PM 02:30PM 02:30PM 02:30PM 02:30PM 02:30PM 02:30PM 02:31PM 02:31PM 02:31PM 02:31PM 02:31PM 02:31PM 02:31PM 02:31PM 02:31PM 02:31PM 02:31PM 02:31PM 02:31PM 02:31PM 02:32PM 02:32PM 02:32PM

for compassionate release. So let's see, it will be ECF No. 1628. That's what we'll hear tomorrow. Okay.

MS. MCCONWELL: At 4.

THE COURT: At 4:00 p.m. after we're done.

(Jury in at 2:32 p.m.)

THE COURT: Okay. That's a motion for summary -- there's another motion for summary chart I haven't looked at, that was this morning, but the ones from last week, I'm going to hear, you guys already briefed that. So we'll hear that tomorrow at 4 after the jury leaves.

All right. Please be seated. Welcome back, ladies and gentlemen of the jury. All right, Mr. McConwell, you may continue on with your cross-examination, sir.

MR. MCCONWELL: Thank you, Your Honor.

THE COURT: Uh-huh.

BY MR. MCCONWELL: (CONTINUING)

Q. Let's take a look at Exhibit 133, please. 134 also and 135. Just look at them all together. Did you receive these letters in your subpoena from the Bank of Hawaii, sir?

A. I do not recall seeing these documents until now.

Q. These documents dated June 25, 2018, I believe you were critical of the companies for moving accounts at this timeframe in the July 2013 -- or '18 timeframe; correct?

A. I did say moneys was moved to -- during this timeframe; yes.

Q. And that was to Community Bank and Limey was the -- Limey Air Service, Inc., I think, was the bank name for that account; correct?

A. That was one of a few; yes.

Q. Okay. And Wilma's Flight Services also removed its money from the Bank of Hawaii, same time; correct?

MS. MCCONWELL: Excuse me, I believe these are admitted, aren't they?

MR. MCCONWELL: They had no objection, I thought.

THE COURT: All right.

MS. MCCONWELL: We need them published.

MR. MCCONWELL: Oh, I'm sorry.

THE COURT: Oh, you want it published?

MR. MCCONWELL: We want --

BY MR. MCCONWELL: (CONTINUING)

Q. Now, this is a letter from the Bank of Hawaii, right after your subpoena, right after the indictment telling Wilma's and the other corporations associated with Hansen Helicopters, Inc. to get their money out of the bank within 30 days; correct?

A. If you give me time, I could review it because I don't --

Q. Why don't you take a moment and read it then.

A. Okay. Thank you.

Q. Let me ask you before you do that, let me say one

more thing, this is a document that should have been produced to you in response to your subpoena; correct?

MS. M. MILLER: Objection, Your Honor; speculation.

THE COURT: Overruled.

THE WITNESS: At the time that I issued the subpoena, it was before this particular date.

BY MR. MCCONWELL: (CONTINUING)

Q. Did you get ongoing production from the bank after the particular date -- initial date of the subpoena?

A. From Bank of Hawaii?

Q. Yes.

A. I don't recall as it relates to these documents here.

Q. Okay. Take a look at the first document, 133, if you would, sir.

MR. MCCONWELL: I'm sorry, Laura, I don't have a number on that.

BY MR. MCCONWELL: (CONTINUING)

Q. Anyway, this particular document, take a look at it. This document is 134; is that correct?

A. Oh, I'm sorry. I was reading the hard copies.

Q. But we marked it 134. Somehow it was unmarked?

A. Actually, this is pertaining to Wilma's and it's identified... it's identified as Defendant's Exhibit 132.

Q. Okay. All right. So it's a fair statement to say

02:35PM 02:35PM 02:35PM 02:35PM 02:35PM 02:35PM 02:35PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:36PM 02:37PM 02:37PM 02:37PM 02:37PM 02:37PM 02:37PM

that the banks told them to get their money out of the bank within 30 days or they'll find someplace to put it?

A. Yes, this is -- can I read it? Do you want me to read it?

Q. If you'd like, yeah?

A. Out loud?

Q. Yes.

A. Sure. I'll start with "Dear sir." Is that all right?

Q. That's fine.

A. "Dear sir, we have conducted a review of our customer accounts and transaction history and have determined that we will no longer be able to service your account. This letter will serve as a notice of our intent to terminate the account listed above, collectively the account, on July 31st, 2018, pursuant to the business deposit account agreement governing the account. We believe this will provide you with sufficient time to make other arrangements to meet your financial needs. In conjunction with this closure, any debit cards attached to your account will be blocked from further transactions five business days prior to the closure date identified above. You may voluntarily close your account prior to July 31st, 2018, by visiting one of our branches. If you do not do so by August 7th, 2018, a check in the amount of any funds remaining in your account will be sent to your last address of record.

If you have any questions concerning this matter, please feel free to contact me at the number below, sincerely, Brian Bliss, Vice President, Guam Commercial."

Q. And this was at a time there were millions of dollars coming into the account for lease payments and moneys for payments for obligations of the various companies; correct?

A. This is the time after the indictment.

Q. After the indictment?

A. Yes, this is the time after the indictment.

Q. So this was a pretty hectic time for them to have to find a bank to handle this amount of money that quickly; correct?

A. I don't know about hectic.

Q. Difficult though?

A. I don't know their state of mind.

Q. Okay. Take a look at Exhibit 136, if you would, sir.

THE COURT: You have a copy of this, Ms. Marie Miller, 136?

MR. MCCONWELL: I belive they've got it.

MS. M. MILLER: He did, Your Honor.

THE COURT: Okay. Go ahead.

BY MR. MCCONWELL: (CONTINUING)

Q. Take a look at this, and tell us what this is.

MR. MCCONWELL: First of all, there was no objection to this.

THE COURT: Is there any objection to 136?

MS. M. MILLER: No, Your Honor.

THE COURT: All right. Ladies and gentlemen, 136 will be admitted without objection. Yes, you may produce it. Project it. Present it.

(Exhibit 136 admitted.)

THE COURT: Publish it, I'm sorry. I'm trying to find the right word. Publish it.

BY MR. MCCONWELL: (CONTINUING)

Q. Did you have a chance to look at it, sir?

A. Yes.

Q. Does this help you recall whether there was a bona fide company Williams[sic] Flight Service, Inc., incorporated in Vanuatu, July 1st 2002?

A. That's incorrect.

Q. That's the date of its constitution though; correct?

A. Specifically that's the date of this constitution, July 1, 2002.

Q. Okay. And you have no reason to believe that there was another Wilma's Flight Services in fact incorporated that handled money for -- during the time period of your analysis; correct?

A. I have no evidence of another...

Q. Just this company, Wilma's, and the one that was terminated in 2008; correct?

         A. This is the first time I've seen this -- this particular; yes.

Q. Okay. Let's take a look now at Exhibit 76.

THE COURT: 76?

MR. MCCONWELL: Yes.

THE COURT: Has that been admitted or no objection?

MS. M. MILLER: I don't even know what it is.

MR. MCCONWELL: It's an insurance policy, the Caledonian Insurance policy.

THE COURT: Did you get a copy of that?

MS. M. MILLER: Yes.

THE COURT: Oh, you want to look at that?

MS. M. MILLER: I would like to, Your Honor, and then I'll let you know if I have any objections.

THE COURT: Okay. Right. Hold on.

Are you wanting to publish this, Mr. McConwell?

MR. MCCONWELL: Yes, Your Honor.

THE COURT: Give her a second to review it. Exhibit 76.

MS. M. MILLER: I don't see it. It's not on the screen. I can't review it.

MS. MCCONWELL: Oh, I'm sorry.

THE COURT: 76.

MS. M. MILLER: It's 32 pages, Your Honor. So

I'm going to need sometime to review it before I can let you know if I have any objections or not.

THE COURT: Go ahead.

MS. M. MILLER: Do you have a hard copy, Ms. McConwell?

MS. MCCONWELL: No. I don't have an additional because this is one of our exhibits on our exhibit list.

We gave you hard copy, a binder of our exhibits.

MS. M. MILLER: It will be faster if I do that, if I review it.

MS. MCCONWELL: Here you go.

MS. M. MILLER: Thanks. It's 76?

MS. MCCONWELL: Yeah.

(Counsel conferred.)

MS. M. MILLER: I have no objection, Your Honor.

THE COURT: Ladies and gentlemen of the jury, Exhibit 76 will be admitted without objection and, yes, you may publish what you need to, Mr. McConwell.

(Exhibit 76 admitted.)

MR. MCCONWELL: Thank you, Your Honor. Let's do the first page.

BY MR. MCCONWELL: (CONTINUING)

Q. First of all, you indicated earlier you had seen the insurance policy that -- issued by Caledonian; correct?

A. I've seen some insurance policies.

Q. All right. This particular document starts out with Bean Bag. Would you read the first four lines there for me?

A. Do you want me to start at the insurance effected and go down?

Q. Yes.

A. Okay, sure. "This insurance effected and provided for Bean Bag Helicopters, Inc., PMB9102 Lini Highway, Port Vila, Vanuatu, South Pacific and the following wholly-owned subsidiary companies."

Q. Now go down to the bottom, if you would, of that page, or under Wilma's. Read the last line.

A. Port Vila, Vanuatu.

Q. No, the last -- the Vanuatu companies.

A. Oh, the last line -- okay. Wilma's Flight Services, Inc.

Q. And then keep on going, please.

MR. MCCONWELL: Let's go down to the list of aircraft, Laura. It's about 4 or 5 pages, I think. Oh, it says schedule of aircraft on page 4.

BY MR. MCCONWELL: (CONTINUING)

Q. Can you tell us what this is?

A. A list of U.S.-registered helicopters, as well as Philippine-registered helicopters and New Zealand-registered helicopters.

Q. At that time, these helicopters were on the registry

of the United States; correct?

A. The U.S.-registered ones were on the FAA registry.

Q. Okay. And those are the ones that were owned by the Vanuatu companies earlier identified in the said policy; correct?

A. They are identified in this policy.

MR. MCCONWELL: Okay. Keep on going, please. Let's go to Exhibit 77 now. And I'll move this into evidence, Your Honor.

THE COURT: It's already been admitted. 76 is admitted.

MR. MCCONWELL: Yes, thank you. Exhibit 77.

THE COURT: Has that been admitted already?

MR. MCCONWELL: Not yet. We'll need to identify it.

THE COURT: Does prosecution have a copy of this?

MR. MCCONWELL: It was produced to them earlier.

MS. M. MILLER: I have it, Your Honor.

THE COURT: She has it now. Very well.

MS. M. MILLER: Your Honor, I'm going to object to the admissibility of this document on the basis of a lack of foundation. It is a document that was prepared by a company that has not been -- there is no way to determine whether this document is accurate or inaccurate. There has been no foundation for its admissibility.

MR. MCCONWELL: It's a business record of the companies, Your Honor, prepared by the registered agent, but if we have to have a foundation witness, I guess we'll have to do that.

THE COURT: Okay.

MS. M. MILLER: I'm sorry. So he's withdrawing it until he has a foundation witness to bring it in?

MR. MCCONWELL: I haven't offered it yet.

THE COURT: I think he's thinking about it.

MS. M. MILLER: He's thinking about it, okay.

THE COURT: Yeah.

MR. MCCONWELL: And I do have an Exhibit 72 also.

THE COURT: I'm sorry. Exhibit 72? Is that what you said?

MR. MCCONWELL: Yes.

THE COURT: Okay. Exhibit 72. So take out the other one. 72.

Prosecution, can you see that?

MS. M. MILLER: Yes, Your Honor.

THE COURT: You're trying to move to admit this, Mr. McConwell?

MR. MCCONWELL: Yes, Your Honor.

THE COURT: Is that just a one-page certificate?

MR. MCCONWELL: Yes, one-page certificate.

THE COURT: Any objections?

MS. M. MILLER: Yes, Your Honor. Same objection, lack of foundation.

MR. MCCONWELL: Again, we can have somebody from the corporation to identify it as a business record of the company if that's necessary.

MS. MCCONWELL: Well, I thought business records of the Defendants were something that we weren't going to object to foundation and require those types of foundational.

THE COURT: Did you guys stipulate to that?

MS. M. MILLER: No.

MR. MCCONWELL: We stipulated they could do that with things that were produced, but it's not reciprocal apparently.

THE COURT: If you stipulated to it, then of course it's going to be allowed.

MR. MCCONWELL: I can't tell you the exact terms of it, but I anticipated it would not be objected to, but we'll deal with it.

THE COURT: Okay. All right. Next question?

MR. MCCONWELL: Let's take that off, please.

THE COURT: Okay.

BY MR. MCCONWELL: (CONTINUING)

Q. There has been discussion, Mr. Khamvongsa, about the shell companies. Can you tell us what a shell company is in your view?

A. Are we talking hypothetical or in this case?

Q. Hypothetically.

A. Hypothetically, a shell corporation may be used to limit the liability of an asset or something of that nature. It exists primarily in name, it's not -- it's not really generating any income or has any employees.

Q. But it has assets in the form of, for example, the boats; companies have 3 or 4 subsidiary companies that you could call shell companies, couldn't they?

A. Are we talking about the tuna boat companies?

Q. Yes, sir.

A. Well, and hypothetically speaking?

Q. Yes, sir.

A. Well, hypothetically, a shell company or corporation could own boats for tuna spotting or tuna fishing.

Q. Well, hasn't that been done on 3 or 4 of the boat companies that you went through yesterday when you went through the billing? You had sub -- boats, different LLCs, but the primary boat company was also included?

A. They were -- they appear to be subsidiaries of fishing companies. They didn't appear to be shell corporations, per say.

Q. Well, they appear to be LLCs, that's a corporate type of device, isn't it, sir?

A. They appear to be LLCs? Is that what you asked?

02:54PM 02:54PM 02:54PM 02:55PM 02:55PM 02:55PM 02:55PM 02:55PM 02:55PM 02:55PM 02:55PM 02:55PM 02:55PM 02:55PM 02:55PM 02:55PM 02:55PM 02:55PM 02:55PM 02:55PM 02:56PM 02:56PM 02:56PM 02:56PM 02:56PM

Q. Yes.

A. I do recall -- there are LLCs on the documents that I reviewed.

Q. And that would be the same thing as a shell company to hold aircraft under Bean Bag; correct?

A. That's not correct. If we're talking about Bean Bag.

Q. Well, isn't it true that the use of shell companies, calling them shell companies, is a common practice in the aviation industries to hold the title to aircraft that are registered in the United States?

A. It's not true to the facts in this case.

Q. Isn't it true that it's a common practice for aircraft registered in the United States for companies to use a subsidiary shell company, that they call them, to hold the title and register the aircraft?

A. Is this a general question? Or are we talking about the facts as it relates to this case?

Q. A general practice in the aviation industry recognized by the United States government as a legitimate practice?

A. My knowledge is only as it relates to the evidence I reviewed in this case, and what's reflected in the evidence.

Q. You know what the Government Accounting Office is, sir, of the United States?

A. The Government Accounting Office?

Q. The GAO?

A. I'm aware of it.

Q. Are you aware that the GAO has reported that --

MS. M. MILLER: Objection, Your Honor. I'm going to object because the government filed a motion in limine to exclude the GAO report that Mr. McConwell is attempting to talk about, and the judge granted that motion in limine and Mr. McConwell knows it.

MR. MCCONWELL: It's about a 90-page document, Your Honor, and there is one particular page that does directly relate to the question and we --

THE COURT: Does it relate to the report?

MR. MCCONWELL: Yes, but --

THE COURT: If it does --

MR. MCCONWELL: -- it relates directly to what we're dealing with in this case.

MS. M. MILLER: Your Honor, you granted the motion in limine to exclude that.

MR. MCCONWELL: Anyway, I'd like to offer it, like the Court to look at it and review that, see if this is within the Court's scope of the Court's order because I think many more things involving that order --

THE COURT: Okay. We'll come back to that. Why don't you go to another line of questioning, we'll come back to that. So we can try to finish up what we can without

02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM

taking a recess.

BY MR. MCCONWELL: (CONTINUING)

Q. Isn't it true that the reason that shell companies cause some concern is you need the ability to identify the beneficial owner or ultimate owner of the corporation, that needs to be done; correct?

A. It's true that the owner should be identified; yes.

Q. Or easily identifiable; correct?

A. Easily identifiable, transparency; yes.

Q. And Mr. Prozik, in his testimony, indicated that Mr. Walker was easily identifiable as the owner of all of these corporations, the ultimate beneficial owner, not the individual specific owner of corporation by corporation?

MS. M. MILLER: Objection, Your Honor, Counsel is misstating the testimony of Special Agent Prozik.

MR. MCCONWELL: I don't believe I am --

THE COURT: Okay. The Court will overrule the objection. Do you recall that?

THE WITNESS: I don't recall Mr. Prozik saying that.

THE COURT: All right. Next question.

MR. MCCONWELL: Okay. I have no further questions after we resolve the GAO issue.

THE COURT: Okay, so can you get me -- okay, I guess I need to get the proffer on that.

MR. MCCONWELL: It's Exhibit --

MS. M. MILLER: Yes, the government would need the proffer on that as well, obviously outside the presence of the jury.

MR. MCCONWELL: 64-A.

THE COURT: Hold on. Hold on. Wait. Wait. Just a minute. What, Mr. McConwell?

MR. MCCONWELL: It's Exhibit 64-A, and we've given it to the government.

THE COURT: 64-A. Let's pull up 64-A somebody. Pull it up and zoom in on what you want me to look at it. Okay.

MR. MCCONWELL: I'm sorry, 66-A.

THE COURT: Okay. 66-A, that's fine.

MS. M. MILLER: Your Honor, the whole report is in this --

THE COURT: Hold on. Let's just see what he wants -- I just want to look -- he's not going to talk about it.

MS. M. MILLER: I don't have A is my point, I only have the whole report.

THE COURT: Okay, so pull up -- let her pull up what they have. Let's see what they're talking about. Maybe you might have this.

MR. MCCONWELL: It will be about page 80 or 81.

We could do that.

THE COURT: Page 80 or 81.

MR. MCCONWELL: In that area.

THE COURT: Okay. The only thing is -- let me just -- okay. Counsel, the Court does exclude the GAO report so if you want to get anything from that report, the Court will sustain that objection.

MR. MCCONWELL: In its entirety, but it was a motion in limine, which I understood we could bring back up and give the Court the opportunity to look at the particular portion we wanted to --

THE COURT: I'm sorry. So can you repeat that? What was --

MR. MCCONWELL: I understood in a motion in limine that when you have a particular paragraph or statement within a document, you can bring that back to the Court's attention, and that's the purpose of giving you advance notice.

THE COURT: Okay. Why don't we -- maybe we need to look at what you're talking about. I'm not clear on that. But let's just see what the deal is. Excuse me. Okay. Okay. Is that it, Mr. McConwell? On the screen?

MS. M. MILLER: Is that the page?

MR. MCCONWELL: No, go over one more.

MS. M. MILLER: That's the page?

THE COURT: No, she said next page. What are you looking at, which block there? First block?

MR. MCCONWELL: First of all, the block of noncitizen corporation.

MS. M. MILLER: Objection to Counsel --

THE COURT: Just say first block.

MR. MCCONWELL: First block.

THE COURT: First block there?

MR. MCCONWELL: Right.

THE COURT: You're wanting to ask a question about the first block?

MR. MCCONWELL: I want to have this document, that portion, admitted into evidence.

THE COURT: That page?

MR. MCCONWELL: Yes, that page.

THE COURT: Or that block?

MR. MCCONWELL: Well, that block in particular, yeah, that block --

THE COURT: The block that has three different columns?

MR. MCCONWELL: Right.

THE COURT: All right. Okay. Hold on a second.

(Pause.)

After the prosecution reviews it, let me know if you object to that block being admitted into evidence and

published to the jury.

MS. M. MILLER: Yes, Your Honor, and I have an additional basis for the objection besides the fact that you already granted our motion.

THE COURT: Okay. And what is the -- I'm sorry, Mr. McConwell, this has already been excluded. Is there a different basis in which to present this?

MR. MCCONWELL: I'm not sure, and I don't recall this document being even totally considered in argument or in total, it was just a blank document with certain portions irrelevant, that's why I thought under the rules would be able to bring it back --

THE COURT: If you're offering it under the void ab initio theory, then the Court has excluded this.

MS. M. MILLER: And also, Your Honor, under our motion in limine, Exhibit ECF 1013, which this Court granted, ECF 1251.

THE COURT: Yes, I do have my ruling from the bench at 1251. Mr. McConwell?

MR. MCCONWELL: Let me show you the next page then.

THE COURT: Next page, okay.

MR. MCCONWELL: Make a record of it and we're --

THE COURT: So let's go to next page, and which paragraph?

MR. MCCONWELL: Keep going, Laura.

THE COURT: Excuse me, which paragraph?

MR. MCCONWELL: We can start here, we have a few more pages -- this page here, the entirety of this page.

THE COURT: Okay. That whole page?

MR. MCCONWELL: Right. That's page 85.

THE COURT: All right.

MR. MCCONWELL: Keep on going. And that page, which is 86, and that entirety of that paragraph 3 which deals specifically with what we are talking about.

THE COURT: Table 3? Next page is that right?

MR. MCCONWELL: That's it. And that's all.

THE COURT: Okay. And that's on page 6 -- 86 of 92?

MR. MCCONWELL: Well, it's actually in the document page 81.

MS. MCCONWELL: Right. She's correct, it's 86 of 92. On Exhibit 66.

THE COURT: All right. Do you have any objection to that, Prosecution? On that particular second page?

MS. M. MILLER: So just to be clear, he's asking for the Court to admit page 80 of the document which is marked as page 85 of his exhibit?

THE COURT: Yeah, it looks like page 85 and 86 of 92, he's requesting admission.

MR. MCCONWELL: That's correct.

THE COURT: Which is page 80 and 81 on the paper.

MS. M. MILLER: Got it.

MS. MCCONWELL: 84, 85, 86? Do you want two or three pages?

MR. MCCONWELL: I think we have three pages, actually.

THE COURT: So now you want -- you also want to include page 84? So 84, 85, 86, which are 79, 80, and 81 of the same -- it just has a different numbering system?

MR. MCCONWELL: Correct.

MS. M. MILLER: 84 we object to, Your Honor, because of the fact that this Court has already ruled.

THE COURT: Okay. Page 85, any objections?

MS. M. MILLER: Page 85, I don't object to.

THE COURT: All right. 85 is admitted without objection.

(Exhibit D-66-85 admitted.)

THE COURT: 86?

MS. M. MILLER: I'm reading it.

(Pause.)

MS. M. MILLER: Would that include page 87 of 92 as well? Because it wouldn't be complete if it didn't also include 87. And if it includes both 86 and 87, I have no objection.

THE COURT: All right.

MR. MCCONWELL: That's fine.

THE COURT: Very well. 86 and 87 are also admitted, ladies and gentlemen of the jury. 84 will not be admitted.

(Exhibit D-66A-86 to D-66A-87 admitted.)

THE COURT: So the others have been admitted without objection. Anything further, Mr. McConwell?

MR. MCCONWELL: Um, yes, I do have a question. Go back and look, if I could ask the -- let's publish this, if we can?

THE COURT: Sure. You may publish it. You want to go to page -- which page you want?

MR. MCCONWELL: 85 and -- 85 and 86.

THE COURT: Okay, 85. Pull that.

BY MR. MCCONWELL: (CONTINUING)

Q. Please, Mr. Khamvongsa, please read the actual text of this paragraph?

THE COURT: Is that 85?

MR. MCCONWELL: It's on page 85, appendix four.

THE COURT: Okay. Is that right? Is that the right page? Okay.

MS. M. MILLER: That is the right page, Your Honor.

THE COURT: All right. Go ahead.

03:07PM 03:07PM 03:07PM 03:07PM 03:07PM 03:07PM 03:07PM 03:07PM 03:07PM 03:07PM 03:08PM 03:08PM 03:08PM 03:08PM 03:08PM 03:08PM 03:08PM 03:08PM 03:08PM 03:08PM 03:08PM 03:08PM 03:08PM 03:08PM 03:08PM

THE WITNESS: "Appendix four. Use of opaque ownership structures for aircraft registration. Opaque ownership structures are legitimate business structures that are widely used by corporations and individuals to facilitate commerce, as well as for asset and tax management; however, the lack of transparency related to aircraft registrations using opaque ownership structures also creates challenges for safety and law enforcement investigators seeking information about beneficial owners to support timely investigations.

The Financial Action Task Force, FATF, and other international organizations have determined that beneficial ownership information can be obscured through, among other things, the use of shell companies which can be established with various forms of ownership structures, especially in cases where there is foreign ownership that is spread across jurisdictions. Complex ownerships and control structures involving many layers of shares registered in the name of other legal entities; formal nominee shareholders and directors where the identity of the beneficial owner is undisclosed; trusts and other legal arrangements that enable a separation of legal ownership and beneficial ownership of assets; and use of intermediaries in forming legal entities including professional intermediaries. Shell companies, one the opaque ownership structures may be formed for legitimate purposes to obtain financing prior to starting operations. In

the aircraft ownership context, shell companies may own aircraft by holding title for registration purposes. However, shell companies may also be used to conceal the beneficial owner's identify for illicit purposes.

For example, according to Federal Aviation Administration, FAA officials, some aircraft registrations have stacked company ownership where shell companies own each other. Such ownership arrangement can be used for illicit purposes to conceal the identity of foreign- based beneficial owners and create challenges for investigators, according to law enforcement officials.

Further, shell companies may use a registered agent's mailing address on the aircraft application forms, further obscuring aircraft ownership information. Table 3 describes the four opaque ownership structures, their legitimate uses and how they can be vulnerable to abuse, according to our illustrative case and intermediary research and interviews with FAA and law enforcement officials.

Table 3 features of opaque ownership structures used in aircraft registrations. Opaque ownership structure shell companies; definition, companies that conduct either no business or minimal business. Legitimate use; shell companies may be formed to obtain financing prior to starting operations.

In the aircraft ownership context, shell companies

may be created to hold title to aircraft for registration purposes. Potential abuse; shell companies are vulnerable to abuse when used to conceal beneficial owner identity for illicit purposes. According to Federal Aviation Administration, FAA officials, some aircraft registrations have stacked company ownership, when shell companies own each other. Such ownership arrangement can be used for illicit purposes to conceal the identity of foreign-based beneficial owners and can be difficult to detect.

"Opaque ownership structure Limited Liability Companies (LLC). Definition, LLCs are a hybrid of a corporation and a partnership protecting the owners who are referred to as members from some debts and obligations like a corporation and may confer certain tax advantages like a partnership.

Legitimate use; as U.S. companies, LLCs provide a range of services that are essential to the country's economic system. In the aircraft ownership context, LLCs may be created to hold title to aircraft for registration purposes. Potential abuse; LLCs may obscure beneficial owner information. Depending on the state at the time of company formation, information on members who are owners of the LLCs may not be required. LLCs may be abused by those who do not meet the definition of a U.S. citizen or by illicit actors to hide their identity for illicit purposes. Additionally, LLCs

 may be shell companies subject to vulnerabilities discussed earlier.

For aircraft registrations, FAA made LLCs a separate registration type on the aircraft registration application in 2018. However, according to FAA officials, LLC corporate structures may change any time after the registration, posing challenges in identifying beneficial owners as part of safety or law enforcement investigations."

MR. MCCONWELL: Okay.

THE WITNESS: Do you want me to read the foot --

MR. MCCONWELL: That's fine. Yeah, that's fine. Thank you very much.

THE COURT: Thank you. All right, Mr. Martin? Do you want us to move the easel there?

MR. MARTIN: I will, Your Honor.

THE COURT: Okay.

MR. MARTIN: I'm having Ms. McConwell help me with the ELMO.

THE COURT: Okay, that's fine.

Okay. Cross-examination by Mr. Martin, you may proceed.

MR. MARTIN: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. MARTIN:

Q. Agent Khamvongsa, I'm going to draw your attention to the indictment. You were shown it yesterday, in particular -- I'm going to publish for him, Your Honor, from the indictment, Counts 100 through 104 that you used yesterday.

THE COURT: Okay.

THE CLERK: One moment, one moment.

BY MR. MARTIN: (CONTINUING)

Q. Agent Khamvongsa, can you see what's -- I think it's published to the jury as well?

THE COURT: Jury, can you see?

THE JURY: Yes.

THE COURT: Yes, they can.

BY MR. MARTIN: (CONTINUING)

Q. Perfect. Agent Khamvongsa, do you see up here where it says "Count," and then it's got 100 through 104?

A. Yes, sir.

Q. And you testified about those particular counts yesterday; correct, sir?

A. Yes, sir.

Q. As a matter of fact, I think you told the jury that you actually assisted and helped prepare the information relating to those counts; correct, sir?

A. Yes, sir.

Q. And you testified that you did that by looking at various documents and coming up with, for example, One

03:15PM 03:15PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:17PM 03:17PM 03:17PM

Thirty-Four Two Nineteen Ninety-Two[sic] in Count 100, right?

A. Yes, sir.

Q. And in Count 101, One Ninety-Four One Eighty-Three Fifty-Two[sic]; correct?

A. Yes, sir.

Q. And in Count 102, $120,000; correct?

A. Yes, sir.

Q. Count 103, 234,980; correct?

A. Yes, sir.

Q. And finally, Count 104, $401,588.41; is that correct, sir?

A. Yes, sir.

Q. Okay. And you based those numbers, as you've indicated, on review of the records in this case; correct?

A. Yes, sir.

Q. Okay. Now, I'm going to draw your attention to and I need to give control back to... Ms. McConwell, so she can -- I'd like to pull up for you to review, sir, what's been previously introduced as Government's Exhibit 2900, page 3280 through 3285. And were going to go over that, okay?

A. Yes, sir.

MS. MCCONWELL: 3280.

THE COURT: Did you say it's been admitted?

MR. MARTIN: It's been, and I think Mr. Reed actually, the first witness in this case, Judge.

THE COURT: Long ago, go ahead.

MR. MARTIN: Just the other day.

THE COURT: Go ahead.

MR. MARTIN: I'm waiting for it to get up on the --

MS. MCCONWELL: 3280?

MR. MARTIN: Yes, 3280 through 3285.

MS. MCCONWELL: Got it.

BY MR. MARTIN: (CONTINUING)

Q. Do you see that agreement, sir?

A. Yes, sir.

Q. And are you familiar with that agreement?

A. Yes, sir. We talked about it through the course of my testimony.

Q. Okay. And in particular, this agreement is one of the agreements that forms the foundation of Count 100, isn't that true, sir?

A. It is a piece of the evidence in which I utilized.

Q. That's what I just said.

A. Yes.

Q. This is one of the agreements that forms the basis of your Count 100, isn't that true, sir?

A. It's one of the items; yes.

Q. Okay. English is your first language, right?

A. Are you insulting me or?

Q. I'm asking you because you don't seem to want to answer my questions. 03:20PM

A. No, I want to be thorough. And so sometimes I just I want to clarify. 03:20PM

Q. Is it one of the pieces or one of the contracts that forms the basis of Count 100, sir? 03:20PM

A. It is one of the pieces; yes, sir. 03:20PM

Q. Okay. If you don't understand my question, please let me know, I'll re-ask it. Okay? 03:20PM

A. Thank you, sir. 03:20PM

Q. Okay. So we're talking about Count 100, one of the contracts, right? 03:20PM

A. Yes, sir. 03:20PM

Q. Okay. And you have indicated many, many times to this jury that the tuna boat companies were defrauded, haven't you, sir? 03:20PM

A. They were defrauded, yes. 03:20PM

Q. No, my question is -- listen carefully, please. 03:21PM

A. Yes. 03:21PM

Q. You have indicated to this jury many, many times that you believe the tuna boat companies were defrauded, isn't that true? I don't care about your opinion, I care about the question I asked you. Isn't that true, you represented it to the jury? 03:21PM

A. Define many. 03:21PM

Q. How about this, more than one?

A. Yes.

Q. And you understand that the tuna boat companies, we're looking at the very first document here, entered into a written contract, in this case, Wilma's Flight Services, with Friesland Fishing Company, LLC; correct?

A. As it relates to this specific contract, Wilma's Flight Services did enter into a contract with Friesland Fishing Company, LLC.

Q. So there is no misunderstanding, for purposes of my questioning, until I put another document up here, I'm referring to this document. Okay?

A. Yes.

Q. So, this is a written lease, written contract between Wilma's Flight Services and Friesland Fishing Company relating to the substance, part of the substance of Count 100; correct?

A. Yes.

Q. And this is the only agreement as relates to this contract, there is not another written contract about this one, is there, sir?

A. There is an amendment.

Q. Does it change anything other than the length or the aircraft?

A. I don't recall, I'd have to see it. But I believe the amendment is signed.

Q. No, my question was -- I didn't ask if it was signed, I said did it change anything other than the length of the contract or the aircraft that --

A. I believe it is the aircraft. I'd have to see it to confirm it.

Q. But that's the only thing it changed? All the other terms and conditions are the same, it's a little blurry, right?

A. The term is --

MS. M. MILLER: Well, Your Honor, I'm going to object. He said he needs to see the amendment so he could answer the question truthfully and thoroughly, otherwise, he's just speculating, and that's not helpful to the jury.

MR. MARTIN: Well, Your Honor, he doesn't get to ask questions. I ask questions, and if he doesn't know, he could tell me I don't know.

MS. M. MILLER: Your Honor, he said he didn't know.

THE COURT: The Court will overrule the objection. Do you understand? Can you answer the last question?

THE WITNESS: The last question again?

THE COURT: About the other terms.

THE WITNESS: The terms, the terms are the same.

BY MR. MARTIN: (CONTINUING)

Q. Okay. And so you have a very good reading voice. All right.

A. Thank you.

Q. And I want you to tell me on this first page, if we can scroll through it, and we'll scroll through it slowly. I don't want you to read it, I want you to read it to yourself but when you get to that first page -- well, let me back up. I'll just -- I'll ask you a different question, I apologize. I think you testified that you looked at each of the contracts, specifically at the sections of the contracts, right?

A. I looked -- yes.

Q. Because you were interested in what each section of the contract said, right?

A. Yes.

Q. Okay. And so in this contract -- and you looked at this contract, right?

A. Yes.

Q. In this contract, can you tell the ladies and gentlemen of the jury where it says, where it says the word "Federal Aviation Administration" or the initials "FAA"?

A. The registration number.

Q. No, I said --

(Pause.)

BY MR. MARTIN: (CONTINUING)

Q. Listen carefully please, sir. I know you want to help Ms. Miller all you can, and you're doing a great job helping Ms. Miller all you can.

MS. M. MILLER: Your Honor.

MR. MARTIN: But I get to ask the questions and my question was --

MS. M. MILLER: Your Honor.

MR. MARTIN: Do I need to repeat it? Is that a question.

MS. M. MILLER: I object and move to strike. I'm going to ask Mr. Martin to, first of all, calm down because he's screaming at the witness, he just screamed at me, and I don't appreciate it in a court of law, first thing. Second thing, this witness is not testifying for Marie Miller. This witness is testifying on behalf of the United States.

THE COURT: All right.

MS. M. MILLER: It is inappropriate, it is argumentative and he needs to calm down.

THE COURT: All right. Go ahead. I think -- the Court will sustain the objection about your statement that the witness -- that may be your opinion, but it is inappropriate to say that and ask him that. So the Court will sustain that objection, strike that. Don't listen to that part. You could argue that later, but you can't ask that in a question, ladies and gentlemen of the jury. Secondly , I think yes, we need to

calm down. I know you're zealous.

MR. MARTIN: I get upset when witnesses don't answer questions intentionally, Your Honor, and they know they are. And I'll go -- I'll ask the questions exactly again.

MS. M. MILLER: Your Honor, I'm going to move to strike that comment. That is an inappropriate comment on the credibility of the witness.

THE COURT: The Court will sustain the objection on commenting on the presentation of the answers. So the -- if you think that he's not answering it, then address it to me, then I can admonish the witness if I agree with you. Okay. Let's go --

BY MR. MARTIN: (CONTINUING)

Q. Agent Khamvongsa --

A. Yes, sir.

Q. -- again, point me and the jury to the section of the contract that is found at Exhibit 2900, pages 3280 through 3285, the words, W-O-R-D-S, Federal Aviation Administration. I want you to point those words out to me. Do you -- first, do you understand my question?

A. As it -- literally, FAA is what you want me --

Q. No, no, I said Federal Aviation Administration.

A. Okay.

Q. Okay. Tell me what section that is so I can point it out to the jury.

A. The word Federal --

Q. Aviation Administration.

A. -- Aviation Administration... does not appear on the contract, except in the registration number.

Q. Registration number, I don't see registration number Federal Aviation Administration, sir. Do you see the words Federal Aviation Administration there?

A. Yes.

Q. The words, point them out to me, circle the words "federal" and then circle the word "aviation" and then circle the word "administration."

THE COURT: Why don't -- hold on, can you do me a favor? Take that off for a second. It's kind of too fat. Let's make it a little skinnier.

THE WITNESS: Can I just underline it?

THE COURT: Yeah, you can underline it. Why don't you underline it. Okay. Underneath, it's underlined underneath those. Okay go ahead.

BY MR. MARTIN: (CONTINUING)

Q. Okay. Can you spell "federal," please?

A. Yes.

Q. Please, spell it.

A. F-E-D-E-R-A-L.

Q. Can you spell "aviation," please?

A. Yes.

Q. Spell it.
A. A-V -- (laughing) A-V -- aviation, A-V-I-A-I-T-I-O-N.
Q. Okay. How about "administration"?
A. I'm going to fail this. A-D-M-I-N, admin, I-S-T-R-A-T-I-O-N. I spelled aviation wrong, I think.
Q. Do you see the words you just spelled on that document, those three words, sir?
A. I do not see those specific three words on the document.
MR. MARTIN: Can we take the yellow line off, please.
BY MR. MARTIN: (CONTINUING)
Q. Now, will you tell me and show the jury, on that document, the letters, sequentially, "FAA." Number one, do you understand my question?
A. Yes. You want me to point out FAA on the document specifically as it relates to those specific letters.
Q. Yes. Every question I ask is specific, Agent Khamvongsa. So, yes, specifically, the letters "FAA."
(Pause.)
THE WITNESS: Those specific letters, FAA, are not on the document that we see.
BY MR. MARTIN: (CONTINUING)
Q. Is there a signature line on this document for the federal aviation to sign, sir?

A. There is no FAA line specifically on this document; yes.

Q. Is there a signature line on this document, sir, for the Federal Aviation Administration to sign, sir?

A. No, no signature line; yes.

Q. Is there a signature line for the Department of Transportation to sign this document, sir?

A. No.

Q. Would you agree with me, sir, that the Federal Aviation Administration is not a party to this written contract?

A. It's not a party to this specific contract; no.

Q. Okay. Now, let's go to Government's Exhibit 2900-2996-3001 -- yeah, excuse me, I gave the wrong number. 2900, starting at 2996. Are you familiar with this document, sir?

A. Yes.

Q. And do you need to see the indictment for -- I'm going to ask you a question, does that document relate to one of the contracts relating to Count 101 of this -- of the indictment?

A. Yes.

Q. You need to see the indictment or you're agreeing with me?

A. I believe it's 101.

Q. Okay. Well, I want to make sure, so here.
A. Thank you, sir. Yes.
Q. So, again, point out for the ladies and gentlemen of the jury, if you know, and if we need to go through the document, we will, but I think you should agree with me that the words "Federal Aviation Administration" do not appear in that document anywhere, do they, sir?
A. The words specifically does not appear in the document.
Q. And the letters "FAA," do not appear in that document, do they, sir?
A. Literally, no.
Q. If we could go to page 3001 of that exhibit, the last page. Do you see the last page, sir?
A. Yes.
Q. Okay. And I represent to you that's page 3001, that's the last page of that lease agreement contract. Is there a signature line for the Federal Aviation Administration on that document, sir?
A. No.
Q. Is there a signature line for the FAA on that document, sir?
A. No.
Q. Is the Federal Aviation Administration or the FAA, based on your -- based on this document, a party to that

03:33PM 03:33PM 03:33PM 03:33PM 03:33PM 03:33PM 03:33PM 03:33PM 03:33PM 03:33PM 03:34PM 03:34PM 03:34PM 03:34PM 03:34PM 03:34PM 03:34PM 03:34PM 03:34PM 03:34PM 03:34PM 03:34PM 03:34PM 03:34PM 03:34PM

document, sir?

A. As it relates to this document, no.

Q. All right. Now, as to Count 102, I'm going to hand you the indictment again. I'm going to ask you to look at Count 102 and compare it to Count 100, and ask you if -- not this one but the contract we just had up on the screen, which would have been 3280 to 3285 of Exhibit 2900, if that contract would also be covered in Count 102?

A. Yes.

Q. So if we went back to Exhibit 3280, if we could, oh, it's up, I'm sorry, somebody was thinking ahead of me. Just like your prior testimony, you'll agree that Federal Aviation Administration and FAA literally do not appear in those documents?

A. They literally do not appear in this contract and this document.

Q. And there is no signature line for the Federal Aviation Administration, and if we need to go to that last page, I'm happy to do that.

A. Could we, please?

Q. Sure.

(Pause.)

BY MR. MARTIN: (CONTINUING)

Q. There is no signature line for the Federal Aviation Administration, is there, sir?

A. No.

Q. Okay. Or the FAA?

A. No.

Q. And they're not a party to the contract?

A. This is -- this contract between the tuna boat, the lessor and the lessee.

Q. Yes, sir.

A. Yes.

Q. Now, if we go to Government's -- I'm going to show you Government's Exhibit 2900-3434-3439, I'm going to hand you the indictment again. Do you see that, sir?

A. Yes.

Q. Is that one of the contracts that is the subject matter of Count 103?

A. I'd have to actually get additional documentation or review it, specifically the aircraft vessel assignment which would further reflect.

Q. Well, let me ask you, sir, do you have Count 103 in front of you, do you not, sir?

A. I do.

Q. And are you saying that you're not familiar enough with this contract to know that this is one of the contracts that was contained within the substance matter of the draft of the Count 103?

A. I know what is there, but there is also documentation

which corroborates it, and in order for me to corroborate it, I refer to other sources to ensure, 'cause Ocean Conquest, there is multiple, there is multiple boats that make up this particular charge.

Q. Yeah. And that's true for Count 100, Count 101, Count 102 and Count 104, isn't it, sir?

A. No, Count 100, 101 and 102 refer to only one boat. Where as Count 103 and 104 refer to multiple boats. So it's easier for me to remember and recall 100 to 102 because I'm only referencing one, whereas 103 I'm referencing multiple boats as it relates to this wire fraud charge.

Q. So you're saying that you don't know that this contract relates to Count 103, is that your testimony, sir?

A. What I'm saying is I would need to review other documents to reference it.

Q. And I would -- well, let me make it a little easier then. You have looked at every one of the 4 to 5,000 pages of contracts in this case, have you not, sir?

A. Yes.

Q. And every one of them that you looked at -- this is already in evidence, if we could go to 3439, please. Every one of them that is in evidence has a page not identical but very similar to page 3439, wouldn't you agree, sir, every one of the contracts?

A. Yes.

Q. Every one of the contracts has a signature page; correct?
A. Has a signature page, yes.
Q. And on the signature page, there are only two signers; correct?
A. The lessor and lessee, yes.
Q. So every contract has two signatures and one of them is the lessor and in this case, it's signed by Marvin Reed, right?
A. Yes.
Q. And the lessee in this case is a tuna boat company; correct?
A. Yes.
Q. And that is true about every contract you looked at; correct, sir?
A. That Marvin Reed signs it?
Q. No.
A. That's --
Q. That there are only two people signing it, the tuna boat company and the lessor?
A. Yes.
Q. And not -- on not one of the 4,000 pages, 4 to 5,000 pages of documents you reviewed, is there a signature line for the Federal Aviation Administration, is there, sir?
A. Not a signature line, no.

Q. Is there a signature line for the FAA on any of those contracts or leases, sir? 03:41PM 03:42PM

A. If we're talking about a signature line for the FAA -- 03:42PM 03:42PM

Q. That's what my question was. 03:42PM

A. -- no. 03:42PM

Q. What was your answer? 03:42PM

A. I said no, sir. 03:42PM

Q. Okay. And they are not a party to any of the 4 to 5,000 pages of lease agreements you looked at, isn't that true, sir? 03:42PM 03:42PM 03:42PM

A. They are not a party, no. 03:42PM

Q. And let me ask you, sir, do I have or do you have -- 03:42PM

A. I have it, sir, the -- 03:42PM

Q. I have a copy too. 03:42PM

A. Oh, okay. 03:42PM

Q. The numbers that are reflected in Counts 100 through 104, that you came up with, those represent funds that were paid pursuant to the lease agreements; correct, sir? 03:42PM 03:42PM 03:43PM

A. Yes. 03:43PM

Q. All of 'em? 03:43PM

A. Yes. 03:43PM

Q. In Count 100? 03:43PM

A. Yes. 03:43PM

Q. Count 102, 101 -- I'll start with 101. 03:43PM

A. Yes.
Q. 102?
A. Pursuant to the leases, yes.
Q. 103?
A. Yes.
Q. And 104?
A. Yes.
Q. And those were payments for the services of helicopters for tuna spotting; correct, sir?
A. Yes.
Q. And nothing else?
A. Well, there were also payments for damages, overages, overtime, yes.
Q. Okay. But they all related to the terms of these written contracts; correct, sir?
A. The terms as the lessee knew it, yes.
Q. Is there anything -- maybe I misunderstood your answer. The terms of this written contract, those are the terms of the contract; correct, sir?
A. As the lessee's knew it, yes.
Q. Which lessees have you talked to? Name them, please.
A. Talked to...the South Pacific Tuna Company. Specifically that one because that was the only U.S.-registered tuna company that I could identify.
Q. Okay. And let me ask you, sir, South Pacific Tuna

Company, this lease, and I'm just looking at the one here, 3439 -- the one that's in front of you?

A. Yes, sir.

Q. We'll go to the front, it's 3434. That's the entire written agreement between the parties, isn't it, sir?

A. Between the parties South Pacific Tuna Company and the lessor, yes.

Q. And in this case, we got Ocean Conquest, LLC and that's South Pacific Tuna Company, right, sir?

A. Yes, it's one of the many boats that they oversee.

Q. And so South Pacific Tuna Company has a shell corporation that Ocean Conquest, LLC falls within; is that correct, sir?

A. I don't know to the specifics of Ocean Conquest and the relationship between South Pacific Tuna Company, but I do know that they are responsible for resolving their financials, such as the payments for the leases and ensuring that all the paperwork is filed as it relates to the specific tuna companies.

Q. All right. And do they have lawyers?

A. They do have lawyers.

Q. That review their leases?

A. I don't know what their responsibilities are.

Q. Okay.

A. Specifically.

Q. And I'm sure you checked this out, but has Ocean Conquest and South Pacific have not filed any litigation against any of Jon Walker's companies to recover any losses for any misrepresentation, isn't that true?

A. Not yet.

Q. I didn't ask you if they done it yet. I'm talking about today. Let's get real. Right now, have they -- isn't it true they have not filed any litigation against any of these companies because of any kind of misrepresentation or fraud or deceit, isn't that true?

A. I haven't seen any -- any documents to reflect such actions.

Q. And as a matter of fact, you have not seen any documents to reflect that any tuna boat company of all of the tuna boat companies have ever filed any type of litigation against any of these companies for fraud, misrepresentation or anything like that, isn't that true, sir?

A. Not yet, I mean --

Q. Is there --

(Pause.)

BY MR. MARTIN: (CONTINUING)

Q. I'm not talking about tomorrow. If you -- if you -- if my question -- you don't understand, let me know. I'm talking about right now. Okay. So I want to know right now, not tomorrow, not five years from now, not when you go out in

 the hall and pick up the phone and call somebody and say, hey, you got to do this so I don't look bad. I want to know about right now have any companies filed any type of civil litigation because of fraud, deceit, misrepresentation, against any of these helicopter companies, sir? 03:47PM 03:48PM 03:48PM 03:48PM 03:48PM

A. No. Because they don't know. 03:48PM

Q. You can read minds now? 03:48PM

A. I'm aware of what South Pacific Tuna Company told us. 03:48PM

Q. No. My question is can you read minds? 03:48PM

A. I cannot read your mind. 03:48PM

Q. Can you read a tuna company's mind? 03:48PM

A. No. 03:48PM

Q. Do you think they can read contracts? 03:48PM

A. I think they can read contracts if it was truthful. 03:48PM

Q. Did I ask you whether or not it was truthful, sir? 03:48PM

A. You did not ask that. 03:48PM

Q. Okay. I'm going to ask the question again, and I'd like for you to answer it. Do you think they can read contracts? 03:48PM 03:48PM 03:48PM

A. They can read. 03:48PM

Q. Okay. Now, I believe you testified that what you referred to as shell corporations didn't own any assets, do you recall that testimony, sir? 03:49PM 03:49PM 03:49PM

A. Yes. 03:49PM

Q. Is an aircraft or a helicopter an asset, sir? 03:49PM

A. In this case, yes.

Q. My questions that I'm asking are about this case, all right?

A. Excellent. Thank you. Yes.

Q. Okay. So helicopters and aircraft are assets. And if a helicopter or an asset is owned by a Vanuatu corporation, that would be an asset; correct, sir?

A. In this case, that's not how it was done.

Q. I didn't ask you how anything was done or anything like that. I said if a Vanuatu corporation owns a helicopter or it owns an aircraft, that is an asset, isn't that true, sir?

A. But are we talking about the facts of this case because if we are --

Q. I'm asking you a question, sir.

A. A general question about just a Vanuatu company? And not the corporations that are tied to this case?

Q. Are you familiar with a corporation called Eddie Air, Inc.?

A. I've seen it before; yes.

Q. A Vanuatu corporation?

A. In name, yes.

Q. And you've seen documentation on the FAA registry indicating that it is the registered aircraft; correct, sir?

A. Eddie Air, it was on a registry, yes, an FAA registry

as a U.S. corporation.

Q. Well, as a corporation?

A. A U.S. corporation.

Q. You know, we went through this with -- you been through this trial, you sat in the back and listened to all the witnesses testify, haven't you sir?

A. Yes, sir.

Q. Okay. And you know that there are all kinds of forms that have come out about these registration forms they've changed, right? You heard that testimony?

A. Yes.

Q. And one time they just said "corporation," then back in probably 2000 -- and I may get the date wrong, so if I do, I apologize -- sometime around 2017, 2018, they added to the form, "U.S. corporation," right?

A. I'd have to see that. I... I don't recall --

Q. I'm not arguing about the date. I could be wrong on the date. I'm talking about they actually added the word "U.S. corporation," right?

A. That still doesn't take away from the fact that it was registered as a U.S. corporation.

Q. My question, sir, is, did the form change to reflect "U.S. corporation"?

A. At some point.

Q. Okay.

A. It may have been added.

Q. And a corporation -- and I just picked Eddie Air as an example --

A. Yes, sir.

Q. -- that owns an aircraft, a helicopter, isn't it true that helicopter that is registered in their name is an asset, sir?

A. A helicopter registered... if it truly was registered in their name and was treated as such, yes, it would be that corporation's asset. But that's not how it was done in this case.

Q. You know, you have your opinion as to what was done in this case. I'll agree with you.

A. No, it's not my opinion; it's based upon what was presented.

Q. Sir, I'm asking you questions. If you let me finish my question, we're going to get through a lot quicker. And I can tell you right now we're not going to get through by 4:00 based on your answers. So here's the question.

A. Yes, sir.

Q. You understand the jury's job is to decide what the facts are in this case, don't you, sir?

A. Yes, sir.

Q. You've testified in Court, I think, you just said at least three times before, right?

A. Yes, sir.

Q. And you know that you're here to testify to what your investigation reveals; correct?

A. Yes, sir.

Q. And --

A. As well as the facts, sir.

Q. That's what your investigation turns up, I'm assuming?

A. Right, but --

Q. Facts?

A. Correct.

Q. Okay. So when -- and I assume you have opinions about this case; correct, sir?

A. Yes, but that doesn't factor into the facts.

Q. My question is, you have opinions about this case; correct, sir?

A. I have opinions.

Q. All right. And you've been an IRS agent for 20 something years?

A. Yes, sir.

Q. And you've probably been to continuing law enforcement or IRS training, schools, every year to assist you with your investigative techniques, right?

A. Yes, sir.

Q. And you've been to actual classes that assist you on

how to testify to a jury to appear to be more believable, isn't that true, sir?

A. To appear more believable? No. No, not -- not the way you framed it. We --

Q. You've been to classes to assist you in testifying, we'll leave it at that, isn't that true, sir?

A. Yeah, we talk about testifying in courtroom and procedures.

Q. Okay. And in that regard, sir --

THE COURT: Okay. Four more minutes before we recess for the day, Mr. Martin.

BY MR. MARTIN: (CONTINUING)

Q. On Government's Exhibit G-2 -- 829, there are multiple corporations listed here under what's labeled "30 Vanuatu international companies," you see that, sir?

A. Yes, sir.

Q. And each of those companies that's listed has an aircraft or helicopter in their assets, isn't that true, sir?

A. No, sir.

Q. They don't all have helicopters?

A. No, sir, they all belong to Hansen Helicopters.

Q. So Eddie Air, the one we just talked about doesn't have a helicopter?

A. It exists in name.

Q. It doesn't -- it's not registered on the FAA registry

as a helicopter?

A. Only as name.

Q. So... what you're saying is the registry is a fraud?

A. Not the registry; what was filed is a fraud.

Q. My question is, you're telling me that if it's filed on the FAA registry, if Eddie's Air is at the FAA registry as a helicopter...(pause.)

MR. MARTIN: Your Honor, I'm looking for an exhibit. It might take me a few minutes. I can go ahead and do it, or we --

THE COURT: Want to recess and finish it up tomorrow?

MR. MARTIN: Yes, Your Honor.

THE COURT: All right. Why don't we do that. It's almost 4:00 anyway. Why don't we do that.

Ladies and gentlemen of the jury, please keep an open mind. Do not form or express any opinion on this case until it's submitted to you, do not speak to anyone on any subject connected with the trial. Now, we're supposed to start at 8:15 tomorrow, I'm going to ask you to be here actually at 9:00 because I have a motion for compassionate release that's going to be heard early in the morning. I'm not sure how long that's going to go. So rather than keep you waiting, we'll start at 9:00 a.m. How much longer do you have with this witness, do you think?

MR. MARTIN: I didn't think I would go as long as I did, Your Honor.

THE COURT: It's okay.

MR. MARTIN: So I'm having -- as quickly as I can.

THE COURT: All right. So --

MR. MARTIN: Maybe 30, 40 minutes, Judge.

THE COURT: Oh okay. So then, Prosecution, you don't have that much long rebuttal, I mean --

MS. M. MILLER: I will have a redirect based on both witnesses questions and the introduction of new exhibits.

THE COURT: Right. But I mean how long -- I'm just --

MS. M. MILLER: Approximately an hour.

THE COURT: All right. So then you'll have your next witness ready to go?

MS. M. MILLER: Yes.

THE COURT: All right. So we're almost there, prosecution has two more witnesses after this agent. All right. Ladies and gentlemen, take care. I'll see you tomorrow. So be here and we'll start at 9:00 a.m. Okay. Thank you.

(Jury out at 3:59 p.m.)

Okay, so we're outside the presence of the jury. So, Counsels, make sure too that when you have exhibits that

are new, give it to other Counsels ahead of time, not during the testimony, so that they can all be prepared. You don't have to waste time, everybody reviewing it. And new exhibits. Okay. All right. Thank you. I'll see all of you tomorrow. 03:59PM 03:59PM 03:59PM 03:59PM

THE WITNESS: Thank you, Your Honor. 03:59PM

THE COURT: Thank you, take care. 03:59PM

(Proceedings concluded at 4:00 p.m.) 04:00PM

* * * 04:00PM

August 18, 2022; 9:06 a.m.; Hagatna, Guam

* * *

THE COURT: I don't have a cold. I really think it's my -- one of my parts of my house is undergoing construction, so I think all the construction dust is actually gotten to me. So I'm coughing.

MS. M. MILLER: It gets everywhere, doesn't it?

THE COURT: Well, I mean -- I'm redesigning a room and making it like a room for my husband, like a man cave.

MS. M. MILLER: A man cave. Nice.

THE COURT: Yeah. So I'm just -- I have a lot of construction ongoing, and I just was there last night trying to clean up. So I think it really is affecting me this morning. Okay. We ready to go, everybody?

MS. M. MILLER: Yes, Your Honor.

MR. MARTIN: Yes, Your Honor.

THE COURT: Where were we last? Oh, yes, that's right, Mr. Martin was cross-examining the witness.

MS. M. MILLER: Yes.

THE COURT: We'll call in the jury.

(Pause.)

THE COURT: Just an FYI. I know I told you I was still thinking about that issue, so I'm actually doing further

research on that issue we discussed yesterday regarding shell corporations. I think that if there is any relevant cases, it would really come from cases dealing with like organized crime, shell corporations and stuff. So we're kind of looking at that. If you guys have any cases you want me to look at, let me look at them, too. Send them to me. Okay? All right.

(Pause.)

THE COURT: How much longer do you have with this witness, Mr. Martin? Approximately?

MR. MARTIN: Your Honor, I would say less than an hour.

THE COURT: Okay.

MR. MARTIN: Kind of going to depend on how things go.

THE COURT: You guys are communicating? You guys are communicating?

MR. MARTIN: Me and the witness?

THE COURT: Yeah.

MR. MARTIN: Sure. We're communicating, Judge. We get along great.

THE COURT: I said -- that's what I mean, depending on how you're communicating? I'm just teasing.

MR. MARTIN: I think we're communicating very well, Your Honor.

THE COURT: Yeah, right. I think so.

THE WITNESS: Yes, ma'am.

THE COURT: (Laughing.) Okay. My allergies have kicked in, team.

MS. M. MILLER: Sorry.

MR. MARTIN: Mine hit this morning, Your Honor.

THE COURT: Well, I take Zyrtec-D. It really works.

MR. MARTIN: I take Allegra? Or the generic Allegra, whatever the heck that is.

THE COURT: Generic?

MR. MARTIN: The Walgreens Allegra.

THE COURT: I don't think I would take generic.

MR. MARTIN: Well, the ingredients are exactly the same.

THE COURT: I know, but there is something about a generic doesn't sound -- it doesn't sound like it's going to do the job, but it probably does.

Please rise for the jury.

(Jury in at 9:09 a.m.)

THE COURT: All right. Please be seated. Welcome back, ladies and gentlemen of the jury. We'll continue on with the cross-examination of the witness by Mr. Martin. You may proceed, Mr. Martin.

MR. MARTIN: Thank you, Your Honor. Good morning, ladies and gentlemen of the jury.

THE JURY: Morning.

BY MR. MARTIN: (CONTINUING)

Q. Morning, Agent Khamvongsa.

A. Good morning, sir.

Q. Turn this on, so be everybody could hear me. I've been known to be very quiet.

THE COURT: Well, you have a country accent or something like that, right? Oklahoma. It's kind of a nice accent there.

MR. MARTIN: Well, thank you, Your Honor.

BY MR. MARTIN: (CONTINUING)

Q. Agent Khamvongsa, I don't know if we'll need this, but I'm going to give it to you just in case. That's the indictment, okay?

A. Yes, sir.

Q. Now, yesterday, Agent, we were testify -- you were testifying about all these corporations. Do you recall that testimony, sir?

A. Yes.

Q. Okay. And that -- that was of interest in your investigation. Would you agree with that, sir?

A. It was a big -- sorry, I think I misunderstood you. Big?

Q. That -- I want to make sure my microphone is on. It looks like it is. That was of interest to your investigation;

is that accurate?

A. Oh, interest? Yes.

Q. Okay. And one of the things that was of interest to your investigation was the fact that we don't really know who the true owner is, or at least you didn't really know who the true owner was. Would you agree with that, sir?

A. Who the true owner of the 30 Vanuatu companies?

Q. Well, of the aircraft.

A. Of the aircraft? Oh, yeah. We know who the owners are.

Q. Okay. How about of the companies, was that a concern to you?

A. In regards to this case --

Q. Yes.

A. -- the companies do play a role in this case.

Q. Okay. So I'm going to show you what's been previously -- and we'll verify that before I put it up, but I'm going to show you what's been previously identified as Government's Exhibit 752-54, sir. I'm hoping Ms. McConwell is ahead of me, which she is most of the time. So she'll...

THE CLERK: Thank you. One moment.

BY MR. MARTIN: (CONTINUING)

Q. Sir, do you see what's been put on the screen as Government's Exhibit 752-54, previously admitted into evidence?

A. Yes.

Q. Do you recognize that as a record that is kept in the regular course of business by the Federal Aviation Administration, sir?

A. Yes.

Q. Okay. And that is an aircraft registration application. Would you agree with that, sir?

A. Yes, sir.

Q. Okay. And it indicates that the owner in this instance is Whirlwide Helicopters, Inc.; correct?

A. The owner -- what's --

Q. The name of the applicant, let's put it that way.

A. The applicant, what was listed here, yes.

Q. Okay. If we could -- and it gets a little -- before I move it, it gives an address, right?

A. In Guam, yes.

Q. Right, it gives an address and the address is in Guam?

A. Mm-hmm.

Q. Correct? And if we go on down, we see that the president of that company, whose address is in Guam, is Jon D. Walker, president. You see that, sir?

A. Yes, sir.

Q. Okay. And if we could go back up to the top of this exhibit, do you see the type of registration there, sir, the

line that says type of registration? I'll -- this box right there. Do you see that box, sir? 09:13AM 09:14AM

A. Yes, sir. 09:14AM

Q. Okay. And would you agree with me, sir, that the type of registration is corporation? 09:14AM 09:14AM

A. U.S. corporation, yes, sir. 09:14AM

Q. Well, let's both agree, will you read the word after number three? Will you just read the word? 09:14AM 09:14AM

A. Yes, sir. 09:14AM

Q. What's that word? 09:14AM

A. Corporation. 09:14AM

Q. Okay. Now if we could go, Agent, to -- or Ms. McConwell, I've lost my notes here, to Government's Exhibit 752-52. And I don't have the capability or the knowledge, let me rephrase that, of removing that yellow thing. 09:14AM 09:14AM 09:14AM 09:14AM 09:14AM

MR. MARTIN: Thank you, Carmen. I appreciate it. 09:14AM

BY MR. MARTIN: (CONTINUING) 09:14AM

Q. Do you recognize this document as a document kept in the normal course of business of the Federal Aviation Administration, sir? 09:14AM 09:15AM 09:15AM

A. Yes, sir. 09:15AM

Q. And as a matter of fact, would you agree with me, sir, that it relates to the same aircraft, sir? 09:15AM 09:15AM

A. Yes, sir. The same U.S. registration, yes. 09:15AM

Q. Right. Right. And this is a bill of sale versus an application for registration; correct, sir?

A. Yes, sir.

Q. And the purchaser of this aircraft, the same one we just saw, is Whirlwide Helicopters, Inc.; correct, sir?

A. What's reflected here is Whirlwide Helicopters, Inc.

Q. Right. I mean, you don't have any reason to believe that this form is inaccurate, do you, sir?

A. Yes.

Q. You have reason to believe this form is inaccurate, that a record kept by the Federal Aviation Administration that is in their files, I don't know -- yeah, it's there right now, right? It's in their files right now?

A. Yes.

Q. Okay, so let's talk about this form that you have reason to believe is inaccurate. It shows the purchaser is Whirlwide Helicopters, Inc.; correct, sir?

A. Yes.

Q. And it shows that the address of this company, Whirlwide Helicopters, Inc., is in Vanuatu; correct, sir?

A. It says Vanuatu; yes.

Q. Okay. Not like the one we just saw where the same company or the same named company had an address in Guam; correct, sir?

A. Same company, two different addresses; yes.

Q. Same named company? We don't know if it's the same company, do we?

A. It's the same -- benefits the same person.

Q. The same named company, sir, we don't know -- I didn't ask you who it benefitted. And we're going to get in this discussion and be here a long time if you don't -- because if you don't understand the question, I'll re-ask it, okay?

A. Sure.

Q. The same named company, the company has the same name?

A. Yes, the company has the same name.

Q. Okay. Now let's go down to the seller. Do you see where it says seller on the left-hand side there?

A. Yes.

Q. Okay. Do you see the name of the seller, sir?

A. Yes.

Q. And the name of the seller is Whirlwide Helicopters, Inc.; correct?

A. Yes.

Q. And the address of Whirlwide Helicopters, Inc. is in Guam; correct, sir?

A. Yes.

Q. Okay. And so from this form, that is kept by the Federal Aviation Administration, it's on their records, you

can get access to it any time you want, right?

A. Yes.

Q. This form shows that the company named Whirlwide Helicopters in Guam sold this helicopter to a company named Whirlwide Helicopters in Vanuatu; correct, sir?

A. That's what this document reflects; yes.

Q. Okay. That's what I'm asking. I'm asking what the document reflects. Thank you. And, again, the seller or co-owner as reflected in the document, looks like Mr. Walker's signature, doesn't it, sir?

A. Yes.

Q. Okay. Now, if we go to Government's Exhibit 752-50. Do you recognize that, sir, as being a record kept in the normal course of business by the Federal Aviation Administration?

A. Yes.

Q. And this is an aircraft registration application; correct, sir?

A. Yes.

Q. And you know from the testimony of other witnesses, because you've been sitting in the courtroom, particularly Wendy Hedrick, that you can't apply for a registration without some form of bill of sale; correct, sir?

A. I do recall something to that effect; yes.

Q. Okay. So Whirlwide Helicopters, Inc. in Vanuatu

cannot apply for a registration of a helicopter without a bill of sale. Would you agree with that, sir?

A. You're asking if a bill of sale needs to be required accompanying this?

Q. Yes.

A. Yes.

Q. Okay. As a matter of fact, we just saw a bill of sale in Government's Exhibit 752-52 that we were just talking about, didn't we, sir?

A. The paperwork, yes.

Q. Yes.

A. Yes.

Q. That the FAA keeps in the normal course of business, right, sir?

A. Yes.

Q. Okay. And so this application for registration of helicopter 60 -- excuse me, 9068F, it's the same helicopter; correct, sir?

A. I don't know if it's the same helicopter, but it's the same U.S. registration.

Q. The number is the same?

A. The U.S. registration number is the same.

Q. Right. And I'm not going to argue with you about that, but the number is the same; correct, sir?

A. The U.S. registration number is the same.

Q. All right. And if we could go back to 752-52?

THE COURT: I'm sorry, 752- --

MR. MARTIN: 52, Your Honor.

THE COURT: 52, okay.

BY MR. MARTIN: (CONTINUING)

Q. Sir, do you see there the aircraft serial number on the bill of sale?

A. Yes.

Q. 2109 -- 2109 -- getting a little dyslexic here. 2-1-0-2-9-3-S, would you agree that's the serial number registered?

A. Yes, sir. It's reflected on the registration right there.

Q. Now, let's go back to Government's Exhibit 52, excuse me, 752-50; do you see the aircraft serial number listed on that bill of sale, sir?

A. Yes.

Q. 2-1-0-2-9-3-S, do you see that, sir?

A. Yes. It's reflected on the document there.

Q. And it's the same serial number that was reflected on the bill of sale that we just looked at; correct, sir?

A. It's the same serial number on the other document; yes.

Q. Okay. And so this application for registration of this helicopter with this company in Vanuatu, if we could go

on down, was actually signed by Mr. Walker, right?

A. Yes, that's his signature, signed as president.

Q. Of the corporation that is located in Vanuatu?

A. Yes.

Q. Okay. Now -- I'm through with that document.

The FAA, in their records, and we've seen them throughout this trial, have every transaction for the registration -- the bill of sale and registration of every helicopter that we are talking about in this indictment; isn't that true, sir?

A. The FAA has that information; yes.

Q. Okay. And so it's not like it's hidden from anyone, is it, sir?

A. It is hidden.

Q. The FAA registration information is hidden?

A. The --

Q. The FAA information we just went over is hidden, sir?

A. The information is incorrect on there, sir.

Q. No, my question -- you misunderstood my question. And I'm sorry, so I'll repeat it. The FAA information that we just saw that is on their records is hidden; is that true, sir?

A. The information reported to the FAA is hidden.

Q. So you're telling me that what we just saw, 752-52, nobody can have access to?

A. Oh, no, everybody can have access to it, but the information is in- -- reported to the FAA incorrectly.

Q. I didn't ask you anything about the correctness of the information, did I, sir?

A. No, but you asked --

Q. Did you ask -- did I ask you anything about the information, the incorrectness of any of that information, sir?

A. Sir, as you --

Q. Did I ask you anything about the incorrectness of that information, sir?

A. It sounded like it to me.

Q. It sounded like it to you? If you misunderstand me, sir, you can ask me to rephrase the question. Did I use the word *incorrect* in any of my questions other than the one I just asked?

A. No, but you asked if it was available and so with that... there is the inference of correctness.

Q. Oh, there is an inference of correctness? The fact that a document is available draws with it the inference of correctness?

A. Yeah, it does. In the U.S. government, yes, it does, because everything is signed and certified --

Q. I didn't ask you to give me a narrative, sir. I asked you one question. It was a simple yes or no. Did you

understand that?

A. I understand that question, yes, sir.

Q. Okay. So... let's go to what has previously been marked -- marked and introduced as Government's Exhibit 366-4.

THE CLERK: One moment, please.

(Pause.)

BY MR. MARTIN: (CONTINUING)

Q. Do you see that document, sir?

A. Yes, sir.

Q. This document has previously been introduced in this case. Can we blow it up just a little bit? Maybe center it. There we go.

This document is relating to the FAA registry; correct, sir?

A. Yes, sir.

Q. And as a matter of fact, it deals with a helicopter that has been assigned an N-number, N1DQ. Do you see that, sir?

A. Yes, sir.

Q. I put a little deal there.

A. Thank you.

Q. Okay. And it actually has a serial number, doesn't it, sir?

A. It has a serial number. Recorded serial number, yes.

Q. Okay. And that is an aircraft that is registered

09:24AM 09:24AM 09:24AM 09:25AM 09:25AM 09:25AM 09:25AM 09:25AM 09:25AM 09:25AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM 09:26AM

that says the registered owner right over here, registered owner, is a company called Evan's Air, Inc. Do you see that sir?

A. Yes, sir.

Q. And the country is Vanuatu, isn't it, sir?

A. What's listed there is Vanuatu. You're correct, sir.

Q. And this is the FAA registry, this is a document that the federal government has at their disposal at any time, right, sir?

A. Yes.

Q. And as a matter of fact, Evan's Air is on this list, is it not, sir?

A. It's on that document -- or 829, yes, sir.

Q. Right. Am I pointing at it? Can you see?

A. No. Yes, sir, it's right there.

Q. Okay.

A. Thank you.

Q. And it's listed as a registration as a corporation; correct, sir? Do you see that?

A. It's identified as a registered owner on this document -- as a corporation, yes.

Q. Yeah.

A. Yes.

Q. So we have a -- if we could take it up just a little further. Perfect. So we have -- an N-number aircraft,

registered as a corporation, under a corporation name Evan Air, Inc., the country is Vanuatu; correct?

A. The country is Vanuatu; yes.

Q. One of the names of the corporations on Government's Exhibit 829; correct, sir?

A. Yes.

Q. And that helicopter that is identified in the FAA registry, this document, has value, doesn't it, sir?

A. Absolutely.

Q. And it is -- registered owner is a Vanuatu corporation; correct, sir?

A. It's what's reflected on here; yes.

Q. Okay, if we could go to -- I think on the same exhibit, if we could go down, there is another, and I apologize, Carmen, could we take my yellow stickies off. Thank you. Another FAA document; correct, sir?

A. Yes, sir.

Q. And this one deals with, and I can point it out if I need to, a helicopter with N-number N1042N. Do you see that, sir?

A. Yes.

Q. And it has a serial number. Do you see that, sir?

A. Yes.

Q. Okay. And this one, the registered owner at the FAA is Jan's Helicopter Services, Inc.; correct, sir?

09:28AM 09:28AM 09:28AM 09:28AM 09:28AM 09:28AM 09:28AM 09:29AM 09:29AM 09:29AM 09:29AM 09:29AM 09:29AM 09:29AM 09:29AM 09:29AM 09:29AM 09:29AM 09:29AM 09:29AM 09:29AM 09:30AM 09:30AM 09:30AM 09:30AM

A. The purported owner is Jan's Helicopter Service, Inc.

Q. The owner that the FAA has on their registry is Jan's Helicopter Services, Inc; correct, sir?

A. What's literally on here is Jan's Helicopter Service, Inc., yes.

Q. Okay. And the country is Vanuatu; correct, sir?

A. Yes.

Q. And the type of registration is corporation; correct, sir?

A. Type of registration, corporation; yes.

Q. And I'll bring this back over there.

A. Thank you, sir.

Q. Jan's helicopter is on this list, is it not, sir?

A. Yes, right here.

Q. Okay.

THE COURT: I'm sorry, Mr. Martin, I have to take an urgent call, so let's --

MR. MARTIN: Sorry, Your Honor.

THE COURT: No, that's okay. It's not your fault. I just got a message. So 20 minutes, ladies and gentlemen of the jury. We'll be right back, keep an open mind. We'll come right back.

(Jury out at 9:31 a.m.)

(Recess taken at 9:35 a.m.)

(Back on the record at 10:19 a.m.)

09:30AM 09:30AM 09:30AM 09:30AM 09:30AM 09:30AM 09:30AM 09:30AM 09:30AM 09:30AM 09:30AM 09:30AM 09:30AM 09:30AM 09:30AM 09:30AM 09:31AM 09:31AM 09:31AM 09:31AM 09:31AM 09:31AM 09:31AM 09:35AM 10:19AM

THE COURT: We're back on the record. All Counsels are present, and let's go ahead and continue. I apologize for that. I had to take that call. Call in the jury.

Mr. Martin, I apologize for cutting you up -- cutting your examination there.

MR. MARTIN: No apology needed, Your Honor.

(Pause.)

THE COURT: Is our computer still messed up? Carm?

(Discussion with clerk.)

(Jury in at 10:20 a.m.)

THE COURT: Please be seated, ladies and gentlemen of the jury. Thank you for your patience, and we'll go ahead and allow Mr. Martin to continue on with his cross-examination.

MR. MARTIN: Thank you, Your Honor. I believe we had up on the monitor Government's Exhibit 366-4, the bottom. There is two FAA registrations, if we could pull that back up. The bottom of the page, I think it was Jan's we were on, because that's Evan's Air.

BY MR. MARTIN: (CONTINUING)

Q. Agent, you remember we were talking about Jan's Helicopter Services?

A. I remember we were talking about this FAA registry,

but I don't remember the discussion before the break.

Q. Well, just for recollection purposes, this is the second one on that list. Do you recall that, sir?

A. Yes.

Q. Okay. And it has an N-number. It has a serial number. It says it's a corporation. The name of the corporation is Jan's Helicopter, Inc. The country is Vanuatu. Do you agree with that, sir?

A. Yes, that's what's purported on there; yes.

Q. And I think we went through this, and we found that Jan's Helicopter Services, Inc. is on this list, right here?

A. It's at the bottom of this list; yes.

Q. This is Government's 829, right, sir?

A. Yes, sir.

Q. And consistent with your prior testimony, you'll agree with me, won't you, sir, that a helicopter -- that helicopter is an asset?

A. Consistent with my prior testimony?

Q. Well, you testified earlier that the other one was an asset so I'll ask a different question. That helicopter is an asset, isn't it, sir?

A. The helicopter is an asset to an entity or a person.

Q. It's an asset, isn't it, sir?

A. Yes.

Q. Okay. If we could go to Government's Exhibit 366-5.

Do you see that, sir?

A. Yes.

Q. And would you agree with me, sir, this is the FAA registry and the records that are kept in the normal course of business of the FAA, sir?

A. As it's record with the FAA; yes.

Q. Okay. Kept in the normal course of business?

A. Yes.

Q. Okay.

A. It's available online.

Q. And it relates to helicopter N105FM. Would you agree with that, sir?

A. N105FM is reflected on this document; yes, sir.

Q. It has a serial number; correct?

A. Yes, sir.

Q. It's registered as a corporation; correct?

A. Yes, sir.

Q. The name of the corporation as registered is Hampton Helicopters, Inc.; correct, sir?

A. It's purported to be Hampton Helicopters, Inc.; yes, sir.

Q. No, it's not purported. It actually says *Hampton Helicopters Inc.*; correct, sir?

A. It's -- yes.

Q. Okay. And the country is Vanuatu; correct, sir?

A. Yes.

Q. And, again, I'm going to show you what's been previously used as Government's Exhibit 829; is Hampton Helicopters, Inc. on this list, sir?

A. Yes.

Q. Right there where I'm pointing my finger?

A. It's right there, sir. Yes.

Q. Okay. And is this helicopter N105FM an asset, sir?

A. It's an asset.

Q. Okay. If we could go to the next one. Do you see, sir, what's up on the monitor now, which is Government's Exhibit 366-, I believe it's 5, at the bottom of the page. Would you agree with me, sir, that that is a record kept in the regular course of business of the FAA?

A. Yes.

Q. And that it relates to helicopter N1156X, that's the registration?

A. It's reflected as the U.S. registration for N1156X; yes.

Q. And it has a serial number; correct?

A. Yes.

Q. And the registration is a corporation; correct?

A. A U.S. corporation; yes.

Q. That doesn't say "U.S. corporation," it says "corporation," doesn't it, sir?

         A. It's a corporation as reflected on what's here, it's an FAA registry, and it's reflected as a -- it's a corporation with the U.S., otherwise it would say "non-citizen corporation" or something to that effect.

Q. Does it say "individual" on there, sir?

A. It says "corporation," sir.

Q. Okay. And the letters "U period, S period" aren't on that document, are they, sir?

A. It's a U.S. corporation -- no, it's literally not on that document; you're correct.

Q. I'm asking you about this document. If you don't understand the document I'm talking to you about, please interrupt me, and I'll make sure we're on the same page. I am talking to you about this document, nothing else. Okay?

A. Yes, sir.

Q. Okay. And when I bring up another document, I'm talking to you about that document and nothing else. Okay?

A. All right. So you just want me to focus on what I see specifically on this document, yes, sir.

Q. Correct.

A. Yes, sir.

Q. Very good. Very good. That's -- this is the FAA registry, a business record kept by them in the normal course of business; correct?

A. Yes.

Q. And their document reflects that the word type of registration says "corporation"; correct, sir?
A. Corporation; yes.
Q. And the name of the corporation is Walker Helicopter, Inc.; correct, sir?
A. Walker Helicopter, Inc. is identified on this document; yes.
Q. And the country is Vanuatu; correct, sir?
A. Vanuatu is the country identified on this document; yes.
Q. And is Walker Helicopter, Inc. on Government's Exhibit 829, sir?
A. Yes, sir. Right where your finger is, sir.
Q. Okay. And is this helicopter an asset, sir?
A. An asset for Hansen Helicopters; yes.
Q. Did I ask you anything about Hansen Helicopters, sir?
A. You asked if it's an asset; yes.
Q. Did I ask you anything about Hansen Helicopters, sir?
A. This case is about Hansen Helicopters --
Q. Did I ask you anything about Hansen Helicopters? Is that a question you're having difficulty understanding?
A. No, sir.
Q. Okay. Now, can you answer the question? Did I ask you anything about Hansen Helicopters?
A. No, sir.

10:27AM 10:27AM 10:27AM 10:27AM 10:27AM 10:27AM 10:27AM 10:27AM 10:27AM 10:27AM 10:27AM 10:28AM 10:28AM 10:28AM 10:28AM 10:28AM 10:28AM 10:28AM 10:28AM 10:28AM 10:28AM 10:28AM 10:28AM 10:29AM 10:29AM

Q. Okay. Now, let's try that again. Is that helicopter an asset?

A. It's an asset.

Q. And as a matter of fact, the FAA says the registered owner is Walker Helicopters, Inc., doesn't it, sir?

A. Actually, the person who registered this says it belongs to Walker Helicopters, Inc.

Q. Actually, my question was, sir, the FAA registry says that the registered owner is Walker's Helicopters, Inc.; isn't that what the registry says, sir?

A. Yes, that's what the registry says.

Q. Okay. Thank you. If we could go to, I believe the next one is Government's Exhibit 366-6. Do you see that document, sir?

A. Yes, sir.

Q. Is that a record that is kept in the normal course of business of the FAA, known as the FAA registry?

A. FAA registry, yes.

Q. And is this particular document dealing with aircraft number N126BC?

A. It's -- it's U.S. registration number N126BC.

Q. All right. It has a serial number, doesn't it, sir?

A. It has a serial number, yes.

Q. And it's registered as a corporation, correct, sir? That's what it says?

A. Yes.

Q. And the corporation is called Bill's Air Services, Inc.; correct; sir?

A. Bill's Air Service, Inc. is the -- is identified there in the name; yes.

Q. And it's also identified as the registered owner; correct, sir?

A. It's listed under the registered owner; yes.

Q. Okay. And it's -- Vanuatu is the country; correct sir?

A. Vanuatu company -- or Vanuatu is the country listed on the document; yes.

Q. All right, sir. And I have in my hand Government's Exhibit 829; is Bill's Air Services identified on that?

A. Yes, where your finger is.

Q. Okay. And this helicopter is an asset; correct, sir?

A. It's an asset.

Q. All right. If we could go to the bottom of that page. Do you see the document now on the page, sir?

A. Yes, sir.

Q. And would you agree with me, sir, that this is a document from the federal aviation registry kept in the normal course of business?

A. This is -- yes.

Q. And would you agree with me, sir, that it deals with

an aircraft with the registration number N129BC?

A. It deals with the U.S. registration number N129BC.

Q. Has a serial number; correct, sir?

A. Yes, sir.

Q. Registered as a corporation; correct, sir?

A. Corporation; yes, sir.

Q. The name is of the corporation is Spotters, Inc.; correct, sir?

A. Spotters, Inc. is listed there; yes, sir.

Q. And it's listed there as the registered owner; correct, sir?

A. It's underneath registered owner; yes, sir.

Q. And the country is Vanuatu; correct, sir?

A. The country identified there is Vanuatu; yes, sir.

Q. And I'm again going to show you Government's Exhibit 829. Do you see Spotters, Inc. on Government's Exhibit 829, sir?

A. Spotters, Inc. is right where your finger is at.

Q. Okay. And that helicopter is an asset; correct, sir?

A. The helicopter, it would be an asset; yes.

Q. All right, sir. If we could go to 366-7. Do you see that document, sir?

A. Yes, sir.

Q. Would you agree that it is from the FAA registry and record kept in the normal course of business?

A. Yes.

Q. Would you agree, sir, that this entry in the registry deals with the registration number aircraft N153EH?

A. U.S. registration number N153EH; yes.

Q. All right, sir. That aircraft also has a serial number; correct, sir?

A. Yes, sir.

Q. And the name of the registered owner in the registry is Tuna Copters; correct, sir?

A. Tuna Copters is identified there; yes.

Q. And the country is Vanuatu; correct, sir?

A. Vanuatu is listed on that document; yes.

Q. I'm going to show you again Government's Exhibit 829, sir. Is Tuna Copters on that list?

A. Yes, right where your finger is pointing.

Q. Okay. And is that helicopter, that aircraft, an asset, sir?

A. That helicopter would be an asset; yes.

Q. If we could go to the next -- same page. Do you see that document, sir?

A. Yes.

Q. Is that a record kept in the normal course of business with the FAA registry?

A. Yes.

Q. And does this document deal with a helicopter with

10:33AM 10:33AM 10:33AM 10:33AM 10:33AM 10:33AM 10:33AM 10:33AM 10:34AM 10:34AM 10:34AM 10:34AM 10:34AM 10:34AM 10:34AM 10:34AM 10:34AM 10:34AM 10:34AM 10:35AM 10:35AM 10:35AM 10:35AM 10:35AM 10:35AM

registration number -- an aircraft with registration number N190M?

A. Regarding U.S. registration number N190M.

Q. Okay, so you're agreeing with me?

A. Yes, sir.

Q. It has a serial number; correct, sir?

A. There is a serial number reflected; yes.

Q. And the registered owner listed on the FAA registry is Jan's Helicopter Services, Inc.; correct, sir?

A. Jan's Helicopter Service, Inc. is identified on this; yes.

Q. And this is a Vanuatu corporation or Vanuatu country, that's what it says?

A. That's what it says, Vanuatu.

Q. Right. And I could bring the board back up there, but you remember already testifying about Jan's Helicopter being on this board, sir?

A. Yes, sir.

Q. Okay. And you'll agree with me, won't you, sir, that that helicopter is an asset; correct?

A. The helicopter is an asset.

Q. Okay. If we could go to the next one, which is Government's Exhibit 3006, dash, I believe it's 8. Do you see that document, sir?

A. Yes.

10:35AM 10:35AM 10:35AM 10:35AM 10:35AM 10:35AM 10:35AM 10:35AM 10:35AM 10:35AM 10:35AM 10:35AM 10:35AM 10:35AM 10:35AM 10:35AM 10:36AM 10:36AM 10:36AM 10:36AM 10:36AM 10:36AM 10:36AM 10:36AM 10:36AM

Q. Would you agree with me, sir, that this is a document kept in the normal course of business relating to the FAA registry by the FAA?

A. Yes.

Q. And would you agree with me, sir, that this document kept by the FAA relates to the registration N192PB?

A. Yes.

Q. Okay. And it has a serial number, doesn't it, sir?

A. Yes.

Q. And the registered owner on the FAA document is Micronesian Aviation Corporation, Inc. Do you see that?

A. Yes.

Q. And the country is, I believe that says North Marianas, sir?

A. Yes.

Q. Okay. I've got Government's 829 here. Do you see that company on this chart, sir?

A. I do not.

Q. Okay. But that aircraft is an asset; would you agree with me, sir?

A. It's an asset, yes.

Q. All right, sir. If we could go to the next one. Do you see the record in front of you there, sir?

A. Yes.

Q. Would you agree with me, sir, that that is a record

from the registry of the federal aviation authority that's kept in a normal course of business?

A. Yes.

Q. Would you agree, sir, that it deals with helicopter registered number N26892?

A. Yes, that's N26892, U.S. registration number, that's correct.

Q. Has a serial number; correct, sir?

A. There is a serial number identified there; yes.

Q. The registration says it's a corporation; correct, sir?

A. Corporation identified there; yes.

Q. It says the registered owner is Williams -- Wilma's Flight Services, Inc.; correct, sir?

A. Wilma's Flight Services, Inc. is identified on this page; yes.

Q. All right. It says the country is Vanuatu, sir; correct?

A. The country is Vanuatu; yes.

Q. And is Wilma's Flight Services -- my thumb is there, is Wilma's Flight Services on this document, sir?

A. It's right by your thumb, sir.

Q. Okay. And would you agree with me, sir, that Wilma's -- excuse me, would you agree with me, sir, that that helicopter is an asset?

10:38AM 10:38AM 10:38AM 10:38AM 10:38AM 10:38AM 10:38AM 10:38AM 10:38AM 10:38AM 10:38AM 10:38AM 10:38AM 10:39AM 10:39AM 10:39AM 10:39AM 10:39AM 10:39AM 10:39AM 10:39AM 10:39AM 10:39AM 10:39AM 10:39AM

A. I'll agree that the helicopter is an asset.

Q. If we could go to the next one, please. Would you agree, sir, that this -- the document we're looking at is the registry of the FAA document kept by the Federal Aviation Administration in the normal course of business?

A. Yes, yes.

Q. And that it deals with U.S. registration number N271M aircraft?

A. Yes.

Q. That it has a serial number?

A. Yes.

Q. The registered owner reflected on the record is Jan's Helicopters, Inc.; correct?

A. Jan's Helicopter Service, Inc. is on this document; yes.

Q. Vanuatu corporation or Vanuatu country?

A. Vanuatu is identified on this document; yes.

Q. And we've talked about Jan's before, haven't we, sir, on this document, on 829?

A. Jan's is on 829; yes.

Q. Okay. And that is -- that aircraft identified there is an asset, wouldn't you agree, sir?

A. The aircraft is an asset, yes.

Q. If we can go to the next one. Again, this is a document kept in the normal course of business on the FAA

registry, sir?

A. Yes.

Q. Relates to registration number N2949P; would you agree with that, sir?

A. U.S. registration number N2949P is reflected on this document; yes.

Q. So you're agreeing with me?

A. Yes, yes.

Q. Okay. It has a serial number; correct?

A. It has a serial number; yes.

Q. And it's listed as a corporation; correct?

A. Corporation is identified; yes.

Q. And the name of that corporation as a registered owner is Heli Fish, Inc.; correct?

A. Heli Fish, Inc. is on this document; yes.

Q. And the country is Vanuatu?

A. The country identified is Vanuatu; yes.

Q. And would you agree with me, sir, that Heli Fish, Inc. is on Government's Exhibit 829?

A. Yes.

Q. Okay. And this document, excuse me, I'll rephrase. The aircraft identified in the registry as November 2949P, is an asset, would you agree, sir?

A. The aircraft itself would be an asset; yes.

Q. Next one, please. Again, this is the FAA registry,

something that is kept in the normal corpus[sic] of business; correct, sir?

A. Yes.

Q. And this document in particular is referring to an aircraft with registration number N336HH; correct, sir?

A. N336HH, yes, it's identified there where you pointed; yes.

Q. It has a serial number?

A. Yes, there is a serial number there; yes.

Q. Registration is a corporation?

A. There is a registration of a corporation there; yes.

Q. Shows, according to the FAA records, that the registered owner is Foxtrot Air, Inc.; correct, sir?

A. Foxtrot Air, Inc. is identified on this document; yes.

Q. As the registered owner?

A. Underneath registered owner; yes.

Q. Right. And that's what the FAA documents show. And the country is Vanuatu; correct, sir?

A. Vanuatu is identified on this document; yes.

Q. And is Foxtrot Air, Inc. on this document, sir? If I need to bring it over there, I will.

A. Could you bring it over, please? I just want to confirm.

Q. Sure.

A. My apologies.
Q. No, that's fine. I don't want to --
A. Yes. Right where your finger is, yes, sir.
Q. And that aircraft is an asset; correct, sir?
A. The aircraft is an asset.
Q. If we could go to the next one. Record kept in the normal course of business of the FAA, again, sir; correct?
A. Yes, sir.
Q. And this deals with aircraft registered number N336SP; correct, sir?
A. U.S. registration number N336SP is identified here; yes, sir.
Q. Has a serial number?
A. Serial number is reflected there where you pointed it out; yes.
Q. It's a corporation, it's registered as a corporation?
A. A corporation is identified on this document.
Q. The registered owner, according to the FAA registry, is Alpha Air, Inc.; correct? Is?
A. Alpha Air, Inc. is identified on this document.
Q. And the location of that registered owner is Vanuatu, as the country; correct, sir?
A. Vanuatu is identified on this document; yes.
Q. As the country; correct, sir?
A. Yes.

Q. Okay. And is Alpha Air, Inc. on this document?
A. Could you bring it over just --
Q. Absolutely.
A. -- to confirm. Thank you.
Q. I need the exercise.
A. Alpha -- there is a different spelling in the name.
Q. Okay. What's the --
A. The difference is how they spelled Alpha. You have A-L-F-A versus the A-L-P-H-A.
Q. Okay. All right. And you'll agree with me, will you not, sir, that this aircraft that's been identified in the FAA registry is an asset; correct, sir?
A. This helicopter is an asset.
Q. All right. And -- well... my technological skills aren't that good. There we go. All right. Another document kept in the normal course of business of the Federal Aviation Administration; correct, sir?
A. Yes.
Q. And this document relates to an aircraft identified as N369BK; correct, sir?
A. U.S. registration number N369BK is identified here; yes, sir.
Q. It's got a serial number, correct, sir?
A. A serial number is identified on this document; yes.
Q. It's identified as a type of registration as a

10:45AM 10:45AM 10:45AM 10:45AM 10:45AM 10:45AM 10:45AM 10:45AM 10:45AM 10:45AM 10:45AM 10:46AM 10:46AM 10:46AM 10:46AM 10:46AM 10:46AM 10:46AM 10:46AM 10:46AM 10:46AM 10:46AM 10:46AM 10:46AM 10:46AM

corporation; correct, sir?

A. A corporation is identified on this document; yes.

Q. And the FAA records reflect that the registered owner is a company called Charlie Air, Inc.; correct, sir?

A. Charlie Air, Inc. is on this document; yes.

Q. And the country listed for the address of Charlie Air Inc. is Vanuatu; correct, sir?

A. Vanuatu is the country; yes.

Q. And is Charlie Air, Inc. listed on Government's Exhibit 0829?

A. Yes, right where your finger is located, sir. Thank you.

Q. And is this helicopter an asset, sir?

A. This helicopter is an asset.

Q. Okay. If we could go to the next one. Again, this document kept in the normal course of business of the Federal Aviation Administration; correct?

A. This document; yes.

Q. And it relates to an aircraft with registration number N369V; correct, sir?

A. U.S. registration number N369V is identified there; yes.

Q. Has a serial number, right, sir?

A. There is a serial number; yes.

Q. And the registration is a corporation?

A. Corporation is identified.

Q. And the corporation listed as a registered owner is Foxtrot Air, Inc.; correct, sir?

A. Foxtrot Air, Inc. is identified on this document.

Q. And the location of Foxtrot Air, Inc. is indicated to be the country of Vanuatu; correct, sir?

A. Vanuatu is identified on this document.

Q. And I do need to bring this chart up there, or are you familiar with Foxtrot Air, Inc.?

A. I'll save you the journey over here, and Foxtrot Air is identified on that document.

Q. And the document I'm referring to is Government's Exhibit 829; correct, sir?

A. Yes, sir.

Q. All right. And you'll agree with me, sir, that this helicopter reflected in the FAA registry is an asset; correct, sir?

A. N369V, the helicopter; yes, it's an asset.

Q. All right, sir. Again, I think we're at G-366-12. This is a record kept in the normal course of business of the Federal Aviation Administration; correct, sir?

A. Yes.

Q. And it deals with an aircraft identified by registration number is N369MV; correct, sir?

A. Yes. It's U.S. registration number N369MV.

Q. It has a serial number; correct, sir?

A. Yes.

Q. The type of registration is a corporation. Would you agree, sir?

A. Corporation is identified on here; yes.

Q. The registered owner, according to the FAA registry, is Heli Fish, Inc.; correct, sir?

A. Heli Fish is identified on this document.

Q. And the country of Heli Fish, Inc. is identified as Vanuatu; correct, sir?

A. Vanuatu is identified; yes.

Q. And I could bring this over there, or I think you've already identified it, but Heli Fish, Inc. is on Government's Exhibit 829, isn't it, sir?

A. Yes, sir. Thank you.

Q. Okay. And would you agree with me that the helicopter identified in this document is an asset?

A. The helicopter itself is an asset.

Q. All right. If we can go to the next one. Again, from the FAA registry, a record kept in the normal course of business. Would you agree with that, sir?

A. Yes.

Q. And this listing from the FAA registry relates to an aircraft register under N369PF. Would you agree with that, sir?

A. N369PF is identified here; yes.

Q. It has a serial number; correct, sir?

A. Yes.

Q. The type of registration is corporation; correct, sir?

A. Type of registration says corporation on the document; yes.

Q. And the registered owner, according to the FAA registry, is Bill's Air Service, Inc.; correct, sir?

A. Bill's Air Service, Inc. is identified here; yes.

Q. And the country for Bill's Air Service, Inc. is Vanuatu; correct, sir?

A. Vanuatu is identified here; yes.

Q. Okay. And are you familiar with Bill's Air, Inc.? Is it on this list?

A. This -- could you bring it over?

Q. Sure.

A. Yes, where your finger is located. Thank you.

Q. Okay. And this aircraft, you'll agree with me, sir, is -- pardon me, is an asset; correct?

A. This aircraft is an asset.

Q. If we could go to the next one. Government's Exhibit 366-13. Do you see that document, sir?

A. Yes.

Q. Would you agree with me, sir, that this is a record

kept in the normal course of business by the Federal Aviation Administration?

A. Yes.

Q. And that it deals specifically with an aircraft identified by registration number is N40490?

A. That is a U.S. registration number N40490; yes, identified here; yes.

Q. Okay. Has a serial number?

A. Yes.

Q. Type of registration, corporation; correct, sir?

A. Corporation is identified here; yes.

Q. The registered owner according to the FAA registry is Wilma's Flight Services, Inc.; correct, sir?

A. Wilma's Flight Services, Inc. is identified here; yes.

Q. And the country for Wilma's Flight Services Inc. is Vanuatu; correct, sir?

A. Vanuatu is identified on this document; yes.

Q. And if I need to, I'm happy to bring this over there, but would you agree with me that Wilma's Flight Services is on this document, Government's 829?

A. Yes.

Q. You're agreeing with me?

A. Yes.

Q. Okay. All right. And are you agreeing -- would you

agree with me, sir, that the aircraft identified as November 40490 is an asset?

A. N40490 is an asset.

Q. Okay, sir. If we could go to the next one. Again, sir, this is from the federal aviation registry, a document kept in the normal course of business. Do you recognize that document, sir?

A. Yes.

Q. And would you agree, sir, that this document relates to an aircraft identified as N4206S?

A. U.S. registration number N4206S is identified here; yes.

Q. And it has a serial number; correct, sir?

A. Yes, there is a serial number.

Q. And the type of registration is a corporation. Would you agree with that, sir?

A. Corporation is identified on this document; yes.

Q. And the registered owner, according to the FAA's records, is a company called Tuna Copter, Inc.; correct, sir?

A. Tuna Copters, Inc. is identified on this document.

Q. As a registered owner?

A. Underneath registered owner; yes.

Q. Okay. And the country for Tuna Copters, Inc. is Vanuatu; correct, sir?

A. Vanuatu is identified on this document.

Q. And I've got in my hand Government's Exhibit 829. Do you need to look at this document to verify that Tuna Copters, Inc. is on there or not?

A. Tuna Copters is on there.

Q. Okay. All right. And would you agree with me, sir, that the helicopter identified in this document, the government's exhibit, is an asset?

A. The helicopter itself is an asset.

Q. If we could go to the next one. Again, we have a document from the FAA registry kept in the normal course of business; correct, sir?

A. Yes.

Q. And this particular document specifically deals with the helicopter identified as N4250N. Would you agree with that sir?

A. U.S. registered N4250N is on here; yes.

Q. Has a serial number; correct, sir?

A. Yes, serial number.

Q. Type of registration is a corporation, right, sir?

A. Corporation is on here; yes.

Q. Okay. And the registered owner, according to the FAA registry, is Bean Bag Helicopters, Inc.; correct, sir?

A. Bean Bag Helicopters, Inc. is identified on this document; yes.

Q. And the country for Bean Bag Helicopters, Inc. is

Vanuatu; correct, sir?

A. Vanuatu is identified on this document; yes.

Q. And, again, I have Government's Exhibit 829 is Bean Bag on this document, sir?

A. Bean Bag is identified on that document, it's -- it's the wholly -- Bean Bag wholly owns the 30 subsidiaries underneath it.

Q. All right. And would you agree with me, sir, that the aircraft identified on this exhibit as N4250N is an asset?

A. The helicopter N4250N is an asset.

Q. All right, sir. Would you agree to the next one. Do you see that document, sir?

A. Yes.

Q. Do you recognize it as a document that's kept in the normal course of business by the Federal Aviation Administration as a business record?

A. Yes.

Q. And do you recognize, sir, that that document deals specifically with an aircraft with a registration number N444GJ?

A. U.S. registration number N444GJ is reflected on this document.

Q. And it shows that the aircraft has a serial number; correct, sir?

A. There is a serial number on this document; yes.

Q. Also shows that the type of registration for this aircraft is corporation; correct, sir?

A. Corporation is identified on this document.

Q. And the FAA registry, the official business records of the FAA, show that the registered owner of this aircraft is a company named Foxtrot Air, Inc.; correct, sir?

A. Foxtrot Air, Inc. is identified on this document.

Q. All right. And the country for Foxtrot Air, Inc. is Vanuatu; correct, sir?

A. Vanuatu is identified on this document.

Q. All right. And, again, I have Government's Exhibit G-829, do you need to look at this document? Do I need to bring it to you to see if it has Foxtrot Air, Inc. on it, or do you remember?

A. No, thank you. I do recall it being on that document. Thank you.

Q. Okay. And would you agree with me, sir, that the aircraft identified in the FAA registry as November 444GJ is an asset?

A. This -- yeah, N444GJ is an asset.

Q. All right, sir. If we could go to the next one. Again, this is the FAA registry, a record kept in the normal course of business. Would you agree with that, sir?

A. Yes.

Q. And, specifically, this page of the registry deals

with an aircraft identified as N454S; correct, sir?

A. That is U.S. registration number N454S; you're correct, sir.

Q. And it has a serial number; correct?

A. A serial number is identified on this document; yes.

Q. And the type of registration reflected in the FAA registry is a corporation; correct, sir?

A. Corporation is reflected on this document; yes.

Q. And the FAA registry, under registered owner, reflects that the registered owner is Dave's Helicopter Services, Inc.; correct, sir?

A. Dave's Helicopter Service, Inc. is identified on this document; yes.

Q. As the registered owner?

A. It's underneath registered owner.

Q. Okay. And the country identified for Dave's Helicopter, Inc. -- Dave's Helicopter Services, Inc., is Vanuatu; correct, sir?

A. Vanuatu is identified on here; yes.

Q. All right. And is Dave's Helicopter Services, Inc. on Government's Exhibit 829? I can bring it over there if you need to see it?

A. I do recall Dave's Helicopter being on there, sir.

Q. Okay. All right. And would you agree with me, sir, that the aircraft identified in the FAA registry as N454S, is

an asset?

A. N4 -- U.S.-registered number N454S, is a asset -- is an asset. Excuse me.

Q. Okay. Do you see the next document that we've pulled up, sir?

A. Yes, sir.

Q. And would you agree with me, sir, that this is a document kept in the normal course of business of the Federal Aviation Administration as a business record?

A. It's a business record; yes.

Q. Of the Federal Aviation Administration?

A. Yes.

Q. And, specifically, this document relates to an aircraft that has been identified as N45777?

A. U.S. registration number N45777 is on here; yes.

Q. Okay. It has a serial number, doesn't it, sir?

A. There is a serial number; yes.

Q. And the type of registration reflects corporation; correct, sir?

A. Corporation is identified; yes.

Q. And according to the FAA records, the registered owner is Charlie Air, Inc; correct, sir?

A. Charlie Air, Inc. is identified on this document; yes.

Q. Okay. And the corporation that's identified as

Charlie Air, Inc. reflects the country is Vanuatu; correct, sir?

A. Vanuatu is identified on this document; yes.

Q. Okay. And I've got in my hand, and I'm happy to bring it up there if you need to see it, Government's Exhibit G-829, is Charlie Air, Inc. on this document?

A. Could you bring it --

Q. Sure. Absolutely.

A. Yes; yes. Charlie Air, Inc.; yes, sir.

Q. Okay. And would you agree with me, sir, the aircraft that is identified on this document as N45777, is an asset?

A. U.S. registration N45777 is an -- is an asset.

Q. Okay. If we go to the next one. Do you recognize the document? You are now looking at Government's Exhibit 366-16, is a business record kept by the Federal Aviation Administration in the normal course of business, sir?

A. Yes.

Q. Do you recognize, sir, that this specifically, this document specifically, deals within an aircraft identified as N500LA?

A. N500LA is identified on this document; yes.

Q. And this aircraft has a registration -- excuse me, has a serial number; correct, sir?

A. There is a serial number on this document.

Q. And the type of registration reflected in the FAA

 registry is a corporation; correct, sir?

A. Corporation is reflected on this document.

Q. And, again, according to the FAA registry, the registered owner of the aircraft listed above is Chance Air, Inc.; correct, sir?

A. Chance Air, Inc. is reflected on this document; yes.

Q. And the country for Chance Air, Inc. is reflected as Vanuatu; correct, sir?

A. Vanuatu is reflected on this document; yes.

Q. All right. And I have Government's Exhibit 829. Is Chance Air, Inc. on this, or I do need to bring it up there for you to verify?

A. I recall Chance Air being on that; yes.

Q. Okay. Would you agree with me, sir, that the helicopter that has been identified as N500LA on this document, is an asset?

A. N500LA is an asset.

Q. Okay. We could go to the next one. Again, sir, do you see this is the second half of Government's Exhibit 366-16, do you see a record reflected that is a business record kept in the normal course of business of the Federal Aviation Administration?

A. Yes.

Q. And, specifically, this document, would you agree, sir, relates to an aircraft identified as N500PA?

A. U.S. registration number N500PA; yes.
Q. And this aircraft has a serial number; correct, sir?
A. There is a serial number reflected there; yes.
Q. And the type of registration for this aircraft, would you agree, sir, is a corporation?
A. Corporation is identified on this; yes.
Q. All right. And the -- according to the FAA registry, the registered owner is Alpha Air, Inc.; correct, sir?
A. Alpha Air, Inc. is identified on this document; yes.
Q. According to the FAA registry is the registered owner; correct, sir?
A. It's identified underneath "registered owner," yes.
Q. Okay. And the country for Alpha Air, Inc. is Vanuatu; correct, sir?
A. Vanuatu is identified on this document; yes.
Q. Okay. And, again, I have Government's Exhibit 829, I can bring it up there. Is Alpha Air, Inc. on here?
A. There is a discrepancy in the name between the two.
Q. The spelling?
A. The spelling.
Q. Yeah. Is the -- and we talked about that earlier, right?
A. We just identified that the PH, there is A-L-P-H-A spelled here on the registry, and it's A-L-F-A identified there.

Q. Right here on this very first listing, right, sir?

A. Correct.

Q. Okay. And you agree with me, sir, that the aircraft identified in the FAA registry is N500PA, is an asset; correct, sir?

A. The U.S.-registered number N500PA is an asset.

Q. If we can go to the next one. I believe this is Government's Exhibit No. G-366-17. Do you recognize this document reflected on the monitor, sir, as a record kept in the normal course of business of the Federal Aviation Administration?

A. Yes.

Q. And do you specifically see, sir, that this document reflect -- relates to an aircraft with a registration number of N501FC?

A. U.S. registration number N501FC is on here; yes.

Q. Okay. You'll agree that this aircraft has a serial number; correct, sir?

A. Yes.

Q. And the type of registration is corporation; correct, sir?

A. Corporation is identified; yes.

Q. And the registered owner is Eddie Air, Inc. Would you agree with that, sir?

A. Eddie Air, Inc. is identified on this document; yes.

Q. And the location identified on the FAA registry for Eddie Air, Inc. is the country of Vanuatu; correct, sir?
A. Vanuatu is identified here; yes.
Q. And let me ask you, sir, Government's Exhibit 829, which I have in my hand, is Eddie Air, Inc. on that? And I'm happy to bring it over there if you need to see it?
A. Yes, Eddie Air, Inc. is on there.
Q. Okay. And would you agree with me, sir, that the aircraft identified on this document as N501FC is an asset?
A. N501FC is an asset.
Q. All right, sir. We can go to the next one. This is the second half of Government's Exhibit 366-17. Again, a record of the Federal Aviation Administration kept in the normal course of business; correct, sir?
A. Yes.
Q. And specifically this document deals with an aircraft listed in the registry as November 501SU; correct, sir?
A. U.S. registration number N501SU is identified here; yes.
Q. And it has a serial number, you agree with that, sir?
A. Serial number is reflected on here; yes.
Q. And the type of registration is a corporation?
A. Type of registration identified here is a corporation; yes.
Q. And would you agree with me, sir, that the federal

11:06AM 11:06AM 11:07AM 11:07AM 11:07AM 11:07AM 11:07AM 11:07AM 11:07AM 11:07AM 11:07AM 11:07AM 11:07AM 11:07AM 11:07AM 11:07AM 11:08AM 11:08AM 11:08AM 11:08AM 11:08AM 11:08AM 11:08AM 11:08AM 11:08AM

aviation registry reflects the registered owner as Dave's Helicopter Service, Inc.?

A. Dave's Helicopter Service, Inc. is identified here; yes.

Q. And the country reflected in the FAA registry for Dave's Helicopter Service, Inc. is Vanuatu, you agree with that, sir?

A. Vanuatu is identified here; yes.

Q. And I have in my hand Government's Exhibit G-829, is Dave's Helicopter Services, Inc. on this chart? And I'm happy to bring it up there.

A. Yes. I mean the corporation is identified on that chart; yes, sir.

Q. Okay. And is that aircraft N501SU, identified on the screen in the FAA registry, an asset?

A. U.S.-registered number N501SU is an asset.

Q. All right, sir. We can go to the next one. Before you on the screen is G-366-18. Would you agree with me, sir, that that is a record kept in the normal course of business at the Federal Aviation Administration?

A. Yes.

Q. Would you agree with me, sir, that this document on the screen specifically relates to an aircraft identified by number N504WW?

A. U.S. registration number N504WW is reflected on this

document; yes.

Q. Do you agree, sir, that it has a serial number?

A. There is a serial number; yes.

Q. And the registration reflected is a corporation; correct, sir?

A. Corporation is identified on this document; yes.

Q. And the corporation -- or excuse me, and the registered owner, according to the FAA registry reflects the name of H-H Helicopters Inc.; correct sir?

A. HH Helicopters, Inc. is identified on this document.

Q. And HH Helicopters, Inc. is recognized from the country of Vanuatu; correct, sir?

A. Vanuatu is identified on this document.

Q. And do you know, sir, if HH Helicopter, Inc. is on Government's Exhibit 829? And I'm happy to bring it over there.

A. Yes, please.

Q. Okay.

A. It's right where your finger is located.

Q. Okay, sir. Thank you. Would you agree with me, sir, that the aircraft identified as N504WW is an asset?

A. U.S. registration number N504WW is an asset.

Q. If we could go to the next one. Again, from the registry, business record FAA registry; correct, sir?

A. Yes.

11:10AM 11:10AM 11:10AM 11:10AM 11:10AM 11:10AM 11:10AM 11:10AM 11:10AM 11:10AM 11:10AM 11:10AM 11:10AM 11:10AM 11:11AM 11:11AM 11:11AM 11:11AM 11:11AM 11:11AM 11:11AM 11:11AM 11:11AM 11:11AM 11:11AM

Q. And this particular document G-366-18, second part of it, deals specifically with an aircraft identified by N539; correct, sir?

A. U.S. registration number N539 is identified on this document.

Q. You'll agree it has a serial number; correct, sir?

A. There is a serial number.

Q. Would you agree with me, sir, that the FAA registry reflects the type of registration is a corporation?

A. Corporation is identified; yes.

Q. Would you agree with me, sir, that according to the FAA registry, the registered owner is a company called Heli Fish, Inc.?

A. Heli Fish, Inc. is identified on this document.

Q. And the location of Heli Fish, Inc. is identified in the country of Vanuatu; correct, sir?

A. Vanuatu is identified on this document.

Q. All right. And is Heli Fish, Inc. on Government's Exhibit 829?

A. Yes, it is.

Q. Okay. And let me ask you, sir, would you agree with me that the aircraft that's identified as N539 on the FAA registry is an asset?

A. U.S. registration number N539 is an asset.

Q. We could go to the next one. Again, sir, we're at

Government's Exhibit 366-19. This is a business record kept in the normal course of business by the Federal Aviation Administration; correct?

A. Yes.

Q. And this document specifically deals with an aircraft identified as N577DW; correct, sir?

A. U.S. registration N577DW is reflected here; yes.

Q. And the FAA registry reflects that the serial number for this aircraft is on there; correct?

A. A serial number is reflected; yes.

Q. And the FAA registry reflects that the type of registration is corporation; correct, sir?

A. Corporation is identified; yes.

Q. And the FAA registry reflects that the registered owner of the aircraft identified above as N577DW, is Whirlwide Helicopters, Inc.; correct, sir?

A. Whirlwide Helicopters, Inc. is identified here; yes.

Q. And the location for Whirlwide Helicopter, Inc. is identified as Vanuatu?

A. Vanuatu is identified here; yes.

Q. And I have in my hand, sir, Government's Exhibit 829, do I need to bring it over there to see if Whirlwide Helicopter, Inc. is on here?

A. Sure.

Q. Okay.

A. Yes. Whirlwide is reflected by your finger.

Q. You'll agree with me, sir, that N577DW reflected in the FAA registry is an asset; correct, sir?

A. N577DW is an asset.

Q. All right, sir. Thank you. If we could go to the next one. Again, Government's Exhibit 366-19 is from the FAA registry records kept in the normal course of business; correct, sir?

A. Yes. Yes, sir.

Q. And specifically this document that we're looking at on the screen relates an aircraft identified by the listing N584SD; correct, sir?

A. U.S. registration number N584SD, is identified.

Q. And the FAA registry reflects that it has a serial number; correct, sir?

A. A serial number is reflected; yes.

Q. And the FAA registry reflects that the type of registration for this aircraft is a corporation; correct, sir?

A. Corporation is identified; yes.

Q. And according to the FAA registry the registered owner for that aircraft is a company called Walk-Air, Inc.; correct?

A. Walk-Air, Inc. is identified here; yes.

Q. And the country for Walk-Air, Inc. is identified as Vanuatu; correct, sir?

A. Vanuatu is identified on this document; yes.

Q. And is Walk-Air, Inc. on this Government's Exhibit 829? I'm happy to bring it up there.

A. Yes, please.

Q. Sure.

A. Walk-Air, Inc. is identified right by your finger.

Q. Okay. And is the aircraft identified in the FAA registry as N584SD an asset?

A. N584SD is an asset.

Q. Thank you, sir. If we could go to the next one. I believe we're now at Government's Exhibit 366-20. Do you see that, sir?

A. Yes, sir.

Q. Would you agree with me, sir, that this document is a record kept in the normal course of business by the Federal Aviation Administration?

A. Yes, sir.

Q. Would you agree with me, sir, that this document specifically relates to an aircraft that's identified as N58478? I put a yellow mark there by it.

A. U.S. registration number N58478 is identified; yes, sir.

Q. Okay. And would you agree, sir, that the FAA registry reflects that this aircraft has a serial number?

A. A serial number is reflected there; yes.

Q. Okay. And the FAA registry further reflects that the type of registration is corporation; correct, sir?

A. Corporation is reflected on this document; yes.

Q. And just like the document before, the FAA registry reflects that the registered owner of this aircraft is a company called Walk-Air, Inc.; correct, sir?

A. Walk-Air, Inc. is reflected on this document; yes.

Q. And the location for Walk-Air, Inc. is identified in the country of Vanuatu; correct, sir?

A. The country reflected on here is Vanuatu.

Q. And if I need to, I can bring it back up, but I think we just did it, Walk-Air, Inc. is on this Government's Exhibit 829; correct, sir?

A. Yes, sir.

Q. Okay. And you'll agree with me will you not, sir, that according -- that the aircraft identified as N58478, is an asset?

A. U.S. registration number N58478 is an asset.

Q. Thank you, sir. If we can go to the next one. I believe we're at the second portion of Government's Exhibit 366-20. On the monitor, will you agree with me, sir, that the document reflected is a record kept in the normal course of business of the Federal Aviation Administration?

A. Yes.

Q. Would you agree with me, sir, that it deals

11:17AM 11:17AM 11:17AM 11:17AM 11:18AM 11:18AM 11:18AM 11:18AM 11:18AM 11:18AM 11:18AM 11:18AM 11:18AM 11:18AM 11:18AM 11:18AM 11:18AM 11:18AM 11:18AM 11:19AM 11:19AM 11:19AM 11:19AM 11:19AM 11:19AM

specifically with an aircraft that's identified as N6188C? 11:19AM

A. U.S. registration number N6188C is reflected. 11:19AM

Q. And the federal aviation registry reflects that there is a serial number for this aircraft; correct, sir? 11:19AM

A. A serial number is identified. 11:19AM

Q. And the federal aviation registry, will you agree, sir, reflects that this registration is a corporation; correct? 11:19AM

A. Corporation is identified on this document. 11:19AM

Q. And according to the FAA registry, the registered owner of aircraft N6188C, is a corporation called Bravo Air, Inc.; correct, sir? 11:20AM

A. Bravo Air, Inc. is identified here; yes. 11:20AM

Q. And the location for Bravo Air, Inc. is Vanuatu; correct, sir? 11:20AM

A. Vanuatu is identified. 11:20AM

Q. And Government's Exhibit 829, is Bravo Air, Inc. on that? Do I need to bring it up there? I'm happy to. 11:20AM

A. No. Bravo Air is on there. Yes, sir. 11:20AM

Q. Right there? 11:20AM

A. Yes, sir. 11:20AM

Q. Where my finger was? 11:20AM

A. Yes. 11:20AM

Q. Okay. And would you agree with me, sir, that the aircraft identified as N6188C is an asset? 11:20AM

A. U.S. registration number N6188C is an asset.

Q. Thank you, sir, we can go to the next one. I believe we're at Government's Exhibit 366-21, and that is a record kept in the normal course of business by the Federal Aviation Administration, isn't it, sir?

A. Yes.

Q. Known as the FAA registry; correct?

A. Yes.

Q. And this document specifically relates to an aircraft identified as N6188D; correct, sir?

A. U.S. registration number N6188D, is identified.

Q. And according to the FAA registry, this aircraft has a serial number; correct, sir?

A. Yes.

Q. And according to the FAA registry, the type of registration is a corporation; correct, sir?

A. Type of registry is a corporation; yes.

Q. And the FAA registry reflects that the registered owner is a company called Bravo Air, Inc.; correct, sir?

A. Bravo Air, Inc. is identified.

Q. All right. And the location for the corporation Bravo Air, Inc. is in the country of Vanuatu; correct, sir?

A. Vanuatu is identified.

Q. And, sir, this is Government's Exhibit 829. I'm happy to bring it up there. Is Bravo Air, Inc. on

Government's Exhibit 829?

A. Yes.

Q. Okay. Would you agree with me, sir, that the aircraft identified as N6188D is an asset?

A. U.S. registration number N6188D is an asset.

Q. Thank you, sir. We are now at Government's Exhibit 366-21. Would you agree with me, sir, that this is a record kept in the normal course of business by the Federal Aviation Administration?

A. Yes.

Q. And that this document reflected on the screen specifically relates to an aircraft identified as N6360S?

A. U.S. registration number N6360S is identified; yes.

Q. Okay. And does the registry reflect that there is a serial number for this aircraft.

A. There is a serial number; yes.

Q. Would you agree with me, sir, that the FAA registry reflects that the type of registration is a corporation, sir?

A. A corporation is identified; yes.

Q. All right. And according to the FFA registry, the registered owner is a company named Oceanside Helicopters, Inc.; correct, sir?

A. Oceanside Helicopters, Inc. is identified here; yes.

Q. Okay. And the location for the corporation Oceanside, Helicopter Inc. is the country of Vanuatu; correct,

sir?

A. Vanuatu is identified; yes.

Q. I'm going to take Government's Exhibit 829 again, sir. And I can bring it over there and have you look at it to look for Oceanside Helicopters, Inc.?

A. Yes, please.

Q. Okay. Is Oceanside Helicopters, Inc. identified on Government's Exhibit 829?

A. Yes, it's identified -- excuse me, it's identified by your finger.

Q. Okay. And would you agree with me, sir, that the aircraft identified as N6360S is an asset?

A. U.S. registration number N6360S is an asset.

Q. Thank you, sir. If we can go to the next one. I believe we are at Government's Exhibit 366-22. Do you see that document, sir?

A. Yes.

Q. And would you agree with me, sir, that this is a document kept in the normal course of business by the Federal Aviation Administration?

A. Yes.

Q. Would you agree with me, sir, that this document deals specifically with an aircraft identified as N66HH?

A. U.S. registration number N66HH is identified.

Q. And would you agree with me, sir, that the registry

reflects that there is a serial number for this particular aircraft?

A. A serial number is identified.

Q. And the FAA registry reflects that the type of registration is a corporation, isn't that true, sir?

A. Corporation is identified; yes.

Q. And the FAA registry reflects that the registered owner for this aircraft identified as N66HH, is a company called Jim's Air Repair, Inc. Would you agree, sir?

A. Jim's Air Repair, Inc. is identified; yes.

Q. Okay. And the location for Jim's Air Repair, Inc., according to the FAA registry, is a country called Vanuatu; correct, sir?

A. Vanuatu is identified.

Q. And I have in my hand or I'm picking it up right now, Government's Exhibit G-829. Is Jim's Air Repair on this document?

A. Could you bring it over here, please?

Q. Absolutely.

A. Thank you, sir. Jim's Air Repair, Inc. is identified by your finger; yes.

Q. Thank you, sir. And would you agree with me, sir, that the aircraft identified in the FAA registry as N66HH is an asset?

A. N66HH is an asset.

Q. Thank you, sir. If we can go to the next one. In front of you is the second half of Government's Exhibit G-366-22. Would you agree with me, sir, that this is a document kept in the normal course of business by the Federal Aviation Administration?

A. Yes.

Q. Would you agree with me, sir, that this document deals specifically with an aircraft identified as N660SL?

A. U.S. registration number N660SL is identified on this document.

Q. And the FAA registry further reflects that this aircraft has a serial number; correct, sir?

A. A serial number is reflected.

Q. And would you agree with me, sir, that the to FAA registry reflects that the type of registration is a corporation?

A. Corporation is identified.

Q. Okay. And the FAA registry, would you agree, sir, identifies the registered owner as a company called Tuna Copter, Inc.?

A. Tuna Copter, Inc. is identified.

Q. And the location identified in the registry for Tuna Copter, Inc. is a country of Vanuatu; correct, sir?

A. Vanuatu is identified.

Q. And I have in my hand Government's Exhibit 829, is

Tuna Copter, Inc. on this chart? I'll bring it over here.

A. Thank you, sir. Yes, it's right by your finger, Tuna Copter, Inc.

Q. Okay. And would you agree with me, sir, that the aircraft identified in the FAA registry as N660SL is an asset?

A. U.S. registration number N660SL is an asset.

Q. Thank you, sir. We're now looking at Government's Exhibit 366-23. Would you agree with me, sir, that this is a record kept in the normal course of business of the Federal Aviation Administration?

A. Yes.

Q. Further, that this record that we're looking at specifically deals with an aircraft identified as N74AM?

A. U.S. registration number N74AM is identified on this document.

Q. And the FAA registry further reflects that this aircraft has a specific unique serial number; correct, sir?

A. A serial number is reflected on this document; yes.

Q. Okay. And according to the registry, the type of registration is a corporation, right, sir?

A. Yes, corporation is identified.

Q. And the FAA registry reflects that the registered owner of this aircraft is a corporation called Fling Air, Inc.; correct, sir?

A. Fling Air, Inc. is identified on this document.

Q. And the location for Fling Air, Inc. is actually identified as Guam; correct, sir?

A. Yes, Guam is identified on this document.

Q. All right, sir. And is Fling Air, Inc., if you know, on this -- on Government's Exhibit 829, or do I need to bring it over there?

A. Could you bring it over, please?

Q. Sure, sure. Absolutely.

A. Fling Air, Inc. doesn't appear to match up with what's purported on this document because it's showing that it's reflected as a Vanuatu international company --

Q. I'm asking you, is that name on there, though?

A. The name is on this document; yes.

Q. Okay. And you'll agree with me, sir, that foreign corporations can have businesses in the United States; correct?

A. Are we talking about generally?

Q. Yes.

A. Generally, foreign corporations can have businesses in the U.S.

Q. You ever heard of Toyota?

A. Yes.

Q. Can you buy a Toyota in the United States?

A. Yes.

Q. Mitsubishi?

A. Yes.

Q. Is that a foreign corporation?

A. Yes.

Q. Can you buy a Mitsubishi in the United States?

A. Yes.

Q. Okay. So Fling Air, you'll agree with me, is identified on Government's Exhibit 829, right here where my finger is, right? You may not see it, but if you don't trust me, I'll bring it back over there?

A. No, Fling Air is on that document, but it doesn't necessarily match up with what's on here.

Q. Fling Air is on the document was my question, okay? Is Fling Air on the document?

A. Fling Air is on 829; yes.

Q. Okay. All right. And it's indicated to be the registered owner; correct, sir?

A. It's identified here as -- underneath registered owner.

Q. All right. And would you agree with me, sir, that according to the FAA registry -- I need to rephrase that. That the aircraft identified as N74AM, according to the FAA registry, is an asset?

A. U.S. registration number N74AM is an asset.

MR. MARTIN: Your Honor, I don't know how long you want me to go.

THE COURT: You still got --

MR. MARTIN: I didn't know what time lunch was.

THE COURT: 11:45 is when we start lunch.

MR. MARTIN: Okay. I've got time to go then, I'm sorry.

THE COURT: We have 13 minutes, now 12.

MR. MARTIN: Sorry, Your Honor.

THE COURT: Go ahead.

BY MR. MARTIN: (CONTINUING)

Q. If we could go to the next one. Before you, sir, is Government's Exhibit 366-23. Would you agree with me, sir, that that is a record from the FAA registry kept in the normal course of business?

A. Yes.

Q. Would you agree with me, sir, that document that we're looking at on the screen specifically relates to an aircraft identified as N755PC?

A. U.S. registration number N755PC is identified here.

Q. Very good. And would you agree, sir, that the FAA registry reflects a serial number?

A. A serial number is reflected; yes.

Q. And according to the U.S.A. -- according to the FAA registry, the type of registration is reflected as a corporation; correct, sir?

A. Corporation is identified; yes.

Q. And according to the FAA registry, the registered owner is a company called HH Helicopters; correct, sir?

A. HH Helicopters is identified; yes.

Q. And the country for HH helicopters is Vanuatu; correct, sir?

A. Vanuatu is identified.

Q. And in my hand is Government's Exhibit 829. Do you need to look at it to see whether or not HH Helicopters is on this chart?

A. HH Helicopters is on the chart that you're holding.

Q. Okay. And would you agree with me, sir, that the aircraft identified as N755PC is an asset?

A. U.S. registration number N755PC is an asset.

Q. If we could go to the next one.

THE COURT: Well, you're keeping us, you know, alert. The way you...

BY MR. MARTIN: (CONTINUING)

Q. Agent Khamvongsa, before you is Government's Exhibit 366-24, would you agree with me, sir, that this a record kept in the normal course of business by the Federal Aviation Administration?

A. Yes.

Q. Would you agree with me, sir, that this particular document on the screen relates to an aircraft identified as N805LA?

 A. U.S. registration number N805LA is identified.
Q. And the FAA registry reflects that this aircraft has a serial number; correct, sir?
A. A serial number is reflected.
Q. And the FAA registry reflects that the registered owner of this aircraft is Jim's Air Repair; correct, sir?
A. Jim's Air Repair is identified here; yes.
Q. And the location for Jim's Air Repair is reflected as Vanuatu; correct, sir?
A. Vanuatu is identified.
Q. An according to the FAA registry, the type of registration is a corporation, right, sir?
A. Corporation is identified.
Q. And I have Government's Exhibit 829. Do you know, sir, whether or not Jim's Air Repair is on this document, and I'm happy to bring it over there.
A. Yes, please.
Q. Okay.
A. Jim's Air Repair is identified right by your finger.
Q. Okay, sir. Thank you.
A. Thank you.
Q. And would you agree with me, sir, that the aircraft identified in the FAA registry as N805LA is an asset?
A. N805LA is an asset.
Q. Thank you, sir. Go to the next one. Before you is

Government's Exhibit 366-24. Would you agree with me, sir, that that is a record kept in the normal course of business by the Federal Aviation Administration?

A. Yes.

Q. Would you agree with me, sir, that that particular record from the FAA registry relates to the aircraft identified as N810M?

A. U.S. registration number N810M is identified on this document.

Q. All right, sir. Would you agree with me that the registry reflects that this aircraft has a serial number?

A. Yes.

Q. Would you agree with me, sir, that the FAA registry reflects that the type of registration for N810M is a corporation?

A. Corporation is identified.

Q. All right, sir. And according to the FAA registry, this official record, the registered owner is Bravo Air, Inc. Would you agree with that, sir?

A. Bravo Air, Inc. is identified on this document.

Q. And the location for Bravo Air, Inc. is the country of Vanuatu. Would you agree with that, sir?

A. Vanuatu is identified on this document.

Q. And on Government's Exhibit 829, do you know whether or not Bravo Air, Inc. is on this document?

A. Bravo Air, Inc. is on that document.

Q. Okay. And would you agree with me, sir, that the aircraft identified as N810M is an asset?

A. The U.S. registration number N810M is an asset.

Q. Thank you, sir. We're now looking at Government's Exhibit 366-25. Would you agree with me, sir, that this a record kept in the normal course of business by the Federal Aviation Administration?

A. Yes.

Q. And that this particular document deals specifically with an aircraft identified as N825LF?

A. U.S. registration N825LF is identified on this document.

Q. And that the registry reflects that this aircraft does have a serial number; correct, sir?

A. There is a serial number there; yes.

Q. And according to the FAA registry, the type of registration is a corporation, right, sir?

A. Corporation is identified; yes.

Q. And would you agree that according to the registry, the registered owner of N825LF is a company called Walk-Air, Inc.

A. Walk-Air, Inc. is identified on this document.

Q. And the location for Walk-Air, Inc. is the country Vanuatu?

A. Vanuatu is identified on this document.

Q. I have, sir, Government's Exhibit 829, happy to bring it up there, is Walk-Air, Inc. on this document, if you know?

A. Sure. Could you bring it up, please?

Q. Absolutely.

A. Walk-Air, Inc. is identified by your thumb.

Q. All right, sir. My fingers and thumbs are getting identified a lot. Would you agree with me, sir, that the aircraft identified by N825LF, is an asset?

A. U.S. registration number N825LF is an asset.

Q. Thank you, sir. We could go to the next one?

THE COURT: You got five minutes.

MR. MARTIN: Thank you, Your Honor.

THE COURT: Okay.

BY MR. MARTIN: (CONTINUING)

Q. Before you is the second half of G-366-25. Again, a document kept in the regular course of business by the Federal Aviation Administration, sir?

A. Yes.

Q. And this particular document relates specifically to an aircraft identified as N831FG; correct?

A. U.S. registration number N831FG is identified on this document.

Q. And in particular, the registry reflects that it has a serial number, sir; correct?

A. A serial number is identified here.

Q. And according to the registry, the type of registration is a corporation; correct, sir?

A. A corporation is identified.

Q. All right. And the registry reflects that the registered owner of N831FG, is a company called Marlin Bay Helicopters, Inc.; correct, sir?

A. Marlin Bay Helicopters, Inc. is identified.

Q. And the country for Marlin Bay Helicopters, Inc. is Vanuatu; correct, sir?

A. Vanuatu is identified.

Q. All right, sir. I have Government's Exhibit 829 in my hand. Do you know, sir, whether or not Marlin Bay Helicopters is on this document? I'm happy to bring it up.

A. Yes, please.

Q. Okay.

A. Marlin Bay Helicopters, Inc. is identified by your finger.

Q. All right, sir. And would you agree with me, sir, that the aircraft identified in the FAA registry as N831FG is an asset?

A. U.S. registration number N831FG is an asset.

Q. Thank you, sir. We could go to the next one. We're now looking at Government's Exhibit 366-26. Do you see that, sir?

A. Yes, sir.

Q. And would you agree, sir, that this is a record kept in the normal course of business by the Federal Aviation Administration?

A. Yes, sir.

Q. And would you agree with me that that particular record of the Federal Aviation Administration deals specifically with an aircraft identified as N831F -- 8312F, I stand corrected.

A. U.S. registration number N8312F is identified.

Q. All right, sir. And according to the registry, this helicopter has a serial number; correct, sir?

A. A serial number is reflected.

Q. And the FAA registry, would you agree with me, sir, reflects that the registered owner for this particular aircraft, N8312F, is a company called Rosie Air Support, Inc.; correct?

A. Rosie Air Support, Inc. is reflected on this document; yes.

Q. All right. And the country for the location of Rosie Air Support, Inc. is Vanuatu; correct, sir?

A. Vanuatu is identified here; yes.

Q. And the type of registration for Rosie Air Support, Inc. is corporation; correct?

A. Corporation is identified on this document; yes.

Q. And if we go to Government's Exhibit 829, do you know whether or not Rosie Air, Inc., if I'm saying that right? Rosie Air Support, Inc. is on that document? I could bring it up there?

A. Yes, please. Rosie Air Support, Inc. is right by your finger.

Q. Thank you, sir. And would you agree with me, sir, that the aircraft identified in the registry as N8312F is an asset?

A. U.S. registration number N8312F is an asset.

Q. Thank you, sir. We're now looking at Government's Exhibit 366-26, would you agree with me, sir, that this is a document kept in the normal course of business by the Federal Aviation Administration?

A. Yes.

Q. Would you agree with me, sir, that this particular document deals with an aircraft identified as N8315F?

A. U.S. registration N8351 -- 15F is identified.

Q. And this aircraft, according to the registry, has a serial number; correct, sir?

A. There is a serial number.

Q. And the type of registration according to the registry is the corporation; correct, sir?

A. Corporation is identified.

Q. And according to the registry, the registered owner

is a company called Rosie Air Support, Inc.; correct, sir?

A. Rosie Air Support, Inc. is identified.

Q. And the location for Rosie Air Support, Inc. is Vanuatu; correct, sir?

A. Vanuatu is identified.

Q. And I believe we just did it, but I'm happy to do it again, Government's Exhibit 829, is Rosie Air Support, Inc. on the document?

A. Rosie Air Support, Inc. is on that document.

Q. Okay. And you would agree with me, sir, that the aircraft identified in the FAA registry is N8315F is an asset?

A. U.S. registration number N8315F is an asset.

Q. Thank you, sir.

THE COURT: Is this a good time to --

MR. MARTIN: Sure, Your Honor.

THE COURT: Okay. Good for you, Mr. Martin?

MR. MARTIN: Yes, Your Honor. I'm sorry. Good for me.

THE COURT: Okay. Ladies and gentlemen of the jury, we'll go ahead and take our lunch recess. Keep an open mind. Do not form or express any opinion on this case until it's submitted to you, and I will see you guys in 45 minutes. Have a nice lunch.

(Jury out at 11:45 a.m.)

THE COURT: How much longer, Mr. Martin, do you

11:44AM 11:44AM 11:44AM 11:44AM 11:44AM 11:44AM 11:44AM 11:45AM 11:45AM 11:45AM 11:45AM 11:45AM 11:45AM 11:45AM 11:45AM 11:45AM 11:45AM 11:45AM 11:45AM 11:45AM 11:45AM 11:45AM 11:45AM 11:45AM 11:46AM

think?

MR. MARTIN: 30, 40 minutes max, Judge.

THE COURT: Okay. Just checking.

MS. M. MILLER: (Laughing.) Sorry. Your Honor, the government is willing to stipulate that the records that Mr. Martin is painfully going through all say that the name of the Vanuatu company is the registered owner of an aircraft.

THE COURT: Well, does he want you to stipulate?

MS. M. MILLER: I don't know, I think --

THE COURT: Probably not because if he did --

MS. M. MILLER: Kill time.

THE COURT: Well --

MR. MARTIN: I don't think trying to prove that the government has failed to prove their case beyond a reasonable doubt can be classified as killing time, Your Honor. I respectfully decline their stipulation.

THE COURT: I figured that.

MS. M. MILLER: Okay. It was worth a try, Your Honor.

THE COURT: Yeah, you should have asked him before.

MS. M. MILLER: Yeah, well, I know.

MS. S. MILLER: We hadn't had a break yet.

MS. M. MILLER: Yeah, I didn't want to interrupt him.

THE COURT: I know. But if you really wanted -- he wasn't going to stipulate.

(Recess taken at 11:47 a.m.)

(Back on the record at 12:40 p.m.)

THE COURT: Shall we call in the jury? All Counsel is present. We'll call in the jury.

Ms. Miller, how long do you think will be your redirect? I'm just trying to figure out if we're going to be able to have your next witness today.

MS. M. MILLER: Well, I'd love to get to him, but I have a feeling that we are not going to.

THE COURT: Oh, why?

MS. M. MILLER: I think just the way this is going, Your Honor. We still have a bunch of pages. If Mr. Martin continues down this path, it's going it take quite a long time, which will require, unfortunately, me to cover more area.

THE COURT: Well, he might stipulate to it.

MR. MARTIN: I'll stipulate to her cross, Your Honor -- her redirect.

THE COURT: Okay. I don't know what that means. But how do you stipulate to cross? You mean, like, stipulate that there be no cross?

MR. MARTIN: No redirect.

THE COURT: I mean -- oh, well, there'd be no

redirect if you guys didn't cross.

MS. M. MILLER: Of course not.

MR. MARTIN: And we wouldn't be in trial if they didn't indict, Judge.

THE COURT: Well, okay. We don't want to go there because I can hear the next rebuttal on that. So --

MS. M. MILLER: Probably know it by heart.

THE COURT: All right. We'll call in the jury. So you don't -- okay. So you don't think you'll done with the witness?

MS. M. MILLER: I would think if --

THE COURT: This afternoon.

MS. M. MILLER: If Mrs. Martin does in fact only take an hour, which I doubt, then I will be done today with this witness. If he goes longer than that, I cannot guarantee that I will be.

THE COURT: I see. And then who is your next witness?

MS. M. MILLER: Jeff Guzzetti.

THE COURT: And how long is Mr. Guzzetti, you think, for you?

MS. M. MILLER: I will be done with him in half a day, Your Honor.

THE COURT: Okay. All right. So I'm looking at my schedule for tomorrow. We thought we -- go ahead. You can

call in the jury. We'll talk about this -- so we thought we'd be done by, you know.

MS. M. MILLER: Yes, that's what I was hoping too.

THE COURT: It's now Thursday. And so... yeah, let me look at my schedule because we have -- I have off-island trainers here for our Court. So I need -- I'll talk with you guys afterwards on just the timing might be changed -- it will probably change tomorrow a little bit.

MS. M. MILLER: Thank you, Your Honor.

THE COURT: I want to get your -- the feeling of how we're going to go, you only have two more witnesses after this agent.

MS. M. MILLER: Yes, Your Honor.

THE COURT: Okay. Please be seated. Ladies and gentlemen, thank you. And you may continue to proceed, Mr. Martin.

MR. MARTIN: Thank you, Your Honor. I believe we left off, if we could put back up on the monitor, Government's Exhibit 366-26.

BY MR. MARTIN: (CONTINUING)

Q. Sir, I believe this was the one we just finished, the one with Rosie Air Support. Do you recall that, sir?

A. This is U.S. registration N8315F. I'm not sure if we just did this last, sorry.

Q. Well, let me just -- this is a record kept in the regular course of business by the Federal Aviation Administration; correct?

A. Yes.

Q. And this directly relates to an aircraft registration number November 8315F; correct, sir?

A. U.S. registration number N8315F; yes.

Q. With a serial number; correct, sir?

A. Yes.

Q. And the FAA registry reflects that the type of registration is a corporation; correct, sir?

A. Corporations identified; yes.

Q. And you'll agree with me, won't you, sir, that the FAA registry reflects that the registered owner of this aircraft is a company called Rosie Air Support, Inc., right, sir?

A. Rosie Air Support, Inc. is identified; yes.

Q. And the location of Rosie Air Support, Inc., according to the FAA registry, is the country of Vanuatu; correct, sir?

A. Vanuatu is identified; yes.

Q. And is Rosie Air Support, Inc. identified in Government's Exhibit G0829?

A. Yes.

Q. Okay. And you'll agree with me, will you not, sir,

that the aircraft identified in the FAA registry as N8315F is an asset?

A. U.S. registration number N8315F is an asset.

Q. Thank you, sir. If we can go to the next one. This is Government's Exhibit G-366-27. Will you agree with me, sir, that that is a record from the Federal Aviation Administration kept in the normal course of business?

A. Yes.

Q. Would you agree, sir, that this specific record relates to the aircraft identified by the numbers N846D?

A. U.S. registration N846D is identified.

Q. And would you agree, sir, that this -- pardon me. This aircraft, according to the registry, has a serial number?

A. Serial number is identified.

Q. All right, sir. And the FAA registry indicates that the type of registration say corporation; correct, sir?

A. Corporation is identified.

Q. And according to the FAA registry, the registered owner of N846D is a corporation called Echo Air, Inc.; correct, sir?

A. Echo Air, Inc. is identified.

Q. And the location of Echo Air, Inc. is the country of Vanuatu; correct, sir?

A. Vanuatu is identified.

Q. And, sir, if you know, is Echo Air, Inc. on

Government's Exhibit 829, and I'm happy to bring it up there if you need to see it? 12:46PM

A. Yes, please. 12:46PM

Q. Okay. 12:46PM

A. Yes, Echo Air, Inc. is identified where you're pointing. 12:46PM

Q. Thank you, sir. And would you agree with me, sir, and I apologize, something in my throat, but would you agree with me, sir, that the aircraft identified as N846D in the FAA registry is an asset? 12:47PM

A. U.S. registration number N846D is an asset. 12:47PM

Q. Thank you, sir. If we could go to the next one. I believe that's going to be Government's Exhibit 366-27. Is that a record that is kept in the normal course of business by the Federal Aviation Administration, sir? 12:47PM

A. Yes. 12:47PM

Q. And this particular document on the screen in front of you, would you agree with me, sir, that it relates to the aircraft identified as N901TM? 12:47PM

A. U.S. registration number N901TM is identified. 12:48PM

Q. All right, sir. And this aircraft has a serial number; correct, sir? 12:48PM

A. Yes. 12:48PM

Q. And would you agree with me, sir, that the -- according to the FAA registry, this registration is that for a 12:48PM

corporation?

A. It's a corporation.

Q. All right, sir. And according to the FAA, the registered owner of N901TM is a company called South Pacific Spotter[sic], Inc.; correct, sir?

A. Based on what was provided to the FAA registry, South Pacific Spotters, Inc. is identified.

Q. Are you agreeing with me that's what the registry shows, sir?

A. The registry reflects that.

Q. Okay. And the location of the company, South Pacific Spotters, Inc. is Vanuatu; correct, sir?

A. Vanuatu is identified.

Q. All right, sir. And I have Government's Exhibit G-0829. And would you agree with me, sir, that South Pacific Spotters is on this document? I'm happy to bring it up there.

A. Sure, please. Yes, South Pacific Spotters is identified where you're pointing.

Q. All right, sir. Thank you. And, sir, is the aircraft that's identified in the FAA registry as N901TM an asset?

A. U.S. registration number N901TM is identified as an asset, or is an asset, excuse me.

Q. Is an asset?

A. Yes.

Q. Okay. Thank you, sir. We could go to the next one. In front of you, sir, is Government's Exhibit 366-28. Do you see that document?

A. Yes.

Q. Sir, is this a record that is kept in the normal course of business by the Federal Aviation Administration?

A. Yes.

Q. And would you agree that the particular document that we are looking at on the screen specifically relates to an aircraft identified as N90176?

A. U.S. registration number N90176 is identified on this document.

Q. All right, sir. And does this aircraft, the FAA registry reflect that this aircraft has a serial number?

A. A serial number is reflected.

Q. All right, sir. And does the FAA registry reflect the type of registration as that of a corporation?

A. Yes.

Q. And would you agree with me, sir, that according to the FAA registry, the registered owner for aircraft number N90176 is a company called Spotters, Inc.?

A. Spotters, Inc. is identified on this document.

Q. And the location for the registered owner Spotters, Inc., would you agree, sir, is the country of Vanuatu?

A. Vanuatu is identified.

Q. And, sir, I have Government's Exhibit 829. If I need to bring it up there for you, which it looks like I need to. Would you agree with me, sir, that Spotters, Inc. is on Government's Exhibit 829?

A. Spotters, Inc. is identified where you're pointing.

Q. Okay, sir. Thank you. Now, sir, would you agree with me that the aircraft that is identified as N90176, according to the FAA registry, is an asset?

A. U.S. registration N90176 is an asset.

Q. Thank you, sir. If we could go to the next. This is the second half of Government's Exhibit 366-28. Would you agree with me, sir, that this is a record kept in the normal course of business by the Federal Aviation Administration?

A. Yes.

Q. Would you also agree with me, sir, that this document we are looking at on the screen specifically refers to an aircraft which has been identified by the FAA by the number November 903F?

A. U.S. registration number N903F is identified.

Q. All right, sir. And the registry reflects this particular aircraft has a serial number; correct, sir?

A. Serial number is identified.

Q. All right. The registry reflects that the aircraft number 903 -- N903F is registered as a corporation, right, sir?

A. Corporation is identified.

Q. And according to the registry, the registered owner of N903F is a company called Marlin Bay Helicopters, Inc.; correct, sir?

A. Marlin Bay Helicopters, Inc. is identified.

Q. And would you agree with me, sir, that according to the registry, the location for Marlin Bay Helicopters, Inc. is the country Vanuatu?

A. Vanuatu is identified.

Q. All right, sir. Now, I have Government's Exhibit 829, do you know, sir, whether or not Marlin Helicopters or -- not Marlin, but Marlin Bay Helicopters, Inc. is on this?

A. Marlin Bay Inc. -- Marlin Bay Helicopters, Inc. is on that document.

Q. On Government's Exhibit 0829?

A. Yes, on the corporate structure there.

Q. All right, sir. And would you agree with me, sir, that the aircraft identified in the FAA registry as N903F is an asset?

A. U.S. registration number N903F is an asset.

Q. All right, sir. If we could go to the next one. Sir, we are looking at Government's Exhibit 366-29. Do you see that, sir?

A. U.S. registration N9056F is identified on this

12:52PM 12:52PM 12:53PM 12:53PM 12:53PM 12:53PM 12:53PM 12:53PM 12:53PM 12:53PM 12:53PM 12:53PM 12:53PM 12:53PM 12:53PM 12:53PM 12:53PM 12:53PM 12:53PM 12:53PM 12:53PM 12:54PM 12:54PM 12:54PM 12:54PM

document.

Q. Okay. Thank you. And would you agree with me, sir, that the document that we are looking at is a document that is kept in the normal course of business by the Federal Aviation Administration?

A. Yes.

Q. And would you agree with me, sir, that that document reflects that the helicopter number N9056F has a serial number?

A. Yes.

Q. And according to the FAA registry, 9056F is registered as a corporation; correct, sir?

A. Corporation; yes.

Q. All right. And according to the registry, the registered owner of 9056F is a company called Limey Air Service, Inc. Would you agree with that, sir?

A. Limey Air Service, Inc. is identified on this document; yes.

Q. All right. The location, according to the FAA registry for Limey Air Service, Inc., is the country of Vanuatu; correct, sir?

A. Identified is Vanuatu.

Q. All right. And, sir, pardon me, I have Government's Exhibit 829, is Limey Air, Inc. on this document, or do you need me to bring it up there for you to look at it?

 A. Yes, please. Yes, it's identified by your -- where you're pointing.
Q. All right, sir.
A. Thank you.
Q. Thank you, sir. And would you agree with me, sir, the aircraft identified as N9056F according to the FAA registry is an asset?
A. November -- U.S. registration N9056F is an asset.
Q. Thank you, sir. In front of you, sir, is Government's Exhibit G-360-29. Do you see that document, sir?
A. Yes.
Q. Would you agree with me, sir, that that document is a record that is kept in the regular course of business by the Federal Aviation Administration?
A. Yes.
Q. And specifically, this document, sir, would you agree, relates to an aircraft that has a registration number of N9057F?
A. U.S. registration N90F -- 57F is identified here.
Q. All right, sir. And this aircraft, also according to the FAA registry, has a serial number, right, sir?
A. Yes.
Q. And according to the FAA registry, sir, would you agree with me that this registration indicates that 9057F is a corporation?

12:55PM 12:55PM 12:55PM 12:55PM 12:55PM 12:55PM 12:56PM 12:56PM 12:56PM 12:56PM 12:56PM 12:56PM 12:56PM 12:56PM 12:56PM 12:56PM 12:56PM 12:56PM 12:56PM 12:56PM 12:56PM 12:56PM 12:56PM 12:56PM 12:57PM

A. Yes.

Q. And according to the FAA registry, sir, the registered owner of 9057F is Wilma's Flight Services, Inc. Would you agree with that, sir?

A. Yes.

Q. And the location of Wilma's Flight Services, Inc. is the country of Vanuatu. Would you agree with that, sir?

A. Yes.

Q. And if we go to Government's Exhibit 829, I'm happy to bring it up there, do you know whether or not Wilma's Flight Services is on this chart?

A. Wilma's Flight Services, Inc. is on the chart.

Q. All right, sir. And would you agree with me, sir, that the aircraft identified in the FAA registry is N5 -- excuse me, N9057F is an asset?

A. U.S. registration N9057F is an asset.

Q. All right, sir. If we could go to the next one. Sir, we're looking at Government's Exhibit 366-30; do you see that document?

A. Yes.

Q. Would you agree with me, sir, that this is a document that is kept in the normal course of business by the Federal Aviation Administration?

A. Yes.

Q. Would you agree that this particular document deals

specifically with an aircraft that is identified in the FAA registry as N907HH?

A. U.S. registration N907HH is identified.

Q. All right, sir. And would you agree with me, pardon me, just a second. Would you agree with me, sir, that that aircraft, according to the FAA registry, has a serial number?

A. Serial number is identified.

Q. All right, sir. And according to the FAA registry, the type of registration is a corporation; correct, sir?

A. Corporation is identified.

Q. And according to the FAA registry, the registered owner of aircraft number N907HH is a company called Limey Air Services, Inc.; correct, sir?

A. Limey Air Services, Inc. is identified on this document.

Q. And the location for Limey Air Services, Inc., according to the FAA registry, is the country of Vanuatu; correct, sir?

A. Vanuatu is identified.

Q. And is Limey Air Services, Inc., if you know, sir, on Government's Exhibit G-0829?

A. Um --

Q. I'm happy to bring it up there.

A. Yes.

Q. Right here where my finger is?

12:58PM 12:58PM 12:58PM 12:58PM 12:58PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 12:59PM 01:00PM

A. Yes; yes.

Q. All right. Would you agree with me, sir, that the aircraft identified in the FAA registry as N907HH is an asset?

A. U.S. registration number N907HH is an asset.

Q. All right, sir. Thank you very much. We could go to the next one. All right, sir. This is the second part of Government's Exhibit 366-30. Will you agree, sir, that this is a record that is kept in the normal course of business by the Federal Aviation Administration?

A. Yes.

Q. Will you agree with me, sir, that this particular exhibit that we're looking at on the screen deals specifically with the aircraft that has been identified in the registry as N910WC?

A. U.S. registration N910WC is identified.

Q. All right, sir. And the FAA registry reflects that this aircraft has a serial number, right, sir?

A. A serial number is identified.

Q. And according to the FAA registry, would you agree, sir, the type of registration for N910WC is a corporation?

A. Corporation is identified.

Q. All right, sir. Now, would you agree that according to the FAA registry, the registered owner of N910WC is a corporation called Bean Bag Helicopter Services, Inc.?

A. Beep Bag Helicopter Service, Inc. is identified.

Q. And the location, according to the registry, for the company Bean Bag Helicopter Services, Inc. is the country of Vanuatu; correct, sir?
A. Vanuatu is identified.
Q. All right, sir. And if you know, I have in my hand Government's Exhibit 829. Do you know whether or not Bean Bag Services is on this document?
A. Bean Bag Services is the -- is on that document as a parent company of the Vanuatu companies.
Q. All right, sir. Thank you. And would you agree with me, sir, that the aircraft that's been identified as N910WC, according to the FAA registry, is an asset?
A. U.S. registration N910WC is an asset.
Q. All right, sir. Thank you. If we could go to the next one. We're looking at Government's Exhibit 366-31. Would you agree with me, sir, that the document we are looking at is a document kept in the normal course of business by the Federal Aviation Administration?
A. Yes.
Q. And particularly, this document -- in particular, the document that is on the screen, would you agree that it deals specifically with the aircraft that's been identified as N911GP?
A. U.S. registration N911GP is identified.
Q. All right, sir. And according to the registry,

 N911GP has a serial number, right, sir?

A. Yes.

Q. And according to the registry, N911GP is registered as a corporation; correct, sir?

A. Corporation is identified.

Q. And would you agree, sir, that the registered owner, according to the registry, of N911GP is a corporation called South Pacific Spotters, Inc.?

A. South Pacific Spotters, Inc. is identified.

Q. And according to the registry, the location of the corporation South Pacific Spotters, Inc. is the country of Vanuatu?

A. Vanuatu is identified.

Q. And, sir, I've got Government's Exhibit 829 here, and I'm happy to bring it up there. Do you know whether or not South Pacific Spotters, Inc. is on this document?

A. It is.

Q. Okay. And, sir, here we are. Would you agree with me, sir, that the aircraft identified in the FAA registry is N911GP is an asset?

A. U.S. registry -- or U.S. registration N911GP is an asset.

Q. All right, sir. Thank you. We could go to the next one. In front of you, sir, is Government's Exhibit 366-31. Would you agree with me, sir, that that is a record that is

kept in the normal course of business by the Federal Aviation Administration?

A. Yes.

Q. And in particular, the record that is on the screen in front of you, would you agree, deals specifically with an aircraft that is identified as N9162F?

A. U.S. registration number N9162F is identified.

Q. And the registry reflects, would you agree, sir, that there is a serial number for that aircraft?

A. A serial number is identified.

Q. And according to the registry, the registration for N9162F is a corporation. Is that correct, sir?

A. A corporation is identified.

Q. And would you agree, sir, that the registered owner is a corporation by the name of Rosie Air Support, Inc.

A. Rosie Air Support, Inc. is identified.

Q. And the location of Rosie Air Support, Inc. is in the country of Vanuatu. Would you agree with that, sir?

A. Vanuatu is identified.

Q. And, sir, I've got again Government's Exhibit No. 829, the chart. Would you agree with me, sir, that Rosie Air Support, Inc. is on this chart? If I need to bring to it over there, I will.

A. No, I do recall it being on that chart. Thank you.

Q. All right. In particular, sir, would you agree that

the aircraft identified in the FAA registry as N9162F is an asset?

A. U.S. registration N9162F is an asset.

Q. All right, sir. Thank you. Now, sir, I have in front of us Government's Exhibit 366-32. Would you agree with me, sir, that that is a record kept in the normal course of business by the Federal Aviation Administration?

A. Yes.

Q. Would you agree with me, sir, that the document on the screen specifically relates to the aircraft identified in the registry as N9212F?

A. U.S. registration N9212F is identified on this document.

Q. All right, sir. Would you agree with me, sir, that according to the registry, this aircraft has a serial number?

A. A serial number is identified.

Q. And according to the registry, sir, N9212F is registered as a corporation; correct, sir?

A. The helicopter is not registered as a corporation.

Q. The type of registration is a corporation; correct, sir?

A. Yes.

Q. All right. Thank you. And the registry reflects that the registered owner for N9212F is a company called Judy's Helicopter Service, Inc. Would you agree with that,

sir?

A. Judy's Helicopter Service, Inc. is identified on this document; yes.

Q. Okay. And the location for Judy's Helicopter Service, Inc. is a country of Vanuatu; correct, sir?

A. Vanuatu is identified on this document.

Q. And do you know, sir, whether or not Judy's Helicopter Service, Inc. is on Government's Exhibit G-0829[sic]?

A. Could you bring it by, please?

Q. Absolutely.

A. Judy's Helicopter, Inc. is identified where your finger is at.

Q. All right, sir. And would you agree with me, sir, that the aircraft identified as N9212F, according to the FAA registry, is an asset?

A. U.S. registration N9212F is an asset.

Q. All right, sir. If we could go to next one. In front of you, sir, is Government's Exhibit 366-32. Would you agree with me, sir, that this is a record kept in the normal course of business of the Federal Aviation Administration?

A. Yes.

Q. Would you agree with me, sir, that the document now on the screen relates specifically to an aircraft identified by the registry as N9237F?

A. U.S. registration N9237F is identified.

Q. All right, sir. And would you agree with me, sir, that the FAA registry reflects that this helicopter has a serial number?

A. A serial number is identified.

Q. And that according to the registry, this helicopter, excuse me, according to the registry, the type of registration is a corporation, sir?

A. Yes, corporation is identified.

Q. And the registered owner, according to the registry, is a corporation called Fling Air, Inc. You see that, sir?

A. Fling Air, Inc. is identified here; yes.

Q. All right. And the location for Fling Air, Inc. is the country of Vanuatu; correct, sir?

A. Vanuatu is identified here.

Q. All right. And if we go to Government's Exhibit G-0829, do you know, sir, whether or not Fling Air, Inc. is on this document?

A. Yes.

Q. Okay. And would you agree with me, sir, that the aircraft that's been identified as N9237F is an asset?

A. U.S. registration N9237F is an asset.

Q. All right, sir. If we could go to the next one. In front of you, sir, is what's been marked and admitted for identification -- and admitted as Government's Exhibit 366-33.

Is that a record that is kept in the regular course of business by the Federal Aviation Administration, sir?

A. Yes.

Q. And particularly, the document on the screen, sir, would you agree with me relates to the aircraft that is identified as N9263F?

A. U.S. registration N9263F is identified.

Q. Would you agree, sir, that according to the registry, helicopter 9236F has a serial number?

A. A serial number is reflected.

Q. And the type of registration for N9236F is a corporation; correct, sir?

A. A corporation is reflected.

Q. An the registered owner is a corporation by the name of Ohara Helicopters, Inc.; correct, sir?

A. Ohara Helicopters, Inc. is identified.

Q. And the location of Ohara -- Ohara Helicopters, Inc. is a country of Vanuatu; correct, sir?

A. Vanuatu is identified.

Q. Sir, again, I have Government's Exhibit 0829 in my hand. Do you know whether or not Ohara Helicopters, Inc. is identified on this document?

A. Can I see the --

Q. Absolutely.

A. Ohara Helicopters, Inc. is identified here on this

document by your finger.

Q. All right, sir. And would you agree with me, sir, that the aircraft identified as N9236F, according to the FAA registry, is an asset?

A. U.S. registration number N9263F is an asset.

Q. All right, sir. Before you, sir, is Government's Exhibit 366-33. Is this a record kept in the normal course of business by the Federal Aviation Administration?

A. Yes.

Q. And would you agree with me, sir, that this particular FAA document relates specifically to an aircraft identified in the registry as N9938A?

A. U.S. registration N9938A is identified.

Q. And would you agree, sir, that this particular document reflects that this aircraft has a serial number?

A. Yes, there is a serial number identified.

Q. And that the FAA registry reflects that the type of registration is a corporation, sir?

A. The type of registration is a corporation.

Q. And the registered owner is a corporation called South Pacific Spotters, Inc. Do you see that, sir?

A. South Pacific Spotters, Inc. is identified.

Q. All right, sir. And the location of South Pacific Spotters, Inc. is the country of Vanuatu; correct, sir?

A. Vanuatu is identified.

01:13PM 01:13PM 01:13PM 01:13PM 01:13PM 01:13PM 01:13PM 01:13PM 01:13PM 01:13PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:14PM 01:15PM 01:15PM

Q. All right. And do you know, sir, whether or not South Pacific Spotters, Inc. is identified on Government's Exhibit G-0829?

A. Yes.

Q. All right, sir. Thank you. And would you agree with me, sir, that the aircraft that's identified as N9938A, according to the FAA registry, is an asset?

A. According to this, U.S. registration N9938A would be an asset.

Q. All right, sir. Sir, before you is Government's Exhibit G-366-34. Do you see that document, sir?

A. Yes.

Q. Would you agree with me, sir, that this is a document that's kept in the normal course of business by the New Zealand Civil Aviation Authority?

A. Yes, but this was actually, I mean, all the documents talked about has been provided by the Hansen Helicopters.

Q. I'm asking you, do you recognize this as a document that is kept in the normal course of business by the New Zealand Civil Aviation Authority?

A. Yes.

Q. All right, sir. And would you agree with me, sir, that this particular document deals with an aircraft with a registration mark -- ZKHIA?

A. This document identifies ZKHIA as being New Zealand

registered.

Q. All right, sir. And it reflects that this aircraft has a serial number; correct, sir?

A. Yes.

Q. And it's now, if we could scroll up just a little bit. It is -- shows that Jon Darrell Walker is entitled to the possession of that aircraft; correct, sir?

A. Jon Darrell Walker owns that aircraft.

Q. Well, it says, "name persons entitled to possession of aircraft for a period of 28 days or longer"; if I read that right.

A. Jon Darrell Walker is identified there; yes.

Q. Okay. All right. All right, sir. And would you agree with me, sir, that the aircraft that's identified as ZKHIA is an asset?

A. New Zealand registered ZKHIA would be an asset.

Q. All right, sir.

MR. MARTIN: May I have just a second, Your Honor?

THE COURT: Yes, that's fine.

BY MR. MARTIN: (CONTINUING)

Q. In front of you, sir, I believe, is what's been identified as Government's Exhibit 366-35. Do you recognize that exhibit as a document that is kept in the normal course of business by the New Zealand Civil Aviation Authority?

        A. Yes.

Q. And would you agree, sir, that this particular document deals specifically with an aircraft identified as ZKHMF?

A. ZKHMF is a New Zealand-registered aircraft.

Q. And would you agree, sir, that this aircraft has a serial number?

A. Yes.

Q. And does it indicate that Mr. Walker is entitled to possess that aircraft for 28 days or longer, sir?

A. Yes, sir, and he's on that document as well.

Q. And does it show in particular that this is care of Oceania Aviation Limited, sir?

A. As to the address; yes.

Q. Right. All right, sir. And would you agree with me, sir, that the aircraft identified as ZKHMF is an asset?

A. It's an asset to Jon Walker; yes.

Q. All right, sir. It's an asset too, right, sir? It's just an asset?

A. Just an asset, if we're limited to that; yes.

Q. That's what I'm asking, is it an asset?

A. Yes, yes.

Q. Thank you, sir. Okay, sir. Sir, in front of you is Government's Exhibit 366-36. Do you recognize that as a document kept in the normal course of business by the

Department of Transportation for the Republic of the Philippines?

A. This is similar to what I've seen; yes.

Q. All right. Would you agree with me, sir, that this is a certificate of registration for the Philippines, in particular, relating to an aircraft identified as RPC588?

A. RPC588 is identified on this document.

Q. And would you agree with me, sir, that this aircraft has a serial number?

A. A serial number is reflected on this document.

Q. All right, sir. And, sir, let me ask you, would you agree that the aircraft identified as RPC588 in this document from the Philippines, the certificate of registration, is an asset?

A. RPC588 Philippine-registered helicopter would be an asset.

Q. All right, sir. Thank you. And --

(Pause.)

BY MR. MARTIN: (CONTINUING)

Q. Would you agree with me, sir, that any helicopter, whether or not it is registered or not, is an asset?

A. To who, or just in general?

Q. Just in general, a helicopter is an asset?

A. To the owner; yes. An asset to the owner. If we're just talking generally; yes.

Q. Okay. Let me ask you, sir -- oh, I forgot we need to pull that back up, I need to go back to one document. I forgot. Just a second. I apologize. I would like to go back to Government's Exhibit 366-23. If we could bring that up. Okay. This is -- do you recall -- this is Government's Exhibit 366-23. Would you agree, sir, this is a record that was kept in the regular course of business by the Federal Aviation Administration?

A. Yes.

Q. And it's a document relating -- in particular to N74AM, which you previously testified about; correct?

A. U.S. registration N74AM; yes, I recall talking about this earlier before the break.

Q. As a matter of fact, pardon me, dealt with a corporation by the name of Fling Air, Inc. Do you recall that, sir?

A. I recall Fling Air, Inc.; yes.

Q. And do you recall in that particular -- in this particular case, relating to this particular aircraft, the location of Fling Air, Inc. was Guam. Do you recall that, sir?

A. Yes.

Q. And do you recall my questions about you -- to you relating to Toyota, Mitsubishi, that corporations, foreign corporations, can operate in the United States. Do you recall

those questions?

A. If we're talking in general, foreign corporations can operate in the U.S.

Q. Okay. Well I'm -- that's what I meant.

A. Okay.

Q. And would you agree with me, sir, that this FAA registry, this document, identified in Government's Exhibit 366-23 reflects that this is a foreign corporation?

A. No, that's incorrect.

Q. That's incorrect? Do you see the word "foreign" there, sir?

A. I see that.

Q. Okay. All right. Well, if we can go on, I'm through with this document. Would you agree, sir -- I want to go back to the contracts. If you don't remember, I'm happy to pull one up, and we can go over it. But would you agree, sir, that the contracts, the leases in this case, which form part of your investigation relating to Counts 100 through 104, those are the wire fraud counts, right, sir?

A. The leases cover the entirety, so it also includes 99 as well.

Q. Well, right now I'm talking about -- do you have the indictment in front of you? I think I gave it to you this morning.

A. Yes.

Q. Okay.

A. You just want me to focus on those particular counts?

Q. Well, the wire fraud counts relate to 100 through 104. Would you agree with that, sir?

A. It's part of the evidence; yes.

Q. No, I said the wire -- my question was, the wire fraud counts relate to Counts 100 through 104. Would you agree with that? That's what the wire fraud counts that are covered in the indictment?

A. No, it's 99. It also includes 99.

Q. Well, 99 is conspiracy to commit wire fraud. I'm talking about wire fraud, okay.

A. Those -- those counts after 99, 100 through 105 are part or a sample of what makes up 99. Count 99.

Q. Okay. Let me ask this question very delicately, and I want you to listen to me. You have the indictment in front of you, sir?

A. What page would you like me to turn to?

Q. Do you have the indictment in front of you, sir?

A. Yes, sir. Right here.

Q. All right. And would you agree with me, sir, that Counts 100, 101, 102, 103 and 104 specifically relate to wire fraud?

A. Yes.

Q. Okay. Now, in that regard, sir, the tuna boat

01:25PM 01:25PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:27PM 01:27PM 01:27PM

companies had written contracts with the company that provided a helicopter to them for tuna spotting; correct, sir? Wilma's?

A. We're just talking specifically about the contract?

Q. Yes, sir. They had contracts, right?

A. The contracts existed; correct.

Q. And the contracts provided that the helicopter -- excuse me, the contracts provided that the tuna boat companies had the opportunity to inspect every helicopter before they left port and went to go do their tuna operations; correct, sir?

A. No.

Q. They didn't have the opportunity to inspect them?

A. Not adequate opportunity, no.

Q. I said -- let's pull up Government's Exhibit 3280, please. Sir, I'm going ask you questions, and I would like you to answer the questions I ask and not reform them and reword them. Can you do that for me?

A. I'll do the best I can, sir. Thank you.

Q. All right. So if we can pull up 3280, please. Sir, we are looking at what's identified as Government's Exhibit 2900-3280. Do you see that, sir? Do you see that document?

A. I see a portion of it; yes.

Q. Okay. A portion of it. Let's start at the top then.

Do you see the top page? 01:29PM

A. Yes. 01:29PM

Q. And this is -- we testified yesterday, I believe, or maybe it was this morning, it's been awhile. I know we testified yesterday, you and I were going yesterday, that this particular document deals specifically with Count 100, right, sir? 01:29PM

A. Uh-huh. 01:29PM

Q. If you need to look at indictment, go right ahead. 01:29PM

A. Yeah, it looks -- yes. Yes. 01:29PM

Q. You're agreeing with me it deals with specifically Count 100? 01:30PM

A. It makes up a part of -- it's one of the pieces of evidence that makes up Count 100; yes. 01:30PM

Q. Okay. So the first part is basically the date and the parties, right, sir? 01:30PM

A. Wilma's Flight Services, Inc. is the lessor and Friesland Fishing Company is the lessee; yes. 01:30PM

Q. Okay. If we can go up just a little bit. I want to go to Section 1. Section 1, do you see Section 1, lease of aircraft, sir? 01:30PM

A. Yes. 01:30PM

Q. Do you see, sir, where it specifically provides that the lessee shall have 24 hours from arrival of the aircraft in which to provide lessor written notification of any defects in 01:30PM

the aircraft or its equipment and accessories or in case the pilot is not sufficient, capable for his work according to the judgment of the captain. In absence of written notification, lessee agrees it is satisfied with and finds the aircraft and its equipment and accessories to be accessible. Do you see that in Section 1 of Government's Exhibit 2900-3280, sir?

A. I see that.

Q. All right. The tuna boat companies were given the option to inspect the helicopters. Isn't that true, sir?

A. The option to inspect? Yes.

Q. All right, sir. And as a matter of fact, if they weren't satisfied, they could notify the lessor, and they could either get a replacement or something like that; correct, sir?

A. It appears that way on the contract.

Q. All right. And as a matter of fact, there are other portions of the contract that provide if something happens to the helicopter, during the term of this lease, it can be replaced; correct, sir?

A. Yes, in that sense; yes.

Q. All right. Now, you'll agree with me, won't you, sir, -- I'm through with that now. Thanks. That -- you'll agree with me, won't you, sir, that a helicopter was provided with every lease that was done with the tuna boat companies; correct, sir?

A. Um, no.

Q. There were tuna boats that did not get helicopters?

A. They were not airworthy.

Q. Sir, did I use the word "airworthy"?

A. Well, if we're talking about contract --

Q. Did I use -- my question, did I use the word "airworthy"? And I'm asking a question, did I use the word "airworthy"?

A. No.

Q. All right.

A. All right.

Q. So let's go back to my question. Did every tuna boat get a helicopter?

A. A helicopter was provided.

Q. Okay. Thank you, sir. Now, are you an FAA certified A&P mechanic, sir?

A. I am not.

Q. Are you an FAA certified, I believe it's called an AI, sir?

A. I am not.

Q. All right. And you know what those terms are, don't you, sir?

A. I do know what they refer to loosely.

Q. They refer to someone that has a specialized certificate to inspect, repair and correct any issues with a

helicopter, generally speaking. Would you agree with that? 01:33PM

A. And, again, that's -- that is in reference to what the FAA provides; correct? Like a certification? 01:33PM 01:33PM

Q. Correct. 01:33PM

A. Yeah, the FAA does provide that. 01:33PM

Q. Okay, sir. Now, would you agree with me, sir, that in Count 99 of the indictment, and you may look at it, I think I've given you a copy of it to look at, do you have Count 99 in front of you, sir? 01:34PM 01:34PM 01:34PM 01:34PM

A. Starting on page 33, sir? 01:34PM

Q. Yes, sir. And if we're going to -- if you would you go to page 34, sir. 01:34PM 01:34PM

A. Yes, sir. 01:34PM

Q. In particular, starting at paragraph 26, there are numerous aircraft that begin with the designation N at page -- excuse me, at paragraph 26. Do you see all those, sir? 01:34PM 01:35PM 01:35PM

A. You're talking about paragraph 126 -- starting at subsection A though subsection RR? 01:35PM 01:35PM

Q. That's correct, sir. Thank you. Yeah, and those are helicopters that have been identified by an N registration; correct, sir? 01:35PM 01:35PM 01:35PM

A. Those are U.S.-registered helicopters; yep. 01:35PM

Q. And those helicopters, many of them, you and I, over the last hour or two, probably closer to two -- 01:35PM 01:35PM

A. Probably two. 01:35PM

Q. -- we have identified for this jury; correct, sir? 01:35PM
A. We identified they're U.S.-registered helicopters; yes. 01:36PM
Q. And many of those are contained in paragraph 126 of the indictment? 01:36PM
A. Yes. 01:36PM
Q. And those are the same aircraft that were registered, many of them, with Vanuatu corporations; correct, sir? 01:36PM
A. They're actually U.S.-registered corporations. 01:36PM
Q. In Vanuatu, is that what you're saying? 01:36PM
A. The country identified for -- the address shows Vanuatu. 01:36PM
Q. All right, sir. They are alleged to be -- they are, according to the FAA registry, what you testified to, the companies are located in Vanuatu; correct, sir? 01:36PM
A. Yes. 01:36PM
Q. Okay. 01:36PM
A. Purportedly. 01:36PM
Q. And -- and -- so it's your testimony then, I guess as a legal expert, that Vanuatu allows U.S. corporations in their country? 01:37PM
A. According to the Constitution, there is a -- it does allow for it to exist by name, but they can't carry on business in Vanuatu. 01:37PM
Q. And when did you get your legal degree, sir? 01:37PM

A. Where did I get my legal degree? I base it upon the evidence.

MS. M. MILLER: Your Honor, I'm --

MR. MARTIN: I'm asking you -- my question was --

MS. M. MILLER -- I'm going to object and move to strike Mr. Martin's comment about where did you get your legal degree.

MR. MARTIN: That was a question, Your Honor.

MS. M. MILLER: He's asking him for legal conclusion.

THE COURT: Hold on just a minute, let me hear the objection. What was the objection?

MS. M. MILLER: Yeah. He's asking him for legal conclusions, and then when the witness is giving him his answer, he's arguing with him. "When did you get your legal degree?" I objected previously when he asked a legal conclusion, and that was overruled. But does the comeback, if that's the question he's going to ask, is appropriate, and I move to strike it.

THE COURT: And? And?

MR. MARTIN: Your Honor, I asked him a question about whether or not U.S. companies could operate in Vanuatu. He gave me an opinion, and I asked him when he got his legal degree.

THE COURT: Overruled, go ahead. Overruled.

Cross-exam -- I mean, yeah, this is cross-exam. Go ahead. 01:38PM

BY MR. MARTIN: (CONTINUING) 01:38PM

Q. Would you tell the ladies and gentlemen of the jury where you got your legal degree, sir? 01:38PM 01:38PM

A. Um, I don't have a legal degree, but I did get training in law -- as it relates to my job in reviewing statutes. 01:38PM 01:38PM 01:38PM

Q. You don't have a legal degree? 01:38PM

A. No. 01:38PM

Q. Okay. Thank you. Now, also, these N helicopters, that are in Count 99, which is paragraph... 01:38PM 01:38PM

MR. MARTIN: I think I'm done. 01:39PM

MS. MCCONWELL: Mr. Martin, do you -- 01:39PM

MR. MARTIN: May I borrow the indictment, sir? 01:39PM

THE WITNESS: Yes. 01:39PM

MS. MCCONWELL: Mr. Martin, do you want me to put it on the screen? 01:39PM 01:39PM

THE WITNESS: Here you go. 01:39PM

MR. MARTIN: Thank you. 01:39PM

THE WITNESS: Thank you, sir. 01:39PM

BY MR. MARTIN: (CONTINUING) 01:39PM

Q. I just want to make sure we're -- there we go. I just want to make sure you and I are talking about the -- can you see the screen, sir? 01:39PM 01:39PM 01:39PM

A. Yes, sir. 01:39PM

Q. We're talking about these helicopters, I'm just going to circle it with my finger, those there, and these particular helicopters right here identified with an N number, are we not sir? So we're on the same page.

A. U.S.-registered helicopters; yes.

Q. Okay. So these here and these here?

A. Yes.

Q. All right. Sir. And those are the same helicopters that we talked about that are listed in the FAA registry, many of them, not necessarily all of them, but almost all of them. Would you agree with that, sir?

A. They are identified in the FAA registry, those helicopters; yes.

Q. Okay. And you would agree with me, sir, that, as you have, and we've talked about it, that each of those helicopters is an asset?

A. They are an asset.

Q. All right. Okay, sir, and... you also testified, sir, not only relating to the conspiracy to commit wire fraud and the wire fraud counts, but you testified relating to the engaging in a monetary transaction or what's commonly referred to as money laundering counts. Do you recall that, sir?

A. I did testify to that.

Q. And those are outlined in Counts 105 through 110. Would you agree with that?

A. Yes. 01:41PM

Q. If I can turn -- just so that I make sure we're on the same pain again here. I'm going to show you, from the indictment, Count 105 and 106 are reflected here; correct, sir?

A. Yes.

Q. And those relate to the transfers of funds from the Caledonian bank to a -- from the Caledonian account in the Bank of Hawaii to the Hansen Northern account in the Bank of Hawaii; correct, sir?

A. Caledonian Bank of Hawaii corporate bank account to Hansen Northern Bank of Hawaii corporate bank account, the $3,000,000 transfer; yes.

Q. And, additionally, Counts 107 through 110, we're on the next page, also relates to the transfer of funds; correct, sir?

A. Electronically-transferred funds; yes.

Q. Correct. Correct. And the premise behind those is that the funds that were transferred were, quote, criminally-derived property; correct, sir?

A. Yes.

Q. And if those funds are not criminally-derived property, those money laundering counts cannot stand. Isn't that true, sir?

A. I would never have included that or recommended that.

Q. I didn't ask you what you recommended or what you concluded. I asked you, isn't it true, sir, that if those funds are not criminally-derived property, those counts cannot stand?

A. That's for the jury to decide.

Q. I agree with you, sir. I agree with you 100%. If the jury were to decide those are not criminally-derived property, those counts can't stand. Isn't that true, sir?

A. Are we talking generally, or are we talking about this case?

Q. I'm talking about the law, sir. If you don't know the law, just tell me. Do you not -- I tell you what, I'll withdraw that question. May I have just one moment, Your Honor? I need to talk to co-counsel.

THE COURT: You may have one minute. Yeah, no I'm just -- we still -- recess not until two, but go ahead.

MR. MARTIN: I don't think I can discuss it with him that long, Your Honor.

THE COURT: Yeah, I didn't think so. Go ahead.

MR. MARTIN: Thank you, agent. No further questions, Your Honor.

THE COURT: All right. Thank you, Mr. Martin. Why don't we just go ahead and take our -- we'll take our recess early, and just still keep it at 15 minutes. So ladies and gentlemen, keep an open mind, do not form or express any

opinion on this case, but when you come back, Ms. Miller, will begin redirect. Please rise for the jury.

(Jury out at 1:45 p.m.)

THE COURT: Okay. I'll see you guys in 15 minutes.

(Recess taken at 1:45 p.m.)

(Back on the record at 2:18 p.m.)

THE COURT: Okay. We ready to proceed, Counsels?

MS. M. MILLER: Yes, Your Honor.

THE COURT: All right. We'll call in the jury. Sorry for that delay. We have a 4:00, right?

MS. M. MILLER: Yes. And then we're having the hearing, Your Honor, at that time?

THE COURT: Right. Shouldn't take too long. I'll just rule from the bench.

MS. M. MILLER: Okay. Thank you.

THE COURT: I don't think I need to hear arguments.

MS. M. MILLER: Okay.

THE COURT: So let me see.

(Pause.)

THE COURT: Maybe just a couple of questions. Oh, how long do you think you'll be, Ms. Marie Miller?

MS. M. MILLER: Probably go until 4.

THE COURT: Okay. You think you'll be done with

the witness?

MS. M. MILLER: I'm hoping -- I'm hoping we will be.

THE COURT: How long have you been here? On the stand?

THE WITNESS: How long I have been on the stand? I think --

THE COURT: How many hours, days?

THE WITNESS: Day five.

MS. M. MILLER: I think you've spent more time off the stand though then on. You don't think so?

MR. MARTIN: June 8th. All day June 8th.

THE WITNESS: Oh, so I could include all the time in between.

THE COURT: I notice when you said "assets," you were like assets.

THE WITNESS: Assets.

THE COURT: Is there a meaning to that?

(Laughing.)

THE COURT: You emphasized. Just joking. But not really.

(Jury in at 2:20 p.m.)

THE COURT: All right. Please be seated. I'm sorry, I thought it would only be about fifteen minutes, but went a little longer than I thought. I had some other legal

matters to take care in my chamber on my other cases. All right. So we'll go ahead and begin.

Ms. Marie Miller, go ahead.

MS. M. MILLER: Thank you, Your Honor. Good afternoon, members of the jury. Thank you.

**REDIRECT EXAMINATION**

BY MS. M. MILLER:

Q. Special Agent Khamvongsa, Mr. McConwell asked you about the essential parts of the tuna boat contracts. Do you recall those questions?

A. Um, I recall him asking something to that effect; yeah.

Q. Okay. Can you tell the members of the jury why is the registration number is an essential part of the tuna boat contract?

A. The registration number is essential because it identifies the helicopter, as well as to what country it's registered to, which means that whatever country is reflected by the prefixes determines what laws they have to follow. In this case, any time it's an N registration, it is -- has to follow FAA laws or regulations.

Q. Why, when Mr. Martin asked you whether the words "Federal Aviation Administration" or "FAA" were in the contracts he showed you, did you say that yes, they are,

because of that registration number?

A. Why did I say that?

Q. Yes.

A. Because the helicopters in which I reviewed and that contract, it specifically identified an N-number which is a U.S. registration number. So you are -- so those helicopters are bound by the rules and regulations of the Federal Aviation Authority.

Q. Why is the lessor, the name of the company that's leasing the helicopter to the tuna boat company, an essential part of the contract?

A. The lessor is important because it identifies who the operator is, what is reflected in the registry, if there is -- in this case, there was a lot of misrepresentations in the contract where the lessor --

MR. MARTIN: Your Honor, I object. I object to the use of the term *misrepresentations*. He can testify as to what his investigation said, but him characterizing something as misrepresentation, he needs to talk about what the contract said, not whether it was misrepresenting or not. And it calls for a conclusion, and I object to a conclusion.

THE COURT: All right. Yes, Ms. McConwell?

MS. MCCONWELL: And it lacks foundation.

THE COURT: I'm sorry, lacks foundation?

MS. MCCONWELL: Yes.

THE COURT: All right.

MS. M. MILLER: Well, Your Honor, we already heard testimony from Special Agent Khamvongsa that even though the contract said the lessor was one company and paragraph 8 of the contract said that the lessor must be the registered owner, that that was not true. It is appropriate for an IRS special agent to identify misrepresentations and inconsistencies, and I do have case law to cite, Your Honor, if necessary, regarding that, that is not --

THE COURT: Okay.

MS. M. MILLER: -- opinion.

THE COURT: If he wants to identify inconsistencies, he can do that.

MS. M. MILLER: Yes, we could use the word inconsistency instead of misrepresentation.

THE COURT: Well, okay.

MS. M. MILLER: Although -- inaccuracy is another word.

THE COURT: Okay, if it relates to this contract --

MS. M. MILLER: Yes.

THE COURT: -- in question, then he can do that, and if it's related to what was already brought out during cross-examination, the Court will allow that.

MS. M. MILLER: Yes.

MR. MARTIN: My objection was conclusions and speculation, Your Honor.

THE COURT: All right. The Court will sustain the objection to that extent, but as far as his personal knowledge and investigation.

MS. M. MILLER: Yes.

THE COURT: The Court will allow that. Go ahead.

BY MS. M. MILLER: (CONTINUING)

Q. Yes. So Special Agent Khamvongsa, could you remind the jury were there inconsistencies between the name of the lessor in the contracts and the name of the registered owner and what we've seen in the FAA files?

A. Yes.

Q. So Section 8 of the contract that says, the lessor shall be the registered owner. If the lessor is not the registered owner, isn't that a misrepresentation of who the lessor is?

MR. MARTIN: Your Honor, this is a leading question, Your Honor. She can ask him --

MS. M. Miller: It is not.

THE COURT: All right. Wait. Wait just a minute, just rephrase it.

MS. M. MILLER: Yes, Your Honor.

THE COURT: It is leading.

BY MS. M. MILLER: (CONTINUING)

Q. So can you please tell the members of the jury, as an experienced IRS agent, what do you make of a situation where the lessor is named with a name, the contract requires that person to be the registered owner, and it is not?

A. It is inconsistent with the contract.

MS. MCCONWELL: That calls for a conclusion.

THE COURT: I'm sorry?

MS. MCCONWELL: I said I think this calls for a legal conclusion.

THE COURT: All right. Overruled. Go ahead.

THE WITNESS: The name on the FAA registry is inconsistent with what's reflected on the contract.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. Why is airworthiness an essential part of a contract?

A. So if we go back to the registration, the N registration is representing that it is a aircraft is being provided that meets the standards of the FAA. So in this case, the representations made that this is an airworthy aircraft to the tuna boat companies, the tuna boat companies are believing that's what they're getting.

Q. Okay. Did you ever see anything in any of the contracts that indicated that these aircraft were on the destroyed list?

A. No.

Q. Was there anything in the contract that indicated that the aircraft had been illegally rebuilt?

A. No indication in the contract.

Q. How about whether the helicopters were actually foreign helicopters not eligible for FAA registration?

A. That was never reflected in the contract.

Q. How about the fact that some of the airworthiness certificates were obtained as a result of a bribe?

A. That was not reflected in the contract, which affects airworthiness.

Q. Why is the qualification of the airman, who were also being leased with the helicopters, an essential part of the contract?

A. Again, if we go back to the registration, these are U.S.-registered helicopters, which must comply with the FAA. So an airman, such as a pilot or mechanic, must be FAA certificated; in this case, they were not.

MS. M. MILLER: Your Honor, I'd like to show the witness what has been previously marked, but not admitted yet, as Government's Exhibit 430.

THE COURT: All right. Counsel, you -- they have a copy of that?

MS. M. MILLER: They do.

THE COURT: All right. Are you going to flash it up?

MS. M. MILLER: It hasn't been admitted yet, Ms. Santos.

THE COURT: All right. 430. You want to -- Okay. Agent can see that.

BY MS. M. MILLER: (CONTINUING)

Q. And if you could take a moment and please review that document.

A. (Witness read document.)

THE COURT: Is there a specific paragraph here that you're focused on, Counsel? If you are --

MS. M. MILLER: It's the entire e-mail, Your Honor.

THE COURT: All right. Can you make this, please, a little bigger, Counsel?

MS. M. MILLER: Yes, Ms. Miller.

MS. S. MILLER: Yes.

MS. M. MILLER: Highlight the bottom part of it or pull it out.

THE WITNESS: Okay.

BY MS. M. MILLER: (CONTINUING)

Q. Did you read it, sir?

A. Yes.

Q. Can you tell --

MR. MARTIN: Has it been admitted or not, Your Honor.

THE COURT: No, it has not been admitted she said. So she's -- I guess she's going to try and set a foundation.

MS. M. MILLER: Correct.

MR. MARTIN: I thought you asked him to read it.

MS. M. MILLER: No, I said have you read it.

MR. MARTIN: I'm sorry, Marie. I couldn't hear.

BY MS. M. MILLER: (CONTINUING)

Q. Have you read it, sir?

A. I just read it as of now.

Q. Yes. Do you recognize it?

A. It's -- yes.

Q. Okay. Is it a true and correct copy of what was seized from the Defendant's computers?

A. Yes.

MS. M. MILLER: Your Honor, at this time, I would offer into evidence what has been previously been marked as Government's Exhibit 430.

MR. MARTIN: Your Honor, I have an objection, but I think it would be appropriate for the jury be excused for this purpose. And I apologize, but we had no idea this exhibit was going to be brought in.

MS. M. MILLER: Could we just approach the bench to talk about that, Your Honor? As opposed to sending the jury out again so soon after break.

THE COURT: Can we get on the thing there? Does it work? Well, let's see if it works, I'd rather just stay over here. Keep you guys over there. Don't get too close to me. You guys have been traveling, and so have I. I don't want to give anything to you either. I'm not trying to be.

(Technical issues with sidebar connection.)

(Pause.)

THE COURT: I guess it's on vacation or something. Mine won't even start. You don't know what channel yours --

MS. M. MILLER: It will turn on, but it doesn't allow the speaker to turn on.

THE COURT: I think there is -- and sorry, but our guy is --

MS. M. MILLER: Not here.

THE COURT: -- not here. I don't know something happened to him. So we'll try to fix it tomorrow, but in the meantime, I'm going to excuse the jurors. Sorry, jurors, but you know, take a stretch. Keep an open mind. Take a stretch. Hopefully, it won't be that long.

(Jury out at 2:32 p.m.)

THE COURT: We're outside the presence -- you want to step outside then.

THE WITNESS: Sure.

THE COURT: Thank you, Agent.

02:30PM 02:30PM 02:30PM 02:30PM 02:30PM 02:30PM 02:32PM 02:32PM 02:32PM 02:32PM 02:32PM 02:32PM 02:32PM 02:32PM 02:32PM 02:32PM 02:32PM 02:32PM 02:32PM 02:32PM 02:32PM 02:33PM 02:33PM 02:33PM 02:33PM

THE WITNESS: Yes, Your Honor.

THE COURT: This is Exhibit -- is it 430?

MS. M. MILLER: Yes, Your Honor.

THE COURT: All right. First of all, once the witness gets out, question is what's your proffer on this, why are you trying to bring this in?

MS. M. MILLER: Because Mr. Martin, in questioning the witness, asked the witness repeatedly whether he was aware of the fact that there was any litigation, either pending or that had occurred, between the tuna boat companies and Hansen Helicopters, arguing that the tuna boat companies always got what they paid for, what they wanted, there wasn't any litigation, any conflict or anything like this.

What this shows, Your Honor, is that there were discussions between the tuna boat companies, and the Defendants as well as litigation -- potential litigation between individual families of persons who were killed or injured by the Defendants. And I have a number of exhibits, some of which have already been admitted into evidence, and this particular one, to show that there were these issues that did arise, that rise to the level of prospective litigation.

THE COURT: Who's Teresa?

MS. M. MILLER: She's somebody -- she's someone who we see in another e-mail who's a representative of one of the tuna boat companies.

THE COURT: Is she like an agent to the company?

MS. M. MILLER: She is.

THE COURT: Mm-hmm. All right. Yes, Mr. Martin?

MR. MARTIN: First of all, Your Honor, if I'm going to be quoted, it should be accurate. My question was, are you aware of any tuna boat company that has sued? That doesn't mean pending litigation or possible litigation. That has sued Hansen Helicopters relating to any of these contracts? And the answer was "not yet."

THE COURT: Right, I recall that question.

MR. MARTIN: I did not ask about possible or pending or anything -- as a matter of fact, I excluded it from my question because I made him correct it. I said -- I specifically said, any litigation that has occurred. Secondly --

THE COURT: Okay, so the Court would agree with you, I do recall that part. Okay. Next one? Next --

MR. MARTIN: Secondly, Your Honor, this is -- it's far outside the scope of my cross-examination, and it is a letter to Marvin Reed from somebody who we have no clue who it is. The government may represent it's one of the tuna boat companies or something, but all I have is -- all I have is TWH-- TWTHSU at Fong K-U-O, dot com, dot TV. And I don't know who that is, Judge. And so I think that we don't have a foundation for this exhibit to come in. Even though it's

beyond the scope of cross-examination, and it's hearsay to Jon

Walker.

MS. M. MILLER:  Your Honor, this goes directly to

counter the cross-examination because Mr. Martin and

Mr. McConwell both asked this witness questions about his

knowledge of and basis for the criminal fraud underlying the

wire fraud counts.

Part of the fraud, as Your Honor knows, is the

fact that the airmen were not certificated.  As a result of

that, plus the fact that the aircraft were not airworthy,

regardless of what was represented, there were claims, there

were injuries, there were deaths.

This goes to the Defendants' knowledge because

this is a co-defendant and the e-mail address is for Fong Kuo,

K-U-O, which is all over the billings and collections list

that the Defendants produced to us in response to a grand jury

subpoena, as Your Honor has seen, Exhibit 725 and 726.  This

is a direct communication between the tuna boat company

representative and the Defendants regarding an incident.  And

some of the other e-mails that the jury should see, Your

Honor, is the Defendants trying to conceal accidents,

incidences, claims, issues, between themselves and the tuna

boat companies.  This goes directly to Mr. Martin opening the

door by leaving an impression with the jury that the tuna boat

companies got what they bargained for.

As a matter of fact, Mr. McConwell even said, isn't it true the tuna boat companies got what they bargained for, they were satisfied? The essential element of this contract was just to produce a helicopter? Didn't matter if it was a tin can or not.

Well, you know what, Your Honor, that's just not true. This goes to the weight, not the admissibility. It's relevant to show that there were conflicts between the tuna boat companies and the Defendants and that there were numerous, numerous issues and problems. This isn't a situation where the tuna boat companies weren't victims of the Defendants' fraud.

THE COURT: All right. Anything further, Counsels? Defense.

MR. MARTIN: Your Honor, other than the fact that my question specifically dealt with, "lawsuits."

THE COURT: All right. Any -- Ms. McConwell?

MS. MCCONWELL: Yeah. Hansen Helicopters is not a party to Counts 99 through 110 --

THE COURT: I'm sorry. Can you get on the mic? I can't hear you.

MS. MCCONWELL: Hansen Helicopters is not named in the indictment, 99 through 110, so to any extent that she wants to assign this to Hansen Helicopters, it's inappropriate for the admission against Hansen Helicopters. Additionally,

just by the plain text of this e-mail, which I would submit is hearsay, it doesn't show that there is a conflict. There is a question that's being broached.

MS. M. MILLER: It shows knowledge on the part of the Defendants regardless of --

THE COURT: All right. The Court will -- the Court has, you know, listened to the evidence and so the question really is -- is it beyond the scope of cross. At this point the Court finds it is beyond the scope of cross, and will sustain the objection.

MS. M. MILLER: Okay.

THE COURT: On this particular letter at this time. Yeah.

MS. M. MILLER: Sure.

THE COURT: Okay. Next, we'll call in the jury then.

MS. M. MILLER: Yes.

THE COURT: Is there anything else that we should look at --

MS. M. MILLER: Well, there is, while the jury is out.

THE COURT: Why don't we look at it now.

MS. M. MILLER: The next exhibit that I intend to use with this witness is G-1, which has already been entered into evidence.

THE COURT: Oh, it's already been admitted? 02:39PM

MS. M. MILLER: It's already been admitted into evidence. 02:39PM 02:39PM

THE COURT: All right. Then you can use that. Move on to the next. 02:39PM 02:39PM

MS. M. MILLER: And 421, which has already been admitted into evidence as well. Okay, that's it. 02:39PM 02:39PM

THE COURT: So is there anything that has not been that you want in -- 02:39PM 02:39PM

MS. M. MILLER: Yes. 02:39PM

THE COURT: That we should look at right now because our COVID bench apparatus is not working. 02:39PM 02:39PM

MR. MARTIN: What was the other, 421? 02:39PM

MS. M. MILLER: Yeah. 02:39PM

THE COURT: What were the next two that you were going to admit? 02:39PM 02:39PM

MS. M. MILLER: So I'm going to what was not already admitted into evidence. 02:39PM 02:39PM

THE COURT: Not already, not admitted. 02:39PM

MR. MARTIN: Well, I want to look at it to make sure that the one she's having aren't beyond the scope. 02:39PM 02:39PM

THE COURT: What are the next two that have been admitted, you believe? 02:39PM 02:39PM

MS. M. MILLER: Exhibit 1 and Exhibit 421. 02:39PM

THE COURT: Okay. Hold on. Give him one second 02:40PM

to look at 1 and 421. Then tell us when you're done, Counsels, Defense. Then when you're done, go to the next one, the ones that are not admitted yet. We might as well get through this, let's do this now at this bench conference. She said 1 and 421 have been admitted.

MS. M. MILLER: They have been.

MS. MCCONWELL: Oh, oh, they have been admitted, but we need to see if they are beyond the scope.

MS. M. MILLER: Oh, boy.

MR. MARTIN: Your Honor, my objection to --

THE COURT: Wait. Pull up.

MR. MARTIN: 421.

THE COURT: Pull 421 up, please. And what's the proffer on 421? Let me just hear the proffer. You should hear the proffer before you object. 421.

MS. MCCONWELL: I've got it on my screen.

MS. M. MILLER: We'll pull it up. So, Your Honor, this is another situation where the -- there is communications back and forth between, in this case, a representative of the family of a pilot who was killed and the Defendants paying for the movement of his body to his home in order to be buried. If you see on the bottom of the second page, Your Honor, that's where the communications start, and there is a discussion regarding compensation.

And if you also remember, Your Honor, Mr. Reed

02:40PM 02:40PM 02:40PM 02:40PM 02:40PM 02:40PM 02:40PM 02:40PM 02:40PM 02:40PM 02:40PM 02:40PM 02:40PM 02:40PM 02:40PM 02:40PM 02:40PM 02:40PM 02:40PM 02:41PM 02:41PM 02:41PM 02:41PM 02:41PM 02:41PM

testified that the Defendants paid $100,000 to this family to avoid any lawsuit being filed. And the Government's contention is that if money is paid to tuna boat companies or to families of pilots and others to avoid lawsuits being filed, that is relevant, that is within the scope of the cross-examination where Mr. Martin asked about whether any lawsuits had been filed. Concealing information, paying people off so that lawsuits aren't filed is very relevant to the issue of fraud. This is a fraud case. Concealment is always something that is included in a fraud.

MR. MARTIN: May I respond, Your Honor?

THE COURT: Okay. Good argument.

MR. MARTIN: My question was, have any tuna boat companies filed any litigation against us because of these contracts. It had nothing to do with death of pilots or settlements or payment of things relating to a pilot or an airman. It had -- the question was very specific, had any tuna boat companies sued us because of failing to comply with contracts. This doesn't go to that issue.

THE COURT: I got it. Any -- Ms. McConwell?

MS. MCCONWELL: We join. Also, it's not relevant to Hansen Helicopters, we're not -- we're not in any of the counts.

THE COURT: Bring the mic closer to you and then just pick it up.

MS. MCCONWELL: I'll do that. I just don't like to bump it. And it was an insurance payment, not some kind of a settlement, buy out, pay off or buy out as Ms. Miller is representing.

THE COURT: All right. Ms. Miller, you may proceed.

MS. M. MILLER: Yes, Your Honor, it's in conjunction with the testimony that we heard from Mr. Reed that in addition to paying the body to be sent back, that this company paid Mr. Santos family $100,000 in compensation for his death. Again, to avoid litigation.

THE COURT: All right. The Court will sustain the objection because it was very narrow. You know, you've already got this in. You could make the argument.

MS. M. MILLER: Sure.

THE COURT: However -- we could talk about that later.

MS. M. MILLER: Yes.

THE COURT: The Court will sustain the objection, and disregard -- disallow this to come in.

MR. MARTIN: We need to look at Exhibit No. 1, Your Honor.

THE COURT: Oh, okay. One?

MR. MARTIN: That's --

THE COURT: Bring it up, one. How many exhibits

do you have so we could let the jurors know, there's some smokers in there, I'm pretty sure they want to smoke.

MS. M. MILLER: Well, I think this is only related to the litigation questions that Mr. Martin asked. The rest of the questions all include exhibits that have already been admitted into evidence except for one that has not been admitted into evidence.

THE COURT: So how many more? You have one more exhibit you're going to talk about this after this?

MS. M. MILLER: Not related to this issue.

THE COURT: Oh, okay. All right. Let's make -- can you make this bigger, and so what's your proffer on this, this G --

MS. M. MILLER: So this one is a communication between Jon Walker and Rufus Crowe where he's talking about the fishing companies being aware of the latest fatality. Also in this e-mail, there is a discussion about losing four contracts. That's the reason why, again, related to this litigation question and issue.

MR. Martin: The subject matter of the e-mail, Your Honor, is where the Pacific Ranger ran into a helicopter that was trying to disconnect a buoy. The spotter was killed in that, and there was no litigation out of that, Your Honor. And so the reference to that , I mean, a helicopter getting hit by a boat does not have anything to do with a tuna boat

company suing us because -- and there is no litigation. You heard the witness. There's been no litigation yet.

MS. M. MILLER: Your Honor, this has to do with Mr. McConwell's discussion in cross-examination, where he was saying didn't the tuna boat companies get what they wanted, weren't the parts -- essential parts of the lease fulfilled, didn't the tuna boat companies, you know, weren't they satisfied because at least they got an airplane, whether it was airworthy or not, same thing with the airman, whether they were qualified or not. This contradicts directly the contention that the tuna boat companies had no problems and no issues with Hansen Helicopters.

THE COURT: All right. So this has nothing to do with the liability question?

MS. M. MILLER: No, this has to do with the more general question.

MR. MARTIN: Read the e-mail, Your Honor, it deals directly with liability, and it doesn't have anything to do with airmen or anything else. It's talking about buoys. This is stealing buoys, boats are having their spotters steal buoys.

MS. M. MILLER: Sorry, I didn't mean to do that, Your Honor. It's more than just that. It has to do with the latest fatality, it has to do with insurance limits, insurance is an essential element of the contract that we're going to

talk about it. It has to do with the fact that four contracts were lost, and Mr. McConwell specifically said, do you have any information that any contracts were lost? This directly goes to this idea that the defense has put into the minds of the jurors that the tuna boat companies were completely satisfied with what they got, so therefore, there cannot be wire fraud. 02:46PM

THE COURT: All right. The Court will -- let me just say, okay, so here's the problem, you have a judge up here who knows some of the evidence, not all of it, only the evidence that's brought before me. You all have the luxury and the opportunity to know whatever these four contracts are, these liability limits and so forth.

So the Court was going to sustain the objection because you're going to have to go deeper. This refers to so many other things. I will sustain the objection as for purposes of this redirect. And if you can tie it in to your closing, tie it in your closing.

MS. M. MILLER: Yeah, and I also have two more witnesses, Your Honor, these issues are very relevant to the safety, culture, or lack thereof, of Hansen Helicopters, so they'll come in --

THE COURT: Court.

MS. M. MILLER: Absolutely.

THE COURT: Court will sustain the objection.

All right. Wait now. Which exhibit does he not know -- they not know?

MS. M. MILLER: So, Your Honor, you had admitted portions of Exhibit 3003, but not all of 3003.

THE COURT: Okay.

MS. M. MILLER: And there was one page of 3003 that was not admitted. And now I think it is relevant, and should be admitted. And that is the one that is not yet admitted that I will use, if, Your Honor, allows in my redirect examination, and specifically, that is page 3003-15.

THE COURT: Okay.

MS. M. MILLER: And, Ms. Miller, if you could pull that up for the Court, please. It's in Trial Director as 3003, not 3003-A, which is the truncated version that has been admitted.

MR. MARTIN: What was the number again?

MS. M. MILLER: 3003-15. And if you can hone in, Ms. Miller, on the paragraph that starts, "The seller here hereby warrants to the buyer." If you could pull that part out. So, Your Honor, what this document is --

THE COURT: So it's an insurance policy?

MS. M. MILLER: No, no, no. This is a sales agreement.

THE COURT: Okay.

MS. M. MILLER: Between Jan's Helicopters, which

is one of the Vanuatu companies in Exhibit 829, and we heard, for two and a half hours, Mr. Martin talk about the Vanuatu companies in Exhibit 829.

Jan's is represented in this buyer-seller agreement as owning all of the helicopters that are listed in that agreement to be sold to Pacific Spotters Corporation. And we just heard Mr. Martin go on for hours about how each of these individual Vanuatu companies, isn't it true this company was the registered owner, and this company was a registered owner, and this company was a registered owner.

Well, if that's true, then how can Jan's sell all of these helicopters when Jan's is not the, according to the FAA, the business record of the FAA, the registered owner of all of these helicopters?

So it goes directly to contradict the representation that Mr. Martin is trying to leave the jury with, which is, that each individual helicopter was an asset of each individual Vanuatu company, which isn't true. Further, Your Honor --

THE COURT: I'm sorry. So each of the helicopters are not -- you're trying to say that it rebuts the representation that the helicopters of the individual corporations that were identified in cross-examination are not individual assets of those corporations?

MS. M. MILLER: Yes, Your Honor.

THE COURT: But rather they are what? 02:50PM

MS. M. MILLER: But rather, they are assets of Jan's Helicopters. If Jan's Helicopters is selling all of these helicopters to Pacific Spotters Corporation as is represented in this document. It contradicts what Mr. --

THE COURT: Okay, so I'm sorry, so where does it say that the seller owns all of those --

MS. M. MILLER: The seller --

THE COURT: Owns all the helicopters?

MS. M. MILLER: So right here.

THE COURT: How do I know that?

MS. M. MILLER: Yeah. So if we go to page 14 first, Ms. Miller, if you can go to 14 where it lists the helicopters.

THE COURT: Okay. I see.

MS. M. MILLER: So page 14, could you make that bigger, Ms. Miller?

MS. MCCONWELL: Your Honor, page 14 is not admitted into evidence, and this is --

THE COURT: That's right. She knows --

MS. M. MILLER: I'm answering the Court's question about why it's relevant.

THE COURT: Yeah. She wants to try to put this in.

MS. M. MILLER: Yes. Can you highlight that, Ms.

Miller, 14?

THE COURT: She indicated this was not in.

MS. M. MILLER: So what we see here, Jan's Helicopters existing under Philippines law, which by the way Jan's was represented -- see this contradicts what Mr. Martin was trying to present to the jury. Jan's was represented to the jury as being a Vanuatu company. Here we have Jan's representing itself as the Philippine company with an address in the Philippines, seller and the owner.

THE COURT: So first of all, it's going to rebut the Vanuatu address.

MS. M. MILLER: Yes, yes, yes. The owner of the following aircraft, then we see the RPC numbers of all of these helicopters with the aircraft serial numbers, and, Ms. Miller, if you could go up so the Judge can see all of them. Then, Your Honor --

THE COURT: And those are the particular RP, which stands for Philippines.

MS. M. MILLER: Yes. And when you look at the serial numbers, that correlates to the U.S. N-registration number. As a matter of fact, Ms. Miller, can you pull up Exhibit D-120 -- no; yes, 123 that Mr. McConwell moved into evidence, thank you, Mr. McConwell, identified for us the correlation between the Philippine registration numbers and the U.S. registration numbers along with the serial number.

So we'll pull that up because that ties it all together for the jury.

THE COURT: Okay, so these -- just for the record, so these helicopter -- RP helicopter registration numbers --

MS. M. MILLER: Yes, Your Honor.

THE COURT: On GE-3003-14, are some of the ones that were represented in the answers by the last witness? On cross-examination.

MS. M. MILLER: Yes, Your Honor.

THE COURT: And were discussed as having been assets of various corporations, not necessarily Jan's corporation.

MS. M. MILLER: Correct. As a matter of fact, Mr. Martin painstakingly went through each individual one to say, so this was owned by Limey, and this was owned by Dave's, and this was opened by Heli Fish, and this was an asset of, and this was an asset of. And now, Your Honor, if you look at what Mr. McConwell introduced, Exhibit 123, you could see RPC numbers, you could see serial numbers, you could also see previous registration numbers here. And what you're going to see, Your Honor, is that this is a moving target for the Defendants.

THE COURT: Well, let me just ask you, is it possible, I mean, that -- maybe Mr. Martin and Ms. McConwell

will say that -- that it was owned by certain of those other corporations, non-Jan's corporations, previous to when Jan's sold it pursuant to this bill of sale?

MS. M. MILLER: But there is no paperwork evidence saying that.

MR. MARTIN: May I respond, Your Honor?

MS. M. MILLER: And here's the issue --

THE COURT: Hold on. Wait, wait, wait. Let me let her answer.

MS. M. MILLER: This is what is really important: Number one, there is no paperwork; number two, Mr. McConwell also entered into evidence those pages from the GEO report that discussed just how companies like Hansen and Mr. Walker can defraud the registry by having this complex schedule of different companies owning different things. Your Honor, it's all smoke and mirrors. I want to show you something here.

THE COURT: No, no, no. I remember the GEO report.

MS. M. MILLER: Absolutely. And when you look at 123, there is something that's very important here.

THE COURT: When I look at what now?

MS. M. MILLER: Exhibit 123 that Mr. McConwell entered into evidence. On the right-hand side, do you see N1DQ?

THE COURT: Yeah.

MS. M. MILLER: Do you see N1DQ? I just highlighted it.

THE COURT: Yeah.

MS. M. MILLER: RPC6911, that is the helicopter that was just in an accident two days ago.

MR. MARTIN: What's that got to do with this?

MS. M. MILLER: That has everything to do with it, Your Honor, everything to do with it because N1DQ is the same helicopter that Mr. Bustos testified about. He said it was in an accident while he was flying it and Jon Walker personally flew out there to do the repairs because the repairs were difficult to do.

Mr. Bustos moves on, this is one of the helicopters that the Defendants claim -- look at this letter, it's saying reserve these registration numbers for Pacific Spotters Corporation, which is yet another shell corporation, which was the subject of the argument we had previously too, Your Honor. And RPC6911, just two days ago, crashed and a helicopter pilot was killed and the mechanics that were flying in the helicopter for a test run were seriously injured.

So Mr. Martin brought up N1DQ to this jury on this cross-examination and he said, isn't N1DQ registered with the FAA and owned by this Vanuatu company? And so, Your Honor, this is absolutely proper redirect to show the jury just what a complex web of deceit has been created by the

Defendants, the way they move these helicopters from company to company depending on who they're trying to defraud.

THE COURT: Okay.

MS. M. MILLER: If they're trying to do fraud the Philippine authorities, here Pacific Spotters owns all of these helicopters, we removed them properly from the U.S. registry, now we want to put them into the Philippine registry; otherwise, it's Jan's Helicopters; otherwise it's Wilma's Flight Services.

You're going to see, Your Honor, because it's already been entered into evidence a balance sheet that shows that Wilma's Flight Service owns all of the helicopters. A balance sheet for the same year that Mr. Martin was showing this jury that the helicopters were owned by all of these different Vanuatu companies. It is critical for the jury to be able to see the fraud.

THE COURT: All right.

MR. MARTIN: May I respond, Your Honor?

THE COURT: Yes.

MR. MARTIN: First, I want to talk about the smoke and mirror. I'm sure everyone can quote every question I asked about every one of the "FAA business records" that I was cross-examining about. I only cross-examined about FAA business records.

"Isn't it true, Agent, that Exhibit 366-4 is a

02:56PM 02:56PM 02:56PM 02:56PM 02:56PM 02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:57PM 02:58PM 02:58PM

record kept in the normal course of business of the Federal Aviation Administration? Yes. Isn't it true, Agent Khamvongsa, that this record is, relates to an N-number? That's true, relating to the FAA registry. Isn't it true, sir, that according to the FAA registry, this particular N-number helicopter has a serial number? Isn't it true, sir, that pursuant to the business record kept by the Federal Aviation Administration, this is registered as a corporation? Yes, sir. Isn't it true, Agent Khamvongsa, that this -- that the FAA registry shows that it is -- the registered owner is this particular corporation? Doesn't the FAA register indicate that the location of this corporation is in Vanuatu."

Every question I asked, Your Honor, dealt specifically with the business records that are kept in the normal course of business relating to the FAA? If she wants to redirect the witness about the business records of the FAA, I can't object, but if she is going to go beyond the scope of what I asked question -- because that's what I asked. My questions were very, very specific, and very specific for an intentional purpose.

THE COURT: What about the last question though about the asset?

MR. MARTIN: I said, "Is the helicopter that is identified by the registry as this number, is that an asset?"

THE COURT: Well, you said is that an asset of

02:58PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM 02:58PM 02:59PM 02:59PM 02:59PM 02:59PM 02:59PM 02:59PM 02:59PM 02:59PM 02:59PM 02:59PM 02:59PM 02:59PM

that corporation though, of that corporation that it's registered to.

MR. MARTIN: I asked if it was an asset.

THE COURT: No, but I -- I know, but it was in the context I thought --

MR. MARTIN: According to the FAA.

THE COURT: Right. According to the business records, and of course he was also very particular, this Agent, and he was saying, okay, so if you're saying is this what the business record demonstrates, or establishes then he was saying; yes, you're right, it is an asset and it's representative of an asset of that corporate registrant owner.

MR. MARTIN: And every one of these has an expiration date and some of these aren't there anymore, Your Honor. And the records that they're trying to bring in, many of them, for example, the one on Jan's Air Service, I can't read the exhibit number. I think it's Exhibit 3003-14, is dated November of 2018. The records I'm referring to come from an e-mail that is in -- found in 366, Exhibit, pardon me, Exhibit 366 that is dated May of 2016. So this is the FAA registry as of May of 2016.

THE COURT: I'm sorry, okay, so wait, wait. So the FAA registry that you queried the agent on was dated May 2016?

MR. MARTIN: Yes, an e-mail from that day.

THE COURT: All right. Okay. But the registration dates were consistent with that date and month, that year and month?

MR. MARTIN: They are -- the e-mail that these came from, Your Honor, was dated, I believe, Wednesday October 5th, 2016, --

THE COURT: No, okay. Let me -- strike that. The ownership dates and the registration dates --

MR. MARTIN: They had to be before that.

THE COURT: Right, so it's before May 2016.

MR. MARTIN: And my questions though --

THE COURT: Wait, wait. So if they're before May 2016, then there is some expiration some other time. As I understand, there is an expiration date.

MS. M. MILLER: None of them expired until 2020, Your Honor. This is 2018. Can we not -- we're being -- we are so splitting the hairs here that the -- we're at risk the government is not having a fair trial at this point. Let me tell you why, Your Honor.

MR. MARTIN: We don't need to go into the government not having a fair --

MS. M. MILLER: Who gives the FAA the information that he read from for two and a half hours? Oh, I'll tell you who, Jon Walker. Jon Walker files with the FAA a registration --

THE COURT: Listen. Okay. Wait. Okay. You guys don't --

MS. M. MILLER: A registration --

THE COURT: You guys don't have to sit and argue, save your arguments for the jury. I get that. We're just focusing on the objection. All I want to do is, we'll find out --

MS. M. MILLER: Yes.

THE COURT: Are the dates inconsistent?

MS. M. MILLER: The dates are --

THE COURT: For example, if somebody could be an owner, a prior owner, and then the subsequent owner was Jan's Helicopters, let's just assume that, then of course Jan's Helicopter Services has the -- is the owner.

MS. M. MILLER: Right.

THE COURT: But if, in fact, these other companies are not really the owners, but it was always Jan's Helicopters, then that's a different story.

MS. M. MILLER: Well, Your Honor, the point is this.

THE COURT: So I'm just looking at the dates, and I think that you guys are flushing it out.

MS. M. MILLER: The point is this, the Defendants had registered these helicopters using the name of different Vanuatu companies as the owners, and then identifying the

03:02PM 03:02PM 03:02PM 03:02PM 03:02PM 03:02PM 03:02PM 03:02PM 03:02PM 03:02PM 03:02PM 03:02PM 03:02PM 03:02PM 03:02PM 03:02PM 03:02PM 03:03PM 03:03PM 03:03PM 03:03PM 03:03PM 03:03PM 03:03PM 03:03PM

mailing address on the registrations as somewhere in Vanuatu. Jon Walker signed most of them indicating that that was correct, and when he signed those, he actually certified that a U.S. corporation was registering the aircraft.

As a matter of fact, let's pull up 752, because Mr. McConwell -- Mr. Martin, actually, specifically brought the witness's attention to a particular registration of aircraft N9068F, and that was Exhibit 752-, was it 52? Yeah. And Mr. Martin asked this witness about this particular aircraft with this particular serial number, and we're going to pull that up for you because this goes right to the heart of this argument, Your Honor.

THE COURT: Okay.

MS. M. MILLER: Okay. So what we see here, is we see a registration of this particular aircraft with this particular serial number N9068F with serial number 210293S, as in Sam. And Mr. Martin talked about this. So this was the original aircraft registration. And we see Whirlwide Helicopters with a Guam address registering this helicopter with Jon Walker as president and, Your Honor, you may or may not remember this because it was a while ago, but the woman from the FAA registry -- Ms. Miller, if you can hone in on the certification part of this here. She brought to the attention of the Court and the jury that when Jon Walker signed this, he was certifying under penalty of perjury, that the company that

was registering it or the individual that was registering it was a U.S. citizen. Look at the certification. We talked about this before. The aircraft is not registered under the laws of any foreign country. We have numerous aircraft in this case that were dual-registered both in the Philippines and in the FAA at the same time, and identified as being owned by different companies at the same time. All of the companies, by the way, owned by Jon Walker. Then it also says that the legal evidence of ownership has been filed with the FAA and it says, if you look at, number one, the above aircraft is owned by the undersigned applicant who is a citizen, including corporations, of the United States. If he was registering as a foreign corporation, which is what Mr. Martin is trying to assert to this jury, then that would have to be marked in that box. And additionally, if we go up --

THE COURT: Marked as --

MS. M. MILLER: Right, are you a corporation or non-citizen corporation. You would have to check non-citizen corporation. Three hundred seventeen times, Jon Walker registered as a U.S. citizen or U.S. corporation.

And Ms. Miller, go to the next registration where Whirlwide now all of a sudden has a Vanuatu address. Because it goes from Guam to Vanuatu, to Guam to Vanuatu. As a matter of fact, Your Honor, you just saw when Mr. Martin was

cross-examining the IRS agent, Limey Air Services, isn't that listed as a Vanuatu company? We had an argument in front of you just yesterday, where you saw that in the bank records for 2939, Limey Air is identified as a U.S. corporation in Guam. And that it is still today a U.S. corporation in Guam. They're using the Vanuatu address in these registrations for these corporations to defraud the FAA. And if they're not using the Vanuatu addresses to defraud the FAA, then they're still defrauding the FAA because they had to identify themselves as a foreign corporation, but they didn't. Because Mr. Martin is right, saying that you have an FAA certification has value. When you're trying to sell a company because you know you're under investigation, you want the person buying the company to believe that your aircraft had value. Look at all of these aircraft registered with the FAA. Look at these valuable, valuable aircraft. In Exhibit 366, which he spent two hours on, are the financial statements of Wilma's and Hansen Helicopters. Wilma's identifies all of the aircraft as being owned by Wilma's.

THE COURT: All right. Well, the Court is going -- go ahead; yes, Mr. Martin.

MR. MARTIN: Your Honor, first of all, the government knows that there is a Limey corporation registered in Vanuatu, if you will pull up Government Exhibit 784, that is the Constitution of Limey Air from -- Services, that is in

Vanuatu. And for them to represent this is a U.S. corporation, that's what their own exhibit, it hadn't been admitted, but it's in their exhibit. 03:08PM 03:08PM 03:08PM

THE COURT: Okay. Well, rather than get into the Limey stuff, let's focus on this -- let's go back to the original objection and the particular, Exhibit 3000 what? Can you go back together it? The one that was not -- 03:08PM 03:08PM 03:09PM 03:09PM

MS. M. MILLER: 3003-15? 03:09PM

THE COURT: Okay. Pull that up one more time. That's really what you're focusing in on. 15. And then the other page after that? 03:09PM 03:09PM 03:09PM

MS. M. MILLER: The page before that was 14. 03:09PM

THE COURT: 14. You're trying to get in 14? 03:09PM

MS. M. MILLER: I'm actually trying to get in 15 because of the representation that Jan's Air makes on 15 that the aircraft that are being sold to Pacific Spotters Corporation, if you go to page 15, and, Ms. Miller, if you go to the middle of that page. 03:09PM 03:09PM 03:09PM 03:09PM 03:09PM

THE COURT: All right. So you're just asking for 3003-15? 03:09PM 03:09PM

MS. M. MILLER: Yes. 03:09PM

THE COURT: That's what you want to bring in? 03:09PM

MS. M. MILLER: Yes. So what I'm trying to focus on here for the jury, Your Honor, is this part, "The aircraft is sold in an as-is basis without any warranties whatsoever as 03:09PM 03:09PM 03:09PM

to the merchantability, fitness for any particular purpose, durability, design, suitability, especially that it was disclosed that the majority of the aircraft are considered to be scrap, non-functional and/or have expired and lost certificates of registration and airworthiness."  That's the part I want to bring in, because of Mr. Martin's insistence on talking about assets, assets, assets, assets, the assets of these Vanuatu companies.  These assets are these helicopters. This is the representation that they're making within their own company about these assets.  They're scrap, they're not airworthy, they have no value, so how can they be an asset. And what's also very important, Your Honor, is in 2018, we have contracts that are covered by these very aircraft in 2018 that are representing to the tuna boat companies, that these aircraft are airworthy.  And here you have an admission by a Defendant, 801D2E, that these aircraft, the majority of the aircraft are scrap, non-functional, and/or have no certificates of registration and no airworthiness certificates.

Additionally, four of the aircraft that he identified in his cross-examination, were on the MD Helicopters destroyed list before 2016 and yet, that's what the Defendants are trying to sell, and that's what they're using.  It is critical for the jury to hear this.  This is relevant.  It has been disclosed.  It's admissible.  It's not

03:09PM 03:10PM 03:10PM 03:10PM 03:10PM 03:10PM 03:10PM 03:10PM 03:10PM 03:10PM 03:10PM 03:10PM 03:10PM 03:10PM 03:10PM 03:11PM 03:11PM 03:11PM 03:11PM 03:11PM 03:11PM 03:11PM 03:11PM 03:11PM 03:11PM

hearsay.  And it's an admission under 801D2E.  It's within the

timeframe of the fraud, and it is directly within the scope of

a cross-examination that went on for two hours to try to leave

this jury with the wrong impression.

THE COURT:  Okay.  I've heard the arguments from

everybody.  With regard to 3003-15, the Court understands that

the prosecution is trying to proffer these list of exhibits --

these list of helicopters as not being really assets, I guess

-- as defined, what assets are, but rather what is indicated

here in this particular highlighted portion that she's talked

about.  And in addition, the proffer is that they're not

assets of the individual alleged shell corporations that have

been identified during cross-examination, but rather are

assets, if you will, of Jan's corporation.  And so, so, to

that extent, the Court does not find it's beyond the scope of

cross-examination, and will allow it.  And allow the exhibit

to be brought forward to the agent.

The question as to whether it's hearsay or

nonhearsay, the Court finds, at this point, it's nonhearsay.

And it's -- because it's an admission by a party opponent, so

the Court will allow question to go.

Yes, Ms. McConwell?

MS. MCCONWELL:  Your Honor, I think it's

important for you to go back and look also -- well, first of

all, this is beyond 2955, which is the third amended exhibit

list. But if the Court is going to be entertaining it, the Court needs to look at 3003-14, which was up prior. Because this is not the Jan's Helicopter that is on the Vanuatu list. This is Jan's Helicopter which is a corporation formed under the Philippine laws. This is not Jan's Helicopters that's a Vanuatu corporation. And it says so directly on the bill of sale, and Ms. Miller can smirk all she wants --

MS. M. MILLER: I'm smirking because of the lies. It's constant. Now we --

MR. MARTIN: Wait.

THE COURT: Counsel, wait. Let her finish. Let her finish. Be respectful.

MS. M. MILLER: Where is the paperwork showing that Jan's --

THE COURT: Hold on. Wait just a minute. Listen -- first of all, I can't understand two people talking at the same -- now three people, three persons, and neither can my court reporter.

MS. M. MILLER: Sorry, Veronica.

THE COURT: Yeah. And then secondly, well, anyway, go ahead. Yes, Ms. McConwell. Proceed.

MS. MCCONWELL: Either if Mr. Leon Guerrero would put up or Ms. Miller whoever has -- is driving, or let me drive, it's 3003-14. If you look in the recital portion of the bill of sale, the Jan's Helicopter Service, Inc. existing

03:13PM 03:13PM 03:13PM 03:13PM 03:13PM 03:13PM 03:13PM 03:13PM 03:13PM 03:13PM 03:13PM 03:13PM 03:13PM 03:13PM 03:13PM 03:14PM 03:14PM 03:14PM 03:14PM 03:14PM 03:14PM 03:14PM 03:14PM 03:14PM 03:14PM

under Philippines laws and having its principal place in the Philippines, is -- the corporation that is involved in this transaction. It is not --

THE COURT: I'm sorry, so -- excuse me?

MS. MCCONWELL: 3003-14.

THE COURT: Can you pull that up, somebody?

MS. MCCONWELL: Yeah. If I can drive, I'll pull it up.

THE COURT: Let's have prosecutors pull it up since they got it. They can go straight to 14, okay. And make that a little bigger please. So Jan's Helicopters Service, Inc. it says there under Philippine laws.

MS. MCCONWELL: So right here.

THE COURT: At the top.

MS. MCCONWELL: Right there under Philippine laws, so this is the Jan's Helicopters Service, Inc. that is a corporation that's organized under the laws of the Philippines. It is not a Jan's Helicopters that has been organized in Vanuatu. They're separate organizations. And Ms. Miller is continually trying to merge them together like she's done with Wilma's, like she's done with Limey's.

These are separate and distinct corporations that she's representing to you the reason it should be in is because that Jan's Helicopters, the Jan's Helicopters in here or on the next page is the Vanuatu corporation, but if you

look at the document --

THE COURT: So I'm sorry, are you saying there is two different Jan's Helicopters?

MS. MCCONWELL: Yes, that's exactly what I'm saying.

THE COURT: One corporation that's established under Philippine law, and the other under Vanuatu laws?

MS. MCCONWELL: Yes, ma'am. That's exactly what I'm saying.

THE COURT: That really, that to the extent that she's trying to rebut the testimony under direct examination with Mr. Martin, on this agent, it's the wrong Jan's corporation?

MS. MCCONWELL: That's correct.

THE COURT: That's what you're saying?

MS. MCCONWELL: That's what I'm saying.

THE COURT: Okay, I got it. I got the gist.

MS. M. MILLER: Absolutely ready to respond because, you know, I'll give Ms. McConwell the benefit of the doubt and assume maybe she just doesn't -- hasn't studied the evidence as much, but this just --

THE COURT: Well, I don't think that -- wait, wait.

MS. M. MILLER: Let me tell you why.

THE COURT: That wasn't nice, Ms. -- excuse me,

03:15PM 03:15PM 03:15PM 03:15PM 03:15PM 03:15PM 03:15PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM 03:16PM

Ms. -- wait, wait, okay. 03:16PM

MS. M. MILLER: I want you to look -- 03:16PM

THE COURT: Hold on. Hold on. 03:16PM

MS. M. MILLER: Ms. Miller, can you bring up so the Judge can see very clearly -- 03:16PM

THE COURT: Excuse me, Ms. Miller, that wasn't nice to say. She hasn't said -- 03:16PM

MS. M. MILLER: Well, Your Honor, you know, it is just so frustrating to sit here and to have Counsel of record who is an officer of the Court say that these are two completely different -- 03:16PM

THE COURT: She just said it. 03:17PM

MS. M. MILLER: I know, okay. 03:17PM

THE COURT: But let me just say. 03:17PM

MS. M. MILLER: Wow. Okay. I'm going to show you why that is absolutely false. 03:17PM

THE COURT: Well, my point is, Counsel, Ms. Miller. 03:17PM

MS. M. MILLER: Sorry. 03:17PM

THE COURT: Let me get your attention, please. So first of all, you guys don't need -- you all don't need to insult each other. I mean, really. All you have to say is you know what, you can say what -- you can think what you feel about somebody, but really, if the evidence shows otherwise, if the evidence is in your favor, all have you to say is, you 03:17PM

know, that's an incredulous argument, I mean, the evidence shows this.

MS. M. MILLER: Yes.

THE COURT: Without saying, hey, did she study the record. Come on.

MS. M. MILLER: Well, it is an incredulous argument, and I'm going to show you.

THE COURT: I think you do need to apologize.

MS. M. MILLER: I'm sorry I said that, Laura. It is an incredulous argument, and I'm going to show you why.

MR. MCCONWELL: May I clarify something, Your Honor? That argument, just to clarify.

THE COURT: I think so; yes.

MR. MCCONWELL: It appears to me that these helicopter -- first of all, 6911 is not on the list. That's the one that crashed a couple days ago. It appears to me these are the helicopters that are registered by Jan's Helicopter Service in the Philippines that had the flag with the government over the fees in 2014, and I don't remember the exact dates, but in the early time, they pulled the certificates, you had somebody from the Philippines testify, and this was all administrative issue, wasn't anything about airworthiness, but those were pulled. I haven't had time to match up the letters, but I suspect those are the 17 or so that lost their airworthiness certificates and their

registration. So that's a totally different deal, and they're probably not -- 1DQ is not on the list. It's been deregistered anyway and now re-registered in the Philippines, and there is a process that the Philippines --

THE COURT: Are you talking --

MS. M. MILLER: Your Honor --

MR. MCCONWELL: Let me finish.

THE COURT: Hold on.

MR. MCCONWELL: It will become relevant to you at some point. But the point is, this is something totally different that has been represented to you, and I don't know how to --

THE COURT: Okay, listen, if you're trying -- it sounds like you're talking about the incident that happened two days ago with that other helicopter, is that what you're talking about?

MR. MCCONWELL: Two days ago, but that's one that wasn't on the Philippine registry here.

THE COURT: Right, but for me to, for me right now, the issue is, if you will, let's just focus on the objection. And then that other issue could very well be a distraction for everybody.

MS. M. MILLER: So if I could share my screen with Your Honor and Counsel?

THE COURT: Yeah.

MS. M. MILLER: I could show you why --

THE COURT: So the only issue is she says they're two separate corporations, you say they're one in the same.

MS. M. MILLER: Yes, they are.

THE COURT: So just show us the evidence.

MS. M. MILLER: Yes, Your Honor.

THE COURT: As they say in Missouri, show me.

MS. M. MILLER: Exactly. So if you --

THE COURT: I should know that, I went to law school there. Go ahead.

MS. M. MILLER: You'll be able to see this in a moment.

THE COURT: All right.

MS. M. MILLER: So, Your Honor, this is a chart that was created to show that Jan's Helicopters is Jan's Helicopters, period. Doesn't matter if they used a Vanuatu address, the Philippines. Just like Limey Air, he mentioned the charter for Limey Air that was in 2002, not in 2016, '17, '18, which all says it is a U.S. corporation in Guam. So which is it? I don't know. I guess they get to choose. But I'm not able to show you this unfortunately.

MS. S. MILLER: I could do it from over there. If you want to stand over there.

MS. M. MILLER: Wait a minute. I think I just connected it now. There we go. So, Your Honor, if you look

at RPC4901, which is in Exhibit 3003.

THE COURT: And that's been admitted.

MS. M. MILLER: No. It was page 14 of 3003 that Ms. McConwell was saying, Your Honor, this is not the same Jan's, this is a different Jan's.

THE COURT: How do I know -- wait just a minute, can I ask you a question?

MS. M. MILLER: Yes.

THE COURT: How do I know --

MS. M. MILLER: I have the exhibit numbers here.

THE COURT: No, I know, but how do I know -- all I see here is Jan's Helicopter assets.

MS. M. MILLER: I'm going to tell you.

THE COURT: But how do I know Jan's is one corporation?

MS. M. MILLER: I am going to tell you, Your Honor.

THE COURT: Okay.

MS. M. MILLER: 3003 is one document, but then there is also 355, which identifies Jan's and identifies RPC4901, which is on --

THE COURT: Okay. Hold on. Hold on. Wait, wait, wait.

MS. MCCONWELL: I want to know what exhibit this is.

MS. M. MILLER: This is a demonstrative aid. It is not an exhibit.

MS. MCCONWELL: This is a new summary chart, Your Honor.

MS. M. MILLER: This isn't a summary chart. Your Honor asked how do we know that Jan's is Jan's, and I'm showing you.

MS. MCCONWELL: It's a chart.

MS. M. MILLER: This is all the exhibits that have been entered into evidence already.

THE COURT: Let me just ask, okay. This sounds like -- I can see this, it looks like it talks about what's the registration number of the helicopters and --

MS. M. MILLER: Correct, and --

THE COURT: -- accidents and serial number.

MS. M. MILLER: -- and the serial number.

THE COURT: And then the name of the registered owner.

MS. M. MILLER: And the N-number, and then the name of the registered owner. So Bean Bag, which you've heard, unless they're going to now say Bean Bag is not a Vanuatu company, maybe that's also a Philippine company. Bean Bag, right here --

THE COURT: Yes, we've heard.

MS. M. MILLER: -- is the registered owner of the

03:21PM 03:21PM 03:21PM 03:21PM 03:21PM 03:21PM 03:21PM 03:21PM 03:21PM 03:21PM 03:21PM 03:21PM 03:21PM 03:21PM 03:21PM 03:21PM 03:21PM 03:21PM 03:21PM 03:21PM 03:22PM 03:22PM 03:22PM 03:22PM 03:22PM

helicopter that is on the list in 3003 that is identified with both RPC4901 and the serial number 810338S. That helicopter was registered in the U.S. as N501F Harry?

MR. MCCONWELL: Hotel.

MS. M. MILLER: Hotel, thank you. And so you see that there. So, Your Honor, what we did was we correlated all of the helicopters that were identified in the Exhibit 3003, which by the way, was an exhibit that was seized from the Defendants' computer, from Hansen Helicopters' computer identifying all of these helicopters, and then we also have Government's Exhibit 355 which correlates it. So we've correlated all of those RPC numbers with serial numbers with N-numbers, if they were ever registered with the FAA and with other identifying information including these Bean Bag helicopters, Ohara Helicopters, Hansen Northern Helicopters. These are all companies that you heard Mr. Martin talking about as having assets --

THE COURT: I see. Okay.

MS. M. MILLER: Yes. Whirlwide, Heli Fish.

THE COURT: Okay, so let me just say, I can streamline this or separate this. I understand how you -- which I think is very good, this is easy to read -- understand, that I can see how you're saying, okay, so when there were sales, these sales were linked back to certain numbers, which link back to certain shell registered owners.

MS. M. MILLER: Yes.

THE COURT: But in the end, it was Jan's Helicopter sales.

MS. M. MILLER: Yes.

THE COURT: Alleged. All right. I get that. But how do I know that -- the issue is, is Jan's Helicopters -- what kind of corporation is it, that's what -- they're trying to say, well, they're two different corporations, so you got the wrong one.

MS. M. MILLER: I'm not saying they're two different corporations.

THE COURT: No, no, no. I know. They're saying -- how do I know that Jan's corporation is --

MS. M. MILLER: They're making that assertion.

THE COURT: No, okay. Strike that. How do you know that Jan's corporation is a -- according to you, Jan's corporation is a -- well, I'm sorry --

MS. M. MILLER: No, no, no.

THE COURT: The exhibit that you were bringing out in 3003-15.

MS. M. MILLER: Yes.

THE COURT: Says Jan's corporation is registered under the Philippines laws.

MS. M. MILLER: No.

THE COURT: Right?

MS. M. MILLER: That's what the Defendants are saying. The government isn't saying that.

THE COURT: Oh, I see. Okay. Wait.

MS. M. MILLER: The Defendants are saying that because it's their documents.

THE COURT: No, no, no. My point -- okay, let me just go back. So the exhibit --

MS. M. MILLER: Yes.

THE COURT: -- said that.

MS. M. MILLER: Yes.

THE COURT: So the exhibit said that. And was that Exhibit 3003-15, that was --

MS. MCCONWELL: 14.

THE COURT: -- that was found from the Defendants' corporation.

MS. M. MILLER: Turner Kapp signs it. Turner Kapp signs that document.

THE COURT: Can you pull up 3003-15 for one second.

MS. M. MILLER: Can you pull 3003 back up and then also --

THE COURT: So wait, wait. Hold on. Let me just finish my thought process, I just got to understand this. All right. So once I get it, I get it, I'll get it. So 3003-15, it says that the Jan's corporation was established under the

laws of Philippines, the Defense Counsel is saying, well, you got the wrong -- there is -- the rebuttal is actually wrong because Jan's corporation that is being represented really is a Vanuatu one, that's what they're saying. I mean, that's the argument.

MS. M. MILLER: No, they're not saying that. As a matter of fact --

THE COURT: They just said there is two separate corporations. You've got the wrong one.

MS. M. MILLER: No, Ms. McConwell --

THE COURT: At least that's what I thought --

MS. M. MILLER: She's not saying that. She's not saying.

THE COURT: Ms. McConwell, did you say that?

MS. MCCONWELL: (Nodded head.)

THE COURT: You said, I thought you said they got the wrong -- she did say that. Okay.

MR. MARTIN: Judge, could we get a copy of the demonstrative exhibit that they're showing you so we can respond to them? The one they just showed you, I've never seen before. I don't think we have it, and I don't think it's fair for them to drop it on you, and we've never seen it.

MS. M. MILLER: I'm not dropping anything on you, I'm answering your question about how will you know it's relevant.

MR. MARTIN: Can you give me the demonstrative exhibit, please?

THE COURT: Can you give him a copy of that one that's --

MS. M. MILLER: Sure. Absolutely.

MR. MARTIN: We've got to get them all.

MS. M. MILLER: Absolutely.

THE COURT: Why don't you give it to them so they can look at it first before we get into this.

MS. M. MILLER: Well, there is something else I want to bring up to your attention.

THE COURT: Hold on. Just let them at least look at it. I think I got.

MS. M. MILLER: Okay.

THE COURT: But, I guess, my -- she did -- that is her argument though.

MS. M. MILLER: But, no, but one thing you don't get, and I'm worried about that, and that's this, Your Honor --

THE COURT: I don't think. I think I got. I think I know what you are going to say.

MS. M. MILLER: No, I mean you got what's been said.

THE COURT: No, no, I got what's been -- not what is being shown to me. Now, whether it's true or not is a

different story.

MS. M. MILLER: Yes.

THE COURT: I get that. But my question is, so this bill of sale says this -- this bill of sale under 3003-14 indicates that the Jan's is registered under the Philippine laws, right?

MS. M. MILLER: Yes.

THE COURT: Okay.

MS. MCCONWELL: Yes.

THE COURT: Okay, so I got that.

MS. M. MILLER: Yes.

THE COURT: And the Defense Counsel is saying, look, there's two different companies here, there is not a true rebuttal here.

MS. M. MILLER: Where is the evidence of the other Jan's company, 829 which is also something that they produced where they have Jan's as a Vanuatu company? Don't you see what they're doing?

THE COURT: No, I understand what you're saying. 829 is what now?

MS. M. MILLER: 829.

THE COURT: Oh, 829 is that?

MS. M. MILLER: 829.

THE COURT: No, no, 829, I thought you said A-29.

MS. M. MILLER: No, 829 was produced by the

Defendants, both of these Counsel, in a motion that they filed with this Court, and they represented to the Court here's the structure of the company, okay. They keep wanting to say the Government's Exhibit 829. This isn't our Exhibit 829. I don't believe anything that they have to say about their corporate entities or their structures. To me that's not issue; the issue is the helicopters. Because the helicopters are what they registered with the FAA and once they did, they were required to comply with the requirements of the FAA. If they want to screw around and say, you know Jan's is a Philippines corporation in one instance, but it's really a Vanuatu corporation in another instance.

The government has never seen a Vanuatu charter for Jan's. Do they have one? I don't know. We've never seen it. The only thing we've seen for Jan's, Your Honor, if we go back to Exhibit 355, as you recall, the Philippine authorities --

THE COURT: Okay. I got it.

MS. M. MILLER: -- involuntarily deregistered and delisted all of those helicopters for their failure to comply with the Philippine rules. Remember that was admitted into that evidence. And Harry Lero, who is their representative in the Philippines for Jan's, accepted that delisting and that deregistration. And then Harry Lero is also the gentleman who is an agent of the Defendants who accepted $18,000 a year in

bribes to keep the Philippine authorities at bay while they were able to fly those helicopters for almost ten years without any oversight without any review or anything. All of that has gotten into evidence as well.

My point is this, doesn't matter if Jan's is a Philippine corporation legitimately or a Vanuatu corporation. What matters is they're identifying helicopters that are subject of this indictment.

THE COURT: Okay. I got it. I got it.

MS. M. MILLER: So helicopters can be traced to the indictment.

THE COURT: Okay. So I got it. I think you pounded it through pretty well.

All right. Yes, Ms. McConwell?

MS. MCCONWELL: I respectfully disagree with Ms. Miller's argument.

THE COURT: Okay. You have to get on to the mic then, please. You respectfully disagree?

MS. MCCONWELL: I respectfully disagree. If you look at the 3003 was a document that Ms. Miller offered after 2955, which was the end of the third amended exhibit list, which we've talked about ad nauseam that they're not to come in beyond that. And several exhibits --

THE COURT: Well, the only way that an exhibit -- let me just say this, the only way an exhibit can come in

that's beyond the exhibit list is if it's true rebuttal or if there is new evidence that needs to be brought in, they can ask for that, but go ahead. 03:30PM

MS. MCCONWELL: Portions of the 3003 were not rebuttal. They were things that they brought in on the direct examination of Mr. Marty, and they couldn't bring in these additional documents. But if the Court is going to look at the 3003, 3003-14 was a document that the Philippines certified that was in their records and it shows that Jan's Helicopters, Inc. that is a portion, that is a party to that contract is a Philippine corporation.

THE COURT: Okay, so let me just say this, all right. Fine, that's fine. So if the evidence shows -- let me just say this, if the evidence shows that the Philippines government registry office, says that Jan's was established under the Philippine laws, then okay, so you got it, that's your argument, you could argue that. And if, if the 892, I guess that exhibit there, says that Jan's is a Vanuatu corporation, I mean, you could make your argument, really. You guys can both make your argument. That the prosecutor is going to say they're one in the same, doesn't matter. She's obviously saying that she feels, well, you know what she feels about fraud.

MS. MCCONWELL: And then beyond that, I believe she conflates the dates. So the e-mail that had or the FAA

documents from the FAA registry are what were attached to Government's Exhibit 366, which Mr. Martin went through, was an e-mail that was sent in late 2016. And those show all of those registry. The aircraft that she wants to talk about that were deregistered in the Philippines, that occurred I believe in 2014. And the evidence was that $17,000 was paid because the Philippines charged all of the aircraft owner for all of the inspections, which the United States doesn't do. And for a number of aircraft they had, that's what the cost was.

THE COURT: Okay. But let me just say, let's just focus on -- the focus is on the particular request. So the prosecution is asking for 3003-15.

MS. MCCONWELL: Right.

THE COURT: And you're asking for -- well, if you're going to do that --

MS. MCCONWELL: I don't think 3003-15 should be admitted. It's not even in, it's not the same timeframe. It's a document that's two years later, it's dated 2018 and what Mr. Martin went through was in 2016.

MR. MARTIN: August. August.

THE COURT: What he went through were records --

MS. MCCONWELL: FAA records.

THE COURT: -- demonstrating registration of all those companies.

MS. MCCONWELL: Right. Effective 2016.

THE COURT: Okay. But does it -- let me ask you this, does it matter though with the -- I guess, the registration though, there would be an expiration, most governments have expirations on vehicles and aircraft so that they can keep getting money. Is that not true?

MS. MCCONWELL: I think it does matter.

THE COURT: No, no, no, but is that not true? There would be an expiration. Wait, wait, and if that's true, then the prosecutor has represented to the Court that the expiration was not until 2020.

MS. M. MILLER: Correct.

THE COURT: And that the particular sale, bill of sale, is identified as 2018.

MS. M. MILLER: That's right.

MS. MCCONWELL: Well, I don't know that we have all of the specific -- all of the specific documents.

THE COURT: So you want to review them?

MS. MCCONWELL: Related to that --

THE COURT: Well, okay. That's her theory, and that's what she says she has the evidence.

MS. MCCONWELL: We do know that a number of aircraft were deregistered in 2020 because it was requested to try to make sure that they were all cleaned up. Because -- and I think Mr. Walker -- those are admitted into evidence of

03:33PM 03:33PM 03:33PM 03:33PM 03:33PM 03:33PM 03:33PM 03:33PM 03:33PM 03:33PM 03:34PM 03:34PM 03:34PM 03:34PM 03:34PM 03:34PM 03:34PM 03:34PM 03:34PM 03:34PM 03:34PM 03:34PM 03:34PM 03:34PM 03:34PM

all of the requests for deregistration for a number of aircraft. So that's for 2020.

THE COURT: But the purpose of this -- the purpose of this redirect is to rebut the testimony that was given by the witness through the cross-examination. And they're trying to rehabilitate. That's what they're trying to do.

So the Court finds, just based on what has been presented -- are you saying you need more time to review it? Because based on what I see, I think -- I mean, I think it's right, I think she's does have an opportunity to go forward and the Court will allow the questioning.

MR. MARTIN: Your Honor, I went through -- I think.

THE COURT: Yeah.

MR. MARTIN: I went through multiple, as everybody will recall.

THE COURT: Yes.

MR. MARTIN: Multiple, some of them expired in -- I haven't looked at them all, but they all had different expiration date. I'm looking at one right now, 2017; this document, 2018. I'd like to go through them and find out --

THE COURT: Well, why don't do you that. Since this is a new document, go look through it. And to the extent that, I mean, if there's 40 helicopters -- you know, I'm just

 -- if there are 40 helicopters that were -- that he identified as being registered to all of these alleged shell corporations and only two of them are relevant to that bill of sale, then you got a good point. She can only -- you know, so, yeah.

MS. M. MILLER: And it goes to the weight and not the admissibility, and now we lose 24 minutes of the day.

THE COURT: Well, no, but they're right, I mean, they do have the right to look at this. They haven't looked at that what you just indicated.

MS. M. MILLER: Right now on the FAA registry, one of these very helicopters is shown as being registered in the name of Jan's in Vanuatu, right now.

MR. MARTIN: Well, that's great.

MS. M. MILLER: Right today.

MR. MARTIN: That's not relevant to what we're talking about.

MS. M. MILLER: It's very relevant because it's one of the ones that Mr. Martin identified with this agent to say, isn't this an asset of this particular Vanuatu corporation, and then we have Ms. McConwell coming up going, wait a minute, Jan's is a Philippine corporation. They mixed and matched which corporations they used.

THE COURT: So that may be true. Maybe that's exactly what they believe and they know. Okay. In the end, it's what the jury is going to believe, so you guys have to

03:35PM 03:35PM 03:35PM 03:35PM 03:36PM 03:36PM 03:36PM 03:36PM 03:36PM 03:36PM 03:36PM 03:36PM 03:36PM 03:36PM 03:36PM 03:36PM 03:36PM 03:36PM 03:36PM 03:36PM 03:36PM 03:36PM 03:36PM 03:36PM 03:36PM

pull to together.

MR. MARTIN: Your Honor.

THE COURT: This case will rise and fall on your understanding of the evidence and your closing argument.

MS. M. MILLER: 100%.

MR. MARTIN: Your Honor, that is not what I represented. I said is this aircraft in the FAA registry an asset. I did not particularly refer to any specific corporation, but what I would ask is --

MS. M. MILLER: What?

MR. MARTIN: We just saw an exhibit I haven't seen before. If the government has exhibits, I'd like to see them.

THE COURT: I think, no, maybe I'm wrong, but I was under the impression that you were -- okay. I'll have to think about that or go back and listen to that question. I was under the impression that when you were going through the registration requirements, and he was confirming them, that when you asked the last question about the asset, it was essentially, is this an asset of the corporation that is being registered.

MS. M. MILLER: Yes.

MR. MARTIN: May I say what I said, since I remember, I asked it. I believe the question was, based upon the records of the FAA, a particular helicopter has been

03:36PM 03:36PM 03:36PM 03:37PM 03:37PM 03:37PM 03:37PM 03:37PM 03:37PM 03:37PM 03:37PM 03:37PM 03:37PM 03:37PM 03:37PM 03:37PM 03:37PM 03:37PM 03:37PM 03:37PM 03:37PM 03:37PM 03:37PM 03:37PM 03:37PM

identified as X, is that helicopter an asset?

MS. M. MILLER: Of that entity.

MR. MARTIN: I didn't say that.

MS. M. MILLER: Oh, of course you did.

MR. MARTIN: Then let's replay it.

MS. M. MILLER: Let's look at -- let's have Veronica read it back. Because I think that's going to be the most fair way to do this because we have revisionist history going on. Your Honor, if your memory and my memory, is that --

THE COURT: Let's not get Washingtonian, please.

MS. M. MILLER: But if your memory and my memory is he was associating these helicopters with that company --

THE COURT: Let me just say, I got the impression, really, Mr. Martin, I got the appreciation that you were -- I mean.

MS. M. MILLER: Why else do it?

THE COURT: No, we can do it.

MS. M. MILLER: But, no, what I'm saying is why else would he do it unless --

THE COURT: Let's just hear the Q and A. Yeah. He did say -- he did put an emphasis on the first three letters. Let's hear it.

MR. MARTIN: May I make a suggestion, Your Honor? I don't think we are going to get done with this issue before

4, and I'm just saying that for the purposes of the jury.

THE COURT: Yeah. Right. Let me call the jury back in, and I'm going to just excuse them. I'm going tell -- so, Counsels, here's the deal, we have -- I have some off-island trainers coming in for my staff, and I have to meet with them. And my staff has asked that I, because some of the staff wants to go to the training, which I understand. So I -- I'm going to just recess for a few hours, and then we'll start later tomorrow.

MS. M. MILLER: Okay.

THE COURT: All right. I'm sorry about that, but I thought we'd be done by Wednesday.

MS. M. MILLER: Yeah, I know. Well, you know, if we take all this time we can't -- but a couple of things, one of the things we have talked about and just for planning purposes because next week then becomes tricky.

THE COURT: What happened -- what's going on next week?

MS. M. MILLER: Well, I mean we thought we'd be done this week. I'm sure you have things planned, we have witnesses, like Mr. Guzzetti, was supposed to leave on Sunday. He has other obligations so we're running into an issue there, but we're going to push through. I don't know if Saturday is a possibility for trial, Your Honor. I also think, just for planning purposes, one of the things that we've been

discussing is we may just finish our case with Mr. Guzzetti, and not call Mr. Klang. In which case, it would be nice to know if the defense is going to call any witnesses, and whether we need to be ready for closings, and we still have to discuss jury instructions. Yes.

THE COURT: Jury instructions, which you guys have a copy of. I'm not so worried about us handling the legal issues, working overtime in the morning or late evening. The issue is getting the jurors done, and you guys getting into closing argument. That's the issue. What Mr. -- all right, Counsel? What do you think?

MR. MARTIN: Your Honor, I think if we're going to do Saturday, we got to take the jury into consideration.

THE COURT: I'll have to ask them. I'll have to ask them. I'll have Lani -- come on, bring in the jury.

MR. MARTIN: If we're not going to call Mr. Klang --

(Jury in at 3:40 p.m.)

THE COURT: If you're not going to call him what? All right. Please be seated. Thank you, ladies and gentlemen, for your patience. We're going to go ahead and retire for the day, recess for the day. We're still going through some legal issues that come up, and I'm sorry about that, but when there are legal issues that have to be decided by the Court, it has to be outside your presence. So that we

can figure it out and see if certain evidence can come in or not. So I would like to thank you again for your patience. Please keep an open mind, and do not form or express any opinion on this case until it's submitted to you at the time of deliberation. Do not speak to anyone on any subject connected with the trial. In addition, stay away from all social media that may report on the case. Tomorrow I have some off-island trainings that are coming in for my staff and in order to let them have an opportunity to attend that training, the Court is going to have to be in recess. I've decided to be in recess while they're training, but we will come back tomorrow and resume at 1:00 in the afternoon. I apologize for that, but we'll have to do that.

In the meantime, I'll have to work on some stuff with the lawyers here. Either today and finish up today, we're going to be here until later today and then hopefully, we'll finish up some stuff tomorrow. But still, we're almost done with the testimony of this last witness, and then the prosecution may call one or two more witnesses, and so I'm thinking, to be perfectly honest, we thought we would be done this week, and unfortunately, it's not happening because there are legal issues that have arisen during the course of the trial. And that happens in every trial. It's not just limited to this trial. So it looks like we'll be done next week. I'm pretty confident you guys will get the case next

week.

The Court has to ascertain how many more witnesses will actually testify, I'll be speaking to the lawyers, and then while we were -- while we had the break, the attorneys were working on the jury instructions, so we will have to have a jury instructions conference, I will have to have that with them and have all the jury instructions prepared for you.

So I just want you to hang in there, we still need you. We don't -- I don't want to lose you because we've gone this far, and the government has paid so much money just to keep you here, and to make sure that -- and I appreciate your dedication to staying on in the trial and listening to the evidence. So I'll see you tomorrow. Please be here by no later than 12:45 and we'll start at 1:00. Please rise for the jury.

(Jury out at 3:44 p.m.)

THE COURT: Please be seated. Okay. So, yeah.

MR. MARTIN: I was going to say, Your Honor, Ms. Miller indicated that they may rest after Mr. Guzzetti.

THE COURT: Okay. Hold on. Hold on. Hold on.

MR. MARTIN: I'm sorry.

THE COURT: Oh sorry, Veronica needed to --

MR. MARTIN: I'm sure she heard everything I said.

03:43PM 03:43PM 03:43PM 03:43PM 03:43PM 03:43PM 03:43PM 03:43PM 03:43PM 03:43PM 03:43PM 03:43PM 03:43PM 03:43PM 03:43PM 03:44PM 03:44PM 03:44PM 03:44PM

THE COURT: Who? Veronica? Yeah. Well, she -- hold on.

MR. MARTIN: As I was saying, Your Honor, Ms. Miller just indicated, possibly, that the government may rest after Mr. Guzzetti. 03:44PM 03:44PM 03:44PM

THE COURT: Right. 03:44PM

MR. MARTIN: And asked, it would be nice to know what our intentions were. Of course, this is the first we've heard of that. We need to visit privately about that before we can give and answer, but if that's truly something that's going to occur, then we would like to know that too because it impacts where we are going too, as far as, are we going to call witnesses or not. And I don't want, hypothetically, tomorrow at 3:00, let's say, they're done and suddenly we're expected to call witnesses so that's the reason I make this comment. 03:44PM 03:45PM 03:45PM 03:45PM 03:45PM 03:45PM 03:45PM 03:45PM 03:45PM 03:45PM

THE COURT: Is that -- that's the reason why what? 03:45PM 03:45PM

MR. MARTIN: Well, I mean, if they are going to end with Mr. Guzzetti, that impacts anything we do, whether we call witnesses or not, so that's the reason I'm making this comment. 03:45PM 03:45PM 03:45PM 03:45PM

THE COURT: Guzzetti has to leave by this Sunday? 03:45PM

MS. M. MILLER: Well, that was what he was scheduled to do, and I'm going to have to now see if we can 03:45PM 03:45PM

move him back. I mean, I don't know what else to do.

THE COURT: Is he here on Guam?

MS. M. MILLER: He's here on Guam; yes.

THE COURT: Okay.

MS. M. MILLER: Pardon?

THE COURT: Yeah, I forgot to ask the jurors, are they still out there? For Saturday, I'm not sure.

MS. M. MILLER: Yeah, that would work, if we could do it on Saturday, then we could do that. Worse case scenario, since Mr. Khamvongsa is here on island, we could jump in Mr. Guzzetti and then finish him, and then get Mr. Khamvongsa back on to finish him.

THE COURT: How much time do you need on Guzzetti? Oh, Guzzetti was the guy --

MS. M. MILLER: He's the accident reconstruction expert, Your Honor, he's the gentleman that did the jury view. So my direct examination of him will be four hours.

THE COURT: Oh, okay. That's a long time then.

MR. MARTIN: Judge, I don't mean any disrespect to anyone, but based upon how long it's taken with every witness we've had, I don't know how in the world, even if we go Saturday, I mean, I would love to finish Saturday, I don't know how in the world though that we might get done on Saturday.

THE COURT: Yeah.

MR. MARTIN: And I'm just saying that out of caution so that if they do need to make other arrangements, I want them -- I'm not misrepresenting.

THE COURT: I'm going to bet that some of the jurors already have plans. Really, I do think that. It's kind of late for us to ask them. I mean, if I had done it earlier in the week. They were under the impression that we would be done this week, but you guys have a new issue popping up every hour on the hour.

MS. M. MILLER: Yeah, I mean, it wouldn't hurt to ask. They may have plans, but if they don't, we can then push through. Anyway.

THE COURT: Yeah, I don't know because the way in which this is going, even if you did four hours without interruption, without any objections, which I doubt that will happen.

MS. M. MILLER: Yeah, I doubt that, too.

THE COURT: I doubt that. They have the right to present their case, and when they go -- when they cross-examine Mr. Guzzetti, I'm sure it's going to be.

MS. M. MILLER: But, I mean, it's also -- you know, one of the reasons why I would cut Mr. Klang is if they were going to present a witness, because we're going to running up against some deadline just with Counsel here. And so that's why this whole -- we don't know if we're going to

call anybody. You know, if they really don't, that's one thing you, I would think by now, after all this time, they probably do know. So it would just help us with scheduling, Your Honor, if we knew if they were going to call anybody.

THE COURT: Do you guys have an idea, or you just don't want to tell her?

MR. MARTIN: Two things, we are considering whether or not to do it, and I'll be honest with you, Your Honor, I never make that final decision until the government rests and I evaluate where we think we are in the case. So if I say, no, we're not calling any witnesses, and then come next Tuesday I'm going, well, Your Honor, you know, because they did this and this and this, I got to call these three witness. I don't want to misrepresent anybody. I will not make that decision or Mr. Walker won't make that decision until he and I talk about where we are in the case. I'm saying that out of candor so everybody will understand what goes into this, it doesn't just happen.

THE COURT: Yeah, well, I mean, I think everybody says that. All Defense Counsels say that, and then they -- and I think they probably mean it. So that's fine. We understand. So putting that aside.

MS. M. MILLER: Yes, the motion.

THE COURT: Back together this issue. So let me just say I'll -- let the Defense Counsel review the

demonstrative exhibit. But I am inclined to allow it in. Or at least let her bring it in. And under the theory -- under proper rebuttal.

MS. M. MILLER: And just so you know, Your Honor, we did give Defense Counsel 3003 and our intent to use it on May 20th of 2022. So on May 20th they had that entire exhibit, they had had all of that information, so this last minute, you know, give me a break. I mean, they had it. They had to review. Since May 20th of 2022.

MR. MARTIN: We're not arguing about 3003, we're talk about the demonstrative exhibit you just put up. We don't have it.

THE COURT: Oh, I know. No, the yellow one, you have that one.

MS. M. MILLER: That's a demonstrative aid. That wasn't anything we were going to introduce in trial. That was an analysis we did ourselves --

THE COURT: Right.

MS. M. MILLER: -- to use for questions.

MR. MARTIN: They just argued with it, and I've never seen it.

THE COURT: Just let them look at it though.

MS. M. MILLER: We sent it to them.

THE COURT: Oh, okay. Just now?

MR. MARTIN: When?

MS. M. MILLER: Right now.

THE COURT: Oh, I know. But that's what they are saying, they never got it until after they asked.

MS. M. MILLER: Well, yeah, because we didn't intend to use it as an exhibit at trial. It was something we put together for ourselves to analyze the helicopters. It was working papers. It's work product.

THE COURT: Sort of like your work product? Okay, got it.

MS. M. MILLER: It identifies the exhibits that have already come in. It identifies relationships. It's -- we have a lot of those.

MR. MARTIN: I haven't received an e-mail from the government. If they sent it, I haven't got it.

MS. M. MILLER: I sent it as soon as you said send it.

MR. MARTIN: I still don't have it.

MS. M. MILLER: Okay.

THE COURT: All right. Well, there is something going on with the computers. I thought it was fixed, but mine apparently is not with the e-mails. So Microsoft is to be -- okay, so we'll come back to this issue. Let's see. If the jurors are coming in tomorrow, let me just ask, are there any other exhibits that you want, with regard to rebuttal, that they have not -- that.

MS. M. MILLER: Everything else has been introduced, Your Honor.

THE COURT: And admitted. Introduced and admitted?

MS. M. MILLER: And admitted. And admitted; yes.

THE COURT: So there's nothing else that has not been admitted?

MS. M. MILLER: It has -- no.

THE COURT: Okay, good. So we're only talking about 3000 --

MS. M. MILLER: 3-15.

THE COURT: 15, that's it.

MS. M. MILLER: Yup.

THE COURT: All right. Got it.

MR. MARTIN: The only issue that will come up then, Your Honor, will be whether or not it's beyond the scope, whether or not it's relevant.

THE COURT: Right. Yeah.

MR. MARTIN: Those issues may come up during.

THE COURT: Right. Right. But really the main issue is you wanted to be sure that you got to look at the exhibit that she wants to redirect the witness with. All right. Now, on this issue.

MR. MARTIN: I don't know what they are. I mean, she's given the ones that aren't in evidence, but I don't know

what the other ones are.

MS. M. MILLER: No, and I didn't -- did I get what they planned on using before they cross-examined, I mean, Your Honor, come on.

THE COURT: You don't want to give it to them?

MS. M. MILLER: No, I really don't. I'm really not inclined to give it to them. I'm inclined for this to go the way it should go, which is if they have a legitimate objection, make the objection at the time.

THE COURT: They don't want to give it to you, they don't have to give to you.

MS. M. MILLER: I don't have to.

THE COURT: But if they wanted to.

MS. M. MILLER: I don't want to.

MS. MCCONWELL: Well, I'd just like the record to reflect, Mr. McConwell gave his cross-examination exhibits to them, even though he shouldn't have had to.

MS. M. MILLER: 130, 131, 132, 133, 134, 135, 136, never saw them.

MS. MCCONWELL: Oh, bologna, you saw them.

MS. M. MILLER: Bologna, the new ones you brought in today?

MS. MCCONWELL: You saw those Hawaii ones, Bank of Hawaii.

MS. M. MILLER: In what universe?

MS. MCCONWELL: Well, then you didn't read my motion because it -- you didn't read my motion.

THE COURT: Well --

MS. M. MILLER: What motion? As exhibits what motion?

THE COURT: Counsels, Counsels, keep your conversations, chats to yourselves. I don't want to be involved in that. But, anyway. It's getting on the record. Come on.

MS. M. MILLER: Oh, by the way, on the record, could we go back to Mr. Martin question and the answer because I don't think that he is stating exactly what was said.

THE COURT: So let me, in fairness to Mr. Martin, we'll go back to the last two registration questions dealing with assets.

Veronica, want to put that in your search?

(Whereupon the reporter read back requested portion.)

MS. M. MILLER: There is an association to the company that is in the registration file. Can you go back, Ms. Veronica, please to where Mr. Martin asked about the Vanuatu company that is in the FAA record? He starts with, Is this a business record of the FAA? So can you find that part where he says, Is this a business record of the FAA? And then he asks about the company that is identified as the owner of

03:52PM 03:52PM 03:52PM 03:52PM 03:52PM 03:52PM 03:52PM 03:52PM 03:52PM 03:52PM 03:52PM 03:52PM 03:52PM 03:52PM 03:52PM 03:54PM 03:54PM 03:54PM 03:54PM 03:54PM 03:54PM 03:55PM 03:55PM

 the helicopter.

MR. MARTIN: I can repeat them verbatim, Your Honor, I did it several times.

MS. M. MILLER: I'd rather her read it back.

MR. MARTIN: Well, she read it back exactly the way I asked it.

MS. M. MILLER: She read a part of it back, not the whole thing.

THE COURT REPORTER: That was one whole question.

MR. MARTIN: Thank you, Veronica.

MS. M. MILLER: But the question preceding it.

MR. MARTIN: The question preceding it is --

MS. M. MILLER: I want it from her, not you.

THE COURT: We will get it from her. Let's get it from the official court reporter.

MR. MARTIN: It had to do with the location, Judge, of the company.

THE COURT: We'll just hear from the court reporter.

03:59PM

(Whereupon the reporter read back requested portion.)

03:59PM

03:59PM

MS. M. MILLER: So clearly, Your Honor, the impression that you got and I got and I'm sure the jury got, is that he's implicating that the asset is the asset of South Pacific Spotters Corporation in Vanuatu. How do I know that?

03:59PM

03:59PM

03:59PM

03:59PM

Because then he went to the registration document, and then he went to the bill of sale document. To really reenforce this issue that on the FAA paperwork, isn't it true that that particular helicopter is being identified as owned by a Vanuatu corporation. Therefore, it is an asset of the Vanuatu corporation. That is what he was trying to do, that's what he did for two and half hours. And when I tried to stipulate to move it along, he wouldn't. Because he wanted to keep making those associations, and Your Honor even commented, he commented, I want to be able to argue to the jury that my client didn't own those aircraft, they were owned by these Vanuatu companies. That's what he was trying to do, that's what he did, it's appropriate impeachment of that concept to bring in the fact that his client's companies had that ownership all over the place.

MR. MARTIN: May I respond, Your Honor? That's not what my question was. My question was what she said. Is that an asset? Any impression she got, if it's right, wrong, or indifferent, it's limited to what my question was, and my question was, Is this an asset, is this identified? And he said yes.

THE COURT: Yeah, well, I think -- you know what, it might just -- it might be just something that you both can argue. I might -- I still -- I'm going to think about it, I'll let you know tomorrow morning or tomorrow. But I was

04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:00PM 04:01PM 04:01PM 04:01PM 04:01PM 04:01PM 04:01PM 04:01PM 04:01PM

under the impression -- I mean, you're right, the question is very clear, Is it just an asset, generally. I mean, you know. 04:01PM

MR. MARTIN: And I asked that every time, Judge, specifically. Because -- I mean, I know exactly what I ask, and I ask very narrow questions.

THE COURT: Right. That's understood. It's clear that that was very narrowly queried, but it also seemed to the Court, but, you know, that it was relating to that particular corporation. And I'm not sure what your argument will be with regard to all of that questioning, other than to say that it was an asset of that corporation, not an asset of Mr. Walker.

MS. M. MILLER: I mean, if he wants to stipulate that he's not going to argue that, then no problem, but I have a doubt that he will.

MR. MARTIN: I got your e-mail, thank you. No comment, Your Honor.

THE COURT: Well, maybe you'll think about it. Yeah, okay. Anyway, in the meantime, okay, so it could be that, I mean, let me just say, I'm inclined to allow it in, and that you guys can argue. You can argue away, say, hey, the question was just really whatever the question was and he answered the question because, you know, Mr. Agent here is very precise. Very precise how he answers. But on the -- and then the prosecution could say, hey, look, I mean, what other

purpose would you ask that question other than your argument. All right, but in the meantime, to be fair to the defense, they should have the opportunity to review what assets we're discussing, and if they were expired or not. So I think that's fair, and we could discuss that tomorrow.

On the issue of United States' Motion in Limine to admit summary charts pursuant to Federal Rule of Evidence 1006, all right, so I do have a question, the government proposed to use G-3025 and G-1242, Guzzetti's summary chart. The first one was the aircraft registration information related to Jon Walker; when was that chart provided?

MS. M. MILLER: That was provided during the testimony of Ms. Hedrick, Your Honor. And I believe that was, was that March? May.

THE COURT: All right. And then what about --

MS. M. MILLER: And that, Your Honor, by the way, was a document that we created in rebuttal to the assertion by Mr. McConwell and Mr. Martin that Mr. Walker retired from the company.

THE COURT: Okay. And then there was a first iteration of the Guzzetti summary.

MS. M. MILLER: That was given to the defense, his expert summary was given to them in May of 2020, his summary charts were given to them for the first time in August of 2020. And from that point forward, any time any change was

made to them, they were provided to the defense. Those were also summary charts that we met with Ms. McConwell on and she wanted some changes, and we made some changes, and so I don't know what the objections to them are as it stands today. I don't know. They'll have to make those objections, I guess.

MS. S. MILLER: And if I could just add, Your Honor, those two summary charts were ones we discussed with Your Honor when we had a hearing on summary charts back in middle of March, I think it was maybe the 13th or the 15th.

THE COURT: Okay. Thank you. Yes, Ms. McConwell?

MS. MCCONWELL: We objected to the 1242 chart, which we received, first time I remember seeing it, is in January, but notwithstanding that, we objected to all of Mr. Guzzetti's editorial comments, and then some of the items that are on in 1242 wasn't substantiated by the documents that they provided, there were holes. And so it's all his sort of interpretation of documents, so I think it's more appropriate that if he's going to be an expert and testify, he needs to testify about that and lay the foundation for it, rather than just admit a chart because I don't believe that a number of the items that are in what they provided are admissible in this Court. That's 1242. 3025, the first time we saw that was with, I believe, Ms. Hedrick, and they attempted for an hour and a half, two hours to try to get that in with Ms.

Hedrick, and the Court would not -- did not allow that admission of that. It's -- it wasn't provided, it wasn't on their third amended witness list or, I mean, exhibit list. And they just keep, after the Court rules on it, they just continue to keep trying to get documents in. I think it is inappropriate for them to file a motion to try to get something in that they couldn't even get in with a live witness because they couldn't lay the foundation for it, and it's not on their third amended witness list, and we're in their case in chief.

THE COURT: That's 1242.

MS. MCCONWELL: No, that was 3025.

THE COURT: I'm sorry, 3025.

MS. M. MILLER: 3025. And we did file a motion to allow that to be admitted as a summary chart. And we reiterate that also when the Court asked for us to identify which witness we want to get it in on.

And if you recall, Your Honor, Ms. Hedrick did lay the foundation for the admissibility of it because Ms. Hedrick created it herself. Ms. Hedrick created it as records custodian for all of the registration information. The only reason why the Court didn't let it in is because Ms. McConwell said she didn't have the sufficient amount of time to review any of the underlying documents. However, those are the Blue Ribbon records from the FAA files that have been provided

repeatedly to the defense that are available to the defense via public record, and now we're talking months and months and months, and it is appropriate rebuttal evidence to the Defendants' contention at trial made for the first time that Jon Walker either retired or stepped back from the active management of the company. It wasn't a foundational issue, it was a notice issue, and they have had notice now since March.

THE COURT: Okay. So with regard to the underlying information, are there any specific objections?

MS. MCCONWELL: Well, because the admit -- the exhibit wasn't admitted and the Court has said that nothing beyond 2955 on their third amended witness list, or exhibit list, was going to be admitted into evidence, I -- over break, I did not look at all of the Blue Ribbon copies to go back and review this particular -- this exhibit.

THE COURT: Okay, but the -- the offer of proof is that it's really now to be rebutting.

MS. MCCONWELL: Well, then that's what they do in their -- in their -- that's what they would do to rebut anything that we have. It's inappropriate -- they're in their case in chief, Your Honor, if they want to bring something in later after we put on our case for rebuttal, then I suppose it's fair game to use new exhibits.

MS. M. MILLER: That's not the way rebuttal works.

MS. MCCONWELL: But they couldn't get it in with Ms. Hedrick and it wasn't just that --

THE COURT: Yeah, but if you don't have a case in chief.

MS. M. MILLER: Exactly.

THE COURT: They wouldn't have opportunity to do that.

MS. MCCONWELL: Okay. I mean --

MS. M. MILLER: That's fine.

MS. MCCONWELL: That's correct, but this was not on their exhibit list.

THE COURT: Right.

MS. MCCONWELL: And I was working to go through it, we had -- there were a number of inaccuracies on it that I addressed to the Court just when we talked about it with Ms. Hedrick. There were a number of problems with this exhibit, which is why, you know, Ms. Miller withdrew the exhibit and --

MS. M. MILLER: Why didn't she file a response.

THE COURT: Only one person at time. Let me just say, so for G-3025, I understand that. Now, if you have any specific objections, the Court will review it. If there are no specific objections, and because it's being used to rebut assertions or implications that Mr. Walker either retired or was no longer active in the fraud, then the Court is inclined to allow it in. But if you want time to review it, let me

know by tomorrow then, and we'll hold off on my ruling. 04:09PM

MS. MCCONWELL: I will, and I need them to reopen their Blue Ribbon copies because I'm missing, I think, one copy. So I need that to be reopened so I can pull it back out. 04:09PM 04:10PM 04:10PM 04:10PM

THE COURT: So, Samantha Miller, if you're the one working with her, make sure you reopen that, G-3025, okay? 04:10PM 04:10PM

MS. S. MILLER: Yes, Your Honor. 04:10PM

THE COURT: On G-1242, let's, moving right along. The summary chart here, the first iteration, let's see, was provided over two years ago. What was the issue with this Ms. -- did you want to review this as well? 04:10PM 04:10PM 04:10PM 04:10PM

MS. MCCONWELL: No, it has a number of his editorial and summary comments, it's -- it has documents that are not admissible in trial. 04:10PM 04:10PM 04:10PM

THE COURT: So but did the -- 04:10PM

MS. MCCONWELL: So it's -- it's -- I don't know who generated the chart, I don't know if Mr. Guzzetti did or Counsel did, but Mr. Guzzetti is the one that's going be testifying about it and so he -- so he should be the one laying the foundation to bring it in. I don't believe that there is foundation. 04:10PM 04:10PM 04:10PM 04:10PM 04:10PM 04:11PM

MS. M. MILLER: He is going to, he will be, Your Honor. I'm not sure what Ms. McConwell is thinking. Of course Mr. Guzzetti created the charts, we said that to them 04:11PM 04:11PM 04:11PM

more than two years ago. Here are Mr. Guzzetti's summary charts. These are summarizing all of the underlying documents. Here are all of the underlying documents. For two years they've had an opportunity to review those underlying documents and to raise specific objections.

THE COURT: All right. Hold on.

MS. M. MILLER: To the charts.

THE COURT: I got it. Let me just, I don't really need to hear arguments, all I need to know is this, there was G-1242 and 1247. The Court has ordered that the Counsels, Ms. McConwell and Ms. Miller, I think it was Samantha Miller, meet together to ascertain how they can streamline this, and apparently, allegedly there is modifications made pursuant to the objections by the defense.

MS. MCCONWELL: Not to these, not to 1242 or 1247, Your Honor. There were other charts that have been admitted that we did agree to, they did, I mean, we don't agree with them, but they did -- I mean, it was something, what did she say, it goes to the weight, not the admissibility. Not these -- not 1242 or 1247. We don't -- all of these -- I mean, this is essentially part -- this is essentially part of his report and all of his comments.

THE COURT: So my question is --

MS. MCCONWELL: And then he's basing it on, and he's got other information that was provided to us, some of it

was not provided to us. So I'm not -- I'm not clear where he had his source of the information, and some of it are reports that are not admissible. 04:12PM

MR. MARTIN: By the way, Your Honor, if I might respond. By way of example, if the Court has Exhibit 1242 in front of it, the section that says "remarks," those remarks we contend are improper for him. He can testify --

THE COURT: I thought -- so, okay. I thought Counsels met with each other and they threw out whatever was surplusage, remarks, you know, whatever. Is that not true?

MS. S. MILLER: Your Honor, we met, and you might recall during the hearing, so they never said a single specific word since we had the hearing, and at the hearing what their argument was, was they didn't think it was accurate, and we had a whole discussion and Your Honor basically held, verbally, that it goes to the weight, not the admissibility. Unless they can point to specific issues in the underlying documents, which we provided to them over and over again, then they can cross-examine him all they want on whatever commentary is in the chart.

THE COURT: I do recall that. I guess what they're saying is, okay --

MS. S. MILLER: They never asked for specific changes.

MS. MCCONWELL: Well, that's because the only

thing -- I mean, this --

THE COURT: Let me just say, unless you specifically point out what the objection is, the Court is going to allow the summary chart.

MS. MCCONWELL: Well, all of these remarks, I mean, none of these remarks should be, as a threshold, none of the remarks should be in it. Then they have --

THE COURT: Did you guys exclude the remarks?

MS. M. MILLER: No, that's whole point of -- this is a summary chart of an accident reconstruction expert who worked for the NTSB for 18 years.

THE COURT: So is -- I'm sorry, strike that. Okay. I got that.

MS. M. MILLER: Right.

THE COURT: I know his resume.

MS. M. MILLER: Yeah, and --

THE COURT: No, no, you don't have to convince me.

MS. M. MILLER: Those remarks --

THE COURT: My question is --

MS. M. MILLER: Okay. There's --

THE COURT: When he says remarks.

MS. M. MILLER: It's summaries of the records, they're not his personal remarks.

THE COURT: That's what I'm asking. Is it --

MS. M. MILLER: Yes, and we already responded to them. Summary of the records, the NTSB records, not his personal view, it is a summary. The NTSB records alone, Your Honor, would have been over 4,000 pages of documents relating to all of their accidents. And so what we asked Mr. Guzzetti to do was to summarize the facts underlying the accidents based on the NTSB data and reports, which is exactly what he did. And from two years ago until today, this is the same nonsense we've been hearing, which is we don't like the fact that he has that summary in there.

THE COURT: You guys got one more minute on this issue because I got to go.

MS. M. MILLER: Okay.

THE COURT: 30 seconds to go.

MS. MCCONWELL: Okay, here's an example. He's like, oh there's a YouTube video that was uploaded on September 5th 2010. Well, but that's not -- I mean, I don't know that that's -- I don't know that it's relevant, I don't know that it's admissible. It's in all probability not admissible. He's going to have to lay the foundation for that. And the items that this has to be based on, they don't have to be admitted, but they do need to be admissible. And all of his remarks, I mean, that's just the thing. It's just all his -- it's --

MR. MARTIN: Your Honor, he can testify. What

04:14PM 04:14PM 04:14PM 04:14PM 04:14PM 04:14PM 04:15PM 04:15PM 04:15PM 04:15PM 04:15PM 04:15PM 04:15PM 04:15PM 04:15PM 04:15PM 04:15PM 04:15PM 04:15PM 04:15PM 04:15PM 04:15PM 04:15PM 04:15PM 04:15PM

we're concerned about is the government is trying to submit a summary chart with his remarks. We're not -- his testimony is his testimony and we understand that. But putting together a document with his commentary in it, we are objecting to.

MS. MCCONWELL: And we also objected to all of the red and the purple and all of the different colors that they had on the chart, and they were disinclined to indicate that. The other thing is under their damage --

THE COURT: Well, you don't like the colors of the chart because why?

MS. M. MILLER: We had this before, too, if you recall.

THE COURT: I know, but why don't you like the color charts?

MS. MCCONWELL: Um, well, I don't like the colors. I think it draws -- I think it draws emphasis, and under "damage," that are no terms, I mean, there aren't terms of art for where these came from on his particular opinion. I mean, we talked about all of that.

MS. M. MILLER: Mr. Guzzetti will testify, Your Honor, that everything in his summary charts are just that, summaries of information that are contained in the NTSB reports and in the NTSB files. And the defense has had two years now to bring to this Court, to the government's attention, any inaccuracy, which is what is required under

Rule 1006, for two years they haven't been able to do it.

THE COURT: Yeah. Is there any specific objection to the merits of what he's -- what he's found with regard to the investigation?

MS. MCCONWELL: Well, a number of these, there are not -- if we're going to talk about specifically the NTSB, there are not investigations. There is not a reference to one. There is not a reference to one. There is just his editorial comment.

THE COURT: I thought he was reviewing NTSB --

MS. M. MILLER: He did.

THE COURT: -- investigations?

MS. M. MILLER: He reviewed NTSB files and NTSB records, and there is one chart which is 1247, I believe, I don't know, 1242 or 1247, where he includes accidents that were never reported to the NTSB, but we know about because the files and information regarding the accidents were in the possession of the Defendants. And where he has relied on the Defendants records, to identify the date of an accident, the helicopter involved, the personnel involved, et cetera, he cites to which parts of the Defendants evidence he is relying on. They have absolutely everything, Your Honor, and they have to date, after two years, been able to show one inaccuracy.

MS. MCCONWELL: He also -- getting back --

THE COURT: All right, so let me just say, okay, so unless and until there is specific objections, and they're valid objections, the Court is inclined to allow the summary charts in. I'll be honest with you.

On the issue of the one that you want to talk about on the G-3025, you want to go back and discuss that with Counsel on the Blue Ribbon, the Court will allow that. So I'll hold off on that. But unless, you know, so that's the Court's inclination at this time, Counsels. Anything further?

MS. M. MILLER: No, Your Honor. Thank you.

THE COURT: Nothing further, then I will see all of you tomorrow. Yeah.

MS. M. MILLER: 1:00.

THE COURT: Yeah, 1:00. Sorry about that. We have to do at 1:00.

MS. M. MILLER: That's fine.

THE COURT: And I'm not inclined to ask the jurors at the last minute. I thought about that. I don't think so. I think that one juror's baby is going to come out like -- any minute now, pretty soon.

MS. M. MILLER: We'll talk to Mr. Guzzetti, Your Honor.

THE COURT: Yeah. Talk to Guzzetti, tell Guzzetti, I'm pretty sure you can stand to stay on Guam for a few more days.

         MS. M. MILLER: Yes. 04:19PM

THE COURT: All right. Maybe not, but I hope he can. All right. Take care. 04:19PM 04:19PM

MS. M. MILLER: Thank you, Your Honor. 04:19PM

THE COURT: You guys have a nice weekend. Or no, I'll see you -- (Laughing.) 04:19PM 04:19PM

MR. MARTIN: See you Monday, Judge. 04:19PM

THE COURT: I don't want to see all of you guys anymore. I feel like I never left Guam. 04:19PM 04:19PM

(Proceedings concluded at 4:19 p.m.) 04:19PM

* * * 04:19PM

August 19, 2022; 1:03 p.m.; Hagatna, Guam

* * *

THE COURT: All right. You guys ready to go?

MS. M. MILLER: Yes.

THE COURT: All right. I want you to know I don't have COVID. I know I'm coughing a lot. I did take a test again. It's just I have construction in my house and I have a lot of dust in my lungs, I think. So I know I sound bad, but do know that you're safe.

All right. Let's call in the jury. They're all here. And I think we're fit to go. Where were we last?

MS. M. MILLER: We were on the admissibility of that exhibit. We were discussing it because I -- I have that 3003-15.

THE COURT: Oh, right. I already ruled on that.

MS. M. MILLER: (Shook head.) Okay.

THE COURT: I thought I did.

MS. M. MILLER: Oh, it's admitted. Okay. Thank you, Your Honor.

THE COURT: Well, you can try to get --

MS. M. MILLER: I can try to admit it; yes.

THE COURT: Yeah.

MS. M. MILLER: Got it.

THE COURT: I will allow you to at least probe

that.

MS. M. MILLER: Got it. Thank you, Your Honor.

THE COURT: But the other ones I already made my rulings on.

MS. M. MILLER: Yeah, yeah. And I'll bring those up on direct.

THE COURT: Now, for the record, there is nothing else that's new that --

MS. M. MILLER: No, no.

THE COURT: -- that they haven't seen?

MS. M. MILLER: No. I made sure I went through all the questions. Nothing is going to be introduced that wasn't previously introduced.

THE COURT: And admitted?

MS. M. MILLER: And admitted. And all -- I can tie every single question to the cross-examination.

THE COURT: All right. Okay.

MR. MARTIN: We'll reserve the right to object if we think --

THE COURT: (Laughing.) *Ai adai.*

THE WITNESS: Sorry, I didn't mean to laugh.

MS. M. MILLER: And just so you know, Your Honor, this will not take all day. I should be done with Mr. -- Special Agent Khamvongsa in an hour.

THE COURT: Oh, good.

01:04PM 01:04PM 01:04PM 01:04PM 01:04PM 01:04PM 01:04PM 01:04PM 01:04PM 01:04PM 01:04PM 01:04PM 01:04PM 01:04PM 01:04PM 01:04PM 01:04PM 01:04PM 01:04PM 01:04PM 01:05PM 01:05PM 01:05PM 01:05PM 01:05PM

MS. M. MILLER: We'll go straight to the Mr. Guzzetti.

THE COURT: Okay. Mr. Guzzetti is ready to go?

MS. M. MILLER: Yes, he is.

THE COURT: Okay. Excellent. But you haven't decided if you're going to stop at Guzzetti?

MS. M. MILLER: Correct.

THE COURT: Okay. All right. So is our -- our computer's working now? Everybody? Do we know? Up here at least?

Okay. Please rise for the jury.

(Jury in at 1:05 p.m.)

THE COURT: Okay. Please be seated. Welcome back, ladies and gentlemen of the jury. We'll continue on. I just told the attorneys that I don't have COVID. I'm coughing, but I did take a COVID test. So I want you to know I'm good, I'm negative. But I'm -- I'm just coughing because I have construction going on in my house, so I think it's all the dust coming into me. So I apologize if I cough too much. I've got tea and stuff.

All right. You may proceed.

MS. M. MILLER: Yes, Your Honor. Thank you.

Good afternoon, members of the jury. I was going to say, "Good morning," but we're past morning and we're in afternoon. Good afternoon, everyone.

THE JURY: Afternoon.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, welcome back.

A. Hello; good day.

Q. And I appreciate your bow tie today. It looks very good. I'm not sure in the jurors have all seen it, but it's very interesting. Okay. So --

THE COURT: Is it island wear?

MS. M. MILLER: No.

THE WITNESS: I tried.

MS. M. MILLER: Okay. We're exhausting -- we're exhausting his professional wardrobe because he thought he'd be on and off in a couple of days.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. What I'd like to do, Special Agent Khamvongsa, is talk about with you Wilma's Flight Service. Can you tell the members of the jury, when was Wilma's Flight Service first incorporated in the U.S.?

A. It was incorporated in 1999 in Guam.

Q. And yesterday, Mr. McConwell introduced to the jury a document that was marked as Defense Exhibit 136. Do you recall that?

A. I believe that's -- that's the --

Q. The charter, Wilma's, for Vanuatu?

A. Yes.

Q. And what was the year that that charter was created for Wilma's Vanuatu? 01:08PM
A. I can't recall.
Q. Okay.
A. Can I review it?
Q. Let's --
MS. M. MILLER: Is Exhibit 136 in? No? Okay. Your Honor, may I approach with Exhibit 136? It's not in Trial Director yet.
THE COURT: Okay, yes.
MS. M. MILLER: Here you go, sir.
THE WITNESS: Thank you.
BY MS. M. MILLER: (CONTINUING)
Q. Can you tell the members of the jury, what's the date of that charter for Wilma's in Vanuatu?
A. It's represented as July 1st, 2002.
Q. Okay. Do you remember as part of your investigation reading why the Defendants opened up all of these Vanuatu corporations?
A. To limit their liability. Hansen Helicopters and Jon Walker was trying to limit their liability as it relates to the helicopters.
Q. Okay. Have you seen all of the Vanuatu charters for all of the Vanuatu companies listed either in 829 or identified in this case?

A. I've only seen what was provided to me.

Q. By whom?

A. By Hansen Helicopters.

Q. Of all the charters that were provided to you, were they identical?

A. Yes.

Q. Could you please look at the second page of the charter that you have in front of you as Defense Exhibit 136. Do you see a section called "restrictions"?

A. Yes.

Q. What is a restriction on the Vanuatu companies?

A. "Shall not carry on business in Vanuatu."

Q. From the evidence that you've seen, did the Defendants carry on business in Vanuatu?

A. No.

Q. I'd like you to look at what has previously been entered into evidence as Exhibit G-890, and it will come up on your screen shortly.

THE COURT: And, Ms. Miller, can you blow up the content of that; eliminate the white so we could read it more easily. And let's wait until it's up on the jurors' screens before we talk about it.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. First, let's talk about the companies identified on the very top of this document. Marlin Bay

01:09PM 01:09PM 01:09PM 01:09PM 01:09PM 01:10PM 01:10PM 01:10PM 01:10PM 01:10PM 01:10PM 01:10PM 01:10PM 01:10PM 01:10PM 01:10PM 01:10PM 01:11PM 01:11PM 01:11PM 01:11PM 01:11PM 01:11PM 01:12PM 01:12PM

Helicopters and Fling Air, Inc. Do you recall Mr. Martin asking you about those companies yesterday?

A. I remember questions being asked about those particular companies; yes.

Q. And do you remember those companies were not listed on Exhibit 829?

A. I -- I can't recall without actually looking at the document.

Q. Okay. Let me show it to you.

MS. M. MILLER: May I approach the witness with Exhibit 829, Your Honor?

THE COURT: You may.

BY MS. M. MILLER: (CONTINUING)

Q. Do you see Fling Air?

A. Yes. Fling Air and Marlin Bay Helicopters are identified on the document.

Q. Okay. Yesterday when Mr. Martin was asking you the questions about them, though, do you remember that the address in 366 was Guam, not Vanuatu?

A. For Fling Air; I recall it being for Fling Air; yes.

Q. Okay. And we're going to talk about that a little bit more, but let's look at this content of this e-mail. Who is Gary Wiggs?

A. He was the former CFO for Hansen Helicopters, the chief financial officer.

Q. And who's being copied on this e-mail? 01:13PM
A. Defendant Jon Walker. 01:13PM
Q. And who is this e-mail addressed to? 01:13PM
A. It's addressed to individuals in Vanuatu with the -- appears to be civil aviation agency in Vanuatu. 01:13PM
Q. Okay. Could you read what is being communicated here? 01:13PM
A. "Hi, Joseph. Jon Walker is currently off Guam island, so I am providing you with the information you requested." 01:13PM
Q. Okay. Hold on. Start with No. 1. Read No. 1. 01:13PM
A. "The helicopters are not and will not be located in Vanuatu." 01:13PM
Q. Okay. Just stop there for a minute. Read No. 2. 01:13PM
A. "The helicopters will be operated under N registrations when we get them reinstated to the FAA register." 01:14PM
Q. Okay. Stop there for one moment. Read No. 3, please. 01:14PM
A. "The helicopters were removed from the N register by accidental misunderstanding on the part of the seller." 01:14PM
Q. And read No. 4, please. 01:14PM
A. "There are and will be no flight operations undertaken out of or within Vanuatu." 01:14PM
Q. And the date of this communication? 01:14PM

A. May 5th, 2010.

Q. Okay. Now, in 2018, who did you issue a grand jury subpoena to for records regarding schedules of billings for the tuna boat leases involving the helicopters?

A. Hansen Helicopters.

Q. Okay. And let's look at Exhibit 726, which was previously produced. And when you issued this grand jury subpoena to Hansen Helicopters, is this with a return to you? And we'll wait until the jury can see it as well. Do you see this, sir?

A. Yes.

Q. Okay. And what does it say on the very top of this document?

A. "Wilma's Flight Services, Inc."

Q. Okay. And underneath that?

A. "Top level schedule of billings and collections."

Q. Could you tell the members of the jury, from what day to what day did Hansen Helicopters give you schedules of billings and records that were in the name of Wilma's Flight Services, Inc?

A. Exhibit 7 -- Government Exhibit 726 covers the years December 2013 to April of 2018.

Q. Now I would like you to look at what the Defendants introduced yesterday as Exhibit 76.

MS. M. MILLER: Is that in Trial Director,

Ms. Miller? Okay.

All right. And could we blow up the top portion of it that has the list of companies.

BY MS. M. MILLER: (CONTINUING)

Q. Do you see Wilma's on this document?

A. Yes.

Q. What is this document?

A. This is the purported insurance document that was provided to me in -- in testimony through Mr. McConwell.

Q. Okay. And what is Wilma's identified as in this document?

A. It is a wholly owned -- one of the wholly-owned subsidiary companies for Bean Bag Helicopters, Inc.

Q. Now let's look at Exhibit 366, which Mr. Martin was talking to you about yesterday.

MS. M. MILLER: Now, Ms. Miller, can you highlight or just hone in on the very top portion of Exhibit 366, Page 1. We'll wait until it's on screen for the jurors. Yup.

BY MS. M. MILLER: (CONTINUING)

Q. Where it says "attachments," can you tell the members of the jury, what does it say right after the word "attachments"?

A. "Hansen Helicopters in Vanuatu, group structure."

Q. Okay.

A. Do you want me to keep going?
Q. No.
And the date of this, sir?
A. October 5th, 2016.
Q. Okay. Now, I would like you to look at Page 3 of Exhibit 366. And that is the list of helicopters that was being shared with a prospective buyer of Hansen Helicopters; correct?
A. Yes.
MS. MCCONWELL: Your Honor, I object. That misstates prior evidence and testimony.
THE COURT: Okay.
MS. MCCONWELL: If she's indicating that the receiver of the e-mail is a prospective buyer, that's not what the testimony has been in the case.
MS. M. MILLER: I disagree, Your Honor. The testimony has absolutely been that.
THE COURT: Why don't we -- the Court will leave that up to the jury to decide.
MS. M. MILLER: Okay.
THE COURT: It's their memory that counts anyway. So you may proceed.
BY MS. M. MILLER: (CONTINUING)
Q. Do you remember why this information was being shared with the group that it was being shared with?

01:19PM 01:19PM 01:19PM 01:19PM 01:19PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM 01:20PM

A. It was to show the -- the entire fleet that Hansen Helicopters had in its possession.

Q. For what purpose?

A. It's to identify the assets, to determine the worth or the value of the company.

Q. Who is Hansen sharing this information with?

A. They're sharing this information with the potential buyers.

Q. Of these helicopters that are being listed as an asset, could you tell the members of the jury how many of these were on the MD Helicopters destroyed list?

A. I've identified 14 of these helicopters being on the MD Helicopters destroyed list.

Q. Now let's turn to Page 37 of Exhibit 366, please. Could you tell the members of the jury who is being identified as having a total of 46 helicopters on Page 37?

A. Hansen Helicopters, Inc., as identified here in this document.

Q. Where do you usually see assets in financial paperwork?

A. On the balance sheet.

MS. MCCONWELL: I object to foundation.

MS. M. MILLER: He's an accountant, he's an IRS agent.

THE COURT: Overruled. Overruled.

MS. MCCONWELL: He's not an accountant, he is not -- he was -- no --

MR. MARTIN: He has an accounting degree.

MS. MCCONWELL: He has a bachelor of arts -- a bachelor of arts. And he's not an expert, he's an IRS agent.

MS. M. MILLER: He has an accounting degree --

THE COURT: Don't you have an accounting degree?

THE WITNESS: I do.

THE COURT: I do recall that. Overruled. Go ahead.

BY MS. M. MILLER: (CONTINUING)

Q. Where do you usually see assets in financial documents?

A. I see them in the balance sheet. Specifically the balance sheet of the company that owns it.

Q. Let's look at the balance sheet that was produced to the prospective buyer on Page 87 of Exhibit 366. What is the name of the company on the top of this balance sheet?

A. Wilma's Flight Service, Inc.

Q. Okay. Now, if you look at -- well, first, before we go to that, what is Wilma's identified as in Row 1 of this balance sheet?

A. "Jon D. Walker, Entities Under Common Control."

Q. Now let's go to Row 30 -- well, first, before we do that --

MS. M. MILLER: Thank you, Ms. Miller.

BY MS. M. MILLER: (CONTINUING)

Q. Could you please tell the members of the jury, when we look at the top of this, how many different companies are identified as Jon Walker entities under common control.

A. Six.

Q. And what are the names of those companies?

A. Wilma's Flight Service, Inc., Bean Bag Helicopters Services, Inc., Caledonian Insurance Company Limited, Caledonian Agency, Inc., Hansen Helicopters, Inc., Hansen Northern Helicopters, Inc. That's it.

Q. Are all those companies on Exhibit 829?

A. Yes.

Q. Now go to Line -- Row, rather, 36 of Page 87. What is identified in Row 36 of Page 87?

A. Fixed -- fixed assets, and it identifies aircraft underneath that.

Q. Okay. What is the value of the aircraft being identified in that document?

A. Under Wilma's, it's identified as ten point -- over 10.5 million. And then for Hansen Northern Helicopters, it's identified as over 3 million. And then for -- or, excuse me, for Hansen Helicopters, it's over 3 million. And then for Hansen Northern Helicopters, it's 360,000 in value for the aircraft, so totaling a little under $14 million in aircraft

assets.

Q. Now let's go to Page 97 of this document.

MS. M. MILLER: And, Ms. Miller, if you could hone in on the very top so the jury can see what this document is.

BY MS. M. MILLER: (CONTINUING)

Q. What is this document, sir?

A. It's a profit/loss statement for Hansen Helicopters for the period January through December of 2015.

Q. And what is identified in Row 1 of this particular document?

A. These are Jon D. Walker's group companies.

Q. Okay. Jon D. Walker's what companies?

A. Group.

Q. Group companies.

A. Group companies.

Q. Okay. Now, identify those companies.

A. Wilma's Flight Services, Inc., Bean Bag Helicopters, Inc., Caledonian Insurance Company Limited, Caledonian Agency, Inc., Hansen Helicopters, Inc., and Hansen Northern Helicopters, Inc.

Q. Okay. And let's go to what is being identified as the profit for those combined companies.

MS. M. MILLER: Ms. Miller, if you can get out of this one and highlight the profit.

01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:26PM 01:27PM 01:27PM 01:27PM 01:27PM 01:27PM 01:27PM 01:27PM 01:27PM 01:27PM 01:27PM 01:27PM 01:27PM 01:27PM

BY MS. M. MILLER: (CONTINUING)

Q. And this is for the year 2016; correct?

A. 2015.

Q. 2015. Okay. And could you tell the members of the jury, what is the total profit?

A. It's actually -- it's the gross revenue, actually. It's what --

Q. Gross revenue.

A. And that reflects over $23 million.

Q. Can you give me the exact amount, sir?

A. Yes. $23,167,598.96.

Q. And this is for 2015 for Hansen Helicopters?

A. Yes.

Q. And this amount rolls up any income for any of those six companies that you identified?

A. Yes. This includes all six companies identified on the profit/loss statement.

Q. Can you tell the members of the jury whether you tried to get tax return information for all of the companies that were identified by the Defendants as being used?

A. Yes.

Q. Which companies actually filed tax returns?

A. Hansen Helicopters.

MR. MARTIN: Well, Your Honor, I'm objecting. Tax returns has never been brought up on direct or cross, and

we're getting into it for the first time now, and I object to it.

THE COURT: That's a good point.

MS. M. MILLER: May I respond?

MS. MCCONWELL: And Hansen Helicopters is not a party to Counts 99 through 110 to the -- and I would also join in Mr. Martin's objection.

THE COURT: Okay.

MS. M. MILLER: May I respond, Your Honor?

THE COURT: Yes.

MS. M. MILLER: So yesterday, we heard Mr. Martin go on for two hours about the representations being made in Exhibit 366 from each of these Vanuatu companies, or non-Vanuatu companies, having as an asset of each of these individual aircraft.

So this goes directly to contradict the fact that any of those companies had as an asset any of those aircraft because none of them ever identified the aircraft as an asset. We just showed that the aircraft were all identified as assets of Hansen Helicopters and the six companies that are wholly owned by Hansen, and the only income from all of the tuna boat leases was income shown by Hansen Helicopters and its tax return because none of those other companies ever filed a tax return. That's directly relevant to contradict what Mr. Martin tried to do with this jury yesterday.

THE COURT: All right. 01:30PM

MR. MARTIN: May I respond, Your Honor? 01:30PM

THE COURT: Yes. Go ahead. 01:30PM

MR. MARTIN: To begin with, the fact that I went on for two hours and the fact that the government has gone on for five days with this witness has nothing to do with the objection -- 01:30PM

THE COURT: Okay, okay, okay. Wait, wait, wait. 01:30PM

MS. M. MILLER: Move to strike that, because I haven't been doing this witness for five days. We've been on breaks -- 01:30PM

MR. MARTIN: It's my response. 01:30PM

THE COURT: Ms. Miller, no, no, do not interrupt the Court. 01:30PM

MS. M. MILLER: Yes, yes. 01:30PM

THE COURT: And do not interrupt the objection. I agree that -- you know, to say that he went on for two hours, that's a cheap shot. And to say that she went on for five days, another cheap shot. 01:31PM

MR. MARTIN: I agree, Your Honor. 01:31PM

THE COURT: So the two of you, cut it out. Let's just move on because -- let's not waste our energy on these little -- 01:31PM

MS. M. MILLER: Yes, Your Honor. 01:31PM

THE COURT: -- tit-for-tat. Let's just go on. 01:31PM

1105

We all get heated; in the heat of battle, we get all excited. Let's just focus and get this little guy off the stand -- this guy. He needs -- he probably needs to, you know, go eat something. He's tired of being here. All right.

MR. MARTIN: My objection was beyond the scope of cross, Your Honor.

THE COURT: Yeah.

MR. MARTIN: Her response had nothing to do with my cross-examination because the questions that I asked did not identify any assets. My question was very specific. We heard Veronica read it back yesterday: Is aircraft on the FAA registry X, Y, Z an asset? He answered it. That's -- that is where I ended. Anything beyond that is beyond the scope of my cross, and I object.

THE COURT: And I told both of you that, you know, when you guys argue this with the jury, it will be -- that'll be the argument --

MS. M. MILLER: Right.

THE COURT: -- that it was related only to the document, not necessarily to the corporation.

MS. M. MILLER: And, Your Honor, the government --

THE COURT: The issue of beyond the scope --

MS. M. MILLER: But the government is very -- if Mr. Martin wants to stipulate that these --

01:31PM 01:31PM 01:31PM 01:31PM 01:31PM 01:31PM 01:31PM 01:31PM 01:31PM 01:31PM 01:31PM 01:31PM 01:32PM 01:32PM 01:32PM 01:32PM 01:32PM 01:32PM 01:32PM 01:32PM 01:32PM 01:32PM 01:32PM 01:32PM 01:32PM

*Redirect - Khamvongsa*

THE COURT: No, no, no, no. Strike that.

MS. M. MILLER: Okay.

THE COURT: Let's not -- if you guys want to talk about stipulations, do it outside the presence of the jury.

MS. M. MILLER: Okay. That's fine.

THE COURT: Because it's not fair -- it's like saying, "Hey, do you want to stipulate to... everything I want in." Don't do that.

MS. M. MILLER: Sure.

THE COURT: Because no prosecutor, no defense attorney will stipulate to anything unless it's -- unless they really want to do it, and they would have already done it.

MS. M. MILLER: Clearly, the inference --

THE COURT: I know -- I know the argument.

MS. M. MILLER: Okay.

THE COURT: The issue is -- the -- the objection is beyond the scope. I heard your argument.

MS. M. MILLER: Yes.

THE COURT: Yes, Ms. McConwell?

MS. MCCONWELL: I was just going to ask the Court to remind Counsel that we're not to be making speaking objections.

MS. M. MILLER: Your Honor, I'm responding to a speaking objection.

THE COURT: Okay. I think everybody --

MS. MCCONWELL: Argument --

THE COURT: You all have to be reminded NSO, "no speaking objections."

All right. Everybody, let's calm down. Because if not, if we don't at least get through this, you know, we don't have to -- I don't have to speak so much. I'm already losing my voice, so let's -- let's get through this.

On this objection, I think -- excuse me. On the -- I think you're getting too -- you know, if you're going to keep on and on about the tax stuff --

MS. M. MILLER: Oh, no.

THE COURT: Is that it, you're done?

MS. M. MILLER: I --

THE COURT: Are you done on this tax question?

MS. M. MILLER: I'm done.

THE COURT: All right. Move on to the next question.

MS. M. MILLER: Okay.

THE COURT: Go ahead.

BY MS. M. MILLER: (CONTINUING)

Q. So the next question --

THE COURT: So we wasted ten minutes talking about it. If you're going to move on, let's go.

MS. M. MILLER: I know. All right.

BY MS. M. MILLER: (CONTINUING)

01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM 01:33PM

Q. Right. Now, one of the questions that was asked of you by Mr. McConwell was, Isn't it true that since these transactions involved Vanuatu companies that the funds weren't necessarily paid in U.S. dollars? I'd like you to look at a document that was admitted as Exhibit 1542.

MS. MCCONWELL: Your Honor, I object. That's not the question that was posed by Mr. McConwell.

MS. M. MILLER: Well, we can go to the exact question.

THE COURT: Let's not. 1542. Court will overrule the objection. Go ahead.

MS. M. MILLER: Yeah, 1542 is already admitted, Your Honor.

THE COURT: Okay.

(Pause.)

MS. MCCONWELL: I do not have 1542 as having been admitted.

THE COURT: 1542, nobody has it? Carmen doesn't have it? She doesn't have it. You want to double-check? Maybe it's the wrong number?

MS. M. MILLER: We had it -- no, I don't think it's the wrong number, but we did have it as admitted, Your Honor.

MS. MCCONWELL: No.

THE COURT: Okay. Well, let's try to find it.

MS. M. MILLER: Yup.

THE COURT: My court clerk doesn't have it. Neither does Ms. McConwell.

MS. M. MILLER: Okay. So we'll lay the foundation. We did have it as admitted, Your Honor, but we will go ahead and lay the foundation.

THE COURT: Okay.

MS. M. MILLER: And if we could show it to the witness and to the Court and to Counsel.

Can you -- Ms. Miller, could you get the -- my yellow -- oh, you can't. Oh, never mind. Ms. Santos did it.

BY MS. M. MILLER: (CONTINUING)

Q. All right. So, sir, so do you recognize Exhibit 1542?

A. Yes.

Q. Okay. Is it a true and correct copy of a document that was seized or subpoenaed from the defendants?

A. Yes.

MS. M. MILLER: Your Honor, at this time, the Government would offer Exhibit 1542 in. And I will not say anything further until Your Honor rules about it.

THE COURT: Okay. Any objections, Counsel?

MR. MARTIN: May I have just a minute, Your Honor? I'm just pulling it up.

THE COURT: That's fine. I think it's -- yeah,

it's on the screen. Uh-huh.

(Pause.)

MR. MARTIN: If it please the Court, Your Honor.

THE COURT: Yes.

MR. MARTIN: I have an objection, but I would rather not make it in the presence of the jury. I think it would be more appropriate. And I apologize, but there is an issue here.

THE COURT: Oh. Okay. Have we fixed that? Oh, we fixed it? Okay. Well, can we -- let's try it. Let's try the... will it take just a few minutes?

MR. MARTIN: It shouldn't take too long.

(Trying to get sidebar microphones on.)

(Pause.)

MR. MARTIN: You'll be absolutely amazed, Your Honor, but in the -- in the attempt to reach cooperation, I think we have an agreement. Just if I may talk with Ms. Miller one minute, I think we can resolve this.

THE COURT: Oh, nice, I like that.

MS. M. MILLER: Miracles do occur.

MR. MARTIN: It will never happen again.

THE COURT: I'm praying, I'm praying. I've got my rosary here.

(Pause.)

(Counsel conferred.)

MS. M. MILLER: We have a stipulation.

THE COURT: Still good, team?

MS. M. MILLER: Yeah, we have a stipulation.

THE COURT: Oh, go ahead. Read it out.

MS. M. MILLER: So the stipulation is that all of the payments from the tuna boat companies were always made in U.S. dollars. So we don't need to bring this in.

THE COURT: Oh, very good. Is that correct, Mr. Martin?

MR. MARTIN: Amazingly, Yes, Your Honor.

THE COURT: And Ms. McConwell?

MS. MCCONWELL: Yes, ma'am.

THE COURT: Okay. Well, I'm glad we had that breakdown in our COVID -- whatever that thing is, apparatus. What's it called? Mouthpiece?

MS. M. MILLER: I don't know. So we could take this off the screen, Ms. Miller.

THE COURT: Okay. Well, I hope that moved -- yeah, this is moving it along.

MS. M. MILLER: And that eliminated three questions.

THE COURT: Even better. Okay.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, yesterday we did hear from -- or it might have been the day before, Mr. McConwell

introduced letters from the Bank of Hawaii to several of the Hansen Helicopters subsidiaries closing their accounts; do you remember that?

A. Yes.

Q. And, for the record, those were Exhibits 132, 133, 134 and 135; do you recall that, sir?

A. I recall reviewing those, yes.

Q. And one of those companies was Wilma's Flight Service?

A. Yes.

Q. Could you tell the members of the jury the address that the bank had for Wilma's Flight Services.

A. Though I know it, could I review the document real quick, please?

Q. Yes.

MS. M. MILLER: May I approach the witness with the documents, Your Honor?

THE COURT: Yes, you may.

THE WITNESS: Thank you.

BY MS. M. MILLER: (CONTINUING)

Q. Thank you.

What was the address, sir?

A. It is PO Box 9099, Tamuning, Guam.

Q. Okay. And the next letter?

A. Hansen Helicopters, Inc. The address is PO Box 9099,

Tamuning, Guam.

Q. Next letter.

A. Caledonian Agency, Inc. The address is PO Box 9099, Tamuning, Guam.

Q. And the next letter.

A. Hansen Northern Helicopters, Inc. The address is PO Box 9099, Tamuning, Guam.

Q. Okay. Thank you, sir.

Now let's look at an exhibit that Mr. Martin showed you yesterday, which is Government's Exhibit 752-54. And I'll come and retrieve those documents from you. Thank you, sir. Thank you.

MS. MCCONWELL: Your Honor, I'm going to object to this as cumulative. Ms. Miller was already asking questions about 752-54 yesterday, I think, so I'm objecting that it's cumulative.

MS. M. MILLER: I don't recall that at all.

THE COURT: You never -- you never asked about 752-54?

MS. M. MILLER: I may have started and then we had objections and -- anyway.

THE COURT: May have got lost?

MS. M. MILLER: Yeah.

THE COURT: Well -- all right. Let's hear the -- overruled at this time then since we can't pinpoint this. Go

1114

ahead. What was the question?

MS. M. MILLER: We're going to look at 752-54, which is what Mr. Martin introduced or discussed yesterday.

THE COURT: All right.

BY MS. M. MILLER: (CONTINUING)

Q. And do you see that, sir?

A. Yes.

Q. Okay. Now, what is the date on this document?

A. August 29th, 2007.

Q. Okay. Which aircraft does this document pertain to?

A. N9068F.

Q. And what is the serial number on this document?

A. 210293S.

Q. And what is the name of the company that is registering the aircraft?

A. Whirlwide Helicopters, Inc.

Q. And the individual?

A. The individual signing it is Jon D. Walker, President.

Q. And the certification is indicating what, sir?

A. The certification? Would you like me to read it specifically?

Q. Yes, please.

A. "I certify that the above aircraft is owned by the undersigned applicant who is a citizen, including

01:45PM 01:45PM 01:45PM 01:45PM 01:45PM 01:45PM 01:45PM 01:45PM 01:45PM 01:46PM 01:46PM 01:46PM 01:46PM 01:46PM 01:46PM 01:46PM 01:46PM 01:46PM 01:46PM 01:46PM 01:46PM 01:46PM 01:46PM 01:46PM 01:47PM

*Redirect - Khamvongsa*

corporations, for the United States -- or of the United States." For voting trust, give name of trustee -- that's blank -- or check one as appropriate. "A, a resident alien with alien registration"; number is blank. "(B), a noncitizen corporation organized and doing business under the laws of state," which is left blank, "and said aircraft is based and primarily used in the United States. Records or flight hours are available for inspection at," and that's left blank. "Two, that the aircraft is not registered under the laws of any foreign country."

Q. Okay.

MS. M. MILLER: Ms. Miller, can you back up out of that to show the rest of it and the signature, please. Okay.

BY MS. M. MILLER: (CONTINUING)

Q. Sir, how many times did Jon Walker register aircraft under the name of some other company but certifying that the aircraft was being registered by a U.S. citizen or a U.S. citizen corporation?

A. 317 times.

Q. Now, we also saw, which was produced or identified by Mr. Martin, the bill of sale for 9068F. I'd like to show you Exhibit 752-56. Do you see that, sir?

A. Yes.

MS. S. MILLER: Marie?

MS. M. MILLER: Yes?

(Counsel conferred.)

MR. MARTIN: Your Honor, the bill -- I object. The bill of sale I used was 752, I believe 52, if we're going to use the one that I used.

THE COURT: Okay. Did you hear that, Counsel?

MS. M. MILLER: No, I didn't hear, I'm sorry.

THE COURT: He said he used 752-52, not 56.

MS. M. MILLER: Okay. So let's go to that one. 752-52. And if you could, please, expand that, Ms. Miller, so we could see it.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. So who is identified as the seller of 9068F?

A. The seller is identified is Whirlwide Helicopters, Inc., out of Tamuning, Guam, Jon Walker.

Q. And what is the address for Whirlwide as the seller?

A. PO Box 9099, Tamuning, Guam.

Q. And who is the purchaser?

A. The purchaser is Whirlwide Helicopters, Inc., 9102 PMB Lini Highway, Port Vila, Vanuatu.

Q. And what is the date of this document? Whoops. What is the date of this document?

A. The 21st day of December 2007.

MS. M. MILLER: Okay. Now let's go back, Ms. Miller, to the document that I identified which predates

this.

BY MS. M. MILLER: (CONTINUING)

Q. And what is the date of this bill of sale, sir?

A. The 3rd day of August 2007.

Q. And in August of 2007, who was the seller of this helicopter?

A. Hansen Helicopters, Inc.

Q. And who is the purchaser?

A. Whirlwide Helicopters -- excuse me. Whirlwide Helicopters, Inc., PMB 9102 Lini Highway, Port Vila, Vanuatu.

MS. M. MILLER: Okay. So if we could, Ms. Miller, put both of those bills of sale side by side.

MR. MARTIN: Your Honor, my objection still stands. I did not talk about 752-56. I object as it being beyond the scope.

MS. M. MILLER: May I respond? He did talk about this bill of sale, which the bill of sale that he talked about was only one month after this bill of sale. And it regards the same helicopter that he talked about with the same serial number that he talked about.

THE COURT: Okay.

MR. MARTIN: Your Honor, this is a speaking objection.

MS. M. MILLER: I'm responding to the relevance.

THE COURT: I'm sorry. So --

MS. M. MILLER: And that's --

MR. MARTIN: I didn't object to relevance. I objected beyond the scope.

THE COURT: All right. Okay.

MR. MARTIN: And I never questioned about this exhibit, Your Honor.

THE COURT: All right. Okay. So you're just saying it's related to the exhibit that was -- essentially, you don't have to tell how it's related, but it's related to 752-52?

MS. M. MILLER: Yes, Your Honor.

THE COURT: Okay. That's her response.

MS. M. MILLER: Yes.

MR. MARTIN: It's beyond the scope, Your Honor. This file that they are in, 752, all deals with the same helicopter. So that -- under that theory, I believe this file is 170 pages long. That makes every exhibit in there not beyond the scope. It is beyond the scope. I talked about specific documents, and so I object.

THE COURT: All right. So the Court will overrule the objection at this time. Go ahead.

MS. M. MILLER: Yes. Ms. Miller, can you put them both side by side, please. Okay.

BY MS. M. MILLER: (CONTINUING)

Q. So we see here, Special Agent Khamvongsa, bills of

sale that are only one month apart; is that correct?
A. Yes.
Q. Okay. And what we see here, the earlier bill of sale --
MR. MARTIN: Your Honor, the objection is leading. I think she should ask him a specific question --
MS. M. MILLER: I'm --
MR. MARTIN: -- and let him answer and not leading him.
THE COURT: All right. The objection will be sustained.
BY MS. M. MILLER: (CONTINUING)
Q. What is the earlier bill of sale of these two?
A. The earlier bill of sale is the one on the right, reflecting that Hansen Helicopters sold N9068F to Whirlwide Helicopters.
Q. Okay. Can you circle the owner of this helicopter in the earlier bill of sale, please.
A. Yes.
Q. And can you put the No. 1 next to that.
A. (Witness complied.)
Q. Okay. And could you circle who is the purchaser of this helicopter, according to what was filed with the FAA.
A. On that same document?
Q. Yes, sir. And put No. 2 there.

01:53PM 01:53PM 01:53PM 01:53PM 01:53PM 01:53PM 01:53PM 01:53PM 01:53PM 01:53PM 01:53PM 01:53PM 01:53PM 01:53PM 01:53PM 01:53PM 01:53PM 01:53PM 01:54PM 01:54PM 01:54PM 01:54PM 01:54PM 01:54PM 01:54PM

THE WITNESS: Can I change the color?

THE COURT: Hold on. He wants to change the color. Okay. Hold on. Let's see. Show you how do it. Hold on. Hold on and Carmen will help you.

THE WITNESS: Okay. Thank you.

THE COURT: You want a different color, though?

MS. M. MILLER: I think he wanted the thickness to be gone, Your Honor.

THE WITNESS: I meant the thickness. I'm sorry.

MS. M. MILLER: Because the thickness was kind of covering some of the... yeah.

BY MS. M. MILLER: (CONTINUING)

Q. So now let's look at the exhibit that Mr. Martin talked to you about yesterday. Who is the seller in 752-52? Can you circle that?

A. (Witness complied.)

Q. And can you write No. 3 next to that.

A. (Witness complied.)

Q. What is the difference between the purchaser in Exhibit 752-56, who is now the seller in 752-52?

A. The address is different on both -- on the document for Whirlwide Helicopters.

Q. And who is the purchaser in the document that Mr. Martin introduced through you yesterday?

A. Whirlwide Helicopters out of -- that reflects the

address PO Box 9099, Tamuning, Guam.

Q. Purchaser, sir, of 752-52.

A. Sorry. Whirlwide Helicopters, Inc., 9102 PMB Lini Highway, Port Vila, Vanuatu.

Q. Can you circle that and put No. 4, please.

A. Yes. (Witness complied.)

Q. So if we look at these two documents together, then it would appear, would it not, sir, that --

MS. MCCONWELL: Your Honor, I object to leading.

MS. M. MILLER: I haven't even finished the question yet, Your Honor.

THE COURT: Okay. Go ahead, finish the question.

BY MS. M. MILLER: (CONTINUING)

Q. Who, as the owner, as of the final transaction evidenced in 752-56, is selling to who as the purchaser in the final transaction in 752-52?

A. Who is the owner?

Q. To to for?

A. There is no change. Whirlwide -- or Jon Walker.

Q. Well -- but Whirlwide Vanuatu is selling to Whirlwide Vanuatu?

A. Correct.

Q. Why?

MR. MARTIN: Speculation, Your Honor.

THE COURT: Sustained.

BY MS. M. MILLER: (CONTINUING)

Q. And who is signing off on this information that's being sent to the FAA?

A. Jon Walker.

Q. Now, 752-52, which Mr. Martin asked you about yesterday, we end with who owning 9068F, serial number 210293S. Who's the final owner of that helicopter according to the paperwork that Mr. Martin presented to you?

A. Whirlwide Helicopters, Inc.

Q. And what is the address of that owner at that time?

A. 9102 PMB Lini Highway, Port Vila, Vanuatu.

Q. So the last info the FAA has about the ownership of 9068F is Whirlwide Vanuatu; correct?

A. Yes.

MS. MCCONWELL: Could we have a date on that, Your Honor? I'm not sure what the time frame is.

THE COURT: Date?

THE WITNESS: The date on that document is December 21st, 2007.

BY MS. M. MILLER: (CONTINUING)

Q. Let's look at the chart of registrations that has been entered into evidence as Exhibit 1252. And we'll look at 9068F and see if that registration information ever changed.

MS. M. MILLER: Thank you, Ms. Santos. Ms. Miller, can you just focus -- thank you so much.

01:57PM 01:57PM 01:57PM 01:57PM 01:57PM 01:58PM 01:58PM 01:58PM 01:58PM 01:58PM 01:58PM 01:58PM 01:58PM 01:58PM 01:58PM 01:58PM 01:58PM 01:58PM 01:58PM 01:59PM 01:59PM 01:59PM 01:59PM 02:00PM 02:00PM

BY MS. M. MILLER: (CONTINUING)

Q. So, sir, can you tell the members of the jury, all the way through the time it was deregistered in 2019, who was identified as the registered owner of 9068F?

A. Whirlwide Helicopters, Inc.

Q. Okay. And the address that was provided, if you look at the first row, what was the address there?

A. 9102 Lini Highway PMB, Port Vila, Vanuatu.

Q. Okay. Now --

MS. M. MILLER: I'd like to approach the witness, Your Honor, with what has been previously entered into evidence as Exhibit 2972.

THE COURT: You may.

BY MS. M. MILLER: (CONTINUING)

Q. What is that document that I just gave you, sir?

A. This is one of the items that was seized from the search warrant in October of 2016 from the Hansen facilities in Guam, Saipan and in -- also in Georgia.

Q. Sir, what is the file that I just gave you?

A. The file is tied to N9068F.

Q. Does the cover of the file say 9068F?

A. Yes.

MR. MARTIN: Your Honor, does this have an exhibit number?

MS. M. MILLER: 2972.

MR. MARTIN: I'm sorry?

MS. M. MILLER: 2972.

MR. MARTIN: It would be helpful if we could hear these --

THE COURT: Yeah, okay. You got it, 2972?

MS. M. MILLER: Yes.

THE COURT: All right. Is that right?

THE WITNESS: Yes.

THE COURT: Okay.

BY MS. M. MILLER: (CONTINUING)

Q. So that is the file that was seized from where?

A. From Hansen facilities.

Q. Located where?

A. In Guam, Saipan and --

Q. Where was that file seized from, sir? Where was that particular file seized from?

A. Here in Guam.

Q. Open up that file, please, and tell the members of the jury what you see in that file that was seized from Guam.

A. I see --

MR. MARTIN: Your Honor, I object. This is well beyond the scope of my cross-examination. I did not go into this file, I did not talk about this file.

THE COURT: Okay.

MR. MARTIN: I can't even find -- is this a -- is

this in the --

MS. MCCONWELL: It's a summary chart -- oh, no --

MS. M. MILLER: It's a physical file.

MS. MCCONWELL: It's a physical file.

THE COURT: Physical file.

MR. MARTIN: I never went into this chart. I object to the use of it, Your Honor. It's beyond the scope of cross-examination, and I object.

MS. MCCONWELL: Hansen joins.

THE COURT: Hansen joins. Okay. Yes?

MS. M. MILLER: May I respond?

THE COURT: Yes.

MS. M. MILLER: Yes, Your Honor.

THE COURT: No speaking, just right to the point.

MS. M. MILLER: Yes, right to the point. Mr. Martin talked about the fact that that particular helicopter was registered to a company in Vanuatu. However, the file for that particular helicopter was found at Hansen Helicopters here in Guam. That's the point. Any inference that -- well, I'll stop talking.

THE COURT: Okay. You want to look at the file; have you seen it?

MR. MARTIN: I would like to look at the file.

THE COURT: Why don't you let him look at the file?

MS. M. MILLER: Sure.

THE COURT: Maybe you guys can --

MS. M. MILLER: He has seen it.

THE COURT: -- stipulate. Go ahead.

MS. MCCONWELL: It's still beyond the scope of his cross-examination.

THE COURT: Okay. Well, it could very well be.

(Pause.)

(Counsel conferred.)

THE COURT: Yes?

MR. MARTIN: If we may approach, Your Honor, there is something --

THE COURT: Okay. Why don't you guys talk over there? Maybe you can --

MR. MARTIN: No, we have a major problem. That is --

THE COURT: We fixed it?

MR. MARTIN: -- way beyond the scope.

MS. M. MILLER: Really? Okay. Well, I disagree.

MR. MARTIN: Turn your mic off, please.

MS. M. MILLER: Sorry.

THE COURT: Ladies and gentlemen, why don't you -- yeah. Ten minutes, 15 minutes. Keep an open mind.

(Jury out at 2:04 p.m.)

MR. MARTIN: Your Honor, if I may hand the file

to you.

THE COURT: Oh, okay. Let me see. Might it explode?

MS. M. MILLER: No, it won't explode.

MR. MARTIN: The prosecution intends, I believe, to go into the fact that they found a file, contained within that file is a -- what appears to be a data plate.

THE COURT: A what?

MR. MARTIN: A data plate, that piece of metal --

THE COURT: Data plate?

MR. MARTIN: Yes. That piece of metal there.

THE COURT: Oh, this thing?

MR. MARTIN: That thing. My cross-examination never went into data plates at all. There has already been testimony about this file and about that data plate, but not by this witness. And this has nothing whatsoever to do with my cross-examination, Mr. McConwell's cross-examination. But it's specifically for the purpose of adding new evidence in their case-in-chief. And there -- the word "data plate," I promise you -- and we can have Veronica search all day long -- never came out of my mouth yesterday, and it never came out of Mr. McConwell's mouth the day before that.

THE COURT: Are you trying to get the data plate info out of this file?

MS. M. MILLER: Serial number.

THE COURT: I mean, you're trying to get the serial number on the data plate?

MS. M. MILLER: Yes. Because when Mr. Martin brought up Exhibit 752-52 to this jury, he said to them, What is the registration number of this helicopter? N9068F. What is the serial number associated with that registration? And he had this witness identify the serial number associated with that registration. And the whole point of doing that was, Whirlwide is the registered owner, Whirlwide owns 9068F; that's an asset of Whirlwide with this serial number. What that shows, Your Honor, is when the file for 9068F was seized, No. 1, it was seized in Hansen Helicopters' facility; No. 2, in that file was a serial number associated with 9068F that was not 9068F; that's called evidence of fraud. This is absolutely directly within the scope of Mr. Martin's cross-examination.

MR. MARTIN: If I might respond, Your Honor? My cross-examination about 9068F did not deal with what Ms. Miller said. My cross-examination was before I ever went to those charts. My cross-examination went to show that Whirlwide in Guam sold this helicopter to Whirlwide, a Vanuatu corporation. I never talked about the serial number of that helicopter. I never talked about the data plate of that helicopter. I simply talked about that exhibit for the specific purpose, Exhibit No. 752-52 and 752, I believe -54,

for that purpose. I mean, they already got into 752-56 which I didn't even use. But this, Your Honor, is so far beyond the scope of what I ever went into, it's just -- it's more case-in-chief stuff.

MS. M. MILLER: It's not.

THE COURT: Okay. Let me -- okay. So what -- okay. Just so I can understand this, the serial number -- I mean, do you agree that the serial number that's contained in this little plastic Ziploc bag is consistent with the helicopter 9 -- N9085 -- or 9086 --

MS. M. MILLER: 9068F.

THE COURT: -- F?

MR. MARTIN: I haven't even looked at the serial number, Your Honor. My objection was immediately when I saw it that they're going into a data plate. I never went into data --

THE COURT: What's the significance of a data plate?

MS. M. MILLER: The data plate identifies the serial number. Here's -- here is --

THE COURT: I know, but is there a problem -- is there, like, a missing helicopter here?

MS. M. MILLER: Yes. Here's the problem --

THE COURT: No, no, wait. We've already -- just a minute. Hold on.

02:08PM 02:08PM 02:08PM 02:08PM 02:08PM 02:08PM 02:08PM 02:08PM 02:08PM 02:08PM 02:08PM 02:08PM 02:08PM 02:08PM 02:08PM 02:09PM 02:09PM 02:09PM 02:09PM 02:09PM 02:09PM 02:09PM 02:09PM 02:09PM 02:09PM

MS. M. MILLER: Yes.

THE COURT: As I understand it --

MS. M. MILLER: Yes.

THE COURT: -- the evidence shows that -- and correct me if I'm wrong -- N908 --

MS. M. MILLER: 9068F.

THE COURT: -- F, is the helicopter in question that was sold from Wilma's --

MS. M. MILLER: No.

THE COURT: -- one Wilma's to another Wilma's?

MS. M. MILLER: Whirlwide to Whirlwide.

THE COURT: I mean Whirlwide to Whirlwide. Wait, wait. I mean so that's not an issue?

MR. MARTIN: Well, I --

THE COURT: Right, that's not an issue, that --

MS. M. MILLER: Correct, that's not an issue.

THE COURT: Wait, wait. The helicopter N9068F was sold from Whirlwide seller in one country to another Whirlwide seller -- another country. Okay. So what's -- what's the relevance of this data plate?

MS. M. MILLER: Okay.

THE COURT: Why do you need this?

MS. M. MILLER: No. 1, every registration number is associated with a specific serial number.

THE COURT: Yeah, but, I mean, I don't think

that's an issue, though.

MS. M. MILLER: No, it is an issue. Listen to this, Your Honor: The Defendants represented to the FAA that this helicopter, 9068F, with this serial No. 210293S, was its helicopter sold from Hansen to Whirlwide, then from Whirlwide to Whirlwide. What that shows --

THE COURT: A different serial number?

MS. M. MILLER: It shows a different serial number --

THE COURT: Yeah, okay.

MS. M. MILLER: -- because it is consistent with the government's theory of the case that the defendants violated the law by creating and using serial numbers that did not belong to the registration number.

So the fact that Mr. Martin yesterday said, "Let's look at Exhibit 9068F[sic], this registration number, and what is the serial number," he had, this witness, identify the serial number not once, but twice.

THE COURT: I got it.

MS. M. MILLER: Yeah.

THE COURT: I got it.

MR. MARTIN: Your Honor, I did not have him identify it, I do not believe, and I would ask that we check that.

MS. M. MILLER: We should.

MR. MARTIN: I do not believe that I had the witness identify it.

MS. M. MILLER: We should.

THE COURT: Wait, let him finish.

MR. MARTIN: She's been wrong before about what I said.

THE COURT: Let him finish because he didn't interrupt you. For once, you guys cut it out. Go ahead.

MR. MARTIN: I -- this was not part of the, quote, "two-hour part." This was at the very beginning of my cross-examination.

THE COURT: I thought you guys were going to stop about that two-hour stuff.

MR. MARTIN: Well, I'm just trying to put it in reference. I'm not trying to criticize anyone, okay? I'm just trying to put it in reference to my cross-examination. At the very beginning of the cross-examination --

THE COURT: No, no. The question is, You said you never asked for the serial number.

MR. MARTIN: On this particular exhibit, yes, Your Honor, I do not believe.

THE COURT: All right. Let's check it out.

MR. MARTIN: It would be --

THE COURT: Let's check it out. I never listen to lawyers, I only listen to my court reporter. Go ahead,

Veronica. You want to help guide her?

(Whereupon, the reporter read back the requested portion.)

MR. MARTIN: Your Honor, that was a portion of my question. That's where I was talking about yesterday where I was showing that Whirlwide sold to Whirlwide. And I stand corrected, I did say "serial number," obviously.

THE COURT: Okay.

MR. MARTIN: But I still say it's beyond the scope in that the -- it was used to identify that particular document.

THE COURT: Okay. So I have a question. The -- I can't remember, but was there prior testimony that these data plates are what -- are what? Are on the helicopters? They're like --

MS. M. MILLER: Yes.

THE COURT: Like...

MS. M. MILLER: They're riveted --

THE COURT: Put into -- it's almost like a VIN number.

MS. M. MILLER: Correct. They're -- they are. That's exactly correct.

THE COURT: Well, I'm just trying to remember if I recalled that somebody testified to that.

MS. M. MILLER: You do. That was --

02:12PM 02:12PM 02:15PM 02:15PM 02:15PM 02:15PM 02:15PM 02:15PM 02:15PM 02:15PM 02:15PM 02:15PM 02:15PM 02:15PM 02:15PM 02:15PM 02:15PM 02:15PM 02:15PM 02:15PM 02:15PM 02:15PM 02:15PM 02:15PM 02:16PM

THE COURT: That was, like, weeks ago.

MS. M. MILLER: Mr. Breitzman, the MD Helicopters --

THE COURT: Right. Okay, I remember -- okay. I remember somebody testifying to that.

MR. MARTIN: There has been previous testimony about this --

THE COURT: I'm sorry. Mr. Martin, I don't think you're on a -- okay. I'm sorry. All right. Hold on. What were you saying, Mr. Martin?

MR. MARTIN: I was saying, I believe -- and I may by mistaken, but I believe there's already been previous testimony about this exhibit.

THE COURT: About this data plate --

MR. MARTIN: Yes.

THE COURT: -- in particular?

MR. MARTIN: I think Mr. Prozac[sic], and I may be -- I may be incorrect, but one of the witnesses testified --

THE COURT: I don't think his name is Prozac.

MS. M. MILLER: It's Prozik, Your Honor.

MR. MARTIN: Prozik. Yes.

MS. M. MILLER: I mean, you take Prozac, but Prozik was the testifier.

THE COURT: He probably wants to change his name.

MS. M. MILLER: Anyway, Your Honor, obviously this is within the scope. Obviously this is an important piece of evidence for the government because it shows that the serial number that was identified in the file folder that Hansen Helicopters had for this particular helicopter was a different serial number than what it represented to the FAA. That is right in line with our allegations in this case, and it right in line with the cross-examination. So I would ask permission for us to get the jury back and keep going.

THE COURT: Yep.

MR. MARTIN: Your Honor, they just used a chart, Government's Chart 15 -- 1252-9.

MS. MCCONWELL: It's actually --

THE COURT: I'm sorry?

MS. MCCONWELL: I think --

THE COURT: You have to speak into the mic, I can't hear you. Are you talking to him?

MS. MCCONWELL: 1252-18.

THE COURT: Okay. What about it? What about that?

MR. MARTIN: Well, that -- that exhibit we just had deals with this one and -- this exhibit, and the serial number on there is the serial number that is 210293S, which is what Ms. Miller wrote up there.

MS. M. MILLER: That's the whole point. What was

represented to the FAA is the serial number is not the serial number in the file for 9068F when it was seized from Hansen Helicopters. 02:17PM 02:17PM 02:18PM

MR. MARTIN: It's never been changed, Your Honor. The serial number on the helicopter has never been changed. That is in the file, but that serial number has never been represented as being a helicopter. 02:18PM 02:18PM 02:18PM 02:18PM

MS. M. MILLER: Your Honor. 02:18PM

THE COURT: I'm sorry. Wait. That serial number is not -- is not -- is not together with N9068F? 02:18PM 02:18PM

MR. MARTIN: May I borrow that a second? Sorry. Okay. Correct, Your Honor. That serial -- that data plate may have been found in that file, but all the records that the government has introduced, including their summary chart, reflect that the helicopter 9068F has consistently had the serial number 210293S. And that's reflected in their last exhibit. 02:18PM 02:18PM 02:18PM 02:18PM 02:18PM 02:18PM 02:19PM

MS. M. MILLER: And the summary chart, Your Honor, is a summary chart of the FAA records. The FAA records, Your Honor, are the data in the FAA that was given to the FAA by Jon Walker. Jon Walker certified under penalty of being prosecuted that that serial number belonged to that helicopter. However, when we seized that file, we had a baggie -- 02:19PM 02:19PM 02:19PM 02:19PM 02:19PM 02:19PM 02:19PM

THE COURT: All right. I got it. 02:19PM

MS. M. MILLER: Yes.

THE COURT: I figured it out.

MS. M. MILLER: Thank you. Can we --

THE COURT: Listen. So it seems like you got this folder here, or file, that has been testified to as having been seized at the Hansen Helicopters Corporation.

MS. M. MILLER: Correct.

THE COURT: And the documents indicate that the helicopter N9068F, at least the paperwork I'm reading here, you're right, is consistent with the 21 -- that particular serial number. But we've got this data plate that's in a plastic baggie with a --

MS. M. MILLER: Serial number.

THE COURT: -- a serial number --

MS. M. MILLER: That's different.

THE COURT: -- with a magic marker over the plastic baggie that's, I guess, trying to say that this is -- I'm not sure -- how do I know -- I guess the question is, How do I know that this --

MR. MARTIN: You don't.

MS. MCCONWELL: You don't.

THE COURT: Here's my question -- okay. I'm sorry. How do I know or how does the jury know that this data plate actually belongs to N9068F? It's in a plastic baggie that says that, but how do we know it actually belongs --

MS. M. MILLER: It was in the plastic baggie that said that in the file that had on its cover 9068F that was seized from Hansen Helicopters pursuant to the search and seizure. And, Your Honor, if you look --

THE COURT: Wait, wait. This file? This file?

MS. M. MILLER: Yes. If you look at this everything in that file --

THE COURT: Yeah.

MS. M. MILLER: -- every single piece of paper references 9068F.

THE COURT: Right.

MS. M. MILLER: Everything.

THE COURT: No, I know that. But my --

MS. M. MILLER: That's how we know.

THE COURT: No, I know. But my question is, How do I know or will the jury know that this data plate that has this other serial number, which you believe is the original serial number --

MS. M. MILLER: Oh, I'm not saying that I believe that's the original serial number. May I tell you what I believe based on the evidence?

THE COURT: No, no. Here's my question. How would the jury know that this data plate belongs to that particular helicopter?

MS. M. MILLER: It's in its file.

THE COURT: Wait, wait. Okay.

MS. M. MILLER: The 9068F file, everything in there is related to 9068F.

THE COURT: The data plate is in the file. Right. I got that.

MS. M. MILLER: And it's in the baggie with 9068F on there. And if you look in that file, the defendants represented to the FAA that N9068F sunk to the bottom of the ocean after it was involved in an accident that killed Mr. Santos. They also represented to the FAA that the airworthiness certificate and the registration for 9068F was lost. None of that is true. That file has the original airworthiness certificate. It has the issued airworthiness certificate from Tim Cislo. It has the registration paperwork that the defendants said was lost at sea. It has proof that the helicopter was not lost at sea; it was retrieved. And that is one of the helicopters that we found at Rogers' facility that the defendants were going to patch back together and put a new data plate on with a different serial number and continue operating it just like they have with the other helicopters in this case.

THE COURT: And essentially, if it was lost at sea, you wouldn't be having the data plate --

MS. M. MILLER: Exactly. It was a lie.

THE COURT: Well, okay.

MS. M. MILLER:  Fraud.  That's the whole thing

we're trying to prove here, Your Honor.

THE COURT:  No, no, I'm trying to put the points

together.  You guys know this better than I do.  Go ahead.

MR. MARTIN:  Nothing she just said, Your Honor,

goes to the -- to the scope of my cross-examination.  My --

MS. M. MILLER:  But --

MR. MARTIN:  May I finish, please?

THE COURT:  Yeah, let him finish.

MR. MARTIN:  I mean, I never brought up anything

about lost at sea or helicopter -- or the airworthiness

certificate or anything else.

THE COURT:  It sounds like what she's saying,

though --

MR. MARTIN:  I know what she's saying.  I'm

sorry, Judge, I didn't mean to interrupt you.

THE COURT:  What she's saying is that the

representation of the serial number by Mr. Walker or whoever

submitted the paperwork as to that -- as to that helicopter

is -- is not the actual serial number.

MR. MARTIN:  She's saying that, what's in your

hand --

THE COURT:  She's saying this is the actual

serial number of the original.

MR. MARTIN:  No.  She's saying that is not the

actual serial number. This number here, the 210293S, is the actual serial number. That's what I read yesterday. I think we're in agreement that that's the actual serial number. She's -- what she's saying is, in the file, they found that one, and then she's going to bootstrap from there that this is a different helicopter. I never went into that data plate. I never went into any information relating to that, Your Honor. I specifically went into Whirlwide Guam selling this helicopter to Whirlwide Vanuatu.

THE COURT: Okay. I'm sorry. Wait. So I'm just looking at -- just let me get this in perspective. The affidavit of lost certificate says that on September 2, 2015, N9068F, a Hughes serial No. 210293S was crashed at sea and subsequently sank. All right. And then all of its certificates of airworthiness, etc., were lost with the aircraft. So they're saying that that was the original helicopter, but now -- now this is -- this is a new one?

MS. M. MILLER: No.

THE COURT: This is a new number that went in?

MS. M. MILLER: Yes. This shows the defendants' intent to do what its modus operandi we've seen throughout this case --

THE COURT: Okay. So the original one was 210293S --

MS. M. MILLER: Correct.

THE COURT: -- originally attached to the original -- to the helicopter?

MS. M. MILLER: Correct. Correct.

THE COURT: In terms of original serial number.

MS. M. MILLER: Correct.

THE COURT: This is like somebody made this new data plate?

MS. M. MILLER: Correct.

THE COURT: Okay.

MS. M. MILLER: That's -- that's one of the overt acts that's we've alleged; that's something that we established repeatedly.

MR. MARTIN: I understand that's their theory. That's not within the scope of my cross, Your Honor. My cross dealt with the transfer from Whirlwide Guam to Whirlwide Vanuatu. That serial number over there, I never had that file. I never used that file. That file, I don't -- I have a copy of it somewhere, but I -- I never questioned anything about the file that she's trying to question him about.

THE COURT: Yeah, but her point is that -- that a fraud was -- alleged fraud was committed.

MS. M. MILLER: Correct. And, Your Honor --

MR. MARTIN: They already presented --

THE COURT: Wait, wait. You guys -- I just need to talk -- just shh, everybody. Go ahead. You don't have to

talk to me.

MS. M. MILLER: Thank you.

THE COURT: Mr. Martin.

MR. MARTIN: Your Honor, I understand their theory. And I understand they've already presented this evidence through another witness, not through --

THE COURT: Mm-hmm. So your objection now is cumulative?

MR. MARTIN: Well, no. My objection is his testimony about it, No. 1, is beyond the scope. And it could be cumulative, but the major objection is, I never went into the subject matter that she is trying to bring out now. They've already -- as I said, they've already had another witness testify about the very substance of this.

MS. M. MILLER: He went into the serial number more than once.

THE COURT: I got it. Yeah, you don't have to -- yes, Ms. McConwell.

MS. MCCONWELL: Your Honor, she's trying to bootstrap this into the thing. Finding a -- a data plate in a baggie in that file when it's seized doesn't -- yeah, doesn't mean that -- I mean --

MS. M. MILLER: Goes to the weight.

MS. MCCONWELL: We don't know why that was in that file.

MS. M. MILLER: Goes to the weight. 02:27PM

THE COURT: Okay -- 02:27PM

MS. MCCONWELL: And it wasn't affixed to the helicopter. 02:27PM 02:27PM

MS. M. MILLER: Goes to the weight. 02:27PM

THE COURT: All right. I agree. I think it does go to the weight of the evidence. I think you can guys can argue this away. First of all, it's in a little trash -- a little plastic baggie, and it's not like it's got, you know -- what do you call it? Permanent identifying numbers on the date plate itself. Like, what is the exact helicopter; does it say? 02:27PM 02:27PM 02:27PM 02:27PM 02:27PM 02:27PM 02:27PM

MS. M. MILLER: There are. 02:27PM

MS. MCCONWELL: The serial number does not -- 02:27PM

THE COURT: No, no. There is a serial number here. I'm just saying on the data plate itself. Might be in another record, I'm guessing. But on the data plate itself, it doesn't say N9 -- 02:27PM 02:28PM 02:28PM 02:28PM

MS. M. MILLER: Correct. 02:28PM

THE COURT: Okay. That's what I'm saying. 02:28PM

MS. M. MILLER: Correct. 02:28PM

THE COURT: So to -- to connect it to that helicopter by virtue of, No. 1, it's in the file, and you can -- you can make an inference that's what they're going to try to argue. 02:28PM 02:28PM 02:28PM 02:28PM

MS. M. MILLER: Right.

THE COURT: You guys can argue away just as strongly that, hey, it is in a little plastic baggie, somebody could have just put it on a -- take the little black marker and put down the -- the helicopter number.

So -- and so -- okay. So in terms of beyond the scope, the Court will overrule the objection and allow the question.

MS. M. MILLER: May I have the file back, Your Honor?

THE COURT: Sure. Now I know a lot about data plates. Okay. Let's go. Let's take -- let me let my staff take a ten-minute recess and then we'll come back.

MS. M. MILLER: Yes, Your Honor.

THE COURT: Let's try to get this witness done with, team.

MS. M. MILLER: If we have to keep going back to the transcript...

MS. MCCONWELL: So, Your Honor --

THE COURT: Yes? The Court is overruling the objection at this time. I'm going to allow her to -- to ask questions regarding that.

MS. MCCONWELL: I understand.

THE COURT: But you guys can make your argument to the jury that, well, it just doesn't hold true.

MS. MCCONWELL: Okay. My last one is, it's not relevant to anything that's in Count 99 through 110, which is what this --

MS. S. MILLER: Conspiracy.

MS. MCCONWELL: -- this witness is about, even if you look at their paragraphs.

THE COURT: Okay. Very well. The Court will overrule the objection. Ten minutes, Counsels. And I will make my ruling, too, with regard to the --

MS. M. MILLER: The two pages on the bank records?

THE COURT: Yes, yes. The Court has been reviewing cases, my law clerks have been looking at it carefully. So the Court is inclined to allow that questioning in.

MS. M. MILLER: Yes, Your Honor.

THE COURT: And I'll cite to some of the cases that we've looked at in the different circuits.

MS. M. MILLER: Yes, Your Honor.

THE COURT: So that means that he can be called back. But why don't we finish --

MS. M. MILLER: I don't have to call him back now, I'll just ask while he's on here.

THE COURT: Oh, that's right. Okay. That's fine. But are you almost done with him?

MS. M. MILLER: Yeah. 02:30PM

THE COURT: Okay. Let's go ten minutes. Staff, you guys can, you know, go use the restroom. 02:30PM

(Recess taken at 2:30 p.m.) 02:30PM

(Back on the record at 2:48 p.m.) 02:48PM

THE COURT: Okay. We'll -- everybody ready? We'll call in the jury? 02:48PM 02:49PM

MS. M. MILLER: Yes, Your Honor. 02:49PM

THE COURT: All right. Okay. While we're waiting for the jury, let me just make -- let me just tell you, the Court has reviewed some of the cases, and let me just say, the Court finds that Paragraph 127 of the Second Superseding Indictment which contains the language, quote, "numerous shell corporations of defendants, including but not limited to," dot dot dot, "in conjunction with the discovery in this case has given sufficient notice to defendants that they would have to defend against the theory of conspiracy to commit wire fraud that included Pacific Spotters." 02:49PM 02:49PM 02:49PM 02:49PM 02:50PM 02:50PM 02:50PM 02:50PM 02:50PM 02:50PM

The Court further finds that pursuant to Federal Rule of Evidence 104(b), that the jury could reasonably find that Pacific Spotters is an alter ego of Defendant Hansen Helicopters, and as such, the relevancy objection to Exhibit G-2939082[sic] and 3 -- 83 is overruled. The United States' motion to allow redacted G-2939, Pages 82 and 83 ECF No. 1699 is denied as moot. That will be the Court's order. 02:50PM 02:50PM 02:50PM 02:50PM 02:50PM 02:50PM 02:50PM

And the Court will -- with regard to the cases, I looked at *United States v. Cardel*, Fifth Circuit, No. 896051; *U.S. v. McGill*, 359 F. App'x 56, 2010, U.S. App. Lexis 34. And that's M-C-G-I-L-L; *United States v. Williams*, United States Court of Appeals from the Eleventh Circuit; 785 F. App'x 6922019 U.S. App. Lexis 25073.

And finally -- okay, please rise for the jury.

(Jury in at 2:51 p.m.)

THE COURT: *United States v. Stavroulakis*, S-T-A-V-R-O-U-L-A-K-I-S, U.S. Court of Appeals for the Second Circuit, 952 F. 2d 686 (1992), U.S. App Lexis 165; and *U.S. v. Johnson*, U.S. District Court for the District of Utah, Reporter 2015 U.S. District Lexis 145102.

Okay. Please be seated, ladies and gentlemen.

That will be the Court's order.

Okay. We'll continue on. You may proceed.

MS. M. MILLER: Yes, Your Honor. Thank you.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, can I refer you back to the file folder for N9068F that was seized from Hansen Helicopters facility here in Guam.

A. Ms. Miller, the file is still up there.

Q. Let me hand it to you.

MS. M. MILLER: May I approach the witness, Your Honor?

THE COURT: (Nodded head.)

THE WITNESS: Thank you.

BY MS. M. MILLER: (CONTINUING)

Q. Sir, can you tell the members of the jury if you see a baggie in that file with 9068F on it.

A. Yes.

Q. And is there a serial number on a data plate in that baggie for 9068F?

A. Yes.

Q. Can you read the serial number that is on that -- in that baggie.

A. 700239S.

Q. Is there also an affidavit in that file regarding 9068F?

A. Yes.

Q. What does that affidavit indicate?

A. It's an affidavit of lost certificate.

Q. And what does it say?

A. It says, "This is to certify that Whirlwide Helicopters, Inc., does not possess the aircraft registration certificate of N9068F, a Hughes 369HS Serial No. 210293S, issued on May 28th, 2008, or any aircraft registration certificate for N9068F because of the following circumstances: On September 2nd, 2015, N9068F, a Hughes 369HS Serial No. 210293S, crashed at sea and subsequently sank. The

aircraft's registration and certificate of airworthiness were lost with the aircraft."

Q. The affidavit is dated what date?

A. March 4th, 2016.

Q. And it says the aircraft registration -- the airworthiness certificate first; correct?

A. Certificate of airworthiness; yes.

Q. The registration?

A. Yes.

Q. And the aircraft itself, right?

A. Yes.

Q. All lost at sea; is that correct?

A. Yes.

Q. Can you tell the members of the jury, do you see the airworthiness certificate in that file, sir?

A. Yes, it's right here.

Q. So is it lost at sea?

A. No.

Q. Do you see the registration in that file, sir?

A. Yes, it's right here.

Q. So is it lost at sea?

A. No.

Q. And even though they say that the aircraft sunk to the bottom of the ocean, do you see evidence that that aircraft was also not lost at sea?

A. Yes. 02:55PM

Q. What do you see? 02:55PM

A. I see the data plate that has the same serial number of 2102934 -- 34S, as well as the work being done at Vanguard Aviation, which is listed -- which is right here in this file.

Q. Yesterday, Mr. McCon -- Mr. Martin also asked you to read to the jury a registration for an aircraft that was identified as N74AM, and I would like you to look at Exhibit 366, Page 23. Do you see that, sir?

A. Yes.

Q. Do you remember Mr. Martin asking you about that yesterday?

A. Yes.

Q. And what company --

MS. M. MILLER: Ms. Miller, if you go down to the next section.

BY MS. M. MILLER: (CONTINUING)

Q. What company is identified as the registered owner of this particular aircraft?

A. Can you scroll down, please?

Q. She's going to do that in a moment.

A. Okay. Fling Air, Inc.

Q. And what's the address of Fling Air, Inc?

A. PO Box 9099, Tamuning, Guam, the same address as Hansen Helicopters.

Q. And remember, yesterday and today, you saw that Exhibit 829 shows Fling Air, Inc., as being a Vanuatu company?

A. Yes.

Q. Okay. Now, what is the serial number of N74AM on this document?

A. 1250790S.

Q. All right. Now, I would like you to look at what was previously entered into evidence as Government's Exhibit 204. And, to remind the jury, this was already admitted, and I'm going to wait until it comes up for the jury.

Okay. And what is the subject of this e-mail?

A. E-mailing Hansen Helicopters aircraft registrations, October 20th, 2015.

Q. Now, I'd like you to go to Page 9 of Exhibit 204, please. And could you tell the members of the jury whether you see on Page 9 of Exhibit 204 a reference to Fling Air and the aircraft identified as N74AM. And Ms. Miller will hone in on that page for you.

MS. M. MILLER: And it's on Row 79, Ms. Miller. Page 9, Row 79. Is there a way to pull that out even further?

THE WITNESS: I see it.

MS. M. MILLER: I can't see it. (Laughing.) Can we hone in on that more, or is that the best we can do? There we go. Okay.

BY MS. M. MILLER: (CONTINUING)

Q. So do you see Row 79, Special Agent Khamvongsa? 03:00PM
A. Yes. If I may, can I mark it just so -- 03:00PM
Q. I'm sorry? 03:00PM
A. May I mark it? 03:00PM
Q. Yes, please. If you could just circle it to make it easier to see. 03:00PM
A. (Witness marked the exhibit.) 03:00PM
Fling Air is right there where the yellow circle is. 03:00PM
Q. Yes. Perfect. And can you also circle the N registration number for Fling Air on this document? 03:00PM
A. (Witness complied.) 03:00PM
Q. There we go. And can you also circle the serial number associated with that N number? 03:00PM
A. (Witness complied.) 03:00PM
Q. And is that consist with what I wrote on the board that the Defendant Jon Walker represented to the FAA was the serial number for this particular aircraft? 03:01PM
A. Yes. 03:01PM
Q. Now I'd like you to look at Page 10 of this exhibit, Hansen Helicopters registration fleet information. And when we get to Page 10, I'd like to bring your attention to Row 161. Thank you. Do you see N74AM? 03:01PM
A. Yes. 03:02PM
Q. And could you read that, what it says there. First of all, the title of this section of the Hansen Helicopters 03:02PM

registration information for their aircraft is entitled what?

A. "Problem Children."

Q. And now can you read what is on this document regarding N74AM?

A. "This aircraft was changed into N74AM. Have paperwork for recertification of new air frame."

Q. What is the serial number that is now going to be associated with N74AM because it needed a new air frame and it was now going to be associated with a different serial number?

A. 590102E.

Q. Do you recall the testimony of Mr. Breitzman?

A. I do recall his -- his testimony.

Q. How many serial numbers can be associated with a helicopter?

A. One; it's like a car VIN.

Q. All right. Sir, now let's talk about another helicopter that Mr. Martin questioned you about, and that is N454S. Do you recall those questions?

A. I recall being questioned.

Q. Okay. What counts does N454S pertain to?

A. Counts 100 and 102.

Q. Okay. And let's look at the contract for that particular helicopter. And that was entered into evidence as Exhibit 2900-3280.

MS. M. MILLER: And, Ms. Miller, can you hone in

03:02PM 03:02PM 03:02PM 03:02PM 03:02PM 03:02PM 03:02PM 03:02PM 03:02PM 03:02PM 03:03PM 03:03PM 03:03PM 03:03PM 03:03PM 03:03PM 03:03PM 03:03PM 03:03PM 03:03PM 03:03PM 03:03PM 03:04PM 03:04PM 03:04PM

on the top portion of that contract, please.

BY MS. M. MILLER: (CONTINUING)

Q. Who is identified as the lessor of this helicopter?

A. Wilma's Flight Service, Inc.

Q. Do you remember who the registered owner of the helicopter was according to what Mr. Walker sent to the FAA?

A. I believe it was Eddie's or -- Eddie's, and it changed over to Dave's.

Q. Well, let's make sure it's absolutely correct.

MS. M. MILLER: Ms. Miller, could we go to Exhibit 1252, the registration information regarding this helicopter, N454S.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. So tell the members of the jury, please, who is the first registered owner of this helicopter?

A. Hansen Helicopters, Inc.

Q. And then who is the registered owner after that?

A. Eddie Air, Inc.

Q. And then who is the registered owner after that?

A. Dave's Helicopter Service.

Q. And who is the individual who was registering and reregistering this helicopter with the FAA under all these different names?

A. Defendant Jon Walker.

Q. When this helicopter was leased by Wilma's Flight

Service and the money came in, what account was the money deposited into?

A. Caledonian Agency, Inc., bank account.

Q. When you traced the money from Caledonian Agency, where did it go after it left the bank account of Caledonian Agency?

A. It went into Hansen Northern Helicopters' bank account --

MR. MARTIN: Your Honor, may I enter an objection? We're going way beyond cross. I never mentioned bank accounts, I didn't go into any type of money on this. This is way beyond -- this is just a re -- re-examination.

MS. M. MILLER: May I respond?

THE COURT: Wait just a minute. Any other objections?

MR. MARTIN: Cumulative.

THE COURT: Yeah. Okay. Beyond -- well, first of all, beyond the scope. And then cumulative? So is it --

MR. MARTIN: Well, he's redoing what he's already done. I mean, this is his direct examination, again.

MS. M. MILLER: Mr. Martin cross-examined this witness on these counts. And Mr. Martin, in cross-examining the witness on these counts, brought to the witness's attention and to the jury that this helicopter was registered, it was leased, and didn't the tuna boat companies get what

they bargained for.

Mr. McConwell brought in Defense Exhibit 66, which was an excerpt of the GAO report showing that one of the ways in which companies --

THE COURT: You don't have to explain it. I know what it said.

MS. M. MILLER: Okay.

THE COURT: Go ahead. And therefore...

MS. M. MILLER: And therefore, this is relevant, Your Honor, to show the stacked ownership, complex business relationships --

THE COURT: You're trying to show what the GAO report shows?

MS. M. MILLER: Yes. It ties into -- first of all, it's within the scope of Mr. Martin questioning about these counts, because he did question him about these counts.

THE COURT: Uh-huh.

MS. M. MILLER: Secondly, it is also within the scope of Mr. McConwell's questioning about --

THE COURT: I got it. All right. Further?

MR. MARTIN: Your Honor, I never questioned him about any bank accounts. And that's where she's going now. Where did it go from this account to that account, I never went into that.

MS. M. MILLER: The whole point of --

MR. MARTIN: And I don't think Mr. McConwell did either.

THE COURT: Okay.

MS. M. MILLER: If we need to go back, we -- we certainly can, Your Honor. But, he did question him regarding these counts, and the whole point of the wire fraud is --

MR. MARTIN: Not the counts.

MS. M. MILLER: -- part of the underlying --

THE COURT: No, she's saying --

MR. MARTIN: I'm saying "account," bank accounts, not the counts of the indictment.

THE COURT: Bank accounts.

MS. M. MILLER: Wire fraud requires -- he questioned --

THE COURT: No, he's saying he never talked about bank accounts.

MS. M. MILLER: I know what he's saying. But what I'm saying --

THE COURT: But did they talk about bank accounts?

MS. M. MILLER: They talked about the money with the wire fraud which goes into accounts. You don't have wire fraud without it going into a bank account.

THE COURT: Which monies, though? Which monies -- what was it, the monies that the tuna boats

received?

MS. M. MILLER: Correct.

THE COURT: Okay. Yes, Mr. Martin?

MR. MARTIN: Your Honor, I never talked about bank accounts. I did not go into the depth that she's trying to go back into, and I stand on my objection that it's cumulative.

THE COURT: All right. The Court has considered the objections and the proffer, and the Court will overrule the objections and allow. Go ahead. You may proceed.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, after the money was transferred to Hansen Northern, where was it transferred then?

A. It was transferred into Walker Agricola, LLC.

Q. And who is the sole owner of Walker Agricola?

A. The sole signer on that account is Jon Walker.

Q. Now let's look at Exhibit 66 which was a defense exhibit that Mr. McConwell entered into evidence yesterday. And could you go to the next page, please. Thank you.

MS. M. MILLER: And then, Ms. Miller, could you please highlight potential abuse where it says "shell companies" and focus in on that, pull that out, please.

BY MS. M. MILLER: (CONTINUING)

Q. And, Special Agent Khamvongsa, can you read the part that says "shell companies."

THE COURT: Okay. Hold on. I'm sorry. Hold on. Carmen is checking something. Hold on. Fine. You may proceed. Go ahead. Sorry.

MS. M. MILLER: Thank you, Your Honor.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, could you please read this to the jury?

A. Yes. "Potential abuse. Shell companies are vulnerable to abuse when used to conceal beneficial owner identity for illicit purposes. According to the Federal Aviation Administration, FAA, officials, some aircraft registrations have stacked company ownership. When shell companies own each other, such ownership arrangement can be used for illicit purposes to conceal the identity of foreign-based beneficial owners and can be difficult to detect."

Q. Special Agent Khamvongsa, when we look at Exhibit 829, do you see stacked ownership?

A. Yes.

Q. When we look at this transaction involving this helicopter, 454S, do we see one, two, three, four, five, six, seven different entities involved in one lease of one helicopter?

A. Yes.

Q. Despite that, who initially registered the

03:10PM 03:10PM 03:11PM 03:11PM 03:11PM 03:11PM 03:11PM 03:11PM 03:11PM 03:11PM 03:11PM 03:11PM 03:11PM 03:11PM 03:11PM 03:12PM 03:12PM 03:12PM 03:12PM 03:12PM 03:12PM 03:12PM 03:12PM 03:12PM 03:12PM

helicopter?

A. Jon Walker.

Q. Who eventually receives the money from the lease?

A. Jon Walker.

Q. Why seven different corporations from different countries in between Jon Walker to Jon Walker?

MR. MARTIN: Objection, Your Honor; speculation.

THE COURT: All right. Sustained.

BY MS. M. MILLER: (CONTINUING)

Q. All right. Let's go now to another topic that was covered by Mr. Martin yesterday. Actually, we're going to go to an exhibit that was introduced previously, and it's Exhibit 2939. Okay?

MS. M. MILLER: And, Ms. Miller, can you bring that up, please?

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, do you see Exhibit 2939?

A. Yes.

Q. Okay. And this exhibit was entered into evidence previously with the exception of the last two pages. First of all, can you tell the members of the jury, what is this document?

A. This is a member application with Community First Guam Federal Credit Union, and it's for Limey Air Service, Inc.

03:12PM 03:12PM 03:12PM 03:12PM 03:12PM 03:12PM 03:12PM 03:12PM 03:12PM 03:12PM 03:12PM 03:13PM 03:13PM 03:13PM 03:13PM 03:13PM 03:13PM 03:13PM 03:13PM 03:13PM 03:13PM 03:13PM 03:13PM 03:14PM 03:14PM

Q. What's the address for Limey Air Services, Inc., that you see there?

A. There's two. There is the mailing address of PO Box 9099, Tamuning, Guam. Then the street location is Lot 51584, No. 521 East Harmon Industrial, Harmon, Guam.

Q. Who else shares that address?

A. Hansen Helicopters.

Q. Now, Special Agent Khamvongsa, when this account was opened, what happened just two months earlier?

A. The first -- the first indictment took place.

Q. When were the defendants indicted?

A. May of 2018.

Q. When was this account opened?

A. July 26, 2018.

Q. Did the defendants enter into a transaction to sell their helicopters to another corporate entity after the indictment?

A. Yes.

Q. Let's look at Exhibit 3003-15.

MS. M. MILLER: And this has not been entered into evidence yet, Your Honor.

THE COURT: Okay. Yes, Ms. McConwell?

MS. MCCONWELL: I object to the aggregate of defendants. She needs to identify what defendant -- which defendants she's --

THE COURT: Okay, that's fair enough. Yeah, which --

MS. M. MILLER: Jon Walker.

THE COURT: Okay, very well. Please do that when you question the witness.

BY MS. M. MILLER: (CONTINUING)

Q. Let's look at Exhibit 3003-15, it's going to come up on your screen. Do you recognize this document, sir?

A. Yes.

Q. Is it a true and correct copy of the information that you obtained from and regarding Pacific Spotters?

A. Yes.

MS. M. MILLER: Your Honor, at this time, we would offer this into evidence.

THE COURT: Counsel?

MS. MCCONWELL: Well, Your Honor, this was -- this was obtained and produced on February 11th, 2022. And Mr. Khamvongsa -- Agent Khamvongsa --

MS. M. MILLER: Your Honor, this is a speaking objection. What is the legal basis?

THE COURT: I'm sorry. What's the legal basis then?

MS. MCCONWELL: Well, the witness has just testified that he relied on this as part of his investigation. However, this was produced, according to the government, after

his investigation. So if he's indicating that he relied -- used this to rely on his investigation, it doesn't substantiate --

THE COURT: It didn't exist?

MS. M. MILLER: I did not ask him that question, so I'm really not sure where that came from. And this has already been argued. The relevance, the foundation, etc. This Court has already ruled on it.

THE COURT: Yeah, but I think it's a different objection.

MS. M. MILLER: I'm really not sure what that objection is, Your Honor --

THE COURT: Why don't you rephrase?

MS. M. MILLER: -- because I didn't ask the witness that question.

THE COURT: Well, let's rephrase the question. Let me hear the question again or --

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, I had asked you just previously did you see evidence that there was a sale or transfer of the helicopters from one company to another.

A. Yes.

Q. Okay. Is this one piece of evidence that supports your knowledge of that sale?

A. Yes.

Q. When we go back to the Limey bank records, are there two pages that have not been entered into evidence yet that will be entered into evidence that also support your investigation regarding the fact that those aircraft were transferred to another company?

MS. MCCONWELL: I object to leading.

MR. MARTIN: I object to commenting on evidence.

MS. M. MILLER: It's foundational.

THE COURT: Okay. The Court will sustain the objection as to leading.

BY MS. M. MILLER: (CONTINUING)

Q. What does --

THE COURT: Let the exhibit speak for itself.

BY MR. M. MILLER: (CONTINUING)

Q. What does Exhibit 2939, the last two pages of that exhibit that we're going to show the jury in a moment, show you regarding this transaction?

A. It shows that the operation moved offshore into the Philippines, and then wires are being sent back to Guam here so that they could pay their own operational expenses from the account that we just looked at.

MR. MARTIN: Your Honor, I object to him speculating as to what -- what was paid with what. He can say that -- he can say what the document reflects, but he's testifying as to what his theory of the case is, and I object

to it.

THE COURT: Okay. Okay. Just focus on what the document states then. Does the document state what you just said, everything you said?

THE WITNESS: It supports -- it's one piece of the document that supports what I just said.

MR. MARTIN: That's his theory, Your Honor, which I object --

THE COURT: It's not -- okay. So the question is, though -- okay.

MS. M. MILLER: We argued this --

THE COURT: Okay. I know.

MS. M. MILLER: At length. If we have to go all the way back, we can.

THE COURT: No, no, I'm just -- hold on.

MR. MARTIN: Your Honor, my objection is speculation. And we haven't argued that. He's testifying as to his theory, which is speculation. I'm not arguing what the document says.

THE COURT: All right. Why don't we -- okay. The Court will sustain the objection in terms of -- of what you believe the document says. Let the document speak for itself. So sustained.

BY MS. M. MILLER: (CONTINUING)

Q. Sir, Limey Air Service, when you received these bank

records from Limey Air Service, can you tell the members of the jury why you asked for these bank records from Limey Air Service?

A. I asked for those particular bank records because it was identified they opened that account shortly after the first indictment.

Q. Okay. And was there evidence about Limey Air Service being involved in the underlying actions that you were investigating?

A. Yes.

Q. Was there also evidence about the defendants opening up a new corporate entity after they were indicted?

MR. MARTIN: Objection.

THE WITNESS: Yes.

MR. MARTIN: Objection; leading, Your Honor. I'd ask the witness --

MS. M. MILLER: I'm laying a foundation.

THE COURT: Hold on. Hold on. Just -- the objection is leading, the Court will sustain the objection.

BY MS. M. MILLER: (CONTINUING)

Q. What evidence was there, sir, of any additional corporations opened after the indictment?

A. Pacific.Spotters Corporation was opened up around the timeframe after the indictment.

Q. And how do you know that, sir?

A. I've seen the records from the Philippines.
Q. Who is the president of Pacific.Spotters?
A. Defendant Jon Walker.
Q. Who's the president of Limey Air Services, Inc?
A. Defendant -- Defendant Jon Walker.
Q. What is the business of Pacific.Spotters Corporation?
A. Helicopter leasing.
Q. What was the business of Limey Air Services, Inc.?
A. Helicopter leasing.
Q. And this exhibit in front of you, sir, Exhibit 3003-15, what does this exhibit show you?

MR. MARTIN: Well, Your Honor, I object. He can read from the exhibit, but he cannot interpret the exhibit.

MS. M. MILLER: And I move in Exhibit 3003-15, Your Honor, based on all the arguments you heard yesterday regarding this, and I would ask it to be published to the jury.

THE COURT: All right. Is it okay?

MR. MARTIN: And I understand that, Your Honor, and I want the record to reflect my continuing objection.

THE COURT: Okay. Objection so noted. Yes, Ms. McConwell?

MS. MCCONWELL: And Hansen Helicopters and also this -- if this is admitted, Hansen Helicopters is not part of Counts 99 through 110.

THE COURT: All right. So noted. Objection overruled. And Exhibit...

MS. M. MILLER: 3003-15.

THE COURT: 3003-15 will be admitted.

(Exhibit 3003-15 admitted.)

MS. M. MILLER: Thank you, Your Honor. May I publish it to the jury, please?

THE COURT: You may.

MS. M. MILLER: May I publish it to the jury, Your Honor?

THE COURT: You may.

MS. M. MILLER: Yes. Thank you.

BY MS. M. MILLER: (CONTINUING)

Q. Okay. Special Agent Khamvongsa, do you see the document in front of you?

A. Yes.

Q. Can you tell the members of the jury, what date is this document?

A. November 17th, 2018.

Q. Read the first paragraph of the document, please, sir.

A. "The -- the seller did on this November 17th, 2018, day of November 2018 sell, transfer and deliver all of its rights, title and interest in and to the aircraft in each case to the following entity, the said aircraft to be the property

thereof: Pacific.Spotters Corporation, Unit 117, Charlie Building, Subic International Hotel Complex, Zarita Road, Subic Bay, Freeport Zone, Philippines. The buyer."

Q. And how much did Pacific.Spotters Corporation pay for the helicopters?

A. $340,000.

Q. Can you remind the jury what the value of the helicopters were in the balance sheet of Wilma's?

A. Approximately $14 million.

Q. Now let's go down to the bottom of this document, please, and see what is being represented regarding the condition of the helicopters. And can you please read Subparagraph 3, starting with "the aircraft."

A. "The aircraft is sold in an as-is basis without any warranties whatsoever, expressed or implied, as to the merchantability, fitness for any purpose, durability, design or suitability, especially that it was disclosed that the majority of the aircraft are considered to be scrap, nonfunctional and/or have expired and lost certificates of registration and airworthiness."

Q. All right. Now, sir, I would like you to look at Exhibit 2939 again. And this time, I would like you to look at Page 82 of that exhibit, which has not been entered into evidence yet, but I will seek to move it in. And while that's being pulled up for you, can you tell the members of the jury

whether Pacific.Spotters did, in fact, start leasing helicopters to tuna boat companies for money in 2018?

A. Yes, they did.

Q. And I want you to look at Exhibit 2939, Pages 82 and 83. Do you recognize those pages?

A. Yes.

Q. And are they a true and correct copy of the information that you obtained from the bank account of Limey Air Services, Inc.?

A. Yes.

MS. M. MILLER: Your Honor, at this time, the government would move into evidence Exhibit 2939, Pages 82 and 83.

MR. MARTIN: Your Honor, we'll stand on our previous objection.

THE COURT: Okay. Same?

MS. MCCONWELL: Same with Hansen.

THE COURT: All right. Very well. Objections will be preserved.

MS. M. MILLER: May I publish to the jury?

THE COURT: Yes, 2939-82 are both -- are admitted.

MS. M. MILLER: Thank you, Your Honor.

THE COURT: You may publish.

(Exhibit 2939-82, 2939-83 admitted.)

03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:25PM 03:26PM 03:26PM 03:26PM 03:26PM

MS. M. MILLER: May I publish that to the jury, Your Honor?

THE COURT: You may. It's just one exhibit there, right?

MS. M. MILLER: It's Pages 82 and 83.

THE COURT: Oh, okay. That was -- okay. I see. 82, that has both 82 on it. Okay. 82 and 83 are both admitted, and the objections are preserved and noted. And may be published.

BY MS. M. MILLER: (CONTINUING)

Q. Special Agent Khamvongsa, can you tell the members of the jury what we're looking at here?

A. This was provided from the bank. This is a summary of incoming wire transfers for January to December of 2018.

Q. Okay. From the originator, what is the originator?

A. The originator, Limey -- excuse me. The originator is Pacific.Spotters Corporation.

Q. And the funds are going into which account?

A. Limey Air Service, Inc.

Q. Okay. And that is the account we've been talking about, sir?

A. Yes.

Q. Who's the president of Limey Air?

A. Defendant Jon Walker.

Q. Who's the president of Pacific.Spotters?

A. Defendant Jon Walker.

Q. Now let's look at Page 83. And what do we see here?

A. This is an incoming wire transfer log from January to December 2019 identifying the originator and the beneficiary and the amounts.

Q. And who is the originator of these hundreds of thousands of dollars totaling $5 million coming into this account?

A. Pacific.Spotters Corporation.

Q. And who's the beneficiary or recipient of those funds?

A. Limey Air Service, Inc.

Q. Can you tell the members of the jury whether you traced these funds to determine the source of the funds?

A. Yes.

Q. What was the source of the funds?

A. The leasing of the helicopters to tuna boat companies.

Q. Okay. Now, sir, I'd like to talk to you about all of these different companies that were used and ask you some questions.

What did the defendants themselves say about why so many different companies were used to lease these helicopters?

MR. MARTIN: Your Honor, I object, this is beyond the scope of direct -- I mean of cross, and not -- not

consistent with the exhibits just introduced, that the Court allowed the government the opportunity -- I'm sorry. And not consistent with the exhibit that was just introduced which the Court allowed, which was 3003-82 and 83.

THE COURT: Ms. McConwell?

MS. MCCONWELL: And it's leading.

THE COURT: All right.

MS. M. MILLER: It is within the scope, Your Honor, because Mr. Martin and Mr. McConwell both asked this witness questions about the different companies that were used and also asked questions to try to represent that these companies were actually legitimate, valid, independent from the defendants.

MR. MARTIN: This is a speaking objection. If we're going to go into that, I mean -- what I intend to represent is a speaking objection.

THE COURT: Yeah, right. Yeah, don't -- yeah, just respond to -- the objection is beyond the scope -- beyond the -- beyond the scope of the --

MS. M. MILLER: My response -- it is -- it is within the scope because it rebuts and refutes any assertion that these Vanuatu companies --

MR. MARTIN: We're making a speaking objection again, Your Honor, what she thinks it rebuts or -- is a speaking objection.

THE COURT: All right. All right. Anything -- okay. That's it. The Court will overrule the objection. Go ahead and proceed.

BY MS. M. MILLER: (CONTINUING)

Q. What did the defendants say about why all of these different companies were used?

A. To limit their liability; to limit Hansen Helicopters and Mr. Walker's liability.

Q. Mr. Martin also showed you an Exhibit 366 yesterday, an aircraft that was registered in New Zealand; do you recall that?

A. Yes.

Q. I'd like to you show what has been previously marked as Exhibit 302 and has been entered into evidence as Exhibit 302.

MS. M. MILLER: And specifically, Ms. Miller, if you can go to Page 2 of Exhibit 302, that references the New Zealand-registered aircraft.

MS. MCCONWELL: I do not -- oh, no. Never mind.

BY MS. M. MILLER: (CONTINUING)

Q. Could you please read for the jury what the defendants represented the reason was for the aircraft being registered in New Zealand.

A. "The aircraft wasn't changed to" --

MS. MCCONWELL: Your Honor, I object to the

grouping of defendants.

THE COURT: All right. Please specify which defendant.

MS. M. MILLER: Yes. This was rep -- this was an attempted sale by Hansen Helicopters --

MR. MARTIN: Your Honor --

MS. M. MILLER: -- of its company --

MR. MARTIN: The objection was --

THE COURT: Right, the -- the Court -- what is the -- which defendant is it?

MS. M. MILLER: So this goes to both Hansen Helicopters and Jon Walker.

THE COURT: That was the question. All right.

MS. MCCONWELL: Hansen Helicopters is not a party to Counts 99 through 110, and I would object to any questions about --

MS. M. MILLER: But Jon Walker is, and our contention is as the sole owner --

THE COURT: I know --

MS. M. MILLER: -- and controller --

THE COURT: -- I got it.

MS. M. MILLER: Right.

THE COURT: Anything else, counsels?

MR. MARTIN: Your Honor, we don't know who the author -- the government hasn't -- our question was, who is

the author of this document. That's the objection.

MS. M. MILLER: This was -- this was previously --

THE COURT: Hold on. You want -- you want to voir dire the witness in aid of an objection?

MR. MARTIN: Yes, Your Honor.

THE COURT: All right. That might be faster than all these objections. Go ahead.

VOIR DIRE

BY MR. MARTIN:

Q. Agent Khamvongsa, in front of you, I believe, is Exhibit No. G-302; do you see that, sir?

A. They took it off screen, but I -- oh, yes. Yes.

Q. Okay. And have you had a chance to review that, sir?

A. Yes.

Q. Okay. And do you -- sir, by looking at that document, can you tell --

MS. MCCONWELL: He doesn't have the front, the first page.

MR. MARTIN: All right.

BY MR. MARTIN: (CONTINUING)

Q. Do you know who the author of that document is, sir?

A. Co-defendant, Mr. Crowe.

Q. Well, no, where do you see that, sir?

A. It came as a result in response to an e-mail. This was an e-mail attachment in regards to a potential buyer that we've been talking about throughout this trial.

Q. So the -- so it is -- it refers to a meeting with Rufus; correct, sir?

A. Mr. Crowe, yes.

Q. Okay. It doesn't say Mr. Crowe is the author, this is some third party; correct, sir?

A. This -- this is in response -- this is between that meeting, yes.

Q. This is not a document that was authored by Mr. Crowe, this is a document that was written by a third party in --

MS. M. MILLER: Objection, Your Honor.

MR. MARTIN: -- is that correct?

THE COURT: Hold on. No, no, let him finish the question. What is the question, Mr. Martin? Go ahead. Okay. One person.

MS. MCCONWELL: Well, no, Your Honor. He needs to have the first page and I'm not driving on the exhibit. He needs to have the first page of the exhibit --

MS. M. MILLER: Your Honor --

MS. MCCONWELL: -- displayed to the witness.

THE COURT: Hold on, Counsel. Okay. Let -- Mr. Martin, do you want the first page of the exhibit on, or

what's the deal? You want to keep on asking questions?

MR. MARTIN: I thought he had the first page because I'm looking at it on my computer. I'm sorry. If we could go to the very first page, 302-1.

BY MR. MARTIN: (CONTINUING)

Q. Do you see the top of the first page, sir?

A. Yes.

Q. Okay. And would you agree with me, sir, that this is some type of a document that somebody prepared based upon a meeting with Mr. Crowe?

A. This is from Mr. Crowe.

Q. Does it have Mr. Crowe's e-mail address on it, sir?

A. Sir, if you look, it's answering a question, he's responding --

Q. The question was --

THE COURT: Hold on. Hold on. Q and A, question and answer.

BY MR. MARTIN: (CONTINUING)

Q. My question was, Does it have Mr. Crowe's e-mail address on there?

A. His e-mail is not on this document.

MS. M. MILLER: By the way, Your Honor, we went through this when this document was admitted into evidence months ago. We had the e-mail introduced --

THE COURT: That's not -- that's not the

question. I know, but the question is the query of getting into the substance of this because you're trying to get --

MS. M. MILLER: But the prior --

THE COURT: Hold on. Trying to get an admission, so let's just try to get through this.

MS. M. MILLER: And he's already answered. This was prepared by Mr. Crowe.

THE COURT: Hold on. Let him finish his question. Go ahead, Mr. Martin.

BY MR. MARTIN: (CONTINUING)

Q. From the document that is on the screen, Exhibit 302, is there anything to identify who the author of the document is?

A. This was attach -- the documents with Mr. Crowe in his response.

Q. Is there anything on the document to identify who the author of the document is, sir?

A. The author is both --

Q. Is there anything --

A. -- the buyer and Mr. Crowe.

Q. -- on the -- in the contents of the document to identify who the author of the document is? Do you understand that question?

A. Yeah, it's the response to the questions.

Q. No, is there -- I'm not asking about response, I'm

 not asking about anything, I'm asking --

A. But you said "is there anything," is there anything --

Q. Is there anything --

A. The response is to the buyer. The response is a meeting with Rufus.

Q. Sir, read in this document where it says who the author of the document is.

A. Sure. "All the companies owned by Jon with a few percentages going to Ledger, Marv or me" --

Q. That --

A. -- or me. "Or me, Rufus Crowe, for legality's sake."

Q. Where are you reading, sir?

A. Look at No. 1. Look at the -- "revisit the organizational structure and ownership interest of the various companies." Now look at the response in bold.

Q. Who is the -- who is it -- where does it say that Rufus said that, sir?

A. Meeting with Rufus.

MR. MARTIN: Your Honor, I -- I object that there is no indication who the author of this is and that it reflects actually it is a third party. Somebody prepared this -- not Mr. Crowe, but somebody prepared this document that is not one of the defendants in this case.

THE COURT: Anything else? Okay. Any other

objection or any other question?

MR. MARTIN: That's it, Your Honor.

THE COURT: Okay. Now you may respond, Ms. Miller.

MS. M. MILLER: First of all, this document is in evidence. Secondly, this argument was made the first time the government moved this document into evidence. At that time, we offered Your Honor the e-mail --

THE COURT: We got that. The question is -- he just asked him a very specific question.

MS. M. MILLER: Yes. So when you see "all of the companies are owned by Jon with a few percentages going to Ledger, Marv or me," Rufus Crowe is the other person besides David Ledger, Marvin Reed and Jon Walker.

THE COURT: All right. So you're repeating everything he just said. All right. Very well. Anything else?

MR. MARTIN: Your Honor, that does not reflect who the author is.

THE COURT: All right. So I think that this is one of those situations where, again, it will go to the credibility of the witness and what the jury wants to glean from that; whether Rufus Crowe is the author or not, that's up to them. So the Court will overrule the objection. Next question.

           MS. M. MILLER: Yes, Your Honor. Can we go to Page 2, please?

BY MS. M. MILLER: (CONTINUING)

Q. And, sir, by the way, where did the government get this document from?

A. It was obtained through the search warrant back in October of 2016.

Q. From whose computer?

A. Hansen Helicopters.

Q. Now can we go to Page 2. What was represented here regarding the New Zealand-registered helicopters that Mr. Martin asked you about yesterday?

A. "The aircraft wasn't changed to U.S. registration because leaving it this way circumnavigates the FAA. Just like Stewart does with skydiving planes Australian. The FAA leaves you alone."

Q. Okay, sir. Now let's go down to Question 4 in this document which is on the same page, Page 2, Question 4. And to remind the jury, sir, this document was prepared in anticipation of an attempt to sell Hansen Helicopters?

MR. MARTIN: Your Honor, I object to that. There's...

THE COURT: Objection will be leading. Next question.

BY MS. M. MILLER: (CONTINUING)

Q. Why was this document prepared, sir?
A. It was --
MS. MCCONWELL: I object to speculation.
THE COURT: Sustained.
BY MS. M. MILLER: (CONTINUING)
Q. Do you know why this document was prepared?
A. Yes.
Q. Why?`
MR. MARTIN: Your Honor, we object to speculation.
BY MS. M. MILLER: (CONTINUING)
Q. How do you know why?
A. Based upon e-mails that I reviewed --
Q. Okay.
A. -- between the -- between Hansen Helicopters and its officers and an outside third party.
Q. And what was the communications with the outside third party?
A. They either wanted to buy or invest into the company.
Q. Okay. Now, let's look at Question 4. "Some of the leases refer to Wilma's Flight Service as the lessor and operator, registered owner, whereas other leases do not. Is this a typo, or is there some explanation?"
And can you read the answer to that question?
MR. MARTIN: Your Honor, I -- my objection is,

this is a brand-new direct examination.  We are way beyond the scope of cross, we're way beyond the scope of the new exhibits you allowed in.  This is just a brand-new redirect, and we're plowing ground that should have been plowed a long time ago. That's an Oklahoma phrase, it's not a legal -- it's not a legal objection, but I apologize.

MS. M. MILLER:  Well, Your Honor, Mr. Martin --

THE COURT:  Hold on.  Let me hear the next objection first.

MS. M. MILLER:  I think he's done.

THE COURT:  I take all objections first before --

MS. M. MILLER:  Yeah.

MS. MCCONWELL:  Hansen joins.

THE COURT:  Hansen joins, yes.

MS. M. MILLER:  So Mr. Martin yesterday, Your Honor, asked the witness about the lease between Wilma's Flight Service and the tuna boat company that identified S45S -- 454S as part of the lease.  And Wilma's Flight Service was identified as a lessor.  And that was a lease that Mr. Martin went over with Special Agent Khamvongsa.  So this is directly in response to his cross-examination, and it's very relevant to whether that was, in fact, a valid and independent transaction or not.

THE COURT:  All right.  Overruled.  Go ahead.

BY MS. M. MILLER: (CONTINUING)

Q. Can you please read the answer to Question 4?

A. "It is all Hansen Helicopters. All the aircraft are owned wholly by Hansen and its subsidiary companies, and all leases and contracts are basically with Hansen, Jon and -- Hansen. Jon and Ledger were trying to spread out the liability through the forming of the other companies. Everything is controlled by Hansen and Jon. They are synonymous."

MS. M. MILLER: I have no further questions, Your Honor.

THE COURT: I'm sorry?

MS. M. MILLER: I have no further questions.

THE COURT: No further questions. Okay. So -- yes? Are we ready to excuse this witness, everyone?

MS. M. MILLER: Yes, Your Honor.

MR. MCCONWELL: Might we take a break before we start?

THE COURT: Well, it's already -- okay. I'm going to excuse this witness. Are you done -- we're done with him?

MS. M. MILLER: Yes, we're done with this witness, Your Honor.

THE COURT: Oh, no.

MR. MARTIN: No, no, Your Honor. I have extensive cross-examination that I, in all candor, after

Mr. McConwell gets done, I don't think I can finish before 4:00. I don't know how much time he's going to take, but --

THE COURT: Oh, I thought --

MR. MARTIN: She's gone three hours and 45 minutes with him.

MS. M. MILLER: I have not.

MR. MARTIN: Two hours and 45 minutes. I can't see that well.

THE COURT: Okay.

MS. M. MILLER: Okay. Then we had breaks, then we had arguments. So I certainly didn't.

THE COURT: Ms. Miller, let him talk. I thought we were done.

MS. M. MILLER: We should be done.

THE COURT: Hold on, hold on. You still want to come back and do a re -- hold on, let me think. It's a recross because there's -- is there new stuff that you guys need to --

MR. MARTIN: You just introduced two brand-new exhibits, Judge.

MS. M. MILLER: Your Honor, that was all in response to his cross.

THE COURT: Hold on. This is -- no, no, I didn't make a ruling subsequent in the middle of -- yeah, so I'll let you speak on those -- on those particular exhibits, yes.

MR. MARTIN: And she substantially expanded several areas that I think I should be allowed to go into. I'll try to be as brief as I can, but...

MS. M. MILLER: Well, then, Your Honor, I'm going to want re-redirect. I mean --

THE COURT: No, no, no, no, no. Let me tell you this. If I allow -- here's the deal. The only time -- the only time -- see? Not only is my throat going out, my computer is going out because you guys are getting too noisy. All right. And now my microphone is broken. Everything is breaking apart up here. Never mind. You can fix it later.

All right. All right. So listen, normally I allow direct examination, cross-examination and redirect, and I allow recross if there is new information that was brought out that you -- and so the Court will agree with Mr. Martin, Ms. McConwell, that they can go back to the exhibits that I allowed in, and I made that ruling -- you know which one I'm talking about -- earlier. So I will allow --

MS. M. MILLER: Those two new exhibits?

THE COURT: -- right now with regard to those two. Now, if -- is there anything further than those two, and if so, you have to explain that to me.

MR. MARTIN: Well, you admitted 3003-15. You admitted 3003-82, 3003-83. And --

MS. M. MILLER: No, no, wrong numbers.

THE COURT: Okay. Hold on.

MR. MARTIN: 2939-82 and 2939 -- I apologize. 3929 -- 2939-83. And there are exhibits, Your Honor -- there is an exhibit... okay. There are exhibits, Your Honor, a couple of them that have been admitted that relate that should be gone into.

THE COURT: All right. I don't think my throat is going to stay -- we've got like 15 more minutes. So what we're going to do is we'll recess and start on Monday with him. But I want to talk to all of you so we can narrow, narrow this recross-examination.

Now, the only way that Ms. Marie Miller is going to come back again, if I allow her to go on re-redirect, is if it's something totally brand-new. But I'm pretty sure we can get this done with. You-all are pounding -- I think we got it. We got it. This is a smart jury. They got it.

Okay. So, ladies and gentlemen, let me say, keep an open mind. Please do not form or express any opinion on this case. You're still here. Oh, my gosh. I feel like we live together.

THE WITNESS: You're a great roommate, Your Honor.

THE COURT: Thank you. Well, I'm falling apart here. Everything, my throat, my everything is falling apart. But do not form or express any opinion on this case until it's

03:43PM 03:43PM 03:44PM 03:44PM 03:44PM 03:44PM 03:44PM 03:44PM 03:44PM 03:44PM 03:44PM 03:44PM 03:44PM 03:44PM 03:44PM 03:44PM 03:44PM 03:45PM 03:45PM 03:45PM 03:45PM 03:45PM 03:45PM 03:45PM 03:45PM

submitted to you.  Do not speak to anyone on any subject

connected with this trial.  If there is any media coverage,

sometimes there is or has been, just ignore it, don't pay

attention to it.  What really counts is what happens in the

courtroom.  And there is a lot happening in the courtroom.

So, you know, what's very important is what you

hear from the testimony of the witnesses and the exhibits that

are produced, and you will be able to get that when you go and

deliberate.  But it's important to ensure that both the

prosecution, the defense have a fair trial that you focus only

on what happens here.

So we're going to hopefully finish with the agent

on Monday morning.  And then prosecution will have their next

witness, Mr. Guzzetti, ready to go right after.  So you guys

have a nice weekend.  Take care of yourself.  I know one of

you is going to have a baby soon, so we wish you the best.

We're praying for you.  All right.  Have a nice weekend.  Take

care.

(Jury out at 3:46 p.m.)

THE COURT:  Same time, same time.  8:15, right.

Get her ice chips.  All right.  So what --

MS. M. MILLER:  Your Honor, I just had something

brought to my attention that I do want to bring to the Court's

attention.

THE COURT:  Oh, no.

THE CLERK: One moment.

THE COURT: Hold on. Hold on. Hold on.

MS. MCCONWELL: Am I in trouble?

MS. M. MILLER: Yeah, you are.

MS. MCCONWELL: She's looking at me.

THE COURT: Uh-huh.

MS. M. MILLER: Someone overheard Ms. McConwell approach Ms. Santos to try to convince her, I guess, that Exhibit 3003-14 was already admitted into evidence when it has not been admitted into evidence; is that correct?

MS. MCCONWELL: Well, I e-mailed to ask if it was admitted into evidence because I said my notes said it -- my note -- I have two conflicting notes; was it admitted or was it not admitted.

THE CLERK: It is admitted, Your Honor. And it showed up also on the transcript of proceedings that one of the parties just requested and was docketed just recently regarding 3003.

THE COURT: So just some confusion?

THE CLERK: 3003-14 was admitted.

THE COURT: It was admitted.

THE CLERK: It was my error that I did not note it as being admitted.

THE COURT: Okay. So Carmen has indicated it was her error, she made a mistake and she does note it was already

admitted. You were correct.

MS. M. MILLER: So 3003-14 is in?

THE COURT: Yes.

MS. M. MILLER: Because we had it out.

MS. MCCONWELL: Well, as I said --

THE COURT: No. Anyway, long story short, Carmen said it's in because she verified it with the court reporter.

MS. M. MILLER: Okay.

THE CLERK: And also the recording, Your Honor --

THE COURT: The recording.

THE CLERK: -- I verified with the recording.

THE COURT: Okay.

THE CLERK: It's ECF 1691, the transcript.

MS. M. MILLER: Well, one of the problems is, I just finished with this witness and I had no knowledge that that exhibit was in, and I could have used that exhibit with 3003-15 to show which aircraft were transferred. So I'm going to ask the Court to allow me, with this information, to reopen my redirect, because it would be appropriate for me to be able to tie that to 15 and finish out that examination. Otherwise, I am in a situation where Counsel can now question potentially the witness regarding that, and I haven't had an opportunity to because we had it as not admitted.

THE COURT: All right. So --

MR. MARTIN: Your Honor, it's not our fault they

don't know what exhibits are in or out. That's why we ask questions.

THE COURT: Yeah, but Ms. --

MS. M. MILLER: But she had it as not admitted.

THE COURT: Hold on. So there was a mistake. My courtroom clerk made a mistake just like some other people might have made a mistake. My court reporter confirmed that it was admitted and the FTR confirms that. So -- okay, so we have human error and whatever. So let's just move on. I don't think I disagree -- I agree with the prosecutor, if they needed to just come back in and clean it up before we pass the witness to the defense. So I'll allow that. But it's very limited questioning. How many questions?

MS. M. MILLER: No, it will be limited questioning, but --

THE COURT: Like how many questions?

MS. M. MILLER: I don't know right now, but I will tell Your Honor Monday morning, and it will be limited.

THE COURT: All right. I think it's fair. Yes, Ms. McConwell?

MS. MCCONWELL: Well, I'm going to -- I don't know that it's fair, and I'm going to tell you why. Because yesterday when we had our conversation with you outside the presence of the jury and Ms. Miller went through the exhibits that she wanted to use, she told us she wanted to use 3003-15.

She never said she wanted to use 14. All along she's always said she wanted to get 3000 -- 3003-15 in. She never asked to also have 3003-14 admitted.

MS. M. MILLER: That's right, because my assumption was -- if you recall, Your Honor, we tried to introduce the entirety of 3003, and we were not permitted to introduce the entirety because the defense objected to it. And as a result, only certain pages were introduced. And we relied on what we confirmed with Ms. Santos that 14 was not one of the pages introduced. That is not our fault.

THE COURT: All right. All right. So -- okay, look. I think it's -- okay. However way it shakes out, the exhibit has been admitted, and it was erroneously usually said -- it was erroneously represented that it was not. Officially, officially by the Court.

MS. MCCONWELL: Well, Ms. Miller was asking to have a new exhibit admitted and 3003-15. She could have also asked yesterday that she wanted to have 3003-14 admitted along with 15. She didn't want to do that. She only wanted 3003-15 admitted.

MS. M. MILLER: Your Honor --

THE COURT: Let's not keep going back because, you know, I'm getting headaches.

MS. M. MILLER: I know.

THE COURT: And I never get headaches. I tell

you, I rarely get headaches, and I've only gotten headaches in this trial. Let me just say -- I really do, I'm serious. So let me just say, look, I'm going to allow the prosecution -- because the exhibit's already been admitted, if it was in your -- if it was -- you know, the tide were turned here, I would do the same thing. I'm going to allow the prosecution to continue with the witness because he hasn't been obviously turned over. Focus your questions just narrowly on those exhibits. And then defense can do their recross-examination on the exhibits -- the newer exhibits that were admitted throughout the redirect. I will allow that. Okay? That's fair.

MS. MCCONWELL: So it's limited to 3003-14?

THE COURT: Yeah, that's all she's going to talk about.

MS. S. MILLER: 2939, Pages 82 and 83.

MS. MCCONWELL: Well, we've already talked about that. We've already talked about 2939-82 and 83.

MR. MARTIN: We're talking about reopening direct.

THE COURT: Okay. So yeah, so direct, she's only going to focus on that 3003-14.

MS. M. MILLER: Yes.

THE COURT: And then it will be passing over to the two of you if you wish to speak or query the witness on

all the new exhibits that were introduced during the redirect examination.

MS. M. MILLER: And I will ask Your Honor, in the future, if Ms. McConwell is going to make an inquiry about whether an exhibit has or has not been admitted and there's a decision that there was an error, that we be included in any of that correspondence, because otherwise, it would -- it would not be appropriate. If Ms. Santos did confirm that that was admitted and Ms. McConwell then confirmed that it was admitted but they didn't let the government know, I'm confused about why that would be the case when the minutes indicated that it was not admitted.

THE COURT: All right. Yeah.

MS. MCCONWELL: Your Honor, then it goes both ways. Because --

THE COURT: What goes both ways?

MS. MCCONWELL: Because the agent came up -- has -- continually comes up to ask Ms. Santos about what's been admitted, and I'm not jumping him.

THE COURT: Yeah. Listen -- yeah.

MS. M. MILLER: But if there was ever a situation --

THE COURT: Let's just say -- look, look, we're on Guam. This is not like we have to get into, like, little knit-picky, like, should I talk to the court reporter, should

I talk to the courtroom clerk? Yeah. So...

(Discussion with clerk.)

THE CLERK: The transcript with regard to 3003 was docketed August 16th, and it does state that 3003 was filed.

THE COURT: Yeah.

THE CLERK: So, sorry. That's where I picked it up.

THE COURT: Yeah. Don't worry about it. Listen. Everybody had noted -- if you guys want to, like, clear this up with Carmen, talk to her, you can. But I'm going to allow you to -- if you need to come talk to my clerk and my court reporter informally about exhibits, it's fine to do that. I don't have a problem with you doing it individually. I mean, you know, you're all officers of the court.

MS. M. MILLER: And I'm not suggesting that's a problem. What I'm saying, though, is, if the minutes indicate that something was not admitted and then there is a correction --

THE COURT: Okay.

MS. M. MILLER: All parties need to know that a correction was made and that an exhibit is now admitted and available.

THE COURT: Well, a dispute -- all right. So at this point, I'm not going to order that -- I mean, I don't

03:54PM 03:54PM 03:54PM 03:54PM 03:54PM 03:54PM 03:54PM 03:54PM 03:54PM 03:54PM 03:54PM 03:54PM 03:54PM 03:54PM 03:54PM 03:54PM 03:54PM 03:55PM 03:55PM 03:55PM 03:55PM 03:55PM 03:55PM 03:55PM 03:55PM

think we have to get to that point yet. I'd rather you just calm down, everybody, and -- you know. All right. I'll see you Monday. Okay. Let's see.

03:55PM 03:55PM 03:55PM

THE WITNESS: Take care, Your Honor. Thank you. 03:55PM

THE COURT: Thank you. 03:55PM

(Proceedings concluded at 3:55 p.m.) 03:55PM

* * * 03:55PM

August 22, 2022; 8:40 a.m.; Hagatna, Guam

* * *

08:12AM 08:12AM 08:12AM

THE COURT: All right, good morning, everyone. Are we ready to go? All the jurors are present now?

MS. M. MILLER: And, Your Honor, I'm not going to ask Special Agent Khamvongsa any questions about 3003-14. So we could go straight to recross.

THE COURT: Oh, very good. Okay. You ready to go? Did we -- is there anything left that -- did I forget anything? (Laughing.) I -- I will say -- sorry, I still have a little -- still a little cough. So I'll try to contain it.

So there was nothing else further, right? I mean, just that you guys wanted to recross, and I made my ruling that we can contain -- I mean we'll limit to the new exhibits that you all had heard about on re- --

MS. M. MILLER: Redirect.

THE COURT: Right. Right, is that it?

MS. M. MILLER: Yes.

THE COURT: That was last thing I recall?

MS. M. MILLER: Yes.

THE COURT: Okay. So we'll call -- we'll call in the jury. And the agent is here?

MS. M. MILLER: Yes.

THE COURT: Oh, there you are. You're always

there.

MS. M. MILLER: He was here all weekend.

(Laughing.)

THE WITNESS: I've been waiting patiently.

THE COURT: Oh, poor guy. The longest witness ever. All right. So we'll call in the jury, and then I -- the Court also will be prepared to -- I've already written a decision, an order on the United States Attorney's motion for an order permitting testimony and evidence of Defendants' alter ego shell companies. So I will -- I will send that out to you guys right after -- why don't we do that after -- we'll talk about that after this witness? You want to do that?

MS. M. MILLER: Sounds good, Your Honor. Thank you.

MR. MARTIN: Sure.

THE COURT: Okay. We'll do that. And... yeah, let's do that afterwards, let's just focus on this. I don't want to send it to you now, and then you're going to get thinking about others things. Let's focus on trying to complete the testimony of this witness. And then -- then after he's done, which will be -- how long do you think you'll be, Mr. Martin, and -- based on what you know? Approximately.

MR. MCCONWELL: I have no questions, Your Honor.

THE COURT: Oh, Mr. McConwell has none.

How about you, Mr. Martin?

MR. MARTIN: 10, 20 minutes max, Your Honor.

THE COURT: Then you'll have Mr. Guzzetti ready?

MS. M. MILLER: Yes, Your Honor. He's ready.

THE COURT: Okay. Excellent. And then he'll be ready. And then you said you might have him for four hours today approximately?

MS. M. MILLER: Yes, Your Honor.

THE COURT: Okay. All right. So what we'll do is... um... let's finish him, let's finish this agent. And then I will issue my decision, you guys might want to take a few minutes to read it. And then we could talk about it.

The only thing I might have to do -- I'm just trying to decide if I'm going to go to mass or go to a viewing. I do have a cousin who died, and I did not know today was his viewing, but I'll let you know that. It's just down the street. If I go to the viewing, it will only take me 15 minutes. Please rise for the jury. So I can do it during a recess just to be efficient.

MS. M. MILLER: Yes, Your Honor.

(Jury in at 8:43 a.m.)

THE COURT: All right. Please be seated, ladies and gentlemen of the jury. We'll continue on with the examination of Agent Khamvongsa. And Mr. Martin will have an opportunity to conduct a recross-examination. Yes, Mr. Martin.

MR. MARTIN: Thank you, Your Honor. Morning, ladies and gentlemen.

THE JURY: Morning.

MR. MARTIN: Good morning, Agent Khamvongsa.

THE WITNESS: Good morning, sir.

RECROSS-EXAMINATION

BY MR. MARTIN:

Q. When we recessed -- pardon me, I didn't have my microphone on. When we recessed Friday, you had just finished your testimony, sir, and in particular, I think you were testifying about Government's Exhibit 3003-15.

If we could briefly pull that up.

And that had to do with the sale of some aircraft, did it not, sir, to Pacific Spotters; correct?

A. No.

Q. It did not have to do with sale of aircraft to Pacific Spotters?

A. No.

Q. All right. And who did it have to do with aircraft --

A. It actually had to do the sale of scrap.

Q. Okay, sir. Let's go, sir, to Exhibit 30014[sic] that's already been introduced into evidence.

Would you agree with me, sir, that 300.314 is the

bill of sale that relates to 300.15 that I just asked you questions about, sir?

A. What's reflected here is purported to be --

Q. Would you agree, sir, that that relates to the bill of sale in 300.15, that's the bill of sale for the property that's in 300.15, sir, would you agree with that? That's a yes or no? Do you agree or not?

A. Just to clarify, just this page matches up with the previous -- the page 3003-15; correct? That's it?

Q. That's it.

A. Yes, this page goes to that.

Q. And at the top, it says it's a bill of sale, doesn't it, sir?

A. It does say bill of sale.

Q. Right. And -- and it says it is a bill of sale from Jan's Helicopter Services, and we know to Pacific Spotters; correct, sir?

A. It is from -- it does represent on this document Jan's Helicopter Service to Pacific.Spotters Corporation.

Q. And it deals with the sale of aircraft -- if we can go back up to the top, please.

It deals with the sale of what is collectively known as aircraft from Jan's Helicopter Services; correct , sir?

A. No.

Q. Okay. And if we can go up to right about there.

08:46AM 08:46AM 08:46AM 08:46AM 08:47AM 08:47AM 08:47AM 08:47AM 08:47AM 08:47AM 08:47AM 08:47AM 08:47AM 08:47AM 08:47AM 08:47AM 08:47AM 08:47AM 08:47AM 08:47AM 08:47AM 08:48AM 08:48AM 08:48AM 08:48AM

Just go right up there. That's where I want to be.

Are you telling me that those items that are listed there are not aircraft, sir?

A. You're negating the second page where they say --

Q. I asked you about the items listed on this page. I'll get to the second page, okay, sir.

This is not going to take ten minutes, Judge. And I apologize.

We're on page 300.3.14. That's the only page I'm talking about.

A. Okay. So --

Q. All right. Would you agree with me, sir, that the items listed there are aircraft?

A. The items listed here are purported to be aircraft.

Q. Okay. And will you agree with me, sir, and if we need to raise this, you can you count them, that there purport to be 17 aircraft on that page?

A. Yes, 17.

Q. Okay.

A. I will agree with 17.

Q. All right. And will you agree with me, sir, that they were sold for $340,000 for all of 'em?

A. I will not -- I disagree.

Q. All right. Would you agree with me, sir, if we can go to page 303 -- 3003.15, stop right there. That the total

08:48AM 08:48AM 08:48AM 08:48AM 08:48AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:49AM 08:50AM

amount of the sale was $340,000?

A. This document represents $340,000. May have happened, but the exchange was basically between Jon Walker and Jon Walker. So there is no real exchange of money.

Q. I'm asking you -- I didn't ask you about your opinion. I asked you what's on that page, sir. Does that page represent that there was a sale for $340,000? What's on that page?

A. This page does reflect $340,000, yes.

Q. And as a matter of fact, you testified Friday that the value of these aircraft, as I recall, was almost $14 million, do you recall that, sir?

A. What I testified to was that there was an inconsistency with what's reflected here and what's on Hansen Helicopters -- or Wilma's Flight Services, Inc. balance sheet, which reflected a $14 million aircrafts, their inventory.

Q. And you will agree with me, won't you, sir, if we'll go back up to 3003.14, that is not their inventory, is it, sir? Will you agree with that?

A. Who is their inventory?

Q. You just said that there is an inconsistency in the inventory. That is not the inventory, is it, sir?

A. For Hansen Helicopters or Jan's Helicopter Service? Or Pacific Spotters Corporation?

Q. I'm talking to you, sir, about your prior testimony.

A. Correct.

Q. Do you recall testifying --

A. So --

Q. Do you recall testifying Friday that there was approximately $14 million in inventory of helicopters? Do you recall that, sir?

A. Absolutely, yes, it's on the balance sheet that's reflected on the --

Q. This is not that inventory, is it?

MS. M. MILLER: Your Honor, for the record, could we have just the witness be able to answer then -- because otherwise, it's not -- the record is not going to be clear.

THE COURT: Good point.

MR. MARTIN: If he would answer, Your Honor, we'd get a lot better, but he's just arguing with me.

My question is --

THE COURT: Okay. Well --

MS. M. MILLER: Your Honor, I'm going move to strike that.

THE COURT: Okay. Let's -- motion granted. Stricken. Please disregard it, ladies and gentlemen of the jury. So Mr. -- hold on. So Mr. -- Agent, make sure that -- listen to the question, and just answer the question. So if it calls for yes or no, just answer yes or no, if you could answer yes or no. But just answer the questions.

08:51AM 08:51AM 08:51AM 08:51AM 08:51AM 08:52AM 08:52AM 08:52AM 08:52AM 08:52AM 08:52AM 08:52AM 08:52AM 08:52AM 08:52AM 08:52AM 08:52AM 08:52AM 08:52AM 08:52AM 08:52AM 08:52AM 08:52AM 08:52AM 08:52AM

THE WITNESS: Yes, Your Honor.

THE COURT: And then Mr. Martin, let's not get excited. Let's calm down. You guys -- we're almost at the finish line, team. So let's do it.

Okay. Go ahead.

BY MR. MARTIN: (CONTINUING)

Q. Agent Khamvongsa, 3003.14, is not the inventory, is it, sir?

A. It is the inventory.

Q. I'm going to show you what's already been shown to you multiple times. It's from the indictment. It's paragraph 126, sir.

Sir, do you see part of paragraph 126 there?

A. Yes, I see part of it.

Q. All right. And those are aircraft, are they not, sir?

A. These are U.S.-registered aircraft; yes.

Q. Okay. Let's just deal with page 34, right there.

How many aircraft are listed on that page?

A. 20, on page 34.

Q. 20. Okay. Let's go up to page 35.

How many aircraft are listed on page 35, sir?

A. I believe it's 50.

Q. And so 20 plus 50, will you agree with me, that's 70 aircraft listed in -- listed in the indictment in

08:52AM 08:52AM 08:52AM 08:52AM 08:52AM 08:52AM 08:52AM 08:53AM 08:53AM 08:53AM 08:53AM 08:53AM 08:54AM 08:54AM 08:54AM 08:54AM 08:54AM 08:54AM 08:54AM 08:54AM 08:54AM 08:54AM 08:54AM 08:55AM 08:55AM

paragraph 126, sir?

A. Yes, around that much. Yeah. Yes.

Q. And will you agree with me, sir, that 17 is less than 70?

A. I will agree with you that the number 17 is less than 70.

Q. Okay. And, sir, you made reference, I believe, to, I think it's... Exhibit 2939 on Friday, do you recall that, sir? That's the -- that's the -- let me be more specific for you. I apologize. That's the -- I believe, the records for the Community First Bank of Guam; do you recall that?

A. I recall the log, I'm just not 100% sure the exhibit number matches up with the document.

Q. Okay. Well, let's go to 2939, if we could.

A. Thank you.

Q. Does that aid your recollection, sir?

A. The signature card member application for Community First Guam Federal Credit Union, yes, sir. For one year of service.

Q. Right, right. And you testified about that Friday, do you recall that, sir?

A. Yes, sir.

Q. As a matter of fact, if -- if we look, for example, you mentioned that it was a -- the signature card. Those are the people that are authorized to write checks and wires, do

things relating to that account, right?

A. Those are individuals that are signers on the account; yes.

Q. Okay. Jon Walker is not on that account as a signatory, is he, sir?

A. His name literally isn't on this.

Q. He is not a signatory; correct, sir?

A. Yes.

Q. Okay. Now, you testified, sir, in particular, about Government's Exhibit 366-23, I believe that was aircraft number, if we could pull that up, aircraft number N74AM. Do you recall that aircraft? It was from the list of those that I had shown you that Ms. Miller cross-examined -- or direct examined you about?

A. I believe this is the one with Fling Air and the Guam address?

Q. Absolutely, sir.

A. Correct.

Q. Absolutely. And as you'll recall, those records came from Jon Walker -- were sent to Jon Walker's friend, the lawyer who was going to put together the business plan for him, right?

A. I don't know if that's his friend or not.

Q. I'm sorry?

A. I don't know if that's Jon Walker's friend or not. I

08:57AM 08:57AM 08:57AM 08:57AM 08:57AM 08:57AM 08:57AM 08:57AM 08:57AM 08:57AM 08:57AM 08:57AM 08:57AM 08:57AM 08:57AM 08:57AM 08:58AM 08:58AM 08:58AM 08:58AM 08:58AM 08:58AM 08:58AM 08:58AM 08:58AM

just know, based upon the information, it appeared to be a potential buyer.

MS. M. MILLER: Your Honor, I'm going to move to strike, assumes facts not in evidence.

MR. MARTIN: You've read everything -- I'll withdraw the question.

THE COURT: All right. Question withdrawn, answer withdrawn -- stricken. Go ahead.

BY MR. MARTIN: (CONTINUING)

Q. You've reviewed everything in this case?

A. I have.

Q. And you know from reviewing everything in this case, number one, he's a lawyer, right?

A. Don't recall if he's a lawyer or not.

Q. If we could look at Government's Exhibit -- not being introduced, but for you, 3007.

MS. M. MILLER: Your Honor, I'm going to object. We're going outside the scope right now of my redirect.

MR. MARTIN: It's impeachment, Your Honor.

THE COURT: Okay.

MR. MARTIN: It's clear impeachment.

THE COURT: Impeachment? All right. Overruled.

MS. M. MILLER: Can I have clarity on what's being impeached?

MR. MARTIN: When the exhibit comes up it will be

--

THE COURT: Well, I think the last question?

MR. MARTIN: The last question.

THE COURT: Well, let's see.

MS. M. MILLER: Well, here's the problem with that question, Counsel had represented that that attorney was Mr. Walker's attorney, Then he withdrew that representation.

MR. MARTIN: We're doing a speaking --

THE COURT: Counsel.

MR. MARTIN: We have a speaking objection.

THE COURT: The Court will overrule the objection. Overruled.

MR. MARTIN: This is not in evidence, Your Honor. If we need to do something --

THE COURT: All right. So okay it's not in evidence. All right. So just show the Counsel.

BY MR. MARTIN: (CONTINUING)

Q. Sir, do you recognize what's been marked for identification purposes as Government's Exhibit 3007-1, sir?

A. It looks familiar.

Q. Well, that's the government's exhibit, isn't it?

A. I reviewed a lot of documents so --

Q. My question was, is that a government's exhibit?

A. 3007-1, yes.

Q. Okay. And you, I believe, testified you've seen

08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 08:59AM 09:00AM 09:00AM 09:00AM

everything in this case; correct, sir?

A. I've seen a lot of documents just like you have.

MR. MARTIN: All right. And, Your Honor, I move for the introduction of Government's Exhibit 3007.

THE COURT: Okay. Any objections, Counsel?

MS. M. MILLER: Yes, Your Honor. I object, outside the scope, I object on the basis of hearsay. It's not being offered by a party opponent. And I object on the basis of relevance.

MR. MARTIN: Your Honor.

THE COURT: Okay. Relevance is overruled. But beyond -- okay. And beyond the scope, that's overruled on impeachment. What was the third objection?

MS. M. MILLER: Hearsay, Your Honor.

THE COURT: Hearsay?

MR. MARTIN: It's impeachment, Your Honor.

MS. M. MILLER: That -- just because it's impeachment doesn't except it from the hearsay rule, Your Honor.

THE COURT: Anything further? Anything further?

MS. M. MILLER: No.

MR. MARTIN: Your Honor, it's not impeachment under the government's theory in that they say it's a co-conspirator statement.

THE COURT: Okay.

MS. M. MILLER: Well, Your Honor, but it -- I would have to offer it.

THE COURT: Okay. Yes, Ms. McConwell?

MS. MCCONWELL: The --

THE COURT: I'm sorry, can you speak a little louder?

MS. MCCONWELL: Yes. The agent had previously testified that it was an investor that was being communicated with in other exhibits, and Ms. Miller also made that representation. And so this directly affects his knowledge of who the identity of Mr. Ferruzzo is.

MS. M. MILLER: There is absolutely nothing in this document that is contrary to that representation.

THE COURT: All right.

MS. M. MILLER: As a matter of fact, Your Honor, there's been a piece of evidence that has been admitted, which is Exhibit 425, which has this person's name on it and the fact that he is part of a law firm --

THE COURT: Okay. Well, Court will overrule the objection. Go ahead, proceed.

MR. MARTIN: May we publish it to the jury, Your Honor?

THE COURT: You may. 3007-1 admitted over objection and may be published.

(Exhibit 3007-1 admitted.)

09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:01AM 09:02AM 09:02AM

BY MR. MARTIN: (CONTINUING)

Q. Agent Khamvongsa, would you agree with me that this -- the lower portion of this is an e-mail from Jon Walker to Rufus Crowe, sir?

A. Yes, from Jon Walker to Rufus Crowe.

Q. And will you read to the ladies and gentlemen of the jury where I've marked where it says "Rufus," would you read that to the ladies and gentlemen of the jury?

A. "Rufus, I hired a legal firm to help with the company sale. It's Greg Ferruzzo and his uncle Tom Ferruzzo. Greg races with us. I'm not sure if you met him or not when you were in Baja. They operate some huge law firm in Long Beach. They'll be calling and e-mailing you and Les. Give them whatever they need. Thanks, Jon."

Q. Does that refresh your memory, sir, as to who Tom Ferruzzo and Greg Ferruzzo are, sir?

A. The name Tom Ferruzzo is familiar. Greg Ferruzzo, I'm not -- this is the first that I can remember the name coming up.

Q. So your answer is -- let me rephrase the question. Does it refresh your memory as to who Tom Ferruzzo is, sir?

A. Yes.

Q. He's a lawyer; correct, sir?

A. (Pause.) Uhh, he's represented as -- as being part of the legal firm.

Q. Okay. If we could go to 366, Government's Exhibit 366.
And, sir, do you see that e-mail?
A. Yes.
Q. This has already been introduced. And who is the e-mail to, sir?
A. Tom Ferruzzo, the name that I'm familiar with.
Q. The gentleman we just talked about?
A. As it relates to this e-mail, yes.
Q. Okay. And this -- as a matter of fact, it's on the same day, isn't it? I don't know if we need to go back to the other e-mail, but I'll represent to you that both e-mails were sent on October 5th, and if you don't believe me, I'm happy to go back.
A. Yes, please.
Q. Okay. Let's go back to 3007. The date here is Wednesday, October 5th, right, 2016?
A. That's what's represented there, yes.
Q. Okay. And tell me what the date is on the one that's getting ready to come up. Will you tell us what the date is?
A. October 6th, 2016.
Q. Okay. And the date at the top from Rufus?
A. October 5th, 2016.
Q. Okay. They're all within the same general time frame, right?

09:03AM 09:03AM 09:03AM 09:03AM 09:03AM 09:04AM 09:04AM 09:04AM 09:04AM 09:04AM 09:04AM 09:04AM 09:04AM 09:04AM 09:04AM 09:04AM 09:04AM 09:04AM 09:04AM 09:04AM 09:04AM 09:05AM 09:05AM 09:05AM 09:05AM

A. Yes.
Q. And you'll agree with me that Guam is several hours ahead of the United States, right, sir?
A. Yes.
Q. In the time -- in the time -- okay. Now, in this e-mail that's on -- that's here, if we can go to -- I think I was asking you about Fling Air, and, I believe, it's on page 23 of this exhibit. If we can -- don't move it.
MS. MCCONWELL: I'm sorry.
BY MR. MARTIN: (CONTINUING)
Q. All right. Do you see where I put the dot, sir?
A. Yes.
Q. And that's Fling Air?
A. Yes.
Q. And that's the one that we said shows that it's in Guam, right, sir?
A. Yes.
Q. Okay. And we -- we talked about this the other day, and maybe you forgot it when you were testifying Friday, but next to state, the word "foreign" is inserted. Do you see that sir?
A. It's purported to be foreign on the document.
Q. Well, the word "foreign" is inserted; correct, sir, just the word "foreign" is inserted?
A. For this document, the word "foreign" is listed on

09:05AM 09:05AM 09:05AM 09:05AM 09:05AM 09:05AM 09:05AM 09:05AM 09:05AM 09:05AM 09:05AM 09:05AM 09:05AM 09:05AM 09:05AM 09:06AM 09:06AM 09:06AM 09:06AM 09:06AM 09:06AM 09:06AM 09:06AM 09:06AM 09:06AM

this document.

Q. Okay. And this is a document that was created by the Federal Aviation Administration; correct, sir?

A. Well, it was actually created by Jon Walker, who would have submitted the document.

Q. Now, this document that's on the page, Jon Walker didn't create this page, did he, sir?

A. If we're just talking about what's on the page --

Q. I'm asking you, the page that is being disclosed to you, Government's Exhibit 366-23, that document was prepared by the Federal Aviation Administration, one of their employees; correct, sir?

A. No.

Q. Who prepared it? Who prepared that page?

A. Jon Walker, because they rely -- all this information is dependent upon what the individual submits to the FAA registry.

Q. So you're saying that although Jon Walker's name is nowhere on this page, he sat down at a computer and a typewriter and typed all these numbers and letters and everything out. Is that what you're telling the ladies and gentlemen of the jury?

A. No, that's incorrect.

Q. Well, somebody at the FAA prepared this document, isn't that true, sir?

A. They relied -- no, they relied on Jon Walker's input. It relies on a document submitted to the FAA.

Q. Let me ask you a question, sir. I want you to think about it.

A. Okay.

Q. Did I ask you anything about anybody relying on anything?

A. Your question --

Q. Did I ask you anything about anybody relying on anything?

A. Not specifically the word "rely."

Q. So the answer is, no, you didn't, Mr. Martin?

A. Sorry. I wasn't sure if that was a question or a statement.

Q. The question was -- so the answer is, no, you didn't ask me anything about reliance, Mr. Martin.

MS. M. MILLER: Your Honor, I'm going to object.

BY MR. MARTIN: (CONTINUING)

Q. Do you agree with that?

MS. M. MILLER: I'm trying to object.

THE COURT: I'm sorry. What's your objection?

MS. M. MILLER: Basis of argumentative, Your Honor. He now wants to tell the witness this is how I want you to answer. Is the witness being scolded like a child?

MR. MARTIN: Is that an objection, Your Honor?

That wasn't a scold, it was a question. I asked him if I asked him about reliance.

THE COURT: All right. Whatever it was, objection or not, overruled. Just answer the question.

Did you understand his last question on reliance?

THE WITNESS: Sorry. Go ahead and ask it again. Again, I wasn't sure if it was a statement or a question.

THE COURT: All right.

BY MR. MARTIN: (CONTINUING)

Q. Isn't it true I didn't ask you anything about anybody relying on anything?

A. No.

Q. You disagree with that?

A. In the question -- the -- specifically the word "rely," you're right; correct.

Q. Okay.

MR. MARTIN: Your Honor, I need just a second.

THE COURT: Sure. That's fine.

BY MR. MARTIN: (CONTINUING)

Q. Would you agree with me, sir, that the exhibit we just had up, which was 366-23 relating to Fling Air, somebody told the FAA it was a foreign corporation?

A. Somebody.

Q. Okay.

MR. MARTIN: No further questions.

THE COURT: No further questions. Mr. McConwell, or Ms. McConwell, any questions?

MS. MCCONWELL: No, ma'am.

THE COURT: No, okay. Very well.

MS. M. MILLER: Only one question, Your Honor.

THE COURT: Oh, okay. Yes.

REDIRECT EXAMINATION

BY MS. M. MILLER:

Q. So Special Agent Khamvongsa, based on what we just heard from Mr. Martin, everything in Exhibit 366 was produced at the request of Jon Walker to attorneys representing him when he tried to sell his company?

A. Yes.

MS. M. MILLER: No further questions, Your Honor.

THE COURT: Okay. All right. May we excuse this witness, Counsels?

MS. M. MILLER: Yes.

THE COURT: Yes?

MR. MARTIN: Do we have to, Judge? We're having a good time.

THE COURT: Okay. I'm glad somebody is.

MS. M. MILLER: Yes, Your Honor.

THE COURT: Yeah.

MR. MARTIN: He may be excused.

THE COURT: Yes, Ms. McConwell --

MS. MCCONWELL: Yes.

THE COURT: So you're excused. Have a nice day.

THE WITNESS: Thank you, Your Honor. Thank you.

THE COURT: Take care.

THE WITNESS: Thank you.

THE COURT: How long have we been -- yeah, three -- three minutes. All right. Ladies and gentlemen of the jury, we're going to go ahead and take a 15-minute recess. I want to talk to the attorneys on something real quick before they call their next witness. All right. So please rise, keep an open mind. It's not yet over, but we're almost over. We're almost there. So please rise for the jury.

(Jury out at 9:12 a.m.)

THE COURT: Okay. Thank you, jury. Thank you. All right. So let me just -- let me just give you my conclusion and I'm going to submit -- send this out to you. It is -- so we got to put the numbers on -- put the page numbers on it. I forgot -- this one didn't have it. Before I -- before I sign off and issue it. But so I wrote a -- how many pages, it's about 15? Emily? 34. 34 pages. Let's backtrack. 34-page -- the Court has issued -- is going to issue a 34-page decision. I'm issuing it today like in the next minute or so. Order regarding, as I'm indicating, United States' motion for order permitting testimony in evidence of

defendant's alter ego shell companies. I'm sorry, I thought it was less, but it actually was back-to-back. I have the back-to-back version.

So my conclusion is Alpha Air, let me look at this, Alpha Air, A-L-F-A Air, A-L-P-H-A Air, Americo -- Americopters, Bean Bag, Bill's, Bravo, Caledonian, Chance, Charlie, Dave's, Echo, Eddie, Evan, Fidget, Figet, Fling, Foxtrot, H-H, Hansen, Hansen Northern, Heli Fish, Jan's, Jerry's, Jim's, Judy's, Limey, Marlin Bay, O'Hara, Oceanside, Rosie, South Pacific Spotters, Tunacopters, Walk Air, Walker Helicopters, Whirlwide, and Wilma's shall be considered alter egos of Defendant Hansen Helicopters for the purposes of relevancy objections. The Court declines to make a Rule 104(b) finding at this time as to Defendant Hansen Helicopters, Hansen Helicopters Marshall, M-A-R-S-H-A-L-L, Mid-America Turbine, Trafficopters, Vanguard Aviation, Walker Agricola, LLC, and Walker's Helicopters and those -- the reasons for both findings are contained in the 34-page opinion.

So do you want -- you guys want take time to review this before we hear from Mr. Guzzetti, or do you want to just go -- I'm going to go ahead and issue it. I'm signing off on it, I'm just going to put on my electronic signature, and we could go forward.

MS. M. MILLER: I think we'd like to go forward

with Mr. Guzzetti, Your Honor.

THE COURT: Okay. And Mr. -- yeah, it's probably a good idea.

MR. MARTIN: We kind of like to look at it, Judge. Just so we know that we don't step into something.

THE COURT: Okay. Well, I'll give you 15 minutes, and if you need more time, just let me know. But I think -- well, you think you can you read -- are you guys fast readers? Did you take speed reading in law school? I did.

MS. M. MILLER: Evelyn Wood. Remember?

THE COURT: Yeah, I took --

MS. M. MILLER: Evelyn Wood.

THE COURT: Or what's Stanley Kaplan, was that for LSAT?

MS. M. MILLER: That was LSAT.

THE COURT: Yeah, I took that too. I needed all the help I could get. All right. So why don't I give you -- you want 30 minutes?

MS. MCCONWELL: Yes.

THE COURT: Well, if I give you 30 minutes, then I could run over -- actually.

MS. M. MILLER: Oh, yeah, yeah, yeah.

THE COURT: I could run and go to a family viewing for -- for my cousin who passed away. So I could just

run up to Sinajana, which is like eight minutes away.

MS. MCCONWELL: We'll multitask.

MS. M. MILLER: Could we also count this as our morning break? So when the jury does come back after Guzzetti gets on, we can go through lunch.

THE COURT: Yeah -- yeah, we can do that -- we can do that. But why don't you review it --

MS. MCCONWELL: Go until lunch.

THE COURT: I'm sorry.

MS. MCCONWELL: She means go until lunch, not through lunch.

THE COURT: Yeah, that's right. So let me go -- I'll sign off on this, you guys will get your electronic copies. And then I think -- I might have another -- I know we worked on something else. Should I issue that one too, or the other one, or no, not yet?

MR. MARTIN: There were some summary exhibits objections that we had, Your Honor, that may relate to Mr. Guzzetti's --

THE COURT: Okay. I thought I -- okay. Let me -- let me double-check that. I know -- I know I was -- we were working on these things so --

MS. M. MILLER: And you instructed Counsel, Your Honor, if they had any specific inaccuracy challenges to raise those, and we've gotten nothing from them. So the government

would object to having any more protracted arguments on the general admissibility of summary charts.

THE COURT: Yeah, yeah, I don't -- I don't want any --

MR. MARTIN: That would -- we've never even addressed the issue I just brought up, Your Honor.

THE COURT: These are other --

MR. MARTIN: They came up with, I think, and I may be wrong on the number, let me just say, multiple summary charts that were not -- I'm not talking about -- they label them as demonstrative exhibits, we call them summary charts that were just produced last week.

THE COURT: Okay. Well, okay.

MR. MARTIN: And I filed a motion on that.

MS. M. MILLER: We did talk about this already.

THE COURT: Hold on. Let me just say something. On the demonstrative exhibits that they have put up, they're really just a copy of the indictment, like, they'll just pull up, like, a count. As I recall.

MR. MARTIN: Not the ones I'm talking about now, Your Honor. These are related to Mr. Guzzetti, and I filed a motion and, if I -- if you'll give me a second --

THE COURT: Let me just ask you, if they're not related to Guzzetti, then we won't worry about that, but were they related to Mr. Klang.

MR. MARTIN: They're related to Mr. Guzzetti. The ones --

THE COURT: Oh, they're related to Mister -- oh, to both? Okay. Let me -- let me go back -- hold on, let me -- what was that that you said?

MR. MARTIN: I'm talking about the demonstrative aids that Marie e-mailed to me last week.

THE COURT: Are you still going to use them?

MS. S. MILLER: We're talking --

MS. M. MILLER: I think he's -- I think what he's talking about is when we were addressing the argument for 3,315, the admissibility of it.

THE COURT: Right, I --

MS. M. MILLER: I had a working document that I produced to Counsel. I don't intend to use that. So if that's what he's talking about, then done, we're done.

THE COURT: So why don't we do this rather than discuss it because everybody sounds a little confused. Why not during this next 30 minutes, before you start your 30 minutes, talk about if it's true that the United States attorney is not going to use whatever you think you're going to use, then you don't have to discuss it, and you do not have to talk to me about it.

MS. M. MILLER: Right. Sounds good, thank you, Your Honor.

THE COURT: Yes, Mr. McConwell.

MR. MCCONWELL: I have a motion in limine to exclude evidence about failure of the pitch links and the like, for Mr. Guzzetti, that needs to be dealt with before he testifies.

THE COURT: Did you file that already?

MR. MCCONWELL: I did it last week.

THE COURT: Oh, okay. All right. Let me -- yeah, that's right. Okay. I've got that. I've got that. Yeah. Yeah. I think every -- every time I look at my inbox it says another motion filed. So we're catching up with all of 'em. So yeah, let me look at that. So you want -- yeah, I'll talk about that before Mr. Guzzetti starts his examination.

Any other motions? So we got the -- you're going to take care of the summary demonstrative one?

MS. M. MILLER: Yes.

THE COURT: This is on the rotor link thing?

MR. MCCONWELL: The -- the pitch link.

THE COURT: I'm sorry?

MR. MCCONWELL: Pitch change links.

THE COURT: Pitch rotor links?

MR. MCCONWELL: The tail rotor pitch links.

THE COURT: Tail rotor pitch links. That's right. Okay. That one. And then anything else?

MS. M. MILLER: No.

MR. MCCONWELL: No, I think that was all we included. As it relates to death and serious bodily injury.

THE COURT: Right. Right. Okay. And I know there is another one, there is another motion that I've already worked on about whether or not the mention of nine deaths as opposed to less than nine deaths, that's the one -- that's the one we -- okay -- okay, I worked on that. So let me just finish that up.

MS. M. MILLER: And it's now ten deaths.

THE COURT: Okay. Well, we'll -- we'll talk about that, because I -- anyway, I will issue something on that, I've already written something on it.

MS. M. MILLER: Yes, Your Honor.

THE COURT: Okay. Anything further, Counsels?

MS. M. MILLER: No, thank you.

THE COURT: Nothing? Okay. I'll see you all, let's see, now let's get the time right so we're all in sync.

MS. MCCONWELL: May we have 30 minutes from when we get the document?

THE COURT: Okay. I'll give you -- yeah. You should get the document like -- it will be instant like this. As I talk, boom.

MS. MCCONWELL: Okay.

THE COURT: Emily, did we do it yet?

09:19AM 09:19AM 09:19AM 09:19AM 09:19AM 09:19AM 09:20AM 09:20AM 09:20AM 09:20AM 09:20AM 09:20AM 09:20AM 09:20AM 09:20AM 09:20AM 09:20AM 09:20AM 09:20AM 09:20AM 09:20AM 09:20AM 09:20AM 09:20AM 09:20AM

(Discussion with law clerk.)

THE COURT: So tell the clerk, chop, chop. Let's go. It's fast. So I'll give you guys -- it's 9:00 -- let's be in sync. It's 9:22 on my watch. So I'll give you until ten. I'm actually going to give you 40 minutes.

MS. M. MILLER: Okay. Thank you.

THE COURT: So that gives you time to discuss your other issues. I'll see you at ten, thank you.

(Recess taken at 9:21 a.m.)

(Back on the record at 10:04 a.m.)

THE COURT: Ready to proceed, Counsels? Did you have enough time to review the Court's decision?

MS. M. MILLER: Yes, Your Honor.

THE COURT: Okay. U.S. Attorneys. Mr. Martin and Ms. McConwell? Mr. Martin?

MR. MARTIN: Yes, Your Honor.

THE COURT: Okay. Ms. McConwell?

MS. MCCONWELL: Yes, Your Honor.

THE COURT: And Mr. McConwell?

MR. MCCONWELL: Yes.

THE COURT: Mr. Han? Excuse me?

MR. HAN: Yes.

THE COURT: See, I can't see you there with that podium. All right. And then, hold on one second. And the court is in receipt of and I'm looking at it right now, the

09:20AM 09:20AM 09:20AM 09:20AM 09:20AM 09:21AM 09:21AM 09:21AM 09:21AM 10:04AM 10:05AM 10:05AM 10:05AM 10:05AM 10:05AM 10:05AM 10:05AM 10:05AM 10:05AM 10:05AM 10:05AM 10:05AM 10:05AM 10:05AM 10:05AM

motion, defendant Jon Walker's motion filed -- just looking, still looking at that. Objection to the government's proposed use of new summary charts designated, demonstrative aids. Let me ask, did you guys figure that out?

MR. MARTIN: Your Honor, it's my understanding that there will be only be two exhibits used with -- and those were the summary charts that were previously provided to us?

MS. M. MILLER: Yeah, so the three charts I was going to use, I've withdrawn. So we don't need any argument on them.

THE COURT: Thank you.

MS. M. MILLER: You're welcome.

MR. MARTIN: For the record, can we just have the numbers of the one you intend to use? Summary charts.

MS. M. MILLER: Three demonstrative aids? No, the three demonstrative aids in that e-mail that you showed me that Mack showed you.

MR. MARTIN: No, no, no, what you intend to use.

MS. M. MILLER: Oh, the ones we're going to use? Hold on.

THE COURT: Yeah, right, want to be on the same --

MS. M. MILLER: Yes, yes.

THE COURT: Track.

MS. M. MILLER: Okay. So the ones we're going to

use are Government's Summary Chart 17, G-DA17, and... that's a demo aid, though. Then for summary chart, we're using 1242, 1247, 1236. 10:07AM

THE COURT: Did you get that? You want -- why don't you repeat that one more time, Ms. --

MS. M. MILLER: 1242, 1247, 1236. I'm just going through to make sure there isn't anything else.

THE COURT: What's the last one? 1230 --

MS. M. MILLER: 1236, Your Honor. That's not a summary chart, that's an NTSB report, I'm sorry, of the accident of 1243D. We have the summary chart of the Spares, Inc. parts that were purchased, which is 3038. And we have another demo aid that I sent to defense Counsel on June 4th, which is the NTSB -- how it investigates accidents, and, Mack, you didn't raise any objections to that.

MR. MARTIN: I'm not objecting to that. I'm looking for 17, I don't see that I have 17.

MS. M. MILLER: Demonstrative aid 17? I sent that to you on June 4th as well. And all that is, is "How Helicopters Work," that's the title of the demonstrative aid. It's not a summary chart.

MS. MCCONWELL: I don't -- I don't have it either.

MS. M. MILLER: I sent it to you as well, and I saved the e-mail. So if I need to send that --

THE COURT: Why don't you just send it again.
MS. M. MILLER: I'll send it again.
THE COURT: Yeah, it gets lost.
MS. M. MILLER: Yup.
THE COURT: They'll send it again. I think they should just send it again. Sometimes it's just too many e-mails.
MS. M. MILLER: Yup. And then -- and that's it. So the two summary chart that Mr. Guzzetti prepared, 1242, 1247, the summary chart regarding the purchase of the parts, 3038... and I'm going through his direct just to make sure there is nothing else.
I believe that's it. That's it.
THE COURT: Okay. Mr. Martin, did you -- are you able to -- did you retrieve the e-mail? I don't know if she sent it already.
MS. M. MILLER: I'm going to resend. I saved all of those e-mails, just in case there was an issue. And let me go down to 64.
(Pause.)
MR. MARTIN: I'm looking at 6/4, and I have them all as well.
THE COURT: You got it?
MR. MARTIN: No, Your Honor, I'd just like to see the demonstrative aid they intend to use. I --

10:08AM 10:08AM 10:08AM 10:08AM 10:08AM 10:08AM 10:08AM 10:08AM 10:08AM 10:09AM 10:09AM 10:09AM 10:09AM 10:09AM 10:09AM 10:09AM 10:09AM 10:09AM 10:10AM 10:10AM 10:10AM 10:10AM 10:10AM 10:10AM 10:10AM

THE COURT: Okay. So you've got it. So. Anyway --

MR. MARTIN: I don't have it, no.

THE COURT: It should be --

MS. M. MILLER: I'm going to send it -- I'm going to send it to you again. Hold on.

THE COURT: Okay. Assuming you get it, so there is no issues then, and you're prepared to withdraw ECF 695 because they are either A -- well, they're not using certain ones and, B, the ones that they are using, have already been admitted. Is that -- is that a fair statement, Mr. Martin?

MR. MARTIN: Kind of.

THE COURT: Okay. Well, then you state on the record what it is.

MR. MARTIN: Your Honor --

THE COURT: I was trying --

MR. MARTIN: My concern is I want to see 17 because I don't know what it is.

MS. M. MILLER: Yeah, I'm sending it -- I'm sending it again. Hold on.

THE COURT: Okay. Why don't we wait a minute here. Maybe it's lengthy. So it takes a while.

MS. M. MILLER: Yeah. So that is gone. And then I'm also going to send you again the NTSB one. Did you get it, Mack?

MR. MARTIN: I'm sure I will.

(Pause.)

MS. MCCONWELL: And I would ask that it also be sent to me.

MS. M. MILLER: I did -- I did -- I did. And to Ed and everyone.

MR. MARTIN: Your Honor, what I'd like to do is -- I got it.

THE COURT: Oh, okay. Good, you received it.

MR. MARTIN: I'm assuming it will be a little bit before you get to that, or are you going to go right into that?

MS. M. MILLER: The "How Helicopters Work" one is pretty early one. It's just a recap of Mr. Guzzetti's expertise, which is very brief, and then we're going right into "How Helicopters Work."

THE COURT: Okay. Therefore? Yes, Mr. Martin?

MR. MARTIN: If I might have a minute to review it, Your Honor?

THE COURT: Sure.

(Pause.)

(Discussion with clerk.)

(Pause.)

THE COURT: Yes, go ahead -- go ahead. He's just going to fix my computer.

MR. MARTIN: We reviewed the demonstrative aids the government intends to use, and we don't have an objection to it.

THE COURT: No objections. Okay.

MR. MARTIN: To 17.

THE COURT: 17. All right. Did you want to review the other ones?

MS. M. MILLER: That will come a little later.

(Pause.)

(Defense Counsel conferred.)

THE COURT: Did you -- okay. So I guess my question is, 17 is okay --

MR. MARTIN: The others I have seen, Your Honor.

THE COURT: All right. So then my question is, on your ECF, the one that -- ECF 6095, will you withdraw that from the record then?

MR. MARTIN: It's my... it's my understanding, Your Honor, that the government doesn't intend to use any of those exhibits with Mr. Guzzetti, and if that's correct, then I withdraw it.

MS. M. MILLER: That's correct.

THE COURT: That is correct. Okay. Withdrawn for the record. And -- are you guys both -- anything else, Ms. McConwell, on the -- on what was just transpiring?

MS. MCCONWELL: Yeah, for those demonstrative

10:15AM 10:15AM 10:15AM 10:15AM 10:15AM 10:15AM 10:15AM 10:16AM 10:16AM 10:16AM 10:16AM 10:16AM 10:16AM 10:16AM 10:16AM 10:17AM 10:17AM 10:17AM 10:17AM 10:17AM 10:17AM 10:17AM 10:17AM 10:17AM 10:17AM

aids, that would -- that would be true. And --

THE COURT: Okay.

MS. MCCONWELL: We -- we still continue to have an objection to the remark section of 1242 and 1247 because that's just -- that -- that's just -- that is -- those are just opinions and things that Mr. Guzzetti has written into the remarks section of both of those 1242 and 1247. And so -- and we notified them in January that we had that objection, but they don't agree.

THE COURT: All right. So when he testifies -- when he gets to that, why don't you renew that objection.

MS. MCCONWELL: Yes, I will.

THE COURT: If you -- if he does testify to that.

MS. MCCONWELL: And then we will also be having objections to 3038, but we'll wait.

THE COURT: All right. So yeah, to the extent that -- yeah, let's just see what he says. All right. And then we already took care of the other issue. The 34-page decision I issued. So now there is a defense motion in limine concerning the testimony of Jeff Guzzetti, and he's the one that's going be testifying in a few minutes; is that correct Ms. --

MS. M. MILLER: He is, Your Honor, he is our -- our next and probably last witness.

THE COURT: Oh, he will be your last witness?

10:17AM 10:17AM 10:17AM 10:17AM 10:17AM 10:17AM 10:17AM 10:17AM 10:17AM 10:17AM 10:18AM 10:18AM 10:18AM 10:18AM 10:18AM 10:18AM 10:18AM 10:18AM 10:18AM 10:18AM 10:18AM 10:18AM 10:18AM 10:18AM 10:18AM

MS. M. MILLER: I believe so, yes.

THE COURT: Okay. All right. So Defendants had filed a joint motion in limine concerning the testimony of Mr. Guzzetti, ECF 1686. The motion seeks an order barring the prosecution from arguing and/or offering testimony that any parts Hansen obtained from Spares, Inc. caused a helicopter crash causing the death or serious bodily injury -- or causing death or serious bodily injury.

Motion at 2 ECF 1686. The Defendants are claiming that the United States failed to provide any details about the purported nine deaths or serious bodily injuries that Defendants are alleged to have caused by the misrepresentation of, failure of, or defects in the tail rotor pitch change link, TRPCL, or more specifically, a pitch link blank, installed on the helicopters referenced in paragraph 126 of the Second Superseding Indictment.

Motion at 6 ECF No. 1686, they also seem to object on relevancy grounds and of -- relevancy grounds of unde -- and grounds of undue prejudice.

Motion at 23 ECF 1686. Mr. Jeff Guzzetti's expert report states that, "He will testify that 23 accidents occurred in helicopters while being operated by Hansen for one of its numerous subsidiaries." That, quote, in light of the 23 Hansen accidents were fatal, killing nine people and seriously injuring four, and that three of the Hansen

accidents fit the pattern of a failed tail rotor pitch control link.

United States of America notice of intent to use expert testimony of Guzzetti at 1112 ECF 480. Count 9 charges both Defendants, Walker and Hansen Helicopters, with aircraft parts fraud, that proximately caused serious bodily injury. Second Superseding Indictment, paragraphs 93 through 96 ECF 862, Count 10 charges both Defendants with aircraft parts fraud that proximately caused Second Superseding Indictment -- caused death -- I'm sorry, strike that, let me start that again.

Count 10 charges both Defendants with aircraft parts fraud that proximately caused death, Second Superseding Indictment paragraphs 99 through 100 at ECF 862.

Count 13 charges only Defendant, Hansen Helicopters, with aircraft parts fraud that proximately caused death, Second Superseding Indictment, paragraphs 109 through 110 at ECF 862.

The Court notes in a footnote that Counts 8, 11, and 12 are also for aircraft parts fraud, but do not allege violations of 18 United States Code 38(b)(2) or (b)(3), which contained the sentencing enhancements for proximately causing serious injury and death, respectively. The government, therefore, needs only prove one serious bodily injury and two deaths. The Second Superseding Indictment provides notice of

three crashes, one of which caused serious bodily injury and two of which caused deaths.

The Court cites at Second Superseding Indictment paragraphs 51, 59 through 61, and 80 at ECF 862. These accidents are not described in Counts 9, 10, and 13, but an indictment should be read as a whole, quote, end quote. The Court cites *United States versus Blinder,* 10 F.3d 1468, 1473, 9th Circuit, 1993. Therefore, testimony about those accidents goes directly to a fact of consequence in determining the action and should be admitted, Federal Rule of Evidence 401(b). Therefore, the motion should be denied.

Testimony about other accidents, however, should be inadmissible as unfairly prejudice, the Court knows that there's-- anyway, the Court notes that -- well, this part I'm not sure how I'm going rule upon, but at this point -- I mean, I'm not sure if there will be a further ruling on that unless there was notice potentially through discovery that the government was going to prove 9, 10, and 13 based on different accidents than the ones alleged in the second superseding indictments and what those -- what actions those were. And the Court cites the Federal Rule of Evidence 403.

So that's the Court's ruling on --

MR. MCCONWELL: May I ask for clarification? Our motion was made on the basis that there was no evidence proffered by the government at all that would come close to

establishing a failure of the pitch link -- the pitch link causing a death. And it's a Daubert-type motion that the witnesses provided no document and no specific statement. It seems like, fits the pattern, is not adequate evidence by an expert. There should be some scientific basis for it and reasons specifically for it, but they -- he's cited no failure of a pitch link at all, no metallurgical examinations, anything. In fact, he's not even said a pitch link actually failed. And -- and we don't know -- they've not told us which aircraft they're really referring to on these alleged deaths, but it fits the pattern is not even close to being something that should be allowed to be admissible under the Daubert standard. That -- that was the basis for our motion.

THE COURT: Okay. All right.

MS. M. MILLER: And, Your Honor, this Court previously already ruled when Mr. McConwell filed a motion for a bill of particulars for a second time as to Counts 8 through 13. This Court entered an order at ECF 1179 specifically saying that the motion for an additional bill of particulars was denied because there was substantial evidence in discovery provided to the Defendant to provide further insight into the allegations against them, and specifically, I cite to page 3, lines 9 to 10 of your, ECF 1179.

Additionally, you talked about reviewing the Second Superseding Indictment, and the additional discovery

that was provided to the defense. We provided the summary charts to the defense which outline all of the accidents that the aircraft were involved in before Hansen purchased them, and the status of those aircraft at the time, whether they were destroyed or substantially damaged. And then that Hansen actually purchased those destroyed or substantially-damaged aircraft. And then, after Hansen purchased them and started leasing them out with the tuna boat contracts, they were in another 37 accidents.

And we provided that summary chart to the defense back in August of 2020. So in August of 2020, following the May 2020 17-page disclosure of opinions of Mr. Guzzetti, the government provided in explicit detail not only the summary charts identifying the registration number of the helicopter, the date of the accident, the NTSB report underlying the information, whether there were fatalities or serious bodily injuries, and the cause of the accident. Those were all provided to the defense more than two years ago. And that's why, Your Honor, when Mr. Kapp, through Mr. McConwell, had filed a motion for a second bill of particulars, we objected. And this Court ruled there is enough evidence, you have enough evidence, you have all of the underlying documents, and as you have said repeatedly, Your Honor, if any of the summary evidence in those exhibits is in any way inaccurate, bring it to my attention. They've had the NTSB reports, and they've

had Mr. Guzzetti's charts for two years and not once did they say, Your Honor, look at this report, and look at this summary and this chart, do you see the inconsistency. They have never done that, Your Honor. And so here we are, Mr. Guzzetti is about to get on the witness stand, and they're making the objection again. 10:26AM 10:27AM 10:27AM 10:27AM 10:27AM 10:27AM

This is relevant because, number one, in paragraph 50 of our Second Superseding Indictment, we actually identified the 30 aircraft that they purchased that had been previously destroyed or substantially damaged. And in his summary chart, regarding the accidents that occurred after they bought it, we provided them with all of that information. That information isn't only relevant to Counts 8 through 13 of the Second Superseding Indictment, that information is also relevant to Count 1, which we have also alleged in Mr. Guzzetti's expert summary. Count 1 alleges that the Defendant was involved in a conspiracy to commit a fraud against the FAA and NTSB. And this Court has agreed that the Ninth Circuit jury instructions on fraud against the government includes an agreement or a conspiracy to impede, obstruct, or otherwise make it difficult for the government to fulfill its mission. 10:27AM 10:27AM 10:27AM 10:27AM 10:27AM 10:27AM 10:27AM 10:27AM 10:27AM 10:27AM 10:27AM 10:27AM 10:28AM 10:28AM 10:28AM 10:28AM

We've heard testimony from FAA representatives that the mission of the FAA is to ensure safe flight. We also have heard information from Mr. Guzzetti before doing the jury 10:28AM 10:28AM 10:28AM

view of what the mission of the NTSB is, which is to investigate any accidents or incidents involving U.S.-registered aircraft or aircraft that are manufactured in the U.S.

The Defendants have violated 18 U.S.C. 371 by their fraud because they have impeded the ability of the FAA to ensure safe travel in relation to those aircraft that they've used in their fraud. And the jury will also see, and the Defendants have seen for the last two years, that there are at least 20 accidents that occurred that the Defendants failed to report to the NTSB, which is a direct impediment of the ability of the NTSB to fulfill its mission, which is evidence for Count 1.

So Mr. Guzzetti's testimony is relevant to Count 1 as well as Counts 8 through 13. His summary charts underlying his opinions have been in the possession of the Defendants as well as all the underlying documents for two years. There can be no alleged prejudice. Certainly not unfair prejudice under 403 as to this evidence coming in for both Count 1 and Counts 8 through 13.

That's the government's position, Your Honor.

MR. MCCONWELL: May I respond, Your Honor?

THE COURT: Okay. All right. But you guys understanding my ruling?

MS. MCCONWELL: Yup.

THE COURT: Do you get it?

MR. MCCONWELL: I understand your ruling. I just want clarification. Our motion is directed at the parts fraud that there were violations of Chapter 38. And there is certain enhanced penalties involved and if there is a fraud, a failure of one of these parts, that's why it's isolated.

(Pause.)

THE COURT: Right. Okay. But... but you --

MR. MARTIN: Your Honor.

MR. MCCONWELL: Maybe I misunderstood your ruling.

THE COURT: Did you misunderstand my ruling?

MR. MARTIN: Could I ask for you to repeat the relevant portions of the ruling?

THE COURT: Why don't I give you copy of this so you guys can read it or not, you know. Let me -- let me just -- let me -- let's download copies and give it to them. Can we Xerox it or whatever we do? Oh. Okay. You know what, I actually didn't put it in order. Actually this is my own notes. I haven't issued an order. Yeah, let me just... I'll just convert it to an order.

MS. M. MILLER: And I think one of the things though, Your Honor, before you convert it --

THE COURT: I thought -- yeah, I'm sorry, I didn't convert it to an order. It was just my own notes.

MS. M. MILLER: Before you -- I'm sorry to interrupt. Before you convert it to an order --

THE COURT: I'm going to convert it to order right now.

MS. M. MILLER: It was strictly -- it was strict -- it seems to be strictly geared towards Counts 8 through 13, which was Mr. McConwell's motion. What I want to ensure is that we don't have any limitations for Count 1, which is conspiracy to defraud the FAA and the NTSB, which as you know in the jury instructions, requires the government to show an impediment, obstruction, or otherwise deceitful, or other actions which made it difficult or impossible for the FAA and NTSB to fulfill its mission. The evidence of the accidents, and the incidents, and the death go directly to Count 1 and, therefore, under Count 1, those should not be excluded under 403 of the Federal Rules of Evidence. The government will not argue under the aircraft parts fraud that other than the accidents we previously identified as causing serious bodily injury or death, did in fact cause serious bodily injury or death under those counts, but for Count 1, the totality regarding the number of accidents, and incidents, and injuries, and death -- first of all, the jury has already heard --

THE COURT: Okay. I got it. You want -- you wanted -- you're saying, look, because the limit -- strike

10:30AM 10:30AM 10:30AM 10:30AM 10:30AM 10:30AM 10:31AM 10:31AM 10:31AM 10:31AM 10:31AM 10:31AM 10:31AM 10:31AM 10:31AM 10:31AM 10:31AM 10:31AM 10:31AM 10:31AM 10:32AM 10:32AM 10:32AM 10:32AM 10:32AM

that. Because the motion in limine was limited to the three counts, I'm only -- I ruled on 9, 11 and 13, I think. 10:32AM

MS. M. MILLER: Yes, Your Honor.

THE COURT: All right. 9, 10 and 13 -- 9, 10 and 13.

MS. M. MILLER: Yes, Your Honor.

THE COURT: You're saying, Judge, the other remaining fatalities and/or injuries should be allowed under Count 1.

MS. M. MILLER: Correct. Thank you.

MR. MARTIN: May I respond, Your Honor?

THE COURT: Yeah.

MR. MARTIN: 403, which is undue prejudice among other things, would apply to the whole indictment, and I would object to the government trying to say, well, it doesn't apply to this, but it applies to that. And to try to expand 403 undue prejudice against us in that regard. I think if's unduly prejudicial, it's unduly prejudicial to the whole indictment, and so I would submit to the Court that, you know, sustaining it in part on these counts but not to that count is actually no order at all.

MS. M. MILLER: And, Your Honor, I would disagree. And the reason why I would disagree is the very language contained in Rule 403. 403 says that there is a balancing test the Court must exercise when deciding whether

evidence comes in to prove a particular fact. In this case, what the Court is ordering is that evidence of other fatalities unrelated to the aircraft parts fraud would be unduly prejudice under 403, for those counts. And the government is not going to object to that order at all.

However, when you look at Count 1, and you look at the requirements the government has to prove for Count 1, it is a different analysis. For Count 1, impeding the FAA's ability to fulfill its function, impeding the NTSB's ability to fulfill its function, if we are not permitted to allow into evidence all of the accidents, and incidents, and death that were the result of the Defendants' conspiracy to defraud the U.S., that is extremely probative for Count 1. And the balancing test for Count 1 is not overcome by the danger of unfair prejudice.

And, again, Your Honor, Counsel has not moved to exclude any of this evidence under Count 1. Their motion exclusively addressed Counts 8 through 13. So if they are now expanding their motion to Count 1, first of all, they never filed this motion and my question would be, why not? The government produced this information to them more than two years ago. It took them two years to figure out that that may be unfairly prejudicial under Count 1? I don't think so. I also think, Your Honor, that the balancing test does not weigh in favor of unfair prejudice when we look at the jury

10:33AM 10:33AM 10:33AM 10:33AM 10:33AM 10:33AM 10:33AM 10:33AM 10:33AM 10:34AM 10:34AM 10:34AM 10:34AM 10:34AM 10:34AM 10:34AM 10:34AM 10:34AM 10:34AM 10:34AM 10:34AM 10:34AM 10:34AM 10:34AM 10:34AM

instructions for Count 1.

THE COURT: Okay. Well, let me just say -- okay. All right. All right. I understand the argument. I mean, we've already -- we've already gone through the issue of the fact that the United States Attorney's did not put in the indictment all of the -- well, any of the... companies, the -- the companies that they were using to shelter -- the shelter companies to allegedly commit the fraud, we note that they were not noted in the indictment. Now we're talking about death and serious bodily injury which enhances the sentencing of any of the Defendants if they're found guilty.

MS. M. MILLER: Only Counts 8 through 13 is an enhancement.

THE COURT: Right, I got --

MS. M. MILLER: Not for Count 1.

THE COURT: No, hold on. So let's just listen. Now Counts 9 -- so the counts, let me verify this on my order here. Counts 9, 10, and 13 charges the Defendants with either causing -- proximately causing death or serious bodily injury. That's actually noted within the grand jury indictment. Not necessarily so with regard to any other death or serious bodily injury. And so I think that that -- the Court has to look at the issue of under the balancing test and so specifically, the question is, will relevant evidence be excluded if its probative value is substantially outweighed by

any danger of unfair prejudice, confusion of issues, misleading the jury, considerations of delay, waste of time, or needless presentation of cumulative evidence. I understand your argument. You don't have to repeat it -- 10:36AM

MS. M. MILLER: Oh, I'm not going repeat it.

THE COURT: No, no, no, just hold on. I just need you just -- can I have you both sit down?

MS. M. MILLER: Yes, of course.

THE COURT: Makes it easier. You both keep jumping up. All right. So let me just say, I'm concerned about that because it's clear that the indictment does give the Defendants absolute notice that -- clear notice that at least you're focusing in on two potential deaths and one serious bodily injury. Anything beyond that is not necessary -- it's not in the indictment, it's not in the four corners of the indictment. If it is, show me where it is.

MS. M. MILLER: It is, that's why I got up.

THE COURT: Okay. Hold on. Just hold on. So well, it's not -- and I guess when it was raised in the motion in limine, I get that, but I want to be sure that the Defendants have notice within the indictment. Just show me -- just tell me the counts, you don't have to read it, just tell me what counts they were.

MS. M. MILLER: One.

THE COURT: Okay. I got that. Any other count

MS. M. MILLER: No, but specifically, in Count 1 if you look at paragraph 50.

THE COURT: Okay. So let me look at that. That's all I need to know. Just cite it and I'll review it.

MS. M. MILLER: Yes, Your Honor.

THE COURT: All right.

MS. M. MILLER: And then I have --

THE COURT: All right. So paragraph -- hold on. So the Court looks at paragraph 50, which is under the -- is under the overt acts title. And it -- and it has a chart about how -- and it alleges Walker, Reed, Crowe, Kapp, Hansen and Rogers purchasing aircraft previously destroyed or substantially damaged with the intent to conceal the condition of said aircraft from the government and others and it lists -- it lists 26 instances from year 1992 to 2016 reflecting what I -- what I just stated. Okay. What else?

MS. M. MILLER: Look at paragraph 51, please.

THE COURT: Hang on. Okay. Let me just -- let me get a different color. Any other -- any other paragraph?

MS. M. MILLER: Yes, Your Honor, 55.

THE COURT: Can you ask Steve to see my computer went out again. As soon as he walked out it goes out. Okay. What, 55?

MS. M. MILLER: 55, Your Honor.

THE COURT: Let me look at that. Okay. What

else?

MS. M. MILLER: 59.

THE COURT: Okay. What else?

MS. M. MILLER: And just for your reference, Your Honor, 59, 60 and 61 are referring to the same fatal accident, as is 62.

THE COURT: That's referring to 59's accident?

MS. M. MILLER: That's all -- that's all related to --

THE COURT: 59 --

MS. M. MILLER: 608 9068 F.

THE COURT: 59, 60, 61, and 62?

MS. M. MILLER: Yes, Your Honor. It's kind of like all of the allegations through paragraph 63 are related to that particular incident -- 62 -- are related to that particular incident.

THE COURT: Okay. Any other paragraph?

MS. M. MILLER: Um, let me see. No, Your Honor, that's it.

THE COURT: All right. So the one thing I note, and I just read this pretty quickly, is that the only paragraph that actually talks about a fatal crash is 59. That's the only one -- of all the ones that you just cited.

(Discussion with IT.)

MS. M. MILLER: 51 does too, Your Honor.

THE COURT: Oh, I'm sorry what?

MS. M. MILLER: 51.

THE COURT: Yeah, that's related though to 59. Yeah, you said that that's all related to -- it's related to the same --

MS. M. MILLER: No.

THE COURT: -- aircraft. N9068F.

MS. M. MILLER: 51?

THE COURT: Oh, I'm sorry.

MS. M. MILLER: No, 51 is not.

THE COURT: You're right. I missed that one. That's right. So 51, so -- okay. So now I see 51 and 59 are two. Any other ones? The other ones do not, as I see it.

MS. M. MILLER: Yes, Your Honor.

THE COURT: They do not reflect serious bodily injury or fatal crash; is that correct?

MS. M. MILLER: That is -- yes.

THE COURT: All right.

MS. M. MILLER: And then, Your Honor, in your -- in your order, when you denied the Defendants' motion for a bill of particulars and this was also for Count 1, they had asked for a bill of particulars for Count 1. One of the findings that you had was that there had been so much discovery provided to the Defendant, including the charts that Mr. Guzzetti had prepared, what's important about that, Your

Honor, is as of August of 2020, the Defendants had

Mr. Guzzetti's charts which identified all of the Hansen

accidents that resulted in injury or death.  So for two years,

they've had the N-number of the aircraft, they've had the date

of the accident, they've had how many injuries or deaths were

sustained as a result of the accident, and they've had the

underlying NTSB report citing that accident.  This is all in

reference to Count 1, which this Court has denied their motion

to dismiss repeatedly, denied repeated motions for bill of

particulars on the basis that sufficient evidence was

provided.  So, Your Honor --

THE COURT:  Okay.  Can you -- okay.  I've got it.

I know your argument on that.

MS. M. MILLER:  Yes.

THE COURT:  Can you clarify that the list in

paragraph 50 is of accidents that occurred before --

MS. M. MILLER:  Yes.

THE COURT:  -- Hansen became the owners.

MS. M. MILLER:  Yes, and that supports one of

Mr. Guzzetti's charts, and the other chart he did was of the

accident occurred -- that occurred after Hansen's ownership.

THE COURT:  No, but, I mean, I'm just saying on

paragraph 50 in particular.

MS. M. MILLER:  Yes, that's before.  Yes, 100%.

THE COURT:  All right.  So yes, Counsel?

Defense? Defense? On her -- okay. So now we have, okay. The Court has already made a ruling on three of the paragraphs, the prosecutor is now citing to two additional paragraphs that focus on death. And you know what they are. She just stated them. So let's focus on that first. And then let's focus on the other argument that she makes regarding the bill of particulars issue, the fact that you all have discovery and so forth. Let's start with the first question.

MR. MARTIN: The first question -- the first question, Your Honor, Rule 403 doesn't divide it into what counts have been charged. Rule 403 says, "The Court may exclude relevant evidence if it's probative value is substantially outweighed by danger of one or more of the following: Unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needless presenting cumulative evidence." If it is prejudicial or it's a violation of 403 as to one count, that same prejudice applies to all counts of the indictment.

As relates to, Your Honor, the Counts 8, 9, and 10, let me make just -- make this, I filed a motion to dismiss those. The Court ordered the government to file a bill of particulars as to 8, 9 and 10, the government did file a bill of particulars as to 8, 9 and 10, and basically amended their charges where the Count 8 aircraft fraud by way of election, and that's in ECF 106-1, Count 8 now charges a violation of

38(a)(1)(A), which relates to a particular purchase order. Count 9 relates to a different purchase order, is a violation of 38(a)(1)(B), and Count 10 is now an attempt or a conspiracy which is out -- which is outlined that we conspired to falsely identify counterfeit parts versus we conspired to defraud the government by falsely identifying counterfeit critical parts or legitimate parts, including a tail rotor pitch change link. That does not, in their amendment and election, allege that caused serious bodily injury or death, Your Honor, in Count 10.

And I submit to the Court that just for the purposes of 403, those should be excluded. I understand that their argument relating to the conspiracy, but if it's prejudicial as to the other counts, it should be prejudicial as to the conspiracy. I understand the Court is going to issue a ruling that outlines which deaths should come out --

THE COURT: Well, I just did -- I've just given you a... I've just given you a, you know, a written -- or not written, a verbal ruling on the specific counts. And then now, the prosecutor says, well, no, no there are other -- there are two other counts she's indicated -- showing there are two other counts within the indictment that talk about fatal --

(Discussion with IT.)

THE COURT: I got to keep my IT guy here.

10:45AM 10:45AM 10:45AM 10:45AM 10:45AM 10:46AM 10:46AM 10:46AM 10:46AM 10:46AM 10:46AM 10:46AM 10:46AM 10:46AM 10:46AM 10:46AM 10:46AM 10:46AM 10:46AM 10:46AM 10:46AM 10:46AM 10:47AM 10:47AM 10:47AM

MS. M. MILLER: Your Honor, there is also paragraph --

THE COURT: Wait, wait, wait, hold on.

MS. M. MILLER: -- 47. Oh, okay. I just wanted to --

THE COURT: Wait, wait, wait. Just hold on. Let me finish. Now they've given me two other -- other counts and they've given the other argument. So you're saying that it's not good enough, the other argument, about discovery, the fact that they've given you summary charts, they've given you other further evidence with regard to justifying or substantiating further deaths or serious bodily injury?

MR. MARTIN: Your Honor, I submit to you that the materials that we have been provided by Mr. Guzzetti in terms of his expert opinion, do not specifically identify -- may I have just one second?

THE COURT: Mm-hmm.

MR. MARTIN: He doesn't identify --

THE COURT: Hold on -- hold on. Let me just verify with my --

(Pause.)

THE COURT: All right. Thank you, Steve.

MR. MCCONWELL: May I?

MR. MARTIN: I'm referring to Mr. Guzzetti's notice of intent for expert testimony which is ECF 480. I

don't believe he's identified in his testimony one specific death, Your Honor, in his -- in his expert testimony. And I submit that beyond that, that it is -- it still falls within the 403 analysis and the Court should exclude it beyond what you've already -- what you've already ordered.

MR. MCCONWELL: Your Honor, may I clarify one thing?

THE COURT: Yes, go ahead.

MR. MCCONWELL: My motion was directed on the fact -- first of all, 9068F, there is no allegation or evidence that there was a failed pitch link for that. I'm talking about --

THE COURT: No, that can go to credibility. I mean, you guys can --

MR. MCCONWELL: Well, I understand but -- but we're -- we -- you gave us an opportunity when I moved for Daubert to say at the time of the trial if something comes up, we'll take care of it then. That was the purpose of my motion effectively. And they've offered no evidence that a pitch link failed, let alone caused the death. So I mean -- I think they should have to have that evidence or say some credible evidence to be able to speculate that that happened. That was my problem. That was my motion.

THE COURT: Yeah, but there was -- but you recall there was some evidence regarding that -- that particular --

or that particular part. There was some evidence.

MS. M. MILLER: Yes.

MR. MCCONWELL: There is no evidence one of those failed. Let alone caused a death.

THE COURT: Okay. But there was evidence that it was deficient, if you will, allegedly deficient in certain expert's eyes and -- is that not true?

MR. MCCONWELL: That wasn't the opinion expressed in his report that he disclosed to us. And there is no document --

THE COURT: Who are you talking about, who is he?

MR. MCCONWELL: Mr. Guzzetti.

THE COURT: Okay. Never mind Mr. Guzzetti yet, but what about the other -- other -- other witnesses who may have testified?

MR. MCCONWELL: I don't think there was any credible evidence that one of these failed and caused a death.

THE COURT: No, okay. But the connection of causing the death is one thing. The particular testimony that the part, the link, rotor pitch -- I keep getting -- I have to write that down, I'm sorry.

MS. M. MILLER: Tail rotor pitch change link.

THE COURT: I know, I --

MS. M. MILLER: I know it's -- it's hard.

MR. MCCONWELL: The problem is we're going to get

into, Your Honor, there is a complicated chain of things that could have cause the failure of a tail rotor --

THE COURT: You know what, I don't think it's a problem. I think that that has come out during the trial.

MS. M. MILLER: It has.

THE COURT: I think the witnesses have testified that even the particular transport of that part could have been affected by movement, by packaging, by a lot of other things. And so I mean, in terms of -- in terms of credibility, that -- that will be a good -- may be a good argument for the defense. Anyway, that -- but I understand your point.

MR. MCCONWELL: But I just think they shouldn't be allowed to speculate.

THE COURT: All right. And you know what? Hold on. Hold on. Let me just finish with the defense first. I understand what you're saying, but again, I think it's really going to come down to whether or not the jurors want to believe that little, looks like a -- I don't even know I'm not a tool person, anyway, whatever that is, the tail... rotor pitch link, it's up to them to decide whether that has caused, if there is sufficient evidence and if there is any indicia of reliability, that that in particular caused the death of anyone. Really.

So I mean your best bet is look at -- I mean, you

10:50AM 10:50AM 10:50AM 10:50AM 10:51AM 10:51AM 10:51AM 10:51AM 10:51AM 10:51AM 10:51AM 10:51AM 10:51AM 10:51AM 10:51AM 10:51AM 10:51AM 10:51AM 10:51AM 10:51AM 10:51AM 10:52AM 10:52AM 10:52AM 10:52AM

know, look at the evidence, listen -- I'm sure you have listened to the evidence and pull it together in a blended closing argument. You can do it.

MS. M. MILLER: Yup.

THE COURT: I've seen it done.

MS. M. MILLER: So, Your Honor, may I just respond --

THE COURT: No, no, no, no, no, no, hold on. Let me just -- let me just finish with this -- objections.

MS. M. MILLER: Yes.

THE COURT: I think -- I have to think. So I got that. Yes, Ms. McConwell?

MS. MCCONWELL: I was just standing up to ask if you have filed your order because I was watching for it.

THE COURT: Oh, no, I -- I'm going to. Have I -- we going to issue it out? Okay. Yeah, good. Yeah. Yeah, Emily was just waiting for me to say go, hit it, hit the button. It's going to you right now as we speak.

MS. MCCONWELL: Okay.

THE COURT: So to be clear, it's only limited at this point to what I just said.

MS. M. MILLER: Right.

THE COURT: We're only -- we're hearing arguments now whether the additional deaths and/or serious bodily injuries could be added. Yes, Mr. Martin?

MR. MARTIN: Your Honor, what I'm -- the point I was trying to make is in his report, he makes reference to well, there were 23 accidents, nine people were killed, but there is no specifics relating to who he's talking about, when the accidents occurred, anything about particularly who they are. And I submit to Your Honor, that, you know, when we got 26 terabytes of discovery, in this case, for us --

(Ms. M. Miller sighed.)

THE COURT: No comments. That's commenting on the evidence. That's commenting on his position.

MS. M. MILLER: I'm just taking a deep breath.

MR. MARTIN: I can sit over here and sigh every time, Your Honor --

THE COURT: Yeah, I know.

MR. MARTIN: -- the other side says something, and I restrain myself, and I don't appreciate this --

THE COURT: Counsel, not being professional. Let's not -- let's not do it.

MS. M. MILLER: Sorry, I'm just taking a deep breath, Your Honor.

THE COURT: Then turn off the mic.

MS. M. MILLER: Yes. Definitely. Good idea.

THE COURT: Good idea. Okay. Yes. Mr. Martin?

(Pause.)

THE COURT: Okay. So. We are -- you were --

MR. MARTIN: My objection is, Your Honor, let me -- so the record is clear. Anything outside what the Court just announced as to all these other accidents or deaths that we haven't, in my opinion, have not been given the appropriate notice and the expert -- in the expert report or the discovery material provided, I object to.

THE COURT: What about -- so now the prosecutor has just pointed out to me paragraph 51. What do you say about paragraph 51?

MS. M. MILLER: Paragraph 47.

THE COURT: Hold on -- hold on, Counsel. Let me finish.

MR. MARTIN: I'll do them one at a time.

THE COURT: Paragraph 51 and 59. Hold on. She wants to add one.

MS. M. MILLER: 47.

THE COURT: Is that the only one to add?

MS. M. MILLER: That's the only one right now, yes. And then I do have other argument, Your Honor.

THE COURT: No, no, no.

MS. M. MILLER: 47.

THE COURT: I just want -- let me just tell you, Counsel, all I care about is the paragraphs.

MS. M. MILLER: 47.

THE COURT: Don't say right now. Tell me now

forever. Because -- or forever hold your peace. So tell me is there any other -- any others, you guys should know this indictment inside out.

MS. M. MILLER: No, no, 47.

THE COURT: So let me just little tag it there. 47. So let's start with -- let everybody look at 47 right now. Let me look at that too. The conspiracy...

(Pause.)

THE COURT: So that's Count 1, though. That's really -- 47 comes under Count 1, okay. That's where -- we see that. That's already incorporated. So really, it's just the other -- she's citing to Count 1, and then the two other counts. So --

MR. MARTIN: It's all -- I mean, you've already ruled on counts -- I think 8 through 13, Your Honor.

THE COURT: Yeah.

MR. MARTIN: And she's asking you to allow her to bring this in under Count 1.

THE COURT: I -- I ruled on Counts 9, 10 and 13. Those are the ones. So I already heard your argument on Count 1. Because that's the overall charge of conspiracy. What about count -- now she's citing to Count 51.

MS. M. MILLER: No, that's still --

MR. MARTIN: That's a paragraph in Count 1.

THE COURT: Oh, that's still in Count 1, okay.

         MS. M. MILLER: It's all Count 1. Everything that I cited, Your Honor, was Count 1.

THE COURT: Oh, that's all right. That's right.

MS. M. MILLER: Yes.

THE COURT: It's all in Count 1. Okay. Those two are in Count 1.

MS. MCCONWELL: And, Your Honor, you had already --

THE COURT: Is the Count 1 -- hold on. Is the Count 1, let me look at this for one second then. I need to review this carefully. I know that Count 1... okay. So 59 was N9068F. And I --

MS. MCCONWELL: You have 51 and then you'd have paragraphs 59 through 61 and that's the 908 -- 68F. And 51 was 104BN. And, Your Honor, when you initially ruled, you already identified those four paragraphs and those two incidents.

THE COURT: Are those contained -- let me just be sure, are those contained in either Counts 9, 10 and 13?

MS. MCCONWELL: No.

THE COURT: They're not. So they're different, they're different --

MS. M. MILLER: This is all Count 1.

THE COURT: All right. Okay. That's Count 1. So -- but I guess my question is -- all right. All right. So

that is just Count 1.

MS. M. MILLER: Just Count 1.

THE COURT: Right. All right. So essentially, then it's Count 1, 9, 10, and 13. So if there is going to be an additional -- if there is going to be an additional injury or serious -- I mean a death, then it will relate to those two helicopters.

MS. M. MILLER: No, Your Honor. Paragraph 47 identifies nine deaths as a result of the Defendants' accidents, paragraph 9.

THE COURT: Okay. Hold on.

MS. M. MILLER: 47. I'm sorry, paragraph 47 refers to nine deaths.

THE COURT: 47. Oh, it says numerous persons died, it doesn't say nine. Where does it say nine?

MS. M. MILLER: It says numerous persons died, many more were seriously injured. Yes, you're right.

THE COURT: So it doesn't say nine.

MS. M. MILLER: No, it says many died, and many were seriously injured. Then, Your Honor, for the record, Mr. Guzzetti's disclosure in May of 2020, gave the Defendants notice of the following --

THE COURT: All right. Let's not -- let's not worry -- I don't want to get into his disclosures right now. My focus is on the indictment only.

MS. M. MILLER: Yes.
THE COURT: All right. So I've got -- I see it says numerous.
MS. M. MILLER: Yes.
THE COURT: All right. So my question is, on paragraphs 51 and 59, which are part of the conspiracy charge.
MS. M. MILLER: Yes.
THE COURT: In Count 1.
MS. M. MILLER: Yes.
THE COURT: Are those different events, different deaths and/or serious bodily injuries from Counts 9, 10, and 13?
MS. M. MILLER: Yes.
THE COURT: All right. That's all I want to know. You don't have to tell me about the disclosure stuff because I -- I understand the argument on there. Yes?
MR. MARTIN: We don't know who 9, 10, and 13 are because it's not in the indictment, it's not in their -- that they filed. And so I don't know how they -- I mean, I know that Count 9, Your Honor, based on their bill of particulars, alleges to something that occurred on August 24th, 2016, with a purchase order, but we don't have anything from that bill of particulars about a death. I know from Count 10 that that is a -- that is an attempt or conspiracy to commit an offense, but there is no reference in there about a death or serious

bodily injury. So we don't know from the indictment or the bill of particulars that they filed pursuant to your Court order what helicopters, what dates they're referring to, for those two counts. And then they try to say, oh, and we got more going back to these others where they don't identify them, doesn't give us notice.

MS. M. MILLER: May I approach, Your Honor, with the summary chart that was given to the Defendants two years ago? So that you could see what they are claiming did not give them sufficient notice.

THE COURT: All right. That's fine. Do you have that?

MS. M. MILLER: They do.

MR. MARTIN: Well, I'd like to know what number she's referring to.

THE COURT: Give her -- give him the cite of what you're referring to --

MS. M. MILLER: It's Exhibit 1242, Your Honor.

THE COURT: Okay. Exhibit 1242.

MS. M. MILLER: Yes, Your Honor.

THE COURT: Okay.

MS. M. MILLER: So as you could see, they've had that for two years. That's why this is such an insincere argument that they don't know about these other accidents, they don't know about these other incidents, they don't know

about these other deaths, that's not true. If you look at that summary chart I just gave you, which defense Counsel had just three months after Mr. Guzzetti's disclosure where he said that he looked at 53 different cases, that's in his disclosure in May, and he said that he was putting together the summary chart that would identify all of the accidents that occurred after Hansen Helicopters owned this. And that's Exhibit G-1242, Emily.

MR. MARTIN: The problem, Your Honor --

MS. M. MILLER: And so I'm still -- I'm still making this assertion, Your Honor.

THE COURT: Okay.

MS. M. MILLER: When you look at that, the defense has had notice May of 2020 from Mr. Guzzetti's disclosure which said here's the number of accidents I reviewed, here's the number of injuries, here's the number of deaths, here's the number of analyses that I performed, etc.

Then two months later, we give them two summary charts with all of the underlying data. The summary charts identify the tail number of the helicopters --

THE COURT: Okay. And I saw that. I've read it.

MS. M. MILLER: You have all of that. They had it for two years, including all of the underlying documents, that's why this is so insincere.

THE COURT: Okay. I've got the -- I read the

chart real quickly, has a red highlighted portion that shows nine deaths alleged deaths. Okay. Let me just say something, let me just go back for one second just to --

MR. MARTIN: May I briefly respond to --

THE COURT: Yeah, you can respond to that in a minute, but let me just -- to close the argument by Mr. McConwell. So I went back to -- I pulled up my ECF 706, the Court's order denying Daubert motion and the Daubert motion, as the Counsels know, has to be based on methodology, not on the quality of evidence and in my ruling, so sometimes I have to go back and remember what did I write, I issue so many orders that I have to look and see what did I order.

The Court said that the specific factors discussed in Daubert peer review publication potential error rate, etc., and on which Defendants rely heavily on their objections are particularly helpful, thank you, in cases where the reliability of expert testimony depends on the correct application of a valid methodology. However, those same factors simply are not applicable to some kinds of testimony whose reliability depends heavily on the knowledge and experience of the expert rather than methodology of the theory behind it.

The Court -- I cite U.S. v. Hankey, H-A-N-K-E-Y, 203 F.3d 11601169[sic], 9th Circuit, 2000. Most, if not all, of the opinions contained in the prosecution's expert

disclosures fall into the latter category. And let me just say, let me see what I put here. All right. I said, "This is not intended to suggest that every proffered expert testimony will be admissible at trial. The Court simply finds," and this is what I found, "that in light of the nature of the expert testimony, proffered by the government, no special pretrial proceedings were necessary to determine the admissibility of the government's expert testimony. Rather, the ordinary procedures for objecting during trial will adequately permit the Court to fulfill its gatekeeping role. However, as you might know," I did say, "if it becomes clear during trial that a Daubert hearing would be helpful in assessing the reliability of a particular expert's testimony, the Court will hold one." But I don't -- anyway, so that was my -- I wanted to go back. What did I rule again? So that's -- that was my ruling.

MR. MCCONWELL: That's what I was referring to in my motion, actually. If now is the time to bring it up. They -- I'm happy to hear them say that the Count 1 deaths are different than the Counts in 9, 10 and 13 deaths. They've never identified those deaths, they've never identified the failure of a single pitch link. There is no evidence in their documents they're going to have with the witness, and I say that should be something precluded from speculating about whether there was a death that proximately caused the death.

THE COURT: All right. So the prosecution now has cited -- and this is exhibit what, 1241?

MS. M. MILLER: 1242, Your Honor.

THE COURT: 1242. The prosecution has excited -- not excited -- cited to 1242. And so the Court is just -- look at this just quickly and sees that on their injuries, you see the red highlights there. So that is what I asked you to respond to.

MR. MCCONWELL: It doesn't respond to a failure of a pitch link, which wrecks or accidents involve that, or which -- which ones actually involved the death that are separate than their Count 1 allegations.

THE COURT: Well, it has remarks there. It has remarks.

MR. MCCONWELL: It doesn't tie anything to pitch link failure. That's the problem. And that's -- and that's the enhanced penalty that's going to occur in 38 -- the three paragraphs. And that was the purpose of my motion.

THE COURT: Well, so some of the remarks in the -- this particular 1242, does indicate they have the words tail rotor -- tail rotor pitch link.

MR. MCCONWELL: I'm not sure it ties to one of -- one of the deaths. The fact that there may have been a tail rotor problem or bearing within a tail rotor in one of the other accidents doesn't mean it was one that was in the -- in

an accident that caused a death. And that's what we're tying it up.

THE COURT: Okay. I mean, you make a good point. I suppose, again, that -- all right. So for purposes of those -- the three that I have already said could go through -- no, I'm sorry, did you say that those--

MR. MCCONWELL: 9, 10, and 13.

THE COURT: 9, 10, 13 occurred before Hansen Helicopters became owners?

MS. M. MILLER: No.

THE COURT: Or occurred after?

MS. M. MILLER: No, after.

MR. MCCONWELL: After original ones involving Hansen or the -- the subsidiary corporation.

THE COURT: So, again, you know, if we -- well, I don't need to tell you guys how to do your closing arguments but --

MR. MCCONWELL: We'll bring it up, I'm sure.

THE COURT: I'm sorry?

MR. MCCONWELL: I think I'd like to block it from the jury knowing because it's pure speculation at this point.

THE COURT: No, no, this is critical. I mean, I know that -- so that there is a lot to lose here, a lot to gain for whoever, whoever the Court decides. I already made a decision as to three. The question is do I make a decision,

do I allow any -- an additional two, or full nine, or whatever. That's really the question. So you're just saying it's still not enough?

MR. MCCONWELL: We don't know who the -- we don't know the deaths -- we do not know the deaths.

THE COURT: Well, it says -- it says the deaths here, it shows the deaths.

MS. M. MILLER: Yes.

THE COURT: It says fatalities.

MR. MCCONWELL: The type of the failure of the pitch link is my problem.

THE COURT: Okay. All right. Ms. McConwell, do you have anything, and then I'll go to Mr. Martin?

MR. MCCONWELL: And I'll drop off now.

THE COURT: No, no, thank you.

Ms. McConwell, anything further?

Mr. Martin, on this issue? Of 1242?

MR. MARTIN: On 1242, Your Honor, the problem I have with it, although I have the chart, it doesn't specifically tie it to Counts 8 through 13, so we don't know which ones we're defending against. I know this is the government's allegation within their conspiracy, but the chart in and of itself has things that completely negate the fact that it was caused by some -- a failure of a tail rotor pitch change link, just by reading the comments.

THE COURT: All right, but by virtue of the summary chart though, as we all know under the rule of evidence, the summary chart has to be substantiated by documents, and you are to have received that in discovery. Right?

MS. M. MILLER: Which they have, two years ago.

THE COURT: That's -- that's what's critical.

MS. MCCONWELL: In January, Mr. McConwell provided to Ms. Miller, actually I think I did, there were a number of line items on those where no documentation was provided, and our objection has been also to the remarks -- that remarks column on the far right, which is what Mr. Guzzetti has said which don't -- doesn't appear to be tied to the documents that form the basis for the left portion of the chart.

THE COURT: All right. So are you saying though then that -- okay. So if we have a summary chart, did you guys agree on this summary chart, 1242.

MS. MCCONWELL: No, ma'am.

MS. M. MILLER: We discussed it, and this is the circular argument over --

THE COURT: No, wait, wait, I only asked the question, did you agree?

MS. M. MILLER: We did not agree because it's the same thing.

11:07AM 11:08AM 11:08AM 11:08AM 11:08AM 11:08AM 11:08AM 11:08AM 11:08AM 11:08AM 11:08AM 11:08AM 11:08AM 11:08AM 11:08AM 11:08AM 11:08AM 11:08AM 11:08AM 11:08AM 11:08AM 11:08AM 11:08AM 11:08AM 11:09AM

THE COURT: So that's all I asked about. 11:09AM

MS. M. MILLER: Yes. 11:09AM

THE COURT: So you did not agree to this. So it's still pending as to whether or not it's admissible? 11:09AM

MS. M. MILLER: Yes. 11:09AM

THE COURT: The summary chart. All right. Are you trying to put in 1242? 11:09AM

MS. M. MILLER: Yes, and their argument -- 11:09AM

THE COURT: Hold on, hold on, hold on. All I care -- I got to focus here. So on 1242, are you telling me that, Ms. McConwell, that as far as you know, that any and all documentation provided by the prosecution to substantiate summary chart 1242, do not connect the failure of the... 11:09AM

MR. MCCONWELL: Tail rotor. 11:09AM

THE COURT: Yeah, here it is. Tail rotor pitch link to any deaths? 11:09AM

MR. MCCONWELL: Right. 11:09AM

MS. MCCONWELL: Yes. 11:09AM

THE COURT: Mr. McConwell says, yes, Ms. McConwell -- Mr. Martin. 11:09AM

MR. MARTIN: I join, Your Honor. 11:09AM

THE COURT: Not one? And has -- not one? 11:09AM

MR. MARTIN: Not one. 11:09AM

MR. MCCONWELL: Not one. 11:09AM

MR. MARTIN: Not one. 11:09AM

THE COURT: Wow, that's -- that's -- let me just say, that's --

MR. MARTIN: The best we have, Your Honor, is --

THE COURT: I'm sorry?

MR. MARTIN: The best we have from the government is it fits the pattern. That's --

MR. MCCONWELL: On 30 --

MR. MARTIN: Right.

THE COURT: It fits the pattern?

MR. MARTIN: The testimony, as represented in this summary, is that the accident against -- as observed fit the pattern that these could possibly be tail rotor pitch change link failures.

THE COURT: So are you telling -- okay. So but have you all -- so you did submit objections? You said I object to the summary chart because it doesn't -- it's not sufficient to answer our objections.

MR. MCCONWELL: The comments are what we object to.

THE COURT: The remarks? You mean remarks?

MS. M. MILLER: Yes, the remarks.

MS. MCCONWELL: The remarks and the lack of connecting with the tail rotor pitch link blank.

THE COURT: Right. So there is three -- there's -- all right. So there is -- 1, 2, 3, 4, 5. 5 columns, and

you got -- so the defense is objecting to, what do you call it, Mr. Guzzetti's conclusions or remarks, that's what you're objecting to? And that's what you have objected to throughout the discovery process, throughout and up till today?

MS. MCCONWELL: (Nodded head.)

MS. M. MILLER: And, Your Honor, has said to the defense repeatedly, show me the money. Show the NTSB report that Mr. Guzzetti is summarizing here and the inconsistency or inaccuracy between that underlying document and his comments. And the defense has not once in two years done that. Their argument has been this general, general, "we don't like the comments; we don't like the remarks." So on the one hand, they say we don't know which accidents were caused by the tail rotor pitch change link, but then they just admit, well, we do know which accidents he's going to say were caused by the tail rotor pitch change link, but we still don't have enough information. This is a criminal case, this is not a civil case. This Court in ECF 1179 already ruled on this issue. And this Court has repeatedly, repeatedly told the defense Counsel, even as recently as yesterday, if you have a specific objection to these charts, based on the underlying documents, you must give that to the government, they still don't.

THE COURT: All right.

MS. M. MILLER: It's still this general thing. 1179 you said, Your Honor, "The Ninth Circuit has stated that

a defendant is not entitled to know all the evidence the government intends to produce, but only the theory of the government's case." And you cited *United States versus Ryland* 9th Circuit for that proposition. 11:12AM

THE COURT: Okay. I got it, I got it, I got your argument. Let me -- okay. I got it. Okay. You can be seated, Ms. Miller. 11:13AM

MS. M. MILLER: Thank you, Your Honor. 11:13AM

THE COURT: All right. Well, well, well, (laughing) here we are, it's 11:13 and we are now at the finish line, the end of the -- right at the -- like right before the finish line and we have this issue. So let me -- let me see, it's 11:13, the jurors are going to -- they are getting their lunch shortly. So what I'm going to do is I'm going to have you all go and get your lunch now, and I'm going to come back with my ruling on this issue. Okay. 11:13AM

MS. M. MILLER: Thank you, Your Honor. 11:13AM

THE COURT: Anything further? That's it. 11:13AM

MS. M. MILLER: No, that's it. 11:13AM

THE COURT: All right. Thank you. So our -- we have -- we go from 11 -- 11:13AM

MS. MCCONWELL: I think it's 11:45 to 12:30. 11:13AM

THE COURT: Okay. 11:45 to 12:30. Yeah. So come back at 12:30. So the jurors are already used to that. Let me ask you this though, Counsels. 11:13AM

(Pause.)

THE COURT: All right. For -- under Rule 1006, Defendants do have to give a specific objection for notice, I'm thinking that the language in paragraph 47 so paragraph 47 in the grand jury indictment, I don't think it's enough to put the Defendants on notice that accidents, other than the ones mentioned in the Second Superseding Indictment, will be used to prove any of the counts. Let me just say that's what I'm thinking temporarily -- as of right now. I -- let me -- let me just say, in the accidents in paragraph 50 aren't prejudicial because they weren't allegedly caused by the Defendants on 50. Let me just say, okay. So this indictment is like -- unlike -- is like other indictments, it's not precisely crafted. I -- I will say that. It's not. Part of the problem is that the United States Attorney's Office is still investigating. That's -- that's part of the issue. Is that -- I mean, so that can cause problems. But also, there is an inordinate amount of -- of discovery here. I know that. That doesn't excuse anything.

MS. M. MILLER: We just want -- we just want 1242, which they've had -- that's a summary chart, they've had it for two years. Those are the only accidents and incidents that we want to use.

THE COURT: But Counsel, anyway, my point is I'm going to go back and look at it, but I'm just telling you that

-- that -- you know, I've -- I've really looked at this issue of notice, you know, I've given -- I've actually given you guys the benefit of the doubt. I let the prosecution have the alter ego corporations in. Some of them, not all of them.

MS. M. MILLER: Right.

THE COURT: But on this issue, this is -- this is causing death and serious bodily injury. It is high stakes for both sides.

MS. M. MILLER: Yes.

THE COURT: For prosecution and defense. Really, again, you know, I'm -- I'm pretty conservative in terms of pleadings, I always believe that, man if you're a prosecutor, put everything in the indictment. Everything. I mean, to the extent that you can do it. And give the defendants all notice that they can. That's just always been my philosophy as a prosecutor, a former prosecutor. And even just as a judge watching this because things always unravel during trial. This is a big case, it's a 100-count indictment. Involves so many defendants. But Mr. Walker and Hansen Helicopters are on trial right now. And the United States Attorney's Office represents the United States of America, this is also a trial for them too.

MS. M. MILLER: Absolutely.

THE COURT: So I -- I understand that, I'm going to think about this issue, and I'll come back. All right.

MS. M. MILLER: Thank you, Your Honor.

THE COURT: Have a nice lunch. All right. Take care. Thank you.

So we'll have Mr. Guzzetti start then right after lunch at 12 -- did I -- what time is it? 12:45? Is that when we come back usually? It's 11:45 to 12:30, right, is our lunch break? We're going to take lunch early so I can make this ruling.

MS. M. MILLER: Thank you, Your Honor.

THE COURT: Thank you, take care.

(Recess taken at 11:17 a.m.)

(Back on the record at 12:34 p.m.)

THE COURT: We're outside the presence of the jury. And let's see. So I think we have additional information regarding Guzzetti submitted to the Court; is that right? So I just had a chance to review. You got a chance to review that, Counsel, defense? Memorandum or an e-mail from Ms. Samantha Miller?

MR. MARTIN: We got it, Your Honor, we sent you an e-mail response.

THE COURT: Oh, you did? You sent me something?

MR. MARTIN: Well, we just said that --

THE COURT: Sorry, can you get on your mic there?

MR. MARTIN: Is there another one?

MS. M. MILLER: No.

THE COURT: Oh, I don't know. I just got this like --

MS. M. MILLER: It's not.

MR. MARTIN: I'm sorry. I wasn't on the microphone, Your Honor.

THE COURT: It says additional -- today is May 22nd, right?

MS. M. MILLER: Yes, well --

MR. MARTIN: During the lunch hour, they sent another one. I think Laura responded to it, Your Honor.

THE COURT: Okay. Let me get there -- let me --

MR. MARTIN: Just if we could -- we're happy to make further discussion with the Court on it, but we disagree with it.

THE COURT: All right. Well, let me just make my rulings. I -- I've read this without looking at the objections from defense, I'm sorry, I did not or not objections, but -- well, I guess objections or response. So the Court has considered all the arguments by Counsel. And I've already made my ruling regarding the motion in limine by Mr. McConwell and team. And so the Court will stand by that ruling on those three particular counts.

Any other deaths or serious bodily injury, the Court will disallow at this time. And I know you guys have made all your arguments ad nauseam, I've heard it, I've seen

it, and we don't need to go through it again. I believe that pursuant to federal evidence -- Federal Rule of Evidence 403 in particular, the Court finds that for the Court to allow these additional requests by prosecution, it would be in violation of 403. The Court believes that the probative value is substantially outweighed by danger of unfair prejudice. And so the Court has already discussed that earlier. So at this time, with regard to the -- as I've indicated, I've already made my ruling. So we'll stick with that. Anything further, Counsel? And if not we'll proceed forward.

MS. M. MILLER: I want to make sure I understand your ruling. So then for Mr. Guzzetti's chart 1242, we need to redact the column that has a reference to death and serious bodily injury; is that correct, Your Honor?

THE COURT: Unless it relates to the three counts --

MS. M. MILLER: The Counts 9 -- yes, yes, yes. So the two that relate to that are 9068F and 74LB. And what we'll do is we will redact that column for the rest of those accidents and incidents and, Your Honor, I'm assuming that --

THE COURT: You'll redact -- oh, I see, I'm sorry you'll redact --

MS. M. MILLER: The column that has serious bodily injury or death, so we will -- we will redact that column with the exception of the two accidents that

Mr. Guzzetti will testify were approximately caused by the failure of the tail rotor pitch change link which are accident 9068F and accident 74LB.

THE COURT: So just to be clear, let me just ask you, just to be clear on this 1242, the third column says injuries, so --

MS. M. MILLER: That would be redacted.

THE COURT: The entire -- the entire column will be redacted?

MS. M. MILLER: Yes.

THE COURT: Pull that all out, but everything else you want to leave as is?

MS. M. MILLER: Yes.

THE COURT: Okay. I don't think I have a problem with that, but I -- let me hear from the defense.

MS. M. MILLER: And no, the other thing I want to make sure we're not going have a problem with, the jury has already heard evidence about the death of Mr. Santos, 9068F, and that is, Your Honor, one of the deaths that we attribute to a failure of the tail rotor pitch change link. So I don't think there is any problem there.

THE COURT: Yeah, that's already been -- I've already allowed this.

MS. M. MILLER: That's already in evidence. The jury also heard, Your Honor, the death of the spotter who was

on the aircraft, N471M, with Mr. Bustos. And they've also heard about the serious bodily injury to both the pilot and the spotter in N805LA, which was testified to by Mr. Reed and Ms. Leon Guerrero. If you recall, Your Honor, that was the aircraft that was brought in to the Guam harbor, and the pilot was removed from the aircraft. He had a broken back and put in the Hansen Helicopter's van. So those pieces of evidence have already been come in, Your Honor. And those are incidents that I will be discussing with Mr. Guzzetti during his testimony.

Mr. Braga testified about his accident, 4910, said he had minor injuries as a result of that accident. And then, of course, in our Second Superseding Indictment, we do also discuss the death associated with N104BN. And I'm assuming that that --

THE COURT: I'm sorry. What was your last part? You're assuming what?

MS. M. MILLER: In our Second Superseding Indictment, I cited the paragraph to you, Your Honor, that talked about 104, N104BN.

THE COURT: Okay. Hold on one second. Anything else?

MS. M. MILLER: No, that's it.

THE COURT: All right. So hold on, hold on, hold on, Defense, calm down.

MR. MARTIN: I just --

THE COURT: Wait just a minute.

MR. MARTIN: Repeat the numbers.

THE COURT: Oh, repeat the numbers then.

MR. MARTIN: That that's all I'm asking.

MS. M. MILLER: So the numbers, Your Honor, are 471M, N471M... RPC4910, 9068F, 74LB, 805LA, and 104BN.

And what we're going to do, Your Honor, so that there is no issue, we'll redact that entire column from Exhibit 1242, but Mr. Guzzetti will testify about those accidents and incidents that caused serious bodily injury or death --

THE COURT: Well, yeah, I don't -- I think -- and I agree, I think, to the extent that it's either in the indictment, I already ruled on that. And to the extent that there's already been testimony and, you know, whatever objections were made, the Court ruled on those objections.

MS. M. MILLER: Right.

THE COURT: So Counsel will all have to abide by those. But to that extent, the Court will allow that evidence in. I don't disagree with you on that.

MS. M. MILLER: Right. Right.

MR. MARTIN: May I talk to Marie a minute, Your Honor?

THE COURT: Okay. Hold on. Wait, wait. So he

wants to talk to Ms. Miller, and you want to talk. So hold on. I gotta do one or the other. Yes, Ms. McConwell, go ahead, you're first.

MS. MCCONWELL: I was just going to say N74LB is not in your order, the two that were in your order were the 9068F and 104BN.

MS. M. MILLER: No, Laura, 74LB is one of the aircraft that Mr. Guzzetti is going to testify was caused by the failure of the tail rotor pitch change link. Remember you said you didn't know which two? Those are the two, 9068F and 74LB.

MS. MCCONWELL: Well, the two that we discussed prior to the break --

MS. M. MILLER: No, no, no, I'm not talking about what we had discussed prior to the break. The Judge's order regarding Counts 9, etc., the aircraft parts fraud was the only accidents that the government can discuss that caused death or serious bodily injury are those that we contend were approximately caused by a failure of the tail rotor pitch change link. I'm telling you that 74LB is one of those. That accident is not excluded by the Court's earlier order, and it is not excluded by her order now.

MS. MCCONWELL: Well, the Court's order, 1707, identified 9068F and 104BN, and I did not see 74LB listed. Which page is that listed on?

MS. M. MILLER: There is no page. The Court's order was that any of the accidents that the government contends were proximately caused by a failure of the tail rotor pitch change link may come in. I am telling you that those accidents include N74LB.

THE COURT: Okay. So --

MS. MCCONWELL: I'm not conceding to that. I'll let Mr. Martin talk, and I'll reread the order --

THE COURT: All right. Why don't you guys all -- why don't you go together though so you guys are all -- Ms. McConwell, then you could come back and look at your notes, but so you guys all understand the Court's ruling.

(Counsel conferred.)

THE COURT: And then we could get to Mr. Guzzetti's testimony.

(Pause.)

THE COURT: You're just going to merge the columns and just delete that out?

MS. M. MILLER: Yeah.

THE COURT: Good.

MS. MCCONWELL: But then she's got all those other things that she has listed and all the remarks on the right side of the column. Are we just going to take those up as we go?

THE COURT: Yeah, I think so. I mean, you know I

think that -- you know what, that will go really just to the credibility of the witness. I mean, those are his remarks, those are his findings, I suppose, when he conducted his review so --

MS. M. MILLER: They actually aren't. They're just a summary of what he reviewed.

THE COURT: All right. So it's even that. Okay. Whatever that is. Yeah. All right. Okay. Is that -- is everybody -- is it clear what the ruling is.

MS. M. MILLER: I showed Mr. Martin what we're going to do in terms of the redaction, and he said that's fine.

THE COURT: All right. So essentially, Column 3 is wiped out completely.

MS. M. MILLER: Yes.

THE COURT: Deleted.

Yes, Ms. McConwell, on the -- on 1242, Column 3?

MS. MCCONWELL: No, I'm -- I'm back to 74LB. I don't -- I guess I'm not seeing where in your 1707 that that's -- that that aircraft is allowed.

(Pause.)

THE COURT: Okay. Hold on.

MS. M. MILLER: Your Honor, that aircraft was not specifically addressed in your order. Your order specifically said that the aircraft that the government contends were in an

accident as a result of the failure of the tail rotor pitch change link and that caused serious bodily injury or death. Those accidents can come in.

THE COURT: I said just two -- okay. So, Ms. McConwell, so I have my order that's pretty clear. The part that's verbally being discussed today and ordered today, right now, is the evidence that has already come into trial, whatever evidence has been brought in through the testimony of whatever witness as far as any event that may have caused bodily injury, whether it's serious or not, or death. And to the extent that there were objections, the objections should be honored, but the prosecution has the right to at least try to bring them in to show something, whatever they're intending to show, and then you have the right to rebut that through cross-examination.

MS. MCCONWELL: Okay. I just had understood her say to that your order specifically addressed N74LB, and I just -- I did not see it in the order, which is why I was trying to clarify.

THE COURT: So we got it clarified now.

MS. MCCONWELL: Right. And so then on their chart, are they then going to be limited to these aircraft that they're contending have already been into evidence and then this additional one that they're claiming is a tail rotor pitch link related failure, or they still going to have all

the 35 aircraft identified on the chart?

THE COURT: I'm sorry, can you repeat the question?

MS. MCCONWELL: Yeah. Their -- their summary chart, 1242, has about 34, 35 aircraft on it.

THE COURT: Right.

MS. MCCONWELL: And my question, trying to understand the Court's ruling, is there only certain aircraft they're going to -- that the witness is going to be able to testify about, are the other ones going to be redacted from the chart so that we're only --

MS. M. MILLER: No.

MS. MCCONWELL: Having maybe ten, or wait, 1, 2, 3, 4, 5, 6 aircraft on the chart rather than 35?

MS. M. MILLER: The Court's ruling --

THE COURT: So okay. Hold on. That's a good question.

MS. M. MILLER: No, the Court's ruling from my understanding is, any evidence of injury or death is what's coming out. The fact that there were those accidents described in 1242 go to Count 1, which is two-fold. Number one, the mission of the FAA as to safe transportation, and obviously, with 35 accidents, that's not safe transportation. Number 2, 22 of those accidents were never reported to the NTSB. That goes to fraud against the NTSB, failure to report

accidents. The Court found that what was 403, what was unfairly prejudicial was for the jury to hear about all of the death and injury not related to the tail rotor pitch change link so --

THE COURT: It's not -- well, it's not just -- okay, and it could be even further could be something not even related or related to something else other than the tail rotor pitch link because it was all about notice.

MS. M. MILLER: Correct.

THE COURT: So that's not allowed, but you're right to the extent there has been -- if there has been evidence brought in during the trial of all of these incidences --

MS. M. MILLER: Yes.

THE COURT: -- occurring on 1242, that are relevant to Charge 1 conspiracy, the answer is yes, that can come in.

MS. M. MILLER: And that's our position --

THE COURT: The Court has said that's fine, but I -- but I did say -- but I did exclude any deaths that have not been specifically noted in the --

MS. M. MILLER: The tail rotor pitch change link.

THE COURT: Well, tail rotor pitch link and any other type of cause of death --

MS. M. MILLER: Or injury.

THE COURT: -- that has not been noted in the indictment.

MS. M. MILLER: Yes.

MS. MCCONWELL: Or serious bodily injury.

THE COURT: Or serious bodily injury; that is correct.

MS. M. MILLER: Right. And that's why we're just taking that whole column out so there is no question.

THE COURT: Is that clear? Do you guys -- is that -- do you --

MS. MCCONWELL: Well, but she's still leaving all of the aircraft. She may take that column out, but she's still leaving all the aircraft -- all the aircraft on the list that the Court said that they're not supposed to testify about.

MS. M. MILLER: Because there is evidence already about those aircraft being involved in accidents after Hansen's ownership.

THE COURT: Yes. And -- and I did say that that can come in. What I was very focused on -- and I was trying to streamline it in terms of what I felt would be prejudicial to the Defendant would be the death and serious bodily injury notices. But everything else, if the prosecution has already, to this point, because Mr. Guzzetti is the expert witness, he's coming in, to this point, if they have already introduced

evidence of these -- is it 35? 12:50PM

MS. M. MILLER: It is -- I'll show you in one second -- can you give me --

THE COURT: Hold on -- hold on. Let me just finish my thought here. If the prosecution has already introduced evidence of these numbered -- however numbers, whatever the total number is, in 1242, if that's already been introduced, and admitted, and discussed, and cross-examined, they can bring that out because they are saying that it's relevant to conspiracy in Count 1. Okay. Does that -- you understand that?

MS. MCCONWELL: Right. But I just want to make sure, but -- but for the aircraft that are on this list, what -- which have not been brought out already in evidence, that needs to come off the list.

THE COURT: Well, I assume that that's -- they're going -- they're going to make sure that's not -- she says these are all in.

MS. M. MILLER: They're all in because we already --

THE COURT: But you're right to the extent they have not been discussed ever, they should be out.

MS. M. MILLER: They're all in, if I have to list all the exhibits that we got in that reference them --

THE COURT: I don't think so. As an officer of

the Court, if --

MS. M. MILLER: -- testimony that's got it in.

THE COURT: No. If you're stating as an officer the Court, that with regard to all of the air -- whatever -- what do they call -- registration numbers of those air -- air -- helicopters --

MS. M. MILLER: Yes.

THE COURT: -- or aircrafts, if they have been discussed during the course of the trial, then they're in.

MS. M. MILLER: Yes.

THE COURT: Ms. McConwell, see she's already indicating that.

MS. MCCONWELL: Well, yeah, I understand the ruling. I just don't agree with her that all 35 have been -- have been discussed or admitted into some type of evidence.

THE COURT: Okay. Well, I mean, when -- when it comes up during trial, I mean, if he testifies, and you say that's not been admitted then we have to do the search, but just make sure you know what your specific --

MS. MCCONWELL: Right. I'm going to do that --

THE COURT: Make sure you know your specific objection. All right. Are we ready --

MS. M. MILLER: We're ready.

THE COURT: Yes, Mr. Martin?

MR. MARTIN: Your Honor, just take a second if we

12:51PM 12:51PM 12:51PM 12:51PM 12:51PM 12:52PM 12:52PM 12:52PM 12:52PM 12:52PM 12:52PM 12:52PM 12:52PM 12:52PM 12:52PM 12:52PM 12:52PM 12:52PM 12:52PM 12:52PM 12:52PM 12:52PM 12:52PM 12:52PM 12:52PM

compare that to paragraph 126 to make sure that they're all in the indictment, if you'll just give us a moment.

THE COURT: I'm sorry, 126?

MR. MARTIN: It lists all -- it lists all the aircraft that are the subject of this indictment in paragraph 126, if we could just have a moment.

THE COURT: Okay. You got a moment. I'll give you five minutes, and then we'll call in the jury, how is that?

MR. MARTIN: Sure.

THE COURT: All you have to do is go in and do a search, like pull up the indictment, stick in the OCR, put in the numbers. That should do it, I believe. Is that right, Emily? Is that right? They could just take -- they have the indictment they could just do the OCR search? Stick it -- okay.

Can you tell the jury five more minutes?

(Pause.)

MR. MARTIN: May I visit with the government a minute, Your Honor?

THE COURT: Yeah, that's fine.

(Counsel conferred.)

THE COURT: You guys okay? So --

MS. M. MILLER: Your Honor, we're comparing what Mr. Martin gave us with our list. There are some helicopters

that are on that list that are not specifically mentioned in the indictment, Your Honor. However, we would argue that those are still relevant under Count 1 because they show the evidence of the attempt to defraud the FAA and the NTSB. We would also refer the Court to the jury instruction you're going to give about charged and uncharged conduct, so these are helicopters that are absolutely owned by Hansen Helicopters, Jon Walker, or one of the affiliated corporations.

These are accidents that occurred during the course of and in furtherance of the conspiracy to defraud the FAA and the NTSB. And these are also helicopters that were identified by Mr. Guzzetti in August of 2020. So in terms of notice of these accidents, that has been given to the Defendants. We will, of course, as we already said, redact any reference to serious bodily injury or death from all of those accidents so that the 403 aspect of it is addressed. But in terms of the 401 aspect of it, the government believes that this entire chart should come in with that exception.

THE COURT: All right. So let me just say, the Court 's ruling is this: That my prior -- my order that I issued earlier stands. Any -- let me just pull this chart. Any registered helicopter on Column 1 that's neither -- that's neither listed in the grand jury Second Superseding Indictment nor discussed during trial will not be allowed. That's it,

period. Does that -- you understand what my ruling is? 01:01PM

MS. M. MILLER: And when you say discussed during trial, so Mr. Sprayberry during his testimony, he actually identified the total number of accidents that the Defendants were involved in. He was using this particular chart to identify those number of accidents.

And so we would argue that that evidence has, in fact, already came in. And that -- when he was cross-examined on that by Mr. McConwell and Mr. McConwell asked him, Well, isn't it true that Hansen's operation is a relatively safe operation? Mr. Sprayberry responded, no, their record is abysmal, I believe is the word he used, Your Honor. And then he specifically said they've had over 35 accidents. And so that testimony has already come in, and it was not stricken.

THE COURT: All right. So let me just say, even if Sprayberry said there were 35 or 105, bottom line is, in terms of notice, the Court believes that notice has to be given in term of specific numbers.

MS. M. MILLER: And we did in August of 2020.

THE COURT: No, I said it has to be within either in the grand jury indictment, or in the trial itself. In the testimony. So if Sprayberry said there were 35 accidents or 12 accidents that caused whatever it caused and these are the registered numbers, then the Court will allow that in. I don't want to have to get into all this discovery dispute

stuff that is arising here. So that -- to that extent, unless it's -- let me just repeat this, unless it's in the grand jury indictment specifically listed, or unless it's testified during the trial itself, specifically mentioned by any witness, it won't come in. So basically, if it's -- if it hasn't been either of those -- in either of those situations, then delete them. 01:02PM 01:02PM 01:02PM 01:02PM 01:03PM 01:03PM 01:03PM

MS. M. MILLER: Okay. 01:03PM

THE COURT: Okay. It just keeps it simple. So the Court has ruled in your favor defense. Did you just hear my ruling? 01:03PM 01:03PM 01:03PM

MS. MCCONWELL: Yes. 01:03PM

MR. MARTIN: I think we might need to get with the government and decide if there is any modifications that need to be made. 01:03PM 01:03PM 01:03PM

THE COURT: Okay. Then talk to them. But you -- but did you understand my ruling, Mr. Martin? 01:03PM 01:03PM

MR. MARTIN: Yes, I did, Your Honor. 01:03PM

THE COURT: So if you need to go further -- 01:03PM

MR. MARTIN: And I appreciate it. 01:03PM

THE COURT: Well, don't worry about it. You don't have to tell me -- 01:03PM 01:03PM

MR. MARTIN: I understand what you said when you ruled in our favor, and that's why I think we need to talk to the government. 01:03PM 01:03PM 01:03PM

THE COURT: Well, you know, I'm ruling in favor of notice. I'm not trying to --

MR. MARTIN: No, I understand, Judge.

THE COURT: Go ahead. Continue on, I guess you're going to keep trying to whittle it down.

(Counsel conferred.)

MS. M. MILLER: So, Your Honor, we have an agreement on the first four helicopters that are listed in Mr. Guzzetti's chart based on your order that if they are not in the indictment, and they weren't specifically brought up at trial --

THE COURT: Okay. Good.

MS. M. MILLER: -- that they should be out. What we do not have an agreement on is the RPC helicopters that were involved in accidents here. Ms. McConwell is saying even if they have come up in trial, multiple times, she doesn't agree they should be on there, and I don't agree with that. So for example, 40 --

THE COURT: Okay. I think it's clear. It doesn't matter to me. The -- the thing is, I've already made my ruling. I think it's pretty simple. Either they're notified -- notice in the indictment or they're testified to in trial as it relates to Count 1, the Court is going to allow. I think it's pretty simple. Yes, Ms. McConwell?

MS. MCCONWELL: Well, just --

THE COURT: Can you get on to the mic? Pull the mic over.

MS. MCCONWELL: Yes, yes. So with the exception of the RPC4910 with the accident date listed as 5-30-2017, we objected to the rest of those RPC. Ms. Miller is saying her -- the reason that those should come in is because they appeared on 3003-14. And there's -- and I don't agree that those should be in there's no testimony about -- that was a bulk sale document, that was a bill of sale, and that doesn't have anything to do with any type of accident. A number of the other aircraft on there --

THE COURT: Okay. Let's stop then. All right. So let me -- let me go back, and maybe let me make it even a little more clear. To the extent that the registered helicopter or aircraft, I guess it's all helicopters, but just in case I don't -- is it all helicopters, right?

MS. M. MILLER: It's all helicopters.

THE COURT: Right. So to the extent that these registered helicopters listed in Column 1 have been noticed in the grand jury indictment as indicated in the order that I had issued earlier, or has been testified during the trial as it relates to Count 1 , the conspiracy, then the Court will allow it. Now, what is it that -- that you don't -- because the prosecutor is saying they're only going to introduce -- and it's the second category, what was testified in trial. If

there was a testimony in trial about accidents or -- not -- well, any -- accidents or any type of death or anything that relates to Count 1 and the conspiracy, then the Court will allow it.

MS. MCCONWELL: So the testimony was relating to the Counts 99 through 110 for those particular counts for the wire fraud, and the money laundering, and the conspiracy to commit -- I mean, this is what we've just been talking about with Mr. Khamvongsa for a couple of days.

THE COURT: No, but they're talking about Count -- okay. So I'm sorry, what is the objection? I'm not sure.

MS. MCCONWELL: I'm just saying I don't believe that those aircraft have been discussed and identified as it relates to Count 1. I think those aircraft were identified as a bill of sale and a bulk sale as part of Mr. Khamvongsa's testimony, and Mr. Khamvongsa's testimony related to Counts 99 through 110, not to Count 1.

THE COURT: Well are they -- let me just ask, is the witness, Mr. Guzzetti, going to discuss those particular, is it RP --

MS. M. MILLER: Yes, RPC4910.

THE COURT: Is she -- is he going to testify about testimony that has come out and it relates to Count 1?

MS. M. MILLER: Count 1.

THE COURT: All right.

MS. M. MILLER: All Count 1. As a matter of fact, Your Honor.

THE COURT: Okay. We got it.

MS. M. MILLER: Obviously, you don't have Counts 99 through 110 without Count 1. The conspiracy to defraud, the underlying actions, are all about the fraud against the FAA and the NTSB. So yes, this all comes in under Count 1. And when you look at Exhibit 3003-14, what was so relevant about that on 15 is that the Defendants were even describing these aircraft as being scrapped, not airworthy because of the fact that they were in accidents, incidents, destroyed. So obviously, this is all related to Count 1.

MR. MARTIN: Your Honor, we don't know why they were described that way, Ms. Miller can say what she wants, and she's been doing it throughout the trial, but the deal is --

MS. M. MILLER: I object and move to strike that comment, Your Honor.

MR. MARTIN: -- you don't know why that was written that way, Ms. Miller.

THE COURT: Okay. I'll rule at that time. Go ahead. What?

MR. MARTIN: Counts -- the RPC aircraft, with the exception of, I believe it's 4910 --

MS. MCCONWELL: Well, the 2017 accident of 4910.

MR. MARTIN: Well, anyway with the exception of RPC4910, have only been described in an exhibit, which is 3003.14, which today I cross-examined Mister -- Agent Khamvongsa about, and they were not about accidents or incidents. They were about the fact that they were in a bulk bill of sale between Jan's and Pacific Spotters, and not that they were involved in any accidents. I believe the only one that's been testified about that was involved in any accident is RPC4910.

THE COURT: Okay.

MS. M. MILLER: Your Honor, that's --

THE COURT: Hold on, hold on, hold on. Let me just say, but conspiracy to defraud the United States under Count 1 is broader than that. They're talking about --

MS. M. MILLER: Yes.

THE COURT: And you see that on the object of the conspiracy, paragraphs 46 and 47. It's not just deaths, it's serious injuries and so forth.

MR. MARTIN: What we're saying is, Your Honor, that the only testimony that's come out about those helicopters was under Counts 99, conspiracy to commit wire fraud, wire fraud, and money laundering.

MS. M. MILLER: No.

MR. MARTIN: Not Count 1.

MS. M. MILLER: That is wrong and let me tell you

why. We brought in Count 1, Mr. Prozik testified about the fact that we found the Philippine authorities had issued the cease and desist order for all of those RPC aircraft that are in Mr. Guzzetti's chart. And that cease and desist order, Your Honor, was because of the Defendants' violation of the Philippine authorities rules.

We also, Your Honor, brought to the Defendants' attention that these RPC-numbered helicopters were registered in the U.S. with the FAA at the same time that they were being operated in the Philippines. We provided defense Counsel with a chart showing the N-Number of these helicopters. We provided them with a chart showing the registered owner of the helicopters being one of the shell companies that this Court has already ruled could be considered an alter ego of the Defendant, and we provided them with a chart showing all of the ones that were dual registered.

So the evidence that has come in regarding these is much, much more substantial than what Mr. Martin and Ms. McConwell is saying. I could cite to the Court to G-355. I could cite to the Court to G-1252. I could cite the Court to Defense Exhibit 124, where Mr. McConwell actually identified a number of these aircraft and said that they intend to reregister them in the Philippines. I cite the Court to Mr. Marty's testimony from the Philippines, which I know is a long time ago, Your Honor. But when Mr. Marty testified,

Mr. Marty testified about these helicopters. So this evidence is substantial, and it did not just come in in the last few days with Mr. Khamvongsa. We started with our first witness, Special Agent Prozik, who talked about how these very helicopters were used by the Defendants to defraud the FAA.

THE COURT: All right. Let me -- hold on a second. Hold on. Let me just check something on the conspiracy.

MS. M. MILLER: And we say in our conspiracy allegation defrauding other civil aviation authorities is part of the modus operandi of the Defendants.

THE COURT: Okay. Hold on. Yeah. Defense, real quickly, because -- or Ms. McConwell, you want to go?

MS. MCCONWELL: Yes, Your Honor, because I had one more that I didn't want to lose site of. On N74LD, I don't have that something's been admitted about that, and I've just run through, did that OCR of the government's exhibit list, and I don't see that there is an exhibit that's been admitted about that aircraft at all.

THE COURT: You know, let me just ask you, are you going to try to push this summary chart right now? I mean -- is he going to be able to speak without the summary chart?

MS. M. MILLER: I could go around -- I could go around the summary chart.

THE COURT: Why don't you go around the summary

chart for now, and then let's get back to -- because I think it's delaying.

MS. M. MILLER: I could do that -- I could do that.

THE COURT: Let me just say, like I said, to the extent that it is part of conspiracy one, which it sounds like it is, I -- I think it's going to be okay. Yeah, I think it's going to be fine so that the prosecution lets this in. Now let me also say, Counsels, from now on, if you guys have something to submit to the Court, make sure you file it. Don't send it to me in chambers. I don't need to have a chitchat with you all. I mean, unless it's a procedural matter with my -- with my clerk or something, they can handle it. But -- but this is, you know, the last substantive e-mail that was submitted by Samantha Miller, and then the responses, I'd rather you guys put that through, put it on the docket because that's actual -- that's actually a part of the record, the appellate record, if there is going to be an appeal.

MS. M. MILLER: Yes, Your Honor.

THE COURT: All right. So, Counsels, remember that. All right. Let's go ahead and call in the jury. I -- so the Court has not ruled on the summary chart yet. But, I -- I mean, part of it I do think is relevant, and I will allow it. But since you all are still concerned about certain parts of it, we'll just hold off on that. The prosecution is not

going to -- the prosecution is not going to proceed forward with it at -- right at this time. So let's let Mr. Guzzetti begin. And then we will see what happens. It is now 1:20. So let's try to go straight through.

MS. M. MILLER: We'll go straight through till 4:00?

THE COURT: As long as the jurors are not too...

Mr. Guzzetti has already been sworn in on June 6th.

MS. M. MILLER: He was.

THE COURT: Is that D-Day?

(Pause.)

THE COURT: What's today?

THE WITNESS: Today is World Helicopter Day, believe it or not.

THE COURT: Is it really?

THE WITNESS: Yes, it is.

THE COURT: Oh, my gosh. I love it.

MS. M. MILLER: You're kidding.

THE WITNESS: Nope.

THE COURT: Is it really, or are you just joking?

THE WITNESS: Nope, Google it. World Helicopter Day.

THE COURT: See that? How ironic. You have to tell -- celebrate helicopters.

MS. M. MILLER: So just so there is no confusion and panic, there is a chart that he prepared about the pre-Hansen ownership accidents that I will get in pretty early on in his testimony, Your Honor, but I won't go into the post-ownership ones.

THE COURT: Okay. So we'll call in the jury, and yeah, it's now 1:17. We'll take -- we'll take a break after one hour and a half. Or maybe even earlier, just let me know. We've been going since -- wow, world helicopter day. I didn't know there was such a thing.

MS. S. MILLER: Make days for everything now.

THE COURT: I'm just trying to think how many helicopters that I rode in my life. One.

MS. M. MILLER: One? I flew one.

THE COURT: On, like...

MS. M. MILLER: Like flew it.

THE COURT: Like you piloted it?

MS. M. MILLER: Yeah.

THE COURT: Wow. I believe that.

MS. M. MILLER: Yup. It wasn't -- it wasn't one like the ones in this case. It was like a $20 million helicopter.

THE COURT: Oh my God. I was a passenger. Actually, my father-in-law was a pilot.

MS. M. MILLER: Helicopter pilot?

THE COURT: Yeah. In the war. Please rise. 01:18PM

(Jury in at 1:18 p.m.) 01:18PM

THE COURT: This is definitely your last witness? 01:18PM

MS. M. MILLER: Yes. 01:18PM

MS. S. MILLER: Definitely? 01:18PM

MS. M. MILLER: Well, you know, I mean, barring some weird strange thing, which with this case, you never know. 01:18PM 01:18PM 01:18PM

THE COURT: Please be seated. Welcome back, ladies and gentlemen of the jury. Thank you for your patience. I actually had to speak with the lawyers on very important issue and -- or issues. And so we worked through all the time since we last saw you this morning. So the prosecution will call their next witness who has already been previously sworn in. 01:18PM 01:18PM 01:18PM 01:18PM 01:18PM 01:18PM 01:18PM

MS. M. MILLER: Yes, Your Honor. 01:18PM

THE COURT: You may proceed. 01:18PM

MS. M. MILLER: At this time, the government will continue with Mr. Guzzetti. And good afternoon, members of the jury. 01:18PM 01:19PM 01:19PM

(End of excerpt.)

* * *

CERTIFICATE OF OFFICIAL REPORTER


CITY OF HAGATNA      )
                     )  ss.
TERRITORY OF GUAM    )


   I, Veronica F. Flores, Official Court Reporter for the District Court of Guam, do hereby certify the foregoing pages, 1 to 1,310, to be a true and correct transcript of the proceedings held in the above-entitled matter to the best of my ability.

   Dated this 9th day of March 2023.


         /s/Veronica F. Flores
         Veronica F. Flores