IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM


UNITED STATES OF AMERICA,    ) Criminal Case No. 18-00010
                          )
               Plaintiff,  )
                          )
         vs.           )
                          )
JOHN D. WALKER, et al.,     )
                          )
_____ Defendants. )


TRIAL TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE FRANCES TYDINGCO-GATEWOOD,
CHIEF JUDGE
MAY 9-10, 2022; 12:57 P.M.
HAGATNA, GUAM


**Continued Testimony of Marvin Reed**

(Jury Trial Excerpt)


Veronica F. Flores, CSR-RPR
Official Court Reporter
veronica_flores@gud.uscourts.gov

APPEARANCES


Appearing on behalf of plaintiff:

**OFFICE OF THE UNITED STATES ATTORNEY**
**BY: MARIE MILLER, SAUSA,**
**SAMANTHA MILLER, SAUSA,**
**STEPHEN LEON GUERRERO, AUSA**
Suite 500, Sirena Plaza
108 Hernan Cortez Avenue
Hagatna, Guam 96910
(671) 472-7332


Appearing on behalf of Defendant Walker:

**MARTIN LAW OFFICE**
**BY: MACK K. MARTIN, ESQ.**
125 Park Avenue, 5th Floor
Oklahoma City, OK 73102
(405) 236-8888


Appearing on behalf of Defendant Hansen:

**MCCONWELL LAW OFFICES**
**BY: EDWARD A. MCCONWELL, SR., ESQ.**
**LAURA MCCONWELL, ESQ.**
5201 Johnson Drive, Suite 300
Mission, KS 66205
(913) 262-0605

**LAW OFFICE OF EDWARD C. HAN**
**BY: EDWARD C. HAN, ESQ.**
238 Archbishop Flores Street
DNA Building, Suite 802
Hagatna, Guam 96910
(671) 477-5055


ALSO PRESENT:

Jon D. Walker, Defendant

Carmen Santos, Clerk

Emily Brown, Law Clerk

Peter Perez, Law Office of Peter Perez

I N D E X

|                          | Direct | Cross | Redirect | Recross |
|--------------------------|--------|-------|----------|---------|
| GOVERNMENT WITNESS:      |        |       |          |         |
| Marvin Reed              |        |       | 202      | 10(MM)  |
|                          |        |       |          | 26(EM)  |
|                          |        |       |          | 269(MM) |

EXHIBITS:

| | Description | Page |
|---|---|---|
| D-117 | Life Vest | 68 |
| 278 | Mandatory Weekly Report N584SD on Atun Sta dated 09/09/2018 | 111 |
| 517 | Mandatory Weekly Report for RPC588 on Atun Planti | 177 |
| 876 | Hansen Weekly Rt., Parts Request | 180 |
| D-118 | Tail Rotor Pitch Fork Link | 198 |

```
 1                  May 9, 2022; 12:57 p.m.; Hagatna, Guam

 2                              * * *

 3

 4         THE COURT:  How is everybody doing?  We'll go

 5  ahead and call the case.

 6         THE CLERK:  Good afternoon, Your Honor.  This is

 7  Criminal Case No. 18-00010, *United States of America versus*

 8  *John D. Walker and Hansen Helicopters;* Continued jury trial.

 9         Counsel, please state your appearances, beginning

10  with the government.

11         MR. LEON GUERRERO:  *Buenas* and *hafa adai*, Your

12  Honor.  Stephen Leon Guerrero on behalf of the United States.

13  Also present are Special Assistant U.S. Attorneys, Marie

14  Miller and Samantha Miller.

15         MS. M. MILLER:  *Hafa adai*, Your Honor.

16         THE COURT:  *Hafa adai*, good afternoon.

17         MR. MARTIN:  Good afternoon, Your Honor.  Mack

18  Martin, appearing on behalf of Jon Walker, who is also

19  present.

20         THE COURT:  Good afternoon and *hafa adai*,

21  Mr. Martin and Mr. Walker.

22         MR. MCCONWELL:  Good afternoon, Your Honor.

23  Edward McConwell, Laura McConwell, and Edward Hans, appearing

24  for Hansen Helicopters.

25         THE COURT:  All right, very well.  You may be
```

*Recross - Reed*

1    seated.  Thank you.

2            This is what I was going to give to the jurors

3    and see if there is any objections or concerns.  I was going

4    to say, as you may have noticed, Phillip -- defendants, excuse

5    me.  As you may have noticed, excuse me, Defendant Phillip

6    Kapp is not present.  I have severed him from the trial;

7    meaning, I have taken him out of this trial because he has

8    fallen seriously ill and cannot stand trial at this time.

9            Defendant Kapp will have his trial separately at

10   a later time.  Defendant Kapp's former lawyers, Mr. Ed

11   McConwell and Ms. Laura McConwell, will now be representing

12   Defendants Hansen Helicopters, alongside Mr. Han.  They are no

13   longer representing David[sic] Kapp.  Please do not hold David

14   Kapp's severance against the prosecution or either of the

15   defendants left remaining in this courtroom.

16           Yes?

17           MS. MCCONWELL:  Your Honor, it's Phillip Kapp.

18           THE COURT:  Phillip Kapp; what did I say?

19           MS. MCCONWELL:  David.

20           THE COURT:  All right.  I meant -- I --

21           MS. MCCONWELL:  It's not on my sheet, but I just

22   want to make sure --

23           THE COURT:  Oh, I put -- oh, it says Phillip.

24   David, it should say David Kapp, okay.

25           MS. MCCONWELL:  It's Phillip Kapp.

```
 1                    THE COURT:  David Kapp.

 2                    MS. MCCONWELL:  No, it's Phillip Kapp.

 3                    THE COURT:  I do have Phillip Kapp here.  I have

 4       Defendant Phillip Kapp.  Did I say David?

 5                    MS. MCCONWELL:  Yes, ma'am.

 6                    THE COURT:  That was my mistake, then.  I have

 7       David Kapp -- I mean, Phillip Kapp.  All right, all right.

 8       I'm still jet lagged, okay?  I just got in from DC.  I'm just

 9       joking, but I probably really am.  All right.

10                    Defendant Phillip Kapp for the last time.  I got

11       it right, all right.  Any objections to this instruction,

12       Mr. and Ms. McConwell?  Or additions?

13                    MS. MCCONWELL:  No, ma'am.

14                    THE COURT:  Prosecution?

15                    MS. M. MILLER:  No objection, Your Honor.

16                    THE COURT:  All right, very well.  Ready to

17       proceed?

18                    MS. M. MILLER:  Yes, Your Honor.

19                    MR. MARTIN:  Yes, Your Honor.

20                    THE COURT:  And who is the next witness?  Who --

21                    MS. M. MILLER:  Mr. Reed.

22                    THE COURT:  Mr. Reed.  Okay.  Do you want to come

23       on up, Mr. Reed.  Why don't we get you up here, and I'll

24       remind you.  You're still under oath.  And then all the jurors

25       are present.  They have been informed, and I will inform them
```

1    as well regarding the mask lifting.  The Court has lifted the

2    mask requirement in the District Court of Guam pursuant to

3    Governor Lou Leon Guerrero's latest executive general order --

4    executive order.  All right.  Thank you, sir.

5                    Are you comfortable?  Is that the chair -- that

6    chair is okay?

7                    THE WITNESS:  It's okay.

8                    THE COURT:  Do you want a pillow?

9                    THE WITNESS:  No, it's fine.

10                   THE COURT:  No, I'm talking for your back.

11                   THE WITNESS:  No, it's fine.

12                   THE COURT:  All right, because sometimes...

13   We'll go ahead and call in the jury.

14                   (Pause for jurors.)

15                   THE COURT:  Is somebody calling the jury?  Can

16   you check.

17                   (Side discussion with Mr. Perez.)

18                   THE COURT:  Could be 6:00 next time, team.

19   Hopefully, we don't have too many motions.

20                   MS. MCCONWELL:  I haven't just arrived, that 6:00

21   is just great.

22                   THE CLERK:  Jurors entering.

23                   (Jury in at 1:02 p.m.)

24                   THE COURT:  Please be seated, everyone.  *Hafa*

25   *adai*, everyone.  How are you doing, ladies and gentlemen of

1   the jury?

2                   THE JURY:  Good.

3                   THE COURT:  Glad we are still intact, still

4   together, even though we were apart from each other for what,

5   six weeks, was it?  So I appreciate you all staying healthy

6   and everything.

7                   I do want to let you know as you -- probably

8   already officially, the Court has followed Governor Lou Leon

9   Guerrero's mandate that, if you want to, you may go ahead and

10  take off your mask here at the District Court.  That's

11  optional.  And if you want to keep it on, keep it on.  No

12  problem.  Some people feel more comfortable, especially if

13  they have already been vaccinated and had their booster shot

14  and so forth.  So that is the first order of business.

15                  Second thing is:  As you may now have noticed,

16  Defendant Phillip Kapp, who was seating here next to

17  Ms. McConwell, is no longer present.  I have severed him from

18  the trial; meaning, that I have taken him out of this trial

19  because he has fallen seriously ill and he cannot stand trial

20  at this time.

21                  Defendant Kapp will have his trial separately at

22  a later time with a different jury, not with you.  Defendant

23  Kapp's former lawyers, Mr. Ed McConwell and Ms. Laura

24  McConwell, who are seated here to my left over here at Counsel

25  table, they will now be representing Hansen Helicopters,

```
 1    alongside Mr. Han.  And, you know Mr. Han.

 2                    Mr. Han, do you want to raise your hand?  Yup.

 3                    And then Mr. McConwell and Ms. McConwell, if you

 4    can raise your hand.  They are no longer representing

 5    Defendant Kapp, as I indicated.  Please do not hold Defendant

 6    Kapp's severance against the prosecution or either of the

 7    defendants left remaining in this courtroom.  So the remaining

 8    defendants are Jon D. Walker.

 9                    If you can raise your hand?

10                    Mr. Walker is represented by Mr. Martin.  And the

11    corporation of Hansen Helicopters are represented by Mr. Han,

12    and Mr. Han's already raised his hand.  So those are the two

13    remaining defendants in this courtroom, and that's who you're

14    going to focus on in this trial -- the evidence, you'll be

15    focusing on those two defendants, in particular.

16                    All right, ladies and gentlemen, we will continue

17    on with the examination of -- where were --

18                    We were with you, Mr. Martin, right?

19                    MR. MARTIN:  Right, Your Honor.  We recessed and

20    I was supposed to come back and things changed.

21                    THE COURT:  Thank you, sir, and welcome back,

22    Mr. Martin.  You may proceed.

23                    MR. MARTIN:  Thank you, Your Honor.

24                    THE COURT:  Okay.  Now, if any of you have any

25    problems hearing any of the lawyers or the witness, please
```

*Recross - Reed*

1    raise your hand, so I want you to be sure you hear them, okay?

2    You may proceed, sir.

3

4                        RECROSS-EXAMINATION

5    BY MR. MARTIN: (CONTINUING)

6        Q.   Mr. Reed?

7        A.   Yes, sir.

8        Q.   Isn't it true the government is withdrawing its

9    immunity offer with you because of your perjury before this

10   jury?

11       A.   I don't understand.

12       Q.   You have an agreement with the government; don't you,

13   Mr. Reed?

14       A.   Yes.

15       Q.   Have you not been informed by the government that

16   they are withdrawing this immunity agreement from you because

17   of the perjury you have committed before this jury?

18       A.   I have not been advised.

19       Q.   I'm sorry.  I can't hear you, sir.

20       A.   I have not been advised.

21       Q.   Do you know whether or not your lawyer's been advised

22   that the government is revoking your immunity agreement

23   because of the perjury you've committed before this jury?

24       A.   I don't know.

25       Q.   So if I've been told that, you're telling me you have

1  not?

2      A.   I have not.

3      Q.   Can you tell me, sir, when is the last time you

4  talked to the government about this immunity agreement you

5  have?

6      A.   The last time we were in court.

7      Q.   So six weeks ago?

8      A.   Yeah.

9      Q.   So as of Friday, when I was advised this was being

10  revoked, you've not been advised that?

11      A.   No, I have not.

12      Q.   Ms. Miller has not advised you of that?

13          MS. M. MILLER:  Objection, Your Honor.  I'm going

14  to move to strike Mr. Martin's statements.

15          First of all, Mr. Martin is not a witness.  He

16  asked the witness a question, the witness said he doesn't

17  know, now Mr. Martin is testifying to hearsay.  So I'm going

18  to move to strike his questions and his comments.

19          MR. MARTIN:  My question, Your Honor, was whether

20  or not Ms. Miller had told him that.  That's not hearsay.

21          MS. M. MILLER:  How would this witness --

22          THE COURT:  Excuse me, but that calls for

23  hearsay.

24          MR. MARTIN:  I didn't ask him the contents of it,

25  I asked him if he's been told that, Your Honor.  If I ask him

1    the contents of it, that's different.

2              THE COURT:  I don't know about that.  It's still

3    calling for hearsay, because if he says one answer, it means

4    he's -- he has received -- the objection will be sustained.

5              MR. PEREZ:  Your Honor?

6              THE COURT:  I'm sorry, the objection will be

7    overruled.

8              MR. PEREZ:  I request a bench conference.

9              THE COURT:  Okay.  Ladies and gentlemen, you know

10   what, I'm going -- we're going to take a recess right now.

11   Because I don't want you to have to -- this was unexpected and

12   so let me try to sort this out with the lawyers.

13             So ladies and gentlemen, Counsels, everyone,

14   please rise for the jury.  We'll take a -- hopefully, only

15   15-minute recess.  Enjoy your coffee or -- I hope we have a

16   snack in there for you or something.

17             (Jury out at 1:08 p.m.)

18             THE COURT:  Well, okay.  Mr. Perez, you wanted to

19   make an objection, you may -- you could grab a -- go up to the

20   podium, sir.

21             MR. PEREZ:  May I confer with Counsel first?

22             THE COURT:  Yeah, go ahead.  Go ahead.

23             MR. MARTIN:  Which one?

24             THE COURT:  Well, not you.  He's walking to her.

25             MR. MARTIN:  I wasn't sure, Your Honor.

*Recross - Reed*

```
 1                    THE COURT:  Yeah, me too.  I was sure, I guess.

 2                    (Ms. M. Miller and Mr. Perez conferred.)

 3                    MR. PEREZ:  I withdraw the request.  I just

 4     needed to verify whether that was true.

 5                    MS. M. MILLER:  And I think before the jury comes

 6     back, Your Honor --

 7                    THE COURT:  Well, let's sort this out because --

 8                    MR. MARTIN:  And that is true.

 9                    THE COURT:  -- that was a blockbusting bomb that

10     just landed in my courtroom.

11                    MS. M. MILLER:  This weekend I met with

12     Mr. Martin to discuss further plea discussions regarding

13     Mr. Walker.  And in those plea discussions, a number of things

14     came up that I'm sure Mr. Martin does not want me to share

15     with the Court or with Mr. Walker sitting here; however, one

16     of the other issues that came up was Mr. Reed still being on

17     the witness stand, Mr. Reed still testifying, and the fact

18     that Mr. Reed answered questions affirmatively for me and then

19     answered questions affirmatively for Mr. Martin, and I made

20     the comment that perhaps the immunity agreement with Mr. Reed

21     wasn't really an immunity agreement that was going to be worth

22     much because Mr. Reed kept flip-flopping on his answers.

23                    However, the government has not withdrawn the

24     immunity agreement that we have with Mr. Reed.  If the

25     government did do that, the first person the government would
```

```
1   have contacted would have been Mr. Perez.  We are waiting to
2   see how Mr. Reed's testimony develops in front of this jury.
3               THE COURT:  Okay.
4               MS. M. MILLER:  Any discussions beyond that were
5   in furtherance of plea negotiations.
6               THE COURT:  Okay, fair enough.
7               MR. MARTIN:  May I respond, Your Honor?  Sorry,
8   Your Honor, I'll turn my mic on, too.
9               THE COURT:  That's okay, I can hear you right
10  there, unless you're going to walk around.
11              MR. MARTIN:  I tend to do that sometimes.
12              THE COURT:  I know that, yes.
13              MR. MARTIN:  Ms. Miller and I met Friday, Your
14  Honor, at the Hyatt to discuss things about Mr. Walker's case.
15              THE COURT:  Right.
16              MR. MARTIN:  Prior to the substantive discussions
17  about plea negotiations, we discussed two things:  One was
18  involving Mr. and Ms. McConwell and their participation
19  representing Hansen; and secondly, Ms. Miller advised me that
20  the government was revoking Marvin Reed's immunity agreement
21  because of the perjury he had committed during his testimony.
22              I asked what she meant by that statement, and she
23  advised that he answered one way during direct and the
24  opposite during cross-examination, and that because of that,
25  he committed perjury and the agreement would be revoked for
```

those perjured answers.

She further indicated that then she did not think he was the sharpest person in the world. At the conclusion of our discussion, that lasted approximately an hour, Your Honor, Ms. -- I again asked Ms. Miller about the immunity agreement, and she reaffirmed that the immunity agreement with the government was begone because of the perjury in this pending trial.

Those statements were made to me. I immediately went to my room with my notes and memorialized everything that was said, because in that was certain things I had to talk to Mr. Walker about. But I have a very, very candid memory of everything that was said to me by her, and that's the best recollection I have. I wrote it down virtually verbatim.

THE COURT: So hold on a second, Ms. Marie Miller, okay? Both of you. Let's assume you believe what you believe is true -- to be true and she believes what she believes to be true, if this was in the spirit of plea negotiations --

MR. MARTIN: It wasn't.

THE COURT: -- well, at least according to her it was.

MR. MARTIN: Well, let me go back to my notes.

MS. M. MILLER: He just affirmed that they were, and it was in the context of what his client would have to do

1    in terms of substantial assistance.

2              And like I said, I don't think this is

3    appropriate for us to have this discussion in open court.  We

4    can.

5              THE COURT:  No, no.

6              MS. M. MILLER:  So if Mr. Martin wants to waive,

7    because that's what he's doing right now, the government is

8    more than happy to go into every piece of the discussions that

9    we had about Mr. Walker.

10             THE COURT:  Let me just say this:  I don't need

11   to hear all this, I don't want to hear all this.  All I care

12   about right now is moving the trial.  So putting all that

13   aside, my point is, Mr. Martin, you have your recollection --

14   and I'm not going to sit here and judge it, because I'm not

15   going to have, like, a 20-hour marathon hearing on this,

16   number one -- and she has her recollection, okay?  So it's, he

17   said, she said, he said.

18             MR. MARTIN:  Well, let me make --

19             THE COURT:  Wait, wait.  So my point is -- let me

20   just finish.  So my point is:  When it's all said and done,

21   the United States Attorney's Office has not submitted a formal

22   withdrawal or actual withdrawal of the immunity agreement.

23   I'm pretty sure if Mr. Peter Perez knew it, if he knew it,

24   which obviously he says -- I mean, obviously he went to

25   confirm that there has been no formal withdrawal, then there

is no formal withdrawal.

I'm pretty sure Mr. Perez would not have let his client come up here if he knew that there was a formal withdrawal of the immunity agreement that was communicated in any way to anybody.

MR. MARTIN:  And my --

THE COURT:  So again, I'm not sitting here judging either one of you.  I'm just saying, let's move on. Go ahead.  Last word, five seconds.  Go.

MR. MARTIN:  Before we ever got into the discussions that we're not going into, Ms. Miller wanted to tell me two things, and those were the two things, then we went into those other discussions, and it's very clearly dictated.

I intended to go into this in much greater detail on cross-examination, Your Honor.

THE COURT:  About the no -- the non-immunity agreement -- I mean, the withdrawal of the immunity agreement?

MR. MARTIN:  When the government tells that to me, Your Honor, I'm entitled to go into it because it affects his credibility.

MS. M. MILLER:  Your Honor, the witness has already said he knows -- he wasn't present when I was having plea discussions with Mr. Martin.  And this was all in the context of Mr. Walker cooperating with the government against

his co-defendant.

MR. MARTIN:  No, it was not, Your Honor.

MS. M. MILLER:  Yes, it was.

THE COURT:  Hold on.

MS. M. MILLER:  The best evidence of this is the immunity agreement hasn't been withdrawn.

THE COURT:  Okay, okay, okay.  Mr. -- what's your offer of proof; what do you want to ask him?  I don't think I'm going to allow you to ask him any questions or discussions between yourself and Ms. Miller, that's not appropriate. You've already asked him and he's already said, "my immunity -- I don't know anything about my immunity agreement being withdrawn," so I think you've already raised the specter of something.  The jurors have already heard that, "I didn't know that's going to happen to me," so I don't think you need to go down those steps.

You know your biggest -- as you know, Mr. Martin, you're more experienced than a lot of people in this courtroom.  Your biggest -- you know what your biggest asset would be with regard to this argument, and it's in -- as in closing arguments?  If the witness has been inconsistent, I'm sure you're going to take it away and run with it during closing.  And yeah, so...

So my point is:  What other offer of proof do you have?  I just don't think it's proper.

1          MR. MARTIN:  I have questions of him --

2          THE COURT:  I.e.

3          MR. MARTIN:  -- about the immunity agreement.

4          THE COURT:  Oh, you can ask him about the

5    immunity agreement.

6          MR. MARTIN:  Very good.

7          THE COURT:  Go away -- fly away with the immunity

8    agreement, I don't care.  But I'm just saying on this alleged

9    withdrawal issue, we're not going go into that.

10          Call in the jury.

11          Does everybody understand?

12          MR. PEREZ:  Your Honor?

13          THE COURT:  Mr. Martin, do you understand my --

14          MR. MARTIN:  I do.

15          THE COURT:  And Ms. Martin -- Miller?  Martin?

16    Ms. Miller?

17          MS. M. MILLER:  M.

18          (Laughed.)

19          THE COURT:  All right.  Yes, Mr. Perez?

20          (Mr. Perez and Ms. Miller conferred.)

21          MR. PEREZ:  Your Honor, I just want to put

22    something on the record.

23          THE COURT:  Yes, go ahead, Mr. Perez.  Go ahead.

24          MR. PEREZ:  Sorry, I didn't anticipate that this

25    was going to be brought up.

```
 1                    THE COURT:  Me neither.

 2                    MR. PEREZ:  So just, um... I requested further

 3    assurances regarding my client's immunity agreement, and I

 4    asked the government if I could put on the record that as of

 5    today, based upon his testimony, they have no intention of

 6    withdrawing the immunity agreement?

 7                    THE COURT:  Okay, very well.  And you would agree

 8    with that, Ms. Marie Miller?

 9                    MS. M. MILLER:  I do agree with that, yes.  And

10    as I represented to the Court, if we withdraw the immunity

11    agreement, Mr. Perez is going to be the first one to know.

12    The statement about the immunity agreement was in furtherance

13    of plea discussions with Mr. Martin.

14                    MR. MARTIN:  That's a disagreement.  We can quit

15    repeating that, Your Honor, that's in -- it's disputed.

16                    MS. M. MILLER:  So none of those plea discussions

17    should be brought up in court.

18                    MR. MARTIN:  There were no plea discussions.

19                    MS. M. MILLER:  Mr. Martin doesn't want this jury

20    or this Court or anybody here to hear statements that he made

21    about Mr. Walker.

22                    THE COURT:  Okay, very well.

23                    MS. M. MILLER:  So that's the whole point of plea

24    discussions.

25                    THE COURT:  Like I said, I don't care.  I don't
```

*Recross - Reed*

```
 1    want to hear about it.  I shouldn't hear about it.  It doesn't
 2    matter.  Judges should not be involved in plea negotiations,
 3    especially if she's the trial judge.
 4              MR. MARTIN:  And these are not during plea
 5    negotiations, Your Honor.  That's a misrepresentation.
 6              THE COURT:  Even if it weren't in plea
 7    negotiations, the fact is it's all hearsay and the Court's not
 8    going to allow it.  It is really being offered for the truth
 9    of the matter asserted, so there is no way of getting around
10    that.  Okay, let's call in the jury and we'll move right
11    along.  Wow, what a way to start trial.  I thought we were
12    having some --
13              MS. M. MILLER:  I told Veronica there would still
14    be fireworks even without certain people here.  (Laughed.)
15    Glad to see we haven't disappointed.
16              THE COURT:  Well, you disappointed me, but I'm
17    not surprised.
18              Mr. Martin, how long do you have with this
19    witness, approximately?
20              MR. MARTIN:  Your Honor, I promise you I will be
21    nothing near what Mr. Lujan would do.  In all honesty, maybe
22    ten minutes, Your Honor.
23              THE COURT:  Oh, that's it, ten minutes?
24              MR. MARTIN:  Well, I went a little bit the last
25    day.
```

            1            THE COURT:  Okay, so ten minutes is good.  We'll

            2    call in the jury.  You have your next witness ready to go?

            3            MR. MARTIN:  Well, Mr. --

            4            THE COURT:  That's right.

            5            (Jury in at 1:20 p.m.)

            6            THE COURT:  You're the first attorney to cross,

            7    right?

            8            MS. M. MILLER:  Actually, this is re-cross.

            9            THE COURT:  That's right.  Let me get my bearings

           10    straight.  This is direct, cross, redirect, recross, okay.

           11            MR. MARTIN:  We went a little bit out of order,

           12    Your Honor.  If you recall, we didn't follow the standard way.

           13            THE COURT:  Who's next then?  We'll figure that

           14    out after you.

           15            All right, please be seated.

           16            Okay, ladies and gentlemen of the jury, the Court

           17    apologizes, I had to take care of this legal issue, so we will

           18    now proceed on.

           19            Mr. Martin, you may continue on with the

           20    examination of this witness.

           21    BY MR. MARTIN: (CONTINUING)

           22        Q.   Mr. Reed, you have seen a copy of the immunity

           23    agreement that you have with the government; you actually

           24    signed it; isn't that true, sir?

           25        A.   That is correct.

1     Q.   And you understand that the government has the

2    absolute discretion to decide whether or not they believe you

3    are providing false or misleading statements or committing

4    perjury to this jury; don't you, sir?

5    A.   Yes.

6    Q.   And that they and they alone make that determination;

7    correct?

8    A.   Yes.

9    Q.   Now, let me ask you something, there were a few

10   things.  It's been a while, and if you have difficulty

11   remembering the questions, I apologize, but it's been a while

12   since you testified.

13         You're not a mind-reader; are you, sir?

14   A.   No, sir.

15   Q.   And you can't tell me what somebody intended to do;

16   can you, sir?

17   A.   I cannot.

18   Q.   You can't look this jury in the eye and tell them

19   that Jon Walker intended to do anything because you can't read

20   his mind; isn't that true, sir?

21   A.   That is correct.

22   Q.   You can't look this jury in the eye and tell them

23   whether or not Mr. Walker willfully did something because you

24   can't read his mind; can you, sir?

25   A.   That is correct, cannot.

```
 1       Q.   And any statements you said inconsistent -- for
 2   example, if the government asked you if Mr. Walker
 3   intentionally did something, that's -- you can't answer that
 4   question truthfully; can you, sir?
 5              MS. M. MILLER:  Objection, Your Honor.  That is a
 6   misstatement, and it would also refute what this witness has
 7   said in terms of statements made directly to him by
 8   Mr. Walker.
 9              THE COURT:  All right.  Hold on a second.
10              (Whereupon the reporter read back requested
11   portion.)
12              THE COURT:  All right, objection overruled.  Go
13   ahead.
14   BY MR. MARTIN: (CONTINUING)
15       Q.   You can't answer that to this jury; isn't that true,
16   sir?
17       A.   I cannot.
18       Q.   Likewise, I want to turn your recollection to the
19   contract for the tuna boat, sir; you recall that?
20       A.   Yes.
21       Q.   You signed all those contracts, right?
22       A.   Most of them, yes.
23       Q.   The majority of them?  Let me try to be as accurate
24   as I can.
25       A.   Yes.
```

1     Q.   And every one of those contracts was with a separate

2    corporation; wasn't it, sir?

3     A.   Yes.

4     Q.   And by that -- let me clarify that a little bit.  By

5    that, those contracts were not with Hansen Helicopters and the

6    tuna boat companies; were they, sir?

7     A.   No.

8     Q.   They were, like, with Eddie Air or some other

9    corporation, right?

10     A.   That is correct.

11     Q.   And I believe, as you've testified earlier, the

12    Federal Aviation Administration, also known as the FAA, they

13    were not a party to nor had anything to do with those

14    contracts; did they, sir?

15     A.   They did not.

16               MR. MARTIN:  May I have just a minute, Your

17    Honor?

18               THE COURT:  Yes.

19               (Pause.)

20               MR. MARTIN:  Your Honor, I don't have any further

21    questions.

22               THE COURT:  All right.  Thank you, Mr. Martin.

23               Who is next, Carmen on the -- do you know?  Is it

24    Ms. McConwell or Mr. McConwell?

25               MR. MCCONWELL:  Yes, Your Honor.

*Recross - Reed*

```
 1                    MS. MCCONWELL:  There are only two of us.

 2                    THE COURT:  On behalf of Hansen Helicopters,

 3       Mr. McConwell, you're going to go ahead and proceed?

 4                    MR. MCCONWELL:  Yes, Your Honor.  Do I need to

 5       have this extra...

 6                    THE COURT:  No, no, I think you're fine.

 7                    (Referring to lavaliere.)

 8                    THE COURT:  Are you more comfortable sitting down

 9       from your chair?

10                    MR. MCCONWELL:  I can go up there.

11                    THE COURT:  Okay, very well.

12                    MR. MCCONWELL:  Let me try that for a while and

13       see how it goes.

14                    THE COURT:  If your legs hurt, we can accommodate

15       you.

16                    MR. MCCONWELL:  Just have to be slow and

17       deliberate.

18                    THE COURT:  Okay.

19

20                         RECROSS-EXAMINATION

21       BY MR. MCCONWELL:

22          Q.   Mr. Reed, when did you first become involved with

23       tuna spotting?

24          A.   With what?  Tuna spotting?

25          Q.   Yes, sir.
```

1    A.    I don't understand exact --

2    Q.    Before you were with Hansen Helicopters, you were

3 with another company that provided helicopters to tuna boats

4 for tuna spotting; correct?

5    A.    Yes, that was Big Eye Helicopters.

6    Q.    And when was that?

7    A.    That was in 1983, I think.

8    Q.    And then you and Mr. Hansen left Big Eye and went to

9 -- and formed Hansen Helicopters; is that correct?

10    A.    That is correct.

11    Q.    And what was your initial position -- or first of

12 all, what was your position with Big Eye?

13    A.    Parts department, parts manager.

14    Q.    Did Big Eye have contracts with individual tuna

15 boats?

16    A.    I never got into any of that, so I can't answer you.

17    Q.    When did you first become aware of existence of

18 contracts between the tuna boat and the helicopter owner?

19    A.    When it was -- when he formed that company, Hansen.

20    Q.    1987?

21    A.    Yes.

22    Q.    And those were contracts similar to the ones that are

23 even used today; correct?

24    A.    Yes.

25    Q.    And that's kind of an industry standard to have a

1   contract between the owner of the helicopter and the tuna boat

2   company that actually -- or the actual tuna boat itself, even

3   if it's part of a group; correct?

4      A.   Yes.

5           MS. M. MILLER:  Your Honor, I'm going to object

6   to the questions, they're outside the scope of the

7   government's direct and the cross and everything else.  Now

8   we're talking about a period of time outside the indictment.

9           THE COURT:  Mr. McConwell, the relevance of that

10  period of time?

11         MR. MCCONWELL:  I think I'm entitled to build his

12  background because it started very soon after they're talking

13  about 1992, it was the beginning of the indictment period or

14  the conspiracy that they're alleging.  And this is for

15  preliminary background.  I'm not going to spend much time with

16  it, but I'd like to develop it.

17         MS. M. MILLER:  Then why spend any time on a

18  background of him working for another company?  That's not

19  relevant.

20         THE COURT:  Relevance of that, Mr. McConwell?

21         MR. MCCONWELL:  Well, for example, the relevance

22  is they use similar-type contract that are being used -- or

23  were being used by Hansen, and that's how he started getting

24  involved in contracts between tuna boats and helicopter

25  operators.

```
 1              THE COURT:  Okay.  Overruled.

 2              MR. MCCONWELL:  Thank you.

 3              THE COURT:  Go ahead.

 4   BY MR. MCCONWELL: (CONTINUING)

 5       Q.   So anyway, you own 5%, you say, of the new company,

 6   Hansen Helicopters?

 7       A.   Say again?

 8       Q.   You owned 5% --

 9       A.   Oh, yes.

10       Q.   -- of the new company, Hansen Helicopters?

11       A.   Yes, that's correct.

12       Q.   And you're aware that Mr. Kapp was actually born in

13   1982; correct?

14       A.   Yes.

15       Q.   Now, what was your job with the new company, Hansen

16   Helicopters?

17       A.   Parts; I was still in parts.

18       Q.   And how long did you stay in parts?

19       A.   A long time.

20       Q.   Did your duties expand from time to time, then?

21       A.   Yes.

22       Q.   Okay.  Kind of give us a chronology, if you would --

23   not waste time -- but go through, generally, a chronology of

24   job -- of titles up through 1998; how would that be?

25              Was parts all you did during that period of time?
```

*Recross - Reed*

```
 1              MS. M. MILLER:  Your Honor, I'm going to object
 2     again.  What is the relevance of what he did for the company
 3     prior to 1998?
 4              MR. MCCONWELL:  If we're going to be doing
 5     objections for every question, I would like to do it with our
 6     headset operation rather than speaking objections.
 7              THE COURT:  All right.  But -- okay, so you got
 8     the background on the contracts, now you want his background
 9     on his jobs?
10              MR. MCCONWELL:  Yes.
11              THE COURT:  Prior to 19 --
12              MR. MCCONWELL:  Of course.
13              THE COURT:  So she's just asking the relevance of
14     that.  Relevance?
15              MR. MCCONWELL:  Well, she's alleged he's a
16     conspirator of a company starting in 1992, some five years
17     after this company was formed.  And if he's still in parts, I
18     think that's relevant to whether or not it could be a
19     conspirator in overall operations.
20              THE COURT:  What years was that, 19- -- what?
21              MR. MCCONWELL:  1987 to '92, is five years.
22              THE COURT:  Okay.  All right, overruled.  Go
23     ahead.
24     BY MR. MCCONWELL: (CONTINUING)
25         Q.   What was your job by 1992?
```

1    A.    I was still the vice president and I still did parts.

2    Q.    What other actual day-to-day duties did you have

3    other than parts?

4    A.    Um... just assisting him running the company.

5    Q.    Well, did you make business decisions with Mr. Vern

6    Hansen about investments the company might make in helicopters

7    --

8    A.    No, I did not.

9    Q.    You weren't involved in the substantive business

10   decisions of the operation of the company, Hansen Helicopters;

11   were you, sir?

12   A.    Say again?

13   Q.    You were not involved in the substantive business

14   decisions of the operation of Hansen Helicopters when Mr. Vern

15   Hansen was running it; were you, sir?

16   A.    No, I was not.

17   Q.    And that -- that would be all the way up to 1998;

18   correct?

19   A.    Somewhere in there, yeah.

20   Q.    And you were continually primarily involved in parts;

21   is that correct still?

22   A.    Yes.

23   Q.    When did you first meet Mr. Turner Kapp, by the way?

24   A.    I don't remember, I'm sorry.

25   Q.    Not until end of 2001 timeframe, at least?

*Recross - Reed*

1    A.   To be honest, I just don't remember the date.

2    Q.   When did your job expand beyond parts?

3    A.   If they needed me to do other things, I would do it.

4  I just don't know the timeframes.

5    Q.   But again, you weren't involved in the substantive

6  business decisions made --

7    A.   No, I was not.

8    Q.   -- by Mr. Hansen or by Jon Walker; correct?

9    A.   No, I was not.

10   Q.   And when Jon Walker bought the company in 1998, he

11 reorganized it; didn't he, sir?

12   A.   That is correct.

13   Q.   As a matter of fact, in 1999, he formed eight United

14 States corporations, in addition to Hansen Helicopters;

15 correct?

16   A.   That is correct.

17   Q.   You were just aware of that, you weren't involved in

18 how it happened; you know, why it happened, when it happened

19 exactly?

20   A.   That is correct.

21   Q.   You did know that David Ledger, an attorney, was

22 involved in that matter?

23   A.   That is correct.

24   Q.   And then were you also aware that the next thing that

25 happened with regard to Mr. Walker was he decided to

1   self-insure the helicopters; correct?

2       A.   That is correct.

3       Q.   You weren't involved in that substantive decision at

4   all; were you, sir?

5       A.   No, I was not.

6       Q.   Were you aware that during the period of 1990s, the

7   company, Hansen Helicopters, was a FAA-certified Part 145

8   repair station?

9       A.   That is correct.

10      Q.   And that Jon Walker was the principal operating

11  person from 1993 to 1998 of that repair station, whatever the

12  exact duration was; correct?

13      A.   That's correct.

14      Q.   And that he fully cooperated with the FAA all aspects

15  of the operation of the maintenance facility and the operation

16  of the helicopters during that time period; correct?

17      A.   That is correct.

18      Q.   And then he buys the company -- and how many

19  helicopters did he have, the initial part, by the way?

20      A.   I'm not sure.

21      Q.   You don't know the terms and conditions of his

22  acquisition at all; do you, sir?

23      A.   No.

24      Q.   And then he decides that he wants to form an

25  insurance company, a captive insurance company; correct?

1    A.    Yes.

2    Q.    And that was for the purpose of providing insurance

3    and trying to save, maybe, something on premiums, but that is

4    a standard business practice for companies to have captive

5    insurance company; isn't it, sir?

6    A.    Yes.

7    Q.    And he did that, and it's called Caledonian; correct?

8    A.    Yes.

9    Q.    And that was formed in Vanuatu; correct?

10    A.    Yes.

11    Q.    In 2000?

12    A.    (Nodded head.)

13    Q.    And it was formed there because Vanuatu is one of the

14    companies -- countries in the -- in the world that would allow

15    captive insurance companies to be formed?

16              MS. M. MILLER:  Objection, Your Honor.  Lack of

17    foundation.

18              MR. MCCONWELL:  I intend to have evidence about

19    that, Your Honor.

20              THE COURT:  All right, but why don't you lay the

21    foundation for his knowledge regarding this.

22    BY MR. MCCONWELL: (CONTINUING)

23    Q.    You have no knowledge about the extent of the

24    authority of Vanuatu to --

25    A.    No, I do not.

```
 1        Q.    -- form insurance companies; correct?

 2        A.    Correct, I do not.

 3        Q.    But you do know that this company was formed in

 4   Vanuatu for some reason?

 5        A.    Yes.

 6        Q.    Again, you had no part in the decision-making process

 7   or anything to do with the formation of that Caledonian

 8   insurance company at all; correct?

 9        A.    That is correct.

10        Q.    Or any of the business plans of Jon Walker, an

11   individual person, that required the assets of Hansen

12   Helicopters?

13        A.    That is correct.

14        Q.    And then certain Vanuatu corporations were formed;

15   correct?

16        A.    Yes.

17        Q.    And they were -- there, first of all, was Bean Bag in

18   1999; you knew that, didn't you?

19        A.    Yes.

20        Q.    Again, you weren't involved in the substantive

21   business decisions about forming that corporation?

22        A.    I was not.

23        Q.    And the purpose of Bean Bag was to own 30,

24   ultimately, Vanuatu corporations to acquire ownership interest

25   and register somewhere those aircraft?
```

*Recross - Reed*

```
1                MS. M. MILLER:  Objection, Your Honor.  The
2     witness just said he had no knowledge of the rationale behind
3     the formation of any of these companies, so to follow up a
4     question with "isn't it correct that it was formed to..."
5     Mr. McConwell is testifying.
6                THE COURT:  Objection to --
7                MR. MCCONWELL:  I listened to that for a long
8     time not long ago, Your Honor.
9                THE COURT:  All right.  Well, the objection will
10    be sustained, and if you want to rephrase the question, you
11    may do so.
12                MR. MCCONWELL:  I will, Your Honor.  Thank you.
13                THE COURT:  So sustained.
14    BY MR. MCCONWELL: (CONTINUING)
15        Q.   So you know Bean Bag was formed; you don't know
16    exactly why?
17        A.   Yes.
18                MR. MCCONWELL:  Let's look at Exhibit 286, I
19    believe it was, Laura.  The chart, the chart of the companies.
20                Sorry, Your Honor, I caught her off guard.
21                THE COURT:  No, that's okay.
22                MR. MCCONWELL:  I'm sorry, it's 829.  While she's
23    looking at that, let me go on for purposes of time.
24                THE COURT:  Sounds like a good idea.
25    BY MR. MCCONWELL: (CONTINUING)
```

*Recross - Reed*

```
 1        Q.   Now, during this first ten-year period -- or the
 2   period of 1998, for the first 15 -- or first 12 years, for
 3   example, brings us up to the timeframe of 2020 -- or 2010, I'm
 4   sorry, were you involved at all in the business decisions
 5   between yourself and Jon Walker concerning anything to do with
 6   the business decisions of the company that he formed?
 7        A.   No, I was not.
 8        Q.   And Mr. Kapp wasn't involved in any of those
 9   discussions at all; correct?
10        A.   Correct.
11        Q.   He started, actually, in more of a management
12   maintenance position after 2010 and '11; correct?
13        A.   Yes.
14        Q.   And Mr. Walker, by the way, he retired at that point
15   and turned over the entire management of the companies to
16   Rufus Crowe; correct?
17        A.   Yes.
18        Q.   And that was about 2011; correct?
19        A.   Yeah.  Maybe.  I'm not 100% sure.
20             MS. M. MILLER:  Objection, Your Honor.  If the
21   witness is not sure, the government moves to strike his
22   response.
23   BY MR. MCCONWELL: (CONTINUING)
24        Q.   What is your best guess --
25             MR. MCCONWELL:  I'll withdraw it, Your Honor.
```

*Recross - Reed*

```
 1              MS. M. MILLER:  Object to "best guess."

 2              THE COURT:  I'm sorry.  Sorry.  Hold on, hold on.

 3    He's going to withdraw the question, and the Court will strike

 4    the question and the answer.  Okay?  Next question.

 5    BY MR. MCCONWELL: (CONTINUING)

 6       Q.   What is your best estimate of the time that Rufus

 7    Crowe took over as manager of the whole operation of Hansen

 8    Helicopters and any of its subsidiaries?

 9       A.   I don't remember.

10       Q.   Do you remember the circumstances?

11       A.   I remember it taking place, but I don't remember what

12    years it was or...

13       Q.   How did it coincide with Mr. Walker's retirement?

14              MS. M. MILLER:  Objection, Your Honor.  There has

15    been no evidence that Mr. Walker ever retired.  This is

16    Mr. McConwell testifying, not this witness.

17              THE COURT:  Okay, so you're -- the objection is

18    assuming facts not in evidence?

19              MS. M. MILLER:  Absolutely.

20              THE COURT:  All right.  So Mr. McConwell,

21    rephrase.  All right, the question is stricken.  Next

22    question.

23    BY MR. MCCONWELL: (CONTINUING)

24       Q.   Did Mr. Walker retire from the business operations?

25       A.   He was still the owner.  I mean, I don't know
```

*Recross - Reed*

1    anything other than...

2         Q.   You don't know whether he was an active manager of

3    day-to-day operations or not at any point after he moved back

4    -- did he move back to Missouri?

5         A.   Yes.  But he was not involved in the day-to-day

6    operations.

7         Q.   Okay.  He turned that over to Mr. Crowe?

8         A.   Yes, that is correct.

9         Q.   So if we could figure out the day that he moved back

10   to Missouri, we could figure out when Mr. Crowe took over;

11   correct?

12        A.   Yes.

13        Q.   And Mr. Crowe was the manager of all aspects of the

14   operations after he ultimately replaced Mr. Walker; correct?

15        A.   That is correct.

16        Q.   If that turned out to be after 2010, he would have

17   had no involvement in any business plans with regard to the

18   company, as you had no involvement in the decision-making

19   process of that company?

20             MS. M. MILLER:  Objection, Your Honor.  Lack of

21   foundation.  How would Mr. Reed know what Mr. Walker was

22   involved in?

23             THE COURT:  All right, the objection will be

24   sustained.

25   BY MR. MCCONWELL: (CONTINUING)

*Recross - Reed*

1    Q.   Would you know what activities Mr. Walker was
2  involved in during the period of 2000 and 2010?
3    A.   I do not.
4    Q.   Do you know what maintenance certificates he had?
5    A.   I do not.
6    Q.   I thought you had testified at one point he was an
7  A&P mechanic and was inspection authorization for
8  Ms. Miller; do you recall that?
9    A.   Are you asking me what licenses Mr. Walker has?
10    Q.   Yes, sir.
11    A.   As far as I know, he has, yeah, mechanic's license,
12  pilot's license, and the authorization license.
13    Q.   Let's back ourselves back up to the 1990s.  There has
14  been some allegation about the impropriety of purchasing
15  wrecked aircraft by Mr. Walker.
16         Do you recall that?
17    A.   Yes.
18    Q.   And you weren't involved in any of the
19  decision-making process about whether or not to buy any
20  particular aircraft at all; correct?
21    A.   That is correct.
22    Q.   At some point, you took over the process of -- for
23  Hansen Helicopters of handling all the signing of the actual
24  contracts between the Vanuatu companies and the boats?
25    A.   Yes.

*Recross - Reed*

1    Q.    You did not negotiate the contracts?

2    A.    I did not negotiate it.

3    Q.    You had no part of the negotiations at all; correct?

4    A.    Correct.

5    Q.    You were just handed a name and said "use Form A",

6  right?

7    A.    Yes.

8    Q.    Now, what was the essential purpose of those

9  accounts, sir?

10    A.    Say again?

11    Q.    Do you know what "essential purpose" means?

12    A.    Yes.

13    Q.    Okay.  You had a contract between Vanuatu companies

14  and the boats?

15    A.    And the boats, yes.

16    Q.    And what was the purpose of that contract in each

17  instance?

18    A.    That we would provide a service to them.

19    Q.    And what was that service?

20    A.    Fish-spotting service.

21    Q.    And that was by -- the contract was by the Vanuatu

22  corporations and the boat; correct?

23    A.    Yes.

24    Q.    And do you know how the ownership interest in the

25  Vanuatu corporations came to be?

1      A.   No, I don't.

2      Q.   Have you ever seen the bills of sale between Hansen

3  Helicopters or Mr. Walker and any of the Vanuatu corporations?

4      A.   No.

5      Q.   Were you at all involved in the decision-making

6  process as to whether or not these corporations should

7  register the aircraft in the United States?

8      A.   No, I was not involved.

9      Q.   And you were not involved in the discussions about

10  how that came about, whether it was by accident that it was in

11  the United States or some --

12      A.   Yeah, I was not.

13      Q.   And there was no other person of the defendants that

14  was even working at Hansen up until probably about 2010;

15  correct?

16      A.   Yes.

17      Q.   So we're now from 1992 up to 2010, there are no other

18  people there that are named in this litigation, other than

19  yourself and Mr. Walker, that was involved in the

20  decision-making process concerning any of these topics?

21      A.   Yes.

22      Q.   And they were all made by Jon Walker, as an

23  individual?

24      A.   (Nodded head.)

25      Q.   Not in conjunction with the advice or consent of

*Recross - Reed*

1   anybody else to form the Vanuatu corporations?

2                    MS. M. MILLER:  Your Honor, I'm going to object.

3   Mr. McConwell is testifying.  This witness has said repeatedly

4   he has no knowledge of any of the business-making decisions.

5   And yet, Mr. McConwell is saying, "well, isn't it true that

6   this happened and this happened and this happened and this

7   happened."  Mr. McConwell is testifying.

8                    THE COURT:  All right, objection will be

9   sustained.

10                   MR. MCCONWELL:  Aren't I entitled to lead since

11  he is an adverse witness, Your Honor?  I think that's what we

12  were listening to five weeks ago.

13                   THE COURT:  You can lead, but you can't testify.

14  I would agree that you can't testify.  Reframe the question.

15  BY MR. MCCONWELL:  (CONTINUING)

16     Q.   Was there anyone else involved in the decision-making

17  process about the formation of the Vanuatu corporations, the

18  business plan of registering the aircraft, the Vanuatu

19  corporations registering aircraft in the United States?

20                   MS. M. MILLER:  Objection.  Compound question,

21  assumes facts not in evidence, lack of personal knowledge.

22  BY MR. MCCONWELL:  (CONTINUING)

23     Q.   Are you aware --

24                   THE COURT:  You're rephrasing the question?

25                   MR. MCCONWELL:  I'll rephrase.

          THE COURT:  Okay, rephrase.

BY MR. MCCONWELL:  (CONTINUING)

     Q.    Were you aware that the Vanuatu corporation-owned
aircraft were registered in the United States by the Vanuatu
corporations?

     A.    I am not aware of that.

     Q.    Never been aware of that?

     A.    No.

     Q.    Now, one of your jobs was to record -- or record the
flight hours of each aircraft; is that a fair statement?

     A.    That's correct.

     Q.    And when did you start that process, that
responsibility?

     A.    I'm not exactly sure, but it was probably three or
four years ago.

     Q.    It could have been as early as 2013?

     A.    It might have been; I don't know exactly.

     Q.    Now, the individual contracts with boats, what was
the per hour obligation of the boat to the Vanuatu
corporation?  How many hours per year?

     A.    A total of 700.

     Q.    Okay.  So each corporation agreed to supply
helicopters and they agreed to pay for 700 hours; correct?

     A.    Yes, that's correct.

     Q.    Each year?  And how many different -- let's start in

2000.

How many helicopters were subject to this type of
contract?

A.   All of the contracts, all of 'em.

Q.   Are we talking about 10, 20, 30, 50?

A.   I don't know the number that they had at that time.

Q.   Pardon me?

A.   I don't know the number of how many there was.

Q.   Is there any period of time you could provide that
number of total helicopters subject to a lease requiring
700 hours of flight per year?

MS. M. MILLER:  Objection, Your Honor.  How many
time does the witness have to say "I don't know"?

THE COURT:  The objection will be sustained.

MS. M. MILLER:  Thank you.

BY MR. MCCONWELL: (CONTINUING)

Q.   Is there any point in time last month?

A.   Say again?

THE COURT:  I'm sorry, wait just a minute.  Wait
wait, wait.  Hold on.

MR. MCCONWELL:  I'm going to withdraw.

THE COURT:  Withdraw, okay.  Next question.

BY MR. MCCONWELL: (CONTINUING)

Q.   January 1st of 2021, how many helicopters were
subject to contracts that were on boats?

1    A.    Probably around 40.

2    Q.    Okay.  How about the year before, 2020?

3    A.    Probably about the same.  I'm not...  I didn't really

4    keep a count of all of 'em.

5    Q.    Approximately, 40; is that a fair average?

6    A.    Approximately, yes.

7    Q.    Would that be a fair average for the entire decade of

8    2000 to -- 2010 to 2020?

9    A.    Yes.

10   Q.    And how about 2020 to the last time you were working?

11   A.    Say again?

12   Q.    How about from 2020 through 2021, 40?

13   A.    There is still -- yeah.

14   Q.    And how about even prior to that, did you go -- how

15   many years back before that; could you say it's,

16   approximately, 40 going on at all times?

17   A.    Yeah, between 35 and 40.

18   Q.    Okay.  That would be good for, at least, that decade

19   before?

20   A.    Yes.

21   Q.    And that would be 2010 to 2020?

22   A.    Yes.

23   Q.    And how about before that, five years before that;

24   about the same?

25   A.    About the same.

1    Q.   So we're now down to 2015.  If you go backwards from

2  there to 2000 itself, about 40?

3    A.   About 35 to 40.  It was always...

4    Q.   And each boat made how much per month?

5    A.   Um...  The monthly lease agreement?

6    Q.   Yes, sir.

7    A.   I think, 35,000.

8    Q.   And that was elevated to more than that after 2010,

9  at least?

10   A.   Yes.

11   Q.   Up to how much?

12   A.   Up to 40.

13   Q.   So 35 to 40,000 per month, and that was the

14  obligation of Hansen Helicopters or the Vanuatu corporation,

15  that actually was the lessor, to provide aircraft for that

16  many hours; correct?

17   A.   Yes.

18   Q.   And Hansen Helicopters involvement in this was as a

19  -- providing administrative services to the Vanuatu

20  corporations; is that correct?

21   A.   Yes.

22   Q.   And that included maintenance, supervising

23  maintenance, providing parts, providing logistics for travel?

24        MS. M. MILLER:  Objection, Your Honor.  Compound

25  question again, lack of personal knowledge.

*Recross - Reed*

```
 1              MR. MCCONWELL:  I'll withdraw.

 2              MS. M. MILLER:  Mr. McConwell is testifying.

 3              THE COURT:  Objection will be sustained.

 4    Withdrawn.  Go ahead, rephrase.

 5    BY MR. MCCONWELL: (CONTINUING)

 6         Q.   What administrative services did Hansen Helicopters

 7    provide the Vanuatu corporations, sir?

 8         A.   They supplied the helicopter with -- and supplied the

 9    pilots, mechanics, parts, and whatever else they would need.

10         Q.   Who provided the training?

11         A.   Hansen Helicopters.

12         Q.   And who provided the maintenance, the heavy

13    maintenance?

14         A.   Yeah.

15         Q.   Can you tell us what heavy maintenance was provided,

16    normally?

17         A.   Say again?

18         Q.   Can you tell me what heavy maintenance was provided

19    for the helicopters on a regular basis?

20         A.   Like who did it or?

21         Q.   What type of maintenance was provided by Hansen as

22    heavy maintenance on the helicopters?

23         A.   I don't know.

24         Q.   But it was all after 2000 -- whatever it was that

25    Mr. Crowe took over, that was all area he supervised and he
```

```
 1    supervised --
 2              MS. M. MILLER:  Objection, Your Honor.  There is
 3    no evidence Mr. Crowe took over, except for Mr. McConwell's
 4    questions, which this Court has already sustained.  Mr. Reed
 5    said he has no personal knowledge of that.
 6              MR. MCCONWELL:  He said "Mr. Crowe took over,"
 7    and I said "whenever he took over," was my question.
 8              THE COURT:  All right, so -- all right, objection
 9    will be overruled.  Go ahead.
10              Did you understand the question?
11              THE WITNESS:  Say again?
12    BY MR. MCCONWELL: (CONTINUING)
13        Q.   I asked you what type of heavy maintenance was
14    provided by Hansen and its facilities on the helicopters after
15    Mr. Crowe took over?
16        A.   The heavy maintenance, I don't understand...
17        Q.   Were you aware that the boats went into dry dock,
18    periodically?
19        A.   Yes.
20        Q.   And you know what happened to the helicopters when
21    the boats went into dry dock; don't you, sir?
22        A.   Yes.  They would overhaul it, yes.
23        Q.   They were brought back to Guam; correct?
24        A.   Yes, that's correct.
25        Q.   They were completely disassembled?
```

*Recross - Reed*

1       A.   Yes.

2       Q.   And the fuselages, the middle part of the helicopter,

3  was sent out for corrosion inspection and maintenance;

4  correct?

5       A.   That's correct.

6       Q.   And they were contracted with third parties to do

7  this; correct?

8       A.   That's correct.

9       Q.   And then the helicopters came back to Guam -- or the

10  pieces came back to Guam.  They lose their identity; don't

11  they, sir, when they get disassembled?

12      A.   Yes.

13      Q.   And the parts come back -- came back to Guam,

14  helicopters are reassembled; correct?

15      A.   Yes.

16      Q.   And test flown and then delivered out to the boats?

17      A.   Yes.

18      Q.   That was done on -- as far as an ongoing maintenance

19  practice by --

20      A.   Regular basis.

21      Q.   Now, incidentally, back when you first started with

22  Hansen, isn't it a fair statement that Hansen provided life

23  vests for each aircraft and a raft?

24      A.   That is correct.

25           MR. MCCONWELL:  And if -- Your Honor, if I could

*Recross - Reed*

```
 1  show for demonstration purposes only a sample of the type of
 2  life vest?
 3              THE COURT:  Sure.  Okay, you want to show -- you
 4  want the witness to identify it?
 5              MR. MCCONWELL:  If he could?
 6              THE COURT:  You may.
 7  BY MR. MCCONWELL: (CONTINUING)
 8      Q.   Can you tell me what I just gave you?
 9      A.   Say again?
10      Q.   Can you tell what I just handed you, sir?
11      A.   Yeah, it's a life vest.
12      Q.   Why don't you unfold it and hold it up, if you would.
13  Turn it around, if you would, sir.
14           Can you tell me what that little metal thing in the
15  middle is, cylinder?
16      A.   That's the air, pressurized air for the -- that
17  inflates the life vest.
18      Q.   And that has to be activated by a pull tab?
19      A.   Yes.
20      Q.   And then there is a little red spout; do you see
21  that?  Would you tell us what that is?
22      A.   This one?
23      Q.   No, the other one, the long one.
24      A.   Oh, this one?
25      Q.   I think it's -- my side of it there.  No, there is a
```

*Recross - Reed*

1    red thing you blow on to.

2        A.    Oh, this one?

3        Q.    Yeah.

4        A.    Yeah, they can manually blow it up, if they want.

5        Q.    Okay.  And is that -- that is the typical life vest

6    for aviation operations; isn't it, sir?

7            MS. M. MILLER:  Objection, Your Honor.  What is

8    the relevance that that is a typical life vest for aviation

9    operations if that is not a life vest that the defendants gave

10   their pilots?

11           MR. MCCONWELL:  Well, I'm going to ask him.  I

12   think he said --

13           THE COURT:  Overruled at this time.  Go ahead.

14   Are you going to get to that?

15           MR. MCCONWELL:  I am right now.

16           THE COURT:  Oh.

17           MR. MCCONWELL:  She didn't give me time.

18   BY MR. MCCONWELL: (CONTINUING)

19       Q.    That is the type of life vest that was provided to

20   Hansen Helicopters from the start -- when you first started

21   and continues through today; correct?

22       A.    Yes, that is.

23       Q.    Every helicopter gets one of those assigned and also

24   a life raft; correct?

25       A.    Yes, that's correct.

*Recross - Reed*

1      Q.   And the reason you have the blow-up spout and the

2  cylinder that you pull tab is so you don't get trapped in the

3  fuselage if you get under water?

4      A.   Yes, that's correct.

5      Q.   And we talked about the accident involving 9068F; do

6  you recall that?

7      A.   Yes.

8      Q.   And Mr. Santos died; correct?

9      A.   Yes.

10     Q.   He didn't use that life jacket that was assigned to

11  the helicopter; did he, sir?

12     A.   No, he did not.

13          MS. M. MILLER:  Objection, Your Honor.  I

14  withdraw the objection.

15          THE COURT:  All right.  And your answer is?

16          THE WITNESS:  He did not.

17          THE COURT:  Okay.

18  BY MR. MCCONWELL: (CONTINUING)

19     Q.   What he had was an auto inflate?

20     A.   Yes, auto inflate.

21     Q.   The second the water hit that, boom, he couldn't get

22  -- he really couldn't get out of the helicopter; correct?

23     A.   Yes, that's correct.

24     Q.   And that's what killed him?

25     A.   Yes.

*Recross - Reed*

 1                MS. M. MILLER:  Your Honor, objection.  Move to

 2    strike.  No personal knowledge, lack of foundation,

 3    speculation.

 4                THE COURT:  On the last question?

 5                MS. M. MILLER:  Yes.

 6                THE COURT:  Mr. McConwell?

 7    BY MR. MCCONWELL:  (CONTINUING)

 8       Q.   Have you read the reports --

 9                THE COURT:  Wait, wait.  Your response to her

10    objection; lack of personal knowledge, speculation?

11                MR. MCCONWELL:  Well, I think he even testified

12    about it in her direct examination about this.  He has

13    personal knowledge.

14                MS. M. MILLER:  Absolutely not.  Absolutely not.

15    He testified that he knew Mr. Santos died.  There is an NTSB

16    report regarding Mr. Santos's --

17                MR. MARTIN:  Your Honor, if we could go off the

18    record?

19                THE COURT:  I'm sorry?

20                MR. MARTIN:  Can we go off the record?  This

21    badgering back and forth is not appropriate.  It's a speaking

22    objection.

23                THE COURT:  All right.  I guess we could.  This

24    gets into the...

25                     (Technical issue with sidebar

*Recross - Reed*

1    headsets/microphones.)

2            THE COURT:  Let's just take a recess.  It's a

3    2:00 recess anyway.  I have to get IT down here to assist.

4    All right.  Testing.  Can you hear?  Ladies and gentlemen, can

5    you hear me?  It's time to take a recess, so let's -- I'm just

6    looking at my calendar here.  2:00, so let's talk a 15-minute

7    recess.

8            Please keep an open mind.  Do not form or express

9    any opinion on this case.  Please rise for the jury.

10            (Jury out at 2:01 p.m.)

11            THE COURT:  We're outside the presence of the

12   jury.

13            MR. PEREZ:  Can we step out?

14            THE COURT:  No, just stay here.

15            MS. M. MILLER:  So, Your Honor, on the direct

16   examination --

17            THE COURT:  I think you guys --

18            What was that?

19            MS. M. MILLER:  On the direct examination of this

20   witness when asked about the accident that killed Mr. Santos

21   and whether he was aware that Mr. Santos drowned because he

22   could not get out of the helicopter because his life vest was

23   inflated, the witness agreed to that, but the witness never

24   testified having any personal knowledge about the type of life

25   vest -- what happened with the life vest.  He would have no

*Recross - Reed*

1 personal knowledge about whether Mr. Santos used the life vest

2 that was provided to him or used a different one.

3            If Mr. McConwell is now trying to say that this

4 witness has that personal knowledge, then he needs to lay the

5 foundation for it.

6            THE COURT:  All right.  Mr. McConwell?

7            So do you admit that he says he knew that he

8 died?

9            MS. M. MILLER:  Yes, he said he knew he died.  He

10 said he knew he died when he couldn't get out of the

11 helicopter because his life vest wasn't inflated and he

12 couldn't unhook the seatbelt and get out.  He never testified

13 on direct examination about the type of life vest that was

14 used or not.

15            THE COURT:  Okay.  You have to set a foundation

16 for that.

17            MR. MCCONWELL:  He never said hardly any --

18            COURT REPORTER:  I'm sorry, can you get on the

19 microphone, please?

20            THE COURT:  I'm sorry.  You have to get on the

21 mic because I can't hear you.

22            MR. MCCONWELL:  I think I'm okay now.

23            THE COURT:  Yeah, a lot better.

24            MR. MCCONWELL:  As a matter of fact, he didn't

25 say anything.  Almost all of his answers were "yes" to her

*Recross - Reed*

questions. But one thing did come up, he talked about not

having -- changing policy because he didn't have this type of

life vest in the helicopters and this was a change of policy.

There were questions about that. We're trying to find it

right now, but I know she covered this territory.

It was clear that he knew the man had drowned

because of this auto inflate life vest. And that's my point,

that this has been what they provided all along.

THE COURT: So your point is that upon -- can I

tell you, I really don't recall. I mean, I have to go back

and look, but I don't specifically recall him testifying, this

witness, whether or not he testified that he knew that he died

-- or when he died that he was wearing a specific life vest.

I don't recall that, in particular.

And you're saying that that is, in fact -- that

in fact, he did testify on direct exam?

MR. MCCONWELL: The testimony is on Page 260, I

believe.

THE COURT: Okay. And go ahead, read it.

MR. MCCONWELL: You want me to read it? Okay.

THE COURT: Well, just tell me -- get right to

the point. Zoom in right there.

MS. MCCONWELL: And --

THE COURT: Okay, can you give her the mic,

Mr. McConwell? Okay. Yes, go ahead.

1            MS. MCCONWELL:

2            "QUESTION:  Now, the life jackets that were

3  provided to these pilots were the most basic life jackets?

4            "ANSWER:  That's correct.

5            "QUESTION:  And if the life -- pilots wanted

6  something safer or better, they had to ask for it?

7            "ANSWER:  That's correct.

8            "QUESTION:  And after Mr. Santos drowned because

9  he couldn't get out of the helicopter with his life jacket,

10  that is when Hansen Helicopters started paying attention to

11  life jackets; correct?

12            "ANSWER:  Yes."

13            THE COURT:  So the questioner was Ms. Marie

14  Miller?

15            MS. MCCONWELL:  Yes, ma'am.

16            THE COURT:  The questioner was Ms. Miller.

17            The witness was testifying.

18            MS. M. MILLER:  See Your Honor, that foundation

19  that he's seeking was never laid.  He's trying to establish

20  now through this witness that this particular life vest --

21  which by the way he hasn't shown the government that life

22  vest.  We haven't seen that life vest, we have no idea when

23  that life vest was manufactured.

24            Anyway, my point is:  As you just heard, this

25  witness does not have any personal knowledge about the life

vest Mr. Santos was using.  He also doesn't have any personal

knowledge about whether that life vest that Santos used when

he was killed was a life vest provided by Walker or not

provided by Walker, and that is what you just heard from the

testimony.

            THE COURT:  Well, I think what might be helpful

is, number one, if you guys haven't seen the life vest then --

            MS. M. MILLER:  We haven't seen it.

            THE COURT:  Hold on.  You should have just said,

"Hey, can I see that life vest?"  Usually, you guys exchange

it, number one; number two, it might be, also, helpful is to

voir dire the witness in aid of an objection.

            MS. M. MILLER:  Yes.

            THE COURT:  And if you had done that with me and

him, it would make it easier for me.  Because I get what

you're saying now.

            MS. M. MILLER:  Yes, thank you.

            THE COURT:  So let's just do it that way, it's

just easier.

            MR. MCCONWELL:  She actually also covered in her

opening statement the scenario about this life jacket and he

got his life jacket from the boat -- and I apologize for not

giving it to her.  It's the one United Airlines use, by the

way.  But the point was, it's the type of thing that they have

had in all their -- the history, and that's certainly when the

1    -- inference we got from her questions that he answered in the
2    direct examination.
3                   THE COURT:  Okay.  Well, I didn't know there were
4    so many different life vests, but okay.
5                   MS. M. MILLER:  Well, right on the face of this
6    life vest, Your Honor, it has a date of manufacturer of 2019.
7    So we have no idea, because it was never produced or
8    identified, whether that life vest was even available at the
9    time that Mr. Santos died, whether it was -- I mean, this is
10   so -- we're so far afield of reality now, we're just kind of,
11   like, I don't know what we're doing.  But even just looking at
12   that life vest --
13                  THE COURT:  Again, let me just say:  You can voir
14   dire the witness in aide of an objection.
15                  MS. M. MILLER:  Yes.
16                  THE COURT:  Because I do have to have it
17   identified now that --
18                  MS. M. MILLER:  Oh, absolutely.
19                  THE COURT:  -- it hasn't been marked and
20   identified.
21                  MS. M. MILLER:  Yes, yes.
22                  THE COURT:  I thought it was for demonstrative
23   evidence, actually, but it's far more than that.
24                  MS. M. MILLER:  Yeah.
25                  THE COURT:  So I mean -- anyway, go ahead.

*Recross - Reed*

1              MR. MCCONWELL:  I apologize.  I was trying to do

2      this as a demonstration of the type of life jacket, not that

3      this particular one obviously was not the one that was in the

4      helicopter available on that day.  It was 2015, was when this

5      accident occurred, in September.

6              THE COURT:  So four years earlier, earlier than

7      this manufactured date.

8              MR. MCCONWELL:  But he's identified it as the

9      type of life jacket they had forever back into the late '90 --

10             THE COURT:  Okay, he did that.  That's fine.  All

11     right.  Therefore, where do we go from here?

12             MR. MCCONWELL:  I think we got to recess.

13             THE COURT:  Your objection is?

14             MS. M. MILLER:  My objection is, Your Honor.

15             THE COURT:  Yes, your objection is?

16             MS. M. MILLER:  He tried to get Mr. Reed to

17     testify, I guess, that --

18             THE COURT:  Right.

19             MS. M. MILLER:  -- this is the life vest that was

20     available to Mr. Santos --

21             THE COURT:  And he did testify, he --

22             MS. M. MILLER:  -- and that Mr. Santos used this

23     other life vest that was an automatic inflating life vest.

24     There's zero evidence of that.

25             THE COURT:  There is zero evidence that he has

*Recross - Reed*

 1   personal knowledge of that?

 2            MS. M. MILLER:  No evidence he has personal

 3   knowledge of that, no evidence he ever had personal knowledge

 4   of that, and it would be inappropriate to leave the jury with

 5   that impression when there is no evidence to support it.

 6            THE COURT:  Well, of course you could always come

 7   back on that.  You know?

 8            MS. M. MILLER:  But the problem is, it's

 9   un-ringing the bell.

10            THE COURT:  I know, but the point is:  We could

11   voir dire the witness in aid of an objection, then I would

12   have just sustained the objection if I felt you were correct.

13            MS. M. MILLER:  Right.

14            THE COURT:  But, okay.  Mr. McConwell?  So the

15   objection is that you have not established a foundation that

16   the witness has personal knowledge of the type of vest -- is

17   it Mr. Santos -- Santos used?

18            MR. MCCONWELL:  I think he's testified that he

19   knows -- he didn't -- he had an auto inflate one.

20            THE COURT:  I know, but -- so how does he know

21   that?  Was he there?  Did he --

22            MR. MCCONWELL:  Well, we can ask him.

23            THE COURT:  Why don't you ask him that?  Why

24   don't you ask him that before we bring the jury out so I know

25   --

```
 1                    How do you know, do you know?

 2                    Go ahead and ask him the question.  I'll let you

 3      -- it's your case.

 4                    MR. MCCONWELL:  Okay.

 5      BY MR. MCCONWELL:  (CONTINUING)

 6          Q.   Mr. Reed, how did you know that the -- Mr. Santos had

 7      the auto inflate life vest on?

 8          A.   I was told he had the auto inflate.

 9                    MS. M. MILLER:  Now my objection is hearsay.

10      BY MR. MCCONWELL:  (CONTINUING)

11          Q.   Let me finish.  That was also written in the NTSB

12      reports; correct?

13          A.   Yes.

14                    MS. M. MILLER:  Again, hearsay.

15      BY MR. MCCONWELL:  (CONTINUING)

16          Q.   And that's an official document and the factual

17      situations, which is an admissible document?

18                    MS. M. MILLER:  Where is the --

19                    THE COURT:  Okay.

20                    MS. M. MILLER:  Where is the NTSB report?

21                    THE COURT:  The objection is hearsay, so --

22                    MS. M. MILLER:  Yes.

23                    THE COURT:  -- is it, first of all --

24                    MS. M. MILLER:  No person --

25                    THE COURT:  Wait, wait.  Is it being offered for
```

*Recross - Reed*

```
 1    the truth of the matter asserted, or is it being offered for
 2    something else?  If it's being offered for the truth of the
 3    matter asserted, the objection will be sustained.
 4              MR. MCCONWELL:  It's offered for the purpose of
 5    him drawing his conclusion that he had, not for the truth of
 6    it.  But it was the type of life jacket that could trap you in
 7    a helicopter, just like occurred with Mr. Santos.
 8              THE COURT:  Okay, but you can't go make that
 9    leaping conclusion.  I mean, he could always testify that
10    "look, you know what, another type of life vest could cause
11    something else, but the life vest that I'm putting in as
12    exhibit -- whatever number that we're going to give it in a
13    few minutes -- would not do that."  He could say that, but he
14    can't -- he can't draw his conclusions based on an NTSB
15    report.  So the -- that objection will be sustained in that
16    regard.
17              MR. MCCONWELL:  Let me do it this way.
18              THE COURT:  Okay.
19              MR. MCCONWELL:  I'm going back and --
20    BY MR. MCCONWELL: (CONTINUING)
21       Q.   This life vest is the type of life vest --
22              THE COURT:  Let's call it Exhibit -- Carmen,
23    what's the next Defense McConwell's exhibit?
24              MR. MCCONWELL:  We'll get the number here in a
25    second.
```

           THE COURT:  Give me the number somebody so we
could identify correctly for the record.

           MS. MCCONWELL:  I believe, it's 117.

           THE COURT:  Okay, 1-1-7.  Let me confirm that
with Carmen real quick.

           You don't know?

           All right, we'll just do 1-1-7.  Go ahead.

BY MR. MCCONWELL: (CONTINUING)

    Q.   Mr. Reed, isn't it true that Exhibit 117 is the type
of life vest that has been used by Hansen Helicopters from the
inception of the company in 1987, and was continuously used at
the last time you were working at the company, which is within
the last six months; correct?

    A.   That is correct.

           THE COURT:  Okay, that's a good question.  That's
legitimate, okay.  But the next question --

           MS. M. MILLER:  That was already asked and
answered.

           THE COURT:  Right, it was.  But the issue of
getting, you know, to conclude of that Santos used something
other than Exhibit 117, you would have to lay a foundation
that's proper.

           MR. MCCONWELL:  We have all these charts that
they were putting in and the NTSB reports and summaries of
them and all the back up for that is the NTSB reports, but

1  this stuff is covered in the NTSB reports they're relying on.

2          THE COURT:  Therefore?

3          MR. MCCONWELL:  I mean, I think that should be

4  sufficient foundation, frankly.

5          THE COURT:  Well, I mean, okay, it could be, but

6  it's just that the way in which we're -- you're trying to

7  procure this -- obtain this from this witness is -- you got to

8  figure that out.  If it's personal knowledge, if it's being

9  offered for the truth of the matter asserted, then it is

10  hearsay, because it's coming from the NTSB report.  And so if

11  you have an exception to the hearsay rule, hey, I'll --

12          MR. MCCONWELL:  The NTSB report plus being

13  involved in the investigation --

14          THE COURT:  Well, if he knows that, if he was

15  personally involved in the investigation, that's one thing.

16          MR. MCCONWELL:  Well, he was around when the

17  investigation was taking place.

18          THE COURT:  Well, anybody can be around.  But the

19  question is:  If he was personally involved and he had direct

20  knowledge of -- like, he was there when they did the autopsy

21  or whatever, I don't know.

22          MR. MCCONWELL:  I don't think he has that.  Why

23  don't we deal with this after we take the break and give us

24  some time --

25          THE COURT:  All right, let me give you guys ten

*Recross - Reed*

```
 1    minutes' recess.  Let's go.  The objection will be sustained
 2    at this point in terms of hearsay objection, and if you want
 3    to establish a foundation that this witness has personal
 4    knowledge of the cause of death, you know, you could set that
 5    up.  If you can't, you can't.
 6                   MS. M. MILLER:  Thank you.
 7                   THE COURT:  All right.  Let's take a ten-minute
 8    recess and I'll let the jurors have an additional time.
 9                   (Recess taken at 2:14 p.m.)
10                   (Back on the record at 2:35 p.m.)
11                   THE COURT:  Thank you for your patience and we
12    will go ahead and proceed.
13                   Mr. McConwell, you may continue your examination
14    of the witness.  Go ahead.
15    BY MR. MCCONWELL: (CONTINUING)
16        Q.   Mr. Reed, isn't it true that it is the policy of
17    Hansen throughout, starting in 1987 to current, not to provide
18    self-inflating vests to pilots?
19        A.   That is correct.
20        Q.   And Hansen has never done that; correct?
21        A.   Never.
22        Q.   And why have you not done that?
23        A.   Say again?
24        Q.   Why have you not provided self-inflating life vests
25    to pilots?
```

*Recross - Reed*

1    A.   Because it's dangerous.

2    Q.   What kind of danger, sir?

3    A.   So that they could get out of the helicopter, prevent

4  them from getting out.

5    Q.   And staying and drowning; correct?

6    A.   Yes.

7            MR. MCCONWELL:  Laura, could I please have 829

8  now?

9            THE COURT:  Before we continue, do we have a

10  final number on that exhibit; was that the correct number?

11            MR. MCCONWELL:  117, I believe.

12            THE COURT:  Is that a definite?

13            MR. MCCONWELL:  Yes.

14            THE COURT:  That's going to be Hansen

15  Helicopter's Exhibit 117?

16            MR. MCCONWELL:  Yes.

17            THE COURT:  All right, very well.  You may

18  proceed.  Sorry, Ms. McConwell.

19            You may go ahead.

20            MR. MCCONWELL:  I think it would be D-4 or 5, I

21  don't know what the designation of Hansen is, but 117.

22            THE COURT:  So it's Exhibit 117, all right.  Very

23  well.

24  (Exhibit 117 marked.)

25  BY MR. MCCONWELL: (CONTINUING)

```
 1        Q.   That's been admitted into evidence, I believe, by the

 2   government.

 3             Can you tell us what this document is, sir?

 4        A.   It's a document showing all of the names of the

 5   companies and the officers, the owners.

 6        Q.   And Mr. Walker owns 99.9%, I believe Ms. Miller said;

 7   correct?

 8        A.   That's correct.

 9        Q.   Of all the companies below his name?

10        A.   Yes.

11        Q.   It shows you have one share, and you didn't pay

12   anything for that share; did you, sir?

13        A.   I did not.

14        Q.   Of that Hansen Helicopters, Inc.?

15        A.   Yes.

16        Q.   And you were not involved in the decision-making

17   process for the formation of any of the companies?

18             MS. M. MILLER:  Objection, Your Honor.  Asked and

19   answered probably three or four times now.

20             MR. MCCONWELL:  I want to put it in perspective

21   narrative with the exhibit, Your Honor.

22             THE COURT:  I'm sorry?  Okay, is there another

23   part to that question, then?

24   BY MR. MCCONWELL: (CONTINUING)

25        Q.   My question is:  You were not involved in any of the
```

*Recross - Reed*

```
 1   substantive decision-making processes that formed any of these

 2   companies, other than Hansen Helicopters, Inc. in 1987, when

 3   you were involved, initially?

 4        A.   That's correct.

 5             THE COURT:  Okay.  And you're referring to

 6   Exhibit Number?

 7             MR. MCCONWELL:  829, Your Honor.

 8             THE COURT:  All right, very well.  Okay.

 9   BY MR. MCCONWELL: (CONTINUING)

10        Q.   Have you ever seen the insurance policy that was

11   issued by Caledonian Insurance Company for the aircraft and

12   the corporations?

13        A.   No, I did not.

14        Q.   Again, that's not something you're involved in, even

15   though you know the existence of it?

16        A.   Exactly.

17        Q.   Now, do you recall Ms. Miller asking you questions

18   about counterfeit parts in your direct testimony some five

19   weeks ago?

20        A.   I don't remember.

21        Q.   Do you know what a counterfeit part is?

22        A.   (No response.)

23        Q.   Counterfeit aircraft part?

24        A.   Do I know what it is?

25        Q.   Yes, sir.
```

*Recross - Reed*

1      A.   It's something that is done without any

2   authorizations or whatever.  I mean, I don't know.

3      Q.   And you never heard the phrase "owner-produced

4   parts"; is that correct?

5      A.   Yes, I heard of it before.

6      Q.   Okay.  What do you understand owner-produced parts to

7   be?

8      A.   They can use it on the helicopters.

9      Q.   Pardon me?

10      A.   That they could use it on the helicopters, the owner

11   produces the parts.

12      Q.   And the owner couldn't resell the parts, though;

13   correct?

14      A.   Right.

15      Q.   And you're not aware of Hansen Helicopters ever

16   selling any of the owner-produced parts; correct?

17              MS. M. MILLER:  Objection, Your Honor.

18              THE WITNESS:  Yeah, I'm not aware.

19              MS. M. MILLER:  Assumes facts not in evidence.

20   There is no evidence that the defendants made owner-produced

21   parts; yet, his question assumes that in saying, "Is it true

22   Hansen didn't sell their owner-produced parts?"  There's no

23   evidence they ever produced parts.

24              THE COURT:  Mr. McConwell, on that objection?

25              MR. MCCONWELL:  We'll put some evidence in about

*Recross - Reed*

 1  that, Your Honor.

 2              THE COURT:  You are going to have evidence?

 3              MR. MCCONWELL:  It has been brought up by

 4  Ms. Miller.

 5              THE COURT:  I'm sorry.  You are going to produce

 6  evidence through that effect?

 7              MR. MCCONWELL:  Yes.

 8              THE COURT:  To another witness, not through this

 9  witness?

10              MR. MCCONWELL:  I'm going to ask him a few

11  questions about it, and then we'll have other witnesses to

12  deal with that issue.  Mr. Cann extensively testified about

13  this, by the way.

14              THE COURT:  All right.  So you are going to

15  establish a foundation on this.  Okay, go ahead.  So I'll

16  listen to the next question.

17  BY MR. MCCONWELL: (CONTINUING)

18      Q.   Please take a look, if you would, at Exhibit D-455,

19  Page 3 of 7.

20              MR. MCCONWELL:  I don't have it yet.

21              MS. MCCONWELL:  It's coming.  It's loading.

22              (Pause.)

23              MS. MCCONWELL:  Which page?

24              MR. MCCONWELL:  3 of 7.

25              MS. M. MILLER:  Your Honor, I'm going to -- we're

*Recross - Reed*

```
 1    going to, unfortunately, have to have a discussion outside the
 2    presence of the jury before this document is even discussed.
 3                THE COURT:  I'm sorry, 3 through -- is it 3
 4    through 7 or 3 dash -- What is it?
 5                MR. MCCONWELL:  Page 3 of 7, Exhibit 55.  D-455.
 6                THE COURT:  Is that the only -- the exhibit that
 7    we're talking about that's going to be brought up?
 8                MR. MCCONWELL:  There is going to be another one
 9    coming up, and it's 4 of 7, also, Your Honor.
10                THE COURT:  So there's 3 of 7 -- or is that what
11    you said?
12                MR. MCCONWELL:  3 of 7.
13                THE COURT:  3 of 7 and 4 of 7?
14                MR. MCCONWELL:  Correct.
15                THE COURT:  Any other exhibits that you want --
16    going to show him as it relates to this next line of
17    questioning?
18                MR. MCCONWELL:  No.
19                THE COURT:  Okay.  So is this going to take too
20    long on the -- on this?
21                MS. M. MILLER:  No, no.  We could do it on there.
22                THE COURT:  Okay, let's try.  Let's try it.  Now
23    that we tested it, let's try it.
24                (Sidebar.)
25                THE COURT:  Can you hear, Ms. Miller?
```

*Recross - Reed*

1    Ms. Miller, can you hear me?

2                 MR. MCCONWELL:  I can hear you?

3                 MS. M. MILLER:  I can hear you.  Can you hear me?

4                 THE COURT:  Mr. McConwell, yes.  Mr. Han?

5                 MR. HAN:  Yes.

6                 THE COURT:  Go ahead, your objection?

7                 MS. M. MILLER:  Your Honor, the objection is

8    hearsay.  This is a document that the defendants produced at

9    the deposition of Mr. Cann that was signed by a witness named

10   Victor Litkei, who produced these documents.  And Victor

11   Litkei never testified, and Victor Litkei has never been put

12   under oath.  As you recall -- can you hear me, Your Honor?

13                THE COURT:  Yeah.

14                MS. M. MILLER:  Oh, I'm sorry.  As you recall,

15   Mr. Victor Litkei is Mr. Frank Litkei's son.  Mr. Frank Litkei

16   is deceased.  They were the owner operators of Spares, Inc.,

17   the manufacturer of the counterfeit parts.  We received --

18   issued a grand jury subpoena to Spares, Inc., and we got all

19   of the records from the grand jury subpoena from Spares, Inc.

20   And the assertions made by Mr. Litkei in his affidavit and

21   attached documents were never produced before, so the

22   government contends that these documents were created and

23   fabricated by the defendants for the purposes of their

24   defense.  And unless Mr. Victor Litkei actually testifies to

25   the authenticity of these documents and that these are

```
 1    legitimate documents from Spares, Inc., it shouldn't be

 2    admissible.  It's hearsay.

 3                    THE COURT:  Okay.

 4                    MR. MCCONWELL:  The first one is an invoice

 5    created by Mr. Reed.

 6                    THE COURT:  But as per her objection, can you

 7    overcome the objection?

 8                    MR. MCCONWELL:  Yes.

 9                    THE COURT:  He's --

10                    MR. MCCONWELL:  This was produced --

11                    THE COURT:  This witness would be able to

12    authenticate these documents?

13                    MR. MCCONWELL:  The first document for sure.  The

14    second document, I don't know.

15                    THE COURT:  Okay.  Well, then...

16                    MR. MCCONWELL:  We'll find out.

17                    THE COURT:  We'll find out, then.  Okay, very

18    well.

19                    (End of sidebar.)

20                    THE COURT:  Did you guys hear us?

21                    THE JURY:  No.

22                    THE COURT:  This is our COVID objection.  I don't

23    like it, but we got to get used to it.

24                    Yeah, go ahead.

25                    The objection will be deferred until I hear -- my
```

1    ruling will be deferred.  Go ahead, Mr. McConwell.

2    BY MR. MCCONWELL: (CONTINUING)

3        Q.   Mr. Reed, would you take a look at the document.  It

4    should be before you, and it's Exhibit 55, Page 3 of 7.

5        A.   Yes, I see it.

6        Q.   Are you familiar with that document?

7        A.   Yes.

8        Q.   That's an invoice -- purchase order --

9                MS. M. MILLER:  Objection, Your Honor.

10   Objection.

11               MR. MCCONWELL:  Let me finish, ma'am.

12               THE COURT:  Okay.

13               MS. M. MILLER:  Again, don't talk about what the

14   document is.

15               THE COURT:  Right.

16               MS. M. MILLER:  The question is:  Are you

17   familiar --

18               THE COURT:  Lay the foundation first.

19               MS. M. MILLER:  Right.

20               THE COURT:  You can't discuss anything until I've

21   admitted the evidence in.  Go ahead.

22   BY MR. MCCONWELL: (CONTINUING)

23        Q.   That's a document initiated by you on or about

24   July 23, 2007; correct?

25        A.   Yes.

          MS. M. MILLER:  I'm going to ask to voir dire the

witness on this document, Your Honor?

          THE COURT:  Okay.  Well -- okay, you may do so,

but is there any other questions, Mr. McConwell?

          MR. MCCONWELL:  He's identified it's his

document, so --

          THE COURT:  She wants to voir dire the witness in

aid of an objection, so I'm going to allow her do so.  Go

ahead.


                    VOIR DIRE EXAMINATION

BY MS. M. MILLER:

     Q.   Mr. Reed?

     A.   Yes, ma'am.

     Q.   You didn't sign this document; did you?

     A.   No, I did not.

     Q.   Who signed the document?

     A.   I'm not sure.  Looks like one of the mechanics.

     Q.   Mr. Jewel?

     A.   Yes.

     Q.   So your name is preprinted on here; is that correct?

     A.   That is correct.

     Q.   Are you telling this jury that you specifically

remembered this particular document, sir, from 2007?

     A.   I don't remember this particular document, no.

1      Q.   Okay.

2              MS. M. MILLER:  Your Honor, I renew my objection.

3      Just because his name is preprinted on the document, if he

4      doesn't remember the document, he cannot authenticate the

5      document.

6              THE COURT:  Do you have any further questions on

7      that?

8              MR. MCCONWELL:  I do, Your Honor.

9              THE COURT:  All right.  Go ahead.

10     BY MR. MCCONWELL: (CONTINUING)

11     Q.   Mr. Reed, is this the type of purchase order that you

12     submitted to Spares, Inc. or Mr. Litkei for a tail rotor pitch

13     link --

14             MS. M. MILLER:  Objection, Your Honor.

15             THE COURT:  Hold on.

16             Before you answer, let me -- Let's hear the

17     question first.

18             Go ahead.

19     BY MR. MCCONWELL: (CONTINUING)

20     Q.   Is this the type of document that you submitted to

21     Spares, Inc. requesting particular parts be manufactured that

22     are described on this document?

23             THE COURT:  Okay, hold on.  Objection?

24             MS. M. MILLER:  The objection, Your Honor, is

25     again, irrelevant because of "type of document".  The witness

1   either recognized a document, which he just said he does not

2   recognize the document, even though his name is on it.  It was

3   preprinted on it.  He didn't even recognize the name of the

4   employee who has signed this document; therefore, he doesn't

5   have any personal knowledge about the document.  And to

6   question him and say, "well, is this the type of document?"

7   That's not relevant.

8                   THE COURT:  Mr. McConwell, your response?

9                   MR. MCCONWELL:  This is the document that is

10  typically maintained in the ordinary course of business

11  concerning purchase --

12                  THE COURT:  Okay.  I'm sorry, hold on.  So you're

13  withdrawing the last question, you're starting a new question?

14                  MR. MCCONWELL:  Yes, I am.

15                  THE COURT:  Okay, withdrawn.  Next question.

16  BY MR. MCCONWELL: (CONTINUING)

17      Q.   Is this the type of document that you regularly

18  submitted to Spares, Inc. and other vendors, and Spares, Inc.,

19  in this particular instance, in the ordinary course of

20  business at Hansen, in your capacity, is the person who

21  submitted -- request invoice -- invoice or purchase orders?

22                  THE COURT:  Hold on, hold on.

23                  MS. M. MILLER:  Objection, Your Honor.  He's, I

24  believe, attempting now to designate Mr. Reed as a record's

25  custodian for Hansen Helicopters, and he is not laying a

1   proper foundation for a record's custodian exception to the

2   hearsay rule under 8036.  So he would have to establish that

3   Mr. Reed is a record's custodian of this type of document and

4   that he recognizes this type of document to be that type of

5   document normally kept in the course of the business.

6               THE COURT:  Mr. McConwell?

7               So you're going to withdraw your question and

8   start again?

9               MR. MCCONWELL:  I am going to start again.

10              THE COURT:  Okay, next one.

11  BY MR. MCCONWELL: (CONTINUING)

12      Q.   Is this the type of document that's maintained in the

13  ordinary course of business by the persons that reported to

14  you at Hansen?

15              MS. M. MILLER:  Objection, Your Honor.  "By the

16  persons who reported to him"?  There's been no foundation that

17  anyone reported to him.

18              THE COURT:  Okay, objection will be sustained.

19  Mr. McConwell.

20  BY MR. MCCONWELL: (CONTINUING)

21      Q.   Did you have anyone reporting to you that would be

22  maintaining records of purchases -- purchase orders?

23      A.   Can you repeat that?

24      Q.   Did you have anyone in a 2007 timeframe that reported

25  to you that maintained records of purchase orders that you

*Recross - Reed*

1    might have initiated?

2        A.    The parts guys.  If they want to order something,

3    they go ahead and order it.  They don't necessarily have to

4    have my knowledge --

5        Q.    So --

6        A.    -- or my say so to go ahead and do it.

7        Q.    Is this the type of document that is initiated by the

8    parts department for purchase orders?

9        A.    Yes.

10       Q.    Third parties?

11               MS. M. MILLER:  Your Honor, I'm going to object

12   and move to strike.  That is an insufficient foundation for a

13   business record, number one.  Number two, Mr. Reed on voir

14   dire said he does not recognize this document.  Therefore, how

15   can he lay the foundation for it to be admitted to this jury?

16               THE COURT:  Mr. McConwell?

17               MR. MCCONWELL:  Is this --

18               THE COURT:  I'm sorry, you're withdrawing your

19   question?

20   BY MR. MCCONWELL: (CONTINUING)

21       Q.    Well, are these --

22               THE COURT:  Wait.  You are?

23               MR. MCCONWELL:  Yes.

24               THE COURT:  Okay, next question.

25   BY MR. MCCONWELL: (CONTINUING)

*Recross - Reed*

     1      Q.   Are these documents typically maintained in the

     2   ordinary course of business, this format, for purchase orders

     3   of parts by Hansen Helicopters during the period of 2007?

     4      A.   Yes.

     5           MS. M. MILLER:  Objection, Your Honor.  Lack of

     6   foundation under 8036.  8036 has a very specific requirement

     7   for laying a foundation for a record's custodian, which

     8   Mr. McConwell has not done.  I'd be happy to do it for him.

     9   And if Mr. Reed can establish that he's a record's custodian,

    10   fantastic.  If he can't, then we can move on.

    11           THE COURT:  Mr. McConwell, go ahead.  You may

    12   continue to try to lay the proper foundation.

    13   BY MR. MCCONWELL: (CONTINUING)

    14      Q.   Who's the record's custodian at Hansen Helicopters?

    15      A.   The parts guys has their -- has a file with these

    16   records in it.  When they order something, they put it in

    17   there.  I don't necessarily see it all the time.

    18      Q.   Did you see any of those purchase orders; from

    19   Spares, for example?

    20      A.   Only some, yes.

    21      Q.   Let me go back --

    22           MR. MCCONWELL:  Well, I'll still offer the

    23   document, Your Honor.

    24           THE COURT:  I'm sorry, you're moving to admit

    25   this document at this time?

*Recross - Reed*

          MR. MCCONWELL:  Yes.

          THE COURT:  Prosecution?

          MS. M. MILLER:  Yes, Your Honor.  Again, under
8036 of the Federal Rules of Evidence, he would have to
establish that the record was made at or near the time with
information that is normally transmitted by someone with
knowledge, that's 8036(a); (b), that the record was kept in
the course of regularly-conducted business activities of the
business, (b); (c), that making the record was a regular
practice of that activity; (d), that all these conditions are
shown by the testimony of the custodian or other qualified
witness to comply with (a), (b), and (c), and the opponent
does not show that the source of the information or the method
or circumstances of presentation lack trustworthiness.

          As I've stated, Your Honor, this was a document
that was submitted with a hearsay affidavit of someone who has
not testified, so there is a lack of trustworthiness.  If
Mr. Reed said, "I recognize this document," then I would
agree.  But he does not.

          THE COURT:  All right.  The objection will be
sustained at this time.  There is not a proper foundation
laid.

          MR. MCCONWELL:  Okay.

BY MR. MCCONWELL: (CONTINUING)

     Q.   Do you recall Ms. Miller making the statements or

 1  asking you the question:  "Hansen Helicopters bought

 2  counterfeit parts for years; correct?"

 3          And your answer:  "Yes, ma'am."

 4          You don't know that; do you, sir?

 5      A.   Can you repeat that again?

 6      Q.   She asked you the question:  "Hansen Helicopters

 7  bought counterfeit parts for years -- for years; correct?"

 8          And you said:  "Yes, ma'am."

 9          You don't know that specifically, and you can't give

10  us any timeframe at all; can you, sir?

11              MS. M. MILLER:  Objection, Your Honor.  Improper

12  impeachment.

13              THE COURT:  Overruled.

14              Go ahead.  Can you answer?

15              THE WITNESS:  Well, I said "yes" because you're

16  all saying about these -- the parts aren't counterfeit, but --

17  BY MR. MCCONWELL: (CONTINUING)

18      Q.   Well, you're assuming that the Spares parts were

19  counterfeit; correct?

20      A.   Yes, by what you guys were saying.

21      Q.   Pardon?

22      A.   By what you guys were saying.

23      Q.   They're not owner-produced parts?  Or do you know

24  what that is?

25      A.   The owner-produced parts are parts that's made by the

```
 1   owner.

 2       Q.   Or for the owner; correct?

 3       A.   Or for the owner.

 4            MS. M. MILLER:  Objection.  Counsel is

 5   testifying.  Mr. McConwell is testifying.

 6            THE COURT:  Mr. McConwell?

 7            MR. MCCONWELL:  I'm entitled to lead, Your Honor.

 8            MS. M. MILLER:  Move to strike.  The witness said

 9   his definition of owner-produced parts are parts made by the

10   owner.  Mr. McConwell, then, testified "or for the owner".

11   That's not correct.  He's testifying.  We have to hear from

12   the witness, not Mr. McConwell.

13            THE COURT:  All right, overruled.  Go ahead.  Go

14   ahead.

15            THE WITNESS:  Read the question back, I'm sorry.

16            THE COURT:  Read that question, Veronica.

17            (Whereupon the reporter read back requested

18   portion.)

19            THE COURT:  Okay, next question.

20   BY MR. MCCONWELL: (CONTINUING)

21       Q.   So if Hansen Helicopters ordered parts that they --

22   from Spares, they participated in the manufacture of the part;

23   is that an owner-produced part?

24       A.   I think that I'm not the one to make that decision,

25   whether it's owner-produced or not.
```

*Recross - Reed*

1      Q.   Have you ever taken time to look at the 21.9 of the

2  Federal Aviation Regulations or Advisory Circular 4318 and

3  2062(d) that explains owner-produced parts?

4              MS. M. MILLER:  Objection, compound question.

5              THE COURT:  Sustained.  Rephrase.

6  BY MR. MCCONWELL: (CONTINUING)

7      Q.   Have you ever looked at any of the regulations with

8  regard to definitions of owner-produced parts?

9      A.   I have not.

10     Q.   Did you say that on the day of Cann deposition?

11     A.   Say that again?

12     Q.   Did you say it on the day of Cann deposition?

13     A.   (Shook head.)

14     Q.   Did you hear Mr. Cann testify?

15     A.   Mr. Cann?

16     Q.   The former AFS300 director for flight standards

17  maintenance?

18     A.   No.

19     Q.   You didn't sit on that deposition?

20     A.   No.

21     Q.   And you've done no research, you just accepted

22  Ms. Miller's statement "these are counterfeit"; you didn't do

23  any further research to see whether she was right or wrong?

24     A.   I did not.

25     Q.   And then she says that the FBI seized a number of

*Recross - Reed*

1   these counterfeit parts when it searched Hansen Helicopters

2   back in October 2016; correct?

3       A.   Yes.

4       Q.   And you said that, "yes"?

5            That was the search warrant; correct?

6       A.   (Nodded head.)

7       Q.   Again, these counterfeit parts, you had no idea

8   whether she was right or wrong about that; did you?

9       A.   That is correct.

10      Q.   And the company that Hansen Helicopters bought these

11  counterfeit parts from is a company called Spares, Inc., and

12  your answer was "yes"?

13      A.   That's correct.

14      Q.   Again, you don't know whether they're counterfeit

15  parts or owner-produced parts; do you, sir?

16      A.   Right, I do not.

17      Q.   Are you aware that -- are you aware of a pitch --

18  tail rotor pitch link blank?

19      A.   Yes.

20      Q.   And isn't that what you ordered from time to time

21  from Spares, Inc.?

22      A.   That's correct.

23      Q.   And that's the type of invoice that we looked at a

24  minute ago that you hadn't seen the particular invoice;

25  correct?

*Recross - Reed*

1              MS. M. MILLER:  Objection, Your Honor.  We're

2    going back to the invoice that was not properly -- the

3    foundation was not properly laid for it.

4              MR. MCCONWELL:  I'll withdraw the question.

5              THE COURT:  All right, question withdrawn.  Go

6    ahead.

7    BY MR. MCCONWELL: (CONTINUING)

8         Q.   But you initiated or are aware that Hansen, in the

9    ordinary course of business, initiated purchase orders for

10   these pitch -- these tail rotor pitch link blanks, right?

11        A.   Yes.

12        Q.   And you were involved in some of them -- or actually

13   signed it and some of your parts people signed them?

14        A.   That's correct.

15        Q.   Now, do you know whether or not a pitch link blank is

16   actually an aircraft part?

17        A.   No, I do not.

18        Q.   And are you aware that there is work that needs to be

19   done in the form of inspection by Hansen concerning pitch link

20   blanks and the installation of components before it could

21   become --

22              MS. M. MILLER:  Objection.  Compound question,

23   Your Honor.

24              MR. MCCONWELL:  May I finish, please?

25              THE COURT:  Okay.  Finish, please.

*Recross - Reed*

1    BY MR. MCCONWELL: (CONTINUING)

2        Q.   Before it can become an aircraft part?

3        A.   I'm aware that when it comes in, that the bearings

4    and stuff are put into it and make a complete part.

5        Q.   And that's put in by the Hansen mechanics; correct?

6        A.   Yes, that's correct.

7        Q.   And then it becomes an aircraft part?

8        A.   That's correct.

9        Q.   And are you aware of the final inspection of those

10   parts, the pitch link -- with the bearings, are called pitch

11   link assemblies, tail rotor pitch link assemblies; are you

12   aware that they are, then, utilized by Hansen as a

13   owner-produced part?

14       A.   Yes.

15       Q.   And they perform the final inspections before they're

16   released for installation?

17       A.   Yes.

18       Q.   And do you know, approximately, when Hansen first

19   started using Spares, Inc. to produce for them tail rotor

20   pitch link blanks?

21       A.   I don't remember the date.

22       Q.   And you have no memory of it a month ago when you

23   testified either; correct?

24       A.   Yeah, correct.

25       Q.   Yet, you said, "I guess, somewhere around, what, 1996

*Recross - Reed*

```
 1   and 1998," to Ms. Miller in her question; correct?

 2        A.   I don't remember.

 3        Q.   But you have no memory of that; do you?

 4        A.   No, I don't remember when we started buying parts

 5   from those guys.  I don't know.

 6        Q.   And so this particular answer is just not true;

 7   correct?

 8        A.   Yes.

 9        Q.   And you -- the question Ms. Miller asked you was:

10   "The mechanics were instructed to install these counterfeit

11   parts on the helicopters; correct, sir?"

12             And you said:  "Yes, ma'am."

13             But again, she called them counterfeit parts.  There

14   is nothing wrong with installing owner-produced parts on your

15   aircraft; is there?

16        A.   You guys have been calling this counterfeit parts.

17        Q.   Pardon?

18        A.   You guys have been calling this counterfeit parts,

19   and I'm just going along with it.  I'm not --

20        Q.   The government's been calling them counterfeit

21   parts --

22        A.   Yes.

23        Q.   -- and you've just been going along with it.

24        A.   Counterfeit parts, but I have -- it's not been proven

25   that it's counterfeit.  I don't know.
```

*Recross - Reed*

1    Q.   And you do know that when parts are made by -- for

2    them by Spares that are finished off by the installation of

3    the bearings, these are not resold to anybody else; correct?

4    A.   That's correct, they're not sold to anyone.

5    Q.   As a matter of fact, Hansen frequently disassembles

6    helicopters entirely and just uses the parts; correct?

7    A.   Yes.

8    Q.   And then Ms. Miller asked you:  "Now, specifically,

9    I'd like to talk about a part called a tail rotor pitch

10   link -- pitch changed link; are you familiar with that part?"

11          And you said:  "Yes."

12          That was the correct answer; wasn't it, sir?

13   A.   Yes.

14   Q.   And you really were talking about the assembly with

15   the bearings installed; correct?

16   A.   That's correct.

17   Q.   But you're not a mechanic; are you?

18   A.   I am not a mechanic.

19   Q.   And you never really participated in any installation

20   of --

21   A.   No, nothing.

22   Q.   Or any installation of the bearings, the two bearings

23   that fit in the parts?

24   A.   Nothing at all.

25   Q.   Then you said you and Mr. Kapp directed the purchase

*Recross - Reed*

1   of the tail rotor pitch link blanks; correct?

2          And you said:  "That's correct."

3          But it was really the parts department that would

4   direct the request for manufacture of the tail rotor pitch

5   links, right?

6       A.   Yes.

7       Q.   And you were always ordering pitch link blanks that

8   weren't aircraft parts; correct?

9       A.   Yes.

10      Q.   Then you said:  "Hansen Helicopters never provided

11  Spares, Inc. with a formal design drawings; is that correct?"

12          And you said:  "Yes, ma'am."

13          But you don't know that; do you, sir?

14      A.   I don't know that for sure, no, I do not.

15      Q.   But -- you don't have any idea how this came about

16  originally or whether it was a joint design or design was

17  provided by Hansen or just by Spares or --

18              MS. M. MILLER:  Objection, Your Honor.

19  BY MR. MCCONWELL: (CONTINUING)

20      Q.   -- both involved?

21              MS. M. MILLER:  Compound question, speculation.

22  Mr. McConwell is testifying.

23              THE COURT:  All right, the objection will be

24  sustained as to compound question and speculation, so...

25  BY MR. MCCONWELL: (CONTINUING)

*Recross - Reed*

1    Q.   You have no idea how the design was arrived at for

2    the parts; correct?

3    A.   Yeah, I do not.

4    Q.   And then you were asked the question again by

5    Ms. Miller:  "Hansen Helicopters never provided Spares, Inc.

6    with instructions on how to manufacture these parts; is that

7    correct?"

8         And you said:  "That is correct."

9         That's not --

10   A.   I have no knowledge of that.

11   Q.   You have no knowledge of it.  That's not a true

12   answer; is it?

13   A.   It's not a true answer.

14        Can I make a statement or anything?

15        MR. PEREZ:  I'd ask that he confer with Counsel

16   first.

17        THE COURT:  Okay, confer with your attorney.  He

18   wants to talk to you.

19        (Pause.)

20        THE COURT:  Mr. Perez?

21        MR. PEREZ:  I don't know if there was a question

22   pending that he intends to respond to.

23        THE COURT:  No, there wasn't.  He already

24   answered the question, and then he opted to add something.

25        MR. PEREZ:  I think he wanted to supplement his

 1   answer.

 2              THE COURT:  Oh, supplement his answer.  All

 3   right.  You may supplement your answer, if your Counsel --

 4              THE WITNESS:  What we do is we would send the

 5   parts off to Spares, we would send them a copy, and they would

 6   make the parts according to that copy that we sent them.

 7   BY MR. MCCONWELL: (CONTINUING)

 8      Q.   And that went on for many, many years; correct?

 9      A.   Yes.

10      Q.   Then Ms. Miller asked you:  "What part -- when the

11   parts came in, they weren't properly packaged; correct?"

12           And you said:  "Yes."

13           You had no idea whether -- what proper packaging for

14   those parts would be; do you?

15      A.   No.

16      Q.   So that was an incorrect answer?

17      A.   (Nodded head.)

18      Q.   And you're the one sign --

19              MS. M. MILLER:  I didn't hear his response.

20              THE COURT:  His response?

21              Was that an incorrect answer?

22              THE WITNESS:  Yeah.  I mean, they come in, in

23   boxes.  They come in boxes, they're opened, they're, you know,

24   either wrapped up or just put in a box.

25   BY MR. MCCONWELL: (CONTINUING)

1      Q.   They come in, in boxes, they're opened, and they're

2   inspected by Hansen, and then used; correct?

3      A.   Yes.

4      Q.   Or then modified with the bearings?

5      A.   Yes.

6      Q.   But you don't know what proper packaging is -- or you

7   consider -- was properly packaged?

8      A.   Yeah, I don't -- I mean...

9      Q.   You said to Ms. Miller:  "That is correct."

10         Was that your instruction --

11     A.   Well, I wasn't sure what she was saying.  I mean, she

12   was showing a part that was from the factory that was -- had

13   in a package.  That's what she was showing us.

14     Q.   But she was testifying this is a legitimate part; do

15   you recall her saying that?

16     A.   Yes, it was a legitimate part from the manufacturer

17   from --

18     Q.   There wasn't any evidence in the record --

19              MS. M. MILLER:  I'm going to move --

20              THE COURT:  Hold on, hold on.

21              MS. M. MILLER:  I wasn't testifying.  I'm going

22   to move to strike that statement that I was testifying.  I

23   provided Mr. Reed with a legitimate part from a legitimate

24   manufacturer and just asked him to describe it.

25              THE COURT:  All right, very well.

1           MR. MCCONWELL:  Her statement that it was a

2  legitimate part from a legitimate manufacturer, but there was

3  no evidence to that, other than what she was saying, Your

4  Honor.

5           MS. M. MILLER:  Mr. McConwell stipulated to the

6  fact that was a legitimate manufacturer, if you recall, Your

7  Honor.

8           MR. MCCONWELL:  Laura may correct me, I do not

9  recall that.  But anyway, that's beside the point.

10          THE COURT:  Did you want to confer with your --

11  Mr. McConwell, do you want to confer?

12          MR. MCCONWELL:  It's not material.  We'll go on.

13          THE COURT:  Okay.  Go ahead, you may proceed.

14  BY MR. MCCONWELL:  (CONTINUING)

15     Q.   But anyway, you didn't know whether it was a

16  legitimate part or not; correct?

17     A.   That's correct.

18     Q.   And you saw the stamping, and I think it's here

19  someplace.

20          MR. MCCONWELL:  Your Honor, may I approach the

21  witness?

22          THE COURT:  Sure, yup.  And you're grabbing --

23          MR. MCCONWELL:  I'm moving so slow.

24          THE COURT:  What's that?

25          MR. MCCONWELL:  I haven't had my surgery yet.

*Recross - Reed*

1          THE COURT:  That's okay, don't worry.  We're all

2     getting slow.

3          What is that exhibit number, Mr. McConwell,

4     please?

5          MR. MCCONWELL:  It's Exhibit 2956.

6          THE COURT:  2-9-5-6.  And the question is:  Does

7     he recognize it?  Is that the question?

8     BY MR. MCCONWELL: (CONTINUING)

9     Q.   Is that the part that she handed you?

10    A.   Yes.

11    Q.   But you don't know whether that's a legitimate part

12    or not; do you, sir?

13    A.   That's correct, I don't.

14    Q.   You can tell from the part itself that that's a

15    stamped number on it that would, under salt water, disappear,

16    ultimately; correct?

17    A.   Yes.

18    Q.   So it doesn't make a difference whether it comes from

19    the factory with the part number or not, it's going to be gone

20    very quickly after use?

21    A.   Yes.

22    Q.   Then you were asked:  "Do you remember the photograph

23    that the pilot produced showing a piece of fabric, it had to

24    be stuck through the tail rotor pitch link -- or change link,

25    pitch change link so that it actually would be tight enough?"

1          You said:  "Yes, ma'am."

2          And then she asked you:  "And some of these

3   helicopters crashed; correct, sir?"

4          And you said:  "Yes, ma'am."

5          Is that -- was that a correct answer?

6     A.   I don't remember it.

7     Q.   Well, there is an inference that they crashed because

8   of the tail rotor pitch link.  But are you aware of any

9   failure of a tail rotor pitch link assembly installed by

10  Hansen mechanics or Vanuatu lessees -- lessors, I mean, that

11  failed and caused a crash?

12    A.   I'm not aware of it.

13    Q.   And you've never -- you're not aware of any -- or are

14  you aware of any failure -- a crash caused by a pitch link

15  blank manufactured for Hansen by Spares, Inc.?

16    A.   Yeah, that's correct, I don't -- I'm not aware of

17  any.

18    Q.   And were you the one that the company would receive

19  notices of an accident when they would occur?

20    A.   Say that again?

21    Q.   You're in a position in the company that if there'd

22  been an accident involving a pitch link control point blank or

23  assembly, you would have been informed of that if it did, in

24  fact, occur, since 1987?

25    A.   I could have heard about it from somebody, but not --

*Recross - Reed*

1     Q.   Weren't you the one that had conversation with the

2   boats from time to time, and you're the one that had the

3   initial contract was entered into; correct?

4     A.   Yes.

5     Q.   And you knew all the contact people?

6     A.   Yes.

7     Q.   And you surely -- if there had been a crash or some

8   problem that would cause the lack of use of the helicopter,

9   you'd be informed of that right away, right?

10            MS. M. MILLER:  Your Honor, I'm going to object.

11   The witness already said that he would not necessarily have

12   been aware of every accident or the cause of the accident.  He

13   already testified to that.

14            MR. MCCONWELL:  Let me rephrase it.

15            THE COURT:  Mr. McConwell -- so you're

16   withdrawing the last question?

17            MR. MCCONWELL:  I'd like to rephrase it.

18            THE COURT:  Okay, very well.  Withdrawn and

19   rephrase, go ahead.

20   BY MR. MCCONWELL: (CONTINUING)

21     Q.   In your position, you were -- handled all the

22   communications involving crashes one way or the other and had

23   been in that job for many, many years; correct, at Hansen?

24     A.   I would not be aware of all of the crashes that

25   happened, and I would not see all of the reports.

Case 1:18-cr-00010     Document 1922     Filed 03/31/23     Page 99 of 281

1    Q.   What did you do with regard to accident notifications

2    that you got, then; how was that handled within Hansen?

3    A.   It was handled by either Mr. Crowe or Mr. Walker.

4    Q.   You were asked questions by Ms. Miller about the

5    Vanuatu companies having no assets, and you said:  "Yes."

6         Her question was:  "And so when --

7         Oh, this was a cross-examination question.

8         And so when you were -- told Ms. Miller earlier that

9    "these companies had no assets," that was incorrect; wasn't

10   it, sir?

11        And you said:  "Yes."

12        You corrected yourself?

13   A.   Yeah.

14   Q.   But when she asked you the question, you said:  "No,

15   there were no assets."

16        That was wrong, because each of them owned at least

17   one helicopter?

18   A.   Yes.

19   Q.   When you had discussions with regard to the

20   establishment of the 1999 U.S. corporations, you were asked

21   this question by Ms. Miller:  "So you have a lawyer giving you

22   advice on creating a shell corporations and ends up an

23   ownership interest in a company; correct?"

24        And you said:  "Yes."

25        But she said:  "That is a conflict of interest; isn't

1    it, sir?"

2          And you said:  "Yes."

3          Now, first of all, the lawyer was Mr. Ledger, who was

4    being referred to; correct?

5      A.    Yes, that's correct.

6      Q.    And Mr. Ledger was involved in the creation of the

7    eight U.S. corporations; correct?

8      A.    Yes.

9      Q.    But he was not involved in the creation of the

10   Vanuatu corporations or the incorporation of those companies

11   in 2000 and later; correct?

12     A.    I think so, yes.

13     Q.    It's your memory that he was not involved; correct?

14     A.    Yes.

15     Q.    And did you have any idea what she meant by "conflict

16   of interest"?

17     A.    No.

18     Q.    Now, with regard to Wilma's Air, Wilma's Air is a

19   Vanuatu corporation; correct?

20     A.    Yes.

21     Q.    And it coordinated for the other Vanuatu corporations

22   -- um, the revenues that came in from the boats?

23     A.    Yes.

24     Q.    But it was not a U.S. corporation?

25     A.    (No response.)

*Recross - Reed*

1    Q.    Correct?

2    A.    Did you ask me a question?

3    Q.    It's not a U.S. corporation; Wilma's?

4    A.    No.

5    Q.    But you told Ms. Miller you think it was a U.S.

6    corporation?

7    A.    (No response.)

8    Q.    But you don't know one way or the other; do you?

9    A.    No, I do not.

10    Q.    You were asked by Ms. Miller concerning the boats:

11    "They thought they were paying for FAA-registered helicopters;

12    correct?"

13          You said:  "I think so, yes."

14          "QUESTION:  You think so?

15          "ANSWER:  Well, yes.

16          "QUESTION:  Yes, because that is what was on the

17    lease; correct?

18          "ANSWER:  Yes."

19          But you don't know what the boat owners thought;

20    correct?

21    A.    That's correct.

22    Q.    And what they wanted was an airworthy helicopter to

23    perform 700 hours a year pursuant to contract?

24          MS. M. MILLER:  Objection, Your Honor.  He has no

25    knowledge of what they wanted.  Object to the form of the

*Recross - Reed*

1  question, lack of personal knowledge, speculation.

2              THE COURT:  Sustained.

3              Mr. McConwell?

4              MR. MCCONWELL:  So strike both questions, then,

5  of what they thought?

6              THE COURT:  We'll strike the last question, and

7  he didn't answer so...

8              MR. MCCONWELL:  The one I read to you, that on

9  Page 159 of the transcript of the testimony -- I'm sorry, 259.

10             THE COURT:  Okay.  No, I'm just striking the

11 question that you just asked the witness.

12             And if you want to rephrase it, you may do so.

13             MR. MCCONWELL:  I'm saying they thought they were

14 paying for U.S.-registered -- FAA-registered helicopters.  He

15 said, "I think so."  I said that should be stricken, too, if

16 my question is stricken.

17             THE COURT:  Okay.  What do you want -- you want

18 it stricken where?  What do you want stricken?  If I'm

19 striking --

20             MR. MCCONWELL:  The point is -- let me just

21 rephrase.

22             THE COURT:  Okay, I'm getting confused.

23 BY MR. MCCONWELL: (CONTINUING)

24     Q.   You just don't know what was in the minds of the boat

25 owners; correct?

*Recross - Reed*

 1     A.   That is correct.

 2     Q.   But you do know that you had a contract that provided

 3 for:  If there's downtime, there was a credit made; if there

 4 was overtime, there was a $685 charge for hours over the

 5 700 hours.  And it was all sorted out at the end of the year

 6 with each contract; correct?

 7     A.   Yes, that's correct.

 8     Q.   And did you ever have a boat owner come to you and

 9 complain that you didn't furnish airworthy helicopters to

10 fully perform the contracts?

11     A.   No.

12     Q.   And that goes back to, as long as you've been doing

13 this business, and that could be 20-plus years; correct?

14     A.   Yes.

15     Q.   And certainly, since 1992, there's been no boat owner

16 complaining about failure by the company to provide an

17 airworthy helicopter; correct?

18     A.   Correct.

19          MR. MCCONWELL:  Your Honor, could we take a few

20 minutes and let me --

21          THE COURT:  Sure.  You want to just -- what do

22 you want to do?  You want to just talk to Ms. McConwell?

23          MR. MCCONWELL:  Well, I probably need a little

24 bit more time than that, but no more than five minutes; or if

25 you want to, we can take a ten-minute break for a minute.  I

*Recross - Reed*

```
1    will do --
2                    THE COURT:  You want a ten-minute recess?
3                    MR. MCCONWELL:  I'm trying to wrap this up
4    tonight so we don't go over.
5                    THE COURT:  Very well.  Ladies and gentlemen,
6    let's take a ten-minute recess.  Keep an open mind.  Do not
7    form or express any opinion on this case until it's submitted
8    to you.
9                    Please rise for the jury.  And we will be --
10   yeah, recess for today is at 4:00 p.m.
11                   (Jury out at 3:21 p.m.)
12                   THE COURT:  Okay, take a ten-minute recess.  Very
13   well.
14                   (Recess taken at 3:22 p.m.)
15                   (Back on the record at 3:44 p.m.)
16                   THE COURT:  Call in the jury.  You ready to go,
17   Mr. McConwell?
18                   MR. MCCONWELL:  Yes, Your Honor.
19                   THE COURT:  Do you have any further questions?
20                   MR. MCCONWELL:  I do.
21                   THE COURT:  You'll be able to be finished by
22   4:00?
23                   MR. MCCONWELL:  I don't think so.  I'll have some
24   tomorrow, but it won't be too extensive, I don't think.  We're
25   going through a major group of documents that we need to
```

*Recross - Reed*

1    establish in and it's going to take a little time.

2                MS. M. MILLER:  I'm sorry, I didn't hear what he

3    just said.

4                MR. MCCONWELL:  We're going through some

5    documents that'll take a little time to go through.

6                THE COURT:  Okay, all right.  I thought we were

7    trying to streamline this.

8                MR. MCCONWELL:  I was, but when we looked at it,

9    I forgot one major category I wanted to cover.

10                THE COURT:  Okay.  We'll call in the jury, then.

11                MR. MCCONWELL:  That's why Laura is here with me.

12                THE COURT:  Got it.

13                MR. MCCONWELL:  I'm not allowed to touch the

14    exhibits either, so...

15                THE COURT:  Okay.

16                (Jury in at 3:45 p.m.)

17                THE COURT:  Welcome back, ladies and gentlemen of

18    the jury.  Thank you for your patience.  Mr. McConwell had to

19    just work on some exhibits and was able to finalize them.

20                So go ahead, Mr. McConwell, you may proceed.

21                MR. MCCONWELL:  Thank you, Your Honor.

22                THE COURT:  Just for the record, we have about 12

23    minutes before we recess for the day.  Go ahead.

24    BY MR. MCCONWELL: (CONTINUING)

25        Q.   Mr. Reed, how did you accumulate and document hours

*Recross - Reed*

```
 1    flown by helicopters in the early -- in '87 when you started

 2    with the company?

 3         A.   We never kept records like that.

 4         Q.   You didn't accumulate the hours any time?

 5         A.   No.

 6         Q.   Do you recall a single sideband radio communications

 7    at 10:00 on Wednesdays?

 8         A.   Yes.

 9         Q.   Or Tuesdays, I believe?

10         A.   Yes.

11         Q.   Do you recall that?  And what was that all about?

12         A.   That was if they had a problem or something.

13         Q.   They'd report their hours, too?

14         A.   They -- I don't -- I don't remember reporting any

15    hours.

16         Q.   But that was a communication by every boat to the

17    Saipan radio with the --

18         A.   Yes.

19         Q.   -- with the headquarters?

20         A.   Yes.

21         Q.   And how, as time passed, did you communicate with the

22    boats to acquire the same information -- type of information?

23         A.   Repeat that question.

24         Q.   Did you start communicating by satellite telephone,

25    by e-mail, or how did you continue to communicate progressing
```

1  up through current?

2      A.    I think it was usually by Telex or...

3      Q.    Telex only?

4      A.    Or -- yeah, satellite phones or just the single

5  sideband radio.

6      Q.    Did you have a regular schedule for communications

7  like you did back in the early days?

8      A.    No, not really.

9      Q.    Were there any type of weekly reports sent in to you?

10     A.    No.

11     Q.    How about in 2010 timeframe on, had there been weekly

12 reports utilized to accumulate the hours?

13     A.    I don't remember when we started recording the hours

14 and accumulating them.  I don't remember when we started that.

15     Q.    But whenever that was, you were the person that

16 actually did the accumulation?

17     A.    I wasn't the first one, no.  Somebody else was.

18     Q.    Who was the first one?

19     A.    I'm not sure, I don't know.

20     Q.    Okay.  Then you did at some point; can you tell me,

21 approximately, when?

22     A.    (Pause.)  I just don't remember, I'm sorry.

23     Q.    And what format did you receive the weekly

24 information in?

25              MS. M. MILLER:  Your Honor, I'm going to object.

*Recross - Reed*

```
 1    He said he didn't remember the weekly information, now we're

 2    asking questions about the weekly information he doesn't

 3    remember.

 4                    THE COURT:  Okay, sustained.

 5    BY MR. MCCONWELL:  (CONTINUING)

 6         Q.   You accumulated weekly information; correct?

 7         A.   By e-mail.

 8         Q.   You collected it; correct?

 9         A.   Yes.

10         Q.   And I'm asking you what format did you collect it on?

11         A.   We received it in by e-mail.

12         Q.   And what did you receive by e-mail?

13         A.   The weekly reports.

14         Q.   Okay.

15         A.   Hour reports.

16         Q.   And what did you do with that information?

17         A.   I recorded it and then filed it.

18         Q.   Recorded it and then filed it.

19         A.   (No response.)

20         Q.   And you did this each week or...

21         A.   Yeah, each week.

22         Q.   Would you please put up Exhibit Government 278.

23              Can you tell us what Exhibit 278 is?

24         A.   That's a weekly report.

25         Q.   And was this -- is it a fair statement to say that
```

*Recross - Reed*

1    these reports started in, approximately, 2013?

2        A.    Yes.

3        Q.    Okay.  Let's go across and tell the jury what this

4    report is and how it's utilized within Hansen.

5        A.    This is a weekly report done by each -- each

6    helicopter, each one, giving the hours and the readings on the

7    aircraft engine.

8        Q.    Okay.

9            MR. MCCONWELL:  Your Honor, if he touches the

10   screen, will that leave a mark on the screen?

11           THE COURT:  Yeah.  Do you want him to?

12           MR. MCCONWELL:  I do.  There are several things I

13   want you to mark.

14           THE COURT:  Well, it hasn't been admitted yet.

15           Has this been admitted or is there a stipulation?

16   Are you guys trying to have this admitted?

17           MR. MCCONWELL:  I'll offer -- it's their exhibit

18   and I'm offering it.

19           MS. M. MILLER:  First of all, let's clarify.

20   This is a defense document.  It's an exhibit the government

21   marked, but it is not our exhibit.  I have no objection to

22   this exhibit being admitted, Your Honor.

23           THE COURT:  All right.  Exhibit number, what is

24   it?

25           MS. M. MILLER:  278.

*Recross - Reed*

THE COURT:  Ladies and gentlemen of the jury,
Exhibit 278 will be admitted without objection.  And, yes, if
you would like him to -- maybe you might want him to practice,
sometimes it gets a little wobbly.

What do you want him to do?
(Exhibit 278 admitted.)

MR. MCCONWELL:  I'm going --

THE COURT:  So ladies and gentlemen, this can be
published at this time.

Yes, go ahead, Mr. McConwell.
BY MR. MCCONWELL: (CONTINUING)

Q.   Now, this document, there is one of these submitted
for each aircraft that's out on the boat on a weekly basis?

A.   That's correct.

Q.   And you said that ranges from 35 to 40 at any given
time?

A.   Yes.

Q.   Now, let's go across the top and go through each
category, and I'm going to have you put your finger there in
yellow a couple of things.

First of all, you have the date; correct?

A.   Say again?

Q.   The date?

A.   Yes, the date.

Q.   And that happens to be September, 2018; correct?

A. Yes.

Q. Then you have "Attention: Parts at Hansen Helicopters, Inc."; that's your parts department?

A. Yes.

Q. And this document is used to order parts and bring headquarters up-to-date on what the status of maintenance -- ongoing maintenance?

A. Yes.

Q. And this is light maintenance, this is not heavy maintenance; correct?

A. Correct.

Q. All right. The next category, you've got the pilot. Who is that in this instance?

A. Jing De Guzman.

Q. And you have a mechanic?

A. Yes.

Q. And very frequently your mechanics are Philippine-certified mechanics, right?

A. Yes.

Q. Certificated mechanic, that be aircraft or air --

MS. M. MILLER: I'm sorry, I --

MR. MCCONWELL: Air frame and power plant --

MS. M. MILLER: Hold on. I'm having difficulty hearing Mr. McConwell, first. So if we can go back to the question about the pilot.

```
 1                    THE COURT:  You want a repeat on -- Veronica,
 2    what was the question regarding the pilot?
 3                    Hold on, Mr. McConwell.  From the pilot down to
 4    the -- start with the pilot, Ms. Veronica.
 5                    THE COURT:  Is that better, everyone?
 6                    MS. M. MILLER:  It is better, yes.  Thank you,
 7    Your Honor.
 8                    THE COURT:  So Veronica -- hold on.
 9    Mr. McConwell, we will hear from Veronica.
10                    (Whereupon the reporter read back requested
11    portion.)
12                    MS. M. MILLER:  Yes, Your Honor.  So the
13    objection, Your Honor, is lack of foundation.  There's been no
14    foundation laid that Mr. Reed has any knowledge or information
15    that these pilots were certificated in the Philippines or the
16    mechanics were certificated in the Philippines.
17                    So without that foundation, I'm very concerned
18    about the jury hearing that and there is no evidence to
19    support.
20                    THE COURT:  Yes, Mr. Martin?
21                    MR. MARTIN:  On cross-examination of him earlier,
22    I asked him if every pilot and every mechanic was
23    certificated, and he answered "yes," Your Honor.  So that's an
24    improper objection.  He specifically said every one of them is
25    certificated.
```

1              MS. M. MILLER:  And this is the problem, Your

2    Honor.  It is apparent now, I would believe to everyone, that

3    Mr. Reed is having a lot of difficulty with his memory.

4              THE COURT:  Let's not comment on the evidence.

5              MS. M. MILLER:  Yes.

6              THE COURT:  Let's not comment on the witness.

7              MS. M. MILLER:  Yes.

8              THE COURT:  Keep that to yourself.

9              MS. M. MILLER:  So there's been no foundation

10   laid about any evidence that's been collected about these

11   pilots being certificated in the Philippines.

12             THE COURT:  All right.  So the Court will

13   overrule the objection and I'll let the jurors recall what

14   they can recall about any examination made with this witness,

15   whether it's direct, cross, redirect from any of the

16   attorneys.  So I will overrule the objection at this time.

17             And what was the last question, Veronica?

18             (Whereupon the reporter read back requested

19   portion.)

20             MR. MCCONWELL:  Airframe and power plant is what

21   I was about to say.

22             THE COURT:  So go ahead and re-ask the question,

23   then.  Go ahead.

24   BY MR. MCCONWELL:  (CONTINUING)

25        Q.   The mechanic would be an airframe and power plant

1  certificated mechanic from the Philippines; correct?

2      A.    That is correct.

3      Q.    And this gentleman, do you recognize him as one of

4  the Philippine mechanics precisely or just know that

5  90 percent of your mechanics are Philippine certified?

6      A.    I think 100% of the mechanics are Filipino.

7      Q.    Okay.  And they're all qualified certificated

8  mechanics?

9      A.    Yes.

10     Q.    And they received training when they come to Hansen

11 before they could even work on a boat at all; correct?

12     A.    Yes.

13     Q.    And all their work is in international waters?

14     A.    Yes.

15     Q.    On a tuna boat; correct?

16     A.    Yes.

17     Q.    And the pilots are flying only in international

18 waters from a tuna boat; correct?

19     A.    Yes.

20     Q.    And your mechanics all have certificates from their

21 home country, whether it be the Philippines, Spain, Brazil, or

22 otherwise?

23            MS. M. MILLER:  Objection.  Compound and, again,

24 lack of personal knowledge.

25            THE COURT:  Mr. McConwell, your response?

Case 1:18-cr-00010    Document 1922    Filed 03/31/23    Page 115 of 281

 1            MR. MCCONWELL:  I'll rephrase.

 2            THE COURT:  Okay, so withdraw the question and

 3   rephrase.  Go ahead.

 4   BY MR. MCCONWELL: (CONTINUING)

 5       Q.   You have personal knowledge that all the pilots are

 6   certificated from their country?

 7       A.   From their home country, yes.

 8       Q.   And they come and -- you have involvement with them

 9   when they come to Guam; correct?

10       A.   Yes.

11       Q.   And they're all trained before they're released to

12   the --

13       A.   Yes.

14       Q.   -- tuna boats; correct?

15       A.   Yes.

16       Q.   Unlike Mr. Walker when he came, he wound up going

17   right out on a tuna boat with no training at all; do you

18   recall that?

19       A.   Yes.

20            THE COURT:  You got one minute, Mr. -- before we

21   recess.

22            MR. MCCONWELL:  I'll just say one more thing,

23   then we can stop, Your Honor.

24            THE COURT:  Okay.

25   BY MR. MCCONWELL: (CONTINUING)

*Recross - Reed*

1      Q.   There's been argument here, what you call an opening

2   statement or other about greed.  Mr. Walker is not a greedy

3   person; is he, sir?

4             MS. M. MILLER:  Objection, Your Honor.  First of

5   all, lack of personal knowledge, speculation, argumentative.

6   The jury's going to draw its conclusions about that.

7             THE COURT:  Okay.  Well, let -- we will -- the

8   Court will rule -- at this time, the Court will sustain the

9   objection.  It calls into the character of the defendant, but

10  I'll sustain the objection for now.  We'll get into that

11  later.

12            MR. MCCONWELL:  As for lack of personal knowledge

13  in the question; is that correct, Your Honor?

14            THE COURT:  For all the reasons stated, but we'll

15  -- the Court will come back to that question.  We'll discuss

16  that later.

17            All right, ladies and gentlemen, we'll go ahead

18  and recess for the day.  I want to thank you very much for

19  coming back, staying healthy.  We'll see you tomorrow morning.

20  We will start bright and early, 8:15, and we'll have the same

21  schedule as we have been having -- as we've been having, and

22  the Court will provide lunch for all of you and snacks.  Have

23  a safe evening.

24            You may take your notebooks back there, but keep

25  an open mind.  Do not form or express any opinion on this case

1  until it's submitted to you.  Do not speak to anyone in any

2  subject connected to the trial.

3             In addition, ladies and gentlemen of the jury,

4  stay away from all social media, accessibility with regards to

5  this case, all right?  Thank you.  Please rise for the jury.

6  And I will see you tomorrow morning.  Take care.

7             (Jury out at 4:02 p.m.)

8             THE COURT:  We're outside the presence of the

9  jury.

10            Mr. McConwell, so you're wanting to get into the

11 character of your client about greed or -- not being greedy?

12            MR. MCCONWELL:  Right.

13            THE COURT:  Is that correct?

14            MR. MCCONWELL:  From his personal knowledge and

15 observations and experience.  We've got specific reasons and

16 --

17            THE COURT:  All right.  So you're going to lay

18 the foundation that this witness would know about your

19 client's -- I'm sorry, not your client -- but Mr. Walker's --

20            MR. MCCONWELL:  Mr. Martin.

21            THE COURT:  I'm sorry?

22            MR. MCCONWELL:  Mr. Martin's client.

23            THE COURT:  Mr. Martin's client I meant to say, I

24 apologize.  Mr. Martin's client, that's right.  That's right

25 because you're representing Hansen Helicopters corporation.

1          So you're going to present evidence that this

2  witness is very familiar with Mr. Walker, his -- how he

3  conducts himself with his -- I guess, his character, really?

4          MR. MCCONWELL:  And his employees, his practices.

5  He's very familiar with that, since 1987.

6          THE COURT:  All right.  Well, if you lay the

7  foundation properly, we could get into that.  I mean, you're

8  objecting to his character into evidence, but there's

9  different ways to do it by reputation or opinion evidence.

10          MS. M. MILLER:  Yes, but under 609 of the Federal

11  Rule of Evidence, Your Honor, it's only the witness's

12  character for truthfulness or untruthfulness.

13          There isn't a general character -- I mean, it is

14  inappropriate under the Federal Rules of Evidence.  And we

15  will do some research tonight and bring case law, but Your

16  Honor, I refer the Court to Rule 608 which says:  That the

17  witness character for truthfulness or untruthfulness is

18  admissible.  But general character for something like greed?

19  That is so subjective and that has to do with the motivation

20  of the defendant, and the jury -- motivation isn't an element

21  of the crime, first of all.  That's why character evidence

22  outside of truthfulness or untruthfulness is not admissible.

23  And --

24          THE COURT:  I'm aware of that rule, so --

25          MS. M. MILLER:  Yes.

```
 1                    THE COURT:  Yes, Mr. Martin?

 2                    MR. MARTIN:  That rule applies to witnesses not a

 3       defendant, Your Honor.  If she would read the rule, it says

 4       "witnesses".  The defendant's credibility, I believe, is

 5       covered under a different rule.

 6                    THE COURT:  I'll look at it.  You guys, we'll see

 7       how you flush it out tomorrow.  We'll look at --

 8                    MS. M. MILLER:  Yes.

 9                    THE COURT:  We'll look at the rule.  But we have

10       -- I guess he's going to say that -- I guess he's saying that

11       the door is open through opening statement.  But of course

12       opening statement is not evidence.

13                    MS. M. MILLER:  That's right.

14                    THE COURT:  The issue is:  If it's brought in

15       during the course of the trial as evidence, then of course

16       that might be a different story.

17                    MS. M. MILLER:  Right.

18                    THE COURT:  But I don't recall that necessarily

19       being brought in, as of yet, but we'll see -- we'll flush that

20       out tomorrow morning.

21                    MS. M. MILLER:  Your Honor, the other thing I

22       think we should address is timing.  Now, we're still on

23       cross-examination of Mr. Reed and we're finished with trial

24       for the day.

25                    THE COURT:  Remember, we didn't go for the day,
```

     1   though.

     2              MS. M. MILLER:  No, I know.  We only went a half

     3   a day, but a lot of the questions are being:  "Ms. Miller

     4   asked you this, this was your answer, is that true; Ms. Miller

     5   asked you this.

     6              If we do this, I have to adjust how long the

     7   government's case is going to take, because now we're at least

     8   four weeks.

     9              THE COURT:  All right.  Well -- okay, putting

    10   that aside, how much longer do you have with this witness?

    11              MR. MCCONWELL:  Less than an hour.

    12              THE COURT:  All right, very well.  Let's be

    13   mindful of how we're doing.  I don't think he's actually

    14   wasting time, Ms. Marie Miller.  I don't think so.  I mean,

    15   he's trying to streamline it to the extent that he can, so...

    16   If I felt it was getting out of line, it was being repetitious

    17   and accumulative, waste of time, then I would bring it up, but

    18   I think he's trying to stay on track.  So I'll cut

    19   Mr. McConwell a little slack here.

    20              All right, you're doing okay there?  You're doing

    21   okay?

    22              THE WITNESS:  Yeah.

    23              THE COURT:  Okay.  If you need --

    24              THE WITNESS:  I got a headache, but other than

    25   that.

*Recross - Reed*

         1              THE COURT:  I think a lot of people have

         2    headaches.  This trial is a headache sometimes.

         3              THE WITNESS:  Yeah.

         4              THE COURT:  All right.  I'll see all of you

         5    tomorrow morning.  We'll start bright and early.  Take care,

         6    and we'll look at this issue on --

         7              MR. MCCONWELL:  8:15.

         8              THE COURT:  That's right.

         9              MS. M. MILLER:  Are we going to meet earlier to

        10    discuss the credibility -- or the character evidence issue?

        11              THE COURT:  We will meet at 7...

        12              MS. M. MILLER:  30?

        13              THE COURT:  Yeah.  We start -- yeah, 7:30 a.m.

        14    Let's meet at 7:30 a.m.

        15              MS. M. MILLER:  Thank you, Your Honor.

        16              THE COURT:  Unless you guys come to an agreement.

        17              MS. M. MILLER:  Yes, Your Honor.

        18              THE COURT:  I'll let you guys talk about it, and

        19    you guys agree that -- because I don't recall his -- I don't

        20    recall evidence of greed being brought in, as of yet.  I do

        21    recall maybe in opening statement, but again, that's not

        22    evidence.

        23              Yes?

        24              MR. MARTIN:  The problem we have, Your Honor, is

        25    if they don't put on a witness that says Jon Walker is greedy,

                                  *Recross - Reed*

1  then how are we going to get to rebut it?

2          MS. M. MILLER:  The jury can infer whether he's

3  greedy or not.  Greed is motivation.

4          THE COURT:  Hold on.  If a prosecutor or defense

5  Counsel presents opening statement, then it's what they expect

6  their evidence will be.

7          MS. M. MILLER:  Right.

8          THE COURT:  So if the -- I'm going to assume that

9  the prosecution is going to have evidence that Mr. Walker was

10 greedy.

11         MS. M. MILLER:  It's going to be an inference the

12 jury can make, Your Honor.

13         THE COURT:  No, I know, but -- so whether it's an

14 inference or by direct evidence?

15         MS. M. MILLER:  Correct.

16         THE COURT:  So if the prosecution is going to

17 bring that on, then the Court can conditionally admit the

18 questioning of the witness --

19         MS. M. MILLER:  Absolutely.

20         THE COURT:  -- on Reed.  You see what I'm saying?

21 Because, I mean, no prosecutor, no defense attorney should not

22 be making an opening statement without being sure that that's

23 what they want to put on as evidence.

24         MS. M. MILLER:  Oh, yeah, and there isn't going

25 to be direct evidence of his greed, but there is going to be a

*Recross - Reed*

```
 1    ton of circumstantial evidence of money being the motivator
 2    for a lot of the defendant's actions and failure to act, so
 3    that's definitely going to come out.  But to ask a witness to
 4    actually testify based on his own opinion about whether the
 5    defendant is or is not greedy, is absolutely inappropriate.
 6    And we'll have case law tomorrow morning, Your Honor, to
 7    present you on that point.
 8              MR. MCCONWELL:  I have a solution.
 9              THE COURT:  Yes, go ahead.
10              MR. MCCONWELL:  I withdraw the question so we
11    don't have to come in at 7:30.  We'd like to have breakfast at
12    the hotel.
13              MS. M. MILLER:  Come on.  Get up earlier and have
14    breakfast.  We're never going to get this trial done.
15              THE COURT:  The question is withdrawn?
16              MR. MCCONWELL:  That's right.
17              THE COURT:  All right, very well.  Question
18    withdrawn.  By the way, the hotel that you guys are staying
19    at, I'm pretty sure that the manager would make sure that you
20    guys have your breakfast on time, at 7:00 or earlier.
21              MS. MCCONWELL:  We tried that last time, it
22    didn't work.
23              THE COURT:  It should work.  I actually spoke to
24    the manager.  I said, "hey, I got these attorneys who have
25    issues with their breakfast time."
```

         1                MR. MCCONWELL:  My favorite meal.

         2                THE COURT:  Yeah, I know.

         3                MR. MCCONWELL:  We're all recovering.  We came in

         4    Thursday night, too, so we're all the same level.

         5                THE COURT:  We're jet lagging.  All right, so

         6    I'll see all of you -- since the question is withdrawn, so be

         7    it.  All right, see you guys tomorrow.  We'll start at 8:15.

         8                MS. M. MILLER:  Thank you, Your Honor.

         9                THE COURT:  Thank you, all.  Take care.

        10                MS. S. MILLER:  Thank you, Your Honor.

        11                (Proceedings concluded at 4:10 p.m.)

        12                          *  *  *

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

*Recross - Reed*

          1              May 10, 2022; 8:22 a.m.; Hagatna, Guam

          2                            * * *

          3

          4              THE COURT:  We'll call the case up.  And I think

          5    Steve is --

          6              (Discussion with clerk.)

          7              THE COURT:  Did he fix it?  We just had a slight

          8    delay because of our sidebar microphones, not -- whatever this

          9    is called.  Earphones.  All right.  We'll call the case up.

         10              THE CLERK:  Good morning, Your Honor.  This is

         11    Criminal Case No. 18-00010, *United States of America v. John*

         12    *D. Walker and Hansen Helicopters,* Jury Trial, Day 7.

         13              Counsel, please state your appearances, beginning

         14    with the government.

         15              MR. LEON GUERRERO:  *Buenas* and *hafa adai*, Your

         16    Honor.  Stephen Leon Guerrero on behalf of the United States.

         17    Also present are Special Assistant U.S. Attorneys, Marie

         18    Miller and Samantha Miller.

         19              MS. M. MILLER:  *Hafa adai*, Your Honor.

         20              MS. S. MILLER:  *Hafa adai*.

         21              THE COURT:  *Hafa adai*.  Good morning.

         22    Ms. Miller, Ms. Miller and Mr. Leon Guerrero.

         23              MR. MARTIN:  Good morning, Your Honor, Mack

         24    Martin appearing on behalf of John Walker, who is also to my

         25    left and present.

1          THE COURT:  Good morning, Mr. Martin and

2     Mr. Walker.

3          MR. MCCONWELL:  Good morning, Your Honor.  Edward

4     McConwell appearing on behalf of Hansen Helicopters along with

5     Laura McConwell and Edward Han.

6          THE COURT:  Okay.  Good morning.  Mr. Han, Ms.

7     McConwell, Mr. McConwell.  Ready to proceed, Counsels?

8          MR. MCCONWELL:  Yes.

9          THE COURT:  Okay.  Very well.  We'll call in the

10    jurors and -- so you know, I think we're good to go.  It

11    sounds like on the mics.  So our IT guy knows this -- I guess

12    he was fixing it early, just now.  So we are good.

13         So let me just say, you don't need to do speaking

14    objections.  Just object.  If you're going to object, say

15    "hearsay."  You don't have to tell me why it's hearsay, I

16    think I can figure it out.  If it's assuming facts not in

17    evidence, just say that.  If it's lack of foundation, just

18    tell me that.  That's all you need to do.  Then we could avoid

19    having everybody come up to like congregate on the, you know,

20    aggravating thing.  It's not that aggravating, but it's a

21    little cumbersome, let's put it that way.

22         And so I just -- just stick with the specific

23    objection, you should know them, evidentiary objections under

24    the Federal Rules and then I think I could rule on that.  I'm

25    pretty sure I can.  Okay, we'll call in the jurors; okay,

```
 1    thank you, Mr. Perez.

 2                    MR. PEREZ:  Morning, Your Honor.

 3                    THE COURT:  Please rise for the jury.

 4                    (Jury in at 8:25 a.m.)

 5                    THE COURT:  All right.  Please be seated.  Hafa

 6    adai and good morning, everyone.  I'm sorry for the slight

 7    delay here, we wanted to -- we had to get my IT guys to work

 8    on the earphones and microphones for our objection

 9    conferences.

10                    So thank you for your patience and we're ready to

11    proceed.  We'll continue on with the examination,

12    Mr. McConwell, you still have further questions, sir?  So yes,

13    witness, you're still under oath.

14                    MR. MCCONWELL:  Is this microphone working okay

15    now?

16                    THE COURT:  Yes, it is, can you all here?

17    Prosecutors?

18                    MS. M. MILLER:  Yes, Your Honor.

19                    THE COURT:  And then maybe, Mr. McConwell, take

20    the mics and just go like this.  Bring it like towards the

21    center.

22                    MR. MCCONWELL:  I got the head mic in my tie.

23                    THE COURT:  Maybe just move it over anyway

24    because sometimes you pressure -- maybe in --

25                    MR. MCCONWELL:  I've been brushing this way.
```

*Recross - Reed*

```
 1                    THE COURT:  Right.  Bring it in towards you.
 2       There you go, that's better.  There you go, I think we're
 3       going to be good.  Okay.
 4                    MR. MCCONWELL:  Okay.
 5                    THE COURT:  (Nodded head.)
 6       BY MR. MCCONWELL: (CONTINUING)
 7          Q.   I'd like to refer to Exhibit 2900, 1 through 6.
 8                    THE COURT:  Okay.  Has that already been admitted
 9       or not admitted?
10                    MR. MCCONWELL:  This has been admitted.  To my
11       understanding it is.
12                    THE COURT:  Has been previously admitted.  Let me
13       just confirm with my --
14                    MS. M. MILLER:  No, Your Honor.  So Exhibit 2900
15       has not been admitted into evidence, yet, but the government
16       would move it into evidence.
17                    THE COURT:  Okay, 2900, 1 through 6.
18                    MS. M. MILLER:  Hold on, 2900 in its entirety the
19       government would move into evidence, Your Honor.
20                    MR. MARTIN:  Which I object, Your Honor.
21                    THE COURT:  Hold on a second.  Just for -- okay,
22       so -- so it has not been admitted.  And it's 2900, it's not
23       just 1 through 6, there's a whole -- it's a whole other --
24                    MS. M. MILLER:  It's all of the leases.
25                    (Discussion with clerk.)
```

 1                    MR. MCCONWELL:  How many pages?

 2                    THE COURT:  Just a minute.  Just a minute.  What

 3       is it?

 4                    MR. MCCONWELL:  How many pages is this exhibit?

 5                    MS. MCCONWELL:  It's six pages and on the -- on

 6       the 15 -- well, the entire exhibit is 4300 pages.  What was

 7       admitted on the 16th of March were pages 1 through 6.

 8                    THE COURT:  Okay, so if it's already been

 9       previously admitted, then we'll move on.  All right.  Okay,

10       we'll move on, 2900, 1 through 6 has been admitted.

11                    THE CLERK:  Yes, ma'am.

12                    THE COURT:  So hold on one second.  All right.

13       We're good.  2900, 1 through 6, has been previously admitted

14       and -- already, and, okay, you may show it to the witness and

15       it could be published.  You may proceed.

16                    MR. MCCONWELL:  Thank you, Your Honor.

17       BY MR. MCCONWELL: (CONTINUING)

18          Q.   Mr. Reed, this is one of the contracts that you were

19       involved with; is that correct?

20          A.   Yes.

21          Q.   This is one discussed by the government with you in

22       direct examination.  I'd like to go back to this contract

23       briefly and point out a few of the sections.  And when you get

24       to a point, I'll ask you to mark a yellow part, yellow by

25       yellow with your finger, particular sections, okay?

```
 1                THE COURT:  Well, first of all, have you done

 2    that before?  I can't remember, have you used your finger on

 3    that?

 4                THE WITNESS:  Yeah.

 5                THE COURT:  You have?  Oh, okay.

 6                THE WITNESS:  It's in green.

 7                MR. MCCONWELL:  We'll take green.

 8                THE COURT:  He'll take green.  All right.

 9    BY MR. MCCONWELL: (CONTINUING)

10       Q.   Mr. Reed, thank you.  Now, this is one of the

11    contracts and this happens to be --

12                THE COURT:  Hold on, one second.  Do me a favor,

13    can you make that guys a little bigger font size?  Zoom it out

14    or make it bigger.  Yeah let's --

15                MR. MCCONWELL:  Wrong way.

16                MS. MCCONWELL:  I have to do this to make it

17    bigger, I'm just having trouble when I --

18                THE COURT:  Take your time.  Just pull up the top

19    there.  You're fine, you're good.

20                MS. MCCONWELL:  What I was going to say is, when

21    I go back to the full screen, for some reason page -- it zooms

22    back.  So I'll just go back to showing it this way.

23                THE COURT:  It's just hard to read.

24                MS. MCCONWELL:  Yes, ma'am.

25                THE COURT:  What are you having a problem with?
```

*Recross - Reed*

 1    That's good.

 2              MS. MCCONWELL:  When I go back to full screen, it

 3    gets it out of my zoom mode, so we'll just go here.

 4              THE COURT:  Yeah.  Let's do it that way.  It's a

 5    lot easier to see.

 6              MS. MCCONWELL:  Yes, ma'am.

 7              THE COURT:  And I think, well, at least for me to

 8    see and the other fact-finders -- I mean the fact-finders and

 9    then the witness.  Can you see that okay, sir?

10              THE WITNESS:  (Nodded head.)

11              THE COURT:  Is that better?

12              THE WITNESS:  Yeah.

13              THE COURT:  Okay.  Go ahead.

14    BY MR. MCCONWELL: (CONTINUING)

15       Q.   With regard to this particular document, February 27,

16    2015, contract; correct?

17       A.   Yes.

18       Q.   And this is with Bravo Air, Inc., a Vanuatu

19    corporation, and TSP Marine Industries Limited a/k/a Nupla

20    Solwara at Section 54; do you see that?

21       A.   Yes.

22       Q.   Now, is that particular TSP Marine Industries, is

23    that a sub company with one of your major boat owners?

24       A.   Yes.

25       Q.   And we'll get into that later.  And this involves a

369 model helicopter.  And if we scroll down to page 2,
please.  At the top, it says, "This lease shall commence and
delivery of the aircraft will occur when the aircraft arrives
in international waters," do you see that?

     A.   Yes.

     Q.   Would you mark that with your marker, your finger?
What I just read?

     A.   (Witness complied.)

     Q.   Then we go down to the next section.

               THE COURT:  Okay.  And what -- he's marking, is
that page 2 of 2900?

               MR. MCCONWELL:  It's page -- 2900, page 2, I
think.

               THE COURT:  Okay.  Section 2, at least.

               MR. MCCONWELL:  Yes.

               THE COURT:  Very well.  Thank you.

               MR. MCCONWELL:  Laura, if you could pull it down
a minute, we could confirm that.  It's got a "G" number at the
top right there.

               MS. MCCONWELL:  It's 2900-2.

               MR. MCCONWELL:  At the top, right-hand corner
it's 2900-2, that'll be page 2.

               THE COURT:  Very well.  Thank you.

               MR. MCCONWELL:  That's 2 of 40-some hundred
ultimately.

```
 1              THE COURT:  26.

 2   BY MR. MCCONWELL: (CONTINUING)

 3       Q.    Okay.  The next section, do you see that, sir?

 4       A.    Section 3?

 5       Q.    Section 3, "rent and other charges"?

 6       A.    Yes.

 7       Q.    And the amount of the rent is $40,000; correct?

 8       A.    Say again?

 9       Q.    The amount of the rent, per month, that the lessee

10   boat pays is forty thousand hundred -- $40,000 per month?

11       A.    Yes.

12       Q.    Would you underline that, please?

13              MS. MCCONWELL:  Just a moment, Your Honor.

14              THE COURT:  Yes, go ahead.

15              MS. MCCONWELL:  I -- when I move the screen, it

16   moves his marking and so it was my understanding when we did

17   this ahead of time, that we'll need to then do a screen shot.

18              THE COURT:  That's right.  We need to do that.

19   We have not done that.  Let's get -- let's go back to --

20              MS. MCCONWELL:  So I'm back to where we started

21   and I think he could make it -- I won't move it until we take

22   the screen shot.

23              THE COURT:  Right, you are absolutely right.

24              MS. MCCONWELL:  I apologize for the interruption.

25              THE COURT:  No, no, no.  We need to do that, I'll
```

*Recross - Reed*

 1    have my clerk do that.

 2                    MR. MCCONWELL:  A screenshot.

 3                    THE COURT:  We're going to take it right now.

 4    We'll take it, the Court will take the screenshot.  So ladies

 5    and gentlemen, we'll take a screenshot so that when you get

 6    this as evidence in the deliberation room, you'll get the

 7    mark, you'll see the marking on it.  But we have to take a

 8    screenshot.  She's right.  Ms. McConwell is correct.  So once

 9    my courtroom clerk takes the screenshot, then we could move on

10    to the next question.  So hold on, one second, one second.

11    Taking a screenshot.

12                    MR. MCCONWELL:  I know you tap somewhere and the

13    underline is removed, but I don't know where it is.

14                    THE COURT:  I'm sorry, what was that?

15                    MR. MCCONWELL:  I know we're going to the next

16    section, but will that stay there then?

17                    THE COURT:  We can remove it.

18                    MR. MCCONWELL:  Well, let's move down to the next

19    section.  Cursor.

20                    THE COURT:  Let me see if we got the screenshot

21    done.  Hold on.

22                    Carmen, do you have it done?

23                    THE CLERK:  Yes, ma'am.

24                    THE COURT:  Let's go to the next one then.  Next

25    section that you want to --

```
 1              MR. MCCONWELL:  I got a black screen.

 2              MS. MCCONWELL:  I have a black screen.

 3              THE CLERK:  Can you unplug and re-plug?

 4              THE COURT:  There we go.  Okay.

 5    BY MR. MCCONWELL: (CONTINUING)

 6       Q.   Now we're down to Section 3.  Could you

 7    underline $40,000 dollars per month?

 8              THE COURT:  Do you want him to do anything else

 9    on Section 3?

10              MR. MCCONWELL:  There will be some more.  We'll

11    move down to the next section.  Hopefully the line will stay

12    where it is.  Next paragraph.

13              THE COURT:  I don't think it will.  Take the

14    screenshot.

15              THE CLERK:  Yes, ma'am.

16              THE COURT:  Hold on.  We'll take a screenshot.

17    Can you make that full size on the screen?

18              MS. MCCONWELL:  Well, when I do, then it get

19    small.

20              THE COURT:  Oh, odd.

21              MS. MCCONWELL:  See, I can do this.

22              THE COURT:  Go return back to where you were.

23    How about to the top right there?  See on the very top right,

24    no, no, see on the top of the there.  Up up up, keep going up,

25    big square, no, the middle one, there try that.  And then try
```

 1    pulling the white.

 2                MS. MCCONWELL:  Try again?

 3                THE COURT:  I don't know.

 4                MS. MCCONWELL:  It looks bigger.

 5                THE COURT:  It looks bigger kind of.  Okay.  I'll

 6    just have IT come down maybe they can come help you.  That's

 7    fine.  It's okay, keep going, you're fine.

 8                MS. MCCONWELL:  Enlarge it again.

 9                THE COURT:  Don't worry about it.  We'll get it.

10    I'll have my IT guys.  Maybe they can assist you.  Pull that

11    back, there we go.  You want to re-do it again?  Put

12    underneath it.  So okay, just really nicely, gently.  Uh-huh.

13    Okay, very nice.  All right.  Stop.  Stop.  Okay, go ahead,

14    take picture.  We'll get it down.  I think we need a stylus.

15    I think a stylus is better than our fingers but I don't know

16    where's my stylus here.  I'll try to find one.

17                (The Court handed witness a stylus.)

18                THE COURT:  Why don't you go like this, Mr. --

19    Mr. Kapp[sic].  Yeah, yeah.  Go right, just test it.

20                THE WITNESS:  It won't work.

21                THE COURT:  Oh, it doesn't work?

22                THE WITNESS:  No.

23                MR. MCCONWELL:  Do you know what that arrow is in

24    the upper right-hand corner?  Upper right?  Does that --

25                THE COURT:  Anyway, just tell Steve to come down.

 1   And then I think you have a stylus in my desk in my pencil box

 2   or something.

 3                   MR. MCCONWELL:  It's gone now, Carmen.  Is that

 4   what you did?

 5                   THE CLERK:  Yes, sir.

 6                   MR. MCCONWELL:  Let's let Carmen, she can remove

 7   it.  We'll go to the next one.

 8   BY MR. MCCONWELL: (CONTINUING)

 9      Q.   The third paragraph, if you would, sir.  It's not

10   far.  Keep going.  Back up.

11                   MS. MCCONWELL:  There?

12   BY MR. MCCONWELL: (CONTINUING)

13      Q.   "Lessee agrees to provide up to 700 hours flight time

14   for 12-month period of the lease, hours flown in excess of

15   700 hours.  Excess flight hours will be billed annually at the

16   rate of 685.71."  Underline that sentence, those two

17   sentences, please.

18      A.   Yes.

19                   THE COURT:  Carmen, don't -- we don't have a

20   stylus that goes with this, Carmen?

21                   (Discussion with clerk.)

22                   MR. MCCONWELL:  Can you take a photo shot of

23   that, please?

24                   THE COURT:  Yeah, we'll do that.

25                   Like even when you're doing a credit card with

                          *Recross - Reed*

```
 1   your signature, it's very difficult with your finger.

 2               MR. MCCONWELL:  Do we have a screenshot taken?

 3               THE CLERK:  Yes, sir.

 4               MR. MCCONWELL:  Go ahead and remove that please,

 5   Carmen.

 6               MS. M. MILLER:  Your Honor.  I have a stylus.

 7   May I approach the witness?

 8               THE COURT:  Oh, okay.  Yeah, thank you.  That's

 9   nice.  Hopefully yours will work.  My eraser didn't.  Want to

10   check that out?  You want to just --

11               THE WITNESS:  Oh, okay.

12   BY MR. MCCONWELL:  (CONTINUING)

13      Q.   The next one I want you to underline is "the downtime

14   credit is to be computed at a rental rate of $1,290.32 per

15   day"?

16      A.   So you want me to start with the downtime credit?

17      Q.   The downtime credit, yes.

18               MS. M. MILLER:  Is it working?

19               THE WITNESS:  It's -- it's shaking, it's jumping.

20   BY MR. MCCONWELL:  (CONTINUING)

21      Q.   It's now dots.

22      A.   Yeah.  It's just now dots.

23               THE COURT:  Just use your hands then.  Use your

24   finger.  You're getting a little better at it any way.

25               THE WITNESS:  Do you want this back?
```

*Recross - Reed*

```
 1            MS. M. MILLER:  No, you can keep it.

 2            THE COURT:  She doesn't want it.  Okay, just

 3   leave it there.

 4            THE WITNESS:  How far do you want me to

 5   underline?

 6   BY MR. MCCONWELL: (CONTINUING)

 7       Q.   Go up all the way to the end of the sentence.  That

 8   provision is in case there is a mechanical problem with the

 9   helicopter, you have to switch out helicopters; correct?

10       A.   That is correct.

11       Q.   And that all -- all that, the overage usage and

12   downtime credit and all settle up at the end of each year?

13       A.   Yes.

14       Q.   Just get a photo shot of that.

15            THE CLERK:  It's done.

16            THE WITNESS:  You want me to test it or?

17            THE COURT:  Yeah.  Can you test it, just like any

18   line.  It's not working, huh?

19            THE WITNESS:  No.

20            THE COURT:  Okay.

21            MR. MCCONWELL:  We could go ahead and he could

22   actually underline the next paragraph.  And then we get the

23   photo shot of the entire both photographs, if you like.

24            THE WITNESS:  Where it says downtime credit?

25            MR. MCCONWELL:  You got downtime credit that
```

*Recross - Reed*

1  sentence.  Then I want you to drop down to, "it is further

2  agreed" in the next paragraph.  Go ahead all the way through

3  the first two sentences.  "It's further agreed that excess

4  flight hours and downtime days will be computed on an annual

5  basis beginning on the date of delivery of the aircraft.  To

6  the extent the downtime days exceed the amount of billable

7  excess flight hours upon receipt of instructions, lessee will

8  issue a cash refund or credit lessee at the time of the

9  downtime credit.  Do you see that?  Underline all that,

10 please.

11             THE COURT:  All the way down to down credit rate,

12 is that what you just said?

13             MR. MCCONWELL:  Yes.  All the way down to credit

14 rate.

15             THE COURT:  Okay.

16             THE WITNESS:  Down to there?

17             THE COURT:  Okay.  We'll take a screenshot.

18             MR. MCCONWELL:  We'll have quite a few more, Your

19 Honor.

20             THE COURT:  I don't know what's going on.

21             MR. MCCONWELL:  Finished with that?  Did we get

22 the photo shot?

23             THE COURT:  She's getting it right now.  One

24 second.  Done.

25 BY MR. MCCONWELL: (CONTINUING)

*Recross - Reed*

     1          Q.   Now the purpose of this discussion about downtime

     2     credits and all and setting up the end of the year, is to

     3     resolve any issues on a performance of the contractor or any

     4     complaints that the boat owner has or any problems you have

     5     and that is settled up every year; correct?

     6          A.   Yes, that is correct.

     7          Q.   And the boat owners throughout your career, have not

     8     complained about the settlement amount that's occurred on an

     9     annual basis for every boat for the entire time?

    10               MS. M. MILLER:  Objection.  Hearsay.

    11               THE COURT:  Okay.  Let me hear the question

    12     please, I don't know if --

    13               (Whereupon the reporter read back requested

    14     portion.)

    15               THE COURT:  All right.  Objection is hearsay.

    16               Mr. McConwell, are you offering for the truth of

    17     the matter asserted.

    18               MR. MCCONWELL:  I'm just asking whether or not

    19     there were complaints.

    20               THE COURT:  Well, that calls for hearsay.

    21               MR. MCCONWELL:  I guess it is.

    22               THE COURT:  Okay, so sustained.

    23     BY MR. MCCONWELL: (CONTINUING)

    24          Q.   If complaints had been made by any boat owner,

    25     there'd be some record of it kept in the records of Hansen

*Recross - Reed*

1   Helicopters; correct?

2           MS. M. MILLER:  Objection, Your Honor, lack of

3   foundation.

4           THE COURT:  Sustained, want to set up the

5   foundation, his knowledge.

6           MR. MCCONWELL:  No.  I'm asking him if a

7   complaint happened to be arrived at or had received, it would

8   be a record of it in the permanent records of Hansen

9   Helicopters.

10          THE COURT:  Right.  So her objection is that

11  there has not been -- there is a lack of foundation laid about

12  his knowledge.

13  BY MR. MCCONWELL: (CONTINUING)

14     Q.  You would be the one to make a record of any

15  complaint; correct?

16          MS. M. MILLER:  Objection.  Leading, Your Honor,

17  and this is a witness that works for the defendants.

18          MR. MCCONWELL:  I think we're entitled to lead.

19  The Court ruled on that a month ago, six weeks ago.

20          THE COURT:  Overruled, go ahead.

21  BY MR. MCCONWELL: (CONTINUING)

22     Q.  You understand the question?

23     A.  Repeat the question.

24     Q.  Okay.  If a complaint had been made, you would be the

25  one they would come to you and you'd be the one to make an

*Recross - Reed*

entry about it in the records before the settlement is arrived

at; correct?

    A.   Yes, that's correct.

    Q.   And there have been no such entries made by you of

any complaint concerning --

    A.   That's correct.

           MS. M. MILLER:  Objection.  Hearsay.

           THE COURT:  Overruled.  Okay, he's established

he's got knowledge.  Okay.  Overruled.

BY MR. MCCONWELL: (CONTINUING)

    Q.   And wouldn't that mean there'd been full performance

by Hansen or for the maintenance part and the Vanuatu

corporations as the lessor by providing a helicopter, a

mechanic and a pilot for those periods of time?

           MS. M. MILLER:  Objection.  Compound question,

Your Honor.

           THE COURT:  Sustained.  You want to break it

down.

           MR. MCCONWELL:  Well, I can't --

           (Whereupon the reporter read back requested

portion.)

BY MR. MCCONWELL: (CONTINUING)

    Q.   Number 1, helicopter?

    A.   Correct.

    Q.   Number 2, pilot?

*Recross - Reed*

  1        A.    Yes.

  2        Q.    And No. 2 or No. 3, mechanic?

  3        A.    Yes.

  4        Q.    Let's take a look at page 4, if you would, please.

  5   Paragraph 6.

  6        A.    Section 6?

  7        Q.    Section 6, I'm sorry.  "While aboard the fishing

  8   vessel, flight plans and objectives will be at the direction

  9   -- and direction -- at the discretion and direction of the

 10   captain of the vessel or its designee.  With respect to flight

 11   safety, weather conditions, the actual aviation maintenance of

 12   the aircraft, all judgments and authority will reside with the

 13   pilot and/or the mechanic of the aircraft."  Would you

 14   underline that whole section for us, please?

 15        A.    (Witness complied.)

 16        Q.    Doesn't that mean that the captain or the fish

 17   master, as the case may be, maintains operational control over

 18   the aircraft that are involved in fish spotting?

 19        A.    Yes.

 20        Q.    Let's go down to the next Section 8, if we could.

 21   "The registration and title of the aircraft shall be in the

 22   name of the lessor and the aircraft at all times during the

 23   term of the agreement or automatic renewals shall bear

 24   international-recognized registration marks."  Would you

 25   underline that, please.

*Recross - Reed*

 1    A.    (Witness complied.)

 2              MR. MCCONWELL:  Let's take a photo shoot.

 3              THE CLERK:  I'm sorry, it moved.  One moment.

 4              THE COURT:  Okay.  Hold on a second.  She's

 5    taking it right now.  Hold on.

 6              MS. MCCONWELL:  I moved it.

 7              THE CLERK:  It's okay, I'm trying again.

 8              MS. MCCONWELL:  I'm sorry.

 9    BY MR. MCCONWELL:  (CONTINUING)

10    Q.    Now in this instance, for Bravo Air, Bravo Air was

11    the registered owner; correct?

12    A.    Yes.

13    Q.    They were the lessor; correct?

14    A.    (Nodded head.)

15    Q.    And Bravo Air, the aircraft referred to by for Bravo

16    Air is 6188C; do you see that in the front page of the

17    agreement?

18    A.    Yes.

19    Q.    And if the aircraft had actually been registered,

20    which it was, on the aircraft U.S. registry, it would have

21    that registration mark on the aircraft?

22    A.    Yes.

23    Q.    And that didn't make any difference, whether or not

24    it was lawfully-registered at that point.  The fact is, it was

25    registered; correct?

*Recross - Reed*

1    A.   Yes.

2    Q.   Now, let's go on to Exhibit No. 216-2.  And 216-3,

3  all these are government exhibits.  216-3 has already been

4  admitted; part of the same section of documents, but 2 and 4

5  have not been.  So if -- let's go ahead --

6              THE COURT:  Which one are you going to right now?

7  20 -- this is on the 2900 category?

8              MR. MCCONWELL:  Yes -- no 216.

9              MS. M. MILLER:  No, Your Honor.  This is not

10  2900.

11              MR. MCCONWELL:  216-2 is the first one.  And that

12  should just be for the Court only.

13              THE COURT:  Wait, 216-2, has that been admitted?

14              MR. MCCONWELL:  That has not been admitted.

15  216-3 has been.  And so this one needs to be considered first

16  for questions.

17              THE COURT:  Wait.  All right, so 216-3 has been

18  admitted.  And so which one are you looking at right now?

19              MR. MCCONWELL:  216-2, 216-3 has been admitted.

20              THE COURT:  Right.  And 2 has not?

21              MR. MCCONWELL:  Right.  216-4 will be the next

22  one.  And I might as well ask him to foundational questions.

23              THE COURT:  All right.  Let me just hold off.

24              Ms. McConwell, go ahead.

25              MS. MCCONWELL:  I think all three -- I believe

1   all three of those pages, 2, 3 and 4 were admitted.

2              THE COURT:  All right.  Very well.  Mr.

3   McConwell --

4              MS. MCCONWELL:  On the 15th.

5              THE COURT:  All right.  216-2, 216-3 and 216-4

6   have already been admitted.

7              MR. MCCONWELL:  I didn't remember that.  And if

8   that's correct, we won't have to go through this process.

9              THE COURT:  No, I've confirmed that with my

10  court.

11             MS. M. MILLER:  If it's confirmed with the Court,

12  no objections, Your Honor.

13             THE COURT:  All right.  Very well.

14             MR. MCCONWELL:  I'm just trying to be careful.

15             THE COURT:  Okay.  Okay, got it.

16  BY MR. MCCONWELL: (CONTINUING)

17     Q.   First one up, we'll deal with the...

18             THE COURT:  Can I get Steve down here?

19  BY MR. MCCONWELL: (CONTINUING)

20     Q.   Dash 2 first?

21             THE COURT:  Tell him let's go.  Want to see if he

22  can help us with this.  Now what number is this, Mr. --

23             MR. MCCONWELL:  This is 216-2.

24             THE COURT:  2, got it.

25  BY MR. MCCONWELL: (CONTINUING)

*Recross - Reed*

 1      Q.   Now, can you tell us what this is?  What's a
 2 whiteboard by the way?
 3      A.   What's a what?
 4      Q.   A whiteboard?
 5      A.   (No response.)
 6      Q.   Let me ask this, do you have a whiteboard in your
 7 office?
 8      A.   Oh, yes.
 9      Q.   October 2016; correct?
10      A.   Yes.
11      Q.   And what was the purpose of that whiteboard?
12      A.   To list all the helicopters and boat names and the
13 date of the contracts and the pilots and mechanics.
14      Q.   Just all the relevant information and report
15 information?
16      A.   Yes.
17      Q.   Correct?
18      A.   Yes.
19      Q.   We'll go through this a little slowly here.  This
20 particular first document, dash 2, can you tell us what this
21 one is?  In general terms first?
22      A.   It's just a chart showing the boat name, the
23 aircraft, the dates of the contracts, the terms and amounts.
24           THE COURT:  Can you try to enlarge this, Ms.
25 McConwell?

*Recross - Reed*

```
 1              MS. MCCONWELL:  I'll try do it some more.
 2   BY MR. MCCONWELL: (CONTINUING)
 3       Q.   Now, this particular document, dash 2, we need the
 4   left-hand column, Laura.  Thank you.  This particular document
 5   lists eight companies; correct?
 6       A.   Yes.
 7       Q.   And then it lists the sub companies, the subsidiary
 8   companies that the actual boat registered owners or the actual
 9   boat owners; correct, for each of the main parent companies?
10       A.   Yes.
11       Q.   And the first one is, why don't you read that for us?
12       A.   Fong Kuo Fisheries.
13       Q.   Yes.
14       A.   Fong Kuo 188, 189.
15       Q.   Okay.  You don't need to read all of them, but if you
16   look down at No. 15, would you tell us what that one is?
17       A.   Nupla Solwara.
18       Q.   And that is what "N" number?
19       A.   N1 -- N6188 Charlie.
20       Q.   Now, that happens to be the boat involved in the
21   contract that we just reviewed; correct?
22       A.   Correct.
23       Q.   Would you yellow or make a highlight on that for us?
24   I hate -- let's just put a little plus on the column 14 there
25   or 15, I mean, by maybe a long line.  But I don't want you to
```

1   blank it off but...that particular boat was a subsidiary

2   company...

3                   THE COURT:  Hold on a second.  So we could make

4   the exhibit bigger, if I don't show the witness, so we'll pull

5   -- we'll take the witness off the witness box on the screen

6   and then let's just make this exhibit bigger so we could see.

7   May I just ask the witness, so when it says "Fong Kuo" or is

8   it?

9                   THE WITNESS:  Fung Kuo.

10                  THE COURT:  Fung Kuo Fishery, that is the company

11  and then the one through 18, those are the subsidiary

12  companies?

13                  THE WITNESS:  Yes.

14                  THE COURT:  Oh, okay.  Thank you for clarifying

15  that.  I wasn't sure about that.  Thank you.

16  BY MR. MCCONWELL: (CONTINUING)

17      Q.   So that company --

18                  MS. M. MILLER:  I'm sorry, Your Honor, hold on.

19  I didn't get your question.  You're asking him -- so the

20  vessel is the name of the company.  And what did you say about

21  the subsidiary company?

22                  THE COURT:  So I wasn't clear with the

23  questioning that was had earlier.  Are the numbers 1

24  through 18 under Fung Kuo Fishery Vessel its subsidiaries,

25  Nos. 1 through 18?  And he said "yes."

*Recross - Reed*

 1                MS. M. MILLER:  I don't think that is correct.

 2    BY MR. MCCONWELL: (CONTINUING)

 3        Q.   Well, let's go back, if we could, Your Honor, to

 4    2900.1 or dash 1 and we'll correct -- find out right now?

 5                THE COURT:  I wasn't clear what he meant by --

 6    which ones are the subsidiaries, I don't know.  I'm looking at

 7    this chart.  Okay.  So we're back on 216-2, previously

 8    admitted.

 9                MR. MCCONWELL:  We're now down to 2900-1 is what

10    we're looking at.  The one I'll go back to.  Can we do a split

11    screen on this?

12                MS. MCCONWELL:  You're challenging my

13    technological.

14                MR. MCCONWELL:  My grandchildren aren't here, so

15    we're having problems.

16                THE COURT:  My two-year-old grandchild is not

17    here.

18                (Discussion with IT.)

19                THE COURT:  Do you know how?

20                MR. MCCONWELL:  Rather labor that, I think we may

21    be since we're talking about one boat and one entry, we

22    probably could just go back and forth, then that'll be --

23                THE COURT:  Let's see, though, let's try it.

24                MS. MCCONWELL:  Problem is, it will be small.  I

25    can do it but...

                              *Recross - Reed*

```
 1                    THE COURT:  Okay.  It's up to you.

 2                    MR. MCCONWELL:  Let's try doing it the other way,

 3       let's look at the lease first and if we write the down the

 4       name of the company, that's the boat owner for the purpose of

 5       this contract and then we compare it back over to the same

 6       boat in the master list, then I think that'll suffice.

 7                    THE COURT:  Okay.  Hold on one second.  Let me

 8       just ask Steve something.

 9                    All right.  So just an FYI, I just asked Steve,

10       my IT guy, that the reason why we can't use any stylus on this

11       screen is because it's only -- it's touch.  Finger touch,

12       that's it.  Okay.  We'll work on that later.

13                    MR. MCCONWELL:  Okay.  Let's go back to the

14       contract, the 2900-1.

15                    MS. MCCONWELL:  Yeah, I'm -- I'm good, do I need

16       to unplug and re-plug, Carmen?  I have everything on the

17       screen.

18                    THE COURT:  Steve, does she have to plug and

19       unplug?

20                    MS. MCCONWELL:  I've done that a couple times.  I

21       don't know if I have the control or not.

22                    THE COURT:  Let's try that.  There you go.  You

23       got it.  Looks good.

24                    MR. MCCONWELL:  Thank you, Laura.

25       BY MR. MCCONWELL: (CONTINUING)
```

*Recross - Reed*

1    Q.   You see that this company, and it's Fong Kuo Fishery

2    has a sub company, TSP Marine Industries; correct?

3    A.   Yes.

4    Q.   And that does business as this boat, Nupla Solwara?

5    A.   Yes, Nupa Solwara.

6    Q.   And you marked Item No. 15 as the particular boat

7    we're talking about; correct?

8    A.   Yes.

9    Q.   And that's on the big spreadsheet, your whiteboard?

10   A.   (No response.)

11   Q.   And then you got the other detail $40,000 a month,

12   contract dates and all that stuff.

13           MR. MCCONWELL:  Okay, Laura, we can go back on

14   the big screen again on the chart?  Let's scroll down slowly.

15   BY MR. MCCONWELL: (CONTINUING)

16   Q.   And I'll have you read the name of the individual.

17   The one back, Fong Kuo, has 18 subsidiary corporations that

18   own boats; correct?

19   A.   Okay.

20           MS. M. MILLER:  Objection, Your Honor.  Assuming

21   facts not in evidence.  No personal knowledge.

22           THE COURT:  Well, he did testify when I asked the

23   question, he said they do.  Now, okay, and then now you're

24   saying -- they're making the objection now.

25           MS. M. MILLER:  Yes.

```
 1              THE COURT:  You want to lay the foundation of his
 2    knowledge then, Mr. McConwell?
 3    BY MR. MCCONWELL: (CONTINUING)
 4        Q.   We have Fong Kuo Fisheries on your chart and it shows
 5    the subsidiary companies, the 18 companies; correct?
 6        A.   Yes, correct.
 7        Q.   And each of them have a separate boat and the
 8    N-number of the boat or the aircraft involved is also on the
 9    second column; correct?
10        A.   Yes.
11        Q.   In this particular instance, Item 15 is a subsidiary
12    company of Fong Kuo Fishery?
13        A.   Yes.
14        Q.   And that's similar to Bravo Air, Inc., being a
15    subsidiary of Beanbag and the companies that are owned by Jon
16    Walker; correct?
17        A.   Correct.
18        Q.   So their system is set up about the same way;
19    correct?
20        A.   Yes.
21              THE COURT:  Actually, why don't you do this, go
22    like this, pull it up like this and up, instead -- okay, come
23    here, this way.  Bring it in.  Center.  Yeah.  Center.  It's
24    not exactly center, but that's fine.  Go ahead.  We'll figure
25    it out.
```

*Recross - Reed*

BY MR. MCCONWELL: (CONTINUING)

Q.   So the next one is -- read the second fishery
company.

A.   Fong Song Fisheries.

Q.   Okay.  How many subsidiary companies does it have,
that owns boats?

A.   Looks like seven, total.

Q.   And only four of them happen to be ones that you have
contracts with; correct?

A.   Yes.

Q.   And the next company is what?

A.   Young Da Fa Fisheries.

Q.   And it has how many sub companies?

A.   Eleven.

Q.   And you have contracts with each of those seven
companies; correct?

A.   Yes.

Q.   And the contract from the Vanuatu corporation side is
whatever corporation that is the owner registered -- person
that registered that on the United States registry; correct?

A.   Yes.

Q.   And the next one is what?

A.   Han Song Enterprises.

Q.   That only has one; correct?

A.   Has one.

1      Q.    And that's for N1042N; correct?

2      A.    Yes.

3      Q.    And at the next one.  Please?

4      A.    Friesland Fisheries.

5      Q.    And it has a subsidiary company?  That owns 454S?

6      A.    Yes.

7      Q.    And the next one?

8      A.    Koos Fishing Company.

9      Q.    And how many does it have?

10     A.    Three.

11     Q.    And it owns -- it has three boats involved in -- each

12  of their subsidiaries has a single boat; correct?

13     A.    Yes.

14     Q.    And it's contracted with the Vanuatu corporation,

15  just like this independent company for the Fishery?

16     A.    Yes.

17     Q.    And the next one?

18     A.    Japan Esse Fisheries.

19     Q.    And how many does it have?

20     A.    Four.

21     Q.    And it has boats for each of those four; correct?

22     A.    Yes.

23     Q.    And one of them is 805LA; correct?

24     A.    Yes.

25     Q.    And that's owned by one of the Vanuatu corporations

*Recross - Reed*

1    under Bean Bag; correct?

2        A.    Yes.

3        Q.    And the next one?

4        A.    Win Far Fisheries.

5        Q.    And it has how many?

6        A.    Two.

7        Q.    Actually, it has only one, but it has two boats;

8    correct?

9        A.    Yes, two boats.

10       Q.    45777 and 471M; correct?

11       A.    Yes.

12       Q.    Okay.  Let's go on down to the next item -- dash 2 --

13   or dash 3, please.  And this is one that was discussed by Ms.

14   Miller yesterday.  And it gives detail of contact information

15   for each of the subsidiary companies of the boat owners or the

16   boat -- off the boat owners; correct?

17       A.    Yes.

18       Q.    And the next one is dash 4, please.  What is -- oh,

19   good, thanks, can you blow that up a little bit more, please.

20   And this -- what is this chart?

21       A.    This is just showing all the fisheries and

22   helicopters and the vessels, pilots, start and end contract

23   dates.

24       Q.    So this identifies the pilots of which aircraft and

25   the mechanic; correct?

*Recross - Reed*

1      A.    Yes.

2      Q.    All right.  Now, when the government came to your

3 office in October of 2016, this is on your wall, when they

4 came up to talk to you?

5      A.    Yes.

6      Q.    And you let them make copies of this, didn't you?

7      A.    They took copies, yes.

8      Q.    There is nothing wrong with this information.  It's

9 all factual, isn't it, sir?

10     A.    Yes.

11     Q.    Now, let's go to -- before we get there, in order to

12 -- you were keeping track of hours for purposes of determining

13 whether there'd been an overage of the 700 hours; correct?

14     A.    That's correct.

15     Q.    And that been since the beginning, you did it maybe

16 not the way we have here, but you had some former -- or

17 recording all this information, so you could bill 'em if they

18 used more hours than you were -- pursuant to the lease;

19 correct?

20     A.    Yes.

21     Q.    And you were the person in charge of that collection

22 of data?

23     A.    Yes.

24     Q.    It all came to you from the boats, one form or

25 another?

```
 1          A.   Yes.

 2          Q.   And you entered it into some sort of a spreadsheet?

 3          A.   (Nodded head.)

 4          Q.   Correct?

 5          A.   Yes.

 6          Q.   And in about 2013, the current weekly report

 7     procedure came into play around 2013; correct?

 8          A.   Yeah.

 9          Q.   And during the period of 2013 to 2019, you're the one

10     that entered -- received all the weekly reports, you're the

11     one that entered all the data about the hours, if there was a

12     parts request, it was forwarded on to the parts department?

13               MS. M. MILLER:  Objection; compound question and

14     Counsel is testifying.

15               MR. MCCONWELL:  I'll rephrase.

16               THE COURT:  All right.  Rephrase.  Withdrawn.  Go

17     ahead.

18     BY MR. MCCONWELL: (CONTINUING)

19          Q.   You're the one that collected all the hour data and

20     entered it into which ultimately got into a spreadsheet;

21     correct?

22          A.   Yes.

23          Q.   And who actually maintained the spreadsheet?

24          A.   I think one of the secretaries.

25          Q.   Was that somebody that worked for you or with you or
```

*Recross - Reed*

1    what?

2        A.   No -- well, works in -- yeah.

3        Q.   By the time 2013, she was reporting to Mr. Crowe

4    though; correct?

5        A.   She was making the reports; yes.

6        Q.   And did you have access to the actual ultimate final

7    product, the Excel --

8        A.   Yes.

9        Q.   -- spreadsheet?  Did you review those to make sure

10   they were accurate?

11       A.   Yes.

12       Q.   And that would be to be -- verified the information

13   you entered and actually got into the actual spreadsheet?

14       A.   Yes.

15       Q.   And that was all part of your weekly routine in the

16   ordinary course of business?

17       A.   Yes.

18            MS. M. MILLER:  May I voir dire the witness, Your

19   Honor, on the spreadsheet issue?

20            THE COURT:  In aid of an objection?

21            MS. M. MILLER:  Yes.

22            THE COURT:  Yes, you may.

23            MS. M. MILLER:  Thank you, Your Honor.

24

25                         VOIR DIRE

*Recross - Reed*

BY MS. M. MILLER:

    Q.   Mr. Reed?

    A.   Yes, ma'am.

    Q.   Do you have any idea what spreadsheet Mr. McConwell is talking about?

    A.   The one that we just looked at, wasn't it?

    Q.   No, sir.  That's not what he's talking about.

          MR. MCCONWELL:  I can ask more questions about that if we need more information about it.  I wasn't getting there yet, but we can.

          THE COURT:  Okay, go ahead.

BY MR. MCCONWELL: (CONTINUING)

    Q.   By spreadsheet, you had the information, you entered it into some sort of format, electronic format that was a...a format designed by Mr. Crowe?

    A.   Yes.

    Q.   So you entered in the information.  And then you knew it went into other electronic Excel spreadsheet; correct?

    A.   Yes.

    Q.   And you had access to that Excel spreadsheet to determine whether the information had been accurately entered; correct?

    A.   Yes.

    Q.   And that's been consistent since the inception of this practice?

1    A.    That is correct.

2    Q.    And by you and you're the one that entered it, you're

3    the one that verified it was accurate; correct?

4    A.    Yes.

5    Q.    And you had access to the final product, if you

6    wanted to know what was in the spreadsheet, you just hit a

7    button and Excel spreadsheet, if you know how to operate

8    Excel, appears; correct?

9    A.    Yes, that's correct.

10   Q.    You knew how to work that, didn't you, sir?

11   A.    Yes.

12   Q.    And out of that, you could get a summary of every

13   hour for each of the boats, for the year or whatever period of

14   time you select; correct?

15   A.    Yes.

16   Q.    As a matter of fact, you could go back to 2013 and

17   ask it to give you everything on that particular boat up to

18   2019, and you'd hit play and it would calculate it?

19   A.    Yes.

20          MS. M. MILLER:  Objection, Your Honor.

21          THE COURT:  What was the objection?

22          MS. M. MILLER:  Lack of foundation and Counsel is

23   testifying.  And, again, I would ask permission to briefly

24   voir dire the witness because I don't believe the witness is

25   talking about the same thing Mr. McConwell is talking about.

*Recross - Reed*

         1               THE COURT:  The Court will overrule the

         2     objection.  Let me -- go ahead, proceed.  Hold off.

         3     BY MR. MCCONWELL: (CONTINUING)

         4         Q.    Did you know what an Excel spreadsheet is?

         5         A.    Yes.

         6         Q.    And you know that this information was entered into

         7     and maintained in the ordinary course of business?

         8         A.    Yes.

         9         Q.    And you had to access to it?

        10         A.    Yes.

        11         Q.    And you verified that information is accurate?

        12         A.    Yes.

        13         Q.    And it gave you information about each boat for each

        14     -- for any particular period of time you wanted; correct?

        15         A.    Yes.

        16         Q.    Up to the date that you're working on; correct?

        17         A.    Yes.

        18         Q.    Okay.  Let's go to Exhibit 278.

        19               THE COURT:  Has 278 already been admitted, Mr. --

        20               MR. MCCONWELL:  I believe we talked about it

        21     yesterday -- I think it was.

        22               THE COURT:  Okay.  Ms. McConwell is indicating

        23     "yes."  Let me just confirm with my Court -- it's just 278.

        24               MR. MCCONWELL:  Yes.

        25               THE COURT:  Okay.  Hold on one second.  Did you

                                      *Recross - Reed*

say 278 or 287?

           MR. MCCONWELL:  278.

           THE COURT:  278.  You said it's admitted.  278, Carmen?

           THE CLERK:  Yes, ma'am.

           THE COURT:  Is that a "yes," Carm?

           THE CLERK:  Yes, ma'am.

           THE COURT:  All right.  Admitted.  It's already been admitted.  Previously admitted.

BY MR. MCCONWELL: (CONTINUING)

    Q.  Before we start with this particular document, back to the white page, whiteboard information we just went through, that had information for eight companies; correct?

    A.  Yes.

    Q.  And all their subsidiary companies.  And for 44 aircraft; correct?

    A.  Yes.

    Q.  Okay.  Now let's go to 278.  It's on your screen, sir?

    A.  Yes.

    Q.  Now, the boat here is one of the subsidiary companies that's on your whiteboard; correct?

    A.  Yes.

    Q.  And that is -- what would you say the boat is, is that Star, is that the second word supposedly?

     1          A.    Yes.

     2          Q.    So it's Atun Star?

     3          A.    Atun Star.

     4          Q.    Why don't you put a mark on that, if you would.  Find

     5    it easily.

     6          A.    (Witness complied.)

     7          Q.    And then it's got an aircraft registration number.

     8    Would you underline that.  It's 584SD.  Then it has the name

     9    of the pilot and the mechanic; correct?

    10          A.    Yes.

    11          Q.    And this, by the way, is for the period of September

    12    9, the week of September 9, 2018?

    13          A.    Yes.

    14          Q.    And it has the word *Hobbs*, what is the Hobbs?

    15          A.    That's the hour meter on the helicopter.

    16          Q.    Okay, underline that Hobbs, 1452.2.  If you would.

    17    What does that mean for us?

    18          A.    That means the total time on the machine was

    19    1452.2 hours.

    20          Q.    And that's as reported by the mechanic and pilot

    21    onboard, at the time of this report?

    22          A.    Yes.

    23          Q.    It all come to you?

    24          A.    Yes.

    25          Q.    You enter your data ultimately into the Excel

1    spreadsheet; correct?

2        A.    Yes.

3        Q.    Let's look at page 15 of Exhibit 115.

4              THE COURT:  Has that already been previously

5    admitted?

6              MR. MCCONWELL:  No, we need to do that.  So the

7    Court only.

8              THE COURT:  So Exhibit 115?

9              MR. MCCONWELL:  Yes.

10             THE COURT:  Okay.  So why don't you look at

11   Exhibit 115 and then you may proceed.

12   BY MR. MCCONWELL:  (CONTINUING)

13       Q.    And actually want to have the first page first of the

14   entry of the entire spreadsheet, then we'll go to page 15.

15   This first page of this document, can we get the bottom?

16             MS. MCCONWELL:  Yeah.  I'm getting it bigger,

17   too.

18             MS. M. MILLER:  Your Honor, you already ruled on

19   this.

20             THE COURT:  Was that been admitted?

21             MS. M. MILLER:  No, it has not been admitted.  As

22   a matter of fact, you entered an order denying the

23   admissibility of it.

24             MR. MCCONWELL:  Don't do this, please.

25             THE COURT:  Okay.  11 -- okay.

*Recross - Reed*

1          MR. MCCONWELL:  You have a 1006 matter.  This is

2   a business record we're talking about now.

3          MS. M. MILLER:  Your Honor, we had extensive

4   argument on this and you excluded it both under 8036 and under

5   1006.

6          THE COURT:  Okay.  Let me look at this exhibit.

7   This is Defendant's D-4, Exhibit 115.  Is that what it says

8   here?

9          MR. MCCONWELL:  Right.  And I have a lower line

10  and I hope we could get it up there for you.

11         THE COURT:  Hold on a second, Counsel.  This is

12  -- let me just verify that.  I don't -- let me look at this

13  exhibit.  Pull up.  Can you go up to the very top?

14         MS. MCCONWELL:  Yes, ma'am.

15         THE COURT:  Mr. McConwell, the Court has

16  previously ruled on this exhibit.

17         MR. MCCONWELL:  Not as a business record

18  maintained in the ordinary course of business.  We've had

19  extensive discovery -- discussions about that and we're not --

20  we're not going to do it this way, as I understand.

21         THE COURT:  Hold on a second.

22         (Pause.)

23         MR. MCCONWELL:  Can I ask the witness to describe

24  what it is?

25         THE COURT:  Okay.  No, hold on.  Let me just --

*Recross - Reed*

1    I'm going to pull up my prior order.  Hold on.  All right.

2    The Court is -- and I'm looking at ECF, hold on.  Let me get

3    my order, Counsels.  I'm sorry I'm looking at my order

4    granting the motion in limine to exclude the exhibit.

5                   MR. MCCONWELL:  As a 1006 exhibit.

6                   THE COURT:  No, no, not necessarily that.  That's

7    not it.  That's not it.  You might -- why don't you guys look

8    at my order.  Do you need to go back and -- do you know which

9    order I'm looking at?

10                   MR. MARTIN:  What's the number, Your Honor?

11                   THE COURT:  Let me see what the ECF is.  I don't

12   have -- what's the ECF on this?  Hold on.  I don't have the

13   ECF on this original.  Hold on.  I should have it, let me get

14   it.  ECF 1513.  Why don't you all look at that.  Court ECF

15   1513, go to the last page, line 9 and 10.  This is the Court's

16   order.

17                   MR. MCCONWELL:  Might I suggest we do this off

18   the record because it might take a moment to --

19                   THE COURT:  I think -- hold on, I don't think it

20   will take any minute to discuss, just look at the Court's

21   order.  You guys can look at that.  Just remind yourself what

22   I issued already.

23                   (Pause.)

24                   MR. MCCONWELL:  I remember it, vividly.

25                   THE COURT:  Well, I remember it very vividly,

*Recross - Reed*

 1    too.  I wrote it.  I rule.

 2                    MR. MCCONWELL:  I know.

 3                    THE COURT:  Okay.  So you might want to go look

 4    at my order, Mr. McConwell.  I mean, if you guys just want to

 5    look at that.

 6                    (Pause.)

 7                    THE COURT:  If you look at it.  Do you see what

 8    I'm saying, Counsels?

 9                    MR. MCCONWELL:  Your Honor, the discussion about

10    that order, when you had entered that order, when you applied

11    to 1006 -- 1006 off summary chart offer, that's not what we're

12    offering here and discussing.  It was already identified in

13    the other pages of this document that -- behind this.  It has

14    information based on --

15                    THE COURT:  I'm sorry, I'm sorry.  So just to be

16    clear, you're not asking that this be part of a summary chart?

17                    MR. MCCONWELL:  No.

18                    THE COURT:  For the defense, you're asking it to

19    be a standalone business document?

20                    MR. MCCONWELL:  Exactly.

21                    THE COURT:  And you're saying that you're going

22    to be able to accomplish this by having set the foundation

23    under the business records exception?

24                    MR. MCCONWELL:  That's correct.

25                    THE COURT:  On this exhibit, which is

*Recross - Reed*

1   Exhibit 115?

2               MR. MCCONWELL:  Right.

3               THE COURT:  All right.  Counsel?

4               MS. M. MILLER:  Yes.

5               MR. MCCONWELL:  He's already established --

6               THE COURT:  Go ahead.

7               MS. M. MILLER:  The problem is, Your Honor, this

8   is the identical exhibit that Mr. McConwell proffered to the

9   Court as a summary chart.  He also represented to the Court,

10  Your Honor, that it was made in anticipation of litigation.

11  That is not a business record, if it was made in anticipation

12  of litigation and a summary chart.  It can't be both.

13              MR. MCCONWELL:  May I respond, Your Honor?

14              THE COURT:  Well, I think we've already -- this

15  has already been ruled upon in the Court's order.  And...

16              MR. MCCONWELL:  This is not a summary chart.

17  This is not a summary chart.  We discussed this in our --

18              THE COURT:  Counsel, let me just say, the Court

19  has made a ruling, the Court will sustain the objection.

20              MS. M. MILLER:  Thank you.

21              THE COURT:  I already made a ruling on this.

22  This is the Court's prior order.  Yes, Ms. McConwell?

23              MS. MCCONWELL:  Yes, ma'am.  I believe what the

24  primary discussion was, was on page 1 of 115.  It was not on

25  the balance of the pages that were contained within 115, which

*Recross - Reed*

1    is what this witness has testified about now.  And

2    Mr. McConwell is -- wants him to look at that to verify that

3    basically that is what he's been testifying about thus far.

4              THE COURT:  I'm sorry, so just pull up 15, you

5    only want 115, that's what you're saying?

6              MS. MCCONWELL:  No, what I'm saying is, the

7    complaint by the government has been to page 1 of that

8    Exhibit, but the pages that Mr. Reed has been testifying about

9    occur on -- starting on, you know, you'll have page 3, page 4

10   and so on, page 15, page 30, where it has the information that

11   he's been testifying about right now, how he contemporaneously

12   enters it when he receives those weekly sheets.  And

13   Mr. McConwell wants to show this to you because it has the

14   date, the aircraft, the Hobbs number on calculating the hours

15   and keeping track of the hours that these helicopters have

16   flown, which is separate from the first sheet which is the one

17   that she's concerned about.  And if Mr. Reed says he didn't

18   keep that contemporaneously, then that ends the conversation

19   but we don't believe that will be his testimony.

20             MS. M. MILLER:  Your Honor, she just pulled up

21   the exact sheet that you ruled was inadmissible.  So now she's

22   saying, no, Mr. McConwell really wants to testify about all

23   these other docs, then let him testify about all these other

24   docs, but that's not what we're looking at.

25             THE COURT:  Did you say "ducks"?

```
 1                    MS. M. MILLER:  Docs.

 2                    THE COURT:  Docs?

 3                    MS. M. MILLER:  Docs.  Documents.

 4                    THE COURT:  Okay, I thought --

 5                    MS. M. MILLER:  For surgical precision,

 6   documents, docs.  Quicker.

 7                     THE COURT:  Okay.  She says ducks.

 8                    MS. M. MILLER:  Sounds like ducks, right?

 9                    (Laughing.)

10                    MS. M. MILLER:  These ducks.

11                    THE COURT:  I said what is a duck doing in my

12   Court?

13                    MR. MCCONWELL:  We got off to a bad start here

14   because the document I wanted to show was the bottom end of

15   the -- on this document for the Court only.  And for the

16   witness.  Showing that the information about each boat and

17   that --

18                    THE COURT:  Hold on, Counsels, look, the Court

19   has already ruled on a motion in limine on Exhibit 115.  I've

20   done that.  We already got this order.  You guys have this.

21   So the Court will keep its order in place.

22                    MR. MCCONWELL:  Okay.  Now, if we go to page 2 of

23   the same document because that's what has just been testified

24   about.

25                    THE COURT:  You want to go to page 2 of the
```

*Recross - Reed*

```
1    document, okay, let's go to page 2.
2                 MR. MCCONWELL:  Page 15 or 15 is where we're
3    going to go to.
4                 THE COURT:  You can go to page 15.  I'm just
5    saying that the Court's prior order remains in effect.  But go
6    ahead and go to page 2 or what exhibit do you want to go to,
7    what page?
8                 MS. M. MILLER:  115, I'm sorry, page 15.
9                 THE COURT:  So all of the Exhibit 15[sic] is
10   being excluded.  The Court has already ruled that.
11                MR. MCCONWELL:  He's testified about --
12                THE COURT:  Okay.  Let's go to page 15, but the
13   Court's already made a ruling, but go ahead, let's see what
14   you try to do here.  115.  Page 5.  15.
15                MS. MCCONWELL:  Yes, ma'am.  I'm having technical
16   issue here.
17                THE COURT:  Thirty more minutes before the first
18   break, 31 more minutes, Counsel -- Counsels.  Are you trying
19   to pull it up?
20                MS. MCCONWELL:  Yes, ma'am.  I have to do the
21   old-fashioned way, I have to scroll.
22                THE COURT:  Don't you have an OCR?  Can you pull
23   that up, the optical reader?
24                MS. MCCONWELL:  No, ma'am.
25                THE COURT:  You don't have that on your computer?
```

*Recross – Reed*

1          MS. MCCONWELL:  No, ma'am.

2          THE COURT:  I thought we required that.

3          MS. M. MILLER:  All of the PDF documents, Your

4    Honor, are OCR' d and they are searchable.

5          THE COURT:  Yeah, I think -- yeah, they are

6    searchable.

7          MS. MCCONWELL:  It wasn't coming up on my screen.

8    All right, now it is.

9          THE COURT:  You should be able to search, put

10   down what you want and it will come right up.  Okay.

11   BY MR. MCCONWELL: (CONTINUING)

12   Q.   Mr. Reed, do you see that list of information, can

13   you tell us what it is?

14   A.   That's the information that I record.  It states the

15   aircraft and the dates and the weekly Hobbs for that time.

16   Q.   That's the date of the report?

17   A.   Yes.

18   Q.   And scroll down to, if you would, scroll down to

19   September 9 of 2018.  Okay, put a mark by that document for

20   the Court, if you would.  And this is on just for us, right?

21   Your Honor?

22          THE COURT:  I'm sorry?  What did you say?

23   BY MR. MCCONWELL: (CONTINUING)

24   Q.   Put a mark by the September 9, 2018.

25   A.   (Witness complied.)

*Recross - Reed*

1    Q.   Maybe a little longer than a dash.  Little -- a dash

2  or something right there.  Okay.  And then you got the Hobbs

3  meter there?

4    A.   Yes.

5    Q.   And that is -- what is the Hobbs meter there?

6  Underline that, if you would.  Okay.  And isn't that the same

7  information that's on Document 278 as the Hobbs meter?

8    A.   That is correct.

9    Q.   For -- .2.  And you did that with each weekly sheet?

10    A.   Yes.

11    Q.   Just like this.  And there's one for since 2013 for

12  every boat, for every week?

13    A.   Yes.

14    Q.   Correct?  And these are all entered by you in this

15  spreadsheet?

16    A.   Yes.

17    Q.   This something you went back and confirmed it after

18  it was done?

19    A.   Yes.

20    Q.   And you've frequently printed off a report from that

21  spreadsheet; correct?

22    A.   Yes.

23    Q.   And that's the Excel spreadsheet that we've been

24  discussing here that had the front page that did a

25  summarization of everything within the document that you

1    created; correct?

2        A.    Yes.

3        Q.    Let's go to Exhibit No. 517.  This is 517-1.  Can you

4    tell us what that is, sir?

5                    THE COURT:  All right, so that's different from

6    115, has this been admitted previously, 517.

7                        MS. M. MILLER:  It has not, Your Honor.

8                        THE COURT:  So are you stipulating for its

9    admission, Prosecution?

10                       MR. MCCONWELL:  I'm going to move for its

11   admission, Your Honor.

12                       THE COURT:  Are you stipulating to it?

13                       MS. M. MILLER:  Yes, Your Honor, the prosecution

14   has no objection to the admission of this document.

15                       THE COURT:  All right.  517 will be admitted

16   then.

17   (Exhibit 517 admitted.)

18                       THE COURT:  Okay.  Hold on.  What page?  What

19   page?  So you want all of the pages, there is a hundred --

20   let's get --

21                       MR. MCCONWELL:  This is one page, this is a

22   weekly report, right?

23                       THE COURT:  Okay, so you want just one page,

24   517-1?

25                       MR. MCCONWELL:  Yes.

```
 1                    THE COURT:  Is that what we want?  Is that what
 2        it is?
 3                    MR. MCCONWELL:  That's what it is.
 4                    THE COURT:  Okay.  517.
 5                    MS. MCCONWELL:  Your Honor, according to my
 6        exhibit list from the government, 517 is only a one-page
 7        document.
 8                    THE COURT:  Okay.  Well, this is...
 9                    MR. MCCONWELL:  We only want to offer one --
10                    THE COURT:  517, all right.  So yeah, Carm, I
11        think you're reading a 115, Carm, at the top, is 115 pages 1
12        through 181 -- strike that.
13                    All right.  So 517-1 is only one page, has now
14        been admitted by stipulation.  You may proceed, Mr. McConwell.
15        Thank you for getting this cleared up.
16        BY MR. MCCONWELL: (CONTINUING)
17             Q.    And this is January 10, 2016; correct?
18             A.    That's correct.
19             Q.    And you identify this as the weekly report concerning
20        Aircraft RPC588?
21             A.    That's correct.
22             Q.    Now, go to page 10 of Exhibit 115, please.  If you
23        locate the January 10, 2016, if you'd put a mark by that,
24        please, for me.  And that shows a Hobbs number of what?
25             A.    395.3.
```

 1     Q.   And that's the identical Hobbs number that's on the

 2   weekly report; correct?

 3     A.   That's correct.

 4     Q.   So you verified the accuracy of it?

 5     A.   Yes.

 6     Q.   As you have every other entry on this list?

 7     A.   That's correct.

 8     Q.   Now, let's go to Exhibit 876.

 9          THE COURT:  Okay, what is that again?  876?

10          MR. MCCONWELL:  876, government 876.

11          THE COURT:  Okay.  Has that been previously

12   admitted?

13          MR. MCCONWELL:  I don't believe so and we're only

14   offering page 1.

15          THE COURT:  So Government Exhibit 876-1, let me

16   verify.

17          Prosecution, have you moved for admission of

18   that?

19          MS. M. MILLER:  We haven't seen it yet.  It

20   hasn't been pulled up on the screen yet, Your Honor.

21          THE COURT:  Why don't we pull that up.  Then I'll

22   verify if it's been admitted either through -- no, not yet,

23   Carm.  876-1 has not been admitted.  So we'll let the

24   prosecution review and see if they want to agree for

25   admission.

1          MS. M. MILLER:  No objection, Your Honor.

2          THE COURT:  All right.  876 admitted without

3     objection, you may proceed.

4     (Exhibit 876 admitted.)

5     BY MR. MCCONWELL: (CONTINUING)

6     Q.   Now, Mr. Reed, this particular document has parts

7     listed; correct?

8     A.   Yes.

9     Q.   Was that the manner in which parts are ordered from

10    Guam?

11    A.   That's --

12    Q.   For the boats?

13    A.   Yes, that's one of the ways.

14    Q.   And it has the Hobbs number of 1775.2?

15    A.   Yes.

16    Q.   Could you mark that for me?

17    A.   (Witness complied.)

18    Q.   And it's on which boat?

19    A.   Fong Kuo 866.

20    Q.   That's one of the boats listed on your white page;

21    correct?

22    A.   Yes.

23    Q.   And the aircraft is what, sir?

24    A.   November 6360S.

25    Q.   Okay, now let's go to page 30, possibly 28 of

*Recross - Reed*

```
1    Exhibit 15 -- 115, please.

2                  THE COURT:  I'm sorry which page is it?

3                  MS. MCCONWELL:  130.

4                  THE COURT:  130 of Exhibit 115.

5                  MR. MCCONWELL:  You're sure it's not page 30?

6                  MS. MCCONWELL:  130.  (Pause.)  Oh, I'm sorry,

7    you're right.

8                  THE COURT:  So what page is it?

9                  MS. MCCONWELL:  30.

10                 MR. MCCONWELL:  30.

11                 THE COURT:  Page 3-0.  Exhibit 115.  Go ahead.

12   BY MR. MCCONWELL:  (CONTINUING)

13       Q.   Go to October 25, 2018.  Put a mark by that, if you

14   would.  And what's the Hobbs number on that one?

15       A.   1775.2.

16       Q.   And that's the same Hobbs number that's on the weekly

17   sheet; correct?

18       A.   That's correct.

19       Q.   So if we went through every weekly sheet, you would

20   have taken it, the information off of Hobbs number and you

21   would have entered it into this Excel spreadsheet on a weekly

22   basis and it would confirm the Hobbs numbers for everyone,

23   which gives you total hours for the aircraft for the end of

24   date of the weekly report; correct?

25       A.   That's correct.
```

*Recross - Reed*

1     Q.   That would also give you the name of the boat that

2  the aircraft was on?

3     A.   Yes.

4     Q.   And that the document, itself, all this internal

5  data, you verified yourself?

6     A.   Yes.

7     Q.   And then it would be in Excel spreadsheet that would

8  automatically create the first page we were looking at on this

9  Exhibit 115; correct?

10     A.   Yes.

11     Q.   And you viewed that before, you reviewed the accuracy

12  of it and you know that it's an accurate document maintained

13  in the ordinary course of business by Hansen?

14     A.   Yes.

15     Q.   And under your direction; correct?

16     A.   Yes.

17        (Pause.)

18        MR. MCCONWELL:  At this time, I will offer all

19  the spreadsheet except for the first page.

20        THE COURT:  I'm sorry, when you say "all the

21  spreadsheet," what are you talking about?  What exhibit number

22  is that?

23        MR. MCCONWELL:  115.  The data that he just

24  verified and the accuracy of it, maintained contemporaneously

25  in the ordinary course of business.

*Recross - Reed*

 1          THE COURT:  Okay.  Why don't we, ladies and

 2    gentlemen, why don't we go ahead and take our recess just a

 3    little early.  I want to discuss this with the Counsels.  I

 4    don't want to get on to the -- you know, the little earphone

 5    because it's a little aggravating.  And I rather, it's more

 6    cumbersome, really.  I'd rather speak out openly with the

 7    lawyers.  So keep an open mind.  You'll just have a little

 8    longer break, you know, drink some water.  Do they have coffee

 9    back there, snacks for you?  Okay, please rise for the jury.

10          (Jury out at 9:38 a.m.)

11          THE COURT:  Please be seated.  You could take the

12    exhibit off the screen.  All right, first of all,

13    Mr. McConwell, the Court has made a ruling.  And I'm going to

14    stick with it.  That -- I made a previous ruling that the

15    prosecutor's motion, which was to exclude Defendant Kapp's

16    Exhibit D-4, Exhibit 115 because we're -- you're asking only

17    for the admission of Exhibit 115 at this point.

18          I've already previously ruled that that will be

19    excluded from being offered during trial.  And the reason the

20    Court had done this, if you will go back and review it , is

21    because the Court notes that Defendant Kapp failed to describe

22    in what way the underlying documents were made available to

23    the prosecution other than through the January 2020 subpoena,

24    which the Court had already found insufficient.  This Court

25    has already indicated that it was the defendant's obligation

1    to provide or if already provided in another context,

2    identified to the prosecution, the underlying documents of any

3    summary charts that would be offered under Rule 1006.

4           The defendants himself has said throughout the

5    course of this case, identifying specific documents is needed

6    when there has been a high volume of discovery as there has

7    been here for sure.

8           So the Court ruled, in conclusion, that's me,

9    that the response to this motion, the Defendant Kapp's cursory

10   response to the motion, fails to provide the Court with any

11   information pertaining to the issues noted in the order.  It

12   is the proponent's burden to satisfy Rule 1006.  Kapp was a

13   proponent of the summary charts at issue and yet he failed to

14   satisfy the burden, despite the Court's March 10, 2022 order.

15          As such, the Court granted the prosecutor's

16   motion and D-4, Exhibit 115, is excluded from being offered

17   during trial.  So the Court is going to stick with that.

18          MR. MCCONWELL:  I'm not arguing with the Court.

19   But I did discuss, heavily, that we're dealing with a business

20   record, the Court acknowledged that.  If we went back and

21   looked at the record of our conversation.

22          I did not understand that you meant -- if we

23   could establish, which we have, that it was maintained in the

24   ordinary course of business as a business record, not created

25   for this case, that that was a different matter and that was a

1  matter which we were going to pursue.  We made that clear on

2  the record, if we go back look at it.

3              THE COURT:  It doesn't really matter.  Okay.  The

4  Court already said that a document that has been prepared in

5  anticipation of litigation may not be admitted under business

6  record exception.

7              Okay, so you understand -- you understand that

8  the problem was preparing for to get this to this point for

9  trial, you want this in, really as a summary chart.

10             MS. M. MILLER:  (Nodded head.)

11             THE COURT:  This Excel spreadsheet is a summary

12  chart.  And the whole -- the whole goal of summary chart is to

13  -- summary charts, as we all should know, is that the opposite

14  side, the opposing side, needs to have the underlying

15  documents so that they can verify and look through it, and

16  they weren't given that, according to the evidence and the

17  record that's been established in this Court.  That's the

18  problem.

19             MR. MCCONWELL:  Our understanding was, and it was

20  unanimous among the defendants that we could approach the

21  matter as a business record like we did.  It was not

22  maintained, it was not prepared in the ordinary -- for

23  anticipation of litigation.  There were a set of documents

24  that were and that's where it may have gotten confused.

25             THE COURT:  But I'm not confused.  This is a

*Recross - Reed*

 1   summary chart.

 2              MR. MCCONWELL:  I'm not --

 3              THE COURT:  No, no, Mr. McConwell long story

 4   short, this Excel spreadsheet is a summary chart.  This is

 5   your summary chart.  Your Counsel -- your defense's summary

 6   chart.

 7              MR. MCCONWELL:  It wasn't prepared for

 8   litigation.  It was in ordinary course of business and I

 9   accept the Court's ruling, but I didn't think we should be

10   arguing about it in front of the jury, but you know --

11              THE COURT:  You were not arguing in front of the

12   jury, we're outside of the jury.  Let me just say this, if it

13   was prepared as a business record, I mean I'm sorry, if it was

14   prepared and you guys had -- if it was prepared in the

15   ordinary course of business, let's put it this way, and if you

16   had given it, if Kapp and everybody had given it to the other

17   side and they reviewed it, I wouldn't have a problem, even if

18   there's inconsistencies.  The Court's allowed to -- the

19   Court's allowed to allow summary charts.  The problem is

20   preparation time.  And you guys just didn't get it in.  That's

21   the problem.

22              MR. MCCONWELL:  This was prepared in the ordinary

23   course of business.  I made that clear earlier.  But what

24   wasn't was, we had charts made of different aircraft,

25   individual aircraft made, those were prepared for litigation.

1    This part wasn't.  He's clearly testified it wasn't.  But

2    anyway, it is what it is.  And the Court denied it, that is

3    fine.

4              THE COURT:  No, no, no.  The bottom line is,

5    Exhibit 115 is Exhibit 115.  And that's the chart.  These are

6    the same charts.  These are not anything different.  These are

7    the charts that you guys wanted.  These Excel spreadsheets are

8    the same Excel spreadsheets that the Court has already

9    excluded.  Am I wrong on that?

10             MS. M. MILLER:  No, you're absolutely correct.

11             THE COURT:  Hold on.  Wait.  Wait.  Wait.  Hold

12   on.  What, Mr. McConwell?

13             MR. MCCONWELL:  There were other spreadsheets

14   that were made that were submitted and prepared for the course

15   of the litigation to make it easier for all of us in summary

16   charts.  These were not ever presented as summary charts.

17   They were prepared as information maintained in the ordinary

18   course of business, is what my point is.  And I thought I made

19   that clear in our discussions.  And I bet if we look at the

20   record, but you've ruled on it and that's fine.

21             THE COURT:  Okay.  All right.  So the Court's

22   ruling stays.  Just so you're clear, the Court has made a

23   ruling that Exhibit 115 is not going to be admitted, mainly

24   because the underlying documents that are supposed to support

25   a summary chart, whatever you want to call it, Excel

1  spreadsheet, I don't care what you guys call it, it's trying

2  to be a summary chart here.  It wasn't provided to the

3  prosecution.  It was just cursory.  And so that's why the

4  Court said, okay, we're not going to let it in.  Had it been

5  done, I would have let it in.  More likely than not if there

6  was no legitimate objection.

7          MR. MCCONWELL:  -- spent hundreds of hours

8  gathering information from the government and included was all

9  these weekly sheets back in January of '21, as we told you,

10 but we did not ever offer this as a summary chart -- a 1006

11 summary chart.  I thought that was sort of your limitation on

12 your order was, and if I misunderstood, I apologize.

13         MS. M. MILLER:  Your order was very clear, Your

14 Honor.  A business record that is, itself, a summary of other

15 business records is not admissible.  As a matter of fact, we

16 saw right here with Mr. Reed, he identified the underlying

17 business record, which was a weekly report.  That Mr.

18 McConwell -- can you hear me?

19         THE COURT:  I got it.

20         MS. M. MILLER:  You got it.  Summary charts

21 within summary charts within summary charts.  And the other

22 problem is, they never gave us all of the underlying

23 documents.  And when we analyze the documents that they did

24 give us, there were errors and omissions.  So even without

25 having all of the underlying documents, the ones that were

1    provided don't match up with the summaries.  So --

2                    THE COURT:  Anyway, but the Court -- so anyway,

3    long story short, I already ruled; it's not going to come in.

4    Exhibit 115 will not come in.  That's the bottom line.  So we

5    move on to the next question.  Anything further on 115?  I

6    doubt it.

7                    MR. MCCONWELL:  You ruled on it.  You ruled on

8    the face page of all the underlying --

9                    THE COURT:  I ruled on.

10                   MR. MCCONWELL:  Even --

11                   THE COURT:  Exhibit 115 in its entirety.

12   Whatever -- however -- how many pages is 115?

13                   MS. MCCONWELL:  181 pages.

14                   THE COURT:  So that means it's out.  It's out.

15   It's out.  Based on my ruling -- yes, Ms. McConwell?

16                   MS. MCCONWELL:  Mr. McConwell just wanted to make

17   sure the record was protected, Your Honor.  He understands

18   your ruling.

19                   THE COURT:  All right.  Very well.  So let's go

20   ahead and take a recess.  I let the jurors go early.  So why

21   don't we...it's about 12 till 10.  Why don't we just come back

22   at 12 -- I mean I'm sorry, 10:05.  So we'll get 15 more

23   minutes, 17 more minutes.  10:05.  Okay, Counsels?

24                   MS. M. MILLER:  Yes, thank you, Your Honor.

25                   THE COURT:  All right.  Thank you, Counsels.

*Recross - Reed*

1  We'll move on.  How much longer do you have, Mr. McConwell,

2  with the witness?

3              MR. MCCONWELL:  Probably 15 or 20 minutes, less

4  than 30, but probably shorter.

5              THE COURT:  15, 20, 30?  Okay.  So max 30.  I'm

6  just trying to figure out our schedule here.  So if you have

7  him and then we're going to go till -- you'll be done with him

8  by 11:45?

9              MR. MCCONWELL:  Oh, yes.

10             THE COURT:  And then you have your next witness

11 ready to go?

12             MS. M. MILLER:  Yeah, but I have redirect.

13             THE COURT:  Oh, that's right.  How long do you

14 think that'll be based on?  Remember short and succinct is

15 better.

16             MS. M. MILLER:  Oh, 1000%.  I will not be -- I

17 will not be any longer than 30, 45 minutes, max.

18             THE COURT:  All right.  I'll see all of you at

19 five after 10.  Take care.  Take a 17-minute recess.

20             (Recess taken at 9:48 a.m.)

21             (Back on the record at 10:10 a.m.)

22             THE COURT:  Back on the record.  All Counsels are

23 present, Defendant is present and we'll call in the jury.

24 Thank you.  Please rise for the jury.  Please be seated.

25 Thank you, ladies and gentlemen of the jury.  We'll continue

*Recross - Reed*

1    on with the examination of the witness.  You may proceed.

2    Mr. McConwell?

3              MR. MCCONWELL:  Thank you, Your Honor.

4              THE COURT:  And it's now 10:15.  So we will go

5    until 11:45 and then we'll have lunch for the jurors.  Okay,

6    you may proceed.

7    BY MR. MCCONWELL: (CONTINUING)

8        Q.   Mr. Reed, when we were discussing the mandatory

9    weekly reports, you referred to a Hobbs meter and then there

10   was an hour entry.  What is a Hobbs meter and what's its

11   purpose?

12       A.   It's purpose is to keep track of the hours that the

13   aircraft is flown.

14       Q.   And it works off of oil pressure?

15       A.   It does work off of oil pressure from the manual or

16   gear box.

17       Q.   And by that, you could maintain -- you could keep

18   total records of the hours flown weekly or monthly or --

19       A.   Yes.

20       Q.   For its whole history; correct?

21       A.   Yes.

22       Q.   And if the aircraft had been operating 700 hours a

23   year per contract with 40 boats and your white paper, 44

24   boats, for 20 years, that would amount to 560,000 hours of

25   operation, would you agree?

```
1        A.   If you say so.  I don't -- I didn't calculate it.
2                MS. M. MILLER:  Objection, Your Honor, move to
3    strike the witness's answer.  No foundation.
4                THE COURT:  Yeah, objection will be sustained.
5    BY MR. MCCONWELL: (CONTINUING)
6        Q.   Well, you would take -- if you were going to
7    calculate --
8                THE COURT:  Motion to strike will be granted.
9                Ladies and gentlemen, disregard the question and
10   answer, next question.
11   BY MR. MCCONWELL: (CONTINUING)
12       Q.   If you were going to calculate the total hours flown
13   in the last 20 years at the 700-hour per rate, you would
14   multiply that times the number of aircraft; correct?
15       A.   Yes.
16       Q.   Whatever that total is, that will be the hours.  And
17   that would be for the 700, there is also excess hours flown
18   typically on an annual basis; correct?
19       A.   Yes.
20       Q.   And you estimate how many?  Normally?
21       A.   Anywhere from 30 to 100.
22       Q.   Per aircraft?
23       A.   Yes.
24       Q.   And that's been an average, effectively, for the last
25   20 years?
```

*Recross - Reed*

 1     A.   Yes.

 2     Q.   Now, you worked for Jon Walker for 20 years or more;

 3  correct?

 4     A.   Yes.

 5     Q.   What kind of an employer was he?

 6     A.   He was a great employer.

 7     Q.   Was he kind to his employees?

 8     A.   Yes.

 9     Q.   Was he generous with his employees?

10     A.   Yes.

11     Q.   When he first started, did that business get off to a

12  good start in 1998?

13     A.   Yes.

14     Q.   For several years, didn't it, sir?

15     A.   Yeah.

16     Q.   And then what happened?

17     A.   Then...there was the oil crisis and the boats kind of

18  stopped fishing for a while.

19     Q.   And that lasted a couple years, didn't it, sir?

20     A.   Yeah, something like that.

21     Q.   The tuna market effectively collapsed?

22     A.   Yeah, tuna market was real low, it was -- diesel

23  would be more expensive than fish.

24     Q.   And so Mr. Walker had boats coming in and docking and

25  not bringing in revenue?

*Recross - Reed*

```
1        A.   Yes.

2        Q.   And did he make sure that all of the employees were

3   paid throughout that period of time, sir?

4        A.   Yes.

5        Q.   And he didn't take a salary, did he?

6        A.   Not aware of it.

7        Q.   You don't know whether he took a salary or not?

8        A.   Yeah, I'm not aware.

9             MS. M. MILLER:  Objection, Your Honor, move to

10  strike both the question and the answer if he has no knowledge

11  of that.

12            THE COURT:  All right.  Stricken.  Disregard the

13  last question, the last answer, ladies and gentlemen.

14  BY MR. MCCONWELL:  (CONTINUING)

15       Q.   He started out as a pilot at age 21, I mean I'm

16  sorry, a mechanic at age 21; correct, '87?

17       A.   I guess so; yes.  I'm not --

18            MS. M. MILLER:  Objection, Your Honor, move to

19  strike.  The witness has no -- this is not a responsive

20  answer.  "I guess so" is not an answer.

21  BY MR. MCCONWELL:  (CONTINUING)

22       Q.   What was his first job as he came to Hansen?

23            THE COURT:  Okay, I'm sorry, let me back up then.

24  The last question answer will be stricken from the record.

25  Please disregard, ladies and gentlemen, and you may go to the
```

*Recross - Reed*

next question.

              Mr. McConwell, go ahead.

              MR. MCCONWELL:  Thank you, Your Honor.

BY MR. MCCONWELL: (CONTINUING)

   Q.   What was his first job?

   A.   He was a mechanic.

   Q.   And he did that for a couple years; correct?

   A.   Yes.

   Q.   And then what did he do next?

              MS. M. MILLER:  Your Honor, objection, outside the scope and this has already been asked and answered several times now.

              MR. MCCONWELL:  Not in this particular, fashion, Your Honor.

              MS. M. MILLER:  Not in this fashion?  The jury has heard this, Your Honor.  I think we need to move on.

              MR. MCCONWELL:  I'll withdraw it.

              THE COURT:  Okay.  Withdrawn, next question.

BY MR. MCCONWELL: (CONTINUING)

   Q.   He was a young man that came in and started working from ground up and built a very successful business, is that a fair statement?

   A.   That's correct.

   Q.   He was kind to his employees and fair with his employees at all times that you've been involved with him?

*Recross - Reed*

1    A.   Yes.

2    Q.   You've seen him work with the FAA and you've had no

3  -- you've seen him work with the FAA; correct?

4    A.   Yes.

5    Q.   As a repair station -- head of a repair station?

6    A.   Yes.

7    Q.   He had a principal maintenance inspector from the

8  Honolulu Flight Standards District Office that surveilled his

9  work?

10    A.   Yes.

11    Q.   You never saw any issues come up with the Honolulu

12  Flight Standards District Office as Jon Walker did you, sir?

13    A.   That's correct.

14    Q.   Or any other FAA person throughout the time up until

15  he retired in approximately 2011?

16    A.   Yes.

17    Q.   And he tried to follow the rules and have safe

18  helicopters; correct?

19    A.   Yes.

20    Q.   He was the head of all the maintenance, he was an

21  inspection-authorized A&P mechanic; correct?

22    A.   Yes.

23    Q.   And he had a principal maintenance inspector from the

24  Honolulu FSDO that surveilled his work for all these years?

25    A.   Yes.

*Recross - Reed*

1    Q.   And he was never sanctioned or suspended or anything

2  and his work was never questioned by the Honolulu Flight

3  Standards District Office of the Federal Aviation

4  Administration?

5    A.   That is correct.

6    Q.   Hansen had no policy to interfere with the operations

7  of the Federal Aviation Administration, did they?

8    A.   No.

9    Q.   And you're not aware of any interference by Hansen or

10  Jon Walker with the Federal Aviation Administration or the

11  National Transportation Administration in the performance of

12  their duties, whatever they are; correct?

13    A.   That is correct.

14    Q.   Did you ever meet any of the inspectors that came out

15  and worked with him during the time period that you were with

16  Hansen?

17    A.   Just to acknowledge 'em, just to say "hello" and --

18    Q.   But no substantive communications?

19    A.   No.

20    Q.   I'm going to show you an item that's called a *tail

21  rotor pitch link blank*?

22           THE COURT:  We'll have that marked as an exhibit

23  then.

24           MR. MCCONWELL:  118.

25           THE COURT:  1-1-8.

```
 1              MR. MCCONWELL:  Yes, Your Honor.

 2              THE COURT:  All right.  Has that been previously

 3   admitted or not?

 4              MR. MCCONWELL:  Not yet.

 5              THE COURT:  All right.  No objections to

 6   admission?

 7              MS. M. MILLER:  No objection to admission, Your

 8   Honor.

 9              THE COURT:  1-1-8 admitted.  Go ahead.  By

10   stipulation.

11   (Exhibit 118 admitted.)

12              THE COURT:  That's okay, we'll --

13              MR. MCCONWELL:  I'll give it to him.

14              THE COURT:  We'll mark it later.  That's fine.

15   118.

16   BY MR. MCCONWELL: (CONTINUING)

17      Q.   And this is an item that came from Hansen that the

18   FAA or the someone in the government took at a search warrant;

19   correct?  Or do you know?

20      A.   (No response.)

21      Q.   Let me back up.  I represent to you, this is a pitch

22   link blank that was at Hansen that was taken by the

23   government.  Now, is that the same type of doc -- or part that

24   you ordered from Spares?

25      A.   Yes.
```

*Recross - Reed*

1     Q.   You described the circumstances of doing business

2  with Spares concerning those particular parts concerning

3  giving the drawing and description of what you needed and they

4  would come back with that for you, Hansen; correct?

5     A.   Yes.

6     Q.   All your years, had any of those pitch link blanks

7  ever fractured or failed in any regard?

8     A.   Not to my knowledge.

9     Q.   They never caused an aircraft accident to your

10  knowledge?

11     A.   Not to my knowledge.

12     Q.   Never caused a death of anybody?

13     A.   Not to my knowledge.

14     Q.   And you're not aware of any death caused by a failed

15  part that was installed by Hansen, are you, sir?

16     A.   No.

17          MR. MCCONWELL:  I'll offer 118 into evidence.  I

18  believe maybe it was already been admitted but...

19          THE COURT:  It's admitted now.  Stipulated by the

20  prosecution just now.  Admitted.  Yup.

21  BY MR. MCCONWELL: (CONTINUING)

22     Q.   That particular part is the one that you said

23  required installation of bearings at each end of the bearing

24  or the part?

25     A.   Yes.

*Recross - Reed*

1    Q.   To be used on an aircraft?

2    A.   Yes.

3    Q.   And Hansen has the equipment to install the bearings

4  properly; correct?

5    A.   That's correct.

6    Q.   And the bearings are purchased or had been purchased

7  for years from one of two sources; Seaside, which is a parts

8  supplier, or Heletech, another parts supplier in California;

9  correct?

10   A.   Yes, that's correct.

11   Q.   And they cost a couple hundred dollars a piece, don't

12  they, sir?

13   A.   Yes.

14   Q.   For the -- to go into the pitch link blank?

15   A.   Yes.

16   Q.   So you don't have a $28 part that gets installed on

17  an aircraft, do you, sir?

18   A.   No.

19            MR. MCCONWELL:  I have nothing further, Your

20  Honor.

21            THE COURT:  All right.  Very well.  Thank you.

22            (Pause.)

23            MR. PEREZ:  Your Honor.

24            THE COURT:  Yes, Mr. Perez?

25            MR. PEREZ:  Before we resume with questioning,

_Recross - Reed_

1    may we approach?

2                    THE COURT:  Okay.  Yeah, come up.

3                    (Sidebar.)

4                    MR. PEREZ:  Thank you, Your Honor.  I just wanted

5    to confirm before my client continues his testimony, that my

6    understanding that the immunity agreement that he's entered

7    into with the government remains in place and that the

8    government has no intention of withdrawing it?

9                    MS. M. MILLER:  At this time, we do not --

10                   THE COURT:  Come over to the --

11                   MS. M. MILLER:  Yes, Your Honor, at this time,

12   the government has no intention of withdrawing it.

13                   MR. PEREZ:  That's all.

14                   THE COURT:  Okay.  Very well.  You heard that,

15   Counsels?  Okay, and then Ms. Marie Miller.

16                   MS. M. MILLER:  Yes, Your Honor.

17                   THE COURT:  How much time do you think you'll be

18   with the witness.

19                   MS. M. MILLER:  I'll be done before lunch.

20                   THE COURT:  Okay, very well.  Before lunch.

21                   MS. M. MILLER:  Thank you.

22                   THE COURT:  She said she'll be done.  Very well

23   thank you.

24                   (End of sidebar.)

25                   THE COURT:  All right.  Just an FYI, okay,

*Recross - Reed*

1    Mr. Perez, you're -- everything is okay?

2                    MR. PEREZ:  Yes, Your Honor.

3                    THE COURT:  Thank you.  So just back to our

4    touchscreen.  So it's going to be better that we just

5    highlight it instead of doing a line.  So I just spoke to

6    Steve.  And Steve just switched it to highlight.  So we'll

7    just highlight it next time, okay?  You may proceed.  Thank

8    you, Steve.  Appreciate it.

9                    All right.  Go ahead, Ms. Marie Miller.

10                   MS. M. MILLER:  Yes, Your Honor.  Thank you.

11

12                   REDIRECT EXAMINATION

13   BY MS. M. MILLER:

14      Q.   Mr. Reed, you just testified that Mr. Walker is kind

15   to his employees, is that your testimony, sir?

16      A.   Yes.

17      Q.   Was he kind to you?

18      A.   Yes.

19      Q.   Do you recall meeting with me before you testified in

20   this case?

21      A.   Yes.

22      Q.   Didn't you tell me that you haven't had a raise in

23   30 years?

24      A.   No, that's not true.

25      Q.   That's not true?

```
 1     A.   No, I don't --

 2     Q.   Okay.

 3     A.   But I don't remember exactly when I had it.

 4     Q.   You don't remember exactly when you've had a raise?

 5     A.   Yeah.

 6     Q.   Okay.  Let's look at Exhibit G-1091.

 7          THE COURT:  That's already been previously

 8   admitted; is that correct?

 9          MS. M. MILLER:  No, Your Honor.  It has not.

10          THE COURT:  Oh, okay, G-10...

11          MS. M. MILLER:  9-1.

12          THE COURT:  Okay, Counsel.

13          MS. M. MILLER:  It's going to come up on your

14   screen, Mr. Reed.

15   BY MS. M. MILLER: (CONTINUING)

16     Q.   Do you see it?

17     A.   Yes.

18     Q.   Do you recognize it?

19     A.   (Witness reading.)

20     Q.   It says "Hansen Helicopters, Inc." on top; correct?

21     A.   Yes, that's correct.

22     Q.   And it's from Jon Walker; correct?

23     A.   Yes.

24     Q.   March 21, 2008; correct?

25     A.   Yes.
```

*Redirect - Reed*

```
 1        Q.   And it's to the pilots; correct?

 2        A.   Yes.

 3             MS. M. MILLER:  Your Honor, at this time we would

 4   offer into evidence Exhibit 1091, and we remind the Court of

 5   the stipulation between the prosecution and defense as to the

 6   authenticity of all of the documents that were seized by the

 7   defendants.

 8             THE COURT:  Okay.

 9             MS. M. MILLER:  By us from the defendants.

10             THE COURT:  All right.  Yes, Mr. Martin?  Go

11   ahead.

12             MR. MARTIN:  Your Honor, I would object to this

13   because it does not relate to Mr. Reed.  It's not shown that

14   he even knows this, has ever seen this document before, he's

15   not proper responsible for the document.  And she's trying to

16   attack my client's character pursuant to this document.  That

17   violates Rule 403 relating to character evidence.

18             MS. M. MILLER:  Absolutely not, Your Honor.  As a

19   matter of fact, Mr. Reed testified on Mr. McConwell's question

20   about Mr. Walker's kindness to his clients, to his employees.

21   This is an e-mail communication from Mr. Walker to his

22   employees.

23             THE COURT:  We don't have to get into the merits

24   of it, I can read it.

25             MS. M. MILLER:  Yes, thank you, Your Honor.
```

*Redirect - Reed*

1          MR. MARTIN:  404, Your Honor, you can attack

2    credibility of a witness by reputation or opinion.  Not

3    specific acts or conduct and that's what she's trying to do.

4          MS. M. MILLER:  That's absolutely not what I'm

5    trying to do.  It's the credibility of Mr. Reed that's at

6    issue because he's the one on the witness stand.

7          THE COURT:  All right.  You're trying to attack

8    his credibility in terms of his knowledge?

9          MS. M. MILLER:  Correct.

10          THE COURT:  Of the --

11          MS. M. MILLER:  Correct.

12          THE COURT:  Of the defendant.

13          MS. M. MILLER:  Absolutely correct.

14          MR. MARTIN:  Which I object to this manner and

15    mode because it's a specific attack on their part of

16    Mr. Walker, not Mr. Reed, Your Honor.

17          THE COURT:  But her purpose, though, you've heard

18    her purpose is, even though that may be a fallout that her

19    intention or her motivation or proffer is as to attacking the

20    credibility of this witness's knowledge of who Mr. Walker is.

21          MR. MARTIN:  I heard that, Your Honor, I don't

22    know even if he -- may I voir dire the witness?

23          THE COURT:  You may voir dire the witness in aid

24    of an objection.  You may.  And you want to pull that mic a

25    little closer to you.  Thank you, Mr. Martin, go ahead.

*Redirect - Reed*

```
 1                          VOIR DIRE

 2   BY MR. MARTIN:

 3       Q.   Mr. Reed, have you ever seen --

 4            THE COURT:  Wait, can you make this a little

 5   bigger for me?  Counsels?

 6            MS. M. MILLER:  Yes.

 7            THE COURT:  For me and Mr. Reed.  I cannot see

 8   this in like this .0003 font.  Go ahead.  I can't see.

 9   BY MR. MARTIN:  (CONTINUING)

10       Q.   Mr. Reed, have you seen this document before?

11       A.   I don't remember seeing it.  I'm sorry.  I just don't

12   remember.

13            MR. MARTIN:  He's not the person to sponsor it,

14   Your Honor.  He's not seen it before.

15            MS. M. MILLER:  It doesn't matter, that's not the

16   point.  The point is Mr. Reed testified --

17            MR. MARTIN:  No, no, no.

18            THE COURT:  Hold on.  Hold on.  Let me just hear

19   from Mr. Martin, go ahead.

20            MR. MARTIN:  Your Honor, you can't impeach

21   somebody's credibility about a document they've never seen

22   before.  That's basic hornbook law.

23            MS. M. MILLER:  It's their knowledge, that's

24   basic applicable law.  He said Mr. Walker was kind to his

25   employees.  If he is unaware of this statement to the
```

employees, if this is something he's unaware of, it's still

relevant to show that Mr. Walker is not kind to his employees.

             THE COURT:  Okay.

             MR. MARTIN:  Your Honor, she's getting way out of

line.

             THE COURT:  Let's not get into the merits.

             MS. M. MILLER:  Yes, Your Honor.

             THE COURT:  Substance.

             MR. MARTIN:  It would --

             THE COURT:  So the Court will sustain the

objection.  He has no knowledge of this document.  No

awareness.

BY MS. M. MILLER: (CONTINUING)

    Q.   Let's not talk about the document then, Mr. Reed.

Mr. Reed, do you recall Mr. Walker saying to his pilots, "If

you can't fly or can't fix the helicopters --

             MR. MARTIN:  Your Honor, I object, she's doing

indirectly what she can't do directly.  We've already gone

through.

             MS. M. MILLER:  Absolutely not.

             THE COURT:  Hold on.  The Court will sustain the

objection because he says -- first of all, he never -- doesn't

know this document.

             MS. M. MILLER:  No, I'm not talking about the

document anymore.

*Redirect - Reed*

```
 1              THE COURT:  Yeah, I know, but you're talking
 2    about the substance of the document.  The Court will sustain
 3    the objection.
 4    BY MS. M. MILLER: (CONTINUING)
 5        Q.   All right.  Have you heard Mr. Walker talk to his
 6    pilots?
 7        A.   No.
 8        Q.   Have you ever heard Mr. Walker talked to his
 9    mechanics?
10        A.   No.
11        Q.   So you have zero knowledge about the way in which
12    Mr. Walker treated his pilots or mechanics; is that correct?
13        A.   That's correct.
14        Q.   Okay.  So when you say that Mr. Walker is kind to his
15    employees, what is your knowledge based on?
16        A.   I just meant that it was the shop employees.
17        Q.   The people located in Guam?
18        A.   Yes.
19        Q.   Including yourself?
20        A.   Yes.
21        Q.   He's even paying your attorney's fees, isn't he, sir?
22        A.   Yes.
23        Q.   Okay.  So let's now look at the next issue, which is
24    Mr. McConwell asked you if there were ever any issues with the
25    Honolulu Flight Safety District Office that Hansen Helicopters
```

*Redirect - Reed*

1  dealt with.  Do you remember that?

2     A.    Yes.

3     Q.    The person you dealt with there was a safety

4  inspector named Timothy Cislo; correct?

5     A.    That I dealt with?  I never deal with him.

6     Q.    Excuse me, sir?

7     A.    I never did deal with Timothy Cislo.

8     Q.    So then how can you tell the jury that there was

9  never any issue with the Honolulu FSDO if you never dealt with

10  anyone there?

11     A.    I just never dealt with anyone.

12     Q.    Did you know that the inspector pled guilty to

13  accepting a bribe from Mr. Walker?

14             MR. MARTIN:  Your Honor, he's already testified

15  he doesn't deal with Mr. Cislo.  And unless she can prove --

16             MS. M. MILLER:  I'm going to move to strike his

17  testimony that he has knowledge that there was never any issue

18  with the Flight Safety Office.  It can't be both ways.

19             THE COURT:  Let me just do one thing at a time.

20  Your objection is?

21             MR. MARTIN:  My objection is that she's asking

22  him a question about a person he's already said he never

23  talked to.

24             THE COURT:  Objection sustained to that.  Now

25  she's moving to strike prior testimony.

 1              MS. M. MILLER:  Yes.

 2              THE COURT:  About?  Specifically?

 3              MS. M. MILLER:  Mr. McConwell asked this witness

 4     if he had knowledge of any issues or problems with the

 5     Honolulu FSDO and the witness says, no, I don't -- there were

 6     no problems with the Honolulu FSDO, when Counsel knows that

 7     that inspector accepted a bribe and already pled guilty to

 8     this court.

 9              MR. MARTIN:  Your Honor, we got it.  If she can't

10     control herself when she makes these statements with no

11     backing, no factual --

12              MS. M. MILLER:  No factual?

13              THE COURT:  Wait, one per- -- wait, wait,

14     Counsels.  Counsels, one person at a time.  I can only hear

15     one person at a time.  And my court reporter cannot take you

16     all down.

17              MS. M. MILLER:  Sorry, Veronica.

18              THE COURT:  All right.  The Court, on the issue

19     of -- let's put it this way, on the issue of motion to strike

20     his prior testimony, the Court will overrule that objection.

21     I mean, if he testifies one way, he testifies the other way,

22     it's up to the jury to decide credibility.  So the Court will

23     overrule your objection and not allow it.

24              Okay, next question?

25              MS. M. MILLER:  Now I'll ask the Court to take

*Redirect - Reed*

1  judicial notice of Government's Exhibit 930, which is the plea

2  agreement that Mr. Cislo --

3            MR. MARTIN:  Which, Your Honor, I object.

4            THE COURT:  All right.  All right.

5            MS. M. MILLER:  Excuse me?

6            THE COURT:  The problem is, the witness says he

7  doesn't know anything about Cislo.

8            MS. M. MILLER:  Absolutely.  Right.  But that is

9  not the point.  This is the point:  Mr. Martin had the

10 audacity to stand up and say that I was making a

11 representation unsupported in the record.  And Your Honor --

12           THE COURT:  All right.  All right.  Hold on.

13 Hold on, Counsel.  Okay, on the issue of judicial notice

14 regarding that, we will get to that later.

15           MS. M. MILLER:  Thank you, Your Honor.

16           THE COURT:  How is that?  And we don't need to

17 deal with this now.  Next question.  Go ahead and proceed.

18 And let's not have any personal attacks against each other,

19 Counsels.  Let's just get right to the specific evidentiary

20 objection.  Next question.

21           MS. M. MILLER:  Absolutely.  Yes, Your Honor.

22 BY MS. M. MILLER: (CONTINUING)

23    Q.   Mr. Reed, when I asked you questions when you were

24 first the witness five weeks ago?

25           THE COURT:  Carmen, fix up this mic, this screen.

*Redirect - Reed*

1    Get the defendant, the witness on.  Go ahead.

2    BY MS. M. MILLER: (CONTINUING)

3        Q.   When I asked you questions five weeks ago, you

4    answered my questions in a certain way; do you remember that?

5        A.   Yes.

6        Q.   And then yesterday and today, when you were asked

7    questions, you answered them in a completely opposite way; do

8    you recall that?

9        A.   No, not really.

10                MR. PEREZ:  Objection.

11   BY MS. M. MILLER: (CONTINUING)

12       Q.   You don't?  You don't recall Mr. McConwell asking

13   you, Mr. Reed, when you told Ms. Miller that the parts were

14   counterfeit, you really didn't know whether they were

15   counterfeit or not, do you remember that?

16       A.   Yes.

17       Q.   So which is it?  Do you know or do you not know

18   whether the parts, that were purchased by Hansen Helicopters,

19   were counterfeit?

20       A.   Well, what you call them, I mean I know we had them

21   made by Liskei[sic]...so, but I don't know if they're called

22   *counterfeit* or what.

23       Q.   Okay.  So, do you have difficulty with your memory,

24   sir?

25       A.   Sometime, yes.

1    Q.   Have you had more difficulty with your memory in

2    recent times than before?

3    A.   In recent years, yes.

4    Q.   Would you say that your memory, back in 2016, was

5    better than your memory today?

6    A.   Probably.

7    Q.   Did you have a chance to review the statements that

8    you gave to the FBI?

9              MR. MCCONWELL:  Your Honor, I object.  This is

10   beyond the scope of the cross-examination.

11             THE COURT:  Overruled.  Overruled.  Go ahead.

12   BY MS. M. MILLER:  (CONTINUING)

13   Q.   Did you have a chance to review the statements that

14   you gave to the FBI?

15   A.   Yes.

16   Q.   And did you review them with your attorney?

17   A.   Yes.

18   Q.   And your attorney sent a letter to the U.S.

19   Attorney's office saying that all of those statements were

20   true and correct?

21   A.   Yes.

22   Q.   Do you recall that?

23   A.   That's correct.

24   Q.   Do you, sir, adopt those statements as your own?

25             MR. MARTIN:  Your Honor, I object.  That's not

*Redirect - Reed*

```
 1    what Mr. Perez's letter said and it's a mischaracterization.
 2                MS. M. MILLER:  No, it's not.  I'm asking this
 3    witness if he adopts the statement as his own.
 4                THE COURT:  All right.  But the objection is as
 5    to the letter.  That's the objection.
 6                MS. M. MILLER:  We have the letter in evidence.
 7                THE COURT:  Okay.  The letter has already been
 8    admitted in evidence?  Wait, wait, the letter has been
 9    admitted into evidence?
10                MS. M. MILLER:  Let me grab the letter, Your
11    Honor.
12                THE COURT:  Just confirm that.
13                MS. M. MILLER:  Yes, Your Honor.
14                THE COURT:  If the letter is in evidence, then
15    the letter will speak for itself.
16                MS. M. MILLER:  The letter --
17                THE COURT:  Let's move on to the next -- the
18    letter is in evidence.  I'll let the jury determine what is in
19    the letter.
20    BY MS. M. MILLER: (CONTINUING)
21        Q.   Mr. Reed, when you read --
22                THE COURT:  Proceed.
23                MS. M. MILLER:  Thank you, Your Honor.
24    BY MS. M. MILLER: (CONTINUING)
25        Q.   When you read and reviewed those statements you gave
```

*Redirect - Reed*

1  to the FBI, were those statements true and correct?

2    A.    Yes.

3    Q.    And do you adopt those statements, sir, as your own?

4              MR. MARTIN:  This is an improper question.

5              THE COURT:  Okay.  I'm sorry, what's the

6  objection?

7              MR. MARTIN:  I object to -- he can't adopt those

8  statements as his own.  It's either true or correct or not,

9  but adoption of them is an improper question.

10              THE COURT:  Okay.  Do you mean, does he adopt the

11  statements that he made?

12              MS. M. MILLER:  Yes.

13              THE COURT:  Specifically.

14              MS. M. MILLER:  Absolutely, Your Honor.

15              THE COURT:  What the FBI said were his words?

16              MS. M. MILLER:  Yes.

17              THE COURT:  So he could adopt that?

18              MS. M. MILLER:  Yes.

19              THE COURT:  But you're saying he can't adopt the

20  whole report?  Is that what your objection is?

21              MR. MARTIN:  Yes, Your Honor.

22              THE COURT:  All right.  So just, why don't you

23  clarify that, Ms. Miller.  Rephrase the question.

24  BY MS. M. MILLER:  (CONTINUING)

25    Q.    Do you adopt the statements, that the FBI said in the

*Redirect - Reed*

1  report that you made, as your own statements?

2      A.   Yes.

3      Q.   And is that because in 2016, your memory was better

4  than it is today?

5      A.   Yes.

6          MR. MARTIN:  Objection; calls for speculation,

7  Your Honor.

8          THE COURT:  Overruled.

9  BY MS. M. MILLER: (CONTINUING)

10     Q.   Can you please answer that, sir?

11     A.   Yes.

12         MS. M. MILLER:  Your Honor, at this time, the

13 government would move into evidence the following exhibits,

14 which have already been identified by the witness, and Counsel

15 for the defense has already authenticated as what they purport

16 to be, and those are Exhibits 833, 1822, 1818 and 1817.

17         THE COURT:  Are these the 302s?

18         MS. M. MILLER:  They are.

19         MR. MARTIN:  Yes, Your Honor.

20         THE COURT:  Objections?

21         MR. MARTIN:  Hearsay.  And I would like to voir

22 dire the witness if the Court --

23         THE COURT:  The Court -- I will consider the

24 objection and the request.  But go ahead, you want to voir

25 dire the witness in aid of your objection?

```
 1                    MR. MARTIN:  Because there are multiple
 2       statements in there, that I believe the witness will say he
 3       will not adopt, Your Honor.  And I think I'm entitled to voir
 4       dire that or I will cross-examine him over it.
 5                    (Pause.)
 6                    THE COURT:  All right, well, he just -- voir dire
 7       the witness in aid of the objection, go ahead.  Go ahead.
 8
 9                             VOIR DIRE
10       BY MR. MARTIN:
11          Q.   Mr. Reed, have you -- when's the last time you looked
12       at all these statements, sir?
13          A.   Say again?
14          Q.   When is the last time you looked at all of these
15       statements, sir?
16          A.   Just whenever they were presented to me.
17          Q.   Can you give me a date?  Because I don't know when
18       they were presented to you because I was not in the meetings
19       with you and the government.
20          A.   I don't remember the date.
21          Q.   Was it within the last month?
22                    THE COURT:  All right.  Let's focus.  Is it on
23       302 -- is it 833, let's get to one at a time.
24                    MR. MARTIN:  I just want to know when he looked
25       at them last, Your Honor.
```

1          THE COURT:  Oh, I'm sorry.

2          MR. MARTIN:  There is five of 'em, I believe.

3          THE COURT:  She focused on three exhibits.

4          MS. M. MILLER:  Four.

5          THE COURT:  Well, I have 833, 1822 and 1818, is

6    there another one?

7          MS. M. MILLER:  And 1817.

8          THE COURT:  Oh, 1817.  So there is four.

9          MS. M. MILLER:  Yes.

10          THE COURT:  All right.  Go ahead.  Okay.

11    Question is?  I'm sorry, go back to the question is, what was

12    the question again, Mr. Martin?

13    BY MR. MARTIN: (CONTINUING)

14      Q.   When was the last time you looked at 833?  Do you

15    have the statements in front of you, sir?  I'm sorry.

16      A.   No, I do not.

17      Q.   Would you like to see the statements?

18          MS. M. MILLER:  Your Honor, this is -- this is

19    inappropriate.  Under Rule 611, if a witness says that he

20    adopts a statement, this particular witness says that his

21    memory was better back then, his attorney who represented him

22    made an assertion to the government and to the Court that

23    Mr. Reed adopted those statements.

24          THE COURT:  Okay.  The Court has that, the Court

25    --

*Redirect - Reed*

        1                MS. M. MILLER:  Yes.

        2                THE COURT:  The thing is, he's asked me to voir

        3   dire the witness in aid of an objection to ascertain whether

        4   the witness is truly adopting all the statements he made as to

        5   each of these FBI 302 reports.

        6                MS. M. MILLER:  And if he --

        7                THE COURT:  Is that correct.

        8                MR. MARTIN:  Rule 611 deals with the mode and

        9   order of interrogating witnesses.  It has nothing to do with

       10   adoption of statements.  If you would like to read the rule?

       11                MS. M. MILLER:  No, I don't need to read the

       12   rules.

       13                THE COURT:  Counsel, calm down.  I'm going to

       14   allow him to voir the witness.

       15                MS. M. MILLER:  Yes.

       16                THE COURT:  He's already indicated yes.

       17                MS. M. MILLER:  Yes.

       18                THE COURT:  Let him voir dire the witness.  If

       19   the witness says otherwise, then we may have a problem with

       20   the admission.

       21                MS. M. MILLER:  Yes.

       22                THE COURT:  If not, we may not have a problem

       23   with the admission.

       24                MS. M. MILLER:  Right.

       25                THE COURT:  All right.  Proceed.

*Redirect - Reed*

BY MR. MARTIN: (CONTINUING)

Q.   Mr. Reed, you did not know that Hansen ever bought wrecked aircraft and never saw wrecked aircraft at the Hansen facility; isn't that correct?

A.   Can you speak louder?

Q.   I'm sorry.  Yes, sir, I can.

MS. M. MILLER:  Which document is Mr. Martin reading from, Your Honor?

THE COURT:  That would be helpful, Mr. Martin. Exhibit?

BY MR. MARTIN: (CONTINUING)

Q.   Well, I've got the FBI number one, let me -- it's the one dated 11/13/16.

MR. PEREZ:  May I confer with my client?

THE COURT:  All right.  Okay, go ahead.  Yes.

MR. PEREZ:  Can he and I go outside, Your Honor?

THE COURT:  You want to take a recess?  Oh, you want to talk, yeah, you can go out there.

(Mr. Perez and witness stepped out.)

THE COURT:  While he's out there, he'll find the exhibit number and give it to you.  You guys can all stretch, stand up if you want, relax.  I'm going to stand up.

MR. MARTIN:  The number is 1822, Your Honor, I apologize.

THE COURT:  1822.

```
 1              MR. PEREZ:  Your Honor, are we on the record?

 2              THE COURT:  Yes, we are.  We are.  We're on

 3    record, yes, Mr. -- yes, Mr. Peter Perez?

 4              MR. PEREZ:  So if Mr. Reed is going to be

 5    questioned regarding specific reports, I ask that the report

 6    be presented to him so he can answer accordingly.

 7              THE COURT:  Sure.  I think that's fair.

 8              MS. M. MILLER:  Yes, I agree, Your Honor.  And

 9    that's why I cited Rule 611 because it talks about the mode

10    and order of the presentation.  And it also talks, in 611,

11    about the Court ensuring protection of the witness "from

12    harassment or undue embarrassment."  This witness obviously is

13    having difficulty with his memory and he said --

14              MR. MARTIN:  Your Honor, I object to her

15    characterizing what happens to the witness.  It's up to the

16    jury to decide now.

17              THE COURT:  Yeah, let's not comment on the

18    evidence.  Let's not comment on the witness.  Let's give him

19    the exhibits so that he can review it.  You have a hardcopy?

20    You want a hardcopy or you want electronic?  What is your

21    pleasure?  Is it easier for you to look at the hardcopy?

22              THE WITNESS:  Yes.

23              THE COURT:  Okay.  Let's get him a hardcopy and

24    -- so we have it, you know, over here.  We'll find it for you.

25    Okay, are you going to look at every 302?
```

*Redirect - Reed*

```
 1                MR. MARTIN:  I very well may, Your Honor.
 2     Depending.
 3                THE COURT:  Depending on what he says.  Okay.
 4     1822.  Let's go to 1822 because that's where you are now.
 5                MR. MARTIN:  Yes, Your Honor.  All right.  Let's
 6     go to 1822 and we'll pass that over to Mr. Reed.  And then you
 7     need glasses?  You need reading glasses?
 8                THE WITNESS:  No, I'm okay.
 9                THE COURT:  All right.  There we go.  1822.
10                MS. MCCONWELL:  Is it all right if I approach?
11                THE COURT:  Yes, you may.  Thank you, Ms.
12     McConwell.  Okay, Exhibit 1822.  I'm sorry, yeah, that's
13     right, Exhibit 1822, which has not been admitted into
14     evidence.  All right, do you have a specific page?
15                MR. MARTIN:  I'm on page 1.
16                THE COURT:  Page one.
17                MS. MCCONWELL:  And, Your Honor, I don't show
18     that Mr. Perez's letter been admitted into evidence and I
19     don't know the exhibit number.
20                THE COURT:  Okay.  Exhibit number on Perez's
21     letter?
22                MS. M. MILLER:  It's part of the record, Your
23     Honor.  It's attached to an ECF filing.
24                MS. MCCONWELL:  That's different, okay.  Thank
25     you.
```

*Redirect - Reed*

1          THE COURT:  All right.

2          MR. MARTIN:  It's admitted or not admitted?

3          THE COURT:  Well, the question is, was it

4    admitted.  I thought the answer was "yes."

5          MS. M. MILLER:  Part of an ECF filing, Your

6    Honor.  So the Court can take judicial notice of it.

7          MR. MARTIN:  Is it admitted or not admitted, is

8    the question.

9          THE COURT:  Hold on.  Let me verify.  Hold on.

10   Yeah, what is it?

11         (Pause.)

12         THE COURT:  All right.  So I don't know about

13   that.  Is it admitted Carm?  Do you know?

14         MS. M. MILLER:  Like I said, Your Honor, it was

15   part of a filing.  So I would just ask the Court to take

16   judicial notice of it.  But I don't know that that's relevant

17   to the issue of adoption of the statement.  You entered an

18   order and that's where we attached it as part of that order.

19   If you recall, we filed a motion in limine, Your Honor.

20         THE COURT:  Right.  Okay, the Court --

21         MR. MARTIN:  The question was, is it admitted or

22   not; not all this other history.  That's the only question I

23   have.

24         THE COURT:  The answer is, it's not admitted for

25   trial purposes.  But it was attached, I think, as an exhibit.

*Redirect - Reed*

1          MS. M. MILLER:  For a motion in limine.

2          MR. MARTIN:  And I didn't ask that question, Your

3    Honor.

4          THE COURT:  Okay.  All right.  So essentially, I

5    will tell you, oh, yeah, it was a filed as a -- I think

6    1406-1, ECF.  But let me just say, as Counsels know,

7    Mr. Martin, you know, the Court has made a ruling with regard

8    to 302.  If the witness adopts all of the statements, then the

9    Court will admit all the statements.  So you're voir diring

10   the witness in aid of an objection, the Court will allow that,

11   he does have Exhibit -- what exhibit is it?

12          MR. MARTIN:  1822.

13          THE COURT:  Okay.  Do you see that, sir?

14          THE WITNESS:  Yes.

15          THE COURT:  All right.  Go ahead, Mr. Martin.

16   BY MR. MARTIN: (CONTINUING)

17     Q.    Mr. Reed, you have seen wrecked aircraft at the

18   Hansen facility, isn't that true, sir?

19     A.    That is correct.

20     Q.    That's correct?

21     A.    Yes.

22     Q.    So in your 302 at the bottom of the page, I'm talking

23   about Exhibit 1822, where it says, "Reed did not know Hansen

24   ever bought wrecked aircrafts and never saw wrecked aircraft

25   at the Hansen facility"; that's not correct , is it, sir?  You

saw them all the time?

     MS. M. MILLER:  Can you tell me where that is on Exhibit 1822, Your Honor?

     MR. MARTIN:  I can tell you.  It's at the bottom of the page, the next to the last paragraph, starts at "Reed and Walker."

     MS. M. MILLER:  Got it.

BY MR. MARTIN: (CONTINUING)

 Q. Can you answer my question, Mr. Reed?

     MR. PEREZ:  Your Honor, may I confer with my client?

     THE COURT:  Yes, you may.  In fact, you could -- yeah, you may.

     (Pause.)

     THE COURT:  Do we have a Court 1822 up there or does he have it, Carmen, the defendant?

     (Discussion with clerk.)

     THE COURT:  If you have it, or if not, we'll just pull it up electronically.  We usually have a court copy.  If not, I'll pull it up the electronic or no.

     (Pause.)

     MR. PEREZ:  Your Honor, I don't know if it's appropriate for me to make a statement on behalf my client or not?

     THE COURT:  Do you want?

 1                    MR. MARTIN:  I don't want it in front of the

 2      jury, Your Honor.

 3                    THE COURT:  Do you want me to let the jurors take

 4      a recess, real quick, to discuss this?

 5                    MR. PEREZ:  Okay.

 6                    THE COURT:  Outside the presence of the jury?

 7                    MR. PEREZ:  That's fine, thank you.

 8                    THE COURT:  I think -- okay, ladies and

 9      gentlemen, please rise.  If you take your lunch, has come

10      early.  Like probably not.  But I think you guys are going to

11      get a nice lunch.  Please keep an open mind, do not form or

12      express any opinion on this case until it's submitted to you.

13      Take a little recess here and I will be back with you all.

14                         (Jury out at 10:54 a.m.)

15                    THE COURT:  Thank you, Mr. Perez, for shutting

16      the door.  And we're outside the presence of the jury.

17      Mr. Peter Perez, who represents Mr. Reed and wishes to address

18      the Court.  Yes, Mr. Perez?  You may proceed, sir.

19                    MR. PEREZ:  Your Honor, I would just say on

20      behalf of my client, that he stands by the statements that are

21      attributed to him in each of those reports that the government

22      moved to admit.

23                    And with respect to his memory, his memories to

24      those statements was better when those statements were

25      attributed -- were made and recorded in those reports than

1  now.

2          THE COURT:  All right.  And he's already

3  testified to that?  He testified to that, but you're just

4  reconfirming that?

5          MR. PEREZ:  I'm reconfirming that and we're also

6  reaffirming the information we provided to the government in

7  the proffer letter to them.

8          THE COURT:  Okay.  And yeah, so Mr. Martin?

9          MR. MARTIN:  May I voir dire the witness, Your

10 Honor?  He didn't answer my question.

11         THE COURT:  Okay.  Let's voir dire him outside

12 presence of the jury.  Go ahead.

13

14                      VOIR DIRE

15 BY MR. MARTIN:

16    Q.   Mr. Reed, Exhibit No. 1822, I'm at the bottom of the

17 page, and I'm reading from that.  And if I read it

18 incorrectly, I apologize.  I hope you'll follow along.  The

19 last sentence of the next last paragraph begins, "Reed did not

20 know Hansen ever bought wrecked aircrafts and never saw a

21 wrecked aircraft at the Hansen facility."  Do you see that,

22 sir?

23    A.   Yes, I do.

24    Q.   That is not a correct answer, is it, sir?  Wrecked

25 aircraft worked on all the time at the Hansen facility.

1      A.   I'll stand by my statements.

2      Q.   That's not responsive to my question, sir.  My

3 question is, wrecked aircraft worked at, at that facility all

4 the time, isn't it true, sir?

5           MS. M. MILLER:  Your Honor, at this point,

6 Mr. Martin is harassing this witness.  This witness has

7 already testified he has medical issues, he has testified that

8 his memory is not good, the Court has already seen that

9 demonstrated in both his direct examination and his multiple

10 cross-examinations.  And the witness and his attorney, under

11 advisement of his attorney -- attorney, has adopted the

12 statements that he made to the FBI as his own.  Under 611,

13 this Court can accept that and this Court can say that's

14 enough harassment of this witness.

15           THE COURT:  Well, I don't think actually think

16 he's harassing.  I think he's probing, but he's not harassing

17 can him, per se.

18           But Mr. Martin, he has said he's adopted all his

19 statements.

20           MR. MARTIN:  He -- I'm asking him about one

21 statement.  One statement.

22           THE COURT:  Well, he just said, I said stand by

23 it.

24           MR. MARTIN:  He said, "I stand by my statements."

25 I want him to tell me that is not correct because I want to

```
 1  know, you can drive by Hansen virtually any day and there are
 2  wrecked aircrafts out there.  And the government knows that,
 3  Your Honor.  And it is offensive to me that they're trying to
 4  put up a witness, knowing that that is an incorrect statement.
 5  And Mr. Reed knows that they work on wrecked aircraft out
 6  there all the time and I want him to deny that, so that we can
 7  get to this issue.
 8              THE COURT:  But Mr. Martin, what you want is not
 9  probably what you're going to get, because the witness has
10  just testified, and through his attorney, has said that he
11  adopts the statement that he has made to the FBI, including
12  this one.
13              MR. MARTIN:  Well, that's not what he said.  He
14  said "I stand by my statements," Your Honor.  And I'm entitled
15  to go through every one of them then because they're not
16  correct.  And if the Court is inclined --
17              THE COURT:  No, wait.  Let me just say, he says
18  he accepts and adopts all his statements that he made.  That's
19  what he just -- did he not testify to that?
20              MR. MARTIN:  He non-responsively answered a
21  question, yes, Your Honor.  I didn't -- I did not ask him if
22  he adopted all his questions, his statements.  I asked him --
23              THE COURT:  No, but the prosecution did ask him,
24  Do you adopt all the statements that you made to the FBI in
25  the four separate 302 investigative reports.  And I believe he
```

 1  said "yes."

 2          He also said, upon questioning, that he also --

 3  his memory is better when he made those statements to the FBI

 4  in comparison to today, as I recall.  Am I -- do you disagree

 5  with that?

 6          MR. MARTIN:  I don't disagree with that at all,

 7  Your Honor.  I disagree with the fact that the prosecution is

 8  allowing this witness to perpetrate a fraud upon this Court

 9  knowing there are wrecked aircraft out there and this witness

10  can answer that question.  Nobody has answered the one

11  question I asked.  I mean, I'm not disagreeing with the

12  recitation you gave.

13          THE COURT:  Okay.

14          MR. MARTIN:  I'm saying --

15          THE COURT:  But the question is...

16          MR. MARTIN:  He needs to be asked -- answer the

17  question I asked and I can re-ask it.  It needs to be

18  responsive.  It's a "yes" or "no" question.

19          THE COURT:  What is your question?

20          MR. MARTIN:  Any question is --

21          THE COURT:  Remember, he has already adopted it

22  so he's already answered that the part of the adopting.

23          MR. MARTIN:  I didn't ask if he adopt -- I never

24  asked that question.

25  BY MR. MARTIN:

1    Q.    Mr. Reed, where it says, "Reed did not know Hansen

2    ever bought wrecked aircraft and never saw a wrecked aircraft

3    at the Hansen facility," that is an incorrect statement, isn't

4    that true?

5              THE COURT:  Okay, Mr. Perez?  You want to talk to

6    your lawyer?  Yes, of course.  Talk to your lawyer.

7              MR. MARTIN:  Your Honor --

8              THE COURT:  Let him talk.

9              MR. MARTIN:  I want -- the answer to my statement

10   is not responsive.

11             THE COURT:  Hold on.  It was responsive to her

12   question.

13             MS. M. MILLER:  Absolutely.

14             MR. MARTIN:  It's not responsive to my question.

15             THE COURT:  Let him answer.  We're going to get

16   the answer.  We're going to get the answer.  Give us a minute.

17             (Pause.)

18             THE WITNESS:  Okay.  To my memory, when I made

19   those statements, it was correct.

20   BY MR. MARTIN: (CONTINUING)

21    Q.   I'm asking you today?  Today, you know those aren't

22   correct; correct?

23             MS. M. MILLER:  Your Honor --

24             THE COURT:  Wait.  Just a minute.

25             MS. M. MILLER:  I'm going to object.

*Redirect - Reed*

         1              THE COURT:  You object to that last question?

         2              MS. M. MILLER:  Yes, Your Honor.  He's now

         3    harassing this witness.  This witness has stated, repeatedly,

         4    that his memory was much better six years ago when he made

         5    these statements than it is today.  I know he wants a

         6    different answer.  He's not going to get a different answer.

         7              MR. MARTIN:  Well, Your Honor, Ms. Miller has

         8    never seen harassment like I can get to.  And I --

         9              THE COURT:  You're --

        10              MS. M. MILLER:  Threatening me now?

        11              MR. MARTIN:  She's never seen harassment like I

        12    can get.

        13              THE COURT:  Well, neither of you have ever seen

        14    harassment like I can get, too.  So calm down everyone.

        15              MR. MARTIN:  The government has seen, they have

        16    seized wrecked helicopters, Your Honor, they have wrecked

        17    helicopters that they have he's seized from us.  They are

        18    perpetrating a fraud in these statements.  And it's offensive

        19    to me that this witness, who's scared to death because they

        20    told me they were revoking his immunity agreement.

        21              MS. M. MILLER:  We never told him that.

        22              MR. MARTIN:  You did, too, Marie.

        23              MS. M. MILLER:  We never -- he admitted that we

        24    never told him and his lawyer admitted you never told him.

        25              MR. MARTIN:  You told me that, Marie.

```
 1                THE COURT:  All right, Counsels.

 2                MS. M. MILLER:  No, I did not.

 3                THE COURT:  Let me just say something I learned

 4   early on when I first became a lawyer, the judge says address

 5   the Court, not each other.  So let's not talk against each

 6   other.

 7                MR. MARTIN:  Your Honor.

 8                THE COURT:  You can talk to each other unless I

 9   go tell you to go meet and confer.  Now, go ahead.

10                MR. MARTIN:  Your Honor, the government knows

11   they have wrecked -- they have seized wrecked helicopters, our

12   wrecked helicopters.

13                THE COURT:  Okay.  But that's.  Okay.  So...

14                MR. MARTIN:  That have been on Hansen's -- that

15   have been repaired on Hansen's.  They know that statement is

16   incorrect.  They know that this witness --

17                THE COURT:  Mr. Martin, though, all we're

18   focusing on is his knowledge, his -- this witness's knowledge

19   about Hansen Helicopters and how -- how -- how -- how if and

20   how, if and when Hansen ever brought wrecked aircrafts onto

21   their facility.  That what's we're focusing on.  Just on that

22   one limited question.  All right.

23                And so he's already said when he made that

24   statement earlier on, with the 302, he stands by that

25   statement.  Your latest question is, does he stand by it
```

```
 1   today.
 2                MR. MARTIN:  Yes.
 3                THE COURT:  Okay.  Can he answer that, Mr. Perez?
 4                MR. PEREZ:  He can, I mean, I've already
 5   addressed it.
 6                THE COURT:  Okay.  But let me just -- is he going
 7   to say the same thing?
 8                MR. PEREZ:  Yes.
 9                THE COURT:  Can you answer the question, Mr.?
10                MR. MARTIN:  May I re-ask the question?
11                THE COURT:  There is another question?
12                MR. MARTIN:  No.  I said, may I re-ask that
13   question.
14                THE COURT:  Go ahead, re-ask the question.
15   BY MR. MARTIN: (CONTINUING)
16      Q.   Mr. Reed?
17                THE COURT:  He's going to re-ask it.  Listen to
18   it carefully, okay?  Go ahead.
19   BY MR. MARTIN: (CONTINUING)
20      Q.   Mr. Reed, you know today that wrecked helicopters
21   were on Hansen facility, isn't that true, sir?
22      A.   (Pause. )
23                THE COURT:  You want to talk to your lawyer?
24                MR. PEREZ:  I also ask Mr. Martin to specify as
25   to timeframe.
```

*Redirect - Reed*

1          THE COURT:  Timeframe.  Like --

2    BY MR. MARTIN: (CONTINUING)

3      Q.   Mr. Reed, you know today that Hansen helicopter has

4    had wrecked aircraft on the facility at any time because your

5    last statement was never.  I'm saying ever.

6          MS. M. MILLER:  So Your Honor...

7          THE COURT:  Okay.

8          MS. M. MILLER:  The statement was made in 2016.

9    And Mr. Martin is questioning the witness's knowledge today to

10   impeach something he said in 2016?

11         THE COURT:  All right.  You want to rephrase the

12   question, Mr. -- okay.  Withdraw the question.  Do another

13   one.  Go.

14   BY MR. MARTIN: (CONTINUING)

15     Q.   Mr. Reed, you know today that prior to October 26,

16   2016, Hansen Helicopters had wrecked aircraft at their

17   facility, isn't that true, sir?

18     A.   I still stand by my statement in 2016.

19         MR. MARTIN:  That's not responsive, Your Honor.

20   It's either "yes" or "no."

21         THE COURT:  Well, I think -- I mean, if he's

22   saying I stand by my statement, the answer is, he knows today

23   that what he said in --

24         MR. MARTIN:  I don't think that's what it means,

25   Your Honor.  I think that means I'm afraid I'm going to have

1  my immunity agreement withdrawn because the government's

2  already told Mr. Martin I'm withdrawing.  And I'm saying that

3  to you.

4          THE COURT:  I know, but I think you're

5  speculating.

6          MR. MARTIN:  It was said to me, Judge, and I

7  represent that to you as an officer the Court that it had been

8  withdrawn.

9          THE COURT:  Okay, but we're not going to get into

10  this --

11          MS. M. MILLER:  I don't think Mr. Martin has the

12  authority to withdraw the immunity agreement, Your Honor.

13          MR. MARTIN:  I don't think this is a funny matter

14  and I don't think it's appropriate you're laughing about it,

15  either, Your Honor.

16          THE COURT:  All right.  Counsels, look, this

17  whole issue of the immunity agreement, rather than -- I mean

18  we're not -- if we were to get into an evidentiary hearing

19  about it, we'd be spending hours on this.  And I would have to

20  assess the credibility of attorneys.  I'm going to take your

21  word for it, that you believe, Mr. Martin, what you believe

22  and she believes what she believes.  And lawyers in the heat

23  of trial, sometimes believe different things if they're on

24  opposing sides.

25          So bottom line is, the question is, has the

1    immunity agreement been withdrawn.  The answer is "no."

2    Officially no, it has never been withdrawn.  Period.  And I

3    haven't seen anything in writing.  And so I believe that it

4    has not been withdrawn.

5    BY MR. MARTIN: (CONTINUING)

6        Q.   Okay, Mr. Reed, Hansen Helicopters started in 1987 by

7    buying wrecked helicopters, isn't that true, sir?

8                MS. M. MILLER:  Objection, Your Honor, now we're

9    going outside the scope of whether he adopts or doesn't adopt

10   his statement.

11               THE COURT:  Yeah, Mr. --

12               MS. M. MILLER:  We could be here all day on every

13   single line.

14               MR. MARTIN:  So I'm going to the heart of the

15   issue.

16               THE COURT:  Here's the deal, Mr. Martin.  He's

17   already answered the question.  He adopts -- he stands by this

18   statement that as far as he knows, as far as he recalls, and

19   to the best of his ability, which was -- memory which was

20   better 20 --- in what year was that, 2016?

21               MR. MARTIN:  Yes, Your Honor.

22               THE COURT:  That he did not know Hansen ever

23   bought wrecked aircrafts and never saw a wrecked facility --

24   aircraft at the Hansen facility.  He's standing by that.

25   Period.

1          MR. MARTIN:  The objection then, Your Honor, is

2     this, I object to the introduction of these statements for

3     these reasons:  No. 1, we're not done, yet.  Ms. Miller is

4     going to lead him for as long as you're going to let her.  And

5     she's already led him all over the place; No. 2, these are

6     blatant hearsay.  These are hearsay, he can't adopt them and

7     bring in 302s like this.  There has been no issue about that;

8     No. 3, there are things in these 302s that he hasn't even

9     testified about and it's inappropriate for the jury to have a

10    document about things he hasn't even testified about.  And so

11    those are several reasons why these should not be admitted.

12         THE COURT:  All right.  So let me ask you this,

13    so to the extent that what he -- strike that.  To the extent

14    as to what he has testified to, why don't you go through it

15    and then you guys can figure out, you have do it on your own

16    and present it to the Court what should be redacted or not

17    redacted.  We could do that.  But he is saying that whatever

18    statement he made back on those 302s, he adopts them in full.

19         MR. MARTIN:  Well, then I better be given the

20    opportunity to cross-examine him in front of the jury again,

21    Your Honor, because --

22         THE COURT:  I haven't admitted it.  I'm just

23    saying that, you know, you're questioning the admission of the

24    document in full.  Now you're saying because there are matters

25    contained in there, that should not be shown to the jury, so

1   just -- so what's in, what's out, show me what should be out,

2   what should be in, if anything.  I think that's -- I'm -- I

3   don't have a problem with that.

4           So at this point, the Court will hold off on

5   that.  Because I don't know, I've not -- I mean, you guys have

6   scoured through this.

7           MR. MARTIN:  I will ask the Court to withhold

8   ruling on this until after the witness is off the stand.

9           THE COURT:  I will hold off on it.  That's fine.

10  But he may be subject to recall if there is going to be an

11  issue of having to have him come back.  But the Court will not

12  issue a ruling until after you've reviewed it.  And you say

13  okay, in Exhibit 1822, we find, for example, you find that the

14  Defendant -- it's only one page.  And on this -- 1, 2, 3, 4,

15  5, 6, there is six paragraphs on 1822.  And if you say on

16  those six paragraphs there are three sentences that we object

17  to, because whatever, then we'll review it.

18          MR. MARTIN:  Your Honor, so the record is

19  straight, the only reason to redact, would be if the Court

20  decided to introduce them at some later time.

21          THE COURT:  Well, no, if I admit it.  I haven't

22  decided to admit it.

23          MR. MARTIN:  That's what I'm saying.  If you

24  admit, then we'd redact it.  We'd go through and redact it.

25  But -- because I'm objecting to the whole report.

```
 1              THE COURT:  Right.  You're objecting to the whole
 2   report now, but your objection has now morphed into, there is
 3   things in here that he hasn't testified to, would be very
 4   unfair, so tell me what they are and I'll throw them out.
 5              MR. MARTIN:  Okay.  And when the Court rules, we
 6   will.  Because if I tell you now, she's going to ask him about
 7   them.
 8              THE COURT:  No, no, no.  I can't -- I can't make
 9   a ruling in -- blindly.  I don't know.  I mean --
10              MS. M. MILLER:  There is nothing that he has not
11   covered that is in these statements.  And I challenge
12   Mr. Martin to identify one topic that hasn't been covered
13   exhaustively, either on the direct or the cross or the
14   redirect or the recross or Mr. McConwell's cross.  They've all
15   been covered.
16              THE COURT:  Do you really need these 302s?
17              MS. M. MILLER:  (Nodded head.)
18              THE COURT:  Does the prosecution --
19              MS. M. MILLER:  I'm sorry?
20              THE COURT:  Do you really want these 302s?
21              MS. M. MILLER:  I do.  And under 8035 --
22              THE COURT:  Sometimes -- sometimes you got to be
23   careful what you want.
24              MS. M. MILLER:  Absolutely.
25              THE COURT:  Be careful what you wish for.
```

1          MS. M. MILLER:  And under 8035, since this

2    witness has said the recorded recollection matter the witness

3    once knew about but now cannot recall well enough to testify

4    fully and accurately was made or adopted by the witness when

5    the matter was fresh in his memory; and --

6          THE COURT:  Okay, I've got that.  I'm just saying

7    that in terms of any alleged messiness with the substance,

8    let's figure this out.  Mr. Martin.

9          MR. MARTIN:  Yes, Your Honor.

10          THE COURT:  I would suggest, okay, because you

11   indicated that you believe that there might be, I don't know

12   think you're saying that there may be information contained

13   within these 302 reports that are, what, irrelevant,

14   prejudicial, not testified to, whatever, show us what it is.

15   Show me, show the prosecution what it is.  And they may agree

16   that such should be redacted.

17          To the extent that the witness has testified to

18   this information, like for example, this one particular piece

19   of information that you're focusing on, on wrecked aircraft

20   and he's already testified to that, then that's going to be

21   in, that'll be left in because he's already -- he's adopted

22   and continues to adopt it.

23          So the Court will defer its ruling until you come

24   back to me.  Don't -- you can't put the ball in my court

25   because I don't know what your strategy is.

```
 1                    MR. MARTIN:  Very well, Your Honor.

 2                    THE COURT:  Okay.  Very well.  The Court will --

 3       and anyway, we already know what his position is and what his

 4       attorney's position is.  Okay.  Let me see what's our status

 5       with the -- oh, Lani, is the jury food here, yet?

 6                    (Discussion with clerk.)

 7                    THE COURT:  All right.  Okay, so where were we?

 8       Do you have any further voir dire in aid of an objection,

 9       Mr. Martin, or you just want to circle back?

10                    MR. MARTIN:  I was under the impression the Court

11       was reserving ruling until a later time.

12                    THE COURT:  I am.  I am.  Because you --

13                    MR. MARTIN:  So I have no more further --

14                    THE COURT:  Okay.  So we'll call back the jurors.

15       I'm sorry, we'll call back the jurors.  We got 15 -- we got

16       30 minutes, the jurors' food is not here, yet.  So it appears

17       the prosecution still wishes to move for admission.  If they

18       change their mind, just let me know, Ms. Miller and let the

19       defense know; otherwise, you guys can work on what you need to

20       work on.  Please rise for the jury.

21                    (Jury in at 11:15 a.m.)

22                    THE COURT:  We just had a legal issue outside

23       your presence and we'll circle back to Mr. Martin if necessary

24       later.  And go ahead, Ms. Miller.

25                    MS. M. MILLER:  Yes, Your Honor.
```

*Redirect - Reed*

 1  BY MS. M. MILLER: (CONTINUING)

 2      Q.   Now, I want the witness to look at Exhibit 372.

 3              THE COURT:  And has that been admitted or not?

 4              MS. M. MILLER:  That I will offer into evidence,

 5  Your Honor.  It has been identified previously by Mr. Reed.

 6              THE COURT:  372?

 7              MS. M. MILLER:  372, Yes, Your Honor.

 8              THE COURT:  Counsels will want to see if you want

 9  to make any -- well...first of all, do Counsels object to the

10  admission of this Exhibit 372?

11              MR. MARTIN:  I have to find it, Your Honor.

12              THE COURT:  I'm sorry?

13              MS. M. MILLER:  It's up on the screen.

14              THE COURT:  Okay.

15              MR. MCCONWELL:  Can you blow it up, please?

16              THE COURT:  Can you make it a little bigger,

17  please?  Go ahead.

18              MS. M. MILLER:  Is there any objection to moving

19  it into evidence, Your Honor?

20              THE COURT:  Any objections, Counsels?  You're

21  reviewing.

22              MR. MARTIN:  I just didn't realize it, Your

23  Honor, I actually pulled up the wrong exhibit and I apologize.

24              THE COURT:  Okay.  We'll have -- we'll check with

25  Mr. Martin and Hansen Helicopters.

*Redirect - Reed*

1                    (Pause.)

2                    MR. MARTIN:  Other than it appears to be beyond

3      the scope of Mr. McConwell's direct examination, Your Honor, I

4      don't think it's appropriate because this is what recross is

5      directed to.

6                    THE COURT:  Well, okay, so are you saying it's

7      beyond the scope?

8                    MR. MARTIN:  Yes, Your Honor.

9                    THE COURT:  That's your objection?  And Hansen

10     Helicopter s?

11                   MS. MCCONWELL:  Yes.

12                   THE COURT:  Same objection?

13                   MS. MCCONWELL:  Yes.

14                   THE COURT:  Counsel?

15                   MS. M. MILLER:  Yes, Your Honor.  So

16     Mr. McConwell specifically asked this witness whether Hansen

17     Helicopters was responsible for hiring pilots on his direct

18     examination, and so I am now asking the witness about a

19     particular pilot contract that is clearly within the scope.

20                   THE COURT:  All right.  Overruled.  Go ahead.

21     And then let's see if he can identify it.

22                   MS. M. MILLER:  Yes.

23                   THE COURT:  And if you can, if you make the

24     foundation, I'll admit it.

25                   MS. M. MILLER:  Yes, Your Honor.

*Redirect - Reed*

1  BY MS. M. MILLER: (CONTINUING)

2      Q.   Mr. Reed, do you recognize this document?

3      A.   I may have seen it before, but I'm not really

4  familiar with it.

5      Q.   So let's look at the last page of the document, sir.

6  Do you recognize your signature on the last page of the

7  document, sir?

8      A.   Yes, that is my signature.

9      Q.   Is that a true and correct copy of a document that

10  you signed, sir?

11      A.   Yes.

12      Q.   And as you stated, when Mr. McConwell was questioning

13  you, you were responsibile for the contracts between Hansen

14  Helicopters and the pilots; correct?

15      A.   Yes.

16          MS. M. MILLER:  Your Honor, at this time I would

17  move into evidence --

18          THE COURT:  I'm sorry.  Hold on.  There is an

19  objection?  What's the objection?

20          MR. MCCONWELL:  Your Honor, my questions related

21  to contract between the boats and Vanuatu companies, not the

22  pilots.  I object.

23          THE COURT:  I'm sorry, so your question -- I'm

24  sorry, when you did your examination, your examination dealt

25  with contracts between who?

*Redirect - Reed*

          1                    MR. MCCONWELL:  The boats and the boat owners and

          2       the -- with the individual boats and the Vanuatu corporation.

          3                    THE COURT:  And that's where you're saying that

          4       beyond the scope?  And this is a contract between --

          5                    MR. MCCONWELL:  Alpha Air and this pilot, I

          6       believe.

          7                    THE COURT:  Who is it between?  It's between --

          8       it's between Hansen?

          9                    MR. MARTIN:  No, Alpha Air.

         10                    THE COURT:  Alpha Air, right, the contractor, but

         11       duly-authorized representatives, Reed.

         12                    MR. MCCONWELL:  I did not bring up any pilot

         13       contracts at all.

         14                    THE COURT:  So this is a contract between the

         15       contractor and the pilot, all right.  Yeah.

         16                    MR. MCCONWELL:  And also based on 403, I object

         17       to the document.

         18                    THE COURT:  403?  Okay, saying it's more

         19       prejudicial, more what is it?  On the 403 balancing test, what

         20       is it?

         21                    MR. MCCONWELL:  Yes.  And a waste of time of the

         22       jury's time and the Court's time.

         23                    THE COURT:  All right.  And yes, Mr. --

         24       Mr. Martin?  Go ahead.  I got your objection, Mr. McConwell.

         25                    MR. MARTIN:  Your Honor, the parties to this

1    contract are Alpha Air, Inc. and a pilot.  That is not Hansen.

2    That is Alpha Air, Inc. and I object to it.

3                    THE COURT:  As irrelevant?

4                    MR. MARTIN:  Yes, Your Honor.

5                    THE COURT:  Okay.

6                    MS. M. MILLER:  Yes, Your Honor, may I respond?

7                    THE COURT:  Yes, go ahead.

8                    MS. M. MILLER:  Yes.  First of all, the question

9    from Mr. McConwell to Mr. Reed was, "Isn't it correct that

10   Hansen Helicopters provides the helicopters, the pilots, the

11   mechanics, the maintenance, and the parts to all of the

12   helicopters?"  He also discussed, at length, the Vanuatu

13   companies, which we know through the introduction of

14   Exhibit 829 are wholly-owned by Hansen Helicopters and

15   Mr. Walker.  To say that this is irrelevant, is not correct.

16                   Additionally, it's not unduly prejudicial because

17   it is a contract between a pilot and this company, which is a

18   subsidiary of Hansen Helicopters, according to the Defendants,

19   and it shows that Mr. Reed was in fact the person signing off

20   on these contracts.

21                   And as Your Honor remembers, Jose Eduardo Marinho

22   Goncalves is someone who is going to be presented to the jury

23   in terms of his testimony as a pilot who worked for the

24   Defendants.

25                   THE COURT:  All right.  Counsel?

*Redirect - Reed*

 1          MR. MARTIN:  Your Honor, the government's

 2  assertion is that this is Hansen.  There has been -- they have

 3  a chart that they say proves that.  That is not -- that is for

 4  the jury to decide and I object to it.  And based on their own

 5  chart, this evidence does not fall under Hansen Helicopters.

 6          THE COURT:  All right.

 7          MS. M. MILLER:  Your Honor, this --

 8          THE COURT:  Hold on.  Hold on.  Hold on.

 9          MR. MARTIN:  It falls under one of the 30 Vanuatu

10  international corporations.

11          THE COURT:  All right.  What the Court could do,

12  though, Counsels, without bringing up all the exhibits at this

13  point, is do a conditional admission assuming that the

14  prosecution's able to present evidence that this corporation

15  is part of Hansen.

16          So I can conditionally admit it or defer

17  admission until such time.  So I think what I'll do is defer

18  admission until such time, but it appears should be

19  conditionally admitted.  But anyway, we'll defer admission for

20  this -- at this moment.  We'll come back to it.  So remind me

21  to come back to it.

22          MS. M. MILLER:  Yes, Your Honor.  We're going do

23  to come back it to with Mr. Reed.

24          THE COURT:  Okay.  Same witness?  This witness.

25  Okay.

1    BY MS. M. MILLER: (CONTINUING)

2        Q.   Mr. Reed, who is Alpha Air?

3        A.   Who is Alpha Air?

4        Q.   Yes, sir.

5        A.   It's a company that Hansen owns.

6        Q.   And I believe you testified, when Mr. McConwell was

7    asking you all these questions, that Hansen created all of

8    these Vanuatu companies to enter into accounts with the

9    different fishing companies; correct?

10       A.   Yes.

11       Q.   And despite the fact that Hansen created these

12   companies to enter into the different fishing contracts,

13   didn't you also testify that Hansen Helicopters was

14   responsible for the pilots?

15            MR. MCCONWELL:  Your Honor, I object.

16            THE WITNESS:  Yes.

17            MR. MCCONWELL:  Misstatement of the testimony.

18   The testimony was Jon Walker created these companies in his

19   reorganization, not Hansen Helicopters.

20            MS. M. MILLER:  And Jon Walker is 99.99% owner of

21   Hansen Helicopters.  A company can't work outside of its

22   employees, directors, officers, etc., Your Honor.

23            THE COURT:  Okay.  Objection will be overruled.

24   Go ahead.

25   BY MS. M. MILLER: (CONTINUING)

*Redirect - Reed*

1    Q.   Sir, isn't Jon Walker the 99.99% owner of Hansen

2   Helicopters?

3    A.   Yes.

4    Q.   And isn't Hansen Helicopters the 99.9%[sic] owner of

5   all of these companies?

6    A.   Yes.

7    Q.   You testified in response to Mr. McConwell's

8   questions about Mr. Walker that Mr. Walker retired in 2011; is

9   that correct?

10    A.   I'm not aware of it.

11    Q.   You're not aware of it?

12    A.   Yes.

13    Q.   So you are not aware of Mr. Walker retiring in 2011;

14   correct?

15    A.   I know that, at one time, Rufus Crowe was taking over

16   for him and he was going back to Missouri.

17    Q.   Okay.  Did Mr. Walker continue to be involved in

18   Hansen Helicopters after 2011?

19    A.   I -- I'm not aware of it.

20    Q.   You're not aware of?

21    A.   Him being in control of it, no.

22    Q.   You're not aware of Mr. Walker being in control?

23    A.   You mean after 2011?

24    Q.   Yes, sir.

25    A.   No.

*Redirect - Reed*

1     Q.    Okay, you have no awareness of that?

2     A.    No.

3     Q.    Okay.  So let's look at Exhibit No. 694.

4            THE COURT:  Has that been admitted?

5            MS. M. MILLER:  No, not yet, Your Honor.

6            THE COURT:  694.

7            MS. M. MILLER:  Yes.

8            THE COURT:  Counsels, look at 694.  See if you

9     object or you stipulate to admission.  And if you stipulate,

10    we don't have to go through the foundation.  If you do -- if

11    you don't --

12    BY MS. M. MILLER:  (CONTINUING)

13    Q.    Would you, please, look at that document, sir.  Can

14    you see it?

15    A.    Yes.

16    Q.    What's the date on that document?

17    A.    April 8, 2016.

18    Q.    Who is that document from?

19            MR. MARTIN:  Your Honor, I think it should be

20    established whether or not he's familiar with this document

21    before we go any further.

22            THE COURT:  Okay.

23            THE WITNESS:  It's from Rufus Crowe.

24    BY MS. M. MILLER:  (CONTINUING)

25    Q.    And who is it to?

*Redirect - Reed*

1          MR. MARTIN:  Your Honor, I have an objection.

2          THE COURT:  All right.  Yeah, rather than going

3    into the substance of it, why don't you see if he recognizes

4    the document.  Does he know about it?

5    BY MS. M. MILLER: (CONTINUING)

6        Q.   Do you recognize this communication, sir?

7        A.   No.

8        Q.   Okay.  Do you recognize the people, who are

9    discussing issues in this communication?

10          MR. MARTIN:  Your Honor, I object to further

11   questions about this document.

12          THE COURT:  Right, the objection will be

13   sustained.

14          MS. M. MILLER:  Okay.

15          THE COURT:  He doesn't recognize the exhibit.

16          THE WITNESS:  I recognize John and --

17          THE COURT:  Mr. Reed.

18          MS. M. MILLER:  Hold on.

19          THE COURT:  You don't --

20          MS. M. MILLER:  We're going to take this document

21   away.  And then we're going to move on to another question.

22   BY MS. M. MILLER: (CONTINUING)

23       Q.   Do you remember seeing Jon Walker at Hansen

24   Helicopters at any time after 2011?

25       A.   Not really.  I know he visited sometime, but I don't

*Redirect - Reed*

1    -- I'm not -- I don't know the dates.

2        Q.    You were part of a joint defense agreement with the

3    other defendants in this case; is that correct?

4                    MR. MARTIN:  Your Honor, I object to this

5    question.

6                    THE COURT:  The objection will be sustained.

7    BY MS. M. MILLER: (CONTINUING)

8        Q.    Okay.  Do you recall that Mr. Crowe signed an

9    affidavit in this case?

10                    MR. MARTIN:  Your Honor, I object on affidavit by

11    Mr. Crowe.

12                    THE COURT:  Objection will be sustained.

13    BY MS. M. MILLER: (CONTINUING)

14        Q.    Isn't it true that the management team at Hansen

15    Helicopters kept Jon Walker involved in all day-to-day

16    operations?

17                    MR. MCCONWELL:  We object to that.  Hansen

18    Helicopters objects to that.  There is no foundation for that.

19                    THE COURT:  All right.  Court will sustain the

20    objection.  Go ahead.

21    BY MS. M. MILLER: (CONTINUING)

22        Q.    Are you part of the management team at Hansen

23    Helicopters?

24        A.    Yes.

25        Q.    Isn't it true that the management team of Hansen

*Redirect - Reed*

1  Helicopters kept Jon Walker informed of all of the decisions?

2         MR. MCCONWELL:  Once again, I object.  There is

3  no foundation for this statement.

4         THE COURT:  The Court will overrule that

5  objection.  Go ahead.

6         MR. MCCONWELL:  May I voir dire the witness, Your

7  Honor?

8         THE COURT:  Sure.  Go ahead.

9

10                    VOIR DIRE

11 BY MR. MCCONWELL:

12    Q.   Mr. Reed, even though you were, quote, "on the

13 management team," you weren't involved in management decisions

14 at all, were you, sir?

15    A.   No, I was not.

16    Q.   So you don't know whether or not they kept him

17 advised of anything or not; correct?

18    A.   I do not know.

19         MR. MCCONWELL:  Okay.  I still object, Your

20 Honor.

21         THE COURT:  All right.

22 BY MS. M. MILLER:  (CONTINUING)

23    Q.   Who was involved in the management decisions?

24         MR. MCCONWELL:  Excuse me.  Based upon my voir

25 dire, is the Court still overruling?

*Redirect - Reed*

1          THE COURT:  The Court will sustain the objection.

2          MR. MCCONWELL:  Thank you, Your Honor.

3          THE COURT:  Next question.

4   BY MS. M. MILLER: (CONTINUING)

5      Q.   Who was involved in the management decisions?

6      A.   Rufus Crowe.

7      Q.   Who else?

8      A.   And I don't know.

9      Q.   So are you saying that Rufus Crowe was making all the

10  decisions on behalf of Hansen Helicopters?

11     A.   Um, I think so.  I'm not sure.

12          MR. MCCONWELL:  Your Honor, I object to lack of a

13  timeframe.  I want to know if this is after Mr. Crowe took

14  over management.

15          THE COURT:  You want to be more specific?

16  BY MS. M. MILLER: (CONTINUING)

17     Q.   Sure.  Mr. Crowe making all of the decisions for

18  Hansen Helicopters today, sir?

19     A.   Yes.

20     Q.   Is Mr. Crowe the president of Hansen Helicopters?

21     A.   No.

22     Q.   Who's the president of Hansen Helicopters?

23     A.   I think Mr. Walker.

24     Q.   Okay.  Does Mr. Crowe get 99.99% of the profits of

25  Hansen Helicopters?

*Redirect - Reed*

          MR. MARTIN:  Your Honor, this is way beyond the

scope of cross-examination by Mr. McConwell, and I object.

          MS. M. MILLER:  Absolutely not, Your Honor.

Mr. McConwell wants this jury to believe that Mr. Walker

retired in 2011 and had nothing to do with Hansen Helicopters.

          MR. MCCONWELL:  I object to this.

          THE COURT:  Okay, the objection will be

overruled.  Go ahead.  Proceed.

BY MS. M. MILLER: (CONTINUING)

     Q.  Does Mr. Crowe receive 99.9% of the profit of Hansen

Helicopters?

     A.  I don't think so.

     Q.  Who does receive 99.9% of the profit of Hansen

Helicopters?

     A.  It's still Mr. Walker.

     Q.  Who can sign checks for Hansen Helicopters?

     A.  Mr. Walker, Mr. Crowe and myself.

     Q.  Okay.  Where were the contracts signed between the

companies, the Vanuatu companies and the boat companies?

     A.  Repeat that.

     Q.  Where were the contracts signed between the Vanuatu

companies and the boating companies?

     A.  They were signed in the office, Guam; one signature;

then they were DHL-sent to the main companies for their

signature.

1    Q.    To the fishing companies?

2    A.    Yes.

3    Q.    Okay.  So those contracts were never signed in

4    Vanuatu; correct?

5    A.    Not to my knowledge, no.

6    Q.    And the contracts between Hansen Helicopters and the

7    pilots, where were they signed?

8    A.    In Guam.

9    Q.    What about the contracts with the mechanics, where

10   were they signed?

11   A.    In Guam.

12   Q.    Do you know why the contracts were signed in Guam, if

13   the Vanuatu companies were really the companies that were

14   entering into the agreements with the fishing boats?

15             MR. MARTIN:  Your Honor, I object to the

16   question.  If they were really -- the question is -- that's

17   not an appropriate question.

18             THE COURT:  All right.  The objection will be

19   sustained.  Rephrase.

20   BY MS. M. MILLER: (CONTINUING)

21   Q.    So why were the Vanuatu companies not signing the

22   contracts in Vanuatu?

23   A.    I don't know.

24   Q.    Were there any employees in Vanuatu?

25   A.    I don't think so.

1     Q.   You also testified when Mr. McConwell was asking you

2   questions, that Hansen Helicopters provides maintenance on the

3   helicopters; correct?

4     A.   Yes.

5     Q.   And that's in Guam, right?

6     A.   That's in Guam and on the boats.

7     Q.   Okay.  And you said the major maintenance is

8   performed in Guam; correct?

9     A.   The major ones, yes.

10     Q.   Okay.  Now, that would include the purchase of parts;

11   correct?

12     A.   Yes.

13     Q.   And Hansen Helicopters was the company actually

14   purchasing the parts; correct?

15     A.   That's correct.

16     Q.   There are no invoices between a Vanuatu company and a

17   parts manufacturer; correct?

18     A.   Correct.

19     Q.   Now, you testified under oath that, as far as you

20   know, there were never any problems with the tail rotor pitch

21   change links; is that correct?

22     A.   Yes.

23     Q.   Let's look at Exhibit No. 278, which has already been

24   admitted into evidence.

25          MR. MCCONWELL:  Your Honor, I would like --

```
 1                    THE COURT:  Yes, 278.  Yes?

 2                    MR. MCCONWELL:  I have two -- I want to object to

 3        phraseology.  She claimed he testified there was never any

 4        problems with the tail rotor pitch links.

 5                    The question was, there was no defect or failure,

 6        ever, in the pitch link blanks, that what was asked of the

 7        witness.

 8                    THE COURT:  Okay, so I'm sorry, so what was the

 9        -- what's the -- what are you -- you just want --

10                    MR. MCCONWELL:  Well, the problem is, service

11        issues are just minor items that have -- if there is a loose

12        bearing, it has to be replaced and they do that.  But the

13        question was, it was asked of him, are there any defects in

14        these manufactured parts or failure of these manufactured

15        parts, particularly the pitch link control link.  And the

16        question she asked was not that same question.

17                    THE COURT:  So she's misstating the evidence?  Is

18        that what you're saying?

19                    MR. MCCONWELL:  Misstating the evidence.

20                    MS. M. MILLER:  I'm going to -- this was admitted

21        into evidence and I want the jury --

22                    THE COURT:  I guess nobody is saying your

23        question --

24                    MS. M. MILLER:  My question is not misstating the

25        evidence, Your Honor.  My question is going right to the heart
```

1   of the evidence, which is that there were problems, defects,

2   inconsistent operations involved with the tail rotor pitch

3   change link.

4            The very document that the defendants introduced

5   into evidence shows, in this particular instance, that the

6   tail rotor pitch change link had to be removed and replaced

7   because of excessive play.

8            THE COURT:  Okay.  So the Court will -- okay,

9   anything further?

10           MR. MCCONWELL:  Well, the issue here, that's not

11  a fracture or a defect in the part itself, that's a bearing

12  looseness issue and a maintenance issue.  So there is a major

13  issue here between a failure of a part and a normal

14  maintenance.  These parts are checked every day.  And if

15  they're loose, they have to be replaced or repaired and this

16  is just part of the maintaining a helicopter that everything

17  on it shakes, all the time.

18           MS. M. MILLER:  Your Honor --

19           THE COURT:  Hold on, the Court will overrule the

20  objection.  You guys can save that for argument, if it's based

21  on the evidence.

22           MS. M. MILLER:  Thank you, Your Honor.

23           THE COURT:  So credibility, go ahead, next

24  question.

25  BY MS. M. MILLER:  (CONTINUING)

*Redirect - Reed*

1     Q.   Mr. Reed, what are the remarks in this particular

2   weekly report from the pilot to you?

3     A.   It says, "remove and replaced tail rotor pitch link

4   due to excessive play."

5     Q.   What does it mean that there is excessive play?

6     A.   It means that maybe the bearings are loose or

7   something that the unit is loose.

8     Q.   And you talk --

9     A.   So --

10     Q.   Go ahead, I'm sorry, sir.

11     A.   So they replace it with the ones that's good and

12   solid.

13             MS. M. MILLER:  May I approach the witness, Your

14   Honor?

15             THE COURT:  You may.  And you got -- we got five

16   minutes before the jury has -- and your lunch is here, ladies

17   and gentlemen.  So...

18             (Pause.)

19             MS. M. MILLER:  I'm approaching the witness, Your

20   Honor, with what has been previously marked as Exhibit 295-6.

21             THE COURT:  Oh, it's already been admitted you

22   said?

23             MS. M. MILLER:  It's been previously marked,

24   subject to admissibility, Your Honor, hasn't admitted, yet.

25             THE COURT:  So 295-6, so it's just one exhibit?

*Redirect - Reed*

```
 1                    MS. M. MILLER:  Yes.

 2                    THE COURT:  Counsel, you want to look at 295-6.

 3    What is it?  Counsels, have you seen that?  Counsels?

 4    Mr. McConwell.

 5                    MR. MCCONWELL:  No, Your Honor.

 6                    THE COURT:  You want to show it to him?

 7                    MS. M. MILLER:  They have seen it.

 8                    MR. MCCONWELL:  I have not seen it.

 9                    THE COURT:  He hasn't seen it lately.  So show it

10    to him.  And then Mr. Martin can look at it as well.  Mr. Han.

11                    MR. MARTIN:  Apparently, I've seen it and didn't

12    know it, Your Honor.

13                    THE COURT:  Huh?  You saw it, but you didn't know

14    it?  Okay.

15                    MR. MARTIN:  Well, I was advised I've seen it.

16                    MS. M. MILLER:  Your Honor, this was marked into

17    evidence six weeks ago.  If Counsel doesn't remember, I'm

18    sorry, but it's been sitting on there and it's been marked and

19    we've discussed and argued it.  So I don't know.

20                    MS. MCCONWELL:  Your Honor, I'm going to object.

21    I think that's inappropriate.

22                    MR. MCCONWELL:  And we've seen this but I think

23    it's a brand new part.  She was acting like she's bringing a

24    failed service part as an exhibit.  And that's why I said I

25    hadn't seen it before.
```

*Redirect - Reed*

          1                    THE COURT:  Okay.

          2                    MR. MCCONWELL:  I'm not even sure it's the same

          3      part for this aircraft, frankly, but little different size.

          4                    MR. MARTIN:  Was it in the box?

          5                    MS. M. MILLER:  It was in the box.

          6                    MR. MARTIN:  I have not seen it before, but --

          7                    THE COURT:  Okay.  You haven't seen it before.

          8      Go ahead.

          9                    MS. M. MILLER:  I would like the Court and the

         10      court reporter to note that I retrieved it from the evidence

         11      table.  And it had been previously marked approximately six

         12      weeks ago.  And it was shown to Counsel then and we had a

         13      whole argument about the paperwork that did or did not

         14      accompany it so...

         15                    THE COURT:  That's right.

         16                    MR. MARTIN:  I'd like the Court and the record to

         17      note that Mr. McConwell and Ms. Miller did do that.  I was not

         18      part of that.

         19                    Here's your exhibit, Ms. Miller.

         20                    THE COURT:  All right.  So you know what, on that

         21      note, we're going to go take a lunch break.  Ladies and

         22      gentlemen, have a nice lunch break and we'll come back to this

         23      exhibit, take care, do not form or express any opinion on this

         24      case until it's submitted to you.  And do not speak to anyone

         25      on any subject connected with the trial.

```
 1                    Mr. Perez, you might --
 2                    Thank you, go ahead, jurors.  Ladies and
 3      gentlemen, please rise for the jury.
 4                    (Jury out at 11:39 a.m.)
 5                    THE COURT:  We will start at 12:30, 11:45 to
 6      12:30 is lunch.  So see you at 12:30.  Very well.  Thank you.
 7                    (Recess taken at 11:40 a.m.)
 8                    (Back on the record at 12:42 p.m.)
 9                    THE COURT:  We'll call in the jury.  All Counsels
10      present, Defendant is present and witness is present.  You may
11      be seated.  We'll call in the jurors.  How much more time do
12      you have, Ms. Marie Miller?
13                    MS. M. MILLER:  None.
14                    THE COURT:  Oh, done.  You're just going to get
15      up say that's it?
16                    MS. M. MILLER:  That's it.
17                    THE COURT:  Okay.  Yes?
18                    MR. MARTIN:  Your Honor.
19                    THE COURT:  Yup?  Hold on.  Yes?
20                    MR. MARTIN:  In light of the fact that
21      Mr. McConwell did a direct, she's now done a cross, they both
22      talked about Mr. Walker, I'm requesting the Court that I be
23      allowed further cross-examination to ensure Mr. Walker's Sixth
24      Amendment right to cross-examination.
25                    THE COURT:  Okay.  So let me look at what
```

*Redirect - Reed*

1  happened.  Let me get the -- we had a direct exam by the

2  prosecution.  Then we had a cross by...

3              MS. M. MILLER:  Mr. Martin.

4              THE COURT:  Martin.  Then we had a cross by

5  McConwell.

6              MR. MARTIN:  No, no, the cross, then again by Ms.

7  Miller.

8              THE COURT:  I mean, a redirect.

9              MR. MARTIN:  Redirect.

10             THE COURT:  I'm sorry, with a direct first by the

11 prosecution, cross-examine by Martin, then a redirect by the

12 prosecution?

13             MR. MARTIN:  Then cross by me.

14             THE COURT:  Okay?

15             MR. MARTIN:  Then Mr. McConwell.

16             THE COURT:  And then cross-exam -- I mean a

17 recross?

18             MR. MARTIN:  No, cross.

19             MS. M. MILLER:  Mr. Martin --

20             THE COURT:  Sorry.  Cross by McConwell.  Then you

21 came on?

22             MS. M. MILLER:  Now, Mr. Martin did --

23             THE COURT:  Wait.  Wait.  Cross-exam by McConwell

24 and then after McConwell was, oh, wait, the prosecution, so

25 that's a re-redirect by the prosecution.  And then now -- then

*Redirect - Reed*

1    now what?

2              MS. M. MILLER:  Mr. Martin did a

3    cross-examination after I finished my direct of Mr. Reed.

4              THE COURT:  Right.

5              MS. M. MILLER:  Then I did a redirect.

6              THE COURT:  Right, I got that.

7              MS. M. MILLER:  Then you allowed Mr. Martin to do

8    a recross of Mr. Reed after I did my redirect.

9              THE COURT:  Okay.

10              MS. M. MILLER:  Then we went to Mr. McConwell.

11              THE COURT:  So I allowed a recross on -- with

12    Martin?

13              MS. M. MILLER:  Yes, you did.

14              THE COURT:  So actually -- okay, that's right.

15    Okay.

16              MS. M. MILLER:  Then we went to Mr. McConwell.

17              THE COURT:  Right.

18              MS. M. MILLER:  Then I redirected after

19    Mr. McConwell.  So the only thing that Mr. Martin should be

20    permitted to do, Your Honor, if anything, since he has crossed

21    twice, is to address anything within the scope of my very

22    limited redirect after Mr. McConwell.

23              THE COURT:  All right.  Let me see.  Okay.

24    That's right.  I would agree with that.  And then you also

25    have -- we'll come back to the other issue later.  Right?

*Redirect - Reed*

 1    You're going to look at the 302s?

 2                MR. MARTIN:  I haven't had a chance.

 3                THE COURT:  Right.  All right.  So she's just

 4    asking that your scope of your re -- okay, so let's see.

 5                MS. M. MILLER:  It's now re-recross.

 6                THE COURT:  (Laughing.)  That's right.  I

 7    normally shouldn't do this, but go ahead, re-recross.

 8                MR. MARTIN:  Correct.

 9                THE COURT:  You would agree with that?

10                MR. MARTIN:  And it will be a limited and short

11    cross.

12                THE COURT:  As long as it's within -- it's just

13    limited to the scope of the cross-examination by McConwell.  I

14    would agree with that.

15                MR. MARTIN:  Cross-examination of...

16                MS. M. MILLER:  By the redirect -- redirect by

17    the government.

18                THE COURT:  Right.  That's correct.

19                MR. MARTIN:  That's correct -- and that's only --

20    I wouldn't do it -- on the mode we went last time, Your Honor,

21    it put me in a situation.  I'm assuming we're going to change

22    back to the normal mode where it's --

23                THE COURT:  We will.

24                MR. MARTIN:  Very well.

25                THE COURT:  Right.  Let's go, call in the jury.

*Redirect - Reed*

 1    We'll get back to the normal mode.

 2                    MS. MCCONWELL:  Your Honor, may I have one

 3    request?

 4                    THE COURT:  Yes.

 5                    MS. MCCONWELL:  We talked about this before March

 6    and we did not renew it yesterday or today, but we're trying

 7    to -- we're joining each other's objections so that we're not

 8    all objecting and stating a bunch of different --

 9                    THE COURT:  So you're just saying, any objections

10    that have been previously made, that you've joined in all

11    those objections?

12                    MS. MCCONWELL:  Yes.  And we'll continue doing

13    that so we try not have everybody talking throughout the whole

14    trial.

15                    THE COURT:  All right.  So noted.  Very well.

16    All right.  Please rise.

17                    (Jury in at 12:46 p.m.)

18                    THE COURT:  Welcome back, ladies and gentlemen of

19    the jury.  Did you guys have a nice lunch?

20                    THE JURY:  Yes.

21                    THE COURT:  Good.  All right.  We're going go to

22    go ahead and proceed.

23                    Ms. Marie Miller, any further questions?

24                    MS. M. MILLER:  No further questions of this

25    witness, Your Honor.

*Redirect - Reed*

1          THE COURT:  Okay.  Thank you very much.  And

2     Mr. Martin, you may go ahead and do a re-recross based on what

3     we previously indicated.

4          MR. MARTIN:  Thank you, Your Honor.

5          THE COURT:  Before the jurors came.  Yup.

6

7                    RE-RECROSS EXAMINATION

8     BY MR. MARTIN:

9     Q.    Mr. Reed, you recall on direct examination or

10    redirect examination by Ms. Miller, her asking you about the

11    statements you made to the law enforcement officers, the -- I

12    believe the FBI and other law enforcement agencies, that you

13    talked about, sir?

14    A.    Yes.

15    Q.    Was that a "yes"?

16    A.    Yes.

17    Q.    And I believe you told the Judge and the ladies and

18    gentlemen of the jury that you were adopting those; is that

19    correct?

20    A.    Yes.

21    Q.    And let me ask you, sir; those are the same

22    statements that you -- when you were a defendant in this case,

23    filed a motion for this Court to hear, saying that they were

24    coerced and that they were involuntarily obtained from you;

25    isn't that true, sir?

*Re-recross – Reed*

           1           MR. PEREZ:  Hold on.  Your Honor, I instruct my
           2    client not to answer on the basis of attorney-client privilege
           3    and work product.
           4           THE COURT:  All right.  Very well.  Based on that
           5    then, the witness need not answer.  Go ahead, proceed.
           6           MR. MARTIN:  I don't think this witness has the
           7    authority to refuse to answer a question based on work
           8    product.  Mr. -- we have a right to cross-examine and have his
           9    testimony if the government is going to bring him in Court and
          10    I object to that.  I think he should be required to answer the
          11    question.
          12           THE COURT:  Counsel just indicated that this is
          13    an attorney-client privilege information that --
          14           MR. MARTIN:  Okay.
          15           THE COURT:  -- prevents him from answering that
          16    question.
          17    BY MR. MARTIN: (CONTINUING)
          18      Q.   Okay, Mr. Reed, did you see the motions that your
          19    Counsel filed in this case?
          20      A.   Yes.
          21      Q.   And one of those motions was to suppress those
          22    statements, that you gave, that the government says you
          23    adopted; isn't that true, sir?
          24      A.   Yes.
          25      Q.   I'm sorry?

*Re-recross – Reed*

1    A.   Yes.

2    Q.   And the basis, that was acclaimed in those motions,

3    was that they were coerced from you by the FBI; isn't that

4    true, sir?

5              MR. PEREZ:  Hold on.  I'm instructing my client

6    not to answer on the basis of attorney-client privilege.

7              THE COURT:  Right.  The Court will grant that the

8    request and witness need not answer that question.

9    BY MR. MARTIN: (CONTINUING)

10   Q.   Did you read the motion, sir?

11   A.   Yes.

12   Q.   And that's what the motion said, that the FBI coerced

13   those statements out of you; isn't that true, sir?

14             MR. PEREZ:  Hold on.  I instruct my client not to

15   answer on the basis of attorney-client privilege.  Also, the

16   document speaks for itself.

17             THE COURT:  All right.  Very well.  The Court

18   will honor that request by Mr. Perez on behalf of his client.

19   His client need not testify.

20             MR. MARTIN:  Then, Your Honor, the document

21   speaks for itself, the jury doesn't know what that document

22   says.  May I introduce it -- I don't have it with me now, but

23   I could obtain it and make it an exhibit in this case.

24             THE COURT:  All right.  Objection, Counsel?

25   Prosecution?  Any objection?

        MS. M. MILLER:  Yes, Your Honor, the objection is
that if Mr. Perez has stated that there is an attorney-client
privileged communication that formed the basis of that filing,
he's not waiving it, he's instructing his client not to answer
any questions about it, then it would be inappropriate to
introduce that document into the courtroom or for the jury.
It's a collateral matter.  It is not relevant to these
proceedings today and we already have this witness's testimony
that the statements he gave to the FBI were truthful and
voluntary.

        THE COURT:  All right.  So let me just say, the
Court will defer ruling on that issue to a later time.  We'll
discuss that later.

        MR. MARTIN:  In response, Your Honor, it is a
public filing.  I don't know how a public filing can be
attorney-client privilege.

        THE COURT:  It's not sealed; is that correct?

        MR. MARTIN:  No, it's not sealed.

        THE COURT:  So the question, though, is should
the Court take judicial notice and allow the jurors to see it.
So I'll defer ruling on that, let me think about that.

        MR. MARTIN:  Okay.

BY MR. MARTIN: (CONTINUING)

    Q.   Does the fact that your attorney filed a motion,
saying that your statement was coerced by the FBI, cause you

*Re-recross - Reed*

1  any concern about now adopting those statements as correct,

2  sir?

3          MR. PEREZ:  I'm instructing my client not to

4  answer that, that question, on the basis of attorney-client

5  privilege.

6          THE COURT:  All right.  Very well.  The Court

7  will honor that request.  And Mr. Reed need not answer that

8  question.

9  BY MR. MARTIN: (CONTINUING)

10     Q.   Mr. Reed, are you concerned today, as you sit here in

11  this courtroom in front of this jury, that the prosecution,

12  because of your testimony, is going to revoke your immunity

13  once you get off the stand?

14     A.   (No response.)

15     Q.   Did you understand the question?

16          THE COURT:  Hold on, let his client -- attorney

17  speak.  Go ahead, Mr. Perez.  You can speak to your client.

18          (Pause.)

19          THE WITNESS:  The U.S. Attorney has indicated

20  that she's not going to revoke my immunity.

21  BY MR. MARTIN: (CONTINUING)

22     Q.   I didn't ask you what the U.S. Attorney said and I

23  can't speak for the U.S. Attorney and you can't either, sir.

24  My question was, are you concerned, based from right now

25  forward, that the U.S. Attorney can revoke your immunity

*Re-recross - Reed*

```
 1   because of your testimony in this courtroom?
 2               MR. PEREZ:  May I confer with my client?
 3               THE COURT:  Yes, you may, Mr. Perez.  Go ahead.
 4               (Pause.)
 5               THE WITNESS:  The premises of your question is
 6   without basis and I cannot respond.
 7   BY MR. MARTIN: (CONTINUING)
 8       Q.   I can't hear you, Mr. Reed.  I'm sorry?
 9       A.   The premises of your question is without basis and I
10   cannot respond.
11       Q.   The premise of my question is without basis?
12       A.   Yes.
13       Q.   Let me repeat it again.  Are you concerned?  That's
14   the premise.  Are you concerned, based upon the testimony
15   you've given in this courtroom, that the United States
16   Attorney's office might revoke their immunity agreement?
17       A.    No, because the U.S. Attorney has indicated they're
18   not going to revoke my immunity.
19       Q.   Okay.  Has the agreement with the United States
20   Attorney, relating to your immunity, affected your memory in
21   this case, sir?
22               THE COURT:  You understand the question?
23               THE WITNESS:  Yes.
24               THE COURT:  And your answer is?  Or hold on.  Let
25   me let your attorney.
```

*Re-recross - Reed*

 1                  THE WITNESS:  Can he say it again?

 2                  THE COURT:  Repeat it then.  Your attorney wants

 3      to speak to you.  Go ahead.

 4                  Mr. Martin, you want to restate the question?

 5                  MR. MARTIN:  (Pause.)  I'd like to, Your Honor,

 6      but I was thinking about something else and I forgot what I

 7      said.  I think I know what I said.  Could we have it repeated?

 8      I apologize.

 9                  THE COURT:  Sure.  No, no, that's fine.  Veronica

10      can repeat.  Veronica.

11                  MR. MARTIN:  And I'm sorry, Judge.  I was

12      thinking of my next question.

13                  (Whereupon the reporter read back requested

14      portion.)

15                  THE WITNESS:  No, it has not.

16      BY MR. MARTIN: (CONTINUING)

17          Q.   Okay.  Is there a reason why it took you so long to

18      just say that, sir?

19          A.   No.

20          Q.   Would you agree with me, sir, that you have provided

21      this jury with many, many inconsistent statements during your

22      testimony?

23                  (Mr. Perez and witness consulted.)

24          A.   I cannot respond to your question because it's vague

25      with the many, many, many.

*Re-recross – Reed*

1    Q.   I apologize for my vagueness.  Have you testified

2  inconsistently about different subjects during your testimony,

3  sir?

4    A.   That's not for me to decide; it's for the jury to

5  determine.

6    Q.   I appreciate that.  Do you not believe you've

7  testified inconsistently, sir?

8    A.   I have attempted to testify truthfully to the best of

9  my ability.

10    Q.   And you understand, if the government doesn't think

11  you've done that, they have the absolute authority to revoke

12  your immunity agreement?

13    A.   It's been confirmed, repeatedly, that they're not

14  revoking my immunity.

15    Q.   You understand that the government has the absolute

16  authority, if they don't think you've testified truthfully, to

17  revoke your immunity agreement, don't you, sir?

18    A.   That's a legal issue that I'm not qualified to

19  answer.

20    Q.   Have you read the letter between you and the United

21  States Attorney's office relating to your immunity?

22    A.   Yes.

23    Q.   And have you read the part in there that says they

24  can determine whether or not you have fulfilled, pardon me,

25  the conditions of this agreement and if they disagree, they

1    can revoke your immunity, sir?

2        A.   I don't have the document, but the document speaks

3    for itself.

4        Q.   That's a very important document, don't you think,

5    sir?

6        A.   Yes.

7        Q.   And it could impact your life substantially, you

8    agree, sir?

9        A.   Yes.

10       Q.   And are you telling me, you don't remember what the

11   document says now, sir?

12       A.   The document is a technical and legal, and I don't

13   know how to respond.

14       Q.   The document is addressed to you and to Mr. Perez;

15   correct, sir?

16       A.   I don't have the document, but I believe so, yes.

17                MR. MARTIN:  May I approach the witness, Your

18   Honor?

19                THE COURT:  You may.  All right.  What exhibit

20   number is that, sir?

21                MR. MARTIN:  Your Honor, this is the agreement.

22   I don't believe it's been introduced into evidence.

23                THE COURT:  Has it been marked at all?

24                MR. MARTIN:  I don't believe so.

25                THE COURT:  You want to mark it?  Let's have it

*Re-recross - Reed*

1    marked then.  Okay.  What is it?

2                   MS. MCCONWELL:  119.

3                   THE COURT:  Okay.

4                   MS. MCCONWELL:  119.

5                   THE COURT:  Ms. McConwell is indicating that's

6    119, Mr. Martin.

7                   MR. MARTIN:  May I approach, Your Honor?

8                   THE COURT:  You may, you may.  Exhibit 119.

9    BY MR. MARTIN: (CONTINUING)

10       Q.   Mr. Reed, I hand you what's been marked -- may I

11   examine for --

12                  THE COURT:  You may.  Just speak loud, though.

13   BY MR. MARTIN: (CONTINUING)

14       Q.   I hand you what's been marked for identification

15   purposes as Exhibit 119, sir.  Do you see that?

16       A.   Yes.

17       Q.   Is that a letter addressed to you and your attorney,

18   Mr. Perez?

19       A.   It's to Attorney Perez.

20       Q.   Okay.  And are you the subject matter of that letter?

21       A.   United States v. John D. Walker a/k/a Jon Walker,

22   Marvin R. Reed, Kenneth R. Crowe, Phillip T. Kapp, Randall

23   Rogers, Hansen Helicopters, Spares Incorporated, the District

24   Court, Criminal Case 18-00010.

25       Q.   Is that your immunity agreement, sir?

*Re-recross - Reed*

1      A.   Yes.

2      Q.   And does it contain the terms of your agreement with

3 the United States?

4      A.   Yes.

5      Q.   I draw your attention to the, if I may, Mr. Reed, to

6 the second page and if you'll follow along with me.  "In the

7 event your client has knowingly provided false or misleading

8 statement at trial, then this agreement shall be null and void

9 and any information provided by your client including

10 statements and information provided pursuant to this agreement

11 may be used against him without limitation and for any purpose

12 in a perjury prosecution."  Did I read that correctly, sir?

13     A.   Yes.

14     Q.   Okay.  And is that the terms -- one of the terms of

15 this agreement, sir?

16     A.   Yes.

17     Q.   Do you understand what that means, Mr. Reed?

18     A.   Yes.

19          MR. MARTIN:  I don't have any further questions,

20 Your Honor.

21          THE COURT:  All right.  No further questions.

22 All right.  Yup.

23          MS. M. MILLER:  No further questions, Your Honor.

24          THE COURT:  We're going to go ahead and have the

25 witness excused then.  We don't need him further; is that

*Re-recross - Reed*

1   correct, Counsel?

2            MS. M. MILLER:  That is correct, Your Honor.

3            THE COURT:  Unless there is an issue with regard

4   to the 302s.

5            MS. M. MILLER:  Right.

6            THE COURT:  Potentially.  Correct?  Mr. Martin?

7            MR. MARTIN:  That's correct, Your Honor.

8            THE COURT:  And Mr. Perez, could you have him on

9   stand by on that one issue, that I'm deferring?

10           MR. PEREZ:  Yes, Your Honor, but he's otherwise

11  excused?

12           THE COURT:  He's otherwise excused.  Thank you,

13  sir.  Mr. Reed, take care.  Be careful when you walk down.

14  All right, thank you, Mr. Perez for being here all these days.

15  Take care.

16                    (End of excerpt.)

17                        *  *  *

18

19

20

21

22

23

24

25

*Re-recross - Reed*

CERTIFICATE OF OFFICIAL REPORTER

CITY OF HAGATNA      )
                      ) ss.
TERRITORY OF GUAM   )

        I, Veronica F. Flores, Official Court Reporter for the District Court of Guam, do hereby certify the foregoing pages, 1 to 280, to be a true and correct transcript of the proceedings held in the above-entitled matter to the best of my ability.

        Dated this 31st day of March 2023.

                          /s/Veronica F. Flores
                          Veronica F. Flores