1

IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM

UNITED STATES OF AMERICA, Plaintiff,

vs.

JOHN D. WALKER aka JON WALKER, and HANSEN HELICOPTERS, INC., Defendants.

Court of Appeals No. 25-3808

Criminal Case No. 18-00010

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE FRANCES TYDINGCO-GATEWOOD
CHIEF JUDGE
JUNE 9, 2025; 8:17 A.M.
HAGATNA, GUAM

**Sentencing Hearing**

**(Excerpt)**

Veronica F. Flores, RMR
Official Court Reporter

APPEARANCES


Appearing on behalf of plaintiff:

**OFFICE OF THE UNITED STATES ATTORNEY**
**BY: MARIE MILLER, SAUSA,**
**STEPHEN LEON GUERRERO, AUSA**
Suite 500, Sirena Plaza
108 Hernan Cortez Avenue
Hagatna, Guam 96910
(671) 472-7332


Appearing on behalf of Defendant Walker:

**LAW OFFICE OF STEVEN R. WELK**
**BY: STEVEN R. WELK, ESQ.**
4675 MacArthur Court
Suite 1250
Newport Beach, CA 92660
(949) 732-3724


**LAW OFFICE OF VANESSA L. WILLIAMS**
**BY: VANESSA L. WILLIAMS, ESQ.**
GCIC Building, Suite 500H
414 West Soledad Avenue
Hagatna, Guam 96910
(671) 477-1389


Appearing on behalf of Defendant Hansen:

**LAW OFFICE OF EDWARD C. HAN**
**BY: EDWARD C. HAN, ESQ.**
238 Archbishop Flores Street
DNA Building, Suite 802
Hagatna, Guam 96910
(671) 477-5055

ALSO PRESENT:

John D. Walker, Defendant

Virginia Kilgore, CRD

Anna Perez, CRD

Karen Quitlong, Law clerk

Janet Yamashita, Probation

Kirstin Ault, Esq. (via video)

Richard Ficarelli, Agent

I N D E X

| GOVERNMENT WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Luis Reyna | 9 | 114 | | |

Case 1:18-cr-00010 Document 2332 Filed 07/29/25 Page 4 of 338

June 9, 2025; 8:17 a.m.; Hagatna, Guam

* * *

THE CLERK: All rise. The District Court of Guam is now in session. The Honorable Frances Tydingco-Gatewood presiding.

THE COURT: All right. Please be seated. Good morning everyone. We'll call the case, please. I'm sorry, hold on. We're getting your client. He's coming out. We'll wait. He's on his way in.

(Defendant entered.)

THE COURT: Okay, good morning, Mr. Walker.

THE DEFENDANT: Morning.

THE COURT: Ready to proceed? Okay, we'll call the case.

THE CLERK: Criminal Case 18-00010, *the United States of America versus John D. Walker and Hansen Helicopters*; Continued sentencing.

Counsel, please state your appearances beginning with the government.

MR. LEON GUERRERO: Good morning, Your Honor, Stephen Leon Guerrero, Marie Miller and Richard Ficarelli on behalf of the United States.

MS. MILLER: *Hafa adai*, Your Honor, good morning.

THE COURT: *Hafa adai*, Ms. Miller, Agent

Ficarelli and Mr. Leon Guerrero. Yes.

MR. WELK: Good morning, Your Honor, Steve Welk for Defendant, John Walker, who is present in Court and I'm also joined by co-Counsel Vanessa Williams.

THE COURT: Okay, good morning, Mr. Welk, Mr. Walker.

THE DEFENDANT: Morning.

THE COURT: Ms. Williams and Mr. Han. Okay, we ready to proceed now?

MR. HAN: Morning, Your Honor.

MS. MILLER: Yes, Your Honor.

THE COURT: All right. Yes, Ms. Miller, you may proceed.

MS. MILLER: Thank you, Your Honor.

THE COURT: Okay.

MS. MILLER: Your Honor, before I call my next witness, I just want to level set a bit so perhaps we could move this along more quickly than what we did on Friday. Mr. Welk said several times the federal rules of evidence are applied loosely during the sentencing hearing, except that's not correct. The federal rules of evidence do not apply at all during sentencing hearing.

THE COURT: Hold on. Hold on.

MS. MILLER: Yes.

THE COURT: Ms. Williams?

                    MS. WILLIAMS:  I'm sorry, Your Honor, may

approach the bench to grab two hearing assisting devices.

                    THE COURT:  Oh, yes, go ahead, yes.  You may.

Hold on a second.  We'll just verify that it works.  Yeah,

sometimes it's hard to hear in this courtroom because of the,

you know, the high ceilings.

                    THE CLERK:  Test, test, test, test.

                    THE COURT:  Okay, good.  All right.  Okay.  All

right.  Let's make sure.  Mr. Walker, can you hear okay?

                    THE DEFENDANT:  I can.

                    THE COURT:  All right.  At any time you cannot,

please either let your Counsels know or your Counsel know or

just raise your hand to the Court.  Okay?

                    THE DEFENDANT:  I will.

                    THE COURT:  All right.  Very well, you may

proceed, Ms. Miller.

                    MS. MILLER:  Yes, Your Honor.  So, hearsay is

generally admissible in sentencing hearings and one of the

issues that Mr. Welk argued was that there could be a

constitutional issue if hearsay was accepted at the sentencing

hearing but neither the confrontation clause nor the federal

rules of evidence support any such argument.

                    So, I just want to make sure that we don't impose

a higher burden than is necessary during the sentencing

hearing and obviously, Your Honor, you know why.  You are the

decision maker during this sentencing hearing.  You are not a

jury, you're not a lay person.  You know what is and is not

reliable.  You make the determination about whether any

evidence presented has an indicia of reliability that you

would like to rely on in issuing its sentence or not.

So, I think that if we ensure that we follow 18

U.S.C. 3661 which puts no limitation on what you could

consider, and if we ensure that we do not impose a higher

burden than is necessary, we can get through this more

quickly, so that's just what I wanted to put on the record

before we started and now the government would like to call

its expert money laundering expert Luis Reyna.

THE COURT:  Okay.  Mr. Reyna.  Oh, yes, Mr. Welk.

MR. WELK:  If I could respond briefly?

THE COURT:  You may, you may, come on -- come on

up.  Yeah.  I'll let him come up and just settle himself then

you could respond briefly.  Go ahead.

MR. WELK:  Just really quickly, Your Honor.  The

government when filed its notices regarding the expert

witnesses in this case relied upon the federal rule of

evidence that applies to expert witnesses, so the idea that

the federal rules of evidence do not apply at all, is -- is

not accurate.

Secondly, to the extent that the government is

arguing that the Constitution also does not apply to this

proceeding, that is also clearly arranged and I -- I believe that this Court understands what the rules are regarding sentencing, so and I trust that the Court will apply those rules.

THE COURT: I will.

MR. WELK: Appropriately. Thank you.

THE COURT: Yeah, I do. Okay, you may proceed. Can you please stand, sir, and be sworn in by the clerk.

THE CLERK: Please raise your right hand.

*(Luis Reyna was sworn by clerk.)*

THE CLERK: Please be seated. For the record, state your full name and spell your last name.

THE WITNESS: Luis Reyna, R-e-y-n-a.

THE COURT: Okay, yes, Ms. Miller.

MS. MILLER: Yes, Your Honor, thank you.

DIRECT EXAMINATION

BY MS. MILLER:

Q. Mr. Reyna, could you please describe for the Court your educational background?

A. Yes. I have a Bachelors in Business Administration with a concentration in accounting from the University of Texas at San Antonio. I also have a Masters in Business Administration from Webster University as well.

           THE COURT: From which university is that?

THE WITNESS: Webster University.

THE COURT: Webster. I'm sorry, where is that located?

THE WITNESS: In Saint Louis, Missouri.

THE COURT: Oh, okay.

BY MS. MILLER: (CONTINUING)

Q. Were you in the military, Mr. Reyna?

A. Yes, I was.

Q. Could you tell the Court what branch?

A. Yes, I served in the Army Reserves and I also deployed to Bosnia in support of Operation to Enforce.

Q. And after the military, could you tell the Court what your work experience has been?

A. Yes. I was an accountant for Cessna Aircraft Company, I was there for a little over six years. And then I also -- am currently employed as a Special Agent with the Internal Revenue Service Criminal Investigation. I'm based in Houston, Texas, that's my field office but I'm specifically assigned to the San Antonio Texas post of duty.

Q. And how long have you been an IRS Criminal Investigations Agent?

A. Over 20 years.

Q. Okay. Do you have any certifications?

A. Yes, I do.

Q. Could you explain to the Court what your certification is in?

A. Yes. I'm a certified Anti-Money Laundering Specialist. And this certification is provided through the association of certified anti-money laundering specialist. And they are responsible for standardizing the anti-money laundering profession with the certification and based on your education, training and experience, you're able to sit for the exam, the CAMS exam and then once you pass the exam, you're certified. You just need to maintain so many continuing education credits per year through your cycle.

Q. How many money laundering cases have you investigated?

A. Over a hundred.

Q. And how many times have you testified in Court?

A. At least 30 times.

Q. Have -- have you ever been rejected as an expert witness?

A. No.

MS. MILLER: Your Honor, at this time, the government would offer Mr. Reyna as an expert in money laundering.

THE COURT: All right.

MR. WELK: Your Honor, the government objects to the designation as an expert for the reasons stated in the

 arguments of our filings.

THE COURT: All right, very well. All right. So the Court -- the Court does look at federal rules although it's -- there is -- the issue, is it -- does it apply -- does apply to some obviously I mean we do -- doesn't apply completely like you would in -- before a jury but it clearly, the Court does find that based on this witness's knowledge, experience, training and education, he may testify as an expert in the field of money laundering, anti-money laundering; is that right?

MS. MILLER: That's right.

THE COURT: Anti -- yes, you've be qualified as that. You may proceed.

MS. MILLER: Thank you, Your Honor, may I proceed?

THE COURT: You may.

BY MS. MILLER: (CONTINUING)

Q. Could you please tell the Court whether it's part of your expertise, you have to determine whether a person who is a target of an investigation is using what is termed sophisticated means in conducting money laundering?

A. Yes.

Q. And could you tell the Court what that terminology means to you?

MR. WELK: I object, Your Honor, it's

sophisticated means is not an element of money laundering and he hasn't been qualified. That's a sentencing guidelines issue.

THE COURT: So, you want to -- okay.

MS. MILLER: Again, Your Honor, this is what I'm talking about.

THE COURT: Okay. Wait, wait, wait. Hold on a second, the objection is, is he using the sophisticated means in terms of a definition as delineated in the sentencing guidelines?

MS. MILLER: So, Your Honor, this witness has testified in multiple sentencing hearings before but sophisticated means is also a term that is used by money laundering experts to determine whether a particular target is using sophisticated means in conducting money laundering. So, it's obviously very relevant to the sentencing issues here.

THE COURT: Okay. As long as that there is a connection --

MS. MILLER: Yes, absolutely.

THE COURT: We'll listen to his testimony.

MS. MILLER: Yes.

THE COURT: The Court will allow him to -- well, you're laying the foundation now, so --

MS. MILLER: Yes, thank you, Your Honor.

THE COURT: The Court will overrule the objection

at this time, but yes. Whether or not it connects to the sentencing guidelines definition, we'll see if it comes through when she makes her argument later.

MR. WELK: Well, I would -- I would just point out that -- that the fact that people who are designated as -- study money laundering learn how to talk about sophisticated means doesn't mean that sophisticated means is something separate from a sentencing guidelines. It is not an element of money laundering. There is no sophisticated means requirement in money laundering -- that's all --

THE COURT: Well, that's true, it's not -- it's not an element, I would agree with that, and that's true she is not --

MS. MILLER: I'm not saying it is.

THE COURT: That it be -- I'm assuming she's -- well, there is an issue of whether or not it should be an enhancement.

MS. MILLER: Correct.

THE COURT: For the sentencing. So, for that purpose, the Court will allow the -- at least the witness to testify regarding sophisticated means.

MS. MILLER: Thank you.

MR. WELK: I just want to be clear, Your Honor, so the witness is going to be allowed to testify whether sophisticated means were applied in this case within the

meaning of the sentencing guidelines?

THE COURT: Well, I'm sure she's going to argue that then -- that it is, it has to be applicable.

MR. WELK: Sure.

THE COURT: Right? In terms of to have any relevance, so yes, that's why I asked her is it somehow later going to be grouped together at argument.

MR. WELK: I would -- I would just suggest, Your Honor, that there is a difference between the government prosecutor arguing that -- that something satisfies --

THE COURT: Right.

MR. WELK: -- sophisticated means and then money laundering expert explaining how sophisticated means are part of money laundering when it's not an element.

THE COURT: Well, so the Court agrees with you it's not a part of the elements of the proof that prosecutor has had to prove during the trial. This is for purposes of sentencing. She's indicating that she wants to put on evidence that it is an enhancement that the Court will -- that the Court should consider, so whether I consider that or whether I believe it, all or part or nothing of what he says.

MS. MILLER: Up to you.

THE COURT: It's up to the Court.

MS. MILLER: Right.

THE COURT: Later on the argument. But the Court

notes your objection and over -- and I definitely sustain -- I mean it's true, I would agree with you, Mr. Welk, it's not an element of the crime. Go ahead, you may proceed.

BY MS. MILLER: (CONTINUING)

Q. Could you please tell the Court, what it means when you determine whether there is or has not been sophisticated means used in a money laundering scheme?

A. Sophisticated means can involve complex methods that criminals and/or money launders use to distance illegally-sourced money. And the methods they can use can include but not be limited to the use of multiple bank accounts, the use of multiple businesses. It can also include the use of multiple jurisdictions, domestically or internationally. The use of complicated or unexplainable transactions.

Q. Okay. I'd like to show you what has been previously marked for purposes of this sentencing as Exhibit 93 at trial, Your Honor, this was admitted as Exhibit G-0829. May I approach the witness?

THE COURT: I'm sorry, can you repeat that? G-0.

MS. MILLER: 829.

THE COURT: Okay, and then can I get Anna or Gina, can you give me that. What is the sentencing exhibit number?

MS. MILLER: 93.

THE COURT: All right. That has not been

presented yet as -- right? You guys -- that wasn't presented earlier?

MS. MILLER: It may have been presented during the testimony of Mr. DeVogel or Ms. Pena.

THE CLERK: Yes.

THE COURT: It was. Okay. Let me double-check if I have it here. 93? I understand it was.

MS. MILLER: And, Your Honor, do you have that exhibit?

THE COURT: No, I think -- but that's fine. You're going to put it on, Mr. Leon Guerrero, you're going to put it up on the screen?

MS. MILLER: We're going to try. We're prepared to do the good old fashioned hard copy exhibits, Your Honor. In case the -- it doesn't work.

THE COURT: Oh, it's not working. Do we need --

MS. MILLER: It was working, you know, not consistently on Friday, so I didn't want to delay the Court.

THE COURT: No, no, sometimes we just have to reconnect it and my -- either my clerk or my -- IT guys will, Government Exhibit 93, how many pages is that?

MS. MILLER: It's only one.

THE COURT: Okay, I'm looking at -- I'm trying to see it. I don't see Government Exhibit 93. I'm sorry this is for the sentencing.

MS. MILLER: May I approach, Your Honor, and give you my copy.

THE COURT: Oh yeah. Yeah, I don't think I ever got that one. 93. I have got the chart. Okay, yeah.

(Government handed copy to the Court.)

THE COURT: Oh, yeah no, no. Hold on, I found it. You're right. You can have it back. I'm sorry. I missed that. Do you see it there?

THE WITNESS: Yes, Your Honor.

THE COURT: And Mr. Welk, were you able to retrieve yours?

MR. WELK: Yes, Your Honor, I have it.

THE COURT: Okay. Very good.

BY MS. MILLER: (CONTINUING)

Q. So, Mr. Reyna, could you please tell the Court what we're looking at here?

A. These are businesses that were established and owned by John Walker.

Q. Okay. And could you tell the Court --

MR. WELK: Objection, foundation.

MS. MILLER: Excuse me? I'm sorry.

MR. WELK: Objection, foundation.

THE COURT: All right. Sustained. Sustained. Why don't you just lay the foundation.

MS. MILLER: Sure, by the way, Your Honor, just

for the record, this exhibit was admitted into evidence at
trial, number one.  Number two, this particular exhibit was
produced to the government by the defendant.

THE COURT:  Okay, I do recall that.

MS. MILLER:  Okay.

THE COURT:  I do recall you saying that
previously, go ahead.

MS. MILLER:  Yes.  Can you go back to that
exhibit, Stephen.

MR. LEON GUERRERO:  Yes.

BY MS. MILLER: (CONTINUING)

Q.   And Mr. Reyna, if you look at the bottom of
Exhibit A-29, do you see the case number for this case?

A.   Yes, I do.

Q.   And you see the electronic Court filing number for
this case?

A.   Yes.

Q.   And this was something that was produced by the
defendant?

A.   Yes.

Q.   Okay.  So, what do we see here?

A.   Again, these are corporations that fall under
Mr. John Walker.

Q.   Okay.  And do we see John Walker's name under the
names of these corporations?

A. Yes.

Q. And his ownership of the shares in these corporations?

A. Yes.

Q. Okay.

MR. LEON GUERRERO: Marie?

MS. MILLER: Yes.

MR. LEON GUERRERO: Sorry, can we just use the ELMO?

MS. MILLER: Yeah, we could just use the ELMO. Your Honor, we're --

THE COURT: All right. Is it -- is it our connection?

MR. LEON GUERRERO: It is, Your Honor.

THE COURT: It is? Ours? Okay, we'll just have our -- should we have our IT guys come and help, Gina? In the meantime, we could use the ELMO but sometimes I think just having use this before, there might be a connection on the top part.

Is Vergel here, Gina.

(Pause.)

THE COURT: No, I know. He thinks it's our connection.

MR. LEON GUERRERO: We can address that at the next break, Your Honor.

(Discussion with clerk.)

THE COURT: But anyway, okay, we'll just go through the ELMO.

Okay, go ahead, proceed.

MS. MILLER: Okay, Your Honor.

BY MS. MILLER: (CONTINUING)

Q. Approximately how many different corporations were used by Mr. Walker?

A. At least 48.

MS. MILLER: Okay. I'd like to also show you a document that we've already discussed and was entered into evidence as, Your Honor, the sentencing exhibit document was 33.

THE COURT: Okay.

MS. MILLER: The trial exhibit document was G-0305.

THE COURT: Okay, was that already previously --

MS. MILLER: It was.

THE COURT: Oh, yes, okay the business plan?

MS. MILLER: The business plan, yes, Your Honor.

THE COURT: I got that. Mr. Welk, let me know if you find your exhibit.

MR. WELK: I have it, Your Honor.

THE COURT: All right. Very well.

MR. WELK: Thank you.

THE COURT: Oh and just for the record, your Co-Counsel, Ms. Ault, I believe is on the Zoom call. Is that correct, Ms. Ault?

MS. AULT: Yes, I confirm that with your clerk this morning, Your Honor.

THE COURT: Very well. Put that on the record. Go ahead. Exhibit 33.

MS. MILLER: Thank you, Your Honor.

BY MS. MILLER: (CONTINUING)

Q. So, Mr. Reyna, did you also look at the business plan?

A. Yes, I did.

Q. And this was also entered into evidence in the trial; correct?

A. Yes.

Q. And if you look at the bottom of page 8 and on top of page 9 of the business plan, do you see where I am?

A. Yes.

Q. This was a document retrieved from Mr. Walker's computers at his offices at Hansen Helicopters during the investigation?

A. Yes, that's correct.

Q. Okay. And what does this document indicating about Mr. Walker's position in Hansen Helicopters?

A. It lists John Walker, President, CEO, he has been the

owner of Hansen Helicopters since 1998 and it's President and Chief Operating Officer since 1999.

Q. And how many people does this document indicate during that period of time he managed?

A. During this period he managed a staff of 85 employees both on site and in the field.

Q. Okay, and if you go down to the second paragraph, what does it indicate about Mr. Walker's certifications with the FAA?

A. John holds an FAA commercial mechanic air frame and power plant and inspection authorization proof license and FAA commercial license for helicopters, airplane and glider, he holds type ratings for single and multiple engine certified flight instrument and sea instrument.

Q. Thank you. Now, if you look back at Exhibit 93 for the sentencing, which is G-0829, there is a list of --

THE COURT: Okay, hold on.

MS. MILLER: 829, which was the first document we looked at, Your Honor.

THE COURT: Okay.

BY MR. MILLER: (CONTINUING)

Q. On the bottom of that document, there is a list of 30 Vanuatu International Companies. Do you see that, sir?

A. Yes, I do.

Q. As an expert in money laundering, are you familiar

with the Vanuatu jurisdiction?

A. I am.

Q. And could you please tell the Court, how you're familiar with the Vanuatu jurisdiction?

A. Yes, in preparation for my testimony, I conducted research on Vanuatu, specifically I looked at the Financial Action Task Force also known as FATF and this is an intergovernmental body and what they're responsible for is to monitor the money laundering policies, procedures and controls for countries throughout the world. And during the timeframe of 2015, they were reviewing these money laundering controls for Vanuatu and in 2016, they put them on the gray list, which meant that they were under review for having inadequate money laundering controls.

THE COURT: I'm sorry, what was the name of the organization?

THE WITNESS: The Financial Action Task Force. Also known as FATF. FATF.

THE COURT: And that's -- is that formed in Vanuatu?

THE WITNESS: No, it's an intergovernmental body that consists of country members throughout the world.

THE COURT: I see.

THE WITNESS: Yes, and also during my research, they were taken off that list in 2018, but during further

research, I could see that the European union currently has Vanuatu on their black list. So, they thought of finding them to have inadequate money laundering controls at this time.

THE COURT: Okay.

MS. MILLER: Thank you, Your Honor.

BY MS. MILLER: (CONTINUING)

Q. Did you review the charters of the Vanuatu companies that were created by Mr. Walker?

A. I did.

Q. And could you tell the Court in reviewing those charters, what stood out to you as a money laundering expert?

A. That if someone created a business in Vanuatu, they were not allowed to conduct any business there.

Q. So, to be clear, Mr. Walker's Vanuatu companies were not permitted to actually conduct business in Vanuatu?

A. Yes, that's correct.

THE COURT: And for the record, Your Honor, that evidence came in through the defense during trial, and that was Exhibit D-136.

MR. WELK: I'm sorry, what evidence came in?

MS. MILLER: The evidence of the Vanuatu charters.

MR. WELK: Okay, where is it now?

MS. MILLER: It was admitted at trial, as Exhibit D-136. And it is marked as an exhibit for sentencing, as

Exhibit 230.

Q. What does that fact mean to you, Mr. Reyna --

MR. WELK: Could I have a moment to look for that exhibit?

THE COURT: Okay, yes. Well, yes, you may. Hold on. Was that brought in the other day or is that something you're looking at right now?

MS. MILLER: I'm sorry, Your Honor?

THE COURT: Was that brought in on Friday?

MS. MILLER: No, that wasn't brought in on Friday but we can -- we can pull that, Your Honor.

THE COURT: Okay, let me just have my staff bring it to me.

MS. MILLER: Yes. And for the purposes --

THE COURT: Hold on, let Mr. Welk try to find it.

MS. MILLER: It's Exhibit 230.

MR. LEON GUERRERO: I could pull it up, Your Honor.

THE COURT: Okay. So, it's D-136 is the trial exhibit?

MS. MILLER: Yes, Your Honor, D-136.

THE COURT: Okay, sentencing exhibit.

(Discussion with clerk.)

THE COURT: Sentencing Exhibit 230.

MR. WELK: I have it, Your Honor. Thank you.

(Discussion with clerk.)

THE COURT: Go ahead, go ahead. Did you find it there, Mr. Welk?

MR. WELK: I do, yes, thank you, Your Honor. I have it.

THE COURT: Yeah, well, make sure you're able to look at the exhibits as the witness is being asked to refer to them.

MS. MILLER: And Mr. Leon Guerrero said he could pull it up on the screen, Your Honor.

THE COURT: You're able to do that now? Okay, thank you, Anna. Okay.

MR. WELK: Just for purposes of cross-examination though, Your Honor, I'd like to be able to find them, so then I could ask him about it on cross-examination.

THE COURT: Of course, yeah. The point is even just during direct I want to see them as well.

MR. WELK: Okay. Thank you.

THE COURT: So, I -- yeah I understand that. Okay. So, we're looking at Exhibit 230.

MS. MILLER: Yes, Your Honor. Which was admitted at trial by defense as D136. And this is one of numerous Constitutions for the creation of these companies, all of them were identical.

MR. WELK: Objection, Your Honor. The

prosecution --

MS. MILLER: This is evidence that came in during trial.

THE COURT: Hold on. Hold on. Let's hear his objection. What's the objection?

MR. WELK: The prosecutor just testified that all of them are identical. There is no foundation for that. That's -- that's -- that's a statement of fact that prosecutor is not allowed to make.

THE COURT: All right. Um, well, I mean it's true, you are testifying.

MS. MILLER: Your Honor, we're at sentencing. I have to be able to rely on evidence that came in that you heard protracted argument on and it came into evidence. If I have to resubmit every piece of evidence that came in through trial, we're going to be here for eight months again. So, that should be unnecessary. And as Counsel for sentencing, Mr. Welk is responsible for being familiar with the evidence that was admitted at trial. This is a sentencing, this is a critical proceeding in this case. And this cannot continue to delay this sentencing to say, well, wait a minute, that's a fact that hasn't been established. Yes, it has. Absolutely, it has.

THE COURT: All right. Hold on. Go ahead.

MR. WELK: Your Honor, we're in the phase right

now of this hearing of examination of witnesses.  If the

prosecution wants to make argument during the argument phase

of this hearing and refer to evidence that was admitted during

trial, that's one thing.  But to -- but to in the midst of her

direct examination of a witness to merely state facts,

that -- she's testifying, it's inappropriate in any phase.

THE COURT:  Well, I think it probably be -- I

think it will be more appropriate -- you're not

right -- you're not wrong saying that she's testifying but she

could just say Court, Your Honor, can you just take judicial

notice, the jury trial that all the other charters as it

relates to the other 47 companies were identical.

MS. MILLER:  Yeah, that's fine.

THE COURT:  The Court will allow that.

MS. MILLER:  Thank you, Your Honor.

THE COURT:  So, Mr. Welk, the Court will accept

that, go ahead, proceed.

MR. WELK:  Thank you.

BY MS. MILLER: (CONTINUING)

Q.   Mr. Reyna, if you look at the first page of this

particular charter, this is for which of the alter ego

companies?

A.   Wilma's Flight Services.

Q.   Okay.  And if you go to the second page and Mr. Leon

Guerrero --

MR. LEON GUERRERO: Yeah.

MS. MILLER: -- pull it up.

BY MS. MILLER: (CONTINUING)

Q. Okay, if you go to the second page, the restrictions and -- yes, right there, section five, the restrictions on operations, could you tell the Court, what you're referring to when you said the companies could not conduct business?

A. Under restrictions, Number 52A, it states, "carry on business in Vanuatu."

Q. Okay. Thank you, sir. As a money laundering expert, what does it mean to you if a company is created in a country like Vanuatu but then the constitution for the company does not allow the company to actually conduct business in Vanuatu?

A. That the sole purpose of these companies are to be used as shell companies or alter egos.

Q. How many persons were involved in Walker's fraud based on the exhibits that you reviewed, for example, the ones we already saw this morning G-305, and G-829?

A. At least seven co-conspirators, a 120 employees, and numerous alter egos and additional co-conspirators and nominees.

Q. Okay. I would like to show you what has been previously marked and introduced at trial for the purposes of sentencing. It's Exhibit 91. At trial it was admitted as Exhibit G-0761.

THE COURT: Okay. Again, we are going to pull that. Hold on, I'll pull 91. We'll wait for -- I think Mr. Welk is trying to get his as well.

MR. WELK: It's showing up on the screen, I'll be able to see it there, Your Honor.

THE COURT: All right, yeah. All right. He's ready too. Are you sure you don't want to get it there, Mr. Welk. If you want to get it, we'll take a minute to allow you to get. You need to get a copy of it. It looks like it's a declaration.

MR. WELK: I got it.

THE COURT: Okay. Go ahead.

MS. MILLER: May I proceed, Your Honor?

THE COURT: You may. You may.

MS. MILLER: Thank you.

BY MS. MILLER: (CONTINUING)

Q. Mr. Reyna, what is this document?

A. This is the declaration of Kenneth Crowe in support of motion to modify conditions of release.

Q. Okay. And who is Mr. Crowe based on your review of the evidence?

A. He's a former business partner and employee of Mr. John Walker.

Q. Okay. Can you look at Paragraph 4 on page 2 of this declaration.

A. Yes.

Q. And please let the Court know how many individuals are identified as of July 5th, 2018, as being employed by Hansen Helicopters?

A. Approximately 121 persons.

Q. And where is their location of employment shown on Paragraph 4?

A. Guam, CNMI, Majuro, Philippines, Missouri and on ships.

Q. Okay. And then could you please turn to Paragraph 14. And can you read Paragraph 14 for the Court please?

A. "Each member of the management team has a responsibility to keep Walker, the company's principal owner, informed of Hansen's operations. Walker resides in Missouri and the time difference between Missouri and Guam does not -- or does create some communication problems."

Q. Okay. And I'd like to now show you what has been marked for sentencing as Exhibit 40 but what was entered into trial as Exhibit G-0366.

THE COURT: Okay, hold on. Okay.

(Discussion with clerk.)

THE COURT: You have that there, Mr. Welk?

MR. WELK: I have it, Your Honor, thank you.

THE COURT: All right. You may proceed.

MS. MILLER: Yes, Your Honor.

BY MS. MILLER: (CONTINUING)

Q. Do you have Exhibit 366 in front of you, sir?

A. I do.

Q. Okay. And can you tell the Court what that exhibit is?

A. The first page includes an e-mail from Rufus Crowe to Tom Feruzzo.

Q. Okay. And what is the subject?

A. The subject is MNS Capital files and there is multiple attachments as well that's noted here on the first page.

Q. Okay. And the attachment consists of what generally?

A. The structure of John Walker's companies and other financial documents related to his businesses.

Q. Okay. If you go to page 2 of Exhibit 366, could you tell the Court what we see here?

A. Yes. These are companies that are owned and controlled by Mr. John Walker.

Q. So, it's a slightly different organizational chart than what we saw in G-0829?

A. Yes.

Q. Okay. And this was being provided to MNS Capital Group; is that right?

A. Yes.

Q. Okay. If you go to page 3, what do we see on page 3?
A. These are a list of registration, make and model numbers of helicopters that are owned and controlled by Mr. John Walker.
Q. Okay. And Pages 3 through page 33, what are we seeing there?
A. Here we see the screen prints of FAA registry records for specific helicopters which list their tail numbers and other specific information about these helicopters.
Q. Okay. And then if you go to page 34, what do we see on Pages 34 and 35?
A. So, on page 34, we see a New Zealand certificate of registration for tail number ZK-HIA. And we see that's Hughes Tool Company with number 369HS. And again, it lists the aircraft's serial number and it further states that the name of person lawfully entitled to the possession of the aircraft for a period of 28 days or longer is John Walker.
Q. Okay. And then if you turn to page 36, what do we see on page 36?
A. We see a certificate of registration from the Department of Transportation and Communications Air Transportation Office out of Manila and the type of registration is a renewal for general aviation and it lists a Philippine registration number of RP-C588 and it's a Hughes Helicopter and it provides the number 500-369 HS. And the

name of the owner is Jan's Helicopter, with an address in Tandang Sora, Quezon City.

Q. And is Jan's Helicopters one of the companies that was identified as a shell company of John Walker?

A. Yes.

Q. Can you turn to page 37, please?

THE COURT: Okay, why don't you, for the court reporter, just spell out this Tandang, sorry, I think it's Tandang City, right? Is that what he said?

THE WITNESS: Yes.

THE COURT: Okay. Could you spell that for the Court reporter?

THE WITNESS: Yes. Tandang is spelled T-A-N-D-A-N-G, Sora is spelled S-O-R-A, Quezon is spelled Q-U-E-Z-O-N and then city, C-I-T-Y.

BY MS. MILLER: (CONTINUING)

Q. Can you turn to page 37 and can you tell the Court what we see on page 37?

A. Yes. This is a copy of a spreadsheet that lists Hansen Helicopters with a total of 46 helicopters and the contracts show a date of August 18th, 2016 and the current rate of helicopter rental is a total of 480,000 per year and under that, it lists the different companies that are -- have lease agreements with the Walker company and next to that, under the specific column -- so Column C lists those companies

 that have the lease agreements with Hansen Helicopters, or the John Walker companies. Then under Column D, is the registration number of the helicopters and then, I'm sorry, Column E will list the vessel names and then Column F lists the monthly rent and Column G lists the contract expired and then Column H lists the terms of these agreements.

Q. Now even though all of these helicopters contracts are identified under the heading Hansen Helicopters Inc., you had an opportunity to look at the actual helicopter contracts?

A. Yes.

Q. Was Hansen Helicopters, Inc., the lessor name, used in all of those contracts?

A. No.

Q. What was the name of the lessor in those contracts?

A. Wilma's.

Q. And was it also various other alter ego companies?

A. Yes, it was.

Q. Could you please look at page 38 and if it's too small looking at it, with your glasses, you can look on the screen in front of you. And what do we see identified in -- on page 38?

A. Yes, it lists the directors of the John Walker businesses and under Column B, it lists the different names of these businesses and under Columns C, D and E, it lists the directors which include John Walker, Kenneth Crowe, and Regent

 Limited and in Columns F, G and H, it lists the shareholders to include Bean Bag, Caledonian Insurance, law partners, nomination shareholder, and under Columns I, J and K, it lists the documents held on file to include specific amounts of share certificates and whether or not there is a signed copy of a file for both Columns J and K.

Q. Okay. And those companies that are listed on that Page, are those are the companies under whose names the helicopters were leased?

A. Yes.

Q. Okay. If you turn now to page 30 -- sorry page 43, what do we see here on page 43?

A. Wilma's Flight Service accounts receivable aging as of June 30th, 2016.

Q. So, regardless of which company leased the helicopters, which company was actually receiving the income from the leases?

A. Wilma's Flight Services.

Q. Okay. Now, can you please turn to page 53. And what are we seeing on page 53?

A. A Caledonian Agency Incorporated balance sheet as of December 31st, 2013.

Q. And was Caledonian Agency another one of Walker's alter ego companies?

A. Yes, it was.

Q. Okay. Can you please now turn to page 71. And what do we see starting on page 71? If you could go to the top of that Page, Mr. Leon Guerrero.

A. A Caledonian Insurance Company balance sheet as of December 31st, 2015.

Q. And was Caledonian Insurance Company another alter ego of John Walker?

A. Yes.

Q. Can you turn to page 79. And what do we see on the top of page 79?

A. A Caledonian Insurance Company profit and loss spreadsheet for January through December 2013.

Q. Okay. And now can you turn to page 87. And what do we see here?

A. Wilma -- Wilma's Flight Service Inc. Balance sheets as of December 31st, 2013.

Q. Now, could you tell the Court on the balance sheet, what do we usually see on a balance sheet of a company?

MR. WELK: Objection, vague and ambiguous.

MS. MILLER: What's on a balance sheet of a company is vague and ambiguous?

MR. WELK: What does that have do with what's on this balance sheet?

MS. MILLER: Well, if I'm able to continue the questioning, Your Honor, you will see what the relevance of

this is.

THE COURT: Overruled, go ahead. I'm sorry, what Page is this, 83?

MS. MILLER: Yes, Your Honor, no, now we're on page 87.

THE COURT: Okay, this is 87. Let me pull up 87.

MR. WELK: Further objection is made on foundation, he's an expert in money laundering, not balance sheets.

THE COURT: Overruled. He had.

BY MS. MILLER: (CONTINUING)

Q. What's contained on the balance sheet, sir?

A. So, in a balance sheet, the assets, liabilities, and owners equity are listed on this document.

Q. And could you tell the Court, are the helicopters that were used in Walker's fraud listed on Wilma's balance sheet as an asset?

A. Yes.

Q. And what is the depreciated value of those helicopters as listed on Wilma's Flight Service balance sheet?

A. Yes, under Column F, Row 36, under the aircraft amount there, it shows over 10.5 million.

Q. Okay. And specifically we're looking at Row 36?

A. Yes.

THE COURT: I'm sorry, what exhibit is that

again.

THE WITNESS: Yes, Your Honor. It's under Column F, Row 36, where it lists aircraft. It's an amount that's over 10.5 million.

THE COURT: And that's the -- did you say depreciated value, what did you say? It represents what? I'm sorry, what does that column represent?

THE WITNESS: It represents the valued amount of the aircraft.

THE COURT: Oh, okay.

THE WITNESS: As of December 31st, 2013.

THE COURT: Okay, what's -- okay. It's the value of the aircraft? The fixed assets, that's what it says there?

THE WITNESS: Yes.

THE COURT: All right. Thank you.

BY MS. MILLER: (CONTINUING)

Q. Are there other assets identified on that sheet?

A. Yes, there are.

Q. Okay. And if you go up, Mr. Leon Guerrero. Thank you. Could you tell the Court what other sets are identified on that sheet?

A. Yes, just starting from the top, for example, under Column F, Row 7 and going down, we see multiple checking and savings accounts and as we continue going down this spread sheet, for example, under Column E, Row 20, you see accounts

receivable and further down, we see additional amount that's are due to Wilma's Flight Service as well.

Q. Okay. Are there buildings and equipment's and real estate identified as well?

A. Yes, under Column E and underneath the Row 35, that says fixed assets, it lists just as you mentioned, buildings, furniture, and fixtures and vehicles.

Q. Okay. And there is depreciation shown as an accountant and as an expert in money laundering, could you explain to the Court what the depreciation expense represents?

THE COURT: I'm sorry, is that up -- is that up at GA -- I'm sorry, what -- what -- what line is it at?

MS. MILLER: The depreciation expense, Your Honor?

THE COURT: Yeah, I'm just --

MS. MILLER: It covers, it follows every single -- Mr. Leon Guerrero, can you go down.

THE COURT: He keeps going up and down, I'll try to find where you're talking about.

MS. MILLER: I'm saying down and I mean up, keep going up, up, up, up, up, up. Up, right there. Right there. So, if you see for example, Your Honor, there is the line that says aircraft.

THE COURT: That's right, he talked about that.

MS. MILLER: Then it has accumulated depreciation

 under that.

THE COURT: Oh, I see, the depreciation is after each of the --

MS. MILLER: Correct, after each of the fixed assets, there is depreciation.

THE COURT: Okay.

MS. MILLER: And so, could you explain to the Court what the depreciation expense represents?

THE WITNESS: Yes. So, when assets are purchased for a business, they are purchased at cost, for example. And so, instead of the business taking that expense within that year, the asset is capitalized. So, they're given a period of time to take that expense each month and it accumulates over a year over years, so they basically get to take that total cost and expense it throughout, you know, a series of monthly -- you know, expenses and throughout the years, spreads it out basically.

THE COURT: Okay.

MR. WELK: I'm sorry, Your Honor, I'm going to object to this line of questioning.

THE COURT: Okay. Okay. Yes, your objection?

MR. WELK: This witness has been qualified as an expert in money laundering. That's what he's here to testify about. What he's testifying about right now is how accounting is done for businesses. How tax is presumably are -- ways

taxes can be calculated for businesses. This doesn't have anything to do with any kind of money laundering. There is no -- there is been no -- this balance sheet doesn't -- there has been no allegation that it includes anything illegal or that it represents specified unlawful activity and explain how depreciation works in a profit and loss statement has nothing to do with money laundering. If the government wanted to have an expert testify about accounting, then they should have designated, they should have called an expert witness and designated him or her as an expert in accounting. But the fact that this expert happens to know how to do accounting, that's interesting but it doesn't have anything to do with why he was designated as an expert which is about money laundering.

THE COURT: All right. And your response?

MS. MILLER: My response is, Your Honor, as a money laundering expert, he absolutely part of his job is to review financial statements of companies, the whole point of this exercise is to show the numerous companies that were used by Walker, how regardless of which company under which the lease was entered into, all of the money came into one company, which was Wilma's Flight Service. It also shows the assets that Walker had accumulated and used during the fraud. One of the considerations that this Court has to make in sentencing is the consideration of what the appropriate

application of economic loss is.  The defendant has entered

into an agreement with the government to forfeit not only a

money judgment but also all of the aircraft that were involved

in the fraud.  This is directly relevant to the value of those

aircraft for the purposes of this Court making that

determination and it's also relevant to the issue of

sophisticated means.  We've seen now numerous companies used

and numerous jurisdictions, we've seen how the defendant hides

income and assets on various different balance sheets and

income statements for the various companies.

So, it's very relevant to the issue of

sophisticated means, it's relevant to the issue of economic

loss and those issues are controverted.  If Counsel withdraws

his objection to the sophisticated means enhancement, then we

don't have to continue doing this exercise.  However, as long

as he maintains an objection, it's important for this Court to

see just how convoluted Mr. Walker made his scheme to avoid

detection.

THE COURT:  All right.  Fine, go ahead, Mr. Welk.

MR. WELK:  How allegedly convoluted the business

was -- this expert -- this person is not qualified, he hasn't

been qualified to testify as about convoluted business.  He's

here to testify about money laundering.  The government can

tie everything into whatever it happens to say, so because

five of the counts of the 110 were money laundering, which by

the way had nothing to do with any of these businesses, it had to do with very specific transactions that went from one company to another and then to another. But it didn't involve Wilma's services. Not directly.

MS. MILLER: What? Of course it did.

THE COURT: No, no, let him speak.

MR. WELK: And that's not alleged in the -- my point is, Your Honor, this is -- I understand that the government wants to expand its arguments, its ability to argument everything else, but designating this agent as a money laundering expert. And by the way, in the paperwork that explained why this -- this witness was an expert witness, it was to discuss how money laundering works, the layering, the placement, all of that, and to -- and to answer any questions the Court might have about money laundering.

Nothing he has testified to about so far has anything to do with money laundering anymore than every crime or any crime has something to do with money laundering if the government is eventually going to allege it, but this isn't -- this isn't what an expert witness is supposed do when they're qualified for a specific topic which this -- which this witness has been.

THE COURT: All right. Court will overrule the objection. You may proceed.

MS. MILLER: Thank you, Your Honor.

BY MS. MILLER: (CONTINUING)

Q.   Could you please now turn to page 97.  And what do we see on page 97, sir?  If you get to the top, there you go.

A.   Hansen Helicopters profit and loss for the time period of January through December 2015.

Q.   And on the very top left-hand corner of this profit and loss statement, specifically Row 1, how are these companies being described?

A.   John D. Walker Group Companies.

Q.   Okay.  And what was the profit for 2015 as shown on this statement?

A.   May I ask which company are you --

Q.   Yes, so if could you go down, Stephen, I'm sorry, yes, can you go all the way down to the bottom, it's on the next page.  And if you go to the right.  Thank you.  So, we have both on the very bottom there, we have a net income, do you see that net income?

A.   I do.

Q.   Identified for the combined companies?

A.   Yes.

Q.   And what is that?

A.   It's over 4.9 million.

Q.   Okay.  And if we go up, the gross income for the combined companies, down, I keep saying up and I mean down, I'm sorry.  No, the other way.  Yes.  Thank you.

THE COURT: I'm sorry, what Page, is this 97 again?

MS. MILLER: So, 97 and 98, Your Honor, are the profit and loss statements.

THE COURT: Let me look --

MS. MILLER: The combined for the businesses.

THE COURT: So, where are we looking at, can you make that bigger?

MS. MILLER: Yes, so Mr. Leon Guerrero, can you go back down to page 98 to the very bottom right. Yes. And can you focus in on the combined.

THE COURT: What you are you asking --

MS. MILLER: Net profit. Down. Right. Far right.

THE COURT: Oh, okay. I keep looking --

MS. MILLER: Right there.

THE COURT: I was looking for combined there. All right.

MS. MILLER: And do you see that, Your Honor?

THE COURT: I do now.

MS. MILLER: Almost 5 million dollars.

THE COURT: Okay. That's the 4,000,922.

MS. MILLER: Yes, Your Honor. And that was the net profit for the combined companies. And --

MR. WELK: Excuse me, the document says net

 income not net profit.

THE COURT: Okay. Let's go to what is --

MS. MILLER: The profit and loss statement. Do we need to explain that, Your Honor.

THE COURT: No, no, no, hold on, hold on. Let's just -- let's look at --

MR. WELK: You don't need to explain anything because that's what it says.

THE COURT: Okay. Let's go -- I'm trying to find -- let's go back to the left, what does it say all the way to the left. Net income.

MS. MILLER: And loss.

THE COURT: All right. Net income and then parenthesis, loss.

MS. MILLER: Right.

THE COURT: Right.

MS. MILLER: And can you go up now or down. Yes, there you go. Keep going. Keep going. Keep going. Keep going. Keep going. Keep going. Keep going. Okay, hold on. And then keep going. Okay. There we go.

BY MS. MILLER: (CONTINUING)

Q. And then could you tell us what the service lease rental income is for that year?

A. Do you want me to state the one for Wilma's under Column E, Row 9 or the combined number Q --

         MS. MILLER: Combined. And Mr. Leon Guerrero, can you go to the right, to the combined for all the companies; thank you, sir. Right there.

THE WITNESS: Yes, it's over 23 million.

BY MS. MILLER: (CONTINUING)

Q. $23,167,598.96?

A. Yes.

Q. Okay. Thank you.

MS. MILLER: Did you see that, Your Honor?

THE COURT: Yes, I did.

MS. MILLER: Wonderful, thank you.

BY MS. MILLER: (CONTINUING)

Q. So, sir, based on your review of the documents and the evidence, how many different jurisdictions were involved in Mr. Walker's fraud?

A. It included the United States, Vanuatu, the Philippines, and Canada.

Q. Okay. As an expert in money laundering, and an IRS Criminal Investigations Special Agent, how would you characterize Mr. Walker's scheme?

A. A sophisticate -- sophisticated complex scheme.

Q. Okay. I'd like you to go back to Exhibit 93, which was previously entered into evidence as G-0829.

THE COURT: Okay. Hold on let me pull 93. Okay. The chart?

MS. MILLER: Yes, Your Honor.

THE COURT: You got it, Mr. Welk? 93, okay Exhibit 93. Go ahead. You got it. All right.

MR. WELK: Thank you.

BY MS. MILLER: (CONTINUING)

Q. In conducting your money laundering investigations, do you often have to determine who the organizer or leader is of the scheme?

A. Yes.

Q. And what does that mean when you are conducting your investigation and testifying when you -- when you talk about organizer or leader?

MR. WELK: Objection, this is -- this is sentencing guidelines, this is a sentencing guidelines issue not a money laundering issue, it has nothing to do with money laundering. I'm sorry, Your Honor, I just -- maybe I'm mistaken, was -- was this witness qualified as a sentencing guidelines expert or as money laundering expert?

THE COURT: He was qualified as a money laundering expert.

MS. MILLER: And, Your Honor, all of these concepts apply in money laundering investigations and cases. Mr. Welk seems to think that the sentencing guidelines are somehow detached from the reality of the charges under which Mr. Walker was convicted. The reason why these enhancements

exist is because if these things are present in the particular

scheme, it is something that this Court must consider during a

sentencing.  So, I'm not sure why he's having so much

difficulty connecting these two things.  But they're relevant.

They go --

THE COURT:  Just respond to the -- the objection

rather than -- editorial lines about the opinion.

MR. WELK:  Let me see if I can clarify it.

THE COURT:  Yeah.

MR. WELK:  The agent's job is to investigate

criminal activity and make -- gather evidence in support of

suspected criminal activity and present that to the U.S.

Attorney's office.  The prosecutor's job is to upon obtaining

a conviction, argue to the Court whether or not certain

sentencing enhancements apply or departure to whatever else,

how the sentencing guidelines are applied.  It is up to the

Court to decide whether those things apply.  But the idea that

an agent who regardless of his experience in investigating

money laundering has that same training, experience and

knowledge about how to apply the sentencing guidelines, it's

outside of his scope of his employment.  It's outside the

scope of what he does.  He's not an expert in applying

sentencing guidelines.  So, in his -- nor is he an agent, an

expert in interpreting the sentencing guidelines or how they

apply to a specific case, especially a case in which he

appears to have had no personal experience whatsoever. So, I object to him being asked questions about how he interprets the sentencing guidelines. He's not an expert in that area. That's something for the government to argue and for me to argue to you, Your Honor. Not -- this testimony is superfluous.

MS. MILLER: I did not ask him to apply the sentencing guidelines. I'm not asking him to apply the sentencing guidelines. Your Honor, will apply the sentencing guidelines. However, as I stated earlier, the sentencing guidelines consider things such as sophisticated means, organizer leader, because if those things are present in the case, in the investigation, then it's something this Court can and should consider in enhancing the sentence. We have a probation report that recognized those things. We have a money laundering expert, I'm asking him about in his investigations, does he determine who the organizer leader is of these schemes. That's absolutely within the bailiwick of his expertise.

THE COURT: The Court will overrule the objection. Go ahead. Proceed.

BY MS. MILLER: (CONTINUING)

Q. So, can you tell the Court when you're looking at a determination of who is the organizer leader, what factors are you looking at?

A. I'm looking at factors to include who is directing individuals underneath that person, for example, are they giving them instructions on opening accounts, financial institutions, are they being asked to be signatory on these accounts, are they asked to conduct financial transactions, such as wire transfers, bank deposits, are they also being asked to be directors on a business document such as Articles of Incorporation, as well but overall, the organizer leader, they're the person that I would say is the shot caller, they are calling the shots and they are directing the individuals underneath them on what they need to do.

Q. So, if we go back to Exhibit G-0829, the organizational chart that the defendant actually produced to the Court and to the government in this case, who is identified as the organizer leader on that specific exhibit?

A. John Walker.

Q. Who is the president of all of these companies that were used in this fraud?

A. John Walker.

Q. Who is the primary signatory used on every bank account used in the fraud?

A. John Walker.

Q. Who received profits from the fraud as opposed to regular pay?

A. John Walker.

Q. Who agreed to forfeit all of the aircraft that were involved in this fraud?

MR. WELK: Objection. Foundation.

THE COURT: I mean that's already been asked and answered too. Isn't that part of the forfeiture?

MR. WELK: No.

MS. MILLER: No, Your Honor, it hasn't been asked and answered. However --

MR. WELK: She -- she testified to that.

MS. MILLER: --

THE COURT: But that's already been presented, has it not?

MR. WELK: Yes.

THE COURT: With regard to the civil forfeiture.

MS. MILLER: Oh, no, no, no, this is the criminal forfeiture.

THE COURT: I'm sorry, criminal forfeiture.

MS. MILLER: Yes, so there is a consent judgment of forfeiture, Your Honor, that Mr. Walker entered into.

THE COURT: Yeah.

MS. MILLER: Yes. And this witness has reviewed it because one of the other things that --

THE COURT: Maybe I shouldn't have said asked and answered but the Court notes that it's already been -- I don't know if it was through another witness but that's already been

testified.

MS. MILLER: Mr. Walker has. Yes, Your Honor.

THE COURT: That too, so sustained.

MS. MILLER: Yes, Your Honor.

BY MS. MILLER: (CONTINUING)

Q. Who is controlling the dissolution of the alter ego companies?

A. John Walker.

Q. I'd like to show you an exhibit which has been marked as Exhibit 104 for sentencing, but at trial it was admitted as G-1091.

THE COURT: Okay, hold on, Trial 1091?

MS. MILLER: Yes, Your Honor.

THE COURT: Okay.

MS. MILLER: And for sentencing, it's in the sentencing notebook as Exhibit 104.

THE COURT: That hasn't been brought in yet, right? We're getting that --

MS. MILLER: No, not yet, yes.

THE COURT: All right. Let Mr. Welk get his and then I can get mine.

MR. WELK: I have it, Your Honor.

THE COURT: All right. Okay. Mr. Welk, has it.

MS. MILLER: Okay. And do have you have it, Mr. Reyna?

THE WITNESS: Yes, I do.

MS. MILLER: And, Your Honor?

THE COURT: I do.

MS. MILLER: Thank you, Your Honor. May I proceed?

BY MS. MILLER: (CONTINUING)

Q. Could you tell us what we are looking at here?

A. Yes. It's a --

MS. MILLER: Can you scroll up, Mr. Leon Guerrero.

THE COURT: Okay, you said this was already admitted -- oh yeah, this was admitted at trial?

MS. MILLER: It was admitted at trial, Yes, Your Honor.

THE COURT: Okay. 1091. Okay.

BY MS. MILLER: (CONTINUING)

Q. So, what we are looking at here, Mr. Reyna?

A. Yes, it's a letter stating Hansen Helicopters, Inc., and it's dated March 21st, 2008, and it's to, and it says attention and from John Walker.

Q. Okay. And the topic?

A. Yes, "It's time for a new company policy."

Q. Could you read that, please?

A. "If you can't fly or can't fix the helicopter for some stupid bullshit reason, HH is not going to continue to

pay your salary.  Against my better judgment and contrary to
our competitor's policy, I will pay half salary.  This does
not include honest downtime, the result of unavoidable issues
or probably even avoidable issues.  This new policy is for
stupid lazy bullshit.  This has been an ongoing problem for
sometime.  It has just come to a boiling point because we had
a flight crew sit on the boat for 55 days and never fly once.
They also never once called the shop to inform us there was a
problem.  Twenty years and you think you heard it all."

Q.    Okay.  Thank you, sir.  Based on this and other
communications that you reviewed, including that declaration
of Mr. Crowe, which we talked about earlier, who is ultimately
in control of the employees in this company?

A.    John Walker.

Q.    On the balance sheet that we just reviewed in
Exhibit 366, who was identified as the controller and owner of
all of the companies?

A.    John Walker.

Q.    And who is identified as the CEO of all of the
companies in the business plan?

A.    John Walker.

Q.    Based on your review of this evidence, could you tell
the judge what your expert opinion is on who is the organizer,
leader of the scheme to defraud?

A.    That John Walker is the owner, controller, leader of

all of these shell companies, also known as alter egos.

Q. Okay. Following his indictment in May of 2018, what did Mr. Walker do with his bank accounts?

A. He --

MR. WELK: Objection, foundation.

THE COURT: Yeah, why don't you lay a foundation. Sustained. Why don't you just -- the Court will sustain that. Go ahead.

BY MS. MILLER: (CONTINUING)

Q. Have you reviewed the bank records that are related to this case?

A. Yes, I have.

Q. Okay. And you are an IRS Criminal Investigation Agent; correct?

A. Yes, I am.

Q. And you have a relationship with the other IRS agents who were involved in the investigation in this case?

A. Yes.

Q. And you've reviewed numerous documents in anticipation of your testimony; correct?

A. Yes, I have.

Q. And you're basing all of your testimony on the review of those documents; is that correct?

A. Yes.

Q. All right. Could you tell the Court, what did

Mr. Walker do with his bank accounts after he was indicted in May of 2018?

MR. WELK: Your Honor, I object again. On foundation grounds, it's interesting that the agent looked at a lot of documents and talked to other agents, but the question of what Mr. Walker did with his bank accounts has to be more specific because the government is arguing that every bank account of every company in which Mr. Walker had an interest appears to -- they appear to be arguing that those are his bank accounts and so, there needs be some clarity about what -- what bank accounts the agent looked at and why or if he considers every account of a Walker-related agency company to be Mr. Walker's bank account.

THE COURT: All right. The Court will sustain, why don't you narrow it.

MS. MILLER: Your Honor, again, this is sentencing, number one.

THE COURT: I got it. I got it, no objection.

MS. MILLER: Which means federals don't apply. Number two --

THE COURT: I know --

MS. MILLER: He's an expert, you know, even in trial, we would have to produce all of the underlying evidence to support his testimony at trial.

THE COURT: Ms. Miller though.

MS. MILLER: Yes.

THE COURT: He's saying that maybe Mr. Walker has -- it sounds like maybe Mr. Miller has a whole bunch of other accounts that may not be relevant to this trial or this sentencing. So, is he just focused on the ones that are relevant to --

MS. MILLER: That's all I'm focusing on, Your Honor, that's all I'm focusing on.

THE COURT: Just narrow that then.

MS. MILLER: Sure.

THE COURT: Or clarify that.

BY MS. MILLER: (CONTINUING)

Q. After May of 2018, specifically in July of 2018, did Mr. Walker open up a new bank account for one of his alter egos called Limey Air Services, Inc.?

A. Yes.

MS. MILLER: Your Honor, I'd like to show the witness an exhibit that has been previously marked as Exhibit 138, which was introduced at trial as Exhibit 2939.

THE COURT: Okay. Is that a new one? Let me pull that. Hold on a second, let me try to get that, Ms. Miller.

MS. MILLER: Yes, Your Honor.

THE COURT: We'll look at that. 138, Anna?

(Discussion with clerk.)

MR. WELK: I have it, Your Honor.

THE COURT: Okay, very well. Okay, go ahead, you may proceed.

MS. MILLER: Yes, Your Honor.

BY MS. MILLER: (CONTINUING)

Q. So, if we look at the first page here; can you tell the Court what we're looking at?

A. Yes, this is a member application with Community First Guam Federal Credit Union.

Q. Okay. And who is identified on this document as the treasurer of Limey Air Services, Inc.?

A. Kenneth Rufus Crowe.

Q. And who is Mr. Crowe?

A. The treasurer of Limey Air Service.

Q. And we also saw his name on Exhibit 829 as a director and owner of some of the other corporations?

A. Yes.

Q. And who is identified as a director of Limey Air besides Mr. Crowe?

A. Marvin Ray Reed.

Q. Okay. And who else?

A. Phillip Turner Kapp.

Q. Okay. And are those three people who were co-defendants with Mr. Walker in the criminal case?

A. Yes.

Q. Are those people also ones referenced in Mr. Crowe's affidavit as the management team that had to keep Mr. Walker apprised of everything happening with the companies?

A. Yes.

Q. Could you now please turn to page 76 of Exhibit 2939 and what do we see on page 76?

A. Yes, it's a corporate affidavit dated July 25th, 2018, for Limey Air Services, Inc.

Q. And what does the address show for Limey Air Services, Inc.?

A. P.O. Box 9099, Tamuning Guam 96931.

Q. Okay. And could you read just the first paragraph of the corporate affidavit?

A. "I, John D. Walker, 99.9% owner of the company, certify that two of the original officers of the company verbally resigned sometime ago and are no longer affiliated with the company, specifically Angela Walker, past Treasurer, and David P. Ledger, past Vice President and Secretary. The current officers of the company are myself as President, Phillip T. Kapp as Vice President, and Kenneth R. Crowe , as Secretary Treasurer."

Q. Okay, thank you. And could you now go to page 72, Mr. Leon Guerrero and Mr. Reyna, of these documents and what do we see on page 72?

A. The Hansen Helicopters, Inc. minutes of the

shareholders meeting of Hansen Helicopters, Inc. held at the company's offices in Harmon Guam on January 26th, 2015.

Q. Okay, and who is signing those minutes in Guam on January 26st, 2016? As a shareholder? If you go to the bottom?

A. John D. Walker, Kenneth R. Crowe and Marvin R. Reed.

Q. Okay. And Mr. Leon Guerrero, if you can go to page 73 of the document. And what are we seeing here, sir?

A. Limey Air Services, Inc., minutes of the shareholders and board of directors meeting of Limey Air Services, Inc. held at company's affiliates Hansen Helicopters, Inc., attorney's office in Hagatna, Guam on June 8th, 2018."

Q. And what is present during that meeting in Guam?

A. John D. Walker, Kenneth R. Crowe, Phillip T. Kapp, and Marvin R. Reed.

Q. And the next Page who is signing the minutes, it's page 74?

A. John D. Walker, Kenneth R. Crowe, Marvin R. Reed and Phillip T. Kapp.

Q. And page 75, Mr. Leon Guerrero, can you tell us what we're seeing Mr. Reyna, on page 75?

A. Limey Air Services, Inc., minutes of the shareholders and board of directors meeting of Limey Air Service, Inc. held at company's affiliates Hansen Helicopters, Inc. offices in Harmon, Guam on June 25th, 2018.

Q. Okay. And who signs off on those minutes?
A. John D. Walker and Kenneth R. Crowe.
Q. Okay. Thank you. And now if you would please turn to Pages 82 and 83 of these documents. And could you tell the Court, starting on page 82, what are we seeing here?
A. Incoming wire transfer log, January through December 2018.
Q. And the beneficiary of the incoming wire transfers?
A. Limey Air Service.
Q. Which is the company that we saw Mr. Walker's signature on page 76, saying he's 99.9 percent owner of?
A. Yes.

MS. MILLER: Go to the right please, Mr. Leon Guerrero.

BY MS. MILLER: (CONTINUING)

Q. Where are these wire transfers originating from?
A. Pacific Spotters Corporation.
Q. Okay. And we see the amounts there, can you go to the next page, Mr. Leon Guerrero? Go all the way to the left first, please. And again, who is the beneficiary of these wire transfers in 2019?
A. Limey Air Service.
Q. A company that Mr. Walker is a 99.9 percent owner of?
A. Yes.
Q. And where are these wire transfers coming from.

Mr. Leon Guerrero, if you could go to the right. Thank you, originator?

A. Pacific Spotters Corporation.

Q. Did you total the amount of wire transfers that went from Pacific Spotters Corporation in 2018 and 2019 into Limey Air's bank account?

A. Yes.

Q. And what is that total?

A. Approximately $5 million.

Q. Okay.

THE COURT: Can you pull that -- I'm sorry, it goes all the way down.

MS. MILLER: It does, Your Honor, yes.

THE COURT: Okay. What Page is that?

MS. MILLER: 82 and 83. Page 82, Your Honor, has the 2018 wire transfers and page 83 has the 2019 wire transfer.

THE COURT: I'm sorry, what was the total amount approximately?

THE WITNESS: Approximately $5 million.

THE COURT: 5 million?

THE WITNESS: Yes, Your Honor.

THE COURT: All right. Thank you.

BY MS. MILLER: (CONTINUING)

Q. Were bank accounts of Mr. Walker's closed in 2018

after he was indicted?

A. Yes.

Q. Okay. I'd like to show you what has been marked for sentencing as Exhibit 228, which was admitted at trial as Exhibit Defense 132.

THE COURT: I'm sorry, this is for Exhibit 228 for sentencing?

MS. MILLER: Yes, Your Honor, and D-132, was the number of the exhibit at trial?

THE COURT: All right. Hold on, let me pull that. And give Mr. Welk a chance as well to pull 228.

MS. MILLER: May I proceed, Your Honor?

THE COURT: --

MS. MILLER: Oh, okay, I'm sorry.

THE COURT: He's also looking for it as well.

MS. MILLER: Oh, Okay. You have it?

MR. WELK: I have it, Your Honor.

THE COURT: Okay. Very well. You may proceed, Ms. Miller.

MS. MILLER: Thank you, Your Honor.

BY MS. MILLER: (CONTINUING)

Q. Mr. Reyna, do you have -- do you see the document on the screen and do you have it?

A. I do.

Q. Okay. Can you tell the Court what we're looking at

here?

A.   It's a letter from Bank of Hawaii dated June 25th, 2018, in regards to Wilma's Flight Services, Inc. account number ending in 2462.

Q.   Or 7462?

A.   I'm sorry, 7462.

Q.   Okay.  And what is this letter saying?

MS. MILLER:  Can you scroll up, Mr. Leon Guerrero?  Thank you.

BY MS. MILLER: (CONTINUING)

A.   "Dear, sir, we have conducted a review of our customer accounts and transaction history and have determined that we will no longer be able to service your account.  This letter will serve as notice of our intent to terminate the account listed above collectively the account, on July 31st, 2018, pursuant to the business deposit account agreement governing the account.  We believe this will provide you with sufficient time to make other arrangements to meet your financial needs.  In conjunction with this closure, any debit cards attached to your account will be blocked from further transactions five business days prior to the closure date identified above.  You may voluntarily close your account prior to July 3rd, 2018 by visiting one of our branches.  If you do not do so by August 7th, 2018, a check in the amount of any funds remaining in your account will be sent to your last

address of record."

Q. As a money laundering expert, can you tell the Court whether you have substantial experience dealing with banks and information regarding accounts of persons who are targets of money laundering investigations?

A. Yes.

Q. Are banks required to close accounts if they believe that there's any illegal activity occurring with those accounts?

A. Yes.

Q. Could you please explain to the Court why that is?

A. Per the bank secrecy act, it requires financial institutions to maintain anti-money laundering procedures which include customer due diligence, know your customer policies and procedures. So, when a new customer is on boarded with the bank, the financial institution wants to get an idea of what kind of customer this is going to be, so they want to know what type of business they're in, what should they expect in deposits, such as wire transfers, deposits, expenses, or debits and credits. And during the monitoring of the account, if the account activity does not match what initially was told to the bank employees at the time, they might find it suspicious. And over a period of time if the client can't justify the basis of the account activity, they will find it suspicious and then possibly close the account.

Q.    Okay.  And did that happen with Mr. Walker's various
alter ego companies in this case?

A.    Yes, it did.

Q.    Did the government seek to get records about
Mr. Walker's accounts in the Philippines?

A.    Yes.

Q.    Can you tell --

MS. MILLER:  Do I need to break now?

THE COURT:  Oh, okay.  Yeah, sure, go ahead.
Finish your last question and then we'll take a recess.

MS. MILLER:  Okay, thank you, Your Honor.

BY MS. MILLER: (CONTINUING)

Q.    Could you tell the Court what the Mutual Legal
Assistance Treaty process is that the government uses to
obtain bank records from foreign countries?

A.    Yes.  The MLAT is a process that the investigators
and the prosecutors work on, it includes an affidavit
requesting specific records from a foreign country.  And
during this process of drafting up this affidavit and all the
particulars are noted on what's needed, it's then handled
through the office of international affairs at the Department
of Justice.  Once they receive it and everything is good to be
passed on to the foreign country, the foreign country will
then comply with the request and provide any requested records
or documents and then they will be certified so that way in

turn the U.S. government can use it as evidence.

THE COURT: All right. Very well. Take a 15-minute recess and come back. Thank you, Counsels.

MS. MILLER: Yes, Your Honor. Thank you.

(Recess taken at 9:41 a.m.)

(Back on the record at 10:11 a.m.)

THE COURT: Okay. We're all settled on the computer.

MS. MILLER: Yes, Your Honor. Well, unfortunately, Your Honor, and we appreciate the -- the giving us the time, it is still not working. So --

THE COURT: It's not our computer.

MS. MILLER: No, it's not on your side, it's on our side. So, the U.S. Attorney's office is moving away from trial director to some other software program for trial. And I don't know if that's what's causing the kinks but it keeps crashing. So, I apologize, we'll have do the good old-fashioned --

THE COURT: That's fine.

MS. MILLER: -- hard copy exhibits.

THE COURT: Yes, Mr. Welk, go ahead.

MR. WELK: Just waiting for Mr. Walker.

THE COURT: Oh, yes, okay. We'll call him in.

(Pause for defendant.)

(Discussion with law clerk.)

THE COURT: Where is the defendant? Is he right there?

(Defendant present.)

THE COURT: Okay. We're back on the record. All Counsels present, Mr. Walker is present. Okay. We'll proceed -- hold on, wait till you're seated. All right, very well. You may proceed.

MS. MILLER: Thank you, Your Honor.

THE COURT: Mr. Walker, you need your hearing aid. Test it, make sure it's okay. Testing. You can hear?

THE DEFENDANT: (Nodded head.)

THE COURT: All right. Very well. You may proceed.

MS. MILLER: Thank you, Your Honor.

BY MS. MILLER: (CONTINUING)

Q. Mr. Reyna, when we left off last time, you were talking about the Mutual Legal Assistance Treaty process or the MLAT process. Did the government do that in this case to get the records from the Philippines?

A. Yes, it did.

Q. Okay. I'd like you to look at what has been previously marked for sentencing as Exhibit 265 and at trial it was marked as G-2990.

THE COURT: I'm sorry, so sentencing is what now?

MS. MILLER: 265.

THE COURT: Okay. Sentencing. And the trial number is?

MS. MILLER: G-2990.

THE COURT: 2990. Okay.

MR. WELK: Your Honor, 265 is a rebuttal exhibit.

THE COURT: Okay.

MR. WELK: Which the Court said the government could not use except in rebuttal.

MS. MILLER: Actually that's not what the Court said.

THE COURT: Well, I mean I know my order said that. I should have expounded on that. I know my order said that there would be rebuttal of any prosecution presentation, but then at the sentencing hearing early on Friday, the Court indicated that if it was rebutting any type of information that was extracted during cross-examination, the Court would consider that as rebuttal. So, is that what this is?

MS. MILLER: That's what this is, Your Honor, yes.

THE COURT: Okay. All right. So -- and this is 265.

MS. MILLER: Yes, Your Honor.

THE COURT: And what is the -- what is it that you believe is rebutting in terms of cross-examination that Mr. Welk conducted either today or on Friday?

           MS. MILLER: Your Honor, if you recall, Mr. Welk in questioning both witnesses, Ms. Pena as well as Mr. DeVogel, was challenging the testimony that Pacific Spotters Corporation was an alter ego of John Walker and that Pacific Spotters continued the illegal operations of the leases, that was the issue that was being contested and that's the issue that this testimony goes directly to.

THE COURT: All right. Yes, Mr. Welk? You wanted to respond to that?

MR. WELK: I do. Your Honor, because --

THE COURT: Go ahead.

MR. WELK: I'm confused by this line of analysis that the government is using that it seems that testing a witness or exploring a witness testimony has turned into -- has been involved into the defense making a presentation -- it's not a presentation of evidence, the cross-examination is merely questioning of the witness on direct examination. The idea that that that question merely asking the witness about something they've already testified about, that allows the use of rebuttal evidence is completely unfamiliar to me.

THE COURT: Well, I'm sorry, what is the -- well, let's first of all, what is the offer of proof here? Specifically?

MS. MILLER: The specific offer of proof, Your

Honor, is that the United States, in Exhibit G-2990, at trial and 265 for the sentencing received from the Philippines, the information that was provided to the bank that Mr. Walker put opened when he went to the Philippines in 2018 for Pacific Spotters Corporation. If you recall, the witnesses were cross-examined on to the leases and the fraud continuing and also specifically the challenges was Pacific Spotters Corporation was not an alter ego of John Walker. Mr. Welk argued that to the Court. And this shows, if you turn to page 27 of Exhibit 2990, that after Mr. Walker was indicted, he not only opened up Pacific Spotters Corporation and the bank account for Pacific Spotters Corporation, but starting on page 27 through the end of this exhibit, you see that all of the leases for the helicopters were signed over to the name of Pacific Spotters Corporation.

So that shows the continuation of the fraud even post indictment, which is extraordinarily relevant obviously to the sentencing, and it also contradicts Mr. Welk 's argument to this Court both in his filings and with the cross-examination of the witnesses that Pacific Spotters Corporation was not just yet another alter ego of Mr. Walker, allowing him to continue the fraud.

It also goes directly to this issue of sophisticated means as we talked about before. Now moving the operations off of the U.S., off of Guam, into the Philippines

to try to avoid, you know, continued prosecution and detection.

THE COURT: All right. Okay.

MR. WELK: Your Honor, I did not argue that PSC wasn't a --

THE COURT: I'm sorry, hold on hold on.

(Discussion with the clerk.)

MR. WELK: I didn't argue that PSC wasn't an alter ego of Mr. Walker, I pointed out that the Court's order regarding alter ego corporations did not identify PSC as an alter ego of Mr. Walker. It identified it as an alter ego of Hansen and went to find that -- that Hansen was not an alter ego of Mr. Walker. Now, that's not -- there is nothing new there, I was just referencing the Court's previous order. And the fact that the government -- look, the question of whether something is rebuttal evidence or not, that's -- that's not a difficult question. But it does -- it requires -- you have to be rebutting some sort of evidence, not just a question. The fact that the government thinks that I may attack one of their theories in argument doesn't mean that they get to then bring in rebuttal evidence because that didn't occur to them. Or --

MS. MILLER: I don't, I don't --

THE COURT: I agree with you that in terms of arguments, that's true, but in terms of any evidence that was

extrapolated during the cross-examination of the witnesses, either on Friday or this witness today, the Court's allowing the prosecution to go ahead and let this witness speak on that particular point of rebuttal.

MR. WELK: So, you mean even if the government introduces a topic?

THE COURT: No, no, she's saying she's only rebutting what -- what may have already been cross-examined of the prior witnesses on Friday and today. That's what -- not the arguments, but the evidence.

MR. WELK: I know --

THE COURT: Which is their testimony.

MR. WELK: I know that's what she's saying, Your Honor, and thank you for putting it that way, my questions on cross-examination are not evidence.

THE COURT: No.

MR. WELK: They're questions and the fact --

THE COURT: But the answers could be evidence.

MS. MILLER: Right.

THE COURT: Whether it's accepted or not by the Court.

MR. WELK: But they're answers from her witness and what she's trying to prove now is, she's trying to get another witness, who I have not cross-examined at all to try and get in a document that the previous witness who I did

cross-examine was found incompetent to authenticate. That's just -- the problem I have with this, Your Honor, is that --

THE COURT: Okay.

MR. WELK: -- the Court set rules.

THE COURT: Yeah.

MR. WELK: -- for the parties to identify what they were going to use during this hearing, where the rules of evidence don't apply with full force and effect.

MS. MILLER: And the Court --

THE COURT: Well, the rules of evidence don't apply.

MS. MILLER: They don't.

THE COURT: It is. But however, there is case law that says from the Ninth Circuit and U.S. Supreme Court that in terms of relevancy, there has to be some indicia of reliability, so we all know that.

MR. WELK: Right.

THE COURT: So, that's why the Court is like listening to what's relevance of it, and also in fairness to -- to your client, like when you -- when you make an objection on vague and ambiguous, the Court does believe that's important because that issue of relevancy does come into question.

MR. WELK: Sure.

THE COURT: Like you did with the accounts,

Mr. Walker's accounts but anyway, all right, I understand what you're saying. All right. The Court will overrule the objection. Go ahead. You may proceed.

BY MS. MILLER: (CONTINUING)

Q. So, if you could turn to page 27 of Exhibit 265, which was G-2990, can you please tell the Court what we're seeing starting on page 27 through the end.

A. "Helicopter lease service amendment."

Q. And who is being identified now as the lessor of these helicopters?

MR. WELK: I'm sorry, can I have the Page number?

THE COURT: Yes, what was the Page number again?

MS. MILLER: 27, Your Honor.

THE COURT: Okay. Hold on. Did you get that, Mr. Welk? Page 27.

MR. WELK: I have it, yes.

THE COURT: Okay, go ahead.

THE WITNESS: The lessor is Pacific Spotters Corp.

BY MS. MILLER: (CONTINUING)

Q. And for example, I'm not going go through all the leases but just on this particular one, what is the registration number of the helicopter that's being leased?

A. N6188D.

Q. So basically, after the indictment, the leases that

were previously in the name of the different alter ego companies are now in the name of Pacific Spotters Corporation?

MR. WELK: Objection, overstates the exhibit Which applies to one helicopter.

THE COURT: I'm sorry, let me -- let me hear the -- I'm sorry, I have to re-listen to the question, Veronica, can you just repeat that question again and the objection too.

*(Whereupon the reporter read back the requested portion.)*

THE COURT: All right. Court will sustain that objection.

MS. MILLER: So, Your Honor, for the record, from page 27 through page 272, we have leases. If this Court needs me or would like me to go through every single one of those, I'm happy to. But Mr. Welk has this document, he's had an opportunity to review the document and I think we can ask this Court to take judicial notice of the fact that the leases, it's not one lease, it is multiple leases that are contained herein.

THE COURT: Right, but his objection was really focused on the exhibit that was identified by the witness Exhibit 27.

MS. MILLER: Okay.

THE COURT: So, the Court has sustained that but with regards to -- since this exhibit has already been

admitted in trial, you're asking the Court to take notice, judicial notice that page 27 to 272 include all the leases?

MS. MILLER: Yes, Your Honor.

THE COURT: That's what the --

MS. MILLER: That is correct.

THE COURT: And what, and what else and that the less or is?

MS. MILLER: Pacific Spotters Corporation in every single one of those.

THE COURT: On all those leases.

MS. MILLER: Correct, Your Honor.

THE COURT: All right.

MR. WELK: If I may --

THE COURT: Okay. So, the Court sustains your objection on 27 but the Court will accept the -- grant the request for notice, judicial notice of the leases from 27 to 272.

MS. MILLER: Yes, Your Honor.

MR. WELK: If the witness is not going to answer the question then that was asked of him? Because I know -- I know the government feels like I should have looked closely at all 2800 pages, well actually, that be about 3,000 pages if we count these exhibits but the fact is she's asking this witness to testify about this.

THE COURT: So, I sustained your objection and so

yeah, he's not answering the question as it's posed to that exhibit but in lieu of that, so I guess the question is withdrawn; correct?

MS. MILLER: Yes.

THE COURT: All right. And the Court will take judicial notice of 27 to 272.

MS. MILLER: Thank you, Your Honor.

THE COURT: Next question.

BY MS. MILLER: (CONTINUING)

Q. The next question is, Mr. Reyna, did you also look at another schedule of leases being operated by Pacific Spotters Corporation?

A. Yes.

Q. Okay. Before we get to that question, let me ask you, as an expert in money laundering, could you tell the Court what the reference to a specified unlawful activity is?

A. A specified unlawful activity also known as an SUA, is a predicate offense. So, for example, there are multiple federal violations such as fraud, in this case wire fraud that create illicit funds and that particular predicate offense is also known as an SUA.

Q. Okay. And in this particular case, Mr. Walker was convicted of conspiracy to commit wire fraud, is conspiracy to commit wire fraud or wire fraud an SUA for money laundering?

A. Yes, it is.

Q. And the wire fraud under which Mr. Walker was convicted was in relation to these leases; is that correct?
A. Yes.
Q. And after he was indicted in May of 2018 as we just saw the leases continued but now under the name of Pacific Spotters Corporation?
A. That is correct.
Q. Who is the owner of Pacific Spotters Corporation?
A. John Walker.
Q. Who is the president of Pacific Spotters Corporation?
A. John Walker.
Q. As an expert in money laundering, are you also asked to testify as to the economic loss that was suffered by victims of a fraud?
A. Yes.
Q. In rendering any opinions regarding economic loss that's suffered by victims of a fraud, can you tell the Court generally what evidence do you look at?
A. In this particular case, I looked at bank records --
MR. WELK: Objection, Your Honor, the question was what does he look at generally, I would like to have an answer to that.
BY MS. MILLER: (CONTINUING)
Q. You could answer generally what you look at and then I'll ask you what do you look at in this particular case?

THE COURT: Okay, so go ahead.

BY MS. MILLER: (CONTINUING)

A. Financial records such as bank records, financial statements, tax returns.

Q. Do you look at things such as QuickBooks records?

A. Yes.

Q. And in a case like the Walker case, did you look at leases?

A. I did.

Q. Do you look at things like investor materials?

A. Yes.

Q. Did you look at the prior testimony from trial of the IRS agent who was the agent in this case?

A. I did.

Q. And did you also review the evidence of the forensic accountant in this case?

A. Yes.

Q. Okay. Did you formulate an opinion based on your review of the bank records, Quickbooks records, testimony of the IRS agent, testimony of the forensic accountant, and investment materials as well as financial records and tax records, what the total amount of the fraud was involved in this case?

MR. WELK: Objection.

THE WITNESS: Yes --

MR. WELK: It calls for a legal conclusion.

THE COURT: Overruled, go ahead.

THE WITNESS: Yes, I did.

BY MS. MILLER: (CONTINUING)

Q. And could you tell the Court what that amount was?

A. On an annual basis, the total loss was over $19 million and the total loss for the entire conspiracy was over $408 million.

THE COURT: I'm sorry, how much?

THE WITNESS: $408 million for the total conspiracy.

BY MS. MILLER: (CONTINUING)

Q. Did you also read an order of this Court where the Court indicated that the tuna boat companies did not get what they bargained for?

A. Yes.

Q. And did you listen to the testimony of Mr. DeVogel?

A. I did.

Q. Can a person enter into a legal contract for a good that is fraudulently obtained?

A. No.

Q. Can a person enter into a legal contract to provide the services of a licensed professional if the person is not licensed?

MR. WELK: Objection, these are straight pure

legal conclusions that he's being asked to called to testify on. He's not qualified as a legal expert on contract law or similar areas of law.

MS. MILLER: Your Honor, I'm not asking him as a legal expert, I am asking him as an IRS criminal investigator and as a money laundering expert because one of the things that Mr. Reyna is asked to do often in sentencings is to determine issues, such as economic loss, which he is particularly poised to do. And so this isn't a legal, this is his analysis. And of course, Your Honor, you will be the one to apply the law.

MR. WELK: No, he's specifically being asked about the specific contract law and conclusions being drawn on whether a contract is valid or not. That's not within the realm of his -- first of all, it's a legal conclusion that he's not qualified or competent to testify to. But he's also not qualified an expert in that area.

THE COURT: All right. Overruled. Go ahead.

BY MS. MILLER: (CONTINUING)

Q. Can you enter into such an agreement legally?

A. No.

Q. When you're evaluating issues such as economic loss, do you consider those issues whether, for example, if the lease was entered into for $40,000 and the argument is well, there was some sort of a benefit provided, do you look at

whether there was a legality to the lease or an illegality?

A. Yes.

Q. In this particular case, did you review documents that showed the opening of Pacific Spotters Corporation by Mr. Walker?

A. I did.

Q. I'd like you to look at what has been marked for sentencing as Exhibit 141, which was introduced at trial, Your Honor, as Exhibit G-3003.

THE COURT: Okay. Do you have that? Let me pull that Exhibit 141.

MS. MILLER: Mr. Reyna, do you have that exhibit in front of you.

THE COURT: Do you have it, Mr. Welk?

MR. WELK: I have it.

THE WITNESS: I have it on the monitor.

THE COURT: We have it on the monitor. Okay.

MS. MILLER: May I proceed, Your Honor?

THE COURT: You may. Yes, you may.

BY MS. MILLER: (CONTINUING)

Q. So we're looking at what was previously entered into evidence as Exhibit 3003 at trial. Could you tell the Court if you reviewed this exhibit?

A. Yes, I have.

Q. And what is this exhibit?

 A. It's a deed of absolute sale.

Q. Okay, the whole exhibit, I'm asking generally and then I'll go to specific pages.

A. Yes, this in particular this page shows that one unit Hughes helicopter is being sold and it is being sold from Jan's Helicopter, Inc.

Q. Okay. And Jan's is, you already testified, one of the alter ego companies Mr. Walker used?

A. Yes.

Q. Okay. Can you go to the second opinion, Mr. Leon Guerrero, and hold on before you go to the second opinion, who's signing this document as the president of Jan's?

A. John Walker.

Q. Okay. And this opinion --

THE COURT: I'm sorry, what package is this?

MS. MILLER: So, if you go back to the first opinion, Your Honor, on the bottom, you'll see the signature of John Walker as the president of Jan's.

THE COURT: Okay, so this is package 1 at the top.

MS. MILLER: That was package 1, yes, Your Honor.

THE COURT: Thank you.

BY MS. MILLER: (CONTINUING)

Q. Then if we go down to package 2, we're just seeing documentation relating to that particular helicopter; is that

correct?

A. Yes.

Q. Okay. Can you go down to package 3, please. And that's the registration information for that particular helicopter?

A. Yes.

Q. Package 4. Again, registration information for that helicopter?

A. Yes.

Q. Package 5, package 6, package 7, package 8. Okay. Package 9. Here we go. So, I want to stop on package 9 for a moment. The other documents that we saw were related to the registration for that one particular helicopter. On package 9, we see a certificate of insurance for Jan's Helicopters, can you tell the Court who is the insurance company that is providing the certificate of insurance for Jan's?

A. Caledonian Insurance Company.

Q. Okay. And is that another one of Walker's alter egos?

A. Yes, it is.

Q. Okay. And could you move ahead to the next opinion, Mr. Leon Guerrero. Okay, so let's stop there for a moment. You see 17 aircraft identified here?

A. Yes.

Q. Okay.

THE COURT: Sorry, what exhibit number --

MS. MILLER: This is package 9, I believe, is that -- no, ten.

THE COURT: Ten, all right.

MS. MILLER: Package 10.

THE COURT: Okay. What was the last question, this is what now, what does this represent.

MS. MILLER: So, this is a listing of the helicopters, Your Honor --

THE COURT: Okay.

MS. MILLER: -- that were owned by Jan's Helicopters, one of the Walker's alter egos.

BY MS. MILLER: (CONTINUING)

Q. And you see the agreed value of those helicopters there, Mr. Reyna?

A. Yes, I do.

Q. Okay. And can we go to package 11, please. And that's more registration information. Let's go to package 12, please. More registration information. And now, let's go to package 13 and package 14. So, if we stop on package 14, can you tell the Court what we see here on package 14?

A. Yes, this is a bill of sale for Jan's Helicopters Service, Inc. is the seller.

Q. Okay. And what is being sold here?

A. Helicopters that are registered in the Philippines.

Q. Okay. And that's a list of helicopters we saw on package 10; is that correct?

A. Yes, that's correct.

Q. And if you go scroll down, Mr. Leon Guerrero. And hold on right there, that's perfect. And what is the date that is inserted hereby the seller?

A. November 13th, 2018.

Q. So, this is approximately six months after Mr. Walker was indicted?

A. Yes.

Q. And who is the buyer of these helicopters?

A. Pacific Spotters Corporation.

Q. Okay. And if you scroll down, and what is the total amount that Pacific Spotters Corporation is paying for these helicopters?

A. $340,000.

Q. Okay. And that substantially less than the agreed value we saw on package 10 for all of these helicopters?

A. Yes, it is.

Q. All right. And can we go down, Mr. Leon Guerrero --

THE COURT: I'm sorry, pull that up.

MS. MILLER: Stop right there.

THE COURT: What opinion is that, sorry, that's package 15.

MS. MILLER: This is package 15, yes, Your Honor.

THE COURT: Okay, so this is for all of the helicopters noted on package 14?

MS. MILLER: Yes, Your Honor.

THE WITNESS: Yes, Your Honor.

THE COURT: All right. Thank you.

BY MS. MILLER: (CONTINUING)

Q. And if you read the -- there is a paragraph that starts with the seller hereby warrants to the buyer and then there is -- there is a Roman numeral I, II and Roman numeral III, can you read Roman numeral III, please?

THE COURT: I'm sorry, where are we looking at? What paragraph?

MS. MILLER: We're on the third paragraph down under the buyer.

THE COURT: Okay. Okay, I got it.

MS. MILLER: And the seller Jan's is warranting to the buyer Pacific Spotters Corporation certain warranties.

THE COURT: Okay. All right paragraph 3, that's what you're going to discuss?

MS. MILLER: Yes, Your Honor.

BY MS. MILLER: (CONTINUING)

Q. And then Roman numeral III, if you could read that please, Mr. Reyna?

A. "The aircraft is sold in an as-is basis, without any

warranties whatsoever expressed or implied as to the marketability, fitness for any purpose, durability, design or suitability, especially that it was disclosed that the majority of the aircraft are considered to be scrap, nonfunctional, and/or have expired and lost certificates of registration and airworthiness."

MS. MILLER: Okay. Can you go on to the next page, please, Mr. Leon Guerrero.

BY MS. MILLER: (CONTINUING)

Q. And first, let's go down a moment. Who signed on behalf of the buyer, Pacific Spotters?

A. Phillip Turner Kapp.

Q. And he was a named co-defendant in this case?

A. Yes.

MS. MILLER: Okay. Can you scroll down again, Mr. Leon Guerrero. And we see a opinion of acknowledgements here and can you scroll down, Mr. Leon Guerrero. Thank you. And scroll down some more, please. And let's go -- and stop right there at package 18.

BY MS. MILLER: (CONTINUING)

Q. And what do we see on package 18?

A. Board's resolution, bulk sales, which lists all the helicopters that are being sold by Jan's Helicopter Services.

MS. MILLER: Okay. And can you scroll down, Mr. Leon Guerrero.

THE COURT: I'm sorry, is that the same listing that was on package 11?

MS. MILLER: It is, Your Honor.

THE COURT: No, I'm asking the witness.

THE WITNESS: Yes, it is.

THE COURT: Okay. Thank you. All right. Thank you.

BY MS. MILLER: (CONTINUING)

Q. And who is signing this board resolution on November, looks like maybe 2nd, 2018?

A. John Darrell Walker.

MS. MILLER: Okay. And can you scroll down, Mr. Leon Guerrero?

THE COURT: What package is that?

MS. MILLER: And hold on, that was package I believe 8 -- 19, Your Honor.

THE COURT: Okay.

MS. MILLER: Thank you, and if we -- keep scrolling down please. And right there. Package 20.

BY MS. MILLER: (CONTINUING)

Q. What do we see there, whose passport is copied there?

A. John Walker.

Q. And what is the date there?

A. December 14th, 2018.

MS. MILLER: Okay. And that's it. Thank you,

Mr. Leon Guerrero.

BY MS. MILLER: (CONTINUING)

Q. In your experience as a money laundering expert, why would someone charged with a crime open up a new company to do exactly the same thing that their other companies were doing?

A. In order to continue the ongoing criminal scheme, and that way it's -- gives the criminal the ability to avoid the detection of law enforcement.

Q. So, in 2018, after Mr. Walker was indicted, did the articles of incorporation for Pacific Spotters Corporation change?

A. Yes, I did.

Q. And could you tell the Court how they changed?

A. They were changed so that they modeled Hansen Helicopters and so it listed that not only repairs can be done but also that the business could lease helicopters.

Q. Okay. In addition to selling those 17 aircraft that we saw in Exhibit 3003, did you review an exhibit that showed that the remainder of Mr. Walker's helicopter fleet was sold to Pacific Spotters Corporation?

A. Yes.

MS. MILLER: Your Honor, I would like to show the witness and the Court Exhibit 7 for the sentencing.

THE COURT: Okay, seven.

MS. MILLER: Yes, Your Honor.

                    THE COURT:  Hold on a second.  Let me pull that
up.

                    MR. WELK:  I have it.

                    THE COURT:  You got it.  I guess we're trying to
find ours but go ahead.  My I think --

                    MS. MILLER:  So Mr. Leon Guerrero can pull it up
on the screen as well, Your Honor.

                    THE COURT:  You may.  Can you repeat the exhibit
number again?

                    MS. MILLER:  Yes, Your Honor, it's Exhibit 7.

                    THE COURT:  So, sentencing Exhibit 7.

                    MS. MILLER:  Yes, Your Honor.

                    THE COURT:  What was the trial exhibit?

                    MS. MILLER:  There wasn't a trial exhibit for
this, this is a document that was received by Pacific Spotters
Corporation.

                    THE COURT:  Okay, so this is a new exhibit then?

                    MS. MILLER:  Yes.

                    THE COURT:  Okay.  Exhibit 7.

                    MR. WELK:  Um, Your Honor, could I ask for a
clarification because there was a ruling on -- with respect to
the proffer of Cherry Espion and the documents that were
received in connection with that proffer --

                    THE COURT:  On Cherry Espion, uh-huh.

                    MR. WELK:  I would inquire whether this is

included within those documents because that was -- that was the proffer that we were notified of at the last minute.

MS. MILLER: As I told Counsels previously and the Court, PSC produced all of these documents to us before the proffer of Cherry Espion. These documents were produced to Mr. Welk before the proffer of Cherry Espion. And these documents are not related to the proffer of Cherry Espion.

THE COURT: Okay. So, they're not related. So, what are they related to?

MS. MILLER: They show, Your Honor, the --

THE COURT: Hold on.

MR. WELK: They weren't produced to me by the government until late in the process. I know Ms. Miller is convinced that PSC's attorney gave me -- gave me these documents because he told her he did, but I did not receive them.

MS. MILLER: But I gave him the documents in a timely manner, Your Honor, pursuant to this Court's order, yes, he received them.

MR. WELK: Thank you, Your Honor.

THE COURT: All right. So, you're not saying you didn't receive it, is that right, Mr. Welk?

MR. WELK: No, I received it in connection with this.

THE COURT: Right.

MR. WELK: It's fine, Your Honor. I'll withdraw the objection.

THE COURT: Okay. Very well, proceed.

MS. MILLER: Thank you, Your Honor.

MR. LEON GUERRERO: Gina.

THE COURT: Sorry, this is Exhibit 7.

MS. MILLER: Yes, Your Honor.

BY MS. MILLER: (CONTINUING)

Q. So, in addition to the 17 aircraft that we see that Jan's Helicopters sold to Pacific Spotters in 2018, were the other helicopters that were used in the fraud sold to Pacific Spotters?

A. Yes, they were.

Q. And if we look at Exhibit 7, if we could pull it up on the screen and if we can't, we'll do the good old-hard copy. Okay. There it goes. So, Exhibit 7 is 567 pages, Your Honor, I'm obviously not going go through all of those pages, however, we will go through the first one and any others that the Court would like, but basically let's look at this first exhibit. Eddie Air Inc., do you recognize the name of that company?

A. I do.

Q. And what is that company?

A. It's a company owned and controlled by John Walker.

Q. This is one of the alter ego Vanuatu companies?

A. Yes, it is.

Q. And what is this company doing in this particular document?

A. It's selling a helicopter to Pacific Spotters Corporation.

MS. MILLER: Okay. And can you scroll down please, Mr. Leon Guerrero.

BY MS. MILLER: (CONTINUING)

Q. And for this particular document, which two helicopters are being sold to Pacific Spotters Corporation?

A. It's 1 and 2, which are Hughes Helicopters.

Q. Okay. With U.S. registration numbers?

A. Yes.

MS. MILLER: Okay. Can you keep scrolling down, Mr. Leon Guerrero.

BY MS. MILLER: (CONTINUING)

Q. And who is signing this on behalf of Eddie Air?

A. Kenneth R. Crowe.

Q. Okay. And he was one of the defendants in the criminal case; correct?

A. Yes.

Q. Okay. And when you continue to look through the 567 pages of this document, do you see the various names of various different alter egos that were used by John Walker in this scheme?

A. Yes, I do.

Q. And do you see the listing of various helicopters that were used by John Walker in this scheme as well?

A. Yes.

Q. Okay. Let's look at Exhibit 11, please.

THE COURT: Sorry, so for purposes of your testimony, are the helicopters, the 17 helicopters that were previously identified in the last exhibit.

THE WITNESS: These are additional helicopters, Your Honor.

THE COURT: These are additional. Additional to the 17?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay.

THE WITNESS: And they're also in the names of other shell or alter ego companies.

THE COURT: Okay. I'm sorry, hold on one second. What was the other exhibit please?

MS. MILLER: Yes, Your Honor, the next exhibit is Exhibit 11.

THE COURT: All right. This is -- now was this also in trial or not?

MS. MILLER: No, this is another Pacific Spotters exhibit, Your Honor.

THE COURT: Oh, okay, let me pull 11. Do we

have -- I think it's here, right? This is it? Okay. All right. Okay, I've got 11.

Do you have that, Mr. Welk?

MR. WELK: I have it, Your Honor, yes.

THE COURT: Very well. Okay, go ahead.

MS. MILLER: May I proceed, Your Honor?

THE COURT: You may, you may.

BY MS. MILLER: (CONTINUING)

Q. So, Mr. Reyna, we saw earlier in Exhibit G-2939, on package 82, wire transfers going from Pacific Spotters to Limey Air, a company in which John Walker was a 99.9% owner; correct?

A. Yes, that's correct.

Q. And on package 83, we saw wire transfers going from Pacific Spotters to Limey Air in 2019, wire transfers from Pacific Spotters to Limey Air; correct?

A. Yes, that's correct.

Q. And we had a total of approximately $5 million going from Limey Air to Pacific Spotters in 2018 and 2019; is that correct?

A. It is correct.

Q. Okay. Now what we're seeing here is a certification by Pacific Spotters that $3,000,110 went to John Walker between 2021 and 2024; is that correct?

A. That is correct.

 Q. Okay. Could you also look at what has been previously marked as Exhibit 211, 211, we're going to go to that.

THE COURT: I'm sorry, this is now Exhibit 211?

MS. MILLER: Exhibit 211 to the sentencing, Your Honor.

THE COURT: Okay. Sentencing Exhibit 211. Okay, let's pull that. Hold on. Okay. This is not a government trial exhibit, right?

MS. MILLER: No, Your Honor, this is another exhibit from Pacific Spotters Corporation.

(Discussion with clerk.)

THE COURT: Mr. Welk, you got it? Did you get it, Mr. Welk?

MR. WELK: I have it, Your Honor.

THE COURT: Go ahead.

BY MS. MILLER: (CONTINUING)

Q. So, Mr. Reyna, have you reviewed this document?

A. Yes, I have.

Q. The first three entries to this document, if you move over more to the right, Mr. Leon Guerrero, appear to be what?

A. Remittances to John Darrell Walker for the account of Jan's Helicopters Service, Inc. to apply as payment to the $310,000 balance for the purchase of helicopters in November of 2018.

Q. So, this is related to the document we showed the Court earlier, G-3003, which was the bill of sale for those 17 helicopters between Jan's Helicopters owned by John Walker to Pacific Spotters owned by John Walker; correct?

A. That is correct.

Q. Okay. And if we continue down, what is being described in the remarks as why these funds are going between Pacific Spotters to John Walker?

A. These are advances to John Walker.

Q. Okay. And at the very bottom, we see two dividends?

A. Yes, that's correct.

Q. Okay. And the total again equals the total of the summary we saw on the prior document of $3,000,110; correct?

A. Yes, that's correct.

Q. Okay. I'd like you to look at what has been marked for the purposes of sentencing, as Exhibit 210.

THE COURT: Okay, 210. Is that it up here? No, this is not it --

MS. MILLER: That's 211, Your Honor, in front of you.

THE COURT: Okay.

MS. MILLER: So, we are going to 210.

THE COURT: Okay. Did you find it, Mr. Welk?

MR. WELK: I have it, Your Honor.

THE COURT: Okay.

MS. MILLER: Okay, and if could you expand that, Mr. Leon Guerrero. Excellent. Okay.

BY MS. MILLER: (CONTINUING)

Q. And what are we seeing here? And can you scroll up, Mr. Leon Guerrero. Perfect, to the total on the bottom. What are we seeing here, who is the receiving these payments from Pacific Spotters?

A. Yes, this is a summary of payments to Kenneth R. Crowe for 2021 through 2024.

Q. So, for the same period of time that Mr. Walker was receiving payments; correct?

A. That is correct.

Q. And what is the total amount of money that was remitted to Mr. Crowe during that period of time?

A. A little over $93,000.

Q. For a fraction of the funds that were received by Mr. Walker; correct?

A. Yes, that's correct.

Q. Did you also analyze, sir, the transfers that were made between Pacific Spotters Corporation and Limey Air from 2021 to 2023?

A. Yes.

Q. And what was the total amount of wire transfers between Pacific Spotters and Limey Air between those two dates?

A. (No response.)

Q. 21 through 23?

A. $3 million.

Q. No, that's --

A. Oh, I'm sorry.

Q. That's the funds that went directly to John Walker.

THE COURT: Is he -- is he reviewing the same exhibit.

MS. MILLER: We have another exhibit, Your Honor, that we're going to pull up that shows the additional transfers.

THE WITNESS: Yeah, that's over $9.5 million.

MS. MILLER: Okay. And if you give me one second, Your Honor.

THE COURT: Mm-hmm.

MS. MILLER: It's Exhibit 15, Your Honor, to the sentencing exhibits.

THE COURT: Okay, all right. Okay, again, this is not a trial exhibit?

MS. MILLER: This is not a trial exhibit.

THE COURT: All right, so sentencing Exhibit 15?

MS. MILLER: Yes, Your Honor.

THE COURT: Okay. We'll get that. Let's see if Mr. Welk will have it too.

(Pause.)

MS. MILLER: No, that's not it.

THE COURT: Is this it?

MS. MILLER: No, it's not.

THE COURT: Wrong exhibit?

MS. MILLER: Wrong exhibit.

THE COURT: Wrong exhibit.

MS. MILLER: The PSC bates number, Mr. Leon Guerrero, is PSC_001572.

MR. WELK: It's not 15.

THE COURT: No, she said it's not 15. Gina, the sentencing exhibit number.

MS. MILLER: That's what we're looking for, Your Honor, the PSC bates number is 001572. So, we are looking for the correlating sentencing exhibit number.

THE COURT: Gina, thinks it's 213, do you want to double-check that.

MS. MILLER: Oh, 213? Thank you, Gina.

THE COURT: Is that right, Gina? So, that's the trial -- the trial exhibit or government's exhibit? Sentencing?

MS. MILLER: Sentencing.

THE COURT: Number?

MS. MILLER: Gina, is the --

THE CLERK: Sentencing.

THE COURT: Try -- try 213.

MS. MILLER: 213.

THE COURT: 213, that's right.

MR. LEON GUERRERO: I'm pulling it up.

THE COURT: Yeah, I got to pull it too.

MS. MILLER: Thank you, Gina.

THE CLERK: You're welcome.

MS. MILLER: No, that's not it, but that's okay.

THE COURT: That's not it?

MS. MILLER: 0015 -- yeah, no, this is a different one, but yes, I want to use this one so let's keep that up for a moment.

THE COURT: Okay. Hold on hold on. Let Mr. Welk try to find it.

MS. MILLER: Yes, Your Honor.

THE COURT: If he wants to be able to.

MR. WELK: I'm sorry, what am I looking for?

THE COURT: She says it's exhibit -- government Exhibit 213?

MS. MILLER: Yes.

MR. WELK: Got it.

THE COURT: Okay, very well.

MS. MILLER: Thank you, Your Honor.

BY MS. MILLER: (CONTINUING)

Q. So --

THE COURT: 213.

BY MS. MILLER: (CONTINUING)

Q.   So, when the Articles of Incorporation for Pacific Spotter changed so that Pacific Spotters was now going to be a helicopter leasing company, what did Mr. Walker do with a percentage of his ownership in Pacific Spotters?

A.   He divested himself because under Philippine law a U.S. citizen could not have more than a third of the ownership of the company.

Q.   Okay.  And when he divested a portion of his 90% ownership of the company, who did he divest that interest to?

A.   To four mechanics that worked for his companies, along with the wife of one of the mechanics.

Q.   Okay.  And this exhibit, 213, to the sentencing, is what?  What do we see in this exhibit?

A.   It's a loan document between John Walker and Cherry Espion.

Q.   Okay.  And if we continue looking at this exhibit, is it also a loan document between Mr. Walker and the other individuals who assumed some of his portion of ownership?

A.   Yes, that's correct.

Q.   And what was the interest on this loan?

A.   There is no interest listed on this loan document.

Q.   Okay, as a matter of fact, Paragraph 2 says the loan shall not bear any interest; is that correct?

A.   That is correct.

Q. And what are the terms of the loan?

A. The terms include the amount of 26 million pesos shall be payable in 120 equal monthly installments for a period of ten years starting July 1st, 2020 until July 1st, 2030.

Q. And did you perform an analysis of what 26 million Philippine pesos is in U.S. dollars approximately?

A. Yes, I did.

Q. And what is that amount?

A. It was roughly about $4,000.

Q. A month?

A. A month.

Q. Okay. And if we go to the next package, Mr. Leon Guerrero. Is that the only opinion there? Okay, so did you see other loan agreements between Mr. Walker and Oswald Espion, and this Cherry Espion's husband?

A. Yes, I did.

Q. And between Mr. Walker and Jeffrey Sarimos?

A. Yes.

Q. Okay. Did you see any evidence in the financial records that we received from Pacific Spotters Corporation of any of these individuals making that almost $4,000 a month payment to Mr. Walker?

A. No, I did not.

THE COURT: I'm sorry , you saw no transactions

of repayment?

THE WITNESS: No, Your Honor.

THE COURT: Or I guess payment, not repayment but payment. Okay.

BY MS. MILLER: (CONTINUING)

Q. Okay. I would now like you to look at what has been previously marked for sentencing purposes as Exhibit 223.

THE COURT: Okay, 223? Is that a new one as well?

MS. MILLER: Yes, Your Honor, that's another Pacific Spotters document.

THE COURT: Okay. Hold on. Let me pull that. Mr. Welk, did you find it?

MR. WELK: I have it, Your Honor.

THE COURT: Okay, good. Go ahead.

MS. MILLER: And, Your Honor, do you have it?

THE COURT: I do.

MS. MILLER: Okay. And we also have it on the screen.

THE COURT: All right.

BY MS. MILLER: (CONTINUING)

Q. Mr. Reyna, what is the date of this memorandum of understanding and agreement?

A. March 22nd, 2021.

Q. And could you read this to us, please?

A. Yes. "Memorandum of understanding and agreement. This agreement documents a verbal arrangement that has existed between Pacific Spotters Corporation, PSC, and Wilma's Flight Services, Inc., Wilma's, since August 2018 whereby PSC agreed to process the fleet payroll for all independent contractors, pilots and mechanics, of Wilma's. It is understood between PSC and Wilma's that Wilma's does not currently have a bank account which has to capacity to process its fleet's payroll, and as a result, it is more efficient for PSC to process such payroll since PSC is the one that collects all lease payments for the fleet helicopters, and as such, if Wilma's were to have its own bank account, then PSC would have to remit money to Wilma's out of the lease payments it receives for Wilma's to be able to process the fleet payroll."

Q. As an expert in money laundering, what is your interpretation of this document?

A. That PSC is taking the place of Wilma's.

Q. And to remind the Court, Wilma's Flight Service was one of the John Walker companies under his control?

A. That is correct.

Q. And to remind the Court, we saw an Exhibit G-0366, the balance sheet and income statement for Wilma's Flight Service?

A. Yes, that's correct.

Q. And Wilma's was the alter ego that was identified as

 owning all of the helicopters that were used in the fraud?

A. Yes, that's correct.

Q. And in the consolidated financial statements we saw a gross profit from the leases of excess of $23 million?

MR. WELK: Objection, leading.

THE COURT: Overruled.

THE WITNESS: Yes, that's correct.

BY MS. MILLER: (CONTINUING)

Q. Okay. How much total funds went from Pacific Spotters to Limey Air Services, the company in which John Walker is a 99.9% owner from the creation of Wilma's -- from the creation, I'm sorry, of Pacific Spotters through 2023, the total amount?

A. Approximately 20 million USD.

Q. Okay.

A. Just a little under.

MS. MILLER: Okay. Let's now look at Exhibit 224 please for the sentencing, which is another Pacific Spotters document, Your Honor.

THE COURT: Okay. Hold on, 224 give us a second. Did you get that, Mr. Welk?

MR. WELK: I have it, Your Honor.

THE COURT: All right. Okay. We're good.

MS. MILLER: Do you see that document in front of you, Mr. Reyna?

THE WITNESS: Yes, I do.

BY MS. MILLER: (CONTINUING)

Q. Okay. Can you tell us what this document represents?

A. Yes, it's a memorandum of understanding and agreement.

Q. Okay. And could you read this to the Court, please?

A. Yes. "Pilots, mechanics, and other support personnel for the aircraft onboard fishing vessels, collectively flight support personnel, are under independent contractor agreements with Wilma's Flight Services, Inc., Port Vila, Vanuatu, a corporation providing flight support personnel to helicopters. Pacific Spotters Corporation is a helicopter maintenance and leasing corporation located in Clark Freeport Zone Philippines, leasing helicopters to fishing vessels operating in the Pacific ocean. By virtue of this memorandum, Wilma's Flight Service, Inc., Wilma's, and Pacific Spotters Corporation, PSC, hereby document their verbal agreement that has existed since July 1st, 2019, to wit, one, PSC shall collect all lease payments from fishing vessels, lease contracts shall be executed between the vessel companies and PSC; two, in consideration of the above lease collections, PSC shall be responsible for and shall timely pay costs of contractor-related compensation due to such flight support personnel; three, this agreement is without prejudice to other fees that may occur between the two parties."

Q. And who is signing the agreement on behalf of Wilma's Flight Service and Pacific Spotters Corporation?

A. Kenneth R. Crowe.

Q. And Pacific Spotters?

A. Phillip T. Kapp.

Q. Again, two of the defendants -- co-defendants?

A. Yes.

Q. So, in reviewing --

MR. WELK: I object to Mr. Crowe being referred to as a co-defendant. He's not.

Q. In reviewing the --

THE COURT: Overruled, go ahead.

BY MS. MILLER: (CONTINUING)

Q. -- transfers of funds between Pacific Spotters and Limey Air, and as you testified almost $20 million, do those funds represent funds of a specified unlawful activity?

MR. WELK: Objection.

THE WITNESS: Yes.

MR. WELK: Calls for a legal conclusion.

THE COURT: Overruled, go ahead.

THE WITNESS: Yes, it does.

BY MS. MILLER: (CONTINUING)

Q. And do those funds represent money laundering?

A. Yes, they do.

MS. MILLER: I have no further questions for the

witness, Your Honor.

THE COURT: Mr. Welk?

MR. WELK: Just a moment, Your Honor.

CROSS-EXAMINATION

BY MR. WELK:

Q. Good morning, Special Agent Reyna.

A. Good morning, sir.

Q. Are you a CPA?

A. I am not.

Q. You testified earlier that you -- let me ask you, I understood you to testify earlier that you had reviewed whatever you have reviewed, you came to the conclusion that the manner in which the Walker-related entities were operated -- was a complex -- complex methods used to distance criminal proceeds. Do you recall that?

A. I do.

Q. And you identified as reasons for that, is that there were multiple bank accounts, right?

A. Yes.

Q. Multiple companies, yes?

A. Yes.

Q. And multiple jurisdictions, right?

A. Yes.

          Q.    Before we get -- before we go any further, you've
made multiple references to these companies as alter ego
companies, what is your basis for that, the use of that term?
          A.    (No response.)
          Q.    Well, I'm sorry, I'm sorry, what is an alter ego
corporation?
          A.    Alter ego is another term for a shell company.
          Q.    Okay, what is -- what is an alter ego corporation
other than a synonym for shell company?
          A.    It is a company that provides no legitimate service
or business.
          Q.    Anything else?  Is there anything else that defines
an alter ego company?
          A.    That's all I have.
          Q.    Doesn't alter ego mean as a term of art that
it -- that there is no legal distinction to be drawn between
alter egos, whether they're companies or other companies or
individuals?
          A.    I'm not sure what you're asking.
          Q.    I'm asking you, if the term alter ego -- you
understand what the term alter ego means, right?
          A.    Yes, I gave you my definition.
          Q.    Okay.  But have you ever heard that the term alter
ego is a legal term of art that refers to corporations that
have no legal distinction between them and either the person

who owns them or the corporation who owns them?

A. I haven't heard it specifically phrased the way you just mentioned.

Q. You ever heard the phrase piercing the corporate veil?

A. I've heard the term.

Q. Do you know what that means?

A. I mean there is a related -- there is a relationship between the owner and the alter ego, if that's what you're asking me.

Q. I don't understand your answer. Were you answering what you think piercing the corporate veil means?

A. I don't understand what your question. So if you could rephrase it in way or somehow better, then I can answer it.

Q. I asked you if you know what piercing a corporate veil means?

A. That there is a potential relationship between an owner and corporation. And what the link is, the pierce, I'm not sure what you're trying to ask me.

Q. Okay. I don't want you to focus not so much on what you think I'm trying to find out but -- so piercing the corporate veil, you're familiar with that phrase?

A. I've heard the term, I'm trying to give you my interpretation of what I think it may mean.

Q. Okay. And what does it mean to pierce the corporate veil in your understanding?

A. Is that trying to connect the owner and the corporation, what's the link between the two; that's how I interpret it.

Q. Just trying to connect them?

A. That's what I just said.

Q. So, you don't understand it to mean that there is derivative liability of an individual because the corporate veil is pierced and the individual is therefore liable under circumstances that it -- he normally would not be?

A. What's your question?

Q. I just asked it. I can have it re-read if you like?

A. Re-read it.

Q. Okay.

THE COURT: Can you -- Veronica, could you repeat the question for the witness. The last question.

*(Whereupon the reporter read back the requested portion.)*

THE WITNESS: If you could just rephrase the question in plain simple English, I think I can maybe answer what you're trying to ask me.

BY MR. WELK: (CONTINUING)

Q. Okay. I'll give it a try. It may be a little complicated because *piercing the corporate veil* is a legal term of art. And what I'm asking you is, you've answered that

you think it means there's a link between an individual and a corporation, so do you think that if Mr. Jones owns Apex, Inc., that that means that -- that means piercing the corporate veil, just the fact that Mr. Jones owns Apex, Inc.?

A. What's your question? I'm not tracking what your question is.

MS. MILLER: Your Honor, I'm going to object. I think the problem here is, Mr. Welk is using a specific legal term of art that frankly applies in the civil context, of piercing the corporate veil. And he's asking this witness to agree with his legal definition and the witness is not understanding the question -- I'm not sure I understand exactly what he's asking. And I'm not sure it's relevant to these proceedings, so I'm going to object on that basis.

THE COURT: Court will overrule the objection. Go ahead.

The objection is overruled. Go ahead.

MR. WELK: Thank you.

BY MR. WELK: (CONTINUING)

Q. Let's try this. Let's try this, Agent Reyna. Because you used the term alter ego, right?

A. I did.

Q. And you think you believe you have an understanding of what that term means?

A. Yes.

Q. Do you think that the mere fact that John Walker is a majority owner of a company means that the company is his alter ego?

A. Yes.

Q. All right. And that's the context in which you have used the term alter ego in your testimony today; correct?

A. That he is a owner of these corporations and also that the corporations, as I used it during my testimony, that it's also known as a shell company that's not forming any legitimate business.

Q. I see. Okay. So -- so, it also includes in your mind alter ego also includes this idea of a shell company, yes?

A. Yes.

Q. And shell company is defined as a company that provides no services or business, yes?

A. No legitimate business or service.

Q. And what do you mean by "legitimate"?

A. Something that's legal.

Q. So -- and when you use the term alter ego about, let me put this exhibit back up, number 93.

THE COURT: Okay. Gina, can you --

THE CLERK: Yes.

THE COURT: Let's try --

BY MR. WELK: (CONTINUING)

Q. Is it your belief, Special Agent Reyna, that all of these entities listed on here are alter egos of John Walker?

A. Yes.

Q. But did you do an investigation into what all of these companies did?

A. As far as what?

Q. Like for example, did you know that the -- did you uncover in your investigation that the Vanuatu international companies, that most if not all of them were the title holder of at least one helicopter?

A. I reviewed records, I did not conduct the investigation. I was not the case agent. I was just brought in to testify as a money laundering expert witness for this hearing.

Q. I see. Okay. So -- so going back to my question, did you -- do you know that these international, these Vanuatu corporations that most or all of them own, were the title holder of a single helicopter?

A. I do recall that they were -- that they were owners of multiple helicopters.

Q. Each of them?

A. I don't recall if exactly all of 'em were under every single one of these companies.

Q. Do you recall that there were any of the companies that didn't own any helicopters?

A. I don't recall that.

Q. Do you know Bean Bag Helicopters Services owned any helicopters?

A. If you have something to show me, then I can review that.

Q. I'm just asking whether you know?

A. I don't recall.

Q. Okay.

A. If they did own one or multiple or if any at all?

Q. I'm sorry, I -- I didn't hear that last part or any at all?

A. That's what I said.

Q. Okay, so it's your -- it's your testimony today that all of these companies were alter egos, right?

A. Yes.

Q. That there were 48 alter egos?

A. At least.

Q. And in making that determination, did you look at each of those companies to see if they owned anything or if they did any kind of business?

A. I looked at multiple records and some of those records show that some of these helicopters were registered in some of these names.

Q. Thank you. Did you look at each of these companies to see whether each of them owned helicopters or was involved

in some sort of business?

A. Again, I can't tell you if I looked at every single one of these and whether -- if they owned any helicopters, whether it's one or more or any at all, but I did look at records related to this chart.

Q. So you said -- so, if I'm understanding you correctly you looked at some records and based on that review, you found that each of these companies either didn't own any helicopters, owned one or owned more than one, right?

A. I just told you that I looked at these records and I don't recall if each one of these corporations owned one, more or any of the helicopters.

Q. I think that's -- okay, that's what I asked.

MS. MILLER: Your Honor, I'm going to move to strike Mr. Welk's comment.

THE COURT: That's what I asked? Okay, just go ahead.

MR. WELK: Just confirming that I got an answer to my question.

THE COURT: You're talking to yourself?

MR. WELK: Exactly. I'll withdraw the statement I'm happy to withdraw it. I don't want to upset the government since --

THE COURT: Let's move on.

MS. MILLER: I'm going to move to strike these

unnecessary --

THE COURT: Yeah, yeah, yeah. Both of you.

MS. MILLER: -- comments.

THE COURT: All right. Yeah.

MR. WELK: Can I --

MS. MILLER: The part about -- okay, the part about.

THE COURT: He was just reconfirming, the Court will overrule that objection, but let's just be civil and let's continue on, proceed.

BY MR. WELK: (CONTINUING)

Q. Can I have the ELMO back up again? So, going back to your definition of alter ego, it was a company that provides no legitimate service. Did you inspect each one of these companies or the records of each one of these to companies to determine whether each of them was providing a legal service or business?

A. I reviewed multiple records, I don't recall if I reviewed every single one.

Q. Did you -- do you believe that you reviewed enough records to come to the conclusion that none of these businesses was operating, was providing legitimate service or business?

A. Based on what I have learned during the preparation for my testimony and also the prior testimony on Friday, as I

understand it, the services that were being provided were
based on helicopters that had fraudulent parts, that were
being worked on by mechanics that weren't licensed.  So, based
on that and those facts, that I can see is not legitimate
business.

Q.   And how is it that you know that that's not a
legitimate business?

A.   I listened to the testimony, for example, of the FAA
employee, Mr. DeVogel.

Q.   And you understood his testimony to be that none of
these companies was operating as a legitimate business?

A.   I don't know about specifically that question, but as
far as the -- as I mentioned, the mechanics not being licensed
or the parts -- having counterfeit parts being used to be
installed on these aircraft.

Q.   Was it your understanding that Mr. DeVogel or anyone
else testified that the pilots weren't licensed?

A.   That's what I learned during the preparation for my
testimony.

Q.   Not licensed anywhere?

A.   I don't know about whether they were licensed in
other jurisdictions and I don't know whether or not they
were -- like all of them were licensed or maybe there was just
a few, I just know that some from based on what I've learned
during the preparation of my testimony that they were not

licensed.

Q. How many pilots were there?

A. I don't recall but I remember there being at least a 120 employees.

Q. Oh, how many of those employees were pilots?

A. Again, I don't -- I don't recall exactly how many were pilots.

Q. I see. How many of them were mechanics?

A. Again, I don't have the exact break out between pilots and mechanics and the different employees within John Walker's businesses.

Q. How many of the employees were office staff?

A. Again, I don't -- I don't know.

Q. Would they have to be licensed?

A. Depending on what they were performing.

Q. As office staff?

A. As far as I know, no.

Q. Okay. So -- so there would be -- so -- the office staff could have been providing legal services, right?

A. I am unaware if any of the office staff provided any type of legal services.

Q. Are you aware of them providing illegal services?

A. Um, if you give me a list of the office staff and -- do you have them?

Q. Look, I'm just trying to understand your use of this

term alter ego, which seems to be that because you heard that, this isn't the question by the way, I just want to clarify this is what I understand your answer to be, that you heard other government witnesses talk about the fact that there was illegality in the operation of these businesses and it sounds like that led you to conclude that these were alter egos because they weren't providing legal services, is that right?

A. I learned that these were corporations that were established by John Walker and that he was the majority owner of them.

Q. Okay. What does -- what does that mean, does that alone make him an alter ego?

A. That the corporations that were established were done under his guidance and that he's a majority owner of them, that's -- that's what I know.

Q. And you know that because people told you that?

A. Again, it's based off of, you know, my review of evidence which also included transcripts of other, you know, witnesses that testified at the trial.

Q. So -- so and these are government witnesses?

A. Yes.

Q. So you based on your review of government evidence here, you've come to the conclusion that all of John Walker's businesses were engaged in illegal conduct, yes?

A. As far as I know that his business was involved with

providing leased helicopters that were maintained by uncertificated mechanics and also included helicopters that had counterfeit parts installed on them.

Q. And that's because someone told you that or you read testimony to that --

MS. MILLER: Your Honor, I'm going to object, we are now -- we've asked this question now about five times and we're wasting court time because, Your Honor, the jury verdict speaks volumes here. And so, we're -- I'm not sure what we're trying to get to. The other issue here, Your Honor, is you instructed the jury at trial, if the defendant used a corporation to perpetrate a fraud or the defendants have dominated or disregarded the corporation as a separate entity, then the jury could find that the corporations were alter egos. That was already a finding that the jury found as to at least 36 of these alter ego companies. So we're -- we're wasting time. And we're asking the witness the same question over and over and over again expecting I guess a different answer? But he's answered.

THE COURT: All right. The Court will overrule the objection. He's testing the credibility of the witness, the Court will allow it. Go ahead.

MR. WELK: Thank you, Your Honor.

BY MR. WELK: (CONTINUING)

Q. What was the time period you studied in preparing for

your testimony?

A. 2014 to the present.

Q. And you did -- you did some research yourself I think you said right, in addition to reading other people's testimony?

A. I did.

Q. And what did that involve?

A. As I mentioned earlier, it involved the review by the Financial Action Task Force on the money laundering controls of the country of Vanuatu.

Q. Is that -- is the IRS associated with the Financial Action Task Force?

A. No.

Q. How did you review the records of the Financial Action Task Force?

A. I learned about the Financial Action Task Force when I became a certified anti-money laundering specialist. And as I previously mentioned, they're responsible for ranking the money laundering controls of multiple countries. And so in this case, I looked online and I read about their review of the country of Vanuatu, along with the European unions ranking as well.

Q. That's open source material you looked at?

A. Yes, it is.

Q. And you looked at things the government showed you,

      right?

A. Yes, I did.

Q. When you were looking at the -- sorry, the complex methods used to distance criminal proceeds, did you look at bank accounts for all of these, could I have the ELMO back, please. Did you look at bank accounts for all of these companies?

THE COURT: Are you focusing on the 30 Vanuatu internationals or --

MR. WELK: No, I --

THE COURT: Or every company that's on this list?

MR. WELK: Thank you, Your Honor.

THE COURT: Is that what you're asking?

BY MR. WELK: (CONTINUING)

Q. To clarify, I'm asking about all of the companies on this list because I believe your testimony was that all of them are alter egos of John Walker, is that right?

A. Yes.

Q. Okay. So starting with Hansen Helicopters and Hansen Helicopters Marshals, all the way down to the bottom of the list, did you do any investigation of any kind to determine whether each of these companies had bank accounts?

A. No, I just reviewed any bank records that were provided to me in preparation for my testimony.

Q. Okay. And the bank records that were provided to you

were for which of these companies?

A. I'd have to see them again. But I do recall, for example, like last week there were wire transfers records and signature cards that were shown at the hearing on Friday, I looked at those.

Q. You looked at those during the hearing or you --

A. Both -- both during the hearing and then obviously in preparation for my testimony, but I also looked at some other records as well. If it didn't include the actual records, it included schedules or spreadsheets that summarized totals, for example, amounts that were just shown to me earlier, wire transfers from Pacific Spotters Corporation to Limey Air Services.

Q. Okay, and who provided you with these documents?

A. The U.S. government. And the prosecutor's that I'm working with right now in preparation for my testimony.

Q. You got everything from the prosecutors in the case, right?

A. Everything in preparation for my testimony I did.

Q. Okay. You didn't -- you didn't contact any banks or contact any government databases or any sort of law enforcement sources other than the prosecutor's in this case to find out information about any of these entities, did you?

A. I did not contact anybody, I received everything from the prosecutors.

Q.   How many -- so how many bank accounts did Hansen
Helicopters have in 2014?

A.   I can tell you I don't know how many bank accounts
that any of these corporations have.  Again, I just reviewed
what was provided to me.

Q.   I see.  The reason I ask is because you said that one
of the complex methods used to discuss criminal proceeds is to
have multiple bank accounts?

A.   Correct.

Q.   But you don't know how many bank accounts any of
these companies had, right?

A.   No, just for example, just seeing the accounts in
different jurisdictions, for example, accounts in the
Philippines, in the name of Pacific Spotters Corporation that
are in turn transferring money to Limey Air Services.

Q.   Well, how many bank accounts -- how many PSC bank
accounts have you seen?

A.   Just again, you know, the spreadsheet that listed I
believe it was multiple accounts with different financial
institutions, and if needed if you want to show me that trial
exhibit or I'm sorry, the sentencing exhibit I'll be happy to
look at that.

Q.   Maybe I'll find it.  I don't know what you're talking
about but I'll -- maybe we'll come across it.  So, you don't
know how many accounts PSC has or ever had, right?

A. I do not.

Q. What about Wilma's, how many accounts did Wilma's have?

A. I don't know how many.

Q. Okay. All right. So, what about multiple companies, if multiple companies are used, well let me go back to bank accounts for a second. If multiple bank accounts are used to distance criminal proceeds by someone, distance them from who?

A. So, when criminal proceeds originate, oftentimes criminals or money launderers will first figure how to place it into the financial system, after that they'll conduct multiple transactions to then transfer it from account to account, which is also known as layering and during that process, once those illegal funds are moved from the original source to multiple accounts, it just makes it more difficult for law enforcement to detect the origination of where those accounts entered into a financial account with a bank.

Q. And that last step is called *integration*, right?

A. That's correct.

Q. Right, so what you just described, that's concealment money laundering, isn't it?

A. Those are the three known processes of laundering funds which is the placement, layering and then the integration.

Q. And that's true even if 19 -- 18 USC 1957 money

laundering, the spending statute, as it's known?

A. Yes.

Q. So you think in -- is it your package that in 1957 money laundering transaction, there is placement layering and integration?

A. Well, in that example, the layering can just happen at the same time as the placement. It can go where the funds are wired or deposited directly into account of a alter ego or shell company or a nominee, so you have the placement and also the layer happening all at once.

Q. So if someone is trying to -- to achieve placement and layering and they move it from one bank account to the other, would you expect that someone who's attempting to distance themselves from criminal proceeds would move money from one account that they are clearly associated with to another account that they are clearly associated with?

A. Can you re-ask that question?

Q. Sure. Like for example, would a money launder, let's say his name is John Smith, no, let's do something better than that because there is lots of John Smiths, Harold Wilkerson, Harold Wilkerson has money in his bank account, he's put money in his bank account, now if Harold Wilkerson earns criminal proceeds and he puts that money into an account in his own name, is that money laundering?

A. It depends.

Q. Under which circumstances would receipt and deposit of money accounts to money laundering?

A. What's your question? If you could rephrase it.

Q. I'll re-ask it.

A. Sure.

Q. Under what circumstances does a person receive money and deposit it into an account in his own name, under what circumstances is that a money laundering transaction?

A. So it can happen if he's trying to, for example, evade the reporting requirement. So if the funds are structured into the account and the funds included illicit proceeds, that's also known as structured money laundering.

Q. And does that sort of -- wait, so structuring is a form of money laundering?

A. So under the money laundering provision, there is a prong that involves evading the reporting requirement.

Q. Okay. But the mere -- you're suggesting that the mere deposit of -- that structured deposits into an account constituted money laundering violation in addition to a structuring violation?

A. No. If it involves illicit proceeds, money that's derived from a specific unlawful activity.

Q. Money derived from a specified unlawful activity? The mere receipt and deposit as structuring, you're saying that's a money laundering violation?

A. It can be charged as money laundering.

Q. And what statute would that be charged?

A. If you provide me the violations of the 1956 provision, then I can show you.

Q. So -- is it your package that if money is derived from a specified unlawful activity as defined in Section 1956(c)(7) or 18 U.S.C. 1961(a), that the mere deposit of specified unlawful activity into an account in the depositor's name is a violation of Section 1956?

A. It depends. See, there is more to it. So if somebody else is conducting the transaction for them, such as a nominee, there is other -- there is other ways to look at it. If you're trying to describe concealment money laundering, there is other factors to look at, such as concealing the nature, source, location, ownership or control of the proceeds.

Q. Right. Yeah, that's -- you're right, but that's not what I asked you. I asked you if a person receives money and all he does is deposit that money into a bank account in his name, even if he does it in a structured manner, I'm trying to figure out if you think that's a money laundering violation under 1956 or 1957?

A. Yes, if you bring out the money laundering violations, I can show you.

Q. I don't have to bring it out. Because --

A. Okay.

Q. -- because if you're talking about SUA's, SUA's, are not money laundering. There's more to it than that, right?

A. An SUA as I previously mentioned is a predicate offense that generates illicit proceeds, the money laundering involves conducting a financial transaction with proceeds of the SUA.

Q. Right.

A. And those proceeds, that transaction as mentioned, comes from the SUA and the transactions can involve promoting the SUA, concealing the proceeds.

Q. Right.

A. The evasion of tax and also as I mentioned, the trying to evade the reporting requirement.

Q. Okay. So -- but again, I'm really trying to focus you on what my question is. You've -- you've grafted intent and other acts upon the deposit. The mere deposit of money into an account in the depositor's name. Standing alone, nothing else. It's not a money laundering transaction, is it?

A. It depends on the circumstances.

Q. Those are the circumstances. I've given you the circumstances. This is a hypothetical question that I'm allowed to ask an expert witness to discovery your -- the depth of your knowledge in this area. So the hypothetical is, a person deposits illegal proceeds into a bank account in his

own name, does that, only that, is that enough to establish

money laundering?

    A.    It depends.

    Q.    Okay.  All right.  Would you describe that as a

complex method being used to distance one's self from criminal

proceeds?

    A.    The mere deposit?  Do you have another example?

Other than how it's being done?

    Q.    I'm sorry, Agent Reyna, I'm not trying to -- I

really -- I'm asking you a very specific question.  And you

keep telling me that the answer would be different depending

on other things.  I would like to get your answer to the

question that I'm asking you as opposed to -- we can -- we can

sit here all day talk about how we change the facts and have

it be different but all I want to know is, is what I've asked

you and that is, doesn't mere receipt and deposit of even

specified unlawful activity proceeds, does that constitute

money laundering under the money laundering statutes in the

U.S. Code?

            MS. MILLER:  Asked and answered this question

repeatedly.  The witness's answer has not changed.  The

witness has asked Counsel to provide him with a code.

            THE COURT:  Okay.  The Court -- the Court will

sustain the objection.  He has answered it.  He keeps saying

it depends.

MR. WELK: It depends, okay.

THE COURT: So, that's his answer.

MR. WELK: Okay, good.

BY MR. WELK: (CONTINUING)

Q. What is it about having multiple companies that makes something a complex method to distance someone from criminal proceeds?

A. The use of multiple companies makes it more difficult. For example, if law enforcement is trying to trace illicit funds that are being transferred between these different corporate accounts, especially if they're in foreign jurisdictions.

Q. Does it? So if I deposit money in Bank of Hawaii and then I transfer it to another account in my name at Bank of America, does that inhibit law enforcement at all?

A. Again, it depends. So if the funds, like I just mentioned, are being transferred to a foreign jurisdiction as previously I testified to, if we have to go through the MLAT process, we need to obtain those records from the foreign jurisdiction, in order to learn the names of the owners of the bank accounts.

Q. But even if it went to a foreign jurisdiction, if it came from a domestic account, you'd be able to obtain the records from the domestic account, the bank, to figure out where the money went, right?

A.    Through the process of serving a grand jury subpoena.

Q.    Right.  Is that something that you do as a part of

criminal org- -- criminal investigation, right?

A.    That's correct.

Q.    You know how -- you served probably hundreds of

subpoenas in your career, yeah?

A.    I served multiple subpoenas, yes.

Q.    So if it's a transfer from a domestic bank to another

domestic bank, and the transfer goes from an account that is

openly -- by openly, I mean according to publicly-filed

documents, that bank is owned by Harold Jones, I'll just stick

with one name, and just use that one, Harold Jones owns a

company, publicly, and he has a bank account, in the name of

that company and he sends money to another company that he

owns in his name and the records for which are in his name, a

public record, would you describe that as a complex method to

distance himself from that money?

A.    I mean it adds a layer to the ultimate origination of

where the funds are going.  So if it goes into one account,

then it goes to the next, it's all about does it make business

sense, what's the purpose?  And the more accounts that are

used, it just makes it difficult and, for example, for law

enforcement, to trace the money.  And oftentimes, criminals

and money launderers use these layering processes of moving

money from account to account in order to avoid our detection.

Q. But in your experience, isn't it true that if they're trying to disguise the nature, location, source, ownership or control of the money, that they would move it into an account that wasn't easily identifiable as belonging to them?

A. Yes, that would be an option for them.

Q. Well, in your experience though, what do people who are trying to launder money, do they just tend to, in your experience, in the cases that you've worked, do you find that these criminals transfer money from one account that -- to which their name is attached to another account to which their name is attached?

A. Yes, I have seen that.

Q. Is that -- is that effective money laundering in your view?

A. Well, in the examples or in the example I'm trying to give, in my own case experience, I have seen it where it's done from one account to the other but they could be in business names, so even just using a business name adds another layer to the overall, you know, movement of funds and opening up these different accounts as well.

Q. Right. So in that example I gave you, Harold Jones owns a business that he is publicly attached to, and that business has a bank account and then transfers the money to another business with which he is also publicly attached, do you consider -- do you consider that to be an effective form

of layering in your experience?

A. It's used all the time.

Q. Again?

A. And as far as its effectiveness --

Q. I'm sorry, excuse me. I'm sorry. In your experience, do you consider that to be an effective act of money laundering? It's a yes or no question.

A. Yes.

Q. Yes? Okay, I'm sorry, that surprised me. Because that's --

MS. MILLER: Objection, again, Your Honor, I'm going to move to strike the gratuitous comments made by Counsel.

THE COURT: Yeah, that's true, I'll strike that. It surprises you.

MR. WELK: My apologies, Your Honor.

THE COURT: Let's not comment on the evidence. Let's go, proceed.

BY MR. WELK: (CONTINUING)

Q. Because that's -- in that situation I just gave you, that's a really easy way to connect that money and the transaction to Harold Jones, right?

A. I wouldn't define that as easy, because as a criminal investigator, we have to go through the process to determine, one, what is the name of this corporation? Who is the owner?

We have to go through those processes to find out, for example, from account A to B and then we have to get a grand jury subpoena, serve it to, you know, maybe 1 or 2 financial institutions, so all of that adds steps, all of that is a process. And the more steps that criminals or money launders take, it makes it more difficult for law enforcement to detect what the scheme may be. So oftentimes, the criminals or money launderers are adding more steps to what they're doing to again layer illicit funds, so that way they can distance where those funds originate from to and then where they ultimately end up so they can avoid detection from law enforcement, whether the accounts or businesses somehow come back to them or not.

Q. Okay. If you add facts, you're right, you make it a far more compelling case to my hypo, but I'm going to ask you again to stick to the facts that I set up for you. Do you know what a corporate subsidiary is?

A. Yes.

Q. What is a corporate subsidiary?

A. So if there is a parent corporation underneath it, it might have some subsidiary businesses that fall under it.

Q. And are you familiar with the practice of companies that have a subsidiary that is actually a separate corporation?

A. I believe so. Do you have an example?

Q. I don't know that I have an example that you would have heard of. The idea that a corporation can be a 100 percent owner of another corporation. You understand that, right?

A. Yes.

Q. And you operate primarily in Texas, is that right?

A. I do.

Q. Does Texas have electronically-available corporate records?

A. It does.

Q. So if you look up a name of a corporation in Texas, can you find the articles of incorporation and other corporate documents?

A. Yes.

Q. And that's open source material, right?

A. It is, but depending on the secretary state of Texas, they may -- you might need an account and pay for those records, so -- it's not fully open source, you might have to pay for those records.

Q. Even the government has to pay for it?

A. It depends on whether there is an account and whether they agree to provide it to us at charge or not.

Q. It depends. All right. The situation I just described to you, where a corporation owns another corporation, is that to you, in your experience, training,

knowledge, is that a signal that that parent corporation is involved in some sort of criminal activity?

A. Not necessarily.

Q. What if a company owns a bunch of restaurants and they put each of those restaurants in the name of a subsidiary corporation, for business purposes, does that mean -- is that a sign that they're going to be involved in money laundering?

A. Again, not necessarily.

Q. Multiple jurisdictions, you said that's another sign that -- of a complex method to distance money from an owner?

A. Yes, it can be.

Q. If -- let's say that Harold starts a business and he's selling clothes in Los Angeles, a store, and he buys clothes from a company in Mexico and he buys clothes from a company in Canada, you know that those countries have different forms of currency than the U.S. dollar, right?

A. Yes.

Q. If Harold was to incorporate a company in each of Mexico and Canada to make it easier for him to do business with them in their own currency, pesos and Canadian dollars, do you consider that to be an effort to somehow distance himself from those -- from those moneys?

A. Again, no, not necessarily, it just depends on the facts.

Q. So -- so it's certainly allowed, it's certainly

credible that companies that a company or an individual

could -- could create multiple companies for business

purposes, right?

    A.    Yes.

    Q.    They're completely not associated with any illegal

activity, yes?

    A.    Correct.

    Q.    And they could even do that in Vanuatu, right?

    A.    Again, just based of what I learned during

preparation of my testimony and in reading what I read earlier

that business can be conducted there in the country of

Vanuatu, that to me was a suspicious.

    Q.    Do you know why business cannot be -- that business

can't operate in Vanuatu?

    A.    No, I don't.

    Q.    Did you investigate that at all?

    A.    No, I did not.

    Q.    Is it possible that that's just the law of Vanuatu?

    A.    Yes, it is possible that's the law.

    Q.    So that's -- that's legal in Vanuatu, yes?

    A.    I don't know the specific laws related to established

incorporations there.  As I mentioned earlier, I reviewed the

rankings that the fact of Financial Action Task Force and the

European Union assessed on the country in Vanuatu's money

laundering controls.

Q. Have you ever become aware in your job as a Special Agent of the IRS that the state of South Dakota has financial laws that some have argued are inconsistent with the know your -- know your customer and anti-money laundering programs required by many other states in the United States?

A. I haven't heard that specifically about South Dakota but I've heard it referenced related to other states.

Q. Does that suggest to you that companies that are incorporated in those other states are like maybe involved in money laundering because they incorporated there?

A. It could be.

Q. But do you conclude that all of the companies that are incorporated in those states are involved in some sort of criminal activity?

A. No.

Q. And you don't think that about Vanuatu, do you?

A. Um, no.

Q. What about the Cayman Islands?

A. Where?

Q. The Cayman Islands?

A. No.

Q. It's another commonly known as a -- as a money laundering haven, right?

A. Yes, I'm aware of that.

Q. Okay. Do you know how many accounts John Walker had?

A. No, no, I'm not.

Q. Do you have any -- did anyone ever show you any accounts that John Walker ever had?

A. I've mentioned earlier the evidence I reviewed. I looked at a few schedules, spreadsheets, detailing, financial transactions that include wire transfers, I also looked at a few of the signature documents and other related records to the different account.

Q. Did you look at any records of the bank account that was in the name of John D. Walker?

A. Are you asking if the account was titled just in his name?

Q. Yes.

A. No, I didn't, I don't recall reviewing any account just in his name.

Q. Okay. So when you say -- in your testimony when you referred to accounts belonging to John Walker, what do you mean?

A. If he was listed as a signator of the account, and that signature authority of the account even if the account was titled in a business name.

Q. Do you consider Pacific -- Pacific Spotters account to be a Walker account?

A. If you -- do you have a signature card for me to review?

Q. It has to be a signature card? Can it just be that his name is on the account?

A. I mean if you have anything for me to review, I can answer your question.

Q. Please put the ELMO on the screen. This is Exhibit 138 that you were asked about. And you testified that you felt that Walker accounts, you identified an account as a Walker account, if it had his name on it or he was a signatory, right?

A. Yes.

Q. So here's an account, signature opinion for Community First Guam Federal Credit Union, you see that at the top?

A. I do.

Q. And can you tell me who the authorized individuals to sign are on that account?

A. Yes. Kenneth Crowe, Phillip Kapp and Marvin Reed.

Q. So you wouldn't consider this to be a John Walker account then?

A. During the review of some of these documents maybe it was another package in here that I saw in preparation. I believe John Walker is listed on there.

Q. For the bank account?

A. I believe it's -- it might be this one, yes.

Q. Or is it just that he's the owner of -- owner of the company?

A. I just need to see the additional pages that are included in this exhibit.

Q. I don't have any other pages from this exhibit so -- maybe the prosecutor can answer about that.

MS. MILLER: For the record, Counsel does have all of the pages for that exhibit? I just want the record to be clear to.

MR. WELK: So, the record is clear, I have this many pages with me. I may have it somewhere but I don't have it with me.

THE COURT: You don't have it. Like with regard to what was shown today at sentencing? Is that what you're saying?

MR. WELK: No, I don't have it in my hand right now because I did not -- I am not -- I do not intend to ask Special Agent Reyna about every single piece of paper that we went over during his testimony.

THE COURT: Okay. I got it. All right. It's 12 noon, Counsels. So why don't we take a lunch recess. Just to get a feel for, Mr. Welk, how much more time do you need with this witness?

MR. WELK: I am not -- I promise you I'm not trying to be flip, but it depends.

THE COURT: No, no, no. Okay.

MR. WELK: I mean I'm having a hard time getting

answers in my view, I'm frustrated by getting a lot of answers that it depends. So, I'm not sure. I'm hoping hopefully in an hour I could be done.

THE COURT: You might have an hour? Okay, that's fine. And then this is your last witness?

MS. MILLER: Yes, Your Honor. Depending on what the defendant puts on, we do have rebuttal witnesses.

THE COURT: Okay. All right. We'll see you in an hour. Okay. Thank you. Thank you everyone.

(Recess taken at 12:01 p.m.)

(Back on the record at 12:57 p.m.)

THE COURT: Okay, ready to go? I see Mr. Walker is here. Okay. Did you have your lunch, Mr. Walker?

THE DEFENDANT: I did, thank you.

THE COURT: Okay. Very well. We are back on record. We're back on the record, all Counsels present and if it's not working or if you need a new one, let us know on your hearing assistance.

Okay. Go ahead, Mr. -- Welk's -- Mr. Welk, go ahead.

MR. WELK: Thank you, Your Honor.

THE COURT: Sorry about that. Just had a brain --

MR. WELK: Funny story about that involving another U.S.A. that I used to know, it has nothing to do with

this.

BY MR. WELK: (CONTINUING)

Q. All right. Mr. -- or I'm sorry, Agent Reyna, I'm going to move on to Exhibit 91, which I'll put up. This is a declaration of Kenneth Crowe. Do you recall seeing this document and testifying about it?

A. Yes, I do.

Q. What -- based on this document, I'll refer to you Paragraph 2, what was Mr. Crowe's title at Hansen Helicopters?

A. Operations Manager and Chief Pilot.

Q. Putting up package 2 of that same document, this indicates correct that Hansen as of 2018 and its related companies, do you have an understanding of what that means, *related companies*?

A. Yes.

Q. What is your understanding?

A. Any associated companies to Hansen Helicopters.

Q. Would that be the companies that you have referred to as the alter ego companies?

A. Yes.

Q. Are there any other companies other than those that you think are included in this category?

A. No.

Q. And what is the basis for your understanding that related companies means the, as you refer to them, the alter

ego companies?

A.   That based on the evidence I reviewed in preparation for this testimony, that John Walker was the owner -- the majority owner of these corporations.

Q.   Let me ask you something about that, do you -- is it your understanding that PSC is one of these related companies?

A.   Yes.

Q.   That it's an alter ego of John Walker?

A.   Yes.

Q.   And do you contend that John Walker is a major -- what did you -- I mean, do you consider him to be a majority shareholder of that company?

A.   I reviewed records related to the percentage of ownership of the other individuals involved with the corporation.  I know that it later changed and he divested part of his ownership and that way, individuals that had Philippine citizenship are now owners as well.

Q.   Okay.  But in your -- do you have an opinion on whether John Walker is the majority shareholder of PSC?

A.   I have to look at the amended articles of incorporation to see where the ownership interest and percentage is at, at this point.

Q.   Let me -- if -- let's assume for the sake of this question that Mr. Walker is the owner of approximately 33% of PSC and that the ownership is otherwise divided amongst

several individuals, none of whom own individually as much as 33%, under that scenario, would you characterize Mr. Walker as a majority shareholder of the company?

A. Yes.

Q. Okay, so when you say -- when you use the term *majority shareholder*, you don't mean 50% or more, you mean whoever holds the most stock, right?

A. Based on the example given, that is correct.

Q. Okay. Paragraph 5, can you -- you see where it says that John D. Walker is a resident of Missouri?

A. Yes, I see that.

Q. Do you have any reason to believe that statement is inaccurate?

A. I have no reason to believe that it's not accurate.

Q. And on paragraph number 6, is Mr. Walker identified as a member of the management team of Hansen?

A. I don't see his name mentioned in Paragraph 6.

Q. Paragraph number 9, can you read the -- well, actually can you read that whole paragraph please, Paragraph 9?

A. "Crowe is responsible for the safe daily operation of approximately 40 helicopters and has continuous responsibility for pilot training. Crowe must communicate with Kapp, Reed and Zuroske regarding the needs of pilots and their maintenance."

Q. And I'm going to put up the next page, if you could continue?

A. "Assistants who are working aboard fishing vessels throughout the western pacific, Crowe regularly receives information from those who fly and maintain the helicopters at sea and he must forward that information to others in the company who are responsible for maintenance and logistics."

Q. Based on that paragraph what were -- what were John Walker's responsibilities with respect to daily operation of the company?

A. I didn't see it mentioned, it just referred to Crowe.

Q. Can you read Paragraph 10, please?

A. "As director of maintenance, Kapp coordinates with the ship-based mechanics to troubleshoot mechanical issues that arise until the issue is either resolved or the helicopter is grounded while waiting the delivery of parts or the helicopter is landed in Guam or another port for maintenance. Kapp must coordinate maintenance issues with Crowe and work with him on relocating helicopters from one ship to another when necessary. If Crowe is not made aware of maintenance issues, a pilot's safety could be jeopardized."

Q. And could you please read Paragraph 11?

A. "As Vice President for logistics, Reed is responsible for acquiring parts and supplies needed in Guam and dispatching those parts and supplies to the ships or ports

where they are needed by Hansen Helicopters.  Reed, Crowe and

Kapp need to be in continuos communication with each other

about the safety of the pilots and mechanics, the scheduling

and timing of maintenance, the work that will have to be done

and the parts and materials that are needed for each

helicopter regardless of where it may be located."

Q.   Thank you.  This will be the next page, page 4, again

this is Exhibit 91 that I'm referring to.

THE COURT:  I'm sorry, Exhibit 91, right?  Is

that what you said?

MR. WELK:  91, the sentencing and I'm

using -- I'll be using only sentencing exhibit numbers, Your

Honor.

THE COURT:  Okay.  Okay.

BY MR. WELK: (CONTINUING)

Q.   Can you read the last sentence of that top paragraph

on this opinion, the fourth page?

A.   "Getting the helicopters to the right ship at the

right time requires close coordination amongst Crowe, Kapp and

Reed."

Q.   Now, I'll ask you to read the first -- the first

sentence of Paragraph 14.

A.   "Each member of the management team has a

responsibility to keep Walker, the company's principal owner,

informed of Hansen's operations."

Q. Can you describe for the Court what documents you reviewed in preparation for your testimony that showed the management team notifying Walker of things that were going on with the company?

A. Yes, there were some e-mails that I reviewed.

Q. And what was -- what was the subject matter of those e-mails?

A. I would need to review them in order for me to answer.

Q. Do you have them available to you?

A. I don't have them in front of me but I believe the prosecutors that I'm working with, have, have some of these e-mails.

Q. These were documents that they gave you?

A. For review, yes, that's correct.

Q. Were these -- were these documents where these individuals on the management team were actually notifying Mr. Walker of activities?

A. Yes.

Q. What sort of activities were involved?

A. If I recall right, one of the e-mails may have involved an accident and a death of individuals on helicopter.

Q. So that was someone notifying Mr. Walker of an accident and a death?

A. I believe so. Again I would have to review that

specific exhibit to make sure.

Q. Do you recall whether Mr. Walker responded to that communication?

A. Again, I'd have to review that exhibit to answer the question.

Q. You don't recall that there being any communication like that though, right?

A. I would need to review that exhibit.

Q. Okay. I'd ask you to do that then.

A. If you have the exhibit available, I'd review it.

Q. I have no idea what you're talking about, sir. I didn't give you the exhibit to look at in the first place.

A. Okay. I don't have it in front of me so I can't tell you at this point.

Q. And you don't know if it's available to you either?

A. I don't know at this point in time.

Q. Okay. Do you have any recollection of any documents that you were given to look at that involved Mr. Walker giving directions to any of those individuals on the management team identified in Mr. Crowe's declaration?

A. Again, I believe so, I would just need to review -- I believe it was an e-mail with some communication from Mr. Walker to some of the employees that worked for him.

Q. And what was the subject matter?

A. Again, I'd have to review the e-mail and then I could

answer your question.

Q. What was the time period when that e-mail was sent?

A. I don't -- I don't recall the exact date.

Q. Do you recall an approximate date?

A. I -- I don't recall even the approximate date.

Q. Was it between 2014 and 2024?

A. It's possible.

Q. It's possible it was outside that range as well?

A. It could be.

Q. You don't know?

A. At this time, I don't recall the exact timeframe.

Q. I just -- when you say at this time you don't recall, do you think you may recall later or?

A. I need to refresh my memory by reviewing the exhibit.

Q. Okay. I'm happy to have you do that if you can find it or if you know where it is, is that possible?

A. I don't have it in front of me at this time. I would need to be provided the exhibit.

Q. Okay. Is it -- is it at your seat or --

A. No, it's not.

Q. I'm referring next to Exhibit No. 40. Do you recall this document?

A. I do.

Q. So this is a -- you testified it's a New Zealand certificate of registration, right?

A. Yes.

Q. And what's the date on this?

A. August 5th, 1998.

Q. What was your -- this was something that you were given to review by the government?

A. Yes.

Q. And did anyone explain to you what the purpose of showing you this document was?

A. It showed that his businesses and helicopters were registered in different jurisdictions throughout the world.

Q. Okay. This shows that as of this date of issue, that one helicopter was registered as of 5 August, 1998, right?

A. Yes.

Q. Well, outside your period of review, yes?

A. Based on my understanding of the timeframe of the conspiracy, that's correct.

Q. Didn't the conspiracy start in 2020, I'm sorry, 2000, sorry not 2020, didn't it start in 2000?

A. I believe that's correct, yes.

Q. So this is from August 5 of 1998, right?

A. Yes, that is correct but I'm not sure this helicopter came back into the conspiracy once -- once it began.

Q. Well, what do you know about this helicopter other than that it's listed on this document?

A. That's it, other than what you just mentioned.

Q. Okay, can you read the -- can you read the line right above "John Darrell Walker" on this exhibit?

A. "Name of person lawfully entitled to possession of the aircraft for a period of 28 days or longer."

Q. Do you have any idea how long Mr. Walker was entitled to possession of this aircraft?

A. I don't other than the information that I just read on this exhibit.

Q. So it could have been as brief as 28 days?

A. That is correct.

Q. You don't know?

A. I don't know.

THE COURT: I'm sorry, Mr. Welk, my clerk is asking what page is this for Exhibit 40?

MR. WELK: Oh, I'm sorry, it's page 34.

THE COURT: Page 34. Okay. Thank you.

THE CLERK: Thank you.

MR. WELK: My apologies for that.

BY MR. WELK: (CONTINUING)

Q. I'm putting up another one. This is page 35 of Exhibit 40. What's the date on this one?

A. February 16th, 1999.

Q. And do you ascribe any significance to this document?

A. Again, it shows a helicopter owned by John Walker that was registered in New Zealand.

Q. And do you recall -- do you have any knowledge about this particular helicopter having been involved in this case in any other way?

A. Not specifically.

Q. Except that -- except that Mr. Walker was entitled to possession of it for 28 days in 1999?

A. Yes, for a period of 28 days or longer.

Q. Next -- next document I want to show you also from Exhibit 40, this will be page 37 of Exhibit 40, you were asked about this. Do you recall this document?

A. I can't see it too clearly. If there is a way to magnify it? Might be better. Yeah, I can see it now.

Q. Is that better? Great. Okay.

A. Yes, I do recall this one.

Q. And this shows monthly rent on helicopters, right?

A. That is correct.

Q. And what period does this apply to?

A. The contract date under Column D, Row 3, shows August 18th of 2016 and then on Column H going all the way down under the column "Heading of Terms" it shows the timeframes of either 3 years, 1 year, or even 2 years.

Q. Where did this -- do you know where this document came from?

A. I don't recall but I know it was shown to me earlier.

Q. Okay. And I -- that was -- that's my fault that I

was vague there. I assumed that it came to you from the government?

A. It did.

Q. The prosecutor. But do you know -- do you have any idea where this document came from where they -- where they obtained it, where the prosecution obtained it?

A. I need to refresh my memory from the additional documents that accompanied this particular spreadsheet.

Q. And do you have any of those documents with you here in the courtroom today?

A. They're here, I just don't have them in front of me.

Q. Okay. Could you recover them if -- if I asked you to do so?

A. I could if I needed to.

Q. Well, would it help you refresh your recollection if you -- you're saying if you saw the document in hard copy, it would refresh your recollection as to where it was obtained from?

A. If I saw the additional documents, in particular this shows G-0366-37, if I saw the preceding documents in front of this one, it may help, yes.

Q. Did you review the -- the contracts that are referenced on this spreadsheet?

A. I saw several contracts.

Q. How many do you think you saw?

A. I can't say exactly how many.

Q. Is it more than half of them?

A. I don't know in total how many there were so I can't say if I reviewed half or not.

Q. Was it more than two?

A. I believe so, yes.

Q. Was it more than ten?

A. I believe so, yes.

Q. More than 20?

A. I don't recall.

Q. Can you explain to the Court, let's look at line number -- I'm looking at second column the one that has the heading number over it. And then you got beyond that the company name. Number one is Fong Kuo 18 something. There is a monthly rent indicated there of $37,500. What did that include?

A. What do you mean by what did it include?

Q. What was the -- what was the boat paying for, what did it receive in return for that money?

A. As I understand, it included the use of that particular registration number, that helicopter. And the pilot that piloted that particular aircraft.

Q. What about a mechanic?

A. I believe so, yes.

Q. How much of the $37,500 per month was attributable to

the pilot?

A. That I don't know.

Q. How many of it was attributable to the mechanic?

A. I don't know.

Q. How many of the contracts that you reviewed contained a specific representation that the helicopter would be FAA-certified?

A. I don't remember seeing that language in the lease contracts.

Q. The answers you've given so far as to that contract, is that the same for all of these contracts that are referenced here?

A. Yes.

Q. And again that was Exhibit 40, page 37. Next document is Exhibit 40, page 38, this one is even smaller. I may be able to -- I may be able to zoom in.

THE COURT: Yeah, I think you can.

MR. WELK: There you go.

THE COURT: You could do it even more so.

MR. WELK: This is -- this is old school. This takes you back to the old days.

THE COURT: The ELMO.

MR. WELK: The ELMO.

BY MR. WELK: (CONTINUING)

Q. Okay. What are we looking at here?

A. I would say a copy of a spreadsheet that lists the directors, shareholders and documents held on file for the companies listed under Column B.

Q. And it appears that Kenneth Crowe and John Walker are directors in all the same companies, yes?

A. Yes, that's what it looks like.

Q. Do you consider Kenneth Crowe to be -- do you consider any of these companies to be an alter ego of Kenneth Crowe?

A. No.

Q. And why is that?

A. Just based on what I've looked at, John Walker is the majority shareholder of these corporations.

Q. So to you the alter ego characterization is based entirely on ownership?

A. Yes.

Q. So the fact that Kenneth Crowe as we saw in his declaration had all of those very specific responsibilities for day-to-day operations, that doesn't change your opinion about whether these companies were alter egos of John Walker?

A. No.

Q. Next is Exhibit 40, page 43. And this is titled "Wilma's Flight Service A/R Aging Summary." Can you tell me what the significance of this document is, or what this is about?

A. Yeah, it shows the accounts receivable, aging summary as of June 30th, 2016.

Q. And does this have any particular significance to you in terms of your determination as to whether this scheme as you've called it, is some sort of criminal operation?

A. What are you exactly asking me?

Q. Well, you're -- you were designated as an expert to talk about money laundering and you've testified today at some length about how you think that this scheme that Mr. Walker was operating was a criminal scheme. I'm just wondering if this has any significance to your opinion about that -- about this -- about there being a scheme that Mr. Walker was running?

A. Well, based on the evidence I reviewed for my testimony, after Wilma's Flight Service was no longer used in the scheme, the Pacific Spotters Corporation took over all receipts of revenue from the leases, since Pacific Spotters Corporation became the lessor in these contracts with different tuna boat companies.

Q. Okay, did that happen in 2016?

A. As I understand it in 2016, law enforcement conducted search and seizure warrant of Walker's businesses and in 2018, Pacific Spotters Corporation began to then become the lessor with the tuna boat companies instead of it being Wilma's Flight Service.

Q.   Let me go back for a second to Exhibit 40, page 37.
This is the listing of the -- we looked at this just a second
ago.  The listing of the contracts with the various boats.
You remember this?

A.   Yes.

Q.   Now you indicated that an alter ego was a company
that wasn't providing any legitimate services or product,
right?

A.   That's correct.

Q.   Okay.  And so, but there is all these contracts here
where these are tuna boat companies, right?  Tuna boats?

A.   That's what I understand.

Q.   Okay.  And they were paying between $37,500 and
$40,000 a month to rent these helicopters with mechanics and
pilots, right?

A.   Yes.

Q.   And this is in 2016, yeah?

A.   Yes.

Q.   Is it your -- is it your opinion that that this
was -- this was illegitimate business?

A.   Yes.

Q.   And what is your basis for that comment?

A.   Again, based on evidence that I reviewed and also
that I listened to last Friday from Mr. DeVogel of the FAA,
that Walker and his businesses employed uncertificated pilots

and mechanics and also used counterfeit parts on their helicopters.

Q. Did they use the -- did they use -- is it your understanding that they used counterfeit parts on all of their helicopters?

A. I'm not sure of that.

Q. Okay. Do you have any idea what percentage of their helicopters had counterfeit parts?

A. I do not.

Q. Do you know that there were counterfeit parts being used on any helicopters in August of 2016?

A. Not for that specific -- specific timeframe.

Q. During what timeframe are you -- do you know that Hansen Helicopters or its subsidiaries was using counterfeit parts in their helicopters?

A. I don't have that evidence or I do not review evidence specific to the timeframe of that violation.

Q. Do you recall seeing any -- no, never mind, okay. I understand. Thank you. This is Exhibit 40, page 71, which the heading on the document is "Caledonian Insurance Company Balance Sheet." Do you see that?

A. I do.

Q. What was -- what was the business of Caledonian Insurance Company?

A. From what I learned during the review of evidence in

preparation for my testimony, this particular business was to be used as a insurance company for John Walker's businesses.

Q. Do you have any reason to believe that it was not used as an insurance company by John Walker's businesses?

A. I don't have any information on its specific use.

Q. Do you know what the country of incorporation was for Caledonian Insurance Company Limited?

A. I believe it was Vanuatu.

Q. And do you have any reason to believe that it did not in fact operate as an insurance company in Vanuatu?

A. Again, I don't have any information if it was used as an insurance company or not.

Q. But you don't have any information that it was not used as an insurance company, right?

A. That's correct.

Q. You just don't know?

A. I just don't know.

Q. Understood. Are you familiar with self insurance?

A. Yes.

Q. And this company according to this balance sheet as of December 31, 2015, had nine half million dollars in assets, right?

A. Based on what I see under Rows E and G, I'm sorry, Columns E and G, Row 18, yes, that's correct.

Q. Do you have any reason to believe that they weren't

in fact capitalized in that amount?

A. I don't have any information to say that that those amounts weren't available in the accounts of that business.

Q. Okay. Exhibit 40, page 79. This is from January through December 2013, do you have any reason to believe that these numbers were not entirely accurate?

A. I don't have any information about that.

Q. One way or other?

A. That's correct.

Q. So do you have an opinion upon whether this business was doing legitimate business?

A. I don't have enough evidence or I did not receive enough evidence to review any of the facts related specifically to that business and its operations.

Q. With respect to all of the Vanuatu companies, which of those companies did you review records that you feel comfortable making a -- giving an opinion about whether it was a legitimate business or not?

A. Hansen Helicopters.

Q. And what did you review for Hansen Helicopters?

A. Again, I'd have to review anything that was presented to me earlier today and then I can answer that.

Q. I'm sorry, so did you -- did you reach your opinion today? About whether these -- the Hansen Helicopters was a legitimate business?

A. No.

Q. Okay. So when you got here today, did you have an opinion formed in your mind already about whether Hansen Helicopters was a legitimate business?

A. Based on the evidence I reviewed, yes.

Q. And you reviewed what the prosecutors gave you?

A. That's correct.

Q. And what was your conclusion?

A. That the businesses established by John Walker were alter ego or shell companies.

Q. Okay. But --

A. And --

Q. I'm sorry, I didn't mean to interrupt?

A. And involved in providing services to these tuna boat companies with air helicopters that were maintained and piloted by uncertificated pilots and mechanics and also the helicopters which contained counterfeit parts.

Q. I'm sorry, I thought you testified just a few minutes ago that you had no idea whether any of these helicopters had counterfeit parts in them, does it -- did I get that wrong?

A. I've listened as I've mentioned to testimony of Mr. DeVogel last Friday talking about that.

Q. And do you recall Mr. DeVogel testifying about -- are you talking about his testimony of the helicopters that were seized at the Guam warehouse here? Recently?

A. I'd have to -- I'd have to look at the transcript on the specifics of that testimony.

Q. Do you recall Mr. DeVogel testifying about finding counterfeit parts in any helicopter owned by Hansen Helicopters?

A. Again, I'd have to look at the transcript from last Friday.

Q. You don't recall that now though, right?

A. I don't recall any specifics if it was Hansen Helicopter or another alter ego or shell company.

Q. So -- you didn't look at any records relating to any of the, what you call alter ego or shell companies, right?

A. Can you rephrase the question?

Q. I thought you testified just a few minutes ago that you did not look at any business records of any of the alleged alter ego companies and I thought you said you had not looked at any of those records?

A. No, I've looked at some records.

Q. What did you look at?

A. Articles of incorporations, some bank records, lease contracts, QuickBooks files, spreadsheets and summaries of financial transactions, testimony of other witnesses that testified at trial.

Q. Okay. And in any of those documents, any of those records that you reviewed, did you find evidence that specific

helicopters associated with a specific company had counterfeit
parts in them?

    A.   Again, I don't -- I didn't have that evidence
presented to me, I just listened to the testimony that was
presented last Friday, by Mr. DeVogel.

    Q.   Okay.  Do you have any idea who owned the helicopters
that were seized from the Guam warehouse within the last year?
By the United States government?

    A.   From what I understand, they were owned by
Mr. Walker.

    Q.   Individually?

    A.   I don't know if they were owned directly in his name
or one of his alter ego or shell companies.

    Q.   Okay.  Do you have a government card that's assigned
to you?

    A.   I do.

    Q.   Okay.  And that's your card that you -- it's for your
use, right?

    A.   Yes, I have a government-owned vehicle assigned to
me.

    Q.   But you don't own that car, do you?

    A.   I do not.

    Q.   Okay.  And you understand that there is a difference
a car that you own and a car that's owned by the government
that you have use of, right?

A. Yes.

Q. So when you say those helicopters in the warehouse that you think they belonged to John Walker, do you mean they belonged -- they were titled in his name?

A. I don't believe any of them were titled in his name.

Q. I see. So your statement that they were owned by John Walker is -- is a follow on to your understanding or your believe that every company that was owned by John Walker is in fact owned by -- it might as well be the property of John Walker, right?

A. Yes.

Q. And is it your opinion that all of these lists of helicopters that we've looked at in 2013, 2014, 2016, that all of those helicopters belonged to John Walker?

A. They were, from what I understand, they were under the names of businesses that he was a majority owner of.

Q. And so, did they belong to him then?

A. Yes.

Q. So if a helicopter would have crashed into somebody's house and put the house on fire and caused damage, nobody was hurt or died, could the -- could the owner of the house just sue John Walker instead of the company that actually owned the -- the helicopter?

A. I mean it's at the discretion of that individual who they want to sue, but individuals that establish corporations

try to set them up in order to limit their liability, that way if somebody is sued, that typically would be the corporation that would be sued.

Q. Okay. Well, don't you think that in this instance, if one of these tuna boats wanted to sue over the lease, that they would sue the company that they entered into the lease with and not Mr. Walker?

A. Again, it would be up to them if they wanted to try to sue both Mr. Walker and the tuna boat company, but again, that's why someone would establish a corporation to handle any type of liability for an injury, for example, or a death.

Q. So I'm trying to figure out, maybe -- maybe I do understand this but you -- you testified that Mr. Walker's ownership of these companies is the determining factor for you, please correct me if I'm wrong, but this is what I understand your testimony to be, that because Mr. Walker was the owner of 99.9% of these companies that that's why he's an alter ego of the company and therefore, it's just his, right ?

A. Yes.

Q. So how does that square with the idea, the concept that you just described where people start corporations so that they can shift liability away from themselves individually?

A. Well, there was limited shareholders in these corporations and he was the 99.9% owner of these corporations.

Q. So you think the shift of liability is based on the percentage of ownership and that -- well, first of all, let me say that, do you think that the -- the liability protection that one gains from creating an incorporation, that that depends on the level of their -- the degree of their ownership of the company?

A. No.

Q. Okay, then why does it matter that he's the 99.9% owner?

A. It matters in the sense that in that instance or these instances that he is the owner, controller, leader of all of these companies and he's directing his employees that we've discussed to conduct specific duties for his businesses.

Q. Right, but okay, so give me an example of something that he directed as the leader of the company that you're aware of?

A. Yeah, again, if -- if there is an exhibit, for example, like an e-mail communication between him and one of his employees, then I can discuss that. It would help me refresh my memory on the specific instance.

Q. We will absolutely get to that. But is that the only one that you're aware of where he was directing something to his employees?

A. At this time, yes.

Q. Well, what if -- what if Mr. Crowe -- you're aware

that Mr. Crowe had some level of ownership in at least some of these companies, right?

A. I'd have to look again at the percentage ownership of all the corporations and all the list of shareholders to -- to say that he in fact was said owner at all in any of 'em.

Q. What if he was a 1% owner? Would he have any -- would he have complete protection or would he be -- could he be considered an alter ego as well?

A. Again, I believe that ultimately Mr. Walker is the owner controller, leader of all these companies and he provided a small percent ownership in these companies so they can have the ability to make decisions on behalf of the corporation, that's why I believe he gave them at least one percent ownership or less or maybe slightly more.

Q. So to the extent that Mr. Crowe or Mr. Kapp had an ownership interest regardless of the size of it, if they had an ownership interest, you think that the reason Mr. Walker did that was to so that those guys, Crowe and Kapp, could make decisions and act on behalf of the corporation?

A. Yes, and possibly receive some type of profit sharing or dividends that the corporations earned throughout the duration of their operations.

Q. So going back to -- I'm going go back to the declaration of Kenneth Crowe, where he identifies himself as responsible for the safe daily operation of approximately 40

helicopters and has continuous responsibility for pilot

training.  Wouldn't that make him largely responsible for the

conduct of the companies as well?

    A.    If you want to show me the exhibit again, I can read

it.

    Q.    Sure.  Yeah.  I'm back to Exhibit 91.  This is

page 2.  And I'm referring to Paragraph 9.  Do you see that?

    A.    I do.

    Q.    Do you think that -- that his position as he

describes it there and what his responsibilities are, does

that make him -- why doesn't that make him a leader?

    A.    Based on what I'm reading, he has responsibility with

the businesses ultimately owned and operated by Mr. John

Walker.

    Q.    Right, but -- but you acknowledge that he has what

appear to be here, I don't mean to put words in your mouth,

but is it fair to say that he had significant

responsibilities, he was responsible for the safe daily

operation of approximately 40 helicopters and has continuos

responsibility for pilot training.  Doesn't that make him

sound like a leader?

    A.    It sounds like he has significant responsibility

within the corporation or corporations.

    Q.    Okay.  And then going to the next page, this is

page 3 of Exhibit 91, I'll refer to you Paragraph 10, which

describes Mr. Kapp as the director of maintenance who
coordinates with ship-based mechanics to troubleshoot
mechanical issues that arise until the issue is either
resolved or the helicopter is grounded while waiting the
delivery of parts or the helicopter is landed in Guam.  It
goes on to say that Kapp is required to coordinate maintenance
with Crowe and work with him on relocating helicopters from
one ship to another.  Doesn't that -- isn't that fairly
characterized as Mr. Kapp also having leadership
responsibilities for the companies?

A.   Yes, he has a significant amount of responsibility
for that company or corporations.

Q.   I'm going to put up exhibit -- oh, I'm sorry, I have
one last thing on this last exhibit.  This is Exhibit 40, I'm
going to put up page 97 of Exhibit 40.  I'm going to refer to
you that very top line there, line number one.  Okay.  Do you
see that?

A.   I do.

Q.   What does that say?

A.   John D. Walker Group Companies.

Q.   Okay.  It doesn't say just John D. Walker's
companies, right?

A.   No, it does not.

Q.   Thank you.  All right.  Next I'm going to go to
Exhibit 104.  I think this may be -- I'll ask you, is this the

e-mail or the document that you were referring to earlier about Mr. Walker giving direction?

A. No, not specifically this one.

Q. Oh, I see. Do you think that this -- this document demonstrates that -- do you think it demonstrates anything?

A. Yes.

Q. And what is that?

A. I mean just in summary, it appears that, you know, within the first sentence, he's talking about not continuing to pay salaries.

Q. For people who don't do their jobs, right?

A. Yes.

Q. What's the date on this?

A. March 21st, 2008.

Q. Well, outside your period of investigation, right?

A. As I understand, it's prior to the timeframe of the start of the conspiracy.

Q. That's right, 2000. All right. Do you recall testifying that that Mr. Walker received profits and not regular pay?

A. Can you repeat the question?

Q. Yeah. Do you recall either -- either saying or agreeing with maybe with Ms. Miller that Mr. Walker received profits and not regular pay?

A. I recall profits, I don't -- I don't remember

anything specific to a salary.

Q. Okay, you recall saying that or something very much like that?

A. About the profits.

Q. Yeah, so he was -- he was paid out of profits of his company?

A. That's what I understand.

Q. As opposed to being paid like a regular wage?

MS. MILLER: Objection. Your Honor, he's already answered that question. He's already said that he did testify that Mr. Walker received profits. He didn't say anything about whether he also received a salary.

THE COURT: Okay. That's fine. Overruled. Go ahead.

BY MR. WELK: (CONTINUING)

Q. Okay. Do you have the question in mind?

A. Repeat your question, please?

Q. Okay. Again, I apologize if I misunderstood you, Special Agent. I asked you if you recalled saying something that he received profits, not regular pay, I thought you said yes, that you had indicated that in your testimony.

A. I don't recall testifying specifically about salaries.

Q. Okay. So did he receive salary?

A. Again, I don't know. I know we reviewed a

spreadsheet that showed that there was some wire transfers that indicated they were advances or dividends.

Q. Okay, do you understand dividends to be different than profits?

A. What's your specific question?

Q. Do you -- aren't dividends distributions of company profits to shareholders, is that --

A. Yes.

Q. Okay. So when you say he received profits wouldn't that include dividends?

A. Yes.

Q. And -- but you don't know whether he received a salary in addition to that, right?

A. I'm unaware if he did or not.

Q. Okay. You also -- you were asked who's controlling the dissolution of the Walker-related companies. How do you know about the dissolution of the Walker-related companies?

A. I reviewed a document filed with the Court that he was ordered to do the -- or to pursue the dissolution of the companies.

Q. And when you were asked about who was doing that, you said John Walker, right?

A. That's how I understand it and that's what I recall.

Q. Okay, you understand -- do you know that John Walker has been in jail in Guam since September of 2022?

A. Yes.

Q. And that that order was entered quite a while after he had gone into jail?

A. Yes.

Q. So what is the basis for your statement that John Walker is the person who is controlling the dissolution of those companies?

A. I don't have the specifics of somebody acted on his behalf or he gave them power of attorney or somebody such as and attorney as yourself facilitated that for him.

Q. Okay. So you don't know if he's controlling it or not?

A. The dissolution or --

Q. Yeah?

A. Or what specifically?

Q. The dissolution?

A. I don't know the exact details of how he's -- Mr. Walker is dissolving those companies.

Q. Do you know the general details?

A. Other than what I read, no.

Q. So all you know is that you read an order that said that those companies are to be dissolved, right?

A. That is correct.

Q. And you don't -- you have no idea whether he has anything to do with it or not?

A.   Specifically, I don't.  Again, I don't know if he did it or somebody on his behalf did it.

Q.   Okay, but if somebody on his -- on his behalf did it, then he didn't do it, right?

A.   Again, if somebody did it on his behalf then he may have asked them to do it for him because he was ordered by the Court.

Q.   He may have but you don't know that, right?

A.   Again, I don't -- I don't have the details.

Q.   I'm sorry, this is important because this thing about something being done on his behalf, do you consider something being done on his behalf the same as Mr. Walker doing it himself?

A.   If he directed somebody to, yes.

Q.   Do you have any reason to believe that Mr. Walker directed someone to dissolve his companies?

A.   I don't have any of that information.

Q.   Do you have any reason to believe that John Walker directed someone to enter into any specific lease over a helicopter during the entire period of the conspiracy?

A.   I don't have any of those details.

Q.   Do you have any reason to believe that John Walker directed an individual working for him to do anything that's described in the Second Superseding Indictment?

A.   Again, there were some e-mails that I reviewed, I

would need to refresh my memory and read them and then I could answer that question.

Q. Do you remember John Walker directing some evidence showing that John Walker directed someone to sink a helicopter?

A. I don't have any information regarding that.

Q. Do you have any information that John Walker directed someone to wear a specific kind of life vest that went off unexpectedly and caused that person not to be able to get out of a helicopter?

MS. MILLER: Objection, Your Honor, assumes facts not in evidence.

MR. WELK: I believe there was evidence about that presented at the trial.

MS. MILLER: No, actually there was not evidence presented about that at the trial. There was an NTSB report that was presented and in the NTSB report, it specifically indicated that the owner of the aircraft's representative made a statement to the NTSB regarding the life vest of the pilot. That was it.

THE COURT: All right. So --

MR. WELK: I'll rephrase the question.

THE COURT: All right.

BY MR. WELK: (CONTINUING)

Q. Do you have any reason to believe that the

representative who made a representation to the NTSB regarding the helicopter accident that Ms. Miller just described was John Walker?

A. I don't have any of that information.

Q. Do you know if it was Rufus Crowe?

A. I do not know.

Q. Do you know if it was Mr. Kapp?

A. I do not know but as far as Mr. Kapp or Crowe or based on what you're asking me, if there is anything that you could show me, I could -- I could better answer that question.

Q. Well, I'm curious whether -- I'm curious whether you have seen anything that showed you that?

A. Again, as I mentioned there was some e-mails I reviewed, I'd have to refresh my memory by reviewing them.

Q. I see. Did you review any leases, helicopters leases that were signed by Mr. Walker?

A. I reviewed some leases.

Q. Do you recall whether any of them were signed by Mr. Walker?

A. Again, if you have any that you could show me, then I could point out whether or not he signed them.

Q. Okay. Do you recall right now seeing any helicopter leases that were signed by Mr. Walker?

A. I don't recall.

Q. So you can't testify about how many leases John

 Walker signed, helicopter leases?

A. No.

Q. You testified that Mr. Walker opened a Limey account at some point; do you recall that?

A. Yes.

Q. And what is your basis for that?

A. Evidence that I reviewed in preparation for my testimony.

Q. Can you be any more specific than that?

A. I need to see that specific exhibit.

Q. Have any idea what exhibit that was?

A. I don't recall the exact exhibit number.

Q. I'm going to show you a document that was shown to you earlier. This is from Exhibit 138. It's page 72. This is minutes of a shareholders meeting of Hansen Helicopters. Do you see that?

A. I do.

Q. 2015. January 26th, 2015?

THE COURT: I'm sorry, page 72? Is that what you said?

MR. WELK: 72, yes.

THE COURT: Thank you, okay, there you go.

BY MR. WELK: (CONTINUING)

Q. Do you see where it says present?

A. Yes.

Q. Can you read what it says below John D. Walker's name?

A. "Shareholder 5,001 shares, 2.34% of total shares, 99.9% of shares excluding shares owned by the company."

Q. So doesn't that say that he owned 2.34% of total shares?

A. Yes.

Q. This is page 73 of Exhibit 138. Do you recall this document?

A. Yes.

Q. It appears to be minutes of a shareholders and board of directors meeting, Limey Air Service, June 8th, 2018. Is there any significance to you that Mr. Kapp and Mr. Crowe were officers of the -- of Limey, of the corporation?

A. What's your specific question?

Q. I wondered if it has any significance to you in terms of you potentially believing that Mr. Walker was solely responsible for Limey Air?

A. (No response.)

Q. Let me withdraw that question and start over again. Do you contend that Mr. Walker is one and the same as Limey Air?

A. I believe he's an owner of the company.

Q. Okay. But as we talked about before, Mr. Crowe and Mr. Kapp had substantial responsibilities with the companies,

right?

A. Yes.

Q. So, it's not just Mr. Walker, is it?

A. No.

Q. You talked about the fact that after the indictment was issued, that there were a lot of bank accounts closed, do you recall that?

A. I recall reviewing the letter from the Bank of Hawaii about accounts or at least one of the accounts that was due to be closed.

Q. Okay. Do you know -- did you know that when the -- when the indictment was issued, that the -- that Hansen and the related companies were unbanked by the banks in Guam because of the indictment?

A. I didn't know that.

Q. In your experience as an agent, your lengthy experience as an agent, aren't you familiar with the fact that often when an account holder in a bank is indicted, federally indicted that banks where that entity or person holds accounts will often close the accounts?

A. Yes.

Q. And in your experience, do they tell the depositor, we're closing your account because you got indicted?

A. Not specifically.

Q. Are you aware of any case where a bank did do that?

Where a bank said to a depositor, we're closing your account because you've been indicted?

A. No.

Q. So, I'm showing you -- this is Exhibit 138, page 75. That highlighting is mine. Can you read that paragraph that includes the highlighted language?

A. "The was a specific discussion held as to the need for Limey Air Services, Inc. to open a general checking account at Community First Bank in order to conduct general banking for Guam operations. It was unanimously agreed to open this account at Community First Bank."

Q. Thank you. And this is -- these are minutes of a shareholders and board of directors meeting for Limey Air, right?

A. Yes.

Q. Now, is there anything about this where they do a minutes of a shareholders and board of directors meeting where they specifically discuss the need to open a bank account in order to conduct general banking for Guam operations? Does any of this strike you as suspicious as an expert?

A. That this is done after law enforcement conducted search and seizure warrants of Mr. John Walker's businesses in 2016?

Q. You think that's suspicious?

A. Yes.

Q. Do you know that all their bank accounts were closed?

A. I did not know that all of them were closed.

Q. I'll ask you to assume that upon being indicted, that all of the bank accounts for -- in Guam for the Walker-related companies were closed by the banks, where those accounts were held, now if that were true, do you think there is something suspicious about this?

A. I find it suspicious if the businesses were allegedly involved in providing leased helicopters with counterfeit parts and were maintained by mechanics and pilots that were uncertificated, yes.

Q. So you find the mere accusation that they were involved in criminal activity, that means that opening a bank account in the name of the preexisting company at a Guam bank, that that was suspicious?

A. Yes.

Q. Do you have -- do you have an opinion on how a business would operate if it didn't have any bank accounts?

A. As I -- as I previously -- previously mentioned that if the business was operating in an illegal manner and they are now in turn continuing to profit from that and taking the proceeds of wire fraud which is the predicate offense and then putting it into a bank, then they are committing money laundering.

Q. This brings us back full circle, Special Agent. So

you think that Limey Air which has contracts with all these tuna boats, to provide helicopters, pilots and mechanics, that when they get paid, the mere deposit of that money into a bank account in Limey Air Services, Inc. bank account, that that is money laundering?

MS. MILLER: Objection, Your Honor, Limey Air did not have leases with all these companies.

MR. WELK: That is -- I'm sorry, Your Honor, I object to this testimony from the government. I think he can answer the question.

MS. MILLER: No. No, because that's a -- that's a false premise. He just asked this witness what's wrong with Limey Air having leases depositing the money from the leases into the Limey Air account. Limey Air didn't have the leases, it was Pacific Spotters leases that the money was being deposited into this account.

THE COURT: Okay. So your objection is assuming facts not in evidence?

MS. MILLER: Absolutely. That was -- what he just said is not a fact in evidence.

MR. WELK: My understanding.

THE COURT: Okay. Go ahead.

MR. WELK: Setting aside the fact that this is sentencing and therefore the federal rules of evidence do not apply.

                    THE COURT:  Unless it's relevant -- issue of
relevancy.

                    MR. WELK:  My understanding is that he -- in fact
I'm about to get to the exhibits where Pacific Spotters --

                    THE COURT:  What about -- what about the assuming
facts not in evidence, the lease, that's what she's talking
about, the lease.  The leases.

                    MR. WELK:  Let me clarify this.

BY MR. WELK: (CONTINUING)

     Q.   Special Agent, is it -- is it your testimony that
Limey Air Services, did they have an account prior to this
account, that they -- that they opened?

     A.   I don't know.

     Q.   This is in 2018.  You don't know?

     A.   I do not.

     Q.   Do you know if Limey Air Service received any money
for leases prior to 2018?

     A.   I'm unaware if they received anything prior to 2018.

     Q.   But at some point, Limey Air Service began receiving
payments from PSC, right?

     A.   Yes.

     Q.   When was that?

     A.   Approximately in beginning in 2018.

     Q.   So that would have been during this period, June of
2018?

A. Yes.

Q. Now, I feel like I can ask my earlier question because that's now in evidence.

MS. MILLER: Objection, Your Honor.

MR. WELK: What's the objection?

MS. MILLER: The Question -- his earlier question was Limey Air --

THE COURT: Okay. Hold on, it sounds like he withdrew his question cause he asked another --

MS. MILLER: Okay. Okay. He just said -- now I can ask my earlier question. I mean, let's make sure this record is clear.

THE COURT: He withdrew his -- it sounds like he withdrew his question because he asked another question about the receipt, did Limey Air receive funds, that's what you were --

MS. MILLER: From PSC, not from Limey Air leases, right.

THE COURT: Well, he didn't -- he didn't talk about the leases, he talked about the receipt of moneys, right?

MR. WELK: Yes.

THE COURT: Okay. Go ahead, next question.

BY MR. WELK: (CONTINUING)

Q. Is it your understanding that Limey Air was receiving

payments into a Limey Air account in June of 2018?

A. I'd have to see the specific spreadsheet that detailed multiple wire transfers, specifically that they were receiving those transfers from Pacific Spotters Corporation.

Q. All right. I'm going to put up, this is Exhibit 138, page 82; incoming wire log, do you recall this document?

A. Yes, but I believe there might have been another page to this one.

Q. You're right. I can only show you one at a time?

A. Okay.

Q. I will get it for you next. So -- during this time period, didn't -- wasn't PSC leasing helicopters?

A. Yes.

Q. And they were paying rent on those helicopters, right?

A. The tuna boat companies were paying rent to PSC.

Q. Okay. Aren't these PSC paying Limey for the helicopter leases?

A. I don't know why PSC is sending these wires to Limey.

Q. Do you find it suspicious that they're sending money to Limey?

A. Yes, and the fact that these are both John Walker-controlled companies.

Q. And why is that suspicious to you?

A. Because as I testified earlier that this appears to

be layering of proceeds of wire fraud and as it goes from one account to another account, it continues to obscure the origination of where these funds came into the initial account at PSC.

Q. You understand that John Walker controls -- you're under the impression that John Walker controlled PSC in 2018, right?

A. Yes.

Q. And why is it you were under that impression?

A. That he was listed on the Articles of Incorporation as an owner.

Q. Okay. Articles of incorporation; that's a public access document, right?

A. Yes.

Q. And then Limey Air Service, we just looked at the -- we just looked at the shareholders and board of directors meetings, he's the president of that company, right?

A. Yes.

Q. And a director of them?

A. Yes.

Q. What about -- so why is it -- why is it suspicious to you -- strike that. It's suspicious to you that a man who openly owns a company, is sending transferring money to another company that he openly owns?

A. If he was indicted in May of 2018 for wire fraud and

money laundering violations, and if his bank accounts were
subsequently closed and then he is then in turn opening
additional bank accounts to continue the criminal scheme, yes,
I find it suspicious.

Q.   Ah, so you're saying that if a person is indicted for
a crime, that they're guilty of that crime until proven
innocent?

A.   No, I'm not saying that.

Q.   Okay, then why would it be suspicious that he
continued to operate the business after only having been
indicted?

A.   Again, the fact that he is continuing to operate this
business with aircraft that contained counterfeit parts,
pilots and mechanics that are uncertificated, changing the
alter ego that conducts the leases with the tuna boat
companies, then receiving payments in a company now
established in the Philippines, that's been dormant for two
years, those accounts in the Philippines are receiving the
proceeds of the wire fraud and then in turn sending it to
another John Walker-controlled company in the name of Limey
Air services, I do find that very suspicious.

Q.   Do you find that suspicious now because he was
convicted in 2022 or do you think it was suspicious at the
time that just because he'd been indicted and all of their
bank accounts were closed, that he transferred his business

into the one company that had a bank account?

MS. MILLER: I'm sorry, just for clarification, there is no evidence that all bank accounts were closed. So when Counsel originally asked him those questions he said, I want you to assume that. There is no evidence in the record that all of the bank accounts were closed.

THE COURT: Okay, so what's the objection then on the --

MS. MILLER: The objection is he asking another hypothetical question or is he assuming facts not in evidence.

THE COURT: You want to answer to that, can you answer to that objection, Mr. Welk?

MR. WELK: Your Honor, I'll -- you know, I'll just ask for a ruling, then I'll go back to asking him my questions.

THE COURT: I'm not sure if -- I mean --

MR. WELK: I don't understand the objection.

THE COURT: You don't understand the objection.

MS. MILLER: The objection is this, Your Honor, Counsel asked --

THE COURT: Okay. Hold on a second. The whole issue of the closure of all John Walker's accounts, I think it's true though, you had said okay, let's just assume that all his accounts were closed.

MR. WELK: I'll clean it up.

THE COURT: And another -- okay. Clean it up.

MR. WELK: I'll retract the question.

THE COURT: All right. Go ahead.

BY MR. WELK: (CONTINUING)

Q. I thought we covered this earlier but maybe we did not, Special Agent, how many bank accounts did the, what you refer to as the alter ego companies, how many bank accounts did those companies have in Guam in 2018? In April of 2018?

A. I don't know the exact number of accounts.

Q. How many bank accounts did the Walker related-entities have in Guam in July of 2018?

A. I do not know.

Q. Did you ever know?

A. Not the exact number.

Q. Do you know -- do you even have an approximate number?

A. No.

Q. You weren't aware whether there was one account or a hundred, is that right?

A. If you have some exhibit for me to review, then I could tell you.

Q. Not the -- not the question. The question is what did you know and what were you shown, what were you told? Were you told whether the Walker-related entities had any bank accounts in Guam prior to the issuance of the indictment in

2018?

A. Based on what I reviewed, yes, I believe there was some accounts in Guam.

Q. And who held those accounts?

A. They were in Walker-owned businesses.

Q. What were they? What businesses?

A. I don't recall the exact names of them.

Q. Any of 'em?

A. I recall names of the businesses, I just don't recall which ones had accounts and specifically where they were at other than, for example, exhibit that was shown earlier about the Bank of Hawaii in June of 2018 sending of the letter to John Walker about the account that would be closed.

Q. Well, what -- what company was that account held in?

A. If you have the exhibit to show me, then I could tell you.

Q. You don't remember, is that right?

A. Again, if you showed me the exhibit, I could tell you.

Q. I'm just trying to clarify that you don't remember, is that right?

A. I don't remember exactly the name of the company.

Q. Do you remember there being any other company other than that one that you had any awareness of?

A. Not specifically.

Q. Do you recall generally whether there were more accounts?

A. I don't know.

Q. So you don't know -- going back to the ELMO, please. You don't know what these payments were for, right?

THE COURT: Can you give me the exhibit number on this again?

MR. WELK: Sorry, it's 138, page 82.

THE COURT: Okay. Thank you.

THE WITNESS: No, not specifically.

BY MR. WELK: (CONTINUING)

Q. Do you know generally what they are?

A. They're transfers from Pacific Spotters Corporation bank accounts in the Philippines to Limey Air Service.

Q. Do you have any reason to believe that they are -- that they are something other than helicopter lease payments from tuna boats?

A. No.

Q. Let me get you this, let me get you this other opinion. This is just more of the same, right?

THE COURT: Okay. What's your -- this is what?

MR. WELK: Sorry, this is page 83.

THE COURT: Same exhibit?

MR. WELK: Of Exhibit 138.

THE COURT: Thank you.

BY MR. WELK: (CONTINUING)

Q.   Again the highlighting is mine.  What is this?

A.   It shows incoming wire transfer log January through December 2019, it shows the originator name Pacific Spotters Corporation, out of the Philippines and the originating banks include the United Coconut Planters Bank, BDO Unibank, Banco De Oro Unibank and these transfers are being sent to Limey Air Services.

Q.   Do you have a page about what these payments are for?

A.   As I understand, the Pacific Spotters Corporation was receiving revenue from the tuna boat leases and then I see here that in turn these funds from the PSC account or accounts are being then transferred to Limey Air Service but I do not know exactly why, other that that these are John Walker-controlled companies.

Q.   Okay, do you consider -- when you look at bank records, do you -- do you believe as an agent that it should be clear to you by looking at bank records why some -- one company is sending money to another company?

A.   What's your exact question?

Q.   I'd like to have it read back, that was my exact question.

THE COURT:  Okay.  Go ahead, Veronica, read it. Read it back.

*(Whereupon the reporter read back the requested portion.)*

THE WITNESS: Can you rephrase your question?

BY MR. WELK: (CONTINUING)

Q. Sure. You indicated looking at this that when you look at this chart, this isn't a bank record, right?

A. No, it's not.

Q. This is a summary chart?

A. Yes.

Q. Did you look at the underlying bank records?

A. Not for these transfers.

Q. Okay. Did -- did you ask to look at them?

A. No.

Q. So you said you don't understand why these payments are being made, right?

A. I don't know if these are payments.

Q. You don't know that they're payments. So the title -- what do you think they are, what might they be if they're not payments?

A. They're wire transfers from PSC or also known as Pacific Spotters Corporation to Limey Air Service.

Q. I thought you just said that -- that this was PSC having received payments for helicopter leases and then forwarding them on to Limey?

A. As I understand based on the evidence I reviewed, that Pacific Spotters Corporation basically took over being the -- the lessor of these leases with the tuna boat companies

in place of Wilma's, right. And then so, now that they took over, they're receiving the lease payments and then in turn for reasons that I don't know why the moneys are being wired to Limey Air Service, what I've been telling you is that these are John Walker-controlled companies, the money is moving from one John Walker-controlled company to another one.

Q. Okay. Do you consider these to be money laundering transactions?

A. If the predicate offense is the continuation of lease contracts that involve helicopters that contain counterfeit parts, uncertificated pilots and mechanics, yes.

Q. And what is your -- what is your evidence that any of those things are true with respect to these payments?

A. Based on evidence that I reviewed and the review of testimony of witnesses that testified at the trial.

Q. So did you review evidence and testimony where -- where the evidence was that during 2019, every single helicopter that was leased by PSC had counterfeit parts in it?

A. Again, I don't know which -- which helicopters had those counterfeit parts.

Q. You don't know if any of them had counterfeit parts, do you?

A. Me specifically, I do not know.

Q. Okay. And you don't know if even one of those helicopters was being flown by an uncertificated pilot, do

you?

A. I don't know for these wire transfers how it traced back to the tuna boat contracts in which mechanics worked on which specific, you know aircraft.

Q. Did you read all the contracts that PSC entered into in 2018?

MS. MILLER: Objection, Your Honor, asked and answered several times actually.

THE COURT: Yeah, I think he has -- he said he doesn't recall.

MR. WELK: He doesn't recall.

BY MR. WELK: (CONTINUING)

Q. You didn't read these leases, right?

A. I reviewed some leases.

Q. How many of them -- how many of those leases did you conclude involved helicopters that had counterfeit parts in them?

MS. MILLER: Asked and answered, Your Honor, several times. We're just repeating ourselves, I'm not sure why.

THE COURT: Yes, he's already -- he's already been asked.

MR. WELK: He stated it depends?

THE COURT: He just didn't recall.

MS. MILLER: Objection, Your Honor.

 THE COURT: He already indicated he doesn't recall. And if you want to give him the exhibits, he can refresh his recollection as I understand.

THE WITNESS: Yes, Your Honor.

THE COURT: That's what he said.

MR. WELK: Well, that's --

THE COURT: Okay. Go ahead.

MR. WELK: Let me do that.

THE COURT: Okay. Okay.

MR. WELK: I think I'm done with Exhibit 138, Your Honor.

THE COURT: Okay. Very well.

BY MR. WELK: (CONTINUING)

Q. All this money that we just talked about that came from the PSC account into the Limey Air Services account, you have that in mind?

A. Yes.

Q. What investigation did you do to see where that money went after it went into the Limey Air Services account?

A. I didn't review anything related to that.

Q. To your knowledge, did anyone investigate where the money went after it went into the Limey Air Services account?

A. I do not know.

Q. You do not know?

A. That's correct.

Q. But you're not aware of anybody having to do that, right?

A. I'm -- I'm unaware if anybody.

Q. This was nine and half million dollars during 2018 and 2019, right?

A. What was the timeframe again, that you just mentioned?

Q. 2018 and 2019.

MS. MILLER: Objection, Your Honor, again, these -- the facts he's stating are incorrect.

THE COURT: I'm sorry, is that 138? Exhibit 138?

MR. WELK: Here I'll have him do the math, Your Honor.

THE COURT: No, I'm sorry was that the timeframe --

MS. MILLER: He testified and --

MR. WELK: Please, please, I beg of you, please.

THE COURT: Hold on. Mr. -- I'm asking Mr. Welk, referring to Exhibit 238, the last --

MR. WELK: I'm going to go back to --

THE COURT: I'm sorry, 138.

MR. WELK: I'm going to go back to 138, pages 82 and 83 and I'm going to have -- I'm going to ask the agent to add up what these money transfers were in 2018 and 2019.

BY MR. WELK: (CONTINUING)

Q. So we'll start with Exhibit 138, page 82.

MS. MILLER: Your Honor, is he asking the witness to do this addition in his head?

MR. WELK: I am not concerned with how he does it. I'm just asking him --

THE COURT: If he needs a calculator, I'm sure he'll ask. Some people can do it off the top of their head.

MS. MILLER: I'm sure he could do it by rounding. Sure yeah.

THE COURT: Okay, go ahead. Proceed. We'll have Mr. Welk.

BY MR. WELK: (CONTINUING)

Q. Can you give me a ballpark figure of what these -- what these numbers here, what these wires add up to?

A. About 1.2 million.

Q. $1.2 million, okay. That's for 2018, right?

A. Yes, can you hold it up there just for another minute so I can just look at it one more time.

Q. Of course. Go ahead take your time. Whoa that's -- there we go.

THE COURT: That's a lot better. Okay.

THE WITNESS: Roughly like I mentioned, $1.2 million.

BY MR. WELK: (CONTINUING)

Q. Okay. I would apologize to you that this is not my

exhibit so here's the second opinion, this is page 83, from

138.  Can you please do the same thing with this?

MS. MILLER:  Your Honor, I'm going to object

again.  This is -- this has been asked and answered.  If you

recall when I questioned this witness about the total amount

of the wire transfers in 2018, in 2019 he testified

approximately $5 million total for those two years.  He said

that already.  He's done it already.  Do we really need to now

waste the time for him to do this addition again in his brain?

THE COURT:  You know what I actually thought that

the last question was -- we never got to this, did anyone do

an investigation where the money went to after it got to Air

Limey Services and I think the issue was the dates, I thought

you were just going to focus on the dates.

MS. MILLER:  No, now he's back --

THE COURT:  No, no, no, I know but previously,

right, Mr. Welk, I thought you were asking him that.  And

that -- so that's why I said are we talking about the last

exhibit, it indicates the dates.  But now you're getting into

a different issue on the numbers.  I mean he has already

testified to a rough estimate of the numbers.

MR. WELK:  Well, this is sentencing.

THE COURT:  No, I know.  I know.

MR. WELK:  But the fact that the prosecutor may

have asked him a question, that doesn't mean it's asked and

answered for -- because I'm trying to lay a foundation

for -- for these numbers, I mean if --

        THE COURT:  Yeah.  Yeah, all I'm saying is, I

thought your last question was going to focus on what happened

after the -- was there any investigation of where the moneys

went to after it got to Air Limey Services[sic].

        MR. WELK:  Yeah.

        THE COURT:  And I thought the only -- really the

issue was the dates.

        MR. WELK:  It is.

        THE COURT:  So yeah, so the issue was only the

dates and I thought you were just going to go back, that's

what I want to clarify, was it 2018 and 2019.

        MR. WELK:  That's going to be my next question.

        THE COURT:  Go ahead, I thought that was your

last question.

BY MR. WELK: (CONTINUING)

    Q.   So it sounds like Ms. Miller said it was $5 million,

does that sound right?

    A.   Yes, that's correct.

    Q.   So around $5 million that came from PSC to Limey in

2018 and 2019, that was six and seven years ago, right?

    A.   Yes.

    Q.   And -- and are you aware whether anyone, with the

U.S. government, did any investigation whatsoever as to where

that $5 million went after it landed in Limey Air Services account?

MS. MILLER: Objection, Your Honor. Asked and answered twice on cross now.

THE COURT: No, I don't think he ever answered that question.

MS. MILLER: He has, he has. I guarantee you he has.

THE COURT: After -- well, okay, overruled, go ahead. Let me just make sure. Yeah, maybe it was the years I think you're right it may have been year but go ahead.

THE WITNESS: I'm unaware.

THE COURT: All right. Okay.

BY MR. WELK: (CONTINUING)

Q. Do you know whether Limey Air Services is a defendant in this case?

A. I'm unaware and I do not believe they are.

Q. You understand that this sentencing hearing has to do with John Walker and Hansen Helicopters, right?

A. Yes.

Q. What evidence are you aware of that any of the money transferred from PSC to Limey, whether in these last two pages that we looked at or there after ever wound up with John Walker or Hansen Helicopters?

A. I'm unaware where those moneys went.

Q.   Exhibit 228.  Wilma's Flight Services.  Are you aware of any -- any evidence that Mr. Walker had something to do with these transfers from PSC to Limey Air Services?

A.   I'm -- I am unaware of him directly to be involved in those transfers.

Q.   Are you aware of him being involved in any financial transfers at all ever?

A.   I have to review a few of the e-mails that are exhibits to answer that question.

Q.   Do you know what an SAR is?

A.   I do.

Q.   What is that?

A.   An SAR is the acronym for a suspicious activity report.

Q.   And what is a suspicious activity report?

A.   So FINCEN, is a bureau of the treasury --

Q.   And it's -- I apologize, just to be clear, that's abbreviation for the Financial Crimes Enforcement Network?

A.   Yes.

Q.   That is -- it's a component of the United States treasury; correct?

A.   Yes, that's correct.  They're responsible for enforcing the Bank Secrecy Act and the BSA is also known mandates that financial institutions maintain adequate money laundering controls for their financial institutions, which

include reporting requirements, for example, if cash

transactions at a financial institution exceed over $10,000, a

currency transaction report may be or needs to be filed.

Also, if activity that takes place in a financial account is

suspicious, then financial institutions are required to file

what is known as a SAR.

    Q.   And what information is included in the SAR?

    A.   It would include information related to the customer

name, identifying information, such as a social security

number, tax ID number, address, any additional account

information as far as, you know, phone numbers, e-mail

addresses, and then the type of activity that has been deemed

suspicious would be reported to FINCEN on that report.

    Q.   As a Special Agent with the IRS criminal

investigation, do you have access to SARs?

    A.   I do.  These types of reports are maintained in a

database administered by a FINCEN and as a criminal

investigator, I have access to that database.

    Q.   In connection with this case, did you ever do

any -- did you ever do any inquiries as to whether any SARs

were filed with respect to Mr. Walker?

    A.   I did not.

    Q.   Do you know if anybody ever did any searches whether

SARs were filed with respect to Mr. Walker?

    A.   I am unaware if anybody did that.

Q. Exhibit 228, you looked at this earlier, this is the Bank of Hawaii letter, I think you referred to it earlier during cross-examination. And can you just -- so I'm going to -- I'm going to characterize this, I don't want to -- I don't want to get in trouble. This is letter that you were shown earlier that indicates that the Wilma's Flight Services account was going to be closed by Bank of Hawaii, right?

A. Yes.

Q. What's the date on that?

A. June 25th, 2018.

Q. And was that before or after the indictment in this case?

A. I believe the indictment was in May of 2018, so it would have been after.

Q. So that would be about a month afterwards, yes?

A. Approximately.

Q. And you indicated when you talked about this with Ms. Miller that -- that as part of their anti-money laundering protocols, banks will review accounts and then sometimes they'll decide to close those accounts, right?

A. Yes.

Q. And sometimes they'll do that because they find something irregular in the account or maybe a company said it was going do business in a certain area and found out it was doing business in some other area, right?

 A. That could be a potential reason.

Q. Okay. Do you know what the reason was that they closed this account?

A. I don't have that information.

Q. Did you ever talk to anybody at Bank of Hawaii and asked them why they -- why they closed this account?

A. I did not.

Q. Didn't find any SARs related to this account?

A. I never checked the FINCEN database for any SARs related to this account.

MR. WELK: Your Honor, I'm going to -- I need to have him take a look at Exhibit 265.

THE COURT: Okay. Is that a new exhibit?

MR. WELK: I believe that's the 540 opinion exhibit that the government brought up. So, I think he's going to need a hard copy of that.

THE COURT: Do you have have that, 265? You got it.

Do you have it there?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay.

BY MR. WELK: (CONTINUING)

Q. Do you have the document in front of you?

A. Yes, I do.

Q. Do you know what this exhibit consists of?

A. Yes.

Q. What is it?

A. This is the response from the government of the Philippines related to an MLAT request.

Q. Can I ask you to turn to page 28, please. And then I believe the rest of this exhibit, the rest of this exhibit it appears to be helicopter leases. Do you agree?

A. Yes.

Q. Is there any way that you can tell me how many of these leases you looked at in preparation for your testimony?

A. I looked at several of them.

Q. Can you tell me which ones?

A. It would have been the first few.

Q. Who are the parties to -- let's look at the first one. Who are the parties to -- on page 28, who are the signatories on that?

A. The lessor is Pacific Spotters Corp. and the lessee is Oriental Marine Naru Limited.

Q. This is Exhibit 265, page 28, who signed this -- who signed this on behalf of Pacific Spotters?

A. Kenneth R. Crowe.

Q. Do you recall seeing any leases from Pacific Spotters Corporation were signed by someone other than Kenneth R. Crowe for Pacific Spotters?

A. Based on my -- my review right now, just a quick

review just thumbing through these -- these contracts, he's listed as the representative for PSC on signing these -- these contracts, oh, there is it looks like Phillip Kapp as well, towards the end.

Q. Did you come across any signed by John Walker?

A. No, I don't see his name listed and -- as the lessor signing on behalf of the lessor on these contracts.

Q. Thank you. Do you know what the specific fraud was that was alleged in the Second Superseding Indictment?

A. Wire fraud.

Q. Do you know what the nature of the wire fraud was?

A. It included from my understanding was that there was some electronic communications with some of the parties involved and also, which include e-mails and then also the wire transfers of funds from accounts in this case.

Q. Are you aware that there was a crime alleged with respect to the fraud alleged with respect to the leases that were signed described in the Second Superseding Indictment?

A. I'm unaware of anything specifically related to the actual like lease contract other than the lease involves aircraft that are maintained by pilots and mechanics that are uncertificated.

Q. Let me be clear, I don't believe any of these contracts were actually referenced in the indictment because the ones in the indictment aren't with Pacific Spotters Corp.

But with respect to the wire fraud conspiracy, which related to the contracts, do you know what the objects of the conspiracy were alleged to have been?

A. If you have a copy of the Second Superseding Indictment, I could -- I could read that for you if you need me to. I reviewed the indictment but again, to refresh my memory if you present me a copy, I can -- I can read it with you.

Q. I'm sorry, you have reviewed the indictment?

A. I've taken a look at it.

Q. Would it surprise you to know that the wire fraud conspiracy only alleged misrepresentations as to the airworthiness of the helicopters?

MS. MILLER: Objection, Your Honor, that misstates the facts in the indictment. The indictment speaks for itself.

MR. WELK: Well, many things --

THE COURT: Okay, overruled, go ahead, overruled.

MR. WELK: Okay.

MS. MILLER: Your Honor, I'm going to object because that is -- that is not what was indicted.

THE COURT: The Court has the -- I've got the indictment in front of me, I know what it says, I'm going to allow --

BY MR. WELK: (CONTINUING)

Q. Are you aware that there were three objects of the conspiracy described in the wire fraud conspiracy count, Count 99?

A. I'm not aware of that specifically.

Q. Would it surprise you to hear that the only of those three objects, that involved the leases, was whether the helicopters were airworthy?

A. What was your question again?

Q. Would it surprise you to learn -- let me take a step back. You've said a number of times during this cross-examination, you've talked about helicopters having counterfeit parts, mechanics who are uncertificated and pilots who are uncertificated, is it your -- is it your understanding that the wire fraud conspiracy in this case involved all three of those factors?

A. I'm unaware of that.

Q. You were asked by Ms. Miller about how you determined victim economic loss. You remember that?

A. Yes.

Q. How do you determine who's a victim when you're doing a criminal investigation?

A. The victim can be someone who was defrauded of some type of -- some type of financial means or an amount of moneys.

Q. Do you believe that in order to be defrauded, a

victim is required to suffer some pecuniary or economic loss?

A. That's my experience, that based on your question, yes.

Q. So okay, so just to clarify, if someone -- if Person A makes a material misrepresentation to person, B, person B relies upon that, and they've suffered some kind of loss but it's not an economic loss, do you think there's been a fraud?

A. Yes.

Q. Okay, so there is such a thing as a fraud without economic loss, right?

A. I mean if it's a material -- could be like a material misstatement or omission, it depends.

Q. But I'm talking about the loss. A person can be defrauded in some way but their loss can be noneconomic, right?

A. I believe it's possible.

Q. Okay. And in that situation, how would you determine economic loss?

A. Well, it could be the potential loss, maybe there was an attempt of defrauding a victim and the predicate offense, the fraud did not -- was not completed so, there could have been a potential loss in that instance or if another example if there was some type of predicate offense that related to fraud and the amounts weren't of significant value but it was a material -- something material to the overall scheme, then

yeah, I mean it's still be some type of fraud.

Q. Right, but if the victim suffered no economic loss and that was my question, and I'll -- and so I'll ask you again, if the victim suffered no economic loss, let's say whatever the situation was, the -- it didn't cause the victim any money but the victim had his feelings hurt and he was sad, because he had his feelings hurt but he didn't suffer any economic loss, he didn't lose any money, could still be a fraud, right?

A. Yes.

Q. And in determining the loss for that victim, it would be zero, wouldn't it?

A. Depends. Again, if there is a total amount involved, yes. We can -- we can come up with a number.

Q. Okay. You can come up with a number even if the victim didn't suffer an economic loss?

A. It depends on what was potentially agreed upon. If the victim didn't receive what they believed they were going to obtain through a contract, there's still a loss but we can't calculate it.

Q. And if you can't calculate it, then there is no loss, right?

A. There is still -- I think a loss we can attribute to the total amount of the fraud. If we can calculate the fraud, then I think we can.

Q. So you're saying that if you can calculate a fraud, then even a victim who suffered no economic loss, that the victim -- you can figure out a number for loss when they suffered no economic loss? That's the question. The question isn't, you know, maybe they could have suffered a loss or something different would have happened, the question is here's what happened, did the victim suffer a loss, and are you suggesting that where the victim suffers no economic loss, that you could calculate an economic loss for the victim?

A. Not specifically for the victim just -- just in total, like just the total fraud is, you know, this is based on the total amount that was related to the predicate offense.

Q. And what -- for what purpose would you determine the amount of a fraud if not to determine loss to victims?

A. Just to determine the total amount that, for example, somebody who is a criminal or defendant is responsible for.

Q. How and in what way would they be responsible for?

A. Well, I mean based on the scope of the timeframe of the violations that are being alleged like the timeframe of the conspiracy, the amount that they potentially -- or that amounts that they defrauded individuals, victims, also where did the crimes take place, I mean all of that is taken into account.

Q. Taken into account in determining what?

A. What the -- what the individual is charged for.

        Q.   Okay, I'm really focusing on what you were asked

about by Ms. Miller and that is economic loss.  You said you

look at financial records to determine economic loss, right?

        A.   Yes.

        Q.   You look at tax records?

        A.   Yes.

        Q.   And what if you look at those and you find that the

victim didn't lose any money, there is no loss, right?

        A.   It's hard to calculate based off -- I mean are we

relating this question to Mr. John Walker or is this a

hypothetical question?

        Q.   For now, it's a hypothetical -- what I'm trying to

figure out Special Agent is how you can determine victim loss,

where the victim did not suffer an economic loss?  Do you

think that -- do you think that the victim can recover like

damages, like civil damages, some sort of like pain and

suffering or hurt feelings?

        A.   I mean if an individual victim wants to seek some

type of legal, you know, action, that's up to them.

        Q.   So they can sue the fraudster, right?

        A.   Sure.

        Q.   I'm not talking about that.  I'm talking about a

federal criminal prosecution, where there is a fraud but it

results in no economic loss to the victim, who may have been

victimized in some way, but it doesn't cost them anything,

they didn't lose any money, nothing happened to them that made them spend money that they otherwise would not have spent and I'm trying to figure out if you think under that scenario without having any additional facts that there is a way to determine economic loss for a victim who is not suffered an economic loss?

A. I don't think we come up with the total amount of economic loss, specifically in this case because the lease contracts did not include legally, you know, based certified mechanics and pilots, so it's hard to come up with a true value.

Q. Not one of them?

A. I don't know which of the mechanics, I don't know individuals that were responsible for which of the contracts but just in general.

Q. So if you -- if you don't know which helicopters, if any, had counterfeit parts in them, and you don't know which pilots, if any, were uncertificated and you don't know which mechanics, if any, were uncertificated, then how can you determine the loss?

A. I don't think we can.

THE COURT: So why don't we, Counsels, let me take a 15-minute recess at this time.

MR. WELK: Okay.

THE COURT: Come back. Thank you.

(Recess taken at 2:54 p.m.)

(Back on the record at 3:12 p.m.)

THE COURT: Okay. We are back on the record. All Counsels present, Mr. Walker is present. You can proceed, go ahead.

MR. WELK: Sorry about that, Your Honor, you kind of snuck back in on me.

THE COURT: No, it's okay, we're just waiting for Mr. Walker to come out.

MR. WELK: All right.

BY MR. WELK: (CONTINUING)

Q. Okay. Look at Exhibit 141. Do you recall this document, sir?

A. Yes.

Q. And this indicates that Jan's Helicopters sold a helicopter to someone. Is it your view that this is John Walker selling this helicopter?

A. Yes, John Walker is listed on the bottom of the signature.

Q. But it -- but it belongs to Jan's Helicopter, right?

A. Yes.

Q. Let me show you page 10 of Exhibit 141. Do you recall what the -- what the significance of this is?

A. It's a list of registered helicopters in the Philippines that were valued at $130,000 each that were in

total sold for a little over 300,000 USD.

Q.   Do you know who -- who this value was agreed between?

A.   If you show me the additional documents, I could tell you.

Q.   So you -- you don't know off hand?

A.   No, but again, if you show me the additional documents for that exhibit, I could explain it.

Q.   This is Exhibit 141, page 15.  Can you tell me what this is?

A.   It shows that on November 13th, 2018, that there is a looks like an agreement or deed of sale between Pacific Spotters Corporation and Jan's Helicopter Service and the total consideration is for 340,000 USD.

Q.   Who signs this -- can you tell who signed this agreement on behalf of Jan's Helicopter?

A.   John Paul Huey, V, Lero.

Q.   And who signed it on behalf of Pacific Spotters Corporation?

A.   Phillip -- I'm sorry, Phillip Turner Kapp.

Q.   And do you see any indication anywhere on this document that John Walker was involved in any way in the transaction?

A.   I don't see his name on there other than these are companies that he is an owner of.

Q.   But you don't see his name on there at all, do you?

A. I do not.
Q. Do you know if John Walker ever went to the Philippines?
A. I don't know.
Q. As an IRS CI agent, do you have the ability to contact Department of Homeland Security or Immigration and Customs Enforcement and inquire about international travel by U.S. citizens?
A. Yes.
Q. Never did that with respect to Mr. Walker?
A. I did not do that for this --
Q. How difficult is that to make that kind of inquiry?
A. It's a request made to someone who works for one of the Department of Homeland Security agencies and just waiting for response back on the particular request.
Q. You don't need a court order or anything, right?
A. If -- if it's needed, if the travel records are needed for evidence, yes, but if it's just to obtain information to determine if someone traveled internationally, then those employees of DHS can provide that to an agent as myself.
Q. Exhibit 7. You recognize this document?
A. I do.
Q. And this is -- according to this, Mr. Crowe is the director, is authorized to sell aircraft to Pacific Spotters,

 right?

A. Yes.

Q. It's his signature at the bottom?

A. Yes, it is.

Q. Any reason to believe that this document doesn't give him the authority indicated on it?

A. No.

Q. Are you aware of the idea of that -- that an alter ego, one way to determine whether a company is an alter ego of an individual is the failure to comply with corporate formalities?

A. I'm not familiar with what you're trying to ask me. Is there a way you can rephrase your question?

Q. Do you know what corporate formalities are?

A. Can you explain that to me?

Q. No, I just wondered if you knew what it was. Exhibit 11, you recall seeing this document?

A. I do.

Q. Now this indicates advances to Mr. Walker, right?

A. Yes.

Q. By PSC?

A. That is correct.

Q. And what's the time period?

A. 2021 to 2024.

Q. Where did this document come from and let me -- let

        me retract that.  I'm not interested in where you got it from.

        I presume you got it from the prosecutors.  Do you know where

        they got it from?

             A.   I do not.

             Q.   Do you have any idea what these payments are for?

             A.   They were payments such as what's listed here as

        advances or dividends for his ownership in PSC.

             Q.   How do you know that?

             A.   Well, it says here that the following remittances

        relate to Mr. John Darrell Walker from 2021 to 2024.

             Q.   Do you know what the advances were for?

             A.   From what I learned during the preparation for my

        testimony, that Mr. John Walker had divested his ownership

        interest in PSC, so that four mechanics and the mechanic's

        wife could then be added to the ownership of Pacific Spotters

        Corporation.  And that in particular, he was allegedly going

        to loan funds to these individuals so that they could buy his

        ownership shares from him.

             Q.   And when you say allegedly, does that mean that you

        doubt that that's true?

             A.   Well, based on those loan documents with these

        mechanics and the mechanic's wife and the other one in

        particular the one I reviewed earlier today, where there is a

        loan document that shows there is no interest rate, I find

        that suspicious that in fact it really is a loan.

Q. So, if -- if I give money to someone and they promise to pay me back but I don't charge them interest, that's not a loan?

A. There is different circumstances and in this case, this is involving large amounts of money.

Q. Well, how much do you consider a large amount of money?

A. If you want, we can just reference this exhibit right here, I mean these are advances and dividends that total up to 3.1 million USD.

Q. Right, but do you think this is a loan where somebody called it a loan?

A. Again, I've mentioned to you about the details of what I learned that he had divested himself of his ownership interest.

Q. What does that have to do with this document, these numbers? Do you know?

A. That, for example, this individual Cherry Anne Espion became a owner of PSC.

Q. Okay?

A. And that there was also loan documents between Mr. Walker and Cherry Espion.

Q. Let me -- let me ask you something, is it -- are you -- are you implying that there was something -- that the transaction by which Mr. Walker divested a large portion of

his ownership interest in PSC to these individuals, Ms. Espion and her husband and a few others, that there was something inappropriate about that or something not true about that?

A. Based on what I learned in preparation for my testimony, a U.S. citizen can't have more than a third percentage of ownership in a Philippine corporation.

Q. Okay.

A. So the mechanics and the mechanic's wife that have Philippine citizenship were able to then or were brought in to become owners of the company. So that way, he still has some ownership share and he still has some control over the company as well.

Q. Are you implying though that they -- that that wasn't real, that that was some kind of a sham transfer?

A. Again, based on the loan document I reviewed, when there is zero interest, that's suspicious.

Q. Why is it suspicious, is your suspension that it's a sham transaction, is that what you're suggesting?

A. In other investigations that I worked, criminals and money launderers have used loan documents to facilitate money laundering with little to no interest rates. So in fact it is not a true loan.

Q. Well, what about -- what about parents who make a down payment on a house for their children but don't charge them interest on -- and they're going to pay it back, do you

think that's -- that's a sham?

MS. MILLER: Objection. Objection, Your Honor, relevance, we're far afield now.

THE COURT: Overruled.

BY MR. WELK: (CONTINUING)

Q. Or is your -- is your belief that no interest loans are a sham, does that only have to do with commercial transactions?

A. Based on the totality of the evidence I reviewed, including the timing of the indictment, the change in the articles of incorporation, of PSC to reflect the same business model as Hansen Helicopters, Mr. John Walker divested himself in this -- part of his ownership interest in PSC to bring in Philippine citizens as owners and then to also continue with conducting some type of loan agreement without a interest rate, it is suspicious to me.

Q. Is it suspicious to you if a person goes to a car dealership and they buy a car but they don't have to pay -- they get zero percent interest on the loan?

A. No.

Q. Why -- why not?

A. Because that's a promotion that auto manufacturers, you know, offer to customers.

Q. Do you know that Mr. Walker's been a mechanic, a certified mechanic for decades?

         A.   I don't know about his specific certifications or
their standings.

         Q.   Do you know anything about his past?

         A.   I know what I reviewed during the preparation of my
testimony.

         Q.   And you didn't review anything that indicated to you
that he's been a mechanic for something like 30 years?

         A.   I'm unaware of his length of time as a mechanic.

         Q.   Are you aware that he was -- that he's been a pilot
for around that same period of time?

         A.   Again, I'm unaware of how long.

         Q.   Do you know -- do you know how he became the owner of
Hansen Helicopters?

         A.   I do not.

         Q.   Would it change your opinion about the legitimacy of
the transfer to Mrs. Espion and Mr. Espion and the others, the
mechanics and the mechanic's wife, would it change your
opinion to know that Mr. Walker got a break when he was young
and -- and acquired part of a company probably for less than
it was worth because the person who owned the company wanted
to help him get a leg up?

              MS. MILLER:  Objection, Your Honor, assuming
facts not in evidence.

              MR. WELK:  It's a hypothetical question.

              MS. MILLER:  Oh, it's hypothetical?  Sorry, I

didn't hear that part. Okay.

THE COURT: Overruled, go ahead.

BY MR. WELK: (CONTINUING)

Q. Would that change your opinion?

A. Can you repeat your question?

Q. Yeah. Would it change your opinion about the legitimacy of Mr. Walker transferring interests to the Espion's and the other people who acquired interest in the Philippine company, that to know that Mr. Walker, when he was a young man, was given a break on buying into Hansen Helicopters by the owner of that company who saw promise in him and wanted to help him get a leg up?

A. No.

Q. So do you think that if that happened with Mr. Walker, that that was a sham transaction as well?

A. I don't know if that happened or not. I don't know if you even know if that truly happened or not either.

Q. I'd be happy to tell you but that's not my job here today to tell you things like that. I'm asking you a hypothetical which I'm allowed to do because you're an expert witness and I'm trying to discovery why you think that a papered transaction that you've seen the documents for, why you think that's not a legitimate transaction? Do you think that John Walker today is still the effective 100% owner of PSC?

A.   I don't know his exact percentage but based on the totality of everything I reviewed, again, based on the timing of search and seizure warrants conducted at his businesses in 2016, the migration of his alter ego companies to then using PSC in 2018, and then him divesting himself of ownership interest in that business and then bringing in a Philippine citizen and then conducting some type of a loan agreement with zero interest I find it very suspicious.

Q.   When you say bringing in Philippine -- this is a company in the Philippines, you understand that, right?  PSC. You understand that PSC is in the Philippines?

A.   Yes.

Q.   So you -- what do you think that Mr. Walker started this company with a bunch of white people and then he brought in Philippine people so he could do a sham transaction about giving them an interest in his company?

A.   You can rephrase your question.

Q.   I'm asking you if that's what you think?

A.   I've already told you, I've explained -- I find it suspicious based on the totality of all the things I've mentioned.

Q.   Let me tell you what else you said.  You said he brought in these Philippine people and gave them an interest in his company.  What do you mean by that, that he brought in these Philippine people?

A.   Those are individuals that are listed on the articles of incorporation, the amended articles of incorporation.

Q.   Right.  What do you mean by he brought them in?

A.   What are you trying to imply or what are you trying to ask me?  You can ask me a specific question.

Q.   Special Agent Reyna, I'm not trying to imply anything.  I'm asking you, what you meant when you said the words he brought in Philippine people, what do you mean by that?

A.   I've already told you that he needed to divest himself of his ownership shares, he couldn't -- because he could not maintain over a third -- over a third ownership interest in the business.  So by having Philippine individuals of Philippine nationality brought in to the business to become owners, he still maintains some ownership control of the business.

Q.   Do you understand them to be mechanics for the business?

A.   From what I've learned during preparation for my testimony, that four of them were mechanics and one was a mechanic's wife.

Q.   Were they mechanics for Pacific Spotters?

A.   From what I understand, they were mechanics for John Walker-owned companies.

Q.   Can I get the ELMO back, please?  Now, can you please

explain to me why you think they're paying -- why are they paying $3.1 million to John Walker in support of a sham agreement?

A. I explained to you that what I saw in those loan documents were suspicious.

Q. We'll get to that. I'm talking about this document?

THE COURT: Can you give me -- this is exhibit what, 11?

MR. WELK: This is Exhibit 11.

THE COURT: Or Exhibit 11, okay. Thank you.

BY MR. WELK: (CONTINUING)

Q. You've -- you've indicated that you think this was a sham -- and you've told me why you think it's a sham?

A. I never said the word sham. You've repeated yourself by saying the word sham.

Q. I see. You think this is a legitimate agreement, the loan?

A. I've already explained to you what I believe about the loan based on the totality of all the evidence I reviewed.

Q. Okay. Why in your page, why would they pay John Walker $3.1 million if they didn't -- if they weren't actually paying the loan?

MS. MILLER: Objection, Your Honor , that misstates the facts in evidence. These weren't payments, these were advances and they were dividends.

 THE COURT: Okay. Yeah, I mean they are advances. Okay. That's right overruled, go ahead.

BY MR. WELK: (CONTINUING)

Q. Can you answer the question?

A. It appears to me that there were payments, whether they were advances or dividends, being made to Mr. Walker based on his ownership interest in the business.

Q. But -- but the -- but don't the documents say that they are -- they are payments to him for the transfer of his shares to those people, that they were paying him for those?

MS. MILLER: Objection, Your Honor, again, misstates facts in evidence. The documents do not say what Mr. Welk just said.

THE COURT: Hold on. Let me -- I'm sorry, I was just reviewing this. Can I just get the last question? Hold on.

What was the last question, Veronica?

*(Whereupon the reporter read back the requested portion.)*

THE COURT: I'm not sure if I understand the question. Okay. Sorry, can you rephrase the question?

MR. WELK: I can.

THE COURT: Yeah, go ahead.

BY MR. WELK: (CONTINUING)

Q. Maybe we need to come back to this one. This is Exhibit 211.

          THE COURT:  Okay.  Can you make that a little

thicker, please.  Even more so.  That's hard to read this.

          Can you read it okay?

          THE WITNESS:  I can see it.  It's -- it's better

in focus, yes, that's better.

          THE COURT:  Better for me too.  Go ahead.  211.

BY MR. WELK: (CONTINUING)

     Q.   Do you know what these payments are for?

     A.   If we go to the column heading "Remarks," there is

listed some details about each of the transactions.

     Q.   Okay.  Let's start with the top one, 29 January 21.

It says, "Remittance to John Darrell Walker in for the account

of Jan's Helicopter Service, Inc."  Do you see that?

     A.   I do.

     Q.   So that's a payment to Jan's, right?

     A.   Based on what it says here.

     Q.   You don't think it's -- you don't think that's what

it is?

     A.   I don't know this is just -- that's just what it

says, I don't know if that's really the true reason of why the

payment occurred.

     Q.   Do you have any -- any reason to believe it might be

something else?

     A.   Again, based on the evidence I reviewed for my -- in

my preparation for my testimony, as I understand, John Walker

is a owner of Pacific Spotters Corporation and also Jan's Helicopter Services, so these are two businesses that he owns.

Q. And why does that make you doubt that the payment is to Jan's Helicopter Service?

A. I don't know if the transaction actually occurred. I just know that these are two companies listed here that he is listed as an owner of.

Q. Wait, when you say you don't know if the transaction occurred, does that mean that you don't know if he -- if he was actually -- if somebody was paid $10,000?

A. I mean based on this, yes, that's what it says that there is a $10,000 payment, there's a reference number, it shows a paying banking institution, and a payee account number, yes.

Q. Okay. Let me ask you about the line, if you go down to the fourth box, 30 April 21. And now, it says there was $10,000 advanced to John Darrell Walker. Do you think that's true?

A. If the transaction happened, whether or not it was truly for an advance, I don't know.

Q. But you don't even know -- you're saying you don't even believe necessarily that the transaction happened, right?

A. Well, let me -- let me clarify. Based on this, if I could reference the actual source documents, and I could actually look to see if that's what happened, then yes. But

these are two John Walker corporations, why would one John

Walker corporation advance $10,000 to another John Walker

corporation?  That to me is suspicious.

Q.   Right, but the line we looked at 30 April 21,

that -- that's a transfer to John Walker, so you believe -- do

you believe that one?

A.   For all of these like I said, if -- if I could

reference, you know, the source documents for these, I could

see them and I could tell you that it happened, I know this is

a summary of these transactions but the basis for the saying

in the remarks, I find them suspicious.

Q.   Can I get a yes or no answer to my question.  The 30

April 21, transaction listed on this paper here, says it's a

$10,000 payment as an advance to John Walker, do you believe

that that transaction occurred?

A.   I already explained to you if I saw the supporting

documents that support this, then I could tell you that but

again, I find it suspicious on what the remarks state in here

because these are John Walker companies.

Q.   Except that John Walker is not a John Walker company,

is he?  Is he?

A.   What's your question?

Q.   Okay.  30 April 21, you see it, see the line?

A.   I do.

Q.   Let's follow it across.  John D. Walker is the payee.

Follow it along, amount of remittance in dollars, 10,000. Remarks, advances to John Darrell Walker, do you think John Darrell Walker is a company?

A. Him specifically is the person sitting right behind you.

Q. That's right.

A. That's him right there.

Q. Does he look like a company to you, is he a company or is he a person?

A. He's a person.

Q. Okay. So 30 April 21, that's not a payment from a John Walker company to a John Walker company, is it?

A. This is Pacific Spotters Corporation here at the top, it's a summary of payments to John Darrell Walker, says that at the top, at the top left corner of this exhibit.

Q. So let me -- let me see if I got this right. You don't -- okay, I still haven't gotten an answer to this. Your Honor, I beg of you, please, if he could just -- this is a yes-or-no question and it's a simple one and he won't answer it. I want to know Special Agent, if you think , if you are suspicious -- everything okay? Yeah?

A. Excuse me?

THE COURT: I think --

MR. WELK: I'm sorry --

THE COURT: Hold on. Hold on.

THE WITNESS: Can you rephrase your question?

THE COURT: I think he testified that he's suspicious. He has testified to that.

MS. MILLER: Testified to it a hundred times.

MR. WELK: He's answered the question that I haven't asked a hundred times but he won't answer the one --

MS. MILLER: Because he can't.

THE COURT: Hold on. Okay. What's your -- what's your next question?

MR. WELK: Do you want me to just move along, and he doesn't have to answer this question, that's fine.

THE COURT: I think he just said he has -- he suspects that that may not be true. That's what he says. Right, does he not say?

MR. WELK: But he -- no, I respectfully disagree.

BY MR. WELK: (CONTINUING)

Q. Do you think every transaction on this opinion is suspicious, that whether or not it really happened or not based on what you know?

A. Not that they happened, it's based on what it states under the "remarks" section.

Q. Does what -- are you saying that what it says under "remarks" section is how you determine whether you think the transaction really happened?

A. Based on the totality of all the evidence I reviewed,

it's suspicious to me.

Q. What's suspicious to you about the 30 April 21 transaction -- no, strike that. What's suspicious about the 29 April 22 transaction?

THE COURT: I'm sorry, which one is that, is that the next one underneath?

MR. WELK: No, it's a few -- it's a few down. These aren't numbered.

THE COURT: Okay, can you make that a little large. Can you make that larger? I'm looking for 29. 29 what?

MR. WELK: 29 April 22. You know what I could point to it here.

THE COURT: 29, April 2020 -- okay, I can't see. 29.

MR. WELK: Right there.

THE COURT: Okay. There.

BY MR. WELK: (CONTINUING)

Q. See that?

A. Yes.

Q. Are you suspicious of that transaction?

A. I'm suspicious of all these transactions based on the column heading "remarks."

Q. Okay. And you could have -- I think you indicated that you could have sort of clarified your suspicions by

looking at the source documents, right?

A. I would just reference like, for example, the reference number in the paying bank and the account number, that's all. I don't -- I don't have any reason to believe that the transactions didn't happen. Again, I am just suspicious of what's listed under the "remarks" section.

Q. For every transaction?

A. For all of these, yes.

Q. So you think the advances to John Darrell Walker, you suspect they could have been something else?

A. Could have been for another reason but what I find suspicious is that this involves, you know, Pacific Spotters Corporation and everything else I've already talked about, involving him divesting his ownership, shares, and everything related to that.

Q. To the Filipino people, right?

A. As I mentioned, as I learned, they were four mechanics and a mechanic's wife Philippine nationality.

Q. Okay. What did you find when you looked at the source material for these transactions?

MS. MILLER: Objection, Your Honor, asked and answered. He already said he didn't look at source material.

THE COURT: Yes.

MS. MILLER: Right?

THE COURT: I think he -- I think he already

testified that he has not looked at those.

MR. WELK: Okay.

BY MR. WELK: (CONTINUING)

Q. This is 210.

THE COURT: Okay. What page is this, is it just one page, 210?

MR. WELK: As far as I know, Your Honor, 210, it's just 210.

THE COURT: Is it a summary sheet of 210?

MS. MILLER: Yes, Your Honor, it's just one page.

THE COURT: All right. Exhibit 210.

BY MR. WELK: (CONTINUING)

Q. What are these, Special Agent?

A. Based on what it says on the top left corner of the exhibit, these are summary of payments to Kenneth R. Crowe from Pacific Spotters Corporation.

Q. Are you suspicious of these?

A. What makes it suspicious to me is if you allow me to see the bottom of the page, that at the bottom, the total amount listed that he received was a little over 93,000, and that John Walker received over 3 million in the previous exhibit, so that tells me that he has a larger ownership interest than Mr. Crowe.

Q. How -- how does it -- why do you think it means he has -- that Mr. Walker has a larger ownership interest than

Mr. Crowe?

A. Because he received more funds based on these charts.

Q. What about the salaries? Are you suspicious about the salary payments?

A. I don't have any reason to be suspicious of the salaries.

Q. I'm sorry, I don't understand what you think is suspicious about this list now.

A. That Mr. Walker, even though he divested his ownership or a portion of his ownership interest, it appears he still receiving a large amount of money from the corporation.

Q. Right, but didn't you -- didn't you testify earlier that -- that you understood that he had to divest a certain percentage of his interest because there was a -- there was a limit to how much a non-Filipino citizen could hold in a Philippine corporation?

MS. MILLER: Your Honor, again, asked and answered multiple, multiple times.

MR. WELK: Well, I'm not sure why -- I guess maybe you can help me, Special Agent.

THE COURT: It's true. I mean he has been asked and answered.

MR. WELK: Okay, but -- okay.

MS. MILLER: But what?

MR. WELK: I'm sorry, Ms. Miller.

THE COURT: Okay. Wait. Hold on. Next question. Go ahead.

MS. MILLER: Let's move on.

THE COURT: The objection will be sustained. Mr. Welk, go ahead, next question.

MS. MILLER: Move on to something than something different.

THE COURT: Counsel, no, no, Counsel, just -- wait, wait, wait, Counsel. Address the Court, not each other.

MS. MILLER: Yes, Your Honor.

THE COURT: All right. Let's go.

MS. MILLER: We have heard the same question.

THE COURT: The Court has sustained the objection, go ahead, next question.

MS. MILLER: Thank you.

BY MR. WELK: (CONTINUING)

Q. In light of the fact that you understand that Mr. Walker had to divest a certain percentage and that he didn't send all of it, didn't have to divest all of it, I don't understand why it makes you suspicious that Mr. Crowe had a lower amount of ownership than Mr. Walker did?

A. I just find it suspicious that even though on paper he may have divested a portion of his ownership interest, he

still is receiving a significant amount of more of funds from PSC than Mr. Crowe.

Q. But -- are you suspicious because you think that Mr. Walker's requirement to divest means that his ownership has to be equal to that of Mr. Crowe?

A. No.

Q. Okay. All right. Exhibit 213. You testified about this loan document, do you recall?

A. Yes.

Q. And you -- I believe you testified that you had seen similar loan documents between the other Filipino people that he brought in, as you put it, that Mr. Walker brought in, yes?

A. Yes.

Q. Other than the zero percent interest, is there anything else that you find suspicious about this loan agreement? I can show you the rest of the opinion as needed.

A. Item number 2 is what stands out to me.

Q. Okay. Nothing else?

A. Can you scroll down or so I can see the bottom a little more.

Q. Yup.

THE COURT: Did you have another question?

BY MR. WELK: (CONTINUING)

Q. I'm sorry, I thought you were going to tell me when you were done reading it. Do you find anything else

 suspicious about this agreement?

A. No.

Q. Okay. How many aviation cases have you worked on in your career?

A. I worked on several investigations where illicit funds were used to purchase aircraft and I was involved in being the seizing agent of those aircraft.

Q. Were those aircraft leased for any commercial purpose?

A. Yes, they were.

Q. What were they leased for?

A. They were leased to customers in a foreign country and the aircraft were owned by a company that in fact provided lease -- leasing services.

Q. Have you done any other cases, have you ever been involved in cases other than this one involving the Philippine islands?

A. Can you ask that question again?

Q. Have you ever been involved in any cases involving the Philippine islands?

A. No.

Q. Have you ever heard the term *scrap* in the Philippine islands aviation industry refers to unregistered aircraft?

A. I was reading something about that.

Q. Is that different than what scrap means in the United

States in your understanding?

A. Yes.

Q. Could you please explain the difference to me?

A. As I understand that scrap in the Philippines means --

MS. MILLER: I'm going to object, Your Honor, there is no foundation for his understanding and as a matter of fact, I know that any understanding he has comes from the statement of Ms. Cherry Espion which Counsel has argued so vehemently that the government should not be able to use in this sentencing.

So if Counsel wants this witness to talk about one portion of Ms. Espion's statements, then the government will ask the Court to allow us to move in the entire statement.

THE COURT: I'm sorry, your objection is that the Counsel has not laid the foundation?

MS. MILLER: Correct. Because the only information this witness has about this question, and Mr. Welk knows this, comes from the proffer of Cherry Espion which he has objected to any portion of that proffer coming in for the purposes of sentencing.

THE COURT: All right. Mr. Welk?

MR. WELK: I challenge --

THE COURT: She's objecting to the failure to lay

a foundation with this witness.

MR. WELK: I asked him if he understood the meaning of the term in the Philippines and he said he did, that's a foundation.

THE COURT: All right. Overruled. Go ahead. Overruled.

MR. WELK: Thank you.

MS. MILLER: Objection, Your Honor.

THE COURT: He said he knows --

MS. MILLER: No, how does he know? That's the appropriate foundation. Not do you know. How do you know and as I said, Your Honor, the only knowledge he has is from Cherry Espion's proffer, so if he --

THE COURT: That hasn't been established yet. The Court will overrule the objection at this time. Go ahead.

MR. WELK: Thank you.

BY MR. WELK: (CONTINUING)

Q. Could you please tell me your understanding of the meaning of the word scrap in the United States?

A. During the preparation for my testimony for this hearing I did read a report that was based on an interview with Cherry Espion and during the review of that report, she then referenced that scrap in the Philippines refers to unregistered aircraft.

Q. Okay. During your direct examination, you were asked

 by Ms. Miller why would a person who's been indicted open a company in another country. Do you recall that?

A. Yes.

Q. And your answer was to hide from law enforcement, right?

A. I explained that in order to continue the ongoing scheme, that the criminal or the money launderer, if they sought to avoid the detection of law enforcement, that they can open up a corporation -- a foreign corporation and it would be more difficult for law enforcement to detect any type of activity.

Q. Can you think of any other reason why a person might move their company out of the United States into another country?

A. Is this a hypothetical question? Or is this related to Mr. John Walker?

Q. It's just a question. Can you think of any other reason why a person would move a company from the United States to another country?

MS. MILLER: Your Honor, objection. It is either a hypothetical or it is based on the facts of this case. And the witness is asking for clarification. What is the question?

THE COURT: Sounds like a general question.

MS. MILLER: All right.

THE COURT: Overruled. Go ahead.

MR. WELK: That's what he's intending --

THE COURT: Sounds like a general question.

THE WITNESS: Yes, Your Honor. If the individual opened up a company for a country, could be because they're going to conduct business there.

BY MR. WELK: (CONTINUING)

Q. Okay. Exhibit 223. Do you recall seeing this agreement earlier?

A. Yes, I do.

Q. And who is this agreement between, what parties?

A. Pacific Spotters Corporation and Wilma's Flight Services.

Q. And who is the signatory for each?

A. Under Pacific Spotters Corporation, it lists Phillip T. Kapp and under Wilma's Flight Services, Inc. it lists Kenneth R. Crowe.

Q. Do you see any -- do you see John Walker's name on this document anywhere?

A. I do not.

Q. Exhibit 224, who are the parties to this agreement?

A. Wilma's Flight Services and Pacific Spotters Corporation.

Q. And who signs for each company?

A. Kenneth R. Crowe and Phillip T. Kapp.

Q. Are you suspicious of this agreement?

A. I find it suspicious that Wilma's was used prior to the indictment of John Walker and then after the indictment, the new alter ego shell company business that's being used to facilitate the wire fraud and money laundering is Pacific Spotters Corporation.

Q. What money laundering is being facilitated here?

A. If there were proceeds derived from any wire fraud activity, that would be the money laundering violations.

Q. And what evidence are you aware of they were involved in money laundering activities in connection with this agreement?

A. That I'm just aware that based on the evidence I reviewed for preparation for my testimony that the scheme continued post the indictment of John Walker and that Pacific Spotters Corporation was the business that was used to be the lessor or the lease agreements with the tuna boat companies.

Q. And -- okay, so you -- you said you know that. What -- what is the fraud scheme that you know was continuing during this time period?

A. That the leases between Pacific Spotters Corporation and the tuna boat companies involved aircraft that involved pilots and mechanics that were uncertificated and that aircraft involved counterfeit parts.

Q. How many of the helicopters involved in the leases

during this time period had counterfeit parts?

          MS. MILLER:  Objection, Your Honor, asked and answered multiple times.

          THE COURT:  True.

          MR. WELK:  Actually --

          THE COURT:  Sustained.

BY MR. WELK: (CONTINUING)

    Q.  The question I asked you earlier, agent, was how many of the tuna boat leases in the early stages, not with PSC, but with the Guam or Vanuatu companies; am I correct, if -- if the question was in fact asked and answered, then can I please confirm that your answer to the Pacific Spotter Helicopters is the same as the answer you gave earlier when I did not ask specifically about Pacific Spotters, specifically that you don't know if any of those helicopters had counterfeit parts, you don't know if any of the pilots were uncertificated and you don't know if any of the mechanics were uncertificated?

    A.  I don't know the number of those individual components.

    Q.  Okay.  And that's true for the entire scope of the -- of the conspiracy, right?

    A.  Yes, other than what I've seen in the superseding indictment that there was individual violations related to unapproved or uncertified parts, aircraft parts and mechanics and also just reviewing you know, listening to the testimony

of Mr. DeVogel last week.

MR. WELK: I have nothing further.

THE COURT: Okay. Ms. Miller.

MS. MILLER: No redirect, Your Honor.

THE COURT: Okay. Please step down, sir. Thank you.

MS. MILLER: Government has no more presentation of witnesses, Your Honor, we're ready to go to argument unless defense has evidence.

THE COURT: Defense, do you have any --

MR. WELK: Can I have a moment, Your Honor?

THE COURT: Yes, you may.

MR. WELK: Your Honor.

THE COURT: Yes?

MR. WELK: The defense rests.

THE COURT: Okay, the defense says no evidence that they want to proceed forward with. Okay. Let's hear the arguments.

MS. MILLER: Your Honor, how would you like to handle each of these? Would you like to go through each contested issue? The government does its argument, then the defense, then the government rebuts? How would you like do this?

THE COURT: I think it makes it easier if we look at this specific objections, right?

 MS. MILLER: Yes.

THE COURT: He's talked about that.

MS. MILLER: Yes.

THE COURT: So if we start with the objection, that will make it easier for everybody. Yeah. So we've already resolved -- yeah, let's go to the first one on aggravated role. So, I'll hear from Ms. Miller and then from the defense, Mr. Welk, on the first issue of aggravating role. Pursuant to 3B1.1(a) as it relates to Count 10 and 99 of the superseding indictment or the verdict form too. So aggravating role. Okay. Yes, prosecution, go ahead, you may proceed. You're asking for an additional plus four enhancement; is that correct?

MS. MILLER: Yes, Your Honor. As organizer and leader.

THE COURT: Okay. Go ahead.

MS. MILLER: And so, Your Honor, as we heard through the testimony of Mr. Reyna, John Walker was the 99.9% owner of all of the companies that were used in the fraud.

In addition to being the 99.9% owner of all of the companies that were used in the fraud, John Walker was also the person who, when the companies were going to be sold and he was sharing information with others, he identified himself as the sole owner, CEO and controller of the companies. I would refer the Court specifically to Trial

Exhibits G-305, this is the business plan that John Walker had

created and had shared when he was interested in selling the

company.  And he indicated in that business plan that he was

in fact the CEO and Director of all of the companies.  And

then I would also refer the Court to G-0366 which was a

communication that was made to a company called MNS Capital.

When Mr. Walker again was considering selling the company to a

third party, he identified himself as being the controller and

owner of all of the companies that were listed in that

document.

And, Your Honor, if you recall at trial, we

introduced Exhibit G-0302 in which Mr. Walker was described as

"being the sole person for whom all of the companies and

everything that was being operated in terms of the leases of

the helicopters, it was all John, that was the language in

0302, John and Hansen Helicopters are one and the same.  They

represent the same thing, it's all John."

So, that's what we have, Your Honor, and what we

know is that when John Walker wanted money to come out of any

of the companies, all he had to do was send an e-mail and say

send me money.  We saw at trial Exhibit G-0001, in which John

Walker was directing the company to send him $400,000.  We saw

at trial another transfer of $4.8 million to John Walker for

supposedly for the purchase of helicopters even though there

was never any evidence that he ever purchased any helicopters

with those funds. John Walker was convicted of money laundering and the testimony of the IRS agent who was actually the agent in charge of the case, who testified, Your Honor, that he examined 15,000 pages of bank records, said that John Walker would move the money from company to company to company where it would then end up in the possession of Walker Agricola and then it would end up in John Walker's pocket.

And what you saw was shown today with the Court was Exhibit G-00024, from the trial, which actually was the signature card for Walker Agricola showing that John Walker was the only person on that signature card who could take the funds from Walker Agricola. And Special Agent Viranousith Khamvongsa testified that even though one company was used to lease the helicopter, a second company was used to receive the funds from the leased helicopter, then a third company was used to transfer those funds to and then the funds would transfer through several more companies before they would end up in John Walker's pocket.

And the jury believed his testimony and the testimony of Teshara Jones who was the forensic accountant who testified as well as the evidence that was introduced to the jury that showed that, ultimately, Mr. Walker was the one who received all of the funds. As Mr. Reyna testified to be an organizer and a leader, you don't have to do all of the nefarious acts yourself.

MR. WELK: Objection, Your Honor, that is an absolute attempt to use a money laundering expert's witness testimony to apply the sentencing guidelines, he was not qualified as an expert in the sentencing guidelines.

THE COURT: All right. Very well. Overruled. Go ahead.

MS. MILLER: So you can use other people and as a matter of fact people who are king pins do use other people all the time. We saw Mr. Walker use Mr. Crowe, we saw him use Mr. Kapp, we saw him direct them do things, yet, Your Honor, the most compelling piece of evidence is how much money did they get from committing these acts versus Mr. Walker? At trial, Your Honor, we introduced evidence both Mr. Kapp and Mr. Crowe received W-2 income from their work and all these companies, they did not receive profits from any of the companies.

At trial, you heard the testimony of Mr. Reed, who is another part of the management team, who said that nobody received profits from any of these companies except for John Walker. And that makes sense when you look at exhibit that Mr. Walker himself through his Counsel introduced to the Court, Exhibit G-0829, which identifies all of the companies and it shows that John Walker is the 99.9% owner of all of the companies with one share going to Mr. Crowe or one share going to Mr. Kapp or one share going to Mr. Reed, for "legalities

      sake," which is what you saw, Your Honor, introduced into
      evidence as Exhibit 0302.

               Today, we saw that during the exact same period
      of time between 2021 and 2023, when Pacific Spotters took over
      the operations, after Mr. Walker was indicted, Mr. Walker
      pulled over $3 million from Pacific Spotters or as Mr. Crowe
      received $90,000.  That's 3% of the total.  And that was
      consistent across the board for every single one of these
      companies.

               How else do we know that Mr. Walker is the
      organizer leader?  You saw summary charts that were entered
      into evidence in the case.

               THE COURT:  Wasn't that -- if there's, you know,
      100% of the company, if Mr. Walker had -- can only get the
      maximum or the cap of one-third, so that's 33 and a third?

               MS. MILLER:  So you're talking now about Pacific
      Spotters, Your Honor?

               THE COURT:  Pacific Spotters.

               MS. MILLER:  Yes.

               THE COURT:  So how is the breakdown --  I wasn't
      clear how the breakdown, so you're saying Mr. Crowe received
      3%?  Or he owned a 3% interest of Pacific Spotters?

               MS. MILLER:  Yes, Your Honor, so if you look at
      Exhibit G-3003, that was entered into evidence during the
      criminal case, and you also look at Exhibit G-2990, which

would -- was entered into evidence in the criminal case and you put those two things together they give you the whole story of Pacific Spotters. So --

THE COURT: Okay. So --

MR. WELK: Excuse me, Your Honor, are any of these -- I'm curious whether any of these documents were actually presented in this hearing and if they are, if we could please get the sentencing exhibit number?

MS. MILLER: Both of them were.

THE COURT: Yeah, okay. She said they were. What is the -- what is the sentencing --

MR. WELK: So far, I haven't heard a single number of the sentencing exhibit number I only heard --

MS. MILLER: Sentencing, Your Honor, I'm certainly not limited to what was introduced in this hearing. However, those two particular exhibits were introduced in this hearing.

MR. WELK: Can I --

THE COURT: He just want the sentencing --

MS. MILLER: Yeah, Mr. Leon Guerrero what was -- and by the way he has an exhibit list which correlates the exhibit number that was used for this hearing with the exhibits that were used at trial.

THE COURT: All right. So just tell me what the exhibit number is?

MR. LEON GUERRERO: Could I get --

THE COURT: I'm sorry, Mr. Leon Guerrero, could you bring the mic down, I couldn't hear you.

MR. LEON GUERRERO: I'm asking Ms. Marie.

THE COURT: Oh, okay.

MS. MILLER: 3003.

MR. LEON GUERRERO: And the second one?

MS. MILLER: 2990.

(Pause.)

THE COURT: Okay. So while he's -- while he's looking for that, you're saying that that will just breakdown the percentage of --

MS. MILLER: Yes.

THE COURT: Ownership interest?

MS. MILLER: So when Pacific Spotters was opened, Your Honor, in 2016 right after the government performed its search and seizures on the Walker properties, Mr. Walker opened Pacific Spotters identifying himself as a 90% owner of the company, that's in Exhibit 3003, and identifying Mr. Crowe as having a percentage ownership in the country -- in the company as well as Mr. Kapp. Let me just pull up that exhibit again to give you those exact numbers back in 2016.

THE COURT: You're still -- you're still trying to figure out the -- find the sentencing --

MR. LEON GUERRERO: I have 3003 is sentencing

Exhibit 141.

THE COURT: Okay.

MS. MILLER: And I believe 2990 is 265, Your Honor; is that correct?

THE COURT: Is that right -- oh yeah, my clerks indicated they believe you're right.

MS. MILLER: Yeah.

THE COURT: But Mr. Leon Guerrero, you want to double-check that?

MR. LEON GUERRERO: Yes, Your Honor.

THE COURT: 265 is the sentencing exhibit number.

MR. LEON GUERRERO: It is, it is, Your Honor.

THE COURT: Okay. That's fine. All right. Go ahead.

MS. MILLER: So when Pacific Spotters was first opened, Mr. Walker had a 90% ownership interest in Pacific Spotters, Your Honor. And then he gave an ownership interest also to Mr. Crowe and Mr. Kapp. When --

THE COURT: And what is that, what's that ownership interest?

MS. MILLER: That ownership interest for those two, let me look at Philippines produce and exchange. Here we go. So if you look at 3003-25, for the record, the ownership interests when the company first opened, it was -- here we go, sorry, Your Honor, it is on page -- I'm going to have to get

that page for you, Your Honor.

THE COURT: Okay. It's fine. Yeah, everybody keeps talking about the percentage point.

MS. MILLER: Yes, yes, it started in 2016 as 90%. It went down to 32% in 2018 because the company's article of incorporation were changed in 2018 after the indictment.

THE COURT: Right.

MS. MILLER: To reflect that the company was now going to lease helicopters. And when Pacific Spotters opened up a bank account in the Philippines, it was necessary to produce the leases and the other information that proved that the company was in fact going to be operating a helicopter leasing company but also --

THE COURT: I guess the question is, is he the major shareholder?

MS. MILLER: He is. So his -- 32% --

THE COURT: What's the percentage to --

MS. MILLER: His 32% is higher than the percentage that any other alleged owner has in the company.

THE COURT: So that will be Mr. Crowe, Mr. Kapp.

MS. MILLER: Correct.

THE COURT: Ms. Espion and the other mechanics?

MS. MILLER: Correct. So we have Mr. Padua.

THE COURT: Okay.

MS. MILLER: Antonio Padua, who was a Hansen

Helicopters mechanic, who is identified as owning 15% of the
company as of 2018.  We have Mr. Crowe who is identified as
owning 4% of the company in 2018, Mr. Kapp who's identified as
owning 2% of the company in 2018, Mr. Plew who is another
mechanic, who is identified as owning 2% of the company in
2018, Mr. Jeffrey Sarimos who is another mechanic, who is
identified as owning 15% interest in the company as of 2018;
Oswald Espion, who is Cherry Espion's husband and who was
mechanic for Hansen Helicopters for ten years, owns a 15%
interest according to the paperwork as of 2018 and Cherry
Espion, his wife, 15% interest in the company as of 2018 and
for the record, Your Honor, those percentages are shown in
Exhibit G-3003 on pages 30 and 31.

THE COURT:  Okay, thank you.

MS. MILLER:  You're welcome.  But what we see in
the financial records that we received through the MLAT and
that we received directly from Pacific Spotters in relation to
the discovery in the civil case is that regardless of what the
representations were about the ownership of the shares of
stock in Pacific Spotter Corporation, it was John Walker who
was still receiving all of the funds from Pacific Spotters
Corporation with the exception of payments of salaries, for
example, like what you saw for Mr. Crowe during that same
period of time.

THE COURT:  I'm sorry, so John Walker you're

saying received not only the profits but -- and allegedly -- some people are using allegedly, at least the last witness was, the advanced loan amounts?

MS. MILLER: Correct.

THE COURT: To the other mechanics from the Philippines.

MS. MILLER: Correct, Your Honor.

THE COURT: Okay.

MS. MILLER: What we see is that from 2021, through 2023 in the documents that Pacific Spotters produced to us, Mr. Walker personally received over $3.1 million from Pacific Spotters. What we also see, Your Honor, in Exhibit G-2939 --

THE COURT: And the superseding indictment was second -- or the first -- or yeah, Second Superseding Indictment, that's what it says here, right?

MS. MILLER: Yes.

THE COURT: It was January 8th, 2021.

MS. MILLER: Yes, January of 2021, that's correct, Your Honor.

THE COURT: Okay.

MS. MILLER: So prior to that time, you saw in Exhibit G-2972 which were the -- not 2972, 2939 which were the Limey Air bank records.

MR. LEON GUERRERO: That's sentencing

Exhibit 138.

THE COURT: Okay, thank you. Mr. Leon Guerrero. Thank you. Okay.

MS. MILLER: What we saw on page 72 of the Limey Air bank records was a letter signed by Mr. Walker --

MR. WELK: Objection, Your Honor, that mischaracterizes the document, it's a summary of the alleged records. It's not the records.

THE COURT: It's a summary chart?

MS. MILLER: It's not a summary chart.

THE COURT: Exhibit 138.

MS. MILLER: It's not a summary, no.

THE COURT: It's not a summary chart?

MS. MILLER: No.

THE COURT: I'm sorry, let me just look at that.

MS. MILLER: It's an 83-page document, Your Honor. It's not a summary chart.

THE COURT: Yeah, do you see that, Mr. Welk? You want to look at Exhibit 138? Do you see that?

MR. WELK: Hold on.

THE COURT: Okay. Yeah, it's not -- it doesn't look like a summary chart.

MS. MILLER: It's not a summary chart.

THE COURT: It's like -- it looks like banking records.

MS. MILLER: It is.

THE COURT: Okay. Let him make sure he sees that.

MR. WELK: Your Honor, may I inquire about the source of these records? Are these received from an MLAT?

THE COURT: Um, Exhibit 138, I don't remember, was that from MLAT?

MS. MILLER: 2939 was not received pursuant to a MLAT because it is Limey Air bank records for a bank account that was locally -- these were received pursuant to a grand jury subpoena or an IG subpoena.

MR. WELK: Thank you.

THE COURT: Okay. You see that, did you get a -- get to look at that the 2939?

MR. WELK: Yes.

THE COURT: Okay. Very well, proceed.

MS. MILLER: Yes, Your Honor, if you look at page, for the record 72 of Exhibit 2939, you will see that John Walker produced a letter from himself to the bank when the Limey Air bank account was opened, this is page 72. And in that letter, I'm sorry, it's 76, I said 72 but it's 76.

THE COURT: Okay.

MS. MILLER: In that letter, Mr. Walker is telling the bank that Limey Air Services, Inc., with an address of Tamuning, Guam, is a company that is owned by him,

99.9% owned by him, and he is telling the bank the reason why there is an update to the signature card which you saw on pages 1 and 2 of this document is because the former officers, Angela Walker and David Ledger, are no longer officers and now they're being replaced in 2018 by Mr. Kapp and Mr. Crowe.

THE COURT: Okay.

MS. MILLER: And you see it's signed by John Walker.

THE COURT: I see.

MS. MILLER: The important thing about this document and these documents is that after the first indictment, funds start flowing instead of going to Wilma's Flight Service which we saw before the indictment, now the funds from the leases are going to Limey Air Services. And we also see as the last two pages of this exhibit, that when Pacific Spotters was opened and created and the leases were changed over into the name of Pacific Spotters, that Pacific Spotters started transferring funds to Limey Air through wire transfers. We saw wire transfers in 2018 and 2019, that exceeded $5 million. During trial, in 2020, we saw evidence that the lease income exceeded $21 million. And then we heard testimony today that between 2021 and 2023, an additional $9 million was transferred to Limey Air, from Pacific Spotters Corporation which was just passing through the lease income, with Mr. Walker being the 99.9% owner of Limey Air

corporation.

In addition to the exhibits that were presented at the sentencing, Your Honor, there were additional exhibits that were entered into evidence at trial, which further show that John Walker was the owner and controller, the leader and the organizer of this company.

We saw an exhibit that was entered into evidence G-0551 during trial that was --

THE COURT: What --

MS. MILLER: G-0551, which was a letter to Mr. Walker from Randy Rogers who is an indicted co-defendant who's deceased who was actually repairing the aircraft that Mr. Walker purchased and Mr. Walker and Mr. Rogers agreed that Mr. Walker would actually buy Mr. Rogers' facility that was repairing the aircraft so that he could control the repair and maintenance of the aircraft.

We also see from trial Exhibit G-0739, G-0739, which is an e-mail from Rufus Crowe to John Walker, where Crowe is letting Mr. Walker know that Mr. Cislo who was bribed to issue airworthiness certificates, would like the yellow airplane in exchange for his issuance of these airworthiness certificates. We also see in Exhibit G-0158, that's 0158, a reference to the fact that John, Mr. Walker, will buy it for you, again communications regarding bribe to Mr. Cislo showing that it is John Walker, not anyone else, who had the authority

and the control over whether to pay these bribes and how to pay these bribes.

We saw an e-mail which was identified at trial and entered into evidence as G-0842 to Mr. Walker from his co-conspirators saying are there any other helicopters you would like to own?  We saw evidence entered into -- during this sentencing proceedings including the declaration filed by Mr. Crowe where even though he described work done by others on behalf of the company, he specifically said that everyone had to keep Mr. Walker informed of everything that was happening.

So what we see over and over again, Your Honor, is Mr. Walker being contacted for raises for individuals who worked for the company, they couldn't be approved without Mr. Walker saying okay, payments to people who worked for the company and how much they were paid, Mr. Walker controlled all of the payments, we saw in Exhibit G-0024 introduced during trial, Mr. Walker transferring $2.5 million from a alter ego to himself and he did that over and over again when he wanted to the pull cash out of the companies.  There wasn't anyone else who worked for any of these companies who had the authority to do that or whoever actually did do that.

We saw Exhibit G-0031 introduced at trial, that showed Walker using Walker Agricola and, Your Honor, to remind the Court, Walker Agricola again was the company in Missouri

that Mr. Walker transferred the funds to so that he could then pull them out to himself, making purchases in Guam using that company and wire transferring himself $5 million immediately after the seizures that occurred in 2016.

We saw, Your Honor, entered into evidence G-1245 at trial, the summary chart for the bill of sale of helicopters showing Mr. Walker signing off on the bill of sale for the helicopters that were used in the fraud. We saw summary chart G-1252 which was the registration summary chart and you also heard the testimony of Ms. Pena on Friday that regardless of which one of the alter ego companies that were registering the helicopters, it was John Walker signing for those companies and you heard that out of over 400 times that he signed registering those helicopters, 117 times were the electronic signatures and the rest of the time it was handwritten signatures by Mr. Walker. And during trial, Your Honor, we produced and showed you the actual registration applications which show they were filled out by hand and we saw Mr. Walker's signature under every one of them.

So, we saw on Friday, Your Honor, that Mr. Walker, when he renewed his FAA certificate as a mechanic with the FAA, that every other year that he was required to fill out those certifications from 1997 through 2021, Mr. Walker indicated to the FAA that he was performing personally mechanical work on the helicopters in Guam. As

recently as 2021, Your Honor, you saw Ms. Pena testify about

that. And Mr. Walker in that inspection authorization form

which was filed with the FAA under the penalty of perjury, he

specifically stated that during his normal work week when he

was performing these mechanical functions on these

helicopters, he could be located at the Guam address of Hansen

Helicopters. So either he lied to the FAA again when he said

that, or as Mr. Welk suggested, perhaps he what was lying back

and forth to and from Guam from Missouri to actually do these

mechanical functions on these helicopters. Or maybe it's a

combination of both. It doesn't matter. The point is, it

always goes back to Mr. Walker being the person who is in

control and is the leader and is the organizer of all of the

actions related to this case.

And the last thing I'm going to discuss, Your

Honor, before I turn it over to Mr. Welk is the stipulations

that were entered into for forfeiture. Immediately after the

trial in this case when Mr. Walker was found guilty of 99

felonies, his trial Counsel stipulated that the government met

its burden for forfeiture, for the items that had already been

seized and that stipulation was accepted by this Court and it

could be found in the court records at ECF 1813. Just a few

months ago, Mr. Walker's current Counsel entered into a

stipulation with the government again regarding forfeiture.

And in that stipulation, Your Honor, which was accepted by the

Court and could be found at ECF 2237, Mr. Walker's Counsel stipulated and agreed that $58 million of the funds received by Mr. Walker were associated with the wire fraud in this case. He also stipulated and agreed that almost $12 million was involved in the money laundering in this case, he stipulated and agreed that all of the helicopters that were used in this case were in fact fraudulent and subject to forfeiture to the United States. Every single one of them.

And then he also stipulated and agreed that the rest of the personal property in the attachment to ECF 2237, were subject to forfeiture. And this was an agreement signed by Mr. Welk on behalf of Mr. Walker, not anybody else in the case, not Crowe, not Kapp, not any other corporate entity but Mr. Walker. It is absolutely clear that he is the organizer and the leader, the owner and controller and it is an appropriate enhancement to identify him as such for sentencing purposes. Thank you, Your Honor.

THE COURT: Okay. Mr. Welk?

MR. WELK: Thank you, Your Honor. I'm going to start at the end with the last thing that Ms. Miller mentioned.

THE COURT: Okay.

MR. WELK: Having to do with this order of forfeiture. She said that the consent order of forfeiture was not entered in by Mr. Crowe or Mr. Kapp, it was entered into

by Mr. Walker.  Well, there is a very simple reason for that,
is Mr. Crowe and Mr. Kapp aren't defendants in this case
anymore and this was a forfeiture order directed towards
Mr. Walker in connection with his -- with his conviction.
There are some other interesting things about this consent
order of forfeiture.  There was no admission in this consent
order of forfeiture.  It is an agreement to the entry of a
consent order of forfeiture and that's all it is.  Document
provides that the parties agree that based on the jury's
verdict, the forfeiture order can be entered.  There is no
admission here that -- that Mr. Walker earned this amount of
money in proceeds.  There is no admissions at all in here.
This was a effort -- you know one of the problems with -- with
large, the government is -- you know you could never
win -- there is constant accusations of wasting time, wasting
the government's time and the Court's time and here we
negotiated an agreement regarding this consent order of
forfeiture, which it's obvious from the wording of it
including, particular in the last paragraph, or the second to
last paragraph, "that in the event that any of the guilty
verdicts upon which this order is based are reversed, vacated
or remanded or a new trial is ordered, this order shall be
vacated and void as to any else as to counts of conviction and
any property order ceased or forfeited pursuant to this order
shall be returned promptly to the defendant."

            That's not an admission that the money

was -- that the property was paid.  I'll point out something

else, Ms. Miller talked a lot about Walker Agricola and how

that was a part of this massive scheme that the government

alleges Mr. Walker was involved in.  There is a lot

of -- there is a lot of redaction in the Exhibit C of this

agreement.  And if one were to go to look at Exhibit C, well,

actually, when you go back and you look at what appears in

Exhibit C, all the things that are non-redacted in Exhibit C,

those are all assets of Walker Agricola.  Those are all assets

associated with --

            MS. MILLER:  Objection, Your Honor, Counsel is

testify to facts that are not in evidence.  There is zero

evidence that those assets that are exempted from this

forfeiture are in fact owned by Walker Agricola.  The

government has always contended and still contends that Walker

Agricola is an alter ego of John Walker.  So for the purposes

of entering into this stipulation, the government agreed to

all of the terms herein and did agree to allow certain

property be exempted based on the representation by Mr. Welk

that that was family property of Mr. Walker that had been

inherited by him.  The government never made any concession

about Walker Agricola.  So there should not be a misstatement

on this record before what really occurred here.

            MR. WELK:  May I be heard, Your honor?

THE COURT: Yes, go ahead.

MR. WELK: Go to page 33 of 36 of this exhibit, you will see the property that is exempted from forfeiture and --

THE COURT: I'm sorry, I got to pull the exhibit then.

MR. WELK: I'm sorry?

THE COURT: Which exhibit number is it?

MR. WELK: It's not an exhibit. It's a file -- it's a filed document, it's 2237.

THE COURT: Okay, let me pull 2237.

MR. WELK: ECF 2237.

THE COURT: Okay. Hold on. Go ahead and I'll try to get it.

MR. WELK: Well, there is a column here that says name of first -- first owner, name of owner.

THE COURT: Okay. Hold on, I got it -- I found it. 2237, I got it right here. I'm sorry, go ahead, what page?

MR. WELK: 33.

THE COURT: Okay. Okay I see it, okay, go ahead.

MR. WELK: Number 194, Walker Agricola.

THE COURT: Mm-hmm.

MR. WELK: This chart, by the way, was prepared by the government. It was filed in support of their motion

for forfeiture back in September a couple years ago. 197, Walker Agricola; 198, Walker Agricola; 199, Walker Agricola; 200, Walker Agricola; 201, Walker Agricola; 203, Walker Agricola; 204, Walker Agricola; 205, Walker Agricola; 206, Walker Agricola. Anyway, I would suggest that the government can't have it both ways. The documents says what it says. No where in this document does it say that Mr. Walker admits to the -- that those are proceeds, the admission -- there is no admission there, it's an agreement that the jury's verdict could support the entry of a forfeiture order. Government can't argue with that and then come back and say, but where it says it belongs to Walker Agricola, it doesn't really belong to Walker Agricola.

Some of the other comments by Ms. Miller, there is no evidence that Mr. Walker controlled the payments that the government cited no exhibits in support of that statement. There is no evidence that Walker, that John Walker approved raises, again there were no citations to evidence with respect to that statement.

According to the -- Ms. Miller stated that Exhibit G-158[sic] was admitted at trial, but it does not appear -- it's not on the list of exhibits admitted to trial on the list that I have. So G-158, to the extent that Ms. Miller relies upon G-158, it was not admitted at trial.

With respect to -- there seems to be a lot of

back and forth about where Mr. Walker lived and I'm going address that in a few minutes, but you know --

THE COURT: Does it really I mean -- of course -- in your paperwork, says that Mr. Walker was living in Missouri.

MR. WELK: Yeah.

THE COURT: But -- is it also plausible or reasonable to assume that he was going back and forth Guam and Missouri during the times in question?

MR. WELK: Well, is it -- is it plausible? It's -- I suppose it's equally plausible that he didn't. There is no evidence that he was going back and forth, but what I am going to get to in this section of my argument is that there is substantial evidence that he was living in Missouri for that entire period between 2011 and 2022.

THE COURT: What about the argument that Ms. Miller makes that he made representations that he would be in charge of the maintenance of the helicopters at the base headquarters, if you will, of Hansen Helicopters here on Guam?

MR. WELK: Well --

THE COURT: He himself?

MR. WELK: If -- if he made those representations, in the worst case scenario is that -- if he -- if he wasn't there, then he made a misrepresentation to the FAA about where he was conducting maintenance on

 helicopters.

THE COURT: Go ahead.

MR. WELK: Which is seems like an inconsequential untruth if it was an untruth.

THE COURT: Well, I mean it was --

MS. MILLER: It was consequential to file an official --

THE COURT: Yeah, Ms. -- okay, I mean he does indicate that, I think in the -- I can't remember which -- I remember seeing that, I saw those blocks where he indicated his business was located, his maintenance of his helicopter business was located here on Guam. Anyway, go ahead.

MR. WELK: You know.

THE COURT: Okay. So you're saying there is -- you're saying there is no evidence really that they've demonstrated that Mr. Walker was coming back and forth from Missouri to Guam.

MR. WELK: I'm saying that there is evidence that Mr. Walker was living in Missouri that I'm going to get to in this section of my argument.

THE COURT: Okay, go ahead.

MR. WELK: But you know, there was a -- it's an area of the law in 19 -- I think it was in the 1990s or early two thousands where the Supreme Court was asked to weigh in on this issue of whether currency reporting violations and border

crosses was significant, whether it was excessive.  These are

the cases that the excessive fines, application to forfeiture

began and the Court made a --

MS. MILLER:  Your Honor, could I stop Counsel for

a moment?  If he's going to cite a case, I would like the

citation for the case.  With all due respect, talking about

case law generally --

THE COURT:  It's fair, do you have the case

citation?

MR. WELK:  I do not.

THE COURT:  That would help me too.

MR. WELK:  The Court -- the Court, over a series

of cases, I don't have the cases at my fingertips right now

because the way the law went was there was a determination

that mere -- so that when people left -- were going to leave

the country or were coming into the country and they lied

about how much money they were carrying, that that was merely

depriving the government of information, that was nothing more

to it than that, it was a mere reporting violation.  So the

idea that -- in other words, the courts generally don't

consider things like that where the only penalty, the only

loss to the government is the lack of information.

MS. MILLER:  Your Honor, I'm going to have to

object and move to strike.  If Counsel is asking this Court to

not consider --

THE COURT:  The Court -- the Court will sustain the objection.

MS. MILLER:  Thank you.

MR. WELK:  I have a --

THE COURT:  Insofar as there is just no -- no specific case that's been cited.  So, just continue on.  Go ahead.

MR. WELK:  Well, now I'm wondering if I should look up the citation.  Maybe I'll -- maybe I'll supplement it later and come back to this.

THE COURT:  Okay.

MR. WELK:  The business plan that -- that Ms. Miller referred to, is from 2013.  Which -- and the -- her implication seems to be and this runs -- this is common in the government's argument, that if a document says something that the government thinks is incriminating towards Mr. Walker, then it appears that they think it applied forever.  So she looks at a business plan for 2013, there is no background of what that was used for or what it was intended for by Mr. Walker and she said -- he says in there look, I'm in charge of the company and I do all these things.  Maybe he did in 2013, maybe he didn't.  That's just what he said in a -- in a business plan.

THE COURT:  Okay.

MR. WELK:  So there is no -- there is no

evidence -- the thing -- she's got a piece -- she's got a writing that says it's all John, but what does that mean? What -- what evidence is there that it's all John, besides somebody wrote it on a piece of paper, it's all John. What does that mean? If it's all John, then why is it that throughout the evidence in this case, it's Crowe's name that shows up on documents that he signed. It's Crowe that sends e-mails to John, to which John apparently never replied. It's Crowe saying here's something we're going to do, again, to which he does not reply. It's Kapp saying he's going to do something or it's Kapp signing papers. That -- just because John Walker owned the company doesn't make him a leader or a manager within the meaning of the sentencing guidelines.

3B1.1, it doesn't say if the defendant was an organizer or leader of a company that involved five or more participants, it says if the defendant was an organizer or the leader of a criminal activity that involved five or more. So the things that he did that aren't crimes does not prove that he's subject to a role enhancement for purposes of the -- of the sentencing guidelines. At Paragraph 193 of the PSR, probation officer calls for a four-level increase on the ground that Mr. Walker was an organizer or leader. That involved four or more participants or was otherwise -- the PSR falls into the same trap as the government jumps into constantly, concluding that because -- because he owned the

 companies, 99.9% according to Ms. Miller, even though that's not accurate as to PSC, that that's the end of the game. Because he owned the company, because he almost owned all of the company, that he's a -- he's a leader within the meaning of the sentencing guidelines. But at the same time, there is the false assumption that just because there were employees of the companies, that those people are participants, although Ms. Miller did say during her argument that she referred to Mr. Crowe and Mr. Kapp, how much did they get for committing these acts? She was talking about money, how much did they get paid? But committing these acts, that's exactly what they did. Because for the most part, what the evidence shows is that these acts, the illegal acts, the acts of which Mr. Walker was convicted, were committed by Crowe and Kapp.

Now, the theory that was applied was that there is alter ego criminal liability and because they were working for companies that were owned by Mr. Walker, that he -- that he was responsible for that. But the fact is he did not commit these acts, Mr. Crowe -- there is ample evidence that Mr. Crowe and Mr. Kapp did. So --

THE COURT: But the -- I'm just looking at the 3B1.1 aggravating role commentary of the 2018 sentencing guidelines, it does say that there can of course be more than one person who qualifies as an organizer of a criminal association or conspiracy and you were -- I saw that you were

trying to bring that out with regard to Mr. Crowe's and Mr. Kapp's role, if you will. That was indicated in one -- I can't remember which exhibit but the Court saw that. Are you saying though that -- are you saying that Mr. Walker had no degree of participation in the commission of the offense?

MR. WELK: I'm saying that there is no evidence that he -- that his level of participation rose to the level of an organizer or leader of the activity.

THE COURT: How about the claim -- how about the claim right to a larger share of the -- of the fruits of the crime? They're saying that the profits were fruits of the crime. What about that?

MR. WELK: Well, as the owner of the company, the sharing was determined -- particularly when it comes to PSC, the reason that the -- by the way, the four Filipinos that were brought in to take over, the four of them, they held 60% of the total shares in PSC, 15% each. Mr. Walker held 32%. So together, they held a majority of the stock. But the other thing --

THE COURT: But individually though, individually --

MR. WELK: Right.

THE COURT: -- individually, it sounds like Mr. Walker had the highest percentage of share, is that true?

MR. WELK: Absolutely true, yes. Yes.

 THE COURT: Right. So I see what you're saying in terms of collectively, but if you're just looking at individual shares, okay, we all agree with the numbers.

MR. WELK: But the reason Mr. Walker received an outsized share of the dividends is because the agreement that Special Agent Reyna was so suspicious of for some reason because it didn't have interest on it. They were -- those four, the Philippine citizens who acquired the shares through that arrangement, they were -- they've been applying their dividends --

MS. MILLER: Objection, Your Honor, objection.

THE COURT: I'm sorry?

MS. MILLER: There is zero evidence that supports what Mr. Welk is saying right now. Zero evidence. All we saw was advances to Walker --

THE COURT: Hold on, hold on. I don't even -- let him finish what he said, I don't know what he -- let me hear what he was saying first.

MS. MILLER: Sure.

THE COURT: He was starting to say something but go ahead, Mr. Welk.

MR. WELK: I'm going to find the evidence, Your Honor, because I think there is references in the documents that the government referred to that explains where that money came from. I believe in the --

                    THE COURT:  You're talking about the advancements
or --

                    MR. WELK:  No, no, no.  There's no advancements,
it's -- give me just a moment, please.

                    THE COURT:  Mm-hmm.

                    (Pause.)

                    THE COURT:  Go ahead.  You were going to say?

                    MR. WELK:  One possible explanation for how why
Mr. Walker was receiving the lion's share of the dividends is
that the Philippine shareholders were applying their dividends
to pay the debt that they owed.

                    MS. MILLER:  I'm going to object, Your Honor,
one --

                    THE COURT:  Hold on.  Okay, your objection is
what now?

                    MS. MILLER:  My objection is lack of any reality
here.  He's saying one possible explanation.  What does that
have to do with Your Honor accepting evidence with some
indicia of reliability?  He can't say maybe the advances meant
this or meant this or meant that.  There is no indicia of
reliability associated with Counsel's saying, you know, one
possible explanation is that goes beyond the pail in terms of
relevant evidence.

                    THE COURT:  She's right about that, Mr. Welk.

                    MR. WELK:  I'll move on, Your Honor.

THE COURT: All right.

MR. WELK: Let's talk about the declaration of Rufus Crowe.

THE COURT: Okay.

MR. WELK: Which Ms. Miller spends a lot of -- has spent a lot of time with both her witnesses and in her argument pointing out that in this four-page declaration --

THE COURT: Why don't we come back to that declaration. We'll take a recess at this time. Okay.

MR. WELK: Okay.

THE COURT: Let me take a 15-minute recess. I got -- yeah. Thank you, Counsels.

MS. MILLER: Thank you, Your Honor.

THE COURT: 15 minutes, then we'll come right back.

(Recess taken at 4:59 p.m.)

(Back on the record at 5:12 p.m.)

THE COURT: Okay. Go ahead. We're back on the record, go ahead, you may -- Mr. Walker is now present. You may proceed.

MR. WELK: Thank you, Your Honor.

THE COURT: All Counsels present.

MR. WELK: I was about to discuss the declaration of Mr. Crowe and the government spends a lot of time and they

mention it in the argument, this one sentence in Mr. Crowe's
declaration, and this is Exhibit 91. And the sentence is
"each member of the management team had a responsibility to
keep Walker, the company's principal owner, informed of
Hansen's operation" and there is a lot of emphasis placed on
that sentence. But then in the midst of this argument about
who is really running things and who is making decisions and
who is taking actions and who is doing all these things, the
government just ignores the paragraphs where Mr. Crowe says,
he's responsible for the daily operation of 40 helicopters,
continuous responsibility for pilot training. This is on
page 2.

             THE COURT: Yeah.

             MR. WELK: He must communicate with these three.
Even -- even the agent today admitted that these are
substantial responsibilities that he had. Same thing with
respect to Kapp. Kapp is the director of maintenance for the
company. He has to coordinate with all these mechanics, he's
doing all these logistics, he's troubleshooting mechanical
issues, mechanical issues having to do with parts; things like
that. Those are mechanical issues. Kapp had
coordinate -- Kapp had coordinate those with Crowe.
Relocating helicopters from one ship to another, then you've
got Reed. Reed was responsible for what? Acquiring parts and
supplies needed in Guam and dispatching those parts and

supplies to the ships or ports where they're needed.  These

are critical actions, these are critical actions that go

directly to the charges in the indictment, but Walker is not

responsible for any of those things.  And there's no evidence

separate from this that Walker did these things.  This is

evidence that he did those things.  And if we're going to

believe that it matters, that Crowe had to keep Walker aware

of what was going on, we can't just ignore the rest of this

document.  This is an important declaration that shouldn't be

ignored.

In terms of this name thing, Ms. Miller referred

to Mr. Walker as king pin in her -- in her argument.  There is

a case about that, the Ninth Circuit has held, the case is

*U.S. versus Harris*, 999 F.3d, 1233, and at 1235 to 36, and

that's -- I'm sorry, that's Ninth Circuit, 2021.  1235 to

1236, the Ninth Circuit held that a nominal position in an

organization is not enough to satisfy the requirement of

someone being a leader or a manager.  There has to be

substantive evidence that they were -- as long as we're going

to use lingo, a shot caller, and that evidence just isn't

there with respect to Mr. Walker.  Not enough to justify

this -- this enhancement.

Mr. Walker wasn't charged with being the owner of

numerous companies.  That's not a crime.  He wasn't charged

with failing to follow corporate formalities, which the

witness who was called as the business and money laundering
expert wasn't even familiar with that term.  Also not a crime.
It's not enough to show that the underlying crimes involve
money, activities or property or even that the -- the
defendant had some control over those things.  And that -- and
that -- doesn't matter.  The government, as it does so often,
just constantly retreats to Mr. Walker's position as CEO and
owner of the company to hold him responsible for the conduct
for everyone who worked for the company, this time because
he's a leader for purposes of guidelines 3B1.1.

But here is the thing, the evidence showed that
Crowe, Kapp and Reed oversaw the parts, pilots, mechanics.
Pilot Marinho testified that he dealt only with Crowe, Kapp or
Reed.  That's ECF 2052 at 38.  Pilot Braga testified he dealt
only with Crowe, Reed or Kapp.  ECF 2042 at 37 and 39
through 40.  Pilot Bustos only dealt with Crowe and Reed.
ECF 2025 at 46 and 47 and ECF 2029 at 204 and 05 and 330.

There was evidence that pilots had little or no
interaction with Mr. Walker, ECF 2052 at 124, where Marinho
never met -- he said he never met or spoke to John.  The
evidence showed that Crowe and Reed also signed and managed
the tuna boat leases, which are in many ways are at the heart
of this.  Walker didn't even control wire transfers.  They
were handled by someone else which is why there is references
to him asking someone and telling someone to send an e-mail.

They were ordered by Crowe, also based on the evidence at
trial.

So if you disregard the nominal position, as you
must under Harris, there is no evidence that John Walker
himself organizing or leading anyone, there is no e-mails,
showing him giving directions for illegal actions, there is no
phone calls of him directing illegal actions or organizing any
type of criminal activity, there is no directives from him
with respect to those things.  There is no one saying I have
to check with John first before I can give you an answer to
that or I have to clear that with John.  The government has to
prove leadership with respect to a particular crime, not just
the overall scheme.  There is no evidence that he led or
organized with respect to the parts fraud, employing the
pilots, employing mechanics, the wire fraud or the money
laundering.  Crowe, Kapp and Reed were the leaders and
organizers for these criminal activity and that's bolstered by
this Crowe declaration.

Reed testimony -- Reed was kind of all over the
place but he testified that Walker owned the companies, and
that accidents were reported to Walker or Crowe.  The first
was -- he testified to, that Walker owned the companies
March 16th, pages 253 to 254, that testimony.  And that
accidents were reported to Walker or Crowe, May 9th testimony
at 100.  But he also testified that he didn't know if anyone

kept Walker advised and that Crowe was making all the

decisions.  That's from May 9th testimony, 254 to 55.

He testified that Walker was not involved in the

day-to-day running of the company, March 16thtestimony at 192.

He said that Walker retired in 2011 and Crowe took over.

That's May 9th testimony at page 37.  Walker moved back to

Missouri, this is also -- this is also Reed testifying, Walker

moved back to Missouri and turned over day-to-day operations

to Crowe after which Crowe managed all aspects of operation.

That's May 9th, 38, 39.  Reed said he did not know what

Walker's activities were between 2000 and 210, he had no

knowledge of how Walker treated pilots and mechanics and Reed

only ever saw him with shop employees in Guam.  That's

May 9th, at 208.  Reed was not aware of Walker being in

control of Hansen after Walker left in 2011.  That's May 9th,

250 and 251.  He did not see Walker at Hansen after 2011

except for a few times when he visited, that's May 9 th, 252

to 53.

Cislo testimony; Cislo said that he was told that

Walker had operational control of Hansen.  That's at page 73

of his testimony but that he had no communications with Hansen

about the bribe aircraft.  His communication were with Crowe

and Kapp, he admitted he didn't know who was running Hansen

but that he was talking to Crowe and Kapp.  That's Cislo

testimony at 416 and 417.  This is as good a time as any to

talk about what Mr. Walker was doing after 2011 when the government claims that he was masterminding a huge criminal organization in the southwest corner of the Pacific Ocean. And where that can be found, Your Honor, in the support letters that were submitted to the Court from Mr. Walker's friend and neighbors in Neosho, Missouri located 7,346 miles away from Guam.

MS. MILLER: I'm going to object, Your Honor, to any reference to those letters. There's been zero foundation laid for the introduction of any of those letters, doesn't even come close to any indicia of reliability. Those letters are not authenticated. Those letters -- we have no idea if the people who purportedly drafted those letters actually did draft those letters, they're unmitigated hearsay. And speaking of late filings that Mr. Welk just submitted days after the Court entered the deadline, so there is no indicia of reliability whatsoever. There are people in the courtroom today, some of who may or may not have written those letters, if they want to get on the witness stand and corroborate anything that they said, fine. But otherwise, Your Honor, the government would object and move to strike any of those letters as unmitigated, unreliable hearsay with no foundation whatsoever.

THE COURT: Okay. I'm just pulling up those letters. I do recall -- you're saying they're not relevant?

                    MS. MILLER:  Absolutely they're not relevant.
How could they be relevant if they're not authentic?  How can
they be authenticated if all -- you have no way of knowing who
wrote those letters.  None.

                    MR. WELK:  Earlier today, Your Honor, I believe
at the beginning of this hearing, Ms. Miller stood up here and
made a little presentation about how the rules of evidence
don't apply in a sentencing hearing and that how even major
elements of the U.S. Constitution don't apply in the
sentencing hearing.

                    THE COURT:  I mean it does say that in case law
but except -- well, to the extent that it's relevant, that's
true.  But anyway --

                    MS. MILLER:  Indicia of reliability is the
standard.

                    THE COURT:  That's right.

                    MS. MILLER:  Indicia of reliability.

                    THE COURT:  I said that earlier today.  Okay.  Go
ahead.

                    MR. WELK:  I don't think there is -- should I
just go forward?

                    THE COURT:  Yeah, you know, so these letters, I
mean I normally allow all letters in, and I don't really get
any objections as to indicia of reliability objections.  Go
ahead.  The Court will -- the Court will overrule that

objection and allow these letters to be brought -- to be submitted, go ahead.

MS. MILLER: To the extent that the Court is going to rely on any content of those letters, Your Honor, the government would like an opportunity to counter that, because for example, some of those letters are by employees of Hansen Helicopters, who we have investigative reports showing that they admitted to criminal acts. One of those letters is by Mr. Walker's girlfriend. Who is in the courtroom who can be called to testify and so the government would ask that that be permitted. So if the Court is going to actually consider them, it's one thing to say sure, you filed them, no problem. It's another thing to say that any of the content of those letters is going to weigh in your decision, Your Honor, in determining whether or not Mr. Walker is an organizer/leader because that raises a different spectre of responsibility for the government to challenge that.

THE COURT: All right.

MR. WELK: I'm prepared to proceed, Your Honor. I think that -- that -- look, there is no question that -- one of the major features of the last two days, the only two days of this hearing has been the government's insistence that Mr. Walker never lived in Missouri, that he didn't move to Missouri that, he stayed in Guam arguably. I'm not sure what their argument is. But the question is, they said well, you

know, they've raised this question, they've opened the door to the question what was Mr. Walker doing during this period after 2011 when it's -- when it is alleged that he moved back to Missouri.

THE COURT: Okay. Let me just say. The Court will allow the letters to come in. If the prosecution wishes to call any witnesses to rebut any of these letters, they may do so.

MS. MILLER: Thank you, Your Honor.

THE COURT: Any of the statements, it's up to the prosecution.

MS. MILLER: Thank you, Your Honor.

THE COURT: All right. But I will allow these in. Go ahead. You may proceed.

MR. WELK: Okay, before we -- before we go on, are they going to be able to call witnesses of people who's -- who are referred to in my presentation who wrote letters? Or do they just get to call whoever may be in the room that wrote a letter?

THE COURT: I'm not sure who they -- I don't know who she's going to call.

MS. MILLER: Well, for example, like I said, your Honor, Rose Hansen is here, she -- she wrote one of these letters. So I would absolutely want to call her. And there may be other individuals who wrote the letters who are in the

courtroom who I would absolutely wish to call, yes.

THE COURT: Okay.

MR. WELK: Okay. I guess what I'm trying to -- what I'm trying to --

THE COURT: Go ahead.

MR. WELK: This is the nightmare, right. This is the nightmare. That somebody who makes the mistake of writing a letter of support for a defendant that the government is trying to send to prison for life, is going to be -- is going to be called up and punished for having supported him by being grilled and interrogated by the prosecutor. Now, my question is, is she going to get to call -- is she going to take roll in the back of the room and get to call whoever, even if I don't refer to their letter, just because we submitted a letter?

THE COURT: I just got the impression that -- this is what I understand just on the brief moments that we had, that to the extent that she believes that the representation regarding Mr. Walker's continued stay in Missouri is noted within this -- these particular letters of support, she wanted to at least test that -- test that voracity of that. That's what I understand she's indicating that she wishes to do.

MS. MILLER: That is correct, Your Honor.

MR. WELK: Okay.

THE COURT: I mean she has the right to call 'em.

MR. WELK: She does?

THE COURT: Well, I mean if she wants to call them, she can subpoena them.

MR. WELK: She --

MS. MILLER: He's proffering the testimony of these people through these letters.

THE COURT: She can subpoena them. Go ahead, go ahead, proceed.

MR. WELK: (Laughing.) You'll learn in the course of these letters, Your Honor --

THE COURT: I've read them.

MR. WELK: Huh?

THE COURT: I read them. Go ahead.

MR. WELK: That John's a member of a church in Neosho where the pastor, his wife and dozens of parishioners signed a petition asking that he be allowed to continue to be an asset to the community to which he donated five acres of land on which to build a new church and school. Those are Exhibits 316 and 34. You'll read about how John brings his ailing mother to watch him and his farming crew clear ground or bale hay. Mr. Walker isn't a gentleman farmer, Your Honor. He worked his farm caring for the cattle and baling hay. You'll read how he made sure he talked to his mother every day, no matter where he was or what he was doing. It's

Exhibit's 4 and 16. You will read about how he took care of people who are not part of his family but worked for him or were neighbors of him or just lived in his community with no expectation of compensation. Exhibit 4, John surprised one of his employees by --

THE COURT: Do you mean page 4?

MR. WELK: Exhibit, the fourth letter.

THE COURT: Okay. Like -- I'm sorry, but this is ECF 2296, right?

MR. WELK: I think that's right, yeah. And there should be --

THE COURT: When you say Exhibit 4, do you mean 2296, page 4?

MR. WELK: No. There were attachments. It's the -- they were -- they should have --

THE COURT: I've got the attachments.

MR. WELK: Attached as exhibits.

THE COURT: Let me make sure I got all of these. But, go ahead. Go ahead. You may proceed.

MR. WELK: He surprised one of his employees by flying them down to South Carolina so he could see his son graduate. And he -- in Exhibit 6, you will see that the sixth letter, he helped raise his nephew after the death of his brother When his nephew was ten years old. He invited him to come work for the farm in 2013, he turned his life around, the

nephew. John made it possible for Chance to get his degree. It's Exhibit 6. There was also random acts of kindness expressed in these letters.

THE COURT: I'm sorry, so you don't really mean -- you mean 2296, page 6, right? I just want to make sure I've got the right thing because I see Chance's letter here. I want to make sure I'm not missing anything. Right? Am I right?

MR. WELK: Yeah.

THE COURT: Okay, yeah.

MR. WELK: Yeah, that's how it's --

THE COURT: When you say Exhibit 6, I'm like thinking okay, no, you must be --

MR. WELK: Yeah, that's what -- okay, yeah, so dash 6 would be the -- I'll use that instead of -- instead of exhibit.

THE COURT: Okay. I just want to make sure I'm not missing the exhibits. Go ahead.

MR. WELK: Random acts of kindness that are expressed in these letters in -7 --

MS. MILLER: Your Honor, Your Honor.

MR. WELK: -- teaching a friend's son.

MS. MILLER: With all due to respect to Mr. Welk, this has nothing to do with organizer or leader of the criminal organization. He could have a hundred letters

talking about how nice John is to his family and the people that he pays, but we're talking specifically about a specific enhancement and you know, Your Honor, because you actually cited to the sentencing guideline, you could be an organizer or leader from anywhere. You don't have to live in Guam to be an organizer or leader of an --

THE COURT: Okay, I'm sorry, you're just saying it's not relevant to the aggravating --

MS. MILLER: It's not relevant. Talking about this is not relevant to this issue.

THE COURT: Mr. Welk?

MR. WELK: Said the prosecutor who has made an issue for the last two days of testimony about where Mr. Walker was and what he was doing after 2011. The government has made a point repeatedly, not just today, but throughout this case that Mr. Walker has been running this organization, running PSC, running all the companies for this entire --

THE COURT: So to the extent that you're saying that all of these letters show where he was during this period of time and -- okay, so the Court will allow that for that purpose.

MS. MILLER: For that limited purpose, right?

THE COURT: Yeah, I agree. Go ahead.

MS. MILLER: And by the way, Your Honor, just for

 the record --

THE COURT: That he's working from Missouri and he's doing all of these wonderful things with his pastor, his church, his nephew and so forth. Okay. Go ahead.

MS. MILLER: And for the record, the only reason why the government spent any time showing the Court all of Walker's representations about his presence in Guam is because of the fact that they raised this issue, that he retired and moved to Missouri and had nothing to do with the companies any more.

THE COURT: Okay. Got it. Go ahead.

MR. WELK: She said with utter incredulity.

THE COURT: Okay. Go ahead. Proceed on. Proceed.

MR. WELK: Thank you, Your Honor.

MS. MILLER: Move to strike, Your Honor.

THE COURT: Stricken, yeah. Utter incredulity, you don't have to comment on the prosecutor's statement. Let's go.

MR. WELK: Understood.

Teaching a friend's teenage son to drive a farm vehicle, that's -7, helping fellow farmers get their crops in either by working their fields or lending equipment, that's -13, -26, -27, -31, -32. Stories of John cleaning animal -- other people's animal pens, feeding other people's

cattle, helping out in poultry operations when, I kid you not, an elderly neighbor was kicked by a cow. It doesn't get any more country than that. But that man wrote a letter and in it is sincere, it helped him keep his farm going. Covering medical bills -8, -32, -35. He paid for hotel rooms for people with no place to stay -9. He taught children interested --

MS. MILLER: Objection, Your Honor. Paying for a hotel room? What does that have to do with organizer or leader? We're so far afield here of this particular issue.

THE COURT: I think he's just saying he's quite busy in Missouri doing a lot of --

MS. MILLER: Oh, okay. So he was in Missouri when he was paying for this stuff for other people? Because that's not in the letter, but I wonder if Counsels now adding to the letter.

THE COURT: Overruled.

MS. MILLER: I just want to make the record clear.

THE COURT: Overruled. Go ahead. Continue on.

MR. WELK: Thank you, Your Honor. He taught children interested in aviation about flying and what they needed to know and do to be able to accomplish that, -10. He helped out with local school lunch programs, -12, -34. He took time to talk to kids and teach them, -17. He gave a

competitor in an off-road race his only spare tire so the

competitor could continue, that's - 19.  Donating the use of

equipment after a devastating tornado in Missouri, -21, -23,

-39.

Giving a calf to a young boy who wanted to show a

calf in the county fair, -24.  Giving people a place to live

when they were having trouble, -29.  Working with kids of 4-H

clubs and Future Farmers of America Clubs, -33 and -35.

There are letters from the professional care

givers who helped John care for his mother, who saw him sit

for hours by her bed.  This went on for six years when she was

ailing, six years when he helped care for his mother in

Missouri.  Saw him offer the use of that wheelchair van for

youth by members of the community who needed it for

transportation, -10, -9, -40.

There is a quote from -11, that van made it

possible for an elderly neighbor to pass at home instead of in

a medical facility, an act that brought peace to the family.

There are letters from people who have known John Walker since

he was a child, -15.  But most of them are from people who got

to know him and interacted with him between 2012, when he

moved back to Missouri from Guam and 2022, when these letters

were written.

But those letters are important for two reasons:

First they go directly to the first of the seven factors to be

considered under 3553. The history and characteristics of the defendant --

MS. MILLER: Your Honor --

THE COURT: Why don't -- we're not on -- hold on, we're just on the aggravating role issue.

MR. WELK: I'll come back. Second reason is probably more important anyway, because unless the dozens of people who wrote these letters are being dishonest, they tell you what John Walker was doing when he left Guam in 2011 and returned to Missouri. They tell you why he came home, how much he helped people, he was not operating a company more than seven thousand miles away, he was not negotiating or managing leases, and pilots and mechanics working half the world away. He was clearing brush, baling hay, helping his neighbors take care of his chickens, he was caring for his family and neighbors, grieving and healing from personal tragedies. That's why you don't see him giving orders or being involved in day-to-day operations. Crowe and Kapp were running that business and the government's insistence that they weren't is a false narrative.

THE COURT: Okay, thank you.

MR. WELK: Thank you, Your Honor.

THE COURT: All right. Let's go to the next.

MS. MILLER: Your Honor, I do have rebuttal to what was just presented.

THE COURT: Okay, go ahead, what's your rebuttal on this?

MS. MILLER: Yes, Your Honor.

THE COURT: On the aggravating role.

MS. MILLER: Absolutely.

First of all, the case that was cited by Mr. Welk at 999 F.3d 1233 was a situation where the defendant had a nominal role in the scheme. Nominal. How can you describe Mr. Walker's role in this scheme as nominal? Mr. Welk is talking about Mr. Walker moved back to Missouri in 2012. Well, the conspiracy started in 1992, according to the Second Superseding Indictment. The conspiracy then continued for over 20 years. And everything that Mr. Walker put in place between the time that he purchased Hansen Helicopters from Vern Hansen until the time that he allegedly moved back to Missouri continued after he moved back to Missouri. But he put it all in place, Your Honor. And we know that because of the actual evidence, not because of unsolicited, unsubstantiated letters from people who said, well, he was living in Missouri. The government never contended that he didn't live in Missouri, Your Honor. What the government contended was that it didn't matter.

Your Honor, if you look at the sentencing guidelines, a defendant is accountable for the defendant --

THE COURT: I'm sorry, okay where?

MS. MILLER: I'm sorry?

THE COURT: Where are you looking at?

MS. MILLER: 3C1.1 application note 9.

THE COURT: Okay. Hold on, hold on, 3C1.1.

MS. MILLER: Application note 9.

THE COURT: Okay.

MS. MILLER: The defendant --

THE COURT: I'm sorry, it's the wrong one. 129. You're looking at 2018? I'm looking at the --

MR. WELK: There is no application note 9 for 2018.

THE COURT: Yeah, I don't see that. I'm looking at 2018.

MS. MILLER: Could you go to 1B1.3, Your Honor.

THE COURT: Okay, one -- 2018.

MS. MILLER: 1B1.3.

THE COURT: 1B1.3.

MS. MILLER: Yes, Your Honor.

THE COURT: Okay, 13, 1B -- 1B1.3.

MS. MILLER: Three.

THE COURT: Oh, three, okay, let me pull this. Okay, and what application note?

MS. MILLER: Actually, it says under 1B1.3, in applying the sentencing adjustments, the Court shall determine the basis of the following, do you see that section there,

Your Honor.

THE COURT: 1B1.3. Let me go to the actual guideline, right?

MS. MILLER: Yes, Your Honor.

THE COURT: 1B1.3(a)?

MS. MILLER: 1(a).

THE COURT: Okay. I got there. What am I -- what am I looking at? 1B1.3(a).

MS. MILLER: Where it says "all acts and omissions committed, aided, abetted," do you see that, Your Honor?

THE COURT: I do.

MS. MILLER: Okay. "All acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and B, in the case of a jointly undertaken criminal activity, in parenthesis, a criminal plan, scheme, endeavor or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy," and in this case, we did have a conspiracy charge, "all acts and omissions of others that were, one, within the scope of the jointly undertaken criminal activity; two, in furtherance of that criminal activity; and three, reasonably foreseeable in connection with that criminal activity that occurred during the commission of the offense of conviction in preparation for that offense or in the course of

attempting to avoid detection or responsibility for that offense, justifies the leader, organizer role enhancement."

THE COURT: This is like -- this is relevant conduct?

MS. MILLER: So the relevant conduct, Your Honor, as we talked about starting in 1992 and through 2023 based on the evidence that we had, John Walker was in fact directing and controlling. Mr. Crowe didn't even start working for Hansen Helicopters until 2011. So Walker, and if you read the Exhibit G-1818, which was admitted at trial, which was the statement by Mr. Reed, Mr. Crowe didn't start working for Hansen Helicopters until 2011. None of the illegal activity took place at Hansen Helicopters until Mr. Walker joined Hansen Helicopters in the 1990's.

So from the 1990's through the time that Mr. Crowe joined Hansen Helicopters, Mr. Walker created the Vanuatu companies. They were all created prior to 2011. Mr. Walker created the leases that were used. If you look at leases in G-2900, which were the leases for the company.

MR. WELK: I'm sorry, Your Honor, I have to object. This has nothing to do with role.

MS. MILLER: Of course it does.

THE COURT: I'm sorry, it doesn't have to do with what?

MR. WELK: With role. The role depends on the

defendant's role in the underlying offense. I mean this is --

THE COURT: I know but she's now including -- trying to include the relevant conduct during this period --

MS. MILLER: Correct.

THE COURT: -- that's not necessarily within the -- within the indictment.

MS. MILLER: Correct, so if Mr. Walker --

THE COURT: Hold on.

MR. WELK: I'm sorry. I'm not done yet. And that's in response to -- is this -- is this in response to the letters? Or just --

THE COURT: Are you rebutting the letters?

MS. MILLER: No, not at all.

MR. WELK: This is rebuttal, right?

MS. MILLER: This is rebuttal and this is -- Mr. Welk is trying to say that starting in 2012, when Mr. Walker apparently moved to Missouri, that he came to Guam infrequently, and therefore, he could not be the leader and organizer of this criminal scheme. What I cited to was --

THE COURT: But the rebuttal time is really from 2011 to 2023.

MS. MILLER: No, the relevant --

THE COURT: That's what he --

MS. MILLER: And what I'm saying is that Walker was convicted of a conspiracy to defraud the government and a conspiracy to commit wire fraud that started in the 1990's. That's what you're sentencing him on. You're not sentencing him on his actions between 2012 and 2021.

THE COURT: Yeah, but I think his point was, are you -- are you trying to bring in this evidence for only the purposes of rebutting that timeframe from 2011 to 2023?

MS. MILLER: Yes.

THE COURT: Okay.

MS. MILLER: Yes, absolutely.

MR. WELK: But how can -- how can she rebut that timeframe by talking about what happened in 1990's?

MS. MILLER: Because he put it in action and then he put people in control and the conspiracy and the frauds continued.

THE COURT: Okay, so that was another part of his argument earlier?

MS. MILLER: Correct. Correct, that was another part of his argument.

THE COURT: Okay, I got it.

MR. WELK: I object as improper rebuttal.

MS. MILLER: So, is he --

THE COURT: Overruled. Go ahead.

MS. MILLER: Okay. Great. So if we go to,

Mr. Leon Guerrero, I asked you to pull up a PowerPoint for me,
please.

    MR. WELK:  Your Honor, can I ask that any
PowerPoint shown be made part of the record?

    THE COURT:  Sure.

    MS. MILLER:  I don't have any problem with that,
Your Honor.  They're all marked as exhibits that were
identified for trial.

    THE COURT:  So really the PowerPoint is just
really exhibits.  That's all.

    MS. MILLER:  It is just a PowerPoint of exhibits.

    THE COURT:  It's not argument.

    MS. MILLER:  Correct.

    THE COURT:  Actual exhibits.  All right.

    MS. MILLER:  And it supplements what Ms. Pena
presented in her evidence about Mr. Walker's personal
involvement after 2011, since that seems to be the issue here.

    THE COURT:  Okay.  Go ahead.  Well, that's part
of the issue.

    MS. MILLER:  It is part of the issue, it's not
the whole issue obviously because of the length of the
conspiracy.

    THE COURT:  Well, that's part of his argument
that he has.

    MS. MILLER:  Correct.

THE COURT: Both parts. Go ahead. I'm talking about Mr. Welk's arguments.

MS. MILLER: Right. If you can -- there we go.

So, Your Honor, the first thing I want to bring your attention to is Exhibit G-1977. And Mr. Welk was talking about the Limey Air account and he was talking about the different co-conspirators who are identified in Exhibit 2939 on the signature card when the Limey Air account changed until 2018. Exhibit 1977 shows Mr. Walker in 2019 in the Limey Air bank account identifying persons who should have a credit card dealing with the Limey Air bank account. And when you see in this document in the middle, it says John Darrell Walker, about yourself, this was something that was actually produced to us by the bank pursuant to a grand jury subpoena and this was signed in 2019. Next slide and this is just a close-up of that information, Your Honor.

THE COURT: Okay.

MS. MILLER: Okay.

MR. WELK: May I inquire if this was admitted at trial?

MS. MILLER: It was not but it doesn't have to have been admitted at trial. It was marked as a trial exhibit and it's relevant to contradict Mr. Welk's contention that once Mr. Walker moved to Missouri, he didn't have any leadership role in the companies that are responsible for the

fraud.

MR. WELK: Object as irrelevant.

THE COURT: I'm sorry, you object as what?

MR. WELK: Irrelevant, improper rebuttal.

THE COURT: Overruled. Go ahead.

MS. MILLER: Okay, can you go to the next slide, Mr. Leon Guerrero, please. Here, Your Honor, we have Exhibit G-3006. This is an e-mail from Rufus Crowe to Les at Hansen Helicopters based on an e-mail from John Walker, who by the way, Your Honor, all the way through 2021 was still using the e-mail address for the Guam e-mail. From Walker to Rufus Crowe regarding Hansen Helicopters sale. "Rufus, I hired a legal firm to help with the company's sale" and then he's identifying who he -- who he hired to help with his sale. They will be calling and e-mailing you unless give them whatever they need.

So this is Mr. Walker directing Rufus Crowe to give the potential buyer of Hansen's Helicopters whatever they need. That sounds like somebody who is a leader and organizer in this criminal scheme. Could we go to the next slide please, Mr. Leon Guerrero. Okay, and the next slide. And now we see, Your Honor, Exhibit --

MR. WELK: Are there sentencing exhibit numbers for any of these?

MS. MILLER: No, they're not.

         MR. WELK: I see.

MS. MILLER: These are strictly rebuttal to your contention that Mr. Walker has nothing to do with these companies after 2012.

MR. WELK: Your Honor, I object to this avalanche of admission of exhibits that have never been identified before in connection with this hearing.

MS. MILLER: Do we not want to sentence Mr. Walker based on the facts that actually exist in this case? Is this -- I'm not really sure what the objection is here. It's relevant. These are admissions by Mr. Walker. So the indicia of reliability is clearly met. These are exhibits that were marked for trial and we've already talked about under 18 U.S.C. 3661, there is no limitation on what this Court could consider in sentencing Mr. Walker.

So, Your Honor, I'm just bringing this information which was available to Mr. Welk and to myself to your attention because Mr. Welk stood up here said, Your Honor, as an officer of the court, right, I mean he's talking to you as an officer of the court, Mr. Walker left and had nothing to do with the company. I have hundreds of exhibits that contradict that representation and all of those exhibits were marked for the trial and all of those exhibits were given to Mr. Welk. So do we want to fraud upon this Court now in the sentencing? Or can we get to the heart of what was really

happening and show that John Walker continued to be the leader organizer all the way through 2021.

THE COURT: I gather though that what Mr. Welk is saying is that these exhibits were not identified as prosecution exhibits for your presentation at sentencing, but really these exhibits are rebuttals to his argument, that's really what -- rebuttal to his argument.

MS. MILLER: Correct.

THE COURT: Which is not really the evidence that was presented.

MS. MILLER: Correct.

THE COURT: Okay.

MS. MILLER: Correct.

THE COURT: Is that what -- that's your objection?

MR. WELK: It's partially that, Your Honor, but it's also that --

THE COURT: Well, it's mainly that because you're saying you didn't have notice then.

MR. WELK: But what -- what compounds it is that these are not -- these are -- what she's referring to are exhibits that were not admitted at trial. Maybe -- maybe they were identified as exhibits but they weren't admitted at trial. So -- I mean that -- that's the objection.

MS. MILLER: Some of these were admitted --

          THE COURT: I'm sorry.

MS. MILLER: I'm sorry.

THE COURT: Your exhibits -- Okay, so I'm sorry, your objection is the first one we just discussed and the second one that they were not admitted?

MR. WELK: Yes.

THE COURT: Okay.

MS. MILLER: And again, Your Honor, some of them were admitted at trial, some of them weren't admitted at trial for purposes of sentencing, Your Honor could consider either. And so, I want to go through these and to the extent, Your Honor, chooses to accept them, great, reject them, that's fine too. But what I do not want to see as a fraud upon this court by having an uncontested representation by Counsel that Mr. Walker stepped away and did not exercise authority as the leader of this organization after 2012.

THE COURT: Okay. Hold on one second. Let me just double-check.

MS. MILLER: Yes, Your Honor.

(Pause.)

THE COURT: All right. Court will overrule the objection, go ahead.

MS. MILLER: Okay. Could you get a little closer view of Exhibit G-0694 please, Mr. Leon Guerrero.

THE COURT: Let me just cite to -- for purposes

of the Court's ruling, "18 U.S. Code 3661, no information shall be placed on the information concerning the background character and conduct of a person convicted of an offense which the Court of the United States may receive and consider for the purpose of imposing appropriate sentence." Okay, go ahead.

MS. MILLER: Yes, Your Honor. So in this exhibit, Your Honor, you see an e-mail from Vanguard Aviation to John Walker. "And Dear John Walker, your payment receipt, the wire for $56,362 is attached. Thank you for your business. We appreciate it very much." This is one example, Your Honor, of numerous invoices that were sent to John Walker personally for the important things, and this is in 2016. And the important things had to do with the repair and maintenance of the helicopters, and most importantly to Mr. Walker, spending money.

So here's from John Walker on April 8th of 2016 to Rufus Crowe. "Payment receipt wire from Vanguard Aviation, "Rufus, we're going to have to think about this a bit, I'm spending, I'm, John Walker, is spending $60,000 a month to fix these air frames." He's not saying, we're spending. He's saying, I'm spending.

Next slide, Mr. Leon Guerrero. 2015, we see this communication to John, from Rufus Crowe, and he's explaining to John how they're jumping through all of these hoops and

they are doing all of these things and they're keeping Mr. Walker informed of the day-to-day business.

THE COURT: I'm sorry, what is this exhibit number?

MS. MILLER: Yes, this is G-0549.

THE COURT: Okay, -1, is that right?

MS. MILLER: Yes, Your Honor, it's one page.

THE COURT: It's a letter, okay. Go ahead.

MS. MILLER: Yes, Your Honor. So we see Rufus Crowe keeping John Walker informed of the day-to-day business of the operations. "We've been jumping through our asses and just finished shipping ten machines, plus ten complete inventories to Majuro last Friday. This week I've been trying to get the pilots trained up to meet with the aircraft on the 20th, I didn't have the time or energy to respond to e-mails." You know, he goes on and on and on, but basically that's what we're talking about, he's keeping John Walker informed of all the details of --

THE COURT: Who is this from again?

MS. MILLER: This is from Rufus Crowe to John Walker. And this consistent with Mr. Crowe's affidavit in 2018, when Mr. Crowe says, "we all have to keep Mr. Walker informed of what's going on." Let's go to the next slide, Mr. Leon Guerrero.

THE COURT: Yes?

                    MR. WELK:  I want to -- I want to object one more

time, Your Honor.

                    THE COURT:  Yes, go ahead.

                    MR. WELK:  This very nice looking, very

well-produced PowerPoint, it seems highly unlikely to me that

this was put together while I was up there doing my rebuttal

and that means that the government had all these things

stacked up and ready to go and yet didn't identify them as

exhibits.  So I just want to -- and then I'll stop and she can

continue to go through however many hundreds of these she

wants to do, but that's my point.  There's no -- this

is -- this is -- this is a -- this is an ambush with this and

they could have identified all this stuff before.

                    MS. MILLER:  An ambush using exhibits that

Counsel himself has had access to for over two years?  I

prepared this PowerPoint, Your Honor, during the break.  I

know all of these exhibits.  I have identified all the ways in

which Mr. Walker from 2012 through 2021 was personally

involved in the companies, as matter of fact, to remind, Your

Honor, because Mr. Welk wasn't there.  During trial, trial

Counsel tried to pull this same stunt, if you remember,

Mr. Walker retired and as we started bringing in evidence that

Mr. Walker did not retire, trial Counsel said we withdraw the

contention that he retired --

                    MR. WELK:  Objection.

MS. MILLER: -- because they didn't want new evidence brought in. And we are dealing --

THE COURT: Okay --

MS. MILLER: -- with the same thing here.

MR. WELK: Relevance of the history of what's happened before --

THE COURT: Right now, we don't -- let's move on. All right.

MS. MILLER: Okay, can you go to the next slide please, Mr. Leon Guerrero.

THE COURT: Court has already ruled the objection, go ahead.

MS. MILLER: Okay, and again --

THE COURT: How many more exhibit do you have?

MS. MILLER: So, Your Honor, these -- there is just a few more that go back to 2012. I'll go through them quickly for, Your Honor, and then this will be made part of the record, so I don't have to spend a lot of time on each of them.

THE COURT: Okay, how --

MS. MILLER: And then we could -- would you like to break now and continue tomorrow?

THE COURT: No, I just want to figure out. I got to talk to my staff.

MS. MILLER: Yes, Your Honor, of course.

THE COURT: I thought we -- well anyway, I wanted to try to get all the arguments done tonight.

MS. MILLER: I don't think that's --

THE COURT: But I don't think that's going to happen.

MS. MILLER: I don't think so.

THE COURT: We're only on -- we're only on the first one.

MS. MILLER: Yes.

THE COURT: And there's like a few more.

MS. MILLER: Many, yes.

So I can go through this, there are how many more slides, Mr. Leon Guerrero?

MR. LEON GUERRERO: Three more.

MS. MILLER: Three more slides after this.

THE COURT: If there is three more slides, let's go.

MS. MILLER: Then we'll stop after this. So 2015, Your Honor, here we see another filing by Mr. Walker with the Federal Aviation Administration.

THE COURT: Exhibit number is?

MS. MILLER: And that is Exhibit No. G-3028, Mr. Leon Guerrero. Can we get a closer look at that please, sir.

So, Your Honor, this is a another one in 2015.

As you heard the testimony of Ms. Pena, every other year, or I think it was Mr. DeVogel, every other year someone who has an inspection authorization as an mechanic with the FAA, which is the highest level of mechanic certification you can have, has to give this information to the FAA and has to tell the FAA, where you've been working for last two years, what have you been doing for the last two years and they certified that the information they're providing to the FAA is true and correct. Mr. Walker, from 1997 through 2021, said the same thing on every single one of these applications. He identified as the place where he could be found during the work week, the Hansen Helicopters facility in Guam, and he identified the description of activity, the work that he was performing on the aircraft that were located in Guam.

Mr. Leon Guerrero, could you go to the next slide, please. This is Exhibit G-0483, Your Honor. This is a communication from Mr. Kapp to Mr. Walker in December of 2015, again, keeping Mr. Walker informed of information that he obtained about purchasing more helicopters and helicopter parts and providing that information to Mr. Walker to keep him apprised of what's going on with the day-to-day operations of the company, consistent with the affidavit filed by Mr. Crowe.

Next slide, Mr. Leon Guerrero. Okay, that's a closer look at that.

And then we have Exhibit G-0708. It is an e-mail

from Mr. Walker to Rufus Crowe and then from Mr. Crowe back to

Mr. Walker.

So, Your Honor, this particular e-mail

communication was immediately after the crash that killed

Mr. Santos.  So while Mr. Walker was I guess doing nice things

in Missouri, one of his pilots was dying in an accident in one

of his helicopters, and Mr. Walker was made aware of the fact

that that accident had occurred, and here's Mr. Rufus Crowe

talking to Mr. Walker about doctoring the NTSB report

regarding that particular accident.

As a matter of fact, Your Honor, if you look at

Exhibit G-1242, which was entered into evidence during trial,

from 2013 through 2022, during trial, there were multiple

accidents, incidents and deaths that occurred that Mr. Walker

was made aware of while he was playing gentleman farmer in

Missouri.

MR. WELK:  Objection, Your Honor, objection that

is --

MS. MILLER:  On what basis?

MR. WELK:  Over with her mocking gentleman

farmer.

MS. MILLER:  He said he was a gentleman farmer.

MR. WELK:  I said he was not a gentleman farmer

and why.  That -- that is an improper comment, improper

commentary, that -- the mocking way she said gentleman farmer.

     That's inappropriate.

MS. MILLER: I wasn't mocking him. I thought Mr. Welk said that he was a gentlemen farmer. If he didn't say he was a gentleman farmer, then I withdraw it.

MR. WELK: He's not a gentleman farmer because he is a working farmer. That's what I said.

MS. MILLER: So while he was --

THE COURT: I'm sorry, I don't know what the difference between a gentleman farmer --

MR. WELK: A gentleman --

THE COURT: I know -- it sounds like -- to be honest with you, it sounds, based on all of the letters, that Mr. Walker is a gentleman, he's a farmer.

MR. WELK: Right, but a gentleman --

THE COURT: And he works, I mean I got that but I don't know if there's like a mocking insinuation.

MR. WELK: A gentleman farmer to a real farmer is an insult because it is someone who owns a farm that doesn't do anything to work it.

THE COURT: Okay, so I guess thank you for informing us.

MS. MILLER: Yes, thank you.

THE COURT: So she probably didn't know that either?

MS. MILLER: I didn't. I'm not a farmer, Your

Honor.

THE COURT:  Okay.  All right.  So we'll -- okay,
well, anyway I took it as he's a gentleman, he's a farmer and
he works.  I got it.

MS. MILLER:  So if we look at this, Your Honor,
in 2015, we see Mr. Walker communicating with Mr. Crowe about
the death of Mr. Santos about this fatal accident and the NTSB
report.  Mr. Walker is receiving a copy of the information
that is Mr. Crowe is going to provide to the NTSB about this
accident.  That's how intimately involved he is.  And
Mr. Walker has to approve what is going to be told to the NTSB
about this accident.

Next slide, Mr. Leon Guerrero.

THE COURT:  I'm sorry, where does it say that
Mr. Walker has to --

MS. MILLER:  So if you look at it, Your Honor,
from the bottom up.

THE COURT:  Okay.

MS. MILLER:  We're seeing "good news, the NTSB
pretty much just copied and pasted my report.  I know I
shouldn't have been sweating it, but I do.  Everything else A
okay, Mike Lau is coming back for a year, want me to ask him
if he wants to make some extra money."  That's Rufus Crowe to
John Walker.  And then John Walker, "Rufus, it just came
through as a blank file, no problem, though I'm sure it reads

fine. Thanks, John Walker." Then Rufus Crowe to John Walker, "Hey John, huh, that's odd. Must be an Apple thing, here's the link" and that's the link to the NTSB report.

THE COURT: Okay.

MS. MILLER: Next slide, Mr. Leon Guerrero. And that's jut a closer look at that. And now, G-0842, this is in 2014, we're going backwards in time. From Rufus Crowe to John Walker, FAA bill of sale, "Hey John, I was getting ready to send off the registration paperwork for N1156X, Mark Small signed several blank bills of sale from Plymouth Copters, Inc., if he has any other helicopters you'd like to own, you'd like to own," this is Rufus Crowe saying to John Walker if there is any other helicopters you would like to own, "send me the numbers and serial numbers and I can make it happen. I was getting ready to fill out one of the bills of sale and checked the FAA website, and unless he submitted paperwork that the FAA hasn't processed yet, the helicopter is still owned by J & P Apparel. We're going to need a bill of sale from J & P Apparel to Plymouth Copters, Inc. or to Bravo Air, Inc.," Your Honor, Bravo Air, one of the alter ego companies, Vanuatu, "I have attached the bill of sale. Just need to add the same of the officers signing it, their title and date, date it in both places, oh, yeah, you've probably done this before, haven't you?" This is Crowe to Walker.

And what we see, Your Honor, on the bill of sale

summary chart, is these bills of sale being filed.  And if you

recall, Your Honor, during trial, we had the testimony of

Mr. Marson who testified that when John Walker signed the bill

of sale, indicating that Mr. Marson had sold him a helicopter

that was used in the fraud, that was a forgery.  And we see

here in this e-mail this was a common thing to happen but the

important part here is --

           MR. WELK:  Objection.  That mischaracterizes --

that mischaracterizes this document.  This doesn't say

anything about committing a forgery.

           MS. MILLER:  Of course it does.

           THE COURT:  I'm sorry?  It what?  What was your

objection, Mr. -- I'm sorry, I couldn't hear it.

           MR. WELK:  It mischaracterizes the document, Your

Honor.  She's --

           MS. MILLER:  You could read the e-mail yourself.

           THE COURT:  Let him finish.

           MR. WELK:  These e-mail speak for themselves

because they're in writing, that was one of the earlier

objections that the government made.  And -- and a few seems

to be a lot more than a few from this end.  I mean -- I'm

wondering when this is going to end, all these -- all these --

           MS. MILLER:  Again, Your Honor --

           THE COURT:  Hold on.

           MR. WELK:  -- disclosed exhibits.

THE COURT: Let him finish. Okay, so the objection is that this document doesn't indicate that there was a forgery. That's his objection. What -- or does it?

MS. MILLER: Of course it does because what he's saying is we have several signed blank bills of sale, the FAA hasn't processed any information other than what we have, so I'm attaching a bill of sale. Just need to add the same of the officer, which should be name of the officer signing it, their title and date it in both places. Oh yeah, you've probably done this before, haven't you?"

And what I'm reminding the Court of is the testimony that you heard during trial of Mr. Marson who gave us yet another example of Mr. Walker forging a bill of sale indicating that Mr. Walker bought Mr. Marson's helicopter from him when in fact he did not.

Next slide, Mr. Leon Guerrero --

THE COURT: All right. So the objection will be overruled. Go ahead.

MS. MILLER: And that's just a close-up. Next slide. And that is in 2014, the same year, Your Honor. A letter to Mr. Walker from Randy Rogers, Trafficopters, Inc., "Dear John, it is my understanding of our agreement as follows: You, John Walker, are purchasing all of Trafficopters, all of their assets, helicopters, parts as well as other things." And so this shows, Your Honor, that when

Randy Rogers wanted to sell the business that he was operating, fixing aircraft for John Walker and his companies, he addressed this to Mr. Walker, saying this is a writing based on my understanding of the oral agreement I have with you. Not Rufus Crowe, not Mr. Kapp, Mr. Walker.

Next slide. Here again, Your Honor, in 2014, John Walker to Joe Snaer, an employee of Hansen Helicopters, "Joe, I was going to give you a raise when I was there last, it just kind of slipped my mind. Go ahead and make it $25." And then Joe Snaer to John Walker, "Thank you very much." There isn't one piece of exhibit, Your Honor, one piece of evidence in this case that shows that Rufus Crowe or Turner Kapp had the authority to give anyone a raise, had the authority to purchase any helicopters, had the authority to pay for the renovation of any helicopters. When businesses were purchased, it was John Walker who purchased them. When helicopters that were used in the scheme were purchased, it was John Walker who purchased them. And when those helicopters were fraudulently leased, it was John Walker who registered those fraudulently-leased helicopters with the FAA from the beginning all the way through 2021, and you saw the summary chart that was produced by Ms. Pena. So I'm going to stop here today with this presentation, Your Honor, but I am reserving some time to address several other items that Mr. Welk addressed in his arguments.

MR. WELK: Wait.

THE COURT: Oh, I'm sorry?

MR. WELK: So the rebuttal is going to continue tomorrow? Is that -- is that right?

MS. MILLER: I can keep going now if you'd like to, Your Honor, but it's already 6:11 and I'm assuming that Veronica and others here would like to break. I want to be considerate of their time.

THE COURT: You still have further arguments on this?

MS. MILLER: I do, Your Honor. Because Mr. Welk made representations again that were not correct and I want to make sure that the record is clear on that. So we could keep going now or --

THE COURT: How much longer do you have on your --

MS. MILLER: I would say, Your Honor, no more than about 15 minutes.

THE COURT: Okay. And we still have to go through all the other enhancements, Counsels.

MR. WELK: Your Honor, I -- honestly, I'd prefer for, can we just finish this tonight?

MS. MILLER: Sure, we can finish this tonight if --

MR. WELK: If it's only going to go for fifteen

more minutes? Because I'm -- you know this -- we're never going to get through this stuff if --

THE COURT: Well, this is only one.

MR. WELK: That's what I mean.

THE COURT: This is only one enhancement.

MR. WELK: I think she's -- I think she's already spent more than twice as much time on her rebuttal as I did on my response to the government's argument. This is absurd.

MS. MILLER: I don't think it's absurd at all, Your Honor.

THE COURT: Counsels, look, look, look, let's just finish this -- because there's a lot of enhancements that the prosecution is requesting and --

MR. WELK: Understood.

THE COURT: So we have to plow through these. You guys have already put on all the evidence and we just really need to just get right to it. I mean I've got -- Okay, let's just figure this out because I do have to -- I want to take into consideration my staff, too.

MS. MILLER: Of course.

THE COURT: They've been here since 8 o'clock this morning. We've got the administration of justice obstruction still have to go through, the loss application, the victim enhancement, the sophisticated means enhancement, the plus two enhancements under 2C1.1(b)(1) plus two

enhancement. Okay. Oh, if there was involving more than one bribe or extortion. And yeah, the acceptance of responsibility, yeah, those are the -- those are the ones we have to go through.

(Pause.)

We still have -- we still have to sentence Hansen Helicopters tomorrow.

MS. MILLER: I think, Your Honor, that Mr. Han and Mr. Leon Guerrero have an agreement regarding that, so I don't think we're going to hear any argument on that, is that --

MR. HAN: Very short.

MS. MILLER: Okay. Yeah, I think that's going to be really, really short, as well as the forfeiture is going to be really short.

THE COURT: All right. Hold on one second. Let me talk -- let me talk to my staff.

MS. MILLER: Yes, Your Honor.

THE COURT: Let me talk to Veronica and Anna.

(Discussion with the Court.)

THE COURT: Okay, I just spoke to my staff. I think we're going to go ahead and recess for the evening, Counsels. I -- you know, I don't mind plowing through it but I want to take into consideration my -- my court reporter who's here also and, you know, everybody, they want to do it

 but it's tough to be here as a court reporter as well, so I want to be careful about that.

All right. I think we, you know, just -- if we just -- I don't think it should be that difficult really to try to finish all of the objections by tomorrow morning. We start at 8:15, if we get can get through all the objections, and, yeah, and then plus we also have to add the warrant -- downward departure from the guidelines, or departure from the guidelines and application of statutory maximum and the 3553(a), those are also needed to be argued. So I think we can -- let's try to finish all that by 12 noon tomorrow.

MS. MILLER: Yes, Your Honor.

THE COURT: Okay?

MS. MILLER: Yes.

THE COURT: Just keep it --

MR. WELK: Yes, I think we should try.

THE COURT: Well, I want to -- I want to definitely finish, I'm sure you do too. We've -- the Court has dedicated these three days, including tomorrow, so let's do that. I'll see you tomorrow morning, Counsels.

MS. MILLER: Yes, Your Honor. Thank you.

THE COURT: 8:15. See you tomorrow morning at 8:15.

MS. MILLER: Yes, Your Honor. Thank you.

THE COURT: Thank you very much.

Are you guys going to agree to the sentencing, I'm sorry, Mr. Leon Guerrero?

MR. LEON GUERRERO: No, I think according to Attorney Han, arguments are going to be brief.

MR. HAN: Very brief, Your Honor.

THE COURT: Okay. All right. All right. Very well. See you tomorrow.

(Proceedings concluded at 6:16 p.m.)

----------------------------------------------

CERTIFICATE OF OFFICIAL REPORTER

CITY OF HAGATNA )
) ss.
TERRITORY OF GUAM )

I, Veronica F. Flores, Official Court Reporter for the District Court of Guam, do hereby certify the foregoing pages, 1 to 338, to be a true and correct transcript of the proceedings held in the above-entitled matter, to the best of my ability.

Dated this 29th day of July 2025.

/s/Veronica F. Flores
Veronica F. Flores